**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| DAVID FAGEN, Individually and on Behalf of All Others Similarly Situated,<br><br>                  Plaintiff,<br><br>        v.<br><br>ENVIVA INC., et al.,<br><br>                  Defendants. | Civil Action No. DKC 22-2844<br><br>**CLASS ACTION**<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Hon. Deborah K. Chasanow |

Lead Plaintiff Dustin Fanucchi ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's amended complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Enviva Inc. ("Enviva" or the "Company"), analysts' reports and advisories about the Company, statements of knowledgeable former employees, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein following a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of a "Class" consisting of all persons and entities, other than Defendants and their affiliates, who purchased Enviva common stock from December 18, 2018 through December 2, 2022, both dates inclusive, as well as all

persons and entities, other than Defendants and their affiliates, who purchased Enviva common stock pursuant or traceable to the Company's add-on Offering (the "Offering") pursuant to the registration statement and prospectus dated January 19, 2022 (the "Offering Documents") for violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act") and/or the Securities Act of 1933 ("Securities Act").

2.      As set forth herein, Defendants made material misrepresentations and omissions regarding the procurement and environmental practices of Enviva, a manufacturer of wood pellets.

3.      During the Class Period, Enviva marketed itself to investors as a "growth-oriented" environmental, social, and governance ("ESG") company with a "platform to generate stable and growing cash flows" and represented that *all* wood pellets comprising its core product were, without exception, the "***byproducts of the sawmilling process or traditional timber harvesting, principally low-value wood materials, such as … tree tops and limbs, understory, brush, and slash that are generated in a harvest***."  This was not true.

4.      Enviva further claimed that it "***does not take sawtimber***," and that the Company's "***wood pellets are never made from sawtimber***," but instead consist of low-value wood byproducts that would rot on the forest floor if not diverted to use as allegedly sustainable power. This was also false.

5.      In these statements and throughout the Class Period, Defendants made false and/or misleading statements that: (i) overstated the sustainability of Enviva's wood pellet production and procurement; (ii) omitted that Enviva relied on environmentally-destructive clear-cutting practices;[1] (iii) overstated the extent and effectiveness of Enviva's forest management practices;

---

[1] Unlike selective logging, where loggers choose only wood that is highly valued, "clear-cutting" refers to situations where loggers cut down all of the tree, thus *clearing* the forest. *See, e.g.*, https://rainforests.mongabay.com/kids/lesson_plans/lisa_algee/logging.html

(iv) and omitted that Enviva's procurement involved *deforestation*, not conservation.

6.      Defendants' serial misrepresentations artificially inflated, and maintained the artificial inflation of, Enviva shares throughout the Class Period, and further enabled the Company to raise gross proceeds of ***$346 million*** in an add-on Offering conducted in January 2022.

7.      For Defendants, whether Enviva was actually a green company paled in comparison to whether it was perceived that way by regulators and investors.

8.      The truth began to emerge on October 12, 2022, when Blue Orca Capital ("Blue Orca") published a report on Enviva (the "Blue Orca Report"). The Blue Orca Report stated that "newly discovered data suggests . . . the company is flagrantly greenwashing its wood procurement" and characterized Enviva's claim to be a "pure play ESG Company" as "nonsense on all counts." Instead, the Blue Orca Report persuasively alleged that Enviva is "***a product of deranged European climate subsidies which incentivize the destruction of American forests so that European power companies can check a bureaucratic box.***"[2]

9.      In particular, the Blue Orca Report revealed that:

- Despite repeated denials, the statements of former senior executives and satellite imagery show that Enviva is procuring wood from clear-cutting.

- In contrast to Enviva's claims to purchase on average less than 30% of the wood from each harvest, Enviva's own Track and Trace data shows that the Company is violating this threshold, thus driving deforestation.

- Enviva routinely retains the remaining ***70%*** from each harvest, undermining its claims that higher value timber from its harvests is sold to other industries.

- Enviva misled investors in claiming that forest inventories are on the increase in sourcing regions around its facilities. In fact, they are decreasing.

10.     On this news, Enviva's stock price fell $7.74 per share, or 13.13%, to close at $51.23 per share on October 12, 2022.

---

[2] Unless otherwise noted, all emphasis is supplied.

11.    The Blue Orca Report, as one analyst observed, presents a colorable violation of industry sustainability standards.  Still, Enviva could muster little more than a half-hearted denial, completely bereft of specifics, in response.

12.    Then, on December 5, 2022, *MONGABAY*, a conservation news portal, published a damning report on Enviva highlighting the statements of a well-positioned insider and exposed the Company's alleged green credentials as "all nonsense" (the "Whistleblower Report").

13.    The *MONGABAY* story revealed that the Company's claim to source from wood byproducts like tops and limbs was manifestly false, and the Company actually sourced from whole trees.  "***We use 100% whole trees in our pellets***," *MONGABAY* quoted the insider as admitting. "We hardly use any waste. ***Pellet density is critical***. ***You get that from whole trees, not junk***."

14.    On the disclosure of this information, which substantially corroborated the Blue Orca Report, Enviva's stock price fell $3.35 per share, or 9.43%, to close at $55.44 per share on December 6, 2022.

15.    Further corroborating the Blue Orca and *MONGABAY* whistleblower reports, on December 15, 2022, after an investigation, the Netherlands' Parliament approved a motion compelling its government to stop paying subsidies to Enviva. The sponsoring legislator specifically cited the Whistleblower Report's revelation that Enviva falsifies its green credentials as the basis for ending payments.

16.    As a result of Defendants' wrongful acts and omissions, and the consequent decline in value of Enviva common stock, Plaintiff and the Class have incurred significant losses.

## JURISDICTION AND VENUE

17.    The claims asserted herein arise under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o and under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5

promulgated thereunder, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 22 of the Securities Act, 15 U.S.C. § 77v.

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; Section 22 of the Securities Act, 15 U.S.C. § 77v; and 28 U.S.C. § 1391(b). Enviva is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

20.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

21.     Plaintiff, as set forth in his previously-filed Certification (ECF No. 10-6), acquired Enviva common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

22.     Defendant Enviva is a Delaware corporation with principal executive offices located at 7272 Wisconsin Avenue, Suite 1800, Bethesda, Maryland 20814. Enviva's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the trading symbol "EVA".

23.     Defendant John K. Keppler ("Keppler") served as Enviva's Chairman and Chief Executive Officer ("CEO") from 2004 until November 2022, when Defendant Keppler stepped

down from his role leading the Company.

24.    Defendant Shai S. Even ("Even") has served as Enviva's Executive Vice President ("EVP") and Chief Financial Officer ("CFO") at all relevant times.

25.    Defendant Jennifer Jenkins ("Jenkins") served as Enviva's Vice President and Chief Sustainability Officer ("CSO") from February 2016 through July 2021.

26.    Defendant Don Calloway ("Calloway") served as a Vice President, Equity, Inclusion, and Impact at Enviva from July 2021 through December 2022.  Defendant Calloway's duties at Enviva included "lead[ing]" Enviva's efforts with respect to "environmental justice, stakeholder equity and value creation …."

27.    Defendant Michael A. Johnson ("Johnson") has served as Vice President and Chief Accounting Officer ("CAO") at Enviva from June 2021 to the present.

28.    Defendant Jason E. Paral ("Paral") served as Vice President, Associate General Counsel, and Secretary at Enviva at all relevant times.

29.    Defendants Keppler, Even, Jenkins, Calloway, Johnson, and Paral are sometimes referred to herein as the "Enviva Defendants."

30.    The Enviva Defendants possessed the power and authority to control the contents of Enviva's SEC filings, press releases, and/or other market communications. The Enviva Defendants were provided with copies of Enviva's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Enviva, and their access to material information available to them but not to the public, the Enviva Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially

6

false and misleading.  The Enviva Defendants are liable for the false statements and omissions pleaded herein.

31.    Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") was an underwriter of the Company's Offering, acted as a representative of the underwriters, and assisted in the preparation and dissemination of the Offering Documents.  Goldman Sachs' headquarters are located at 200 West Street, New York, New York 10282.

32.    Defendant Citigroup Global Markets Inc. ("Citigroup") was an underwriter of the Company's Offering, acted as a representative of the underwriters, and assisted in the preparation and dissemination of the Offering Documents.  Citigroup's headquarters are located at 388 Greenwich Street, New York, New York 10013.

33.    Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter of the Company's Offering, acted as a representative of the underwriters, and assisted in the preparation and dissemination of the Offering Documents.  J.P. Morgan's headquarters are located at 277 Park Avenue, New York, New York 10172.

34.    Defendant Barclays Capital Inc. ("Barclays") was an underwriter of the Company's Offering and assisted in the preparation and dissemination of the Offering Documents.  Barclays' headquarters are located at 745 Seventh Avenue, New York, New York 10019.

35.    Defendant BMO Capital Markets Corp. ("BMO Capital") was an underwriter of the Company's Offering and assisted in the preparation and dissemination of the Offering Documents.  BMO Capital's headquarters are located at 151 West 42nd Street,  New York, New York 10036.

36.    Defendant HSBC Securities (USA) Inc. ("HSBC") was an underwriter of the Company's Offering and assisted in the preparation and dissemination of the Offering Documents.

HSBC's headquarters are located at 452 Fifth Avenue, New York, New York 10018.

37.     Defendant RBC Capital Markets, LLC ("RBC Capital") was an underwriter of the Company's Offering and assisted in the preparation and dissemination of the Offering Documents. RBC Capital's headquarters are located at 60 South 6th Street, Minneapolis, Minnesota 55402.

38.     Defendant Truist Securities, Inc. ("Truist") was an underwriter of the Company's Offering and assisted in the preparation and dissemination of the Offering Documents.  Truist's headquarters are located at 3333 Peachtree Road, N.E., Atlanta Financial Center, South Tower, 9, Atlanta, Georgia 30326.

