# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| **DAVID FAGEN**, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>**ENVIVA INC.,** et al.<br><br>Defendants. | **Case No. 8:22-cv-02844-DKC** |

## THE ENVIVA DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

**TABLE OF CONTENTS**

**Page**

I.      PRELIMINARY STATEMENT ........................................................................... 1

II.     INTRODUCTION AND SUMMARY OF ARGUMENT ..................................... 1

III.    FACTUAL BACKGROUND................................................................................ 4

    A.    The Defendants ......................................................................................... 4

    B.    Enviva's Business Model........................................................................... 5

    C.    The Blue Orca Report ............................................................................... 6

IV.     LEGAL STANDARD.......................................................................................... 7

V.      ARGUMENT ....................................................................................................... 8

    A.    Counts I and III must be dismissed because the Complaint fails to allege an
        actionably misleading statement. ............................................................... 8

        1.    Category A: Statements About Greenhouse Gas Emissions (Statements
               1–16). ........................................................................................... 9

        2.    Category B: Statements About Forest Growth (Statements 17–24). ................ 14

        3.    Category C: Statements About Enviva's Sources of Wood (Statements
               25–34). ......................................................................................... 16

        4.    Category D: Statements About Enviva's Commitment to Sustainability
               (Statements 35–47). ...................................................................... 19

        5.    Category E: Statements About Policies (Statements 48–50)............................ 21

        6.    Category F: SOX Certifications (Statement 51) ............................................... 24

    B.    Plaintiff fails to satisfy the PSLRA's high standards for pleading scienter............... 25

        1.    Plaintiff fails to plead scienter as to any Speaking Defendant.......................... 27

            a.    The Complaint does not plead particularized facts establishing that
                 Defendant Keppler made any statements with scienter. .......................... 27

            b.    The Complaint does not plead particularized facts establishing that
                 Defendant Calloway made any statements with scienter.......................... 29

            c.    The Complaint does not plead particularized facts establishing that
                 Defendant Jenkins made any statements with scienter. .......................... 30

            d.    The Complaint does not plead particularized facts establishing that
                 Defendant Even made any statements with scienter................................. 31

        2.    Plaintiff's suggestion that "wood pellet production was Enviva's core
               operation" does not suffice to plead scienter. ..................................................... 31

        3.    The Complaint's failure to assert any well-pled motivation to defraud
               further undermines Plaintiff's attempt to allege scienter. ................................. 32

        4.    The Complaint does not plead scienter as to Defendant Enviva. ...................... 32

C.    Count I must be dismissed because the Complaint fails to allege plausibly that Plaintiff bought shares pursuant or traceable to the offering at issue. ........................ 34

D.    Plaintiff's secondary liability claims fail as a matter of law. ..................................... 35

VI.    CONCLUSION ................................................................................................................... 35

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. StoneMor Partners, L.P.*,
  296 F. Supp. 3d 693 (E.D. Pa. 2017) ....................................................................... 25

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..................................................................................................... 7

*Belville v. Ford Motor Co.*,
  13 F. Supp. 3d 528 (S.D. W. Va. 2014) ..................................................................... 20

*Browning v. Amyris, Inc.*,
  2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) ........................................................... 32

*City of Roseville Emps. Ret. Sys. v. Horizon Lines, Inc.*,
  686 F. Supp. 2d 404 (D. Del. 2009) .......................................................................... 22

*Cozzarelli v. Inspire Pharm. Inc.*,
  549 F.3d 618 (4th Cir. 2008) ................................................................................. 7, 26

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ...................................................................................... 20

*Emps. Ret. Sys. of Haw. v. Whole Foods Mkt., Inc.*,
  905 F.3d 892 (5th Cir. 2018) ............................................................................... 20, 21

*Emps.' Ret. Sys. of the City of Baton Rouge v. Macrogenics, Inc.*,
  61 F.4th 369 (4th Cir. 2023) ................................................................................. 12, 35

*Fan v. StoneMor Partners LP*,
  927 F.3d 710 (3d Cir. 2019) ...................................................................................... 25

*Harrington v. Tetraphase Pharm. Inc.*,
  2017 WL 1946305 (D. Mass. May 9, 2017) ......................................................... 13, 14

*Hershewe v. JOYY Inc.*,
  2021 WL 6536670 (C.D. Cal. Nov. 5, 2021) ............................................................. 10

*Howard v. Arconic Inc.*,
  395 F. Supp. 3d 516 (W.D. Pa. 2019) ....................................................................... 21

*In re 2U, Inc. Sec. Class Action*,
  2021 WL 3418841 (D. Md. Aug. 5, 2021) ........................................................... 34, 35

*In re Acterna Corp. Sec. Litig.*,
  378 F. Supp. 2d 561 (D. Md. 2005) ............................................................... 26, 28, 30

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017) ....................................................................... 22

*In re BP p.l.c. Sec. Litig.*,
  852 F. Supp. 2d 767 (S.D. Tex. 2012) ....................................................................... 21

*In re Braskem S.A. Sec. Litig.*,
  246 F. Supp. 3d 731 (S.D.N.Y. 2017) ....................................................................... 22

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) ........................................................ 34, 35

*In re Constellation Energy Grp., Inc. Sec. Litig.*,
738 F. Supp. 2d 614 (D. Md. Aug. 13, 2010) ........................................ 21

*In re Criimi Mae, Inc. Sec. Litig.*,
94 F. Supp. 2d 652 (D. Md. 2000) ................................................ 27, 29

*In re Cryomedical Scis., Inc. Sec. Litig.*,
884 F. Supp. 1001 (D. Md. 1995) ........................................................ 25

*In re Genworth Fin. Inc. Sec. Litig.*,
103 F. Supp. 3d 759 (E.D. Va. 2015) .................................................... 8

*In re Hertz Glob. Holdings Inc.*,
905 F.3d 106 (3d Cir. 2018) .............................................................. 30

*In re Human Genome Sciences Inc. Sec. Litig.*,
933 F. Supp. 2d 751 (D. Md. 2013) ...................................................... 4

*In re Intelligroup Sec. Litig.*,
527 F. Supp. 2d 262 (D.N.J. 2007) ...................................................... 30

*In re InvenSense, Inc. Sec. Litig.*,
2017 WL 11673462 (N.D. Cal. Apr. 12, 2017) ...................................... 15

*In re Karyopharm Therapeutics Inc., Sec. Litig.*,
552 F. Supp. 3d 77 (D. Mass. 2021) ................................................ 2, 11

*In re LifeLock, Inc. Sec. Litig.*,
690 F. App'x 947 (9th Cir. 2017) ......................................................... 8

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
910 F. Supp. 2d 561 (S.D.N.Y. 2012) ................................................. 10

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
543 F. Supp. 3d 96 (D. Md. 2021), *aff'd sub nom. In re Marriott Int'l, Inc.*,
31 F.4th 898 (4th Cir. 2022) ............................................................. 20

*In re Novan, Inc.*,
2018 WL 6732990 (M.D.N.C. Nov. 30, 2018)......................................... 7

*In re Omnicare, Inc. Securities Litigation*,
769 F.3d 455 (6th Cir. 2014) ............................................................. 33

*In re PetroChina Co. Ltd. Sec. Litig.*,
120 F. Supp. 3d 340 (S.D.N.Y. 2015) ................................................. 22

*In re Rigel Pharm., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ............................................................. 11

*In re Sinclair Broad. Grp., Inc. Sec. Litig.*,
2020 WL 571724 (D. Md. Feb. 4, 2020) .............................................. 12

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
160 F. Supp. 2d 1059 (N.D. Cal. 2001).......................................... 10, 15

*In re Stone & Webster, Inc., Sec. Litig.*,
  253 F. Supp. 2d 102 (D. Mass. 2003) ........................................................ 20

*In re Triangle Cap. Corp. Sec. Litig.*,
  988 F.3d 743 (4th Cir. 2021) ..................................................................... 32

*In re Under Armour Sec. Litig.*,
  409 F. Supp. 3d 446 (D. Md. 2019) ............................................................. 8

*In re Vale S.A. Sec. Litig.*,
  2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) ............................................ 19

*In re Veon Ltd. Sec. Litig.*,
  2018 WL 4168958 (S.D.N.Y. Aug. 30, 2018) ............................................ 24

*Janies v. Cempra, Inc.*,
  816 F. App'x 747 (4th Cir. 2020) ......................................................... 25, 26

*KBC Asset Mgmt. NV f. DXC Tech. Co.*,
  19 F.4th 601 (4th Cir. 2021) ..................................................................... 31

*Klein v. PetroChina Co.*,
  644 F. App'x 13 (2d Cir. 2016) ................................................................. 22

*Kleinman v. Elan Corp.*,
  706 F.3d 145 (2d Cir. 2013) ..................................................................... 11

*Knurr v. Orbital ATK Inc.*,
  294 F. Supp. 3d 498 (E.D. Va. 2018) .................................................. 26, 33

*Lerner v. Northwest Biotherapeutics, Inc.*,
  273 F. Supp. 3d 573 (D. Md. 2017) ......................................... 2, 11, 15, 29

*Longman v. Food Lion*,
  197 F.3d 675 (4th Cir. 1999) ............................................................. 12, 19

*Lorusso v. Boulder Brands, Inc.*,
  2017 WL 4365180 (D. Colo. Mar. 1, 2017) .............................................. 25

*Maguire Fin., LP v. PowerSecure Int'l, Inc.*,
  876 F.3d 541 (4th Cir. 2017) ............................................................. 25, 26

*McDonald v. Kinder-Morgan, Inc.*,
  287 F.3d 992 (10th Cir. 2002) .................................................................. 16

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  135 S. Ct. 1318 (2015) ........................................................................ 13, 14

*Ottmann v. Hanger Orthopedic Grp., Inc.*,
  353 F.3d 338 (4th Cir. 2003) .................................................................... 32

*Phillips v. LCI Int'l, Inc.*,
  190 F.3d 609 (4th Cir. 1999) ............................................................. 12, 13

*Raab v. Gen. Physics Corp.*,
  4 F.3d 286 (4th Cir. 1993) ................................................................. 19, 20

*SAS Inst., Inc. v. World Programming Ltd.*,
   952 F.3d 513 (4th Cir. 2020) ........................................................................... 14

*Shah v. GenVec, Inc.*, 2013 WL 5348133, at *9 (D. Md. Sept. 20, 2013)............................ 5, 8, 10

*Sinnathurai v. Novavax, Inc.*,
   2022 WL 17585715 (D. Md. Dec. 12, 2022).......................................................... 19

*Slack Techs., LLC v. Pirani*, 2023 WL 3742580, at *6 (U.S. June 1, 2023) ............................... 34

*Smith v. Circuit City Stores, Inc.*,
   286 F. Supp. 2d 707 (E.D. Va. 2003) ................................................................... 29

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
   365 F.3d 353 (5th Cir. 2004) ................................................................... 26, 27, 33

*Teachers' Ret. Sys. of La. v. Hunter*,
   477 F.3d 162 (4th Cir. 2007) ..................................................................... 7, 26, 33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)........................................................................... 25, 26, 32, 34

*TransEnterix Inv'r Grp. v. TransEnterix, Inc.*,
   272 F. Supp. 3d 740 (E.D.N.C. 2017) ............................................................ 34, 35

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
   525 F.3d 370 (4th Cir. 2008) .................................................................................. 7

*Yates v. Municipal Mortg. & Equity, LLC*,
   744 F.3d 874 (4th Cir. 2014) ........................................................................ passim

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
   780 F.3d 597 (4th Cir. 2015) ............................................................................... 25

**Statutes**

15 U.S.C. § 77k............................................................................................. 8, 34, 35

15 U.S.C. § 78j(b) ........................................................................................ 8, 22, 32

15 U.S.C. § 78u–4(b)(1) ........................................................................................ 8

**Rules**

Fed. R. Civ. P. 12(b)(6)...................................................................................... 4, 8

Fed. R. Civ. P. 9(b) ........................................................................................... 3, 7, 9

**Regulations**

17 C.F.R. § 240.10b-5........................................................................................... 8

17 C.F.R. § 240.13a-14 ....................................................................................... 24

17 C.F.R. § 240.15d-14 ....................................................................................... 24

**Other Authorities**

MERRIAM-WEBSTER.COM DICTIONARY ......................................................................................... 17

## I.    PRELIMINARY STATEMENT

At the heart of this case is an ongoing public debate about the environmental benefits of using wood pellets—rather than fossil fuels—to generate heat and electricity.  The Enviva Defendants—along with numerous reputable scientists and academics—believe that replacing coal with wood pellets (1) provides customers around the world with a renewable fuel source that is better for the environment than fossil fuels and (2) creates a market for low-value wood, which promotes forest stewardship and growth by incentivizing landowners to maintain their land as forestland.  Plaintiff disagrees on both counts and concludes that the Enviva Defendants must therefore be violating the federal securities laws.  But a difference of scientific opinion is not securities fraud.  This case should be dismissed.

## II.    INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff in this action is a purported stockholder of Defendant Enviva Inc.  Enviva is a manufacturer of wood pellets for use by utilities in the generation of heat and electricity.  Part of the thesis behind Enviva's business model is that substituting wood pellets for fossil fuels leads to long-term environmental benefits.  Unlike fossil fuels, wood pellets are often referred to as carbon neutral because only the atmospheric carbon that was absorbed during the plant's growth (and which would otherwise be emitted when the trees decay) is emitted during combustion.  Moreover, woody biomass is a renewable resource—wood forests can be replanted or left to naturally regenerate, and the new trees will absorb additional greenhouse gases. Wood pellet manufacturers like Enviva enhance the economic incentives for replanting, regeneration, and forest growth by creating a market for low-quality wood that might otherwise go to waste.

For these and other reasons, Enviva believes that its business generates substantial long-term benefits for the environment and has publicly said as much.  Enviva is not alone in this position.  Dozens of highly credentialed academics and numerous scientific studies have publicly

1

touted the wood pellet industry's environmental benefits.  But not everyone agrees.  Throughout

Enviva's existence, a debate has taken place among scientists about the environmental impacts of

the wood pellet industry.  For example, before the proposed Class Period in this case even began,

the *New York Times* ran an article detailing the findings of a climate activist that argued that the

wood pellet industry provided no benefits to the environment, and instead imposed harm.