39.     Defendant Raymond James & Associates, Inc. ("Raymond James") was an underwriter of the Company's Offering and assisted in the preparation and dissemination of the Offering Documents.  Raymond James' headquarters are located at 880 Carillon Parkway, St. Petersburg, Florida 33716.

40.     Defendant Loop Capital Markets LLC ("Loop Capital") was an underwriter of the Company's Offering and assisted in the preparation and dissemination of the Offering Documents. Loop Capital's headquarters are located at 111 West Jackson Boulevard, Suite 1901, Chicago, Illinois 60604.

41.     Defendant USCA Securities LLC ("USCA") was an underwriter of the Company's Offering and assisted in the preparation and dissemination of the Offering Documents.  USCA's headquarters are located at 4444 Westheimer, Suite G500, Houston, Texas 77027.

42.     The Defendants referenced above in ¶¶31-41 are sometimes referred to herein collectively as the "Underwriter Defendants."

43.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Offering Documents.

44.    The Underwriter Defendants owed Plaintiff and the other members of the Class who purchased Enviva common stock pursuant or traceable to the Offering Documents the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. The Underwriter Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as alleged in ¶185 below.

45.    All of the Defendants referenced in ¶¶22-41 above are referred to collectively herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

46.    Enviva portrays itself as the world's largest biomass energy company that develops, constructs, acquires, owns, and operates fully contracted wood pellet production plants in the southeastern part of the US.  The Company, formerly known as Enviva Partners, LP, was founded in 2004, went public in 2015, and converted into a corporation on December 31, 2021.  Enviva's headquarters are located in Bethesda, Maryland.  As of March 2023, it owned and operated ten wood pellet production plants throughout six states and transported wood pellets to its customers in Europe and Asia via six ports located in six southeastern states.

47.    At all relevant times, wood pellet production was Enviva's core operation. As such, it would be absurd to suggest that the Enviva Defendants were not aware of the truth about Enviva's wood pellet production activities and practices at all relevant times.

48.    Enviva promotes itself as a "growth-oriented" ESG company with a "platform to generate stable and growing cash flows" and is primarily valued based on its purported ESG *bona*

9

*fides*. However, the entirety of Enviva's business relies on cutting down forests, and is thus environmentally destructive, notwithstanding the Company's reliance on self-credentialing via the "Sustainable Biomass Program (SBP)" and other greenwashing schemes "created solely by the industry it is meant to evaluate and regulate."[3]

### **Enviva Expands its Core Operations**

49.     In 2004, Keppler and Thomas Meth ("Meth") founded Enviva. According to Keppler, "at the time, 'green' was starting to become cool and people were thinking about energy and the environment."[4]  Keppler and Meth seized on this perceived surface interest in renewable resources to greenwash Enviva and drum up business among European and Japanese utilities seeking to increase their use of sustainable energy.

50.     Although Enviva's entire operations are in the Southeastern U.S., "every single ton of what [Enviva] produce[s] is sold overseas to customers, under very long-term agreements, principally in Europe and Japan," according to Keppler.

51.     In 2009, the European Union committed to obtaining 20 percent of its energy needs from renewable sources by 2020 – and burning wood for fuel was considered a zero-emissions renewable source, provided that the harvesting of that wood is counterbalanced by effective reforestation practices.

52.     Enviva's long-term agreements are in the form of off-take contracts in which

---

[3] Natural Resource Defense Council, Inc. (NRDC); Dogwood Alliance, *The Sustainable Biomass Program: Smokescreen for Forest Destruction and Corporate Non-Accountability* (June 2017), https://media.dogwoodalliance.org/wp-content/uploads/2017/06/Sustainable-Biomass-Program-Report.pdf

[4] Emily Van Zandt, *Covid-19 grounded his travel, but John Keppler's biofuel business is growing despite the slowdown*, WASHINGTON BUSINESS JOURNAL, (October 13, 2020, 3:47 p.m. EDT), https://www.bizjournals.com/washington/news/2020/10/08/meet-enviva-partners-ceo-john-keppler.html.

Enviva's customers agree to purchase, in advance, some quantity of Enviva's wood pellets that have not yet been made. Enviva prefers to call such contracts "take-or-pay contracts" because they include a firm obligation to take a fixed quantity of product at a stated price and provisions that ensure Enviva will be made whole in the case of its customer's failure to accept all or a part of the contracted volumes or for termination by our customer. Each contract defines the annual volume of wood pellets that the customer is required to purchase and the Company is required to sell, the fixed price per metric ton for product satisfying a base net calorific value and other technical specifications.[5] According to Keppler, "[l]ong-term off-take contracts are expected to underpin substantial investment in new plant and port capacity."[6]

53.     In August 2010, Enviva acquired its first wood pellet processing plant located in Amory, Mississippi. The Amory plant increased its production capacity to 115,000 metric tons by the end of 2018.

54.     In December 2010, the Company announced its plans to build its first wood pellet production plant in Ahoskie, North Carolina. The Ahoskie plant became operational in November 2011, with a capacity to produce 410,000 metric tons of wood pellets each year.

55.     In 2011, Enviva acquired a deep-water marine terminal from Giant Cement Company which became the Company's Norfolk, Virginia shipping terminal. Enviva followed up with acquisitions of deep-water marine terminals at Port of Wilmington, North Carolina and Port of Pascagoula, Mississippi. Enviva also leases terminals at the ports of Mobile, Alabama; Panama City, Florida; and Savannah, Georgia, respectively.

---

[5] The term "calorific value" refers to the amount of heat released by unit weight or unit volume of a substance during its complete combustion.

[6] Erin Voegele, *Enviva announces new contracts, discusses plans to add capacity*, BIOMASS MAGAZINE, (August 9, 2018), https://biomassmagazine.com/articles/15513/enviva-announces-new-contracts-discusses-plans-to-add-capacity.

56.     In 2013, Enviva constructed wood pellet production plants in North Carolina at Northampton, with a capacity of 750,000 metric tons, and Southampton, with a capacity of 510,000 metric tons.

57.     Enviva continued its expansion through 2023 as it acquired or constructed six wood pellet production plants: Cottondale, Florida (2015), Sampson, North Carolina (2016), Greenwood, South Carolina (2018), Hamlet, North Carolina (2019), Waycross, Georgia (2020), and Lucedale, Mississippi (2022). Enviva is in the process of constructing two more plants, one in Epes, Alabama, and the other in Bond, Mississippi, each with a capacity to produce one million metric tons of wood pellets per year. As of 2022, Enviva's ten pellet production plants had a combined production capacity of approximately 6.2 million metric tons annually.

**Wood Pellets: From Forest to Fire**

58.     Enviva defines wood pellets as "energy-dense, low-moisture, and uniformly sized units of wood fuel produced from processing various wood resources or byproducts."

59.     In simple terms, Enviva procures wood from forest owners and processes that wood into pellets at its various production plants and ships the "utility-grade" wood pellet product to its customers via one of its ports. The Company's wood pellets are then used as a substitute for coal in power generation.

60.     The United States Energy Information Administration (USEIA) defines biomass energy as energy derived from "renewable organic material that comes from plants and animals."[7]

61.     According to Enviva, all of its "***raw materials are byproducts of the sawmilling process or traditional timber harvesting, principally low-value wood materials, such as trees generally not suited for sawmilling or other manufactured forest products, tree tops and limbs,***

---

[7]

*understory, brush, and slash that are generated in a harvest*."

62.     Enviva defines "low-value wood" as "(a) wood fiber that is unsuitable for or rejected by the sawmilling and lumber industries because of small size, defects (e.g. crooked, knotty, etc.), disease or pest-infestation," (b) "the parts of trees that cannot be processed into lumber" (*i.e.*, tops and limbs), (c) commercial thinnings or "harvests that promote growth of higher value timber by removing weaker or deformed trees," and (d) mill residuals consisting of chips, sawdust, or other wood industry by-products.[8]

63.     To entice environmentally-focused investors, Enviva claims that it "***does not take sawtimber***,"[9] and asserts that its "***wood pellets are never made from sawtimber***,"[10] or the parts of trees suitable for sawmilling and typically used for construction or furniture-making purposes:



___

[8] Enviva Wood Fiber Sources (Oct. 8, 2014), https://www.youtube.com/watch?v=zk6aGg7iZ8M

[9] *Id.*

[10]     Enviva,   How   Biomass   is   Fighting   Climate   Change,   (Oct.   7,   2021), https://www.youtube.com/watch?v=IpwVMrycNns)



64.    Enviva reiterated the statements in ¶¶61, 63, and other similar statements about its sole use of "low-value wood" in its wood pellet production process in promotional materials, SEC filings, media statements, YouTube videos, and Twitter posts, both before and during the Class Period. *See, e.g.*, ¶¶92, 156, 174, 180, 192, 196.

**Enviva Sourced its Wood Pellets from Whole Trees**

65.    Former Employee 1 ("FE1") worked for Enviva from September 2018 to April 2020 as a Regional/Corporate Project Manager.

66.    FE1 primarily worked on-site at Enviva production plants in North Carolina and Virginia.  Specifically, he worked at the Southampton production plant in Franklin, VA; the Sampson production plant in Faison, NC; the Northampton production plant in Garysburg, NC; and the Ahoskie production plant in Ahoskie, NC.

67.    FE1 reported to Director – Capital Projects Michael Carter, who reported to Executive Vice President – Operations Royal Smith ("Smith").

68.    FE1 disclosed that instead of scraps or waste, almost all of the trees Enviva used were whole trees and trees that were cut in half, otherwise known as "double bunk trees."

69.    Meanwhile, the amount of wood that FE1 indicated Enviva procured from scraps or waste was close to *zero*.

70.    In fact, FE1 related, Enviva, during the 2018 to 2020 period, had yet to purchase portable chippers that would be needed to chip scraps/waste out in the fields.