Plaintiff's contention that Enviva's position in this debate violates the federal securities

laws fails under well-settled law.  The securities laws regulate "falsehood[s]," not disagreements

"between two permissible judgments."  *Lerner v. Northwest Biotherapeutics, Inc.*, 273 F. Supp.

3d 573, 587 (D. Md. 2017).  "[S]cientific disagreement" is "non-actionable" under the federal

securities laws. *In re Karyopharm Therapeutics Inc., Sec. Litig.*, 552 F. Supp. 3d 77, 89 (D. Mass.

2021).  Yet that is exactly what Plaintiff alleges here.  Unlike the typical securities action, the

Complaint points to no undisclosed, firm-specific information contradicting the company's

statements.  Instead, Plaintiff argues, based on publicly available information, that Defendants

should have reached a different conclusion in the ongoing debate over the environmental benefits

of wood-pellet production.  That disagreement is not actionable under the federal securities laws.

While this disposes of the heart of the Complaint, Plaintiff also attempts to challenge four

other categories of statements.  But each such attempt also fails under well-settled law:

- *First*, the Complaint asserts that Enviva hid from investors that it procures "whole trees" for wood pellet production.  But, in fact, Enviva has routinely and repeatedly disclosed this to investors—including in the very documents the Complaint selectively edited to compile its challenged statements.  Plaintiff cannot conjure a securities fraud claim based on selective editing.

- *Second*, the Complaint targets several statements in which Enviva affirms its "commitment" to "sustainability."  As an initial matter, these statements are immaterial as a matter of law, as numerous courts have held in dismissing strikingly similar statements of corporate aspiration and commitment.  And, even if they were material, these statements would not be actionable because Plaintiff has not alleged that Enviva did not have these "commitments."  Rather, he has merely suggested

that Enviva did not live up to them, which does not suffice to render such statements misleading or untrue.

- *Third*, and similarly, Plaintiff challenges several statements identifying policies governing Enviva's operations.  But Plaintiff has not alleged that Enviva did not have these policies.  And even if he had sufficiently pleaded a violation of the policies—and he has not even done that—such an allegation does not render statements simply acknowledging the policy's existence false or misleading.

- *Finally*, Plaintiff challenges Enviva's statutorily required certifications of its financial statements under regulations promulgated under the Sarbanes-Oxley Act.  As an initial matter, these claims fail because SOX certifications are per se inactionable under the federal securities laws.  And, in any event, Plaintiff does not allege that Enviva's financial statements were materially inaccurate.

Plaintiff has thus failed to adequately allege a single actionably misleading statement.  Because all of Plaintiff's claims depend on the existence of such a misstatement, the Complaint should be dismissed in its entirety.

Separately, Counts I and II of the Complaint, Plaintiff's claims made under the Securities Act of 1933 (the "Securities Act"), also fail because Plaintiff does not have standing to bring them.  These claims concern alleged misrepresentations made in the Registration Statement for a secondary stock offering Enviva made in January 2022.  To survive a motion to dismiss on such claims, a complaint must plead facts sufficient to show that the plaintiff bought shares (i) in the secondary offering itself or (ii) whose chain of title can be traced back to the secondary offering.  Plaintiff does not meet this burden, requiring dismissal of Counts I and II on standing grounds.

Finally, Counts III and IV, Plaintiff's claims made under the Securities Exchange Act of 1934 (the "Exchange Act"), should also be dismissed because the Complaint fails to adequately allege scienter.  For such claims to survive dismissal, plaintiffs are required to allege with particularity—in accordance with the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA")—that Defendants (i) made materially false statements (ii) with intent to deceive investors.  Plaintiff fails to sufficiently allege either of these

3

elements.  As noted above, he fails to allege a single materially misleading statement.  And he almost entirely ignores his obligation to plead a "cogent and compelling" inference of scienter. Plaintiff does not allege that Defendants had any motive to defraud investors and he fails to allege any facts showing that the makers of the statements at issue were presented with information contradicting the statement at issue.  Instead, Plaintiff rests his scienter allegation on a bare contention that Defendants were "in a position" to know such facts—a contention which federal courts have repeatedly held does not suffice to plead scienter under the PSLRA.

In sum, Plaintiff has fallen far short of meeting the heightened pleading burdens faced by a plaintiff bringing claims under the federal securities laws.  The Complaint should be dismissed with prejudice under Rule 12(b)(6).

### III.    FACTUAL BACKGROUND

#### A.    The Defendants

Enviva Inc. ("Enviva") is a publicly traded Delaware corporation with its headquarters in Bethesda, Maryland.  *See* Amended Complaint (ECF No. 34) (the "Complaint") at ¶ 46.  Enviva's predecessor, Enviva Partners, LP ("EPLP") was formed on November 12, 2013 and became a publicly traded Delaware limited partnership through an initial public offering completed on May 4, 2015 (the "IPO").  *Id*.; Ex. 1 at 7 (A0009),[1] EPLP Form 10-K (March 8, 2016).[2]  EPLP converted to Enviva Inc. on December 31, 2021.  Ex. 2 at 23 (A0177), Enviva Form 10-K (March 4, 2022).

---

[1] References herein in the form of "Ex. __" are references to exhibits to the Declaration of Robert Ritchie, which is being filed contemporaneously herewith.  For ease of reference, citations in the form of "(A____)" refer the Court to the consecutively stamped page numbers in the bottom right of each page of such exhibits.

[2] On a motion to dismiss "[i]n a securities fraud action, the Court may also consider statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the Securities and Exchange Commission, analyst reports, documents upon which Plaintiffs relied in bringing suit, and matters of which the Court may take judicial notice." *In re Hum. Genome Scis. Inc. Sec. Litig.*, 933 F. Supp. 2d 751, 753 n.1 (D. Md. 2013).  In addition, "district courts in this circuit routinely take judicial notice of newspaper articles, analysts reports,

Defendant John K. Keppler ("Keppler") served as Enviva's Chairman and Chief Executive Officer from 2004 until November 2022. ¶ 23.[3] Defendant Shai S. Even ("Even") has served as Enviva's Executive Vice President and Chief Financial Officer since June 2018. ¶ 24; Ex. 2 at 93 (A0247). Defendant Jennifer Jenkins ("Jenkins") served as Enviva's Vice President and Chief Sustainability Officer from February 2016 through July 2021. ¶ 25. Defendant Jason E. Paral ("Paral") served as Vice President, Associate General Counsel, and Secretary at Enviva from January 2018 through March 2022 and has since become Enviva's Senior Vice President, General Counsel, and Secretary. ¶ 28. Defendant Michael A. Johnson ("Johnson") served as Vice President and Chief Accounting Officer at Enviva from June 2021 to May 2023. ¶ 27. Defendant Don Calloway ("Calloway") served as Vice President, Equity, Inclusion, and Impact at Enviva from July 2021 through December 2022 (Enviva, Keppler, Even, Johnson, Paral, Jenkins and Calloway are collectively referred to as the "Enviva Defendants"). ¶ 26.

## B.    Enviva's Business Model

Enviva owns and operates wood pellet production plants in Virginia, North Carolina, South Carolina, Georgia, Florida, and Mississippi, where it aggregates wood fiber and processes it into dry, densified, uniform wood pellets. *See* ¶¶ 46, 54–57, 96. After processing, Enviva sells the wood pellets primarily to heat and power producing customers in the UK, Europe, and Japan to be burned as fuel in place of coal. ¶¶ 50, 59.

The wood fiber used by Enviva in producing its pellets consists of "byproducts of the

---

and press releases in order to assess what the market knew at particular points in time, even where the materials were not specifically referenced in the complaint." *Shah v. GenVec, Inc.*, 2013 WL 5348133, at *1 n.1 (D. Md. Sept. 20, 2013) (citation and internal quotation marks omitted) (Chasanow, J.). Thus, the Court should consider each of the exhibits filed with this Motion, which consist of public documents filed with the SEC (Exs. 1–4, 13, 15–30) and other publications available to investors introduced for the purpose of indicating what information was available to investors at and following the time of their publication (Exs. 5–12, 14, 31–34).

[3] Citations in the format "¶ _" are citations to the specified paragraph of the Complaint.

5

sawmilling process or traditional timber harvesting, principally low-value wood materials, such as trees generally not suited for sawmilling or other manufactured forest products, tree tops and limbs, understory, brush, and slash that are generated in a harvest." ¶ 61. As Enviva explained prior to its IPO and frequently thereafter, the low-value wood used in its pellet production includes a wide variety of sources, including "(a) wood fiber that is unsuitable for or rejected by the sawmilling and lumber industries because of small size, defects (e.g. crooked, knotty, etc.), disease or pest-infestation," (b) "the parts of trees that cannot be processed into lumber" (i.e., tops and limbs), (c) commercial thinnings or "harvests that promote growth of higher value timber by removing weaker or deformed trees," and (d) "mill residuals consisting of chips, sawdust, or other wood industry by-products." ¶ 62. As these disclosures indicate, Enviva sometimes procures whole trees, including "low-grade" or "non-merchantable" trees that are "unsuitable for or rejected by the sawmilling and lumber industries because of small size, defects (e.g. crooked or knotty), disease or pest infestation," and "commercial thinnings: harvests that promote the growth of higher value timber by removing weaker or deformed trees to reduce competition for water, nutrients and sunlight." Ex. 3 at 10 (A0302), EPLP Form 10-K (March 4, 2019).

Under Enviva's Global Responsible Sourcing Policy, "[t]he primary wood [Enviva] purchase[s] must be sourced from sustainably-managed forests and harvesting operations." ¶ 91. Enviva requires all of its suppliers to commit, as a condition to Enviva's fiber purchase agreements, that the landowner will replant or allow regeneration of the forest following any harvests in which Enviva participates. ¶¶ 92, 168. Enviva sources much of the wood it uses from forestlands that are certified as sustainably managed by the American Tree Farm System. Ex. 4 at 6 (A0443), Exhibit 99.1 to EPLP Form 8-K (February 20, 2019).

### C.    The Blue Orca Report

On October 12, 2022, during pre-market hours, Blue Orca Capital ("Blue Orca"), a short-

seller who was financially motivated to cause Enviva's stock price to decline, published a report in which it attacked the sustainability of Enviva's business model (the "Blue Orca Report") and accused Enviva of "greenwashing its wood procurement." ¶ 8.  Enviva responded later that day, noting the report contained numerous errors and mischaracterizations and explaining that, contrary to Blue Orca's allegations, "the forest inventory of standing timber in [Enviva's] catchment area has increased by 21% since [it] began operations." Ex. 5 at 1–2 (A0458–59), Enviva Press Release (published October 12, 2022).  This lawsuit quickly followed, copying Blue Orca's allegations and accusing the Enviva Defendants of violating federal securities laws.

## IV.    LEGAL STANDARD

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Because Plaintiff's allegations sound in fraud,[4] each alleged misrepresentation must also meet the heightened pleading standards of Rule 9(b), which requires plaintiffs to lay out with particularity "the who, what, when, where and how" of his allegations.  *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (citation omitted).  Plaintiff's Exchange Act claims are also subject to the heightened pleading standard of the PSLRA, which requires plaintiffs to explicitly and precisely set out why each challenged statement was false or misleading and why the speaker knew the statement was misleading.  *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 172 (4th Cir. 2007).

These heightened pleading requirements "are an unusual deviation from the usually lenient

---

[4] Because Plaintiff's Securities Act and Exchange Act claims are premised on the same alleged misconduct, his Securities Act claims sound in fraud and Rule 9(b) applies to them.  *See In re Novan, Inc.*, 2018 WL 6732990, at *15 (M.D.N.C. Nov. 30, 2018).  The Complaint includes a boilerplate disavowal of an intent to plead fraud with respect to the Securities Act claims.  ¶ 227.  "However, a conclusory disclaimer cannot alter the substance of plaintiffs' allegations, which sound in fraud." *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 629 (4th Cir. 2008).

requirements of federal rules pleading." *In re LifeLock, Inc. Sec. Litig.*, 690 F. App'x 947, 949 (9th Cir. 2017) (citation omitted). "The various requirements are not satisfied merely by making a complaint long." *Id.* Rather, to survive a motion to dismiss, a complaint must be able to withstand an exacting "statement-by-statement analysis" of objective falsity[5] and, for the Exchange Act claims, must plead detailed facts raising a "cogent and compelling" inference that the defendants made the statements with intent to defraud investors.[6] Doing so imposes "no small burden" on securities plaintiffs. *Under Armour*, 409 F. Supp. 3d at 458.

Plaintiff has not satisfied this heavy burden here. Accordingly, the Complaint should be dismissed under Rule 12(b)(6) for failure to state a claim.

## V.  ARGUMENT

**A.  Counts I and III must be dismissed because the Complaint fails to allege an actionably misleading statement.**

Counts I and III of the Complaint purport to state claims for violations of Section 11 of the Securities Act and Section 10(b) of the Exchange Act. In order to state either a Section 11 or a Section 10(b) claim, a plaintiff must identify an "untrue statement of a material fact" or a statement rendered materially misleading by the omission of a material fact. 17 C.F.R. § 240.10b-5; 15 U.S.C. § 77k. Here, Counts I and III should be dismissed because Plaintiff has not sufficiently alleged a single actionably misleading statement. *See* 15 U.S.C. § 78u–4(b)(1); *Cozzarelli*, 549 F.3d at 624 (in a securities action, a plaintiff faces "strict requirements for pleading falsity with specificity"); *Shah*, 2013 WL 5348133, at *9 (to survive a motion to dismiss in a securities action, "particularity of pleading is required" with respect to "the manner in which the statements are false").[7]

---

[5] *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 771 (E.D. Va. 2015).

[6] *In re Under Armour Sec. Litig.*, 409 F. Supp. 3d 446, 458 (D. Md. 2019).

[7] Because Plaintiff's claims depend on a statement-by-statement analysis, Defendants have created

1. **Category A: Statements About Greenhouse Gas Emissions (Statements 1–16).**

The first category of challenged statements, which Defendants have grouped into "Category A" in Appendix A, are those in which Enviva states its position that the use of wood pellets, as opposed to coal, "lower[s] the lifecycle greenhouse gas emissions profile of utilities" and, by doing so, contributes "to the fight against climate change."[8] Plaintiff has failed to plead that the statements in Category A are actionable for three primary reasons.