71.    In regard to the scraps, FE1 said workers wouldn't carry the brush into the plant, and while at one time they would try and chip that in the field, to FE1's knowledge, no one was doing that between 2018 to 2020.

72.    FE1's activities involved a review of Enviva's wood piles on Google Earth. According to FE1, this review confirmed that the Company sources very little from scraps.

73.    FE1's supervisors – Director-Capital Projects Michael Carter and Executive Vice President-Operations Smith – knew that Enviva used whole trees as opposed to waste for its pellets because they were in the mills quite a bit.

74.    FE1 said that Enviva tracked its sourcing on a daily basis, categorized by the percentage of hardwood versus pine (which is softwood).

75.    According to FE1, Enviva would track the sourcing of hardwood because when the hardwood pile was getting low, they would try to source more. FE1 explained that Enviva would go over what percentage of hardwood piles that they have out in the yard, especially on a vacation weekend or a holiday weekend so they could make it through the weekend without running out of hardwood.

76.    FE1 stated that it would not be possible to create pellets without needing the entire tree, specifically because scrap material does not contain enough lignan to bind the pellets.

77.    Enviva's heavy reliance on whole trees is corroborated by Former Employee 2 ("FE2"), who worked at Enviva from June 2021 to October 2022 as a Finance Operations Manager.

78.     FE2 worked out of Enviva's Raleigh, North Carolina operational headquarters office and reported to Director – Finance Daniel Bacon, who in turn reported to Senior Vice President – Finance James "Jim" Geraghty ("Geraghty").  Geraghty reported to Defendant Even.

79.     FE2 confirmed that Enviva used whole trees in its pellets, and referred to Enviva's claims about using only scraps and waste as a "story" at odds with the truth.

80.     In fact, said FE2, it seemed like the only people who believed Enviva was not using whole trees were those outside the Company. Meanwhile, everybody who had been to one of Enviva's plants knew the Company was using whole trees.

81.     FE2 relayed that at a Q2 2022 meeting among Enviva's top executives, senior leaders – including directors, vice presidents and senior vice presidents – voted that Enviva stop stating publicly that it did not use whole trees, which was false, only to be overridden by executive leadership. As a result, the Company continued to state publicly that it did not use whole trees.

82.     Former Employee 3 ("FE3") worked for Enviva as a Maintenance and Reliability Manager from July 2020 through June 2022, by which time FE3 had become disillusioned by the Company's greenwashing and lying.

83.     FE3 was the whistleblower who spoke with journalist Justin Catanoso for *MONGABAY*'s December 5, 2022 report about Enviva's sustainability claims, and has confirmed that the statements attributed to the whistleblower in the article were accurate.

84.     FE3 worked at Enviva's Hamlet production plant in Hamlet, North Carolina, and the Southampton production plant in Southampton County, Virgina.  FE3 reported to Plant Manager Paul Pereira ("Pereira") and Plant Manager Franklin Castillo ("Castillo"). Pereira reported to Regional Director of Maintenance and Reliability Matt Cutshall ("Cutshall"), and later to Port Operations Director Darren Graveel ("Graveel"). Castillo reported to Director – Operations

Matt Szambelan ("Szambelan"). Cutshall, Graveel and Szambelan reported to Vice President – EHS (Environmental Health and Safety) and Operations Chris Seifert, who reported to Executive Vice President – Operations Smith. Smith reported to Enviva's then-CEO, Defendant Keppler.

85.     FE3 confirmed that Enviva used whole trees – including giant ones – in its pellets, which was not what the Company advertised.

86.     FE3 knew the Company used whole trees at its Southampton production plant in Southampton County, Virginia because he worked in the wood yard there and saw the trees firsthand.

87.     FE3 estimated that ***Enviva used at least 90% whole trees in making pellets***, with sawdust accounting for most of the remainder.

88.     FE3 stated that Defendant Keppler certainly knew Enviva was using whole trees because he visited the company's Hamlet plant while FE3 was there, and would have seen substantial quantities of leaves and limbs from whole trees harvested lying conspicuously on the ground.

89.     The problem, said FE3 is that it simply is not possible to make usable pellets using scraps.  In order to produce pellets with sufficient density, explained FE3, Enviva needed the whole tree, and thus does not care where it sources the wood.

**Enviva Never Obtained the Third-Party Commitments it Touted to Investors**

90.     As explained by Enviva's top sustainability officers during the Class Period (one of whom was Defendant Jenkins), the majority of forests in the Southeastern U.S. are privately owned, so Enviva predominantly sources wood from these "privately-owned working forests

across the Southeast United States." [11]

91.     On December 18, 2018, Enviva adopted a "Global Responsible Sourcing Policy and Pledges in Conservation Leadership," which required, among other things, that: "*[t]he primary wood we purchase must be sourced from sustainably-managed forests and harvesting operations*" and "*Enviva will only source primary materials from a supplier when …. [t]he forest source will be replanted or regrown as forests and will not be converted to non-forest uses ….*"

92.     According to Enviva's 2021 year-end Corporate Sustainability Report, the Company contracts with private landowners to collect the low-value wood, and its sourcing contracts require landowners to "replant or regenerate the forests," otherwise, Enviva does "*not accept any wood from a harvest without this information and commitment*."  However, despite these statements, Enviva did not secure replanting or regeneration of the whole trees it procured for its wood pellets.

93.     Former Employee 4 ("FE4") worked at Enviva from August 2017 to August 2020 in, among other roles, as a Sustainability Analyst, operating out of Enviva's corporate headquarters office in Bethesda, MD, working closely with the Sustainability team led by Defendant Jenkins. FE4's duties at Enviva included supporting wood-sourcing teams in industry-related forest research.  FE4 also contributed to Enviva's annual sustainability reporting and assisted with project management efforts to identify material ESG topics.

94.     In that capacity, FE4 indicated that FE4 was unaware of Enviva seeking any consequences for its landowner partners if they did not reforest their land post-harvest.

95.     Enviva claims to track the source of all the wood it uses to produce wood pellets

---

[11] Jennifer Jenkins & Alan Kroeger, *SEEING THE FOREST: Sustainable Wood Bioenergy in the Southeast United States*, at 3 (May 2020).

through its proprietary Track & Trace® System ("Track & Trace").  According to Keppler, Enviva created Track & Trace "to provide unmatched transparency into [Enviva's] supply chain and to make important information about the health of the working forests in the Southeastern U.S. available to the public."[12]

96.    The wood pellet production process is simple once the wood makes it to a production plant.  First, the wood is milled into uniform chips and then sent to a dryer where the moisture content of the chips is reduced.  The lower the moisture level of the pellet, the higher its energy potential.  Thereafter, the dried chips are sent to the hammermills to reduce their size further and refine the fiber for pelletizing.  The dried wood fiber is then mechanically pressed through a pellet press which gives the pellets their size and shape.

97.    The finished wood pellet product is then shipped via ocean-going transport vessels to Enviva's customers in Europe and Asia.

98.    To that end, FE4 said that sustainability was far less important to Enviva's business model than its ability to arbitrage loose regulations in the EU and Japan to its own advantage.

**Enviva Contributes to Deforestation**

99.    Enviva's supposed green credentials hinge entirely on its representations that it is only harvesting waste left by the timber industry, scraps that otherwise would be left to rot on the forest floor.  Enviva claims to purchase on average less than 30% of the wood from each harvest.  The other 70%, according to Enviva, is higher-value timber sold to other industries.  Yet, as revealed in the Blue Orca Report, Enviva's own Track and Trace data shows that the Company is violating this key threshold and driving demand for deforestation.

---

[12] Enviva, *Enviva: Track & Trace data confirms sustained forest growth*, BIOMASS MAGAZINE, (Jan. 26, 2018), https://biomassmagazine.com/articles/15004/enviva-track-trace-data-conforms-sustained-forest-growth.

100.    Enviva's own Track & Trace data shows that Enviva took greater than 30% of the harvest volume in over 2/3 of the acreage harvested by the Company, and often took 70-100% of the wood harvested. A former high-level sustainability officer quoted in the Blue Orca Report flatly stated that Enviva takes 70-90% of the volume in "plenty of tracks" because of the low prices to procure such wood.

101.    The larger the proportion of a harvest taken by Enviva, the more likely Enviva's presence and payments are driving the economics that influence a decision of the landowner to cut the forest down

102.    And while Enviva claims that forest inventories are increasing in sourcing regions around its facilities, the exact opposite is true: inventories of hardwood trees are decreasing, replaced by less enduring inexpensive pine seedlings, negatively impacting forest biodiversity.

**Materially False and Misleading Statements Issued During the Class Period**

103.    The Class Period begins on December 18, 2018, when Enviva issued a statement claiming "Global Responsible Sourcing Policy and Pledges in Conservation Leadership," which required, among other things, "pledged" that: "*[t]he primary wood we purchase must be sourced from sustainably-managed forests and harvesting operations*" and "*Enviva will only source primary materials from a supplier when …. [t]he forest source will be replanted or regrown as forests and will not be converted to non-forest uses ….*"

104.    The statements referenced in ¶103 were materially false and misleading when made because they omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva did not procure its wood primarily from sustainably-managed forests and harvesting operations; (ii) Enviva did not enforce replanting and regrowth initiatives from the forests that were stripped to make Enviva pellets; and

(iii) Enviva did source whole trees from forests that were converted to non-forest uses.

105.    On February 20, 2019, Enviva issued a press release during after-market hours announcing the Company's Q4 and full year 2018 financial results. The press release trumpeted Enviva's "*commitment to sustainable forestry practices and our customers' demand for responsibly sourced wood fiber.*"

106.    The statements referenced in ¶105 were materially false and misleading when made because they omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests; and (ii) Enviva's pellets were not responsibly sourced.