*First*, the Complaint's allegation of falsity is entirely conclusory. The Complaint simply asserts, without factual support, that "Enviva's practices did not lower carbon emissions, and in fact involved higher greenhouse gas emissions than coal, and did not in any way mitigate climate change."[9] This does not suffice under the PSLRA or Rule 9(b). Rather, "[w]hen alleging that

---

Appendix A, which numbers each allegedly misleading statement and organizes the statements into various categories. References herein to "Statement _" are references to the statements as numbered in Appendix A. To the extent a statement could fall into more than one category, it fails for the reasons provided below as to each applicable category.

[8] ¶ 117 (Statement 2). ¶ 152 (Statement 9). The other statements in Category A express the same sentiment in varying formulations. *See* ¶¶ 109 (Statement 1) ("biomass is an important part of delivering a low-carbon future"); 119 (Statement 3) ("Enviva's wood pellets directly displace coal in power generation and heating applications and lower the lifecycle greenhouse gas emissions profile of utilities"); 123 (Statement 4) (noting Enviva's "ability to reduce life cycle greenhouse gas emissions"); 130 (Statement 5) (noting the "critical role [Enviva] play[s] in delivering a sustainable solution to our customers' efforts to mitigate climate change"); 138 (Statement 6) (noting that the company's growth had been driven by the "global commitment" to "cut greenhouse gas emissions"); 148 (Statement 8) ("Enviva is leading an industry that plays an increasingly critical role in the global fight against climate change."); 154 (Statement 10) ("Enviva's leading an industry that plays an increasingly critical role in the global fight against climate change."); 159 (Statement 11) (Enviva "enable[s] customers to reduce their carbon emissions by more than 85% on a lifecycle basis"); 161 (Statement 12) ("[T]he product we manufacture helps reduce the lifecycle GHG emissions of our customers."); 164 (Statement 13) (noting "substantial GHG reductions" from wood pellets); 178 (Statement 14) ("Our renewable products help our customers meet their net-zero targets."); 188 (Statement 15) ("We are incredibly privileged to have the opportunity to continue to build a company and a unique platform that delivers real climate change benefits."); 193 (Statement 16) ("[T]here's no real doubt here that wood pellets and frankly, woody biomass, are a far superior climate change mitigation option than fossil fuels, particularly coal").

[9] ¶ 118; *see also* ¶¶ 120, 124, 131, 133, 137, 141, 143, 149, 151, 153, 155, 160, 162, 165, 179, 195

particular statements were *false* or *misleading*, the complaint must make 'specific references to specific facts' as the basis for the falsity allegation." *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1072 (N.D. Cal. 2001) (citation omitted); *see also Shah*, 2013 WL 5348133, at *9, *11 (similar). The Complaint's falsity section does not even attempt to meet this burden.

Nor is the Complaint's quotation—found in a separate section—of the Blue Orca Report's statement that "***burning*** wood emits more CO2 per unit of heat generated than any major energy source (including coal)" sufficient to meet Plaintiff's burden.[10] This is because the quotation does nothing to contradict the statements in Category A. The Category A statements concern "***lifecycle***" greenhouse gas emissions—i.e. the ***net*** emissions of biomass over the whole lifecycle of wood pellets used to generate electricity, taking into account the carbon sequestration effect of forests during periods of growth.[11] By contrast, the Blue Orca quotation solely discusses the narrow issue of emissions at the point of "burning." This has no bearing on the broader statements in Category A and was well known to Enviva investors in any event. As Enviva disclosed, "[o]f course, the combustion of forest biomass releases carbon dioxide emissions, even surpassing those of coal on an emissions per unit of energy basis in some cases. But again, what is climate-relevant is whether the atmosphere is experiencing a ***net*** increase in GHG emissions."[12] Accordingly, the quotation

---

(similar).

[10] ¶ 200 (emphasis added). The insufficiency of the allegation is further demonstrated by its complete reliance on an unsupported excerpt from a report that was issued by a short seller with "an obvious motive to exaggerate the infirmities of the securities in which they speculate" and which bears no "indica of reliability." *Hershewe v. JOYY Inc.*, 2021 WL 6536670 at *4–6 (C.D. Cal. Nov. 5, 2021) (rejecting use of short seller report to establish falsity); *see also In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 577 (S.D.N.Y. 2012) (short seller's allegations did not provide basis for adequate pleading of scienter).

[11] *See* Ex. 6, Measuring the Environmental Impact of Wood Pellet Electricity: A Case Study of Enviva at 12–13 (A0474–75), *available at* https://tinyurl.com/3smsb74h (explaining calculation that burning biomass emits far less lifecycle greenhouse gas emissions).

[12] *See* Ex. 7, Seeing the Forest: Sustainable Wood Bioenergy in the Southeast United States at 9 (A0500) (emphasis added), *available at* https://tinyurl.com/28ut6h8r.

in the Blue Orca Report only confirmed what Enviva had already disclosed, and certainly does not contradict any of the Category A statements.

*Second*, to allege falsity under the federal securities laws, a complaint must plead facts sufficient to demonstrate that the challenged statement's alleged shortcomings "are not merely 'the difference between two permissible judgments.'" *Lerner*, 273 F. Supp. 3d at 587 (quoting *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012)). Here, Plaintiff has not met this burden. Nor could he, given the detailed support Enviva has provided to investors for the Category A statements. For example, Enviva's 2021 Sustainability Report, which the Complaint incorporates by reference, includes an appendix listing academic and scientific literature supporting Enviva's position that use of forest biomass for energy production reduces lifecycle greenhouse gas as compared to fossil fuels.[13] In one of the cited (and linked) articles, dozens of highly credentialed academics signed a statement asserting that "[f]orest biomass energy yields significant net decreases in overall carbon accumulation in the atmosphere over time compared to fossil fuels"[14]—precisely the position espoused by the Category A statements.

Plaintiff may have a different view. But even if the Complaint had cited studies supporting such a position—and it did not—the law is clear that a "scientific disagreement" is "non-actionable" under the federal securities laws. *Karyopharm*, 552 F. Supp. 3d at 89 ("Although the FDA interpreted the RWD study results differently (adjusting for alleged methodological errors) and defendants' view of the data may have been erroneous, those facts alone do not render their opinions actionable."); *see also Kleinman v. Elan Corp.*, 706 F.3d 145, 154 (2d Cir. 2013)

---

[13] *See* Ex. 8, Enviva 2021 Corporate Sustainability Report at 63 (A0587) (*available at* https://tinyurl.com/4bw4fsdy).

[14] *See* Ex. 9, Attestation by leading scientists and academics at 1 (A0590) (*available at* https://tinyurl.com/bdz2ny9k).

("[W]here a defendant's competing analysis or interpretation of data is itself reasonable, there is no false statement."). Rather, as the Fourth Circuit found in an analogous context earlier this year, "Plaintiff['s] negative interpretation . . . is merely a difference of opinion, which is insufficient to establish a securities law violation." *Emps.' Ret. Sys. of the City of Baton Rouge v. Macrogenics, Inc.*, 61 F.4th 369, 387 (4th Cir. 2023).

*Third*, "allegedly fraudulent corporate statements must be examined in context and in light of the 'total mix' of information made available to investors." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 615 (4th Cir. 1999). Thus, in evaluating a securities fraud complaint, a court must examine "the other information that was publicly available to reasonable investors at the time" the statements were made. *Id.* at 617. Indeed, "even lies"—let alone scientific opinions like those at issue here—"are not actionable when an investor possesses information sufficient to call the misrepresentation into question." *Id.* (cleaned up); *see also Longman v. Food Lion*, 197 F.3d 675, 684 (4th Cir. 1999) ("rosy statements" about employee relations not actionable where union's competing claims were publicly available to investors); *In re Sinclair Broad. Grp., Inc. Sec. Litig.*, 2020 WL 571724, at *10 (D. Md. Feb. 4, 2020) (potentially misleading statement that transaction was with an "unrelated party" was inactionable where "the details of [that party's] relationship [to the defendants] . . . were already in the public domain").

This too is fatal to Plaintiff's challenge to the statements in Category A because, throughout the Class Period, it was well known to the investing public that not everyone agreed that replacing coal with biomass had a beneficial long-term effect on environmental greenhouse gases. As noted above, dozens of highly credentialed academics agreed with Enviva's position that doing so was beneficial.[15] But, as the *Wall Street Journal* and the *New York Times* reported before and during

---

[15] *See supra* n.14.

the proposed Class Period, others disagreed.[16]   Indeed, Enviva itself disclosed to investors that

debate existed as to the environmental impact of replacing coal with biomass.[17]   Investors were

thus positioned to evaluate this debate and draw their own conclusions.   Enviva's taking of a

position in this public debate would not "significantly alter[] the total mix of information"

available to the market and is, accordingly, not actionable under the federal securities laws.

*Phillips*, 190 F.3d at 619–20.

*Finally*, Enviva's opinion about the environmental benefits of replacing coal with wood

pellets is just that—an opinion, albeit a well-supported one.  *See, e.g.*, *Harrington v. Tetraphase*

*Pharm. Inc.*, 2017 WL 1946305, at \*5 (D. Mass. May 9, 2017) ("courts have been clear that

scientific opinions are just that: opinions").  As the Supreme Court has recognized, "[r]easonable

investors do not understand [opinion] statements as guarantees, and [the federal securities laws]

therefore do[] not treat them that way."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus.*

*Pension Fund*, 135 S. Ct. 1318, 1328 (2015).  Instead, to allege that an opinion statement was

materially misleading, a plaintiff must—at a minimum—identify "particular (and material) facts"

---

[16] *See* Ex. 10, Charlie McGee, *Wood Pellets Draw Fire as Alternative to Coal*, WALL ST. J., Aug. 7, 2019 at 1 (A0603), *available at* https://tinyurl.com/2p8w23h8 (last visited May 4, 2023) ("A lawsuit says European policy on using pellets will increase greenhouse-gas emissions"); Ex. 11, Andrew C. Revkin, *Flawed Carbon Accounting Drives Boom in Burning U.S. Forests in E.U. Power Plants*, N.Y. TIMES, Oct. 22, 2015 at 2 (A0609) ("The assumption [that greenhouse gas released by burning wood pellets will be reabsorbed by trees that grow to replace them] is convenient, but wrong. Climate science has been rejecting it for more than 20 years."), *available at* https://tinyurl.com/bde6py52 (last visited May 4, 2023); Ex. 12, John Upton, *Pulp Fiction: The European Accounting Error That's Warming the Planet*, CLIMATE CENTRAL, Oct. 20, 2015 at 1 (A0617), *available at* https://tinyurl.com/58w7krz2 ("Burning trees as fuel in power plants is heating the atmosphere more quickly than coal.").

[17] *See* Ex. 13, EPLP Form 10-K (February 25, 2021) at 19–20 (A0664-65) ("Biomass has been under additional regulatory scrutiny in recent years to develop standards to safeguard against adverse environmental effects from its use. Although regulators continue to consider biomass harvested with certain practices to be sustainable, certain special interest groups that focus on environmental issues have expressed their opposition to the use of biomass . . . [and] have encouraged the EU not to classify the use of forest-related biomass as sustainable.")

that were not disclosed and "that cannot be squared" with the statement of opinion (the "*Omnicare* standard"). *Id.* at 1330, 1332. "That is no small task for an investor." *See id.* at 1332.

The Complaint falls short of accomplishing this difficult task. Instead, as noted above, the Complaint relies wholly on a conclusory assertion that Enviva's opinion is incorrect—without identifying any facts that "cannot be squared" with the opinion. *Id.* The statements in Category A are thus inactionable. *See Harrington*, 2017 WL 1946305, at *5 (opinion statements about the efficacy of a drug inactionable where "various scientific opinions both parties offer . . . show that there was disagreement in the scientific community" on the subject).

### 2. Category B: Statements About Forest Growth (Statements 17–24).

The challenged statements Defendants have grouped into "Category B" concern Enviva's impact on forest growth. The Complaint fails to allege falsity as to these statements for reasons similar to the deficiencies relating to the statements in Category A.

First, Statements 17–21 state Enviva's position that "forest inventory growth and therefore increases in carbon stocks result from the market incentives created by a healthy forest products industry, of which our company is an integral part."[18] But these statements simply reflect the commonsense economic principle that "[p]eople, and companies, respond to incentives." *SAS Inst., Inc. v. World Programming Ltd.*, 952 F.3d 513, 526 (4th Cir. 2020). As the Complaint points out, "the majority of forests in the Southeastern U.S. are privately owned." ¶ 90. Manufacturers of wood pellets—like Enviva—increase the demand for the wood produced by such forests

---

[18] ¶ 116 (Statement 18); *see also* ¶¶ 115 (Statement 17) ("[O]ur sponsor continues to work with our local partners to conserve forest land and support forest growth."); 121 (Statement 19) ("robust forest markets such as ours are the key to healthy forests"); 127 (Statement 20) ("Enviva and our sponsor's activities contribute to a robust market for forest products, which in turn contributed to the nearly 20 percent increase in forest inventory in our sourcing regions since 2008."); 132 (Statement 21) ("'By creating a market for low-value wood, one renewable energy company is helping landowners maintain their forests.'").

14

(including wood that might otherwise have gone unsold), thereby increasing the economic incentives for the private owners of such forests to increase their stocks.

Plaintiff's disagreement with this commonsense notion does not suffice to allege falsity under the PSLRA and Rule 9(b). As discussed above, to allege falsity, Plaintiff was required to plead facts sufficient to demonstrate that these statements' alleged shortcomings were "not merely 'the difference between two permissible judgments, but rather the result of a falsehood.'" *Lerner*, 273 F. Supp. 3d at 587. The Complaint does not attempt to do so here. Nor could it have, as the position espoused by Enviva is consistent not only with economic common sense, but with the stated opinion of dozens of academics in forest science.[19] Instead, Plaintiff's attempt to allege these statements were false relies on a conclusory assertion: that Enviva's "procurement practices undermined rather than sustained forests."[20] This threadbare statement falls far short of Plaintiff's burden to "make 'specific references to specific facts' as the basis for the falsity allegation." *Splash Tech. Holdings*, 160 F. Supp. 2d at 1072. Statements 17–21 are thus not actionable.[21]

The remaining statements in Category B state that Enviva would "continue to ensure that our wood pellets remain sustainably produced from forests whose inventories have and continue

---

[19] *See* Ex. 9 at 2 (A0591) (stating the opinion of numerous academics that "[r]esearch demonstrates that demand for wood helps keep land in forest and incentivizes investments in new and more productive forests, all of which have significant carbon benefits").