107.    That day, Enviva hosted an earnings call with investors and analysts to discuss the Company's Q4 2018 results (the "Q4 2018 Earnings Call").  During the scripted portion of the Q4 2018 Earnings Call, Defendant Keppler claimed that "*[s]ustainability is the foundation of our business and is increasingly an area of focus for our investors, who place a great deal of value on having Enviva as in ESG investment in their portfolio.*"

108.    During the same call, Defendant Keppler stated that Enviva's "*[p]rograms … [including] our industry-leading track and trace system, tangibly and transparently illustrate our innovation on and commitment to sustainability in ways that extends far beyond third-party audits, and legal and regulatory compliance.*"

109.    During the question-and-answer portion of the Q4 2018 Earnings Call, Defendant Keppler stated that "*biomass is an important part of delivering a low carbon future. We're excited to be part of that today* ….*"

110.    The statements referenced in ¶¶107-109 were materially false and misleading when

made because they omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests; (ii) Enviva's Track & Trace program actually demonstrated its widespread reliance on environmentally-destructive clear-cutting practices; and (iii) Enviva's practices did not lower carbon emissions, and in fact involved has higher greenhouse gas emissions than coal.

111.    On March 4, 2019, Enviva filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2018 (the "2018 10-K"), in which Defendants claimed that "*[o]ur customers are subject to stringent requirements regarding the sustainability of the fuels they procure. In addition to our internal sustainability policies and initiatives, our wood fiber procurement is conducted in accordance with leading forest certification standards.*"

112.    In discussing the Company's committees of the board of directors, the 2018 10-K stated, in relevant part:

> **Health, Safety, Sustainability and Environmental Committee**
>
> The board of directors of our General Partner has established a Health, Safety, Sustainability and Environmental Committee (the "HSSE committee") [that] assists the board of directors of our General Partner in fulfilling its oversight **responsibilities with respect to the board's and our continuing commitment to (1) ensuring the safety of our employees and the public and assuring that our businesses and facilities are operated and maintained in a safe and environmentally sound manner, (2) sustainability, including sustainable forestry practices, (3) delivering environmental benefits to our customers, the forests from which we source our wood fiber and the communities in which we operate and (4) minimizing the impact of our operations on the environment.**

113.    Appended to the 2018 10-K as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Keppler and Even, attesting that "the information contained in the [2018 10-K fairly presents, in all material respects, the … results of

operations of [Enviva]."

114.    The statements referenced in ¶¶111-113 were materially false and misleading when made because the 2018 10-K did not fairly present, in all material aspects, the results of Enviva's operations, and because the statements omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests; (ii) Enviva's actual practices did not ensure that its "business and facilities are operated in … an environmentally sound manner"; (iii) Enviva did not "deliver[] environmental benefits" but instead used environmentally unsound procurement practices to deliver a product with worse emissions than coal; and (iv) Enviva did not minimize the impact of its operations on the environment.

115.    On May 8, 2019, Enviva issued a press release announcing the Company's Q1 2019 financial results and which claimed that "***our sponsor continues to work with our local partners to conserve forest land and support forest growth***."

116.    The May 8, 2019 press release further claimed that Enviva's Track & Trace data "***shows that forest inventory growth and therefore increases in carbon stocks result from the market incentives created by a healthy forest products industry, of which our company is an integral part***."

117.    Finally, the May 8, 2019 press release stated that "***Enviva's wood pellets directly displace coal in power generation and heating applications, lowering the lifecycle greenhouse gas emissions profile of utilities and effectively eliminating the harmful trace element emissions … from burning coal***."

118.    The statements referenced in ¶¶115-117 were materially false and misleading when made because Enviva's Track & Trace program actually demonstrated its widespread reliance on

23

environmentally-destructive clear-cutting practices, and because the statements omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests (ii) Enviva's actual practices denatured forests, stripping them of hardwood and replacing, if at all, with low-value softwood saplings;  and (iii) Enviva's pellets Enviva's practices did not lower carbon emissions, and in fact involved higher greenhouse gas emissions than coal.

119.    On May 9, 2019, Enviva hosted an earnings call with investors and analysts to discuss the Company's Q1 2019 results (the "Q1 2019 Earnings Call").  During the scripted portion of the Q1 2019 Earnings Call, Defendant Keppler stated, in relevant part:

> …. I would like to take a minute to highlight our efforts around sustainability. ***As the foundation of our business and an area of increasing focus for our investors who plays a great deal of value on having Enviva as an ESG investment in their portfolios. As a company, our purpose is simple to improve the environment by displacing coal and growing more trees. Enviva's wood pellets directly displace coal in power generation and heating applications and lower the lifecycle greenhouse gas emissions profile of utilities***.

120.    The statements referenced in ¶119 were materially false and misleading when made because they omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests (ii) Enviva's actual practices denatured forests, stripping them of hardwood and replacing, if at all, with low value softwood saplings;  and (iii) Enviva's practices did not lower carbon emissions, and in fact involved higher greenhouse gas emissions than coal

121.    On August 7, 2019, Enviva issued a press release announcing the Company's Q2 2019 financial results. The press release quoted Defendant Keppler's claim that "'***robust forest***

*markets such as ours are the key to healthy forests* ….'"

122.    The statement referenced in ¶121 was materially false and misleading when made because they omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests and (ii) Enviva's actual practices denatured forests, stripping them of hardwood and replacing, if at all, with low-value softwood saplings.

123.    On August 8, 2019, Enviva hosted an earnings call with investors and analysts to discuss the Company's Q2 2019 results (the "Q2 2019 Earnings Call").  During the scripted portion of the Q2 2019 Earnings Call, Defendant Keppler stated that Enviva's purported ability to track its raw materials would "***give our customers and regulators around the world comfort in the sustainability of our activities and our ability to reduce life cycle greenhouse gas emissions***." Also on the Q2 2019 Earnings Call, Defendant Keppler reiterated his contention that "***our purpose is to displace coal and grow more trees, and it's clear we're making a difference sustainably***."

124.    The statements referenced in ¶123 were materially false and misleading when made because they omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests (ii) Enviva's actual practices denatured forests, stripping them of hardwood and replacing, if at all, with low-value softwood saplings;  and (iii) Enviva's practices did not lower carbon emissions, and in fact involved higher greenhouse gas emissions than coal.

125.    On September 20, 2019, a tweet from Enviva's official Twitter account stated as follows:



126.    The statements referenced in ¶125 were materially false and misleading when made because Enviva's pellets were not procured primarily from wood that otherwise would have gone to waste.

127.    On October 30, 2019, Enviva issued a press release announcing the Company's Q3 2019 financial results and stating, in relevant part:

> *Enviva's sustainable practices, as outlined in our sponsor's Responsible Sourcing Policy and through the Track & Trace® program, continue to contribute to increasing forest carbon storage in the Southeastern United States. Enviva and our sponsor's activities contribute to a robust market for forest products, which in turn contributed to the nearly 20 percent increase in forest inventory in our sourcing regions since 2008.*

128.    The statements referenced in ¶127 were materially false and misleading when made because Enviva's practices worsened, not decreased, carbon emissions, and because the statements omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices

undermined rather than sustained forests; and (ii) Enviva's actual practices denatured forests in their sourcing regions, stripping them of hardwood and replacing, if at all, with low-value softwood saplings

129.    On October 31, 2019, Enviva hosted an earnings call with investors and analysts to discuss the Company's Q3 2019 results (the "Q3 2019 Earnings Call").  During the scripted portion of the Q3 2019 Earnings Call, Defendant Keppler stated, in relevant part: "*[t]he low-grade wood fiber we procure is a byproduct of sustainable forestry operations and traditional saw timber harvest and gives us consistent and stable access to a growing natural resource without any dependency on sawmilling, sawdust or other industrial residuals*."

130.    On the same Q3 2019 Earnings Call, Defendant Keppler claimed that "our industry leadership is not defined solely by the scale and reliability of our global operations, *but also by the critical role we play in delivering a sustainable solution to our customers' efforts to mitigate climate change*."

131.    The statements referenced in ¶¶129-130 were materially false and misleading when made because they omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests (ii) Enviva sourced whole trees, not just "low-grade wood fiber," and was dependent on sawdust and other industrial residues; and (iii) Enviva's practices did not lower carbon emissions, and in fact involved higher greenhouse gas emissions than coal, and did not in any way mitigate climate change.

132.    On February 10, 2020, Enviva issued the following tweet from its official Twitter account:



133.    The statements referenced in ¶132 were materially false and misleading when made because they omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than maintained forests (ii) Enviva sourced whole trees, not just "low-grade wood"; and (iii) Enviva's practices did not lower carbon emissions, and in fact involved higher greenhouse gas emissions than coal, and did not in any way mitigate climate change.

134.    On February 27, 2020, Enviva filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2019 (the "2019 10-K"). The 2019 10-K contained substantively similar discussions of the Company's business, wood fiber procurement, sustainability, and HSSE Committee as discussed, *supra*, in ¶¶111-112, and appended as exhibits to the 2019 10-K were substantively similar SOX certifications signed by the Enviva Defendants as referenced, *supra*, in ¶113.

135.    The statements referenced in ¶134 were materially false and misleading when made because the 2019 10-K did not fairly present, in all material aspects, the results of Enviva's operations, and because the statements omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests; (ii) Enviva's actual practices did not ensure that its "business and facilities are operated in … an environmentally sound manner"; (iii) Enviva did not "deliver[] environmental benefits" but instead used environmentally unsound procurement practices to deliver a product with worse emissions than coal; and (iv) Enviva did not minimize the impact of its operations on the environment.

136.    On April 29, 2020, Enviva issued a press release announcing the Company's Q1 2020 financial results, which stated, in relevant part:

> *Recently, our sponsor issued its 2020 plans under our global Responsible Sourcing Policy, which set forth new initiatives to continue to deliver on its commitment to sustainable practices of wood sourcing, transparency, and forest conservation …. Our sponsor [ ] committed to issue its first Corporate Sustainability Report describing how we and our sponsor deliver on our mission to displace coal, grow more trees, and fight climate change, our current environmental impact and sustainability practices, and our goals for continuous improvement in sustainability of our business in the long-term.*

137.    The statements referenced in ¶136 were materially false and misleading when made because they omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests (ii) Enviva sourced whole trees, not just low-grade wood; and (iii) Enviva's practices did not lower carbon emissions, and in fact involved higher greenhouse gas emissions than coal, causing an adverse environmental impact.