[20] ¶¶ 118, 122, 128, 133, 167, 171, 177. It is also unclear what Plaintiff means by its allegation that Enviva's procurement practices "undermined" forests.

[21] The Complaint's conclusory assertions that Enviva's procurement practices "denatured forests, stripping them of hardwood and replacing, if at all, with low-value softwood saplings," ¶¶ 118, 120, 122, 124, 128, and "did not lower carbon emissions, and in fact involved higher greenhouse gas emissions than coal," ¶¶ 118, 133, 177, also do not help Plaintiff because they do not undermine Statements 17–21. *See In re InvenSense, Inc. Sec. Litig.*, 2017 WL 11673462, at *3 (N.D. Cal. Apr. 12, 2017) (dismissing claims where "there is a mismatch between the statement[s] identified as false and misleading on the one hand, and the reasons why plaintiff says the statement was false or misleading on the other").

to grow over time."[22]  But the Complaint nowhere alleges facts showing that Enviva's suppliers would not grow their inventory over time.  Instead, Plaintiff alleges that—though forest inventories overall were increasing—inventories of a specific sort of tree, namely "hardwood trees," were not. ¶ 102.  But, even if this were so, it would not undermine these statements, because the statements make no representation about the growth of "hardwood trees" or "forest biodiversity," but instead discuss the overall inventories of these forests.[23]  Accordingly, Plaintiff has failed to allege that these statements are actionably misleading.  *See McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998–99 (10th Cir. 2002) (affirming dismissal because alleged omission "d[id] not alter the accuracy of the information actually disclosed").

### 3. Category C: Statements About Enviva's Sources of Wood (Statements 25–34).

The statements grouped into Category C state that Enviva purchases "low-grade" "wood that might [otherwise] have gone to waste," as opposed to "traditional sawtimber."[24]  Plaintiff contends that these statements were false because "Enviva sourced whole trees."[25]

This is a strawman argument based on disingenuous, selective quotations that omit Enviva's actual statements about its wood sources.  Enviva has never said that it never uses whole trees—and the Complaint does not identify a single statement stating as such.[26]  To the contrary,

---

[22] ¶ 170 (Statement 23); *see also* ¶¶ 176 (Statement 24) (same), 166 (Statement 22) (Enviva purchases from "sustainably managed forests where the land will be reforested").

[23] Indeed, Statements 25 and 41 specifically discuss Enviva's efforts to restore pine forests.

[24] ¶¶ 125 (Statement 25), 129 (Statement 26); *see also* ¶¶ 142 (Statement 27) ("Good biomass is made from low-value wood…."); 144 (Statement 28) ("Low-value wood is a byproduct of traditional timber harvests"); 156 (Statement 29) ("Want to learn how we . . . us[e] [] low-value wood?"); 174 (Statement 30) ("Enviva only uses the remaining low-value wood in its operations"); 180 (Statement 31) ("[L]ow-value wood [is] the wood Enviva uses to produce our sustainable biomass…"); 192 (Statement 33) ("Every piece of fiber that's taken into our program is low value wood."); 196 (Statement 34) ("All of the wood we procure, regardless of its form, is low-value wood.").

[25] ¶ 133; *see also* ¶¶ 131, 143, 145, 157, 175, 181, 195, 197 (similar).

[26] The closest the Complaint comes to doing so is in Statement 32 (¶ 191), where it states that

16

Enviva has routinely and repeatedly told its investors that it does use whole trees in certain circumstances. Indeed, in compiling purported "misstatements," Plaintiff resorted to ellipses to conceal Enviva's disclosure that it procures whole trees that are "diseased and crooked" and thus not the target of "a traditional sawtimber harvest."[27] And elsewhere, Enviva confirms that it procures "*trees* generally not suited for sawmilling."[28]

Rather than denying use of "whole trees," the statements at issue (1) deny Enviva's use of "traditional sawtimber" and (2) affirm its use of "low-value wood."[29] But sawtimber is not synonymous with whole trees (and the Complaint does not define this term). Rather, sawtimber is a subset of whole trees: "timber suitable for sawing into lumber."[30] There are a number of reasons why whole trees may not be suitable for sawing into lumber. Similarly, the Complaint itself confirms that "Enviva defines 'low-value wood'" to include "weaker or deformed *trees*" and any other "wood fiber that is unsuitable for or rejected by the sawmilling and lumber industries because of small size, defects (e.g. crooked, knotty, etc.), disease or pest-infestation."[31]

---

Defendant Calloway "insist[ed] that the company . . . uses 'tops' and 'limbs'" as opposed to "trunks." ¶ 191. But the article to which this paragraph cites indicates that Mr. Calloway was discussing specific stacks of wood at a specific location. He was not stating that Enviva never uses whole trees in any capacity. *See* Ex. 14 (CBS News Article) at 2 (A0912) ("CBS News' drone captured what foresters say appeared to be entire trunks of pine trees . . . . Calloway denied they were tree trunks, insisting they were tree tops and limbs."), *available at* https://tinyurl.com/3xtptfdz. In fact, the very next sentence of the article acknowledges that "the company's own public disclosures" disclose Enviva's use of "trunks" in some instances. *Id.*

[27] *Compare* ¶ 196 *with* Ex. 15, Enviva Form 8-K (May 4, 2022) at 7 (A0924) (discussing Enviva's use of "diseased or crooked trunks and trees[] that are byproducts of a traditional sawtimber harvest").

[28] ¶¶ 61 (emphasis added), 63, 156 (linked video available here: https://www.youtube.com/watch?v=2ZU6M2ovyL0), 180, n.8; *see also infra*.

[29] *See* ¶ 129.

[30] *Sawtimber*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/sawtimber (accessed 5/5/2023). Plaintiff cannot allege that Enviva procures "timber suitable for sawing into lumber" for use in manufacturing wood pellets.

[31] ¶ 62 (emphasis added).

17

Accordingly, statements that Enviva uses "low-value wood" are not rendered false or misleading by Enviva's alleged procurement of "whole trees."

Enviva has made it clear to investors throughout the Class Period that it uses whole trees. For instance, Enviva informed investors in its preliminary prospectus for the IPO as well as in every Form 10-K it has filed since, and numerous other public filings, that its "procured wood fiber consists of . . . *trees* . . . that are unsuitable for or rejected by the sawmilling and lumber industries[.]"[32] In 2019, Enviva published on its website a report stating "[w]e're the only industry in the bunch that can take almost anything . . . . *Sometimes this takes the form of whole trees*, or roundwood . . . ."[33] And it published on its website a July 2020 white paper stating "Enviva acknowledges it *does* use trees *in their intact form*."[34] Accordingly, Plaintiff's contentions about Enviva's use of "whole trees" do nothing to advance his claims.[35]

---

[32] Ex. 3 at 10 (A0302) (emphasis added); *see also, e.g.*, Ex. 1 at 14 (A0016) (similar); Ex. 2 at 4 (A0158) (similar); Ex. 13 at 7 (A0652) (similar); Ex. 15 at 7 (A0924) (similar); Ex. 16 at 136 (A1083), EPLP Form 424B4 (April 29, 2015) (similar); Ex. 17 at 15 (A1320), EPLP Form 10-K (February 28, 2017) (similar); Ex. 18 at 13–14 (A1542–43), EPLP Form 10-K (February 22, 2018) (similar); Ex. 19 at 7 (A1744), EPLP Form 10-K (February 25, 2020) (similar); Ex. 20 at 4 (A2008), Enviva Form 10-K (March 1, 2023) (similar); Ex. 21 at 24 (A2192), EPLP Form 10-Q (Apr. 29, 2020) (similar); Ex. 22  at 25 (A2236), EPLP Form 10-Q (Aug. 6, 2020) (similar); Ex. 23 at 31 (A2307), EPLP Form 10-Q (Nov. 5, 2020) (similar); Ex. 24 at 22 (A2356), EPLP Form 10-Q (Apr. 29, 2021) (similar); Ex. 25 at 23 (A2398), EPLP Form 10-Q (July 29, 2021) (similar); Ex. 26 at 27 (A2447), EPLP Form 10-Q (Nov. 4, 2021) (similar); Ex. 27 at 21 (A2492), Enviva Form 10-Q (May 5, 2022) (similar); Ex. 28 at 23 (A2531), Enviva Form 10-Q (Aug. 4, 2022) (similar); Ex. 29 at 23 (A2612), Enviva Form 10-Q (Nov. 3, 2022) (similar); Ex. 30 at Ex. 99.1 (A2642–43), Enviva Form 8-K (Oct. 24, 2022) (explaining that Enviva uses low-value whole trees that are felled, damaged, or left in a leaning position by extreme weather events).

[33] Ex. 31 (A2648), Jen Jenkins, *Sustainably sourced biomass is a key player in the global energy transition*, ENVIVABIOMASS.COM, June 28, 2019, *available at* https://tinyurl.com/3s77dbdy ("We're the only industry in the bunch that can take almost anything . . . . *Sometimes this takes the form of whole trees*, or roundwood, and sometimes it's tops and branches.") (emphasis added).

[34] Ex. 6 at 10 (A0472).

[35] As the Memorandum of Law in Support of the Underwriter Defendants' Motion to Dismiss (the "Underwriter's Brief") explains, Statement 30's reference to the average volume of a harvest obtained by Enviva fails because Plaintiff pleads nothing inconsistent with this figure and because its failed attempt to do so is based on public information.  *See* Underwriter's Brief at 17–19.

18

     **4.**       **Category D: Statements About Enviva's Commitment to Sustainability (Statements 35–47).**

Next, the Complaint puts at issue various statements about Enviva's "commitment" to sustainability and acknowledgments that sustainability is "the foundation" of Enviva's business, is "core to [Enviva's] value proposition," and is a "priority" and "purpose" of the company.[36] These statements are inactionable, as they are both immaterial puffery and have not adequately been alleged to be false.

As to materiality, courts routinely find that "vague statements" and "generalizations" not capable of objective verification are immaterial as a matter of law because "[a]nalysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen." *Food Lion*, 197 F.3d at 685; *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993). Statements like those in Category D about what a company is "'seeking' to do, what it is 'committed' to doing, what it is 'focused on,' what it is 'aiming' to do, and what its 'priorities' are" are "precisely the type of 'puffery'" that federal courts have "consistently held to be inactionable" and immaterial. *In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, at \*22 (S.D.N.Y. Mar. 23, 2017).[37]

---

[36] *See* ¶¶ 136 (Statement 41) (describing Enviva's "commitment to sustainable practices of wood sourcing, transparency, and forest conservation" and "mission to displace coal, grow more trees, and fight climate change, our current environmental impact and sustainability practices, and our goals for continuous improvement in sustainability of our business in the long-term"), 105 (Statement 35) (similar), 112 (Statement 38) (similar), 119 (Statement 39) (similar), 123 (Statement 40) (similar), 139 (Statement 42) (similar), 150 (Statement 44) (similar), 198 (Statement 47) (similar), 176 (Statement 46) ("Sustainability is at the core of our value proposition, and our net zero advancements only make the product we manufacture that much more valuable in our effort to displace coal, grow more trees, and fight climate change."), 107 (Statement 36) (similar), 174 (Statement 45) (similar), 108 (Statement 37) ("Keppler stated that Enviva's "[p]rograms . . . [including] our industry-leading track and trace system, tangibly and transparently illustrate our innovation on and commitment to sustainability . . . ."), 146 (Statement 43) ("The Partnership and its sponsor continue to prioritize efforts to safeguard and enhance the sustainability of wood pellet production in the United States.").

[37] *See also Sinnathurai v. Novavax, Inc.*, 2022 WL 17585715, at \*18 (D. Md. Dec. 12, 2022) ("The

19

For example in *Emps. Ret. Sys. of Haw. v. Whole Foods Mkt., Inc.*, a stockholder challenged "various proclamations . . . suggesting that Whole Foods holds itself to high standards for transparency, quality, and corporate responsibility."  905 F.3d 892, 897 (5th Cir. 2018).[38]  The Fifth Circuit affirmed dismissal, holding that such statements "are the sort of puffery that a reasonable investor would not rely on."  *Id.* at 902; *see id.* at 901 (citing *Raab*, 4 F.3d at 290).

In doing so, the Fifth Circuit followed the Second Circuit's opinion in *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009).  There, the plaintiffs alleged that a bank had made false statements touting its reputation.  *JP Morgan Chase*, 553 F.3d at 205-06.  The plaintiffs argued that the statements were material because "the significance of a bank's reputation is undeniable."  *Id.* at 206.  The court agreed as a general matter with the importance of the bank's reputation, but explained that the "[p]laintiffs [had] conflate[d] the importance of a bank's reputation for integrity with the materiality of a bank's statements regarding its reputation."  *Id.*  "That is, although a reasonable investor would certainly consider the bank's integrity to be relevant to its investment decision, a reasonable investor would not take

---

Fourth Circuit has found that vague statements about the defendant's priorities and other non-factual boasting statements constitute puffery.") (collecting cases); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d 96, 135 (D. Md. 2021), *aff'd sub nom. In re Marriott Int'l, Inc.*, 31 F.4th 898 (4th Cir. 2022) (statements regarding commitment to, and importance of, safeguarding customer data were inactionable puffery) (collecting cases); *Belville v. Ford Motor Co.*, 13 F. Supp. 3d 528, 544 (S.D. W. Va. 2014) (statement that Ford was "underscoring its commitment to safety leadership" was inactionable puffery); *In re Stone & Webster, Inc., Sec. Litig.*, 253 F. Supp. 2d 102, 117 (D. Mass. 2003) ("Statements regarding . . . 'focus' are typical of the kind of 'self directed corporate puffery' and sales talk that courts . . . have shielded from liability.").

[38] *See, e.g., Whole Foods Mkt.*, 905 F.3d at 897 (challenging statement that Whole Foods "always strive[s] for transparency and accuracy in everything [it] do[es]," "take[s] pride in setting higher standards for quality" and "continu[es] to raise the bar even higher on [its] standards of transparency," and "seek[s] to be a deeply responsible company in the communities where [it] do[es] business around the world, providing ethically sourced, high-quality products and transparent information to [its] customers").