138.    On April 30, 2020, Enviva hosted an earnings call with investors and analysts to discuss the Company's Q1 2020 results (the "Q1 2020 Earnings Call"). During the scripted portion

of the Q1 2020 Earnings Call, Defendant Keppler stated that "*[t]he long-term growth of our business continues to be driven by the global commitment to phase out coal, limit the impact of climate change, and cut greenhouse gas emissions*."

139.    On the same Q1 2020 Earnings Call, Keppler contended that "*[s]ustainability is core to our value proposition, and last week, we celebrated the 50th anniversary of Earth Day. This year's theme for Earth Day was Climate Action, which for us is what we do every day, by displacing coal, growing more trees and fighting climate change*."

140.    Finally, Defendant Keppler stated as follows:

> *Last week our sponsor also issued its 2020 plans under our Global Responsible Sourcing Policy, which set forth new initiatives to continue to deliver on our commitment to transparency, forest conservation, and sustainable practices of wood sourcing … We also committed to issue our first Corporate Sustainability Report, describing how we deliver on our company's mission, our current environmental impact and sustainability practices and our goals for continuous improvement over the long term*.

141.    The statements referenced in ¶¶138-140 were materially false and misleading when made because they omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests (ii) Enviva sourced whole trees, not just low-grade wood; and (iii) Enviva's practices did not lower carbon emissions, and in fact involved higher greenhouse gas emissions than coal, and did not in any way fight climate change.

142.    On July 20, 2020, Enviva posted the following tweet from the Company's official Twitter account attributing a statement to Defendant Jenkins:



143.    The statements referenced in ¶142 were materially false and misleading when made because they omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests (ii) Enviva sourced whole trees, not just low-grade wood; and (iii) Enviva's practices did not lower carbon emissions, and in fact involved higher greenhouse gas emissions than coal, causing an adverse environmental impact.

144.    On July 27, 2020, Enviva's official Twitter account posted the following tweet:



145.    The statements referenced in ¶144 were materially false and misleading when made because they omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests and (ii) Enviva sourced whole trees, not just "low-grade wood."

146.    On August 5, 2020, Enviva issued a press release announcing the Company's Q2 2020 financial results, which stated, in relevant part: "*[t]he Partnership and its sponsor continue to prioritize efforts to safeguard and enhance the sustainability of wood pellet production in the United States. This ensures the long-term availability of the forest resources in our production areas while also creating a reputation for environmental best practice among policymakers and our customers.*"

147.    The statement referenced in ¶146 was materially false and misleading when made because they omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests and (ii) Enviva did not follow environmental best practices; (iii) Enviva did not ensure the long-term availability of forest resources but instead stripped forests of hardwood, replacing, if at all, with low-value softwood saplings.

148.    On August 6, 2020, Enviva hosted an earnings call with investors and analysts to discuss the Company's Q2 2020 results (the "Q2 2020 Earnings Call").  During the scripted portion of the Q2 2020 Earnings Call, Defendant Keppler stated, in relevant part:

> *Enviva is leading an industry that plays an increasingly critical role in the global fight against climate change. The climate benefits of sustainably produced wood pellets and the transparency of our sustainability and supply chain practices, really our ESG attributes are garnering international recognition by regulators, policymakers, academics, researchers and investors alike.*

149.    The statements referenced in ¶148 were materially false and misleading when made because they omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests (ii) Enviva sourced whole trees, not just low-grade wood; and (iii) Enviva's practices did not lower carbon emissions, and in fact involved higher greenhouse gas emissions than coal, causing an adverse environmental impact.

150.    On October 28, 2020, Enviva issued a press release announcing the release of its first corporate sustainability report.  Among other things, that press release quoted Defendant Keppler, who stated:

> I am excited to share our first-ever Corporate Sustainability Report that not only reflects the journey that began when we founded Enviva more than 16 years ago but also looks ahead at the opportunities that exist for our company to continue to fuel positive change . . . . ***This milestone document for Enviva focuses on the three core commitments that guide our work – people, forests, and climate change – and how they drive our approach to sustainability in all aspects of our business.*** The choices we make today will have lasting impacts for generations to come, ***and we are privileged to continue to have the input of so many valued stakeholders to inform our choices and help ensure that good biomass protects forests, empowers communities, and puts us on the path to net-zero emissions.***

151.    The statements referenced in ¶150 were materially false and misleading when made because they omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests (ii) Enviva sourced whole trees, not just low-grade wood; and (iii) Enviva's practices did not lower carbon emissions, and in fact involved higher greenhouse gas emissions than coal, causing an adverse environmental impact.

152.    On November 4, 2020, Enviva issued a press release announcing the Company's Q3 2020 financial results, as well as touting its alleged "***contribution to the fight against climate change, … forestland conservation efforts***" and "***efforts to ... promote forest growth and carbon***

33

*sequestration and protect forest habitats in the U.S. Southeast*."

153.    The statements referenced in ¶152 were materially false and misleading when made because they omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests (ii) Enviva sourced whole trees, losing carbon sequestration; and (iii) Enviva's practices did not lower carbon emissions, and in fact involved higher greenhouse gas emissions than coal, causing an adverse environmental impact.

154.    On November 5, 2020, Enviva hosted an earnings call with investors and analysts to discuss the Company's Q3 2020 results (the "Q3 2020 Earnings Call").  During the scripted portion of the Q3 2020 Earnings Call, Defendant Keppler stated, in relevant part: ***Enviva is leading an industry that plays an increasingly critical role in the global fight against climate change. The climate benefits have sustainably produced wood pellets continue to garner international recognition and we are keenly focused on promoting forest growth and providing incremental transparency.***

155.    The statements referenced in ¶154 were materially false and misleading when made because they omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests (ii) Enviva's pellets were not sustainably sourced; (iii) Enviva did not promote forest growth, but instead hurt forests by harvesting mature hardwoods and replacing, if at all, with low-value softwood saplings; and (iv) Enviva's practices did not lower carbon emissions, and in fact involved higher greenhouse gas emissions than coal, causing an adverse environmental impact.

156.    On December 9, 2020, Enviva's official Twitter account issued the following tweet:



157.    The statements referenced in ¶156 were materially false and misleading when made because they omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests; and (ii) Enviva sourced its pellets from whole trees, not just "low-value" wood.

158.    In January 2021, Allen Kroeger, the Company's Director of Sustainability and Climate Initiatives resigned after less than eighteen months in the post. Kroeger co-authored Enviva's white paper "Seeing the Forest" on sustainability practices with Defendant Jenkins.

159.    On February 17, 2021, Enviva issued a press release entitled "Enviva Targets Net-Zero Operations by 2030." The press release stated, in relevant part:

> Enviva's sustainably sourced wood is used to manufacture wood pellets, a renewable fuel source that provides global power and heat generators with a drop-in alternative to fossil fuels. Enviva exports its sustainable wood pellets primarily to the U.K., Europe, the Caribbean and Japan, ***enabling its customers to reduce***

*their carbon emissions by more than 85% on a lifecycle basis, helping them reach their greenhouse gas emissions reduction targets with renewable energy*.

"At Enviva, fighting climate change is at the core of what we do," said John Keppler, Chairman and Chief Executive Officer of Enviva. "*For more than a decade we have played a critical role in helping the world's energy producers substantially reduce their net carbon emissions by using sustainable bioenergy, enabling them to phase out coal, support increases in forest carbon stocks, and provide reliable, affordable energy to their communities.*

160.    The statements referenced in ¶159 were materially false and misleading when made because they omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests (ii) Enviva's pellets were not sustainably sourced; (iii) Enviva did not promote forest growth, but instead hurt forests by harvesting mature hardwoods and replacing, if at all, with low-value softwood saplings; and (iv) Enviva's practices did not lower carbon emissions, and in fact involved higher greenhouse gas emissions than coal, causing an adverse environmental impact.

161.    On February 24, 2021, Enviva issued a press release announcing the Company's Q4 2020 results which claimed that "*the product we manufacture helps reduce the lifecycle GHG [greenhouse gas] emissions of our customers, we believe we must also do our part within our operations to mitigate the impacts of climate change*." The press release further quoted Defendant Keppler's statement that "*Enviva and the sustainable and renewable fuel we supply to our customers are part of an all-in solution to climate change ….*"

162.    The statements referenced in ¶161 were materially false and misleading when made because they omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's practices did not lower

carbon emissions, and in fact involved higher greenhouse gas emissions than coal and (ii) Enviva's practices did not in any way mitigate climate change.

163.    On February 25, 2021, Enviva filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K contained substantively similar misrepresentations to the 2018 10-K and 2019 10-K, as set forth in ¶¶111-113, and were materially misleading when made for the reasons set forth in ¶¶114.

164.    On March 1, 2021, Enviva issued a press release announcing and attaching an investor presentation, that among other things:

- claimed that Enviva was "***fighting climate change, displacing coal, growing more trees***"; and

- touted "***substantial GHG reductions***", participation in a "***market driven by [a] global commitment to fight climate change***", and "***responsible wood supply program***".

165.    The statements referenced in ¶164 were materially false and misleading when made due to Enviva's widespread reliance on environmentally-destructive clear-cutting practices, and because the statements omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests; (ii) Enviva's pellets were not sustainably sourced; and (iii) Enviva's practices did not lower carbon emissions, and in fact involved higher greenhouse gas emissions than coal, and did not in any way "fight climate change."