20

the bank at its word that it indeed possesses the integrity it claims." *Whole Foods*, 905 F.3d at 902. The same is true here. *See id.* Even where a company has "built a brand around holding itself to higher ethical standards than its competitors," its statements touting those standards "are the sort of puffery that a reasonable investor would not rely on." *Id.*[39]

Plaintiff has also failed to allege that these statements were false or misleading. The Complaint does not allege that Enviva did not have the commitments and priorities expressed by the statements in Category D. Nor does the Complaint allege that Enviva has not actually received the numerous sustainability certifications it routinely describes in its public filings.[40] Instead, the Complaint takes issue with Enviva's execution on living up to these high ideals.[41] That is not sufficient to render Enviva's mere statement that it had these aspirations misleading. *See Howard v. Arconic Inc.*, 395 F. Supp. 3d 516, 550 (W.D. Pa. 2019) ("All that Plaintiffs have shown is that Arconic might not have fully lived up to its aspirations. This does not form the basis for a securities law violation."); *In re BP p.l.c. Sec. Litig.*, 852 F. Supp. 2d 767, 813–14 (S.D. Tex. 2012) (similar).

### 5.      Category E: Statements About Policies (Statements 48–50).

Next, Plaintiff points out that Enviva's "Global Responsible Sourcing Policy" states that the "primary wood [Enviva] purchase[s] must be sourced from sustainably-managed forests and harvesting operations[,]" meaning, among other things, that Enviva will only source primary

---

[39] *See also In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 631 (D. Md. Aug. 13, 2010) ("Simply because [certain topics] are important to [an issuer]'s business, it does not follow that any individual statement regarding these topics is per se material.").

[40] *See* Statement 49 (¶ 111) ("Our fiber supply chains are routinely audited by independent third parties. We maintain multiple forest certifications including: Forest Stewardship Council (FSC®) Chain of Custody, FSC® Controlled Wood, Programme for the Endorsement of ForestCertification (PEFC™) Chain of Custody, Sustainable Forestry Initiative (SFI®) Fiber Sourcing and SFI® Chain of Custody. We have obtained independent third-party certification for all of our plants to the applicable Sustainable Biomass Program (SBP) Standards."); Ex. 32 at 5, 14, 22, 48 (A2655, A2664, A2672, A2698), Enviva 2020 Corporate Sustainability Report (*available at* https://tinyurl.com/mwtwc6pj) (similar); Ex. 8 at 54–55 (A0578–79) (similar).

[41] *See* ¶ 110 (arguing the Track and Trace Program was not effective at its intended purpose).

materials from a supplier when "[t]he forest source will be replanted or regrown as forests and will not be converted to non-forest uses[.]"[42]  As an initial matter, beyond conclusory assertions, the Complaint alleges no facts demonstrating that Enviva failed to abide by this policy.  Instead, the Complaint points to a single former employee's statement that he was "unaware of Enviva seeking any consequences for its landowner partners if they did not reforest their land post-harvest."[43] Tellingly, however, this former employee does not dispute that Enviva required its suppliers to commit that harvested forestland would be kept as forests and he does not identify any instance of which he was aware of a supplier violating such a commitment.  Thus, his inability to recall an instance of Enviva "seeking . . . consequences" for an (unidentified) violation of this requirement in no way suggests that Enviva was not adhering to its policy.

Moreover, "[t]here is an important difference between a company's announcing rules forbidding [certain conduct] and its factually representing that no officer has engaged in such forbidden conduct." *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 755, 756 (S.D.N.Y. 2017) (noting that, as a result, codes of conduct are "a particularly inapt candidate to serve as the basis for § 10(b) liability").[44] Thus, even if Plaintiff had sufficiently alleged a violation of Enviva's Global Responsible Sourcing Policy, this would not render the provisions and prohibitions within

---

[42] *See* ¶ 103 (Statement 48) (quoting Ex. 33 (A2706–07), Enviva's Global Responsible Sourcing Policy and Pledges in Conservation Leadership, *available at* https://tinyurl.com/yubpmyj2).
[43] ¶ 94.
[44] *See also, e.g., City of Roseville Emps. Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 415 (D. Del. 2009) (granting motion to dismiss similar statements and calling it "untenable" to hold that "any company with a code of ethics . . . be required to disclose all violations of that code or face liability under federal securities law"); *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 360 (S.D.N.Y. 2015) (dismissing claim regarding defendant's compliance with its code of ethics because "[a]lthough the Company's codes of ethics prohibit[ed] bribery and other forms of fraudulent conduct, they do not claim that PetroChina's officers are abiding by them"), *aff'd sub nom. Klein v. PetroChina Co.*, 644 F. App'x 13 (2d Cir. 2016); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 658 (S.D.N.Y. 2017) (even where a code of conduct contains "relatively forceful wording, it remains an aspirational and hortatory statement.").

the policy misleading under the federal securities laws.

The rest of the statements in this category are similar. The next statement that is challenged notes that Enviva's "customers are subject to stringent requirements regarding the sustainability of the fuels they procure" and that Enviva's "wood fiber procurement is conducted in accordance with leading forest certification standards."[45] But Plaintiff does not allege—even in conclusory fashion—that Enviva's customers were not subject to such "stringent requirements" or that Enviva did not comply with "leading forest certification standards." In fact, the Complaint does not even allege facts specifying what these "requirements" or "standards" were—let alone point to facts showing they had been violated. And, even if he had, Plaintiff could not show that Enviva's mere statement that its practices were subject to these standards was misleading merely by pointing to an instance where Enviva failed to live up to these standards.[46]

The last statement reiterates that "Pursuant to Enviva's Responsible Sourcing Policy, Enviva requires landowners to commit to replant following harvests in which Enviva participates."[47] As noted above, however, the Complaint nowhere alleges that this was untrue, it merely alleges that a single former employee did not witness the enforcement of a violation of this requirement. In the same press release, Enviva also noted that "[i]n an effort to transparently demonstrate our adherence to and accountability for sustainable forest management and wood sourcing, our sponsor developed our proprietary, industry-leading Track & Trace system in 2017."[48] The Complaint does not allege that Enviva did not develop the Track & Trace system in

---

[45] ¶ 111 (Statement 49).

[46] *See supra* n.44.

[47] ¶ 168 (Statement 50); *see also* Ex. 34 at 9 (A2717), EPLP Press Release (published April 28, 2021), *available at* https://tinyurl.com/5dxx754p  (source document for Statement 50 containing additional context omitted by the Complaint).

[48] *Id.*

2017. Nor does it allege that the system was not borne out of a desire "to transparently demonstrate our adherence to and accountability for sustainable forest management and wood sourcing."[49] Accordingly, Plaintiff has fallen far short of his burden to allege that this statement was false.

### 6. Category F: SOX Certifications (Statement 51)

Last, Plaintiff claims that, in connection with Enviva's 2018, 2019, 2020, and 2021 Form 10-Ks filed with the SEC, Defendants Keppler and Even signed certifications stating that "based on [their] knowledge" the information in the filings "fairly present[ed]" Enviva's "results of operations" in "all material respects[.]"[50] These statements are part of routine, statutorily required certifications under regulations promulgated under the Sarbanes-Oxley Act and are focused on Enviva's financial statements, which are not alleged to be false or misleading in the Complaint. *See* 17 C.F.R. §§ 240.13a-14, 240.15d-14. Moreover, the statements merely say that, based on the speaker's "***knowledge***," the 10-K "fairly presents, in all ***material*** respects," the operations of Enviva. Given these qualifiers, to sufficiently allege that these statements were false, Plaintiff would have to have alleged that (1) Defendants Keppler and Even had ***actual knowledge*** that the Form 10-K was (2) ***materially*** misleading.[51] Here, Plaintiff has done neither. As explained in the preceding sections, Plaintiff has not identified a single materially misleading statement—let alone one made in Enviva's Form 10-K with actual knowledge of its falsity.

The Complaint thus falls short of alleging that these statements were misleading or untrue. And, in any event, given that they are drawn from SOX certifications, these statements are

---

[49] *Id.* For the reasons noted in the preceding section, Enviva's statement that it had such a commitment to "sustainable forest management and wood sourcing" is also inactionable puffery. *See supra* § IV.A.4.

[50] *See* ¶¶ 113, 134, 163, 190 (Statement 51).

[51] *See, e.g.*, *In re Veon Ltd. Sec. Litig.*, 2018 WL 4168958, at *14 (S.D.N.Y. Aug. 30, 2018) ("Since the statements are predicated on the certifying officer's belief, and Plaintiffs do not sufficiently allege that Izosimov believed the statements were false or misleading, the SOX certification here is not actionable.").

inactionable as a matter of law. *Lorusso v. Boulder Brands, Inc.*, 2017 WL 4365180, at \*14 (D. Colo. Mar. 1, 2017) ("False SOX certifications are not independently actionable.").[52]

### B.  Plaintiff fails to satisfy the PSLRA's high standards for pleading scienter.

Plaintiff's Section 10(b) claims should also be dismissed for failing to satisfy the PSLRA's high standards for pleading scienter. The PSLRA was enacted by Congress "[a]s a check against abusive litigation by private parties" in securities fraud actions. Congress sought to achieve this "check" in part by imposing a heightened pleading requirement for the element of scienter. *Janies v. Cempra, Inc.*, 816 F. App'x 747, 749 (4th Cir. 2020) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)). Scienter is "a mental state embracing intent to deceive, manipulate, or defraud," *Tellabs*, 551 U.S. at 319, and cannot be shown through "simple, or even inexcusable negligence." *In re Cryomedical Scis., Inc. Sec. Litig.*, 884 F. Supp. 1001, 1013 (D. Md. 1995) (citation omitted). Instead, Plaintiff must plead with particularity facts sufficient to establish at least "severely reckless conduct," which "is a slightly lesser species of intentional misconduct, and is satisfied only by allegations demonstrating such an extreme departure from the standard of ordinary care that the danger of misleading the plaintiff must have been either known to the defendant or so obvious that the defendant must have been aware of it." *Janies*, 816 F. App'x at 749 (citing *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 545 (4th Cir. 2017); *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015)) (internal citations and quotations omitted).

The facts that give rise to an inference of scienter must be alleged with particularity,

---

[52] *See also Anderson v. StoneMor Partners, L.P.*, 296 F. Supp. 3d 693, 702 (E.D. Pa. 2017) ("[T]here is nothing in either the 1934 Securities Exchange Act or the Sarbanes–Oxley Act and implementing regulations that authorizes plaintiffs to base a claim for securities fraud on an alleged misstatement in a Sarbanes–Oxley certification."), *aff'd sub nom. Fan v. StoneMor Partners LP*, 927 F.3d 710 (3d Cir. 2019).

meaning that a plaintiff must plead the "who, what, where, when, and how" of their contentions. *In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 575 (D. Md. 2005) (Chasanow, J.). A plaintiff's allegations will be insufficient to avoid dismissal unless they plead a "strong inference" of scienter that is "cogent and compelling." *Janies*, 816 F. App'x at 749 (quoting *Tellabs*, 551 U.S. at 324). Under this standard, an allegation will survive dismissal only if the inference of scienter is "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* In short, the PSLRA "unequivocally raised the bar for pleading scienter" and clearing this bar "is no small burden" for plaintiffs. *Cozzarelli*, 549 F.3d at 624.

This is particularly so in the Fourth Circuit. The Fourth Circuit has rejected the theory "that an inference that [the speaker] knew his statement was false is sufficient to show that [he or she] acted intentionally or recklessly to deceive, manipulate, or defraud." *Maguire*, 876 F.3d at 547. Such an "argument fuses an inference that [the speaker] knew enough to realize that his characterization was technically incorrect with an inference that he intended it to deceive." *Id.* at 548. Thus, to allege scienter in the Fourth Circuit, a complaint must not only (i) allege detailed facts showing that the speaker knew his statement was incorrect, but must also (ii) allege facts sufficient to "show that [the speaker] affirmatively sought to advance [an untruth] or calculatedly sought to obscure th[e] reality." *Id.*

To determine whether scienter has been alleged with respect to a statement at issue, the Court should only "look to the state of mind of the individual corporate official or officials who order or approve the statement or its making or issuance, or who furnish information or language for inclusion therein, or the like." *Knurr v. Orbital ATK Inc.*, 294 F. Supp. 3d 498, 513 (E.D. Va. 2018) (cleaned up) (quoting *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004)); *see also Teachers' Ret. Sys.*, 477 F.3d at 184 (following *Southland*, 365 F.3d

26

at 363–67).  In other words, "the required state of mind must actually exist in the individual making (or being a cause of the making of) the misrepresentation."  *Southland*, 365 F.3d at 366.

Plaintiff's scienter allegations, which say very little about the state of mind of the speakers of the statements at issue, fall far short of this standard, requiring dismissal of Plaintiff's 10(b) claim.  *See In re Criimi Mae, Inc. Sec. Litig.*, 94 F. Supp. 2d 652, 659 (D. Md. 2000) (Chasanow, J.) ("Throughout the complaint, Plaintiffs state in a conclusory fashion that Defendants were engaged in a 'fraudulent scheme,' and 'knew but failed to disclose,' 'knowingly or recklessly failed to disclose' and acted to 'conceal' adverse material information.  These allegations, however, are 'so broad and conclusory as to be meaningless,' and cannot support an inference of intent to defraud.") (citation omitted).

### 1.    Plaintiff fails to plead scienter as to any Speaking Defendant.

The only individuals that are alleged to have made any purported misstatements are Defendants Keppler, Calloway, Jenkins, and Even (collectively, the "Speaking Defendants").[53] However, Plaintiff pleads next to nothing about the state of mind of any of particular Speaking Defendant, and what few specific allegations he does make do not support an inference—let alone a strong inference—of scienter as to any Speaking Defendant:

### a.    The Complaint does not plead particularized facts establishing that Defendant Keppler made any statements with scienter.

As to Defendant Keppler, Plaintiff's sole scienter allegation is a statement from one of Plaintiff's unnamed former employees providing that "Defendant Keppler certainly knew Enviva was using whole trees because he visited the company's Hamlet plant while FE3 was there, and would have seen substantial quantities of leaves and limbs from whole trees harvested lying

---

[53] Recognizing this, Count III is brought only against these Speaking Defendants.  *See* Compl. at 57.

conspicuously on the ground."[54]   This allegation is insufficient to allege that Defendant Keppler

acted with scienter with respect to any statement challenged by the Complaint for multiple reasons.