166.    On April 7, 2021, Enviva's official Twitter account posted the following:



167.    The statements referenced in ¶166 were materially false and misleading when made

because Enviva did not source wood "[o]nly from sustainably managed forests where the land will

be reforested" and did not "use" only "low-value wood," and because the statements omitted to

disclose the following information necessary to make the statements not misleading under the

circumstances in which they were made: (i) Enviva's actual procurement practices undermined

rather than sustained forests (ii) Enviva's pellets were not sustainably sourced; and (iii) Enviva did

not promote forest growth, but instead hurt forests by harvesting mature hardwoods and replacing,

if at all, with low-value softwood saplings.

168.    On April 28, 2021, Enviva issued a press release announcing the Company's Q1

2021 results touting its purported "***adherence to and accountability for sustainable forest***

***management and wood sourcing***" and claiming that "***Enviva requires landowners to commit to***

***replant following harvests in which Enviva participates***."

169.    The statements referenced in ¶168 were materially false and misleading when made because the statements omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests (ii) Enviva's pellets were not sustainably sourced; and (iii) Enviva did not secure replanting or regeneration of the whole trees it procured for its wood pellets.

170.    On April 29, 2021, Enviva hosted an earnings call with investors and analysts to discuss the Company's Q1 2021 results (the "Q1 2021 Earnings Call").  During the scripted portion of the Q1 2021 Earnings Call, Defendant Keppler stated, in relevant part:

> *With the tremendous growth we have achieved, coupled with what we had, we will continue to ensure that our wood pellets remain sustainably produced from forces inventories have and continue to grow overtime*.

***

> *Our track and trace system and our leading responsible sourcing policy provide us with the tools we need to set public transparent goals regarding how we manage, measure and improve our activities.*

171.    The statements referenced in ¶170 were materially false and misleading when made because Enviva's Track & Trace program actually demonstrated its widespread reliance on environmentally-destructive clear-cutting practices, and because the statements omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests; and (ii) Enviva's pellets were not sustainably sourced.

172.    On May 10, 2021, Enviva issued a press release announcing and attaching an investor presentation that contained substantively similar misrepresentations and omissions to

those set forth in ¶164, *supra*, and were materially misleading when made for the reasons set forth in ¶165, *supra*.

173.    In July 2021, Enviva's Chief Sustainability Officer ("CSO"), Defendant Jenkins, departed abruptly after just fourteen months. During her tenure as CSO, Defendant Jenkins was "responsible for Enviva's environmental stewardship" and "ensuring the sustainability and traceability of the wood supply chain." Enviva provided no explanation for Defendant Jenkins' departure, and, despite consistently drawing attention to its alleged sustainability, Enviva left the CSO position vacant until January 2023.

174.    On July 28, 2021, Enviva issued a press release announcing the Company's Q2 2021 financial results and claiming that "*[s]ustainability is the core of our value proposition in our mission to displace coal, grow more trees, and fight climate change*" while citing Enviva's supposedly "***sustainable forest management***".  The press release further claimed that:

> "[o]ur data demonstrate that … ***on average just under 32% of the volume from each harvest went to Enviva***, while the remaining 68% of the volume went to other participants in the forest products sector, principally to those that manufacture higher-value products that ensure long-term carbon storage such as dimensional lumber, building products, and furniture. ***Enviva only uses the remaining low-value wood in its operations*** ….

175.    The statements referenced in ¶174 were materially false and misleading when made because the statements omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests; (ii) Enviva's pellets were not sustainably sourced; (iii) Enviva's practices in fact involved higher greenhouse gas emissions than coal, and did not in any way "fight climate change"; (iv) Enviva routinely took substantially more than 30% of harvests; and (v) Enviva did not only use "low-value wood".

176.    On July 29, 2021, Enviva hosted an earnings call with investors and analysts to

discuss the Company's Q2 2021 results (the "Q2 2021 Earnings Call").  During the scripted portion of the Q2 2021 Earnings Call, Defendant Keppler stated, in relevant part:

> With the tremendous growth we have achieved, combined with what we see ahead, *tools like our proprietary track and trace system and our industry leading responsible sourcing policy will continue to ensure that our wood pellets remain sustainably produced from forests whose inventories have continued to grow over time*.
>
> ***
>
> *Sustainability is at the core of our value proposition, and our net zero advancements only make the product we manufacture that much more valuable in our effort to displace coal, grow more trees, and fight climate change*.

177.    The statements referenced in ¶176 were materially false and misleading when made because Enviva's Track & Trace program actually demonstrated its widespread reliance on environmentally-destructive clear-cutting practices, and because the statements omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests; (ii) Enviva's pellets were not sustainably sourced; and (iii) Enviva's practices did not lower carbon emissions, and in fact involved higher greenhouse gas emissions than coal, and did not in any way "fight climate change."

178.    On November 4, 2021, Enviva hosted an earnings call with investors and analysts to discuss the Company's Q3 2021 results (the "Q3 2021 Earnings Call").  During the scripted portion of the Q3 2021 Earnings Call, Defendant Keppler stated, in relevant part:

> "Our renewable products help our customers meet their net zero targets and we expect our own net zero commitments to further reinforce our environmental leadership and reputation for sustainability. We are in a very fortunate position to have built a business that by design generates only a modest level of emissions from our own operations."

179.    The statements referenced in ¶178 were materially false and misleading when made

because they omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests (ii) Enviva's pellets were not sustainably sourced; and (iii) Enviva's practices did not lower carbon emissions, and in fact involved higher greenhouse gas emissions than coal, causing an adverse environmental impact.

180.    On November 8, 2021, Enviva's official Twitter account posted the below Tweet:



181.    The statements referenced in ¶180 were materially false and misleading when made because Enviva did not source wood "[o]nly from sustainably managed forests where the land will be reforested" and did not "use" only "low-value wood," and because the statements omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests (ii) Enviva's pellets were not sustainably sourced; and (iii) Enviva did not promote forest growth, but instead hurt forests by harvesting mature hardwoods and replacing,

if at all, with low-value softwood saplings.

182.     Pursuant to (i) the registration statement on Form S-3 filed by the Company (File No. 333-262240) dated and filed with the SEC on January 19, 2022 (the "Registration Statement") and (ii) the prospectus dated January 19, 2022 (the "Prospectus") and filed with the SEC on January 19, 2022, Enviva issued 4,945,000 shares of Enviva common stock.

183.     The Underwriter Defendants were each identified as underwriters in the Offering Documents and distributed the offered shares to the public at $70.00 per share.

184.     The Offering Prospectus incorporated by reference the 2020 10-K, the February 24, 2021 press release, the March 1, 2021 press release, the April 28, 2021 press release, the May 10, 2021 press release, and the July 28, 2021 press release, which were materially false and misleading for the reasons set forth in ¶¶161-165, 168-169, and 172-175, above.

185.     The Offering Registration Statement incorporated by reference the Offering Prospectus, which was materially false and misleading for the reasons set forth in ¶184 above.

186.     As a result, the Offering Documents referred to in ¶¶184-185 above were materially false and misleading at all relevant times.

187.     Ultimately, Enviva raised gross proceeds of $346 million though the Offering.

188.     On March 1, 2022, Enviva hosted an earnings call with investors and analysts to discuss the Company's Q4 2021 results (the "Q4 2021 Earnings Call").  During the scripted portion of the Q4 2021 Earnings Call, Defendant Keppler stated, in relevant part, "***[w]e are incredibly privileged to have the opportunity to continue to build a company and a unique platform that delivers real climate change benefits today at scale***, while consistently, safely and sustainably generating superior returns for all of our stakeholders."

189.     The statements referenced in ¶188 were materially false and misleading when made

because Enviva did not "deliver[] real climate change benefits," but had an adverse impact on the environment by causing more emissions than coal.

190.    On March 4, 2022, Enviva filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K contained substantively similar misrepresentations to the 2018 10-K and 2019 10-K, as set forth in ¶¶112-113, and was materially misleading when made for the reasons set forth in ¶¶114.

191.    On April 22, 2022, CBS News ran a news article and segment on Enviva and its critics. In the CBS News report, Defendant Calloway corrected a reporter who mentioned the Company using tree "trunks" for wood, insisting that the company instead uses "***tops***" and "***limbs***."[13]

192.    In the course of the same report, Defendant Calloway stated that "***[e]very piece of fiber that's taken into our program is low value wood***, …. ***If we did not create this service, it would be left to rot on the forest floor and would be left to create forest fires***."[14]

193.    Finally, Defendant Calloway claimed that "***[t]here's no real doubt here that wood pellets and frankly, woody biomass, are a far superior climate change mitigation option than fossil fuels, particularly coal***."[15]

194.    FE3 said that Defendant Calloway – described as a personal friend of Defendant Keppler – knowingly lied by telling CBS News that Company exclusively used leftover waste wood.

---

[13] Jonathan Vigliotti, *Wood pellet industry may be falsely marketing itself as a green renewable energy source, critics say*, CBS News, (April 22, 2022, 12:07 p.m.), https://www.cbsnews.com/news/wood-pellets-renewable-energy-source-critics/.

[14] *Id.*

[15] *Id.*

195.    The statements referenced in ¶¶191-193 were materially false and misleading when made because Enviva did in fact use whole trees including trunks, not just "tops" and "limbs," because "[e]very piece of fiber that's taken into our program" *was not* "low value wood," and because the statements omitted to disclose that Enviva's practices did not lower carbon emissions, and in fact involved higher greenhouse gas emissions than coal, causing an adverse environmental impact, which omission rendered the statements materially misleading under the circumstances in which they were made.

196.    On May 4, 2022, Enviva issued a press release announcing the Company's Q1 2022 results, which claimed that "*[a]ll of the wood we procure, regardless of its form, is low-value wood*."

197.    The statements referenced in ¶196 were materially false and misleading when made because Enviva did not procure only "low-value wood."