For one, as discussed above, none of the statements challenged by the Complaint—much

less any challenged statement made by Keppler—asserts that Enviva never used whole trees.  *See*

*supra* § IV.A.3.  To the contrary, Enviva repeatedly disclosed throughout the Class Period that it

***did*** procure whole trees.  *See id.*  In any event, however, FE3's statement merely indicates that

Keppler "would have seen substantial quantities of ***leaves and limbs***."[55]  There is no allegation

that Keppler saw "whole trees" procured by Enviva.  Thus, even if the challenged statements had

stated that Enviva never procured whole trees—and they do not—the Complaint would still have

failed to allege sufficient facts showing that Keppler would have scienter with respect to such a

statement.  *See Yates v. Municipal Mortg. & Equity, LLC*, 744 F.3d 874, 885 (4th Cir. 2014)

("'[O]missions and ambiguities count against' an inference of scienter because a complaint's

factual allegations must be stated with particularity.").[56]

Other than this allegation, Plaintiff's scienter allegation against Keppler relies solely on a

boilerplate contention that "[b]y virtue of their positions at Enviva, Defendants had actual

knowledge of the materially false and misleading statements and material omissions alleged herein

. . . or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed

---

[54] ¶ 88.

[55] ¶ 88.

[56] The accounts of FE1 and FE2 likewise fail to plead scienter because they merely attempt to establish that Enviva "used whole trees," which does not contradict any statement challenged by the Complaint.  ¶¶ 73, 81.  Moreover, neither of these accounts qualify as a scienter allegation as to Defendant Keppler in any event because the Complaint does not plead with particularity that Defendant Keppler (or any other Speaking Defendant) was presented with the information that FE1 and FE2 were purportedly aware of.  *See In re Acterna Corp.*, 378 F. Supp. 2d at 575 (scienter allegations fail without such details).  The Complaint's inability to do so is not surprising, as both FE1 and FE2 were lower level employees, several reporting levels removed from Defendant Keppler.  *See* ¶¶ 73, 78.

or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made."[57]  But "[g]uesswork of this kind, based on the position of the Defendants is insufficient under the [PSLRA]."  *Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707, 715 (E.D. Va. 2003) (rejecting "attempt to plead scienter by referencing the individual Defendants' positions . . . [as] senior officers of Circuit City [who] 'were privy to confidential and proprietary information concerning Circuit City.'").  Federal "[c]ourts have routinely held that corporate executives' access to information and internal affairs is not enough to demonstrate scienter under the PSLRA."  *Lerner*, 273 F. Supp. 3d at 593 ("[A] defendant's position of control in a company, without more, is insufficient to establish scienter."); *see also In re Criimi Mae, Inc.*, 94 F. Supp. 2d at 661 (similar).  Rather, to allege scienter, a plaintiff must make "additional detailed allegations establishing the defendants' actual exposure" to the subject of the fraud.  *Yates*, 744 F.3d at 890.  This is exactly what Plaintiff has failed to do here.  As a result, Plaintiff has failed to allege that Keppler acted with scienter and Count III must be dismissed as to him.

> **b.  The Complaint does not plead particularized facts establishing that Defendant Calloway made any statements with scienter.**

The only scienter allegation specific to Defendant Calloway is made at Paragraph 194 of the Complaint, where Plaintiff alleges that one of Plaintiff's unnamed former employees "said that Defendant Calloway . . . knowingly lied by telling CBS News that [the] Company exclusively used leftover waste wood."[58]  But to sufficiently allege scienter, "'at a minimum,' the PSLRA 'requires that . . . for each alleged misstatement or omission, plaintiffs must plead facts concerning, for example, *when* each defendant or other corporate officer learned that a statement was false, *how* that defendant learned that the statement was false, and *the particular document or other source*

---

[57] ¶ 249.
[58] ¶ 194.

of information from with the defendant came to know that the statement was false.'" *In re Acterna Corp.*, 378 F. Supp. 2d at 575 (emphasis added and citation omitted). The Complaint's conclusory allegation that Defendant Calloway "knowingly lied" contains none of this factual particularity and thus adds nothing to the scienter calculus. *See, e.g., In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 359–61 (D.N.J. 2007) (holding that "personal opinions void of specific details regarding the basis [for the CW's] personal knowledge" add nothing to falsity or scienter).[59]

Other than this deficient allegation, the only scienter allegation implicating Calloway is Plaintiff's general statement that all Defendants knew or should have known that their statements were false "[b]y virtue of their positions at Enviva."[60]  This allegation fares no better as to Defendant Calloway than it did as to Defendant Keppler. *See supra* § IV.B.1.a.

> **c.      The Complaint does not plead particularized facts establishing that Defendant Jenkins made any statements with scienter.**

Next, while Plaintiff brings Count III against Defendant Jenkins, it fails to make any particularized scienter allegations as to her at all.  Instead, the Complaint merely states that in July 2021 Jenkins "departed [Enviva] after just fourteen months" as its Chief Sustainability Officer.[61] But "[f]or a resignation to add to an inference of scienter . . . there must be particularized allegations connecting the departure[] to the alleged fraud." *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 118 (3d Cir. 2018).  As the Complaint makes no such allegations here, the bare fact of her departure is irrelevant to the scienter analysis.

Otherwise, the Complaint entirely omits any particularized allegations showing that Jenkins made any statement with fraudulent intent.  And its attempt to allege that Jenkins knew or

---

[59] Moreover, as explained above, the statement about which Calloway allegedly lied has not been adequately alleged to be false. *See supra* n.26.

[60] ¶ 249.

[61] ¶ 173.

should have known that the statements were false "[b]y virtue of [her] position[] at Enviva"[62] fails

for the same reason it fails as to the other Defendants.  *See supra* § IV.B.1.a.

> **d.      The Complaint does not plead particularized facts establishing that Defendant Even made any statements with scienter.**

The Complaint also makes no particularized scienter allegations as to Defendant Even.

Indeed, beyond mentioning his title, the Complaint makes no particularized allegations of any kind

about Defendant Even.  For scienter purposes, Plaintiff is thus left to rely on its boilerplate

assertion that Even knew or should have known that his statements were false "[b]y virtue of [his]

position[] at Enviva."[63]  This allegation fares no better as to Defendant Even than it does as to the

other Speaking Defendants.  Plaintiff has thus failed to allege scienter as to Defendant Even.

> **2.      Plaintiff's suggestion that "wood pellet production was Enviva's core operation" does not suffice to plead scienter.**

At Paragraph 47 of the Complaint, Plaintiff asserts that because "wood pellet production

was Enviva's core operation . . . it would be absurd to suggest that the Enviva Defendants were

not aware of the truth about Enviva's wood pellet production activities and practices at all relevant

times."[64]  But the Fourth Circuit has made clear that "'bare allegations' that officers have

'knowledge of key facts' . . . because such knowledge relates to the business's core operations are

not enough, standing alone, 'to support a strong inference of scienter.'"  *KBC Asset Mgmt. NV f.

DXC Tech. Co.*, 19 F.4th 601, 612 (4th Cir. 2021) (citation omitted).  Rather, to allege scienter,

there must be "additional detailed allegations establishing the defendants' actual exposure to"

information contradicting the challenged statements.  *Yates*, 744 F.3d at 890.  Here, as explained

above, Plaintiff has made no such "detailed allegations" demonstrating the Speaking Defendants'

---

[62] ¶ 249.
[63] ¶ 249.
[64] ¶ 47.

"actual exposure" to information contradicting the challenged statements.  *Id.*[65]    The core operations theory is thus no help to Plaintiff's attempt to allege scienter.

### 3.    The Complaint's failure to assert any well-pled motivation to defraud further undermines Plaintiff's attempt to allege scienter.

Finally, the Complaint does not even try to allege that *any* Defendant had *any* particular motive to defraud investors that would support a finding of scienter.  For example, it does not allege that Defendants gained (or stood to gain) a single cent from the supposed fraud.  Instead, Plaintiff alleges only that Defendants acted out of a desire to "artificially inflate and maintain the market price of Enviva common stock[.]"[66]  "[C]ourts have repeatedly rejected these types of generalized motives—which are shared by *all* companies—as insufficient to plead scienter under the PSLRA."  *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 352 (4th Cir. 2003); *see also Yates*, 744 F.3d at 891 (similar).  The Complaint thus lacks any well-pled motive allegation.  This failing should "weigh heavily" in the Court's scienter analysis, severely "diminish[ing] the strength of any scienter inference" that could be drawn from the facts alleged.  *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 752 (4th Cir. 2021) (quoting *Tellabs*, 551 U.S. at 325).

### 4.    The Complaint does not plead scienter as to Defendant Enviva.

Plaintiff also brings Count III against Enviva itself.  But where a Section 10(b) "defendant is a corporation, the plaintiff must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation, since corporate liability derives from

---

[65] Moreover, Plaintiff cannot invoke the core operations theory to cover the entirety of Enviva's business, merely by saying that the general line of work in which the company operates is its "core operation."  *See Browning v. Amyris, Inc.*, 2014 WL 1285175, at *15 (N.D. Cal. Mar. 24, 2014) ("[P]laintiffs must justify their invocation based on more than a mere assertion that all CEOs should want their companies to succeed and therefore ought to know everything about their business.").  "[A]dopting this standard would eviscerate the core-operations test and turn it into an automatic presumption of comprehensive knowledge on the part of management."  *Id*.
[66] ¶ 247.

the actions of its agents." *Teachers' Ret. Sys. of La.*, 477 F.3d at 184.  Although the Fourth Circuit has not "squarely resolved" which agents' scienter can be imputed to a corporation, it has "cited with approval the Fifth Circuit's opinion in *Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.* in discussing scienter requirements with respect to corporate defendants." *Knurr*, 294 F. Supp. 3d at 513.

*Southland* held that, in assessing the scienter of a corporation, courts should look only to "the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Southland*, 365 F.3d at 366.  "The Sixth Circuit adopted similar reasoning in *In re Omnicare, Inc. Securities Litigation*[, 769 F.3d 455, 475 (6th Cir. 2014)]." *Knurr*, 294 F. Supp. 3d at 513.  Under the Sixth Circuit's approach, "probative for purposes of determining whether a misrepresentation made by a corporation was made by it with the requisite scienter" are the states of mind of: (1) the maker of the statement, (2) any individual who authorized, requested, commanded, furnished information for, prepared, reviewed, or approved the statement, and (3) any high managerial agent or member of the board who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance. *In re Omnicare*, 769 F.3d at 475–76.

Regardless of which of these two tests is applied here, Plaintiff has not alleged scienter as to Enviva.  As discussed above, none of the Speaking Defendants—the individuals that made the statements at issue—acted with scienter.  And the Complaint alleges no facts suggesting that any other individual was sufficiently connected to any of the challenged statements that her state of mind could be relevant in assessing Enviva.  And, even if it had, it has not alleged facts sufficient

33

to show that any such individual acted with scienter with respect to a statement at issue. Accordingly, Plaintiff has failed to allege scienter as to Enviva.

* * *

In sum, taking all of Plaintiff's scienter allegations holistically, they do not support a strong inference that the statements at issue were made with intent to defraud investors. *Tellabs*, 551 U.S. at 326. The far stronger inference is the non-culpable one that Enviva and its executives simply disagreed with Plaintiff's view on the sustainability and environmental benefits of Enviva's business. That Defendants took a different view than Plaintiff does not reflect an intent to defraud investors. Plaintiff has failed to adequately allege scienter and Count III should be dismissed.

### C.    Count I must be dismissed because the Complaint fails to allege plausibly that Plaintiff bought shares pursuant or traceable to the offering at issue.

Count I of the Complaint fails for the additional reason that Plaintiff has not alleged facts sufficient to plead his standing to bring it. "Standing under Section 11 is limited to the 'narrow class of persons consisting of those who purchase securities that are the direct subject of the prospectus and registration statement.'" *TransEnterix Inv'r Grp. v. TransEnterix, Inc.*, 272 F. Supp. 3d 740, 760 (E.D.N.C. 2017) (citation omitted). Thus, where, as here, "a company has issued shares under more than one registration statement, the plaintiff must prove that her shares were issued under the allegedly false or misleading registration statement, rather than some other registration statement." *In re 2U, Inc. Sec. Class Action*, 2021 WL 3418841, at *25 (D. Md. Aug. 5, 2021) (quoting *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013)); *see also Slack Techs., LLC v. Pirani*, 2023 WL 3742580, at *6 (U.S. June 1, 2023) (Section 11 "requires a plaintiff to plead and prove that he purchased shares traceable to the allegedly defective registration statement").

Stockholders may meet this requirement at the pleading stage by alleging "that they

34

purchased their shares directly in the relevant offering itself" or by "alleging sufficient facts to show 'that their shares, although purchased in the aftermarket, can be traced back to the' offering." *In re 2U*, 2021 WL 3418841, at *25. "[W]here the company has issued shares in multiple offerings under more than one registration statement, 'a greater level of factual specificity will be needed before a court can reasonably infer that shares purchased in the aftermarket are traceable to a particular offering.'" *TransEnterix*, 272 F. Supp. 3d at 761 (quoting *Century Aluminum*, 729 F.3d at 1107). Specifically, such "[p]laintiffs must 'trace the chain of title for their shares back to the secondary offering, starting with their own purchases and ending with someone who bought directly in the secondary offering.'" *Id.* (quoting *Century Aluminum*, 729 F.3d at 1106–07).

Here, Plaintiff's Section 11 claim is brought with respect to "an add-on Offering [Enviva] conducted January 2022." ¶ 6. But Plaintiff does not allege that he purchased shares directly through this offering. And he makes no attempt to "trace the chain of title" for his shares back to the Offering. *Century Aluminum*, 729 F.3d at 1106–07; *see also Yates*, 744 F.3d at 900–01 (dismissing Section 12 claims where plaintiff's allegation that he had purchased shares "pursuant and/or traceable to" was conclusory). He has thus failed to allege sufficient facts to establish his standing to assert a Section 11 claim and Count I should be dismissed. *Id.*; *see also* Underwriter's Brief at 4–7.

### D.  Plaintiff's secondary liability claims fail as a matter of law.

Plaintiff's secondary liability claims under Section 15 of the Securities Act and Section 20(a) of the Exchange Act—Counts II and IV of the Complaint—fail as a matter of law because Plaintiff's primary liability claims are not adequately pleaded. *See Macrogenics, Inc.*, 61 F.4th at 391, 393.

### VI.  CONCLUSION

For all these reasons, the Complaint should be dismissed in its entirety and with prejudice.