198.    On May 5, 2022, Enviva hosted an earnings call with investors and analysts to discuss the Company's Q1 2022 results (the "Q1 2022 Earnings Call").  During the scripted portion of the Q1 2022 Earnings Call, Defendant Keppler stated, in relevant part:

> *As a pioneer in the biomass industry, we've built a business focus on our core values, caring about people in our communities, fighting climate change by displacing coal and ensuring that we are growing more trees, managing our business under industry-leading sustainability practices that ensure that we are delivering favorable impact to energy and the environment right in line with the IPCC guidance.* We source our renewable wood fiber from the U.S. Southeast, a region where forests are primarily owned by private land owners. And these sustainably managed forests have grown by over 40% over the last 25 years.

199.    The statements referenced in ¶199 were materially false and misleading when made because they omitted to disclose the following information necessary to make the statements not misleading under the circumstances in which they were made: (i) Enviva's actual procurement practices undermined rather than sustained forests (ii) Enviva's pellets were not sustainably

sourced; (iii) Enviva did not promote forest growth, but instead hurt forests by harvesting mature hardwoods and replacing, if at all, with low-value softwood saplings; and (iv) Enviva's practices did not lower carbon emissions, and in fact involved higher greenhouse gas emissions than coal, causing an adverse environmental impact.

**The Truth Emerges**

200.    On October 12, 2022, during pre-market hours, Blue Orca published a report on Enviva.  Among other allegations, the Blue Orca Report stated:

> Enviva claims to be a pure play ESG Company with a healthy, self-funded dividend and cash flows to provide a platform for future growth. We think this is nonsense on all counts.

> …

> We believe that Enviva is the latest ESG farce, a product of deranged European climate subsidies which incentivize the destruction of American forests so that European power companies can check a bureaucratic box. In an Orwellian twist, even though burning wood emits more CO2 per unit of heat generated than any major energy source (including coal), an arcane carbon accounting loophole subsidizes European power companies to replace coal with wood pellets derived from deforestation in the United States. All in the name of climate activism.

> In our opinion, Enviva is engaging in textbook greenwashing. Hidden GPS data embedded in Enviva's Track and Trace disclosures allowed us to geolocate the Company's harvests. Satellite imagery indicates that contrary to the Company's claims, in many instances Enviva is procuring wood from the widely condemned practice of clear-cutting. Former senior Enviva sustainability and procurement executives confirmed that this practice was endemic. We also think this explains the "**exodus of sustainability leadership**" from Enviva in 2021, including the recent resignations of both authors of the Company's prominent sustainability "white paper."

> Ultimately, we think that any legitimate ESG investor or allocator should be embarrassed to own this stock. But in addition to evidence of greenwashing, Enviva's troubling cash flows, dangerous leverage, and unsustainable dividend only add further momentum to the short thesis, which is why we expect the stock price to contract significantly from Enviva's current nosebleed valuation.

1. **Hidden Metadata Reveals that Enviva Procures Wood from Clear-Cutting Forests**. Enviva publicly denies clear-cutting forests, the controversial practice of

removing full swaths of forest which is widely condemned by ESG investors and climate change advocates. Although Enviva refuses to disclose to watchdogs or investors the exact location of its harvests, **when we analyzed the metadata from its Track and Trace database, we found embedded GPS coordinates**. We think that there is a reason Enviva tried to conceal this data. When we geolocate Enviva's harvests using these GPS coordinates, **satellite imagery reveals hundreds of images of clear-cut forests, suggesting that the practice is widespread and that Enviva is misleading investors**. We corroborated this with interviews of two former senior Enviva executives, who unequivocally stated that Enviva sources wood from clear-cutting. A former senior Enviva sustainability executive lamented that the practice was routine because **clear-cutting was cheaper than other more sustainable methods of harvesting**. Ultimately, multiple strands of independent evidence, from the statements of former senior executives to satellite imagery, indicate that Enviva is procuring wood from clear-cutting, a practice roundly rejected by ESG investors and expressly discouraged by EU sustainability guidelines.

2. **Enviva Drives Demand for Deforestation**. Enviva claims that harvesting forests for wood pellets is sustainable and produces lower greenhouse gas emissions than coal because it is only harvesting **waste** left by the timber industry, scraps that otherwise would be left to rot on the forest floor. Enviva insists that it does not drive demand for deforestation or influence the harvesting decisions of landowners because the Company claims to purchase on average less than 30% of the wood from each harvest. *The other 70%, according to Enviva, is higher value timber sold to other industries*. Yet Enviva's own Track and Trace data shows that the Company is violating this key **threshold** and is likely driving demand for deforestation.

   a. **Enviva Track and Trace Data Contradicts Reported Harvesting Threshold**. On its website, Enviva publishes its Track and Trace data, including the total acreage harvested and the proportion of each harvest purchased by Enviva. This data shows that Enviva took greater than 30% of the volume of the harvest in over 2/3rds of the acreage harvested by the Company, including a substantial amount of acreage in which Enviva took 70-100% of the wood harvested. **According to a former high-level sustainability officer we interviewed, Enviva takes 70-90% of the volume in "plenty of tracks" because of the low prices for such wood**. The larger the proportion of a harvest taken by Enviva, the more likely Enviva's presence and payments are driving the economics that influence a decision of the landowner to cut the forest down. In our opinion, Enviva's own data provides compelling evidence that the Company is driving demand for deforestation and misleading investors regarding its procurement practices.

3. **Hardwood Forest Inventory is Decreasing Around Enviva's Facilities**. As evidence of the purported sustainability of its practices, Enviva claims that forest inventories are increasing in sourcing regions around its facilities. This is misleading, because it ignores that inventories of hardwood trees are decreasing,

replaced by less expensive pine seedlings and negatively impacting forest biodiversity. Recent academic and scientific studies analyzing satellite imagery around Enviva's facilities concluded that it was **"very likely" that Enviva's pellet mill operations contributed to elevated rates of deforestation of deciduous trees in the area**. This ties directly to Enviva's valuation in that it directly undermines the Company's claims regarding the sustainability of its practices and its already controversial standing as an environmentally friendly stock suitable for ESG investors.

4. **"Exodus of Sustainability Leadership" in 2021**. Turnover at the CFO or chief accounting officer position can often be a sign of accounting shenanigans or even fraud, and smart investors tend to haircut a valuation when confronted with a cluster of high-profile resignations. In this case, three of Enviva's key sustainability officers resigned within months of each other in 2021. These were high profile departures, including the Chief Sustainability Officer and the co-author of the Company's sustainability white paper. Both were the public face of Enviva's attempt to attract ESG investment, making their departure akin to a CFO and chief accounting officer resigning at the same time. A former senior sustainability executive we interviewed stated that Enviva's C-level "were making too many decisions that ran contrary to the values that the Company was purporting to have." In our opinion, this lends further credence to our investment opinion that Enviva is greenwashing its ESG credentials. [Emphasis in original,]

201.    On this news, Enviva's stock price fell $7.74 per share, or 13.13%, to close at

$51.23 per share on October 12, 2022:



202.    That same day, J.P. Morgan rated Enviva as "Neutral" and stated, with respect to the Blue Orca Report, "*[i]f true, we believe this would be a violation of industry sustainability standards*."

203.    Despite the explosive nature of Blue Orca's allegations, Enviva's immediate response, released late on October 12, was muted. In particular, the Company said only that the Blue Orca Report had "numerous errors, repeats previous unsupported speculation and gross mischaracterizations, and draws specious, misleading conclusions" without offering any detail on what, exactly, Enviva contended that Blue Orca got wrong.

204.    Also on October 12, Samuel O'Brient of the financial analysis portal *InvestorPlace* wrote, in regard to the Blue Orca Report, that "it's difficult to ignore such a strong bearish case against [Enviva.]"[16]

205.    On October 25, 2022, Blue Ridge Public Radio published a report entitled *Not a clearcut issue: Wood pellets, carbon sequestration, and war in Ukraine* in which Geology Professor Roger Shaw of the University of North Carolina Wilmington explained how Enviva's use of whole trees undermined its purported facilitation of "increases in carbon stocks": "*[w]hen you cut down or use real trees, you're losing the carbon sequestration*," said Shew. "And so then when I go in and plant another tree, *it takes a decade or more* for that seedling tree to start really sequestering larger volumes of carbon."[17]

206.    In response to Shaw's serious allegations, the Company offered no substantive

---

[16] Samuel O'Brient, What Is Going on With Enviva (EVA) Stock Today?, INVESTORPLACE, (Oct. 12, 2022, 5:17 p.m. EDT), https://investorplace.com/2022/10/what-is-going-on-with-enviva-eva-stock-today/

[17] Grace Vitaglione, Not a Clearcut Issue: Wood pellets, carbon sequestration, and war in Ukraine, WHQR PUBLIC MEDIA, (Oct. 24, 2022 at 3:14 p.m. EDT), https://www.whqr.org/local/2022-10-24/not-a-clearcut-issue-wood-pellets-carbon-sequestration-and-war-in-ukraine

defense, but merely stated that "Enviva disputed this."

207.    Enviva has said that its process is better for the environment than fossil fuel energy, because they plant more trees than the amount cut down each year.

208.    Shaw said if Enviva were only using scrap limbs and sawmill residue to make wood pellets, that process would be close to but not quite carbon neutral. But he explained that whole trees are often decades-old and have stored large amounts of carbon over that time, which is released when the pellets derived from the tree are burned.

209.    Then, on December 5, 2022, the conservation news web portal MONGABAY, which reports on environmental science, energy, and green design, published an article entitled, "Whistleblower: Enviva claim of 'being good for the planet… all nonsense'" (the "Whistleblower Report").

210.    In the Whistleblower Report, a wood pellet plant management official with Enviva between 2020 and mid-2022 revealed that the Company's (i) representations that it doesn't use big, whole trees, but only uses wood waste, in biomass production; (ii) assurances that it only sources wood from areas where trees will be regrown; and (iii) claims that it doesn't contribute to deforestation were uniformly "based on false pretenses."