35

Dated:  June 2, 2023

Respectfully submitted,

/s/ Ronald J. Tenpas
Ronald J. Tenpas (#14448)
  State Bar No. 24002307
Michael C. Holmes (admitted *pro hac vice*)
Jeffrey S. Johnston (admitted *pro hac vice*)
Robert Ritchie (admitted *pro hac vice*)
Thomas P. Mitsch (admitted *pro hac vice*)
VINSON & ELKINS L.L.P.
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037
Telephone: (202) 639-6500
Telephone: (202) 639-6604
rtenpas@velaw.com
mholmes@velaw.com
jjohnston@velaw.com
rritchie@velaw.com
tmitsch@velaw.com

*Attorneys for the Enviva Defendants*

## CERTIFICATE OF SERVICE

I, Ronald J. Tenpas, hereby certify that on June 2, 2023, true copies of the foregoing were served on all counsel of record via the Court's ECF system.

/s/ Ronald J. Tenpas
Ronald J. Tenpas

36

**Fagen v. Enviva Inc., et al.**
**Statements Challenged by the Amended Complaint[1]**

| # | AC ¶ | Date | Statement[2] | Source |
|---|------|------|--------------|--------|
| **Category A: Statements About Greenhouse Gas Emissions** | | | | |
| 1 | 109 | Feb. 20, 2019 | During the question-and-answer portion of the Q4 2018 Earnings Call, Defendant Keppler stated that: "[I think here in the U.S. biomass continues to have a tremendous opportunity to play a role, but I think we have a ways to go, and certainly the activities of the EPA, and whether it's agriculture and others, really kind of banging the drum that] *biomass is an important part of delivering a low-carbon future*, works out to be a part of that space. *And we're excited to be a part of the solutions*." | Earnings Call |
| 2 | 117 | May 8, 2019 | Finally, the May 8, 2019 press release stated that: "*Enviva's wood pellets directly displace coal in power generation and heating applications, lowering the lifecycle greenhouse gas emissions profile of utilities and effectively eliminating the harmful trace element emissions* [like mercury and arsenic] *from burning coal*." | Press Release |
| 3 | 119*[3] | May 9, 2019 | On May 9, 2019, Enviva hosted an earnings call with investors and analysts to discuss the Company's Q1 2019 results (the "Q1 2019 Earnings Call"). During the scripted portion of the Q1 2019 Earnings Call, Defendant Keppler stated, in relevant part: ".... I would like to take a minute to highlight our efforts around sustainability . . . . *Enviva's wood pellets directly displace coal in power generation and heating applications and lower the lifecycle greenhouse gas emissions profile of utilities*." | Earnings Call |
| 4 | 123* | Aug. 8, 2019 | On August 8, 2019, Enviva hosted an earnings call with investors and analysts to discuss the Company's Q2 2019 results (the "Q2 2019 Earnings Call"). During the scripted portion of the Q2 2019 Earnings Call, Defendant Keppler stated that Enviva's purported ability to track its raw materials would "*give our customers and regulators around the world comfort in the sustainability of our activities and our ability to reduce life cycle greenhouse gas emissions*." | Earnings Call |

[1] Defendants do not admit the content of any of the allegations in the Amended Complaint (ECF 34) ("Amended Complaint" or "AC") or this Appendix A. The purpose of Appendix A is to organize the allegations in the Amended Complaint for the Court.

[2] Unless otherwise noted as "From the Source," the content in this column of the chart is copied from the Amended Complaint. For certain quotations, Enviva Defendants have added the context of the statements, indicating such change using brackets [ ], based on the source material. For ease of reference, where the Enviva Defendants have added context, the Enviva Defendants have bolded the quotations that are emphasized in the Complaint. Otherwise, statements reflect the emphasis provided in the Amended Complaint.

[3] Certain paragraphs of the Complaint, including Paragraph 119, contain multiple alleged misrepresentations. Where appropriate, those paragraphs have been split into multiple statements and organized into different sections of this chart. Paragraphs that have been split are designated with an asterisk (*). Several other alleged misstatements could fit in more than one of the categories provided herein, but have been placed solely in the primary category here. Those statements fail for the reasons provided in the Enviva Defendants' Brief in Support of its Motion to Dismiss as to each applicable category.

**Appendix A**

| # | AC ¶ | Date | Statement[2] | Source |
|---|------|------|-----------|--------|
| 5 | 130 | Oct. 31, 2019 | On the same Q3 2019 Earnings Call, Defendant Keppler claimed that "our industry leadership is not defined solely by the scale and reliability of our global operations, ***but also by the critical role we play in delivering a sustainable solution to our customers' efforts to mitigate climate change***." | Earnings Call |
| 6 | 138 | Apr. 30, 2020 | During the scripted portion of the Q1 2020 Earnings Call, Defendant Keppler stated that: "***[t]he long-term growth of our business continues to be driven by the global commitment to phase out coal, limit the impact of climate change, and cut greenhouse gas emission***." | Earnings call |
| 7 | 142* | July 20, 2020 | "The carbon benefits of good biomass are clear, if requirements for good #biomass are met – we can mitigate GHG emission by substituting #bioenergy for fossil fuels for energy production. Read more about the new Enviva Case Study report by Boundless Impact: it must safeguard biodiversity and conservation.'" | Tweet |
| 8 | 148 | Aug. 6, 2020 | During the scripted portion of the Q2 2020 Earnings Call, Defendant Keppler stated, in relevant part: "***Enviva is leading an industry that plays an increasingly critical role in the global fight against climate change. The climate benefits of sustainably produced wood pellets and the transparency of our sustainability and supply chain practices, really our ESG attributes, are garnering international recognition by regulators, policymakers, academics, researchers and investors alike***." | Earnings call |
| 9 | 152 | Nov. 4, 2020 | **[From the Source]:**<br><br>The Partnership and our sponsor recently published their first Corporate Sustainability Report (the "CSR Report") as part of our commitment to provide incremental transparency into our Environmental, Social, and Governance (ESG) practices.<br><br>The CSR Report provides a description of Enviva's 16-year sustainability journey from its beginnings as a start-up in 2004 to the publicly traded company that is Enviva today. It also features a comprehensive review of our ***contribution to the fight against climate change***, our fiber procurement approach and ***forestland conservation efforts***, our environmental, heath, and safety processes, our human capital and diversity policies, and our corporate governance practices.<br><br>The Partnership and our sponsor also continue to prioritize ***efforts to*** deliver on our promise to ***promote forest growth and carbon sequestration and protect forest habitats in the U.S. Southeast***. Our sponsor recently announced a partnership with Finite Carbon, North America's leading developer of forest carbon offsets, to leverage its Core Carbon online platform to engage small forest landowners across the U.S. Southeast to voluntarily participate in global GHG reduction programs. Enviva is helping private landowners participate in the program to receive income in exchange for their commitment not to harvest particular tracts of their land, thereby facilitating the conservation and protection of forest | Press Release |

| # | AC ¶ | Date | Statement[2] | Source |
|---|------|------|-----------|--------|
| | | | habitats that are critically important to biodiversity, wildlife, and carbon storage, such as bottomland hardwood forests. | |
| 10 | 154 | Nov. 5, 2020 | During the scripted portion of the Q3 2020 Earnings Call, Defendant Keppler stated, in relevant part: "*Enviva is leading an industry that plays an increasingly critical role in the global fight against climate change. The climate benefits of sustainably produced wood pellets continue to garner international recognition, and we are keenly focused on promoting forest growth and providing incremental transparency*." | Earnings Call |
| 11 | 159 | Feb. 17, 2021 | On February 17, 2021, Enviva issued a press release entitled "Enviva Targets Net-Zero Operations by 2030." The press release stated, in relevant part: Enviva's sustainably sourced wood is used to manufacture wood pellets, a renewable fuel source that provides global power and heat generators with a drop-in alternative to fossil fuels. Enviva exports its sustainable wood pellets primarily to the U.K., Europe, the Caribbean and Japan, *enabling its customers to reduce their carbon emissions by more than 85% on a lifecycle basis, helping them reach their greenhouse gas emissions reduction targets with renewable energy*.<br><br>"At Enviva, fighting climate change is at the core of what we do," said John Keppler, Chairman and Chief Executive Officer of Enviva. "*For more than a decade we have played a critical role in helping the world's energy producers substantially reduce their net carbon emissions by using sustainable bioenergy, enabling them to phase out coal, support increases in forest carbon stocks, and provide reliable, affordable energy to their communities*." | Press Release |
| 12 | 161[4] | Feb. 24, 2021 | On February 24, 2021, Enviva issued a press release announcing the Company's Q4 2020 results which claimed that "*the product we manufacture helps reduce the lifecycle GHG* [greenhouse gas] *emissions of our customers, we believe we must also do our part within our operations to mitigate the impacts of climate change*." The press release further quoted Defendant Keppler's statement that "*Enviva and the sustainable and renewable fuel we supply to our customers are part of an all-in solution to climate change … .*" | Press Release |
| 13 | 164[5] | Mar. 1, 2021 | On March 1, 2021, Enviva issued a press release announcing and attaching an investor presentation, that among other things: claimed that Enviva was "*fighting climate change, displacing coal, growing more trees*"; and touted "*substantial GHG reductions*", participation in a "*market driven by [a] global commitment to fight climate change*", and "*responsible wood supply program*". | Press Release |
| 14 | 178 | Nov. 4, 2021 | During the scripted portion of the Q3 2021 Earnings Call, Defendant Keppler stated, in relevant part: | Earnings Call |

[4] *See also* ¶ 184 which asserts that the alleged misstatement in ¶ 161 was incorporated by reference into Enviva's Offering Documents.
[5] *See also* ¶ 172 which simply alleges that Enviva's May 10, 2021 press release contained similar misstatements; ¶ 184 which asserts that the alleged misstatement in ¶ 164 was incorporated by reference into Enviva's Offering Documents.

3

**Appendix A**

| # | AC ¶ | Date | Statement[2] | Source |
|---|------|------|--------------|--------|
| | | | *"Our renewable products help our customers meet their net zero targets, and we expect our own net zero commitments to further reinforce our environmental leadership and reputation for sustainability. We are in a very fortunate position to have built a business that by design generates only a modest level of emissions from our own operations.*" | |
| 15 | 188 | Mar. 1, 2022 | During the scripted portion of the Q4 2021 Earnings Call, Defendant Keppler stated, in relevant part: "*[w]e are incredibly privileged to have the opportunity to continue to build a company and a unique platform that delivers real climate change benefits, today, at scale,* while consistently, safely, and sustainably generating superior returns for all of our stakeholders." | Earnings Call |
| 16 | 193 | Apr. 22, 2022 | Finally, Defendant Calloway claimed that *"[t]here's no real doubt here that wood pellets and frankly, woody biomass, are a far superior climate change mitigation option than fossil fuels, particularly coal"*. | CBS News Segment |
| **Category B: Statements About Forest Growth** | | | | |
| 17 | 115 | May 8, 2019 | On May 8, 2019, Enviva issued a press release announcing the Company's Q1 2019 financial results and which claimed that "[through programs like the Enviva Forest Conservation Fund (the 'Conservation Fund'),] *our sponsor continues to work with our local partners to conserve forest land and support forest growth*. | Press Release |
| 18 | 116 | May 8, 2019 | The May 8, 2019 press release further claimed that Enviva's Track & Trace data "*shows that forest inventory growth and therefore increases in carbon stocks result from the market incentives created by a healthy forest products industry, of which our company is an integral part*." | Press Release |
| 19 | 121 | Aug. 7, 2019 | On August 7, 2019, Enviva issued a press release announcing the Company's Q2 2019 financial results.  The press release quoted Defendant Keppler's claim that "*robust forest markets such as ours are the key to healthy forests*, we also recognize there are places of high conservation value that need to be preserved and protected, and we are pleased to work with this year's grantees to work toward that common goal." | Press Release |
| 20 | 127 | Oct. 30, 2019 | On October 30, 2019, Enviva issued a press release announcing the Company's Q3 2019 financial results and stating, in relevant part:<br><br>*Enviva's sustainable practices, as outlined in our sponsor's Responsible Sourcing Policy and through the Track & Trace® program, continue to contribute to increasing forest carbon storage in the Southeastern United States. Enviva and our sponsor's activities contribute to a robust market for forest products, which in turn contributed to the nearly 20 percent increase in forest inventory in our sourcing regions since 2008.* | Press Release |
| 21 | 132 | Feb. 10, 2020 | "'By creating a market for low-value wood, one renewable energy company is helping landowners maintain their forests.' @MotherNatureNet goes over how Enviva ensures a healthy thriving #forest product industry. Full video:…" | Tweet |

**Appendix A**

| # | AC ¶ | Date | Statement[2] | Source |
|---|---|---|---|---|
| 22 | 166 | Apr. 7, 2021 | "Where do we source our wood from? Only from sustainably managed forests where the land will be reforested. Take a look at our most recent data through our Track & Trace® program and learn about the low-value wood used to make our #sustainable wood pellets." | Tweet |
| 23 | 170 | Apr. 29, 2021 | During the scripted portion of the Q1 2021 Earnings Call, Defendant Keppler stated, in relevant part: <br><br>"*With the tremendous growth we have achieved, coupled with what [see ahead], we will continue to ensure that our wood pellets remain sustainably produced from [forests whose] inventories have and continue to grow overtime*. <br><br>\*\*\* <br><br>*Our track and trace system and our leading responsible sourcing policy provide us with the tools we need to set public transparent goals regarding how we manage, measure and improve our activities*." | Earnings Call |
| 24 | 176* | July 29, 2021 | During the scripted portion of the Q2 2021 Earnings Call, Defendant Keppler stated, in relevant part: "With the tremendous growth we have achieved, combined with what we see ahead, *tools like our proprietary track and trace system and our industry leading responsible sourcing policy will continue to ensure that our wood pellets remain sustainably produced from forests whose inventories have and continued to grow over time*." | Earnings Call |
| **Category C: Statements About Enviva's Sources of Wood** | | | | |
| 25 | 125 | Sept. 20, 2019 | "Enviva's wood pellet plants create a market for wood that might have gone to waste. All these actively managed forests allow for longleaf pine restoration and other conservation on lands better suited to that." | Tweet |
| 26 | 129 | Oct. 31, 2019 | During the scripted portion of the Q3 2019 Earnings Call, Defendant Keppler stated, in relevant part: "*[t]he low-grade wood fiber we procure is a byproduct of sustainable forestry operations and traditional saw timber harvests and gives us consistent and stable access to a growing natural resource without any dependency on sawmilling, sawdust or other industrial residuals*." | Earnings Call |
| 27 | 142* | July 20, 2020 | "Good biomass is made from low-value wood – a byproduct from sawmilling or planned timber harvests. It's not made from high-value tree and it must safeguard biodiversity and conservation.'" | Tweet |
| 28 | 144 | July 27, 2020 | "Thank you for the question. Low-value wood is a byproduct of traditional timber harvests, that we then turn into a renewable energy sources instead of that wood going to waste." | Tweet |
| 29 | 156 | Dec. 9, 2020 | "Want to learn how we make our sustainable wood pellets, transport them around the globe, and help landowners manage their forests by using their low-value wood? Our new video gives you all the details on sustainable wood…" | Tweet |