211.    On this news, Enviva's stock price fell $3.35 per share from the previous trading day's closing price, or 9.43%, to close at $55.44 per share on December 6, 2022:



212.    As with the Blue Orca Report, Enviva responded with little more than a "non-denial denial," stating, in relevant part:

> We are saddened and take issue by the allegations made by the former employee …. The viewpoints expressed by this employee do not represent Enviva's values nor are they accurate. ***While the source's name was not revealed, we do not believe there is an employee fitting the description of what was shared that would have any credible or expert knowledge about the allegations made.***

213.    Leaving aside Enviva's failure to specify any inaccuracies in or otherwise discredit any part of The Whistleblower Report, undersigned Lead Counsel has spoken with and verified the Whistleblower's prior employment with Enviva and statements about Enviva.

214.    Just over a week later, on December 15, 2022, prompted by the Whistleblower Report, the House of Representatives in The Netherlands's Parliament approved a motion compelling its government to stop paying subsidies to wood-pellet manufacturers found to be untruthful in describing their wood-harvesting practices.

51

215.    Lammert van Raan ("van Raan"), the Dutch Parliament member who spearheaded the motion, specifically cited the Whistleblower, who "reported that all of Enviva's green claims are incorrect, [and] according to an important recent scientific study …, Enviva contributes to deforestation in the southeastern U.S." while calling for the prohibition of all subsidies premised on false sustainability credentials.

216.    As a result of Defendants' wrongful acts and omissions culminating in the precipitous decline in the market value of Enviva common stock on October 12 and December 5, 2022, Plaintiff and other Class members suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

217.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Enviva common stock during the Class Period (the "Class"), including through the Offering, and were damaged upon the revelation of the corrective disclosures alleged herein. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

218.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Enviva common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Enviva or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in

52

securities class actions.

219.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

220.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

221.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Enviva;

- whether the Defendants caused Enviva to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the price of Enviva common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

222.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the

wrongs done to them. There will be no difficulty in the management of this action as a class action.

223.    For his Exchange Act claims, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Enviva common stock is traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Enviva common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

224.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market for Exchange Act claims.

225.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance for Exchange Act claims established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 11 of the Securities Act Against Defendant Enviva, Keppler, Even, Johnson, Paral, and the Underwriter Defendants)**

226.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully

set forth herein.

227.    This claim is premised on strict liability under Section 11 of the Securities Act, and does not assert that Defendants acted with fraudulent intent.

228.    This claim is asserted by Plaintiff against Defendants Enviva, Keppler, Even, Johnson, Paral, and the Underwriter Defendants individually and on behalf of all other persons who acquired shares traceable to the Offering, in which the shares issued pursuant to the Offering Documents were sold.

229.    Defendants Keppler, Even, Johnson and Paral are strictly liable under the Securities Act as signatories of the Registration Statement for the misrepresentations and omissions contained therein, as identified in ¶¶183-188 above.

230.    Enviva is strictly liable as an Issuer under the Securities Act for the misrepresentations and omissions it made in the Registration Statement, as identified in ¶¶183-188 above.

231.    The Underwriter Defendants are strictly liable under the Securities Act as named underwriters for the misrepresentations and omissions made in the Registration Statement, as identified in ¶¶183-188 above.

232.    None of the Defendants named in ¶228 above conducted a reasonable investigation or possessed a reasonable basis for the belief that the statements contained in the Registration Statement and identified in ¶¶184-185 above were true, were without omissions of material fact, and were not misleading.

233.    By reason of the conduct alleged herein, each of the Defendants named in ¶228 above has violated Section 11 of the Securities Act.

234.    Plaintiff and the Class have sustained enormous damages because the value of their

respectively-held Enviva common stock has declined precipitously.

235.    At the time of their purchases, Plaintiff and the Class were without knowledge of the wrongful conduct alleged herein, and could not have reasonably discovered those facts more than one year prior to the filing of the initial complaint in this action.  The initial complaint was filed within three years of the time that Enviva offered the shares covered by the Registration Statement to the investing public.

236.    By virtue of the foregoing, Plaintiff and the other Class members are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the Defendants named in ¶228 above and each of them, jointly and severally.

## COUNT II

### (Violations of Section 15 of the Securities Act
### Against Defendants Keppler, Even, and Johnson)

237.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

238.    This claim is premised on control person liability under Section 15 of the Securities Act, and does not assert that Defendants acted with fraudulent intent.

239.    Defendants Keppler, Even, and Johnson, by virtue of their offices, directorship and/or specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Enviva within the meaning of Section 15 of the Securities Act. Defendants Keppler, Even, and Johnson had the power and influence and exercised the same to cause Enviva to engage in the acts described herein.

240.    Defendants Keppler, Even, and Johnson, as CEO, CFO, and CAO, respectively, exercised control by virtue of their positions over Enviva.

241.    Defendants Keppler, Even, Johnson's positions made them privy to and provided

them with actual knowledge of the material facts concealed from Plaintiff and the Class.

242.    By virtue of the conduct alleged herein, Defendants Keppler, Even, and Johnson are liable as control persons for the violations of Section 11 by the persons they controlled, as alleged in Count I.

243.    None of the Defendants named in ¶239 above conducted a reasonable investigation or possessed a reasonable basis for the belief that the statements contained in the Registration Statement and identified in ¶¶184-185 above were true, were without omissions of material fact, and were not misleading.

244.    Each of the Defendants named in ¶239 above is liable to Plaintiff and the Class for damages suffered as a result of the Securities Act violations of the persons they controlled.

## COUNT III

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants Enviva, Keppler, Even, Jenkins, and Calloway)**

245.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

246.    This Count is asserted against Defendants Enviva, Keppler, Even, Jenkins, and Calloway and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

247.    During the Class Period, Defendants Enviva, Keppler, Even, Jenkins, and Calloway engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices,

schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Enviva common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Enviva common stock and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

248.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Enviva common stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Enviva's finances and business prospects.

249.    By virtue of their positions at Enviva, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

250.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Enviva, Defendants had knowledge of the details of Enviva's internal affairs.

251.    Defendants Enviva, Keppler, Even, Jenkins, and Calloway are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, Defendants Enviva, Keppler, Even, Jenkins, and Calloway were able to and did, directly or indirectly, control the content of the statements of Enviva.  As officers and/or directors of a publicly-held company, the Defendants Enviva, Keppler, Even, Jenkins, and Calloway had a duty to disseminate timely, accurate, and truthful information with respect to Enviva's business, operations, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Enviva common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Enviva's business and compliance policies which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Enviva common stock at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

252.    During the Class Period, Enviva common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Enviva common stock at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the

inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Enviva common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Enviva common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

253.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

254.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT IV**

**(Violations of Section 20(a) of the Exchange Act
Against Defendants Keppler, Even, Jenkins, and Calloway)**

255.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

256.    During the Class Period, Defendants Keppler, Even, Jenkins, and Calloway participated in the operation and management of Enviva, and conducted and participated, directly and indirectly, in the conduct of Enviva's business affairs.  Because of their senior positions, they knew the adverse non-public information about Enviva's misstatement of income and expenses and false financial statements.

257.    As officers and/or directors of a publicly owned company, Defendants Keppler,

Even, Jenkins, and Calloway had a duty to disseminate accurate and truthful information with respect to Enviva's compliance and results of operations, and to correct promptly any public statements issued by Enviva which had become materially false or misleading.

258.    Because of their positions of control and authority as senior officers, the Defendants Keppler, Even, Jenkins, and Calloway were able to, and did, control the contents of the various reports, press releases and public filings which Enviva disseminated in the marketplace during the Class Period concerning Enviva's results of operations.    Throughout the Class Period, the Defendants exercised their power and authority to cause Enviva to engage in the wrongful acts complained of herein. Defendants Keppler, Even, Jenkins, and Calloway, therefore, were "controlling persons" of Enviva within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Enviva common stock.

259.    Defendants Keppler, Even, Jenkins, and Calloway, therefore, acted as controlling persons of Enviva.  By reason of their senior management positions and/or being directors of Enviva, Defendants Keppler, Even, Jenkins, and Calloway had the power to direct the actions of, and exercised the same to cause, Enviva to engage in the unlawful acts and conduct complained of herein.  Defendants Keppler, Even, Jenkins, and Calloway exercised control over the general operations of Enviva and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

260.    By reason of the above conduct, Defendants Keppler, Even, Jenkins, and Calloway are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Enviva.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  April 3, 2023                               Respectfully submitted,

/s/ *Louis C. Ludwig*
Joshua B Silverman (Pro Hac Vice)
Louis C. Ludwig (Pro Hac Vice)
Genc Arifi (Pro Hac Vice)
Pomerantz LLP
10 South LaSalle Street, Ste. 3505
Chicago, Illinois 60603
(312) 377-1181 (Telephone)
(312) 229-8811 (Fax)
jbsilverman@pomlaw.com
lcludwig@pomlaw.com
garifi@pomlaw.com

Jeremy A. Lieberman (Pro Hac Vice)
J. Alexander Hood II (Pro Hac Vice)
Pomerantz LLP
600 3rd Ave.
New York, New York 10016
(212) 661-1100 (Telephone)
(212) 661-8665 (Fax)
jalieberman@pomlaw.com
ahood@pomlaw.com

*Lead Counsel*

Daniel S. Sommers (D. Md. Bar No. 15822)
**Cohen Milstein Sellers & Toll PLLC**
1100 New York Avenue N.W.
West Tower, Suite 500
Washington, DC 20005
(202) 408-4600 (Telephone)
(202) 408-4699 (Fax)
dsommers@cohenmilstein.com

*Liaison Attorneys for Lead Plaintiff*

Lesley F. Portnoy
**The Portnoy Law Firm**
1800 Century Park East Suite 600
Los Angeles, CA 90067
Phone: (310) 692-8883
lesley@portnoylaw.com

*Additional Counsel for Lead Plaintiff*