**Appendix A**

| # | AC ¶ | Date | Statement[2] | Source |
|---|------|------|-----------|--------|
| 30 | 174*[6] | July 28, 2021 | The press release further claimed that: "[o]ur data demonstrate that, [based on the more than 7,800 forest tracts from which we have purchased wood since 2017,] ***on average just under 32% of the volume from each harvest went to Enviva,*** while the remaining 68% of the volume went to other participants in the forest products sector, principally to those that manufacture higher-value products that ensure long-term carbon storage such as dimensional lumber, building products, and furniture. ***Enviva only uses the remaining low-value wood in its operations***, [and only about 3% of the wood harvested in the U.S. Southeast is ultimately used to produce industrial-grade pellets.]" | Press Release |
| 31 | 180 | Nov. 8, 2021 | "Treetops, limbs, thinnings, residues – what do all of these have in common? They are all considered low-value wood, the wood Enviva uses to produce our sustainable biomass…" | Tweet |
| 32 | 191 | Apr. 22, 2022 | In the CBS News report, Defendant Calloway corrected a reporter who mentioned the Company using tree "trunks" for wood, insisting that the company instead uses "***tops***" and "***limbs***." | CBS News Segment |
| 33 | 192 | Apr. 22, 2022 | In the course of the same report, Defendant Calloway stated that "***[e]very piece of fiber that's taken into our program is low value wood***, …. ***If we did not create this service, it would be left to rot on the forest floor and would be left to create forest fires***." | CBS News Segment |
| 34 | 196 | May 4, 2022 | On May 4, 2022, Enviva issued a press release announcing the Company's Q1 2022 results, which claimed that: ***[a]ll of the wood we procure, regardless of its form, is low-value wood***. | Press Release |
| **Category D: Statements About Enviva's Commitment to Sustainability** | | | | |
| 35 | 105 | Feb. 20, 2019 | **[From the Source]:**<br><br>Since the Enviva Forest Conservation Fund was launched in 2015, our sponsor has contributed to the conservation of more than 17,000 acres of sensitive forests, which is nearly half of the initial 10-year target of 35,000 acres. Programs like the Enviva Forest Conservation Fund and our sponsor's industry leading Track & Trace® system demonstrate our commitment to sustainability in ways that extend far beyond third-party audits, compliance, and certification.<br><br>During 2018, our sponsor nearly doubled the total acres enrolled in the Independently Managed Group ("IMG") it operates under the American Tree Farm System ("ATFS"). The IMG is one of the innovative ways our sponsor increases sustainably certified forestlands across the Southeastern United States. Through the IMG and other efforts with state tree farm systems, our sponsor has added more than 66,000 certified acres to our supply base areas to date. In 2018, 45.2 percent of certified wood delivered to our four production plants in North Carolina and Virginia came from the IMG operated by our sponsor. Currently, one out of every ten acres of ATFS-certified forest land in North Carolina is enrolled in our sponsor's IMG. This significant increase in certified land demonstrates our and our sponsor's | Press Release |

---

[6] *See also* ¶ 184 which asserts that the alleged misstatement in ¶ 174 was incorporated by reference into Enviva's Offering Documents.

6

Appendix A

| # | AC ¶ | Date | Statement[2] | Source |
|---|---|---|---|---|
| | | | *commitment to sustainable forestry practices and our customers' demand for responsibly sourced wood fiber*. | |
| 36 | 107 | Feb. 20, 2019 | During the scripted portion of the Q4 2018 Earnings Call, Defendant Keppler stated that "*[s]ustainability is the foundation of our business and is increasingly an area of focus for our investors, who place a great deal of value on having Enviva as an ESG investment in their portfolio*." | Earnings Call |
| 37 | 108 | Feb. 20, 2019 | During the same call, Defendant Keppler stated that Enviva's "*[p]rograms* [like the IMG, the Enviva Forest Conservation Fund, and] *our industry-leading track and trace system, tangibly and transparently illustrate our innovation on and commitment to sustainability in ways that extend far beyond third-party audits, and legal and regulatory compliance*." | Earnings Call |
| 38 | 112[7] | Mar. 4, 2019 | In discussing the Company's committees of the board of directors, the 2018 10-K stated, in relevant part:<br><br>*Health, Safety, Sustainability and Environmental Committee*<br><br>The board of directors of our General Partner has established a Health, Safety, Sustainability and Environmental Committee (the "HSSE committee") [that] assists the board of directors of our General Partner in fulfilling its oversight *responsibilities with respect to the board's and our continuing commitment to (1) ensuring the safety of our employees and the public and assuring that our businesses and facilities are operated and maintained in a safe and environmentally sound manner, (2) sustainability, including sustainable forestry practices, (3) delivering environmental benefits to our customers, the forests from which we source our wood fiber and the communities in which we operate and (4) minimizing the impact of our operations on the environment.* | 2018 10-K |
| 39 | 119* | May 9, 2019 | During the scripted portion of the Q1 2019 Earnings Call, Defendant Keppler stated, in relevant part: "[Before we open up for questions,] I would like to take a minute to highlight our efforts around sustainability. *As the foundation of our business and an area of increasing focus for our investors who place a great deal of value on having Enviva as an ESG investment in their portfolios. As a company, our purpose is simple to improve the environment by displacing coal and growing more trees.*" | Earnings Call |
| 40 | 123* | Aug. 8, 2019 | Also on the Q2 2019 Earnings Call, Defendant Keppler reiterated his contention that "*our purpose is to displace coal and grow more trees, and it's clear we're making a difference sustainably*." | Earnings Call |
| 41 | 136[8] | Apr. 29, 2020 | **[From the Source]:** | Press release |

---

[7] *See also* ¶¶ 134, 163, and 190 which simply allege that Enviva's 2019, 2020, and 2021 10-Ks, respectively, contain similar misstatements; ¶ 184 which asserts that the alleged misstatement in ¶ 163 was incorporated by reference into Enviva's Offering Documents.

[8] *See also* ¶ 140 which contains a nearly identical statement from the earnings call discussing the Company's Q1 2020 financial results on April 30, 2020.

7

Appendix A

| # | AC ¶ | Date | Statement[2] | Source |
|---|---|---|---|---|
| | | | *Recently, our sponsor issued its 2020 plans under our global Responsible Sourcing Policy, which set forth new initiatives to continue to deliver on its commitment to sustainable practices of wood sourcing, transparency, and forest conservation*. This year the plans include increasing certification of the Partnership and our sponsor's network of private forest landowners by 30,000 acres, enhancing longleaf pine restoration and wildlife habitat in partnership with The Longleaf Alliance through our wood sourcing in the Southeast U.S., and conservation of 5,000 acres of bottomland hardwood forests. *Our sponsor [ ] committed to issue its first Corporate Sustainability Report describing how we and our sponsor deliver on our mission to displace coal, grow more trees, and fight climate change, our current environmental impact and sustainability practices, and our goals for continuous improvement in sustainability of our business in the long-term*.<br><br>During this quarter, our sponsor and the Longleaf Alliance announced the signing of a five-year partnership to collaboratively implement our sponsor's longleaf forest restoration plan to protect and restore longleaf pine forests. Longleaf pine forests are a critical ecosystem in the Southeast U.S. and are considered high conservation value forests because of their rarity and biodiversity. This partnership between our sponsor and The Longleaf Alliance will contribute to America's Longleaf Restoration Initiative's goal to increase longleaf pine forests from 4.7 million acres to 8.0 million acres across the southeast U.S. | |
| 42 | 139 | Apr. 30, 2020 | On the same Q1 2020 Earnings Call, Keppler contended that "*[s]ustainability is core to our value proposition, and last week we celebrated the 50th anniversary of Earth Day. This year's theme for Earth Day was Climate Action, which for us is what we do every day, by displacing coal, growing more trees and fighting climate change. Last week our sponsor also issued its 2020 plans under our Global Responsible Sourcing Policy, which set forth new initiatives to continue to deliver on our commitment to transparency, forest conservation, and sustainable practices of wood sourcing*." | Earnings call |
| 43 | 146 | Aug. 5, 2020 | On August 5, 2020, Enviva issued a press release announcing the Company's Q2 2020 financial results, which stated, in relevant part: "*[t]he Partnership and its sponsor continue to prioritize efforts to safeguard and enhance the sustainability of wood pellet production in the United States. This ensures the long-term availability of the forest resources in our production areas while also creating a reputation for environmental best practice among policymakers and our customers*." | Press release |
| 44 | 150 | Oct. 28, 2020 | Among other things, that press release quoted Defendant Keppler, who stated: "I am excited to share our first-ever Corporate Sustainability Report that not only reflects the journey that began when we founded Enviva more than 16 years ago but also looks ahead at the opportunities that exist for our company to continue to fuel positive change . . . . *This milestone document for Enviva focuses on the three core commitments that guide our work – people, forests, and climate change – and how they drive our approach to sustainability in all aspects of our business.* The choices we make today will | Press Release |

| # | AC ¶ | Date | Statement[2] | Source |
|---|---|---|---|---|
| | | | have lasting impacts for generations to come, *and we are privileged to continue to have the input of so many valued stakeholders to inform our choices and help ensure that good biomass protects forests, empowers communities, and puts us on the path to net-zero emissions.*" | |
| 45 | 174*[9] | July 28, 2021 | **[From the Source]:**<br><br>*Sustainability is the core of our value proposition in our mission to displace coal, grow more trees, and fight climate change.* This is because healthy, growing forests remain one of the most critical tools in the fight to mitigate climate change, and *sustainable forest management* is part of every plan outlined by the UN Intergovernmental Panel on Climate Change (the "IPCC") to limit global warming to less than 1.5 degrees Celsius. Specifically, the IPCC's Special Report on Climate Change and Land, which is considered by global policymakers to be one of the key science-based blueprints for climate change mitigation, declared that "a sustainable forest management strategy aimed at maintaining or increasing forest carbon stocks, while producing an annual sustained yield of timber, fiber, or energy from the forest, will generate the largest sustained [climate change] mitigation benefit." | Press Release |
| 46 | 176* | July 29, 2021 | *Sustainability is at the core of our value proposition, and our net zero advancements only make the product we manufacture that much more valuable in our effort to displace coal, grow more trees, and fight climate change.*" | Earnings Call |
| 47 | 198 | May 5, 2022 | During the scripted portion of the Q1 2022 Earnings Call, Defendant Keppler stated, in relevant part: "*As a pioneer in the biomass industry, we've built a business focused on our core values: caring about people and our communities, fighting climate change by displacing coal, and ensuring that we are growing more trees, managing our business under industry-leading sustainability practices that ensure that we are delivering favorable impact to energy and the environment, right in line with the IPCC guidance.*" | Earnings Call |
| **Category E: Statements About Policies** | | | | |
| 48 | 103 | Dec. 18, 2018 | The Class Period begins on December 18, 2018, when Enviva issued a statement claiming "Global Responsible Sourcing Policy and Pledges in Conservation Leadership," which required, among other things, "pledged" that: "*[t]he primary wood we purchase must be sourced from sustainably-managed forests and harvesting operations*" and "*Enviva will only source primary materials from a supplier when …. [t]he forest source will be replanted or regrown as forests and will not be converted to non-forest uses ….*" | Global Responsible Sourcing Policy |
| 49 | 111[10] | Mar. 4, 2019 | On March 4, 2019, Enviva filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2018 (the "2018 10-K"), | 2018 10-K |

---

[9] *See also* ¶ 184 which asserts that the alleged misstatement in ¶ 174 was incorporated by reference into Enviva's Offering Documents.

[10] *See also* ¶¶ 134 and 163 which simply allege that Enviva's 2019 and 2020 10-Ks, respectively, contain similar misstatements; ¶ 184 which asserts that the alleged misstatement in ¶ 163 was incorporated by reference into Enviva's Offering Documents.

9

Appendix A

| # | AC ¶ | Date | Statement[2] | Source |
|---|------|------|-----------|--------|
| | | | in which Defendants claimed that "*[o]ur customers are subject to stringent requirements regarding the sustainability of the fuels they procure. In addition to our internal sustainability policies and initiatives, our wood fiber procurement is conducted in accordance with leading forest certification standards.* [Our fiber supply chains are routinely audited by independent third parties. We maintain multiple forest certifications including: Forest Stewardship Council (FSC®) Chain of Custody, FSC® Controlled Wood, Programme for the Endorsement of Forest Certification (PEFC™) Chain of Custody, Sustainable Forestry Initiative (SFI®) Fiber Sourcing and SFI® Chain of Custody. We have obtained independent third-party certification for all of our plants to the applicable Sustainable Biomass Program (SBP) Standards.]" | |
| 50 | 168[11] | Apr. 28, 2021 | **[From the Source]:**<br><br>In an effort to transparently demonstrate our adherence to and accountability for sustainable forest management and wood sourcing, our sponsor developed our proprietary, industry-leading Track & Trace® system in 2017. . . .<br><br>Pursuant to Enviva's Responsible Sourcing Policy, Enviva requires landowners to commit to replant following harvests in which Enviva participates. | Press Release |
| **Category F: SOX Certifications** | | | | |
| 51 | 113[12] | Mar. 4, 2019 | Appended to the 2018 10-K as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Keppler and Even, attesting that "the information contained in the [2018 10-K fairly presents, in all material respects, the … results of operations of [Enviva]." | 2018 10-K |

---

[11] *See also* ¶ 184 which asserts that the alleged misstatement in ¶ 168 was incorporated by reference into Enviva's Offering Documents.

[12] *See also* ¶¶ 134, 163, 190 which simply allege that Enviva's 2019, 2020, and 2021 10-Ks, respectively, contain similar misstatements; ¶ 184 which asserts that the alleged misstatement in ¶ 163 was incorporated by reference into Enviva's Offering Documents.