# EXHIBIT 13

A0643

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# Form 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2020

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number 001-37363

# Enviva Partners, LP
(Exact name of registrant as specified in its charter)

| **Delaware** | **46-4097730** |
|---|---|
| (State or other jurisdiction | (I.R.S. Employer |
| of incorporation or organization) | Identification No.) |

| **7200 Wisconsin Ave.   Suite 1000   Bethesda,   MD** | **20814** |
|---|---|
| (Address of principal executive offices) | (Zip code) |

**(301) 657-5560**

(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common Units Representing Limited Partner Interests | EVA | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of the common units held by non-affiliates of the registrant as of June 30, 2020 was approximately $943.5 million based upon a closing price of $36.04 per common unit as reported on the New York Stock Exchange on such date.

As of February 15, 2021, 40,023,105 common units were outstanding.

**Documents Incorporated by Reference:**

None

**ENVIVA PARTNERS, LP**
**ANNUAL REPORT ON FORM 10-K**
**TABLE OF CONTENTS**

| | | |
|---|---|---|
| Cautionary Statement Regarding Forward-Looking Statements | | 1 |
| Glossary of Terms | | 3 |
| Part I | | 4 |
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 15 |
| Item 1B. | Unresolved Staff Comments | 36 |
| Item 2. | Properties | 36 |
| Item 3. | Legal Proceedings | 36 |
| Item 4. | Mine Safety Disclosures | 36 |
| Part II | | 37 |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 37 |
| Item 6. | Selected Financial Data | 38 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 39 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 56 |
| Item 8. | Financial Statements and Supplementary Data | 58 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 103 |
| Item 9A. | Controls and Procedures | 104 |
| Item 9B. | Other Information | 107 |
| Part III | | 108 |
| Item 10. | Directors, Executive Officers and Corporate Governance | 108 |
| Item 11. | Executive Compensation | 115 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 132 |
| Item 13. | Certain Relationships and Related Transactions and Director Independence | 134 |
| Item 14. | Principal Accounting Fees and Services | 140 |
| Part IV | | 141 |
| Item 15. | Exhibits, Financial Statement Schedules | 141 |

A0645

**CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS**

Certain statements and information in this Annual Report on Form 10-K (this "Annual Report") may constitute "forward-looking statements." The words "believe," "expect," "anticipate," "plan," "intend," "foresee," "should," "would," "could" or other similar expressions are intended to identify forward-looking statements, which are generally not historical in nature. These forward-looking statements are based on our current expectations and beliefs concerning future developments and their potential effect on us. Although management believes that these forward-looking statements are reasonable as and when made, there can be no assurance that future developments affecting us will be those that we anticipate. All comments concerning our expectations for future revenues and operating results are based on our forecasts for our existing operations and do not include the potential impact of any future acquisitions. Our forward-looking statements involve significant risks and uncertainties (some of which are beyond our control) and assumptions that could cause actual results to differ materially from our historical experience and our present expectations or projections. Important factors that could cause actual results to differ materially from those in the forward-looking statements include, but are not limited to, those summarized below:

- the volume and quality of products that we are able to produce or source and sell, which could be adversely affected by, among other things, operating or technical difficulties at our wood pellet production plants or deep-water marine terminals;

- the prices at which we are able to sell our products;

- our ability to successfully negotiate, complete and integrate drop-down or third-party acquisitions, including the associated contracts, or to realize the anticipated benefits of such acquisitions;

- failure of our customers, vendors and shipping partners to pay or perform their contractual obligations to us;

- our inability to successfully execute our project development, expansion and construction activities on time and within budget;

- the creditworthiness of our contract counterparties;

- the amount of low-cost wood fiber that we are able to procure and process, which could be adversely affected by, among other things, disruptions in supply or operating or financial difficulties suffered by our suppliers;

- changes in the price and availability of natural gas, coal or other sources of energy;

- changes in prevailing economic conditions;

- unanticipated ground, grade or water conditions;

- inclement or hazardous environmental conditions, including extreme precipitation, temperatures and flooding;

- fires, explosions or other accidents;

- changes in domestic and foreign laws and regulations (or the interpretation thereof) related to renewable or low-carbon energy, the forestry products industry, the international shipping industry or power, heat or combined heat and power generators;

- changes in the regulatory treatment of biomass in core and emerging markets;

- our inability to acquire or maintain necessary permits or rights for our production, transportation or terminaling operations;

- changes in the price and availability of transportation;

- changes in foreign currency exchange or interest rates, and the failure of our hedging arrangements to effectively reduce our exposure to the risks related thereto;

- risks related to our indebtedness;

- our failure to maintain effective quality control systems at our wood pellet production plants and deep-water marine terminals, which could lead to the rejection of our products by our customers;

- changes in the quality specifications for our products that are required by our customers;

- labor disputes, unionization or similar collective actions;

1

- our inability to hire, train or retain qualified personnel to manage and operate our business and newly acquired assets;

- the effects of the exit of the United Kingdom from the European Union on our and our customers' businesses;

- our inability to borrow funds and access capital markets; and

- viral contagions or pandemic diseases, such as the recent outbreak of a novel strain of coronavirus known as COVID-19.

All forward-looking statements in this Annual Report are expressly qualified in their entirety by the foregoing cautionary statements.

Please read Part I, Item 1A. "Risk Factors." Readers are cautioned not to place undue reliance on forward-looking statements and we undertake no obligation to update or revise any such statements after the date they are made, whether as a result of new information, future events or otherwise.

A0647

**GLOSSARY OF TERMS**

*biomass:* any organic biological material derived from living organisms that stores energy from the sun.

*co-fire:* the combustion of two different types of materials at the same time. For example, biomass is sometimes fired in combination with coal in existing coal plants.

*cost pass-through mechanism:* a provision in commercial contracts that passes costs through to the purchaser.

*dry-bulk:* describes dry-bulk commodities that are shipped in large, unpackaged amounts.

*metric ton:* one metric ton, which is equivalent to 1,000 kilograms and 1.1023 short tons.

*net calorific value:* the amount of usable heat energy released when a fuel is burned completely and the heat contained in the water vapor generated by the combustion process is not recovered. The European power industry typically uses net calorific value as the means of expressing fuel energy.

*off-take contract:* an agreement concerning the purchase and sale of a certain volume of future production of a given resource such as wood pellets.

*ramp:* increasing production for a period of time following the startup of a plant or completion of a project.

*Riverstone*: Riverstone Holdings LLC.

*Riverstone Funds:* Riverstone/Carlyle Renewable and Alternative Energy Fund II, L.P. and certain affiliated entities, collectively.

*stumpage:* the price paid to the underlying timber resource owner for the raw material.

*utility-grade wood pellets:* wood pellets meeting minimum requirements generally specified by industrial consumers and produced and sold in sufficient quantities to satisfy industrial-scale consumption.

*wood fiber:* cellulosic elements that are extracted from trees and used to make various materials, including paper. In North America, wood fiber is primarily extracted from hardwood (deciduous) trees and softwood (coniferous) trees.

*wood pellets:* energy-dense, low-moisture and uniformly sized units of wood fuel produced from processing various wood resources or byproducts.

3

A0648

## PART I

### ITEM 1. BUSINESS

*Unless otherwise stated or the context otherwise indicates, all references in this Annual Report to "we," "us," "our," the "Partnership," or similar expressions refer to Enviva Partners, LP, including its subsidiaries. References to "our sponsor" refer to Enviva Holdings, LP, and, where applicable, its wholly owned subsidiaries Enviva MLP Holdco, LLC and Enviva Development Holdings, LLC. References to "our General Partner" refer to Enviva Partners GP, LLC, a wholly owned subsidiary of Enviva Holdings, LP. References to "Enviva Management Company" refer to Enviva Management Company, LLC, a wholly owned subsidiary of Enviva Holdings, LP, together with its affiliates that provide services to us, as applicable. References to "our employees" refer to the employees of Enviva Management Company and its affiliates who provide services to the Partnership. Please read Cautionary Statement Regarding Forward-Looking Statements on page 1 and Item 1A. "Risk Factors" for information regarding certain risks inherent in our business.*

### Overview

We are a growth-oriented master limited partnership formed in 2013 that is focused on owning, operating and acquiring assets from our sponsor or third parties. We aggregate a natural resource, wood fiber, and process it into a transportable form, wood pellets. We sell a significant majority of our wood pellets through long-term, take-or-pay off-take contracts with creditworthy customers in the United Kingdom (the "U.K."), Europe and increasingly in Japan. We own and operate nine plants (collectively, "our plants") with a combined production capacity of approximately 5.3 million metric tons of wood pellets per year ("MTPY") in Virginia, North Carolina, South Carolina, Georgia, Florida and Mississippi, the production of which is fully contracted through 2025. We export wood pellets through our wholly owned dry-bulk, deep-water marine terminal at the Port of Chesapeake, Virginia (the "Chesapeake terminal") and terminal assets at the Port of Wilmington, North Carolina (the "Wilmington terminal") and from third-party deep-water marine terminals in Savannah, Georgia (the "Savannah terminal"), Mobile, Alabama (the "Mobile terminal") and Panama City, Florida (the "Panama City terminal"). All of our facilities are located in geographic regions with low input costs and favorable transportation logistics. Owning these cost-advantaged assets, the output from which is fully contracted through 2025, in a rapidly expanding industry provides us with a platform to generate stable and growing cash flows. Our plants are sited in robust fiber baskets providing stable pricing for the low-grade fiber used to produce wood pellets. Our raw materials are byproducts of traditional timber harvesting, principally low-value wood materials, such as trees generally not suited for sawmilling or other manufactured forest products, and tree tops and limbs, understory, brush and slash that are generated in a harvest.

Our strategy is to fully contract the wood pellet production from our plants under long-term, take-or-pay off-take contracts with a diversified and creditworthy customer base. Our long-term off-take contracts typically provide for fixed-price deliveries that may include provisions that escalate the price over time and provide for other margin protection. During 2020, production capacity from our wood pellet production plants and wood pellets sourced from our affiliates and third parties were approximately equal to the contracted volumes under our existing long-term, take-or-pay off-take contracts. Our long-term, take-or-pay off-take contracts provide for a product sales backlog of $14.6 billion and have a total weighted-average remaining term of 12.8 years from February 1, 2021. Under our current product sales backlog, our plants are fully contracted through 2025. Assuming all volumes under the firm and contingent long-term off-take contracts held by our sponsor were included with our product sales backlog for firm and contingent contracted product sales, our product sales backlog would increase to $19.9 billion and the total weighted-average remaining term from February 1, 2021 would increase to 14.0 years.

Our customers use our wood pellets as a substitute fuel for coal in dedicated biomass or co-fired coal power plants. Wood pellets serve as a suitable "drop-in" alternative to coal because of their comparable heat content, density and form. Due to the uninterruptible nature of our customers' fuel consumption, our customers require a reliable supply of wood pellets that meet stringent product specifications. We have built our operations and assets to deliver and certify the highest levels of product quality and our proven track record of reliable deliveries enables us to charge premium prices for this certainty. In addition to our customers' focus on the reliability of supply, they are concerned about the combustion efficiency of the wood pellets and their safe handling. Because combustion efficiency is a function of energy density, particle size distribution, ash/inert content and moisture, our customers require that we supply wood pellets meeting minimum criteria for a variety of specifications and, in some cases, provide incentives for exceeding our contract specifications.

### Our Production Plants, Logistics and Storage Capabilities

We procure low-grade wood fiber and process it into utility-grade wood pellets and load the finished wood pellets into railcars, trucks and barges for transportation to deep-water marine terminals, where they are received, stored and ultimately loaded onto oceangoing vessels for delivery to our customers.

4

A0649

We own and operate nine industrial-scale wood pellet production plants strategically located in the Mid-Atlantic and Gulf Coast regions of the United States, geographic areas in which wood fiber resources are plentiful and readily available. Our plants are constructed according to a "build and copy" approach, which allows for operating efficiencies. Furthermore, our multi-plant profile and scale provide us with flexibility under our portfolio of off-take contracts that enhances the reliability of our deliveries and provides opportunities for optimization.

Our facilities are designed to operate 24 hours per day, 365 days per year, although we schedule up to 15 days of planned maintenance for our wood pellet production plants during each calendar year. There are no regularly required major turnarounds or overhauls.

The following table describes our wood pellet production plants:

| Plant Location | Year of Acquisition or Operations Commenced | Production (MTPY) |
|---|---|---|
| Ahoskie, North Carolina | 2011 | 410,000 |
| Amory, Mississippi | 2010 | 115,000 |
| Cottondale, Florida | 2015 | 780,000 |
| Greenwood, South Carolina | 2020 | 500,000 |
| Hamlet, North Carolina | 2019 | 600,000 |
| Northampton, North Carolina (1) | 2013 | 750,000 |
| Sampson, North Carolina | 2016 | 600,000 |
| Southampton, Virginia (1) | 2013 | 760,000 |
| Waycross, Georgia | 2020 | 800,000 |
| Total | | 5,315,000 |

(1)  Production capacities for the Northampton and Southampton plants include increased production capacity pursuant to ongoing expansion projects. After a ramp period for the expansion projects, the Northampton and Southampton plants are expected to each reach 750,000 MTPY and 760,000 MTPY, respectively, by the end of 2021.

*Ahoskie*

We acquired the site of our wood pellet production plant in Ahoskie, North Carolina (the "Ahoskie plant") in December 2010 and constructed the Ahoskie plant there in less than one year, commencing operations in November 2011. Through an expansion completed in June 2012, we increased the plant's production from 260,000 MTPY to 350,000 MTPY and have made further improvements to increase production to 410,000 MTPY of wood pellets.

Production from the Ahoskie plant is transported by truck to our Chesapeake terminal.

*Amory*

We purchased a wood pellet production plant in Amory, Mississippi (the "Amory plant") in August 2010. The Amory plant initially consisted of three pellet mills producing wood pellets at a rate of 41,500 MTPY. Through operational improvements and installation of a fourth pellet mill, the Amory plant currently produces 115,000 MTPY of wood pellets.

Production from the Amory plant is transported by barge to the Mobile terminal.

*Cottondale*

Our sponsor acquired a wood pellet production plant in Cottondale, Florida (the "Cottondale plant") in January 2015 and contributed it to us in April 2015. We have undertaken several expansions and process improvements at the Cottondale plant since acquiring it from our sponsor and have increased its production capacity from 720,000 MTPY to 780,000 MTPY of wood pellets since 2016.

Wood pellets produced by the Cottondale plant are transported approximately 50 miles by short-line rail to a warehouse that currently can store up to 32,000 metric tons ("MT") of wood pellet inventory at the Panama City terminal.

5

*Greenwood*

Our sponsor acquired a wood pellet production plant in Greenwood, South Carolina (the "Greenwood plant") in February 2018 and contributed it to us in July 2020. Procurement and detailed engineering activities to expand the Greenwood plant's production capacity to 600,000 MTPY are underway and we expect the expansion to be completed by year-end 2021.

Production from the Greenwood plant is transported by rail to the Wilmington terminal.

*Hamlet*

In April 2019, we acquired from our sponsor all of the Class B units of Enviva Wilmington Holdings, LLC (the "Hamlet JV," and such acquisition, the "Hamlet Drop-Down"). The Hamlet JV owns a wood pellet production plant in Hamlet, North Carolina (the "Hamlet plant"). We are the managing member of the Hamlet JV, which is partially owned by John Hancock Life Insurance Company (U.S.A.) and certain of its affiliates (collectively, where applicable, "John Hancock"). We accounted for the Hamlet JV as a consolidated subsidiary, not as a joint venture, following the Hamlet Drop-Down. For more information regarding our rights and obligations with respect to the Hamlet JV, see Note 17, *Partners' Capital—Hamlet JV*.

Production from the Hamlet plant is transported by rail to our Wilmington terminal.

*Northampton*

Our wood pellet production plant in Northampton, North Carolina (the "Northampton plant") was constructed based on the Ahoskie plant design, utilizing the same major equipment suppliers. After a ramp period for the expansion project, the Northampton plant's production capacity is expected to increase by 200,000 MTPY to 750,000 MTPY by the end of 2021.

Production from the Northampton plant is transported by truck to our Chesapeake terminal.

*Sampson*

Our wood pellet production plant in Sampson, North Carolina (the "Sampson plant"), which was built based on our templated design and which we acquired from our sponsor's first development joint venture in December 2016, commenced operations during the fourth quarter of 2016.

Production from the Sampson plant is transported by truck to our Wilmington terminal.

*Southampton*

We acquired a wood pellet production plant in Southampton County, Virginia (the "Southampton plant") from our sponsor's first development joint venture in December 2015. The Southampton plant is a build-and-copy replica of our Northampton plant. After a ramp period for the expansion project, the Southampton plant's production capacity is expected to increase by 200,000 MTPY to 760,000 MTPY by the end of 2021.

Production from the Southampton plant is transported by truck to our Chesapeake terminal.

*Waycross*

In July 2020, we acquired a wood pellet production plant in Waycross, Georgia with a production capacity of approximately 800,000 MTPY (the "Waycross plant").

Production from the Waycross plant is transported by rail to the Savannah terminal.

*Wood Fiber Procurement and Sustainability*

Our fleet of production plants is sited in robust fiber baskets in the Southeast United States that sustainably support our growth operations with low-grade fiber. Our sites minimize wood fiber procurement and logistics costs, which provides a structural cost of goods advantage over many other fiber baskets around the world. Although "stumpage," the industry term for the amount of consideration paid for fiber, constitutes a small portion of our total cost of delivered products, wood fiber procurement is a vital function of our business and cost-effective access to wood fiber is an important factor in our pricing stability.

Wood fiber is a unique energy commodity in that, in resource basins like the Southern United States where we operate, more wood fiber grows each year than is harvested, meaning that the commodity is a negative depletion resource. Over the period from 1953 to 2015, the amount of timberland acreage in the U.S. South remained stable; however, during this same period wood fiber inventory stored in Southern forests increased by 108%. Between 2011, the year in which we opened our first wood pellet production plant, and 2019, forest inventory in our overall supply base increased by more than 370 million MT, or 18%.

6

A0651

Because wood fiber is approximately 50% water at the time of harvest, it has a limited economically efficient distribution radius of roughly 75 miles. The combination of consistent excess supply over demand for a commodity that is not cost-effective to transport to new demand regions means that this stranded natural resource experiences structurally stable long-term pricing: during the period from 2000 to 2018, the delivered cost of fiber in North Carolina, one of our primary sourcing areas, increased at a modest 1.6% compound annual growth rate with limited annual volatility.

We and our customers are subject to stringent requirements regarding the sustainability of the fuels they procure. In addition to our internal sustainability policies and initiatives like our Responsible Sourcing Policy, our wood fiber procurement is conducted in accordance with leading forest certification standards. Our fiber supply chains are routinely audited by independent third parties. We maintain multiple forest certifications including: Forest Stewardship Council (FSC®) Chain of Custody, FSC® Controlled Wood, Programme for the Endorsement of Forest Certification (PEFC™) Chain of Custody, Sustainable Forestry Initiative (SFI®) Fiber Sourcing and SFI® Chain of Custody. We have obtained independent third-party certification for all of our plants to the applicable Sustainable Biomass Program (SBP) Standards.

Our wood fiber demand is complementary to, rather than in competition with, demand for high-grade wood for use by most other forest-related industries, such as lumber and furniture making. For example, improvements in the U.S. housing construction industry typically increase the demand for construction-quality lumber, which in turn increases the available supply of the low-cost pulpwood and mill residues that we use in wood pellet production. By using commercial thinnings and byproducts as raw materials, wood pellet production also indirectly supports other forest-related industries as well as the sustainable management of commercial forests.

We make wood pellets only with low-grade or leftover wood. Across our combined supply base, approximately 10% of the volume of harvested wood is purchased by us and other wood pellet producers, which represents an estimated 4% of the total stumpage value of harvested timber. Our sponsor has created a first-of-its kind, proprietary Track and Trace® program to track the origin and characteristics of fiber that we use, and we publish this information, providing unprecedented transparency into our fiber sourcing activities.

The wood fiber used for wood pellet production predominantly is comprised of:

- *low-grade wood fiber:* trees or wood that are unsuitable for or rejected by the sawmilling and lumber industries because of small size, defects (e.g. crooked or knotty), disease, or pest infestation;

- *tops and limbs:* the parts of trees that cannot be processed into lumber;

- *commercial thinnings:* harvests that promote the growth of higher value timber by removing weaker or deformed trees to reduce competition for water, nutrients, and sunlight; and

- *mill residues:* chips, sawdust and other wood industry byproducts.

Demand for the non-merchantable fiber, waste products or byproducts that we use is generally low because they have few competing uses, in part because they cannot be transported cost-effectively. The tops, limbs and other low-grade wood fiber we purchase would otherwise generally be left on the forest floor, impeding reforestation, or burned. Wood pellet production provides a profitable use for the residues from sawmill and furniture industries and also for the trees that are thinned to support the growth of higher-value lumber-grade trees. U.S. demand for such low-grade wood fiber historically emerged from the pulp and paper industry. However, due to the decline in demand from paper and pulp, many landowners lack commercial markets for this wood fiber. Wood pellet producers help fill the gap.

As a result of the fragmented nature of tract ownership, we procure raw materials from hundreds of landowners, loggers, and timber industry participants, with no individual landowner representing a material fraction of any of our plants' needs. Our wood fiber is procured under a variety of arrangements, including (1) logging contracts for the thinnings, pulpwood and other unmerchandised low-grade fiber, (2) in-woods chipping contracts and (3) contracts with timber dealers. Via our sponsor's proprietary Track & Trace® system, we maintain traceability of the primary wood that is delivered to us directly from forests. Any supplier delivering wood to one of our plants must first share the details about the forest characteristics of the tract from which the wood is sourced with our forestry staff so so we can verify that it meets our strict sustainability criteria. Our supplier contracts require a certification that the relevant tract information has been entered into our database before wood may be delivered directly from a particular tract. We summarize all such tract information periodically and publish tract-level details on our website. During 2020, we sourced wood fiber from approximately 363 suppliers, including brokers who source from landowners growing both hardwoods and softwoods and other suppliers. The diversity of our supply base and our facilities' advantaged siting enables us to benefit from more reliable deliveries, at a lower cost, than others in our region or industry.

A0652

**Plant Operations**

Our plants receive wood fiber in both stem-length and chip form. When this raw material is delivered by truck from our suppliers, it is scaled for weight, checked for quality and recorded consistent with our Track & Trace® system and Responsible Sourcing Policy requirements at the scale house at each of our plants. Each truck is then unloaded in a particular location in each respective plant's woodyard based on the form and species (generally hardwood or softwood) of the raw material. Stem-length wood is stacked by radial or portal cranes and chips are piled, typically through automated conveyors to be reclaimed later for use. Stem-length wood is debarked prior to processing, providing fuel for each plant's drying systems.

Following debarking, stem-length wood is size-reduced through a disc chipper, the chip product from which is co-mingled with delivered chips. The production process begins by mixing a specific formula of species and form factors of chips and metering them into a set of green hammer mills, which perform primary sizing. The now-smaller chips are fed into a green chip bin and metered into a rotary kiln drier, where drying heat is provided by a biomass and bark-fueled furnace. Dried chips are fed from the drier to the secondary sizing process island, which comprises a combination of screening and dry-hammermilling to further size-reduce the chips. This dry, further size-reduced flour or meal is stored in a dry storage silo and conveyed to ripening bins which further homogenize moisture prior to pelletizing. To the extent sawdust or other residuals are available, it is also size-reduced and combined with the processed wood fiber at this point in the process. The meal is metered into a series of pellet mills where hydraulic pressure extrudes the fiber into wood pellets. The pressure and temperature of the pelleting process activate natural lignin present in the wood which acts as a natural binder and finishes the pellet with a shiny exterior. The pellets are gravity-fed into large coolers which utilize counter-current air flow to reduce pellet temperature and moisture. Once cool, the pellets, then averaging approximately 5-7% moisture, are screened to reduce entrained dust and then conveyed to finished goods silos prior to being loaded onto trucks, railcars or barges depending on the facility.

Our larger plants are staffed by approximately 85-100 employees including operators, maintenance technicians, quality leads and area, shift and operations supervisors. Plants operate two shifts per day, with four employee teams operating either on an alternating three days on, two days off, two days on, three days off, or alternating four days on, four days off, basis, with a rotation between day shift and night shift periodically. Plant management consists of a plant manager, operations manager, maintenance manager, quality manager, human capital manager and an environmental health and safety manager, complemented by wood procurement, sustainability, accounting and engineering personnel.

Maintenance activities at the plant include planned and preventive maintenance as well as refurbishment of tools, dies, screens and hammers for key process equipment. The plants receive power from local utilities, have minimal process water requirements and limited exposure to fossil fuel volatility. The furnace burns wood in the form of bark and fuel chips as the source of heat for the dryer to evaporate moisture. Natural gas or propane is used as the energy source for emissions control equipment onsite like regenerative thermal oxidizers and a small amount of diesel is used in mobile equipment on each site. Very little waste besides office refuse leaves the plant as the by-product ash from the furnace operations is usually desirable as a fertilizer and is land-applied by local farmers.

**To-Port Logistics and Port Infrastructure**

Each of our plants is located near multiple truck, rail, river and ocean transportation access points. We also have inland waterway access and rail access at the Chesapeake, Wilmington, Savannah and Panama City terminals. Our multi-year fixed-cost contracts with third-party logistics providers allow for long-term visibility into our to-port logistics cost structure.

The wood pellets produced at our plants are stored, terminaled and shipped to our customers, principally in the U.K., Europe and increasingly in Japan. Limited deep-water, dry-bulk terminaling assets exist in the Southeastern United States, and very few of them have the appropriate handling and storage infrastructure necessary for receiving, storing and loading wood pellets. In response to such scarcity, we have vertically integrated our Mid-Atlantic operations downstream to encompass finished product logistics and storage. As a largely fixed cost and capital intensive piece of the value chain, we believe our port infrastructure allows us to ship incremental product from our regional plants at a fraction of the cost of our competitors. Management of port terminal infrastructure is also a key element in reducing distribution-related costs as it allows us to manage the arrival and loading of vessels. Additionally, we are able to improve our cost position by maintaining a dedicated berth where pellets from our Mid-Atlantic region plants have priority and equipment with sufficient load-rate capabilities to turn around vessels within the allotted time windows.

In addition to terminaling wood pellets from our production plants, we will, on occasion, provide terminaling services for third- and related-party wood pellet producers as well as for owners of other dry-bulk commodities.

A0653

*Port Operations*

We acquired the Chesapeake terminal in January 2011 and converted it into a dry-bulk terminal. The Chesapeake terminal receives, stores and loads wood pellets for export and serves as the shipment point for products produced at our Ahoskie, Northampton and Southampton plants. The Chesapeake terminal accommodates Handysize, Supramax and Panamax-sized vessels, and has a 200-car rail yard adjacent to a Norfolk Southern track, a loading/unloading system that accommodates deliveries by truck, rail and barge and a highly automated conveying system. In May 2011, we erected a 157-foot tall, 175-foot wide storage dome that receives, stores and loads up to 45,000 MT of wood pellets. In April 2013, we placed into operation a second storage dome at the site to add an additional 45,000 MT of storage.

The Chesapeake terminal's storage and loading capacity is more than adequate to store and facilitate the loading of the wood pellets produced at our Ahoskie, Northampton and Southampton plants, and its location decreases our customers' transportation time and costs. Efficiently positioned near our Ahoskie, Northampton and Southampton plants, the Chesapeake terminal delivers up to a three- to four-day European shipping advantage compared to other Southern or Gulf Coast ports. In addition, because we own the Chesapeake terminal, we enjoy preferential berth access and loading, which minimizes costs of shipping and logistics without the need for excess storage. Our ownership and operation of this terminal enable us to control shipment of the production of our Mid-Atlantic region plants that it serves.

Wood pellets produced at our Sampson, Hamlet and Greenwood plants are terminaled at our Wilmington terminal. The Wilmington terminal accommodates Handysize, Supramax and Panamax-sized vessels, and has a receiving system that accommodates deliveries by truck and rail, a highly automated conveying system and two wood pellet storage domes with capacities of 45,000 MT each. The Wilmington terminal's storage and loading capacity is more than adequate to store and facilitate the loading of wood pellets produced at our Sampson, Hamlet and Greenwood plants and its location decreases transportation time and costs through the entire supply chain. We benefit from preferential berth access and loading at our Wilmington terminal, which minimizes costs of shipping and logistics without need for excess storage.

Wood pellets produced at our Amory plant are transported by barge to the Mobile terminal for storage, handling and export pursuant to a short-term services agreement. The Mobile terminal is a privately owned and maintained deep-water, multi-berth terminal that operates 24 hours per day, seven days per week and is the fleeting and loading point for production from our Amory plant. The Amory plant is sited along a major inland waterway that makes transportation to the Mobile terminal easy and efficient, thereby reducing emissions and costs. Our ability to store our wood pellets in barges provides a capital-light, flexible solution that accommodates the storage needs of the Amory plant.

Wood pellets from our Cottondale plant are transported by short-line rail to the Panama City terminal, where we store up to 32,000 MT of wood pellet inventory in a warehouse at Port Panama City. Production from the Cottondale plant is received, stored and loaded under a long-term terminal services agreement with the Panama City Port Authority and a stevedoring contract, each of which runs through September 2023 and may be extended by us for an additional five-year period.

Wood pellets produced by our Waycross plant are transported by rail to the Savannah terminal, which has two wood pellet storage domes with a combined storage capacity of 50,000 MT, for storage, handling and export pursuant to a lease and associated terminal services agreement that are effective through 2028.

Please read Part II, Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations—Recent Developments" for more information regarding our plants, terminals and other long-lived assets.

## Our Contracts

We refer to the structure of our long-term sales contracts as "take-or-pay" because they include a firm obligation of the customer to take a fixed quantity of product at a stated price and provisions for us to be compensated in the event of a customer's failure to accept all or a part of the contracted volumes or for termination of a contract by a customer. Our long-term sales contracts typically provide for annual inflation-based adjustments or price escalators. Certain of our long-term sales contracts also contain provisions that allow us to increase or decrease the volume of product that we deliver by a percentage of the base annual volume, as well as cost pass-through mechanisms related to stumpage, fuel or transportation costs (including pricing fluctuations in bunker fuel) and price adjustments based on actual product specifications. In addition, many of our long-term sales contracts provide for cost recovery and sharing arrangements in connection with certain changes in law or sustainability requirements as well as payments to us in the case of their termination as a result of such changes. In order to mitigate volatility in our shipping costs, we have entered into fixed-price shipping contracts with reputable shippers to form a shipping portfolio matching the terms and volumes of our sales contracts for which we are responsible for arranging shipping.

A0654

We also have entered into several other contracts that have smaller off-take quantities than the contracts described above. We continue to diversify our customer base; however, our largest customer accounted for 40% of our product sales in 2020 and, based on our current contract backlog, our largest customer will account for 20% of our product sales in 2025.

In some cases, we may purchase shipments of product from third-party suppliers and resell them in back-to-back transactions. We determined that we are the principal in such transactions because we control the pellets prior to transferring them to the customer and therefore we recognize the related revenue on a gross basis in product sales.

In some instances, a customer may request to cancel, defer or accelerate a shipment, in which case we seek to optimize our position by selling or purchasing the subject shipment to or from another party, including in some cases a related party, either within our contracted off-take portfolio or as an independent transaction in the spot market. In most instances, the original customer pays us a fee, including reimbursement of any incremental costs, which is included in other revenue. Other revenue also includes certain sales and marketing, scheduling, sustainability, consultation, shipping and risk management services (collectively, the "Commercial Services") that are outside of the scope of an existing take-or-pay off-take contract.

We also provide terminaling services for third- and related-party wood pellet producers as well as for owners of other dry-bulk commodities.

The following chart presents information relating to our and our sponsor's long-term, take-or-pay off-take contracts:



(1)    Represents the Partnership's sales in 2020.

(2)    As of February 1, 2021, excluding volumes under the contracts between long-term off-take customers and our sponsor.

(3)    As of February 1, 2021, includes all volumes under the firm and contingent off-take contracts held by us and our sponsor. Although we expect to have the opportunity to acquire these contracts from our sponsor there can be no guarantee that we will acquire these, or any, contracts from our sponsor.

With our existing long-term, take-or-pay off-take contracts, all of the current production capacity of our production plants is fully contracted through 2025. As our current off-take contracts expire, we will seek to re-contract our capacity with a combination of renewals with existing customers, the assumption of additional contracts from our sponsor and the entry into contracts with new customers.

*Contracted backlog*

As of February 1, 2021, we had approximately $14.6 billion of product sales backlog for firm and contingent contracted product sales to our long-term off-take customers with a total weighted-average remaining term of 12.8 years. Contracted backlog represents the revenue to be recognized under existing contracts assuming deliveries occur as specified in the contracts. Contracted future product sales denominated in foreign currencies, excluding revenue hedged with foreign currency forward contracts, are

10

included in U.S. Dollars at February 1, 2021 forward rates. The contracted backlog includes forward prices including inflation, foreign currency and commodity prices. The amount also includes the effects of related foreign currency derivative contracts.

Our expected future product sales revenue under our contracted backlog as of February 1, 2021 is as follows (in millions):

| | | |
|---|---|---|
| Period from February 1, 2021 to December 31, 2021 | $ | 1,033 |
| Year ending December 31, 2022 | | 1,274 |
| Year ending December 31, 2023 and thereafter | | 12,284 |
| Total product sales contracted backlog | $ | 14,591 |

Assuming all volumes under the firm and contingent off-take contracts held by our sponsor were included with our product sales backlog for firm and contingent contracted product sales, the total weighted-average remaining term as of February 1, 2021 would increase to 14.0 years and product sales contracted backlog would increase to $19.9 billion as follows (in millions):

| | | |
|---|---|---|
| Period from February 1, 2021 to December 31, 2021 | $ | 1,032 |
| Year ending December 31, 2022 | | 1,325 |
| Year ending December 31, 2023 and thereafter | | 17,537 |
| Total product sales contracted backlog | $ | 19,894 |

Included in the product sales contracted backlog above are $2.9 billion of contingent contracts held by our sponsor.

## Industry Overview

Our product, utility-grade wood pellets, is used as a substitute for coal in both dedicated and co-fired power generation and combined heat and power plants. It enables major power, heat or combined heat and power generators ("generators") to profitably generate electricity and heat in a manner that reduces the overall cost of compliance with certain mandatory greenhouse gas ("GHG") emissions limits and renewable energy targets while also allowing countries to diversify their sources of electricity supply.

Unlike intermittent sources of renewable generation like wind and solar power, wood pellet-fired plants are capable of meeting baseload electricity demand and are dispatchable (that is, power output can be switched on or off or adjusted based on demand). As a result, utilities and major generators in Europe, Asia and other areas have made and continue to make long-term, profitable investments in power plant conversions and new builds of generating assets that either co-fire wood pellets with coal or are fully dedicated wood pellet-fired plants. Such developments help generators maintain and increase baseload generating capacity and comply with binding climate change regulations and other emissions reduction targets.

The capital costs required to convert a coal plant to co-fire biomass, or to burn biomass exclusively, are a fraction of the capital costs associated with implementing offshore wind and most other renewable technologies. Furthermore, the relatively quick process of converting coal-fired plants to biomass-fired generation can be an attractive benefit for generators whose generation assets are no longer viable as coal plants due to the expiration of operating permits, regulatory phase-out of coal-fired power generation, the introduction of taxes or other restrictions on fossil fuel usage or emissions of GHGs and other pollutants.

There also continues to be significant growth in the European and Asian demand for wood pellets as a preferred fuel source and renewable alternative to fossil fuels for district heating loops, for heating homes and commercial buildings and for the production of process heat for industrial sites. Increasingly, wood pellets are also being sought as a raw material input for bio-based substitutes for traditional fossil fuel-based fuels and chemicals. As these markets further develop, we believe we will continue to have opportunities to serve this growing material demand beyond our current product sales backlog.

## Competition

We compete with other utility-grade wood pellet producers for long-term, take-or-pay off-take contracts with major power generation customers and trading houses. Competition in our industry is on the price, quality and consistency of the wood pellets produced, the reliability of wood pellet deliveries and the producer's ability to verify and document, through customer and third-party audits, that its wood pellets meet the regulatory sustainability obligations of a particular customer.

Most of the world's current wood pellet production plants are owned by small, private companies, with few companies owning or operating multiple plants. Few companies have the scale, technical expertise or commercial infrastructure necessary to supply utility-grade wood pellets under large, long-term off-take contracts with generators.

11

A0656

We are the largest producer by production capacity, and consider other companies with comparable scale, technical expertise or commercial infrastructure to be our competitors, including AS Graanul Invest, Pinnacle Renewable Energy Inc., Drax Biomass Inc., Fram Renewable Fuels, LLC, Highland Pellets LLC and Pacific BioEnergy Corporation.

**Our Relationship with Our Sponsor**

The Riverstone Funds became the majority owners of our sponsor in March 2010. In 2020, following a reorganization, certain affiliates of Riverstone, Riverstone Echo Continuation Holdings, L.P. and Riverstone Echo Rollover Holdings, L.P. became the majority owners of our sponsor.

We entered into a purchase rights agreement with our sponsor pursuant to which our sponsor agreed to provide us with a right of first offer to purchase any wood pellet production plant or deep-water marine terminal that it, its subsidiaries or any other entity that it controls, owns and proposes to sell (each, a "ROFO Asset") for a five-year period. Pursuant to an amendment, the term of the purchase rights agreement was extended to May 2021 and will automatically renew on an annual basis unless either party provides notice of termination within 60 days prior to the end of the then-current term.

We will have 30 days following receipt of notice of our sponsor entity's intention to sell a ROFO Asset to propose an offer for the ROFO Asset. If we submit an offer, our sponsor will negotiate with us exclusively and in good faith to enter into a letter of intent or definitive documentation for the purchase of the ROFO Asset on mutually acceptable terms. If we are unable to agree to terms within 45 days, our sponsor entity will have 150 days to enter into definitive documentation with a third party purchaser on terms that are, in the good faith judgment of our sponsor entity selling such ROFO Assets, superior to the most recent offer proposed by us.

We expect to continue to pursue the acquisition of such assets from our sponsor to the extent they are supported by long-term off-take contracts with creditworthy counterparties and have long useful lives, stable cost positions and advantaged locations.

Our sponsor owns approximately 34% of our common units and 100% of our General Partner. Our sponsor owns all of our incentive distribution rights, which entitle our sponsor to increasing percentages of our cash distributions above certain targets. As a result, our sponsor is incentivized to facilitate our access to accretive acquisition and organic growth opportunities, including those pursuant to the purchase rights agreement.

Our sponsor is developing and constructing certain wood pellet production and terminaling assets in the Southeastern United States. Although we expect to continue to have the opportunity to acquire assets, including from our sponsor, our sponsor may not complete their development projects, and our sponsor may not decide to sell assets or completed development projects to us.

**Our Sponsor's Assets and Development Projects**

Our sponsor is constructing a wood pellet production plant in Lucedale, Mississippi and a deep-water marine terminal in Pascagoula, Mississippi. In addition, our sponsor is developing a wood pellet production plant in Epes, Alabama along with other sites in Mississippi and Alabama. Our sponsor employs a "build and copy" approach to constructing production plants and terminals, allowing synergies of common processes and operational knowledge. We expect to have the opportunity to acquire assets and off-take contracts from our sponsor.

**Governmental Regulations**

Our operations are subject to stringent and comprehensive federal, state and local laws and regulations governing matters including protection of the environment and natural resources, occupational health and safety and the release or discharge of materials into the environment, including air emissions. Such laws and regulations may require us to obtain permits, limit or avoid certain operational practices and incur costs for compliance or remediation. Failure to comply with such laws may also result in substantial liabilities, including possible fines and penalties, for unpermitted emissions or discharges from our operations. Failure to comply with these laws and regulations may result in the assessment of administrative, civil and criminal penalties, the imposition of investigatory and remedial obligations and the issuance of orders enjoining some or all of our operations in affected areas.

Moreover, the global trend in environmental regulation is towards increasingly broad and stringent requirements for activities that may affect the environment. Any changes in environmental laws and regulations or re-interpretation of enforcement policies that result in more stringent and costly requirements could have a material adverse effect on our operations and financial position. Although we monitor environmental requirements closely and budget for the expected costs, actual future expenditures may be different from the amounts we currently anticipate spending. Moreover, certain environmental laws impose strict joint and several liability for costs to clean up and restore sites where pollutants have been disposed or otherwise spilled or released, potentially resulting in significant costs and liabilities for remediation of resulting damage to property, natural resources or persons. Although

12

A0657

we believe that our competitors face similar environmental requirements, market factors may prevent us from passing on any increased costs to our customers. Additionally, although we believe that continued compliance with existing requirements will not materially adversely affect us, there is no assurance that the current levels of regulation will continue in the future.

The following summarizes some of the more significant existing environmental, health and safety laws and regulations applicable to our operations, the failure to comply with which could have a material adverse impact on our capital expenditures, results of operations and financial position.

*Air Emissions*

The federal Clean Air Act, as amended (the "CAA"), and state and local laws and regulations that implement and add to CAA requirements, regulate the emission of air pollutants from our facilities. The CAA and state and local laws and regulations impose significant monitoring, testing, recordkeeping and reporting requirements for these emissions. These laws and regulations require us to obtain pre-approval for the construction or modification of certain projects or facilities expected to produce or significantly increase air emissions, obtain and strictly comply with stringent air permit emission limits, and in certain cases utilize specific equipment or technologies to control and measure emissions. Obtaining these permits can be both costly and time intensive and has the potential to delay opening of new plants or significant expansion of existing plants; moreover, complying with these permits, including satisfying testing requirements, can be costly and time-intensive. Failure to comply with these laws, regulations and permit requirements may cause us to face fines, penalties or injunctive orders in connection with air pollutant emissions from our operations.

The CAA requires that we obtain various construction and operating permits, including, in some cases, Title V air permits. In certain cases, the CAA requires us to incur capital expenditures to install air pollution control devices at our facilities. We are also required to control fugitive emissions from our operations and may face fines, penalties or injunctive orders in connection with fugitive emissions. We have incurred, and expect to continue to incur, substantial administrative, operating and capital expenditures to maintain compliance with CAA requirements that have been promulgated or may be promulgated or revised in the future.

*Climate Change and Greenhouse Gases*

Our operations are subject to limited direct regulation with respect to emissions of GHGs. For example, at this time, the U.S. Environmental Protection Agency (the "EPA") requires certain large facilities to undergo CAA pre-construction review and obtain operating permits for their GHG emissions. Our operations are also indirectly affected by regulations regarding the carbon treatment of biomass. Several jurisdictions to which we ship our product have imposed regulations on the characterization of biomass as a carbon-neutral fuel, and any change that imposes more stringent regulations on the characterization of biomass as carbon-neutral could negatively impact demand for our products or require us to incur additional costs to achieve such characterization of our products. For more information, see our risk factor titled "Changes in the treatment of biomass could adversely impact our business." Finally, scientists have concluded that increasing concentrations of GHGs in the earth's atmosphere may produce climate changes that have significant physical effects, such as sea-level rise, increased frequency and severity of storms, floods and other climatic events, including forest fires. If any such effects were to occur, they could have an adverse effect on our operations.

**Safety and Maintenance**

We are subject to a number of federal and state laws and regulations, including the federal Occupational Safety and Health Act, as amended ("OSHA"), and comparable state statutes, whose purpose is to protect the health and safety of workers. OSHA regulations impose various requirements, including with respect to training, policies and procedures and maintenance. In addition, the OSHA hazard communication standards in the Emergency Planning and Community Right-to-Know Act and comparable state statutes require that information be maintained concerning hazardous materials used or produced in our operations and that this information be provided to employees, state and local governmental authorities and citizens. National Fire Protection Association (NFPA) standards for combustible dust require our facilities to incorporate pollution control equipment such as cyclones, baghouses and electrostatic precipitators to minimize regulated emissions. Our deep-water marine terminals must also adhere to Homeland Security/U.S. Coast Guard regulations regarding physical security and emergency response plans. We continually strive to maintain compliance with applicable air, solid waste and wastewater regulations; nevertheless, we cannot guarantee that serious accidents will not occur in the future.

**Seasonality**

Our business is affected by seasonal fluctuations. The cost of producing wood pellets tends to be higher in the winter months because of increases in the cost of delivered raw materials, primarily due to a reduction in accessibility during cold and wet

13

weather conditions. Our raw materials typically have higher moisture content during this period, resulting in a lower product yield; moreover, the cost of drying wood fiber increases during periods of lower ambient temperatures.

The increase in demand for power and heat during the winter months drives greater customer demand for wood pellets. As some of our wood pellet supply to our customers is sourced from third-party purchases, we may experience higher wood pellet costs and a reduction in our gross margin during the winter months.

### Human Capital

We do not have any employees. We are party to management services agreements (the "MSAs") with Enviva Management Company, pursuant to which Enviva Management Company provides us with the employees, management and services necessary for the operation of our business. As of December 31, 2020, Enviva Management Company had 1,135 employees. We refer to the employees of Enviva Management Company as our employees in this annual report. Please read Part II, Item 13. "Certain Relationships and Related Transactions, and Director Independence—Other Transactions with Related Persons—Management Services Agreement" for more information regarding our MSAs with Enviva Management Company.

### Principal Executive Offices

Our principal executive offices are located at 7200 Wisconsin Avenue, Suite 1000, Bethesda, Maryland 20814.

### Available Information

We file annual, quarterly and current reports and other documents with the SEC under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The SEC maintains a website at *www.sec.gov* that contains reports and other information regarding issuers that file electronically with the SEC.

We also make available free of charge our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and any amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act, simultaneously with or as soon as reasonably practicable after filing such materials with, or furnishing such materials to, the SEC and on or through our website, *www.envivabiomass.com*. The information on our website, or information about us on any other website, is not incorporated by reference into this Annual Report.

A0659

**ITEM 1A.    RISK FACTORS**

*There are many factors that could have a material adverse effect on our business, financial condition, results of operations and cash available for distribution. New risks may emerge at any time and we cannot predict those risks or estimate the extent to which they may affect financial performance. Each of the risks described below could adversely impact the value of our common units.*

**Summary Risk Factors**

Our business is subject to numerous risks and uncertainties, including those described in this Item 1A "Risk Factors." These risks include the following:

• We may not have sufficient cash from operations following the establishment of cash reserves and payment of costs and expenses, including cost reimbursements to our General Partner and its affiliates, to enable us to pay quarterly distributions to our unitholders at our current distribution rate.

• We will derive substantially all our revenues from six customers in 2021, five of which are in Europe. If we fail to continue to diversify our customer base, our results of operations, business and financial position and ability to pay distributions to our unitholders could be materially adversely affected.

• Changes in laws or government policies, incentives and taxes related to low-carbon and renewable energy may affect customer demand for our products.

• Challenges to or delays in the issuance of air permits, or our failure to comply with our permits, could impair our operations and ability to expand our production.

• Federal, state and local legislative and regulatory initiatives relating to forestry products and the potential for related litigation could result in increased costs and/or additional operating restrictions and delays, which could cause a decline in the demand for our products and negatively impact our business, financial condition and results of operations.

• We may be unable to complete our construction projects on time, and our construction costs could increase to levels that make the return on our investment less than expected.

• The satisfactory delivery of substantially all of our production is dependent on continuous access to infrastructure at our owned, leased and third-party-operated terminals. Loss of access to our ports of shipment and destination, including through failure of terminal equipment and port closures, could adversely affect our financial results and cash available for distribution.

• Failure to maintain effective quality control systems at our production plants and deep-water marine terminals could have a material adverse effect on our business and operations.

• Our business is subject to operating hazards and other operational risks, which may have a material adverse effect on our business and results of operations. We may also not be adequately insured against such events.

• Significant increases in the cost, or decreases in the availability, of raw materials or sourced wood pellets could result in lower revenue, operating profits and cash flows, or impede our ability to meet commitments to our customers.

• We are exposed to the credit risk of our contract counterparties, including the customers for our products, and any material nonpayment or nonperformance by our customers could adversely affect our financial results and cash available for distribution.

• The international nature of our business subjects us to a number of risks, including foreign exchange risk and unfavorable political, regulatory and tax conditions in foreign countries.

• Enviva Holdings, LP owns and controls our General Partner, which has sole responsibility for conducting our business and managing our operations. Our General Partner and its affiliates, including Enviva Holdings, LP, have conflicts of interest with us and limited duties, and they may favor their own interests to our detriment and that of our unitholders.

• The board of directors of our General Partner may modify or revoke our cash distribution policy at any time at its discretion. Our partnership agreement does not require us to pay any distributions at all.

• Our partnership agreement eliminates and replaces our General Partner's fiduciary duties to holders of our units.

15

A0660

- Our partnership agreement restricts the remedies available to holders of our units for actions taken by our General Partner that might otherwise constitute breaches of fiduciary duty.

- Our sponsor has certain incentive distribution rights that reduce the amount of our cash available for distribution to our common unitholders.

- Holders of our common units have limited voting rights and are not entitled to elect our General Partner or its directors.

- We may issue additional units without unitholder approval, which would dilute existing unitholder ownership interests.

- The New York Stock Exchange (the "NYSE") does not require a publicly traded partnership like us to comply with certain of its corporate governance requirements.

- Our tax treatment depends on our status as a partnership for federal income tax purposes and not being subject to a material amount of entity-level taxation. If the Internal Revenue Service ("IRS") were to treat us as a corporation for federal income tax purposes, or we become subject to entity-level taxation for state tax purposes, our cash available for distribution to our unitholders would be substantially reduced.

- The tax treatment of publicly traded partnerships or an investment in our units could be subject to potential legislative, judicial or administrative changes or differing interpretations, possibly applied on a retroactive basis.

- Even if unitholders do not receive any cash distributions from us, unitholders will be required to pay taxes on their share of our taxable income.

- Tax-exempt entities face unique tax issues from owning our common units that may result in adverse tax consequences to them.

**Risks Related to Our Business**

***We may not have sufficient cash from operations following the establishment of cash reserves and payment of costs and expenses, including cost reimbursements to our General Partner and its affiliates, to enable us to pay quarterly distributions to our unitholders at our current distribution rate.***

We may not have sufficient cash each quarter to enable us to pay quarterly distributions at our current distribution rate. The amount of cash we can distribute on our common units principally depends on the amount of cash we generate from our operations, which fluctuates from quarter to quarter based on various factors, some of which are beyond our control, including the following:

- the volume and quality of wood pellets that we are able to produce or source and profitably sell, which could be adversely affected by, among other things, operating or technical difficulties at our plants or terminals;

- the prices at which we are able to sell our products;

- the ability and willingness of our customers to fully perform under our off-take agreements;

- our ability to successfully negotiate, complete and integrate assets and business or to realize the anticipated benefits of such acquisitions, as well as our ability to organically expand our operations in a cost-effective manner;

- the level of competition from other wood pellet producers and suppliers of competing sources of fuel for heat and power generation, as well as the price and availability of such competing sources; and

- the impact of prevailing regional economic and regulatory conditions in the areas in which we and our customers operate.

In addition, the actual amount of cash we have available for distribution depends on other factors, some of which are beyond our control, including the level of capital expenditures we make, fluctuations in our working capital needs, our cost of capital and ability to access the capital markets, fluctuations in interest rates, our debt service requirements and other liabilities, restrictions contained in our existing or future debt agreements and the amount of cash reserves established by our General Partner.

***We will derive substantially all our revenues from six customers in 2021, five of which are located in Europe. If we fail to continue to diversify our customer base, our results of operations, business and financial position and ability to pay distributions to our unitholders could be materially adversely affected.***

A0661

Our contracts with Drax, Lynemouth Power, MGT, RWE, Ørsted and Sumitomo, five of which are located in Europe, will represent substantially all of our product sales volumes in 2021; as a result, we face counterparty and geographic concentration risk. The ability of each of our customers to perform its obligations under a contract with us will depend on a number of factors that are beyond our control and may include the overall financial condition of the counterparty, the counterparty's access to capital, the condition of the regional and global power, heat and combined heat and power generation industry, continuing regulatory and economic support for wood pellets as a fuel source, spot market pricing trends and general economic conditions. In addition, in depressed market conditions, our customers may no longer need the amount of our products they have contracted for or may be able to obtain comparable products at a lower price. If economic, political, regulatory or financial market conditions in Europe deteriorate and/or our customers experience a significant downturn in their business or financial condition, they may attempt to renegotiate, reject or declare force majeure under our contracts. Should any counterparty fail to honor its obligations under a contract with us, we could sustain losses, which could have a material adverse effect on our business, financial condition, results of operations and cash available for distribution. We may also decide to renegotiate our existing contracts on less favorable terms and/or at reduced volumes in order to preserve our relationships with our customers.

Upon the expiration of our off-take contracts, our customers may decide not to recontract on terms as favorable to us as our current contracts, or at all. For example, our current customers may acquire wood pellets from other providers that offer more competitive pricing or logistics or develop their own sources of wood pellets. Some of our customers could also exit their current business or be acquired by other companies that purchase wood pellets from other providers. The demand for wood pellets or their prevailing prices at the times at which our current off-take contracts expire may also render entry into new long-term-off-take contracts difficult or impossible.

Any reduction in the amount of wood pellets purchased by our customers or our inability to renegotiate or replace our existing contracts on economically acceptable terms, or our failure to successfully penetrate new markets within and outside of Europe in the future, could have a material adverse effect on our results of operations, business and financial position, as well as our ability to pay distributions to our unitholders.

***Termination penalties within our off-take contracts may not fully compensate us for our total economic losses.***

Certain of our off-take contracts provide the customer with a right of termination for various events of convenience or changes in law or policy. Although some of these contracts are subject to certain protective termination payments, the termination payments made by our customers may not fully compensate us for losses. We may be unable to re-contract our production at favorable prices or at all, and our results of operations, business and financial position, and our ability to pay distributions to our unitholders, may be materially adversely affected as a result. Currently, we derive substantially all of our revenues from customers in Europe. If we fail to continue to diversify our customer base geographically within and outside of Europe in the future, our results of operations, business and financial position and ability to pay distributions to our unitholders could be materially adversely affected.

***Our long-term off-take contracts with our customers may only partially offset certain increases in our costs or preclude us from taking advantage of relatively high wood pellet prices in the broader markets.***

Our long-term off-take contracts typically set base prices subject to annual price escalation and other pricing adjustments for changes in certain of our underlying costs of operations, including, in some cases, for stumpage or diesel fuel. However, such cost pass-through mechanisms may only pass a portion of our total costs through to our customers. If our operating costs increase significantly during the terms of our long-term off-take contracts beyond the levels of pricing and cost protection afforded to us under the terms of such contracts, our results of operations, business and financial position, and ability to pay distributions to our unitholders, could be adversely affected.

Moreover, during periods when the prevailing market price of wood pellets exceeds the prices under our long-term off-take contracts, our revenues could be significantly lower than they otherwise would have been were we not party to such contracts for substantially all our production. In addition, our current and future competitors may be in a better position than we are to take advantage of relatively high prices during such periods.

***The growth of our business depends in part on locating and acquiring interests in additional wood pellet production plants and marine terminals at favorable prices.***

Our business strategy includes growing our business through drop-down and third-party acquisitions that increase our cash generated from operations and cash available for distribution on a per-unit basis. Various factors could affect the availability of attractive projects to grow our business, including:

17

A0662

- our sponsor's failure to complete its development projects in a timely manner or at all, which could result from, among other things, permitting challenges, failure to procure requisite financing or equipment, construction difficulties or an inability to obtain off-take contracts on acceptable terms;

- our sponsor's failure to offer its assets for sale;

- our inability to exercise our right of first offer with respect to any asset that our sponsor offers to us; and

- fewer accretive third-party acquisition opportunities than we expect, which could result from, among other things, available projects having less desirable economic returns, competition, anti-trust concerns or higher risk profiles than we believe suitable for our business plan and investment strategy.

Any of these factors could prevent us from executing our growth strategy or otherwise could have a material adverse effect on our results of operations, business and financial position, and our ability to pay distributions to our unitholders.

***Any acquisitions we make may reduce, rather than increase, our cash generated from operations on a per-unit basis.***

We may consummate acquisitions we believe will be accretive, but result in a decrease in our cash available for distribution per unit. Any acquisition involves potential risks, some of which are beyond our control, including:

- mistaken assumptions about revenues and costs, including synergies;

- the inability to successfully integrate businesses we acquire;

- the inability to hire, train or retain qualified personnel to manage and operate our business and newly acquired assets;

- the assumption of unknown liabilities;

- limitations on our access to indemnification from the seller;

- incorrect assumptions about the overall costs of equity or debt;

- the diversion of management's attention to other business concerns;

- unforeseen difficulties in connection with operating newly acquired assets or in new geographic areas;

- customer or key employee losses at acquired businesses; and

- the inability to meet obligations in off-take or other contracts associated with acquisitions.

If we consummate any future acquisitions, our capitalization and results of operations may change significantly, and unitholders will not have the opportunity to evaluate the economic, financial and other relevant information that we will consider in determining the application of our funds and other resources to acquisitions.

**Regulatory and Litigation Risks**

***Changes in laws or government policies, incentives and taxes related to low-carbon and renewable energy may affect customer demand for our products.***

Consumers of utility-grade wood pellets currently use our products either as part of a binding obligation to generate a certain percentage of low-carbon energy or because they receive direct or indirect financial support or incentives to do so. Financial support is often necessary to cover the generally higher costs of wood pellets compared to conventional fossil fuels like coal. In most countries, once the government implements a tax (e.g., the U.K.'s carbon price floor tax) or a preferable tariff or specific renewable energy policy either supporting a renewable energy generator or the energy generating sector as a whole, such tax, tariff or policy is guaranteed for a specified period of time, sometimes for the investment lifetime of a generator's project. However, governmental policies that currently support the use of biomass may adversely modify their tax, tariff or incentive regimes, and the future availability of such taxes, tariffs or incentive regimes, either in current jurisdictions beyond the prescribed timeframes or in new jurisdictions, is uncertain. Demand for wood pellets could be substantially lower than expected if government support is removed, reduced or delayed or, in the future, is insufficient to enable successful deployment of biomass power at the levels currently projected. In addition, regulatory changes such as new requirements to install additional pollution control technology could require us to curtail or amend operations to meet new greenhouse gas ("GHG") emission limits. This may also affect demand for our products in addition to increasing our operational costs.

A0663

Biomass energy generation requires the use of biomass that is derived from acceptable sources and is demonstrably sustainable. This typically is implemented through biomass sustainability criteria, which either are a mandatory element of eligibility for financial subsidies to biomass energy generators or will become mandatory in the future. For more information, see our risk factor titled "Changes in the treatment of biomass could adversely impact our business." As a biomass fuel supplier, the viability of our business is therefore dependent on our ability to comply with such requirements. This may restrict the types of biomass we can use and the geographic regions from which we source our raw materials, and may require us to reduce the GHG emissions associated with our supply and production processes.

Currently, some elements of the criteria with which we must comply, including rules relating to forest management practices and carbon accounting, are under revision. Certain requirements, such as the regulations in place in jurisdictions from which we source biomass, may be beyond our ability to control. If different sustainability requirements are adopted in the future, demand for our products could be materially reduced in certain markets, and our results of operations, business and financial position, and our ability to pay distributions to our unitholders, may be materially adversely affected.

**Challenges to or delays in the issuance of air permits, or our failure to comply with our permits, could impair our operations and ability to expand our production.**

Our plants are subject to the requirements of the Clean Air Act and must either receive minor source permits from the states in which they are located or a major source permit, which is subject to the approval of the EPA. In general, our facilities are eligible for minor source permits following the application of pollution control technologies. However, we could experience substantial delays with respect to obtaining such permits, including as a result of any challenges to the issuance of our permits or other factors, which could impair our ability to operate our wood pellet production plants or expand our production capacity. In addition, any new air permits we receive could require that we incur additional expenses to install emissions control technologies, limit our operations and impede our ability to satisfy emission limitations and/or stringent testing requirements to demonstrate compliance therewith. Failure to meet such requirements could have a material adverse effect on our results of operations, business and financial position, and our ability to pay distributions to our unitholders.

**Federal, state and local legislative and regulatory initiatives relating to forestry products and the potential for related litigation could result in increased costs and/or additional operating restrictions and delays, which could cause a decline in the demand for our products and negatively impact our business, financial condition and results of operations.**

Our raw materials are byproducts of traditional timber management and harvesting, principally low-value wood materials such as thinnings and the tops and limbs of trees that are generated in a harvest and industrial residuals (chips, sawdust and other wood industry byproducts). Commercial forestry is regulated by complex regulatory frameworks at the federal, state and local levels. Among other federal laws, the Clean Water Act and the Endangered Species Act have been applied to commercial forestry operations through agency regulations and court decisions, as well as through the delegation to states to implement and monitor compliance with such laws. State forestry laws, as well as land-use regulations and zoning ordinances at the local level, are also used to manage forests in the Southeastern United States, as well as other regions from which we may need to source raw materials in the future. Any new or modified laws or regulations at any of these levels could have the effect of reducing forestry operations in areas where we procure our raw materials and consequently may prevent us from purchasing raw materials in an economic manner, or at all. In addition, future regulation of, or litigation concerning, the use of timberlands, the protection of endangered species, the promotion of forest biodiversity and the response to and prevention of wildfires, as well as litigation, campaigns or other measures advanced by special interest groups, could also reduce the availability of the raw materials required for our operations.

**Changes in the treatment of biomass could adversely impact our business.**

Multiple regulatory agencies, including in jurisdictions where we sell our products, have noted that biomass can support a transition away from fossil fuels and towards a more sustainable energy sector. However, when poorly managed, use of biomass can be related to land conversion, biodiversity and GHG emissions. Therefore, various rules have been issued to regulate the sustainability claims associated with the use of biomass, which in turn may require us to adopt certain practices in our operations.

For example, the European Union has promulgated directives on renewable energy that, among other things, establish targets for renewable energy supply and establish certain sustainability requirements for biomass, including requirements related to carbon stocks and land use. If the wood pellets we produce do not conform to these or future requirements, our customers would not be able to count energy generated therefrom towards these renewable energy goals, which could decrease demand for our products. Biomass has been under additional regulatory scrutiny in recent years to develop standards to safeguard against adverse environmental effects from its use. Although regulators continue to consider biomass harvested with certain practices to be sustainable, certain special interest groups that focus on environmental issues have expressed their

A0664

opposition to the use of biomass, both publicly and directly, to domestic and foreign regulators, policy makers, power, heat or combined heat and power generators ("generators") and other industrial users of biomass. These groups are also actively lobbying, litigating and undertaking other actions domestically and abroad in an effort to increase the regulation of, reduce or eliminate the incentives and support for, or otherwise delay, interfere with or impede the production and use of biomass for or by generators. For example, several commenters to the EU's proposed sustainable finance criteria for climate change mitigation and adaptation have encouraged the EU not to classify the use of forest-related biomass as sustainable. Such efforts, if successful, could materially adversely affect our results of operations, business and financial condition and our ability to pay distributions to our unitholders.

***Our operations are subject to stringent environmental and occupational health and safety laws and regulations that may expose us to significant costs and liabilities.***

Our operations are subject to stringent federal, regional, state and local environmental, health and safety laws and regulations. These laws and regulations govern environmental protection, occupational health and safety, the release or discharge of materials into the environment, air emissions, wastewater discharges, the investigation and remediation of contaminated sites and allocation of liability for cleanup of such sites. These laws and regulations may restrict or impact our business in many ways, including by requiring us to acquire permits or other approvals to conduct regulated activities, limiting our air emissions or wastewater discharges or requiring us to install costly equipment to control, reduce or treat such emissions or discharges and impacting our ability to modify or expand our operations. We may be required to make significant capital and operating expenditures to comply with these laws and regulations. Failure to comply with these laws and regulations may result in the assessment of administrative, civil and criminal penalties, imposition of investigatory or remedial obligations, suspension or revocation of permits and the issuance of orders limiting or prohibiting some or all of our operations. Adoption of new or modified environmental laws and regulations may impair the operation of our business, delay or prevent expansion of existing facilities or construction of new facilities and otherwise result in increased costs and liabilities, which may be material.

***The actions of certain special interest groups could adversely impact our business.***

Certain special interest groups that focus on environmental issues have expressed their opposition to the use of biomass, both publicly and directly to domestic and foreign regulators, policy makers, power, heat or combined heat and power generators ("generators") and other industrial users of biomass. These groups are also actively lobbying, litigating and undertaking other actions domestically and abroad in an effort to increase the regulation of, reduce or eliminate the incentives and support for, or otherwise delay, interfere with or impede the production and use of biomass for or by generators. Such efforts, if successful, could materially adversely affect our results of operations, business and financial condition, and our ability to pay distributions to our unitholders.

***Our net-zero goals, including our failure to achieve them, could adversely affect our business.***

We recently announced our intention to become carbon-neutral in our operations by 2030 and to publicly report our progress against these goals. Our estimates concerning the timing and cost of implementing our goals are subject to risks and uncertainties, some of which are outside of our control. We also may face greater scrutiny as a result of our announcement and publication of our progress, and our failure to achieve our voluntary net-zero goals could lead to adverse press coverage or other public attention.

**Operational Risks**

***We may be unable to complete our construction projects on time, and our construction costs could increase to levels that make the return on our investment less than expected.***

Historically, we typically have acquired wood pellet production plants, marine export terminals and other assets that had already commenced commercial operations. In response to the increasing demand for our product, we have begun undertaking expansion projects at some of our plants to increase their production capacity or make other improvements.

We may face delays or unexpected developments in completing our current or future construction projects, including as a result of our failure to timely obtain the equipment, services or access to infrastructure necessary for the operation of our projects at budgeted costs, maintain all necessary rights to land access and use and/or obtain and/or maintain environmental and other permits or approvals. These circumstances could prevent our construction projects from commencing operations or from meeting our original expectations concerning timing, operational performance, the capital expenditures necessary for their completion and the returns they will achieve. Our inability to complete and transition our construction projects into financially successful operating projects on time and within budget could have a material adverse effect on our results of operations, business and financial position, as well as our ability to pay distributions to our unitholders.

A0665

***The satisfactory delivery of substantially all of our production is dependent on continuous access to infrastructure at our owned, leased and third-party-operated terminals. Loss of access to our ports of shipment and destination, including through failure of terminal equipment and port closures, could adversely affect our financial results and cash available for distribution.***

Substantially all of our production is dependent on infrastructure at our owned, leased and third-party-operated ports. Should we suffer a catastrophic failure of the equipment at these ports or otherwise experience port closures, including for security or weather-related reasons, we could be unable to fulfill off-take obligations or incur substantial additional transportation costs, which would reduce our cash flow. Moreover, we rely on various ports of destination, as well as third parties who provide stevedoring or other services at our ports of shipment and destination or from whom we charter oceangoing vessels and crews, to transport our product to our customers. Loss of access to these ports for any reason, or failure of such third-party service providers to uphold their contractual obligations, may impact our ability to fulfill our obligations under our off-take contracts, cause interruptions to our shipping schedule and cause us to incur substantial additional transportation or other costs, all of which could have a material adverse effect on our business, financial condition and results of operations.

***Failure to maintain effective quality control systems at our production plants and deep-water marine terminals could have a material adverse effect on our business and operations.***

Our customers require a reliable supply of wood pellets that meet stringent product specifications. We have built our operations and assets to consistently deliver and certify the highest levels of product quality and performance, which is critical to the success of our business and depends significantly on the effectiveness of our quality control systems, including the design and efficacy of our quality control systems, the success of our quality training program and our ability to ensure that our employees and contract counterparties adhere to our quality control policies and guidelines. Moreover, any significant failure or deterioration of our quality control systems could impact our ability to deliver product that meets our customers' specifications and, in turn, could lead to rejection of our product by our customers, which could have a material adverse effect on our business, financial condition and results of operations.

***Our business is subject to operating hazards and other operational risks, which may have a material adverse effect on our business and results of operations. We may also not be adequately insured against such events.***

Our business could be materially adversely affected by operating hazards and other risks to our operations. We produce a combustible product that may under certain circumstances present a risk of fires and explosions or other hazards. Moreover, severe weather, such as floods, earthquakes, hurricanes or other natural disasters, climatic phenomena, such as drought, and other catastrophic events, such as plant or shipping disasters, could impact our operations by causing damage to our facilities and equipment, affecting our ability to deliver our product to our customers and impacting our customers' ability to take delivery of our products. Such events may also adversely affect the ability of our suppliers or service providers to provide us with the raw materials or services we require or the ability to load, transport and unload our product.

In addition, the scientific community has concluded that severe weather will increase in frequency and intensity as result of increasing concentrations of GHGs in the Earth's atmosphere, and that climate change will have significant physical effects, including sea-level rise, increased frequency and severity of hurricanes and other storms, flooding, drought and forest fires. We and our suppliers operate in coastal and wooded areas in geographic regions that are susceptible to such climate impacts.

We maintain insurance policies to mitigate against certain risks related to our business, in types and amounts that we believe are reasonable depending on the circumstances surrounding each identified risk; however, we may not be fully insured against all operating hazards and other operational risks incident to our business. Furthermore, we may be unable to maintain or obtain insurance of the type and amount we desire at reasonable rates, if at all. As a result of market conditions and certain claims we may make under our insurance policies, premiums and deductibles for certain of our insurance policies could escalate. In some instances, insurance could become unavailable or available only for reduced amounts of coverage or at unreasonable rates. If we were to incur a significant liability for which we are not fully insured, it could have a material adverse effect on our financial condition, results of operations and cash available for distribution to our unitholders.

***We may be required to make substantial capital expenditures to maintain and improve our facilities.***

Although we currently use a portion of our cash reserves and cash generated from our operations to maintain, develop and improve our assets and facilities, such investment may, over time, be insufficient to preserve the operating profile required for us to meet our planned profitability or meet the evolving quality and product specifications demanded by our customers. Moreover, our current and future construction and other capital projects may be capital-intensive or suffer cost-overruns. Accordingly, if we exceed our budgeted capital expenditures and/or additional capital expenditures become necessary in the future and we are unable to execute our construction, maintenance or improvement programs successfully, within budget, and

A0666

in a timely manner, our results of operations, business and financial position, and our ability to pay distributions to our unitholders, may be materially adversely affected.

*Our business and operating results are subject to seasonal fluctuations.*

Our business is affected by seasonal fluctuations. The cost of producing wood pellets tends to be higher in the winter months because of increases in the cost of delivered raw materials, primarily due to a reduction in accessibility during cold and wet weather conditions. Our raw materials typically have higher moisture content during this period, resulting in a lower product yield; moreover, the cost of drying wood fiber increases during periods of lower ambient temperatures.

The increase in demand for power and heat during the winter months drives greater customer demand for wood pellets. As some of our wood pellet supply to our customers are sourced from third-party purchases, we may experience higher wood pellet costs and a reduction in our gross margin during the winter months. These seasonal fluctuations could have an adverse effect on our business, financial condition and results of operations and cause comparisons of operating measures between consecutive quarters to not be as meaningful as comparisons between longer reporting periods.

**Market and Credit Risks**

*Significant increases in the cost, or decreases in the availability, of raw materials or sourced wood pellets could result in lower revenue, operating profits and cash flows, or impede our ability to meet commitments to our customers.*

We purchase wood fiber from third-party landowners and other suppliers for use at our plants. Our reliance on third parties to secure wood fiber exposes us to potential price volatility and unavailability of such raw materials, and the associated costs may exceed our ability to pass through such price increases under our contracts with our customers. Further, delays or disruptions in obtaining wood fiber may result from a number of factors affecting our suppliers, including extreme weather, production or delivery disruptions, inadequate logging capacity, labor disputes, impaired financial condition of a particular supplier, the inability of suppliers to comply with regulatory or sustainability requirements or decreased availability of raw materials. In addition, other companies, whether or not in our industry, could procure wood fiber within our procurement areas and adversely change regional market dynamics, resulting in insufficient quantities of raw material or higher prices. Any of these events could increase our operating costs or prevent us from meeting our commitments to our customers, and thereby could have a material adverse effect on our results of operations, business and financial position, and our ability to pay distributions to our unitholders.

Any interruption or delay in the supply of wood fiber, or our inability to obtain wood fiber at acceptable prices in a timely manner, could impair our ability to meet the demands of our customers and expand our operations, which could have a material adverse effect on our results of operations, business and financial position, and our ability to pay distributions to our unitholders.

In addition to our production, we purchase wood pellets produced by other suppliers to fulfill our obligations under our portfolio of long-term off-take contracts or take advantage of market dislocations on an opportunistic basis. Any reliance on other wood pellet producers exposes us to the risk that such suppliers will fail to satisfy their obligations to us pursuant to the associated off-take contracts, including by failing to timely meet quality specifications and volume requirements. Any such failure could increase our costs or prevent us from meeting our commitments to our customers, and thereby could have an adverse effect on our results of operations, business and financial position, and our ability to pay distributions to our unitholders.

*We are exposed to the credit risk of our contract counterparties, including the customers for our products, and any material nonpayment or nonperformance by our customers could adversely affect our financial results and cash available for distribution.*

We are subject to the risk of loss resulting from nonpayment or nonperformance by our contract counterparties, including our long-term off-take customers and suppliers. Our credit procedures and policies may not be adequate to fully eliminate counterparty credit risk. If we fail to adequately assess the creditworthiness of existing or future customers or suppliers, or if their creditworthiness deteriorates unexpectedly, any resulting nonpayment or nonperformance by them could have an adverse impact on our results of operations, business and financial position, and our ability to pay distributions to our unitholders.

*Impacts to the cost or availability of transportation and other infrastructure could reduce our revenues.*

Disruptions to or increases in the cost of local or regional transportation services and other forms of infrastructure, such as electricity, due to shortages of vessels, barges, railcars or trucks, weather-related problems, flooding, drought, accidents, mechanical difficulties, bankruptcy, strikes, lockouts, bottlenecks or other events could increase our costs, temporarily impair

A0667

our ability to deliver products to our customers and might, in certain circumstances, constitute a force majeure event under our customer contracts, permitting our customers to suspend taking delivery of and paying for our products.

In addition, persistent disruptions in our access to infrastructure may force us to halt production as we reach storage capacity at our facilities. Accordingly, if the primary transportation services we use to transport our products are disrupted, and we are unable to find alternative transportation providers, it could have a material adverse effect on our results of operations, business and financial position, and our ability to pay distributions to our unitholders.

***We compete with other wood pellet producers and, if growth in domestic and global demand for wood pellets meets or exceeds management's expectations, the competition within our industry may grow significantly.***

We compete with other wood pellet production companies for the customers to whom we sell our products. Other current producers of utility-grade wood pellets include AS Graanul Invest, Pinnacle Renewable Energy Inc., Drax Biomass Inc., Fram Renewable Fuels, LLC, Highland Pellets LLC and Pacific BioEnergy Corporation. Competition in our industry is based on price, consistency and quality of product, site location, distribution and logistics capabilities, customer service, creditworthiness and reliability of supply. Some of our competitors may have greater financial and other resources than we do, may develop technology superior to ours or may have production plants sited in more advantageous locations from a logistics, procurement or other cost perspective.

In addition, we expect global demand for solid biomass to increase significantly in the coming years. This demand growth may lead to a significant increase in the production levels of our existing competitors and may incentivize new, well-capitalized competitors to enter the industry, both of which could reduce the demand and the prices we are able to obtain under future off-take contracts. Significant price decreases or reduced demand could have a material adverse effect on our results of operations, business and financial position, and our ability to pay distributions to our unitholders.

**Financial Risks**

***Our level of indebtedness may increase, thereby reducing our financial flexibility.***

As of December 31, 2020, our total debt was $926.0 million, which primarily consisted of $746.9 million outstanding under our 6.5% senior unsecured notes due 2026. In the future, we may incur additional indebtedness in order to make acquisitions or to develop our properties. Our level of indebtedness could affect our operations in several ways, including the following:

- a significant portion of our cash flows could be used to service our indebtedness;

- the covenants contained in the agreements governing our outstanding indebtedness may limit our ability to borrow additional funds, dispose of assets, pay distributions and make certain investments;

- our debt covenants may also affect our flexibility in planning for, and reacting to, changes in the economy and in our industry;

- a high level of debt would increase our vulnerability to general adverse economic and industry conditions;

- a high level of debt may place us at a competitive disadvantage compared to our competitors that may be less leveraged and therefore may be able to take advantage of opportunities that our indebtedness would prevent us from pursuing; and

- a high level of debt may impair our ability to obtain additional financing in the future for working capital, capital expenditures, debt service requirements, acquisitions or general partnership or other purposes.

In addition, revolving borrowings under our senior secured revolving credit facility bear, and potentially other credit facilities we or our subsidiaries may enter into in the future will bear, interest at variable rates. If market interest rates increase, such variable-rate debt will create higher debt service requirements, which could adversely affect our cash flow.

In addition to our debt service obligations, our operations require substantial expenditures on a continuing basis. Our ability to make scheduled debt payments, to refinance our obligations with respect to our indebtedness and to fund capital and non-capital expenditures necessary to maintain the condition of our operating assets and properties, as well as to provide capacity for the growth of our business, depends on our financial and operating performance. General economic conditions and financial, business and other factors affect our operations and our future performance. Many of these factors are beyond our control. We may not be able to generate sufficient cash flows to pay the interest on our debt, and future working capital borrowings or debt or equity financing may not be available to pay or refinance such debt.

A0668

*Our exposure to risks associated with foreign currency and interest rate fluctuations, as well as the hedging arrangements we may enter into to mitigate those risks, could have an adverse effect on our financial condition and results of operations.*

We may experience foreign currency exchange and interest rate volatility in our business. We began to use hedging transactions in 2016 with respect to certain of our off-take contracts which are, in part or in whole, denominated in foreign currencies, and are party to interest rate swaps with respect to a portion of our variable rate debt, in an effort to achieve more predictable cash flow and to reduce our exposure to foreign currency exchange and interest rate fluctuations.

In addition, there may be instances in which costs and revenue will not be matched with respect to currency denomination. As a result, to the extent that existing and future off-take contracts are not denominated in U.S. Dollars, it is possible that increasing portions of our revenue, costs, assets and liabilities will be subject to fluctuations in foreign currency valuations.

Our hedging transactions involve cost and risk and may not be effective at mitigating our exposure to fluctuations in foreign currency exchange and interest rates. Although the use of hedging transactions limits our downside risk, their use may also limit future revenues. Risks inherent in our hedging transactions include the risk that counterparties to hedging contracts may be unable to perform their obligations and the risk that the terms of such contracts will not be legally enforceable. Likewise, our hedging activities may be ineffective or may not fully offset the financial impact of foreign currency exchange or interest rates fluctuations, which could have an adverse impact on our results of operations, business and financial position, and our ability to pay distributions to our unitholders.

**General Risk Factors**

*Our business may suffer if we lose, or are unable to attract and retain, key personnel.*

We depend to a large extent on the services of our senior management team and other key personnel. Members of our senior management and other key employees collectively have extensive expertise in designing, building and operating wood pellet production plants or marine terminals, negotiating long-term off-take contracts and managing businesses such as ours. Competition for management and key personnel is intense, and the pool of qualified candidates is limited. The loss of any of these individuals or the failure to attract additional personnel, as needed, could have a material adverse effect on our operations and could lead to higher labor costs or reliance on less qualified personnel. In addition, if any of our executives or other key employees were to join a competitor or form a competing company, we could lose customers, suppliers, know-how and key personnel. Our success is dependent on our ability to continue to attract, employ and retain highly skilled personnel.

*The international nature of our business subjects us to a number of risks, including foreign exchange risk and unfavorable political, regulatory and tax conditions in foreign countries.*

Substantially all of our current product sales are to customers that operate outside of the United States. As a result, we face certain risks inherent in maintaining international operations that include foreign exchange movements, restrictions on foreign trade and investment, including currency exchange controls imposed by or in other countries and trade barriers such as export requirements, tariffs, taxes and other restrictions and expenses, which could increase the prices of our products and make our products less competitive in some countries.

*Labor strikes or work stoppages by our employees could harm our business.*

Unionization activities could occur among non-union employees. If union employees strike, participate in a work stoppage or slowdown or engage in other forms of labor strike, it could lead to disruptions in our business, increases in our operating costs and constraints on our operating flexibility. Strikes, work stoppages or an inability to negotiate future collective bargaining agreements on commercially reasonable terms could have a material adverse effect on our business, results of operations, financial condition and cash flows.

*Uncertainty relating to the London Inter-bank Offered Rate ("LIBOR") calculation process and potential phasing out of LIBOR in 2023 may adversely affect our current or future debt obligations, including our senior secured revolving credit facility.*

On July 27, 2017, the Chief Executive of the U.K. Financial Conduct Authority (the "FCA"), which regulates LIBOR, announced that the FCA will no longer persuade or compel banks to submit rates for the calculation of LIBOR after 2021, which was extended through June 2023 for U.S. dollar LIBOR values. At this time, it is not possible to predict what such phase out, alternative reference rates or other reforms, if they occur, will have on the amount of interest paid on, or the market value of, our current or future debt obligations, including our senior secured revolving credit facility.

24

A0669

***The departure of the U.K. from the EU could adversely affect our results of operations, business and financial position and ability to pay distributions to our unitholders.***

The U.K. formally withdrew from the EU in January 2020 under Article 50 of the Treaty of the European Union and was subject to a transition period until the end of 2020. During this period, there has been no fundamental change to U.K.-EU relations, except for the withdrawal of U.K. memberships from EU political institutions. The transition period ceased on December 31, 2020 and as of January 31, 2021 U.K.-EU relations will be determined by a new agreement.

We have take-or-pay off-take contracts with utilities and large generators in the U.K. and in other European markets. For the year ended December 31, 2020, approximately 68% of our product sales were derived from contracts with customers in the U.K. and 28% of our product sales were derived from contracts with customers in other European markets.

The lack of precedent for an exit of a European Member State from the EU means that it is unclear how the access of U.K. businesses to the EU Single Market and how the legal and regulatory environments in the U.K. and the EU will be impacted.

***Our business is subject to cybersecurity risks.***

As is typical of modern businesses, we are reliant on the continuous and uninterrupted operation of our information technology ("IT") systems. User access and security of our sites and IT systems can be critical elements of our operations, as are cloud security and protection against cybersecurity incidents. Any IT failure pertaining to availability, access or system security could potentially result in disruption of our activities and personnel, and could adversely affect our reputation, operations or financial performance. Potential risks to our IT systems could include unauthorized attempts to extract business-sensitive, confidential or personal information, denial of access, extortion, corruption of information, or disruption of business processes. A cybersecurity incident resulting in a security breach or failure to identify a security threat could disrupt our business and could result in the loss of sensitive, confidential information or other assets, as well as litigation, regulatory enforcement, violation of privacy or securities laws and regulations, and remediation costs, all of which could materially impact our reputation, operations or financial performance.

***A terrorist attack or armed conflict could harm our business.***

Terrorist activities and armed conflicts could adversely affect the U.S. and global economies and could prevent us from meeting financial and other obligations or prevent our customers from meeting their obligations to us. We could experience loss of business, delays or defaults in payments from customers or disruptions of fuel supplies and markets, including if domestic and global generators are direct targets or indirect casualties of an act of terror or war. Terrorist activities and the threat of potential terrorist activities and any resulting economic downturn could adversely affect our results of operations, impair our ability to raise capital or otherwise adversely impact our ability to realize certain business strategies.

**Risks Related to Our Partnership Structure**

***Enviva Holdings, LP owns and controls our General Partner, which has sole responsibility for conducting our business and managing our operations. Our General Partner and its affiliates, including Enviva Holdings, LP, have conflicts of interest with us and limited duties, and they may favor their own interests to our detriment and that of our unitholders.***

Enviva Holdings, LP, owns and controls our General Partner and appoints all of the directors of our General Partner. Although our General Partner has a duty to manage us in a manner that it believes is not adverse to our interest, the executive officers and directors of our General Partner have a fiduciary duty to manage our General Partner in a manner beneficial to our sponsor. Therefore, conflicts of interest may arise between our sponsor or any of its affiliates, including our General Partner, on the one hand, and us or any of our unitholders, on the other hand. In resolving these conflicts of interest, our General Partner may favor its own interests and the interests of its affiliates over the interests of our common unitholders. These conflicts may include the following:

- our General Partner is allowed to take into account the interests of parties other than us, such as our sponsor, in exercising certain rights under our partnership agreement;

- neither our partnership agreement nor any other agreement requires our sponsor to pursue a business strategy that favors us;

- our partnership agreement eliminates and replaces the fiduciary duties that would otherwise be owed by our General Partner with contractual standards governing its duties, limits our General Partner's liabilities and restricts the remedies available to our unitholders for actions that, without such eliminations and limitations, might constitute breaches of fiduciary duty;

25

A0670

- except in limited circumstances, our General Partner has the power and authority to conduct our business without unitholder approval;

- our General Partner determines the amount and timing of asset purchases and sales, borrowings, issuances of additional partnership securities and the level of reserves, each of which can affect the amount of cash that is distributed to our unitholders;

- our General Partner determines the amount and timing of any cash expenditure and whether an expenditure is classified as a maintenance capital expenditure, which reduces operating surplus, or an expansion capital expenditure, which does not reduce operating surplus. This determination can affect the amount of cash from operating surplus that is distributed to our common unitholders relative to our sponsor as the holder of our incentive distribution rights;

- our General Partner may cause us to borrow funds in order to permit the payment of cash distributions;

- our partnership agreement permits us to distribute up to $39.3 million as operating surplus, even if it is generated from asset sales, borrowings other than working capital borrowings or other sources that would otherwise constitute capital surplus. This cash may be used to fund distributions to holders of our incentive distribution rights;

- our General Partner determines which costs incurred by it and its affiliates are reimbursable by us, including through the MSAs;

- our partnership agreement does not restrict our General Partner from causing us to pay it or its affiliates for any services rendered to us or entering into additional contractual arrangements with its affiliates on our behalf;

- our General Partner intends to limit its liability regarding our contractual and other obligations;

- our General Partner may exercise its right to call and purchase common units if it and its affiliates own more than 80% of the common units;

- our General Partner controls the enforcement of obligations that it and its affiliates owe to us;

- our General Partner decides whether to retain separate counsel, accountants or others to perform services for us; and

- our General Partner may elect to cause us to issue common units to it in connection with a resetting of the target distribution levels related to our sponsor's incentive distribution rights without the approval of the conflicts committee of the board of directors of our General Partner or the unitholders. This election may result in lower distributions to the common unitholders in certain situations.

In addition, we may compete directly with our sponsor and entities in which it has an interest for acquisition opportunities and potentially will compete with these entities for new business or extensions of the existing services provided by us.

***The board of directors of our General Partner may modify or revoke our cash distribution policy at any time at its discretion. Our partnership agreement does not require us to pay any distributions at all.***

Pursuant to our cash distribution policy, we intend to distribute quarterly at least $0.4125 per unit on all of our units to the extent we have sufficient cash after the establishment of cash reserves and the payment of our expenses, including payments to our General Partner and its affiliates. However, the board may change our cash distribution policy at any time at its discretion and could elect not to pay distributions for one or more quarters. Please read Part II, Item 5. "Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities—Cash Distribution Policy."

In addition, our partnership agreement does not require us to pay any distributions at all. Accordingly, investors are cautioned not to place undue reliance on the permanence of such a policy in making an investment decision. Any modification or revocation of our cash distribution policy could substantially reduce or eliminate the amounts of distributions to our unitholders. The amount of distributions we make, if any, and the decision to make any distribution at all will be determined by the board of directors of our General Partner, whose interests may differ from those of our common unitholders. Our General Partner has limited duties to our unitholders, which may permit it to favor its own interests or the interests of our sponsor to the detriment of our common unitholders.

***Our General Partner limits its liability regarding our obligations.***

Our General Partner limits its liability under contractual arrangements between us and third parties so that the counterparties to such arrangements have recourse only against our assets, and not against our General Partner or its assets. Our General Partner may therefore cause us to incur indebtedness or other obligations that are nonrecourse to our General Partner.

26

A0671

Our partnership agreement provides that any action taken by our General Partner to limit its liability is not a breach of our General Partner's duties, even if we could have obtained more favorable terms without the limitation on liability. In addition, we are obligated to reimburse or indemnify our General Partner to the extent that it incurs obligations on our behalf. Any such reimbursement or indemnification payments would reduce the amount of cash otherwise available for distribution to our unitholders.

***We intend to distribute a significant portion of our cash available for distribution to our partners, which could limit our ability to grow and make acquisitions.***

We intend to distribute most of our cash available for distribution, which could cause our growth to proceed at a slower pace than that of businesses that reinvest their cash to expand ongoing operations. To the extent we issue additional units, whether in connection with acquisitions, expansion capital expenditures or otherwise, the payment of distributions on those additional units may increase the risk that we will be unable to maintain or increase our per unit distribution level. There are no limitations in our partnership agreement on our ability to issue additional units, including units ranking senior to the common units. The incurrence of additional commercial borrowings or other debt to finance our growth strategy would result in increased interest expense, which, in turn, may impact the cash that we have available to distribute to our unitholders.

***Our partnership agreement eliminates and replaces our General Partner's fiduciary duties to holders of our units.***

Our partnership agreement contains provisions that eliminate and replace the fiduciary standards to which our General Partner would otherwise be held by state fiduciary duty law. For example, our partnership agreement permits our General Partner to make a number of decisions in its individual capacity, as opposed to in its capacity as our General Partner, or otherwise free of fiduciary duties to us and our unitholders. This entitles our General Partner to consider only the interests and factors that it desires and relieves it of any duty or obligation to give any consideration to any interest of, or factors affecting, us, our affiliates or our limited partners. Examples of decisions that our General Partner may make in its individual capacity include:

- how to allocate business opportunities among us and its affiliates;

- whether to exercise its call right;

- whether to seek approval of the resolution of a conflict of interest by the conflicts committee of the board of directors of our General Partner;

- how to exercise its voting rights with respect to the units it owns;

- whether to exercise its registration rights;

- whether to elect to reset target distribution levels; and

- whether or not to consent to any merger or consolidation of the Partnership or amendment to the partnership agreement.

Limited partners who own common units are treated as having consented to the provisions in the partnership agreement, including the provisions discussed above.

***Our partnership agreement restricts the remedies available to holders of our units for actions taken by our General Partner that might otherwise constitute breaches of fiduciary duty.***

Our partnership agreement contains provisions that restrict the remedies available to unitholders for actions taken by our General Partner that might otherwise constitute breaches of fiduciary duty under state fiduciary duty law. For example, our partnership agreement provides that:

- whenever our General Partner makes a determination or takes, or declines to take, any other action in its capacity as our General Partner, our General Partner is generally required to make such determination, or take or decline to take such other action, in good faith, and will not be subject to any higher standard imposed by our partnership agreement, Delaware law, or any other law, rule or regulation, or at equity;

- our General Partner and its officers and directors will not be liable for monetary damages or otherwise to us or our limited partners resulting from any act or omission unless there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that such losses or liabilities were the result of conduct in which our General Partner or its officers or directors engaged in bad faith, meaning that they believed that the decision was adverse to our interest or, with respect to any criminal conduct, with knowledge that such conduct was unlawful; and

27

- our General Partner will not be in breach of its obligations under the partnership agreement or its duties to us or our limited partners if a transaction with an affiliate or the resolution of a conflict of interest is:

    (1) approved by the conflicts committee of the board of directors of our General Partner, although our General Partner is not obligated to seek such approval; or

    (2) approved by the vote of a majority of the outstanding common units, excluding any common units owned by our General Partner and its affiliates.

In connection with a situation involving a transaction with an affiliate or a conflict of interest, other than one where our General Partner is permitted to act in its sole discretion, any determination by our General Partner must be made in good faith. If an affiliate transaction or the resolution of a conflict of interest is not approved by our common unitholders or the conflicts committee then it will be presumed that, in making its decision, taking any action or failing to act, the board of directors acted in good faith, and in any proceeding brought by or on behalf of us or of any limited partner, the person bringing or prosecuting such proceeding will have the burden of overcoming such presumption.

***Our sponsor and other affiliates of our General Partner may compete with us.***

Our partnership agreement provides that our General Partner is restricted from engaging in any business activities other than acting as our General Partner, engaging in those activities incidental to its ownership interest in us and providing management, advisory and administrative services to its affiliates or to other persons. However, affiliates of our General Partner, including our sponsor, are not prohibited from engaging in other businesses or activities, including those that might be in direct competition with us. In addition, our sponsor may compete with us for investment opportunities and may own an interest in entities that compete with us.

Pursuant to the terms of our partnership agreement, the doctrine of corporate opportunity, or any analogous doctrine, does not apply to our General Partner or any of its affiliates, including its executive officers and directors and our sponsor. Any such person or entity that becomes aware of a potential transaction, agreement, arrangement or other matter that may be an opportunity for us will not have any duty to communicate or offer such opportunity to us. Any such person or entity will not be liable to us or to any limited partner for breach of any fiduciary duty or other duty by reason of the fact that such person or entity pursues or acquires such opportunity for itself, directs such opportunity to another person or entity or does not communicate such opportunity or information to us. This may create actual and potential conflicts of interest between us and affiliates of our General Partner and result in less than favorable treatment of us and our unitholders.

***The holder or holders of our incentive distribution rights may elect to cause us to issue common units to it in connection with a resetting of the incentive distribution without the approval of our unitholders. This election may result in lower distributions to our common unitholders in certain situations.***

The holder or holders of a majority of our incentive distribution rights (currently our sponsor) have the right, at any time when we have made cash distributions in excess of the then-applicable third target distribution for each of the prior four consecutive fiscal quarters, to reset the initial target distribution levels at higher levels based on our cash distribution levels at the time of the exercise of the reset election. Following a reset election, a baseline distribution amount will be calculated equal to an amount equal to the prior cash distribution per common unit for the fiscal quarter immediately preceding the reset election (such amount is referred to as the "reset minimum quarterly distribution"), and the target distribution levels will be reset to correspondingly higher levels based on percentage increases above the reset minimum quarterly distribution. In addition, in connection with a reset election, the holders of our incentive distribution rights would receive a number of newly issued common units based on the value of cash distributions paid in respect of the incentive distribution rights in the quarter preceding the reset election.

We anticipate that our sponsor would exercise this reset right in order to facilitate acquisitions or internal growth projects that would not be sufficiently accretive to cash distributions per unit without such conversion. However, our sponsor may transfer the incentive distribution rights at any time. It is possible that our sponsor or a transferee could exercise this reset election at a time when we are experiencing declines in our aggregate cash distributions or at a time when the holders of the incentive distribution rights expect that we will experience declines in our aggregate cash distributions in the foreseeable future. In such situations, the holders of the incentive distribution rights may be experiencing, or may expect to experience, declines in the cash distributions they receive related to the incentive distribution rights and may therefore desire to be issued our common units, which are entitled to specified priorities with respect to our distributions and which therefore may be more advantageous for them to own in lieu of the right to receive incentive distribution payments based on target distribution levels that are less certain to be achieved. As a result, a reset election may cause our common unitholders to experience dilution in the amount of cash distributions that they would have otherwise received had we not issued new common units to the holders of the incentive distribution rights in connection with resetting the target distribution levels.

28

***Our sponsor has certain incentive distribution rights that reduce the amount of our cash available for distribution to our common unitholders.***

Our sponsor currently holds incentive distribution rights that entitle it to receive an increasing percentage (15%, 25% and 50%) of the cash that we distribute to our common unitholders from available cash after the minimum quarterly distribution and certain target distribution levels have been achieved. The maximum distribution right for our sponsor to receive 50% of any distributions paid to our common unitholders does not include any distributions that our sponsor may receive on common units it owns. Effective as of our quarterly cash distribution in the fourth quarter of 2017, our sponsor was at the top tier of the incentive distribution rights scale. Given that a higher percentage of our cash flows is allocated to our sponsor due to these incentive distribution rights, it may be more difficult for us to increase the amount of distributions to our unitholders and our cost of capital may be higher, making investments, capital expenditures and acquisitions, and therefore, future growth, by us potentially more costly, and in some cases, potentially prohibitively so.

***Holders of our common units have limited voting rights and are not entitled to elect our General Partner or its directors.***

Compared to the holders of common stock in a corporation, unitholders have limited voting rights and, therefore, limited ability to influence management's decisions regarding our business. Unitholders have no right on an annual or ongoing basis to elect our General Partner or its board of directors. The board of directors of our General Partner, including the independent directors, is chosen entirely by our sponsor, as a result of it owning our General Partner, and not by our unitholders. Unlike publicly traded corporations, we do not hold annual meetings of our unitholders to elect directors or consider other matters routinely addressed at annual meetings of stockholders of corporations.

As a result of these limitations, the price at which the common units trade could be diminished because of the absence or reduction of a takeover premium in the trading price.

***Even if holders of our common units are dissatisfied, they cannot currently remove our General Partner without our sponsor's consent.***

If our unitholders are dissatisfied with the performance of our General Partner, they have limited ability to remove our General Partner. Unitholders are currently unable to remove our General Partner without our sponsor's consent because our sponsor and its affiliates own sufficient units to be able to prevent its removal. The vote of the holders of at least 66 2/3% of all outstanding common units is required to remove our General Partner. As of February 14, 2021, our sponsor owned approximately 34% of our common units. This condition would enable our sponsor to prevent the removal of our General Partner.

***Our partnership agreement restricts the voting rights of unitholders owning 20% or more of our common units.***

Our partnership agreement restricts unitholders' voting rights by providing that any units held by a person or group that owns 20% or more of any class of units then outstanding, other than our General Partner and its affiliates, their transferees and persons who acquired such units with the prior approval of the board of directors of our General Partner, cannot vote on any matter.

***Our general partner interest or the control of our General Partner may be transferred to a third party without unitholder consent.***

Our General Partner may transfer its general partner interest to a third party without the consent of our unitholders. Furthermore, our partnership agreement does not restrict the ability of the owner of our General Partner to transfer its membership interests in our General Partner to a third party. The new owner of our General Partner would then be in a position to replace the board of directors and executive officers of our General Partner with its own designees and thereby exert significant control over the decisions taken by the board of directors and executive officers of our General Partner. This effectively permits a "change of control" without the vote or consent of the unitholders.

***The incentive distribution rights may be transferred to a third party without unitholder consent.***

Our sponsor may transfer the incentive distribution rights to a third party at any time without the consent of our unitholders. If our sponsor transfers the incentive distribution rights to a third party, our sponsor would not have the same incentive to grow our partnership and increase quarterly distributions to unitholders over time. For example, a transfer of incentive distribution rights by our sponsor could reduce the likelihood of our sponsor accepting offers made by us relating to assets owned by our sponsor, as it would have less of an economic incentive to grow our business, which would impact our ability to grow our asset base.

***Our General Partner has a call right that may require unitholders to sell their common units at an undesirable time or price.***

29

A0674

If at any time our General Partner and its affiliates own more than 80% of the common units, our General Partner will have the right, which it may assign to any of its affiliates or to us, but not the obligation, to acquire all, but not less than all, of the common units held by unaffiliated persons at a price equal to the greater of (1) the average of the daily closing price of the common units over the 20 trading days preceding the date three days before notice of exercise of the call right is first mailed and (2) the highest per-unit price paid by our General Partner or any of its affiliates for common units during the 90-day period preceding the date such notice is first mailed. As a result, unitholders may be required to sell their common units at an undesirable time or price and may not receive any return or a negative return on their investment. Unitholders may also incur a tax liability upon a sale of their units. Our General Partner is not obligated to obtain a fairness opinion regarding the value of the common units to be repurchased by it upon exercise of the call right. There is no restriction in our partnership agreement that prevents our General Partner from causing us to issue additional common units and then exercising its call right. If our General Partner exercised its call right, the effect would be to take us private and, if the units were subsequently deregistered, we would no longer be subject to the reporting requirements of the Exchange Act.

***We may issue additional units without unitholder approval, which would dilute existing unitholder ownership interests.***

Our partnership agreement does not limit the number of additional limited partner interests we may issue at any time without the approval of our unitholders. The issuance of additional common units or other equity interests of equal or senior rank will have the following effects:

- our existing unitholders' proportionate ownership interest in us will decrease;

- the amount of cash available for distribution on each unit may decrease;

- the ratio of taxable income to distributions may increase;

- the relative voting strength of each previously outstanding unit may be diminished; and

- the market price of the common units may decline.

There are no limitations in our partnership agreement on our ability to issue units ranking senior to the common units.

In accordance with Delaware law and the provisions of our partnership agreement, we may issue additional partnership interests that are senior to the common units in right of distribution, liquidation and voting. The issuance by us of units of senior rank may (1) reduce or eliminate the amount of cash available for distribution to our common unitholders; (2) diminish the relative voting strength of the total common units outstanding as a class; or (3) subordinate the claims of the common unitholders to our assets in the event of our liquidation.

***The market price of our common units could be adversely affected by sales of substantial amounts of our common units in the public or private markets, including sales by our sponsor or other large holders.***

Our sponsor owns approximately 34% of our common units. Sales by our sponsor or other large holders of a substantial number of our common units in the public markets, or the perception that such sales might occur, could have a material adverse effect on the price of our common units or could impair our ability to obtain capital through an offering of equity securities.

***Cost reimbursements due to our General Partner and its affiliates for services provided to us or on our behalf will reduce cash available for distribution to our unitholders. The amount and timing of such reimbursements will be determined by our General Partner.***

Under the MSAs, we are obligated to reimburse our sponsor for all direct or indirect costs and expenses incurred by, or chargeable to, our sponsor in connection with its provision of services necessary for the operation of our business. If the MSAs were terminated without replacement, or our General Partner or its affiliates provided services outside of the scope of the MSAs, our partnership agreement would require us to reimburse our General Partner and its affiliates for all expenses they incur and payments they make on our behalf. Our partnership agreement does not set a limit on the amount of expenses for which our General Partner and its affiliates may be reimbursed. These expenses include salary, bonus, incentive compensation and other amounts paid to persons who perform services for us or on our behalf and expenses allocated to our General Partner by its affiliates. Our partnership agreement provides that our General Partner determines the expenses that are allocable to us. The reimbursement of expenses and payment of fees, if any, to our General Partner and its affiliates will reduce the amount of cash available for distribution to our unitholders.

***The price of our common units may fluctuate significantly and unitholders could lose all or part of their investment.***

The market price of our common units may be influenced by many factors, some of which are beyond our control, including our results of operations and financial condition, the amount of our quarterly distributions, changes in accounting standards, policies, guidance, interpretations or principles, general economic conditions, the failure of securities analysts to

A0675

cover our common units or changes in financial estimates by analysts, future sales of our common units and the other factors described in these "Risk Factors."

***Unitholders may have liability to repay distributions.***

Under certain circumstances, unitholders may have to repay amounts wrongfully returned or distributed to them. Under Section 17-607 of the Delaware Revised Uniform Limited Partnership Act, we may not make a distribution to our unitholders if the distribution would cause our liabilities to exceed the fair value of our assets. Delaware law provides that for a period of three years from the date of the impermissible distribution, limited partners who received the distribution and who knew at the time of the distribution that it violated Delaware law will be liable to us for the distribution amount. Liabilities to partners on account of their partnership interests and liabilities that are non-recourse to us are not counted for purposes of determining whether a distribution is permitted.

***The New York Stock Exchange (the "NYSE") does not require a publicly traded partnership like us to comply with certain of its corporate governance requirements.***

Our common units are listed on the NYSE. Because we are a publicly traded partnership, the NYSE does not require us to have a majority of independent directors on our General Partner's board of directors or to establish a compensation committee or a nominating and corporate governance committee. Accordingly, unitholders do not have the same protections afforded to certain corporations that are subject to all of the NYSE corporate governance requirements. Please read Part III, Item 10. "Directors, Executive Officers and Corporate Governance—Director Independence."

**Tax Risks to Common Unitholders**

***Our tax treatment depends on our status as a partnership for federal income tax purposes and not being subject to a material amount of entity-level taxation. If the Internal Revenue Service ("IRS") were to treat us as a corporation for federal income tax purposes, or we become subject to entity-level taxation for state tax purposes, our cash available for distribution to our unitholders would be substantially reduced.***

The anticipated after-tax economic benefit of an investment in our common units depends largely on our being treated as a partnership for federal income tax purposes.

Despite the fact that we are organized as a limited partnership under Delaware law, we would be treated as a corporation for U.S. federal income tax purposes unless we satisfy a "qualifying income" requirement. Based on our current operations and current Treasury Regulations, we believe we satisfy the qualifying income requirement. We have requested and obtained a favorable private letter ruling from the IRS to the effect that, based on facts presented in the private letter ruling request, our income from processing timber feedstocks into pellets and transporting, storing, marketing and distributing such timber feedstocks and wood pellets constitute "qualifying income" within the meaning of Section 7704 of the Internal Revenue Code of 1986 (the "Code"). However, no ruling has been, and we expect none will be, requested regarding our treatment as a partnership for U.S. federal income tax purposes. Failing to meet the qualifying income requirement or a change in current law could cause us to be treated as a corporation for U.S. federal income tax purposes or otherwise subject us to taxation as an entity.

If we were treated as a corporation for federal income tax purposes, we would pay U.S. federal income tax on our taxable income at the corporate tax rate. Distributions to our unitholders would generally be taxed again as corporate distributions, and no income, gains, losses or deductions would flow through to our unitholders. Because a tax would be imposed on us as a corporation, our cash available for distribution to our unitholders would be substantially reduced. Therefore, treatment of us as a corporation would result in a material reduction in the anticipated cash flow and after-tax return to the unitholders, likely causing a substantial reduction in the value of our common units.

Our partnership agreement provides that if a law is enacted or existing law is modified or interpreted in a manner that subjects us to taxation as a corporation or otherwise subjects us to entity-level taxation for U.S. federal, state or local or foreign income tax purposes, the minimum quarterly distribution amount and the target distribution amounts may be adjusted to reflect the impact of that law or interpretation on us. At the state level, several states have been evaluating ways to subject partnerships to entity-level taxation through the imposition of state income, franchise or other forms of taxation. Specifically, we currently own assets and conduct business in Mississippi, North Carolina, Florida, Virginia, Georgia and South Carolina, each of which imposes a margin or franchise tax. In the future, we may expand our operations. Imposition of a similar tax on us in other jurisdictions that we may expand to could substantially reduce our cash available for distribution to our unitholders.

***The tax treatment of publicly traded partnerships or an investment in our units could be subject to potential legislative, judicial or administrative changes or differing interpretations, possibly applied on a retroactive basis.***

A0676

The present U.S. federal income tax treatment of publicly traded partnerships, including us, or an investment in our common units may be modified by administrative, legislative or judicial changes or differing interpretations at any time. Members of Congress have frequently proposed and considered substantive changes to the existing U.S. federal income tax laws that affect publicly traded partnerships. Although there is no current legislative proposal to eliminate the qualifying income exception upon which we rely for our treatment as a partnership for U.S. federal income tax purposes, current and former legislative proposals would have eliminated the qualifying income exception for publicly traded partnerships relying on qualifying income from fossil fuel activities. In addition, the Treasury Department has issued, and in the future may issue, regulations interpreting those laws that affect publicly traded partnerships. We believe we qualify as a partnership for U.S. federal income tax purposes under current regulations.

However, any modification to the U.S. federal income tax laws may be applied retroactively and could make it more difficult or impossible for us to meet the exception for certain publicly traded partnerships to be treated as partnerships for U.S. federal income tax purposes. We are unable to predict whether any of these changes or other proposals will ultimately be enacted. Any similar or future legislative changes could increase our entity-level tax burden and negatively impact the value of an investment in our common units. You are urged to consult with your own tax advisor with respect to the status of regulatory or administrative developments and proposals and their potential effect on your investment in our common units.

*If the IRS were to contest the federal income tax positions we take, it may adversely impact the market for our common units, and the costs of any such contest would reduce cash available for distribution to our unitholders.*

We have requested and obtained a favorable private letter ruling from the IRS to the effect that, based on facts presented in the private letter ruling request, our income from processing timber feedstocks into pellets and transporting, storing, marketing and distributing such timber feedstocks and wood pellets will constitute "qualifying income" within the meaning of Section 7704 of the Code. However, no ruling has been, and we expect none will be, requested regarding our treatment as a partnership for U.S. federal income tax purposes. The IRS may adopt positions that differ from the positions we take. It may be necessary to resort to administrative or court proceedings to sustain some or all of the positions we take. A court may not agree with some or all of the positions we take. Any contest with the IRS may materially and adversely impact the market for our common units and the price at which they trade. Moreover, the costs of any contest between us and the IRS will result in a reduction in cash available for distribution to our unitholders and thus will be borne indirectly by our unitholders.

*If the IRS makes audit adjustments to our income tax returns for tax years beginning after December 31, 2017, it (and some states) may assess and collect any taxes (including any applicable penalties and interest) resulting from such audit adjustments directly from us, in which case we may require our unitholders and former unitholders to reimburse us for such taxes (including any applicable penalties or interest) or, if we are required to bear such payments, our cash available for distribution to our unitholders might be substantially reduced.*

Pursuant to the Bipartisan Budget Act of 2015, for tax years beginning after December 31, 2017, if the IRS makes audit adjustments to our income tax returns, it (and some states) may assess and collect any taxes (including any applicable penalties and interest) resulting from such audit adjustment directly from us. To the extent possible under the new rules, our General Partner may elect to either pay the taxes (including any applicable penalties and interest) directly to the IRS or, if we are eligible, issue a revised information statement to each unitholder and former unitholder with respect to an audited and adjusted return, which statement reports the items adjusted and certain other amounts. Although our General Partner may elect to have our unitholders and former unitholders take such audit adjustment into account and pay any resulting taxes (including applicable penalties and interest) in accordance with their interests in us during the tax year under audit, there can be no assurance that such election will be practical, permissible or effective in all circumstances. As a result, our current unitholders may bear some or all of the tax liability resulting from such audit adjustment, even if such unitholders did not own units in us during the tax year under audit. If, as a result of any such audit adjustment, we are required to make payments of taxes, penalties and interest, we may require our unitholders and former unitholders to reimburse us for such taxes (including any applicable penalties or interest) or, if we are required to bear such payments, our cash available for distribution to our unitholders might be substantially reduced. These rules are not applicable for tax years beginning on or prior to December 31, 2017.

*Even if unitholders do not receive any cash distributions from us, unitholders will be required to pay taxes on their share of our taxable income.*

Unitholders are required to pay federal income taxes and, in some cases, state and local income taxes, on unitholders' share of our taxable income, whether or not they receive cash distributions from us. For example, if we sell assets and use the proceeds to repay existing debt or fund capital expenditures, you may be allocated taxable income and gain resulting from the sale, and our cash available for distribution would not increase. Similarly, taking advantage of opportunities to reduce our existing debt, such as debt exchanges, debt repurchases, or modifications of our existing debt could result in "cancellation of indebtedness income" being allocated to our unitholders as taxable income without any increase in our cash available for

32

A0677

distribution. Unitholders may not receive cash distributions from us equal to their share of our taxable income or even equal to the actual tax due from them with respect to that income.

***A tax gain or loss on the disposition of our common units could be more or less than unitholders expect.***

If unitholders sell their common units, they will recognize a gain or loss equal to the difference between the amount realized and their tax basis in those common units. Because distributions in excess of unitholders' allocable share of our net taxable income decrease their tax basis in their common units, the amount, if any, of such prior excess distributions with respect to the units unitholders sell will, in effect, become taxable income to our unitholders if they sell such units at a price greater than their tax basis in those units, even if the price they receive is less than their original cost. In addition, because the amount realized includes a unitholder's share of our nonrecourse liabilities, if they sell their units, unitholders may incur a tax liability in excess of the amount of cash they receive from the sale.

Furthermore, a substantial portion of the amount realized, whether or not representing gain, may be taxed as ordinary income due to potential recapture items, including depreciation recapture. Thus, you may recognize both ordinary income and capital loss from the sale of your units if the amount realized on a sale of your units is less than your adjusted basis in the units. Net capital loss may only offset capital gains and, in the case of individuals, up to $3,000 of ordinary income per year. In the taxable period in which you sell your units, you may recognize ordinary income from our allocations of income and gain to you prior to the sale and from recapture items that generally cannot be offset by any capital loss recognized upon the sale of units.

***Tax-exempt entities face unique tax issues from owning our common units that may result in adverse tax consequences to them.***

Investment in our common units by tax-exempt entities, such as employee benefit plans and individual retirement accounts (known as IRAs), raises issues unique to them. For example, virtually all of our income allocated to organizations that are exempt from federal income tax, including IRAs and other retirement plans, will be unrelated business taxable income and will be taxable to them. Any tax-exempt entity should consult its tax advisor before investing in our common units.

***Unitholders may be subject to limitation on their ability to deduct interest expense incurred by us.***

Historically, we have been entitled to a full deduction for interest paid or accrued on indebtedness properly allocable to our trade or business during our taxable year. However, subject to certain exceptions in the Coronavirus Aid, Relief, and Economic Security Act (the CARES Act, discussed below),under the Tax Cuts and Jobs Act signed into law in December 2017, for taxable years beginning after December 31, 2017, our deduction for "business interest" is limited to the sum of our business interest income and 30% of our "adjusted taxable income." For the purposes of this limitation, our adjusted taxable income is computed without regard to any business interest expense or business interest income, and in the case of taxable years beginning before January 1, 2022, any deduction allowable for depreciation, amortization or depletion. As a result, we expect that a substantial portion of our business interest deduction may be limited.

For the 2020 taxable year, the CARES Act generally increases the 30% adjusted taxable income limitation to 50%. For purposes of determining the 50% adjusted taxable income limitation, partnerships may substitute their 2020 adjusted taxable income with their 2019 adjusted taxable income, which may result in a greater business interest expense deduction. In addition, unitholders may treat 50% of any excess business interest allocated to them in 2019 as deductible in the 2020 taxable year without regard to the 2020 business interest expense limitation. The remaining 50% of such unitholder's excess business interest is carried forward and subject to the same limitations as other taxable years.

***Non-U.S. Unitholders will be subject to U.S. taxes and withholding with respect to their income and gain from owning our units.***

Non-U.S. unitholders are generally taxed and subject to income tax filing requirements by the United States on income effectively connected with a U.S. trade or business. Income allocated to our unitholders and any gain from the sale of our units will generally be considered to be "effectively connected" with a U.S. trade or business. As a result, distributions to a non-U.S. unitholder will be subject to withholding at the highest applicable effective tax rate and a non-U.S. unitholder who sells or otherwise disposes of a unit will also be subject to U.S. federal income tax on the gain realized from the sale or disposition of such unit.

Moreover, the transferee of an interest in a partnership that is engaged in a U.S. trade or business is generally required to withhold 10% of the amount realized by the transferor unless the transferor certifies that it is not a foreign person. While the determination of a partner's amount realized generally includes any decrease of a partner's share of the partnership's liabilities, recently issued Treasury regulations provide that the "amount realized" on a transfer of an interest in a publicly traded partnership, such as our common units, will generally be the amount of gross proceeds paid to the broker effecting the applicable transfer on behalf of the transferor, and thus will be determined without regard to any decrease in that partner's share of a publicly traded partnership's liabilities. The Treasury regulations further provide that withholding on a transfer of an

33

interest in a publicly traded partnership will not be imposed on a transfer that occurs prior to January 1, 2022. For a transfer of interests in a publicly traded partnership that is effected through a broker on or after January 1, 2022, the obligation to withhold is imposed on the transferor's broker. Prospective foreign unitholders should consult their tax advisors regarding the impact of these rules on an investment in our common units.

***We treat each purchaser of our common units as having the same tax benefits without regard to the actual common units purchased. The IRS may challenge this treatment, which could adversely affect the value of the common units.***

Because we cannot match transferors and transferees of common units, we have adopted certain methods for allocating depreciation and amortization deductions that may not conform to all aspects of existing Treasury Regulations. A successful IRS challenge to the use of those methods could adversely affect the amount of tax benefits available to our unitholders. It also could affect the timing of these tax benefits or the amount of gain from our unitholders' sale of common units and could have a negative impact on the value of our common units or result in audit adjustments to their tax returns.

***We generally prorate our items of income, gain, loss and deduction between transferors and transferees of our units each month based on the ownership of our units on the first day of each month, instead of on the basis of the date a particular unit is transferred. The IRS may challenge this treatment, which could change the allocation of items of income, gain, loss and deduction among our unitholders.***

We generally prorate our items of income, gain, loss and deduction between transferors and transferees of our units each month based on the ownership of our units on the first day of each month (the "Allocation Date"), instead of on the basis of the date a particular unit is transferred. Similarly, we generally allocate certain deductions for depreciation of capital additions, gain or loss realized on a sale or other disposition of our assets and, in the discretion of our General Partner, any other extraordinary item of income, gain, loss or deduction based on ownership on the Allocation Date. Treasury Regulations allow a similar monthly simplifying convention, but such regulations do not specifically authorize all aspects of our proration method. If the IRS were to challenge our proration method, we may be required to change the allocation of items of income, gain, loss and deduction among our unitholders.

***A unitholder whose units are the subject of a securities loan (e.g., a loan to a "short seller" to cover a short sale of units) may be considered as having disposed of those units. If so, he would no longer be treated for tax purposes as a partner with respect to those units during the period of the loan and may recognize gain or loss from the disposition.***

Because there are no specific rules governing the U.S. federal income tax consequence of loaning a partnership interest, a unitholder whose units are the subject of a securities loan may be considered as having disposed of the loaned units. In that case, the unitholder may no longer be treated for tax purposes as a partner with respect to those units during the period of the loan to the short seller and the unitholder may recognize gain or loss from such disposition. Moreover, during the period of the loan, any of our income, gain, loss or deduction with respect to those units may not be reportable by the unitholder and any cash distributions received by the unitholder as to those units could be fully taxable as ordinary income. Unitholders desiring to assure their status as partners and avoid the risk of gain recognition from a securities loan are urged to consult a tax advisor to determine whether it is advisable to modify any applicable brokerage account agreements to prohibit their brokers from borrowing their units.

***We have adopted certain valuation methodologies in determining a unitholder's allocations of income, gain, loss and deduction. The IRS may challenge these methodologies or the resulting allocations, which could adversely affect the value of the common units.***

In determining the items of income, gain, loss and deduction allocable to our unitholders, we must routinely determine the fair market value of our assets. Although we may, from time to time, consult with professional appraisers regarding valuation matters, we make many fair market value estimates using a methodology based on the market value of our common units as a means to measure the fair market value of our assets. The IRS may challenge these valuation methods and the resulting allocations of income, gain, loss and deduction.

A successful IRS challenge to these methods or allocations could adversely affect the timing or amount of taxable income or loss being allocated to our unitholders. It also could affect the amount of gain from our unitholders' sale of common units and could have a negative impact on the value of the common units or result in audit adjustments to our unitholders' tax returns without the benefit of additional deductions.

***Our unitholders will likely be subject to state and local taxes and income tax return filing requirements in jurisdictions where they do not live as a result of investing in our common units.***

In addition to U.S. federal income taxes, our unitholders may be subject to other taxes, including foreign, state and local taxes, unincorporated business taxes and estate, inheritance or intangible taxes that are imposed by the various jurisdictions in

34

A0679

which we conduct business or own property now or in the future, even if they do not live in any of those jurisdictions. Our unitholders will likely be required to file foreign, state and local income tax returns and pay state and local income taxes in some or all of these various jurisdictions. Further, our unitholders may be subject to penalties for failure to comply with those requirements.

We currently own assets in multiple states. Many of these states currently impose a personal income tax on individuals, corporations and other entities. As we make acquisitions or expand our business, we may own assets or conduct business in additional states that impose a personal income tax. It is our unitholders' responsibility to file all U.S. federal, foreign, state and local tax returns and pay any resulting taxes due in these jurisdictions. Unitholders should consult with their own tax advisors regarding the filing of such tax returns, the payment of such taxes, and the deductibility of any such taxes paid.

35

A0680

**ITEM 1B.   UNRESOLVED STAFF COMMENTS**

None.

**ITEM 2.   PROPERTIES**

Information regarding our properties is contained in Part I, Item 1. "Business" and Part II, Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**ITEM 3.   LEGAL PROCEEDINGS**

Although we may, from time to time, be involved in litigation and claims arising out of our operations in the normal course of business, we do not believe that we are a party to any litigation that will have a material adverse impact on our financial condition or results of operations.

**ITEM 4.   MINE SAFETY DISCLOSURES**

Not applicable.

36

A0681

**PART II**

**ITEM 5.    MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

**Market Information**

Our common units representing limited partner interests in the Partnership ("common units") are traded on the New York Stock Exchange ("NYSE") under the symbol "EVA."

As of February 15, 2021, there were 40,023,105 common units outstanding held by seven unitholders of record. Because many of our common units are held by brokers and other institutions on behalf of unitholders, we are unable to estimate the total number of unitholders represented by these unitholders of record. As of February 15, 2021, our sponsor held approximately 34% of the common units.

**Cash Distribution Policy**

*General*

Our partnership agreement provides that our General Partner will make a determination as to whether to make a distribution, but our partnership agreement does not require us to pay distributions at any time or in any amount. Instead, the board of directors of our General Partner adopted a cash distribution policy that sets forth our General Partner's intention with respect to the distributions to be made to unitholders. Pursuant to our cash distribution policy, within 60 days after the end of each quarter, we intend to distribute to the holders of common units on a quarterly basis at least the minimum quarterly distribution of $0.4125 per unit, or $1.65 on an annualized basis, to the extent we have sufficient cash after establishment of cash reserves and payment of fees and expenses, including payments to our General Partner and its affiliates.

The board of directors of our General Partner may change the foregoing distribution policy at any time and from time to time, and even if our cash distribution policy is not modified or revoked, the amount of distributions paid under our policy and the decision to make any distribution is determined by our General Partner. Our partnership agreement does not contain a requirement for us to pay distributions to our unitholders, and there is no guarantee that we will pay any specific distribution level, or any distribution, on the units in any quarter. However, our partnership agreement does contain provisions intended to motivate our General Partner to make steady, increasing and sustainable distributions over time.

Please read Part II, Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources—Senior Secured Revolving Credit Facility" for a discussion of the provisions included in our senior secured revolving credit facility that may restrict our ability to pay distributions to our unitholders.

*General Partner Interest and Incentive Distribution Rights*

Our General Partner owns a non-economic general partner interest in us, which does not entitle it to receive cash distributions. Our sponsor owns the incentive distribution rights and may in the future own common units or other equity interests in us and will be entitled to receive distributions on any such interests.

Incentive distribution rights represent the right to receive increasing percentages (15.0%, 25.0% and 50.0%) of quarterly distributions from operating surplus after the minimum quarterly distribution and the target distribution levels have been achieved. Our sponsor currently holds all of the incentive distribution rights, but may transfer these rights separately from the general partner interest.

*Securities Authorized for Issuance under Equity Compensation Plans*

Please read Part III, Item 12. "Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters" for information regarding our equity compensation plans.

A0682

**ITEM 6. SELECTED FINANCIAL DATA**

Not applicable.

A0683

**ITEM 7.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion of our historical performance, financial condition and future prospects should be read in conjunction with Part I, Item 1. "Business" and the consolidated financial statements in Part II, Item 8. "Financial Statements and Supplementary Data." References in this Annual Report to the "Partnership," "we," "our," "us" or similar expressions refer to Enviva Partners, LP, including its subsidiaries. References to "our sponsor" refer to Enviva Holdings, LP, and, where applicable, its wholly owned subsidiaries Enviva MLP Holdco, LLC and Enviva Development Holdings, LLC. References to "our General Partner" refer to Enviva Partners GP, LLC, a wholly owned subsidiary of Enviva Holdings, LP. References to "Enviva Management Company" refer to Enviva Management Company, LLC, a wholly owned subsidiary of Enviva Holdings, LP, together with its affiliates that provide services to us. References to "our employees" refer to the employees of Enviva Management Company and its affiliates who provide services to the Partnership. Please read Cautionary Statement Regarding Forward-Looking Statements on page 1 and Part 1, Item 1A. "Risk Factors" for information regarding certain risks inherent in our business.*

For a discussion of our results of operations for the years ended December 31, 2019 and 2018, see "Part II, Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" of our annual report on Form 10-K for the year ended December 31, 2019, filed with the U.S. Securities and Exchange Commission on February 26, 2020.

**Basis of Presentation**

In April 2019, we acquired from our sponsor all of the Class B units of Enviva Wilmington Holdings, LLC (the "Hamlet JV," and such acquisition, the "Hamlet Drop-Down"). The Hamlet JV owns a wood pellet production plant in Hamlet, North Carolina (the "Hamlet plant"). We are the managing member of the Hamlet JV, which is partially owned by John Hancock Life Insurance Company (U.S.A.) and certain of its affiliates (collectively, where applicable, "John Hancock"). We accounted for the Hamlet JV as a consolidated subsidiary, not as a joint venture, following the Hamlet Drop-Down. For more information regarding our rights and obligations with respect to the Hamlet JV, see Note 17, *Partners' Capital-Hamlet JV*.

**Business Overview**

We are a Delaware limited partnership formed in 2013 to aggregate a natural resource, wood fiber and process it into a transportable form, wood pellets. We sell a significant majority of our wood pellets through long-term, take-or-pay off-take contracts with creditworthy customers in the United Kingdom, Europe and increasingly in Japan. We own and operate nine plants (collectively, "our plants") with a combined production capacity of approximately 5.3 million metric tons ("MT") of wood pellets per year ("MTPY") in Virginia, North Carolina, South Carolina, Georgia, Florida and Mississippi, the production of which is fully contracted through 2025. We export wood pellets through our wholly owned dry-bulk, deep-water marine terminal at the Port of Chesapeake, Virginia (the "Chesapeake terminal") and terminal assets at the Port of Wilmington, North Carolina (the "Wilmington terminal") and from third-party deep-water marine terminals in Savannah, Georgia (the "Savannah terminal"), Mobile, Alabama (the "Mobile terminal") and Panama City, Florida (the "Panama City terminal"). All of our facilities are located in geographic regions with low input costs and favorable transportation logistics. Owning these cost-advantaged assets, the output from which is fully contracted through 2025, in a rapidly expanding industry provides us with a platform to generate stable and growing cash flows. Our plants are sited in robust fiber baskets providing stable pricing for the low-grade fiber used to produce wood pellets. Our raw materials are byproducts of traditional timber harvesting, principally low-value wood materials, such as trees generally not suited for sawmilling or other manufactured forest products, and tree tops and limbs, understory, brush and slash that are generated in a harvest.

Our strategy is to fully contract the wood pellet production from our plants under long-term, take-or-pay off-take contracts with a diversified and creditworthy customer base. Our long-term off-take contracts typically provide for fixed-price deliveries that may include provisions that escalate the price over time and provide for other margin protection. During 2020, production capacity from our wood pellet production plants and wood pellets sourced from our affiliates and third parties were approximately equal to the contracted volumes under our existing long-term, take-or-pay off-take contracts. Our long-term, take-or-pay off-take contracts provide for a product sales backlog of $14.6 billion and have a total weighted-average remaining term of 12.8 years from February 1, 2021. Under our current product sales backlog, our plants are fully contracted through 2025. Assuming all volumes under the firm and contingent long-term off-take contracts held by our sponsor were included with our product sales backlog for firm and contingent contracted product sales, our product sales backlog would increase to $19.9 billion and the total weighted-average remaining term from February 1, 2021 would increase to 14.0 years.

Our customers use our wood pellets as a substitute fuel for coal in dedicated biomass or co-fired coal power plants. Wood pellets serve as a suitable "drop-in" alternative to coal because of their comparable heat content, density and form. Due to the

A0684

uninterruptible nature of our customers' fuel consumption, our customers require a reliable supply of wood pellets that meet stringent product specifications. We have built our operations and assets to deliver and certify the highest levels of product quality and our proven track record of reliable deliveries enables us to charge premium prices for this certainty. In addition to our customers' focus on the reliability of supply, they are concerned about the combustion efficiency of the wood pellets and their safe handling. Because combustion efficiency is a function of energy density, particle size distribution, ash/inert content and moisture, our customers require that we supply wood pellets meeting minimum criteria for a variety of specifications and, in some cases, provide incentives for exceeding our contract specifications.

## Recent Developments

### Georgia Biomass Acquisition

On July 31, 2020, we acquired all of the limited liability company interests in Georgia Biomass Holding LLC, a Georgia limited liability company ("Georgia Biomass") and the indirect owner of a wood pellet production plant located in Waycross, Georgia (the "Waycross plant"), for total consideration of $164.0 million in cash, after accounting for certain adjustments (the "Georgia Biomass Acquisition"). The Waycross plant has been in operation since 2011 and has a production capacity of 800,000 MTPY. The Waycross plant terminals its production at a two-dome pellet export terminal with a storage capacity of 50,000 MT at the Port of Savannah, Georgia pursuant to a lease and associated terminal services agreement effective through 2028. Approximately 500,000 MTPY of the Waycross plant's production is contracted under separate agreements to one of our existing customers through 2024. In August 2020, Georgia Biomass converted to a limited liability company organized under the laws of the State of Delaware under the name Enviva Pellets Waycross Holdings Sub, LLC ("Waycross").

### Greenwood Drop-Down

On July 1, 2020, we acquired from our sponsor all of the limited liability company interests in Enviva Pellets Greenwood Holdings II, LLC ("Greenwood Holdings II"), the indirect owner of Enviva Pellets Greenwood, LLC, which owns a wood pellet production plant in Greenwood, South Carolina (the "Greenwood plant"), for a purchase price of $129.7 million, after accounting for certain adjustments and assumption of a $40.0 million, third-party promissory note bearing interest at 2.5% per year that we assumed at closing (such transaction, the "Greenwood Drop-Down"). The Greenwood Drop-Down was an asset acquisition between entities under common control and accounted for on the carryover basis of accounting. Accordingly, the consolidated financial statements for the period beginning July 1, 2020 reflect the acquisition.

On the date of and in connection with the Greenwood Drop-Down, our sponsor assigned five biomass off-take contracts to us (collectively, the "Associated Off-Take Contracts"). The Associated Off-Take Contracts call for aggregate annual deliveries of 1.4 million MTPY and mature between 2031 and 2041. Our sponsor also assigned to us fixed-rate shipping contracts with aggregate annual shipping volume of 1.4 million MTPY. The Associated Off-Take Contracts were assigned to fully contract wood pellets produced by the Greenwood plant and Waycross plant. The shipping contracts were assigned to facilitate transportation of those produced wood pellets.

The Greenwood plant current production capacity is 500,000 MTPY of wood pellets and transports its production via rail service to our terminal assets at the Port of Wilmington, North Carolina. We expect to invest a total of $28.0 million to expand the Greenwood plant's production capacity to 600,000 MTPY. We expect to complete the expansion, which is currently underway, by year-end 2021.

### Greenwood Make-Whole Agreement

On the date of the Greenwood Drop-Down, we entered into a make-whole agreement with our sponsor, pursuant to which our sponsor agreed to reimburse us for any construction costs incurred for the planned expansion of the Greenwood plant in excess of $28.0 million.

### Greenwood Management Services Fee Waiver

On the date of the Greenwood Drop-Down, we entered into an agreement with Enviva Management Company pursuant to which (1) an aggregate of approximately $37.0 million in management services and other fees that otherwise would be owed by us under our management services agreement ("MSA") with Enviva Management Company will be waived with respect to the period from the closing of the Greenwood Drop-Down through the fourth quarter of 2021 and (2) Enviva Management Company will continue to waive certain management services and other fees during 2022 unless and until the Greenwood plant's production volumes equal or exceed 50,000 MT in any calendar month, in each case, to provide cash flow support to us during the planned expansion of the Greenwood plant. During the year ended December 31, 2020, $18.0 million of MSA fees were waived, of which $9.9 million was included in cost of goods sold and $8.1 million was included in related-party management services fees in general and administrative expenses.

A0685

*Tack-On Notes Issuance*

On July 15, 2020, we issued an additional $150.0 million in aggregate principal amount of our 6.5% senior unsecured notes due January 15, 2026 (the "2026 Notes ") at an offering price of 103.75% of the principal amount, which implied an effective yield to maturity of approximately 5.7%. We received net proceeds of approximately $153.6 million from the offering after deducting discounts and commissions and offering costs.

*Private Placement of Common Units*

On June 18, 2020, we entered into a Common Unit Purchase Agreement (the "Unit Purchase Agreement") with certain investors to sell 6,153,846 common units in a private placement at a price of $32.50 per common unit for gross proceeds of $200.0 million (the "Private Placement"). We used the net proceeds of $190.8 million from the Private Placement to fund a portion of the consideration for each of the Greenwood Drop-Down and the Georgia Biomass Acquisition.

Pursuant to the Unit Purchase Agreement, we entered into a registration rights agreement (the "Registration Rights Agreement") with the investors in connection with the closing of the Private Placement, pursuant to which we agreed to file and maintain a registration statement (the "Shelf Registration Statement") with respect to the resale of the common units on the terms set forth therein. The Registration Rights Agreement also provides certain investors with customary piggyback registration rights. On July 10, 2020, we filed the Shelf Registration Statement and on July 20, 2020, the Shelf Registration Statement was declared effective.

*Financing Activities*

Our net proceeds of $190.8 million from the Private Placement and the net proceeds of the tack-on offering of the 2026 Notes of $153.6 million were used primarily to pay for the $129.7 million purchase price for the Greenwood Drop-Down, and to pay $164.8 million of the purchase price for the Georgia Biomass Acquisition.

*Mid-Atlantic Expansions*

During 2019, we started construction to increase the aggregate wood pellet production capacity of our plants in Northampton, North Carolina (the "Northampton plant"), and Southampton, Virginia (the "Southampton plant") (together, the "Mid-Atlantic Expansions") by approximately 400,000 MTPY. In 2021, we completed the construction of the Mid-Atlantic Expansions and are in the process of ramping the expansions. As of December 31, 2020, we have paid approximately $120.0 million, and expect to pay approximately $10.0 million during 2021, in connection with the expansions.

*Commitment to Achieve Carbon-Neutral Operations*

Consistent with our mission to displace coal, grow more trees and fight climate change, we and our sponsor recently announced our commitment to become "net-zero" in GHG emissions from our operations by 2030. The product we manufacture helps reduce the lifecycle GHG emissions of our customers, but we believe we must also do our part within our operations to mitigate the impacts of climate change. We expect to accomplish neutrality with respect to our Scope 1 emissions (i.e., direct emissions from our manufacturing) by improving energy efficiency and adopting lower-carbon processes, as well as through investment in carbon offsets. We also plan to neutralize our Scope 2 emissions (i.e., indirect emissions from energy we purchase) by using 100% renewable energy by 2030 through the purchase of renewable electricity and/or onsite generation where practicable. Moreover, we will seek to proactively engage with our suppliers, transportation partners and other stakeholders to drive innovative improvements in our supply chain to reduce our Scope 3 emissions (i.e., indirect emissions in our value chain). We intend to report our Scopes 1, 2 and 3 emissions annually and fully meet the requirements of CDP (formerly known as the Carbon Disclosure Project) by 2022. Although it is difficult to project the incremental cost to our operations in 2030, we do not expect any material impact to our financial performance as a result of our efforts to achieve "net-zero" in GHG emissions from our operations.

*Outbreak of the Novel Coronavirus*

The outbreak of a novel strain of coronavirus ("COVID-19") has significantly adversely impacted global markets and continues to present global public health and economic challenges. Although the full impact of COVID-19 is unknown and rapidly evolving, to date, our operations have not been materially impacted by the outbreak.

We have taken prescriptive safety measures including social distancing, hygienic policies and procedures and other steps recommended by the Centers for Disease Control and Prevention (the "CDC"), and adopted the CDC's risk management approach, since the beginning of the outbreak, and have established risk levels based on the degree to which the virus has spread in a given community and the nature of the work performed at that location. Within our field operations, we have continued operations largely as normal with the additional precautionary measures; however, we continue to monitor local data

A0686

on a daily basis and have prioritized putting the right plans, procedures and measures in place to mitigate the risk of exposure and infection and the related impacts to our business.

We specifically designed our operations and logistics systems with flexibility and redundancies so they are capable of effectively responding to unforeseen events. We operate a portfolio of nine wood pellet production plants geographically dispersed across the Southeast U.S. We export our product from a portfolio of five bulk terminals and transport it to our customers under long-term, fixed-price shipping contracts with multiple shipping partners. These operations currently are unaffected by COVID-19.

In March 2020, the United States declared the COVID-19 pandemic a national emergency, and several states and municipalities, including states in which we own assets or conduct business, have declared public health emergencies and taken extraordinary actions in response, including issuing "stay-at-home" orders and similar mandates ("Orders") for many businesses to curtail or cease normal operations. To date, we have not been materially impacted by the Orders, which exempt or exclude businesses that have been designated essential critical infrastructure, such as ours, from various restrictions they impose.

As of December 31, 2020, we had liquidity, which included cash on hand and availability under our $350.0 million revolving credit facility of $229.7 million, and we have no debt maturities until 2023. Our wood pellet production capacity is committed under long-term, take-or-pay off-take contracts with fixed pricing and fixed volumes that are not impacted by the market prices of crude oil, natural gas, power or heat. Furthermore, most of our current deliveries are to Europe, where they fuel grid-critical base load, dispatchable generation facilities that provide power and heat required for local communities to navigate through their own COVID-19 responses. As of December 31, 2020, each of our customers is in compliance with their agreements with us, including payment terms.

We do, however, remain vigilant about the unfolding global crisis and continue to monitor and manage the potential health, safety, business and other risks associated with the COVID-19 pandemic. Nonetheless, we have not experienced these issues in any significant way to date, and we have plans that we believe would mitigate their potential impact if we were to face such issues in the future.

## Factors Impacting Comparability of Our Financial Results

### Greenwood Drop-Down

The Greenwood Drop-Down was an asset acquisition between entities under common control and accounted for on the carryover basis of accounting. Accordingly, the consolidated financial statements for the period beginning July 1, 2020 reflect the acquisition. For more information regarding the Greenwood Acquisition, see Note 1, *Description of Business and Basis of Presentation-Basis of Presentation-Enviva Pellets Greenwood and Note 3, Transactions Between Entities Under Common Control.*

### Georgia Biomass Acquisition

The Georgia Biomass Acquisition was recorded as a business combination and accounted for using the acquisition method. Assets acquired and liabilities assumed were recognized at fair value on the acquisition date of July 31, 2020, and the difference between the fair value of consideration transferred, which excludes acquisition-related costs, and the fair values of the identified net assets acquired, was recognized as goodwill. For more information regarding the Georgia Biomass Acquisition, see Note 1, *Description of Business and Basis of Presentation-Georgia Biomass Holding LLC* and Note 4, *Acquisition.*

### Private Placement of Common Units

In June 2020, we issued 6,153,846 common units in a private placement offering for net proceeds of approximately $190.8 million, net of $9.2 million of issuance costs.

### Hamlet Drop-Down

On April 2, 2019, we acquired from our sponsor all of the Class B units of Enviva Wilmington Holdings, LLC (the "Hamlet JV," and such acquisition, the "Hamlet Drop-Down"). We are the managing member of the Hamlet JV, which is partially owned by John Hancock Life Insurance Company (U.S.A.) and certain of its affiliates (collectively, where applicable, "John Hancock").

The Hamlet JV owns a wood pellet production plant in Hamlet, North Carolina (the "Hamlet plant") and has a firm 15-year take-or-pay off-take contract to supply a customer with nearly 1.0 million MTPY of wood pellets following a ramp period through 2034. Prior to the Hamlet Drop-Down, we already had off-take contracts with the Hamlet JV to supply 470,000 MTPY of the volumes to be delivered pursuant to the 1.0 million MTPY contract; consequently, we acquired 500,000 MTPY in

42

A0687

incremental product sales volumes in connection with the Hamlet Drop-Down. The Hamlet plant became operational during the second quarter of 2019.

We accounted for the Hamlet JV as a consolidated subsidiary, not as a joint venture, following the Hamlet Drop-Down on April 2, 2019. We included all accounts of the Hamlet JV in our consolidated results as of April 2, 2019 as the Class B Units represent a controlling interest in the Hamlet JV. We are generally unrestricted in managing the assets and cash flows of the Hamlet JV; however, certain decisions, such as those relating to the issuance and redemption of equity interests in the Hamlet JV, guarantees of indebtedness and fundamental changes, including mergers and acquisitions, asset sales and liquidation and dissolution of the Hamlet JV, require the approval of the members of the Hamlet JV. For more information regarding the Hamlet Drop-Down, see Note 1, *Description of Business and Basis of Presentation-Basis of Presentation-Enviva Wilmington, Holdings, LLC* and Note 15, *Related-Party Transactions-Drop-Down Agreements-Hamlet Drop-Down.*

### 2026 Notes

During December 2019, we issued $600.0 million in principal amount of the 2026 Notes in private placements under Rule 144A and Regulation S of the Securities Act of 1933, as amended (the "Securities Act"). We received gross proceeds of approximately $601.8 million from the offerings and net proceeds of approximately $595.8 million after deducting commissions and expenses. We used the net proceeds from the offerings (1) to redeem our existing $355.0 million principal amount of 8.5% senior unsecured notes due 2021, including payment of the related redemption premium, (2) to repay borrowings under our senior secured revolving credit facility, including payment of the related accrued interest and (3) for general partnership purposes. Interest payments are due semi-annually in arrears on January 15 and July 15 of each year, commencing July 15, 2020.

As discussed above in "Recent Developments," we issued an additional $150.0 million in aggregate principal amount of 2026 Notes in July 2020.

## How We Generate Revenue

### Overview

We primarily earn revenue by supplying wood pellets to our customers under off-take contracts, the majority of which are long-term in nature. Our off-take contracts are considered "take-or-pay" because they include a firm obligation of the customer to take a fixed quantity of product at a stated price and provisions that require that we be compensated in the case of a customer's failure to accept all or a part of the contracted volumes or termination of a contract by a customer. Each of our long-term off-take contracts defines the annual volume of wood pellets that a customer is required to purchase and we are required to sell, the fixed price per MT for product satisfying a base net calorific value and other technical specifications. These prices are fixed for the entire term, and are subject to adjustments which may include annual inflation-based adjustments or price escalators, price adjustments for product specifications, as well as, in some instances, price adjustments due to changes in underlying indices. In addition to sales of our product under these long-term off-take contracts, we routinely sell wood pellets under shorter-term contracts, which range in volume and tenor and, in some cases, may include only one specific shipment. Because each of our off-take contracts is a bilaterally negotiated agreement, our revenue over the duration of such contracts does not generally follow observable current market pricing trends. Our performance obligations under these contracts include the delivery of wood pellets, which are aggregated into MT. We account for each MT as a single performance obligation. Our revenue from the sale of wood pellets we produce is recognized upon satisfaction of the performance obligation when control transfers to the customer at the time of loading wood pellets onto a ship.

Depending on the specific off-take contract, shipping terms under our long-term contracts are either Cost, Insurance and Freight ("CIF"), Cost and Freight ("CFR") or Free On Board ("FOB"). Under a CIF contract, we procure and pay for shipping costs, which include insurance and all other charges, up to the port of destination for the customer. Under a CFR contract, we procure and pay for shipping costs, which include insurance (excluding marine cargo insurance) and all other charges, up to the port of destination for the customer. Shipping under CIF and CFR contracts after control has passed to the customer is considered a fulfillment activity rather than a performance obligation and associated expenses are accrued and included in the price to the customer. Under FOB contracts, the customer is directly responsible for shipping costs.

In some cases, we may purchase shipments of product from third-party suppliers and resell them in back-to-back transactions ("purchase and sale transactions"). We typically are the principal in such transactions because we control the wood pellets prior to transferring them to the customer and therefore recognize related revenue on a gross basis.

43

A0688

*Other Revenue*

Other revenue includes fees from customers related to cancellations, deferrals or accelerations of shipments and the Commercial Services.

We recognize third- and related-party terminal services revenue ratably over the contract term. Terminal services are performance obligations that are satisfied over time, as customers simultaneously receive and consume the benefits of the terminal services we perform. The consideration is generally fixed for minimum quantities and services above-minimum quantities are generally billed based on a per-MT rate.

*Contracted Backlog*

As of February 1, 2021, we had approximately $14.6 billion of product sales backlog for firm and contingent contracted product sales to our long-term off-take customers and have a total weighted-average remaining term of 12.8 years compared to approximately $10.6 billion and a total weighted-average remaining term of 11.4 years as of February 1, 2020. Contracted backlog represents the revenue to be recognized under existing contracts assuming deliveries occur as specified in the contracts. Contracted future product sales denominated in foreign currencies, excluding revenue hedged with foreign currency forward contracts, are included in U.S. Dollars at February 1, 2021 forward rates. The contracted backlog includes forward prices including inflation, foreign currency and commodity prices. The amount also includes the effects of related foreign currency derivative contracts. Please read Part II, Item 8. "Financial Statements and Supplementary Data—Derivative Instruments" for more information regarding our foreign currency forward contracts.

Our expected future product sales revenue under our contracted backlog as of February 1, 2021 is as follows (in millions):

| | | |
|---|---|---|
| Period from February 1, 2021 to December 31, 2021 | $ | 1,033 |
| Year ending December 31, 2022 | | 1,274 |
| Year ending December 31, 2023 and thereafter | | 12,284 |
| Total product sales contracted backlog | $ | 14,591 |

Assuming all volumes under the firm and contingent off-take contracts held by our sponsor were included with our product sales contracted backlog for firm and contingent contracted product sales, the total weighted-average remaining term as of February 1, 2021 would increase to 14.0 years and product sales contracted backlog would increase to $19.9 billion as follows (in millions):

| | | |
|---|---|---|
| Period from February 1, 2021 to December 31, 2021 | $ | 1,032 |
| Year ending December 31, 2022 | | 1,325 |
| Year ending December 31, 2023 and thereafter | | 17,537 |
| Total product sales contracted backlog | $ | 19,894 |

Included in the product sales contracted backlog above are $2.9 billion of contingent contracts held by our sponsor.

## Costs of Conducting Our Business

*Cost of Goods Sold*

Cost of goods sold includes the costs to produce and deliver our wood pellets to customers, reimbursable shipping-related costs associated with specific off-take contracts with CIF or CFR shipping terms and costs associated with purchase and sale transactions. The primary expenses incurred to produce and deliver our wood pellets consist of raw material, production and distribution costs.

We have strategically located our plants in the Mid-Atlantic and Gulf Coast regions of the United States, geographic areas in which wood fiber sources are plentiful and readily available. We have short-term and long-term contracts to manage the supply of raw materials into our plants. Delivered wood fiber costs include stumpage as well as harvesting, transportation and, in some cases, size reduction services provided by our suppliers. The majority of our product volumes are sold under off-take contracts that include cost pass-through mechanisms to mitigate increases in raw material and distribution costs.

Production costs at our production plants consist of labor, energy, tooling, repairs and maintenance and plant overhead costs. Production costs also include depreciation expense associated with the use of our plants and equipment and any gain or loss on disposal of associated assets. Some of our off-take contracts include price escalators that mitigate inflationary pressure

44

A0689

on certain components of our production costs. In addition to the wood pellets that we produce at our owned and operated production plants, we selectively purchase additional quantities of wood pellets from third- and related-party wood pellet producers.

Distribution costs include all transportation costs from our plants to our port locations, any storage or handling costs while the product remains at port and shipping costs related to the delivery of our product from our port locations to our customers. Both the strategic location of our plants and our ownership or control of our deep-water terminals have allowed for the efficient and cost-effective transportation of our wood pellets. We seek to mitigate shipping risk by entering into long-term, fixed-price shipping contracts with reputable shippers matching the terms and volumes of our off-take contracts pursuant to which we are responsible for arranging shipping. Certain of our off-take contracts include pricing adjustments for volatility in fuel prices, which allow us to pass the majority of the fuel price-risk associated with shipping through to our customers.

Costs associated with purchase and sale transactions are included in cost of goods sold.

Raw material, production and distribution costs associated with delivering our wood pellets to our owned and leased marine terminals and third- and related-party wood pellet purchase costs are capitalized as a component of inventory. Fixed production overhead, including the related depreciation expense, is allocated to inventory based on the normal capacity of the production plants. These costs are reflected in cost of goods sold when inventory is sold. Distribution costs associated with shipping our wood pellets to our customers are expensed as incurred. Our inventory is recorded using the first-in, first-out method ("FIFO"). Given the nature of our inventory, the calculation of cost of goods sold is based on estimates used in the valuation of the FIFO inventory and in determining the specific composition of inventory that is sold to each customer.

Recoveries from customers for certain costs incurred at the discharge port under our off-take contracts are not considered a part of the transaction price, and therefore are excluded from product sales and included as an offset to cost of goods sold.

### General and Administrative Expenses

We and our General Partner are party to the MSAs. Under the MSAs, direct or indirect internal or third-party expenses incurred are either directly identifiable or allocated to us. Our sponsor estimates the percentage of employee salaries and related benefits, third-party costs, office rent and expenses and any other overhead costs to be provided to us. Each month, our sponsor allocates the actual costs incurred using these estimates. Our sponsor also charges us for any directly identifiable costs such as goods or services provided at our request. We believe our sponsor's assumptions and allocations have been made on a reasonable basis and are the best estimate of the costs that we would have incurred on a stand-alone basis.

### How We Evaluate Our Operations

#### Adjusted Net Income

We define adjusted net income as net income excluding interest expense associated with incremental borrowings related to a fire that occurred in February 2018 at the Chesapeake terminal (the "Chesapeake Incident") and Hurricanes Florence and Michael (the "Hurricane Events"), early retirement of debt obligation and acquisition and integration costs, adjusting for the effect of certain sales and marketing, scheduling, sustainability, consultation, shipping, and risk management services (collectively, "Commercial Services"), and including certain non-cash waivers of fees for management services provided to us by our sponsor (collectively, "MSA Fee Waivers"). We believe that adjusted net income enhances investors' ability to compare the past financial performance of our underlying operations with our current performance separate from certain items of gain or loss that we characterize as unrepresentative of our ongoing operations.

#### Adjusted Gross Margin and Adjusted Gross Margin per Metric Ton

We define adjusted gross margin as gross margin excluding asset impairment and disposals, depreciation and amortization, changes in unrealized derivative instruments related to hedged items included in gross margin, non-cash unit compensation expenses and acquisition and integration costs, adjusting for the effect of Commercial Services and including MSA Fee Waivers. We define adjusted gross margin per metric ton as adjusted gross margin per metric ton of wood pellets sold. We believe adjusted gross margin and adjusted gross margin per metric ton are meaningful measures because they compare our revenue-generating activities to our operating costs for a view of profitability and performance on a total-dollar and a per-metric ton basis. Adjusted gross margin and adjusted gross margin per metric ton will primarily be affected by our ability to meet targeted production volumes and to control direct and indirect costs associated with procurement and delivery of wood fiber to our wood pellet production plants and our production and distribution of wood pellets.

A0690

*Adjusted EBITDA*

We define adjusted EBITDA as net income excluding depreciation and amortization, interest expense, income tax expense (benefit), early retirement of debt obligation, non-cash unit compensation expense, asset impairments and disposals, changes in unrealized derivative instruments related to hedged items included in gross margin and other income and expense,and acquisition and integration costs, adjusting for the effect of Commercial Services, and including MSA Fee Waivers. Adjusted EBITDA is a supplemental measure used by our management and other users of our financial statements, such as investors, commercial banks and research analysts, to assess the financial performance of our assets without regard to financing methods or capital structure.

*Distributable Cash Flow*

We define distributable cash flow as adjusted EBITDA less maintenance capital expenditures, cash income tax expenses and interest expense net of amortization of debt issuance costs, debt premium, original issue discounts, interest expense associated with the redemption of the $355.0 million of aggregate principal amount of 6.5% senior unsecured notes due 2021 (the "2021 Notes") and the impact from incremental borrowings related to the Chesapeake Incident and Hurricane Events. We use distributable cash flow as a performance metric to compare our cash-generating performance from period to period and to compare the cash-generating performance for specific periods to the cash distributions (if any) that are expected to be paid to our unitholders. We do not rely on distributable cash flow as a liquidity measure.

*Limitations of Non-GAAP Financial Measures*

Adjusted net income, adjusted gross margin, adjusted gross margin per metric ton, adjusted EBITDA and distributable cash flow are not financial measures presented in accordance with accounting principles generally accepted in the United States ("GAAP"). We believe that the presentation of these non-GAAP financial measures provides useful information to investors in assessing our financial condition and results of operations. Our non-GAAP financial measures should not be considered as alternatives to the most directly comparable GAAP financial measures. Each of these non-GAAP financial measures has important limitations as an analytical tool because they exclude some, but not all, items that affect the most directly comparable GAAP financial measures. You should not consider adjusted net income, adjusted gross margin, adjusted gross margin per metric ton, adjusted EBITDA or distributable cash flow in isolation or as substitutes for analysis of our results as reported under GAAP.

Our definitions of these non-GAAP financial measures may not be comparable to similarly titled measures of other companies, thereby diminishing their utility. Please see below for a reconciliation of each of adjusted net income, adjusted gross margin and adjusted gross margin per metric ton, adjusted EBITDA and distributable cash flow to the most directly comparable GAAP financial measure.

A0691

**Results of Operations**

*Year Ended December 31, 2020 Compared to Year Ended December 31, 2019*

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | Change |
| | (in thousands) | | |
| Product sales | $ 830,528 | $ 674,251 | $ 156,277 |
| Other revenue [1] | 44,551 | 10,142 | 34,409 |
| Net revenue | 875,079 | 684,393 | 190,686 |
| Cost of goods sold[1] | 684,863 | 549,701 | 135,162 |
| Loss on disposal of assets | 6,978 | 3,103 | 3,875 |
| Depreciation and amortization | 76,115 | 50,521 | 25,594 |
| Total cost of goods sold | 767,956 | 603,325 | 164,631 |
| Gross margin | 107,123 | 81,068 | 26,055 |
| General and administrative expenses | 12,800 | 6,932 | 5,868 |
| Related-party management services agreement fee | 32,545 | 29,457 | 3,088 |
| Total general and administrative expenses | 45,345 | 36,389 | 8,956 |
| Income from operations | 61,778 | 44,679 | 17,099 |
| Interest expense | (44,902) | (39,344) | (5,558) |
| Early retirement of debt obligation | — | (9,042) | 9,042 |
| Other income | 273 | 764 | (491) |
| Net income (loss) before income tax expense | 17,149 | (2,943) | 20,092 |
| Income tax expense | 69 | — | 69 |
| Net income (loss) | $ 17,080 | $ (2,943) | $ 20,023 |

(1) See Part II, Item 8. "Financial Statements and Supplementary Data—Note 15, *Related-Party Transactions*"

*Net Revenue*

Revenue related to product sales for wood pellets produced or procured by us increased to $830.5 million in 2020 from $674.3 million in 2019. The $156.3 million, or 23%, increase was primarily attributable to a 22% increase in product sales volumes for the year ended December 31, 2020 as compared to the year ended December 31, 2019.

Other revenue for the year ended December 31, 2020 included $32.5 million in payments to us for adjusting deliveries under our take-or-pay off-take contracts, which otherwise would have been included in product sales. Other revenue also included $4.1 million from the Commercial Services during the year ended December 31, 2020. The $32.5 million and $4.1 million in other revenue was recognized under a breakage model based on when the pellets would have been loaded.

*Cost of goods sold*

Total cost of goods sold increased to $768.0 million for the year ended December 31, 2020 from $603.3 million for the year ended December 31, 2019, an increase of $164.6 million, or 27%. The increase was primarily attributable to a 22% increase in sales volumes and a 4% increase in depreciation and amortization expense, mainly associated with the recent acquisitions, during the year ended December 31, 2020 compared to the year ended December 31, 2019.

*Gross margin*

Gross margin was $107.1 million for the year ended December 31, 2020 as compared to $81.1 million for the year ended December 31, 2019, an increase of $26.1 million, or 32%. The $26.1 million increase in gross margin was principally attributable to a 22% increase in product sales volumes, primarily offset by increases in depreciation and amortization expense associated with the recent acquisitions, during the year ended December 31, 2020 as compared to the year ended December 31, 2019.

A0692

*Adjusted gross margin and adjusted gross margin per metric ton*

| | Year Ended December 31, | | |
| | 2020 | 2019 | Change |
|---|---|---|---|
| | (in thousands, except per metric ton) | | |
| Reconciliation of gross margin to adjusted gross margin and adjusted gross margin per metric ton: | | | |
| Gross margin | 107,123 | 81,068 | 26,055 |
| Asset impairments and disposals | 6,978 | 3,103 | 3,875 |
| Non-cash unit compensation expense | 2,024 | — | 2,024 |
| Depreciation and amortization | 76,115 | 50,521 | 25,594 |
| Changes in unrealized derivative instruments | 4,328 | 4,588 | (260) |
| MSA Fee Waivers | 10,913 | 5,000 | 5,913 |
| Acquisition and integration costs and other | 1,510 | 3,211 | (1,701) |
| Commercial Services | (4,139) | 4,139 | (8,278) |
| Adjusted gross margin | 204,852 | 151,630 | 53,222 |
| Metric tons sold | 4,332 | 3,564 | 768 |
| Adjusted gross margin per metric ton | $ 47.29 | $ 42.54 | $ 4.74 |

We earned an adjusted gross margin of $204.9 million, or $47.29 per MT, for the year ended December 31, 2020 compared to $151.6 million, or $42.54 per MT, for the year ended December 31, 2019. The increase in adjusted gross margin was primarily due to factors discussed above under the heading "Gross margin."

Adjusted gross margin for the year ended December 31, 2019 excludes $4.3 million of incremental costs, which are unrepresentative of our ongoing operations, in connection with our evaluation of a third-party wood pellet production plant we considered purchasing (the "Potential Target"). When we commenced our review, the Potential Target had recently returned to operations following an extended shutdown during a bankruptcy proceeding with the intent of demonstrating favorable operations prior to proceeding to an auction sale process; however, the Potential Target had not yet established a logistics chain through a viable export terminal, given that the terminal through which the plant historically had exported was not operational at the time and was not reasonably certain to become operational in the future. Accordingly, as part of our diligence of the Potential Target, we developed an alternative logistics chain to bring the Potential Target's wood pellets to market and began purchasing the production of the Potential Target for a trial period. The incremental costs associated with the establishment and evaluation of this new logistics chain primarily consist of barge, freight, trucking, storage and shiploading services. We have completed our evaluation of the alternative logistics chain and, therefore, do not expect to incur additional costs of this nature in the future.

During the quarter ended December 31, 2019, we received a non-refundable payment of $5.6 million from a customer in consideration for our performance during the quarter of certain sales and marketing, scheduling, sustainability, consultation, shipping and risk management services (collectively, "Commercial Services") that were outside of the scope of our existing take-or-pay off-take contract. The customer had requested the Commercial Services, among other things, in order to avoid its exposure to market price volatility associated with its anticipated failure to take required deliveries of certain wood pellet volumes during the fourth quarter of 2019 and first half of 2020 pursuant to the off-take contract. The Commercial Services had a value to the customer of $5.6 million. We included the entire non-refundable payment of $5.6 million in our publicly stated guidance for 2019 in our press release issued October 30, 2019.

Under GAAP, we recognized $1.5 million of the $5.6 million payment as revenue during the fourth quarter of 2019, under the breakage model of Accounting Standards Codification ("ASC") Topic 606, *Revenue from Contracts with Customers* ("ASC 606"), and recorded the remaining $4.1 million as deferred revenue as of December 31, 2019, which was recognized as revenue during the first six months of 2020 in accordance with the original product sales schedule under the off-take contract. For presentation of our non-GAAP measures, we included the $4.1 million in adjusted net income, adjusted gross margin, adjusted gross margin per MT and adjusted EBITDA for the year ended December 31, 2019 as such amount relates to our performance of certain Commercial Services, which we completed and for which we were compensated in 2019. The $4.1 million increased adjusted net income, adjusted gross margin per MT and adjusted EBITDA for the year ended December 31, 2019 and decreased such measures by an equal amount during the first six months of 2020.

48

A0693

*General and administrative expenses*

Total general and administrative expenses were $45.3 million for the year ended December 31, 2020 and $36.4 million for the year ended December 31, 2019. The $9.0 million increase in total general and administrative expenses is primarily associated with increased acquisition and integration costs.

*Interest expense*

We incurred $44.9 million of interest expense during the year ended December 31, 2020 and $39.3 million during the year ended December 31, 2019. The increase in interest expense from the prior year was primarily attributable to an increase in borrowings as a result of our acquisitions during the year ended December 31, 2020 compared to the year ended December 31, 2019.

*Early retirement of debt obligation*

In 2019, we redeemed all $355.0 million of aggregate principal amount of 2021 Notes and recognized a $9.0 million loss in early retirement of debt obligation consisting of a $7.5 million debt redemption premium and $1.5 million for the write-off of unamortized debt issuance costs, original issue discount and premium. The amounts were amortized over the term of the 2021 Notes and were expensed in December 2019 when we repaid $355.0 million of aggregate principal amount of the 2021 Notes.

*Income Tax*

We incurred $0.1 million of income tax expense during the year ended December 31, 2020 related to an entity acquired in the Georgia Biomass Acquisition.

*Adjusted net income*

| | | Year Ended December 31, | | | |
|---|---|---|---|---|---|
| | | 2020 | | 2019 | Change |
| | | (in thousands) | | | |
| Reconciliation of net income (loss) to adjusted net income: | | | | | |
| Net income (loss) | $ | 17,080 | $ | (2,943) | $ 20,023 |
| Acquisition and integration costs and other | | 7,407 | | 4,411 | 2,996 |
| MSA Fee Waivers | | 23,400 | | 22,600 | 800 |
| Interest expense from incremental borrowings related to Chesapeake Incident and Hurricane Events | | 2,211 | | 1,705 | 506 |
| Early retirement of debt obligation | | — | | 9,042 | (9,042) |
| Commercial Services | | (4,139) | | 4,139 | (8,278) |
| Adjusted net income | $ | 45,959 | $ | 38,954 | $ 7,005 |

We generated adjusted net income of $46.0 million for the year ended December 31, 2020 compared to $39.0 million for the year ended December 31, 2019. The increase in net income and adjusted net income for the year ended December 31, 2020 was primarily attributable to the factors described below under the heading "Adjusted EBITDA," offset by approximately $6.5 million of acquisition and integration costs and approximately $23.0 million of incremental depreciation, amortization and interest expenses mainly associated with the recent acquisitions, as well as changes in certain non-cash expenses.

49

A0694

*Adjusted EBITDA*

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | Change |
| | (in thousands) | | |
| Reconciliation of net income (loss) to adjusted EBITDA: | | | |
| Net income (loss) | $ 17,080 | $ (2,943) | $ 20,023 |
| Add: | | | |
| Depreciation and amortization | 77,471 | 51,581 | 25,890 |
| Interest expense | 44,902 | 39,344 | 5,558 |
| Early retirement of debt obligation | — | 9,042 | (9,042) |
| Non-cash unit compensation expense | 12,798 | 5,410 | 7,388 |
| Income tax expense | 69 | — | 69 |
| Asset impairments and disposals | 6,978 | 3,103 | 3,875 |
| Changes in unrealized derivative instruments | 4,328 | 4,588 | (260) |
| MSA Fee Waivers | 23,400 | 22,600 | 800 |
| Acquisition and integration costs and other | 7,407 | 4,411 | 2,996 |
| Commercial Services | (4,139) | 4,139 | (8,278) |
| Adjusted EBITDA | $ 190,294 | $ 141,275 | $ 49,019 |

We generated adjusted EBITDA of $190.3 million for the year ended December 31, 2020 compared to $141.3 million for the year ended December 31, 2019. The $49.0 million increase was primarily attributable to the factors described above under the heading "Adjusted gross margin per metric ton."

*Distributable cash flow*

The following is a reconciliation of adjusted EBITDA to distributable cash flow:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | Change |
| | (in thousands) | | |
| Adjusted EBITDA | $ 190,294 | $ 141,275 | $ 49,019 |
| Less: | | | |
| Interest expense, net of amortization of debt issuance costs, debt premium, original issue discount, interest expense on the redemption of the 2021 Notes in 2019, and impact from incremental borrowings related to Chesapeake Incident and Hurricane Events | 40,786 | 35,893 | 4,893 |
| Maintenance capital expenditures | 7,952 | 6,922 | 1,030 |
| Distributable cash flow attributable to Eniva Partners, LP | 141,556 | 98,460 | 43,096 |
| Less: Distributable cash flow attributable to incentive distribution rights | 26,917 | 11,439 | 15,478 |
| Distributable cash flow attributable to Eniva Partners, LP limited partners | $ 114,639 | $ 87,021 | $ 27,618 |

**Liquidity and Capital Resources**

*Overview*

Our primary sources of liquidity include cash and cash equivalent balances, cash generated from operations, borrowings under our revolving credit commitments and, from time to time, debt and equity offerings. Our primary liquidity requirements are to fund working capital, service our debt, maintain cash reserves, finance plant acquisitions and plant expansion projects, finance maintenance capital expenditures and pay distributions. We believe cash on hand, cash generated from our operations and the availability of our revolving credit commitments will be sufficient to meet our primary liquidity requirements. However, future capital expenditures, such as expenditures made in relation to plant acquisitions and/or plant expansion projects, and other cash requirements could be higher than we currently expect as a result of various factors. For example, COVID-19 has disrupted debt and equity capital markets and could restrict our access to, or increase the cost of capital from,

50

A0695

public financing activities. Additionally, our ability to generate sufficient cash from our operating activities depends on our future performance, which is subject to general economic, political, financial, competitive and other factors beyond our control.

### Cash Distributions

To the extent we have sufficient cash from our operations after establishment of cash reserves and payment of fees and expenses, we intend to pay to holders of our common units cash distributions of at least the minimum quarterly distribution of $0.4125 per common unit per quarter, which equates to approximately $16.5 million per quarter, or approximately $66.0 million per year, based on the number of common units outstanding as of February 15, 2021.

### Capital Requirements

We operate in a capital-intensive industry, which requires significant investments to maintain and upgrade existing capital. Our capital requirements primarily have consisted, and we anticipate will continue to consist, of the following:

- Maintenance capital expenditures, which are cash expenditures incurred to maintain our long-term operating income or operating capacity. These expenditures typically include certain system integrity, compliance and safety improvements; and

- Growth capital expenditures, which are cash expenditures we expect will increase our operating income or operating capacity over the long term. Growth capital expenditures include acquisitions or construction of new capital assets or capital improvements such as additions to or improvements on our existing capital assets as well as projects intended to extend the useful life of assets.

The classification of capital expenditures as either maintenance or growth is made at the individual asset level during our budgeting process and as we approve, execute and monitor our capital spending.

In 2021, we completed the construction of the Mid-Atlantic Expansions. As of December 31, 2020, we have paid approximately $120.0 million and expect to pay approximately $10.0 million during 2021.

We expect to invest a total of $28.0 million to expand the Greenwood plant's production capacity to 600,000 MTPY. We expect to complete the expansion, which is currently underway, by year-end 2021.

We have commenced a series of projects (the "Multi-Plant Expansions") at our Sampson plant, Hamlet plant and Cottondale plant, subject to receiving the necessary permits. We expect to invest approximately $50.0 million to de-bottleneck manufacturing processes, eliminate certain costs and increase production capacity. We expect to complete the Multi-Plant Expansions by the end of 2022.

As part of the planned expansion projects or otherwise as part of our ordinary system improvements, we will continue to invest in the purchase and installation of emissions control equipment, such as regenerative thermal oxidizers, cyclones and baghouses at our existing plants, where required for environmental compliance or as part of our environmental leadership strategy. The expenditure amounts mentioned above for the Mid-Atlantic Expansions, the Greenwood plant expansion and the Multi-Plant Expansions include the investment in emissions control equipment.

Our financing strategy is to fund acquisitions, drop-downs and major expansion projects with 50% equity and 50% debt.

### Long-Term Debt

#### 2026 Notes

On December 9 and December 12, 2019, Enviva Partners, LP, with its wholly owned subsidiary Enviva Partners Finance Corp., issued $550.0 million and $50.0 million, respectively, of the 2026 Notes in private placements under Rule 144A and Regulation S of the Securities Act of 1933, as amended, for a total combined aggregate principal amount outstanding of $600.0 million maturing in 2026. We received gross proceeds of approximately $601.8 million from the offerings and net proceeds of approximately $595.8 million after deducting commissions and expenses. We used the net proceeds from the offerings to (1) redeem our existing $355.0 million principal amount of 8.5% senior unsecured 2021 Notes, including payment of the related redemption premium, (2) repay borrowings under our senior secured revolving credit facility, including payment of the related accrued interest and (3) for general partnership purposes. Interest payments are due semi-annually in arrears on January 15 and July 15 of each year, commencing July 15, 2020.

In July 2020, we issued an additional $150.0 million aggregate principal amount of the 2026 Notes at an offering price of 103.75% of the principal amount (the "Additional Notes"). We received net proceeds of approximately $153.6 million from the Additional Notes offering after deducting discounts and commissions. We used the net proceeds from the Additional Notes

51

A0696

offering to fund a portion of the cash consideration for the Greenwood Drop-Down and Georgia Biomass Acquisition, to repay borrowings under our revolving credit facility and for general partnership purposes.

We may redeem all or a portion of the 2026 Notes at any time at the applicable redemption price, plus accrued and unpaid interest, if any (subject to the right of holders of record on the relevant record date to receive interest due on an interest payment date that is on or prior to the redemption date), and, in some cases, plus a make-whole premium.

We were in compliance with the covenants and restrictions associated with, and no events of default existed under, the indenture governing the 2026 Notes as of December 31, 2020. The 2026 Notes are guaranteed jointly and severally on a senior unsecured basis by our existing subsidiaries (excluding Enviva Partners Finance Corp.) that guarantee certain of our indebtedness and may be guaranteed by certain future restricted subsidiaries. For additional information on our senior secured credit facility, see Note 14, *Long-Term Debt and Finance Lease Obligations*.

*2021 Notes*

On December 9, 2019, we redeemed all $355.0 million of aggregate principal amount of 6.5% senior unsecured notes due 2021 (the "2021 Notes") and recognized a $9.0 million loss on the early retirement of debt obligation consisting of a $7.5 million debt redemption premium and $1.5 million for the write-off of unamortized debt issuance costs, original issue discount and premium. The amounts were amortized over the term of the 2021 Notes and were expensed in December 2019 when we repaid $355.0 million of aggregate principal amount of the 2021 Notes. The redemption of the 2021 Notes was funded from a portion of the net proceeds from the issuance of the 2026 Notes.

*Senior Secured Revolving Credit Facility*

We have a $350.0 million senior secured revolving credit facility that matures on October 18, 2023.

Borrowings under the revolving credit commitments thereunder bear interest, at our option, at either a Eurodollar rate or at a base rate, in each case, plus an applicable margin. The applicable margin will fluctuate between 1.75% per annum and 3.00% per annum, in the case of Eurodollar rate borrowings, or between 0.75% per annum and 2.00% per annum, in the case of base rate loans, in each case, based on our Total Leverage Ratio (as defined in our credit agreement) at such time, with 25 basis point increases or decreases for each 0.50 increase or decrease in our Total Leverage Ratio from 2.75:1:00 to 4.75:1:00.

We are required to pay a commitment fee on the daily unused amount under the revolving credit commitments at a rate between 0.25% and 0.50% per annum.

The credit agreement contains certain covenants, restrictions and events of default. We are required to maintain (1) a maximum Total Leverage Ratio at or below 4.75 to 1.00 (or 5.00 to 1.00 during a Material Transaction Period and (2) a minimum Interest Coverage Ratio (as defined in our credit agreement) of not less than 2.25 to 1.00.

As of December 31, 2020, we were in compliance with all covenants and restrictions associated with, and no events of default existed under, the credit agreement governing our senior secured revolving credit facility. Our obligations under the senior secured revolving credit facility are guaranteed by certain of our subsidiaries and secured by liens on substantially all of our assets; however, the senior secured revolving credit facility is not guaranteed by the Hamlet JV or secured by liens on its assets. For additional information on our senior secured revolving credit facility, see Note 14, *Long-Term Debt and Finance Lease Obligations*.

*Seller Note*

In connection with the Greenwood Drop-Down, we became a party to, and a guarantor of, a promissory note (the "Seller Note") with a remaining principal balance of $40.0 million, which was initially recorded at its carrying value of $36.9 million. The Seller Note matures in February 2023 and has an interest rate of 2.5% per annum. Principal and related interest payments are due annually through February 2022 and quarterly thereafter.

*Shelf Registration - Equity Interests in the Partnership*

We filed a shelf registration statement on Form S-3 with the SEC on June 21, 2019 to allow us, from time to time, in one or more offerings, to offer and sell (1) common units representing limited partner interests in Enviva Partners, LP and (2) preferred units representing equity interests in Enviva Partners, LP. The aggregate initial offering price of all securities sold by us under the effective shelf registration statement may not exceed $500.0 million.

On June 18, 2020, we entered into a Common Unit Purchase Agreement (the "Unit Purchase Agreement") with certain investors to sell 6,153,846 common units in a private placement at a price of $32.50 per common unit for gross proceeds of

A0697

$200.0 million (the "Private Placement"). We used the net proceeds of $190.8 million from the Private Placement to fund a portion of the consideration for each of the Greenwood Drop-Down and the Georgia Biomass Acquisition.

Pursuant to the Unit Purchase Agreement, we entered into a registration rights agreement (the "Registration Rights Agreement") with the investors in connection with the closing of the Private Placement, pursuant to which we agreed to file and maintain a registration statement (the "Shelf Registration Statement") with respect to the resale of the common units on the terms set forth therein. The Registration Rights Agreement also provides certain investors with customary piggyback registration rights. On July 10, 2020, we filed the Shelf Registration Statement and on July 20, 2020, the Shelf Registration Statement was declared effective.

### At-the-Market Offering Program

Pursuant to an equity distribution agreement dated August 8, 2016, we may offer and sell common units from time to time through a group of managers, subject to the terms and conditions set forth in such agreement, of up to an aggregate sales amount of $100.0 million (the "ATM Program").

We did not sell any units under the ATM Program during 2020. As of February 15, 2021, $88.4 million remained available for issuance under the ATM Program.

### Cash Flows

The following table sets forth a summary of our net cash flows from operating, investing and financing activities for the years ended December 31, 2020 and 2019:

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| | (in thousands) | |
| Net cash provided by operating activities | $ 119,335 | $ 53,860 |
| Net cash used in investing activities | (396,805) | (177,483) |
| Net cash provided by financing activities | 278,421 | 130,216 |
| Net increase in cash, cash equivalents and restricted cash | $ 951 | $ 6,593 |

*Cash Provided by Operating Activities*

Net cash provided by operating activities was $119.3 million and $53.9 million for the years ended December 31, 2020 and 2019, respectively. The $65.5 million increase in cash provided by operating activities during the year ended December 31, 2020 compared to the year ended December 31, 2019 was primarily due to the increase in net income.

*Cash Used in Investing Activities*

Net cash used in investing activities was $396.8 million and $177.5 million for the years ended December 31, 2020 and 2019, respectively. The $219.3 million increase in cash used in investing activities during the year ended December 31, 2020 compared to the year ended December 31, 2019 was primarily due to a total of net cash paid of $292.9 million in relation to the Greenwood Drop-Down and the Georgia Biomass Acquisition, offset by a $74.7 million cash payment in relation to the Hamlet Drop-Down in the year ended December 31, 2019.

*Cash Provided by Financing Activities*

Net cash provided by financing activities was $278.4 million and $130.2 million for the years ended December 31, 2020 and 2019, respectively. The $148.2 million increase in net cash provided by financing activities in 2020, as compared to 2019, is primarily attributable to a net increase of $107.1 million in proceeds from debt issuances and debt issuance costs net of repayment of debt and a $93.7 million increase in net proceeds from common unit issuances offset by increases of $37.6 million in cash distributions and $15.6 million in deferred consideration for drop-down transactions.

A0698

**Contractual Obligations**

| Contractual Obligations | Total | | 2021 | | 2022-2023 | | 2024-2025 | | 2026 and Beyond |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | (in thousands) | | | | |
| Long-term debt (1) | $ | 910,000 | $ | 2,500 | $ | 157,500 | $ | — | $ | 750,000 |
| Finance leases (2) | | 19,603 | | 8,828 | | 7,043 | | 1,351 | | 2,381 |
| Other long-term debt (3) | | 2,000 | | 2,000 | | — | | — | | — |
| Operating leases (4) | | 98,501 | | 6,726 | | 12,831 | | 12,374 | | 66,570 |
| Interest payments (5) | | 261,602 | | 54,086 | | 105,652 | | 97,653 | | 4,211 |
| Purchase obligations (6) | | 9,748 | | 9,748 | | — | | — | | — |
| Shipping commitments (7) | | 1,381,991 | | 117,875 | | 230,582 | | 214,475 | | 819,059 |
| Other purchase commitments (8) | | 524,763 | | 142,383 | | 232,514 | | 124,855 | | 25,011 |
| | $ | 3,208,208 | $ | 344,146 | $ | 746,122 | $ | 450,708 | $ | 1,667,232 |

(1) Long-term debt as of December 31, 2020 consisted of (1) $746.9 million of outstanding indebtedness, net of unamortized discount, premium and debt issuance of $3.1 million related to the 2026 Notes, (2) $120.0 million of borrowings under our senior secured credit facility and (3) $37.6 million of outstanding indebtedness, net of unamortized discount of $2.4 million, related to the Seller Note.

(2) Finance leases are related to machinery, equipment and other assets included in property, plant and equipment.

(3) Other long-term debt consists of a note payable held by Enviva Pellets Amory, LLC ("Amory"), a wholly owned subsidiary of the Partnership.

(4) Operating leases are related to real estate, machinery, equipment and other assets with an initial term of longer than 12 months.

(5) Cash obligations for interest expense reflect, as of December 31, 2020, interest payments related to (1) the 2026 Notes, (2) borrowings under our senior secured credit facility, (3) the Seller Note, (4) other long-term debt and (5) finance leases.

(6) At December 31, 2020, we had $9.7 million of purchase obligations, which consisted of commitments for the purchase of materials, supplies and the engagement of services for the operation of our facilities to be used in the normal course of business. The amounts presented in the table do not include items already recorded in accounts payable or accrued liabilities at December 31, 2020.

(7) In order to mitigate volatility in our shipping costs, we have entered into fixed-price shipping contracts with reputable shippers matching the terms and volumes of certain of our off-take contracts for which we are responsible for arranging shipping. Our contracts with shippers include provisions as to the minimum amount of MTPY to be shipped and may also stipulate the number of shipments. Pursuant to these contracts, the terms of which extend to up to 15 years, charges are based on a fixed-price per MT and, in most cases, there are adjustment provisions for increases in the price of fuel or for other distribution-related costs. The price per MT may also vary depending on the loading port and the discharge port. Our shippers commit their resources based on our planned shipments and we would likely be liable for a portion of their expenses if we deviated from our communicated plans. As of December 31, 2020, we estimate our obligations related to these shipping contracts to be approximately $1.4 billion through 2039. These amounts will be offset by the related sales transactions in the same period, which are not included in the table above.

(8) Purchase and other commitments consist primarily of commitments under certain wood fiber and wood pellet purchases, handling and terminal and stevedoring service contracts. Some of our suppliers and service providers commit resources based on our planned purchases and require minimum levels of commitments. The wood pellet supply agreements for the purchase of 1,080,000 MT of wood pellets from British Columbia are fully offset by an agreement to sell 1,080,000 MT of wood pellets to the same counterparty from our terminal locations. The amounts in the table represent an estimate of the costs we would incur under these contracts as of December 31, 2020. Many of our contracts are requirement contracts and currently do not represent a firm commitment to purchase from our suppliers; therefore, they are not reflected in the table above. Under these contracts, we may be liable for the costs incurred on services rendered until termination and the costs of any supplies on hand.

A0699

**Off-Balance Sheet Arrangements**

As of December 31, 2020, we did not have any off-balance sheet arrangements, as defined in Item 303(a)(4)(ii) of Regulation S-K, such as the use of unconsolidated subsidiaries, structured finance, special purpose entities or a variable interest in unconsolidated entities.

**Recently Issued Accounting Pronouncements**

See Part II, Item 8. "Financial Statements and Supplementary Data—Note 2, "*Significant Accounting Policies—Recently Adopted Accounting Standards and Recently Issued Accounting Standards not yet Adopted*," in the Notes to our Consolidated Financial Statements included in this Annual Report on Form 10-K for a description of recently issued and adopted accounting pronouncements.

**Critical Accounting Policies and Estimates**

The discussion and analysis of our financial condition and results of operations is based on our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of these consolidated financial statements requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the dates of the consolidated financial statements and the reported revenues and expenses during the reporting periods. We evaluate these estimates and assumptions on an ongoing basis and base our estimates on historical experience, current conditions and various other assumptions that we believe to be reasonable under the circumstances. The results of these estimates form the basis for making judgments about the carrying values of assets and liabilities as well as identifying and assessing the accounting treatment with respect to commitments and contingencies. Our actual results may materially differ from these estimates.

For accounting policies and estimates that we believe are critical to our consolidated financial statements due to the degree of uncertainty regarding the estimates or assumptions involved, please see the following disclosures within the Notes to our Consolidated Financial Statements included in Part II, Item 8. of this Annual Report on Form 10-K: Note 2, *Significant Accounting Policies*, specifically about "*Business Combinations*", "*Inventories*", "*Revenue Recognition*", "*Cost of Goods Sold*", and "*Property, Plant and Equipment*", and Note 4, "*Acquisition*".

A0700

**ITEM 7A.    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

Market risk is the risk of loss arising from adverse changes in market rates and prices. Historically, our risks have been predominantly related to potential changes in the fair value of our long-term debt due to fluctuations in applicable market interest rates. Our market risk exposure is expected to be limited to risks that arise in the normal course of business, as we do not engage in speculative, non-operating transactions, nor do we use financial instruments or derivative instruments for trading purposes.

*Interest Rate Risk*

At December 31, 2020, our total debt had a carrying value of $906.4 million and fair value of $959.3 million.

Although we seek to mitigate a portion of our interest rate risk through interest rate swaps, we are exposed to fluctuations in interest rates on borrowings under our senior secured revolving credit facility. Borrowings under the senior secured revolving credit facility bear interest, at our option, at either a base rate plus an applicable margin or at a Eurodollar rate plus an applicable margin.

We enter into derivative instruments to manage cash flow. We do not enter into derivative instruments for speculative or trading purposes. During the year ended December 31, 2020, we entered into pay-fixed, receive-variable interest rate swaps that expire in September 2021 and October 2021 to hedge interest rate risk associated with variable rate borrowings under our senior secured revolving credit facility. The interest rate swaps are not designated and accounted for as cash flow hedges. The counterparty to our interest rate swap agreements are major financial institutions.

There can be no assurance that our interest rate risk-management practices, if any, will eliminate or substantially reduce risks associated with fluctuating interest rates. For more information, please read Part I, Item 1A "Risk Factors—*Our exposure to risks associated with foreign currency and interest rate fluctuations, as well the hedging arrangements we may enter into to mitigate those risks, could have an adverse effect on our financial condition and results of operations*."

*Credit Risk*

Substantially all of our revenue was from long-term, take-or-pay off-take contracts with four customers for the years ended December 31, 2020, 2019 and 2018. During the year ended December 31, 2020, most of our customers were major power generators in Europe. This concentration of counterparties operating in a single industry and geographic area results in an exposure to credit risk, in that the counterparties may be similarly affected by changes in economic, political, regulatory or other conditions. If a customer defaults or if any of our contracts expire in accordance with their terms, and we are unable to renew or replace these contracts, our gross margin and cash flows and our ability to make cash distributions to our unitholders may be adversely affected. Although we have entered into hedging arrangements in order to minimize our exposure to fluctuations in foreign currency exchange and interest rates, our derivatives also expose us to credit risk to the extent that counterparties may be unable to meet the terms of our hedging agreements. For more information, please read Part I, Item 1A "Risk Factors—*Our exposure to risks associated with foreign currency and interest rate fluctuations, as well the hedging arrangements we may enter into to mitigate those risks, could have an adverse effect on our financial condition and results of operations* and — *We will derive substantially all of our revenues from six customers in 2021, five of which are in Europe. If we fail to continue to diversify our customer base, our results of operations, business and financial position and ability to pay distributions to our unitholders could be materially adversely affected.*

*Foreign Currency Exchange Risk*

We primarily are exposed to fluctuations in foreign currency exchange rates related to contracts pursuant to which deliveries of wood pellets will be settled in foreign currency. We have entered into forward contracts and purchased options to hedge a portion of our forecasted revenue for these customer contracts.

As of December 31, 2020, we had notional amounts of 143.6 million GBP and 13.0 million Euro ("EUR") under foreign currency forward contracts and 51.6 million GBP under foreign currency option contracts that expire between 2021 and 2024. As of December 31, 2020, we had no EUR option contracts outstanding.

Historically, we designated and accounted for forward contracts and purchased options as cash flow hedges of anticipated foreign currency denominated revenue and, therefore, the effective portion of the changes in fair value on these instruments was recorded as a component of accumulated other comprehensive income in partners' capital and was reclassified to revenue in the consolidated statements of operations in the same period in which the underlying revenue transactions occurred. During the third quarter of 2018, we elected to discontinue hedge accounting for all designated foreign currency cash flow hedges and, as a result, we had no unrealized loss (gain) associated with foreign currency forward contracts and foreign currency purchased

56

A0701

options in accumulated other comprehensive income. At December 31, 2020 and 2019, no unrealized amounts associated with foreign currency forward contracts and foreign currency purchased options were included in other comprehensive income.

We do not utilize foreign exchange contracts for speculative or trading purposes. The counterparties to our foreign exchange contracts are major financial institutions. There can be no assurance that our hedging arrangements or other foreign exchange rate risk-management practices, if any, will eliminate or substantially reduce risks associated with our exposure to fluctuating foreign exchange rates. For more information, please read Part I, Item 1A "Risk Factors—*Our exposure to risks associated with foreign currency and interest rate fluctuations, as well the hedging arrangements we may enter into to mitigate those risks, could have an adverse effect on our financial condition and results of operations*."

A0702

**ITEM 8.    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

**INDEX TO FINANCIAL STATEMENTS**

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

| | |
|---|---|
| Reports of Independent Registered Public Accounting Firms | 59 |
| Consolidated Balance Sheets | 63 |
| Consolidated Statements of Operations | 64 |
| Consolidated Statements of Comprehensive Income (Loss) | 65 |
| Consolidated Statements of Changes in Partners' Capital | 66 |
| Consolidated Statements of Cash Flows | 67 |
| Consolidated Statements of Cash Flows (continued) | 67 |
| Notes to Consolidated Financial Statements | 69 |

58

A0703

**Report of Independent Registered Public Accounting Firm**

To the Unitholders and the Board of Directors of Enviva Partners, LP

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Enviva Partners, LP and subsidiaries (the Partnership) as of December 31, 2020 and 2019, the related consolidated statements of operations, comprehensive (loss) income, changes in partners' capital and cash flows for each of the two years in the period ended December 31, 2020, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Partnership at December 31, 2020 and 2019, and the results of its operations and cash flows for each of the two years in the period ended December 31, 2020, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2020, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated February 25, 2021 expressed an unqualified opinion thereon.

**Adoption of New Accounting Standards**

As discussed in Note 2 to the consolidated financial statements, the Partnership changed its method of accounting for leases in 2019.

**Basis for Opinion**

These financial statements are the responsibility of the management of the Partnership's General Partner. Our responsibility is to express an opinion on the Partnership's financial statements based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Partnership in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audit included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by the General Partner's management, as well as evaluating the overall presentation of the financial statements. We believe that our audit provides a reasonable basis for our opinion.

**Critical Audit Matters**

The critical audit matters communicated below are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

A0704

### Related Party Transactions

*Description of the Matter*

The Partnership engages, in the ordinary course of business, in related party transactions with Enviva Holdings LP, and certain of its subsidiaries. Each of these entities is a related party. As discussed in Note 3 and 15 to the consolidated financial statements, the Partnership has entered into a number of transactions with these related parties, including but not limited to agreements for operations, general administrative, management, and other services, as well as an acquisition of the Greenwood plant.

Especially challenging auditor judgment was involved in assessing the completeness and accuracy of related party transactions and assessing the sufficiency of the disclosures due to the complexity of the Partnership's legal structure. Enviva Holdings, LP is involved in many aspects of the Partnership's business, including expenses allocated and charged to the Partnership from Enviva Holdings, LP for services provided under the Management Service Agreements.

*How We Addressed the Matter in Our Audit*

We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over related party transactions. For example, we tested controls over management's identification of related parties, review of the related party transactions listing for completeness, and review for completeness and accuracy of the related party disclosures.

Our audit procedures included, among others, reading public filings and external news for information related to transactions between the Partnership and related parties. In addition, we inspected the Partnership's minutes from meetings of the Board of Directors and related Committees. We inspected the Partnership's organization chart throughout the year to obtain an understanding of the legal structure and confirmed our understanding based on inquiries with legal counsel. We also inspected the Partnership's directors and officers questionnaires, and read material agreements between the Partnership and related parties. We tested all material transactions between related parties based on our review of the related agreements in order to identify the appropriate classification. We inquired with executive officers, key members of management, and the Audit Committee of the Board of Directors regarding related party transactions to understand the nature of the relationship and the business purpose of the transaction. Additionally, we assessed the adequacy and completeness of the Partnerships' related party disclosures.

### Completeness of Revenue from Off-Take Contracts

*Description of the Matter*

As discussed in Note 1 to the consolidated financial statements, the Partnership primarily earns revenue through long-term take-or-pay contracts that include a defined volume of wood pellets that the customer is required to purchase on an annual basis. Revenue on these contracts is recognized when control transfers to the customer at the time of loading wood pellets onto a ship.

Auditing the measurement of revenue at year-end required especially challenging auditor judgment and more extensive audit procedures, including the use of specialists, due to the complexity of determining the quantity of wood pellets transferred to the customer at the end of the year.

*How We Addressed the Matter in Our Audit*

We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over revenue cut-off for off-take contracts. For example, we tested controls over management's review of third-party survey results at year-end, and managements rollforward of pellets.

Our audit procedures included, among others, evaluating the work of management's third-party specialist to survey all partially loaded ships at year end to assist in determining the amount of pellets transferred to customers at the end of year. We also performed observations of finished goods held by the Company at or near year-end, and tested management's rollforward of pellets. We also performed analytical procedures over year-end revenue cut off, made inquiries of employees outside of the accounting department to corroborate the completeness of the vessels being loaded at year-end and inspected a sample of shipping and receiving documentation to test that pellets shipped near year-end were recognized in the appropriate period based on the date of shipment.

60

A0705

| | |
|---|---|
| | ***Valuation of acquired intangible assets and liabilities*** |
| *Description of the Matter* | During 2020, the Partnership completed its business combination of Georgia Biomass Holding LLC for $163 million, as disclosed in Note 4 to the consolidated financial statements. As part of the transaction, the Partnership acquired certain off-take contracts and a shipping contract which were recognized at fair value as intangible assets and liabilities of $5.7 million and $7.4 million, respectively. |
| *How We Addressed the Matter in Our Audit* | Auditing the Partnership's determination of fair value for the intangible assets and liabilities was especially complex due to the significant estimation uncertainty in the Partnership's determination of the fair value of the identified intangible assets and liabilities. The significant estimation uncertainty was primarily due to the limited market data related to the market value of the acquired contracts, due to the limited pricing sources available for comparable utility-grade wood pellets and shipping agreements. The Partnership used an income method to measure the intangible assets and liabilities. The significant assumption used to estimate the fair value of the intangible assets and liabilities is the market rate for similar contracts. |
| | We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over the valuation of acquired contracts. For example, we tested controls over the estimation process supporting the recognition and measurement of the contract assets and liabilities. We also tested management's review controls over the significant assumption used in the valuation models. |
| | To test the estimated fair value of the intangible assets and liabilities, we performed audit procedures that included, among others, evaluating the Partnership's selection of the valuation methodology, evaluating the methods and significant assumption used by the Partnership's valuation specialist, and evaluating the completeness and accuracy of the underlying data supporting the significant assumption and estimates. For example, we compared the significant assumption to current industry, market trends, and other recently negotiated contracts. We involved our valuation specialists to assist with our evaluation of the methodology used by the Partnership and to perform a sensitivity analysis over the significant assumption. |

/s/ Ernst & Young LLP

We have served as the Partnership's auditor since 2019.

Tysons, Virginia

February 25, 2021

A0706

**Report of Independent Registered Public Accounting Firm**

To Unitholders and Board of Directors

Enviva Partners, LP:

*Opinion on the Consolidated Financial Statements*

We have audited the accompanying consolidated statements of income, comprehensive income, changes in partners' capital, and cash flows of Enviva Partners, LP and subsidiaries (the Partnership) for the year ended December 31, 2018, and the related notes (collectively, the consolidated financial statements). In our opinion, the consolidated financial statements present fairly, in all material respects, the Partnership's results of operations and cash flows for the year ended December 31, 2018, in conformity with U.S. generally accepted accounting principles.

*Basis for Opinion*

These consolidated financial statements are the responsibility of the Partnership's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Partnership in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audit included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audit provides a reasonable basis for our opinion.

(signed) KPMG LLP

We served as the Company's auditor from 2010 to 2019.

McLean, Virginia

March 1, 2019

62

A0707

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**
**Consolidated Balance Sheets**
**December 31, 2020 and 2019**
**(In thousands, except number of units)**

|  | 2020 | 2019 |
|---|---:|---:|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 10,004 | $ 9,053 |
| Accounts receivable | 124,212 | 72,421 |
| Related-party receivables, net | 2,414 | — |
| Inventories | 42,364 | 32,998 |
| Prepaid expenses and other current assets | 16,457 | 5,617 |
| Total current assets | 195,451 | 120,089 |
| Property, plant and equipment, net | 1,071,819 | 751,780 |
| Operating lease right-of-use assets | 51,434 | 32,830 |
| Goodwill | 99,660 | 85,615 |
| Other long-term assets | 11,248 | 4,504 |
| Total assets | $ 1,429,612 | $ 994,818 |
| **Liabilities and Partners' Capital** | | |
| Current liabilities: | | |
| Accounts payable | $ 15,208 | $ 18,985 |
| Related-party payables, net | — | 304 |
| Deferred consideration for drop-downs due to related-party | — | 40,000 |
| Accrued and other current liabilities | 108,976 | 59,066 |
| Current portion of interest payable | 24,642 | 3,427 |
| Current portion of long-term debt and finance lease obligations | 13,328 | 6,590 |
| Total current liabilities | 162,154 | 128,372 |
| Long-term debt and finance lease obligations | 912,721 | 596,430 |
| Long-term operating lease liabilities | 50,074 | 33,469 |
| Deferred tax liabilities, net | 13,217 | — |
| Other long-term liabilities | 15,419 | 3,971 |
| Total liabilities | 1,153,585 | 762,242 |
| Commitments and contingencies | | |
| Partners' capital: | | |
| Limited partners: | | |
| Common unitholders—public (26,209,862 and 19,870,436 units issued and outstanding at December 31, 2020 and 2019, respectively) | 424,825 | 300,184 |
| Common unitholder—sponsor (13,586,375 units issued and outstanding at December 31, 2020 and 2019) | 41,816 | 82,300 |
| General partner (no outstanding units) | (142,404) | (101,739) |
| Accumulated other comprehensive (loss) income | (18) | 23 |
| Total Enviva Partners, LP partners' capital | 324,219 | 280,768 |
| Noncontrolling interest | (48,192) | (48,192) |
| Total partners' capital | 276,027 | 232,576 |
| Total liabilities and partners' capital | $ 1,429,612 | $ 994,818 |

See accompanying notes to consolidated financial statements.

A0708

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**
**Consolidated Statements of Operations**
**Years ended December 31, 2020, 2019 and 2018**
**(In thousands, except per unit amounts)**

|  | 2020 | 2019 | 2018 |
|---|---|---|---|
| Product sales | $ 830,528 | $ 674,251 | $ 564,010 |
| Other revenue [(1)] | 44,551 | 10,142 | 9,731 |
| Net revenue | 875,079 | 684,393 | 573,741 |
| Cost of goods sold [(1)] | 684,863 | 549,701 | 461,735 |
| Loss on disposal of assets | 6,978 | 3,103 | 2,386 |
| Depreciation and amortization | 76,115 | 50,521 | 40,179 |
| Total cost of goods sold | 767,956 | 603,325 | 504,300 |
| Gross margin | 107,123 | 81,068 | 69,441 |
| General and administrative expenses | 12,800 | 6,932 | 5,879 |
| Related-party management services agreement fee | 32,545 | 29,457 | 21,762 |
| Total general and administrative expenses | 45,345 | 36,389 | 27,641 |
| Income from operations | 61,778 | 44,679 | 41,800 |
| Other (expense) income: |  |  |  |
| Interest expense | (44,902) | (39,344) | (36,471) |
| Early retirement of debt obligation | — | (9,042) | (751) |
| Other income, net | 273 | 764 | 2,374 |
| Total other expense, net | (44,629) | (47,622) | (34,848) |
| Net income (loss) before income tax expense | 17,149 | (2,943) | 6,952 |
| Income tax expense | 69 | — | — |
| Net income (loss) | $ 17,080 | $ (2,943) | $ 6,952 |
| Net (loss) income per limited partner common unit: |  |  |  |
| Basic and diluted | $ (0.36) | $ (0.54) | $ 0.04 |
| Net income per limited partner subordinated unit: |  |  |  |
| Basic and diluted | $ — | $ — | $ 0.04 |
| Weighted-average number of limited partner units outstanding: |  |  |  |
| Common—basic | 36,813 | 31,791 | 21,533 |
| Common—diluted | 36,813 | 31,791 | 22,553 |
| Subordinated—basic and diluted | — | — | 4,893 |
|  |  |  |  |
| Distributions declared per limited partner unit | $ 3.0000 | $ 2.6500 | $ 2.5300 |
|  |  |  |  |

(1) See Note 15, *Related-Party Transactions*

See accompanying notes to consolidated financial statements.

64

A0709

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**
**Consolidated Statements of Comprehensive Income (Loss)**
**Years ended December 31, 2020, 2019 and 2018**
**(In thousands)**

|  | 2020 | 2019 | 2018 |
|---|---|---|---|
| Net income (loss) | $ 17,080 | $ (2,943) | $ 6,952 |
| Other comprehensive income (loss), net of tax of $0: |  |  |  |
| Net unrealized (losses) gains on cash flow hedges | — | (146) | 5,655 |
| Reclassification of net gains on cash flow hedges realized into net income (loss) | (22) | (288) | (2,178) |
| Currency translation adjustment | (19) | — | 2 |
| Total other comprehensive (loss) income | (41) | (434) | 3,479 |
| Total comprehensive income (loss) | $ 17,039 | $ (3,377) | $ 10,431 |

See accompanying notes to consolidated financial statements.

65

A0710

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**
**Consolidated Statements of Changes in Partners' Capital**
**Years ended December 31, 2020, 2019 and 2018**
**(In thousands)**

| | General Partner Interest | Common Units—Public | | Common Units—Sponsor | | Subordinated Units—Sponsor | | Accumulated Other Comprehensive Income (loss) | Non-controlling Interests | Total Partners Capital |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Units | Amount | Units | Amount | Units | Amount | | | |
| Partners' capital, December 31, 2017 | $ (128,569) | 13,073 | $ 224,027 | 1,347 | $ 16,050 | 11,905 | $ 101,901 | $ (3,040) | $ — | $ 210,369 |
| Distributions to unitholders, distribution equivalent and incentive distribution rights | (5,326) | — | (38,241) | — | (15,845) | — | (14,822) | — | — | (74,234) |
| Issuance of units through Long-Term Incentive Plan | (5,675) | 227 | 511 | (82) | (1,301) | — | — | — | — | (6,465) |
| Issuance of common units, net | — | 8 | 241 | — | — | — | — | — | — | 241 |
| Sale of common units | — | 1,265 | 13,335 | (1,265) | (13,335) | — | — | — | — | — |
| Conversion of subordinated units to common units | — | — | — | 11,905 | 78,504 | (11,905) | (78,504) | — | — | — |
| Non-cash Management Services Agreement expenses | 557 | — | 5,817 | — | — | — | — | — | — | 6,374 |
| Other comprehensive income | — | — | — | — | — | — | — | 3,479 | — | 3,479 |
| Net income (loss) | 5,326 | — | 1,922 | — | 8,279 | — | (8,575) | — | — | 6,952 |
| Partners' capital, December 31, 2018 | (133,687) | 14,573 | 207,612 | 11,905 | 72,352 | — | — | 439 | — | 146,716 |
| Excess consideration over Enviva Wilmington Holdings, LLC net assets and initial recognition of its noncontrolling interest | 5,422 | — | — | — | — | — | — | — | (48,192) | (42,770) |
| Distributions to unitholders, distribution equivalent and incentive distribution rights | (9,821) | — | (51,906) | — | (34,452) | — | — | — | — | (96,179) |
| Issuance of units through Long-Term Incentive Plan | (1,882) | 97 | 72 | — | — | — | — | — | — | (1,810) |
| Issuance of common units, net | — | 5,200 | 146,278 | — | — | — | — | — | — | 146,278 |
| Issuance of units associated with the Hamlet Drop-Down | — | — | — | 1,681 | 50,000 | — | — | — | — | 50,000 |
| Non-cash Management Services Agreement expenses | 23,687 | — | 5,310 | — | — | — | — | — | — | 28,997 |
| Reimbursable amounts under Make-Whole Agreement | 4,721 | — | — | — | — | — | — | — | — | 4,721 |
| Cumulative effect of accounting change - derivative instruments | — | — | (10) | — | (8) | — | — | 18 | — | — |
| Other comprehensive loss | — | — | — | — | — | — | — | (434) | — | (434) |
| Net income (loss) | 9,821 | — | (7,172) | — | (5,592) | — | — | — | — | (2,943) |
| Partners' capital, December 31, 2019 | (101,739) | 19,870 | 300,184 | 13,586 | 82,300 | — | — | 23 | (48,192) | 232,576 |
| Excess consideration over Enviva Pellets Greenwood Holdings II, LLC net assets | (61,830) | — | — | — | — | — | — | — | — | (61,830) |
| Distributions to unitholders, distribution equivalent and incentive distribution rights | (22,092) | — | (74,252) | — | (39,334) | — | — | — | — | (135,678) |
| Issuance of units through Long-Term Incentive Plan | (4,374) | 186 | (572) | — | — | — | — | — | — | (4,946) |
| Issuance of common units, net | — | 6,154 | 190,529 | — | — | — | — | — | — | 190,529 |
| Non-cash Management Services Agreement expenses | 25,539 | — | 12,798 | — | — | — | — | — | — | 38,337 |
| Other comprehensive loss | — | — | — | — | — | — | — | (41) | — | (41) |
| Net income (loss) | 22,092 | — | (3,862) | — | (1,150) | — | — | — | — | 17,080 |
| Partners' capital, December 31, 2020 | $ (142,404) | 26,210 | $ 424,825 | 13,586 | $ 41,816 | — | $ — | $ (18) | $ (48,192) | $ 276,027 |

See accompanying notes to consolidated financial statements.

66

A0711

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**
**Consolidated Statements of Cash Flows**
**Years ended December 31, 2020, 2019 and 2018**
**(In thousands)**

|  | 2020 | 2019 | 2018 |
|---|---|---|---|
| Cash flows from operating activities: |  |  |  |
| Net income (loss) | $ 17,080 | $ (2,943) | $ 6,952 |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: |  |  |  |
| Depreciation and amortization | 77,471 | 51,581 | 40,745 |
| MSA Fee Waivers | 23,400 | 22,600 | — |
| Amortization of debt issuance costs, debt premium and original issue discounts | 1,905 | 1,243 | 1,093 |
| Early retirement of debt obligation | — | 9,042 | 751 |
| Loss on disposal of assets | 6,978 | 3,103 | 2,386 |
| Unit-based compensation | 12,848 | 5,410 | 6,229 |
| De-designation of foreign currency forwards and options | — | — | (1,947) |
| Fair value changes in derivatives | 5,294 | 3,701 | (7,464) |
| Unrealized gains on foreign currency transactions, net | 54 | 177 | 23 |
| Change in operating assets and liabilities: |  |  |  |
| Accounts and insurance receivables | (60,235) | (16,330) | 19,230 |
| Related-party receivables | 2,722 | 1,392 | 2,720 |
| Prepaid expenses and other current and long-term assets | (13,819) | (358) | (182) |
| Inventories | 825 | (1,889) | (7,843) |
| Derivatives | (249) | 1,770 | 4,907 |
| Accounts payable, accrued liabilities and other current liabilities | 35,189 | 9,287 | 14,916 |
| Related-party payables and accrued liabilities | — | (27,933) | 173 |
| Deferred revenue | 780 | 3,887 | — |
| Accrued interest | 15,343 | (5,148) | 367 |
| Operating lease liabilities | (5,828) | (4,826) | — |
| Other long-term liabilities | (423) | 94 | 997 |
| Net cash provided by operating activities | 119,335 | 53,860 | 84,053 |
| Cash flows from investing activities: |  |  |  |
| Purchases of property, plant and equipment | (100,106) | (111,269) | (27,132) |
| Payments in relation to the Greenwood Drop-Down, net of cash acquired | (129,631) | — | — |
| Payments in relation to the Georgia Biomass Acquisition, net of cash acquired | (163,299) | — | — |
| Payment in relation to the Hamlet Drop-Down | — | (74,700) | — |
| Insurance proceeds from property loss | — | — | 1,130 |
| Other | (3,769) | 8,486 | — |
| Net cash used in investing activities | (396,805) | (177,483) | (26,002) |
| Cash flows from financing activities: |  |  |  |
| Proceeds from senior secured revolving credit facility | 755,500 | 453,000 | 299,250 |
| Principal payments on senior secured revolving credit facility | (635,500) | (526,000) | (226,250) |
| Proceeds from debt issuance | 155,625 | 601,777 | — |
| Principal payments on other long-term debt and finance lease obligations | (5,571) | (358,311) | (46,466) |
| Cash paid related to debt issuance costs and deferred offering costs | (3,949) | (7,560) | (2,495) |
| Proceeds from common unit issuances, net | 190,529 | 96,822 | 241 |
| Payment of deferred consideration for Wilmington Drop-Down | — | (24,300) | — |
| Distributions to unitholders, distribution equivalent rights and incentive distribution rights holder | (133,217) | (95,659) | (73,518) |
| Payment to General Partner to purchase affiliate common units for Long-Term Incentive Plan vesting | — | — | (2,341) |
| Payment for withholding tax associated with Long-Term Incentive Plan vesting | (4,996) | (1,910) | (4,536) |
| Payments in relation to the Hamlet Drop-Down | (40,000) | (99) | — |
| Cash paid for redemption premium from early retirement of debt | — | (7,544) | — |
| Net cash provided by (used in) financing activities | 278,421 | 130,216 | (56,115) |
| Net increase in cash, cash equivalents and restricted cash | 951 | 6,593 | 1,936 |
| Cash, cash equivalents and restricted cash, beginning of period | 9,053 | 2,460 | 524 |
| Cash, cash equivalents and restricted cash, end of period | $ 10,004 | $ 9,053 | $ 2,460 |

See accompanying notes to consolidated financial statements.

67

A0712

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**
**Consolidated Statements of Cash Flows (Continued)**
**Years ended December 31, 2020, 2019 and 2018**
**(In thousands)**

|  | 2020 | 2019 | 2018 |
|---|---|---|---|
| Non-cash investing and financing activities: | | | |
| Common unit issuance for deferred consideration for Wilmington Drop-Down | $ — | $ 49,700 | $ — |
| Common unit issuance for the Hamlet Drop-Down | — | 50,000 | — |
| Property, plant and equipment acquired included in accounts payable and accrued liabilities | 16,197 | 3,421 | 8,939 |
| Property, plant and equipment acquired under finance leases | 12,487 | 6,493 | 3,512 |
| Deferred consideration to sponsor included in related-party payable | — | 40,000 | — |
| Conversion of subordinated units to common units | — | — | 78,504 |
| Transfer of Enviva Port of Wilmington, LLC Drop-Down consideration to short-term | — | — | 74,000 |
| Supplemental information: | | | |
| Interest paid, net of capitalized interest | $ 22,150 | $ 41,190 | $ 35,222 |

68

A0713

Table of Contents

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

**(1) Description of Business and Basis of Presentation**

Enviva Partners, LP (together with its subsidiaries, "we," "us," "our," or the "Partnership") is a Delaware limited partnership formed on November 12, 2013 as a wholly owned subsidiary of Enviva Holdings, LP (together with its wholly owned subsidiaries Enviva MLP Holdco, LLC and Enviva Development Holdings, LLC, where applicable, the "sponsor"). Enviva Partners GP, LLC, a wholly owned subsidiary of Enviva Holdings, LP, is the General Partner (the "General Partner") of the Partnership. We procure wood fiber and process it into utility-grade wood pellets and load the finished wood pellets into railcars, trucks and barges for transportation to deep-water marine terminals, where they are received, stored and ultimately loaded onto oceangoing vessels for delivery under long-term, take-or-pay off-take contracts to our customers principally in the United Kingdom (the "U.K.") and Europe and increasingly Japan.

We own and operate nine industrial-scale wood pellet production plants located in the Southeastern United States. In addition to the volumes from our plants, we also procure wood pellets from third parties. Wood pellets are exported from our wholly owned deep-water marine terminals at the Port of Chesapeake, Virginia (the "Chesapeake terminal") and terminal assets at the Port of Wilmington, North Carolina (the "Wilmington terminal") and from third-party deep-water marine terminals in Mobile, Alabama, Panama City, Florida and Savannah, Georgia under a short-term contract, a long-term contract and a lease and associated terminal services agreement, respectively.

**Basis of Presentation**

*Principles of Consolidation*

The accompanying consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("GAAP"). Our consolidated financial statements include all accounts of the Partnership and its wholly owned and controlled subsidiaries. All intercompany accounts and transactions have been eliminated. We operate and manage our business as one operating segment.

*Reclassification*

Certain prior year amounts have been reclassified from general and administrative expenses to related-party management services agreement ("MSA") fees to conform to current period presentation on the consolidated statements of operations.

*Enviva Pellets Greenwood*

On July 1, 2020, we acquired from our sponsor all of the limited liability company interests in Enviva Pellets Greenwood Holdings II, LLC, the indirect owner of Enviva Pellets Greenwood, LLC ("Greenwood"), which owns a wood pellet production plant located in Greenwood, South Carolina (the "Greenwood plant"), for a purchase price of $132.0 million, subject to certain adjustments (such transaction, the "Greenwood Drop-Down"). On the date of and in connection with the Greenwood Drop-Down, our sponsor assigned five biomass off-take contracts to us (collectively, the "Associated Off-Take Contracts"). The Associated Off-Take Contracts call for aggregate annual deliveries of 1.4 million metric tons per year ("MTPY") and mature between 2031 and 2041. Our sponsor also assigned two fixed-rate shipping contracts and partially assigned two additional fixed-rate shipping contracts to us.

The Greenwood Drop-Down was an asset acquisition between entities under common control and accounted for on the carryover basis of accounting. Accordingly, the consolidated financial statements for the period beginning July 1, 2020 reflect the acquisition. See Note 3, *Transactions Between Entities Under Common Control*.

On the date of the Greenwood Drop-Down:

- We entered into an agreement with our sponsor, pursuant to which our sponsor agreed to reimburse us for any construction costs incurred for the planned expansion of the Greenwood plant in excess of $28.0 million (the "Greenwood Make-Whole Agreement").

- We entered into an agreement with Enviva Management Company, LLC, a Delaware limited liability company and wholly owned subsidiary of our sponsor (together with its affiliates that provide services to us, as applicable, "Enviva Management Company"), pursuant to which (1) Enviva Management Company waived our obligation to pay an aggregate of approximately $37.0 million in management services and other fees payable under our management

69

A0714

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

Notes to Consolidated Financial Statements (Continued)

(In thousands, except number of units, per unit amounts and unless otherwise noted)

services agreement with Enviva Management Company for the period from July 1, 2020 through the fourth quarter of 2021 and (2) Enviva Management Company will waive our obligation to pay certain management services and other fees during 2022 unless and until the Greenwood plant's production volumes equal or exceed 50,000 metric tons ("MT") in any calendar month, in each case, to provide cash flow support to us during the planned expansion of the Greenwood plant (the "Third EVA MSA Fee Waiver").

*Georgia Biomass Holding LLC*

On July 31, 2020, Enviva Pellets Waycross Holdings, LLC, a wholly owned subsidiary of the Partnership, acquired all of the limited liability company interests in Georgia Biomass Holding LLC, a Georgia limited liability company ("Georgia Biomass"), and the indirect owner of a wood pellet production plant located in Waycross, Georgia (the "Waycross plant"), for a purchase price of $175.0 million, subject to certain adjustments (the "Georgia Biomass Acquisition"). In August 2020, Georgia Biomass converted to a limited liability company organized under the laws of the State of Delaware under the name Enviva Pellets Waycross Holdings Sub, LLC.

The Georgia Biomass Acquisition was recorded as a business combination and accounted for using the acquisition method. Assets acquired and liabilities assumed were recognized at fair value on the acquisition date of July 31, 2020, and the difference between the consideration transferred, excluding acquisition-related costs, and the fair values of the assets acquired and liabilities assumed was recognized as goodwill. See Note 4, *Acquisition*.

*Enviva Wilmington Holdings, LLC*

On April 2, 2019, we acquired (the "Hamlet Drop-Down") from our sponsor all of the issued and outstanding Class B Units in Enviva Wilmington Holdings, LLC (the "Hamlet JV"), a limited liability company owned by our sponsor and John Hancock Life Insurance Company (U.S.A.) and certain of its affiliates (collectively, as applicable, "John Hancock"). On the date of acquisition, we began to consolidate the Hamlet JV as a variable interest entity of which we are the primary beneficiary. As managing member, we have the sole power to direct the activities that most impact the economics of the Hamlet JV. Additionally, as the Class B Units represent a controlling interest in the Hamlet JV, we account for the Hamlet JV as a consolidated subsidiary, not a joint venture. The Hamlet JV owns a wood pellet production plant in Hamlet, North Carolina (the "Hamlet plant") and a firm, 15-year take-or-pay off-take contract with a customer for the delivery of nearly 1.0 million MTPY of wood pellets, following a ramp period. The Hamlet Drop-Down was an asset acquisition between entities under common control and accounted for on the carryover basis of accounting. Accordingly, the consolidated financial statements for the period beginning April 2019 reflect the acquisition. See Note 3, *Transactions Between Entities Under Common Control*.

**(2) Significant Accounting Policies**

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make judgments, estimates and assumptions that affect the amounts reported in our consolidated financial statements and accompanying notes. Actual results could differ materially from those estimates.

*Business Combinations*

Since the required adoption of Accounting Standards Update ("ASU") 2017-01, *Business Combinations (Topic 805): Clarifying the Definition of a Business* ("ASU 2017-01"), on January 1, 2018, determining whether an entity has acquired a business or an asset (or a group of assets) is critical because the accounting for a business combination differs significantly from that of an asset acquisition. For transfers between entities under common control, the transfer of a business would represent a change in reporting entity requiring a retrospective adjustment of the combined financial statements. Conversely, a common control transaction involving the transfer of net assets that does not constitute a business is not accounted for as a change in reporting entity and is, therefore, accounted for prospectively. For an acquisition of a business from an entity not under common control, the overall principle is that, when an entity (the acquirer) takes control of another entity (the target), the fair value of the underlying exchange transaction is used to establish a new accounting basis for the acquired entity where the acquirer recognizes and measures the assets acquired and liabilities assumed at their full fair values as of the date control is obtained. For an acquisition of an asset from an entity not under common control, a cost accumulation and allocation model is used under which the cost of the acquisition is allocated to the assets acquired and liabilities assumed.

70

A0715

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

We must first evaluate whether substantially all of the fair value of the gross assets acquired is concentrated in a single identifiable asset or group of similar identifiable assets. Gross assets acquired should exclude cash and cash equivalents, deferred tax assets and goodwill resulting from the effects of deferred tax liabilities. However, the gross assets acquired should include any consideration transferred (plus the fair value of any noncontrolling interest and previously held interest, if any) in excess of the fair value of net identifiable assets acquired. A tangible asset that is attached to and cannot be physically removed and used separately from another tangible asset (or an intangible asset representing the right to use a tangible asset) without incurring significant cost or significant diminution in utility or fair value to either asset (for example, land and building) should be considered a single asset. In that context, we consider a wood pellet production facility to be a single identifiable asset.

We need to apply judgment to determine what is considered "substantially all" because ASU 2017-01 does not provide a bright line for making this assessment. If the "substantially all" threshold is met, the acquired set of assets and activities is not a business. If that threshold is not met, we must evaluate whether the set meets the definition of a business, which consists of inputs and at least one substantive process applied to those inputs that have the ability to contribute to the creation of outputs. If that threshold is not met but the set does not meet the definition of a business, the acquisition would be an asset acquisition.

A business combination is an acquisition of a business from an entity not under common control and is accounted for using the acquisition method. Identifiable assets acquired and liabilities assumed are recognized at fair value on the acquisition date. Goodwill is calculated as the excess of the fair value of the consideration transferred, which excludes acquisition-related costs that are expensed, over the fair value of the net assets recognized and represents the future economic benefits arising from other net assets acquired that could not be individually identified and separately recognized. Fair value measurements may require us to make significant estimates and assumptions. A measurement period, which could be up to one year from the date of acquisition, exists to identify and measure the assets acquired and the liabilities assumed. During the measurement period, provisional amounts may be recognized and those amounts may subsequently be prospectively adjusted to reflect any new information about facts and circumstances that existed at the acquisition date that, if known, would have affected the measurement of these amounts. At the end of the measurement period, any subsequent changes would not be recognized under the acquisition method but would instead follow other accounting principles, which would then generally impact earnings.

*Common Control Transactions*

Assets and businesses acquired from our sponsor and its controlled subsidiaries are accounted for as common control transactions. For assets acquired in a common control transaction, net assets acquired are accounted for on the carryover basis of accounting and consolidated prospectively as of the transaction date. For businesses acquired in a common control transaction, the net assets acquired are combined at their historical costs and prior periods are recast with historical net equity amounts prior to the transaction date are attributed to the General Partner and any noncontrolling partner interest at carryover basis. If any recognized consideration transferred in such a transaction exceeds the carrying value of the net assets acquired, the excess is treated as a capital distribution to the General Partner. If the carrying value of the net assets acquired exceeds any recognized consideration transferred including, if applicable, the fair value of any limited partner units issued, then that excess is treated as a capital contribution from the General Partner.

*Other Comprehensive Income (Loss)*

Comprehensive income (loss) consists of two components, net income (loss) and other comprehensive income (loss). Other comprehensive income (loss) refers to revenue, expenses, and gains and losses that under GAAP are included in comprehensive income (loss) but excluded from net income (loss). Other comprehensive income (loss) consists of net unrealized gains and losses related to derivative instruments accounted for as cash flow hedges and foreign currency translation adjustments.

*Cash and Cash Equivalents*

Cash and cash equivalents consist of short-term, highly liquid investments readily convertible into cash with an original maturity of three months or less.

*Accounts Receivable*

Accounts receivable represent amounts billed that are recorded at the invoiced amount and billable under our contracts that are pending finalization of prerequisite billing documentation and do not bear interest. As of December 31, 2020 and 2019, we had no amounts in allowance for doubtful accounts given the lack of historical credit losses and no current expectations of credit losses.

A0716

Table of Contents

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

*Inventories*

Inventories consist of raw materials, work-in-progress, consumable tooling and finished goods. Fixed production overhead, including related depreciation expense, is allocated to inventory based on the normal production capacity of the facilities. To the extent we do not achieve normal production levels, we charge such under-absorption of fixed overhead to cost of goods sold in the period incurred.

Consumable tooling consists of spare parts and tooling to be consumed in the production process. Spare parts are expected to be used within a year and are expensed as used. Tooling items are amortized to expense over an estimated service life generally less than one year.

Inventories are stated at the lower of cost or net realizable value using the first-in, first-out method ("FIFO") for all inventories. Raw material, production and distribution costs associated with delivering wood pellets to marine terminals and third- and related-party wood pellet purchase costs are capitalized as a component of inventory. These costs and the finished production overhead allocated to inventory are reflected in cost of goods sold when inventory is sold.

*Intangibles*

Intangibles primarily consist of favorable or unfavorable customer contracts and an unfavorable shipping contact that were acquired in the Georgia Biomass Acquisition. Intangibles with definite lives are amortized based on the pattern of economic benefit over their estimated useful lives, which are reviewed annually. The intangibles acquired in the Georgia Biomass Acquisition are being amortized on a straight-line basis, as MT of wood pellets to be sold or shipped under each contract are constant through the end of such contracts. See Note 13, *Goodwill and Other Intangibles*.

*Revenue Recognition*

We primarily earn revenue by supplying wood pellets to customers under off-take contracts, the majority of the commitments under which are long-term in nature. Our off-take contracts are considered "take-or-pay" because they include a firm obligation of the customer to take a fixed quantity of product at a stated price and provisions that require that we be compensated in the case of a customer's failure to accept all or a part of the contracted volumes or termination of a contract by a customer. Each of our long-term off-take contracts define the annual volume of wood pellets that a customer is required to purchase, and we are required to sell, the fixed price per MT for product satisfying a base net calorific value and other technical specifications. These prices are generally fixed for the entire term, however, some may be subject to adjustments which may include annual inflation-based adjustments or price escalators, price adjustments for product specifications, as well as, in some instances, price adjustments due to changes in underlying indices. In addition to sales of our product under these long-term off-take contracts, we routinely sell wood pellets under shorter-term contracts, which range in volume and tenor and, in some cases, may include only one specific shipment. Because each of our off-take contracts is a bilaterally negotiated agreement, our revenue over the duration of such contracts does not generally follow observable current market pricing trends. Our performance obligations under these contracts are the delivery of wood pellets, which we aggregate into MT. We account for each MT as a single performance obligation. Our revenue from the sales of wood pellets we produce is recognized as product sales upon satisfaction of our performance obligation when control transfers to the customer at the time of loading wood pellets onto a ship.

Depending on the specific off-take contract, shipping terms are either Cost, Insurance and Freight ("CIF"), Cost and Freight ("CFR") or Free on Board ("FOB"). Under a CIF contract, we procure and pay for shipping costs, which include insurance and all other charges, up to the port of destination for the customer. Under a CFR contract, we procure and pay for shipping costs, which include insurance (excluding marine cargo insurance) and all other charges, up to the port of destination for the customer. Shipping under CIF and CFR contracts after control has passed to the customer is considered a fulfillment activity rather than a performance obligation and associated expenses are included in the price to the customer. Under FOB contracts, the customer is directly responsible for shipping costs.

In some cases, we may purchase shipments of product from third-party suppliers and resell them to other parties in back-to-back transactions ("purchase and sale transactions"). We recognize revenue on a gross basis in product sales when we determine that we act as a principal by having control of the wood pellets before they are transferred to the customer. Indicators of control have included being primarily responsible for fulfilling the promise to provide the wood pellets (such as by contracting to sell wood pellets before contracting to buy them), having inventory risk, or having discretion in establishing the sales price for the wood pellets. The decision as to whether to recognize revenue on a gross or net basis requires significant judgment.

A0717

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

We recognize third- and related-party terminal services revenue ratably over the related contract term, which is included in other revenue. Terminal services are performance obligations that are satisfied over time, as customers simultaneously receive and consume the benefits of the terminal services we perform. The consideration is generally fixed for minimum quantities and any services above the minimum are generally billed based on a per-MT rate as variable consideration and recognized as services are performed. Any deficiency payments receivable and probable of being collected from a customer not meeting quarterly minimum throughput requirements are recognized during the related quarter in satisfaction of the related performance obligation.

Variable consideration from off-take contracts arises from several pricing features outlined in our off-take contracts, pursuant to which such contract pricing may be adjusted in respect of particular shipments to reflect differences between certain contractual quality specifications of the wood pellets as measured both when the wood pellets are loaded onto ships and unloaded at the discharge port as well as certain other contractual adjustments.

Variable consideration from terminal services contracts arises from price increases based on agreed inflation indices and from above-minimum throughput quantities or services.

We allocate variable consideration under our off-take and terminal services contracts entirely to each performance obligation to which variable consideration relates. The estimate of variable consideration represents the amount that is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty is resolved.

Under our off-take contracts, customers are obligated to pay the majority of the purchase price prior to the arrival of the ship at the customers' discharge port. The remaining portion is paid after the wood pellets are unloaded at the discharge port. We generally recognize revenue prior to the issuance of an invoice to the customer.

In instances where we have contracts to exchange wood pellets held for sale in the ordinary course of business for similar wood pellets to be sold in the same line of business to facilitate sales to customers other than the parties to the exchange, we account for these exchanges as nonmonetary transactions at the carrying amount of the wood pellets transferred, with no impact to revenue and with no net impact to cost of goods sold once an equal amount of wood pellets have been exchanged. For the sale of the wood pellets received to customers not parties to the exchange, we recognize product sales revenue as described above for off-take contracts. To the extent that these exchanges also include compensation to us for shipping wood pellets, we recognize it as product sales revenue as those wood pellets are loaded and we recognize the shipping costs in cost of goods sold.

*Cost of Goods Sold*

Cost of goods sold includes the cost to produce and deliver wood pellets to customers, reimbursable shipping-related costs associated with specific off-take contracts with CIF and CFR shipping terms and costs associated with purchase and sale transactions. Distribution costs associated with shipping wood pellets to customers are expensed as incurred. The calculation of cost of goods sold is based on estimates used in the valuation of the FIFO inventory and in determining the specific composition of inventory that is sold to each customer.

*Accrued and other current liabilities*

Accrued and other current liabilities primarily includes liabilities related to construction in progress, amounts related cost of goods sold such as utility costs at our production facilities, distribution costs associated with shipping wood pellets to customers, and costs associated with the purchase of wood fiber and wood pellets not yet invoiced.

*Derivative Instruments*

Derivative instruments are classified as either assets or liabilities on a gross basis and carried at fair value and included in prepaid expenses and other current assets, other long-term assets, accrued and other current liabilities and other long-term liabilities on the consolidated balance sheets. Since August 2018 and March 2020, we have no longer applied hedge accounting treatment to any foreign currency and interest rate derivatives, respectively. Derivative instruments that did not or ceased to qualify, or are no longer designated, as accounting hedges are adjusted to fair value through earnings in the current period.

To the extent hedge accounting had previously been applied, it was applied to qualifying cash flow hedges with unrealized changes in their fair value recognized as accumulated other comprehensive income in partners' capital to the extent they could be considered effective in accordance with the accounting standards on derivatives and hedging applicable during those periods.

73

A0718

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

The effective portion of qualifying foreign currency hedges was reclassified into revenue in the same period or periods during which the hedged revenue affected earnings. The effective portion of qualifying interest rate swaps was reclassified into interest expense in the same period or periods during which the hedged interest expense affects earnings.

*Property, Plant and Equipment*

Property, plant and equipment are recorded at cost, which includes the fair values of assets acquired. Equipment under finance leases is stated at the present value of minimum lease payments. Useful lives of assets are based on historical experience and other relevant information. The useful lives of assets are adjusted when changes in the expected physical life of the asset, its planned use, technological advances, or other factors show that a different life would be more appropriate. Changes in useful lives are recognized prospectively.

Depreciation is calculated using the straight-line method based on the estimated useful lives of the related assets. Plant and equipment held under finance leases are amortized on a straight-line basis over the shorter of the lease term or estimated useful life of the asset.

Construction in progress primarily represents expenditures for the development and expansion of facilities. Capitalized interest cost and all direct costs, which include equipment and engineering costs related to the development and expansion of facilities, are capitalized as construction in progress. Depreciation is not recognized for amounts in construction in progress.

Normal repairs and maintenance costs are expensed as incurred. Amounts incurred that extend an asset's useful life, increase its productivity or add production capacity are capitalized. Direct costs, such as outside labor, materials, internal payroll and benefit costs, incurred during the construction of a new plant are capitalized; indirect costs are not capitalized.

The principal useful lives are as follows:

| Asset | Estimated useful life |
| --- | --- |
| Land improvements | 15 to 17 years |
| Buildings | 5 to 40 years |
| Machinery and equipment | 2 to 25 years |
| Vehicles | 5 to 6 years |
| Furniture and office equipment | 2 to 10 years |
| Leasehold improvements | Shorter of estimated useful life or lease term, generally 10 years |

Costs and accumulated depreciation applicable to assets retired or sold are removed from the accounts and any resulting gain or loss is included in the consolidated statements of operations.

Long-lived assets, such as property, plant and equipment and amortizable intangible assets, are tested for impairment whenever events or changes in circumstances indicate that the carrying amount of a long-lived asset may not be recoverable. There were no such indicators that would require impairment testing to be performed during the periods presented.

*Leases*

We have operating and finance leases related to real estate, machinery, equipment and other assets where we are the lessee. Operating leases with an initial term of 12 months or less are not recorded on the balance sheet but are recognized as lease expense on a straight-line basis over the applicable lease terms. Operating and finance leases with an initial term longer than 12 months are recorded on the balance sheet and classified as either operating or finance.

Right-of-use ("ROU") assets represent our right to use an underlying asset for the lease term and lease liabilities represent our obligation to make lease payments arising from the lease. Our leases do not contain any material residual value guarantees, restrictive covenants or subleases. In addition to fixed lease payments, we have contracts that incur variable lease expense related to usage (e.g. throughput fees, maintenance and repair and machine hours), which are expensed as incurred. Our leases have remaining terms of one to 27 years, some of which include options to extend the leases by up to 5 years. Our leases are generally noncancelable. Certain leases also include options to purchase the leased property. The depreciable life of assets and leasehold

A0719

Table of Contents

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

improvements are limited by the expected lease term unless there is a transfer of title or purchase option reasonably certain of exercise.

An incremental borrowing rate is applied to our leases for balance sheet measurement. As most of our leases do not provide an implicit rate, we generally use our incremental borrowing rate based on the estimated rate of interest for a collateralized borrowing over a similar term of the lease payments as of the commencement date.

We adopted ASU 2016-02, *Leases*, on and as of January 1, 2019 using the modified retrospective transition method, which we applied to all leases existing at the date of initial application of the ASU. We elected to use the effective date as the date of initial application, as opposed to the beginning of the earliest comparative period presented in the financial statements; consequently, financial information and disclosures are not presented under the new standard for periods prior to January 1, 2019. We elected the package of three practical expedients under the transition guidance within the new standard, which permitted us to not reassess our prior conclusions under the previous guidance concerning lease identification, lease classification and initial direct leasing costs. We elected the practical expedient to not evaluate existing or expired land easements that were not accounted for as leases under previous guidance. We did not, however, elect the separate practical expedient pertaining to the use of hindsight in determining the lease term for existing leases.

For contracts that contain lease and nonlease components, nonlease components are separated and accounted for under other, relevant accounting standards. We made an accounting policy election to not separate nonlease components from lease components for heavy machinery and equipment.

Operating leases are included in operating lease ROU assets, accrued and other current liabilities and long-term operating lease liabilities on our consolidated balance sheets. Finance leases are included in property, plant and equipment, the current portion of long-term debt and finance lease obligations and long-term debt and finance lease obligations on our consolidated balance sheets. Changes in ROU assets and operating lease liabilities are included net in change in operating lease liabilities on the consolidated statement of cash flows.

### *Debt Issuance Costs and Original Issue Discounts and Premiums*

Debt issuance costs and original issue discounts and premiums incurred with debt financing are capitalized and amortized over the life of the debt. Amortization expense is included in interest expense. If a debt instrument is retired before its scheduled maturity date, any related unamortized debt issuance costs and original issue discounts and premiums are written-off as gain or loss on debt extinguishment in the same period.

Unamortized debt issuance costs and original issue discounts and premiums related to a recognized debt liability are recognized as a direct deduction from the carrying amount of the related long-term debt and are amortized using the effective interest method. Unamortized debt issuance costs related to our revolving credit commitments are recognized as an asset and are amortized using the straight-line method.

### *Goodwill*

Goodwill represents the purchase price paid for acquired businesses in excess of the identifiable acquired assets and assumed liabilities. Goodwill is not amortized but is tested for impairment annually and whenever an event occurs or circumstances change such that it is more likely than not that the fair value of the reporting unit is less than its carrying amounts. At December 31, 2020 and 2019, we identified the Partnership as having one reporting unit that corresponded to our one reportable segment. We have selected December 1 to perform our annual goodwill impairment test.

For the years ended December 31, 2020 and 2019, we performed a quantitative assessment using the market approach and determined the fair value of the reporting unit exceeded its carrying amount. For the year ended December 31, 2018, we performed a qualitative assessment and determined that it was more likely than not that the estimated fair value of the reporting unit substantially exceeded the related carrying value of our reporting unit. There have been no impairments to the carrying value of the Partnership's goodwill during the periods presented. See Note 13, *Goodwill and Other Intangibles*.

### *Unit-Based Compensation*

Employees, consultants and directors of the General Partner and any of its affiliates are eligible to receive equity awards and other forms of compensation under the Enviva Partners, LP Long-Term Incentive Plan (the "LTIP"). Phantom units issued in

75

A0720

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

tandem with corresponding distribution equivalent rights ("DERs") are granted to employees of Enviva Management Company that provide services to us and to independent directors of the General Partner. Phantom unit awards vest subject to the satisfaction of service requirements and/or the achievement of certain performance goals. Once these conditions have been met, common units in the Partnership will be delivered to the holder of the phantom units. For accounting purposes, units granted to employees of our affiliates (excluding the General Partner, the Partnership and subsidiaries of the Partnership) are treated as if they were distributed by the Partnership. Such affiliates recognize compensation expense for the phantom units awarded to their employees, a portion of which is allocated to us under the MSAs (see Note 15, *Related-Party Transactions-Management Services Agreements* and Note 18, *Equity-Based Awards*). We also recognize compensation expense for phantom units awarded to independent directors. As of December 31, 2020, we have the ability to settle certain of our outstanding phantom unit awards under the LTIP in either cash or common units at our election. As we have the ability to settle the awards in common units as of December 31, 2020 and as we reasonably expect to be able to deliver common units at the settlement date, we have classified all of our outstanding phantom unit awards as equity on our balance sheets.

*Commitments and Contingencies*

Liabilities for loss contingencies arising from claims, assessments, litigation, fines, penalties and other sources are recorded when it is probable that a liability has been incurred and the amount can be reasonably estimated. Legal costs incurred in connection with loss contingencies are expensed as incurred.

*Fair Value Measurements*

We apply authoritative accounting guidance for fair value measurements of financial and nonfinancial assets and liabilities. We use valuation techniques that maximize the use of observable inputs and minimize the use of unobservable inputs to the extent possible. We determine fair value based on assumptions that market participants would use in pricing an asset or liability in the principal or most advantageous market. When considering market participant assumptions in fair value measurements, the following fair value hierarchy distinguishes between observable and unobservable inputs, which are categorized in one of the following levels:

- Level 1 Inputs: Unadjusted, quoted prices in active markets for identical assets or liabilities accessible to the reporting entity at the measurement date.

- Level 2 Inputs: Other than quoted prices included in Level 1, inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the asset or liability.

- Level 3 Inputs: Unobservable inputs for the asset or liability used to measure fair value to the extent that observable inputs are not available, thereby allowing for situations in which there is little, if any, market activity for the asset or liability at the measurement date.

*Income taxes*

Substantially all of our operating subsidiaries are organized as limited partnerships and entities that are disregarded entities for U.S. federal and applicable state income tax purposes. As a result, those entities disregarded for U.S. federal and state income tax purposes are not subject to U.S. federal and most state income taxes. Our partners and unitholders are liable for these income taxes on their share of our taxable income. Some states impose franchise and capital taxes on the Partnership. Such taxes are not material to the consolidated financial statements and have been included in other income (expense) as incurred.

One of our subsidiaries formed in connection with the Georgia Biomass Acquisition, Enviva Pellets Waycross Holdings, LLC, is an entity taxable as a corporation and is subject to U.S. federal income tax and accounts for income tax under the liability method. Deferred taxes are recognized for future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax basis and net operating loss carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect of any tax rate change on deferred taxes is recognized in the period that includes the enactment date of the tax rate change. Realization of deferred tax assets is assessed on an annual basis and, unless a deferred tax asset is more likely than not to be utilized, a valuation allowance is recorded to write down the deferred tax assets to their net realizable value.

76

A0721

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

*Recently Adopted Accounting Standards*

On January 1, 2020, we adopted ASU 2016-13, *Financial Instruments—Credit Losses (Topic 326)*: *Measurement of Credit Losses on Financial Instruments*, which changes how entities measure credit losses for most financial assets. The adoption did not have a material impact on the financial statements.

*Recently Issued Accounting Standards not yet Adopted*

In December 2019, the Financial Accounting Standards Board ("FASB") issued ASU 2019-12-*Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes.* The standard removes certain exceptions for recognizing deferred taxes for investments, performing intraperiod allocation and calculating income taxes in interim periods. The ASU also adds guidance to reduce complexity in certain areas, including recognizing deferred taxes for tax goodwill and allocating taxes to members of a consolidated group. The standard is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2020, with early adoption permitted. We are adopting the standard on January 1, 2021 and do not expect the adoption to have a material impact on our consolidated financial statements.

**(3) Transactions Between Entities Under Common Control**

*Enviva Pellets Greenwood Holdings II, LLC*

The $132.0 million purchase price for the Greenwood Drop-Down consisted of a cash payment of $129.7 million, net of a purchase price adjustment of $2.3 million.

The change in net assets on July 1, 2020 from the Greenwood Drop-Down included $67.8 million of net assets acquired. The following table outlines the changes in consolidated net assets resulting from the Greenwood Drop-Down on July 1, 2020.

| Assets: | | |
|---|---|---|
| Cash and cash equivalents | $ | 2 |
| Accounts receivable, net | | 2 |
| Inventories | | 5,16 |
| Prepaid expenses and other current assets | | 2 |
| Property, plant and equipment, net | | 104,66 |
| Operating lease right-of-use assets | | 7,85 |
| Intangible asset, net | | 84 |
| Other long-term assets | | 7 |
| Total assets | | 118,66 |
| | | |
| Liabilities: | | |
| Accounts payable | | 1,95 |
| Accrued and other current liabilities | | 4,30 |
| Interest payable | | 36 |
| Seller Note | | 36,88 |
| Finance lease obligations | | 69 |
| Long-term operating lease liabilities | | 6,64 |
| Total liabilities | | 50,84 |
| Net assets contributed to Partnership | $ | 67,82 |

The unaudited pro forma combined revenue and net income presented below have been prepared as if the Greenwood Drop-Down had occurred on January 1, 2019. The unaudited pro forma financial information has been derived from the consolidated statements of operations of the Partnership and Greenwood for the below periods. The historical financial information has been

77

A0722

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

Notes to Consolidated Financial Statements (Continued)

(In thousands, except number of units, per unit amounts and unless otherwise noted)

adjusted in the unaudited combined pro forma information to give effect to pro forma events that are (1) directly attributable to the Greenwood Drop-Down, (2) factually supportable and (3) expected to have a continuing impact on our results of operations following the Greenwood Drop-Down. The unaudited pro forma financial information does not include non-recurring items such as transaction costs related to the acquisition. The unaudited pro forma financial information as presented below is for informational purposes only and is not necessarily indicative of the results of operations that would have been achieved if the Greenwood Drop-Down had taken place on January 1, 2019.

The unaudited pro forma combined revenue and net loss for the years ended December 31, 2020 and 2019 are as follows:

|  | 2020 | | 2019 | |
| --- | --- | --- | --- | --- |
| Revenue | $ | 873,815 | $ | 682,604 |
| Net loss | | (4,687) | | (46,323) |

*Enviva Wilmington Holdings, LLC*

The $165.0 million purchase price for the Hamlet Drop-Down consisted of (1) an initial cash payment of $24.7 million, net of a purchase price adjustment of $0.3 million, on April 2, 2019, (2) the issuance of 1,681,237 unregistered common units at a value of $29.74 per unit, or $50.0 million of common units, on April 2, 2019, (3) $50.0 million in cash, paid on June 28, 2019 and (4) a third and final cash payment of $40.0 million paid on January 2, 2020.

The changes in net assets at carryover basis on April 2, 2019 included $120.9 million net assets of the Hamlet JV, net of the elimination of $3.0 million of net related-party receivables and payables. The following table outlines the addition of net assets resulting from the Hamlet Drop-Down on April 2, 2019.

| Assets: | | |
| --- | --- | --- |
| Cash and cash equivalents | $ | 3,426 |
| Related-party receivables | | 241 |
| Prepaid expenses and other current assets | | 22 |
| Property, plant and equipment, net | | 140,446 |
| Other long-term assets | | 8 |
| Total assets | | 144,143 |
| | | |
| Liabilities: | | |
| Accounts payable | | 6,395 |
| Related-party payables | | 1,923 |
| Accrued and other current liabilities | | 14,965 |
| Finance lease obligations | | 3 |
| Total liabilities | | 23,286 |
| Net assets contributed to Partnership | $ | 120,857 |

78

A0723

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

Notes to Consolidated Financial Statements (Continued)

(In thousands, except number of units, per unit amounts and unless otherwise noted)

**(4) Acquisition**

*Purchase Price Allocation*

The Georgia Biomass Acquisition closed on July 31, 2020 and was accounted for as a business combination using the acquisition method of accounting. The following table summarizes the purchase price and the fair values of the amounts recorded for identifiable assets acquired and liabilities assumed at the acquisition date of July 31, 2020.

| | | |
|---|---|---:|
| Purchase price: | | |
| Cash paid by the Partnership at closing | $ | 168,338 |
| Reimbursement to the Partnership of certain acquisition-related costs, net | | 161 |
| Settlement of payable from the Partnership to Georgia Biomass | | (3,684) |
| Payment in relation to the Georgia Biomass Acquisition | | 164,815 |
| Receivable from purchase price adjustment | | (850) |
| | $ | 163,965 |
| Identified net assets acquired: | | |
| Cash | $ | 1,516 |
| Accounts receivable | | 124 |
| Inventories | | 5,774 |
| Prepaid expenses and other current assets | | 792 |
| Intangible assets | | 5,700 |
| Property, plant and equipment | | 170,603 |
| Operating lease right-of-use assets | | 14,716 |
| Accounts payable | | (390) |
| Accrued and other current liabilities | | (9,472) |
| Current portion of long-term finance lease obligations | | (926) |
| Long-term finance lease obligations | | (3,733) |
| Long-term operating lease liabilities | | (13,356) |
| Deferred tax liability, net | | (13,148) |
| Intangible liabilities | | (7,400) |
| Other long-term liabilities | | (880) |
| Identifiable net assets acquired | | 149,920 |
| Goodwill | | 14,045 |
| Total purchase price | $ | 163,965 |

The opening balance sheet from July 31, 2020 has changed since what had been preliminarily included in our consolidated balance sheet as of September 30, 2020. As a result, goodwill decreased by $1.6 million, mainly driven by the change in certain intangible liabilities of $2.5 million resulting from updated information received offset by the impact on deferred taxes. The measurement period has now ended as the purchase price and the purchase price allocation have been finalized.

The net assets of Georgia Biomass were recorded at their estimated fair values. Significant inputs used to estimate the fair values of certain net assets acquired included estimates of the: (1) replacement cost for property, plant and equipment as if each asset was new as of the acquisition date, which was then adjusted for the depreciation and any obsolescence since the date Georgia Biomass originally acquired that asset; (2) market prices for finished goods inventory and for customer and shipping contracts; (3) incremental borrowing rates as of the acquisition date for leases acquired; and (4) appropriate discount rates.

A0724

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

Notes to Consolidated Financial Statements (Continued)

(In thousands, except number of units, per unit amounts and unless otherwise noted)

Goodwill is calculated as the excess of the fair value of the consideration transferred over the fair value of the net assets recognized and represents the future economic benefits arising from other net assets acquired that could not be individually identified and separately recognized. We believe that the primary items that generated goodwill include both (1) the value of the synergies created between the acquired assets and our pre-existing assets and long-term, take-or-pay off-take contracts and (2) our expected ability to grow the combined business by leveraging the combined business experience and the expanded footprint. None of the goodwill is expected to be deductible for tax purposes.

In connection with the Georgia Biomass Acquisition, acquisition-related costs through December 31, 2020 are approximately $3.9 million and are included within general and administrative expenses on the consolidated statements of operations. These acquisition-related costs do not include integration costs.

*Post-acquisition and pro forma financial information*

The consolidated statements of operations for the year ended December 31, 2020 include $45.8 million of revenue and $9.7 million of net loss from the Georgia Biomass Acquisition since July 31, 2020.

The unaudited pro forma combined revenue and net income presented below have been prepared as if the Georgia Biomass Acquisition had occurred on January 1, 2019. The unaudited pro forma financial information has been derived from the consolidated statements of operations of the Partnership for the below periods and from the consolidated abbreviated statements of revenues and direct expenses of Georgia Biomass for the six months ended June 30, 2020 and the year ended December 31, 2019. The abbreviated statements of revenues and direct expenses of Georgia Biomass were prepared for the purposes of complying with the requirements of Rule 3-05 of Regulation S-X as no separate financial statements of Georgia Biomass had previously been prepared. The abbreviated statements of revenues and direct expenses of Georgia Biomass include the revenues and direct expenses directly attributable to manufacturing and distributing wood pellets to customers in the United Kingdom and Europe by Georgia Biomass.

The unaudited pro forma financial information reflects the effects of applying certain purchase price accounting adjustments to the historical financial information based on the fair value of the identified net assets acquired as of July 31, 2020. The historical financial information has been adjusted in the unaudited pro forma information to give effect to pro forma events that are (1) directly attributable to the Georgia Biomass Acquisition, (2) factually supportable and (3) expected to have a continuing impact on our results of operations following the Georgia Biomass Acquisition. The unaudited pro forma financial information does not include non-recurring items such as transaction costs related to the acquisition. The unaudited pro forma financial information as presented below is for informational purposes only and is not necessarily indicative of the results of operations that would have been achieved if the Georgia Biomass Acquisition had taken place on January 1, 2019.

The unaudited pro forma combined revenue and net income for the years ended December 31, 2020 and 2019 are as follows:

|  | 2020 | 2019 |
|---|---|---|
| Revenue | $ 957,537 | $ 845,340 |
| Net income | 16,407 | 9,540 |

**(5) Revenue**

We disaggregate our revenue into two categories: product sales and other revenue. Product sales includes sales of wood pellets. Other revenue includes fees associated with customer requests to cancel, defer or accelerate shipments in satisfaction of the related performance obligation and third- and related-party terminal services fees. Other revenue also includes fees received for other services, including for sales and marketing, scheduling, sustainability, consultation, shipping and risk management services, where the revenue is recognized when we have satisfied the performance obligation and have a right to the corresponding fee. These categories best reflect the nature, amount, timing and uncertainty of our revenue and cash flows.

*Performance Obligations*

As of December 31, 2020, the aggregate amount of consideration from contracts with customers allocated to the performance obligations that were unsatisfied or partially satisfied was approximately $14.3 billion. This amount excludes forward prices related to variable consideration including inflation, foreign currency and commodity prices. Also, this amount excludes the effects of the related foreign currency derivative contracts as they do not represent contracts with customers. We

80

A0725

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

expect to recognize approximately 7.0% of our remaining performance obligations as revenue in 2021, an additional 9.0% by 2022 and the balance thereafter. Our off-take contracts expire at various times through 2043 and our terminal services contract expires in 2021.

*Variable Consideration*

Variable consideration from off-take contracts arises from several pricing features in our off-take contracts, pursuant to which such contract pricing may be adjusted in respect of particular shipments to reflect differences between certain contractual quality specifications of the wood pellets as measured both when the wood pellets are loaded onto ships and unloaded at the discharge port as well as certain other contractual adjustments.

Variable consideration from our terminal services contract, which was insignificant for the years ended December 31, 2020, 2019, and 2018, arises from price increases based on agreed inflation indices and from above-minimum throughput quantities or services.

For the year ended December 31, 2020, we recognized $0.1 million of product sales revenue related to performance obligations satisfied in previous periods. For the year ended December 31, 2019, product sales revenue was reduced by $0.1 million related to performance obligations satisfied in previous periods. For the year ended December 31, 2018, we recognized an insignificant amount of revenue related to performance obligations satisfied in previous periods.

*Contract Balances*

Accounts receivable related to product sales as of December 31, 2020 and 2019 were $108.5 million and $67.7 million, respectively. Of these amounts, $95.0 million and $64.7 million, as of December 31, 2020 and 2019 respectively, related to amounts that were not yet billable under our contracts with customers pending finalization of prerequisite billing documentation. The amounts that have not been billed are expected to be billed within two months.

As of December 31, 2020 and December 31, 2019, we had $4.9 million and $4.1 million, respectively of deferred revenue for future performance obligations under contracts associated with off-take contracts.

*Other*

Accrued and other current liabilities included approximately $50.6 million and $19.8 million at December 31, 2020 and, 2019, respectively, for amounts associated with our product sales.

**(6) Significant Risks and Uncertainties, Including Business and Credit Concentrations**

Our business is significantly impacted by greenhouse gas emission and renewable energy legislation and regulations in the U.K., European Union ("EU") as well as its member states and Japan. If the U.K., the EU or its member states or Japan significantly modify such legislation or regulations, then our ability to enter into new contracts as our existing contracts expire may be materially affected.

Our current product sales are primarily to industrial customers located in the U.K., Denmark, Belgium and the Netherlands. Product sales to third-party customers that accounted for 10% or a greater share of consolidated product sales for each of the years ended December 31 are as follows:

|  | 2020 | 2019 | 2018 |
|---|---|---|---|
| Customer A | 40% | 48% | 46% |
| Customer B | 9% | 10% | 11% |
| Customer C | 23% | 20% | 16% |
| Customer D | 11% | 15% | 17% |

81

A0726

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

Notes to Consolidated Financial Statements (Continued)

(In thousands, except number of units, per unit amounts and unless otherwise noted)

**(7) Inventory Impairment and Asset Disposal**

On February 27, 2018, a fire occurred at the Chesapeake terminal, causing damage to equipment and approximately 43,000 MT of wood pellets (the "Chesapeake Incident"). As part of our risk management process, we maintain certain insurance policies, which are subject to deductibles and sublimits for each covered event. When recovery of all or a portion of property damage loss or other covered expenses through insurance proceeds is probable, a receivable is recorded and the loss or expense is reduced up to the amount of the total loss or expense. No gain or income resulting from business interruption insurance is recorded until all contingencies related to the insurance claim have been resolved.

To meet our contractual obligations to our customers, we incurred incremental costs to commission temporary wood pellet storage and handling and ship loading operations (collectively, "business continuity activities") at nearby locations. The wood pellets from our production plants in the Mid-Atlantic region were delivered to such temporary locations as well as to the Wilmington terminal, which increased our distribution costs. We incurred $60.3 million related to asset impairment, inventory write-off and disposal costs, emergency response costs, asset repair costs and business continuity activities as a result of the Chesapeake Incident. During the year ended December 31, 2018, we recognized recoveries of $62.1 million related to the Chesapeake Incident, which included $25.5 million of business continuity insurance recoveries, recorded in cost of goods sold, and $1.8 million of business interruption insurance recoveries, recorded in other income, for lost profits from both damaged wood pellets and the subsequent reduction in the production of wood pellets. At December 31, 2018, $3.8 million of probable insurance recoveries were included in insurance receivables; we received the $3.8 million in probable insurance recoveries in February 2019 plus an additional $0.5 million recognized as other income in 2019.

**(8) Inventories**

Inventories consisted of the following at December 31:

|  | 2020 | 2019 |
|---|---|---|
| Raw materials and work-in-process | $ 12,500 | $ 9,795 |
| Consumable tooling | 21,855 | 20,485 |
| Finished goods | 8,009 | 2,718 |
| Total inventories | $ 42,364 | $ 32,998 |

**(9) Property, Plant and Equipment, net**

Property, plant and equipment, net consisted of the following at December 31:

|  | 2020 | 2019 |
|---|---|---|
| Land | $ 22,611 | $ 15,226 |
| Land improvements | 60,110 | 56,637 |
| Buildings | 316,706 | 217,167 |
| Machinery and equipment | 799,881 | 588,447 |
| Vehicles | 3,105 | 635 |
| Furniture and office equipment | 8,202 | 6,822 |
| Leasehold improvements | 1,029 | 1,029 |
| Property, plant and equipment | 1,211,644 | 885,963 |
| Less accumulated depreciation | (295,921) | (203,695) |
| Property, plant and equipment, net | 915,723 | 682,268 |
| Construction in progress | 156,096 | 69,512 |
| Total property, plant and equipment, net | $ 1,071,819 | $ 751,780 |

Accrued amounts for property, plant and equipment and construction in progress included in accrued and other current liabilities were $10.8 million and $9.4 million at December 31, 2020 and 2019.

A0727

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

Notes to Consolidated Financial Statements (Continued)

(In thousands, except number of units, per unit amounts and unless otherwise noted)

Total depreciation expense was $72.2 million, $51.6 million and $40.6 million for the years ended December 31, 2020, 2019 and 2018, respectively. Total interest capitalized related to construction in progress was $6.1 million, $2.1 million and $0.2 million for the years ended December 31, 2020, 2019 and 2018 respectively. We recorded loss on disposal of assets of $7.0 million, $3.1 million and $2.4 million for the years ended December 31, 2020, 2019 and 2018, respectively, primarily attributable to the disposal of assets replaced in connection with maintenance capital expenditures.

**(10) Leases**

Operating lease ROU assets and liabilities and finance leases were as follows as of December 31, 2020 and 2019:

|  | | 2020 | | 2019 |
| --- | --- | --- | --- | --- |
| Operating leases: | | | | |
| Operating lease right-of-use assets | $ | 51,434 | $ | 32,830 |
| | | | | |
| Current portion of operating lease liabilities | $ | 3,450 | $ | 1,439 |
| Long-term operating lease liabilities | | 50,074 | | 33,469 |
| Total operating lease liabilities | $ | 53,524 | $ | 34,908 |
| | | | | |
| Finance leases: | | | | |
| Property plant and equipment, net | $ | 24,246 | $ | 7,398 |
| | | | | |
| Current portion of long-term finance lease obligations | $ | 8,828 | $ | 4,584 |
| Long-term finance lease obligations | | 10,775 | | 2,954 |
| Total finance lease liabilities | $ | 19,603 | $ | 7,538 |

Operating and finance lease costs were as follows for the years ended December 31, 2020 and 2019:

| Lease Cost | Classification | 2020 | | 2019 |
| --- | --- | --- | --- | --- |
| Operating lease cost: | | | | |
| Fixed lease cost | Cost of goods sold | $ 5,806 | $ | 4,814 |
| Variable lease cost | Cost of goods sold | 28 | | 16 |
| Short-term lease cost | Cost of goods sold | 8,421 | | 7,309 |
| | Total operating lease costs | $ 14,255 | $ | 12,139 |
| Finance lease cost: | | | | |
| Amortization of leased assets | Depreciation and amortization | 7,498 | | 4,159 |
| Variable lease cost | Cost of goods sold | 254 | | 9 |
| Interest on lease liabilities | Interest expense | 490 | | 292 |
| | Total finance lease costs | $ 8,242 | $ | 4,460 |
| | Total lease costs | $ 22,497 | $ | 16,599 |

We are party to a lease agreement with North Carolina State Ports Authority ("NCSPA") to lease certain real property at NCSPA's Wilmington, North Carolina marine terminal for the Wilmington terminal. The lease has a 21-year term, two five-year renewal options and annual base rent of $0.2 million that is payable monthly or annually, subject to a minimum annual throughput fee of $1.9 million for 1.0 million tons annually, subject to increases for throughput above 1.0 million tons annually and an annual increase in producer's price index up to 1% for industrial commodities less fuel. No payments are due until September 2021. Total estimated payments over the life of the lease are approximately $71.7 million. Operating lease expense related to the lease was $2.3 million for each of the years ended December 31, 2020, 2019 and 2018.

Depreciation expense relating to assets held under finance lease obligations was $1.8 million for the year ended December 31, 2018.

83

A0728

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

Notes to Consolidated Financial Statements (Continued)

(In thousands, except number of units, per unit amounts and unless otherwise noted)

Operating and finance lease cash flow information was as follows for the years ended December 31, 2020 and 2019:

|  | 2020 | 2019 |
|---|---|---|
| **Cash paid for amounts included in the measurement of lease liabilities:** | | |
| Operating cash flows from operating leases | $ 5,828 | $ 4,826 |
| Operating cash flows from finance leases | 490 | 292 |
| Financing cash flows from finance leases | 5,571 | 3,304 |
| | | |
| **Assets obtained in exchange for lease obligations:** | | |
| Operating leases | $ 21,561 | $ 7,465 |
| Finance leases | 12,487 | 6,493 |

The future minimum lease payments and the aggregate maturities of operating and finance lease liabilities are as follows as of December 31, 2020:

| Years Ending December 31, | Operating Leases | Finance Leases | Total |
|---|---|---|---|
| 2021 | $ 6,726 | $ 9,232 | $ 15,958 |
| 2022 | 6,466 | 5,084 | 11,550 |
| 2023 | 6,365 | 2,304 | 8,669 |
| 2024 | 6,190 | 896 | 7,086 |
| 2025 | 6,184 | 608 | 6,792 |
| Thereafter | 66,570 | 2,529 | 69,099 |
| Total lease payments | 98,501 | 20,653 | 119,154 |
| Less: imputed interest | (44,977) | (1,050) | (46,027) |
| Total present value of lease liabilities | $ 53,524 | $ 19,603 | $ 73,127 |

The weighted-average remaining lease terms and discount rates for our operating and finance leases were weighted using the undiscounted future minimum lease payments and are as follows as of December 31, 2020:

| | |
|---|---|
| **Weighted average remaining lease term (years):** | |
| Operating leases | 17 |
| Finance leases | 4 |
| **Weighted average discount rate:** | |
| Operating leases | 7% |
| Finance leases | 3% |

## (11) Derivative Instruments

We use derivative instruments to partially offset our business exposure to foreign currency exchange and interest rate risk. We may enter into foreign currency forward and option contracts to offset some of the foreign currency exchange risk on expected future cash flows and interest rate swaps to offset some of the interest rate risk on expected future cash flows on certain borrowings. The preponderance of our off-take contracts are U.S. Dollar-denominated. We are primarily exposed to fluctuations in foreign currency exchange rates related to a minority of our off-take contracts that require future deliveries of wood pellets to be settled in British Pound Sterling ("GBP") and Euro ("EUR"). Our derivative instruments expose us to credit risk to the extent that hedge counterparties may be unable to meet the terms of the applicable derivative instrument. We seek to mitigate such risks by limiting our counterparties to major financial institutions. In addition, we monitor the potential risk of loss with any one counterparty resulting from credit risk. Management does not expect material losses as a result of defaults by counterparties. We use derivative instruments to manage cash flow and do not enter into derivative instruments for speculative or trading purposes.

84

Table of Contents

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

We have entered and may continue to enter into foreign currency forward contracts, purchased option contracts or other instruments to partially manage this risk and, prior to August 2018, had designated certain of these instruments as cash flow hedges. In August 2018, due to market changes, increases in demand for wood pellets and requests from customers to accommodate the acceleration or deferral of contracted deliveries, we determined that it was not probable that the timing of the forecasted revenues associated with the hedged transactions would occur as originally scheduled. As a result, we discontinued hedge accounting for all designated foreign currency cash flow hedges and recognized the full amount of unrealized net gains included in accumulated other comprehensive income of $1.9 million in earnings. Since August 2018, none of our foreign currency derivative instruments have been designated as cash flow hedging instruments. In connection with the discontinuation of cash flow hedge accounting, we have recorded the on-going changes in the fair value of foreign currency derivatives as product sales or cost of goods sold depending on the nature of the item being hedged.

During the year ended December 31, 2020, we entered into pay-fixed, receive-variable interest rate swaps that expire in September 2021 and October 2021 to hedge interest rate risk associated with our variable rate borrowings under our senior secured revolving credit facility that are not designated and accounted for as cash flow hedges.

Derivative instruments are classified as Level 2 assets or liabilities based on inputs such as spot and forward benchmark interest rates (such as LIBOR) and foreign exchange rates. The fair value of derivative instruments as of December 31, 2020 and 2019 was as follows:

| | | Asset (Liability) | |
| --- | --- | --- | --- |
| | Balance Sheet Classification | 2020 | 2019 |
| Designated as hedging instruments: | | | |
| Interest rate swap | Prepaid and other current assets | $ — | $ 56 |
| Total derivatives designated as hedging instruments | | $ — | $ 56 |
| | | | |
| Not designated as hedging instruments: | | | |
| Interest rate swaps | Accrued and other current liabilities | $ (119) | $ — |
| | | | |
| Foreign currency exchange contracts: | | | |
| | Prepaid and other current assets | $ 308 | $ 408 |
| | Other long-term assets | 924 | 1,774 |
| | Accrued and other current liabilities | (2,224) | (735) |
| | Other long-term liabilities | (3,508) | (1,055) |
| Total derivatives not designated as hedging instruments | | $ (4,619) | $ 392 |

Unrealized losses related to the change in fair market value of interest rate swaps are recorded in interest expense and were $0.2 million for the year ended December 31, 2020. Our interest rate swap outstanding during the year ended December 31, 2019 was designated as a hedging instrument.

Net unrealized losses related to the change of fair market value of foreign currency derivative instruments not designated as hedging instruments were $4.3 million and $4.6 million during the years ended December 31, 2020 and 2019, respectively and are included in product sales on the consolidated statements of operations.

During the year ended December 31, 2018, we recorded a net unrealized gain of $8.6 million related to changes in the fair value of foreign currency instruments not designated as hedging instruments, of which $8.4 million was included in product sales and $0.2 million was included in cost of goods sold on the consolidated statements of operations. Included in the unrealized net gains for the year ended December 31, 2018 was $1.9 million related to the reclassification of unrealized net gains previously included in accumulated other comprehensive income as described above.

Realized gains related to foreign currency derivatives settled were $0.3 million, $1.7 million and $4.6 million, respectively, during the years ended December 31, 2020, 2019 and 2018 and are included in product sales on the consolidated statements of operations.

85

A0730

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

Notes to Consolidated Financial Statements (Continued)

(In thousands, except number of units, per unit amounts and unless otherwise noted)

The effects of instruments designated as cash flow hedges and the related changes in accumulated other comprehensive income and the gains and losses recognized in earnings for the year ended December 31, 2019 were as follows:

| | Amount of Gain (Loss) in Other Comprehensive Income on Derivative (Effective Portion) | Location of Gain (Loss) Reclassified from Accumulated Other Comprehensive Income (Effective Portion) | Amount of Gain (Loss) Reclassified from Accumulated Other Comprehensive Income into Income (Effective Portion) |
|---|---|---|---|
| Interest rate swap | $ (146) | Interest expense | $ 288 |

We enter into master netting arrangements designed to permit net settlement of derivative transactions among the respective counterparties. If we had settled all transactions with our respective counterparties at December 31, 2020, we would have received a net settlement termination payment of $4.8 million, which differs by $0.2 million from the recorded fair value of the derivatives. We present our derivative assets and liabilities at their gross fair values.

The notional amounts of outstanding derivative instruments associated with outstanding or unsettled derivative instruments as of December 31, 2020 and 2019 were as follows:

| | 2020 | 2019 |
|---|---|---|
| Foreign exchange forward contracts in GBP | £ 143,565 | £ 50,575 |
| Foreign exchange purchased option contracts in GBP | £ 51,601 | £ 43,415 |
| Foreign exchange forward contracts in EUR | € 12,968 | € — |
| Foreign exchange purchased option contracts in EUR | € — | € 1,200 |
| Interest rate swaps | $ 70,000 | $ 34,354 |

## (12) Fair Value Measurements

The amounts reported in the consolidated balance sheets as cash and cash equivalents, accounts receivable, prepaid expenses and other current assets, related-party receivables, net, accounts payable, related-party payables, net, deferred consideration due to related-party and accrued and other current liabilities approximate fair value because of the short-term nature of these instruments.

Derivative instruments and long-term debt including the current portion are classified as Level 2 instruments. Derivatives are classified as Level 2 as they are fair valued using inputs that are observable in active markets such as benchmark interest rates and foreign exchange rates (see Note 11, *Derivative Instruments*). The fair value of our 2026 Notes (see Note 14, *Long-Term Debt and Finance Lease Obligations*) was determined based on observable market prices in an active market and was categorized as Level 2 in the fair value hierarchy. The fair value of the Seller Note is classified as Level 2 and is estimated on discounted cash flow analyses based on observable inputs in active markets for debt with similar terms and remaining maturities. The carrying amount of other long-term debt, which is primarily comprised of the senior secured revolving credit facility that resets based on a market rate, approximates fair value.

The carrying amount and estimated fair value of long-term debt as of December 31, 2020 and 2019 was as follows:

| | December 31, 2020 | | December 31, 2019 | |
|---|---|---|---|---|
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| 2026 Notes | $ 746,875 | $ 796,875 | $ 593,476 | $ 644,250 |
| Seller Note | 37,571 | 40,405 | — | — |
| Other long-term debt | 122,000 | 122,000 | 2,006 | 2,006 |
| Total long-term debt | $ 906,446 | $ 959,280 | $ 595,482 | $ 646,256 |

86

A0731

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

Notes to Consolidated Financial Statements (Continued)

(In thousands, except number of units, per unit amounts and unless otherwise noted)

**(13) Goodwill and Other Intangibles**

*Goodwill*

Goodwill was $99.7 million and $85.6 million at December 31, 2020 and 2019, respectively. Goodwill includes $14.0 million recorded associated with the Georgia Biomass Acquisition on July 31, 2020, see Note 4, *Acquisition*. Goodwill includes $80.7 million associated with the acquisition of Cottondale by our sponsor and its contribution of Cottondale to us in 2015 and $4.9 million from acquisitions in 2010. We did not record any impairment losses during the years ended December 31, 2020, 2019 or 2018.

*Intangibles*

Intangible assets (liabilities) consisted of the following at December 31, 2020:

| | Gross Carrying Amount | | Accumulated Amortization | | Net Carrying Amount |
|---|---|---|---|---|---|
| Favorable customer contracts | $ | 6,200 | $ | (5,566) | $ | 634 |
| Assembled workforce | | 1,856 | | (1,249) | | 607 |
| Unfavorable customer contract | | (600) | | 57 | | (543) |
| Unfavorable shipping contract | | (6,300) | | 485 | | (5,815) |
| Total intangible liabilities, net | $ | 1,156 | $ | (6,273) | $ | (5,117) |

The Greenwood Drop-Down included an intangible asset of assembled workforce. As a result of the Georgia Biomass Acquisition, we recorded intangible assets and liabilities related to favorable off-take contracts that expired in 2020 or expire in December 2024, an unfavorable customer contract that expires in December 2024 and an unfavorable shipping contract that expires in December 2025. During the year ended December 31, 2020, $5.3 million of net amortization expense was included in depreciation and amortization on the consolidated statements of operations.

The estimated aggregate net reduction of amortization expense for the next five years is as follows:

| Year Ended December 31, | | |
|---|---|---|
| 2021 | $ | 664 |
| 2022 | | 1,010 |
| 2023 | | 1,140 |
| 2024 | | 1,140 |
| 2025 | | 1,163 |
| Total | $ | 5,117 |

87

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

Notes to Consolidated Financial Statements (Continued)

(In thousands, except number of units, per unit amounts and unless otherwise noted)

## (14) Long-Term Debt and Finance Lease Obligations

Long-term debt and finance lease obligations at carrying value consisted of the following at December 31:

|  | 2020 | 2019 |
|---|---|---|
| 2026 Notes, net of unamortized discount, premium and debt issuance of $3.1 million and $6.5 million as of December 31, 2020 and 2019, respectively | $ 746,875 | $ 593,476 |
| Senior secured revolving credit facility | 120,000 | — |
| Seller Note, net of unamortized discount of $2.4 million | 37,571 | — |
| Other loans | 2,000 | 2,006 |
| Finance leases | 19,603 | 7,538 |
| Total long-term debt and finance lease obligations | 926,049 | 603,020 |
| Less current portion of long-term debt and finance lease obligations | (13,328) | (6,590) |
| Long-term debt and finance lease obligations, excluding current installments | $ 912,721 | $ 596,430 |

### 2026 Notes

In December 2019, we issued $600.0 million in principal amount of 6.5% senior unsecured notes due January 15, 2026 (the "2026 Notes). We received gross proceeds of approximately $601.8 million from the 2026 Notes and net proceeds of approximately $595.8 million after deducting commissions and expenses. We used the net proceeds from the 2026 Notes to (1) redeem our existing $355.0 million principal amount of 8.5% senior unsecured notes due 2021 (the "2021 Notes"), including payment of the related redemption premium, (2) repay borrowings under our senior secured revolving credit facility, including payment of the related accrued interest and (3) for general partnership purposes.

In July 2020, we issued an additional $150.0 million aggregate principal amount of the 2026 Notes at an offering price of 103.75% of the principal amount (the "Additional Notes"). We received net proceeds of approximately $153.6 million from the Additional Notes offering after deducting discounts and commissions. We used the net proceeds from the Additional Notes offering to fund a portion of the cash consideration for the Greenwood Drop-Down and Georgia Biomass Acquisition, to repay borrowings under our revolving credit facility and for general partnership purposes.

Interest payments are due semi-annually in arrears on January 15 and July 15 of each year, commencing July 15, 2020. During 2020, we recorded $2.7 million of premium offset by debt issuance costs associated with the Additional Notes. During 2019, we recorded $6.6 million of debt issuance costs, offset by premium associated with the issuance of the 2026 Notes, which have been recorded as a deduction to long-term debt and finance lease obligations.

We may redeem all or a portion of the 2026 Notes at any time at the applicable redemption price, plus accrued and unpaid interest, if any, (subject to the right of holders of record on the relevant record date to receive interest due on an interest payment date that is on or prior to the redemption date) and, in some cases, plus a make-whole premium.

As of December 31, 2020 and 2019, we were in compliance with the covenants and restrictions associated with, and no events of default existed under, the indenture dated as of December 9, 2019 governing the 2026 Notes. The 2026 Notes are guaranteed jointly and severally on a senior unsecured basis by our existing subsidiaries (excluding Enviva Partners Finance Corp.) that guarantee certain of our indebtedness and may be guaranteed by certain future restricted subsidiaries.

### 2021 Notes

In December 2019, we redeemed all $355.0 million of aggregate principal amount of 2021 Notes and recognized a $9.0 million loss on the early retirement of debt obligation consisting of a $7.5 million debt redemption premium and $1.5 million for the write-off of unamortized debt issuance costs, original issue discount and premium. The amounts were amortized over the term of the 2021 Notes and were expensed in December 2019 when we repaid $355.0 million of aggregate principal amount of the 2021 Notes. The 2021 Notes early redemption was funded from the issuance of the 2026 Notes.

### Senior Secured Revolving Credit Facility

We have a $350.0 million senior secured revolving credit facility that matures on October 18, 2023.

88

A0733

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

Borrowings under the revolving credit commitments thereunder bear interest, at our option, at either a Eurodollar rate or at a base rate, in each case, plus an applicable margin. The applicable margin will fluctuate between 1.75% per annum and 3.00% per annum, in the case of Eurodollar rate borrowings, or between 0.75% per annum and 2.00% per annum, in the case of base rate loans, in each case, based on our Total Leverage Ratio (as defined in our credit agreement) at such time, with 25 basis point increases or decreases for each 0.50 increase or decrease in our Total Leverage Ratio from 2.75:1:00 to 4.75:1:00.

We are required to pay a commitment fee on the daily unused amount under the revolving credit commitments at a rate between 0.25% and 0.50% per annum. During the years ended December 31, 2020, 2019 and 2018, commitment fees were $0.9 million, $0.8 million and $0.5 million, respectively.

At December 31, 2020, we had $120.0 million in outstanding borrowings under our senior secured revolving credit facility. At December 31, 2019, we had no outstanding borrowings under our senior secured revolving credit facility.

We had a letter of credit outstanding under our senior secured revolving credit facility of $0.3 million at December 31, 2020 and none at December 31, 2019.

The credit agreement contains certain covenants, restrictions and events of default. We are required to maintain (1) a maximum Total Leverage Ratio at or below 4.75 to 1.00 (or 5.00 to 1.00 during a Material Transaction Period) and (2) a minimum Interest Coverage Ratio (as defined in our credit agreement) of not less than 2.25 to 1.00.

As of December 31, 2020 and 2019, we were in compliance with all covenants and restrictions associated with, and no events of default existed under, our senior secured revolving credit facility. Our obligations under the senior secured revolving credit facility are guaranteed by certain of our subsidiaries and secured by liens on substantially all of our assets; however, the senior secured revolving credit facility is not guaranteed by the Hamlet JV or secured by liens on its assets.

*Seller Note*

In connection with the Greenwood Drop-Down, we became a party to, and a guarantor of, a promissory note (the "Seller Note") with a remaining principal balance of $40.0 million, which was initially recorded at its carrying value of $36.9 million. The Seller Note matures in February 2023 and has an interest rate of 2.5% per annum. Principal and related interest payments are due annually through February 2022 and quarterly thereafter.

*Debt Issuance Costs and Premium*

Unamortized debt issuance costs and premium included in long-term debt at December 31, 2020 and 2019 were $5.5 million and $6.5 million, respectively. Unamortized debt issuance costs associated with the revolving credit facility included in long-term assets was $1.5 million and $2.0 million at December 31, 2020 and 2019, respectively. Amortization expense included in interest expense for the years ended December 31, 2020, 2019 and 2018 was $1.9 million, $1.2 million and $1.1 million, respectively.

89

A0734

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

Notes to Consolidated Financial Statements (Continued)

(In thousands, except number of units, per unit amounts and unless otherwise noted)

*Debt Maturities*

Our long-term debt matures through 2026 and our finance lease obligations have maturity dates of between 2021 and 2031. The aggregate maturities of long-term debt and finance lease obligations as of December 31, 2020 are as follows:

| Year Ending December 31: | | |
|---|---|---:|
| 2021 | $ | 13,328 |
| 2022 | | 33,623 |
| 2023 | | 130,920 |
| 2024 | | 808 |
| 2025 and thereafter | | 752,924 |
| Long-term debt and finance lease obligations | | 931,603 |
| Unamortized premium and debt issuance costs | | (5,554) |
| Total long-term debt and finance lease obligations | $ | 926,049 |

**(15) Related-Party Transactions**

Related-party amounts included on the consolidated statements of operations were as follows:

| For the Year Ended December 31, | | 2020 | | 2019 | | 2018 |
|---|---|---:|---|---:|---|---:|
| Other revenue | $ | 1,264 | $ | 1,789 | $ | 3,545 |
| Cost of goods sold | | 125,284 | | 111,491 | | 84,148 |
| General and administrative expenses[1] | | 32,545 | | 29,457 | | 21,762 |

[1] Includes $10.3 million, $5.0 million and $4.7 million of expense related to Affiliate Grants

*Management Services Agreements*

Enviva Partners, LP and the Hamlet JV are parties to MSAs with Enviva Management Company. Enviva Management Company provides us with operations, general administrative, management and other services. We reimburse Enviva Management Company for all direct or indirect internal or third-party expenses it incurs in connection with the provision of such services. The MSAs include rent-related amounts for noncancelable operating leases for office space in Maryland and North Carolina held by our sponsor. We believe the costs allocated to us have been made on a reasonable basis and are the best estimate of the costs that we would have incurred on a stand-alone basis.

Under the Hamlet JV's MSA (the "Hamlet JV MSA"), the Hamlet JV pays an annual management fee to Enviva Management Company; to the extent allocated costs exceed the annual management fee, the additional costs are recorded with an increase to partners' capital. In connection with the Hamlet Drop-Down, Enviva Management Company waived the Hamlet JV's obligation to pay approximately $2.7 million of management fees payable to Enviva Management Company from the date thereof until July 1, 2020 (the "Hamlet JV MSA Fee Waiver").

Related-party amounts included on the consolidated balance sheets under our MSAs were as follows:

| As of December 31, | | 2020 | | 2019 |
|---|---|---:|---|---:|
| Finished goods inventory | $ | 907 | $ | 419 |
| Related-party payables | | 8,650 | | 18,703 |

Related-party amounts included on the consolidated statements of operations under our MSAs were as follows:

| For the Year Ended December 31, | | 2020 | | 2019 | | 2018 |
|---|---|---:|---|---:|---|---:|
| Cost of goods sold | $ | 74,475 | $ | 63,377 | $ | 52,280 |
| General and administrative expenses | | 32,545 | | 29,457 | | 21,762 |

90

A0735

Table of Contents

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

Notes to Consolidated Financial Statements (Continued)

(In thousands, except number of units, per unit amounts and unless otherwise noted)

During the years ended December 31, 2020 and 2019, $1.9 million and $2.6 million, respectively, of fees expensed under the Hamlet JV MSA were waived and recorded as an increase to partners' capital.

***Drop-Down Agreements***

*Greenwood Drop-Down*

Pursuant to the Third EVA MSA Fee Waiver, during the year ended December 31, 2020, $18.0 million was recorded as an increase to partners' capital consisting of expenses waived under the agreement.

*Hamlet Drop-Down*

On the date of the Hamlet Drop-Down:

- We entered into an agreement with our sponsor, pursuant to which (1) our sponsor agreed to guarantee certain cash flows from the Hamlet plant until June 30, 2020, (2) our sponsor agreed to reimburse us for construction cost overruns in excess of budgeted capital expenditures for the Hamlet plant, subject to certain exceptions, (3) we agreed to pay to our sponsor quarterly incentive payments for any wood pellets produced by the Hamlet plant in excess of forecast production levels through June 30, 2020 and (4) our sponsor agreed to retain liability for certain claims payable, if any, by the Hamlet JV (the "Hamlet Make-Whole Agreement").

- We entered into an agreement with Enviva Management Company to waive our obligation to pay an aggregate of approximately $13.0 million in fees payable under our MSA with Enviva Management Company (the "EVA MSA") with respect to the period from the date of the Hamlet Drop-Down through the second quarter of 2020 (the "First EVA MSA Fee Waiver").

- The Hamlet JV entered into an interim services agreement (the "ISA") with Enviva Hamlet Operator, LLC, a wholly owned subsidiary of our sponsor ("Hamlet Operator"), pursuant to which Hamlet Operator, as an independent contractor, agreed to manage, operate, maintain and repair the Hamlet plant and provide other services to the Hamlet JV for the period from July 1, 2019 through June 30, 2020 in exchange for a fixed fee per MT of wood pellets produced by the Hamlet plant during such period and delivered at place to the Wilmington terminal. Under and during the term of the ISA, Hamlet Operator agreed to (1) pay all operating and maintenance expenses at the Hamlet plant, (2) cover all reimbursable general and administrative expenses associated with the Hamlet plant and (3) pay other costs and expenses incurred by the Hamlet plant to produce and sell the wood pellets delivered to the Wilmington terminal from the Hamlet plant. Our sponsor guaranteed all obligations of Hamlet Operator under the ISA.

During the year ended December 31, 2020, $3.5 million was recorded as an increase to partners' capital consisting of expenses waived under the First EVA MSA Fee Waiver. Cost of goods sold included $25.2 million net of a cost of cover deficiency fee from our sponsor pursuant to the Hamlet Make-Whole Agreement as a result of Hamlet Operator's failure to meet specified production levels, offset by the agreed-upon price due to Hamlet Operator for the wood pellets produced by the Hamlet plant that we sold. As of December 31, 2020, included in related-party receivables, net are $12.3 million related to the ISA. The Hamlet Make-Whole Agreement, First EVA MSA Waiver and ISA expired pursuant to their terms on June 30, 2020.

During the year ended December 31, 2019, $19.7 million was recorded as an increase to partners' capital and $7.7 million was recorded in cost of goods sold pursuant to the agreements we entered into on the date of acquisition of the Hamlet JV. The increases to partners' capital are comprised of expenses waived under the First EVA MSA Fee Waiver and the Hamlet JV MSA Fee Waiver and reimbursement of construction cost overruns in excess of budgeted capital expenditures for the Hamlet plant. The net reduction in cost of goods sold comprises our receipt of a cost of cover deficiency fee from our sponsor pursuant to the Make-Whole Agreement as a result of Hamlet Operator's failure to meet specified production levels, offset by the agreed-upon price due to Hamlet Operator for the pellets produced by the Hamlet plant that we have sold.

***Hamlet JV Revolver***

Our sponsor assigned to us all of its rights and obligations under the amended and restated credit agreement, dated as of June 30, 2018, between the Hamlet JV, as borrower, and our sponsor, as lender. On April 2, 2019, we amended and restated the Hamlet JV Revolver to extend the maturity date of the revolving loans made to the Hamlet JV and increase our commitment as lender to fund increases in the amount of such loans from $30.0 million to $60.0 million in order to fund capital expenditures and working capital at the Hamlet plant. As of December 31, 2020 and 2019, the outstanding balance of the Hamlet JV Revolver was

91

A0736

Table of Contents

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

Notes to Consolidated Financial Statements (Continued)

(In thousands, except number of units, per unit amounts and unless otherwise noted)

$41.7 million and $52.2 million, respectively, due from the Hamlet JV to Enviva, LP, both of which are eliminated upon consolidation.

*Second EVA MSA Fee Waiver*

In June 2019, we entered into an additional agreement with Enviva Management Company (the "Second EVA MSA Fee Waiver") pursuant to which we received a $5.0 million waiver of fees under the EVA MSA through September 30, 2019 as consideration for an assignment of two shipping contracts to our sponsor to rebalance our and our sponsor's respective shipping obligations under our existing off-take contracts. During the year ended December 31, 2019, $5.0 million of fees expensed under the EVA MSA were waived and recorded as an increase to partners' capital pursuant to the Second EVA MSA Fee Waiver.

*Wilmington Drop-Down - Second Payment*

In October 2017, we purchased all of the issued and outstanding limited liability company interests in Enviva Port of Wilmington, LLC ("Wilmington") for total consideration of $130.0 million (the "Wilmington Drop-Down"). On April 1, 2019, we made the second and final payment of $74.0 million, which consisted of $24.3 million in cash, of which $22.8 million was distributed to John Hancock, and the issuance of 1,691,627 common units, or approximately $49.7 million in common units, which were distributed to John Hancock.

*Greenwood Contract*

We were party to a contract with Greenwood to purchase wood pellets produced by the Greenwood plant through March 2022 (the "Greenwood Contract") and had a take-or-pay obligation with respect to 550,000 MTPY of wood pellets from July 2019 through March 2022 subject to Greenwood's option to increase or decrease the volume by 10% each contract year. Pursuant to an amendment to the Greenwood Contract, our take-or-pay obligation with respect to 550,000 MTPY of wood pellets was deferred to 2021. The Greenwood Contract was terminated on the date of the Greenwood Drop-Down.

During the years ended December 31, 2020, 2019 and 2018, we purchased $18.8 million, $46.2 million and $27.4 million, respectively, of wood pellets from Greenwood and recorded a cost of cover deficiency fee of approximately $0.3 million, $5.0 million and $0.7 million, respectively, as Greenwood was unable to satisfy certain commitments.

As of December 31, 2020, the net purchased amount of $18.1 million related to the Greenwood contract was included in cost of goods sold and there was no finished good inventory. As of December 31, 2019 and 2018, of the net $41.2 million and $26.7 million, $40.9 million and $26.2 million is included in cost of goods sold, and $0.3 million and $0.5 million is included in finished goods inventory, respectively.

As of December 31, 2020, there were no related-party payables related to our wood pellet purchases from Greenwood. As of December 31, 2019, $1.3 million is included in related-party payables related to our wood pellet purchases from Greenwood.

*Holdings TSA*

Prior to its termination on the date of the Greenwood Drop-Down, we were party to a long-term terminal services agreement with our sponsor (the "Holdings TSA"). Pursuant to the Holdings TSA, our sponsor agreed to deliver a minimum of 125,000 MT of wood pellets per quarter for receipt, storage, handling and loading services by the Wilmington terminal and pay a fixed fee on a per-ton basis for such terminal services. During the years ended December 31, 2020 and 2019, we recorded no terminal services revenue from our sponsor. During the year ended December 31, 2018, we recorded $0.8 million as terminal services revenue from our sponsor, which is included in other revenue.

In 2018, the Holdings TSA was amended and assigned to Greenwood and provided for deficiency payments to Wilmington if quarterly minimum throughput requirements were not met. During the years ended December 31, 2020, 2019 and 2018, we recorded $1.3 million, $1.8 million and $2.2 million, respectively, of deficiency fees from Greenwood, which is included in other revenue.

Additionally, in 2018, Hurricane Florence impacted the rail line on which wood pellets are typically transported from the Greenwood plant to the Wilmington terminal. As a result, Greenwood was unable to satisfy certain commitments under the Holdings TSA and the Greenwood Contract and agreed to pay $1.8 million to us as deficiency fees in consideration of these commitments. Consideration of $0.5 million related to the Holdings TSA was included in other revenue and $1.3 million related to the Greenwood contract was included as a reduction of cost of goods sold during the year ended December 31, 2018.

92

A0737

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

Notes to Consolidated Financial Statements (Continued)

(In thousands, except number of units, per unit amounts and unless otherwise noted)

### Enviva FiberCo, LLC

We purchase raw materials from Enviva FiberCo, LLC ("FiberCo"), a wholly owned subsidiary of our sponsor, including through a wood supply agreement that provided for deficiency fees in the event FiberCo did not satisfy certain volume commitments. Purchased raw materials net of cost of cover deficiency fees are included in cost of goods sold. Raw materials purchased during the year ended December 31, 2020 were $7.5 million. No cost of cover deficiency fees were recognized during the year ended December 31, 2020. During the year ended December 31, 2019, cost of cover deficiency fees net of raw material purchases were $0.5 million. During the year ended December 31, 2018, raw material purchases were $7.1 million. There were no cost of cover deficiency fees during the year ended December 31, 2018. As of December 31, 2020, $0.3 million is included in related-party payables related to raw materials purchased from FiberCo. There was no amount in related-party payables related to raw materials purchased from FiberCo as of December 31, 2019.

### Equipment Transfer

In April 2020, Enviva Pellets Northampton, LLC sold certain equipment to the sponsor for approximately $4.1 million.

### Biomass Option Agreement – Enviva Holdings, LP

In February 2017, Enviva, LP entered into an agreement and a confirmation thereunder with our sponsor (together, as amended, the "Option Contract").

During the year ended December 31, 2018, Enviva, LP purchased $1.7 million of wood pellets from our sponsor. The Option Contract terminated in accordance with its terms in March 2018.

### (16) Income Taxes

Our consolidated statement of operations for the year ended December 31, 2020 included income tax expense of $0.1 million. For the years ended December 31, 2019 and 2018, no provision for income tax was recorded in the consolidated financial statements.

Components of the income tax provision applicable to our federal and state taxes are as follows:

|  | 2020 |
| --- | ---: |
| Deferred income tax expense: | |
| U.S. Federal | $ 69 |
| Total deferred | $ 69 |
| Total income tax expense related to continuing operations | $ 69 |

The effective income tax rate from continuing operations varies from the U.S. Federal statutory rate principally due to the following:

|  | 2020 |
| --- | ---: |
| Income taxes at statutory federal income tax rate | $ 3,601 |
| Increase (decrease) in income taxes resulting from: | |
| Partnership earnings not subject to tax | (3,671) |
| Other | 139 |
| Total income tax expense | $ 69 |

A0738

Table of Contents

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

Notes to Consolidated Financial Statements (Continued)

(In thousands, except number of units, per unit amounts and unless otherwise noted)

Deferred tax assets and liabilities result from the following:

|  | 2020 |
|---|---:|
| Deferred tax assets: | |
| Net operating loss carryforward | $ 3,611 |
| Total deferred tax assets | $ 3,611 |
| Deferred tax liabilities: | |
| Investment in affiliates | $ (16,828) |
| Total deferred tax liabilities | $ (16,828) |
| Net deferred tax assets (liabilities) | $ (13,217) |

As of December 31, 2020, we have federal net operating loss carryforwards of approximately $17.2 million expiring in years 2033 to 2036.

For calendar year 2020, the only periods subject to examination for U.S. federal and state income tax returns are 2017 through 2019. We believe our income tax filing positions, including our status as a pass-through entity, would be sustained on audit and do not anticipate any adjustments that would result in a material change to our consolidated balance sheet. Therefore, no reserves for uncertain tax positions or interest and penalties have been recorded during the years ended December 31, 2020, 2019 and 2018.

**(17) Partners' Capital**

*Common Units - Issuance*

In June 2020, we issued 6,153,846 common units in a private placement at a price of $32.50 per common unit for gross proceeds of $200.0 million. We received proceeds of $190.5 million, net of $9.5 million of issuance costs.

In March 2019, we issued 3,508,778 common units in a registered direct offering for net proceeds of approximately $97.0 million, net of $3.0 million of issuance costs. On April 1, 2019, in connection with the Second Payment for the Wilmington Drop-Down, we issued 1,691,627 common units, or $49.7 million in common units, to the Hamlet JV, which common units were distributed to John Hancock.

*Common Units - Sponsor*

In January 2018, our sponsor sold to our general partner 81,708 common units, which were used to satisfy our obligation to settle vested performance-based phantom unit awards granted under the LTIP. On May 9, 2018, our sponsor sold to third parties all of the 1,265,453 common units held by our sponsor on such date. All of our subordinated units, which at the time were held by our sponsor, converted into common units on a one-for-one basis at the end of the subordination period on May 30, 2018. As of December 31, 2018, 11,905,138 common units were held by our sponsor. On April 2, 2019, in connection with the Hamlet Drop-Down, we issued 1,681,237 common units, or $50.0 million in common units, to our sponsor.

*Shelf Registration - Equity Interests in the Partnership*

We filed a shelf registration statement on Form S-3 with the U.S. Securities and Exchange Commission (the "SEC") on June 21, 2019 to allow us, from time to time, in one or more offerings, to offer and sell (1) common units representing limited partner interests in Enviva Partners, LP and (2) preferred units representing equity interests in Enviva Partners, LP. The aggregate initial offering price of all securities sold by us under the effective shelf registration statement may not exceed $500.0 million.

On April 1, 2019, in connection with the Second Payment for the Wilmington Drop-Down, we issued 1,691,627 common units, or $49.7 million in common units, to the Hamlet JV, which common units were distributed to John Hancock. On April 2, 2019, in connection with the Hamlet Drop-Down, we issued 1,681,237 common units, or $50.0 million in common units, to our sponsor. In accordance with our registration rights agreements with John Hancock, we registered the common units issued for the Wilmington-Drop Down and the Hamlet Drop-Down for resale, subject to certain limitations, pursuant to the effective shelf registration statement.

94

A0739

Table of Contents

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

Notes to Consolidated Financial Statements (Continued)

(In thousands, except number of units, per unit amounts and unless otherwise noted)

In connection with the closing of our private placement of common units in June 2020, we entered into a registration rights agreement with investors, pursuant to which we agreed to file and maintain a registration statement with respect to the resale of the common units on the terms set forth therein. On July 10, 2020, we filed the registration statement and on July 20, 2020, the registration statement was declared effective.

*At-the-Market Offering Program*

Pursuant to an equity distribution agreement dated August 8, 2016, we may offer and sell common units from time to time through a group of managers, subject to the terms and conditions set forth in such agreement, of up to an aggregate sales amount of $100.0 million (the "ATM Program"). During the years ended December 31, 2020 and 2019, we did not sell common units under the ATM Program.

*Allocations of Net Income (Loss)*

The Partnership's partnership agreement contains provisions for the allocation of net income and loss to our unitholders and the General Partner, a wholly owned subsidiary of our sponsor. For purposes of maintaining partner capital accounts, the partnership agreement specifies that items of income and loss shall be allocated among the partners of the Partnership in accordance with their respective percentage ownership interest. Such allocations are made after giving effect, if any, to priority income allocations in an amount equal to incentive cash distributions, which are allocated 100% to the General Partner.

Prior to the Hamlet Drop-Down, John Hancock had received all of its capital contributions and substantially all of its preference amount and the historical net losses of the Hamlet JV had been allocated to the members of the Hamlet JV in proportion to their unreturned capital contributions; consequently, the balance of members' capital attributable to John Hancock was negative at the time of the Hamlet Drop-Down. We have not received full repayment of revolving borrowings from the Hamlet JV pursuant to the Hamlet JV Revolver or its capital contributions and full preference amount as of December 31, 2020; as a result, none of the earnings of the Hamlet JV have been allocated to John Hancock following the Hamlet Drop-Down and no change has been recognized to the negative noncontrolling interest balance attributable to John Hancock that we acquired.

*Incentive Distribution Rights*

Incentive distribution rights ("IDRs") represent the right to receive increasing percentages (from 15.0% to 50.0%) of quarterly distributions from operating surplus after we achieve distributions in amounts exceeding specified target distribution levels. Our sponsor currently holds the IDRs but may transfer them at any time.

*Cash Distributions to Unitholders*

The partnership agreement sets forth the calculation to be used to determine the amount of cash distributions that our unitholders and our sponsor will receive.

Distributions that have been paid or declared related to the reporting period are considered in the determination of earnings per unit. The following table details the cash distribution paid or declared (in millions, except per unit amounts):

| Quarter Ended | Declaration Date | Record Date | Payment Date | Distribution Per Unit | | Total Cash Distribution | | Total Payment to holder of Incentive Distribution Rights | |
|---|---|---|---|---|---|---|---|---|---|
| June 30, 2019 | July 31, 2019 | August 15, 2019 | August 29, 2019 | $ | 0.6600 | $ | 22.1 | $ | 2.8 |
| September 30, 2019 | October 30, 2019 | November 15, 2019 | November 29, 2019 | $ | 0.6700 | $ | 22.4 | $ | 3.1 |
| December 31, 2019 | January 29, 2020 | February 14, 2020 | February 28, 2020 | $ | 0.6750 | $ | 22.7 | $ | 3.3 |
| March 31, 2020 | April 29, 2020 | May 15, 2020 | May 29, 2020 | $ | 0.6800 | $ | 22.9 | $ | 3.5 |
| June 30, 2020 | August 5, 2020 | August 14, 2020 | August 28, 2020 | $ | 0.7650 | $ | 30.4 | $ | 7.5 |
| September 30, 2020 | October 30, 2020 | November 13, 2020 | November 27, 2020 | $ | 0.7750 | $ | 30.8 | $ | 7.9 |
| December 31, 2020 | January 29, 2021 | February 15, 2021 | February 26, 2021 | $ | 0.7800 | $ | 31.2 | $ | 8.1 |

For purposes of calculating our earnings per unit under the two-class method, common units are treated as participating preferred units. IDRs are treated as participating securities.

95

A0740

Table of Contents

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

Notes to Consolidated Financial Statements (Continued)

(In thousands, except number of units, per unit amounts and unless otherwise noted)

Distributions made in future periods based on the current period calculation of cash available for distribution are allocated to each class of equity that will receive the distribution. Any unpaid cumulative distributions are allocated to the appropriate class of equity.

We determine the amount of cash available for distribution for each quarter in accordance with our partnership agreement. The amount to be distributed to unitholders and IDR holders is based on the distribution waterfall set forth in our partnership agreement. Net earnings for the quarter are allocated to each class of partnership interest based on the distributions to be made.

*Accumulated Other Comprehensive Income (Loss)*

Comprehensive income (loss) consists of two components, net income (loss) and other comprehensive income (loss). Other comprehensive income (loss) refers to revenue, expenses and gains and losses that pursuant to GAAP are included in comprehensive income (loss) but excluded from net income (loss).

The following table presents the changes in accumulated other comprehensive income (loss):

|  |  |  |
|---|---|---|
| Accumulated other comprehensive income at December 31, 2018 | $ | 439 |
| Cumulative effect of accounting change - derivative instruments | | 18 |
| Net unrealized losses on cash flow hedges | | (146) |
| Reclassification of net gains on cash flow hedges realized into net loss | | (288) |
| Accumulated other comprehensive income at December 31, 2019 | | 23 |
| Reclassification of net gains on cash flow hedges realized into net loss | | (22) |
| Currency translation adjustment | | (19) |
| Accumulated other comprehensive loss at December 31, 2020 | $ | (18) |

*Hamlet JV*

The capital of the Hamlet JV is divided into two classifications: (1) Class A Units and (2) Class B Units, issued at a price of $1.00 per unit for each class.

*Class A Units - Noncontrolling Interests*

Class A Units were issued to John Hancock in exchange for capital contributions at a price of $1.00 for each Class A Unit.

John Hancock had a total capital commitment of $235.2 million and, as of December 31, 2020, John Hancock held 227.0 million Class A Units with a remaining capital commitment amount of $8.2 million.

*Class B Units - Controlling Interests*

Class B Units were issued to the Partnership in exchange for capital contributions at a price of $1.00 for each Class B Unit.

The Partnership had a total capital commitment of $232.2 million and, as of December 31, 2020, the Partnership held 224.0 million Class B Units with a remaining commitment amount of $8.2 million.

Pursuant to the limited liability company agreement of the Hamlet JV (the "Hamlet JV LLCA"), we are the managing member of the Hamlet JV and have the authority to manage the business and affairs of the Hamlet JV and take actions on its behalf, including adopting annual budgets, entering into agreements, effecting asset sales or biomass purchase agreements, making capital calls, incurring debt and taking other actions, subject to consent of John Hancock in certain circumstances. The Hamlet JV LLCA also sets forth the capital commitments and limitations thereon from each of the members and provides for the allocation of sale proceeds and distributions among the holders of outstanding Class A Units and Class B Units.

We included all accounts of the Hamlet JV in our consolidated results as of April 2, 2019 as the Class B Units represent a controlling interest in the Hamlet JV.

A0741

Table of Contents

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

*Distribution Rights*

Distributions to John Hancock and to the Partnership are made in the reasonable discretion of the Partnership as managing member and are governed by the waterfall provisions of the Hamlet JV LLCA, which provides that distributions, after repayment of revolving borrowings under the Hamlet JV Revolver, are to be made as follows:

• First: To the members in proportion to their relative unreturned capital contributions, then to the members in proportion to their relative unpaid preference amount.

• Thereafter: 25% to John Hancock and 75% to the Partnership.

*Wilmington Drop-Down*

Wilmington was a wholly owned subsidiary of the Hamlet JV prior to the consummation of the Wilmington Drop-Down. Our consolidated financial statements for the periods prior to October 2, 2017, were retrospectively recast to include the financial results of Wilmington as if the consummation of the Wilmington Drop-Down had occurred on May 15, 2013, the date Wilmington was originally organized. The interests of the Hamlet JV's third-party investors in Wilmington for periods prior to the related drop-down transactions have been reflected as a non-controlling interest in our financial statements. Our consolidated statements of operations for the years ended December 31, 2020, 2019 and 2018 contained no noncontrolling interests in Wilmington.

**(18) Equity-Based Awards**

*Long-Term Incentive Plan*

The General Partner maintains the LTIP, which provides for the grant, from time to time, at the discretion of the board of directors of the General Partner or a committee thereof, of unit options, unit appreciation rights, restricted units, phantom units, DERs and other awards. The LTIP limits the number of common units that may be delivered pursuant to awards under the plan to 3,450,000 common units in accordance with the second amendment to the LTIP, which became effective on January 27, 2021. If equity awards granted under the LTIP are forfeited, canceled, exercised, paid in cash or otherwise terminate or expire without the actual delivery of the underlying common units, the corresponding number of such common units will remain available for delivery pursuant to other awards under the LTIP. The common units issuable pursuant to the LTIP will consist, in whole or in part, of common units acquired in the open market or from any affiliate or any other person, newly issued common units or any combination of the foregoing as determined by the board of directors of the General Partner or a committee thereof.

During 2020, 2019 and 2018, the board of directors of the General Partner granted phantom units in tandem with corresponding DERs to employees of Enviva Management Company who provide services to us (the "Affiliate Grants") and phantom units in tandem with corresponding DERs to independent directors of the General Partner (the "Director Grants"). The phantom units and corresponding DERs are subject to certain vesting and forfeiture provisions. Award recipients do not have all of the rights of a common unitholder with respect to the phantom units until the phantom units have vested and been settled. Awards of the phantom units settled in common units are settled within 60 days after the applicable vesting date. If a phantom unit award recipient experiences a termination of service under certain circumstances set forth in the applicable award agreement, the unvested phantom units and corresponding DERs (in the case of performance-based Affiliate Grants) are forfeited. Forfeitures are recognized when the actual forfeiture occurs.

97

A0742

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

Notes to Consolidated Financial Statements (Continued)

(In thousands, except number of units, per unit amounts and unless otherwise noted)

*Affiliate Grants*

A summary of the Affiliate Grants for the years ended December 31, 2020, 2019 and 2018 is as follows:

| | Time-Based Phantom Units | | Performance-Based Phantom Units | | Total Affiliate Grant Phantom Units | |
|---|---|---|---|---|---|---|
| | Units | Weighted-Average Grant Date Fair Value (per unit)(1) | Units | Weighted-Average Grant Date Fair Value (per unit)(1) | Units | Weighted-Average Grant Date Fair Value (per unit)(1) |
| Nonvested December 31, 2017 | 595,866 | $ 22.32 | 111,104 | $ 25.52 | 706,970 | $ 22.82 |
| Granted | 398,729 | $ 29.15 | 171,104 | $ 28.92 | 569,833 | $ 29.08 |
| Adjusted | — | $ — | 19,832 | $ 18.19 | 19,832 | $ 18.19 |
| Forfeitures | (89,119) | $ 25.59 | (17,469) | $ 25.76 | (106,588) | $ 25.62 |
| Vested | (181,536) | $ 21.42 | (45,059) | $ 23.80 | (226,595) | $ 21.89 |
| Nonvested December 31, 2018 | 723,940 | $ 25.91 | 239,512 | $ 27.65 | 963,452 | $ 26.34 |
| Granted | 395,851 | $ 30.41 | 219,943 | $ 30.28 | 615,794 | $ 30.36 |
| Forfeitures | (99,999) | $ 28.56 | (24,185) | $ 29.82 | (124,184) | $ 28.80 |
| Vested | (145,506) | $ 18.30 | — | $ — | (145,506) | $ 18.30 |
| Nonvested December 31, 2019 | 874,286 | $ 28.90 | 435,270 | $ 28.84 | 1,309,556 | $ 28.88 |
| Granted | 552,988 | $ 37.98 | 387,060 | $ 38.02 | 940,048 | $ 38.00 |
| Forfeitures | (133,273) | $ 33.15 | (105,935) | $ 30.89 | (239,208) | $ 32.15 |
| Vested | (232,116) | $ 26.97 | (67,881) | $ 28.03 | (299,997) | $ 27.21 |
| Nonvested December 31, 2020 | 1,061,885 | $ 33.52 | 648,514 | $ 34.07 | 1,710,399 | $ 33.73 |

_____

(1)     Determined by dividing the aggregate grant date fair value of awards by the number of awards issued.

Time-based Affiliate Grants vest on the third or fourth anniversary of the grant date and performance-based Affiliate Grants vest in three or four years, where the number of units that vest depend on achievement of specific performance milestones. We account for the delivery of common units upon the settlement of vested Affiliate Grants as if such common units were distributed by us. The fair value of the Affiliate Grants granted during 2020 and 2019 was $35.7 million and $18.7 million, respectively, based on the market price per unit on the applicable date of grant. The grant date fair value of performance-based Affiliate Grants is reported based on the probable outcome of the performance conditions on the grant date. The fair value of the Affiliate Grants is expensed by Enviva Management Company at the grant date. Compensation expense is based on the grant date fair value. Changes in unit-based compensation expense due to passage of time, forfeitures, probability of meeting required performance conditions and final settlements are recorded as adjustments to unit-based compensation expense and partners' capital. For performance-based Affiliate Grants, expense is accrued only to the extent that the performance goals are considered to be probable of occurring.

Enviva Management Company recognizes unit-based compensation expense for the units awarded and a portion of that expense is allocated to us under the MSAs in the same manner as other corporate expenses. Our portion of the unit-based compensation expense is included in cost of goods sold and general and administrative expenses. We recognized $10.3 million, $5.0 million and $4.7 million of general and administrative expense associated with the Affiliate Grants during the years ended December 31, 2020, 2019 and 2018, respectively. As performance goals were met during 2018, no unit-based compensation with respect to performance-based Affiliate Grants expense was adjusted.

We paid $5.0 million to Enviva Management Company to satisfy the withholding tax requirements associated with 232,116 time-based Affiliate Grants and 67,881 performance-based Affiliate Grants that vested under the LTIP during the year ended December 31, 2020. We paid $1.9 million to Enviva Management Company to satisfy the withholding tax requirements associated with 145,506 time-based Affiliate Grants that vested under the LTIP during the year ended December 31, 2019. No performance-based Affiliate Grants vested under the LTIP during the year ended December 31, 2019. The unrecognized estimated unit-based compensation cost relating to outstanding Affiliate Grants at December 31, 2020 was $14.1 million, which will be recognized over the remaining vesting period.

A0743

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

Notes to Consolidated Financial Statements (Continued)

(In thousands, except number of units, per unit amounts and unless otherwise noted)

*Director Grants*

A summary of the Director Grant unit awards subject to vesting for the years ended December 31, 2020, 2019 and 2018, is as follows:

| | Time-Based Phantom Units | |
| --- | --- | --- |
| | Units | Weighted-Average Grant Date Fair Value (per unit)(1) |
| Nonvested December 31, 2017 | 15,840 | $ 25.25 |
| Granted | 13,964 | $ 28.65 |
| Vested | (15,840) | $ 25.25 |
| Nonvested December 31, 2018 | 13,964 | $ 28.65 |
| Granted | 13,264 | $ 30.16 |
| Vested | (13,964) | $ 28.65 |
| Nonvested December 31, 2019 | 13,264 | $ 30.16 |
| Granted | 14,987 | $ 38.37 |
| Vested | (13,264) | $ 30.16 |
| Nonvested December 31, 2020 | 14,987 | $ 38.37 |

---

(1)    Determined by dividing the aggregate grant date fair value of awards by the number of awards issued.

In January and August 2020, Director Grants valued at $0.5 million and $0.1 million were granted, which vest on the first anniversary of the grant dates, in January and August 2021, respectively. In January 2019, Director Grants valued at $0.4 million were granted. which vested on the first anniversary of the grant date in January 2020. In January 2021, the Director Grants that were unvested at December 31, 2020 vested and common units were issued in respect thereof.

During the year ended December 31, 2018, 420 common units were granted and issued to independent directors of the General Partner as compensation for services performed on the General Partner's board of directors. No common units were granted during the years ended December 31, 2020 and 2019.

For the year ended December 31, 2020, we recorded $0.5 million of unit-based compensation expense with respect to the Director Grants. For each of the years ended December 31, 2019 and 2018, we recorded $0.4 million of unit-based compensation expense with respect to the Director Grants. The unrecognized estimated unit-based compensation cost relating to outstanding Director Grants at December 31, 2020 is $0.1 million and will be recognized over the remaining vesting period.

*Distribution Equivalent Rights*

DERs associated with the Affiliate Grants and the Director Grants subject to time-based vesting entitle the recipients to receive payments in respect thereof in a per-unit amount that is equal to any distributions made by us to the holders of common units within 60 days following the record date for such distributions. The DERs associated with the Affiliate Grants subject to performance-based vesting will remain outstanding and unpaid from the grant date until the earlier of the settlement or forfeiture of the related performance-based phantom units.

DER distributions paid related to time-based Affiliate Grants were $3.9 million, $2.7 million and $1.8 million, respectively, for the years ended December 31, 2020, 2019 and 2018. At December 31, 2020, there were no DER distributions unpaid related to time-based Affiliate Grants. At December 31, 2019, $0.6 million of DER distributions unpaid related to time-based Affiliate Grants were included in related-party payables.

A0744

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

Notes to Consolidated Financial Statements (Continued)

(In thousands, except number of units, per unit amounts and unless otherwise noted)

DER distributions unpaid related to the performance-based Affiliate Grants were as follows as of December 31:

|  | 2020 | 2019 |
|---|---|---|
| Accrued liabilities | $ 1,697 | $ 397 |
| Other long-term liabilities | 2,942 | 1,193 |
| Total unpaid DERs related to performance-based Affiliate Grants | $ 4,639 | $ 1,590 |

**(19) Net Income (Loss) per Limited Partner Unit**

Net income (loss) per unit applicable to limited partners is computed by dividing limited partners' interest in net income (loss), after deducting any incentive distributions, by the weighted-average number of outstanding units. Our net income (loss) is allocated to the limited partners in accordance with their respective ownership percentages, after giving effect to priority income allocations for incentive distributions, if any, to the holder of the IDRs, which are declared and paid following the close of each quarter. Earnings in excess of distributions are allocated to the limited partners based on their respective ownership interests. Payments made to our unitholders are determined in relation to actual distributions declared and are not based on the net income (loss) allocations used in the calculation of earnings per unit.

On May 30, 2018, the requirements under our partnership agreement for the conversion of all of our subordinated units into common units were satisfied and the subordination period for such subordinated units ended. As a result, all of our 11,905,138 outstanding subordinated units converted into common units on a one-for-one basis. The conversion did not impact the amount of the cash distribution paid or the total number of our outstanding units representing limited partner interests. Our net income (loss) was allocated to the General Partner and the limited partners, including the holders of the subordinated units and IDR holders, in accordance with our partnership agreement.

In addition to the common units, we have identified the IDRs and phantom units as participating securities and apply the two-class method when calculating the net income (loss) per unit applicable to limited partners, which is based on the weighted-average number of common units and subordinated units outstanding during the period. Diluted net income per unit includes the effects of potentially dilutive time-based and performance-based phantom units on our common units. Basic and diluted earnings per unit that previously was applicable to subordinated limited partners was the same because there were no potentially dilutive subordinated units outstanding.

The computation of net income (loss) available per limited partner unit is as follows for the years ended December 31:

|  | 2020 | 2019 | 2018 |
|---|---|---|---|
| Enviva Partners, LP limited partners' interest in net income (loss) | $ 13,624 | $ (5,822) | $ 6,952 |
| Less: Distributions declared on: |  |  |  |
| Common units | $ 115,318 | $ 88,761 | $ 54,604 |
| Subordinated units through end of subordination period | — | — | 12,407 |
| IDRs | 26,917 | 11,439 | 5,867 |
| Total distributions declared | 142,235 | 100,200 | 72,878 |
| Earnings less than distributions | $ (128,611) | $ (106,022) | $ (65,926) |

Basic and diluted net (loss) income per limited partner unit is as follows:

| Year Ended December 31, 2020 | Common Units | General Partner |
|---|---|---|
| Weighted-average common units outstanding—basic | 36,813 | — |
| Effect of nonvested phantom units | — | — |
| Weighted-average common units outstanding—diluted | 36,813 | — |

100

A0745

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

Notes to Consolidated Financial Statements (Continued)

(In thousands, except number of units, per unit amounts and unless otherwise noted)

| Year Ended December 31, 2020 | | Common Units | | General Partner | | Total |
|---|---|---|---|---|---|---|
| Distributions declared | $ | 115,318 | $ | 26,917 | $ | 142,235 |
| Earnings less than distributions | | (128,611) | | — | | (128,611) |
| Net (loss) income available to partners | $ | (13,293) | $ | 26,917 | $ | 13,624 |
| Weighted-average units outstanding—basic and diluted | | 36,813 | | | | |
| Net loss per limited partner unit—basic and diluted | $ | (0.36) | | | | |

| Year Ended December 31, 2019 | Common Units | General Partner |
|---|---|---|
| Weighted-average common units outstanding—basic | 31,791 | — |
| Effect of nonvested phantom units | — | — |
| Weighted-average common units outstanding—diluted | 31,791 | — |

| Year Ended December 31, 2019 | | Common Units | | General Partner | | Total |
|---|---|---|---|---|---|---|
| Distributions declared | $ | 88,761 | $ | 11,439 | $ | 100,200 |
| Earnings less than distributions | | (106,022) | | — | | (106,022) |
| Net (loss) income available to partners | $ | (17,261) | $ | 11,439 | $ | (5,822) |
| Weighted-average units outstanding—basic and diluted | | 31,791 | | | | |
| Net loss per limited partner unit—basic and diluted | $ | (0.54) | | | | |

| Year Ended December 31, 2018 | Common Units | Subordinated Units | General Partner |
|---|---|---|---|
| Weighted-average common units outstanding—basic | 21,533 | 4,893 | — |
| Effect of nonvested phantom units | 1,020 | — | — |
| Weighted-average common units outstanding—diluted | 22,553 | 4,893 | — |

| Year Ended December 31, 2018 | | Common Units | | Subordinated Units | | General Partner | | Total |
|---|---|---|---|---|---|---|---|---|
| Distributions declared | $ | 54,604 | $ | 12,407 | $ | 5,867 | $ | 72,878 |
| Earnings less than distributions | | (53,720) | | (12,206) | | — | | (65,926) |
| Net income available to partners | $ | 884 | $ | 201 | $ | 5,867 | $ | 6,952 |
| Weighted-average units outstanding—basic and diluted | | 21,533 | | 4,893 | | | | |
| Net income per limited partner unit—basic and diluted | $ | 0.04 | $ | 0.04 | | | | |

**(20) Commitments and Contingencies**

*Commitments*

We have entered into throughput agreements expiring between 2023 and 2028 to receive terminal and stevedoring services at certain of our terminals, some of which include options to extend for up to 5 years. The agreements specify a minimum cargo throughput requirement at a fixed price per ton or a fixed fee, subject to an adjustment based on the consumer price index or the producer price index, for a defined period of time, ranging from monthly to annually. At December 31, 2020, we had approximately $22.8 million related to firm commitments under such terminal and stevedoring services agreements. For the years ended December 31, 2020, 2019 and 2018, terminal and stevedoring services expenses were $9.7 million, $11.3 million and $9.8 million, respectively.

We have entered into long-term arrangements to secure transportation from our plants to our export terminals. Under certain of these agreements, which expire between 2023 through 2026, we are committed to various annual minimum volumes under

101

A0746

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

Notes to Consolidated Financial Statements (Continued)

(In thousands, except number of units, per unit amounts and unless otherwise noted)

multi-year fixed-cost contracts with third-party logistics providers for trucking and rail transportation, subject to increases in the consumer price index and certain fuel price adjustments. For the years ended December 31, 2020, 2019 and 2018, ground transportation expenses were $30.7 million, $25.5 million and $29.8 million, respectively.

We have entered into long-term supply arrangements, expiring between 2021 through 2026, to secure the supply of wood pellets from third-party vendors and related parties. The minimum annual purchase volumes are at a fixed price per MT adjusted for volume, pellet quality and certain shipping-related charges. The supply agreements for the purchase of 1,080,000 MT of wood pellets from British Columbia are fully offset by an agreement to sell 1,080,000 MT of wood pellets to the same counterparty from our terminal locations, where $237.5 million remains to be sold as of December 31, 2020. Under long-term supply arrangements, we purchased approximately $43.2 million, $51.6 million and $29.5 million of wood pellets for the years ended December 31, 2020, 2019 and 2018, respectively.

Fixed and determinable portions of the minimum aggregate future payments under these firm terminal and stevedoring services, ground transportation and wood pellet supply agreements for the next five years are as follows:

| | | |
|---|---|---|
| 2021 | $ | 142,383 |
| 2022 | | 119,881 |
| 2023 | | 112,633 |
| 2024 | | 83,182 |
| 2025 | | 41,673 |
| Total | $ | 499,752 |

In order to mitigate volatility in our shipping costs, we have entered into fixed-price shipping contracts with reputable shippers matching the terms and volumes of certain of our off-take contracts for which we are responsible for arranging shipping. Contracts with shippers, expiring between 2021 through 2039, include provisions as to the minimum amount of MTPY to be shipped and may also stipulate the number of shipments. Pursuant to these contracts, the terms of which extend up to seventeen years, charges are based on a fixed-price per MT and, in some cases, there are adjustment provisions for increases in the price of fuel or for other distribution-related costs. The charge per MT varies depending on the loading and discharge port. Shipping expenses included in cost of goods sold was $75.0 million for the year ended December 31, 2020 and $64.1 million for each of the years ended December 31, 2019 and 2018.

A0747

**ITEM 9.   CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

103

A0748

**ITEM 9A.    CONTROLS AND PROCEDURES**

*Disclosure Controls and Procedures*

An evaluation of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13(a)-15(e) and 15(d)-15(e) under the Exchange Act) was carried out under the supervision and with the participation of management, including the Chief Executive Officer and Chief Financial Officer of our General Partner. Our disclosure controls and procedures are designed to provide reasonable assurance that the information required to be disclosed by us in reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure and is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC. Based on their evaluation, the Chief Executive Officer and Chief Financial Officer of our General Partner concluded that the design and operation of our disclosure controls and procedures were effective as of December 31, 2020, the end of the period covered by this Annual Report.

*Internal Control over Financial Reporting*

*Management's Annual Report on Internal Control over Financial Reporting*

The management of our General Partner is responsible for establishing and maintaining adequate internal control over financial reporting for us as defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act. Under the supervision of, and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework and criteria established in *Internal Control—Integrated Framework* in 2013, issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, management of our General Partner concluded that our internal control over financial reporting was effective as of December 31, 2020. The effectiveness of our internal control over financial reporting as of December 31, 2020 has been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in their report which is included in Part II, Item 8. "Financial Statements and Supplementary Data of this report."

*Inherent Limitations on Effectiveness of Controls*

Control systems, no matter how well conceived and operated, are designed to provide a reasonable, but not an absolute, level of assurance that the objectives of the control system are met. Further, the design of a control system must reflect the fact that there are resource constraints and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected. Because of the inherent limitations in any control system, misstatements due to error or fraud may occur and not be detected.

*Changes in Internal Control over Financial Reporting*

There were no changes in our internal control over financial reporting (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) that occurred during the three months ended December 31, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

We acquired Georgia Biomass Holding, LLC and Enviva Pellets Greenwood Holdings II, LLC during the year ended December 31, 2020, as described in Notes 3 and 4 to our consolidated financial statements included in this Annual Report on Form 10-K. The acquired businesses are included in our 2020 consolidated financial statements and together constituted approximately 23% and 2% of total assets and net assets, respectively, as of December 31, 2020 and 5% of revenues for the year then ended. We are in the process of evaluating the existing controls and procedures of the acquired businesses and are implementing our internal control structure over these acquired businesses. In accordance with SEC guidance permitting the exclusion of an acquired business from management's assessment of the effectiveness of internal control over financial reporting for the year in which the acquisition is completed, we have excluded the acquired businesses from the assessment of the effectiveness of internal control over financial reporting as of December 31, 2020. The acquired businesses will be included in the assessment of the effectiveness of internal control over financial reporting as of December 31, 2021.

*Indemnification for Consent from Predecessor Independent Registered Public Accounting Firm*

We have agreed to indemnify and hold KPMG LLP (KPMG) harmless against and from any and all legal costs and expenses incurred by KPMG in successful defense of any legal action or proceeding that arises as a result of KPMG's consent to the incorporation by reference of KPMG's audit report on the Partnership's financial statements incorporated by reference into the Partnership's registration statements on Form S-8 (File No. 333-236150 and 333-203756) and Form S-3 (333-232247).

A0749

**Report of Independent Registered Public Accounting Firm**

To the Unitholders and the Board of Directors of Enviva Partners, LP

**Opinion on Internal Control Over Financial Reporting**

We have audited Enviva Partners, LP and subsidiaries' internal control over financial reporting as of December 31, 2020, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, Enviva Partners, LP and subsidiaries (the Partnership) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2020, based on the COSO criteria.

As indicated in the accompanying Management's Annual Report on Internal Control Over Financial Reporting, management's assessment of and conclusion on the effectiveness of internal control over financial reporting did not include the internal controls of Georgia Biomass Holding, LLC and Enviva Pellets Greenwood Holdings II, LLC, which are included in the 2020 consolidated financial statements of the Partnership and together constituted approximately 23% and 2% of total assets and net assets, respectively, as of December 31, 2020 and 5% of revenues for the year then ended. Our audit of internal control over financial reporting of the Partnership also did not include an evaluation of the internal control over financial reporting of Georgia Biomass Holding, LLC and Enviva Pellets Greenwood Holdings II, LLC.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of Enviva Partners, LP and subsidiaries as of December 31, 2020 and 2019, the related consolidated statements of operations, comprehensive (loss) income, changes in partners' capital and cash flows for each of the two years in the period ended December 31, 2020, and the related notes (collectively referred to as the "consolidated financial statements") and our report dated February 25, 2021 expressed an unqualified opinion thereon.

**Basis for Opinion**

Management of the Partnership's General Partner is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Partnership's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Partnership in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

A0750

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP

Tysons, Virginia

February 25, 2021

106

A0751

**ITEM 9B.   OTHER INFORMATION**

None.

A0752

**PART III**

**ITEM 10.    DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

We are managed and operated by the board of directors and executive officers of our General Partner. Our unitholders are not entitled to elect our General Partner's directors or otherwise directly participate in our management or operations. Our General Partner owes certain contractual duties to our unitholders as well as a fiduciary duty to its owners.

As a result of owning our General Partner, our sponsor has the right to appoint all members of the board of directors of our General Partner (our "Board"). In evaluating director candidates, our sponsor will assess whether a candidate possesses the integrity, judgment, knowledge, experience, skill and expertise that are likely to enhance the Board's ability to manage and direct our affairs and business, including, when applicable, to enhance the ability of committees of the Board to fulfill their duties.

The Board has ten directors, including five directors meeting the independence standards established by the New York Stock Exchange (the "NYSE") and the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Board met nine times during 2020.

All of the executive officers of our General Partner listed below allocate their time between managing the business and affairs of us and our sponsor. The amount of time that our executive officers devote to our business and the business of our sponsor varies in any given year based on a variety of factors. Our executive officers devote as much time to the management of our business as is necessary for the proper conduct of our business and affairs.

We incur general and administrative costs related to our management services agreements ("MSAs") with Enviva Management Company, LLC, a wholly owned subsidiary of our sponsor (together with its affiliates that provide services to us, as applicable, "Enviva Management Company") that cover the corporate salary and overhead expenses associated with our business. If the MSAs were terminated without replacement, or our General Partner or its affiliates provided services outside of the scope of the MSAs, our partnership agreement would require us to reimburse our General Partner and its affiliates, including our sponsor, for all expenses incurred and payments made on our behalf.

**Executive Officers and Directors of Our General Partner**

The following table shows information for the executive officers and directors of our General Partner. As the owner of our General Partner, our sponsor appoints all members of the Board. Directors hold office until their successors have been appointed or qualified or until the earlier of their death, resignation, removal or disqualification. Executive officers are appointed by and serve at the discretion of the Board. Our corporate governance guidelines to provide that, unless the Board determines otherwise, a non-employee director shall retire from service on the Board effective as of the last day of the fiscal year in which the director has turned 80, provided that the Chairman of the Board may, in his or her sole discretion, waive this requirement for an individual director for up to two years. In 2020, William K. Reilly, one of our independent directors, was granted a one-year waiver pursuant to the guidelines.

There are no family relationships among any of our directors or executive officers. One of our directors and all of our executive officers also serve as executive officers of our sponsor.

A0753

| Name of Beneficial Owner | Age | Position With Our General Partner |
|---|---|---|
| John K. Keppler | 50 | Chairman, President and Chief Executive Officer |
| Shai S. Even | 52 | Executive Vice President and Chief Financial Officer |
| William H. Schmidt, Jr. | 48 | Executive Vice President, Corporate Development and General Counsel |
| Thomas Meth | 48 | Executive Vice President, Sales and Marketing |
| E. Royal Smith | 48 | Executive Vice President, Operations |
| Joseph N. Lane | 40 | Executive Vice President, Human Capital |
| Yanina A. Kravtsova | 44 | Executive Vice President, Communications, Public and Environmental Affairs |
| Ralph Alexander | 65 | Director |
| John C. Bumgarner, Jr. | 78 | Director |
| Jim H. Derryberry | 76 | Director |
| Christopher B. Hunt | 57 | Director |
| Gerrit "Gerrity" L. Lansing, Jr. | 48 | Director |
| William K. Reilly | 81 | Director |
| Jeffrey W. Ubben | 59 | Director |
| Gary L. Whitlock | 71 | Director |
| Janet S. Wong | 62 | Director |

*John K. Keppler.* Mr. Keppler has served as Chairman of the board of directors and President and Chief Executive Officer of our General Partner since our inception in November 2013. Mr. Keppler co-founded Intrinergy, the predecessor to our sponsor, in 2004. From 2002 to 2004, Mr. Keppler was the Director of Corporate Strategy in the Office of the Vice Chairman with America Online and, prior to that, he was Senior Manager, Business Affairs and Development with America Online from 2001 to 2002. Mr. Keppler holds a B.A. in political economy from the University of California, Berkeley, as well as an MBA from The Darden Graduate School of Business Administration at The University of Virginia. Over the course of Mr. Keppler's career, he has gained extensive experience growing innovative ideas into successful businesses across a broad range of industries and has developed a wealth of experience in business strategy and operations and a keen knowledge of the renewable energy sector. For the past fifteen years, Mr. Keppler has been responsible for setting our strategic direction and leading our growth from a start-up company to the world's leading producer of wood biomass fuels. In light of this experience, we believe that he has the requisite set of skills to serve as a director, as well as Chairman, President and Chief Executive Officer.

*Shai S. Even.* Mr. Even has served as Executive Vice President and Chief Financial Officer of our General Partner since June 2018. In this role, Mr. Even leads Enviva's finance, accounting and information technology organizations and provides strategic leadership on finance matters. He has over 25 years of experience with operational and strategic finance, including in senior financial and management roles at master limited partnerships. Most recently, Mr. Even served as Senior Vice President and Chief Financial Officer of Alon USA Energy, Inc. and served as President and Chief Financial Officer of Alon USA Partners, LP. While at Alon, Mr. Even led Alon's parent company's successful IPO on the NYSE in 2005 and the successful IPO of Alon's master limited partnership in 2012. During his tenure at Alon, he led the company's two major acquisitions and scaled its finance organization to complement the growth of the company. Prior to joining Alon, Mr. Even served as the Chief Financial Officer of DCL Group in Tel Aviv, Israel, and as an auditor with KPMG. Mr. Even holds a bachelor's degree in Economics and Accounting from Bar-Ilan University and is a certified public accountant.

*William H. Schmidt, Jr.* Mr. Schmidt has served as Executive Vice President, Corporate Development and General Counsel of our General Partner since February 2018 and, prior to that, as Executive Vice President, General Counsel and Secretary since our inception in November 2013. He also has served as Executive Vice President, Corporate Development and General Counsel of our sponsor's general partner since February 2018 and, prior to that, as Executive Vice President, General Counsel and Secretary since March 2013. Mr. Schmidt also serves as President and General Counsel of Enviva Development Holdings, LLC, our sponsor's development company. In these capacities, Mr. Schmidt is responsible for our and our sponsor's corporate development activities and legal affairs. Prior to joining Enviva, Mr. Schmidt was Senior Vice President and General Counsel of Buckeye GP LLC, the general partner of Buckeye Partners, L.P., a diversified master limited partnership. Mr. Schmidt also was President of Lodi Gas Storage, L.L.C., a subsidiary of Buckeye Partners, L.P., from August 2009 to January 2012. Prior to joining Buckeye in September 2004, Mr. Schmidt practiced law at Chadbourne & Parke LLP, an international law firm that subsequently merged with Norton Rose Fulbright.

*Thomas Meth.* Mr. Meth has served as Executive Vice President, Sales and Marketing of our General Partner since our inception in November 2013. He was also a co-founder of Intrinergy. Mr. Meth is responsible for our commercial customer

109

relations as well as our market development, customer fulfillment and shipping initiatives. Prior to Intrinergy, Mr. Meth was Head of Sales and Marketing in Europe, the Middle East and Africa for the Colfax Corporation from 2002 to 2004. From 1993 to 2000, Mr. Meth was Director of Sales for Europay Austria, a consumer financial services company that offered MasterCard, Maestro and Electronic Purse services. Mr. Meth holds a bachelor of commerce from Vienna University of Economics and Business Administration in Austria as well as an MBA from The Darden Graduate School of Business Administration at The University of Virginia. Mr. Meth was an executive officer of Intrinergy Deutschland Management GmbH ("IDM") and Enviva Pellets GmbH and Co. KG ("EPD"), which were engaged in pellet manufacturing in Germany unrelated to our core business. Our predecessor distributed its indirect interests in IDM and EPD to our sponsor as part of the reorganization in connection with our IPO.

*E. Royal Smith.* Mr. Smith has served as Executive Vice President, Operations of our General Partner and our sponsor since August 2016 and prior to that as Vice President, Operations since April 2014. Previously, he served as Director of Operations, NAA Division of Guilford Performance Textiles, a global textile manufacturing company, from March 2012 to July 2014. From August 2010 to March 2012, Mr. Smith also served as Director of Quality, NAA Division. Prior to joining Guilford, Mr. Smith worked as a Plant Manager at Pactiv, a food packaging manufacturer, from May 2009 to August 2010. Mr. Smith served as General Manager of a facility operated by United Plastics Group International from December 2005 to May 2009, after serving in other roles at the company from April 2002. From January 1999 to September 1999, he served as Production Supervisor of The General Motors Corporation, before serving as Mechanical Device/Tool and Die Supervisor from September 1999 to August 2000. Mr. Smith holds a B.S. in Mechanical Engineering from GMI Engineering and Management Institute.

*Joseph N. Lane.* Mr. Lane has served as Executive Vice President of Human Capital of our General Partner and our sponsor since March 2018. Previously, Mr. Lane was Vice President, Human Resources of Asia Pacific of Milliken & Company since 2015, after holding roles with progressively more responsibility since joining the company in 2001. Over the course of Mr. Lane's career, he has gained a wealth of valuable experience dealing with talent-related matters associated with scaling organizations, mergers and acquisitions activity, industrial manufacturing and international operations. Mr. Lane received a Bachelor of Science in Business Administration with an emphasis in Human Resources Management from Clemson University in 2003 as well as an MBA from the Babcock Graduate School of Business Administration at Wake Forest University in 2009. He holds the SHRM certification for Senior HR Professionals (SPHR-CP).

*Yanina A. Kravtsova.* Ms. Kravtsova has served as Executive Vice President, Communications, Public & Environmental Affairs of our General Partner since December 2019 and, prior to that, as Vice President, Environmental Affairs and Chief Compliance Officer from October 2018. In her current role, Ms. Kravtsova leads the teams responsible for media, governmental and community relations, as well as environmental permitting of our facilities. Ms. Kravtsova brings to Enviva over 20 years of leadership and senior management experience in the renewable energy and power sector. Prior to joining Enviva, Ms. Kravtsova served as Senior Vice President, General Counsel and Secretary of Terraform Global, Inc. from February 2015. Ms. Kravtsova was also Legal Head of Renewable Energy Investments at Google Inc. from August 2011 to January 2015. Ms. Kravtsova practiced law at Clifford Chance U.S. LLP, Latham & Watkins LLP and The World Bank Group, handling international project finance, regulatory and corporate matters for energy projects.

*Ralph Alexander.* Mr. Alexander has served as director on the Board since our inception in November 2013. Mr. Alexander has served as the Chairman of the Board and CEO of Talen Energy since December 2016. He became affiliated with Riverstone Holdings LLC in September 2007. For nearly 25 years, Mr. Alexander served in various positions with subsidiaries and affiliates of BP plc, one of the world's largest oil and gas companies. From June 2004 until December 2006, he served as Chief Executive Officer of Innovene, BP's $20 billion olefins and derivatives subsidiary. From 2001 until June 2004, he served as Chief Executive Officer of BP's Gas, Power and Renewables and Solar segment and was a member of the BP group executive committee. Prior to that, Mr. Alexander served as a Group Vice President in BP's Exploration and Production segment and BP's Refinery and Marketing segment. He held responsibilities for various regions of the world, including North America, Russia, the Caspian, Africa, and Latin America. Prior to these positions, Mr. Alexander held various positions in the upstream, downstream and finance groups of BP. Mr. Alexander has served on the board of Talen Energy Corporation since June 2015. From December 2014 through December 2016, Mr. Alexander served on the board of EP Energy Corporation. He has previously served on the boards of Foster Wheeler, Stein Mart, Inc., Amyris and Anglo-American plc. Mr. Alexander holds an M.S. in Nuclear Engineering from Brooklyn Polytech (now NYU School of Engineering—Polytechnic) and an M.S. in Management Science from Stanford University.

*John C. Bumgarner, Jr.* Mr. Bumgarner has served as a director on the Board since April 2015. Mr. Bumgarner has been engaged in private investment since November 2002, and currently assists in operating a family-owned, multi-faceted real estate company. Mr. Bumgarner previously served as Co-Chief Operating Officer and President of Strategic Investments for Williams Communications Group, Inc., a high technology company, from May 2001 to November 2002. Mr. Bumgarner joined

110

The Williams Companies, Inc., in 1977 and, prior to working at Williams Communications Group, Inc., served as Senior Vice President of Williams Companies Corporate Development and Planning, President of Williams International Company and President of Williams Real Estate Company. He most recently served as a director of Energy Partners, Ltd., an oil and natural gas exploration and production company, from January 2000 to February 2009, and at Market Planning Solutions Inc. from February 1982 until April 2011. Mr. Bumgarner holds a B.S. from the University of Kansas and an M.B.A. from Stanford University. Mr. Bumgarner's substantial experience as an executive at a conglomerate and as a director on boards of public and private companies engaged in a variety of industries provide him with unique insight that is particularly helpful and valuable to the Board.

*Jim H. Derryberry*. Mr. Derryberry has served as a director on the Board since July 2018. Mr. Derryberry served as a director of USA Compression GP, LLC from January 2013 to April 2018. He is currently a special advisor for Riverstone Holdings LLC where he held the office of Chief Operating Officer and Chief Financial Officer until 2006. Prior to joining Riverstone, Mr. Derryberry was a managing director of J.P. Morgan where he was head of the Natural Resources and Power Group. He had previously served in the Goldman Sachs Global Energy and Power Group where he was responsible for mergers and acquisitions, capital markets financing, and the management of relationships with major energy companies. He also served on the board of directors of Magellan GP, LLC, the general partner of Magellan Midstream Partners, L.P, from 2005-2006. Mr. Derryberry has been a member of the Board of Overseers for the Hoover Institution at Stanford University and is a member of the Engineering Advisory Board at the University of Texas at Austin. He received his B.S. and M.S. degrees in engineering from the University of Texas at Austin and earned an M.B.A. from Stanford University.

*Christopher B. Hunt.* Mr. Hunt has served as a director on the Board since April 2016. Mr. Hunt is a partner of Riverstone and joined Riverstone in 2008. In addition to serving on the boards of a number of Riverstone portfolio companies and their affiliates, he also currently serves on the board of directors of NTR Plc. Prior to joining Riverstone, Mr. Hunt ran international power development and generation businesses for BP plc and Enron Corporation. Mr. Hunt received his BA from Wesleyan University and his MBA from Columbia University. He has also completed various post-graduate programs at Harvard University, Stanford University, the Massachusetts Institute of Technology and Oxford University. Mr. Hunt brings extensive experience in the renewable energy, conventional power and natural gas industries to the Board.

*Gerrit "Gerrity" L. Lansing, Jr.* Mr. Lansing has served as a director on the Board since October 2020. Mr. Lansing is a Managing Director and Partner of BTG Pactual and Head of BTG Pactual Tangible Assets Group, which includes BTG Pactual Timberland Investment Group ("TIG"). TIG is one of the world's largest timberland investment managers with more than $3.5 billion under management and investments including more than 2.6 million acres across four continents. Mr. Lansing leads a management team at TIG with more than 800 years of combined experience and which operates in accordance with the UN Principles for Responsible Investment and with first-class sustainable forestry practices including those set forth by the Forest Stewardship Council and Programme for the Endorsement of Forest Certification, as validated by extensive independent audits. Prior to his current role, he was a Founder and Chief Executive Officer of Equator, LLC and its Brazilian subsidiary, TTG Brasil Investimentos Florestais Ltda, which was acquired by BTG Pactual in 2012. Prior to this, as Chief Executive Officer, Mr. Lansing spent nearly a decade building Madison Trading, LLC and Chatham Energy Partners, LLC (acquired by The Intercontinental Exchange). He is on the board of directors of the Nasher Museum of Art at Duke University, the Buckley School in New York City, the National Alliance of Forest Owners and La Fundación de la Universidad del Valle de Guatemala. Mr. Lansing received his B.A. from Duke University.

*William K. Reilly.* Mr. Reilly has served as a director on the Board since April 2015. Mr. Reilly served as Administrator of the U.S. Environmental Protection Agency from 1989 to 1993. From October 1997 to December 2009, Mr. Reilly served as President and Chief Executive Officer of Aqua International Partners, an investment group that finances water improvements in emerging markets. He also served as Senior Advisor to TPG Capital from September 1994 to December 2016. In 2010, Mr. Reilly was appointed by President Obama as co-chair of the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling and in 2012, President Obama named Mr. Reilly to the Council for Global Development. He currently serves as a director and chair of the board committee on environment, safety, security and health of Royal Caribbean Cruises Ltd. Mr. Reilly served as a director of Conoco Inc. from 1998 until its merger with Phillips Petroleum Company in 2002, and thereafter served as a director of ConocoPhillips until May 2013. From 1993 until April 2012, Mr. Reilly also served on the board of directors of E.I. duPont de Nemours and Company and was a director of Energy Future Holdings from 2007 to 2019. He has also previously served as the first Payne Visiting Professor at Stanford University, President of the World Wildlife Fund and President of The Conservation Foundation. He is Chairman Emeritus of the World Wildlife Fund and Chairman of the Nicholas Institute for Environmental Policy Solutions at Duke University. Mr. Reilly's extensive environmental regulatory experience and his service on various other boards make him well qualified to serve as a member of the Board, and allow him to provide unique and valuable perspective on matters critical to our operations.

111

A0756

*Jeffrey W. Ubben.* Mr. Ubben is a Founder, Managing Partner, and member of the Management Committee of Inclusive Capital Partners. Mr. Ubben is a retired Founder of ValueAct Capital, where he was Chief Executive Officer, member of the Management Committee, Chief Investment Officer, and Portfolio Manager. Mr. Ubben also founded and serves as Portfolio Manager of the ValueAct Spring Fund. Prior to founding ValueAct Capital in 2000, Mr. Ubben was a Managing Partner at Blum Capital Partners for more than five years. Mr. Ubben is a director of The AES Corporation, where he is a member of the Compensation and Financial Audit Committees, AppHarvest, and Nikola Corporation. He is the former chairman and director of Martha Stewart Living Omnimedia, Inc., and a former director of Catalina Marketing Corp., Gartner Group, Inc., Mentor Corporation, Misys plc, Sara Lee Corp., Twenty-First Century Fox Inc., Valeant Pharmaceuticals International, Willis Towers Watson plc, and several other public and private companies. In addition, Mr. Ubben serves on the boards of Duke University, The Nature Conservancy's NatureVest, and the E.O. Wilson Biodiversity Foundation, and formerly served as Chair of the National Board of the Posse Foundation for nine years. He has a B.A. from Duke University and an M.B.A. from the Kellogg School of Management at Northwestern University.

*Gary L. Whitlock.* Mr. Whitlock has served as a director on the Board since April 2016. Mr. Whitlock served as Executive Vice President and Chief Financial Officer of CenterPoint Energy, Inc. ("CenterPoint") from September 2002 until April 2015. From April 2015 until his retirement on October 1, 2015, he served as Special Advisor to the Chief Executive Officer of CenterPoint. While at CenterPoint, Mr. Whitlock was responsible for accounting, treasury, risk management, tax, strategic planning, business development, emerging businesses and investor relations. From July 2001 to September 2002, Mr. Whitlock served as Executive Vice President and Chief Financial Officer of the Delivery Group of Reliant Energy, Incorporated ("Reliant"). Prior to joining Reliant, Mr. Whitlock served as Vice President of Finance and Chief Financial Officer of Dow AgroSciences LLC, a subsidiary of The Dow Chemical Company ("Dow"), from 1998 to 2001. He began his career with Dow in 1972, where he held a number of financial leadership positions, both in the United States and globally. While at Dow, Mr. Whitlock served on the boards of directors of various Dow entities. Mr. Whitlock is a Certified Public Accountant and received a BBA in accounting from Sam Houston State University in 1972. He has previously served on the board of directors of Texas Genco Holdings, Inc., the board of directors of the general partner of Enable Midstream Partners, LP from March 2013 to August 2015, the board of directors of KiOR, Inc. from December 2010 to June 2015, the board of directors of CHI St. Luke's Health System, The Woodlands, and the Leadership Cabinet of Texas Children's Hospital. Mr. Whitlock brings extensive experience in public company financial management and reporting to the Board.

*Janet S. Wong.* Ms. Wong has served as a director on the Board since April 2015. Since January 2013, Ms. Wong has served as a National Executive Advisor for Ascend, a non-profit professional organization that enables its members, corporate partners and the community to realize the leadership potential of Asians in global corporations. At Ascend, Ms. Wong has led the largest network of Asian corporate board directors and is recognized as a global thought leader on leadership and diversity issues. Currently, Ms. Wong serves on the board of Lumentum Holdings Inc., a market-leading high technology manufacturer of innovative optical and photonics products where she is a member of the Audit Committee, and the board of Allegiance Bancshares, Inc., a financial services company where she is a member of the Audit Committee and the Corporate Governance and Nominating Committee. In addition, she serves on the non-profit boards of the Computer History Museum, Louisiana Tech University Foundation and the Thirty Percent Coalition. Ms. Wong served as a Partner at Grant Thornton LLP from August 2008 through July 2012, where she was the Central Region Corporate and Partnership Services Lead Partner. In 2008, Ms. Wong retired from the partnership of KPMG, culminating a career with the global firm from 1985 through 2008, where she served as a National Industry Practice Lead Partner. Ms. Wong has extensive experience working with clients in the consumer markets, energy, financial services, manufacturing, and technology sectors. She is a Certified Public Accountant. She holds a Master of Professional Accountancy from Louisiana Tech University and a Master of Taxation from Golden Gate University. We believe Ms. Wong's audit expertise and her professional and leadership experience enable her to provide essential guidance to the Board and our management team.

**Director Independence**

The Board has five independent directors: John C. Bumgarner, Jr., William K. Reilly, Jeffrey W. Ubben, Gary L. Whitlock and Janet S. Wong. The NYSE does not require a publicly traded partnership such as ours to have a majority of independent directors on the board or to establish a compensation committee or a nominating committee. However, our General Partner is required to have an audit committee of at least three members, and all its members are required to meet the independence and experience standards established by the NYSE and the Exchange Act.

**Committees of the Board of Directors**

The Board has three standing committees: an audit committee, a compensation committee and a health, safety, sustainability and environmental committee. The Board may also form a conflicts committee from time to time.

112

*Audit Committee*

We are required to have an audit committee of at least three members, and all the members of the audit committee are required to meet the independence and experience standards established by the NYSE and the Exchange Act. Mr. Bumgarner, Mr. Whitlock and Ms. Wong currently serve as members of the audit committee. The Board determined that all members of the audit committee are financially literate and are "independent" under the standards of the NYSE and SEC regulations currently in effect. SEC rules also require that a public company disclose whether or not its audit committee has an "audit committee financial expert" as a member. An "audit committee financial expert" is defined as a person who, based on his or her experience, possesses the attributes defined by Regulation S-K Item 407(d)(s)(ii). The Board believes Ms. Wong satisfies the definition of "audit committee financial expert."

The audit committee assists the Board in its oversight of the integrity of our financial statements and our compliance with legal and regulatory requirements and partnership policies and controls. The audit committee has the sole authority to (1) retain and terminate our independent registered public accounting firm, (2) approve all auditing services and related fees and the terms thereof performed by our independent registered public accounting firm and (3) pre-approve any non-audit services and tax services to be rendered by our independent registered public accounting firm. The audit committee is also responsible for confirming the independence and objectivity of our independent registered public accounting firm. Our independent registered public accounting firm has been given unrestricted access to the audit committee and our management.

*Compensation Committee*

As a limited partnership listed on the NYSE, we are not required to have a compensation committee. However, the Board has established a compensation committee consisting of Mr. Alexander, Mr. Bumgarner and Mr. Ubben to, among other things, administer our long-term incentive plan and establish and review general policies related to, and determine and approve, or make recommendations to the Board with respect to, the compensation and benefits of the non-employee members of the Board.

*Conflicts Committee*

Our Board may, from time to time, establish a conflicts committee to which the Board will appoint at least one director and which may be asked to review specific matters that the Board believes may involve conflicts of interest and determines to submit to the conflicts committee for review. The conflicts committee determines if the resolution of the conflict of interest is adverse to the interest of the partnership. The members of the conflicts committee may not be officers or employees of our General Partner or directors, officers or employees of its affiliates, including our sponsor, and must meet the independence standards established by the NYSE and the Exchange Act to serve on an audit committee of a board of directors, along with other requirements in our partnership agreement.

Any matters approved by the conflicts committee will be conclusively deemed to be approved by us and all of our partners and not a breach by our General Partner of any duties it may owe us or our unitholders.

*Health, Safety, Sustainability and Environmental Committee*

The Board has established a health, safety, sustainability and environmental committee (the "HSSE committee") consisting of Mr. Lansing, Mr. Reilly and Mr. Ubben. The HSSE committee assists the Board in fulfilling its oversight responsibilities with respect to the Board's and our continuing commitment to (1) ensuring the safety of our employees and the public and assuring that our businesses and facilities are operated and maintained in a safe and environmentally sound manner, (2) sustainability, including sustainable forestry practices, (3) delivering environmental benefits to our customers, the forests from which we source our wood fiber and the communities in which we operate and (4) minimizing the impact of our operations on the environment. The HSSE committee reviews and oversees our health, safety, sustainability and environmental policies, programs, issues and initiatives, reviews associated risks that affect or could affect us, our employees and the public and ensures proper management of those risks and reports to the board on health, safety, sustainability and environmental matters affecting us, our employees and the public. The members of the HSSE committee are non-employee directors of our General Partner.

**Executive Sessions of Non-Management Directors**

The Board holds regular executive sessions in which the non-management directors meet without any members of management present. The purpose of these executive sessions is to promote open and candid discussion among the non-management directors. In the event that the non-management directors include directors who are not independent under the listing requirements of the NYSE, then at least once a year, there will be an executive session including only independent

A0758

directors. The director who presides at these meetings is John C. Bumgarner, Jr. Unitholders and any other interested parties may communicate directly with the presiding director or with the non-management directors as a group, by mail addressed to:

Presiding Director c/o General Counsel
Enviva Partners, LP
7200 Wisconsin Avenue, Suite 1000
Bethesda, Maryland 20814

**Communication with the Board of Directors**

As set forth in the Communications Policy adopted by the Board, a holder of our units or other interested party who wishes to communicate with any director of our General Partner may do so by sending communications to the Board, any committee of the Board, the Chairman of the Board or any other director to:

General Counsel
Enviva Partners, LP
7200 Wisconsin Avenue, Suite 1000
Bethesda, Maryland 20814

and marking the envelope containing each communication as "Unitholder Communication with Directors" and clearly identifying the intended recipient(s) of the communication. Communications will be relayed to the intended recipient of the Board pursuant to the Communications Policy, which is available on the "Investor Relations" section of our website at *www.envivabiomass.com*. Any communications withheld under the Communications Policy will nonetheless be recorded and available for any director who wishes to review them.

**Corporate Governance**

Our General Partner has adopted a Code of Business Conduct and Ethics that applies to our General Partner's directors, officers and employees, as well as to employees of our subsidiaries or affiliates that perform work for us. The Code of Business Conduct and Ethics also serves as the financial code of ethics for our Chief Executive Officer, Chief Financial Officer, controller and other senior financial officers. Our General Partner has also adopted Corporate Governance Guidelines that outline the important policies and practices regarding our governance.

We make available free of charge, within the "Investor Relations" section of our website at *www.envivabiomass.com* and in print to any interested party who so requests, our Code of Business Conduct and Ethics, Corporate Governance Guidelines, Audit Committee Charter, Compensation Committee Charter and HSSE Committee Charter. Requests for print copies may be directed to Investor Relations, Enviva Partners, LP, 7200 Wisconsin Ave., Suite 1000, Bethesda, Maryland 20814, or by telephone at (301) 657-5560. We will post on our website all waivers to or amendments of the Code of Business Conduct and Ethics, which are required to be disclosed by applicable law and the listing requirements of the NYSE. The information contained on, or connected to, our website is not incorporated by reference into this Annual Report on Form 10-K and should not be considered part of this or any other report we file with or furnish to the SEC.

A0759

**ITEM 11.   EXECUTIVE COMPENSATION**

### Compensation Discussion & Analysis

*Background*

This Compensation Discussion and Analysis ("CD&A") explains the 2020 executive compensation program for the Named Executive Officers (the "NEOs") identified below. Please read this CD&A together with the tables and related narrative about executive compensation that follow. The table below lists our NEOs in 2020 whose compensation is described in this CD&A:

| Executive | Title |
| --- | --- |
| John K. Keppler | Chairman of the Board of Directors, President and Chief Executive Officer |
| Shai S. Even | Executive Vice President and Chief Financial Officer |
| Thomas Meth | Executive Vice President, Sales and Marketing |
| William H. Schmidt, Jr. | Executive Vice President, Corporate Development and General Counsel |
| E. Royal Smith | Executive Vice President, Operations |

As a publicly traded partnership, our employment and compensation structure is different from that of a typical public corporation. Neither we nor our General Partner have any employees. Instead, our employees, including our NEOs, are employed by Enviva Management Company, LLC and its affiliates who provide services to the Partnership and the affiliates of our sponsor (collectively, "Enviva Management Company"). As each of our NEOs has been appointed to serve as an executive officer of our General Partner, throughout this CD&A we will refer to them as our NEOs.

We are party to management services agreements (the "MSAs") with Enviva Management Company, pursuant to which Enviva Management Company provides us with employment and management services necessary for the operation of our business. Although our NEOs' salaries and bonuses are paid, and benefits are provided, directly by Enviva Management Company, we partially reimburse Enviva Management Company based on the cost allocated to us for each NEO pursuant to the MSAs. Other than with respect to equity-based awards that may be granted pursuant to the Enviva Partners, LP Long-Term Incentive Plan ("LTIP"), Enviva Management Company generally has all responsibility and authority for compensation-related decisions for the NEOs, and such decisions are not subject to approval by our General Partner's board of directors or the Compensation Committee of our General Partner (the "Compensation Committee"). For a more detailed description of the MSAs and our relationship with Enviva Management Company, see Item 13. "Certain Relationships and Related Transactions, and Director Independence—Other Transactions with Related Persons—Management Services Agreements" in this Annual Report.

This CD&A describes key features of our executive compensation program and summarizes the 2020 cash and LTIP compensation and other benefits received by our NEOs. Although we do not make decisions regarding the base salaries paid, or annual cash incentive awards pursuant to the Enviva Management Annual Incentive Compensation Plan (the "AICP") made, to our NEOs by Enviva Management Company, this CD&A describes each element of compensation for which we are responsible for partially reimbursing Enviva Management Company pursuant to the MSAs. The descriptions of such compensation elements have been provided to us by Enviva Management Company and reflect the philosophy and decisions of Enviva Management Company. Unless otherwise specifically noted, the quantification of these compensation elements within this CD&A and the tables that follow reflect the portion of compensation allocated to us for the 2020 calendar year pursuant to the MSAs.

### Highlights

Enviva Management Company's executive compensation philosophy seeks to tie compensation to our financial and operating performance. Specifically, the executive compensation program includes various performance metrics for NEOs that are closely aligned with financial returns to our unitholders and are designed to result in annual and long-term value creation. The performance goals established in the NEOs' compensation plans are aggressive, and potential awards are intended to provide them an opportunity to earn above-median rewards in return for achieving such aggressive goals.

*Track Record of Strong Performance*

Enviva Management Company believes that the combination of the three primary components of our executive compensation program (annual base salary, annual cash incentive under the AICP and long-term equity incentive under the LTIP), coupled with aggressive goal setting and a pay-for-performance culture, has enabled the Partnership to deliver strong historical results and we expect to continue this trend into the future.

115

A0760

In 2020, we achieved our lowest total recordable incident rate ("TRIR") in the Partnership's history, and substantially reduced certain process and safety risks while confronting a global health pandemic that required us to make adjustments to our daily operations to ensure we could continue to run our plants and terminals in a safe, stable and reliable manner while maintaining a healthy workforce in the face of a rapidly spreading novel coronavirus. Against the particularly challenging economic and operating backdrop due to COVID-19, we achieved-record distributable cash flow attributable to Enviva Partners, LP ("DCF") of $141.4 million, an increase of 44% over 2019 DCF of $98.5 million. For the 3-year period ended December 31, 2020, Enviva's DCF increased at a compound annual growth rate ("CAGR") of 28%. For the 5-year period ended December 31, 2020, Enviva's DCF increased at a CAGR of 18%. Enviva's 2020 total unitholder return ("TSR") of 31% outperformed the TSR of the Alerian Index of -29% and the TSR of the S&P 500 Index of 18%. For the 3-year period ended December 31, 2020, Enviva's TSR of 110% outperformed the TSR of the Alerian Index of -33% and the TSR of the S&P 500 of 49%. For the 5-year period ended December 31, 2020, Enviva's TSR of 278% outperformed the TSR of the Alerian Index of -26% and the TSR of the S&P 500 Index of 103%.

In addition to the directly observable strong financial performance, we also continued to build a fully contracted product sales backlog that now totals $14.6 billion and has a weighted-average remaining term of 12.8 years from February 1, 2021, providing for substantial potential future growth for the Partnership. In 2020, we successfully completed two transformative acquisitions that increased our production capacity by more than 35% and added $5.3 billion to our product sales backlog, all as we continued to maintain our role as a leader in sustainability in pursuit of our mission to displace coal, grow more trees and fight climate change.

**Enviva Financial Highlights**



| TSR[1] | | | DCF[2] Growth | | | EVA TSR as Percentile of S&P 500 TSR Index | | | EVA TSR as Percentile of Alerian TSR Index | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 31% | 110% | 278% | 44% | 28% | 18% | 79th | 85th | 90th | 99th | 99th | 99th |
| 1 Year | 3 Year | 5 Year | 1 Year | 3 Year | 5 Year | 1 Year | 3 Year | 5 Year | 1 Year | 3 Year | 5 Year |

(1) TSR includes unit price appreciation and distributions paid.

(2) DCF is not a specific financial measure calculated in accordance with GAAP.

***Executive Compensation Elements Support Our Philosophy and Strategy***

Enviva Management Company's executive compensation program is designed to attract, retain, reward and motivate high-performing executive leadership whose talent and expertise enable us to create long-term unitholder value not only on an absolute basis but also relative to our peers. The program consists of three primary components, described below, that contain a substantial portion of at-risk, performance-based compensation, incorporate our financial and operational results and align our NEOs' interests with those of our unitholders with the ultimate objective of increasing long-term unitholder value.

A0761

| Base Salary | Competitive base salaries are established at a level necessary to retain the individual executive's services and to reward and motivate individual performance. | |
|---|---|---|
| Annual Incentive Compensation (AICP) | Financial Metric | NEOs participate in the Enviva Management Annual Incentive Compensation Plan, an annual cash incentive program. Performance goals in the program align executives with the objectives of growing the value of the partnership and its affiliates. AICP utilizes a gross DCF metric as the primary objective with operational objectives impacting the overall rating. Target award amounts are set for each NEO, but actual payouts may vary depending on company and individual performance for the year. |
| Equity Compensation (LTIP) | Time-Based Awards | We link a significant portion of each NEO's equity compensation to longer-term performance achievement and unitholder returns through grants of time-based and performance-based units. These awards and our accompanying Unit Ownership and Retention Policy align our NEOs directly with the interests of our unitholders. |
| | Performance-Based Awards | The General Partner maintains the LTIP, which provides for the grant of equity-based incentive awards at the discretion of the board of directors of the General Partners. |

*(Annual Incentive Compensation and Equity Compensation are designated "At Risk" Compensation.)*

### *Key Focus of the Compensation Program*

**Competitive compensation opportunities**

- Providing competitive compensation opportunities is a key factor allowing us to attract and retain the caliber of executives we need to deliver on the aggressive performance goals established under the incentive compensation arrangements in which our executives participate.

- Among other factors, each NEO's 2020 target total direct compensation was determined with reference to market data reflecting executive pay levels among our peer companies and survey data taken from the broader market.

**NEO compensation is designed to drive and reward long-term growth in unitholder value**

- All NEOs' 2020 compensation included a significant equity compensation component under the LTIP.

- 50% of each NEO's equity compensation is earned based on achievement of aggressive DCF growth targets, a key driver of growth in unitholder value over the long-term.

- Unitholder alignment is further supported by robust ownership guidelines that encourage a long-term ownership culture among our NEOs.

- In 2020, equity awards to NEOs were subject to a combination of 3-year and 4-year cliff vesting schedules (as compared to our prior practice of solely utilizing a 3-year schedule). In an effort to further enhance retention and more closely align the LTIP with longer-term unitholder interest, our NEOs were transitioned to awards that had a 4-year cliff vesting schedule and an additional TSR modifier for all LTIP grants beginning in 2021.

**Enviva Management Company sets aggressive performance goals**

- Aggressive performance goals for incentive-based compensation require exceptional organizational and individual performance, which is the kind of performance we expect from our NEOs.

- Performance at or above these goals should produce aggregate NEO compensation in the top quartile when compared to the competitive market.

A0762

- As evidence of the difficulty of meeting our aggressive goals, our NEOs have received, on average, an 89% payout against target compensation under the AICP and LTIP during the last three years even as the Partnership's TSR significantly outperformed that of the Alerian and S&P 500 Indices.

**Committed to best practices**

- **Significant At-Risk, Variable Compensation:** A significant percentage of annual compensation is at-risk, variable and performance-based, such as AICP awards and certain LTIP awards.

- **No Guaranteed Bonuses:** We do not have in place any annual or multi-year bonus or incentive guarantees for the NEOs.

- **No Gross-Ups:** No tax gross-ups upon a change in control or with respect to Code Section 409A matters.

- **No Individual Supplemental Executive Retirement Plans:** There are no executive retirement plans that are different from the ones offered to the broader employee population.

- **No Excessive Perquisites:** We do not offer excessive perquisites to our NEOs.

- **No Hedging or Pledging Units:** Our Insider Trading Policy prohibits, among other things, hedging and pledging transactions relating to our units.

- **Independent Compensation Consultant:** Enviva Management Company has engaged an independent compensation consultant the "Compensation Consultant") to assist with Enviva Management Company's and the Compensation Committee's regular review of our executive compensation program.

**2020 NEO Compensation**

*Compensation Strategy and Philosophy*

The aim of Enviva Management Company's executive compensation program is to retain highly skilled and talented leaders to manage and grow our sponsor's and the Partnership's businesses. Furthermore, given that we sit at the forefront of a relatively new and rapidly evolving industry, our success depends in large part on retaining the unique skill sets that our NEOs have developed during their tenure with the Company.

*Process for Determining Executive Compensation*

As discussed above, Enviva Management Company is responsible for developing and administering the executive compensation program. Enviva Management Company also provides the Compensation Committee with access to the Compensation Consultant and relevant data in order for the Compensation Committee to have a fulsome picture of the NEOs' compensation levels as compared to peers when it and the Board make final LTIP award decisions.

*Role of Compensation Consultant*

Enviva Management Company retains an independent compensation consultant to advise on matters related to executive and non-employee director compensation. In 2019 and during part of 2020, Longnecker & Associates ("Longnecker") was the Compensation Consultant. In August 2020, Enviva Management Company transitioned the consulting engagement to Meridian Compensation Partners, LLC ("Meridian").

For 2020, the scope of Longnecker's services included provision of executive compensation benchmarking data used to inform 2020 compensation actions, and the scope of Meridian's engagement included a review of our peer group and an executive compensation analysis based on an updated peer group. Neither Longnecker nor Meridian have authority to make decisions regarding compensation and serve solely in an advisory role.

*Peer Group and Market Data*

Neither peer group data nor broader employment market survey data is a prescription for program design or individual pay levels for Enviva Management Company or our Compensation Committee. Peer data, in combination with broader market survey data, provides a reference point for competitive pay rates and program design for our NEOs. Each year, in cooperation with the Compensation Consultant, Enviva Management Company reviews the peer group used for the prior year and determines what modifications, if any, would be appropriate for the upcoming year. Factors considered in selecting peers include operations in related industry sectors, comparable market capitalization and revenues, similarity of business strategy and availability and clarity of publicly filed compensation data. We also consider companies tracked as peers of ours by the investment community, although these companies may or may not ultimately be included in our peer group for presentation herein. For instance, to supplement the executive compensation information derived from our peer group, Enviva Management

118

A0763

Company has also considered, on a limited basis, available compensation data from NextEra Energy Partners, LP ("Nextera"). Although similar to us in business focus and structure, NextEra was not formally identified as a peer company for compensation benchmarking purposes due to the lack of available comprehensive pay data. In the peer group review process, we may also consider the impact of mergers or other corporate-level transactions that have occurred during the past year.

In October 2019, Enviva Management Company reviewed the peer group to be used for 2020 compensation decisions. The Compensation Consultant advised that the peer group used for 2019 compensation decisions was largely still appropriate for comparison purposes and Enviva Management Company made minimal changes to the group. The peer group adopted as a comparison group for 2020 compensation consisted of the following eleven companies:

### *Peer Group (Approved October 2019)*

| | |
|---|---|
| Bloom Energy Corporation | Rayonier Advanced Materials Inc. |
| CatchMark Timber Trust, Inc. | Rayonier Inc. |
| CrossAmerica Partners LP | Summit Midstream Partners, LP |
| Hi-Crush Inc. | SunCoke Energy, Inc. |
| Pattern Energy Group Inc. | USA Compression Partners, LP |
| PotlatchDeltic Corporation | |

In October 2020, Enviva Management Company reviewed the peer group listed above and determined that certain changes to the list would be appropriate for 2021 compensation decisions, including as a result of bankruptcy filings, changes to business models and changes to market capitalization levels within the previous peer group. The revised peer group of fourteen companies, listed below, will provide a reference point for considering the compensation arrangements for our NEOs in 2021.

### *Peer Group (Approved October 2020)*

| | |
|---|---|
| Atlantica Sustainable Infrastructure plc | Ormat Technologies, Inc. |
| CatchMark Timber Trust, Inc. | PotlatchDeltic Corporation |
| Cheniere Energy, Inc. | Rayonier Advanced Materials Inc. |
| Crestwood Equity Partners LP | Rayonier Inc. |
| Delek US Holdings, Inc. | SunCoke Energy, Inc. |
| Green Plains Inc. | TPI Composites, Inc. |
| Hanon Armstrong | USA Compression Partners, LP |

### *Key Elements of the 2020 Executive Compensation Program*

The following discussion provides details regarding the three primary elements of the 2020 compensation program for our NEOs: base salary, AICP awards and LTIP awards. Our NEOs also receive certain customary health, welfare and retirement plan benefits from Enviva Management Company that are briefly described below.

#### *Base Salary*

Each NEO's base salary is a fixed component of annual compensation and is set out in such NEO's employment agreement with Enviva Management Company. Enviva Management Company makes all final decisions regarding the NEOs' salaries based on a review of the specific job duties and functions, individual NEO expertise and the relative competitiveness of the NEO's compensation compared to our peers and to the market survey data. Below are the amounts allocated to the Partnership with respect to 2019 and 2020 NEO annual base salaries, as of December 31 of each such year, to the extent the individual was a "NEO" for that year:

119

A0764

| Name | Allocable 2020 Annual Base Salary | Allocable 2019 Annual Base Salary |
|---|---|---|
| John K. Keppler | $ 182,838 | $ 170,885 |
| Shai S. Even | 112,796 | 109,614 |
| Thomas Meth | 97,097 | — |
| William H. Schmidt, Jr. | 85,339 | — |
| E. Royal Smith | 249,389 | 238,606 |

*Short-Term Cash Incentive Compensation*

Each NEO participated in the AICP with respect to the 2020 calendar year and received a short-term cash incentive award pursuant to the AICP. The AICP amounts paid to each NEO with respect to 2020 that are allocable to us by Enviva Management Company pursuant to the MSAs are disclosed in the Summary Compensation Table under the "Non-Equity Incentive Compensation" column.

Each year the Compensation Committee and Enviva Management Company have discussions regarding the design and the potential values of the AICP awards. However, Enviva Management Company is the sponsor of the AICP and makes all final decisions regarding the performance metrics and target compensation levels associated with each participating employee.

With respect to the 2020 AICP awards, consistent with prior years, Enviva Management Company established an aggregate company bonus pool that is calculated based on performance relative to a single DCF-based financial target. Enviva Management Company generally sets aggressive performance metrics at levels that are designed to be extremely challenging to achieve. Following the determination of the overall AICP bonus pool, individual NEO awards were determined by Enviva Management Company based on individual performance goals linked to certain safety, operating, financial, growth and other targets measured at both the Partnership and our sponsor. The AICP amounts for each NEO allocated to the Partnership are disclosed below:

| Name | Allocable Amount of the Actual 2020 AICP Award |
|---|---|
| John K. Keppler | $ 343,297 |
| Shai S. Even | 170,465 |
| Thomas Meth | 109,381 |
| William H. Schmidt, Jr. | 107,330 |
| E. Royal Smith | 282,403 |

Apart from the AICP administered by Enviva Management Company, the Partnership's board of directors has the ability to award, in exceptional circumstances, discretionary bonuses. In 2020, the Partnership awarded certain NEOs transaction-related cash bonuses in recognition of their efforts for us in 2020, including the equity financing activities conducted in June of 2020. The transaction bonuses are subject to a claw-back provision requiring repayment net of taxes in the event of the termination of the NEO's employment for cause, or in the event that the NEO resigns without good reason, in each case within the three year period following the grant of the bonus. The transaction bonus amounts are disclosed as "Bonuses" in the Summary Compensation Table.

*Long-Term Equity Incentive Compensation*

The LTIP is intended to promote our long-term success and increase long-term unitholder value by attracting, motivating and aligning the interests of our independent directors, officers and other employees with those of our unitholders. Our LTIP provides for the grant of a variety of awards, but the award that we have determined to most appropriately incentivize and reward our LTIP participants, including the NEOs, is a phantom unit award. See Note 18, *Equity-Based Awards*. Each NEO received a long-term equity incentive award with respect to the 2020 calendar year under the LTIP in the form of phantom units. The terms of our NEOs' LTIP awards are determined by our Board following a recommendation from the Compensation Committee. In 2020, in an effort to further enhance retention and more closely align the LTIP with longer-term unitholder interest, we transitioned the vesting schedule for new equity awards made to our NEOs under the LTIP from a 3-year cliff vesting schedule to a 4-year cliff vesting schedule. Beginning in 2021, our NEOs received LTIP awards that were solely on the 4-year vesting schedule.

120

A0765

The 2020 phantom unit grants to our NEOs were divided into 50% time-based phantom units and 50% performance-based phantom units:

- **Time-based phantom units** vest at the end of a three- or four-year period based on continued service following the grant date.

- **Performance-based phantom units** vest upon the achievement of specified levels of DCF per common unit over a multi-year period. The performance-based phantom unit awards may vest between 0% and 200% of the target amount granted to each NEO.

Each grant of phantom units includes the right to receive distribution equivalent rights ("DERs"). The DERs associated with performance-based phantom units are paid to the holder in cash within 60 days following the vesting of the associated award (if any) and are forfeited if the underlying award was forfeited for any reason. The DERs associated with the time-based phantom units are paid to the holder of the award within the 60-day period immediately following any cash distribution that we make with respect to our common units. The settlement of the phantom units may be made in cash or in common units, at the discretion of our Compensation Committee.

The target value of LTIP awards that each NEO receives annually is set forth in his employment agreement as a percentage of base salary. Although each NEO's employment agreement is with Enviva Management Company, our Board (following recommendations from the Compensation Committee) has decision-making authority over the terms and conditions of any LTIP award, such as vesting and forfeiture provisions. In determining the LTIP awards granted to the NEOs on January 29, 2020, our Compensation Committee and the full Board considered the performance of the Partnership as well as individual performance for 2020. The grant date fair value of the phantom units awarded in January 2020 is disclosed in the Summary Compensation Table under the Stock Awards column, based on the percentage of the award allocated to us.

The number of phantom units granted to the NEOs in January 2020 is set forth below:

| Name | Number of Time-based Phantom Units Granted in 2020* | Target Number of Performance-based Phantom Units Granted in 2020* |
|---|---|---|
| John K. Keppler | 85,878 | 85,878 |
| Shai S. Even | 29,614 | 29,614 |
| Thomas Meth | 20,270 | 20,270 |
| William H. Schmidt, Jr. | 27,968 | 27,968 |
| E. Royal Smith | 18,690 | 18,690 |

*The time-based phantom units and performance-based phantom units were each further divided evenly between a three-year and a four-year cliff vesting schedule. The potential number of phantom units that could become vested pursuant to the satisfaction of the required performance metrics is set forth below.

Beginning with the 2020 compensation year, the Compensation Committee transitioned the vesting schedule under the LTIP applicable to the NEOs and certain other executives of Enviva Management Company to a 4-year cliff vesting schedule. For 2020, two tranches of LTIP awards were issued: (a) one tranche of time- and performance-based phantom units with a three-year cliff vesting schedule and (b) one tranche of time- and performance-based phantom units with a four-year cliff vesting schedule. The combination of awards was implemented for this single year to ensure that the program could be effectively transitioned from a three-year cliff vesting schedule to a four-year cliff vesting schedule without having any periods in which our NEOs would not have equity compensation that directly aligns them with our unitholders.

For each performance-based phantom unit award granted on January 29, 2020, vesting is contingent upon the achievement of certain levels of per-unit DCF growth over the respective three- or four-year periods. Actual levels of per-unit DCF growth will result in between 0% and 200% of the performance units vesting. The achievement of the 200% "maximum" performance level would require exceptional performance, whereas achievement below the threshold performance level would result in 0% vesting. The table below shows the number of common units that could be paid out upon the achievement of threshold, target or maximum performance levels for each performance-based phantom unit granted under the LITP in 2020.

A0766

| | **3-YEAR PERFORMANCE-BASED PHANTOM UNITS** | | | **4-YEAR PERFORMANCE-BASED PHANTOM UNITS** | | |
|---|---|---|---|---|---|---|
| | Threshold | Target | Maximum | Threshold | Target | Maximum |
| John K. Keppler | 21,470 | 42,939 | 85,878 | 21,470 | 42,939 | 85,878 |
| Shai S. Even | 7,404 | 14,807 | 29,614 | 7,404 | 14,807 | 29,614 |
| Thomas Meth | 5,068 | 10,135 | 20,270 | 5,068 | 10,135 | 20,270 |
| William H. Schmidt, Jr. | 6,992 | 13,984 | 27,968 | 6,992 | 13,984 | 27,968 |
| E. Royal Smith | 4,673 | 9,345 | 18,690 | 4,673 | 9,345 | 18,690 |

*2021 LTIP Awards*

In 2021, performance-based phantom units granted to the NEOs under the LTIP will vest solely following a four-year period. Moreover, the Compensation Committee, upon discussion with and review of information provided by the Compensation Consultant, added relative TSR as a new performance metric in addition to DCF-based metrics over such four-year period. The Committee may also exercise its discretion with respect to other factors, such as the Partnership's performance with respect to environmental, social and governance matters, during the relevant performance period.

*Other Benefits*

Retirement and Health and Welfare — Enviva Management Company offers the same types of retirement, health and welfare benefits to the NEOs as part of its total executive compensation package as it does to other eligible employees.

Our NEOs currently participate in a 401(k) plan maintained by Enviva Management Company. The 401(k) plan permits all eligible employees, including our NEOs, to make voluntary pre-tax contributions and/or Roth after-tax contributions to the plan. In addition, Enviva Management Company is permitted to make discretionary matching contributions under the plan. All matching contributions made during the first three years of an individual's employment vest under the plan following the satisfaction of an initial three-year cliff vesting schedule; thereafter, all matching contributions vest immediately. All contributions under the plan are subject to certain annual dollar limitations, which are periodically adjusted as required by law.

Employment Agreements — As noted above, Enviva Management Company has entered into employment agreements with each of the NEOs, with the most recent amendment and restatement of each agreement occurring in November 2020. Mr. Even's employment agreement has a three-year initial term beginning in June 2018, and the remaining NEOs' employment agreements contain one-year terms beginning on the November 2020 amendment date. Each employment agreement provides for automatic renewal for successive 12-month periods following the end of such agreement's term unless either party provides written notice of non-renewal at least 60 days prior to a renewal date. Under the employment agreements, the NEOs are each entitled to an annualized base salary and are eligible for annual AICP awards and LTIP awards, which have been detailed above. As described below under "—Potential Payments Upon Termination or a Change in Control," the employment agreements also provide for certain severance payments in the event an NEO's employment is terminated under certain involuntary circumstances, such as a termination without cause, by an NEO for good reason, or upon the death or disability of an NEO. A portion of payments made as a result of a termination of employment, such as in the event of the acceleration of a NEOs units granted pursuant to the LTIP, may be allocable to us pursuant to the MSAs.

**Unit Ownership Requirements**

The Partnership maintains a Unit Ownership and Retention Policy (the "Retention Policy") that is administered by the Compensation Committee and requires the officers of the General Partner who are required to file ownership reports under Section 16 of the Securities Exchange Act of 1934 (the "Exchange Act") and certain other officers as designated from time-to-time by our General Partner's Board or the Compensation Committee to retain at least 50% (and where the individual has not met certain holding requirements by specific timelines, 100%) of common units awarded under the LTIP (net of any common units withheld or sold to cover tax liabilities) until certain ownership requirements are met. The requirements for our NEOs are set forth in the table below:

| Name | Multiple of Annualized Base Salary |
|---|---|
| CEO | 5x |
| Other NEO's | 3x |

Units that count towards the satisfaction of the officer retention requirement include common units held directly by each NEO, common units owned indirectly by such NEO (e.g., by a spouse or other immediate family member residing in the same

122

A0767

household or a trust for the benefit of such NEO or his or her family) and phantom units granted under the LTIP (excluding phantom units subject to performance-based vesting conditions). As of the date of this filing, each of our NEOs was in compliance with the Retention Policy.

*Incentive Compensation Recoupment Policy*

The LTIP provides that any award granted pursuant to the plan will be subject to any claw-back or recoupment policies required by law, securities exchange rules or otherwise determined appropriate by our General Partner. In the event that Enviva Management Company determines to grant transaction-related or special bonuses to the NEOs, those awards are generally granted with a built-in claw-back provision.

*Anti-Hedging and Anti-Pledging Policy*

All of our employees, including our NEOs, and our directors are subject to our Insider Trading Policy, which, among other things, prohibits any covered individual from entering into short sales or hedging or pledging shares of our common units. The anti-hedging policy contained in our Insider Trading Policy specifically prohibits employees, including our NEOs, directors and their designees from purchasing financial instruments or otherwise engaging in transactions that hedge or offset or are designed to hedge or offset any decrease in the market value of our securities (or derivatives thereof), regardless of how the securities (or derivatives thereof) were acquired.

*Compensation Risk Assessment*

In accordance with the requirements of Item 402(s) of Regulation S-K, to the extent that risks may arise from our compensation policies and practices for our employees that are reasonably likely to have a material adverse effect on us, we are required to discuss our policies and practices for compensating our employees (including our employees that are not NEOs) as they relate to our risk management practices and risk-taking incentives. We have determined that our compensation policies and practices for our employees, including our NEOs, do not encourage excessive risk-taking and are not reasonably likely to have a material adverse effect on us. Our Compensation Committee routinely assesses our compensation policies and practices and takes this consideration into account as part of its review.

A0768

*Report of the Compensation Committee*

The Compensation Committee has reviewed and discussed the Compensation Discussion and Analysis required by Item 402(b) of Regulation S-K with management. Based on the reviews and discussions referred to in the foregoing sentence, the Compensation Committee recommended to the Board that the Compensation Discussion and Analysis be included in this Annual Report.

John C. Bumgarner, Jr.

Ralph Alexander

Jeffrey W. Ubben

## SUMMARY COMPENSATION TABLE

The table below sets forth the annual compensation allocated to us for our NEOs for the fiscal years ended December 31, 2020, December 31, 2019 and December 31, 2018, to the extent the individual was a "named executive officer" for that year.

The compensation disclosed below with respect to the NEOs reflects only the portion of compensation expense that is allocated to us pursuant to the MSAs. The disclosures below relating to compensation and benefits paid directly by Enviva Management Company are based on information provided to us by Enviva Management Company.

| Name and Principal Position | Year | Salary | Bonus (1) | Unit Awards (2) | Non-Equity Incentive Plan Compensation (1) | All Other Compensation (3) | Total |
|---|---|---|---|---|---|---|---|
| **John K. Keppler** | 2020 | $ 182,838 | $ 600,000 | $ 1,631,253 | $ 343,297 | $ 2,138 | $ 2,759,526 |
| *(Chairman of the Board of Directors, President and Chief Executive Officer)* | 2019 | 170,885 | — | 642,712 | 271,875 | 2,100 | 1,087,572 |
| | 2018 | 190,248 | — | 784,014 | 204,300 | 2,355 | 1,180,917 |
| **Shai S. Even** | 2020 | 112,796 | 350,000 | 562,518 | 170,465 | 2,138 | 1,197,917 |
| *(Executive Vice President and Chief Financial Officer)* | 2019 | 109,614 | — | 273,594 | 121,500 | 2,100 | 506,808 |
| | 2018 | 98,780 | — | 467,487 | 105,060 | 835 | 672,162 |
| **Thomas Meth** | 2020 | 97,097 | 75,000 | 385,029 | 109,381 | 2,138 | 668,645 |
| *(Executive Vice President, Sales & Marketing)* | | | | | | | |
| **William H. Schmidt, Jr.** | 2020 | 85,339 | 350,000 | 425,002 | 107,330 | 1,710 | 969,381 |
| *(Executive Vice President, Corporate Development and General Counsel)* | | | | | | | |
| **E. Royal Smith** | 2020 | 249,389 | — | 994,046 | 282,403 | 5,985 | 1,531,823 |
| *(Executive Vice President, Operations)* | 2019 | 238,606 | — | 522,318 | 167,738 | 5,880 | 934,542 |
| | 2018 | 178,480 | — | 728,566 | 160,650 | 4,496 | 1,072,192 |

(1)   Amounts in the Non-Equity Incentive Plan Compensation column with respect to 2018 and 2019 represent the annual discretionary cash bonuses for each NEO under the AICP, which was operated in a manner to provide performance-based incentive awards in those years, although the amounts were inadvertently reported in prior years within the "Bonus" column and have now been moved. As further described in the CD&A, the AICP awards for the 2020 year were also deemed to operate as performance-based incentive awards and are reported within the Non-Equity Incentive Plan Compensation column. Amounts in the "Bonus" column with respect to the 2020 year relate to the transaction-based bonuses received by certain NEOs for the 2020 year.

124

(2)   The amounts reflected in this column represent the aggregate grant date fair value of time-based and performance-based phantom units (which include tandem DERs) granted to the NEOs pursuant to the LTIP, computed in accordance with Financial Accounting Standards Board ("FASB") Accounting Standard Codification Topic 718, disregarding the estimate of forfeitures. The grant date fair value for time-based phantom unit awards issued in 2020 is based on the closing price of our common units on the date of grant, which was $37.99 per unit for awards granted on January 29, 2020. The grant date fair value of performance-based phantom unit awards is reported based on the probable outcome of the performance conditions on the grant date. See Note 18, *Equity-Based Awards*, to our consolidated financial statements for additional detail regarding assumptions underlying the value of these awards. If the maximum amount, rather than the probable amount, allocated to us were reported in the table with respect to the performance-based phantom units, the values associated with the performance-based grants would be as follows: Mr. Keppler, $1,631,253; Mr. Even, $562,518, Mr. Meth, $385,029, Mr. Schmidt, $425,002 and Mr. Smith, $994,046.

(3)   Amounts reported in the "All Other Compensation" column reflect employer contributions to the NEOs' accounts under the 401(k) plan in which the NEOs participate.

## 2020 GRANTS OF PLAN-BASED AWARDS

| Name | Grant Date | Estimated Possible Payouts Under Non-Equity Incentive Plan Awards (1) | | | Estimated Possible Payouts Under Equity Incentive Plan Awards (2) | | | All Other Equity Awards (3) (Units) | Grant Date Fair Value (4) |
|---|---|---|---|---|---|---|---|---|---|
| | | Threshold | Target | Maximum | Threshold (Units) | Target (Units) | Maximum (Units) | | |
| John K. Keppler | | $ 135,938 | $ 271,875 | $ 543,750 | | | | | |
| | 1/29/2020 | | | | 42,939 | 85,878 | 171,756 | | $ 815,626 |
| | 1/29/2020 | | | | | | | 85,878 | 815,626 |
| Shai S. Even | | 67,500 | 135,000 | 270,000 | | | | | |
| | 1/29/2020 | | | | 14,807 | 29,614 | 59,228 | | 281,259 |
| | 1/29/2020 | | | | | | | 29,614 | 281,259 |
| Thomas Meth | | 43,313 | 86,625 | 173,250 | | | | | |
| | 1/29/2020 | | | | 10,135 | 20,270 | 40,540 | | 192,514 |
| | 1/29/2020 | | | | | | | 20,270 | 192,514 |
| William H. Schmidt, Jr. | | 42,500 | 85,000 | 170,000 | | | | | |
| | 1/29/2020 | | | | 13,984 | 27,968 | 55,936 | | 212,501 |
| | 1/29/2020 | | | | | | | 27,968 | 212,501 |
| E. Royal Smith | | 111,825 | 223,650 | 447,300 | | | | | |
| | 1/29/2020 | | | | 9,345 | 18,690 | 37,380 | | 497,023 |
| | 1/29/2020 | | | | | | | 18,690 | 497,023 |

(1)   The values within these columns reflect the threshold, target and maximum values of the AICP awards that could be allocable to us for the 2020 year.

(2)   These columns reflect the performance-based phantom units granted to our NEOs during the 2020 year. The portion of the award settlement that will be allocated to us will be governed by the MSAs.

125

(3)     This column reflects the time-based phantom units granted to our NEOs during the 2020 year.

(4)     As further described in Footnote (2) to the Summary Compensation Table, the values in the "Grant Date Fair Value" column are determined by multiplying (a) the number of phantom units granted (with the probable grant date value for performance-based phantom units to be at target levels) by (b) $37.99, the closing price of our common units on the grant date, by (c) the percentage allocated to us pursuant to the MSAs.

## NARRATIVE DISCLOSURE TO THE SUMMARY COMPENSATION TABLE AND GRANTS OF PLAN-BASED AWARDS TABLE

### Management Services Agreements

The amounts set forth in the table above reflect only the portion of compensation that is allocable to us pursuant to the MSAs. For a more detailed description of the MSAs and our relationship with Enviva Management Company, see "Item 13. "Certain Relationships and Related Transactions, and Director Independence—Other Transactions with Related Persons--Management Services Agreements" in this Annual Report.

### Phantom Unit Awards

We granted time-based and performance-based phantom unit awards to our NEOs pursuant to the LTIP in 2020. Half of the time-based phantom unit awards will cliff vest following a three-year period, and half will cliff vest following a four-year period, in each case subject to the NEOs continued employment. Half of the performance-based phantom units will cliff vest following a three-year performance period, and half will cliff vest following a four-year period, subject to the achievement of specified levels of DCF per common unit over the applicable performance period. The performance-based phantom unit awards may vest between 0% and 200% of the target amount granted to each NEO. The potential acceleration and forfeiture events relating to these phantom units are described in greater detail under "—Potential Payments Upon Termination or a Change in Control" below.

### OUTSTANDING EQUITY AWARDS AT 2020 FISCAL YEAR-END

The following table reflects information regarding outstanding equity-based awards held by our Named Executive Officers as of December 31, 2020:

| | Unit Awards | | | |
|---|---|---|---|---|
| Name | Number of Units That Have Not Vested (1) | Market Value of Units That Have Not Vested (2) | Equity Incentive Plan Awards: Number of Unearned Units That Have Not Vested (3) | Equity Incentive Plan Awards: Market Value of Unearned Units That Have Not Vested (2) |
| **John K. Keppler** | | | | |
| Phantom Units | 234,438 | $   10,648,174 | 122,570 | $   5,567,129 |
| | | | | |
| **Shai S. Even** | | | | |
| Phantom Units | 86,331 | $   3,921,154 | 47,757 | $   2,169,123 |
| | | | | |
| **Thomas Meth** | | | | |
| Phantom Units | 82,805 | $   3,761,003 | 32,704 | $   1,485,416 |
| | | | | |
| **William H. Schmidt, Jr.** | | | | |
| Phantom Units | 101,509 | $   4,610,539 | 43,337 | $   1,968,367 |
| | | | | |
| **E. Royal Smith** | | | | |
| Phantom Units | 74,615 | $   3,389,013 | 29,964 | $   1,360,965 |

(1)     The amounts in this column reflect outstanding time-based phantom unit awards, which vest as set forth in the table that follows, so long as the applicable NEO remains continuously employed by Enviva Management Company or one of our affiliates from the grant date through each vesting date. This table also reflects the number of units that were initially granted as performance-based awards, but for which the performance period ended on December 31, 2020, at which time they became time-based phantom units until the date the Compensation Committee certified performance and

A0771

settled the awards in the 2021 year. See the section below titled "—Potential Payments Upon Termination or Change in Control" for a description of potential acceleration and forfeiture provisions.

(2)    The amounts reflected in this column represent the market value of the common units underlying the phantom unit awards granted to the Named Executive Officers and set forth in the preceding column, computed based on the closing price of our common units on December 31, 2020, which was $45.42 per unit. The portion of the award settlement that will be allocated to us will be governed by the MSAs.

(3)    The amounts in this column reflect the target number of common units issuable upon settlement of outstanding performance-based phantom unit awards granted in 2019 and 2020, which vest on the dates set forth above based on achievement of performance metrics with respect to the three-year period ending on December 31, 2021 and 2022, and the four-year period ending on December 31, 2023, respectively, so long as the applicable Named Executive Officer remains continuously employed by Enviva Management Company or one of our affiliates from the grant date through the end of each performance period. See the section below titled "— Potential Payments Upon Termination or Change in Control" for a description of potential acceleration and forfeiture provisions.

A0772

| | Vesting Date | Number of Phantom Units to Vest |
|---|---|---|
| Keppler | January 27, 2021 | 53,142 |
| | January 31, 2021 | 30,367 |
| | June 4, 2021 | 16,502 |
| | January 30, 2022 | 48,549 |
| | January 29, 2023 | 42,939 |
| | January 29, 2024 | 42,939 |
| | | |
| Even | January 27, 2021 | 24,547 |
| | June 4, 2021 | 14,027 |
| | January 30, 2022 | 18,143 |
| | January 29, 2023 | 14,807 |
| | January 29, 2024 | 14,807 |
| | | |
| as Meth | January 27, 2021 | 17,906 |
| | January 31, 2021 | 10,232 |
| | June 4, 2021 | 16,502 |
| | January 30, 2022 | 17,895 |
| | January 29, 2023 | 10,135 |
| | January 29, 2024 | 10,135 |
| | | |
| m H. Schmidt, Jr. | January 27, 2021 | 22,663 |
| | January 31, 2021 | 12,950 |
| | June 4, 2021 | 16,502 |
| | January 30, 2022 | 21,426 |
| | January 29, 2023 | 13,984 |
| | January 29, 2024 | 13,984 |
| | | |
| al Smith | January 27, 2021 | 16,517 |
| | January 31, 2021 | 9,438 |
| | June 4, 2021 | 16,502 |
| | January 30, 2022 | 13,468 |
| | January 29, 2023 | 9,345 |
| | January 29, 2024 | 9,345 |

**UNITS VESTED IN 2020**

The following table provides information on the vesting of phantom units held by the NEOs in 2020. None of the NEOs held stock options in 2020. The value realized from the vesting of phantom unit awards is equal to the closing price of our common units on the vesting date or the performance certification date for performance awards, as applicable, multiplied by

128

A0773

the number of shares acquired. The value is calculated before payment of any applicable withholding or other income taxes. The portion of the award settlement that will be allocated to us will be governed by the MSAs.

| Name | Number of Units Acquired Upon Vesting | Value Realized Upon Vesting |
|---|---|---|
| John K. Keppler | 42,517 | $ 1,618,399 |
| Shai S. Even | — | — |
| Thomas Meth | 18,079 | 688,173 |
| William H. Schmidt, Jr. | 22,919 | 872,406 |
| E. Royal Smith | 14,305 | 544,516 |

## PENSION BENEFITS AND NON-QUALIFIED DEFERRED COMPENSATION

We have not maintained, and do not currently maintain, a defined benefit pension plan or a nonqualified deferred compensation plan providing for retirement benefits. Our NEOs currently participate in a 401(k) plan maintained by Enviva Management Company. The 401(k) plan permits all eligible employees, including the NEOs, to make voluntary pre-tax contributions and/or Roth after-tax contributions to the plan. In addition, Enviva Management Company is permitted to make discretionary matching contributions under the plan. All matching contributions made during the first three years of an individual's employment vest under the plan following the satisfaction of an initial three-year cliff vesting schedule; thereafter, all matching contributions vest immediately. All contributions under the plan are subject to certain annual dollar limitations, which are periodically adjusted as required by law.

## POTENTIAL PAYMENTS UPON TERMINATION OR CHANGE IN CONTROL

Each of our NEOs maintains an employment agreement with Enviva Management Company. Under the employment agreements, if the applicable NEO's employment is terminated without "cause," by the applicable NEO for "good reason" or due to the applicable NEO's death or "disability," (each term as defined within the employment agreements) then so long as the applicable NEO (or, in the event of his death, his estate) executes (and does not revoke within the time provided to do so) a release in a form satisfactory to Enviva Management Company within the time period specified in such NEO's employment agreement, such NEO will receive full vesting of outstanding awards under the LTIP (which vesting for awards that include a performance requirement (other than continued service) will be based on (i) actual performance if such termination occurs within the six-month period preceding the expiration of the performance period or (ii) target performance if such termination occurs at any other time during the performance period). In addition, the NEOs would be eligible for cash severance benefits based on a predetermined severance factor multiplied by the NEOs annualized base salary and target annual bonus amount. The NEOs would also be eligible for reimbursement from Enviva Management Company for the continuation coverage of applicable group health plans.

The employment agreements also contain certain restrictive covenants pursuant to which our NEOs have recognized an obligation to comply with, among other things, certain confidentiality covenants as well as covenants not to compete in a defined market area with Enviva Management Company (or any of its affiliates to which they have provided services or about which they have obtained confidential information) or solicit their employer's or its affiliates' employees, in each case, during the term of the agreement and for a period of one year thereafter.

Our estimated calculations of the LTIP award acceleration values that would be allocated to us pursuant to the MSAs in the event that the NEOs experienced an eligible employment termination event as of December 31, 2020 are as follows: Mr. Keppler, $3,795,216; Mr. Even, $1,403,115; Mr. Meth, $1,224,467; Mr. Schmidt, $1,227,548 and Mr. Smith, $3,099,788. The estimated payments are not necessarily indicative of the actual amounts such executive would have received in such circumstances, as such amounts could not be known with certainty until the applicable event occurs. Such LTIP acceleration values use the closing price of our common units on December 31, 2020, which was $45.42 per unit.

## DIRECTOR COMPENSATION

For the year ended December 31, 2020, directors of our General Partner, other than Mr. Keppler, received compensation for their services on our General Partner's board of directors and committees thereof consisting of:

- an annual retainer of $85,000,

- an additional annual retainer of $20,000 for services as the chair of the audit committee,

- an additional annual retainer of $17,500 for service as the chair of the compensation committee,

129

A0774

- an additional annual retainer of $15,000 for service as the chair of the health, safety, sustainability and environmental committee (the "HSSE committee"),

- payment of $2,000 each time such director attended a board meeting,

- payment of $1,750 each time such director attended an audit committee meeting, and

- payment of $1,500 each time such director attended any meeting of the compensation committee or the HSSE committee.

Additionally, for the year ended December 31, 2020, directors of our General Partner, other than Mr. Keppler and directors who are also officers or employees of Riverstone Holdings LLC or its affiliates (excluding the General Partner, the Partnership and its subsidiaries) (the "Sponsor Directors"), received an annual grant under the LTIP with a grant date fair value of approximately $115,000.

Until the earlier of (i) four years after a director other than Mr. Keppler, Mr. Lansing and the Sponsor Directors (such director, an "independent director") is appointed to the board of directors of our General Partner or (ii) the date on which such independent director first holds an amount of our common units with an aggregate value equal to at least $250,000, one-half of all annual retainers and payments for attending board or committee meetings are paid to such independent director in the form of common units pursuant to the LTIP and the remainder is paid in cash. Each of our independent directors has met the above conditions and 100% of their annual retainers and payments for attending board or committee meetings were paid in cash. Each director is reimbursed for out-of-pocket expenses incurred in connection with attending board and committee meetings and each director will be fully indemnified by us for actions associated with serving as a director to the fullest extent permitted under Delaware law.

Prior to 2019, the Sponsor Directors did not receive compensation under our director compensation program. Compensation of the Sponsor Directors and Mr. Lansing for their service on the Board is paid directly to Riverstone/Carlyle Management LP. With respect to Mr. Ubben, his cash compensation is paid directly to Inclusive Capital Partners, L.P.

The following table provides information concerning the compensation of our directors, other than Mr. Keppler (whose compensation has been reported within the Summary Compensation Table), for the fiscal year ended December 31, 2020:

| Name | Fees Earned in Cash | | Unit Awards (1) | | Total | |
|---|---|---|---|---|---|---|
| John C. Bumgarner, Jr. | $ | 195,650 | $ | 123,800 | $ | 319,450 |
| William K. Reilly | | 122,500 | | 123,800 | | 246,300 |
| Jeffrey W. Ubben (2) | | 80,250 | | 119,428 | | 199,678 |
| Gary L. Whitlock | | 128,650 | | 123,800 | | 252,450 |
| Janet S. Wong | | 148,650 | | 123,800 | | 272,450 |
| Ralph Alexander (3) | | 117,000 | | — | | 117,000 |
| Jim H. Derryberry (3) | | 103,000 | | — | | 103,000 |
| Robin J. A. Duggan (3)(4) | | 78,750 | | — | | 78,750 |
| Christopher B. Hunt (3) | | 103,000 | | — | | 103,000 |
| Carl L. Williams (3)(5) | | 122,500 | | — | | 122,500 |
| Gerrit ("Gerrity") L. Lansing, Jr. (3)(6) | | 28,750 | | — | | 28,750 |

_____

(1)   Amounts included in this column reflect the aggregate grant date fair value of phantom units (which include tandem DERs) granted to the independent directors, computed in accordance with FASB ASC Topic 718, disregarding the estimate of forfeitures, in each case pursuant to the LTIP. See Note 18, *Equity-Based Awards*, for additional detail regarding assumptions underlying the value of these equity awards. The grant date fair value for the phantom unit awards, except for those of Mr. Ubben, is based on the closing price of our common units on the grant date of January 29, 2020, which was $37.99 per unit. Such phantom unit awards vested in full on January 29, 2021. The grant date fair value for Mr. Ubben's phantom unit awards is based on the closing price of our common units on the grant date of August 5, 2020, which was $40.00 per unit. Such phantom unit awards will vest in full on August 5, 2022. As of December 31, 2020, each then-current independent director held 3,028 unvested phantom units in the aggregate, other

130

A0775

than Mr. Ubben, who held 2,875 unvested phantom units. Our directors that are not independent do not receive LTIP awards, therefore they do not hold outstanding awards as of December 31, 2020.

(2)    Mr. Ubben was appointed to the Board on June 18, 2020. His cash compensation was paid to directly to Inclusive Capital Partners, L.P., although he received his LTIP grant directly.

(3)    Compensation of the Sponsor Directors and Mr. Lansing for their service on the Board is paid directly to Riverstone/Carlyle Management LP.

(4)    Mr. Duggan resigned from the Board on October 18, 2020.

(5)    Mr. Williams resigned from the Board on February 5, 2021.

(6)    Mr. Lansing was appointed to the Board on October 18, 2020.

131

A0776

**ITEM 12.   SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

The following table sets forth the beneficial ownership of common units of Enviva Partners, LP as of February 15, 2021 held by:

- beneficial owners of 5% or more of our common units;

- each director and NEO; and

- all of our directors and executive officers as a group.

Unless otherwise noted, the address for each beneficial owner listed below is 7200 Wisconsin Ave., Suite 1000, Bethesda, MD 20814.

| Name of Beneficial Owner | Common Units Beneficially Owned(1) | Percentage of Common Units Beneficially Owned | |
|---|---|---|---|
| Enviva Holdings, LP(2)(3)(4) | 13,586,375 | 33.95 | % |
| Enviva Partners GP, LLC | — | — | % |
| Inclusive Capital Partners, L.P.(5) | 4,834,867 | 12.08 | % |
| John K. Keppler | 119,952 | | * |
| Thomas Meth | 49,142 | | * |
| William H. Schmidt, Jr. | 49,098 | | * |
| E. Royal Smith | 29,091 | | * |
| Shai S. Even | 12,583 | | * |
| Ralph Alexander | — | — | |
| John C. Bumgarner, Jr.(6) | 188,858 | | * |
| Jim H. Derryberry | — | — | |
| Christopher B. Hunt | — | — | |
| Gerrit ("Gerrity") L. Lansing, Jr. | — | | * |
| William K. Reilly | 34,786 | | * |
| Jeffrey W. Ubben(5) | 4,834,867 | 12.08 | % |
| Gary L. Whitlock | 23,538 | | * |
| Janet S. Wong | 30,562 | | * |
| All directors and executive officers as a group (16 persons) | 5,380,303 | 13.44 | % |

_____

\*   Less than 1% of common units outstanding.

(1)   This column does not include phantom unit awards granted to our directors and officers pursuant to the LTIP.

(2)   Effective July 22, 2020, R/C Wood Pellet Investment Partnership, L.P. transferred its interest in Enviva Holdings GP, LLC ("Holdings GP") to Riverstone Enviva Holdings GP, LLC ("Riverstone Enviva Holdings"). As a result, Riverstone Enviva Holdings became the sole member of Holdings GP, which is the general partner of Enviva Holdings, LP ("Enviva Holdings"), which is the sole member of each of the Common Unit Holders (as defined below).

(3)   David M. Leuschen and Pierre F. Lapeyre Jr. are the managing directors of Riverstone Management Group, L.L.C. ("Riverstone Management"), and have or share voting and investment discretion with respect to the securities beneficially owned by Riverstone Management, which is the general partner of Riverstone/Gower Mgmt Co Holdings, L.P., which is the sole member of Riverstone Holdings LLC, which is the sole member of Riverstone Echo GP, LLC, which is the general partner of Riverstone Echo Partners, L.P., which is the sole member of each of Riverstone ECF GP, LLC ("ECF GP") and Riverstone Echo Rollover GP, LLC ("Echo Rollover GP"). ECF GP is the general partner of Riverstone Echo Continuation Holdings, L.P. ("Echo Continuation Holdings"). Echo Rollover GP is the general partner of Riverstone Echo Rollover Holdings, L.P. ("Echo Rollover Holdings"). Riverstone Enviva Holdings is managed by its members, Echo Continuation Holdings and Echo Rollover Holdings.

132

A0777

(4)   Riverstone Enviva Holdings is the sole member of Holdings GP, which is the general partner of Enviva Holdings, which is the sole member of each of (i) Enviva MLP Holdco, which is the record holder of 7,578,921 Common Units and a 100% limited liability company interest in the general partner, and (ii) Enviva Cottondale, which owns a 100% limited liability company in Enviva Collateral PledgeCo, LLC (together with Enviva MLP Holdco, the "Common Unit Holders") which is the record holder of 6,007,454 common units.

(5)   As reported in a Schedule 13D filed with the SEC on August 4, 2020, Inclusive Capital Partners, L.P. ("In-Cap") and Inclusive Capital Partners Spring Fund Manager, L.L.C. ("In-Cap Spring Fund Manager"), have been granted investment and voting discretion over the common units held by Inclusive Capital Partners Spring Master Fund, L.P. (f/k/a ValueAct Spring Master Fund, L.P.), a British Virgin Islands limited partnership ("In-Cap Spring Master Fund"). In-Cap acts as investment manager to In-Cap Spring Master Fund. The managing member of In-Cap Spring Fund Manager is Inclusive Capital Partners Holdco, L.P., a Delaware limited partnership ("In-Cap Holdco"). In-Cap is the general partner of In-Cap Holdco. Inclusive Capital Partners, L.L.C., a Delaware limited liability company ("In-Cap LLC"), is the general partner of In-Cap. Mr. Ubben is the controlling member of the management committee of In-Cap LLC. The address of the business office of In-Cap, In-Cap Spring Fund Manager, In-Cap Spring Master Fund, In-Cap Holdco, In-Cap LLC and Mr. Ubben is 572 Ruger Street, Suite B, San Francisco, CA 94129.

(6)   Of these 188,858 common units, 165,928 are held by the Bumgarner Family Trust. Mr. Bumgarner has investment control over these units.

**Equity Compensation Plan Information**

The following table sets forth information with respect to the securities that may be issued under the Enviva Partners, LP Long-Term Incentive Plan (the "LTIP") as of December 31, 2020.

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a)(2) | Weighted- average exercise price of outstanding options, warrants and rights ($) (b)(3) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c)(4) |
|---|---|---|---|
| Equity compensation plans approved by security holders(1) | 1,815,827 | n/a | 124,436 |
| Equity compensation plans not approved by security holders(2) | — | — | — |
| Total | 1,815,827 | n/a | 124,436 |

(1)   The LTIP was approved by the board of directors of our General Partner prior to the IPO.

(2)   The LTIP was amended in January 2020 and January 2021 to increase the number of common units that may be issued thereunder. The amendments to the LTIP did not require shareholder approval under the rules of the NYSE.

(3)   The amount in column (a) of this table reflects (i) the aggregate number of common units issuable upon settlement of outstanding time-based phantom units and (ii) the aggregate number of common units issuable upon settlement of outstanding performance-based phantom units assuming a 100% performance factor pursuant to the LTIP as of December 31, 2020. The actual number of common units that may be issued in settlement of outstanding performance-based phantom unit awards is based on a factor of between 0% and 200%.

(4)   This column is not applicable because only phantom units have been granted under the LTIP and phantom units do not have an exercise price.

(5)   The amount in this column reflects the total number of common units remaining available for future issuance under the LTIP as of December 31, 2020. For additional information about the LTIP and the awards granted thereunder, please read Part III, Item 11. "Executive Compensation."

133

A0778

**ITEM 13.   CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS AND DIRECTOR INDEPENDENCE**

As of February 15, 2021, our sponsor owned 13,586,375 common units representing an approximate 34% limited partner interest in us and owns all our incentive distribution rights. In addition, our sponsor owns and controls (and appoints all the directors of) our General Partner, which maintains a non-economic general partner interest in us.

The terms of the transactions and agreements disclosed in this section were determined by and among affiliated entities and, consequently, are not the result of arm's-length negotiations. These terms are not necessarily at least as favorable to the parties to these transactions and agreements as the terms that could have been obtained from unaffiliated third parties.

**Distributions and Payments to Our General Partner and Its Affiliates**

We generally make 100% of our cash distributions to our unitholders, including affiliates of our General Partner. In addition, if distributions exceed the minimum quarterly distribution and other higher target distribution levels, our sponsor, or the holder of our incentive distribution rights, will be entitled to increasing percentages of the distributions, up to 50.0% of the distributions above the highest target distribution level.

Assuming we have sufficient cash available for distribution to pay the full minimum quarterly distribution on all of our outstanding common units for four quarters, our General Partner and its affiliates would receive total annual distributions of approximately $22.4 million on their common units.

Our General Partner does not receive a management fee or other compensation for its management of our partnership, but we reimburse our General Partner and its affiliates for all direct and indirect expenses they incur and payments they make on our behalf. These expenses include salary, bonus, incentive compensation and other amounts paid to persons who perform services for us or on our behalf and expenses allocated to our General Partner by its affiliates. Under our management services agreements ("MSAs") with Enviva Management Company, LLC, a Delaware limited liability company and wholly owned subsidiary of our sponsor (together with its affiliates that provide services to us, as applicable, "Enviva Management Company"), we are obligated to reimburse Enviva Management Company for all direct or indirect costs and expenses incurred by, or chargeable to, Enviva Management Company in connection with its provision of services necessary for the operation of our business. If the MSAs were terminated without replacement, or our General Partner or its affiliates provided services outside of the scope of the MSAs, our partnership agreement would require us to reimburse our General Partner and its affiliates for all expenses they incur and payments they make on our behalf. Our partnership agreement does not set a limit on the amount of expenses for which our General Partner and its affiliates may be reimbursed.

If our General Partner withdraws or is removed, its non-economic general partner interest will either be sold to the new general partner for cash or converted into common units, in each case for an amount equal to the fair market value of those interests.

If we are ever liquidated, the partners, including our General Partner, will be entitled to receive liquidating distributions according to their respective capital account balances.

**Agreements with Affiliates**

*Greenwood Contribution Agreement and Off-Take Contracts Assignment*

On July 1, 2020, we acquired from our sponsor all of the limited liability company interests in Enviva Pellets Greenwood Holdings II, LLC ("Greenwood Holdings II"), the indirect owner of Enviva Pellets Greenwood, LLC, ("Greenwood") which owns a wood pellet production plant in Greenwood, South Carolina (the "Greenwood plant"), for a purchase price of $132.0 million, subject to certain adjustments (such transaction, the "Greenwood Drop-Down"). On July 1, 2020, we paid cash consideration of $129.7 million, net of an initial purchase price adjustment of $2.3 million. Greenwood Holdings II's liabilities included a $40.0 million, third-party promissory note bearing interest at 2.5% per year that we assumed from our sponsor at closing. We also assumed a railcar lease agreement related to the operation of the Greenwood plant from our sponsor.

On the date of the Greenwood Drop-Down, our sponsor assigned five biomass off-take contracts to us (collectively, the "Associated Off-Take Contracts"). The Associated Off-Take Contracts call for aggregate annual deliveries of 1.4 million metric tons per year ("MTPY") and mature between 2031 and 2041. Our sponsor also assigned to us fixed-rate shipping contracts with aggregate annual shipping volume of 1.4 million MTPY.

*Payments to Riverstone for Affiliated Director Services*

Beginning in 2019, we paid Riverstone/Carlyle Management LP, an affiliate of our sponsor, compensation for the services of the officers or employees of Riverstone Holdings LLC or its affiliates who serve as directors on the board of directors of our

A0779

General Partner, as well as for Mr. Lansing. During the year ended December 31, 2020, total compensation expense related to the directors was $0.6 million.

### EVA-MGT Contracts

In January 2016 we entered into a contract with the Hamlet JV to supply 375,000 MTPY of wood pellets (the "EVA‑MGT Contract") to MGT Teesside Limited's ("MGT") Tees Renewable Energy Plant (the "Tees REP"), which is under development. In exchange for a fee, the Partnership amended the EVA‑MGT Contract to delay delivery of volumes originally scheduled for 2019 until 2020 and cancel volumes originally scheduled for 2020. The EVA‑MGT contract commenced in 2020, ramps to full supply in 2021 and continues through 2034. The EVA-MGT Contract is denominated in U.S. Dollars for one shipment in 2020 and in British Pound Sterling ("GBP") for all other shipments. On January 22, 2016, the Partnership entered into a Contingent Novation Agreement relating to the Tees REP with the Hamlet JV and MGT pursuant to which, in the event MGT terminates the MGT Contract or we notify MGT that we wish to terminate the EVA‑MGT Contract, MGT may become a party to the EVA‑MGT Contract in lieu of the Hamlet JV, subject to the terms thereof.

We entered into a second supply agreement (the "Second Supply Agreement") with the Hamlet JV in connection with the acquisition of Enviva Pellets Sampson, LLC to supply an additional 95,000 MTPY of the contracted volume to the Tees REP. In connection with the Hamlet Drop-Down, on March 20, 2019 we amended the Second Supply Agreement, whereby option volumes excisable by the Hamlet JV in 2019 were added for the Hamlet JV to meet its delivery obligations under its long-term, take-or-pay off-take contract with MGT (the "MGT Contract") existing as of the date thereof. In exchange for a fee, we further amended the Second Supply Agreement on November 22, 2019 to cancel certain volumes originally scheduled for 2020. The Secondary Supply Agreement is denominated in GBP, commences in 2021 and continues through 2034.

On August 10, 2016, the Hamlet JV entered into a Fuel Supply Direct Agreement related to the MGT Contract together with our sponsor, John Hancock, MGT and Lloyds Bank PLC, acting as security trustee, pursuant to which, among other things, (1) MGT, as borrower, granted security for the payment of certain liabilities under its financing documents and, on a second-ranking basis, payments to the Hamlet JV under the MGT Contract and certain related documents, and (2) the Hamlet JV, our sponsor and John Hancock consented to MGT granting such security interests and agreed to notify the security trustee of any material default under the MGT Contract or certain other related documents, in all cases subject to the terms thereof.

### Off-take Contract

On April 9, 2015, we entered into a master biomass purchase and sale agreement with the Hamlet JV. In connection with the Hamlet Drop-Down, on March 20, 2019 we entered into a new confirmation (the "Confirmation") thereunder pursuant to which we agreed to purchase all wood pellets produced by the Hamlet plant from commencement of operations through December 31, 2019 and all wood pellets produced by the Hamlet plant but not sold to MGT from January 1, 2020 through June 30, 2020. Additionally, during 2020 we entered into two amendments with the Hamlet JV, pursuant to which we extended the term of the Confirmation and agreed to purchase approximately 60,000 MT produced by the Hamlet plant from July 1, 2020 through August 15, 2020 and all wood pellets produced by the Hamlet plant but not sold to MGT from August 16, 2020 through December 31, 2020. During the year ended December 31, 2020, total wood pellet purchases were $67.0 million.

### Registration Rights Agreement - Sponsor

In connection with our initial public offering ("IPO") on May 4, 2015, we entered into a registration rights agreement with our sponsor pursuant to which we may be required to register the sale of the common units issued (or issuable) to our sponsor. Under the registration rights agreement, our sponsor will have piggyback registration rights, subject to certain limitations. The registration rights agreement also includes provisions dealing with indemnification and contribution and allocation of expenses. All common units held by our sponsor or any permitted transferee will be entitled to these registration rights. In accordance with the registration rights agreement, we registered all of our sponsor's common units for resale, subject to certain limitations, pursuant to our effective registration statement on Form S-3, filed with the SEC on June 21, 2019.

### Purchase Rights Agreement

We entered into a purchase rights agreement with our sponsor pursuant to which our sponsor agreed to provide us with a right of first offer to purchase any wood pellet production plant or deep‑water marine terminal that it, its subsidiaries or any other entity that it controls, owns and proposes to sell (each, a "ROFO Asset") for a five‑year period. Pursuant to an amendment, the term of the purchase rights agreement was extended to May 2021 and will automatically renew on an annual basis unless either party provides notice of termination within 60 days prior to the end of the then-current term.

We will have thirty days following receipt of notice of our sponsor entity's intention to sell a ROFO Asset to propose an offer for the ROFO Asset. If we submit an offer, our sponsor will negotiate with us exclusively and in good faith to enter into a

135

letter of intent or definitive documentation for the purchase of the ROFO Asset on mutually acceptable terms. If we are unable to agree to terms within 45 days, our sponsor entity will have 150 days to enter into definitive documentation with a third party purchaser on terms that are, in the good faith judgment of our sponsor entity selling such ROFO Assets, superior to the most recent offer proposed by us.

***Management Services Agreements and Fee Waivers***

*EVA MSA*

In April 2015, all of our employees and members of management became employed by Enviva Management Company, and we and our General Partner entered into the EVA MSA. The EVA MSA has a term of five years, which is automatically renewed unless terminated by us for cause. Enviva Management Company is also able to terminate the agreement if we fail to reimburse it for its costs and expenses allocable to us.

Pursuant to the EVA MSA, we reimburse Enviva Management Company for all direct or indirect costs and expenses incurred by, or chargeable to, Enviva Management Company in connection with the provision of the services, including salary and benefits of employees engaged in providing such services, as well as office rent, expenses and other overhead costs of Enviva Management Company. Enviva Management Company determines the amount of costs and expenses that is allocable to us.

In connection with the Hamlet Drop-Down, we and Enviva Management Company entered into an agreement pursuant to which an aggregate of approximately $13.0 million in fees that otherwise would be owed by us under the EVA MSA will be waived during the period from the closing of the Hamlet Drop-Down through the second quarter of 2020. The agreement expired pursuant to its terms on June 30, 2020.

In June 2019, we entered into an additional agreement with Enviva Management Company (the "Second EVA MSA Fee Waiver") pursuant to which we received a $5.0 million waiver of fees under the EVA MSA through September 30, 2019 as consideration for an assignment of two shipping contracts to our sponsor to rebalance our and our sponsor's respective shipping obligations under existing off-take contracts. During the year ended December 31, 2019, $5.0 million of fees expensed under the EVA MSA were waived and recorded as an increase to partners' capital pursuant to the Second EVA MSA Fee Waiver.

In connection with the Greenwood Drop-Down, we and Enviva Management Company entered into an agreement pursuant to which (1) an aggregate of approximately $37.0 million in management services and other fees that otherwise would be owed by us under our management services agreement with Enviva Management Company will be waived with respect to the period from the closing of the Greenwood Drop-Down through the fourth quarter of 2021 and (2) Enviva Management Company will continue to waive certain management services and other fees during 2022 unless and until the Greenwood plant's production volumes equal or exceed 50,000 MT in any calendar month, in each case, to provide cash flow support to us during the planned expansion of the Greenwood plant. During the year ended December 31, 2020, $18.0 million of MSA fees were waived, of which $9.9 million was included in cost of goods sold and $8.1 million was included in related-party management services fees in general and administrative expenses.

*Hamlet JV MSA*

Pursuant to a management services agreement between the Hamlet JV and Enviva Management Company (the "Hamlet JV MSA"), Enviva Management Company provides the Hamlet JV with operations, general administrative, management and other services. As compensation for Enviva Management Company's services under the Hamlet JV MSA, the Company pays an annual management fee to Enviva Management Company. The Hamlet JV will reimburse Enviva Management Company for all reasonable and necessary costs and expenses (other than general and administrative costs) incurred by, or chargeable to, Enviva Management Company.

***Make-Whole Agreements***

*Greenwood*

On the date of the Greenwood Drop-Down, we entered into a make-whole agreement with our sponsor, pursuant to which our sponsor agreed to reimburse us for any construction costs incurred for the planned expansion of the Greenwood plant in excess of $28.0 million. No amounts have been reimbursed as of December 31, 2020.

*Hamlet JV*

In connection with the Hamlet Drop-Down, on April 2, 2019 we entered into a make-whole agreement with our sponsor, pursuant to which (1) our sponsor agreed to guarantee certain cash flows from the Hamlet plant until June 30, 2020, (2) our

136

A0781

sponsor agreed to reimburse us for construction cost overruns in excess of budgeted capital expenditures for the Hamlet plant, subject to certain exceptions, (3) we agreed to pay to our sponsor quarterly incentive payments for any wood pellets produced by the Hamlet plant in excess of forecast production levels through June 30, 2020 and (4) our sponsor agreed to retain liability for certain claims payable, if any, by the Hamlet JV. The make-whole agreement expired pursuant to its terms on June 30, 2020. No amounts were reimbursed during the year ended December 31, 2020.

*Interim Services Agreement and Guaranty*

In connection with the Hamlet Drop-Down, on April 2, 2019 we entered into an interim services agreement (the "ISA") with Enviva Hamlet Operator, LLC, a wholly owned subsidiary of our sponsor ("Hamlet Operator") pursuant to which Hamlet Operator, as an independent contractor, agreed to manage, operate, maintain and repair the Hamlet plant and provide other services to the Hamlet JV for the period from July 1, 2019 through June 30, 2020 in exchange for a fixed fee per metric ton of wood pellets produced by the Hamlet plant during such period and delivered at place to the Wilmington terminal. Under and during the term of the ISA, Hamlet Operator agreed to (1) pay all operating and maintenance expenses at the Hamlet plant, (2) cover all reimbursable general and administrative expenses associated with the Hamlet plant and (3) pay certain other costs and expenses incurred by the Hamlet plant. Our sponsor guarantees all obligations of Hamlet Operator under the ISA. The ISA expired pursuant to its terms on June 30, 2020. During the year ended December 31, 2020, we recognized $27.9 million of expense related to the ISA.

Pursuant to the ISA, the Hamlet JV MSA was suspended during the term of the ISA, and Enviva Management Company waived the management fees payable to Enviva Management Company under the Hamlet JV MSA with respect to such period, which was approximately $2.7 million.

*Hamlet JV Revolver*

In connection with the Hamlet Drop-Down, on April 2, 2019, our sponsor assigned to us all of its rights and obligations under the amended and restated credit agreement, dated as of June 30, 2018, between the Hamlet JV, as borrower, and our sponsor, as lender. On April 2, 2019, we amended and restated the credit agreement to extend the maturity date of the revolving loans made to the Hamlet JV and increase our commitment as the lender to fund increases in the amount of such loans from $30.0 million to $60.0 million in order to fund capital expenditures and working capital at the Hamlet plant. As of December 31, 2020, the outstanding balance of the Hamlet JV Revolver was $52.2 million due from the Hamlet JV, which was eliminated upon consolidation.

*Hamlet JV LLC Agreement*

On December 29, 2016, our sponsor and John Hancock entered into the Fourth Amended and Restated Limited Liability Company Agreement of the Hamlet JV (the "Hamlet JV LLCA"). Following the Hamlet Drop-Down and pursuant to the Hamlet JV LLCA, we are the managing member of the Hamlet JV and have the authority to manage the business and affairs of the Hamlet JV and take actions on its behalf, including adopting annual budgets, entering into agreements, effecting asset sales or biomass purchase agreements, making capital calls, incurring debt and taking other actions, subject to John Hancock's consent in certain circumstances. The Hamlet JV LLCA also sets forth the capital commitments and limitations thereon for each of the members and provides for the allocation of sale proceeds and distributions among the holders of outstanding Class A Units and Class B Units. For more information on capital commitments, please see Item 8—Financial Statements and Supplementary Data, Notes to the Consolidated Financial Statements, (17)—*Partners' Capital—Hamlet JV.*

*Replacement Pledge Agreement*

In connection with the Hamlet Drop-Down, on April 2, 2019 we entered into a pledge agreement in favor of John Hancock pursuant to which, among other things, we pledged our Class B Units in the Hamlet JV to John Hancock in replacement of a corresponding pledge previously made to John Hancock by our sponsor as support for a guaranty previously provided to John Hancock.

*Guarantee Fee Agreement*

On December 28, 2017, the Hamlet JV entered into a guarantee fee agreement (the "Guarantee Fee Agreement") with our sponsor pursuant to which our sponsor agreed to guarantee certain obligations of the Hamlet JV under certain equipment leases and shipping contracts related to its business in exchange for certain fees.

*Sponsor Indemnification Agreement*

In connection with the Hamlet Drop-Down, on April 2, 2019 we entered into an agreement (the "Sponsor Indemnification Agreement") with our sponsor pursuant to which we agreed to indemnify our sponsor for any amounts owed under the

137

A0782

Guarantee Fee Agreement and our sponsor agreed to pay to us any fees it receives from the Hamlet JV for providing guarantees under the Guarantee Fee Agreement. Pursuant to the Sponsor Indemnification Agreement, the Partnership also agreed to indemnify our sponsor with respect to its obligations under certain guarantee and indemnity agreements with John Hancock related to the Hamlet JV.

### *Management Services Fee Adjustment Agreement*

On March 20, 2019, our sponsor entered into a management services fee adjustment agreement pursuant to which our sponsor agreed to make payments to us in respect of any amounts payable by the Hamlet JV pursuant to the Hamlet JV MSA in excess of the fixed-priced amounts for services established in the ISA. The agreement terminated on April 2, 2019 in accordance with its terms. No payments were made thereunder.

### *Equipment Transfers*

In April 2020, Enviva Pellets Northampton, LLC sold certain equipment to our sponsor for approximately $4.1 million.

### **Other Transactions with Related Persons**

### *Enviva FiberCo*

We purchase raw materials from Enviva FiberCo, LLC ("FiberCo"), a wholly owned subsidiary of our sponsor.

On July 1, 2019, we entered into an agreement with FiberCo pursuant to which FiberCo agreed to build specified levels of stumpage inventory and we agreed to purchase such inventory during the first and second quarter of 2020 at a fixed-price premium to the then-prevailing market price. Pursuant to such agreement, FiberCo was required to pay us fixed shortfall payments in the event that actual inventory levels fall below the specified levels as of specified dates.

Raw materials purchased during the year ended December 31, 2020 were $7.5 million. No cost of cover deficiency fees were recognized as of December 31, 2020. As of December 31, 2020, $0.3 million is included in related-party payables related to raw materials purchased from FiberCo.

### *Greenwood Contract*

In December 2017, we entered into a master off-take contract with our sponsor (the "Sponsor Off-take Master Agreement"). In February 2018, we entered into a confirmation governed by the Sponsor Off-take Master Agreement with Greenwood. We amended such confirmation in March 2018, July 2019 and January 2020. Under the amended confirmation, we agreed to purchase the wood pellets produced by the Greenwood plant through March 2022 and have a take-or-pay obligation with respect to 550,000 MTPY of wood pellets (prorated for partial contract years) beginning in 2021 and subject to Greenwood's option to increase or decrease the volume by 10% each contract year.

The Sponsor Off-Take Master Agreement was terminated on July 1, 2020 in connection with the Greenwood Drop-Down. As of December 31, 2020, the net purchased amount under the Greenwood contract was of $18.1 million.

### *Netting Agreement*

We entered into an agreement with our sponsor effective as of September 30, 2019 (the "Netting Agreement") pursuant to which we agreed to set off related-party accounts receivable and accounts payable; consequently, we intend to set off related-party receivables and payables, which are reflected net in related-party receivables and payables, as applicable, in accordance with the Netting Agreement.

### *Procedures for Review, Approval and Ratification of Transactions with Related Persons*

In connection with the closing of our IPO, the board of directors of our General Partner adopted policies for the review, approval and ratification of transactions with related persons. The board adopted a written Code of Business Conduct and Ethics under which a director is required to bring to the attention of the board any conflict or potential conflict of interest that may arise between the director or any affiliate of the director, on the one hand, and us or our General Partner on the other. The resolution of any such conflict or potential conflict should, at the discretion of the board in light of the circumstances, be determined by a majority of the disinterested directors.

Under the provisions of our Code of Business Conduct and Ethics, any executive officer will be required to avoid conflicts of interest unless approved by the board of directors of our General Partner.

A0783

The Code of Business Conduct and Ethics described above was adopted in connection with the closing of our IPO and, as a result, the transactions described above that were entered into prior to or in connection with the IPO were not reviewed according to such procedures.

The board has also adopted a Conflicts of Interest Policy, under which if a conflict or potential conflict of interest arises between our General Partner or its affiliates, on the one hand, and us or our unitholders, on the other hand, the resolution of any such conflict or potential conflict should be addressed by the board of directors of our General Partner in accordance with the provisions of our partnership agreement. At the discretion of the board in light of the circumstances, the resolution may be determined by the board in its entirety or by a conflicts committee meeting the definitional requirements for such a committee under our partnership agreement.

The Conflicts of Interest Policy provides that the board may approve certain contracts ("Affiliated Contracts") between us, on the one hand, and the General Partner and any of its affiliates, on the other hand, so long as the board reasonably determines that such contracts are on terms (in the aggregate) not less favorable to us than could be obtained on an arm's-length basis from an unrelated third party, taking into account the totality of the circumstances involved.

The Conflicts of Interest Policy also provides that either of the Chief Executive Officer or the Chief Financial Officer (each, an "Approving Officer") of our General Partner have the authority, without prior board approval but subject to board review, to approve certain Affiliated Contracts involving asset transfers, services related to the production, storage, terminaling or transportation of biomass, or leases in order to promote the proper functioning of our day-to-day business affairs so long as the applicable Approving Officer and the General Counsel of our General Partner determine, after reasonable inquiry, that such Affiliated Contracts are on terms (in the aggregate) not less favorable to us than could be obtained on an arm's-length basis from an unrelated third party, taking into account the totality of the circumstances involved.

***Director Independence***

See Part III, Item 10. "*Directors, Executive Officers and Corporate Governance*" for information regarding the directors of our General Partner and independence requirements applicable to the board of directors of our General Partner and its committees.

139

A0784

**ITEM 14.    PRINCIPAL ACCOUNTING FEES AND SERVICES**

Ernst & Young LLP ("EY") served as our independent auditors during the years ended December 31, 2020 and 2019, respectively. The following table presents fees paid for professional audit services of our annual consolidated financial statements and for other services for the years ended December 31, 2020 and 2019.

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| (in thousands) | | 2020 | | 2019 |
| Audit fees[1] | $ | 2,218 | $ | 1,439 |
| Audit related fees[2] | | 860 | | 10 |
| All other fees[3] | | 10 | | 11 |
| Total | $ | 3,088 | $ | 1,460 |

_____

(1)    Fees for financial statement audit and review services customary under generally accepted auditing standards or for the purpose of rendering an opinion or review on the financial statements related to the fiscal year then ended.

(2)    Fees for assurance and related services traditionally performed by independent accountants, including internal control reviews, audits in which we engaged related to an acquisition and to a less-than-wholly subsidiary, and work performed in connection with a registration statement or issuance of a comfort letter.

(3)    Fees for use of the EY global accounting and financial reporting research tool.

**Policy for Approval of Audit and Permitted Non-Audit Services**

Before the independent registered public accounting firm is engaged by us or our subsidiaries to render audit or non-audit services, the audit committee must pre-approve the engagement. Audit committee pre-approval of audit and non-audit services is not required if the engagement for the services is entered into pursuant to pre-approval policies and procedures established by the audit committee. The chairman of the audit committee has the authority to grant pre-approvals, provided such approvals are within the pre-approval policy and presented to the audit committee at a subsequent meeting.

The audit committee approved the appointment of EY as our independent auditor to conduct the audit of our consolidated financial statements for the year ended December 31, 2020 and all of the services described above.

A0785

**PART IV**

**ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES**

(a)    Certain documents are filed as a part of this Annual Report and are incorporated by reference and found on the pages below.

1.    Financial Statements—Please read Part II, Item 8. "Financial Statements and Supplementary Data—Index to Financial Statements."

2.    All schedules have been omitted because they are either not applicable, not required or the information called for therein appears in the consolidated financial statements or notes thereto.

3.    Exhibits—Exhibits required to be filed by Item 601 of Regulation S-K set forth below are incorporated herein by reference.

A0786

**EXHIBIT INDEX**

| Exhibit Number | Exhibit |
|---|---|
| 2.1 | Contribution Agreement by and among Enviva Development Holdings, LLC, Enviva Holdings, LP, and Enviva Partners, LP dated March 21, 2019 (Exhibit 2.1, Form 8-K filed March 25, 2019, File No. 001-037363) |
| 2.2 | Contribution Agreement, dated as of June 18, 2020, by and among Enviva Development Holdings, LLC, Enviva Partners, LP and Enviva Holdings, LP (Exhibit 2.1, Form 8-K filed June 19, 2020, File No. 001-37363) |
| 2.3 | Membership Interest Membership Interest Purchase and Sale Agreement, dated as of June 18, 2020, by and among Enviva Pellets Waycross Holdings, LLC (as assignee of Enviva Partners, LP), RWE Generation SE (as assignee of innogy SE) and innogy Renewables Beteiligungs GMBH (to be renamed RWE Renewables Beteiligungs GmbH) (Exhibit 2.2, Form 8-K filed June 19, 2020, File No. 001-37363) |
| 3.1 | Certificate of Limited Partnership of Enviva Partners, LP (Exhibit 3.1, Form S-1 Registration Statement filed October 28, 2014, File No. 333-199625) |
| 3.2 | First Amended and Restated Agreement of Limited Partnership of Enviva Partners, LP, dated May 4, 2015, by Enviva Partners GP, LLC (Exhibit 3.1, Form 8-K filed May 4, 2015, File No. 001-37363) |
| 3.3 | Amendment No. 1 to the First Amended and Restated Agreement of Limited Partnership of Enviva Partners, LP, effective as of December 18, 2017, by Enviva Partners GP, LLC (Exhibit 3.1, Form 8-K filed December 21, 2017) |
| 3.4* | Amendment No. 2 to the First Amended and Restated Agreement of Limited Partnership of Enviva Partners, LP, effective as of January 1, 2019 (Exhibit 3.4, Form 10-K filed February 27, 2020) |
| 4.1 | Indenture, dated as of December 9, 2019, by and among Enviva Partners, LP, Enviva Partners Finance Corp., the subsidiary guarantors party thereto, and Wilmington Trust, National Association, as trustee (incorporated by reference herein to Exhibit 4.1 to the Partnership's Form 8-K filed on December 9, 2019, File No. 001-37363) |
| 4.2 | Form of 6.500% 2026 Notes (included in Exhibit 4.1) |
| 4.3 | Registration Rights Agreement, dated May 4, 2015, by and among Enviva Partners, LP, Enviva MLP Holdco, LLC and Enviva Cottondale Acquisition I, LLC (Exhibit 4.1, Form 8-K filed May 4, 2015, File No. 001-37363) |
| 4.4 | Registration Rights Agreement by and between Enviva Partners, LP and John Hancock Life Insurance Company (U.S.A.), dated April 1, 2019 (Exhibit 4.1, Form 10-Q filed August 8, 2019, File No. 001-37363) |
| 4.5 | Registration Rights Agreement, dated as of June 23, 2020, by and among Enviva Partners, LP and the Investors named therein (Exhibit 4.1, Form 8-K filed June 24, 2020, File No. 001-37363) |
| 4.6* | Description of Securities Registered Pursuant to Section 12 of the Securities Exchange Act of 1934 (Exhibit 4.7, Form 10-K filed February 27, 2020) |
| 10.1* | Amended and Restated Purchase Rights Agreement, dated February 24, 2020, by and among Enviva Partners, LP, Enviva Partners GP, LLC and Enviva Holdings, LP (Exhibit 10.1, Form 10-K filed February 27, 2020) |
| 10.2 | Purchase Agreement, dated as of June 29, 2020, by and among Enviva Partners, LP, Enviva Partners Finance Corp., the subsidiary guarantors party thereto and Barclays Capital Inc., as representative of the initial purchasers named therein. (Exhibit 10.1, Form 8-K filed June 29, 2020, File No. 001-37363) |
| 10.3 | Common Unit Purchase Agreement, dated as of June 18, 2020, by and among Enviva Partners, LP and the Purchasers named on Schedule A therein (Exhibit 10.1, Form 8-K filed June 19, 2020, File No. 001-37363) |
| 10.4† | Enviva Partners, LP Long-Term Incentive Plan (Exhibit 4.3, Form S-8 Registration Statement filed April 30, 2015, File No. 333-203756) |
| 10.5† | Management Services Agreement by and among Enviva Partners, LP, Enviva Partners GP, LLC, Enviva, LP, Enviva GP, LLC, the subsidiaries of Enviva, LP party thereto and Enviva Management Company, LLC, dated as of April 9, 2015 (Exhibit 10.12, Form S-1 Registration Statement filed April 15, 2015, File No. 333-199625) |
| 10.6 | Fourth Amendment to Credit Agreement and Second Amendment to Guarantee and Collateral Agreement, dated as of October 18, 2018, by and among Enviva Partners, LP, as Borrower, certain subsidiaries of the Borrower and Barclays Bank PLC, as Administrative Agent and Collateral Agent. (Exhibit 10.1, Form 8-K filed October 19, 2018, File No. 001-37363)) |
| 10.7 | Management Services Agreement Fee Waiver, dated July 1, 2020, by and among Enviva Partners, LP, Enviva Partners GP, LLC and the other parties named therein (Exhibit 10.4, Form 10-Q filed August 6, 2020, File No. 001-37363) |
| 10.8 | Make-Whole Agreement, dated July 1, 2020, by and between Enviva Holdings, LP and Enviva, LP (Exhibit 10.5, Form 10-Q filed August 6, 2020, File No. 001-37363) |
| 10.9 | License Agreement, dated April 9, 2015, by and among Enviva Holdings, LP, Enviva Partners GP, LLC and Enviva Partners, LP (Exhibit 10.3, Form 8-K filed May 4, 2015, File No. 001-37363) |
| 10.10† | Form of Phantom Unit Award Grant Notice and Award Agreement (performance-based vesting for employees) (Exhibit 10.21, Form S-1 Registration Statement filed April 3, 2015, File No. 333-199625) |

142

A0787

| Exhibit Number | Exhibit |
|---|---|
| 10.11† | Form of Phantom Unit Award Grant Notice and Award Agreement (time-based vesting for employees) (Exhibit 10.20, Form S-1 Registration Statement filed April 3, 2015, File No. 333-199625) |
| 10.12† | Fourth Amended and Restated Employment Agreement, effective as of December 23, 2019, between Edward R. Smith and Enviva Management Company, LLC (Exhibit 10.3, Form 8-K filed December 23, 2019, File No. 001-37363) |
| 10.13† | Third Amended and Restated Employment Agreement, effective as of December 23, 2019, between John K. Keppler and Enviva Management Company, LLC (Exhibit 10.1, Form 8-K filed December 23, 2019, File No. 001-37363) |
| 10.14 | Management Services Agreement Fee Waiver by and among Enviva, LP, Enviva GP, LLC, Enviva Pellets Ahoskie, LLC, Enviva Pellets Amory, LLC, Enviva Pellets Northampton, LLC, Enviva Pellets Cottondale, LLC, Enviva Port of Chesapeake, LLC, Enviva Energy Services, LLC, Enviva Pellets Sampson, LLC, Enviva Pellets Southampton, LLC, Enviva Port of Panama City, LLC, Enviva Port of Wilmington, LLC and Enviva Management Company, LLC dated April 2, 2019 (Exhibit 10.3, Form 10-Q filed May 9, 2019, File No. 001-37363) |
| 10.15 | Second Amended and Restated Credit Agreement by and between Enviva Wilmington Holdings, LLC and Enviva, LP dated April 2, 2019 (Exhibit 10.4, Form 10-Q filed May 9, 2019, File No. 001-37363) |
| 10.16 | First Amendment and Issuing Bank Designation Agreement by and among the New Issuing Banks party thereto, Enviva Partners, LP and Barclays Bank plc, dated as of July 22, 2020. (Exhibit 10.1, Form 8-K filed July 24, 2020, File No. 001-37363) |
| 10.17 | Make-Whole Agreement by and between Enviva Holdings, LP and Enviva, LP dated April 2, 2019 (Exhibit 10.5, Form 10-Q filed May 9, 2019, File No. 001-37363) |
| 10.18†* | Fourth Amended and Restated Employment Agreement by and between Enviva Management Company, LLC and John K. Keppler, dated November 24, 2020 |
| 10.19†* | Second Amended and Restated Employment Agreement by and between Enviva Management Company, LLC and Shai S. Even, dated November 24, 2020 |
| 10.20*† | Third Amended and Restated Employment Agreement by and between Enviva Management Company, LLC and Thomas Meth, dated November 24, 2020 |
| 10.21*† | Fourth Amended and Restated Employment Agreement by and between Enviva Management Company, LLC and William H. Schmidt, Jr., dated November 24, 2020 |
| 10.22*† | Fifth Amended and Restated Employment Agreement by and between Enviva Management Company, LLC and E. Royal Smith dated November 24, 2020 |
| 10.23*† | Transaction bonus letter by and between Enviva Partners, LP and John K. Keppler, dated June 18, 2020 |
| 10.24*† | Transaction bonus letter by and between Enviva Partners, LP and Shai S. Even, dated June 18, 2020 |
| 10.25*† | Transaction bonus letter by and between Enviva Partners, LP and Thomas Meth, dated June 18, 2020 |
| 10.26*† | Transaction bonus letter by and between Enviva Partners, LP and William H. Schmidt, Jr., dated June 18, 2020 |
| 10.27† | First Amendment to Enviva Partners, LP Long-Term Incentive Plan (Exhibit 10.1, Form 8-K filed February 3, 2020, File No. 001-37363) |
| 10.28† | Second Amendment to Enviva Partners, LP Long-Term Incentive Plan (Exhibit 10.1, form 8-K filed January 29, 2021, File No. 001-37363) |
| 10.29*† | Form of Phantom Unit Award Grant Notice and Award Agreement (performance-based vesting for employees) (Exhibit 10.21, Form 10-K filed February 27, 2020) |
| 10.30*† | Form of Phantom Unit Award Grant Notice and Award Agreement (time-based vesting for employees) (Exhibit 10.22, Form 10-K filed February 27, 2020) |
| 10.31*† | Form of Phantom Unit Award Grant Notice and Award Agreement (non-employee directors) (Exhibit 10.23, Form 10-K filed February 27, 2020) |
| 10.32*† | Global Amendment to Phantom Unit Award Grant Notices and Agreements (Exhibit 10.25, Form 10-K filed February 27, 2020) |
| 16.1 | Letter from KPMG LLP dated July 12, 2019 (incorporated by reference to Exhibit 16.1 of Registrant's Current Report on Form 8-K filed on July 12, 2019) |
| 21.1* | List of Subsidiaries of Enviva Partners, LP |
| 23.1* | Consent of KPMG LLP relating to the financial statements of Enviva Partners, LP for the year ended December 31, 2018 |
| 23.2* | Consent of Ernst & Young LLP relating to the financial statements of Enviva Partners, LP for the year ended December 31, 2020. |
| 24.1* | Power of Attorney (incorporated by reference to the signature page of this Annual Report on Form 10-K) |
| 31.1* | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |

143

A0788

| Exhibit Number | Exhibit |
|---|---|
| 31.2* | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1** | Certification of Chief Executive Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2** | Certification of Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101 | The following financial information from Enviva Partners, LP's Annual Report on Form 10-K for the year ended December 31, 2020 formatted in Inline XBRL (Extensible Business Reporting Language) includes: (i) the Consolidated Balance Sheets, (ii) the Consolidated Statements of Operations, (iii) the Consolidated Statements of Comprehensive Income (Loss), (iv) the Consolidated Statements of Changes in Partners' Capital, (v) the Consolidated Statements of Cash Flows and (vi) Notes to the Consolidated Financial Statements. |
| 104 | Cover Page Interactive Data File - (formatted as Inline XBRL and contained in Exhibit 101) |

_____

\*    Filed herewith.

\*\*    Furnished herewith.

†    Management Contract or Compensatory Plan or Arrangement

144

A0789

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized.

ENVIVA PARTNERS, LP

By:     Enviva Partners GP, LLC, as its sole general partner

Date: February 25, 2021          By:     /s/ JOHN K. KEPPLER
                                          John K. Keppler
                                          Title: *Chairman, President and Chief Executive Officer*

145

A0790

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints each of William H. Schmidt, Jr. and Jason E. Paral as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, for him and in his name, place, and stead, in any and all capacities, to sign any and all amendments to this Annual Report, and to file the same, with all exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, and each of them, or their or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this Annual Report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ JOHN K. KEPPLER<br>John K. Keppler | Chairman, President and Chief Executive Officer<br>(Principal Executive Officer) | February 25, 2021 |
| /s/ SHAI S. EVEN<br>Shai S. Even | Executive Vice President and Chief Financial Officer<br><br>(Principal Accounting Officer and Principal Financial Officer) | February 25, 2021 |
| /s/ RALPH ALEXANDER<br>Ralph Alexander | Director | February 25, 2021 |
| /s/ JOHN C. BUMGARNER, JR.<br>John C. Bumgarner, Jr. | Director | February 25, 2021 |
| /s/ JIM H. DERRYBERRY<br>Jim H. Derryberry | Director | February 25, 2021 |
| /s/ CHRISTOPHER B. HUNT<br>Christopher B. Hunt | Director | February 25, 2021 |
| /s/ GERRIT L. LANSING, JR.<br>Gerrit L. Lansing, Jr. | Director | February 25, 2021 |
| /s/ WILLIAM K. REILLY<br>William K. Reilly | Director | February 25, 2021 |
| /s/ JEFFREY W. UBBEN<br>Jeffrey W. Ubben | Director | February 25, 2021 |
| /s/ GARY L. WHITLOCK<br>Gary L. Whitlock | Director | February 25, 2021 |
| /s/ JANET S. WONG<br>Janet S. Wong | Director | February 25, 2021 |

146

A0791

EXHIBIT 10.18

*Execution Version*

**FOURTH AMENDED AND RESTATED
EMPLOYMENT AGREEMENT**

This Fourth Amended and Restated Employment Agreement ("Agreement") is made and entered into as of November 24, 2020 (the "Amendment Effective Date") by and between Enviva Management Company, LLC, a Delaware limited liability company (the "Company"), and John K. Keppler ("Executive") and supersedes and replaces in its entirety the Third Amended and Restated Employment Agreement (the "Prior Agreement") dated December 23, 2019 by and between the Company and Executive.

1.     **Employment**. During the period commencing on the Amendment Effective Date and for the duration of the Employment Period (as defined in Section 4 below) (the "Specified Employment Period"), the Company shall continue to employ Executive, and Executive shall continue to serve, as Chairman, President and Chief Executive Officer of the Company, Enviva Holdings GP, LLC, a Delaware limited liability company ("Holdings GP") and the general partner of Enviva Holdings, LP, a Delaware limited partnership ("Holdings"), and such other Affiliates of the Company as may be designated by the Board of Directors of Holdings GP (the "Holdings Board") from time to time.

2.     **Duties and Responsibilities of Executive**.

(a)     During the Employment Period, Executive shall devote Executive's full business time and attention to the business of the Company and its Affiliates, as applicable, and will not hold any outside employment or consulting position. Executive's duties pursuant to this Agreement will include those normally incidental to the positions identified in Section 1, as well as such additional duties as may be assigned to Executive by the Holdings Board from time to time.

(b)     Executive represents and covenants that Executive is not the subject of or a party to any employment agreement, non-competition or non-solicitation covenant, non-disclosure agreement, or any other agreement, covenant, understanding, or restriction that would prohibit Executive from executing this Agreement and fully performing Executive's duties and responsibilities hereunder, or would in any manner, directly or indirectly, limit or affect the duties and responsibilities that may now or in the future be assigned to Executive hereunder.

(c)     Executive acknowledges and agrees that Executive owes the Company and its Affiliates fiduciary duties, including duties of care, loyalty, fidelity, and allegiance, such that Executive shall act at all times in the best interests of the Company and its Affiliates and shall not appropriate any business opportunity of the Company or its Affiliates for Executive. Executive agrees that the obligations described in this Agreement are in addition to, and not in lieu of, the obligations Executive owes the Company and its Affiliates under common law. The Parties acknowledge and agree that Executive may provide services (including as an executive, employee, director, or otherwise) to multiple Affiliates of the Company and, in providing such services, Executive will not be violating Executive's obligations hereunder so long as Executive abides by the terms of Sections 7, 8, and 9 below in the course of performing such services.

A0792

3.    **Compensation**.

(a)    Base Salary. During the Specified Employment Period, the Company shall pay to Executive an annualized base salary of $800,000 (the "Base Salary") in consideration for Executive's services under this Agreement, payable on a not less than biweekly basis, in conformity with the Company's customary payroll practices for executives as in effect from time to time.

(b)    Annual Bonus. During the Specified Employment Period, Executive shall be eligible for discretionary bonus compensation for each calendar year that Executive is employed by the Company hereunder (each, a "Bonus Year") pursuant to the applicable incentive or bonus compensation plan of the Company, if any, that is applicable to similarly situated executives of the Company (each, an "Annual Bonus"). Each Annual Bonus shall have a target value that is not less than 150% of Executive's Base Salary as in effect on the first day of the Bonus Year to which such Annual Bonus relates (the "Minimum Target Annual Bonus"); *provided, however*, that the Minimum Target Annual Bonus for the 2020 calendar year shall not be less than $1,087,500. The performance targets that must be achieved in order to realize certain bonus levels shall be established by the Holdings Board or a committee thereof annually, in its sole discretion, and communicated to Executive in accordance with terms of the applicable incentive or bonus plan, if any, or if no such plan has been adopted, within the first 90 days of each applicable Bonus Year following 2020 (the most recently established target value for Executive's Annual Bonus is referred to herein as the "Target Annual Bonus"). Each Annual Bonus, if any, will be paid as soon as administratively feasible after the Holdings Board or a committee thereof certifies whether the applicable performance targets for the applicable Bonus Year have been achieved, but in no event later than March 15 following the end of such Bonus Year.

(c)    Long-Term Incentive Plan. With respect to the 2021 calendar year and each subsequent calendar year during the Specified Employment Period, Executive shall be eligible to receive annual awards under the Enviva Partners, LP equity compensation plan as in effect from time to time (the "LTIP") with a target value equal to a multiple of Executive's Base Salary as in effect on the first day of such calendar year resulting in a value equal to $3,400,000 (the "Target Annual LTIP Award"). For the avoidance of doubt, such multiple is 425% for a Base Salary of $800,000. All awards granted to Executive under the LTIP, if any, shall be on such terms and conditions as the board of directors (the "Partners Board") of Enviva Partners GP, LLC, a Delaware limited liability company and the general partner of Enviva Partners, LP (the "MLP"), or a committee thereof shall determine from time to time and shall be subject to and governed by the terms and provisions of the LTIP as in effect from time to time and the award agreements evidencing such awards. Nothing herein shall be construed to give Executive any rights to any amount or type of grant or award except as provided in such award to Executive provided in writing and authorized by the Partners Board (or a committee thereof).

4.    **Term of Employment**. The current term of Executive's employment under this Agreement is the period commencing on the Amendment Effective Date and ending on the first anniversary of the Amendment Effective Date (the "Current Term"). On the first anniversary of

2

A0793

the Amendment Effective Date and on each subsequent anniversary of the Amendment Effective Date thereafter, the term of Executive's employment under this Agreement shall automatically renew and extend for a period of 12 months (each such 12-month period being a "Renewal Term") unless written notice of non-renewal is delivered by either party to the other not less than 60 days prior to the expiration of the then-existing Current Term or Renewal Term, as applicable. Notwithstanding any other provision of this Agreement to the contrary, Executive's employment pursuant to this Agreement may be terminated at any time in accordance with Section 6. The period from the Amendment Effective Date through the expiration of this Agreement or, if sooner, the termination of Executive's employment pursuant to this Agreement, regardless of the time or reason for such termination, shall be referred to herein as the "Employment Period."

5.    **Reimbursement of Business Expenses; Benefits**. Subject to the terms and conditions of this Agreement, Executive shall be entitled to the following reimbursements and benefits during the Employment Period:

(a)    Reimbursement of Business Expenses. The Company agrees to reimburse Executive for Executive's reasonable business-related expenses incurred in the performance of Executive's duties under this Agreement; *provided* that Executive timely submits all documentation for such reimbursement, as required by Company policy in effect from time-to-time. Any reimbursement of expenses under this Section 5(a) or Section 12 shall be made by the Company upon or as soon as practicable following receipt of supporting documentation reasonably satisfactory to the Company (but in any event not later than the close of Executive's taxable year following the taxable year in which the expense is incurred by Executive); *provided*, *however*, that, upon the termination of Executive's employment with the Company, in no event shall any additional reimbursement be made prior to the date that is six months after the date of such termination (or, if earlier, prior to the date of Executive's death) to the extent such payment delay is required under Section 409A(a)(2)(B) of the Internal Revenue Code. In no event shall any reimbursement be made to Executive for such expenses incurred after the date that is five years after the date of the termination of Executive's employment with the Company. Executive is not permitted to receive a payment in lieu of reimbursement under this Section 5(a) or Section 12.

(b)    Benefits. Executive shall be eligible to participate in the same benefit plans or fringe benefit policies in which other similarly situated Company employees are eligible to participate, subject to applicable eligibility requirements and the terms and conditions of such plans and policies as in effect from time to time. The Company shall not, by reason of this Section 5(b), be obligated to institute, maintain, or refrain from changing, amending, or discontinuing, any such plan or policy, so long as such changes are similarly applicable to similarly situated Company employees generally.

6.    **Termination of Employment**.

(a)    Company's Right to Terminate Executive's Employment for Cause. The Company shall have the right to terminate Executive's employment at any time for Cause. For purposes of this Agreement, "Cause" shall mean Executive's:

3

(i) material breach of any policy established by the Company or any of its Affiliates that (x) pertains to health and safety and (y) is applicable to Executive;

(ii) engaging in acts of disloyalty to the Company or its Affiliates, including fraud, embezzlement, theft, commission of a felony, or proven dishonesty; or

(iii) willful misconduct in the performance of, or willful failure to perform a material function of, Executive's duties under this Agreement.

(b)     Company's Right to Terminate for Convenience. The Company shall have the right to terminate Executive's employment without Cause, at any time and for any reason or no reason at all.

(c)     Executive's Right to Terminate for Good Reason. Executive shall have the right to terminate Executive's employment with the Company at any time for Good Reason. For purposes of this Agreement, "Good Reason" shall mean:

(i) a material diminution in Executive's authority, duties, title, or responsibilities;

(ii) a material diminution in Executive's Base Salary, Minimum Target Annual Bonus, or Target Annual LTIP Award;

(iii) the relocation of the geographic location of Executive's principal place of employment by more than 100 miles from the location of Executive's principal place of employment as of the Amendment Effective Date; or

(iv) the Company's delivery of a written notice of non-renewal of this Agreement to Executive.

Notwithstanding the foregoing provisions of this Section 6(c) or any other provision of this Agreement to the contrary, any assertion by Executive of a termination for Good Reason shall not be effective unless all of the following conditions are satisfied: (A) the condition described in Section 6(c)(i), (ii), (iii), or (iv) giving rise to Executive's termination of Executive's employment must have arisen without Executive's written consent; (B) Executive must provide written notice to the Company of such condition within 30 days of the date on which Executive knew of the existence of the condition; (C) the condition specified in such notice must remain uncorrected for 30 days after receipt of such notice by the Company; and (D) the date of Executive's termination of Executive's employment must occur within 30 days after the end of such cure period.

(d)     Death or Disability. Executive's employment with the Company shall terminate upon the death or Disability of Executive. For purposes of this Agreement, a "Disability" shall exist if Executive is unable to perform the essential functions of Executive's position, with reasonable accommodation (if applicable), due to an illness or physical or mental impairment or other incapacity that continues for a period in excess of 90 days, whether

4

A0795

consecutive or not, in any period of 365 consecutive days. The determination of a Disability will be made by the Company after obtaining an opinion from a doctor of the Company's choosing. Executive agrees to provide such information and participate in such examinations as may be reasonably required by said doctor in order to form his or her opinion. If requested by the Company, Executive shall submit to a mental or physical examination to be performed by an independent physician selected by the Company to assist the Company in making such determination.

(e)     Executive's Right to Terminate for Convenience. Executive shall have the right to terminate Executive's employment with the Company for convenience at any time upon 60 days' advance written notice to the Company; *provided* that if Executive provides a notice of termination pursuant to this Section 6(e), the Company may designate an earlier termination date than that specified in Executive's notice. The Company's designation of such an earlier date will not change the nature of Executive's termination, which will still be deemed a voluntary resignation by Executive pursuant to this Section 6(e).

(f)     Effect of Termination.

(i)If Executive's employment hereunder shall terminate (1) pursuant to Section 4 at the expiration of the then-existing Current Term or Renewal Term, as applicable, as a result of a non-renewal of this Agreement by Executive or (2) pursuant to Section 6(a) or 6(e), then all compensation and all benefits to Executive hereunder shall terminate contemporaneously with such termination of employment, except that Executive shall be entitled to (x) payment of all earned, unpaid Base Salary within 30 days of Executive's last day of employment, or earlier if required by law, (y) reimbursement for all incurred but unreimbursed expenses for which Executive is entitled to reimbursement in accordance with Section 5(a) and Section 12, and (z) benefits to which Executive may be entitled pursuant to the terms of any plan or policy described in Section 5(b).

(ii)If Executive's employment terminates (1) pursuant to Section 6(b) or 6(c) or (2) due to Executive's death or Disability pursuant to Section 6(d), then all compensation and all benefits to Executive hereunder shall terminate contemporaneously with such termination of employment, except that (I) Executive shall be entitled to receive the compensation and benefits described in clauses (x) through (z) of Section 6(f)(i); and (II) if Executive executes, on or before the Release Expiration Date (as defined below), and does not revoke within the time provided by the Company to do so, a release of all claims in a form satisfactory to the Company (which shall be substantially similar to the form of release attached hereto as Exhibit A) (the "Release")), then, *provided* that Executive abides by the terms of Sections 7, 8, 9, 10, and 12:

(1)     The Company shall pay to Executive an amount (the "Severance Payment") equal to the product of (x) 1.5 (or, if such termination occurs within 12 months following a Change in Control (as defined below), 2.0) and (y) the sum of Executive's Base Salary as in effect on the date of the termination of Executive's employment (the "Termination Date") and Executive's

5

Target Annual Bonus as of the Termination Date. The Severance Payment will be divided into 36 (or, if such termination occurs within 12 months following a Change in Control, 48) substantially equal installments. On the Company's first regularly scheduled pay date that is on or after the date that is 60 days after the Termination Date, the Company shall pay to Executive, without interest, a number of such installments equal to the number of such installments that would have been paid during the period beginning on the Termination Date and ending on the Company's first regularly scheduled pay date that is on or after the date that is 60 days after the Termination Date had the installments been paid on a biweekly basis commencing on the Company's first regularly scheduled pay date coincident with or next following the Termination Date, and each of the remaining installments shall be paid on a biweekly basis thereafter; *provided*, *however*, that (1) to the extent, if any, that the aggregate amount of the installments of the Severance Payment and any payments under Section 6(f)(ii)(C) that would otherwise be paid pursuant to the preceding provisions of this Section 6(f)(ii)(A) or Section 6(f)(ii)(C) after March 15 of the calendar year following the calendar year in which the Termination Date occurs (the "Applicable March 15") exceeds the maximum exemption amount under Treasury Regulation Section 1.409A-1(b)(9)(iii)(A), then such excess shall be paid to Executive in a lump sum on the Applicable March 15 (or the first business day preceding the Applicable March 15 if the Applicable March 15 is not a business day) and the installments of the Severance Payment payable after the Applicable March 15 shall be reduced by such excess (beginning with the installment first payable after the Applicable March 15 and continuing with the next succeeding installment until the aggregate reduction equals such excess), and (2) all remaining installments of the Severance Payment, if any, that would otherwise be paid pursuant to the preceding provisions of this Section 6(f)(ii)(A) after December 31 of the calendar year following the calendar year in which the Termination Date occurs shall be paid with the installment of the Severance Payment, if any, due in December of the calendar year following the calendar year in which the Termination Date occurs.

(2)      All outstanding awards granted to Executive pursuant to the LTIP prior to the Termination Date that remain unvested as of the Termination Date shall immediately become fully vested as of the Termination Date; *provided*, *however*, that with respect to any such LTIP awards that were granted subject to a performance requirement (other than continued service by Executive) that has not been satisfied and certified by the Partners Board (or a committee thereof) as of the Termination Date, then (1) if the Termination Date occurs within six months prior to the expiration of the performance period applicable to such LTIP award, such LTIP award shall become vested based on actual performance upon the expiration of such performance period; and (2) if the Termination Date occurs at any other time during the performance period applicable to such LTIP award, such LTIP award shall become vested as of the Termination Date based on target performance.

6

(3)     If Executive timely and properly elects to continue coverage for Executive and Executive's spouse and eligible dependents, if any, under the Company's group health plans pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), similar in the amounts and types of coverage provided by the Company to Executive prior to the Termination Date, then for a period of 18 months following the Termination Date or such earlier date as provided in this Section 6(f)(ii)(C), the Company shall promptly reimburse Executive on a monthly basis for the entire amount Executive pays to effect and continue such coverage; *provided*, *however*, that Executive's rights to such reimbursements under this Section 6(f)(ii)(C) shall terminate upon the earlier of (1) the time Executive becomes eligible to be covered under a group health plan sponsored by another employer (and Executive shall promptly notify the Company in the event that Executive becomes so eligible) or (2) the date Executive is no longer eligible to receive COBRA continuation coverage. Notwithstanding anything in the preceding provisions of this Section 6(f)(ii)(C) to the contrary, (x) the election of COBRA continuation coverage and the payment of any premiums due with respect to such COBRA continuation coverage will remain Executive's sole responsibility, and the Company will assume no obligation for payment of any such premiums relating to such COBRA continuation coverage and (y) if the provision of the benefit described in this Section 6(f)(ii)(C) cannot be provided in the manner described above without penalty, tax, or other adverse impact on the Company, then the Company and Executive shall negotiate in good faith to determine an alternative manner in which the Company may provide a substantially equivalent benefit to Executive without such adverse impact on the Company. If (1) Executive's termination of employment pursuant to this Section 6(f)(ii) occurs within 12 months following a Change in Control and (2) Executive has not become eligible to be covered under a group health plan sponsored by another employer by the earlier of the date that is 18 months after the Termination Date or December 1 of the calendar year following the calendar year in which the Termination Date occurs (such earlier date being the "COBRA Payment Trigger Date"), then, on the Company's first regularly scheduled pay date following the COBRA Payment Trigger Date (but in no event later than December 31 of the calendar year following the calendar year in which the Termination Date occurs), the Company shall pay to Executive a lump sum cash payment equal to six times the amount Executive paid to effect and continue coverage for himself and his spouse and eligible dependents, if any, under the Company's group health plan for the full calendar month next preceding the COBRA Payment Trigger Date.

For purposes of this Section 6(f)(ii), in the event of Executive's death, references to Executive (other than in Section 6(f)(ii)(C)) shall include Executive's estate, and references to Executive in Section 6(f)(ii)(C) shall include Executive's spouse and eligible dependents, if any, who are "qualified beneficiaries" (within the meaning of COBRA and the regulations thereunder) with respect to Executive's death.

7

(iii)Executive acknowledges Executive's understanding that if the Release is not executed and returned to the Company on or before the Release Expiration Date, and the required revocation period has not fully expired without revocation of the Release by Executive, then Executive shall not be entitled to any payments or benefits pursuant to Section 6(f)(ii). As used herein, the "Release Expiration Date" is that date that is 21 days following the date upon which the Company delivers the Release to Executive (which shall occur no later than seven days after the Termination Date) or, in the event that such termination of employment is "in connection with an exit incentive or other employment termination program" (as such phrase is defined in the Age Discrimination in Employment Act of 1967, as amended), the date that is 45 days following such delivery date.

(iv)For purposes of this Agreement, a "Change in Control" shall mean the occurrence of one or more of the following transactions:

(1)    the sale or disposal by Holdings of all or substantially all of its assets to any person other than an Affiliate of Holdings;

(2)    the merger or consolidation of Holdings with or into another partnership, corporation, or other entity, other than a merger or consolidation in which the unitholders in Holdings immediately prior to such transaction retain a greater than 50% equity interest in the surviving entity;

(3)    the failure of Riverstone Holdings LLC and its Affiliates (collectively, "Riverstone") to possess, directly or indirectly, the power to direct or cause the direction of the management and policies of Holdings, whether through the ownership of voting securities, by contract, or otherwise; or

(4)    the occurrence of one or more of the following events:

(a)    the sale or disposal by the MLP of all or substantially all of its assets to any person other than an Affiliate of the MLP;

(b)    the merger or consolidation of the MLP with or into another partnership, corporation, or other entity, other than a merger or consolidation in which the unitholders in the MLP immediately prior to such transaction retain a greater than 50% equity interest in the surviving entity; or

(c)    the failure of Riverstone to possess, directly or indirectly, the power to direct or cause the direction of the management and policies of the MLP, whether through the ownership of voting securities, by contract, or otherwise.

8

A0799

(g)    Meaning of Termination of Employment. For all purposes of this Agreement, Executive shall be considered to have terminated employment with the Company when Executive incurs a "separation from service" with the Company within the meaning of Section 409A(a)(2)(A)(i) of the Internal Revenue Code; *provided*, *however*, that whether such a separation from service has occurred shall be determined based upon a reasonably anticipated permanent reduction in the level of bona fide services to be performed to no more than 25% of the average level of bona fide services provided in the immediately preceding 36 months.

7.    **Conflicts of Interest; Disclosure of Opportunities**. Executive agrees that Executive shall promptly disclose to the Holdings Board any conflict of interest involving Executive upon Executive becoming aware of such conflict. Executive further agrees that, throughout the Employment Period and for one year thereafter, Executive shall offer to the Company and its Affiliates, as applicable, all business opportunities relating to the acquisition, development, ownership, and operation of facilities that collect, process, and transform wood-based biomass into renewable energy feedstock, including wood pellets, regardless of where such business opportunities arise.

8.    **Confidentiality**. Executive acknowledges and agrees that, in the course of Executive's employment with the Company, Executive has been provided with and had access to (and, during the Employment Period, Executive will continue to be provided with, and have access to) valuable Confidential Information (as defined below). In consideration of Executive's receipt of and access to such Confidential Information and in exchange for other valuable consideration provided hereunder, and as a condition of Executive's employment hereunder, Executive agrees to comply with this Section 8.

(a)    Executive covenants and agrees, both during the Employment Period and thereafter that, except as expressly permitted by this Agreement or by directive of the Holdings Board, Executive shall not disclose any Confidential Information to any Person and shall not use any Confidential Information except for the benefit of the Company or any of its Affiliates. Executive shall take all reasonable precautions to protect the physical security of all documents and other material containing Confidential Information (regardless of the medium on which the Confidential Information is stored). The covenants in this Section 8(a) shall apply to all Confidential Information, whether now known or later to become known to Executive during the Employment Period.

(b)    Notwithstanding Section 8(a), Executive may make the following disclosures and uses of Confidential Information:

(i)disclosures to other executives or employees of the Company or its Affiliates who have a need to know the information in connection with the business of the Company or its Affiliates;

(ii)disclosures and uses that are incidental to Executive's provision of services to the Company and its Affiliates consistent with the terms of this Agreement or that are approved by the Holdings Board;

9

(iii) disclosures for the purpose of complying with any applicable laws or regulatory requirements; or

(iv) disclosures that Executive is legally compelled to make by deposition, interrogatory, request for documents, subpoena, civil investigative demand, order of a court of competent jurisdiction, or similar process, or otherwise by law.

(c)      Upon the expiration of the Employment Period and at any other time upon request of the Company, Executive shall surrender and deliver to the Company all documents (including electronically stored information) and other material of any nature containing or pertaining to all Confidential Information in Executive's possession and shall not retain any such document or other material. Within 10 days of any such request, Executive shall certify to the Company in writing that all such materials have been returned to the Company.

(d)      All non-public information, designs, ideas, concepts, improvements, product developments, discoveries, and inventions, whether patentable or not, that are conceived, made, developed, or acquired by Executive, individually or in conjunction with others, during the period Executive is or has been employed or affiliated with the Company or any of its Affiliates (whether during business hours or otherwise and whether on the Company's premises or otherwise) that relate to the Company's or any of its Affiliates' business or properties, products, or services (including all such information relating to corporate opportunities, business plans, trade secrets, strategies for developing business and market share, research, financial and sales data, pricing terms, evaluations, opinions, interpretations, acquisition prospects, the identity of customers or their requirements, the identity of key contacts within customers' organizations or within the organization of acquisition prospects, or marketing and merchandising techniques, prospective names and marks) is defined as "Confidential Information." Moreover, all documents, videotapes, written presentations, brochures, drawings, memoranda, notes, records, files, correspondence, manuals, models, specifications, computer programs, e-mail, voicemail, electronic databases, maps, drawings, architectural renditions, models, and all other writings or materials of any type including or embodying any of such information, ideas, concepts, improvements, discoveries, inventions, and other similar forms of expression are and shall be the sole and exclusive property of the Company or its Affiliates and be subject to the same restrictions on disclosure applicable to all Confidential Information pursuant to this Agreement.

(e)      Nothing in this Agreement shall prohibit or restrict Executive from lawfully (i) initiating communications directly with, cooperating with, providing information to, causing information to be provided to, or otherwise assisting in an investigation by any governmental or regulatory agency, entity, or official(s) (collectively, "Governmental Authorities") regarding a possible violation of any law, (ii) responding to any inquiry or legal process directed to Executive individually from any such Governmental Authorities, (iii) testifying, participating, or otherwise assisting in an action or proceeding by any such Governmental Authorities relating to a possible violation of law, or (iv) making any other disclosures that are protected under the whistleblower provisions of any applicable law. Additionally, pursuant to the federal Defend Trade Secrets Act of 2016, Executive shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a

10

A0801

trade secret that (x) is made (A) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (B) solely for the purpose of reporting or investigating a suspected violation of law, or (y) is made to Executive's attorney in relation to a lawsuit for retaliation against Executive for reporting a suspected violation of law, or (z) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Nor does this Agreement require Executive to obtain prior authorization from the Company or its Affiliates before engaging in any conduct described in this Section 8(e), or to notify the Company or its Affiliates that Executive has engaged in any such conduct.

9.    **Non-Competition; Non-Solicitation**.

(a)    The Company shall continue to provide Executive access to Confidential Information for use only during the Employment Period, and Executive acknowledges and agrees that the Company will be entrusting Executive, in Executive's unique and special capacity, with continuing to develop the goodwill of the Company, and in consideration thereof and in consideration of the continued access to Confidential Information, and as a condition of Executive's employment hereunder, Executive has voluntarily agreed to the covenants set forth in this Section 9. Executive further agrees and acknowledges that the limitations and restrictions set forth herein, including the geographical and temporal restrictions on certain competitive activities, are reasonable in all respects and are material and substantial parts of this Agreement intended and necessary to protect the Company's legitimate business interests, including the preservation of its Confidential Information and goodwill.

(b)    Executive agrees that, during the period set forth in Section 9(c) below, Executive shall not, without the prior written approval of the Company, directly or indirectly, for Executive or on behalf of or in conjunction with any other person or entity of whatever nature:

(i) engage or participate within the Market Area in competition with the Company in any business in which either the Company or its Protected Affiliates engaged in, or had plans to become engaged in of which Executive was aware during the Employment Period or the period set forth in Section 9(c) below, which business includes the acquisition, development, ownership, and operation of facilities that collect, process, and transform wood-based biomass into renewable energy feedstock, including wood pellets (the "Business"). As used herein, the term "Protected Affiliates" means any Affiliate of the Company for which Executive provided services during the Employment Period, or about which Executive obtained Confidential Information during the Employment Period.

(ii) appropriate any Business Opportunity of, or relating to, the Company or its Affiliates located in the Market Area, or engage in any activity that is detrimental to the Company or its Affiliates or that limits the Company's or an Affiliate's ability to fully exploit such Business Opportunities or prevents the benefits of such Business Opportunities from accruing to the Company or its Affiliates; or

(iii) solicit any employee of the Company or its Affiliates to terminate his or her employment therewith.

11

(c)     Timeframe of Non-Competition and Non-Solicitation Agreement. Executive agrees that the covenants of this Section 9 shall be enforceable during the Employment Period and for a period of one year following the termination of the Employment Period, regardless of the reason for such termination.

(d)     Because of the difficulty of measuring economic losses to the Company and its Affiliates as a result of a breach of the foregoing covenants, and because of the immediate and irreparable damage that could be caused to the Company and its Affiliates for which they would have no other adequate remedy, Executive agrees that the foregoing covenant may be enforced by the Company and its Affiliates, in the event of breach by Executive, by injunctions and restraining orders and that such enforcement shall not be the Company's and its Affiliates' exclusive remedy for a breach but instead shall be in addition to all other rights and remedies available to the Company and its Affiliates, both at law and in equity.

(e)     The covenants in this Section 9 are severable and separate, and the unenforceability of any specific covenant (or any portion thereof) shall not affect the provisions of any other covenant (or any portion thereof). Moreover, in the event any court of competent jurisdiction or arbitrator, as applicable, shall determine that the scope, time, or territorial restrictions set forth in this Section 9 are unreasonable, then it is the intention of the parties that such restrictions be enforced to the fullest extent that the court or arbitrator deems reasonable, and this Agreement shall thereby be reformed.

(f)     For purposes of this Section 9, the following terms shall have the following meanings:

(i)"Business Opportunity" shall mean any commercial, investment, or other business opportunity relating to the Business.

(ii)"Market Area" shall mean any location or geographic area within 75 miles of a location where the Company or its Affiliates conducts Business, or has plans to conduct Business of which Executive is aware, during the Employment Period.

(g)     All of the covenants in this Section 9 shall be construed as an agreement independent of any other provision in this Agreement, and the existence of any claim or cause of action of Executive against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of such covenants.

10.     **Ownership of Intellectual Property**. Executive agrees that the Company or its applicable Affiliate shall own, and Executive agrees to assign and does hereby assign, all right, title, and interest (including patent rights, copyrights, trade secret rights, mask work rights, trademark rights, and all other intellectual and industrial property rights of any sort throughout the world) relating to any and all inventions (whether or not patentable), works of authorship, mask works, designs, know-how, ideas, and information authored, created, contributed to, made, or conceived or reduced to practice, in whole or in part, by Executive during the period that Executive is or has been employed or affiliated with the Company or any of its Affiliates that either (a) relate, at the time of conception, reduction to practice, creation, derivation, or

12

development, to the Company's or any of its Affiliates' business or actual or anticipated research or development, or (b) were developed on any amount of the Company's time or with the use of any of the Company's or its Affiliates' equipment, supplies, facilities, or trade secret information (all of the foregoing collectively referred to herein as "Company Intellectual Property"), and Executive will promptly disclose all Company Intellectual Property to the Company. All of Executive's works of authorship and associated copyrights created during the Employment Period and in the scope of Executive's employment shall be deemed to be "works made for hire" within the meaning of the Copyright Act. Executive agrees to perform, during and after the Employment Period, all reasonable acts deemed necessary by the Company to assist the Company or its applicable Affiliate, at the Company's or such Affiliate's expense, in obtaining and enforcing its rights throughout the world in the Company Intellectual Property. Such acts may include, but are not limited to, execution of documents and assistance or cooperation (i) in the filing, prosecution, registration, and memorialization of assignment of any applicable patents, copyrights, mask work, or other applications, (ii) in the enforcement of any applicable patents, copyrights, mask work, moral rights, trade secrets, or other proprietary rights, and (iii) in other legal proceedings related to the Company Intellectual Property.

11.    **Arbitration**.

(a)    Subject to Section 11(d), any dispute, controversy, or claim between Executive and the Company or any of its Affiliates arising out of or relating to this Agreement or Executive's employment with the Company or services provided to any Affiliate of the Company will be finally settled by arbitration in New York, New York before, and in accordance with the rules for the resolution of employment disputes then in effect of, the American Arbitration Association ("AAA"). The arbitration award shall be final and binding on both parties.

(b)    Any arbitration conducted under this Section 11 shall be heard by a single arbitrator (the "Arbitrator") selected in accordance with the then-applicable rules of the AAA. The Arbitrator shall expeditiously (and, if possible, within 90 days after the selection of the Arbitrator) hear and decide all matters concerning the dispute. Except as expressly provided to the contrary in this Agreement, the Arbitrator shall have the power to (i) gather such materials, information, testimony, and evidence as the Arbitrator deems relevant to the dispute before him or her (and each party will provide such materials, information, testimony, and evidence requested by the Arbitrator, except to the extent any information so requested is proprietary, subject to a third-party confidentiality restriction, or to an attorney-client or other privilege), and (ii) grant injunctive relief and enforce specific performance. The decision of the Arbitrator shall be rendered in writing, be final and binding upon the disputing parties, and the parties agree that judgment upon the award may be entered by any court of competent jurisdiction; *provided* that the parties agree that the Arbitrator and any court enforcing the award of the Arbitrator shall not have the right or authority to award punitive or exemplary damages to any disputing party.

(c)    Each side shall share equally the cost of the arbitration and bear its own costs and attorneys' fees incurred in connection with any arbitration, unless the Arbitrator determines that compelling reasons exist for allocating all or a portion of such costs and fees to the other side.

13

A0804

(d)    Notwithstanding Section 11(a), an application for emergency or temporary injunctive relief by either party (including any such application to enforce the provisions of Sections 8, 9, or 10 herein) shall not be subject to arbitration under this Section 11; *provided*, *however*, that the remainder of any such dispute (beyond the application for emergency or temporary injunctive relief) shall be subject to arbitration under this Section.

(e)    By entering into this Agreement and entering into the arbitration provisions of this Section 11, THE PARTIES EXPRESSLY ACKNOWLEDGE AND AGREE THAT THEY ARE KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVING THEIR RIGHTS TO A JURY TRIAL.

(f)    Nothing in this Section 11 shall prohibit a party to this Agreement from (i) instituting litigation to enforce any arbitration award or (ii) joining another party to this Agreement in a litigation initiated by a person or entity that is not a party to this Agreement.

12.    **Defense of Claims**. Executive agrees that, during the Employment Period and thereafter, upon reasonable request from the Company, Executive will cooperate with the Company or its Affiliates in the defense of any claims or actions that may be made by or against the Company or its Affiliates that relate to Executive's actual or prior areas of responsibility, except if Executive's reasonable interests are adverse to the Company or its Affiliate(s), as applicable, in such claim or action. The Company agrees to pay or reimburse Executive for all of Executive's reasonable travel and other direct expenses incurred, or to be reasonably incurred, to comply with Executive's obligations under this Section 12, *provided* Executive provides reasonable documentation of same and obtains the Company's prior approval for incurring such expenses.

13.    **Withholdings**. The Company may withhold and deduct from any payments made or to be made pursuant to this Agreement (a) all federal, state, local, and other taxes as may be required pursuant to any law or governmental regulation or ruling and (b) any deductions consented to in writing by Executive.

14.    **Title and Headings; Construction**. Titles and headings to Sections hereof are for the purpose of reference only and shall in no way limit, define, or otherwise affect the provisions hereof. Any and all Exhibits or Attachments referred to in this Agreement are, by such reference, incorporated herein and made a part hereof for all purposes. The words "herein," "hereof," "hereunder," and other compounds of the word "here" shall refer to the entire Agreement and not to any particular provision hereof. The use herein of the word "including" following any general statement, term, or matter shall not be construed to limit such statement, term, or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation," "but not limited to," or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that could reasonably fall within the broadest possible scope of such general statement, term, or matter. Unless the context requires otherwise, all references herein to an agreement, instrument, or other document shall be deemed to refer to such agreement, instrument, or other document as amended, supplemented, modified, and restated from time to time to the extent permitted by the provisions thereof.  All references to "dollars" or "$" in this

14

A0805

Agreement refer to United States dollars.  Wherever the context so requires, the masculine gender includes the feminine or neuter, and the singular number includes the plural and conversely.

15.     **Applicable Law; Submission to Jurisdiction**. This Agreement shall in all respects be construed according to the laws of the State of New York without regard to the conflict of law principles thereof. With respect to any claim or dispute related to or arising under this Agreement, the parties hereby consent to the arbitration provisions of Section 11 above and recognize and agree that should any resort to a court be necessary and permitted under this Agreement, then they consent to the exclusive jurisdiction, forum, and venue of the state and federal courts located in New York, New York.

16.     **Entire Agreement and Amendment**. This Agreement contains the entire agreement of the parties with respect to the matters covered herein; moreover, this Agreement supersedes all prior and contemporaneous agreements and understandings, oral or written, between the parties hereto concerning the subject matter hereof. Without limiting the scope of the preceding sentence, except as otherwise expressly provided in this Section 16, all understandings and agreements preceding the Amendment Effective Date and relating to the subject matter hereof (including the Prior Agreement) are hereby null and void and of no further force or effect, and this Agreement shall supersede all other agreements, written or oral, that purport to govern the terms of Executive's employment (including Executive's compensation) with the Company or any of its Affiliates. Executive acknowledges and agrees that the Prior Agreement is hereby terminated and has been satisfied in full, as has any other employment agreement between Executive and the Company or any of its Affiliates. In entering into this Agreement, Executive expressly acknowledges and agrees that Executive has received all sums and compensation that Executive has been owed, is owed, or ever could be owed pursuant to the agreement(s) referenced in the previous sentence and for services provided to the Company and any of its Affiliates through the date that Executive signs this Agreement, with the exception of any unpaid base salary for the pay period that includes the date on which Executive signs this Agreement. Notwithstanding anything in the preceding provisions of this Section 16 to the contrary, the parties expressly acknowledge and agree that this Agreement does not supersede or replace, but instead complements and is in addition to, all equity compensation agreements between Executive and the Company or any of its Affiliates. This Agreement may be amended only by a written instrument executed by both parties hereto.

17.     **Waiver of Breach**. Any waiver of this Agreement must be executed by the party to be bound by such waiver. No waiver by either party hereto of a breach of any provision of this Agreement by the other party, or of compliance with any condition or provision of this Agreement to be performed by such other party, will operate or be construed as a waiver of any subsequent breach by such other party or any similar or dissimilar provision or condition at the same or any subsequent time. The failure of either party hereto to take any action by reason of any breach will not deprive such party of the right to take action at any time while such breach continues.

15

A0806

18. **Assignment**. This Agreement is personal to Executive, and neither this Agreement nor any rights or obligations hereunder shall be assignable or otherwise transferred by Executive. The Company may assign this Agreement to any successor (whether by merger, purchase, or otherwise) to all or substantially all of the equity, assets, or businesses of the Company, if such successor expressly agrees to assume the obligations of the Company hereunder.

19. **Affiliates**. For purposes of this Agreement, the term "Affiliates" is defined as any person or entity Controlling, Controlled by, or Under Common Control with the Company. The term "Control," including the correlative terms "Controlling," "Controlled By," and "Under Common Control with," means possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract, or otherwise) of a person or entity. For the purposes of the preceding sentence, Control shall be deemed to exist when a person or entity possesses, directly or indirectly, through one or more intermediaries (a) in the case of a corporation, more than 50% of the outstanding voting securities thereof, (b) in the case of a limited liability company, partnership, limited partnership, or joint venture, the right to more than 50% of the distributions therefrom (including liquidating distributions), or (c) in the case of any other person or entity, more than 50% of the economic or beneficial interest therein.

20. **Notices**. Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly received (a) when delivered in person, (b) on the first business day after such notice is sent by air express overnight courier service, or (c) on the third business day following deposit in the United States mail, registered or certified mail, return receipt requested, postage prepaid and addressed, in each case, to the following address, as applicable:

(1)   If to the Company, addressed to:

Enviva Management Company, LLC

7200 Wisconsin Ave. Suite 1000

Bethesda, MD 20814

Attention: General Counsel

(2)   If to Executive, addressed to the most recent address the Company has in its employment records for Executive.

21. **Counterparts**. This Agreement may be executed in any number of counterparts, including by facsimile or ".pdf" or similar electronic format, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument. Each counterpart may consist of a copy hereof containing multiple signature pages, each signed by one party, but together signed by both parties hereto.

22. **Deemed Resignations**. Unless otherwise agreed to in writing by the Company and Executive prior to the termination of Executive's employment, any termination of

16

Executive's employment shall constitute (a) an automatic resignation of Executive as an officer of the Company, Holdings GP, and each other Affiliate of the Company, as applicable, (b) an automatic resignation of Executive from the board of directors (or similar governing body) of the Company or any Affiliate of the Company (if applicable), and (c) an automatic resignation from the board of directors or any similar governing body of any corporation, limited liability entity, or other entity in which the Company or any Affiliate holds an equity interest and with respect to which board or similar governing body Executive serves as the Company's or such Affiliate's designee or other representative (if applicable).

23.   **Effect of Termination**. The provisions of Sections 6(f), 7-12, 22, and 24 and those provisions necessary to interpret and enforce them, shall survive any termination of the employment relationship between Executive and the Company.

24.   **Third-Party Beneficiaries**. Each Affiliate of the Company shall be a third-party beneficiary of Executive's obligations under Sections 7, 8, 9, 10, and 22 and shall be entitled to enforce such obligations as if a party hereto.

25.   **Severability**. Subject to Section 9(e), if an arbitrator or court of competent jurisdiction determines that any provision of this Agreement (or part thereof) is invalid or unenforceable, then the invalidity or unenforceability of that provision (or part thereof) shall not affect the validity or enforceability of any other provision (or part thereof) of this Agreement, and all other provisions (or part thereof) shall remain in full force and effect.

26.   **Section 409A**. Notwithstanding any provision of this Agreement to the contrary, all provisions of this Agreement are intended to comply with Section 409A of the Internal Revenue Code of 1986, as amended, and the applicable Treasury regulations and administrative guidance issued thereunder (collectively, "Section 409A") or an exemption therefrom and shall be construed and administered in accordance with such intent. Any payments under this Agreement that may be excluded from Section 409A either as separation pay due to an involuntary separation from service or as a short-term deferral shall be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, each installment payment provided under this Agreement shall be treated as a separate payment. Notwithstanding any provision in this Agreement to the contrary, if any payment or benefit provided for herein would be subject to additional taxes and interest under Section 409A if Executive's receipt of such payment or benefit is not delayed until the earlier of (i) the date of Executive's death or (ii) the date that is six months after the Termination Date (such date, the "Section 409A Payment Date"), then such payment or benefit shall not be provided to Executive (or Executive's estate, if applicable) until the Section 409A Payment Date. Notwithstanding the foregoing, the Company makes no representations that the payments and benefits provided under this Agreement are exempt from, or compliant with, Section 409A and in no event shall the Company or any of its Affiliates be liable for all or any portion of any taxes, penalties, interest, or other expenses that may be incurred by Executive on account of non-compliance with Section 409A.

[*The remainder of this page was left blank intentionally; the signature page follows.*]

IN WITNESS WHEREOF, Executive and the Company each have caused this Agreement to be executed in its name and on its behalf, effective for all purposes as provided above.

**EXECUTIVE**


John K. Keppler


**ENVIVA MANAGEMENT COMPANY, LLC**


By:
   Joseph N. Lane
   Executive Vice President,
   Human Capital

Signature Page to
Fourth Amended and Restated
Employment Agreement
(John K. Keppler)

**EXHIBIT A**

**FORM OF RELEASE AGREEMENT**

This Release Agreement (this "<u>Agreement</u>") constitutes the release referred to in that certain Fourth Amended and Restated Employment Agreement (the "<u>Employment Agreement</u>") dated as of November 24, 2020, by and between John K. Keppler ("<u>Executive</u>") and Enviva Management Company, LLC (the "<u>Company</u>"). Capitalized terms used but not defined herein shall have the meanings assigned to them in the Employment Agreement.

(a)    For good and valuable consideration, including the Company's provision of certain severance payments (or a portion thereof) to Executive in accordance with Section 6(f)(ii) of the Employment Agreement, Executive hereby releases, discharges, and forever acquits (A) the Company, its subsidiaries and all of its other Affiliates, (B) Enviva Partners GP, LLC, Enviva Partners, LP, Holdings, Holdings GP, their respective subsidiaries, and their other Affiliates, and (C) the past, present, and future stockholders, officers, members, partners, directors, managers, employees, agents, attorneys, heirs, representatives, successors, and assigns of the entities specified in clauses (A) and (B) above, in their personal and representative capacities (collectively, the "<u>Company Parties</u>"), from liability for, and hereby waives, any and all claims, damages, or causes of action of any kind related to Executive's employment with any Company Party, the termination of such employment, and any other acts or omissions related to any matter on or prior to the date of the execution of this Agreement including, without limitation, (1) any alleged violation through the date of this Agreement of: (i) the Age Discrimination in Employment Act of 1967, as amended (including as amended by the Older Workers Benefit Protection Act); (ii) Title VII of the Civil Rights Act of 1964, as amended; (iii) the Civil Rights Act of 1991; (iv) Sections 1981 through 1988 of Title 42 of the United States Code, as amended; (v) the Employee Retirement Income Security Act of 1974, as amended; (vi) the Immigration Reform Control Act, as amended; (vii) the Americans with Disabilities Act of 1990, as amended; (viii) the National Labor Relations Act, as amended; (ix) the Occupational Safety and Health Act, as amended; (x) the Family and Medical Leave Act of 1993; (xi) any federal, state, or local anti-discrimination law; (xii) any federal, state, or local wage and hour law; (xiii) any other local, state, or federal law, regulation, or ordinance; and (xiv) any public policy, contract, tort, or common law claim; (2) any allegation for costs, fees, or other expenses including attorneys' fees incurred in or with respect to a Released Claim; (3) any and all rights, benefits, or claims Executive may have under any employment contract, incentive compensation plan, or equity incentive plan with any Company Party or to any ownership interest in any Company Party except as expressly provided: (I) in Section 6(f)(ii) of the Employment Agreement; and (II) pursuant to the terms of any equity compensation agreement between Executive and a Company Party (including any Restricted Unit Agreement with Holdings or any Award Agreement (as defined in the LTIP) relating to an award granted to Executive pursuant to the LTIP), and (4) any claim for compensation or benefits of any kind not expressly set forth in the Employment Agreement or any equity compensation agreement (collectively, the "<u>Released Claims</u>"). In no event shall the Released Claims include (a) any claim that arises after the date Executive signs this Agreement, (b) any claim to vested benefits under an employee benefit plan or equity compensation plan, or (c) any claims for contractual payments under Section 5(a) or Section 6(f)(ii) of the Employment Agreement. This Agreement is not intended to indicate that

EXHIBIT A-1

any such claims exist or that, if they do exist, they are meritorious. Rather, Executive is simply agreeing that, in exchange for the consideration recited in the first sentence of this paragraph, any and all potential claims of this nature that Executive may have against the Company Parties, regardless of whether they actually exist, are expressly settled, compromised, and waived. By signing this Agreement, Executive is bound by it. Anyone who succeeds to Executive's rights and responsibilities, such as heirs or the executor of Executive's estate, is also bound by this Agreement. This release also applies to any claims brought by any person or agency or class action under which Executive may have a right or benefit. Notwithstanding the release of liability contained herein, nothing in this Agreement prevents Executive from filing any non-legally waivable claim (including a challenge to the validity of this Agreement) with the Equal Employment Opportunity Commission, National Labor Relations Board, Occupational Safety and Health Administration, Securities and Exchange Commission, Financial Industry Regulatory Authority (FINRA), or any other federal, state, or local governmental agency, authority, or commission (each, a "Governmental Agency") or participating in any investigation or proceeding conducted by any Governmental Agency. Executive understands that this Agreement does not limit Executive's ability to communicate with any Governmental Agency or otherwise participate in any investigation or proceeding that may be conducted by any Governmental Agency (including by providing documents or other information to a Governmental Agency) without notice to the Company or any other Company Party. This Agreement does not limit Executive's right to receive an award from a Governmental Agency for information provided to a Governmental Agency. **THIS RELEASE INCLUDES MATTERS ATTRIBUTABLE TO THE SOLE OR PARTIAL NEGLIGENCE (WHETHER GROSS OR SIMPLE) OR OTHER FAULT, INCLUDING STRICT LIABILITY, OF ANY OF THE COMPANY PARTIES**.

(b)    Executive agrees not to bring or join any lawsuit or arbitration proceeding against any of the Company Parties in any court relating to any of the Released Claims. Executive represents that Executive has not brought or joined any lawsuit or filed any charge or claim against any of the Company Parties in any court or before any government agency and has made no assignment of any rights Executive has asserted or may have against any of the Company Parties to any person or entity, in each case, with respect to any Released Claims.

(c)    By executing and delivering this Agreement, Executive acknowledges that:

(i)    Executive has carefully read this Agreement;

(ii)    Executive has had at least [twenty-one (21)] [forty-five (45)] days to consider this Agreement before the execution and delivery hereof to the Company [Add if 45 days applies: , and Executive acknowledges that attached to this Agreement are (1) a list of the positions and ages of those employees selected for termination (or participation in the exit incentive or other employment termination program); (2) a list of the ages of those employees not selected for termination (or participation in such program); and (3) information about the unit affected by the employment termination program of which Executive's termination was a part, including any eligibility factors for such program and any time limits applicable to such program];

EXHIBIT A-2

(iii)   Executive has been advised, and hereby is advised in writing, that Executive may, at Executive's option, discuss this Agreement with an attorney of Executive's choice and that Executive has had adequate opportunity to do so;

(iv)   Executive fully understands the final and binding effect of this Agreement; the only promises made to Executive to sign this Agreement are those stated in the Employment Agreement and herein; and Executive is signing this Agreement knowingly, voluntarily, and of Executive's own free will, and that Executive understands and agrees to each of the terms of this Agreement; and

(v)   With the exception of any sums that Executive may be owed pursuant to Section 6(f)(ii) of the Employment Agreement, Executive has been paid all wages and other compensation to which Executive is entitled under the Agreement and received all leaves (paid and unpaid) to which Executive was entitled during the Employment Period.

Notwithstanding the initial effectiveness of this Agreement, Executive may revoke the delivery (and therefore the effectiveness) of this Agreement within the seven-day period beginning on the date Executive delivers this Agreement to the Company (such seven-day period being referred to herein as the "Release Revocation Period"). To be effective, such revocation must be in writing signed by Executive and must be delivered to the General Counsel of the Company before 11:59 p.m., New York, New York time, on the last day of the Release Revocation Period. If an effective revocation is delivered in the foregoing manner and timeframe, this Agreement shall be of no force or effect and shall be null and void ab initio. No consideration shall be paid if this Agreement is revoked by Executive in the foregoing manner.

Executed on this _____ day of _____, _____.


John K. Keppler


EXHIBIT A-3

A0812

**EXHIBIT 10.19**

*Execution Version*

## SECOND AMENDED AND RESTATED
## EMPLOYMENT AGREEMENT

This Second Amended and Restated Employment Agreement ("Agreement") is made and entered into as of November 24, 2020 (the "Amendment Effective Date") by and between Enviva Management Company, LLC, a Delaware limited liability company (the "Company"), and Shai S. Even ("Executive") and supersedes and replaces in its entirety the First Amended and Restated Employment Agreement (the "Prior Agreement") dated December 23, 2019 by and between the Company and Executive.

1.      **Employment**. During the period commencing on the Amendment Effective Date and for the duration of the Employment Period (as defined in Section 4 below) (the "Specified Employment Period"), the Company shall continue to employ Executive, and Executive shall continue to serve, as Executive Vice President and Chief Financial Officer of the Company, Enviva Holdings GP, LLC, a Delaware limited liability company ("Holdings GP") and the general partner of Enviva Holdings, LP, a Delaware limited partnership ("Holdings"), and such other Affiliates of the Company as may be designated by Holdings from time to time.

2.      **Duties and Responsibilities of Executive**.

(a)      During the Employment Period, Executive shall devote Executive's full business time and attention to the business of the Company and its Affiliates, as applicable, and will not hold any outside employment or consulting position. Executive's duties pursuant to this Agreement will include those normally incidental to the position identified in Section 1, as well as such additional duties as may be assigned to Executive by Holdings from time to time.

(b)      Executive represents and covenants that Executive is not the subject of or a party to any employment agreement, non-competition or non-solicitation covenant, non-disclosure agreement, or any other agreement, covenant, understanding, or restriction that would prohibit Executive from executing this Agreement and fully performing Executive's duties and responsibilities hereunder, or would in any manner, directly or indirectly, limit or affect the duties and responsibilities that may now or in the future be assigned to Executive hereunder.

(c)      Executive acknowledges and agrees that Executive owes the Company and its Affiliates fiduciary duties, including duties of care, loyalty, fidelity, and allegiance, such that Executive shall act at all times in the best interests of the Company and its Affiliates and shall not appropriate any business opportunity of the Company or its Affiliates for Executive. Executive agrees that the obligations described in this Agreement are in addition to, and not in lieu of, the obligations Executive owes the Company and its Affiliates under common law. The Parties acknowledge and agree that Executive may provide services (including as an executive, employee, director, or otherwise) to multiple Affiliates of the Company and, in providing such services, Executive will not be violating Executive's obligations hereunder so long as Executive abides by the terms of Sections 7, 8, and 9 below in the course of performing such services.

A0813

3.  **Compensation**.

(a)  Base Salary. During the Specified Employment Period, the Company shall pay to Executive an annualized base salary of $464,000 (the "Base Salary") in consideration for Executive's services under this Agreement, payable on a not less than biweekly basis, in conformity with the Company's customary payroll practices for executives as in effect from time to time.

(b)  Annual Bonus. During the Specified Employment Period, Executive shall be eligible for discretionary bonus compensation for each calendar year that Executive is employed by the Company hereunder (each, a "Bonus Year") pursuant to the applicable incentive or bonus compensation plan of the Company, if any, that is applicable to similarly situated executives of the Company (each, an "Annual Bonus"). Each Annual Bonus shall have a target value that is not less than 120% of Executive's Base Salary as in effect on the first day of the Bonus Year to which such Annual Bonus relates (the "Minimum Target Annual Bonus"); *provided, however*, that the Minimum Target Annual Bonus for the 2020 calendar year shall not be less than $540,000. The performance targets that must be achieved in order to realize certain bonus levels shall be established by the Board of Directors of Holdings GP (the "Holdings Board") or a committee thereof annually, in its sole discretion, and communicated to Executive in accordance with terms of the applicable incentive or bonus plan, if any, or if no such plan has been adopted, within the first 90 days of each applicable Bonus Year following 2020 (the most recently established target value for Executive's Annual Bonus is referred to herein as the "Target Annual Bonus"). Each Annual Bonus, if any, will be paid as soon as administratively feasible after the Holdings Board or a committee thereof certifies whether the applicable performance targets for the applicable Bonus Year have been achieved, but in no event later than March 15 following the end of such Bonus Year.

(c)  Long-Term Incentive Plan. With respect to the 2021 calendar year and each subsequent calendar year during the Specified Employment Period, Executive shall be eligible to receive annual awards under the Enviva Partners, LP equity compensation plan as in effect from time to time (the "LTIP") with a target value equal to 250% of Executive's Base Salary as in effect on the first day of such calendar year (the "Target Annual LTIP Award"). All awards granted to Executive under the LTIP, if any, shall be on such terms and conditions as the board of directors (the "Partners Board") of Enviva Partners GP, LLC, a Delaware limited liability company and the general partner of Enviva Partners, LP (the "MLP"), or a committee thereof shall determine from time to time and shall be subject to and governed by the terms and provisions of the LTIP as in effect from time to time and the award agreements evidencing such awards. Nothing herein shall be construed to give Executive any rights to any amount or type of grant or award except as provided in such award to Executive provided in writing and authorized by the Partners Board (or a committee thereof).

4.  **Term of Employment**. The current term of Executive's employment under this Agreement is the period that began on June 4, 2018 (the "Term Commencement Date") and shall end on the third anniversary of the Term Commencement Date (the "Current Term"). On the third anniversary of the Term Commencement Date and on each subsequent anniversary of the

2

Term Commencement Date thereafter, the term of Executive's employment under this Agreement shall automatically renew and extend for a period of 12 months (each such 12-month period being a "Renewal Term") unless written notice of non-renewal is delivered by either party to the other not less than 60 days prior to the expiration of the then-existing Current Term or Renewal Term, as applicable. Notwithstanding any other provision of this Agreement to the contrary, Executive's employment pursuant to this Agreement may be terminated at any time in accordance with Section 6. The period from the Amendment Effective Date through the expiration of this Agreement or, if sooner, the termination of Executive's employment pursuant to this Agreement, regardless of the time or reason for such termination, shall be referred to herein as the "Employment Period."

5.    **Reimbursement of Business Expenses; Benefits**. Subject to the terms and conditions of this Agreement, Executive shall be entitled to the following reimbursements and benefits during the Employment Period:

(a)    Reimbursement of Business Expenses. The Company agrees to reimburse Executive for Executive's reasonable business-related expenses incurred in the performance of Executive's duties under this Agreement; *provided* that Executive timely submits all documentation for such reimbursement, as required by Company policy in effect from time-to-time. Any reimbursement of expenses under this Section 5(a) or Section 12 shall be made by the Company upon or as soon as practicable following receipt of supporting documentation reasonably satisfactory to the Company (but in any event not later than the close of Executive's taxable year following the taxable year in which the expense is incurred by Executive); *provided*, *however*, that, upon the termination of Executive's employment with the Company, in no event shall any additional reimbursement be made prior to the date that is six months after the date of such termination (or, if earlier, prior to the date of Executive's death) to the extent such payment delay is required under Section 409A(a)(2)(B) of the Internal Revenue Code. In no event shall any reimbursement be made to Executive for such expenses incurred after the date that is five years after the date of the termination of Executive's employment with the Company. Executive is not permitted to receive a payment in lieu of reimbursement under this Section 5(a) or Section 12.

(b)    Benefits. Executive shall be eligible to participate in the same benefit plans or fringe benefit policies in which other similarly situated Company employees are eligible to participate, subject to applicable eligibility requirements and the terms and conditions of such plans and policies as in effect from time to time. The Company shall not, by reason of this Section 5(b), be obligated to institute, maintain, or refrain from changing, amending, or discontinuing, any such plan or policy, so long as such changes are similarly applicable to similarly situated Company employees generally.

6.    **Termination of Employment**.

(a)    Company's Right to Terminate Executive's Employment for Cause. The Company shall have the right to terminate Executive's employment at any time for Cause. For purposes of this Agreement, "Cause" shall mean Executive's:

3

(i) material breach of any policy established by the Company or any of its Affiliates that (x) pertains to health and safety and (y) is applicable to Executive;

(ii) engaging in acts of disloyalty to the Company or its Affiliates, including fraud, embezzlement, theft, commission of a felony, or proven dishonesty; or

(iii) willful misconduct in the performance of, or willful failure to perform a material function of, Executive's duties under this Agreement.

(b)    Company's Right to Terminate for Convenience. The Company shall have the right to terminate Executive's employment without Cause, at any time and for any reason or no reason at all.

(c)    Executive's Right to Terminate for Good Reason. Executive shall have the right to terminate Executive's employment with the Company at any time for Good Reason. For purposes of this Agreement, "Good Reason" shall mean:

(i) a material diminution in Executive's authority, duties, title, or responsibilities;

(ii) a material diminution in Executive's Base Salary, Minimum Target Annual Bonus, or Target Annual LTIP Award;

(iii) the relocation of the geographic location of Executive's principal place of employment by more than 100 miles from the location of Executive's principal place of employment as of the Amendment Effective Date; or

(iv) the Company's delivery of a written notice of non-renewal of this Agreement to Executive.

Notwithstanding the foregoing provisions of this Section 6(c) or any other provision of this Agreement to the contrary, any assertion by Executive of a termination for Good Reason shall not be effective unless all of the following conditions are satisfied: (A) the condition described in Section 6(c)(i), (ii), (iii), or (iv) giving rise to Executive's termination of Executive's employment must have arisen without Executive's written consent; (B) Executive must provide written notice to the Company of such condition within 30 days of the date on which Executive knew of the existence of the condition; (C) the condition specified in such notice must remain uncorrected for 30 days after receipt of such notice by the Company; and (D) the date of Executive's termination of Executive's employment must occur within 30 days after the end of such cure period.

(d)    Death or Disability. Executive's employment with the Company shall terminate upon the death or Disability of Executive. For purposes of this Agreement, a "Disability" shall exist if Executive is unable to perform the essential functions of Executive's position, with reasonable accommodation (if applicable), due to an illness or physical or mental impairment or other incapacity that continues for a period in excess of 90 days, whether

4

A0816

consecutive or not, in any period of 365 consecutive days. The determination of a Disability will be made by the Company after obtaining an opinion from a doctor of the Company's choosing. Executive agrees to provide such information and participate in such examinations as may be reasonably required by said doctor in order to form his or her opinion. If requested by the Company, Executive shall submit to a mental or physical examination to be performed by an independent physician selected by the Company to assist the Company in making such determination.

(e)    Executive's Right to Terminate for Convenience. Executive shall have the right to terminate Executive's employment with the Company for convenience at any time upon 60 days' advance written notice to the Company; *provided* that if Executive provides a notice of termination pursuant to this Section 6(e), the Company may designate an earlier termination date than that specified in Executive's notice. The Company's designation of such an earlier date will not change the nature of Executive's termination, which will still be deemed a voluntary resignation by Executive pursuant to this Section 6(e).

(f)    Effect of Termination.

(i) If Executive's employment hereunder shall terminate (1) pursuant to Section 4 at the expiration of the then-existing Current Term or Renewal Term, as applicable, as a result of a non-renewal of this Agreement by Executive or (2) pursuant to Section 6(a) or 6(e), then all compensation and all benefits to Executive hereunder shall terminate contemporaneously with such termination of employment, except that Executive shall be entitled to (x) payment of all earned, unpaid Base Salary within 30 days of Executive's last day of employment, or earlier if required by law, (y) reimbursement for all incurred but unreimbursed expenses for which Executive is entitled to reimbursement in accordance with Section 5(a) and Section 12, and (z) benefits to which Executive may be entitled pursuant to the terms of any plan or policy described in Section 5(b).

(ii) If Executive's employment terminates (1) pursuant to Section 6(b) or 6(c) or (2) due to Executive's death or Disability pursuant to Section 6(d), then all compensation and all benefits to Executive hereunder shall terminate contemporaneously with such termination of employment, except that (I) Executive shall be entitled to receive the compensation and benefits described in clauses (x) through (z) of Section 6(f)(i); and (II) if Executive executes, on or before the Release Expiration Date (as defined below), and does not revoke within the time provided by the Company to do so, a release of all claims in a form satisfactory to the Company (which shall be substantially similar to the form of release attached hereto as Exhibit A) (the "Release")), then, *provided* that Executive abides by the terms of Sections 7, 8, 9, 10, and 12:

(1)    The Company shall pay to Executive an amount (the "Severance Payment") equal to the greater of (x) the product of (A) 1.0 (or, if such termination occurs within 12 months following a Change in Control (as defined below), 1.5) and (B) sum of Executive's Base Salary as in effect on the date of the termination of Executive's employment (the "Termination Date") and

5

A0817

Executive's Target Annual Bonus as of the Termination Date or (y) the Current Term Multiplier (as defined below), *multiplied by* the sum of Executive's Base Salary as in effect on the Termination Date and Executive's Target Annual Bonus as of the Termination Date. As used herein, the "Current Term Multiplier" means the number of complete calendar months remaining in the Current Term, if any, *divided by* 12. The Severance Payment will be divided into 12 (or, if greater, a number equal to the number of complete calendar months remaining in the Current Term) substantially equal installments; *provided, however*, that if such termination occurs within 12 months following a Change in Control, the Severance Payment will be divided into 18 substantially equal installments. On the Company's first regularly scheduled pay date that is on or after the date that is 60 days after the Termination Date, the Company shall pay to Executive, without interest, a number of such installments equal to the number of such installments that would have been paid during the period beginning on the Termination Date and ending on the Company's first regularly scheduled pay date that is on or after the date that is 60 days after the Termination Date had the installments been paid on a biweekly basis commencing on the Company's first regularly scheduled pay date coincident with or next following the Termination Date, and each of the remaining installments shall be paid on a biweekly basis thereafter; *provided, however*, that (1) to the extent, if any, that the aggregate amount of the installments of the Severance Payment and any payments under Section 6(f)(ii)(C) that would otherwise be paid pursuant to the preceding provisions of this Section 6(f)(ii)(A) or Section 6(f)(ii)(C), as applicable, after March 15 of the calendar year following the calendar year in which the Termination Date occurs (the "Applicable March 15") exceeds the maximum exemption amount under Treasury Regulation Section 1.409A-1(b)(9)(iii)(A), then such excess shall be paid to Executive in a lump sum on the Applicable March 15 (or the first business day preceding the Applicable March 15 if the Applicable March 15 is not a business day) and the installments of the Severance Payment payable after the Applicable March 15 shall be reduced by such excess (beginning with the installment first payable after the Applicable March 15 and continuing with the next succeeding installment until the aggregate reduction equals such excess), and (2) all remaining installments of the Severance Payment, if any, that would otherwise be paid pursuant to the preceding provisions of this Section 6(f)(ii)(A) after December 31 of the calendar year following the calendar year in which the Termination Date occurs shall be paid with the installment of the Severance Payment, if any, due in December of the calendar year following the calendar year in which the Termination Date occurs.

(2)    All outstanding awards granted to Executive pursuant to the LTIP prior to the Termination Date that remain unvested as of the Termination Date shall immediately become fully vested as of the Termination Date; *provided, however*, that with respect to any such LTIP awards that were granted subject to a performance requirement (other than continued service by Executive) that has not been satisfied and certified by the Partners Board (or a committee thereof) as of

the Termination Date, then (1) if the Termination Date occurs within six months prior to the expiration of the performance period applicable to such LTIP award, such LTIP award shall become vested based on actual performance upon the expiration of such performance period; and (2) if the Termination Date occurs at any other time during the performance period applicable to such LTIP award, such LTIP award shall become vested as of the Termination Date based on target performance.

(3)     If Executive timely and properly elects to continue coverage for Executive and Executive's spouse and eligible dependents, if any, under the Company's group health plans pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), similar in the amounts and types of coverage provided by the Company to Executive prior to the Termination Date, then during the COBRA Continuation Period (as defined below), the Company shall promptly reimburse Executive on a monthly basis for the entire amount Executive pays to effect and continue such coverage ("COBRA Benefit"). Each payment of the COBRA Benefit shall be paid to Executive on the Company's first regularly scheduled pay date in the calendar month immediately following the calendar month in which Executive submits to the Company documentation of the applicable premium payment having been paid by Executive, which documentation shall be submitted by Executive to the Company within 30 days following the date on which the applicable premium payment is paid. Notwithstanding anything in the preceding provisions of this Section 6(f)(ii)(C) to the contrary, (x) the election of COBRA continuation coverage and the payment of any premiums due with respect to such COBRA continuation coverage will remain Executive's sole responsibility, and the Company will assume no obligation for payment of any such premiums relating to such COBRA continuation coverage and (y) if the provision of the benefit described in this Section 6(f)(ii)(C) cannot be provided in the manner described above without penalty, tax, or other adverse impact on the Company, then the Company and Executive shall negotiate in good faith to determine an alternative manner in which the Company may provide a substantially equivalent benefit to Executive without such adverse impact on the Company. As used herein, the "COBRA Continuation Period" shall mean the period beginning on the first day of the first calendar month following the Termination Date and continuing for a number of months thereafter equal to the greater of (A) 12 months (or, if such termination occurs within 12 months following a Change in Control, 18 months) or (B) the number of months remaining in the Current Term, up to a maximum of 18 months; *provided, however*, that the COBRA Continuation Period shall immediately terminate upon the earlier of (1) the time Executive becomes eligible to be covered under a group health plan sponsored by another employer (and Executive shall promptly notify the Company in the event that Executive becomes so eligible) or (2) the date Executive is no longer eligible to receive COBRA continuation coverage.

7

A0819

For purposes of this Section 6(f)(ii), in the event of Executive's death, references to Executive (other than in Section 6(f)(ii)(C)) shall include Executive's estate, and references to Executive in Section 6(f)(ii)(C) shall include Executive's spouse and eligible dependents, if any, who are "qualified beneficiaries" (within the meaning of COBRA and the regulations thereunder) with respect to Executive's death.

(iii) Executive acknowledges Executive's understanding that if the Release is not executed and returned to the Company on or before the Release Expiration Date, and the required revocation period has not fully expired without revocation of the Release by Executive, then Executive shall not be entitled to any payments or benefits pursuant to Section 6(f)(ii). As used herein, the "Release Expiration Date" is that date that is 21 days following the date upon which the Company delivers the Release to Executive (which shall occur no later than seven days after the Termination Date) or, in the event that such termination of employment is "in connection with an exit incentive or other employment termination program" (as such phrase is defined in the Age Discrimination in Employment Act of 1967, as amended), the date that is 45 days following such delivery date.

(iv) For purposes of this Agreement, a "Change in Control" shall mean the occurrence of one or more of the following transactions:

1.     the sale or disposal by Holdings of all or substantially all of its assets to any person other than an Affiliate of Holdings;

2.     the merger or consolidation of Holdings with or into another partnership, corporation, or other entity, other than a merger or consolidation in which the unitholders in Holdings immediately prior to such transaction retain a greater than 50% equity interest in the surviving entity;

3.     the failure of Riverstone Holdings LLC and its Affiliates (collectively, "Riverstone") to possess, directly or indirectly, the power to direct or cause the direction of the management and policies of Holdings, whether through the ownership of voting securities, by contract, or otherwise; or

4.     the occurrence of one or more of the following events:

a.     the sale or disposal by the MLP of all or substantially all of its assets to any person other than an Affiliate of the MLP;

b.     the merger or consolidation of the MLP with or into another partnership, corporation, or other entity, other than a merger or consolidation in which the unitholders in the MLP immediately prior to such transaction retain a greater than 50% equity interest in the surviving entity; or

8

c.    the failure of Riverstone to possess, directly or indirectly, the power to direct or cause the direction of the management and policies of the MLP, whether through the ownership of voting securities, by contract, or otherwise.

i.Meaning of Termination of Employment. For all purposes of this Agreement, Executive shall be considered to have terminated employment with the Company when Executive incurs a "separation from service" with the Company within the meaning of Section 409A(a)(2)(A)(i) of the Internal Revenue Code; *provided*, *however*, that whether such a separation from service has occurred shall be determined based upon a reasonably anticipated permanent reduction in the level of bona fide services to be performed to no more than 25% of the average level of bona fide services provided in the immediately preceding 36 months.

7.    **Conflicts of Interest; Disclosure of Opportunities**. Executive agrees that Executive shall promptly disclose to the Holdings Board any conflict of interest involving Executive upon Executive becoming aware of such conflict. Executive further agrees that, throughout the Employment Period and for one year thereafter, Executive shall offer to the Company and its Affiliates, as applicable, all business opportunities relating to the acquisition, development, ownership, and operation of facilities that collect, process, and transform wood-based biomass into renewable energy feedstock, including wood pellets, regardless of where such business opportunities arise.

8.    **Confidentiality**. Executive acknowledges and agrees that, in the course of Executive's employment with the Company, Executive has been provided with and had access to (and during the Employment Period, Executive will continue to be provided with, and have access to) valuable Confidential Information (as defined below). In consideration of Executive's receipt of and access to such Confidential Information and in exchange for other valuable consideration provided hereunder, and as a condition of Executive's employment hereunder, Executive agrees to comply with this Section 8.

ii.Executive covenants and agrees, both during the Employment Period and thereafter that, except as expressly permitted by this Agreement or by directive of the Holdings Board, Executive shall not disclose any Confidential Information to any Person and shall not use any Confidential Information except for the benefit of the Company or any of its Affiliates. Executive shall take all reasonable precautions to protect the physical security of all documents and other material containing Confidential Information (regardless of the medium on which the Confidential Information is stored). The covenants in this Section 8(a) shall apply to all Confidential Information, whether now known or later to become known to Executive during the Employment Period.

iii.Notwithstanding Section 8(a), Executive may make the following disclosures and uses of Confidential Information:

a.    disclosures to other executives or employees of the Company or its Affiliates who have a need to know the information in connection with the business of the Company or its Affiliates;

9

A0821

b.      disclosures and uses that are incidental to Executive's provision of services to the Company and its Affiliates consistent with the terms of this Agreement or that are approved by the Holdings Board;

c.      disclosures for the purpose of complying with any applicable laws or regulatory requirements; or

d.      disclosures that Executive is legally compelled to make by deposition, interrogatory, request for documents, subpoena, civil investigative demand, order of a court of competent jurisdiction, or similar process, or otherwise by law.

iv.Upon the expiration of the Employment Period and at any other time upon request of the Company, Executive shall surrender and deliver to the Company all documents (including electronically stored information) and other material of any nature containing or pertaining to all Confidential Information in Executive's possession and shall not retain any such document or other material. Within 10 days of any such request, Executive shall certify to the Company in writing that all such materials have been returned to the Company.

v.All non-public information, designs, ideas, concepts, improvements, product developments, discoveries, and inventions, whether patentable or not, that are conceived, made, developed, or acquired by Executive, individually or in conjunction with others, during the period Executive is or has been employed or affiliated with the Company or any of its Affiliates (whether during business hours or otherwise and whether on the Company's premises or otherwise) that relate to the Company's or any of its Affiliates' business or properties, products, or services (including all such information relating to corporate opportunities, business plans, trade secrets, strategies for developing business and market share, research, financial and sales data, pricing terms, evaluations, opinions, interpretations, acquisition prospects, the identity of customers or their requirements, the identity of key contacts within customers' organizations or within the organization of acquisition prospects, or marketing and merchandising techniques, prospective names and marks) is defined as "Confidential Information." Moreover, all documents, videotapes, written presentations, brochures, drawings, memoranda, notes, records, files, correspondence, manuals, models, specifications, computer programs, e-mail, voicemail, electronic databases, maps, drawings, architectural renditions, models, and all other writings or materials of any type including or embodying any of such information, ideas, concepts, improvements, discoveries, inventions, and other similar forms of expression are and shall be the sole and exclusive property of the Company or its Affiliates and be subject to the same restrictions on disclosure applicable to all Confidential Information pursuant to this Agreement.

vi.Nothing in this Agreement shall prohibit or restrict Executive from lawfully (i) initiating communications directly with, cooperating with, providing information to, causing information to be provided to, or otherwise assisting in an investigation by any governmental or regulatory agency, entity, or official(s) (collectively, "Governmental Authorities") regarding a possible violation of any law, (ii) responding to any inquiry or legal process directed to Executive individually from any such Governmental Authorities, (iii) testifying, participating, or otherwise assisting in an action or proceeding by any such Governmental Authorities relating to a possible violation of law, or (iv) making any other disclosures that are protected under the

10

whistleblower provisions of any applicable law. Additionally, pursuant to the federal Defend Trade Secrets Act of 2016, Executive shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (x) is made (A) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (B) solely for the purpose of reporting or investigating a suspected violation of law, or (y) is made to Executive's attorney in relation to a lawsuit for retaliation against Executive for reporting a suspected violation of law, or (z) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Nor does this Agreement require Executive to obtain prior authorization from the Company or its Affiliates before engaging in any conduct described in this Section 8(e), or to notify the Company or its Affiliates that Executive has engaged in any such conduct.

9.    **Non-Competition; Non-Solicitation**.

vii.The Company shall continue to provide Executive access to Confidential Information for use only during the Employment Period, and Executive acknowledges and agrees that the Company will be entrusting Executive, in Executive's unique and special capacity, with continuing to develop the goodwill of the Company, and in consideration thereof and in consideration of the continued access to Confidential Information, and as a condition of Executive's employment hereunder, Executive has voluntarily agreed to the covenants set forth in this Section 9. Executive further agrees and acknowledges that the limitations and restrictions set forth herein, including the geographical and temporal restrictions on certain competitive activities, are reasonable in all respects and are material and substantial parts of this Agreement intended and necessary to protect the Company's legitimate business interests, including the preservation of its Confidential Information and goodwill.

viii.Executive agrees that, during the period set forth in Section 9(c) below, Executive shall not, without the prior written approval of the Company, directly or indirectly, for Executive or on behalf of or in conjunction with any other person or entity of whatever nature:

e.    engage or participate within the Market Area in competition with the Company in any business in which either the Company or its Protected Affiliates engaged in, or had plans to become engaged in of which Executive was aware during the Employment Period or the period set forth in Section 9(c) below, which business includes the acquisition, development, ownership, and operation of facilities that collect, process, and transform wood-based biomass into renewable energy feedstock, including wood pellets (the "Business"). As used herein, the term "Protected Affiliates" means any Affiliate of the Company for which Executive provided services during the Employment Period, or about which Executive obtained Confidential Information during the Employment Period.

f.    appropriate any Business Opportunity of, or relating to, the Company or its Affiliates located in the Market Area, or engage in any activity that is detrimental to the Company or its Affiliates or that limits the Company's or an Affiliate's ability to fully exploit such Business Opportunities or prevents the benefits of such Business Opportunities from accruing to the Company or its Affiliates; or

11

A0823

g.     solicit any employee of the Company or its Affiliates to terminate his or her employment therewith.

ix.Timeframe of Non-Competition and Non-Solicitation Agreement. Executive agrees that the covenants of this Section 9 shall be enforceable during the Employment Period and for a period of one year following the termination of the Employment Period, regardless of the reason for such termination.

x.Because of the difficulty of measuring economic losses to the Company and its Affiliates as a result of a breach of the foregoing covenants, and because of the immediate and irreparable damage that could be caused to the Company and its Affiliates for which they would have no other adequate remedy, Executive agrees that the foregoing covenant may be enforced by the Company and its Affiliates, in the event of breach by Executive, by injunctions and restraining orders and that such enforcement shall not be the Company's and its Affiliates' exclusive remedy for a breach but instead shall be in addition to all other rights and remedies available to the Company and its Affiliates, both at law and in equity.

xi.The covenants in this Section 9 are severable and separate, and the unenforceability of any specific covenant (or any portion thereof) shall not affect the provisions of any other covenant (or any portion thereof). Moreover, in the event any court of competent jurisdiction or arbitrator, as applicable, shall determine that the scope, time, or territorial restrictions set forth in this Section 9 are unreasonable, then it is the intention of the parties that such restrictions be enforced to the fullest extent that the court or arbitrator deems reasonable, and this Agreement shall thereby be reformed.

xii.For purposes of this Section 9, the following terms shall have the following meanings:

h.     "Business Opportunity" shall mean any commercial, investment, or other business opportunity relating to the Business.

i.     "Market Area" shall mean any location or geographic area within 75 miles of a location where the Company or its Affiliates conducts Business, or has plans to conduct Business of which Executive is aware, during the Employment Period.

xiii.All of the covenants in this Section 9 shall be construed as an agreement independent of any other provision in this Agreement, and the existence of any claim or cause of action of Executive against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of such covenants.

10.   **Ownership of Intellectual Property**. Executive agrees that the Company or its applicable Affiliate shall own, and Executive agrees to assign and does hereby assign, all right, title, and interest (including patent rights, copyrights, trade secret rights, mask work rights, trademark rights, and all other intellectual and industrial property rights of any sort throughout the world) relating to any and all inventions (whether or not patentable), works of authorship, mask works, designs, know-how, ideas, and information authored, created, contributed to, made,

12

A0824

or conceived or reduced to practice, in whole or in part, by Executive during the period that Executive is or has been employed or affiliated with the Company or any of its Affiliates that either (a) relate, at the time of conception, reduction to practice, creation, derivation, or development, to the Company's or any of its Affiliates' business or actual or anticipated research or development, or (b) were developed on any amount of the Company's time or with the use of any of the Company's or its Affiliates' equipment, supplies, facilities, or trade secret information (all of the foregoing collectively referred to herein as "Company Intellectual Property"), and Executive will promptly disclose all Company Intellectual Property to the Company. All of Executive's works of authorship and associated copyrights created during the Employment Period and in the scope of Executive's employment shall be deemed to be "works made for hire" within the meaning of the Copyright Act. Executive agrees to perform, during and after the Employment Period, all reasonable acts deemed necessary by the Company to assist the Company or its applicable Affiliate, at the Company's or such Affiliate's expense, in obtaining and enforcing its rights throughout the world in the Company Intellectual Property. Such acts may include, but are not limited to, execution of documents and assistance or cooperation (i) in the filing, prosecution, registration, and memorialization of assignment of any applicable patents, copyrights, mask work, or other applications, (ii) in the enforcement of any applicable patents, copyrights, mask work, moral rights, trade secrets, or other proprietary rights, and (iii) in other legal proceedings related to the Company Intellectual Property.

11.    **Arbitration**.

xiv. Subject to Section 11(d), any dispute, controversy, or claim between Executive and the Company or any of its Affiliates arising out of or relating to this Agreement or Executive's employment with the Company or services provided to any Affiliate of the Company will be finally settled by arbitration in New York, New York before, and in accordance with the rules for the resolution of employment disputes then in effect of, the American Arbitration Association ("AAA"). The arbitration award shall be final and binding on both parties.

xv. Any arbitration conducted under this Section 11 shall be heard by a single arbitrator (the "Arbitrator") selected in accordance with the then-applicable rules of the AAA. The Arbitrator shall expeditiously (and, if possible, within 90 days after the selection of the Arbitrator) hear and decide all matters concerning the dispute. Except as expressly provided to the contrary in this Agreement, the Arbitrator shall have the power to (i) gather such materials, information, testimony, and evidence as the Arbitrator deems relevant to the dispute before him or her (and each party will provide such materials, information, testimony, and evidence requested by the Arbitrator, except to the extent any information so requested is proprietary, subject to a third-party confidentiality restriction, or to an attorney-client or other privilege), and (ii) grant injunctive relief and enforce specific performance. The decision of the Arbitrator shall be rendered in writing, be final and binding upon the disputing parties, and the parties agree that judgment upon the award may be entered by any court of competent jurisdiction; *provided* that the parties agree that the Arbitrator and any court enforcing the award of the Arbitrator shall not have the right or authority to award punitive or exemplary damages to any disputing party.

13

A0825

xvi.Each side shall share equally the cost of the arbitration and bear its own costs and attorneys' fees incurred in connection with any arbitration, unless the Arbitrator determines that compelling reasons exist for allocating all or a portion of such costs and fees to the other side.

xvii.Notwithstanding Section 11(a), an application for emergency or temporary injunctive relief by either party (including any such application to enforce the provisions of Sections 8, 9, or 10 herein) shall not be subject to arbitration under this Section 11; *provided*, *however*, that the remainder of any such dispute (beyond the application for emergency or temporary injunctive relief) shall be subject to arbitration under this Section.

xviii.By entering into this Agreement and entering into the arbitration provisions of this Section 11, THE PARTIES EXPRESSLY ACKNOWLEDGE AND AGREE THAT THEY ARE KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVING THEIR RIGHTS TO A JURY TRIAL.

xix.Nothing in this Section 11 shall prohibit a party to this Agreement from (i) instituting litigation to enforce any arbitration award or (ii) joining another party to this Agreement in a litigation initiated by a person or entity that is not a party to this Agreement.

12.    **Defense of Claims**. Executive agrees that, during the Employment Period and thereafter, upon reasonable request from the Company, Executive will cooperate with the Company or its Affiliates in the defense of any claims or actions that may be made by or against the Company or its Affiliates that relate to Executive's actual or prior areas of responsibility, except if Executive's reasonable interests are adverse to the Company or its Affiliate(s), as applicable, in such claim or action. The Company agrees to pay or reimburse Executive for all of Executive's reasonable travel and other direct expenses incurred, or to be reasonably incurred, to comply with Executive's obligations under this Section 12, provided Executive provides reasonable documentation of same and obtains the Company's prior approval for incurring such expenses.

13.    **Withholdings**. The Company may withhold and deduct from any payments made or to be made pursuant to this Agreement (a) all federal, state, local, and other taxes as may be required pursuant to any law or governmental regulation or ruling and (b) any deductions consented to in writing by Executive.

14.    **Title and Headings; Construction**. Titles and headings to Sections hereof are for the purpose of reference only and shall in no way limit, define, or otherwise affect the provisions hereof. Any and all Exhibits or Attachments referred to in this Agreement are, by such reference, incorporated herein and made a part hereof for all purposes. The words "herein," "hereof," "hereunder," and other compounds of the word "here" shall refer to the entire Agreement and not to any particular provision hereof. The use herein of the word "including" following any general statement, term, or matter shall not be construed to limit such statement, term, or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation," "but not limited to," or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that could reasonably fall within the broadest

14

A0826

possible scope of such general statement, term, or matter. Unless the context requires otherwise, all references herein to an agreement, instrument, or other document shall be deemed to refer to such agreement, instrument, or other document as amended, supplemented, modified, and restated from time to time to the extent permitted by the provisions thereof.  All references to "dollars" or "$" in this Agreement refer to United States dollars.  Wherever the context so requires, the masculine gender includes the feminine or neuter, and the singular number includes the plural and conversely.

15.    **Applicable Law; Submission to Jurisdiction**. This Agreement shall in all respects be construed according to the laws of the State of New York without regard to the conflict of law principles thereof. With respect to any claim or dispute related to or arising under this Agreement, the parties hereby consent to the arbitration provisions of Section 11 above and recognize and agree that should any resort to a court be necessary and permitted under this Agreement, then they consent to the exclusive jurisdiction, forum, and venue of the state and federal courts located in New York, New York.

16.    **Entire Agreement and Amendment**. This Agreement contains the entire agreement of the parties with respect to the matters covered herein; moreover, this Agreement supersedes all prior and contemporaneous agreements and understandings, oral or written, between the parties hereto concerning the subject matter hereof. Without limiting the scope of the preceding sentence, except as otherwise expressly provided in this Section 16, all understandings and agreements preceding the Amendment Effective Date and relating to the subject matter hereof (including the Prior Agreement) are hereby null and void and of no further force or effect, and this Agreement shall supersede all other agreements, written or oral, that purport to govern the terms of Executive's employment (including Executive's compensation) with the Company or any of its Affiliates. Executive acknowledges and agrees that the Prior Agreement is hereby terminated and has been satisfied in full, as has any other employment agreement between Executive and the Company or any of its Affiliates. In entering into this Agreement, Executive expressly acknowledges and agrees that Executive has received all sums and compensation that Executive has been owed, is owed, or ever could be owed pursuant to the agreement(s) referenced in the previous sentence and for services provided to the Company and any of its Affiliates through the date that Executive signs this Agreement, with the exception of any unpaid base salary for the pay period that includes the date on which Executive signs this Agreement. Notwithstanding anything in the preceding provisions of this Section 16 to the contrary, the parties expressly acknowledge and agree that this Agreement does not supersede or replace, but instead complements and is in addition to, all equity compensation agreements between Executive and the Company or any of its Affiliates. This Agreement may be amended only by a written instrument executed by both parties hereto.

17.    **Waiver of Breach**. Any waiver of this Agreement must be executed by the party to be bound by such waiver. No waiver by either party hereto of a breach of any provision of this Agreement by the other party, or of compliance with any condition or provision of this Agreement to be performed by such other party, will operate or be construed as a waiver of any subsequent breach by such other party or any similar or dissimilar provision or condition at the same or any subsequent time. The failure of either party hereto to take any action by reason of

15

A0827

any breach will not deprive such party of the right to take action at any time while such breach continues.

18.    **Assignment**. This Agreement is personal to Executive, and neither this Agreement nor any rights or obligations hereunder shall be assignable or otherwise transferred by Executive. The Company may assign this Agreement to any successor (whether by merger, purchase, or otherwise) to all or substantially all of the equity, assets, or businesses of the Company, if such successor expressly agrees to assume the obligations of the Company hereunder.

19.    **Affiliates**. For purposes of this Agreement, the term "Affiliates" is defined as any person or entity Controlling, Controlled by, or Under Common Control with the Company. The term "Control," including the correlative terms "Controlling," "Controlled By," and "Under Common Control with," means possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract, or otherwise) of a person or entity. For the purposes of the preceding sentence, Control shall be deemed to exist when a person or entity possesses, directly or indirectly, through one or more intermediaries (a) in the case of a corporation, more than 50% of the outstanding voting securities thereof, (b) in the case of a limited liability company, partnership, limited partnership, or joint venture, the right to more than 50% of the distributions therefrom (including liquidating distributions), or (c) in the case of any other person or entity, more than 50% of the economic or beneficial interest therein.

20.    **Notices**. Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly received (a) when delivered in person, (b) on the first business day after such notice is sent by air express overnight courier service, or (c) on the third business day following deposit in the United States mail, registered or certified mail, return receipt requested, postage prepaid and addressed, in each case, to the following address, as applicable:

(1)    If to the Company, addressed to:

Enviva Management Company, LLC

7200 Wisconsin Ave.

Suite 1000

Bethesda, MD 20814

Attention: General Counsel

(2)    If to Executive, addressed to the most recent address the Company has in its employment records for Executive.

21.    **Counterparts**. This Agreement may be executed in any number of counterparts, including by facsimile or ".pdf" or similar electronic format, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the

16

A0828

same instrument. Each counterpart may consist of a copy hereof containing multiple signature pages, each signed by one party, but together signed by both parties hereto.

22.  **Deemed Resignations**. Unless otherwise agreed to in writing by the Company and Executive prior to the termination of Executive's employment, any termination of Executive's employment shall constitute (a) an automatic resignation of Executive as an officer of the Company, Holdings GP, and each other Affiliate of the Company, as applicable, (b) an automatic resignation of Executive from the board of directors (or similar governing body) of the Company or any Affiliate of the Company (if applicable), and (c) an automatic resignation from the board of directors or any similar governing body of any corporation, limited liability entity, or other entity in which the Company or any Affiliate holds an equity interest and with respect to which board or similar governing body Executive serves as the Company's or such Affiliate's designee or other representative (if applicable).

23.  **Effect of Termination**. The provisions of Sections 6(f), 7-12, 22, and 24 and those provisions necessary to interpret and enforce them, shall survive any termination of the employment relationship between Executive and the Company.

24.  **Third-Party Beneficiaries**. Each Affiliate of the Company shall be a third-party beneficiary of Executive's obligations under Sections 7, 8, 9, 10, and 22 and shall be entitled to enforce such obligations as if a party hereto.

25.  **Severability**. Subject to Section 9(e), if an arbitrator or court of competent jurisdiction determines that any provision of this Agreement (or part thereof) is invalid or unenforceable, then the invalidity or unenforceability of that provision (or part thereof) shall not affect the validity or enforceability of any other provision (or part thereof) of this Agreement, and all other provisions (or part thereof) shall remain in full force and effect.

26.  **Section 409A**. Notwithstanding any provision of this Agreement to the contrary, all provisions of this Agreement are intended to comply with Section 409A of the Internal Revenue Code of 1986, as amended, and the applicable Treasury regulations and administrative guidance issued thereunder (collectively, "Section 409A") or an exemption therefrom and shall be construed and administered in accordance with such intent. Any payments under this Agreement that may be excluded from Section 409A either as separation pay due to an involuntary separation from service or as a short-term deferral shall be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, each installment payment provided under this Agreement shall be treated as a separate payment. Notwithstanding any provision in this Agreement to the contrary, if any payment or benefit provided for herein would be subject to additional taxes and interest under Section 409A if Executive's receipt of such payment or benefit is not delayed until the earlier of (i) the date of Executive's death or (ii) the date that is six months after the Termination Date (such date, the "Section 409A Payment Date"), then such payment or benefit shall not be provided to Executive (or Executive's estate, if applicable) until the Section 409A Payment Date. Notwithstanding the foregoing, the Company makes no representations that the payments and benefits provided under this Agreement are exempt from, or compliant with, Section 409A and in no event shall the Company or any of its

17

A0829

Affiliates be liable for all or any portion of any taxes, penalties, interest, or other expenses that may be incurred by Executive on account of non-compliance with Section 409A.

[*The remainder of this page was left blank intentionally; the signature page follows.*]

18

A0830

**IN WITNESS WHEREOF**, Executive and the Company each have caused this Agreement to be executed in its name and on its behalf, effective for all purposes as provided above.

**EXECUTIVE**


Shai S. Even


**ENVIVA MANAGEMENT COMPANY**, **LLC**


By:
  Joseph N. Lane
  Executive Vice President,
  Human Capital



Signature Page To
Second Amended and Restated
Employment Agreement
(Shai S. Even)

A0831

**EXHIBIT A**

**FORM OF RELEASE AGREEMENT**

This Release Agreement (this "Agreement") constitutes the release referred to in that certain Second Amended and Restated Employment Agreement (the "Employment Agreement") dated as of November 24, 2020, by and between Shai S. Even ("Executive") and Enviva Management Company, LLC (the "Company"). Capitalized terms used but not defined herein shall have the meanings assigned to them in the Employment Agreement.

(a)    For good and valuable consideration, including the Company's provision of certain severance payments (or a portion thereof) to Executive in accordance with Section 6(f)(ii) of the Employment Agreement, Executive hereby releases, discharges, and forever acquits (A) the Company, its subsidiaries and all of its other Affiliates, (B) Enviva Partners GP, LLC, Enviva Partners, LP, Holdings, Holdings GP, their respective subsidiaries, and their other Affiliates, and (C) the past, present, and future stockholders, officers, members, partners, directors, managers, employees, agents, attorneys, heirs, representatives, successors, and assigns of the entities specified in clauses (A) and (B) above, in their personal and representative capacities (collectively, the "Company Parties"), from liability for, and hereby waives, any and all claims, damages, or causes of action of any kind related to Executive's employment with any Company Party, the termination of such employment, and any other acts or omissions related to any matter on or prior to the date of the execution of this Agreement including, without limitation, (1) any alleged violation through the date of this Agreement of: (i) the Age Discrimination in Employment Act of 1967, as amended (including as amended by the Older Workers Benefit Protection Act); (ii) Title VII of the Civil Rights Act of 1964, as amended; (iii) the Civil Rights Act of 1991; (iv) Sections 1981 through 1988 of Title 42 of the United States Code, as amended; (v) the Employee Retirement Income Security Act of 1974, as amended; (vi) the Immigration Reform Control Act, as amended; (vii) the Americans with Disabilities Act of 1990, as amended; (viii) the National Labor Relations Act, as amended; (ix) the Occupational Safety and Health Act, as amended; (x) the Family and Medical Leave Act of 1993; (xi) any federal, state, or local anti-discrimination law; (xii) any federal, state, or local wage and hour law; (xiii) any other local, state, or federal law, regulation, or ordinance; and (xiv) any public policy, contract, tort, or common law claim; (2) any allegation for costs, fees, or other expenses including attorneys' fees incurred in or with respect to a Released Claim; (3) any and all rights, benefits, or claims Executive may have under any employment contract, incentive compensation plan, or equity incentive plan with any Company Party or to any ownership interest in any Company Party except as expressly provided: (I) in Section 6(f)(ii) of the Employment Agreement; and (II) pursuant to the terms of any equity compensation agreement between Executive and a Company Party (including any Restricted Unit Agreement with Holdings or any Award Agreement (as defined in the LTIP) relating to an award granted to Executive pursuant to the LTIP), and (4) any claim for compensation or benefits of any kind not expressly set forth in the Employment Agreement or any equity compensation agreement (collectively, the "Released Claims"). In no event shall the Released Claims include (a) any claim that arises after the date Executive signs this Agreement, (b) any claim to vested benefits under an employee benefit plan or equity compensation plan, or (c) any claims for contractual

EXHIBIT A-1

payments under Section 5(a) or Section 6(f)(ii) of the Employment Agreement. This Agreement is not intended to indicate that any such claims exist or that, if they do exist, they are meritorious. Rather, Executive is simply agreeing that, in exchange for the consideration recited in the first sentence of this paragraph, any and all potential claims of this nature that Executive may have against the Company Parties, regardless of whether they actually exist, are expressly settled, compromised, and waived. By signing this Agreement, Executive is bound by it. Anyone who succeeds to Executive's rights and responsibilities, such as heirs or the executor of Executive's estate, is also bound by this Agreement. This release also applies to any claims brought by any person or agency or class action under which Executive may have a right or benefit. Notwithstanding the release of liability contained herein, nothing in this Agreement prevents Executive from filing any non-legally waivable claim (including a challenge to the validity of this Agreement) with the Equal Employment Opportunity Commission, National Labor Relations Board, Occupational Safety and Health Administration, Securities and Exchange Commission, Financial Industry Regulatory Authority (FINRA), or any other federal, state, or local governmental agency, authority, or commission (each, a "Governmental Agency") or participating in any investigation or proceeding conducted by any Governmental Agency. Executive understands that this Agreement does not limit Executive's ability to communicate with any Governmental Agency or otherwise participate in any investigation or proceeding that may be conducted by any Governmental Agency (including by providing documents or other information to a Governmental Agency) without notice to the Company or any other Company Party. This Agreement does not limit Executive's right to receive an award from a Governmental Agency for information provided to a Governmental Agency. **THIS RELEASE INCLUDES MATTERS ATTRIBUTABLE TO THE SOLE OR PARTIAL NEGLIGENCE (WHETHER GROSS OR SIMPLE) OR OTHER FAULT**, **INCLUDING STRICT LIABILITY**, **OF ANY OF THE COMPANY PARTIES.**

(b)    Executive agrees not to bring or join any lawsuit or arbitration proceeding against any of the Company Parties in any court relating to any of the Released Claims. Executive represents that Executive has not brought or joined any lawsuit or filed any charge or claim against any of the Company Parties in any court or before any government agency and has made no assignment of any rights Executive has asserted or may have against any of the Company Parties to any person or entity, in each case, with respect to any Released Claims.

(c)    By executing and delivering this Agreement, Executive acknowledges that:

(i) Executive has carefully read this Agreement;

(ii) Executive has had at least [twenty-one (21)] [forty-five (45)] days to consider this Agreement before the execution and delivery hereof to the Company [Add if 45 days applies: , and Executive acknowledges that attached to this Agreement are (1) a list of the positions and ages of those employees selected for termination (or participation in the exit incentive or other employment termination program); (2) a list of the ages of those employees not selected for termination (or participation in such program); and (3) information about the unit affected by the employment termination program of which

EXHIBIT A-2

A0833

Executive's termination was a part, including any eligibility factors for such program and any time limits applicable to such program];

(iii)Executive has been advised, and hereby is advised in writing, that Executive may, at Executive's option, discuss this Agreement with an attorney of Executive's choice and that Executive has had adequate opportunity to do so;

(iv)Executive fully understands the final and binding effect of this Agreement; the only promises made to Executive to sign this Agreement are those stated in the Employment Agreement and herein; and Executive is signing this Agreement knowingly, voluntarily, and of Executive's own free will, and that Executive understands and agrees to each of the terms of this Agreement; and

(v)With the exception of any sums that Executive may be owed pursuant to Section 6(f)(ii) of the Employment Agreement, Executive has been paid all wages and other compensation to which Executive is entitled under the Agreement and received all leaves (paid and unpaid) to which Executive was entitled during the Employment Period.

Notwithstanding the initial effectiveness of this Agreement, Executive may revoke the delivery (and therefore the effectiveness) of this Agreement within the seven-day period beginning on the date Executive delivers this Agreement to the Company (such seven-day period being referred to herein as the "Release Revocation Period"). To be effective, such revocation must be in writing signed by Executive and must be delivered to the General Counsel of the Company before 11:59 p.m., New York, New York time, on the last day of the Release Revocation Period. If an effective revocation is delivered in the foregoing manner and timeframe, this Agreement shall be of no force or effect and shall be null and void ab initio. No consideration shall be paid if this Agreement is revoked by Executive in the foregoing manner.

Executed on this        day of              ,     .


                    Shai S. Even




EXHIBIT A-3

A0834

EXHIBIT 10.20

*Execution Version*

**THIRD AMENDED AND RESTATED**

**EMPLOYMENT AGREEMENT**

This Third Amended and Restated Employment Agreement ("Agreement") is made and entered into as of November 24, 2020 (the "Amendment Effective Date") by and between Enviva Management Company, LLC, a Delaware limited liability company (the "Company"), and Thomas Meth ("Executive") and supersedes and replaces in its entirety the Second Amended and Restated Employment Agreement (the "Prior Agreement") dated December 23, 2019 by and between the Company and Executive.

1.    **Employment**. During the period commencing on the Amendment Effective Date and for the duration of the Employment Period (as defined in Section 4 below) (the "Specified Employment Period"), the Company shall continue to employ Executive, and Executive shall continue to serve, as Executive Vice President, Sales and Marketing of the Company, Enviva Holdings GP, LLC, a Delaware limited liability company ("Holdings GP") and the general partner of Enviva Holdings, LP, a Delaware limited partnership ("Holdings"), and such other Affiliates of the Company as may be designated by Holdings from time to time.

2.    **Duties and Responsibilities of Executive**.

(a)    During the Employment Period, Executive shall devote Executive's full business time and attention to the business of the Company and its Affiliates, as applicable, and will not hold any outside employment or consulting position. Executive's duties pursuant to this Agreement will include those normally incidental to the position identified in Section 1, as well as such additional duties as may be assigned to Executive by Holdings from time to time.

(b)    Executive represents and covenants that Executive is not the subject of or a party to any employment agreement, non-competition or non-solicitation covenant, non-disclosure agreement, or any other agreement, covenant, understanding, or restriction that would prohibit Executive from executing this Agreement and fully performing Executive's duties and responsibilities hereunder, or would in any manner, directly or indirectly, limit or affect the duties and responsibilities that may now or in the future be assigned to Executive hereunder.

(c)    Executive acknowledges and agrees that Executive owes the Company and its Affiliates fiduciary duties, including duties of care, loyalty, fidelity and allegiance, such that Executive shall act at all times in the best interests of the Company and its Affiliates and shall not appropriate any business opportunity of the Company or its Affiliates for Executive. Executive agrees that the obligations described in this Agreement are in addition to, and not in lieu of, the obligations Executive owes the Company and its Affiliates under common law. The Parties acknowledge and agree that Executive may provide services (including as an executive, employee, director, or otherwise) to multiple Affiliates of the Company and, in providing such services, Executive will not be violating Executive's obligations hereunder so long as Executive abides by the terms of Sections 7, 8, and 9 below in the course of performing such services.

3.    **Compensation**.

(a)    Base Salary. During the Specified Employment Period, the Company shall pay to Executive an annualized base salary of $425,000 (the "Base Salary") in consideration for Executive's services under this Agreement, payable on a not less than biweekly basis, in conformity with the Company's customary payroll practices for executives as in effect from time to time.

(b)    Annual Bonus. During the Specified Employment Period, Executive shall be eligible for discretionary bonus compensation for each calendar year that Executive is employed by the Company hereunder (each, a "Bonus Year") pursuant to the applicable incentive or bonus compensation plan of the Company, if any, that is applicable to similarly situated executives of the Company (each, an "Annual Bonus"). Each Annual Bonus shall have a target value that is not less than 110% of Executive's Base Salary as in effect on the first day of the Bonus Year to which such Annual Bonus relates (the "Minimum Target Annual Bonus"); *provided*, *however*, that the Minimum Target Annual Bonus for the 2020 calendar year shall not be less than $346,500. The performance targets that must be achieved in order to realize certain bonus levels shall be established by the Board of Directors of Holdings GP (the "Holdings Board") or a committee thereof annually, in its sole discretion, and communicated to Executive in accordance with terms of the applicable incentive or bonus plan, if any, or if no such plan has been adopted, within the first 90 days of each applicable Bonus Year following 2020 (the most recently established target value for Executive's Annual Bonus is referred to herein as the "Target Annual Bonus"). Each Annual Bonus, if any, will be paid as soon as administratively feasible after the Holdings Board or a committee thereof certifies whether the applicable performance targets for the applicable Bonus Year have been achieved, but in no event later than March 15 following the end of such Bonus Year.

(c)    Long-Term Incentive Plan. With respect to the 2021 calendar year and each subsequent calendar year during the Specified Employment Period, Executive shall be eligible to receive annual awards under the Enviva Partners, LP equity compensation plan as in effect from time to time (the "LTIP") with a target value equal to 200% of Executive's Base Salary as in effect on the first day of such calendar year (the "Target Annual LTIP Award"). All awards granted to Executive under the LTIP, if any, shall be on such terms and conditions as the board of directors (the "Partners Board") of Enviva Partners GP, LLC, a Delaware limited liability company and the general partner of Enviva Partners, LP, or a committee thereof shall determine from time to time and shall be subject to and governed by the terms and provisions of the LTIP as in effect from time to time and the award agreements evidencing such awards. Nothing herein shall be construed to give Executive any rights to any amount or type of grant or award except as provided in such award to Executive provided in writing and authorized by the Partners Board (or a committee thereof).

4.    **Term of Employment**. The current term of Executive's employment under this Agreement is the period commencing on the Amendment Effective Date and ending on the first anniversary of the Amendment Effective Date (the "Current Term"). On the first anniversary of the Amendment Effective Date and on each subsequent anniversary of the Amendment Effective

2

Date thereafter, the term of Executive's employment under this Agreement shall automatically renew and extend for a period of 12 months (each such 12month period being a "Renewal Term") unless written notice of non-renewal is delivered by either party to the other not less than 60 days prior to the expiration of the then-existing Current Term or Renewal Term, as applicable. Notwithstanding any other provision of this Agreement to the contrary, Executive's employment pursuant to this Agreement may be terminated at any time in accordance with Section 6. The period from the Amendment Effective Date through the expiration of this Agreement or, if sooner, the termination of Executive's employment pursuant to this Agreement, regardless of the time or reason for such termination, shall be referred to herein as the "Employment Period."

5.    **Reimbursement of Business Expenses; Benefits**. Subject to the terms and conditions of this Agreement, Executive shall be entitled to the following reimbursements and benefits during the Employment Period:

(a)    Reimbursement of Business Expenses. The Company agrees to reimburse Executive for Executive's reasonable business-related expenses incurred in the performance of Executive's duties under this Agreement; *provided* that Executive timely submits all documentation for such reimbursement, as required by Company policy in effect from time-to-time. Any reimbursement of expenses under this Section 5(a) or Section 12 shall be made by the Company upon or as soon as practicable following receipt of supporting documentation reasonably satisfactory to the Company (but in any event not later than the close of Executive's taxable year following the taxable year in which the expense is incurred by Executive); *provided*, *however*, that, upon the termination of Executive's employment with the Company, in no event shall any additional reimbursement be made prior to the date that is six months after the date of such termination (or, if earlier, prior to the date of Executive's death) to the extent such payment delay is required under Section 409A(a)(2)(B) of the Internal Revenue Code. In no event shall any reimbursement be made to Executive for such expenses incurred after the date that is five years after the date of the termination of Executive's employment with the Company. Executive is not permitted to receive a payment in lieu of reimbursement under this Section 5(a) or Section 12.

(b)    Benefits. Executive shall be eligible to participate in the same benefit plans or fringe benefit policies in which other similarly situated Company employees are eligible to participate, subject to applicable eligibility requirements and the terms and conditions of such plans and policies as in effect from time to time. The Company shall not, by reason of this Section 5(b), be obligated to institute, maintain, or refrain from changing, amending, or discontinuing, any such plan or policy, so long as such changes are similarly applicable to similarly situated Company employees generally.

6.    **Termination of Employment**.

(a)    Company's Right to Terminate Executive's Employment for Cause. The Company shall have the right to terminate Executive's employment at any time for Cause. For purposes of this Agreement, "Cause" shall mean Executive's:

3

A0837

(i)material breach of any policy established by the Company or any of its Affiliates that (x) pertains to health and safety and (y) is applicable to Executive;

(ii)engaging in acts of disloyalty to the Company or its Affiliates, including fraud, embezzlement, theft, commission of a felony, or proven dishonesty; or

(iii)willful misconduct in the performance of, or willful failure to perform a material function of, Executive's duties under this Agreement.

(b)    Company's Right to Terminate for Convenience. The Company shall have the right to terminate Executive's employment without Cause, at any time and for any reason or no reason at all.

(c)    Executive's Right to Terminate for Good Reason. Executive shall have the right to terminate Executive's employment with the Company at any time for Good Reason. For purposes of this Agreement, "Good Reason" shall mean:

(i)a material diminution in Executive's authority, duties, title, or responsibilities;

(ii)a material diminution in Executive's Base Salary, Minimum Target Annual Bonus, or Target Annual LTIP Award;

(iii)the relocation of the geographic location of Executive's principal place of employment by more than 100 miles from the location of Executive's principal place of employment as of the Amendment Effective Date; or

(iv)the Company's delivery of a written notice of non-renewal of this Agreement to Executive.

Notwithstanding the foregoing provisions of this Section 6(c) or any other provision of this Agreement to the contrary, any assertion by Executive of a termination for Good Reason shall not be effective unless all of the following conditions are satisfied: (A) the condition described in Section 6(c)(i), (ii), (iii), or (iv) giving rise to Executive's termination of Executive's employment must have arisen without Executive's written consent; (B) Executive must provide written notice to the Company of such condition within 30 days of the date on which Executive knew of the existence of the condition; (C) the condition specified in such notice must remain uncorrected for 30 days after receipt of such notice by the Company; and (D) the date of Executive's termination of Executive's employment must occur within 30 days after the end of such cure period.

(d)    Death or Disability. Executive's employment with the Company shall terminate upon the death or Disability of Executive. For purposes of this Agreement, a "Disability" shall exist if Executive is unable to perform the essential functions of Executive's position, with reasonable accommodation (if applicable), due to an illness or physical or mental impairment or other incapacity that continues for a period in excess of 90 days, whether

4

consecutive or not, in any period of 365 consecutive days. The determination of a Disability will be made by the Company after obtaining an opinion from a doctor of the Company's choosing. Executive agrees to provide such information and participate in such examinations as may be reasonably required by said doctor in order to form his or her opinion. If requested by the Company, Executive shall submit to a mental or physical examination to be performed by an independent physician selected by the Company to assist the Company in making such determination.

(e)     Executive's Right to Terminate for Convenience. Executive shall have the right to terminate Executive's employment with the Company for convenience at any time upon 60 days' advance written notice to the Company; *provided* that if Executive provides a notice of termination pursuant to this Section 6(e), the Company may designate an earlier termination date than that specified in Executive's notice. The Company's designation of such an earlier date will not change the nature of Executive's termination, which will still be deemed a voluntary resignation by Executive pursuant to this Section 6(e).

(f)     Effect of Termination.

(i)If Executive's employment hereunder shall terminate (1) pursuant to Section 4 at the expiration of the then-existing Current Term or Renewal Term, as applicable, as a result of a non-renewal of this Agreement by Executive or (2) pursuant to Section 6(a) or 6(e), then all compensation and all benefits to Executive hereunder shall terminate contemporaneously with such termination of employment, except that Executive shall be entitled to (x) payment of all earned, unpaid Base Salary within 30 days of Executive's last day of employment, or earlier if required by law, (y) reimbursement for all incurred but unreimbursed expenses for which Executive is entitled to reimbursement in accordance with Section 5(a) and Section 12, and (z) benefits to which Executive may be entitled pursuant to the terms of any plan or policy described in Section 5(b).

(ii)If Executive's employment terminates (1) pursuant to Section 6(b) or 6(c) or (2) due to Executive's death or Disability pursuant to Section 6(d), then all compensation and all benefits to Executive hereunder shall terminate contemporaneously with such termination of employment, except that (I) Executive shall be entitled to receive the compensation and benefits described in clauses (x) through (z) of Section 6(f)(i); and (II) if Executive executes, on or before the Release Expiration Date (as defined below), and does not revoke within the time provided by the Company to do so, a release of all claims in a form satisfactory to the Company (which shall be substantially similar to the form of release attached hereto as Exhibit A) (the "Release")), then, *provided* that Executive abides by the terms of Sections 7, 8, 9, 10, and 12:

(1)     The Company shall pay to Executive an amount (the "Severance Payment") equal to the sum of Executive's Base Salary as in effect on the date of the termination of Executive's employment (the "Termination Date") and Executive's Target Annual Bonus as of the Termination Date. The Severance Payment will be divided into 12 substantially equal installments. On the

5

Company's first regularly scheduled pay date that is on or after the date that is 60 days after the Termination Date, the Company shall pay to Executive, without interest, a number of such installments equal to the number of such installments that would have been paid during the period beginning on the Termination Date and ending on the Company's first regularly scheduled pay date that is on or after the date that is 60 days after the Termination Date had the installments been paid on a biweekly basis commencing on the Company's first regularly scheduled pay date coincident with or next following the Termination Date, and each of the remaining installments shall be paid on a biweekly basis thereafter; *provided*, *however*, that (1) to the extent, if any, that the aggregate amount of the installments of the Severance Payment that would otherwise be paid pursuant to the preceding provisions of this Section 6(f)(ii)(A) after March 15 of the calendar year following the calendar year in which the Termination Date occurs (the "Applicable March 15") exceeds the maximum exemption amount under Treasury Regulation Section 1.409A1(b)(9)(iii)(A), then such excess shall be paid to Executive in a lump sum on the Applicable March 15 (or the first business day preceding the Applicable March 15 if the Applicable March 15 is not a business day) and the installments of the Severance Payment payable after the Applicable March 15 shall be reduced by such excess (beginning with the installment first payable after the Applicable March 15 and continuing with the next succeeding installment until the aggregate reduction equals such excess), and (2) all remaining installments of the Severance Payment, if any, that would otherwise be paid pursuant to the preceding provisions of this Section 6(f)(ii)(A) after December 31 of the calendar year following the calendar year in which the Termination Date occurs shall be paid with the installment of the Severance Payment, if any, due in December of the calendar year following the calendar year in which the Termination Date occurs;

(2)     All outstanding awards granted to Executive pursuant to the LTIP prior to the Termination Date that remain unvested as of the Termination Date shall immediately become fully vested as of the Termination Date; *provided*, *however*, that with respect to any such LTIP awards that were granted subject to a performance requirement (other than continued service by Executive) that has not been satisfied and certified by the Partners Board (or a committee thereof) as of the Termination Date, then (1) if the Termination Date occurs within six months prior to the expiration of the performance period applicable to such LTIP award, such LTIP award shall become vested based on actual performance upon the expiration of such performance period; and (2) if the Termination Date occurs at any other time during the performance period applicable to such LTIP award, such LTIP award shall become vested as of the Termination Date based on target performance.

(3)     If Executive timely and properly elects to continue coverage for Executive and Executive's spouse and eligible dependents, if any, under the Company's group health plans pursuant to the Consolidated Omnibus

6

A0840

Budget Reconciliation Act of 1985, as amended ("COBRA"), similar in the amounts and types of coverage provided by the Company to Executive prior to the Termination Date, then for a period of 12 months following the Termination Date or such earlier date as provided in this Section 6(f)(ii)(C), the Company shall promptly reimburse Executive on a monthly basis for the entire amount Executive pays to effect and continue such coverage; *provided*, *however*, that Executive's rights to such reimbursements under this Section 6(f)(ii)(C) shall terminate upon the earlier of (1) the time Executive becomes eligible to be covered under a group health plan sponsored by another employer (and Executive shall promptly notify the Company in the event that Executive becomes so eligible) or (2) the date Executive is no longer eligible to receive COBRA continuation coverage. Notwithstanding anything in the preceding provisions of this Section 6(f)(ii)(C) to the contrary, (x) the election of COBRA continuation coverage and the payment of any premiums due with respect to such COBRA continuation coverage will remain Executive's sole responsibility, and the Company will assume no obligation for payment of any such premiums relating to such COBRA continuation coverage and (y) if the provision of the benefit described in this Section 6(f)(ii)(C) cannot be provided in the manner described above without penalty, tax, or other adverse impact on the Company, then the Company and Executive shall negotiate in good faith to determine an alternative manner in which the Company may provide a substantially equivalent benefit to Executive without such adverse impact on the Company.

For purposes of this Section 6(f)(ii), in the event of Executive's death, references to Executive (other than in Section 6(f)(ii)(C)) shall include Executive's estate, and references to Executive in Section 6(f)(ii)(C) shall include Executive's spouse and eligible dependents, if any, who are "qualified beneficiaries" (within the meaning of COBRA and the regulations thereunder) with respect to Executive's death.

(iii) Executive acknowledges Executive's understanding that if the Release is not executed and returned to the Company on or before the Release Expiration Date, and the required revocation period has not fully expired without revocation of the Release by Executive, then Executive shall not be entitled to any payments or benefits pursuant to Section 6(f)(ii). As used herein, the "Release Expiration Date" is that date that is 21 days following the date upon which the Company delivers the Release to Executive (which shall occur no later than seven days after the Termination Date) or, in the event that such termination of employment is "in connection with an exit incentive or other employment termination program" (as such phrase is defined in the Age Discrimination in Employment Act of 1967, as amended), the date that is 45 days following such delivery date.

(g)     Meaning of Termination of Employment. For all purposes of this Agreement, Executive shall be considered to have terminated employment with the Company when Executive incurs a "separation from service" with the Company within the meaning of Section 409A(a)(2)(A)(i) of the Internal Revenue Code; *provided*, *however*, that whether such a

7

A0841

separation from service has occurred shall be determined based upon a reasonably anticipated permanent reduction in the level of bona fide services to be performed to no more than 25% of the average level of bona fide services provided in the immediately preceding 36 months.

7. **Conflicts of Interest; Disclosure of Opportunities**. Executive agrees that Executive shall promptly disclose to the Holdings Board any conflict of interest involving Executive upon Executive becoming aware of such conflict. Executive further agrees that, throughout the Employment Period and for one year thereafter, Executive shall offer to the Company and its Affiliates, as applicable, all business opportunities relating to the acquisition, development, ownership, and operation of facilities that collect, process and transform wood-based biomass into renewable energy feedstock, including wood pellets, regardless of where such business opportunities arise.

8. **Confidentiality**. Executive acknowledges and agrees that, in the course of Executive's employment with the Company, Executive has been provided with and had access to (and, during the Employment Period, Executive will continue to be provided with, and have access to) valuable Confidential Information (as defined below). In consideration of Executive's receipt of and access to such Confidential Information and in exchange for other valuable consideration provided hereunder, and as a condition of Executive's employment hereunder, Executive agrees to comply with this Section 8.

(a)    Executive covenants and agrees, both during the Employment Period and thereafter that, except as expressly permitted by this Agreement or by directive of the Holdings Board, Executive shall not disclose any Confidential Information to any Person and shall not use any Confidential Information except for the benefit of the Company or any of its Affiliates. Executive shall take all reasonable precautions to protect the physical security of all documents and other material containing Confidential Information (regardless of the medium on which the Confidential Information is stored). The covenants in this Section 8(a) shall apply to all Confidential Information, whether now known or later to become known to Executive during the Employment Period.

(b)    Notwithstanding Section 8(a), Executive may make the following disclosures and uses of Confidential Information:

(i) disclosures to other executives or employees of the Company or its Affiliates who have a need to know the information in connection with the business of the Company or its Affiliates;

(ii) disclosures and uses that are incidental to Executive's provision of services to the Company and its Affiliates consistent with the terms of this Agreement or that are approved by the Holdings Board;

(iii) disclosures for the purpose of complying with any applicable laws or regulatory requirements; or

8

A0842

(iv) disclosures that Executive is legally compelled to make by deposition, interrogatory, request for documents, subpoena, civil investigative demand, order of a court of competent jurisdiction, or similar process, or otherwise by law.

(c)    Upon the expiration of the Employment Period and at any other time upon request of the Company, Executive shall surrender and deliver to the Company all documents (including electronically stored information) and other material of any nature containing or pertaining to all Confidential Information in Executive's possession and shall not retain any such document or other material. Within 10 days of any such request, Executive shall certify to the Company in writing that all such materials have been returned to the Company.

(d)    All non-public information, designs, ideas, concepts, improvements, product developments, discoveries, and inventions, whether patentable or not, that are conceived, made, developed, or acquired by Executive, individually or in conjunction with others, during the period Executive is or has been employed or affiliated with the Company or any of its Affiliates (whether during business hours or otherwise and whether on the Company's premises or otherwise) that relate to the Company's or any of its Affiliates' business or properties, products, or services (including all such information relating to corporate opportunities, business plans, trade secrets, strategies for developing business and market share, research, financial and sales data, pricing terms, evaluations, opinions, interpretations, acquisition prospects, the identity of customers or their requirements, the identity of key contacts within customers' organizations or within the organization of acquisition prospects, or marketing and merchandising techniques, prospective names and marks) is defined as "Confidential Information." Moreover, all documents, videotapes, written presentations, brochures, drawings, memoranda, notes, records, files, correspondence, manuals, models, specifications, computer programs, email, voicemail, electronic databases, maps, drawings, architectural renditions, models, and all other writings or materials of any type including or embodying any of such information, ideas, concepts, improvements, discoveries, inventions, and other similar forms of expression are and shall be the sole and exclusive property of the Company or its Affiliates and be subject to the same restrictions on disclosure applicable to all Confidential Information pursuant to this Agreement.

(e)    Nothing in this Agreement shall prohibit or restrict Executive from lawfully (i) initiating communications directly with, cooperating with, providing information to, causing information to be provided to, or otherwise assisting in an investigation by any governmental or regulatory agency, entity, or official(s) (collectively, "Governmental Authorities") regarding a possible violation of any law, (ii) responding to any inquiry or legal process directed to Executive individually from any such Governmental Authorities, (iii) testifying, participating, or otherwise assisting in an action or proceeding by any such Governmental Authorities relating to a possible violation of law, or (iv) making any other disclosures that are protected under the whistleblower provisions of any applicable law. Additionally, pursuant to the federal Defend Trade Secrets Act of 2016, Executive shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (x) is made (A) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (B) solely for the purpose of reporting or investigating a suspected violation of law, or (y) is made to Executive's attorney in relation to a

9

lawsuit for retaliation against Executive for reporting a suspected violation of law, or (z) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Nor does this Agreement require Executive to obtain prior authorization from the Company or its Affiliates before engaging in any conduct described in this Section 8(e), or to notify the Company or its Affiliates that Executive has engaged in any such conduct.

9.     **Non-Competition; Non-Solicitation**.

(a)     The Company shall continue to provide Executive access to Confidential Information for use only during the Employment Period, and Executive acknowledges and agrees that the Company will be entrusting Executive, in Executive's unique and special capacity, with continuing to develop the goodwill of the Company, and in consideration thereof and in consideration of the continued access to Confidential Information, and as a condition of Executive's employment hereunder, Executive has voluntarily agreed to the covenants set forth in this Section 9. Executive further agrees and acknowledges that the limitations and restrictions set forth herein, including the geographical and temporal restrictions on certain competitive activities, are reasonable in all respects and are material and substantial parts of this Agreement intended and necessary to protect the Company's legitimate business interests, including the preservation of its Confidential Information and goodwill.

(b)     Executive agrees that, during the period set forth in Section 9(c) below, Executive shall not, without the prior written approval of the Company, directly or indirectly, for Executive or on behalf of or in conjunction with any other person or entity of whatever nature:

(i)engage or participate within the Market Area in competition with the Company in any business in which either the Company or its Protected Affiliates engaged in, or had plans to become engaged in of which Executive was aware during the Employment Period or the period set forth in Section 9(c) below, which business includes the acquisition, development, ownership, and operation of facilities that collect, process, and transform wood-based biomass into renewable energy feedstock, including wood pellets (the "Business"). As used herein, the term "Protected Affiliates" means any Affiliate of the Company for which Executive provided services during the Employment Period, or about which Executive obtained Confidential Information during the Employment Period.

(ii)appropriate any Business Opportunity of, or relating to, the Company or its Affiliates located in the Market Area, or engage in any activity that is detrimental to the Company or its Affiliates or that limits the Company's or an Affiliate's ability to fully exploit such Business Opportunities or prevents the benefits of such Business Opportunities from accruing to the Company or its Affiliates; or

(iii)solicit any employee of the Company or its Affiliates to terminate his or her employment therewith.

(c)     <u>Timeframe of Non-Competition and Non-Solicitation Agreement</u>. Executive agrees that the covenants of this Section 9 shall be enforceable during the

10

Employment Period and for a period of one year following the termination of the Employment Period, regardless of the reason for such termination.

(d)    Because of the difficulty of measuring economic losses to the Company and its Affiliates as a result of a breach of the foregoing covenants, and because of the immediate and irreparable damage that could be caused to the Company and its Affiliates for which they would have no other adequate remedy, Executive agrees that the foregoing covenant may be enforced by the Company and its Affiliates, in the event of breach by Executive, by injunctions and restraining orders and that such enforcement shall not be the Company's and its Affiliates' exclusive remedy for a breach but instead shall be in addition to all other rights and remedies available to the Company and its Affiliates, both at law and in equity.

(e)    The covenants in this Section 9 are severable and separate, and the unenforceability of any specific covenant (or any portion thereof) shall not affect the provisions of any other covenant (or any portion thereof). Moreover, in the event any court of competent jurisdiction or arbitrator, as applicable, shall determine that the scope, time, or territorial restrictions set forth in this Section 9 are unreasonable, then it is the intention of the parties that such restrictions be enforced to the fullest extent that the court or arbitrator deems reasonable, and this Agreement shall thereby be reformed.

(f)    For purposes of this Section 9, the following terms shall have the following meanings:

(i)"Business Opportunity" shall mean any commercial, investment, or other business opportunity relating to the Business.

(ii)"Market Area" shall mean any location or geographic area within 75 miles of a location where the Company or its Affiliates conducts Business, or has plans to conduct Business of which Executive is aware, during the Employment Period.

(g)    All of the covenants in this Section 9 shall be construed as an agreement independent of any other provision in this Agreement, and the existence of any claim or cause of action of Executive against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of such covenants.

10.    **Ownership of Intellectual Property**. Executive agrees that the Company or its applicable Affiliate shall own, and Executive agrees to assign and does hereby assign, all right, title, and interest (including patent rights, copyrights, trade secret rights, mask work rights, trademark rights, and all other intellectual and industrial property rights of any sort throughout the world) relating to any and all inventions (whether or not patentable), works of authorship, mask works, designs, know-how, ideas, and information authored, created, contributed to, made, or conceived or reduced to practice, in whole or in part, by Executive during the period that Executive is or has been employed or affiliated with the Company or any of its Affiliates that either (a) relate, at the time of conception, reduction to practice, creation, derivation, or development, to the Company's or any of its Affiliates' business or actual or anticipated research or development, or (b) were developed on any amount of the Company's time or with the use of

11

any of the Company's or its Affiliates' equipment, supplies, facilities, or trade secret information (all of the foregoing collectively referred to herein as "Company Intellectual Property"), and Executive will promptly disclose all Company Intellectual Property to the Company. All of Executive's works of authorship and associated copyrights created during the Employment Period and in the scope of Executive's employment shall be deemed to be "works made for hire" within the meaning of the Copyright Act. Executive agrees to perform, during and after the Employment Period, all reasonable acts deemed necessary by the Company to assist the Company or its applicable Affiliate, at the Company's or such Affiliate's expense, in obtaining and enforcing its rights throughout the world in the Company Intellectual Property. Such acts may include, but are not limited to, execution of documents and assistance or cooperation (i) in the filing, prosecution, registration, and memorialization of assignment of any applicable patents, copyrights, mask work, or other applications, (ii) in the enforcement of any applicable patents, copyrights, mask work, moral rights, trade secrets, or other proprietary rights, and (iii) in other legal proceedings related to the Company Intellectual Property.

11.  **Arbitration**.

(a)  Subject to Section 11(d), any dispute, controversy, or claim between Executive and the Company or any of its Affiliates arising out of or relating to this Agreement or Executive's employment with the Company or services provided to any Affiliate of the Company will be finally settled by arbitration in New York, New York before, and in accordance with the rules for the resolution of employment disputes then in effect of, the American Arbitration Association ("AAA"). The arbitration award shall be final and binding on both parties.

(b)  Any arbitration conducted under this Section 11 shall be heard by a single arbitrator (the "Arbitrator") selected in accordance with the then-applicable rules of the AAA. The Arbitrator shall expeditiously (and, if possible, within 90 days after the selection of the Arbitrator) hear and decide all matters concerning the dispute. Except as expressly provided to the contrary in this Agreement, the Arbitrator shall have the power to (i) gather such materials, information, testimony, and evidence as the Arbitrator deems relevant to the dispute before him or her (and each party will provide such materials, information, testimony, and evidence requested by the Arbitrator, except to the extent any information so requested is proprietary, subject to a third-party confidentiality restriction, or to an attorney-client or other privilege), and (ii) grant injunctive relief and enforce specific performance. The decision of the Arbitrator shall be rendered in writing, be final and binding upon the disputing parties, and the parties agree that judgment upon the award may be entered by any court of competent jurisdiction; *provided* that the parties agree that the Arbitrator and any court enforcing the award of the Arbitrator shall not have the right or authority to award punitive or exemplary damages to any disputing party.

(c)  Each side shall share equally the cost of the arbitration and bear its own costs and attorneys' fees incurred in connection with any arbitration, unless the Arbitrator determines that compelling reasons exist for allocating all or a portion of such costs and fees to the other side.

(d)  Notwithstanding Section 11(a), an application for emergency or temporary injunctive relief by either party (including any such application to enforce the provisions of

12

Sections 8, 9, or 10 herein) shall not be subject to arbitration under this Section 11; *provided*, *however*, that the remainder of any such dispute (beyond the application for emergency or temporary injunctive relief) shall be subject to arbitration under this Section.

(e)     By entering into this Agreement and entering into the arbitration provisions of this Section 11, THE PARTIES EXPRESSLY ACKNOWLEDGE AND AGREE THAT THEY ARE KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVING THEIR RIGHTS TO A JURY TRIAL.

(f)     Nothing in this Section 11 shall prohibit a party to this Agreement from (i) instituting litigation to enforce any arbitration award or (ii) joining another party to this Agreement in a litigation initiated by a person or entity that is not a party to this Agreement.

12.     **Defense of Claims**. Executive agrees that, during the Employment Period and thereafter, upon reasonable request from the Company, Executive will cooperate with the Company or its Affiliates in the defense of any claims or actions that may be made by or against the Company or its Affiliates that relate to Executive's actual or prior areas of responsibility, except if Executive's reasonable interests are adverse to the Company or its Affiliate(s), as applicable, in such claim or action. The Company agrees to pay or reimburse Executive for all of Executive's reasonable travel and other direct expenses incurred, or to be reasonably incurred, to comply with Executive's obligations under this Section 12, provided Executive provides reasonable documentation of same and obtains the Company's prior approval for incurring such expenses.

13.     **Withholdings**. The Company may withhold and deduct from any payments made or to be made pursuant to this Agreement (a) all federal, state, local, and other taxes as may be required pursuant to any law or governmental regulation or ruling and (b) any deductions consented to in writing by Executive.

14.     **Title and Headings; Construction**. Titles and headings to Sections hereof are for the purpose of reference only and shall in no way limit, define, or otherwise affect the provisions hereof. Any and all Exhibits or Attachments referred to in this Agreement are, by such reference, incorporated herein and made a part hereof for all purposes. The words "herein," "hereof," "hereunder," and other compounds of the word "here" shall refer to the entire Agreement and not to any particular provision hereof. The use herein of the word "including" following any general statement, term, or matter shall not be construed to limit such statement, term, or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation," "but not limited to," or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that could reasonably fall within the broadest possible scope of such general statement, term, or matter. Unless the context requires otherwise, all references herein to an agreement, instrument, or other document shall be deemed to refer to such agreement, instrument, or other document as amended, supplemented, modified, and restated from time to time to the extent permitted by the provisions thereof.  All references to "dollars" or "$" in this Agreement refer to United States dollars.  Wherever the context so

13

A0847

requires, the masculine gender includes the feminine or neuter, and the singular number includes the plural and conversely.

15.    **Applicable Law; Submission to Jurisdiction**. This Agreement shall in all respects be construed according to the laws of the State of New York without regard to the conflict of law principles thereof. With respect to any claim or dispute related to or arising under this Agreement, the parties hereby consent to the arbitration provisions of Section 11 above and recognize and agree that should any resort to a court be necessary and permitted under this Agreement, then they consent to the exclusive jurisdiction, forum, and venue of the state and federal courts located in New York, New York.

16.    **Entire Agreement and Amendment**. This Agreement contains the entire agreement of the parties with respect to the matters covered herein; moreover, this Agreement supersedes all prior and contemporaneous agreements and understandings, oral or written, between the parties hereto concerning the subject matter hereof. Without limiting the scope of the preceding sentence, except as otherwise expressly provided in this Section 16, all understandings and agreements preceding the Amendment Effective Date and relating to the subject matter hereof (including the Prior Agreement) are hereby null and void and of no further force or effect, and this Agreement shall supersede all other agreements, written or oral, that purport to govern the terms of Executive's employment (including Executive's compensation) with the Company or any of its Affiliates. Executive acknowledges and agrees that the Prior Agreement is hereby terminated and has been satisfied in full, as has any other employment agreement between Executive and the Company or any of its Affiliates. In entering into this Agreement, Executive expressly acknowledges and agrees that Executive has received all sums and compensation that Executive has been owed, is owed, or ever could be owed pursuant to the agreement(s) referenced in the previous sentence and for services provided to the Company and any of its Affiliates through the date that Executive signs this Agreement, with the exception of any unpaid base salary for the pay period that includes the date on which Executive signs this Agreement. Notwithstanding anything in the preceding provisions of this Section 16 to the contrary, the parties expressly acknowledge and agree that this Agreement does not supersede or replace, but instead complements and is in addition to, all equity compensation agreements between Executive and the Company or any of its Affiliates. This Agreement may be amended only by a written instrument executed by both parties hereto.

17.    **Waiver of Breach**. Any waiver of this Agreement must be executed by the party to be bound by such waiver. No waiver by either party hereto of a breach of any provision of this Agreement by the other party, or of compliance with any condition or provision of this Agreement to be performed by such other party, will operate or be construed as a waiver of any subsequent breach by such other party or any similar or dissimilar provision or condition at the same or any subsequent time. The failure of either party hereto to take any action by reason of any breach will not deprive such party of the right to take action at any time while such breach continues.

18.    **Assignment**. This Agreement is personal to Executive, and neither this Agreement nor any rights or obligations hereunder shall be assignable or otherwise transferred

14

by Executive. The Company may assign this Agreement to any successor (whether by merger, purchase, or otherwise) to all or substantially all of the equity, assets, or businesses of the Company, if such successor expressly agrees to assume the obligations of the Company hereunder.

19.    **Affiliates**. For purposes of this Agreement, the term "Affiliates" is defined as any person or entity Controlling, Controlled by, or Under Common Control with the Company. The term "Control," including the correlative terms "Controlling," "Controlled By," and "Under Common Control with" means possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract, or otherwise) of a person or entity. For the purposes of the preceding sentence, Control shall be deemed to exist when a person or entity possesses, directly or indirectly, through one or more intermediaries (a) in the case of a corporation, more than 50% of the outstanding voting securities thereof, (b) in the case of a limited liability company, partnership, limited partnership, or joint venture, the right to more than 50% of the distributions therefrom (including liquidating distributions), or (c) in the case of any other person or entity, more than 50% of the economic or beneficial interest therein.

20.    **Notices**. Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly received (a) when delivered in person, (b) on the first business day after such notice is sent by air express overnight courier service, or (c) on the third business day following deposit in the United States mail, registered or certified mail, return receipt requested, postage prepaid and addressed, in each case, to the following address, as applicable:

        (a)    If to the Company, addressed to:

            Enviva Management Company, LLC
            7200 Wisconsin Ave. Suite 1000
            Bethesda, MD 20814
            Attention: General Counsel

        (b)    If to Executive, addressed to the most recent address the Company has in its employment records for Executive.

21.    **Counterparts**. This Agreement may be executed in any number of counterparts, including by facsimile or "pdf" or similar electronic format, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument. Each counterpart may consist of a copy hereof containing multiple signature pages, each signed by one party, but together signed by both parties hereto.

22.    **Deemed Resignations**. Unless otherwise agreed to in writing by the Company and Executive prior to the termination of Executive's employment, any termination of Executive's employment shall constitute (a) an automatic resignation of Executive as an officer of the Company, Holdings GP, and each other Affiliate of the Company, as applicable, (b) an automatic resignation of Executive from the board of directors (or similar governing body) of the Company or any Affiliate of the Company (if applicable), and (c) an automatic resignation from

15

the board of directors or any similar governing body of any corporation, limited liability entity, or other entity in which the Company or any Affiliate holds an equity interest and with respect to which board or similar governing body Executive serves as the Company's or such Affiliate's designee or other representative (if applicable).

23.     **Effect of Termination**. The provisions of Sections 6(f), 712, 22, and 24 and those provisions necessary to interpret and enforce them, shall survive any termination of the employment relationship between Executive and the Company.

24.     **Third Party Beneficiaries**. Each Affiliate of the Company shall be a third party beneficiary of Executive's obligations under Sections 7, 8, 9, 10, and 22 and shall be entitled to enforce such obligations as if a party hereto.

25.     **Severability**. Subject to Section 9(e), if an arbitrator or court of competent jurisdiction determines that any provision of this Agreement (or part thereof) is invalid or unenforceable, then the invalidity or unenforceability of that provision (or part thereof) shall not affect the validity or enforceability of any other provision (or part thereof) of this Agreement, and all other provisions (or part thereof) shall remain in full force and effect.

26.     **Section 409A**. Notwithstanding any provision of this Agreement to the contrary, all provisions of this Agreement are intended to comply with Section 409A of the Internal Revenue Code of 1986, as amended, and the applicable Treasury regulations and administrative guidance issued thereunder (collectively, "Section 409A") or an exemption therefrom and shall be construed and administered in accordance with such intent. Any payments under this Agreement that may be excluded from Section 409A either as separation pay due to an involuntary separation from service or as a short-term deferral shall be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, each installment payment provided under this Agreement shall be treated as a separate payment. Notwithstanding any provision in this Agreement to the contrary, if any payment or benefit provided for herein would be subject to additional taxes and interest under Section 409A if Executive's receipt of such payment or benefit is not delayed until the earlier of (i) the date of Executive's death or (ii) the date that is six months after the Termination Date (such date, the "Section 409A Payment Date"), then such payment or benefit shall not be provided to Executive (or Executive's estate, if applicable) until the Section 409A Payment Date. Notwithstanding the foregoing, the Company makes no representations that the payments and benefits provided under this Agreement are exempt from, or compliant with, Section 409A and in no event shall the Company or any of its Affiliates be liable for all or any portion of any taxes, penalties, interest, or other expenses that may be incurred by Executive on account of non-compliance with Section 409A.

[*The remainder of this page was left blank intentionally; the signature page follows.*]

16

IN WITNESS WHEREOF, Executive and the Company each have caused this Agreement to be executed in its name and on its behalf, effective for all purposes as provided above.

**EXECUTIVE**


Thomas Meth

**ENVIVA MANAGEMENT COMPANY, LLC**


By:
Joseph N. Lane
Executive Vice President,
Human Capital




Signature Page to
Third Amended and Restated
Employment Agreement
(Thomas Meth)

A0851

**EXHIBIT A**

**FORM OF RELEASE AGREEMENT**

This Release Agreement (this "Agreement") constitutes the release referred to in that certain Third Amended and Restated Employment Agreement (the "Employment Agreement") dated as of November 24, 2020, by and between Thomas Meth ("Executive") and Enviva Management Company, LLC (the "Company"). Capitalized terms used but not defined herein shall have the meanings assigned to them in the Employment Agreement.

i. For good and valuable consideration, including the Company's provision of certain severance payments (or a portion thereof) to Executive in accordance with Section 6(f)(ii) of the Employment Agreement, Executive hereby releases, discharges and forever acquits (A) the Company, its subsidiaries and all of its other Affiliates, (B) Enviva Partners GP, LLC, Enviva Partners, LP, Holdings, Holdings GP, their respective subsidiaries, and their other Affiliates, and (C) the past, present, and future stockholders, officers, members, partners, directors, managers, employees, agents, attorneys, heirs, representatives, successors, and assigns of the entities specified in clauses (A) and (B) above, in their personal and representative capacities (collectively, the "Company Parties"), from liability for, and hereby waives, any and all claims, damages, or causes of action of any kind related to Executive's employment with any Company Party, the termination of such employment, and any other acts or omissions related to any matter on or prior to the date of the execution of this Agreement including, without limitation, (1) any alleged violation through the date of this Agreement of: (i) the Age Discrimination in Employment Act of 1967, as amended (including as amended by the Older Workers Benefit Protection Act); (ii) Title VII of the Civil Rights Act of 1964, as amended; (iii) the Civil Rights Act of 1991; (iv) Sections 1981 through 1988 of Title 42 of the United States Code, as amended; (v) the Employee Retirement Income Security Act of 1974, as amended; (vi) the Immigration Reform Control Act, as amended; (vii) the Americans with Disabilities Act of 1990, as amended; (viii) the National Labor Relations Act, as amended; (ix) the Occupational Safety and Health Act, as amended; (x) the Family and Medical Leave Act of 1993; (xi) any federal, state, or local anti-discrimination law; (xii) any federal, state, or local wage and hour law; (xiii) any other local, state, or federal law, regulation, or ordinance; and (xiv) any public policy, contract, tort, or common law claim; (2) any allegation for costs, fees, or other expenses including attorneys' fees incurred in or with respect to a Released Claim; (3) any and all rights, benefits, or claims Executive may have under any employment contract, incentive compensation plan, or equity incentive plan with any Company Party or to any ownership interest in any Company Party except as expressly provided: (I) in Section 6(f)(ii) of the Employment Agreement; and (II) pursuant to the terms of any equity compensation agreement between Executive and a Company Party (including any Restricted Unit Agreement with Holdings or any Award Agreement (as defined in the LTIP) relating to an award granted to Executive pursuant to the LTIP), and (4) any claim for compensation or benefits of any kind not expressly set forth in the Employment Agreement or any equity compensation agreement (collectively, the "Released Claims"). In no event shall the Released Claims include (a) any claim that arises after the date Executive signs this Agreement, (b) any claim to vested benefits under an employee benefit plan or equity compensation plan, or (c) any claims for contractual

EXHIBIT A-1

payments under Section 5(a) or Section 6(f)(ii) of the Employment Agreement. This Agreement is not intended to indicate that any such claims exist or that, if they do exist, they are meritorious. Rather, Executive is simply agreeing that, in exchange for the consideration recited in the first sentence of this paragraph, any and all potential claims of this nature that Executive may have against the Company Parties, regardless of whether they actually exist, are expressly settled, compromised, and waived. By signing this Agreement, Executive is bound by it. Anyone who succeeds to Executive's rights and responsibilities, such as heirs or the executor of Executive's estate, is also bound by this Agreement. This release also applies to any claims brought by any person or agency or class action under which Executive may have a right or benefit. Notwithstanding the release of liability contained herein, nothing in this Agreement prevents Executive from filing any non-legally waivable claim (including a challenge to the validity of this Agreement) with the Equal Employment Opportunity Commission, National Labor Relations Board, Occupational Safety and Health Administration, Securities and Exchange Commission, Financial Industry Regulatory Authority (FINRA) or any other federal, state or local governmental agency, authority, or commission (each, a "Governmental Agency") or participating in any investigation or proceeding conducted by any Governmental Agency. Executive understands that this Agreement does not limit Executive's ability to communicate with any Governmental Agency or otherwise participate in any investigation or proceeding that may be conducted by any Governmental Agency (including by providing documents or other information to a Governmental Agency) without notice to the Company or any other Company Party. This Agreement does not limit Executive's right to receive an award from a Governmental Agency for information provided to a Governmental Agency. **THIS RELEASE INCLUDES MATTERS ATTRIBUTABLE TO THE SOLE OR PARTIAL NEGLIGENCE (WHETHER GROSS OR SIMPLE) OR OTHER FAULT**, **INCLUDING STRICT LIABILITY**, **OF ANY OF THE COMPANY PARTIES**.

ii. Executive agrees not to bring or join any lawsuit or arbitration proceeding against any of the Company Parties in any court relating to any of the Released Claims. Executive represents that Executive has not brought or joined any lawsuit or filed any charge or claim against any of the Company Parties in any court or before any government agency and has made no assignment of any rights Executive has asserted or may have against any of the Company Parties to any person or entity, in each case, with respect to any Released Claims.

iii. By executing and delivering this Agreement, Executive acknowledges that:

a.    Executive has carefully read this Agreement;

b.    Executive has had at least [twenty-one (21)] [forty-five (45)] days to consider this Agreement before the execution and delivery hereof to the Company [Add if 45 days applies:  , and Executive acknowledges that attached to this Agreement are (1) a list of the positions and ages of those employees selected for termination (or participation in the exit incentive or other employment termination program); (2) a list of the ages of those employees not selected for termination (or participation in such program); and (3) information about the unit affected by the employment termination

EXHIBIT A-2

A0853

program of which Executive's termination was a part, including any eligibility factors for such program and any time limits applicable to such program];

        c.      Executive has been advised, and hereby is advised in writing, that Executive may, at Executive's option, discuss this Agreement with an attorney of Executive's choice and that Executive has had adequate opportunity to do so;

        d.      Executive fully understands the final and binding effect of this Agreement; the only promises made to Executive to sign this Agreement are those stated in the Employment Agreement and herein; and Executive is signing this Agreement knowingly, voluntarily and of Executive's own free will, and that Executive understands and agrees to each of the terms of this Agreement; and

        e.      With the exception of any sums that Executive may be owed pursuant to Section 6(f)(ii) of the Employment Agreement, Executive has been paid all wages and other compensation to which Executive is entitled under the Agreement and received all leaves (paid and unpaid) to which Executive was entitled during the Employment Period.

Notwithstanding the initial effectiveness of this Agreement, Executive may revoke the delivery (and therefore the effectiveness) of this Agreement within the seven-day period beginning on the date Executive delivers this Agreement to the Company (such seven-day period being referred to herein as the "Release Revocation Period"). To be effective, such revocation must be in writing signed by Executive and must be delivered to the General Counsel of the Company before 11:59 p.m., New York, New York time, on the last day of the Release Revocation Period. If an effective revocation is delivered in the foregoing manner and timeframe, this Agreement shall be of no force or effect and shall be null and void ab initio. No consideration shall be paid if this Agreement is revoked by Executive in the foregoing manner.

Executed on this _____ day of _____, _____.

        Thomas Meth

EXHIBIT A-3

EXHIBIT 10.21

*Execution Version*

**FOURTH AMENDED AND RESTATED
EMPLOYMENT AGREEMENT**

This Fourth Amended and Restated Employment Agreement ("Agreement") is made and entered into as of November 24, 2020 (the "Amendment Effective Date") by and between Enviva Management Company, LLC, a Delaware limited liability company (the "Company"), and William H. Schmidt, Jr. ("Executive") and supersedes and replaces in its entirety the Third Amended and Restated Employment Agreement (the "Prior Agreement") dated December 23, 2019 by and between the Company and Executive.

1.    **Employment**. During the period commencing on the Amendment Effective Date and for the duration of the Employment Period (as defined in Section 4 below) (the "Specified Employment Period"), the Company shall continue to employ Executive, and Executive shall continue to serve, as Executive Vice President, Corporate Development and General Counsel of the Company, Enviva Holdings GP, LLC, a Delaware limited liability company ("Holdings GP") and the general partner of Enviva Holdings, LP, a Delaware limited partnership ("Holdings"), and such other Affiliates of the Company as may be designated by Holdings from time to time, other than Enviva Development Company, LLC and its subsidiaries, where Executive shall continue to serve as President and General Counsel.

2.    **Duties and Responsibilities of Executive**.

(a)    During the Employment Period, Executive shall devote Executive's full business time and attention to the business of the Company and its Affiliates, as applicable, and will not hold any outside employment or consulting position. Executive's duties pursuant to this Agreement will include those normally incidental to the positions identified in Section 1, as well as such additional duties as may be assigned to Executive by Holdings from time to time.

(b)    Executive represents and covenants that Executive is not the subject of or a party to any employment agreement, non-competition or non-solicitation covenant, non-disclosure agreement, or any other agreement, covenant, understanding, or restriction that would prohibit Executive from executing this Agreement and fully performing Executive's duties and responsibilities hereunder, or would in any manner, directly or indirectly, limit or affect the duties and responsibilities that may now or in the future be assigned to Executive hereunder.

(c)    Executive acknowledges and agrees that Executive owes the Company and its Affiliates fiduciary duties, including duties of care, loyalty, fidelity, and allegiance, such that Executive shall act at all times in the best interests of the Company and its Affiliates and shall not appropriate any business opportunity of the Company or its Affiliates for Executive. Executive agrees that the obligations described in this Agreement are in addition to, and not in lieu of, the obligations Executive owes the Company and its Affiliates under common law. The Parties acknowledge and agree that Executive may provide services (including as an executive, employee, director, or otherwise) to multiple Affiliates of the Company and, in providing such services, Executive will not be violating Executive's obligations hereunder so long as Executive abides by the terms of Sections 7, 8, and 9 below in the course of performing such services.

A0855

3.    **Compensation**.

(a)    Base Salary. During the Specified Employment Period, the Company shall pay to Executive an annualized base salary of $445,000 (the "Base Salary") in consideration for Executive's services under this Agreement, payable on a not less than biweekly basis, in conformity with the Company's customary payroll practices for executives as in effect from time to time.

(b)    Annual Bonus. During the Specified Employment Period, Executive shall be eligible for discretionary bonus compensation for each calendar year that Executive is employed by the Company hereunder (each, a "Bonus Year") pursuant to the applicable incentive or bonus compensation plan of the Company, if any, that is applicable to similarly situated executives of the Company (each, an "Annual Bonus"). Each Annual Bonus shall have a target value that is not less than 120% of Executive's Base Salary as in effect on the first day of the Bonus Year to which such Annual Bonus relates (the "Minimum Target Annual Bonus"); *provided*, *however*, that the Minimum Target Annual Bonus for the 2020 calendar year shall not be less than $425,000. The performance targets that must be achieved in order to realize certain bonus levels shall be established by the Board of Directors of Holdings GP (the "Holdings Board") or a committee thereof annually, in its sole discretion, and communicated to Executive in accordance with terms of the applicable incentive or bonus plan, if any, or if no such plan has been adopted, within the first 90 days of each applicable Bonus Year following 2020 (the most recently established target value for Executive's Annual Bonus is referred to herein as the "Target Annual Bonus"). Each Annual Bonus, if any, will be paid as soon as administratively feasible after the Holdings Board or a committee thereof certifies whether the applicable performance targets for the applicable Bonus Year have been achieved, but in no event later than March 15 following the end of such Bonus Year.

(c)    Long-Term Incentive Plan. With respect to the 2021 calendar year and each subsequent calendar year during the Specified Employment Period, Executive shall be eligible to receive annual awards under the Enviva Partners, LP equity compensation plan as in effect from time to time (the "LTIP") with a target value equal to 250% of Executive's Base Salary as in effect on the first day of such calendar year (the "Target Annual LTIP Award"). All awards granted to Executive under the LTIP, if any, shall be on such terms and conditions as the board of directors (the "Partners Board") of Enviva Partners GP, LLC, a Delaware limited liability company and the general partner of Enviva Partners, LP, or a committee thereof shall determine from time to time and shall be subject to and governed by the terms and provisions of the LTIP as in effect from time to time and the award agreements evidencing such awards. Nothing herein shall be construed to give Executive any rights to any amount or type of grant or award except as provided in such award to Executive provided in writing and authorized by the Partners Board (or a committee thereof).

4.    **Term of Employment**. The current term of Executive's employment under this Agreement is the period commencing on the Amendment Effective Date and ending on the first anniversary of the Amendment Effective Date (the "Current Term"). On the first anniversary of the Amendment Effective Date and on each subsequent anniversary of the Amendment Effective

2

Date thereafter, the term of Executive's employment under this Agreement shall automatically renew and extend for a period of 12 months (each such 12-month period being a "Renewal Term") unless written notice of non-renewal is delivered by either party to the other not less than 60 days prior to the expiration of the then-existing Current Term or Renewal Term, as applicable. Notwithstanding any other provision of this Agreement to the contrary, Executive's employment pursuant to this Agreement may be terminated at any time in accordance with Section 6. The period from the Amendment Effective Date through the expiration of this Agreement or, if sooner, the termination of Executive's employment pursuant to this Agreement, regardless of the time or reason for such termination, shall be referred to herein as the "Employment Period."

5. **Reimbursement of Business Expenses; Benefits**. Subject to the terms and conditions of this Agreement, Executive shall be entitled to the following reimbursements and benefits during the Employment Period:

(a) Reimbursement of Business Expenses. The Company agrees to reimburse Executive for Executive's reasonable business-related expenses incurred in the performance of Executive's duties under this Agreement; *provided* that Executive timely submits all documentation for such reimbursement, as required by Company policy in effect from time-to-time. Any reimbursement of expenses under this Section 5(a) or Section 12 shall be made by the Company upon or as soon as practicable following receipt of supporting documentation reasonably satisfactory to the Company (but in any event not later than the close of Executive's taxable year following the taxable year in which the expense is incurred by Executive); *provided*, *however*, that, upon the termination of Executive's employment with the Company, in no event shall any additional reimbursement be made prior to the date that is six months after the date of such termination (or, if earlier, prior to the date of Executive's death) to the extent such payment delay is required under Section 409A(a)(2)(B) of the Internal Revenue Code. In no event shall any reimbursement be made to Executive for such expenses incurred after the date that is five years after the date of the termination of Executive's employment with the Company. Executive is not permitted to receive a payment in lieu of reimbursement under this Section 5(a) or Section 12.

(b) Benefits. Executive shall be eligible to participate in the same benefit plans or fringe benefit policies in which other similarly situated Company employees are eligible to participate, subject to applicable eligibility requirements and the terms and conditions of such plans and policies as in effect from time to time. The Company shall not, by reason of this Section 5(b), be obligated to institute, maintain, or refrain from changing, amending, or discontinuing, any such plan or policy, so long as such changes are similarly applicable to similarly situated Company employees generally.

6. **Termination of Employment**.

(a) Company's Right to Terminate Executive's Employment for Cause. The Company shall have the right to terminate Executive's employment at any time for Cause. For purposes of this Agreement, "Cause" shall mean Executive's:

3

A0857

(i)material breach of any policy established by the Company or any of its Affiliates that (x) pertains to health and safety and (y) is applicable to Executive;

(ii)engaging in acts of disloyalty to the Company or its Affiliates, including fraud, embezzlement, theft, commission of a felony, or proven dishonesty; or

(iii)willful misconduct in the performance of, or willful failure to perform a material function of, Executive's duties under this Agreement.

(b)    Company's Right to Terminate for Convenience. The Company shall have the right to terminate Executive's employment without Cause, at any time and for any reason or no reason at all.

(c)    Executive's Right to Terminate for Good Reason. Executive shall have the right to terminate Executive's employment with the Company at any time for Good Reason. For purposes of this Agreement, "Good Reason" shall mean:

(i)a material diminution in Executive's authority, duties, title, or responsibilities;

(ii)a material diminution in Executive's Base Salary, Minimum Target Annual Bonus, or Target Annual LTIP Award;

(iii)the relocation of the geographic location of Executive's principal place of employment by more than 100 miles from the location of Executive's principal place of employment as of the Amendment Effective Date; or

(iv)the Company's delivery of a written notice of non-renewal of this Agreement to Executive.

Notwithstanding the foregoing provisions of this Section 6(c) or any other provision of this Agreement to the contrary, any assertion by Executive of a termination for Good Reason shall not be effective unless all of the following conditions are satisfied: (A) the condition described in Section 6(c)(i), (ii), (iii), or (iv) giving rise to Executive's termination of Executive's employment must have arisen without Executive's written consent; (B) Executive must provide written notice to the Company of such condition within 30 days of the date on which Executive knew of the existence of the condition; (C) the condition specified in such notice must remain uncorrected for 30 days after receipt of such notice by the Company; and (D) the date of Executive's termination of Executive's employment must occur within 30 days after the end of such cure period.

(d)    Death or Disability. Executive's employment with the Company shall terminate upon the death or Disability of Executive. For purposes of this Agreement, a "Disability" shall exist if Executive is unable to perform the essential functions of Executive's position, with reasonable accommodation (if applicable), due to an illness or physical or mental impairment or other incapacity that continues for a period in excess of 90 days, whether

4

A0858

consecutive or not, in any period of 365 consecutive days. The determination of a Disability will be made by the Company after obtaining an opinion from a doctor of the Company's choosing. Executive agrees to provide such information and participate in such examinations as may be reasonably required by said doctor in order to form his or her opinion. If requested by the Company, Executive shall submit to a mental or physical examination to be performed by an independent physician selected by the Company to assist the Company in making such determination.

(e)    Executive's Right to Terminate for Convenience. Executive shall have the right to terminate Executive's employment with the Company for convenience at any time upon 60 days' advance written notice to the Company; *provided* that if Executive provides a notice of termination pursuant to this Section 6(e), the Company may designate an earlier termination date than that specified in Executive's notice. The Company's designation of such an earlier date will not change the nature of Executive's termination, which will still be deemed a voluntary resignation by Executive pursuant to this Section 6(e).

(f)    Effect of Termination.

(i) If Executive's employment hereunder shall terminate (1) pursuant to Section 4 at the expiration of the then-existing Current Term or Renewal Term, as applicable, as a result of a non-renewal of this Agreement by Executive or (2) pursuant to Section 6(a) or 6(e), then all compensation and all benefits to Executive hereunder shall terminate contemporaneously with such termination of employment, except that Executive shall be entitled to (x) payment of all earned, unpaid Base Salary within 30 days of Executive's last day of employment, or earlier if required by law, (y) reimbursement for all incurred but unreimbursed expenses for which Executive is entitled to reimbursement in accordance with Section 5(a) and Section 12, and (z) benefits to which Executive may be entitled pursuant to the terms of any plan or policy described in Section 5(b).

(ii) If Executive's employment terminates (1) pursuant to Section 6(b) or 6(c) or (2) due to Executive's death or Disability pursuant to Section 6(d), then all compensation and all benefits to Executive hereunder shall terminate contemporaneously with such termination of employment, except that (I) Executive shall be entitled to receive the compensation and benefits described in clauses (x) through (z) of Section 6(f)(i); and (II) if Executive executes, on or before the Release Expiration Date (as defined below), and does not revoke within the time provided by the Company to do so, a release of all claims in a form satisfactory to the Company (which shall be substantially similar to the form of release attached hereto as Exhibit A) (the "Release")), then, *provided* that Executive abides by the terms of Sections 7, 8, 9, 10, and 12:

(1)    The Company shall pay to Executive an amount (the "Severance Payment") equal to the sum of Executive's Base Salary as in effect on the date of the termination of Executive's employment (the "Termination Date") and Executive's Target Annual Bonus as of the Termination Date. The Severance Payment will be divided into 24 substantially equal installments. On the

5

Company's first regularly scheduled pay date that is on or after the date that is 60 days after the Termination Date, the Company shall pay to Executive, without interest, a number of such installments equal to the number of such installments that would have been paid during the period beginning on the Termination Date and ending on the Company's first regularly scheduled pay date that is on or after the date that is 60 days after the Termination Date had the installments been paid on a biweekly basis commencing on the Company's first regularly scheduled pay date coincident with or next following the Termination Date, and each of the remaining installments shall be paid on a biweekly basis thereafter; *provided*, *however*, that (1) to the extent, if any, that the aggregate amount of the installments of the Severance Payment that would otherwise be paid pursuant to the preceding provisions of this Section 6(f)(ii)(A) after March 15 of the calendar year following the calendar year in which the Termination Date occurs (the "Applicable March 15") exceeds the maximum exemption amount under Treasury Regulation Section 1.409A-1(b)(9)(iii)(A), then such excess shall be paid to Executive in a lump sum on the Applicable March 15 (or the first business day preceding the Applicable March 15 if the Applicable March 15 is not a business day) and the installments of the Severance Payment payable after the Applicable March 15 shall be reduced by such excess (beginning with the installment first payable after the Applicable March 15 and continuing with the next succeeding installment until the aggregate reduction equals such excess), and (2) all remaining installments of the Severance Payment, if any, that would otherwise be paid pursuant to the preceding provisions of this Section 6(f)(ii)(A) after December 31 of the calendar year following the calendar year in which the Termination Date occurs shall be paid with the installment of the Severance Payment, if any, due in December of the calendar year following the calendar year in which the Termination Date occurs.

(2)    All outstanding awards granted to Executive pursuant to the LTIP prior to the Termination Date that remain unvested as of the Termination Date shall immediately become fully vested as of the Termination Date; *provided*, *however*, that with respect to any such LTIP awards that were granted subject to a performance requirement (other than continued service by Executive) that has not been satisfied and certified by the Partners Board (or a committee thereof) as of the Termination Date, then (1) if the Termination Date occurs within six months prior to the expiration of the performance period applicable to such LTIP award, such LTIP award shall become vested based on actual performance upon the expiration of such performance period; and (2) if the Termination Date occurs at any other time during the performance period applicable to such LTIP award, such LTIP award shall become vested as of the Termination Date based on target performance.

(3)    If Executive timely and properly elects to continue coverage for Executive and Executive's spouse and eligible dependents, if any, under the Company's group health plans pursuant to the Consolidated Omnibus

6

Budget Reconciliation Act of 1985, as amended ("COBRA"), similar in the amounts and types of coverage provided by the Company to Executive prior to the Termination Date, then for a period of 12 months following the Termination Date or such earlier date as provided in this Section 6(f)(ii)(C), the Company shall promptly reimburse Executive on a monthly basis for the entire amount Executive pays to effect and continue such coverage; *provided*, *however*, that Executive's rights to such reimbursements under this Section 6(f)(ii)(C) shall terminate upon the earlier of (1) the time Executive becomes eligible to be covered under a group health plan sponsored by another employer (and Executive shall promptly notify the Company in the event that Executive becomes so eligible) or (2) the date Executive is no longer eligible to receive COBRA continuation coverage. Notwithstanding anything in the preceding provisions of this Section 6(f)(ii)(C) to the contrary, (x) the election of COBRA continuation coverage and the payment of any premiums due with respect to such COBRA continuation coverage will remain Executive's sole responsibility, and the Company will assume no obligation for payment of any such premiums relating to such COBRA continuation coverage and (y) if the provision of the benefit described in this Section 6(f)(ii)(C) cannot be provided in the manner described above without penalty, tax, or other adverse impact on the Company, then the Company and Executive shall negotiate in good faith to determine an alternative manner in which the Company may provide a substantially equivalent benefit to Executive without such adverse impact on the Company.

For purposes of this Section 6(f)(ii), in the event of Executive's death, references to Executive (other than in Section 6(f)(ii)(C)) shall include Executive's estate, and references to Executive in Section 6(f)(ii)(C) shall include Executive's spouse and eligible dependents, if any, who are "qualified beneficiaries" (within the meaning of COBRA and the regulations thereunder) with respect to Executive's death.

(iii)Executive acknowledges Executive's understanding that if the Release is not executed and returned to the Company on or before the Release Expiration Date, and the required revocation period has not fully expired without revocation of the Release by Executive, then Executive shall not be entitled to any payments or benefits pursuant to Section 6(f)(ii). As used herein, the "Release Expiration Date" is that date that is 21 days following the date upon which the Company delivers the Release to Executive (which shall occur no later than seven days after the Termination Date) or, in the event that such termination of employment is "in connection with an exit incentive or other employment termination program" (as such phrase is defined in the Age Discrimination in Employment Act of 1967, as amended), the date that is 45 days following such delivery date.

(g)    Meaning of Termination of Employment. For all purposes of this Agreement, Executive shall be considered to have terminated employment with the Company when Executive incurs a "separation from service" with the Company within the meaning of Section 409A(a)(2)(A)(i) of the Internal Revenue Code; *provided*, *however*, that whether such a

7

separation from service has occurred shall be determined based upon a reasonably anticipated permanent reduction in the level of bona fide services to be performed to no more than 25% of the average level of bona fide services provided in the immediately preceding 36 months.

7.    **Conflicts of Interest; Disclosure of Opportunities**. Executive agrees that Executive shall promptly disclose to the Holdings Board any conflict of interest involving Executive upon Executive becoming aware of such conflict. Executive further agrees that, throughout the Employment Period and for one year thereafter, Executive shall offer to the Company and its Affiliates, as applicable, all business opportunities relating to the acquisition, development, ownership, and operation of facilities that collect, process, and transform wood-based biomass into renewable energy feedstock, including wood pellets, regardless of where such business opportunities arise.

8.    **Confidentiality**. Executive acknowledges and agrees that, in the course of Executive's employment with the Company, Executive has been provided with and had access to (and, during the Employment Period, Executive will continue to be provided with, and have access to) valuable Confidential Information (as defined below). In consideration of Executive's receipt of and access to such Confidential Information and in exchange for other valuable consideration provided hereunder, and as a condition of Executive's employment hereunder, Executive agrees to comply with this Section 8.

(a)    Executive covenants and agrees, both during the Employment Period and thereafter that, except as expressly permitted by this Agreement or by directive of the Holdings Board, Executive shall not disclose any Confidential Information to any Person and shall not use any Confidential Information except for the benefit of the Company or any of its Affiliates. Executive shall take all reasonable precautions to protect the physical security of all documents and other material containing Confidential Information (regardless of the medium on which the Confidential Information is stored). The covenants in this Section 8(a) shall apply to all Confidential Information, whether now known or later to become known to Executive during the Employment Period.

(b)    Notwithstanding Section 8(a), Executive may make the following disclosures and uses of Confidential Information:

(i)disclosures to other executives or employees of the Company or its Affiliates who have a need to know the information in connection with the business of the Company or its Affiliates;

(ii)disclosures and uses that are incidental to Executive's provision of services to the Company and its Affiliates consistent with the terms of this Agreement or that are approved by the Holdings Board;

(iii)disclosures for the purpose of complying with any applicable laws or regulatory requirements; or

8

(iv) disclosures that Executive is legally compelled to make by deposition, interrogatory, request for documents, subpoena, civil investigative demand, order of a court of competent jurisdiction, or similar process, or otherwise by law.

(c)    Upon the expiration of the Employment Period and at any other time upon request of the Company, Executive shall surrender and deliver to the Company all documents (including electronically stored information) and other material of any nature containing or pertaining to all Confidential Information in Executive's possession and shall not retain any such document or other material. Within 10 days of any such request, Executive shall certify to the Company in writing that all such materials have been returned to the Company.

(d)    All non-public information, designs, ideas, concepts, improvements, product developments, discoveries, and inventions, whether patentable or not, that are conceived, made, developed, or acquired by Executive, individually or in conjunction with others, during the period Executive is or has been employed or affiliated with the Company or any of its Affiliates (whether during business hours or otherwise and whether on the Company's premises or otherwise) that relate to the Company's or any of its Affiliates' business or properties, products, or services (including all such information relating to corporate opportunities, business plans, trade secrets, strategies for developing business and market share, research, financial and sales data, pricing terms, evaluations, opinions, interpretations, acquisition prospects, the identity of customers or their requirements, the identity of key contacts within customers' organizations or within the organization of acquisition prospects, or marketing and merchandising techniques, prospective names and marks) is defined as "Confidential Information." Moreover, all documents, videotapes, written presentations, brochures, drawings, memoranda, notes, records, files, correspondence, manuals, models, specifications, computer programs, e-mail, voicemail, electronic databases, maps, drawings, architectural renditions, models, and all other writings or materials of any type including or embodying any of such information, ideas, concepts, improvements, discoveries, inventions, and other similar forms of expression are and shall be the sole and exclusive property of the Company or its Affiliates and be subject to the same restrictions on disclosure applicable to all Confidential Information pursuant to this Agreement.

(e)    Nothing in this Agreement shall prohibit or restrict Executive from lawfully (i) initiating communications directly with, cooperating with, providing information to, causing information to be provided to, or otherwise assisting in an investigation by any governmental or regulatory agency, entity, or official(s) (collectively, "Governmental Authorities") regarding a possible violation of any law, (ii) responding to any inquiry or legal process directed to Executive individually from any such Governmental Authorities, (iii) testifying, participating, or otherwise assisting in an action or proceeding by any such Governmental Authorities relating to a possible violation of law, or (iv) making any other disclosures that are protected under the whistleblower provisions of any applicable law. Additionally, pursuant to the federal Defend Trade Secrets Act of 2016, Executive shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (x) is made (A) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (B) solely for the purpose of reporting or investigating a suspected violation of law, or (y) is made to Executive's attorney in relation to a

9

A0863

lawsuit for retaliation against Executive for reporting a suspected violation of law, or (z) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Nor does this Agreement require Executive to obtain prior authorization from the Company or its Affiliates before engaging in any conduct described in this Section 8(e), or to notify the Company or its Affiliates that Executive has engaged in any such conduct.

9. **Non-Competition; Non-Solicitation**.

(a)    The Company shall continue to provide Executive access to Confidential Information for use only during the Employment Period, and Executive acknowledges and agrees that the Company will be entrusting Executive, in Executive's unique and special capacity, with continuing to develop the goodwill of the Company, and in consideration thereof and in consideration of the continued access to Confidential Information, and as a condition of Executive's employment hereunder, Executive has voluntarily agreed to the covenants set forth in this Section 9. Executive further agrees and acknowledges that the limitations and restrictions set forth herein, including the geographical and temporal restrictions on certain competitive activities, are reasonable in all respects and are material and substantial parts of this Agreement intended and necessary to protect the Company's legitimate business interests, including the preservation of its Confidential Information and goodwill.

(b)    Executive agrees that, during the period set forth in Section 9(c) below, Executive shall not, without the prior written approval of the Company, directly or indirectly, for Executive or on behalf of or in conjunction with any other person or entity of whatever nature:

(i)engage or participate within the Market Area in competition with the Company in any business in which either the Company or its Protected Affiliates engaged in, or had plans to become engaged in of which Executive was aware during the Employment Period or the period set forth in Section 9(c) below, which business includes the acquisition, development, ownership, and operation of facilities that collect, process, and transform wood-based biomass into renewable energy feedstock, including wood pellets (the "Business"). As used herein, the term "Protected Affiliates" means any Affiliate of the Company for which Executive provided services during the Employment Period, or about which Executive obtained Confidential Information during the Employment Period.

(ii)appropriate any Business Opportunity of, or relating to, the Company or its Affiliates located in the Market Area, or engage in any activity that is detrimental to the Company or its Affiliates or that limits the Company's or an Affiliate's ability to fully exploit such Business Opportunities or prevents the benefits of such Business Opportunities from accruing to the Company or its Affiliates; or

(iii)solicit any employee of the Company or its Affiliates to terminate his or her employment therewith.

(c)    Timeframe of Non-Competition and Non-Solicitation Agreement. Executive agrees that the covenants of this Section 9 shall be enforceable during the

10

Employment Period and for a period of one year following the termination of the Employment Period, regardless of the reason for such termination.

(d)      Because of the difficulty of measuring economic losses to the Company and its Affiliates as a result of a breach of the foregoing covenants, and because of the immediate and irreparable damage that could be caused to the Company and its Affiliates for which they would have no other adequate remedy, Executive agrees that the foregoing covenant may be enforced by the Company and its Affiliates, in the event of breach by Executive, by injunctions and restraining orders and that such enforcement shall not be the Company's and its Affiliates' exclusive remedy for a breach but instead shall be in addition to all other rights and remedies available to the Company and its Affiliates, both at law and in equity.

(e)      The covenants in this Section 9 are severable and separate, and the unenforceability of any specific covenant (or any portion thereof) shall not affect the provisions of any other covenant (or any portion thereof). Moreover, in the event any court of competent jurisdiction or arbitrator, as applicable, shall determine that the scope, time, or territorial restrictions set forth in this Section 9 are unreasonable, then it is the intention of the parties that such restrictions be enforced to the fullest extent that the court or arbitrator deems reasonable, and this Agreement shall thereby be reformed.

(f)      For purposes of this Section 9, the following terms shall have the following meanings:

(i)"Business Opportunity" shall mean any commercial, investment, or other business opportunity relating to the Business.

(ii)"Market Area" shall mean any location or geographic area within 75 miles of a location where the Company or its Affiliates conducts Business, or has plans to conduct Business of which Executive is aware, during the Employment Period.

(g)      All of the covenants in this Section 9 shall be construed as an agreement independent of any other provision in this Agreement, and the existence of any claim or cause of action of Executive against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of such covenants.

10.    **Ownership of Intellectual Property**. Executive agrees that the Company or its applicable Affiliate shall own, and Executive agrees to assign and does hereby assign, all right, title, and interest (including patent rights, copyrights, trade secret rights, mask work rights, trademark rights, and all other intellectual and industrial property rights of any sort throughout the world) relating to any and all inventions (whether or not patentable), works of authorship, mask works, designs, know-how, ideas, and information authored, created, contributed to, made, or conceived or reduced to practice, in whole or in part, by Executive during the period that Executive is or has been employed or affiliated with the Company or any of its Affiliates that either (a) relate, at the time of conception, reduction to practice, creation, derivation, or development, to the Company's or any of its Affiliates' business or actual or anticipated research or development, or (b) were developed on any amount of the Company's time or with the use of

11

any of the Company's or its Affiliates' equipment, supplies, facilities, or trade secret information (all of the foregoing collectively referred to herein as "Company Intellectual Property"), and Executive will promptly disclose all Company Intellectual Property to the Company. All of Executive's works of authorship and associated copyrights created during the Employment Period and in the scope of Executive's employment shall be deemed to be "works made for hire" within the meaning of the Copyright Act. Executive agrees to perform, during and after the Employment Period, all reasonable acts deemed necessary by the Company to assist the Company or its applicable Affiliate, at the Company's or such Affiliate's expense, in obtaining and enforcing its rights throughout the world in the Company Intellectual Property. Such acts may include, but are not limited to, execution of documents and assistance or cooperation (i) in the filing, prosecution, registration, and memorialization of assignment of any applicable patents, copyrights, mask work, or other applications, (ii) in the enforcement of any applicable patents, copyrights, mask work, moral rights, trade secrets, or other proprietary rights, and (iii) in other legal proceedings related to the Company Intellectual Property.

11. **Arbitration**.

(a)     Subject to Section 11(d), any dispute, controversy, or claim between Executive and the Company or any of its Affiliates arising out of or relating to this Agreement or Executive's employment with the Company or services provided to any Affiliate of the Company will be finally settled by arbitration in New York, New York before, and in accordance with the rules for the resolution of employment disputes then in effect of, the American Arbitration Association ("AAA"). The arbitration award shall be final and binding on both parties.

(b)     Any arbitration conducted under this Section 11 shall be heard by a single arbitrator (the "Arbitrator") selected in accordance with the then-applicable rules of the AAA. The Arbitrator shall expeditiously (and, if possible, within 90 days after the selection of the Arbitrator) hear and decide all matters concerning the dispute. Except as expressly provided to the contrary in this Agreement, the Arbitrator shall have the power to (i) gather such materials, information, testimony, and evidence as the Arbitrator deems relevant to the dispute before him or her (and each party will provide such materials, information, testimony, and evidence requested by the Arbitrator, except to the extent any information so requested is proprietary, subject to a third-party confidentiality restriction, or to an attorney-client or other privilege), and (ii) grant injunctive relief and enforce specific performance. The decision of the Arbitrator shall be rendered in writing, be final and binding upon the disputing parties, and the parties agree that judgment upon the award may be entered by any court of competent jurisdiction; *provided* that the parties agree that the Arbitrator and any court enforcing the award of the Arbitrator shall not have the right or authority to award punitive or exemplary damages to any disputing party.

(c)     Each side shall share equally the cost of the arbitration and bear its own costs and attorneys' fees incurred in connection with any arbitration, unless the Arbitrator determines that compelling reasons exist for allocating all or a portion of such costs and fees to the other side.

(d)     Notwithstanding Section 11(a), an application for emergency or temporary injunctive relief by either party (including any such application to enforce the provisions of

12

Sections 8, 9, or 10 herein) shall not be subject to arbitration under this Section 11; *provided*, *however*, that the remainder of any such dispute (beyond the application for emergency or temporary injunctive relief) shall be subject to arbitration under this Section.

(e)     By entering into this Agreement and entering into the arbitration provisions of this Section 11, THE PARTIES EXPRESSLY ACKNOWLEDGE AND AGREE THAT THEY ARE KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVING THEIR RIGHTS TO A JURY TRIAL.

(f)     Nothing in this Section 11 shall prohibit a party to this Agreement from (i) instituting litigation to enforce any arbitration award or (ii) joining another party to this Agreement in a litigation initiated by a person or entity that is not a party to this Agreement.

12.     **Defense of Claims**. Executive agrees that, during the Employment Period and thereafter, upon reasonable request from the Company, Executive will cooperate with the Company or its Affiliates in the defense of any claims or actions that may be made by or against the Company or its Affiliates that relate to Executive's actual or prior areas of responsibility, except if Executive's reasonable interests are adverse to the Company or its Affiliate(s), as applicable, in such claim or action. The Company agrees to pay or reimburse Executive for all of Executive's reasonable travel and other direct expenses incurred, or to be reasonably incurred, to comply with Executive's obligations under this Section 12, provided Executive provides reasonable documentation of same and obtains the Company's prior approval for incurring such expenses.

13.     **Withholdings**. The Company may withhold and deduct from any payments made or to be made pursuant to this Agreement (a) all federal, state, local, and other taxes as may be required pursuant to any law or governmental regulation or ruling and (b) any deductions consented to in writing by Executive.

14.     **Title and Headings; Construction**. Titles and headings to Sections hereof are for the purpose of reference only and shall in no way limit, define, or otherwise affect the provisions hereof. Any and all Exhibits or Attachments referred to in this Agreement are, by such reference, incorporated herein and made a part hereof for all purposes. The words "herein," "hereof," "hereunder," and other compounds of the word "here" shall refer to the entire Agreement and not to any particular provision hereof. The use herein of the word "including" following any general statement, term, or matter shall not be construed to limit such statement, term, or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation," "but not limited to," or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that could reasonably fall within the broadest possible scope of such general statement, term, or matter. Unless the context requires otherwise, all references herein to an agreement, instrument, or other document shall be deemed to refer to such agreement, instrument, or other document as amended, supplemented, modified, and restated from time to time to the extent permitted by the provisions thereof.  All references to "dollars" or "$" in this Agreement refer to United States dollars.  Wherever the context so

13

requires, the masculine gender includes the feminine or neuter, and the singular number includes the plural and conversely.

15.    **Applicable Law; Submission to Jurisdiction**. This Agreement shall in all respects be construed according to the laws of the State of New York without regard to the conflict of law principles thereof. With respect to any claim or dispute related to or arising under this Agreement, the parties hereby consent to the arbitration provisions of Section 11 above and recognize and agree that should any resort to a court be necessary and permitted under this Agreement, then they consent to the exclusive jurisdiction, forum, and venue of the state and federal courts located in New York, New York.

16.    **Entire Agreement and Amendment**. This Agreement contains the entire agreement of the parties with respect to the matters covered herein; moreover, this Agreement supersedes all prior and contemporaneous agreements and understandings, oral or written, between the parties hereto concerning the subject matter hereof. Without limiting the scope of the preceding sentence, except as otherwise expressly provided in this Section 16, all understandings and agreements preceding the Amendment Effective Date and relating to the subject matter hereof (including the Prior Agreement) are hereby null and void and of no further force or effect, and this Agreement shall supersede all other agreements, written or oral, that purport to govern the terms of Executive's employment (including Executive's compensation) with the Company or any of its Affiliates. Executive acknowledges and agrees that the Prior Agreement is hereby terminated and has been satisfied in full, as has any other employment agreement between Executive and the Company or any of its Affiliates. In entering into this Agreement, Executive expressly acknowledges and agrees that Executive has received all sums and compensation that Executive has been owed, is owed, or ever could be owed pursuant to the agreement(s) referenced in the previous sentence and for services provided to the Company and any of its Affiliates through the date that Executive signs this Agreement, with the exception of any unpaid base salary for the pay period that includes the date on which Executive signs this Agreement. Notwithstanding anything in the preceding provisions of this Section 16 to the contrary, the parties expressly acknowledge and agree that this Agreement does not supersede or replace, but instead complements and is in addition to, all equity compensation agreements between Executive and the Company or any of its Affiliates. This Agreement may be amended only by a written instrument executed by both parties hereto.

17.    **Waiver of Breach**. Any waiver of this Agreement must be executed by the party to be bound by such waiver. No waiver by either party hereto of a breach of any provision of this Agreement by the other party, or of compliance with any condition or provision of this Agreement to be performed by such other party, will operate or be construed as a waiver of any subsequent breach by such other party or any similar or dissimilar provision or condition at the same or any subsequent time. The failure of either party hereto to take any action by reason of any breach will not deprive such party of the right to take action at any time while such breach continues.

18.    **Assignment**. This Agreement is personal to Executive, and neither this Agreement nor any rights or obligations hereunder shall be assignable or otherwise transferred

14

A0868

by Executive. The Company may assign this Agreement to any successor (whether by merger, purchase, or otherwise) to all or substantially all of the equity, assets, or businesses of the Company, if such successor expressly agrees to assume the obligations of the Company hereunder.

19.    **Affiliates**. For purposes of this Agreement, the term "Affiliates" is defined as any person or entity Controlling, Controlled by, or Under Common Control with the Company. The term "Control," including the correlative terms "Controlling," "Controlled By," and "Under Common Control with," means possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract, or otherwise) of a person or entity. For the purposes of the preceding sentence, Control shall be deemed to exist when a person or entity possesses, directly or indirectly, through one or more intermediaries (a) in the case of a corporation, more than 50% of the outstanding voting securities thereof, (b) in the case of a limited liability company, partnership, limited partnership, or joint venture, the right to more than 50% of the distributions therefrom (including liquidating distributions), or (c) in the case of any other person or entity, more than 50% of the economic or beneficial interest therein.

20.    **Notices**. Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly received (a) when delivered in person, (b) on the first business day after such notice is sent by air express overnight courier service, or (c) on the third business day following deposit in the United States mail, registered or certified mail, return receipt requested, postage prepaid and addressed, in each case, to the following address, as applicable:

(1)    If to the Company, addressed to:

Enviva Management Company, LLC

7200 Wisconsin Ave.

Suite 1000

Bethesda, MD 20814

Attention: President and Chief Executive Officer

(2)    If to Executive, addressed to the most recent address the Company has in its employment records for Executive.

21.    **Counterparts**. This Agreement may be executed in any number of counterparts, including by facsimile or ".pdf" or similar electronic format, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument. Each counterpart may consist of a copy hereof containing multiple signature pages, each signed by one party, but together signed by both parties hereto.

22.    **Deemed Resignations**. Unless otherwise agreed to in writing by the Company and Executive prior to the termination of Executive's employment, any termination of

15

A0869

Executive's employment shall constitute (a) an automatic resignation of Executive as an officer of the Company, Holdings GP, and each other Affiliate of the Company, as applicable, (b) an automatic resignation of Executive from the board of directors (or similar governing body) of the Company or any Affiliate of the Company (if applicable), and (c) an automatic resignation from the board of directors or any similar governing body of any corporation, limited liability entity, or other entity in which the Company or any Affiliate holds an equity interest and with respect to which board or similar governing body Executive serves as the Company's or such Affiliate's designee or other representative (if applicable).

23.  **Effect of Termination**. The provisions of Sections 6(f), 7-12, 22, and 24 and those provisions necessary to interpret and enforce them, shall survive any termination of the employment relationship between Executive and the Company.

24.  **Third-Party Beneficiaries**. Each Affiliate of the Company shall be a third-party beneficiary of Executive's obligations under Sections 7, 8, 9, 10, and 22 and shall be entitled to enforce such obligations as if a party hereto.

25.  **Severability**. Subject to Section 9(e), if an arbitrator or court of competent jurisdiction determines that any provision of this Agreement (or part thereof) is invalid or unenforceable, then the invalidity or unenforceability of that provision (or part thereof) shall not affect the validity or enforceability of any other provision (or part thereof) of this Agreement, and all other provisions (or part thereof) shall remain in full force and effect.

26.  **Section 409A**. Notwithstanding any provision of this Agreement to the contrary, all provisions of this Agreement are intended to comply with Section 409A of the Internal Revenue Code of 1986, as amended, and the applicable Treasury regulations and administrative guidance issued thereunder (collectively, "Section 409A") or an exemption therefrom and shall be construed and administered in accordance with such intent. Any payments under this Agreement that may be excluded from Section 409A either as separation pay due to an involuntary separation from service or as a short-term deferral shall be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, each installment payment provided under this Agreement shall be treated as a separate payment. Notwithstanding any provision in this Agreement to the contrary, if any payment or benefit provided for herein would be subject to additional taxes and interest under Section 409A if Executive's receipt of such payment or benefit is not delayed until the earlier of (i) the date of Executive's death or (ii) the date that is six months after the Termination Date (such date, the "Section 409A Payment Date"), then such payment or benefit shall not be provided to Executive (or Executive's estate, if applicable) until the Section 409A Payment Date. Notwithstanding the foregoing, the Company makes no representations that the payments and benefits provided under this Agreement are exempt from, or compliant with, Section 409A and in no event shall the Company or any of its Affiliates be liable for all or any portion of any taxes, penalties, interest, or other expenses that may be incurred by Executive on account of non-compliance with Section 409A.

[*The remainder of this page was left blank intentionally; the signature page follows.*]

16

A0870

   **IN WITNESS WHEREOF**, Executive and the Company each have caused this Agreement to be executed in its name and on its behalf, effective for all purposes as provided above.

**EXECUTIVE**

William H. Schmidt, Jr.

**ENVIVA MANAGEMENT COMPANY**, **LLC**

By:
Joseph N. Lane
Executive Vice President,
Human Capital

Signature Page to
Fourth Amended and Restated
Employment Agreement
(William H. Schmidt, Jr.)

A0871

**EXHIBIT A**

**FORM OF RELEASE AGREEMENT**

This Release Agreement (this "Agreement") constitutes the release referred to in that certain Fourth Amended and Restated Employment Agreement (the "Employment Agreement") dated as of November 24, 2020, by and between William H. Schmidt, Jr. ("Executive") and Enviva Management Company, LLC (the "Company"). Capitalized terms used but not defined herein shall have the meanings assigned to them in the Employment Agreement.

(a)        For good and valuable consideration, including the Company's provision of certain severance payments (or a portion thereof) to Executive in accordance with Section 6(f)(ii) of the Employment Agreement, Executive hereby releases, discharges, and forever acquits (A) the Company, its subsidiaries and all of its other Affiliates, (B) Enviva Partners GP, LLC, Enviva Partners, LP, Holdings, Holdings GP, their respective subsidiaries, and their other Affiliates, and (C) the past, present, and future stockholders, officers, members, partners, directors, managers, employees, agents, attorneys, heirs, representatives, successors, and assigns of the entities specified in clauses (A) and (B) above, in their personal and representative capacities (collectively, the "Company Parties"), from liability for, and hereby waives, any and all claims, damages, or causes of action of any kind related to Executive's employment with any Company Party, the termination of such employment, and any other acts or omissions related to any matter on or prior to the date of the execution of this Agreement including, without limitation, (1) any alleged violation through the date of this Agreement of: (i) the Age Discrimination in Employment Act of 1967, as amended (including as amended by the Older Workers Benefit Protection Act); (ii) Title VII of the Civil Rights Act of 1964, as amended; (iii) the Civil Rights Act of 1991; (iv) Sections 1981 through 1988 of Title 42 of the United States Code, as amended; (v) the Employee Retirement Income Security Act of 1974, as amended; (vi) the Immigration Reform Control Act, as amended; (vii) the Americans with Disabilities Act of 1990, as amended; (viii) the National Labor Relations Act, as amended; (ix) the Occupational Safety and Health Act, as amended; (x) the Family and Medical Leave Act of 1993; (xi) any federal, state, or local anti-discrimination law; (xii) any federal, state, or local wage and hour law; (xiii) any other local, state, or federal law, regulation, or ordinance; and (xiv) any public policy, contract, tort, or common law claim; (2) any allegation for costs, fees, or other expenses including attorneys' fees incurred in or with respect to a Released Claim; (3) any and all rights, benefits, or claims Executive may have under any employment contract, incentive compensation plan, or equity incentive plan with any Company Party or to any ownership interest in any Company Party except as expressly provided: (I) in Section 6(f)(ii) of the Employment Agreement; and (II) pursuant to the terms of any equity compensation agreement between Executive and a Company Party (including any Restricted Unit Agreement with Holdings or any Award Agreement (as defined in the LTIP) relating to an award granted to Executive pursuant to the LTIP), and (4) any claim for compensation or benefits of any kind not expressly set forth in the Employment Agreement or any equity compensation agreement (collectively, the "Released Claims"). In no event shall the Released Claims include (a) any claim that arises after the date Executive signs this Agreement, (b) any claim to vested benefits under an employee benefit plan or equity compensation plan, or (c) any claims for contractual

EXHIBIT A-1

A0872

payments under Section 5(a) or Section 6(f)(ii) of the Employment Agreement. This Agreement is not intended to indicate that any such claims exist or that, if they do exist, they are meritorious. Rather, Executive is simply agreeing that, in exchange for the consideration recited in the first sentence of this paragraph, any and all potential claims of this nature that Executive may have against the Company Parties, regardless of whether they actually exist, are expressly settled, compromised, and waived. By signing this Agreement, Executive is bound by it. Anyone who succeeds to Executive's rights and responsibilities, such as heirs or the executor of Executive's estate, is also bound by this Agreement. This release also applies to any claims brought by any person or agency or class action under which Executive may have a right or benefit. Notwithstanding the release of liability contained herein, nothing in this Agreement prevents Executive from filing any non-legally waivable claim (including a challenge to the validity of this Agreement) with the Equal Employment Opportunity Commission, National Labor Relations Board, Occupational Safety and Health Administration, Securities and Exchange Commission, Financial Industry Regulatory Authority (FINRA), or any other federal, state, or local governmental agency, authority, or commission (each, a "Governmental Agency") or participating in any investigation or proceeding conducted by any Governmental Agency. Executive understands that this Agreement does not limit Executive's ability to communicate with any Governmental Agency or otherwise participate in any investigation or proceeding that may be conducted by any Governmental Agency (including by providing documents or other information to a Governmental Agency) without notice to the Company or any other Company Party. This Agreement does not limit Executive's right to receive an award from a Governmental Agency for information provided to a Governmental Agency. **THIS RELEASE INCLUDES MATTERS ATTRIBUTABLE TO THE SOLE OR PARTIAL NEGLIGENCE (WHETHER GROSS OR SIMPLE) OR OTHER FAULT**, **INCLUDING STRICT LIABILITY**, **OF ANY OF THE COMPANY PARTIES.**

(b)     Executive agrees not to bring or join any lawsuit or arbitration proceeding against any of the Company Parties in any court relating to any of the Released Claims. Executive represents that Executive has not brought or joined any lawsuit or filed any charge or claim against any of the Company Parties in any court or before any government agency and has made no assignment of any rights Executive has asserted or may have against any of the Company Parties to any person or entity, in each case, with respect to any Released Claims.

(c)     By executing and delivering this Agreement, Executive acknowledges that:

(i)Executive has carefully read this Agreement;

(ii)Executive has had at least [twenty-one (21)] [forty-five (45)] days to consider this Agreement before the execution and delivery hereof to the Company [Add if 45 days applies: , and Executive acknowledges that attached to this Agreement are (1) a list of the positions and ages of those employees selected for termination (or participation in the exit incentive or other employment termination program); (2) a list of the ages of those employees not selected for termination (or participation in such program); and (3) information about the unit affected by the employment termination program of which

EXHIBIT A-2

Executive's termination was a part, including any eligibility factors for such program and any time limits applicable to such program];

(iii)Executive has been advised, and hereby is advised in writing, that Executive may, at Executive's option, discuss this Agreement with an attorney of Executive's choice and that Executive has had adequate opportunity to do so;

(iv)Executive fully understands the final and binding effect of this Agreement; the only promises made to Executive to sign this Agreement are those stated in the Employment Agreement and herein; and Executive is signing this Agreement knowingly, voluntarily, and of Executive's own free will, and that Executive understands and agrees to each of the terms of this Agreement; and

(v)With the exception of any sums that Executive may be owed pursuant to Section 6(f)(ii) of the Employment Agreement, Executive has been paid all wages and other compensation to which Executive is entitled under the Agreement and received all leaves (paid and unpaid) to which Executive was entitled during the Employment Period.

Notwithstanding the initial effectiveness of this Agreement, Executive may revoke the delivery (and therefore the effectiveness) of this Agreement within the seven-day period beginning on the date Executive delivers this Agreement to the Company (such seven-day period being referred to herein as the "Release Revocation Period"). To be effective, such revocation must be in writing signed by Executive and must be delivered to the President and Chief Executive Officer of the Company before 11:59 p.m., New York, New York time, on the last day of the Release Revocation Period. If an effective revocation is delivered in the foregoing manner and timeframe, this Agreement shall be of no force or effect and shall be null and void ab initio. No consideration shall be paid if this Agreement is revoked by Executive in the foregoing manner.

Executed on this          day of            ,      .


William H. Schmidt, Jr.


EXHIBIT A-3

A0874

EXHIBIT 10.22

*Execution Version*

**FIFTH AMENDED AND RESTATED**

**EMPLOYMENT AGREEMENT**

This Fifth Amended and Restated Employment Agreement ("<u>Agreement</u>") is made and entered into as of November 24, 2020 (the "<u>Amendment Effective Date</u>") by and between Enviva Management Company, LLC, a Delaware limited liability company (the "<u>Company</u>"), and Edward Royal Smith ("<u>Executive</u>") and supersedes and replaces in its entirety the Fourth Amended and Restated Employment Agreement (the "<u>Prior Agreement</u>") dated December 23, 2019 by and between the Company and Executive.

1.      **Employment**. During the period commencing on the Amendment Effective Date and for the duration of the Employment Period (as defined in Section 4 below) (the "<u>Specified Employment Period</u>"), the Company shall continue to employ Executive, and Executive shall continue to serve, as Executive Vice President, Operations of the Company, Enviva Holdings GP, LLC, a Delaware limited liability company ("<u>Holdings GP</u>") and the general partner of Enviva Holdings, LP, a Delaware limited partnership ("<u>Holdings</u>"), and such other Affiliates of the Company as may be designated by Holdings from time to time.

2.      **Duties and Responsibilities of Executive**.

(a)      During the Employment Period, Executive shall devote Executive's full business time and attention to the business of the Company and its Affiliates, as applicable, and will not hold any outside employment or consulting position. Executive's duties pursuant to this Agreement will include those normally incidental to the position identified in Section 1, as well as such additional duties as may be assigned to Executive by Holdings from time to time.

(b)      Executive represents and covenants that Executive is not the subject of or a party to any employment agreement, non-competition or non-solicitation covenant, non-disclosure agreement, or any other agreement, covenant, understanding, or restriction that would prohibit Executive from executing this Agreement and fully performing Executive's duties and responsibilities hereunder, or would in any manner, directly or indirectly, limit or affect the duties and responsibilities that may now or in the future be assigned to Executive hereunder.

(c)      Executive acknowledges and agrees that Executive owes the Company and its Affiliates fiduciary duties, including duties of care, loyalty, fidelity, and allegiance, such that Executive shall act at all times in the best interests of the Company and its Affiliates and shall not appropriate any business opportunity of the Company or its Affiliates for Executive. Executive agrees that the obligations described in this Agreement are in addition to, and not in lieu of, the obligations Executive owes the Company and its Affiliates under common law. The Parties acknowledge and agree that Executive may provide services (including as an executive, employee, director, or otherwise) to multiple Affiliates of the Company and, in providing such services, Executive will not be violating Executive's obligations hereunder so long as Executive abides by the terms of Sections 7, 8, and 9 below in the course of performing such services.

3.    **Compensation**.

(a)    <u>Base Salary</u>. During the Specified Employment Period, the Company shall pay to Executive an annualized base salary of $370,000 (the "<u>Base Salary</u>") in consideration for Executive's services under this Agreement, payable on a not less than biweekly basis, in conformity with the Company's customary payroll practices for executives as in effect from time to time.

(b)    <u>Annual Bonus</u>. During the Specified Employment Period, Executive shall be eligible for discretionary bonus compensation for each calendar year that Executive is employed by the Company hereunder (each, a "<u>Bonus Year</u>") pursuant to the applicable incentive or bonus compensation plan of the Company, if any, that is applicable to similarly situated executives of the Company (each, an "<u>Annual Bonus</u>"). Each Annual Bonus shall have a target value that is not less than 110% of Executive's Base Salary as in effect on the first day of the Bonus Year to which such Annual Bonus relates (the "<u>Minimum Target Annual Bonus</u>"); *provided, however*, that the Minimum Target Annual Bonus for the 2021 calendar year shall not be less than $319,500. The performance targets that must be achieved in order to realize certain bonus levels shall be established by the Board of Directors of Holdings GP (the "<u>Holdings Board</u>") or a committee thereof annually, in its sole discretion, and communicated to Executive in accordance with terms of the applicable incentive or bonus plan, if any, or if no such plan has been adopted, within the first 90 days of each applicable Bonus Year following 2020 (the most recently established target value for Executive's Annual Bonus is referred to herein as the "<u>Target Annual Bonus</u>"). Each Annual Bonus, if any, will be paid as soon as administratively feasible after the Holdings Board or a committee thereof certifies whether the applicable performance targets for the applicable Bonus Year have been achieved, but in no event later than March 15 following the end of such Bonus Year.

(c)    <u>Long-Term Incentive Plan</u>. With respect to the 2021 calendar year and each subsequent calendar year during the Specified Employment Period, Executive shall be eligible to receive annual awards under the Enviva Partners, LP equity compensation plan as in effect from time to time (the "<u>LTIP</u>") with a target value equal to 200% of Executive's Base Salary as in effect on the first day of such calendar year (the "<u>Target Annual LTIP Award</u>"). All awards granted to Executive under the LTIP, if any, shall be on such terms and conditions as the board of directors (the "<u>Partners Board</u>") of Enviva Partners GP, LLC, a Delaware limited liability company and the general partner of Enviva Partners, LP, or a committee thereof shall determine from time to time and shall be subject to and governed by the terms and provisions of the LTIP as in effect from time to time and the award agreements evidencing such awards. Nothing herein shall be construed to give Executive any rights to any amount or type of grant or award except as provided in such award to Executive provided in writing and authorized by the Partners Board (or a committee thereof).

4.    **Term of Employment**. The current term of Executive's employment under this Agreement is the period commencing on the Amendment Effective Date and ending on the first anniversary of the Amendment Effective Date (the "<u>Current Term</u>"). On the first anniversary of the Amendment Effective Date and on each subsequent anniversary of the Amendment Effective

2

Date thereafter, the term of Executive's employment under this Agreement shall automatically renew and extend for a period of 12 months (each such 12-month period being a "Renewal Term") unless written notice of non-renewal is delivered by either party to the other not less than 60 days prior to the expiration of the then-existing Current Term or Renewal Term, as applicable. Notwithstanding any other provision of this Agreement to the contrary, Executive's employment pursuant to this Agreement may be terminated at any time in accordance with Section 6. The period from the Amendment Effective Date through the expiration of this Agreement or, if sooner, the termination of Executive's employment pursuant to this Agreement, regardless of the time or reason for such termination, shall be referred to herein as the "Employment Period."

5.      **Reimbursement of Business Expenses; Benefits**. Subject to the terms and conditions of this Agreement, Executive shall be entitled to the following reimbursements and benefits during the Employment Period:

(a)      Reimbursement of Business Expenses. The Company agrees to reimburse Executive for Executive's reasonable business-related expenses incurred in the performance of Executive's duties under this Agreement; *provided* that Executive timely submits all documentation for such reimbursement, as required by Company policy in effect from time-to-time. Any reimbursement of expenses under this Section 5(a) or Section 12 shall be made by the Company upon or as soon as practicable following receipt of supporting documentation reasonably satisfactory to the Company (but in any event not later than the close of Executive's taxable year following the taxable year in which the expense is incurred by Executive); *provided*, *however*, that, upon the termination of Executive's employment with the Company, in no event shall any additional reimbursement be made prior to the date that is six months after the date of such termination (or, if earlier, prior to the date of Executive's death) to the extent such payment delay is required under Section 409A(a)(2)(B) of the Internal Revenue Code. In no event shall any reimbursement be made to Executive for such expenses incurred after the date that is five years after the date of the termination of Executive's employment with the Company. Executive is not permitted to receive a payment in lieu of reimbursement under this Section 5(a) or Section 12.

(b)      Benefits. Executive shall be eligible to participate in the same benefit plans or fringe benefit policies in which other similarly situated Company employees are eligible to participate, subject to applicable eligibility requirements and the terms and conditions of such plans and policies as in effect from time to time. The Company shall not, by reason of this Section 5(b), be obligated to institute, maintain, or refrain from changing, amending, or discontinuing, any such plan or policy, so long as such changes are similarly applicable to similarly situated Company employees generally.

6.      **Termination of Employment**.

(a)      Company's Right to Terminate Executive's Employment for Cause. The Company shall have the right to terminate Executive's employment at any time for Cause. For purposes of this Agreement, "Cause" shall mean Executive's:

3

A0877

(i)material breach of any policy established by the Company or any of its Affiliates that (x) pertains to health and safety and (y) is applicable to Executive;

(ii)engaging in acts of disloyalty to the Company or its Affiliates, including fraud, embezzlement, theft, commission of a felony, or proven dishonesty; or

(iii)willful misconduct in the performance of, or willful failure to perform a material function of, Executive's duties under this Agreement.

(b)    Company's Right to Terminate for Convenience. The Company shall have the right to terminate Executive's employment without Cause, at any time and for any reason or no reason at all.

(c)    Executive's Right to Terminate for Good Reason. Executive shall have the right to terminate Executive's employment with the Company at any time for Good Reason. For purposes of this Agreement, "Good Reason" shall mean:

(i)a material diminution in Executive's authority, duties, title, or responsibilities;

(ii)a material diminution in Executive's Base Salary, Minimum Target Annual Bonus, or Target Annual LTIP Award;

(iii)the relocation of the geographic location of Executive's principal place of employment by more than 100 miles from the location of Executive's principal place of employment as of the Amendment Effective Date; or

(iv)the Company's delivery of a written notice of non-renewal of this Agreement to Executive.

Notwithstanding the foregoing provisions of this Section 6(c) or any other provision of this Agreement to the contrary, any assertion by Executive of a termination for Good Reason shall not be effective unless all of the following conditions are satisfied: (A) the condition described in Section 6(c)(i), (ii), (iii), or (iv) giving rise to Executive's termination of Executive's employment must have arisen without Executive's written consent; (B) Executive must provide written notice to the Company of such condition within 30 days of the date on which Executive knew of the existence of the condition; (C) the condition specified in such notice must remain uncorrected for 30 days after receipt of such notice by the Company; and (D) the date of Executive's termination of Executive's employment must occur within 30 days after the end of such cure period.

(d)    Death or Disability. Executive's employment with the Company shall terminate upon the death or Disability of Executive. For purposes of this Agreement, a "Disability" shall exist if Executive is unable to perform the essential functions of Executive's position, with reasonable accommodation (if applicable), due to an illness or physical or mental impairment or other incapacity that continues for a period in excess of 90 days, whether

4

A0878

consecutive or not, in any period of 365 consecutive days. The determination of a Disability will be made by the Company after obtaining an opinion from a doctor of the Company's choosing. Executive agrees to provide such information and participate in such examinations as may be reasonably required by said doctor in order to form his or her opinion. If requested by the Company, Executive shall submit to a mental or physical examination to be performed by an independent physician selected by the Company to assist the Company in making such determination.

(e)    Executive's Right to Terminate for Convenience. Executive shall have the right to terminate Executive's employment with the Company for convenience at any time upon 60 days' advance written notice to the Company; *provided* that if Executive provides a notice of termination pursuant to this Section 6(e), the Company may designate an earlier termination date than that specified in Executive's notice. The Company's designation of such an earlier date will not change the nature of Executive's termination, which will still be deemed a voluntary resignation by Executive pursuant to this Section 6(e).

(f)    Effect of Termination.

(i)If Executive's employment hereunder shall terminate (1) pursuant to Section 4 at the expiration of the then-existing Current Term or Renewal Term, as applicable, as a result of a non-renewal of this Agreement by Executive or (2) pursuant to Section 6(a) or 6(e), then all compensation and all benefits to Executive hereunder shall terminate contemporaneously with such termination of employment, except that Executive shall be entitled to (x) payment of all earned, unpaid Base Salary within 30 days of Executive's last day of employment, or earlier if required by law, (y) reimbursement for all incurred but unreimbursed expenses for which Executive is entitled to reimbursement in accordance with Section 5(a) and Section 12, and (z) benefits to which Executive may be entitled pursuant to the terms of any plan or policy described in Section 5(b).

(ii)If Executive's employment terminates (1) pursuant to Section 6(b) or 6(c) or (2) due to Executive's death or Disability pursuant to Section 6(d), then all compensation and all benefits to Executive hereunder shall terminate contemporaneously with such termination of employment, except that (I) Executive shall be entitled to receive the compensation and benefits described in clauses (x) through (z) of Section 6(f)(i); and (II) if Executive executes, on or before the Release Expiration Date (as defined below), and does not revoke within the time provided by the Company to do so, a release of all claims in a form satisfactory to the Company (which shall be substantially similar to the form of release attached hereto as Exhibit A) (the "Release")), then, *provided* that Executive abides by the terms of Sections 7, 8, 9, 10, and 12:

(1)    The Company shall pay to Executive an amount (the "Severance Payment") equal to the sum of Executive's Base Salary as in effect on the date of the termination of Executive's employment (the "Termination Date") and Executive's Target Annual Bonus as of the Termination Date. The Severance Payment will be divided into 24 substantially equal installments. On the

5

Company's first regularly scheduled pay date that is on or after the date that is 60 days after the Termination Date, the Company shall pay to Executive, without interest, a number of such installments equal to the number of such installments that would have been paid during the period beginning on the Termination Date and ending on the Company's first regularly scheduled pay date that is on or after the date that is 60 days after the Termination Date had the installments been paid on a biweekly basis commencing on the Company's first regularly scheduled pay date coincident with or next following the Termination Date, and each of the remaining installments shall be paid on a biweekly basis thereafter; *provided*, *however*, that (1) to the extent, if any, that the aggregate amount of the installments of the Severance Payment and any payments under Section 6(f)(ii)(C) that would otherwise be paid pursuant to the preceding provisions of this Section 6(f)(ii)(A) or Section 6(f)(ii)(C) after March 15 of the calendar year following the calendar year in which the Termination Date occurs (the "Applicable March 15") exceeds the maximum exemption amount under Treasury Regulation Section 1.409A-1(b)(9)(iii)(A), then such excess shall be paid to Executive in a lump sum on the Applicable March 15 (or the first business day preceding the Applicable March 15 if the Applicable March 15 is not a business day) and the installments of the Severance Payment payable after the Applicable March 15 shall be reduced by such excess (beginning with the installment first payable after the Applicable March 15 and continuing with the next succeeding installment until the aggregate reduction equals such excess), and (2) all remaining installments of the Severance Payment, if any, that would otherwise be paid pursuant to the preceding provisions of this Section 6(f)(ii)(A) after December 31 of the calendar year following the calendar year in which the Termination Date occurs shall be paid with the installment of the Severance Payment, if any, due in December of the calendar year following the calendar year in which the Termination Date occurs.

(2)     All outstanding awards granted to Executive pursuant to the LTIP prior to the Termination Date that remain unvested as of the Termination Date shall immediately become fully vested as of the Termination Date; *provided*, *however*, that with respect to any such LTIP awards that were granted subject to a performance requirement (other than continued service by Executive) that has not been satisfied and certified by the Partners Board (or a committee thereof) as of the Termination Date, then (1) if the Termination Date occurs within six months prior to the expiration of the performance period applicable to such LTIP award, such LTIP award shall become vested based on actual performance upon the expiration of such performance period; and (2) if the Termination Date occurs at any other time during the performance period applicable to such LTIP award, such LTIP award shall become vested as of the Termination Date based on target performance.

(3)     If Executive timely and properly elects to continue coverage for Executive and Executive's spouse and eligible dependents, if any,

6

under the Company's group health plans pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), similar in the amounts and types of coverage provided by the Company to Executive prior to the Termination Date, then for a period of 12 months following the Termination Date or such earlier date as provided in this Section 6(f)(ii)(C), the Company shall promptly reimburse Executive on a monthly basis for the entire amount Executive pays to effect and continue such coverage; *provided*, *however*, that Executive's rights to such reimbursements under this Section 6(f)(ii)(C) shall terminate upon the earlier of (1) the time Executive becomes eligible to be covered under a group health plan sponsored by another employer (and Executive shall promptly notify the Company in the event that Executive becomes so eligible) or (2) the date Executive is no longer eligible to receive COBRA continuation coverage. Notwithstanding anything in the preceding provisions of this Section 6(f)(ii)(C) to the contrary, (x) the election of COBRA continuation coverage and the payment of any premiums due with respect to such COBRA continuation coverage will remain Executive's sole responsibility, and the Company will assume no obligation for payment of any such premiums relating to such COBRA continuation coverage and (y) if the provision of the benefit described in this Section 6(f)(ii)(C) cannot be provided in the manner described above without penalty, tax, or other adverse impact on the Company, then the Company and Executive shall negotiate in good faith to determine an alternative manner in which the Company may provide a substantially equivalent benefit to Executive without such adverse impact on the Company.

For purposes of this Section 6(f)(ii), in the event of Executive's death, references to Executive (other than in Section 6(f)(ii)(C)) shall include Executive's estate, and references to Executive in Section 6(f)(ii)(C) shall include Executive's spouse and eligible dependents, if any, who are "qualified beneficiaries" (within the meaning of COBRA and the regulations thereunder) with respect to Executive's death.

(iii) Executive acknowledges Executive's understanding that if the Release is not executed and returned to the Company on or before the Release Expiration Date, and the required revocation period has not fully expired without revocation of the Release by Executive, then Executive shall not be entitled to any payments or benefits pursuant to Section 6(f)(ii). As used herein, the "Release Expiration Date" is that date that is 21 days following the date upon which the Company delivers the Release to Executive (which shall occur no later than seven days after the Termination Date) or, in the event that such termination of employment is "in connection with an exit incentive or other employment termination program" (as such phrase is defined in the Age Discrimination in Employment Act of 1967, as amended), the date that is 45 days following such delivery date.

(g)    Meaning of Termination of Employment. For all purposes of this Agreement, Executive shall be considered to have terminated employment with the Company when Executive incurs a "separation from service" with the Company within the meaning of

7

A0881

Section 409A(a)(2)(A)(i) of the Internal Revenue Code; *provided*, *however*, that whether such a separation from service has occurred shall be determined based upon a reasonably anticipated permanent reduction in the level of bona fide services to be performed to no more than 25% of the average level of bona fide services provided in the immediately preceding 36 months.

7.    **Conflicts of Interest; Disclosure of Opportunities**. Executive agrees that Executive shall promptly disclose to the Holdings Board any conflict of interest involving Executive upon Executive becoming aware of such conflict. Executive further agrees that, throughout the Employment Period and for one year thereafter, Executive shall offer to the Company and its Affiliates, as applicable, all business opportunities relating to the acquisition, development, ownership, and operation of facilities that collect, process, and transform wood-based biomass into renewable energy feedstock, including wood pellets, regardless of where such business opportunities arise.

8.    **Confidentiality**. Executive acknowledges and agrees that, in the course of Executive's employment with the Company, Executive has been provided with and had access to (and, during the Employment Period, Executive will continue to be provided with, and have access to) valuable Confidential Information (as defined below). In consideration of Executive's receipt of and access to such Confidential Information and in exchange for other valuable consideration provided hereunder, and as a condition of Executive's employment hereunder, Executive agrees to comply with this Section 8.

(a)    Executive covenants and agrees, both during the Employment Period and thereafter that, except as expressly permitted by this Agreement or by directive of the Holdings Board, Executive shall not disclose any Confidential Information to any Person and shall not use any Confidential Information except for the benefit of the Company or any of its Affiliates. Executive shall take all reasonable precautions to protect the physical security of all documents and other material containing Confidential Information (regardless of the medium on which the Confidential Information is stored). The covenants in this Section 8(a) shall apply to all Confidential Information, whether now known or later to become known to Executive during the Employment Period.

(b)    Notwithstanding Section 8(a), Executive may make the following disclosures and uses of Confidential Information:

(i)disclosures to other executives or employees of the Company or its Affiliates who have a need to know the information in connection with the business of the Company or its Affiliates;

(ii)disclosures and uses that are incidental to Executive's provision of services to the Company and its Affiliates consistent with the terms of this Agreement or that are approved by the Holdings Board;

(iii)disclosures for the purpose of complying with any applicable laws or regulatory requirements; or

8

(iv) disclosures that Executive is legally compelled to make by deposition, interrogatory, request for documents, subpoena, civil investigative demand, order of a court of competent jurisdiction, or similar process, or otherwise by law.

(c)     Upon the expiration of the Employment Period and at any other time upon request of the Company, Executive shall surrender and deliver to the Company all documents (including electronically stored information) and other material of any nature containing or pertaining to all Confidential Information in Executive's possession and shall not retain any such document or other material. Within 10 days of any such request, Executive shall certify to the Company in writing that all such materials have been returned to the Company.

(d)     All non-public information, designs, ideas, concepts, improvements, product developments, discoveries, and inventions, whether patentable or not, that are conceived, made, developed, or acquired by Executive, individually or in conjunction with others, during the period Executive is or has been employed or affiliated with the Company or any of its Affiliates (whether during business hours or otherwise and whether on the Company's premises or otherwise) that relate to the Company's or any of its Affiliates' business or properties, products, or services (including all such information relating to corporate opportunities, business plans, trade secrets, strategies for developing business and market share, research, financial and sales data, pricing terms, evaluations, opinions, interpretations, acquisition prospects, the identity of customers or their requirements, the identity of key contacts within customers' organizations or within the organization of acquisition prospects, or marketing and merchandising techniques, prospective names and marks) is defined as "Confidential Information." Moreover, all documents, videotapes, written presentations, brochures, drawings, memoranda, notes, records, files, correspondence, manuals, models, specifications, computer programs, e-mail, voicemail, electronic databases, maps, drawings, architectural renditions, models, and all other writings or materials of any type including or embodying any of such information, ideas, concepts, improvements, discoveries, inventions, and other similar forms of expression are and shall be the sole and exclusive property of the Company or its Affiliates and be subject to the same restrictions on disclosure applicable to all Confidential Information pursuant to this Agreement.

(e)     Nothing in this Agreement shall prohibit or restrict Executive from lawfully (i) initiating communications directly with, cooperating with, providing information to, causing information to be provided to, or otherwise assisting in an investigation by any governmental or regulatory agency, entity, or official(s) (collectively, "Governmental Authorities") regarding a possible violation of any law, (ii) responding to any inquiry or legal process directed to Executive individually from any such Governmental Authorities, (iii) testifying, participating, or otherwise assisting in an action or proceeding by any such Governmental Authorities relating to a possible violation of law, or (iv) making any other disclosures that are protected under the whistleblower provisions of any applicable law. Additionally, pursuant to the federal Defend Trade Secrets Act of 2016, Executive shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (x) is made (A) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (B) solely for the purpose of reporting or investigating a suspected violation of law, or (y) is made to Executive's attorney in relation to a

9

lawsuit for retaliation against Executive for reporting a suspected violation of law, or (z) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Nor does this Agreement require Executive to obtain prior authorization from the Company or its Affiliates before engaging in any conduct described in this Section 8(e), or to notify the Company or its Affiliates that Executive has engaged in any such conduct.

9.    **Non-Competition; Non-Solicitation**.

(a)    The Company shall continue to provide Executive access to Confidential Information for use only during the Employment Period, and Executive acknowledges and agrees that the Company will be entrusting Executive, in Executive's unique and special capacity, with continuing to develop the goodwill of the Company, and in consideration thereof and in consideration of the continued access to Confidential Information, and as a condition of Executive's employment hereunder, Executive has voluntarily agreed to the covenants set forth in this Section 9. Executive further agrees and acknowledges that the limitations and restrictions set forth herein, including the geographical and temporal restrictions on certain competitive activities, are reasonable in all respects and are material and substantial parts of this Agreement intended and necessary to protect the Company's legitimate business interests, including the preservation of its Confidential Information and goodwill.

(b)    Executive agrees that, during the period set forth in Section 9(c) below, Executive shall not, without the prior written approval of the Company, directly or indirectly, for Executive or on behalf of or in conjunction with any other person or entity of whatever nature:

(i) engage or participate within the Market Area in competition with the Company in any business in which either the Company or its Protected Affiliates engaged in, or had plans to become engaged in of which Executive was aware during the Employment Period or the period set forth in Section 9(c) below, which business includes the acquisition, development, ownership, and operation of facilities that collect, process, and transform wood-based biomass into renewable energy feedstock, including wood pellets (the "Business"). As used herein, the term "Protected Affiliates" means any Affiliate of the Company for which Executive provided services during the Employment Period, or about which Executive obtained Confidential Information during the Employment Period.

(ii) appropriate any Business Opportunity of, or relating to, the Company or its Affiliates located in the Market Area, or engage in any activity that is detrimental to the Company or its Affiliates or that limits the Company's or an Affiliate's ability to fully exploit such Business Opportunities or prevents the benefits of such Business Opportunities from accruing to the Company or its Affiliates; or

(iii) solicit any employee of the Company or its Affiliates to terminate his or her employment therewith.

(c)    Timeframe of Non-Competition and Non-Solicitation Agreement. Executive agrees that the covenants of this Section 9 shall be enforceable during the

10

Employment Period and for a period of one year following the termination of the Employment Period, regardless of the reason for such termination.

(d)      Because of the difficulty of measuring economic losses to the Company and its Affiliates as a result of a breach of the foregoing covenants, and because of the immediate and irreparable damage that could be caused to the Company and its Affiliates for which they would have no other adequate remedy, Executive agrees that the foregoing covenant may be enforced by the Company and its Affiliates, in the event of breach by Executive, by injunctions and restraining orders and that such enforcement shall not be the Company's and its Affiliates' exclusive remedy for a breach but instead shall be in addition to all other rights and remedies available to the Company and its Affiliates, both at law and in equity.

(e)      The covenants in this Section 9 are severable and separate, and the unenforceability of any specific covenant (or any portion thereof) shall not affect the provisions of any other covenant (or any portion thereof). Moreover, in the event any court of competent jurisdiction or arbitrator, as applicable, shall determine that the scope, time, or territorial restrictions set forth in this Section 9 are unreasonable, then it is the intention of the parties that such restrictions be enforced to the fullest extent that the court or arbitrator deems reasonable, and this Agreement shall thereby be reformed.

(f)      For purposes of this Section 9, the following terms shall have the following meanings:

(i)"Business Opportunity" shall mean any commercial, investment, or other business opportunity relating to the Business.

(ii)"Market Area" shall mean any location or geographic area within 75 miles of a location where the Company or its Affiliates conducts Business, or has plans to conduct Business of which Executive is aware, during the Employment Period.

(g)      All of the covenants in this Section 9 shall be construed as an agreement independent of any other provision in this Agreement, and the existence of any claim or cause of action of Executive against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of such covenants.

10.      **Ownership of Intellectual Property**. Executive agrees that the Company or its applicable Affiliate shall own, and Executive agrees to assign and does hereby assign, all right, title, and interest (including patent rights, copyrights, trade secret rights, mask work rights, trademark rights, and all other intellectual and industrial property rights of any sort throughout the world) relating to any and all inventions (whether or not patentable), works of authorship, mask works, designs, know-how, ideas, and information authored, created, contributed to, made, or conceived or reduced to practice, in whole or in part, by Executive during the period that Executive is or has been employed or affiliated with the Company or any of its Affiliates that either (a) relate, at the time of conception, reduction to practice, creation, derivation, or development, to the Company's or any of its Affiliates' business or actual or anticipated research or development, or (b) were developed on any amount of the Company's time or with the use of

11

A0885

any of the Company's or its Affiliates' equipment, supplies, facilities, or trade secret information (all of the foregoing collectively referred to herein as "Company Intellectual Property"), and Executive will promptly disclose all Company Intellectual Property to the Company. All of Executive's works of authorship and associated copyrights created during the Employment Period and in the scope of Executive's employment shall be deemed to be "works made for hire" within the meaning of the Copyright Act. Executive agrees to perform, during and after the Employment Period, all reasonable acts deemed necessary by the Company to assist the Company or its applicable Affiliate, at the Company's or such Affiliate's expense, in obtaining and enforcing its rights throughout the world in the Company Intellectual Property. Such acts may include, but are not limited to, execution of documents and assistance or cooperation (i) in the filing, prosecution, registration, and memorialization of assignment of any applicable patents, copyrights, mask work, or other applications, (ii) in the enforcement of any applicable patents, copyrights, mask work, moral rights, trade secrets, or other proprietary rights, and (iii) in other legal proceedings related to the Company Intellectual Property.

11.    **Arbitration**.

(a)    Subject to Section 11(d), any dispute, controversy, or claim between Executive and the Company or any of its Affiliates arising out of or relating to this Agreement or Executive's employment with the Company or services provided to any Affiliate of the Company will be finally settled by arbitration in New York, New York before, and in accordance with the rules for the resolution of employment disputes then in effect of, the American Arbitration Association ("AAA"). The arbitration award shall be final and binding on both parties.

(b)    Any arbitration conducted under this Section 11 shall be heard by a single arbitrator (the "Arbitrator") selected in accordance with the then-applicable rules of the AAA. The Arbitrator shall expeditiously (and, if possible, within 90 days after the selection of the Arbitrator) hear and decide all matters concerning the dispute. Except as expressly provided to the contrary in this Agreement, the Arbitrator shall have the power to (i) gather such materials, information, testimony, and evidence as the Arbitrator deems relevant to the dispute before him or her (and each party will provide such materials, information, testimony, and evidence requested by the Arbitrator, except to the extent any information so requested is proprietary, subject to a third-party confidentiality restriction, or to an attorney-client or other privilege), and (ii) grant injunctive relief and enforce specific performance. The decision of the Arbitrator shall be rendered in writing, be final and binding upon the disputing parties, and the parties agree that judgment upon the award may be entered by any court of competent jurisdiction; *provided* that the parties agree that the Arbitrator and any court enforcing the award of the Arbitrator shall not have the right or authority to award punitive or exemplary damages to any disputing party.

(c)    Each side shall share equally the cost of the arbitration and bear its own costs and attorneys' fees incurred in connection with any arbitration, unless the Arbitrator determines that compelling reasons exist for allocating all or a portion of such costs and fees to the other side.

(d)    Notwithstanding Section 11(a), an application for emergency or temporary injunctive relief by either party (including any such application to enforce the provisions of

12

Sections 8, 9, or 10 herein) shall not be subject to arbitration under this Section 11; *provided*, *however*, that the remainder of any such dispute (beyond the application for emergency or temporary injunctive relief) shall be subject to arbitration under this Section.

(e)     By entering into this Agreement and entering into the arbitration provisions of this Section 11, THE PARTIES EXPRESSLY ACKNOWLEDGE AND AGREE THAT THEY ARE KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVING THEIR RIGHTS TO A JURY TRIAL.

(f)     Nothing in this Section 11 shall prohibit a party to this Agreement from (i) instituting litigation to enforce any arbitration award or (ii) joining another party to this Agreement in a litigation initiated by a person or entity that is not a party to this Agreement.

12.     **Defense of Claims**. Executive agrees that, during the Employment Period and thereafter, upon reasonable request from the Company, Executive will cooperate with the Company or its Affiliates in the defense of any claims or actions that may be made by or against the Company or its Affiliates that relate to Executive's actual or prior areas of responsibility, except if Executive's reasonable interests are adverse to the Company or its Affiliate(s), as applicable, in such claim or action. The Company agrees to pay or reimburse Executive for all of Executive's reasonable travel and other direct expenses incurred, or to be reasonably incurred, to comply with Executive's obligations under this Section 12, provided Executive provides reasonable documentation of same and obtains the Company's prior approval for incurring such expenses.

13.     **Withholdings**. The Company may withhold and deduct from any payments made or to be made pursuant to this Agreement (a) all federal, state, local, and other taxes as may be required pursuant to any law or governmental regulation or ruling and (b) any deductions consented to in writing by Executive.

14.     **Title and Headings; Construction**. Titles and headings to Sections hereof are for the purpose of reference only and shall in no way limit, define, or otherwise affect the provisions hereof. Any and all Exhibits or Attachments referred to in this Agreement are, by such reference, incorporated herein and made a part hereof for all purposes. The words "herein," "hereof," "hereunder," and other compounds of the word "here" shall refer to the entire Agreement and not to any particular provision hereof. The use herein of the word "including" following any general statement, term, or matter shall not be construed to limit such statement, term, or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation," "but not limited to," or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that could reasonably fall within the broadest possible scope of such general statement, term, or matter. Unless the context requires otherwise, all references herein to an agreement, instrument, or other document shall be deemed to refer to such agreement, instrument, or other document as amended, supplemented, modified, and restated from time to time to the extent permitted by the provisions thereof.  All references to "dollars" or "$" in this Agreement refer to United States dollars.  Wherever the context so requires, the masculine

13

gender includes the feminine or neuter, and the singular number includes the plural and conversely.

15.    **Applicable Law; Submission to Jurisdiction**. This Agreement shall in all respects be construed according to the laws of the State of New York without regard to the conflict of law principles thereof. With respect to any claim or dispute related to or arising under this Agreement, the parties hereby consent to the arbitration provisions of Section 11 above and recognize and agree that should any resort to a court be necessary and permitted under this Agreement, then they consent to the exclusive jurisdiction, forum, and venue of the state and federal courts located in New York, New York.

16.    **Entire Agreement and Amendment**. This Agreement contains the entire agreement of the parties with respect to the matters covered herein; moreover, this Agreement supersedes all prior and contemporaneous agreements and understandings, oral or written, between the parties hereto concerning the subject matter hereof. Without limiting the scope of the preceding sentence, except as otherwise expressly provided in this Section 16, all understandings and agreements preceding the Amendment Effective Date and relating to the subject matter hereof (including the Prior Agreement) are hereby null and void and of no further force or effect, and this Agreement shall supersede all other agreements, written or oral, that purport to govern the terms of Executive's employment (including Executive's compensation) with the Company or any of its Affiliates. Executive acknowledges and agrees that the Prior Agreement is hereby terminated and has been satisfied in full, as has any other employment agreement between Executive and the Company or any of its Affiliates. In entering into this Agreement, Executive expressly acknowledges and agrees that Executive has received all sums and compensation that Executive has been owed, is owed, or ever could be owed pursuant to the agreement(s) referenced in the previous sentence and for services provided to the Company and any of its Affiliates through the date that Executive signs this Agreement, with the exception of any unpaid base salary for the pay period that includes the date on which Executive signs this Agreement. Notwithstanding anything in the preceding provisions of this Section 16 to the contrary, the parties expressly acknowledge and agree that this Agreement does not supersede or replace, but instead complements and is in addition to, all equity compensation agreements between Executive and the Company or any of its Affiliates. This Agreement may be amended only by a written instrument executed by both parties hereto.

17.    **Waiver of Breach**. Any waiver of this Agreement must be executed by the party to be bound by such waiver. No waiver by either party hereto of a breach of any provision of this Agreement by the other party, or of compliance with any condition or provision of this Agreement to be performed by such other party, will operate or be construed as a waiver of any subsequent breach by such other party or any similar or dissimilar provision or condition at the same or any subsequent time. The failure of either party hereto to take any action by reason of any breach will not deprive such party of the right to take action at any time while such breach continues.

18.    **Assignment**. This Agreement is personal to Executive, and neither this Agreement nor any rights or obligations hereunder shall be assignable or otherwise transferred

14

A0888

by Executive. The Company may assign this Agreement to any successor (whether by merger, purchase, or otherwise) to all or substantially all of the equity, assets, or businesses of the Company, if such successor expressly agrees to assume the obligations of the Company hereunder.

19.    **Affiliates**. For purposes of this Agreement, the term "Affiliates" is defined as any person or entity Controlling, Controlled by, or Under Common Control with the Company. The term "Control," including the correlative terms "Controlling," "Controlled By," and "Under Common Control with," means possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract, or otherwise) of a person or entity. For the purposes of the preceding sentence, Control shall be deemed to exist when a person or entity possesses, directly or indirectly, through one or more intermediaries (a) in the case of a corporation more than 50% of the outstanding voting securities thereof, (b) in the case of a limited liability company, partnership, limited partnership, or joint venture, the right to more than 50% of the distributions therefrom (including liquidating distributions), or (c) in the case of any other person or entity, more than 50% of the economic or beneficial interest therein.

20.    **Notices**. Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly received (a) when delivered in person, (b) on the first business day after such notice is sent by air express overnight courier service, or (c) on the third business day following deposit in the United States mail, registered or certified mail, return receipt requested, postage prepaid and addressed, in each case, to the following address, as applicable:

(1)    If to the Company, addressed to:

Enviva Management Company, LLC

7200 Wisconsin Ave. Suite 1000

Bethesda, MD 20814

Attention: General Counsel

(2)    If to Executive, addressed to the most recent address the Company has in its employment records for Executive.

21.    **Counterparts**. This Agreement may be executed in any number of counterparts, including by facsimile or ".pdf" or similar electronic format, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument. Each counterpart may consist of a copy hereof containing multiple signature pages, each signed by one party, but together signed by both parties hereto.

22.    **Deemed Resignations**. Unless otherwise agreed to in writing by the Company and Executive prior to the termination of Executive's employment, any termination of Executive's employment shall constitute (a) an automatic resignation of Executive as an officer of the Company, Holdings GP, and each other Affiliate of the Company, as applicable, (b) an

15

A0889

automatic resignation of Executive from the board of directors (or similar governing body) of the Company or any Affiliate of the Company (if applicable), and (c) an automatic resignation from the board of directors or any similar governing body of any corporation, limited liability entity, or other entity in which the Company or any Affiliate holds an equity interest and with respect to which board or similar governing body Executive serves as the Company's or such Affiliate's designee or other representative (if applicable).

23.   **Effect of Termination**. The provisions of Sections 6(f), 7-12, 22, and 24 and those provisions necessary to interpret and enforce them, shall survive any termination of the employment relationship between Executive and the Company.

24.   **Third-Party Beneficiaries**. Each Affiliate of the Company shall be a third-party beneficiary of Executive's obligations under Sections 7, 8, 9, 10, and 22 and shall be entitled to enforce such obligations as if a party hereto.

25.   **Severability**. Subject to Section 9(e), if an arbitrator or court of competent jurisdiction determines that any provision of this Agreement (or part thereof) is invalid or unenforceable, then the invalidity or unenforceability of that provision (or part thereof) shall not affect the validity or enforceability of any other provision (or part thereof) of this Agreement, and all other provisions (or part thereof) shall remain in full force and effect.

26.   **Section 409A**. Notwithstanding any provision of this Agreement to the contrary, all provisions of this Agreement are intended to comply with Section 409A of the Internal Revenue Code of 1986, as amended, and the applicable Treasury regulations and administrative guidance issued thereunder (collectively, "Section 409A") or an exemption therefrom and shall be construed and administered in accordance with such intent. Any payments under this Agreement that may be excluded from Section 409A either as separation pay due to an involuntary separation from service or as a short-term deferral shall be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, each installment payment provided under this Agreement shall be treated as a separate payment. Notwithstanding any provision in this Agreement to the contrary, if any payment or benefit provided for herein would be subject to additional taxes and interest under Section 409A if Executive's receipt of such payment or benefit is not delayed until the earlier of (i) the date of Executive's death or (ii) the date that is six months after the Termination Date (such date, the "Section 409A Payment Date"), then such payment or benefit shall not be provided to Executive (or Executive's estate, if applicable) until the Section 409A Payment Date. Notwithstanding the foregoing, the Company makes no representations that the payments and benefits provided under this Agreement are exempt from, or compliant with, Section 409A and in no event shall the Company or any of its Affiliates be liable for all or any portion of any taxes, penalties, interest, or other expenses that may be incurred by Executive on account of non-compliance with Section 409A.

[*The remainder of this page was left blank intentionally; the signature page follows.*]

16

    **IN WITNESS WHEREOF**, Executive and the Company each have caused this Agreement to be executed in its name and on its behalf, effective for all purposes as provided above.

**EXECUTIVE**

Edward Royal Smith

**ENVIVA MANAGEMENT COMPANY**, **LLC**

By:
   Joseph N. Lane
   Executive Vice President,
   Human Capital

Signature Page To
Fifth Amended and Restated
Employment Agreement
(Edward Royal Smith)

A0891

**EXHIBIT A**

**FORM OF RELEASE AGREEMENT**

This Release Agreement (this "Agreement") constitutes the release referred to in that certain Fifth Amended and Restated Employment Agreement (the "Employment Agreement") dated as of November 24, 2020, by and between Edward Royal Smith ("Executive") and Enviva Management Company, LLC (the "Company"). Capitalized terms used but not defined herein shall have the meanings assigned to them in the Employment Agreement.

(a)     For good and valuable consideration, including the Company's provision of certain severance payments (or a portion thereof) to Executive in accordance with Section 6(f)(ii) of the Employment Agreement, Executive hereby releases, discharges, and forever acquits (A) the Company, its subsidiaries and all of its other Affiliates, (B) Enviva Partners GP, LLC, Enviva Partners, LP, Holdings, Holdings GP, their respective subsidiaries, and their other Affiliates, and (C) the past, present, and future stockholders, officers, members, partners, directors, managers, employees, agents, attorneys, heirs, representatives, successors, and assigns of the entities specified in clauses (A) and (B) above, in their personal and representative capacities (collectively, the "Company Parties"), from liability for, and hereby waives, any and all claims, damages, or causes of action of any kind related to Executive's employment with any Company Party, the termination of such employment, and any other acts or omissions related to any matter on or prior to the date of the execution of this Agreement including, without limitation, (1) any alleged violation through the date of this Agreement of: (i) the Age Discrimination in Employment Act of 1967, as amended (including as amended by the Older Workers Benefit Protection Act); (ii) Title VII of the Civil Rights Act of 1964, as amended; (iii) the Civil Rights Act of 1991; (iv) Sections 1981 through 1988 of Title 42 of the United States Code, as amended; (v) the Employee Retirement Income Security Act of 1974, as amended; (vi) the Immigration Reform Control Act, as amended; (vii) the Americans with Disabilities Act of 1990, as amended; (viii) the National Labor Relations Act, as amended; (ix) the Occupational Safety and Health Act, as amended; (x) the Family and Medical Leave Act of 1993; (xi) any federal, state, or local anti-discrimination law; (xii) any federal, state, or local wage and hour law; (xiii) any other local, state, or federal law, regulation, or ordinance; and (xiv) any public policy, contract, tort, or common law claim; (2) any allegation for costs, fees, or other expenses including attorneys' fees incurred in or with respect to a Released Claim; (3) any and all rights, benefits, or claims Executive may have under any employment contract, incentive compensation plan, or equity incentive plan with any Company Party or to any ownership interest in any Company Party except as expressly provided: (I) in Section 6(f)(ii) of the Employment Agreement; and (II) pursuant to the terms of any equity compensation agreement between Executive and a Company Party (including any Restricted Unit Agreement with Holdings or any Award Agreement (as defined in the LTIP) relating to an award granted to Executive pursuant to the LTIP), and (4) any claim for compensation or benefits of any kind not expressly set forth in the Employment Agreement or any equity compensation agreement (collectively, the "Released Claims"). In no event shall the Released Claims include (a) any claim that arises after the date Executive signs this Agreement, (b) any claim to vested benefits under an employee benefit plan or equity compensation plan, or (c) any claims for contractual

EXHIBIT A-1

payments under Section 5(a) or Section 6(f)(ii) of the Employment Agreement. This Agreement is not intended to indicate that any such claims exist or that, if they do exist, they are meritorious. Rather, Executive is simply agreeing that, in exchange for the consideration recited in the first sentence of this paragraph, any and all potential claims of this nature that Executive may have against the Company Parties, regardless of whether they actually exist, are expressly settled, compromised, and waived. By signing this Agreement, Executive is bound by it. Anyone who succeeds to Executive's rights and responsibilities, such as heirs or the executor of Executive's estate, is also bound by this Agreement. This release also applies to any claims brought by any person or agency or class action under which Executive may have a right or benefit. Notwithstanding the release of liability contained herein, nothing in this Agreement prevents Executive from filing any non-legally waivable claim (including a challenge to the validity of this Agreement) with the Equal Employment Opportunity Commission, National Labor Relations Board, Occupational Safety and Health Administration, Securities and Exchange Commission, Financial Industry Regulatory Authority (FINRA), or any other federal, state, or local governmental agency, authority, or commission (each, a "Governmental Agency") or participating in any investigation or proceeding conducted by any Governmental Agency. Executive understands that this Agreement does not limit Executive's ability to communicate with any Governmental Agency or otherwise participate in any investigation or proceeding that may be conducted by any Governmental Agency (including by providing documents or other information to a Governmental Agency) without notice to the Company or any other Company Party. This Agreement does not limit Executive's right to receive an award from a Governmental Agency for information provided to a Governmental Agency. **THIS RELEASE INCLUDES MATTERS ATTRIBUTABLE TO THE SOLE OR PARTIAL NEGLIGENCE (WHETHER GROSS OR SIMPLE) OR OTHER FAULT**, **INCLUDING STRICT LIABILITY**, **OF ANY OF THE COMPANY PARTIES.**

(b)     Executive agrees not to bring or join any lawsuit or arbitration proceeding against any of the Company Parties in any court relating to any of the Released Claims. Executive represents that Executive has not brought or joined any lawsuit or filed any charge or claim against any of the Company Parties in any court or before any government agency and has made no assignment of any rights Executive has asserted or may have against any of the Company Parties to any person or entity, in each case, with respect to any Released Claims.

(c)     By executing and delivering this Agreement, Executive acknowledges that:

(i)Executive has carefully read this Agreement;

(ii)Executive has had at least [twenty-one (21)] [forty-five (45)] days to consider this Agreement before the execution and delivery hereof to the Company [Add if 45 days applies: , and Executive acknowledges that attached to this Agreement are (1) a list of the positions and ages of those employees selected for termination (or participation in the exit incentive or other employment termination program); (2) a list of the ages of those employees not selected for termination (or participation in such program); and (3) information about the unit affected by the employment termination program of which

EXHIBIT A-2

A0893

Executive's termination was a part, including any eligibility factors for such program and any time limits applicable to such program];

(iii)Executive has been advised, and hereby is advised in writing, that Executive may, at Executive's option, discuss this Agreement with an attorney of Executive's choice and that Executive has had adequate opportunity to do so;

(iv)Executive fully understands the final and binding effect of this Agreement; the only promises made to Executive to sign this Agreement are those stated in the Employment Agreement and herein; and Executive is signing this Agreement knowingly, voluntarily, and of Executive's own free will, and that Executive understands and agrees to each of the terms of this Agreement; and

(v)With the exception of any sums that Executive may be owed pursuant to Section 6(f)(ii) of the Employment Agreement, Executive has been paid all wages and other compensation to which Executive is entitled under the Agreement and received all leaves (paid and unpaid) to which Executive was entitled during the Employment Period.

Notwithstanding the initial effectiveness of this Agreement, Executive may revoke the delivery (and therefore the effectiveness) of this Agreement within the seven-day period beginning on the date Executive delivers this Agreement to the Company (such seven-day period being referred to herein as the "Release Revocation Period"). To be effective, such revocation must be in writing signed by Executive and must be delivered to the General Counsel of the Company before 11:59 p.m., New York, New York time, on the last day of the Release Revocation Period. If an effective revocation is delivered in the foregoing manner and timeframe, this Agreement shall be of no force or effect and shall be null and void ab initio. No consideration shall be paid if this Agreement is revoked by Executive in the foregoing manner.

Executed on this        day of          ,    .


Edward Royal Smith


EXHIBIT A-3

EXHIBIT 10.23

July 14, 2020

John K. Keppler
[PERSONAL INFORMATION REDACTED]

***By Hand Delivery***

Dear John:

In recognition of your contributions to Enviva Partners, LP ("**Partners**"), including the equity financing activities described in Partners' press release dated June 18, 2020, we are pleased to provide you with a transaction bonus (the "**Transaction Bonus**"). This letter agreement (this "**Letter**") sets forth the amount of the Transaction Bonus and the terms and conditions upon which you will be eligible to retain the Transaction Bonus.

The total amount of the Transaction Bonus will be equal to six hundred thousand ($600,000) dollars, less applicable taxes, deductions, and withholdings and will be paid as soon as practicable, but in no event later than 30 days, following the date you return the signed Letter. Notwithstanding anything in this Letter to the contrary, in the event that (i) you resign from Enviva Management Company, LLC (the "**Company**") without Good Reason (as defined in your employment agreement with the Company (the "**Employment Agreement**") and including due to your non-renewal of the Employment Agreement); or (ii) the Company terminates your employment for Cause (as defined in the Employment Agreement), in each case, before the third anniversary of this Letter, then you will be required to return and repay the Transaction Bonus (net of applicable local, state, and federal taxes determined based on the assumption that you paid such taxes on the full amount of the Transaction Bonus at the highest marginal tax rate in effect with respect to individuals for the year of payment of the Transaction Bonus) to the Company promptly following the date of such termination. For the avoidance of doubt, the return and repayment obligations set forth in the previous sentence will not apply in the event your employment with the Company terminates as a result of your death or Disability (as defined in the Employment Agreement).

Nothing in this Letter confers upon you the right to continue to be employed by the Company or any of its affiliates for any particular period of time. The Transaction Bonus will not be taken into account to increase any benefits or compensation provided, or to continue coverage, under any other plan, program, policy, or arrangement of Enviva Holdings, LP ("Holdings"), the Company, or any of their respective affiliates, except as otherwise expressly provided in such other plan, program, policy, or arrangement.

This Letter shall be construed and interpreted in accordance with the laws of the State of New York (without regard to the conflicts of laws principles thereof) and applicable federal law. You may not assign this Letter without the prior written consent of the Company. Further, this Letter may be executed in multiple counterparts and may be amended only by a written instrument executed by you and the Company. The terms of this Letter will be binding upon the Company, Holdings, and any

A0895

successor to the equity in, or all or substantially all of the assets of, the Company, Holdings, or any of their respective subsidiaries.

Please review this Letter carefully and, if you agree with all the terms and conditions as specified above, please sign and date this Letter in the space below and return the signed Letter to Joseph N. Lane, Executive Vice President, Human Capital at 7200 Wisconsin Avenue, Suite 1000, Bethesda, Maryland 20814 or via email at nic.lane@envivabiomass.com.

Sincerely,

**ENVIVA MANAGEMENT COMPANY, LLC**

_____

By: Joseph N. Lane
Title: Executive Vice President, Human Capital

**ACKNOWLEDGED AND AGREED:**

_____
John K. Keppler

Date: _____

2

A0896

EXHIBIT 10.24

July 14, 2020

Shai S. Even
[PERSONAL INFORMATION REDACTED]

***By Hand Delivery***

Dear Shai:

In recognition of your contributions to Enviva Partners, LP ("***Partners***"), including the equity financing activities described in Partners' press release dated June 18, 2020, we are pleased to provide you with a transaction bonus (the "***Transaction Bonus***"). This letter agreement (this "***Letter***") sets forth the amount of the Transaction Bonus and the terms and conditions upon which you will be eligible to retain the Transaction Bonus.

The total amount of the Transaction Bonus will be equal to three hundred and fifty thousand ($350,000) dollars, less applicable taxes, deductions, and withholdings and will be paid as soon as practicable, but in no event later than 30 days, following the date you return the signed Letter. Notwithstanding anything in this Letter to the contrary, in the event that (i) you resign from Enviva Management Company, LLC (the "***Company***") without Good Reason (as defined in your employment agreement with the Company (the "***Employment Agreement***") and including due to your non-renewal of the Employment Agreement); or (ii) the Company terminates your employment for Cause (as defined in the Employment Agreement), in each case, before the third anniversary of this Letter, then you will be required to return and repay the Transaction Bonus (net of applicable local, state, and federal taxes determined based on the assumption that you paid such taxes on the full amount of the Transaction Bonus at the highest marginal tax rate in effect with respect to individuals for the year of payment of the Transaction Bonus) to the Company promptly following the date of such termination. For the avoidance of doubt, the return and repayment obligations set forth in the previous sentence will not apply in the event your employment with the Company terminates as a result of your death or Disability (as defined in the Employment Agreement).

Nothing in this Letter confers upon you the right to continue to be employed by the Company or any of its affiliates for any particular period of time. The Transaction Bonus will not be taken into account to increase any benefits or compensation provided, or to continue coverage, under any other plan, program, policy, or arrangement of Enviva Holdings, LP ("Holdings"), the Company, or any of their respective affiliates, except as otherwise expressly provided in such other plan, program, policy, or arrangement.

This Letter shall be construed and interpreted in accordance with the laws of the State of New York (without regard to the conflicts of laws principles thereof) and applicable federal law. You may not assign this Letter without the prior written consent of the Company. Further, this Letter may be executed in multiple counterparts and may be amended only by a written instrument executed by you and the Company. The terms of this Letter will be binding upon the Company, Holdings, and any

A0897

successor to the equity in, or all or substantially all of the assets of, the Company, Holdings, or any of their respective subsidiaries.

Please review this Letter carefully and, if you agree with all the terms and conditions as specified above, please sign and date this Letter in the space below and return the signed Letter to Joseph N. Lane, Executive Vice President, Human Capital at 7200 Wisconsin Avenue, Suite 1000, Bethesda, Maryland 20814 or via email at nic.lane@envivabiomass.com.

Sincerely,

**ENVIVA MANAGEMENT COMPANY, LLC**

_____

By: Joseph N. Lane
Title: Executive Vice President, Human Capital

**ACKNOWLEDGED AND AGREED:**

_____
Shai S. Even

Date: _____

2

A0898

EXHIBIT 10.25

July 14, 2020

Thomas Meth
[PERSONAL INFORMATION REDACTED]

***By Hand Delivery***

Dear Thomas:

In recognition of your contributions to Enviva Partners, LP ("***Partners***"), including the equity financing activities described in Partners' press release dated June 18, 2020, we are pleased to provide you with a transaction bonus (the "***Transaction Bonus***"). This letter agreement (this "***Letter***") sets forth the amount of the Transaction Bonus and the terms and conditions upon which you will be eligible to retain the Transaction Bonus.

The total amount of the Transaction Bonus will be equal to seventy-five thousand ($75,000) dollars, less applicable taxes, deductions, and withholdings and will be paid as soon as practicable, but in no event later than 30 days, following the date you return the signed Letter. Notwithstanding anything in this Letter to the contrary, in the event that (i) you resign from Enviva Management Company, LLC (the "***Company***") without Good Reason (as defined in your employment agreement with the Company (the "***Employment Agreement***") and including due to your non-renewal of the Employment Agreement); or (ii) the Company terminates your employment for Cause (as defined in the Employment Agreement), in each case, before the third anniversary of this Letter, then you will be required to return and repay the Transaction Bonus (net of applicable local, state, and federal taxes determined based on the assumption that you paid such taxes on the full amount of the Transaction Bonus at the highest marginal tax rate in effect with respect to individuals for the year of payment of the Transaction Bonus) to the Company promptly following the date of such termination. For the avoidance of doubt, the return and repayment obligations set forth in the previous sentence will not apply in the event your employment with the Company terminates as a result of your death or Disability (as defined in the Employment Agreement).

Nothing in this Letter confers upon you the right to continue to be employed by the Company or any of its affiliates for any particular period of time. The Transaction Bonus will not be taken into account to increase any benefits or compensation provided, or to continue coverage, under any other plan, program, policy, or arrangement of Enviva Holdings, LP ("Holdings"), the Company, or any of their respective affiliates, except as otherwise expressly provided in such other plan, program, policy, or arrangement.

This Letter shall be construed and interpreted in accordance with the laws of the State of New York (without regard to the conflicts of laws principles thereof) and applicable federal law. You may not assign this Letter without the prior written consent of the Company. Further, this Letter may be executed in multiple counterparts and may be amended only by a written instrument executed by you and the Company. The terms of this Letter will be binding upon the Company, Holdings, and any

A0899

successor to the equity in, or all or substantially all of the assets of, the Company, Holdings, or any of their respective subsidiaries.

Please review this Letter carefully and, if you agree with all the terms and conditions as specified above, please sign and date this Letter in the space below and return the signed Letter to Joseph N. Lane, Executive Vice President, Human Capital at 7200 Wisconsin Avenue, Suite 1000, Bethesda, Maryland 20814 or via email at nic.lane@envivabiomass.com.

Sincerely,

**ENVIVA MANAGEMENT COMPANY, LLC**

_____

By: Joseph N. Lane
Title: Executive Vice President, Human Capital

**ACKNOWLEDGED AND AGREED:**

____

Thomas Meth

Date: _____

2

A0900

**EXHIBIT 10.26**

July 14, 2020

William H. Schmidt
[PERSONAL INFORMATION REDACTED]

***By Hand Delivery***

Dear William:

 In recognition of your contributions to Enviva Partners, LP ("***Partners***"), including the equity financing activities described in Partners' press release dated June 18, 2020, we are pleased to provide you with a transaction bonus (the "***Transaction Bonus***"). This letter agreement (this "***Letter***") sets forth the amount of the Transaction Bonus and the terms and conditions upon which you will be eligible to retain the Transaction Bonus.

 The total amount of the Transaction Bonus will be equal to three hundred and fifty thousand ($350,000) dollars, less applicable taxes, deductions, and withholdings and will be paid as soon as practicable, but in no event later than 30 days, following the date you return the signed Letter. Notwithstanding anything in this Letter to the contrary, in the event that (i) you resign from Enviva Management Company, LLC (the "***Company***") without Good Reason (as defined in your employment agreement with the Company (the "***Employment Agreement***") and including due to your non-renewal of the Employment Agreement); or (ii) the Company terminates your employment for Cause (as defined in the Employment Agreement), in each case, before the third anniversary of this Letter, then you will be required to return and repay the Transaction Bonus (net of applicable local, state, and federal taxes determined based on the assumption that you paid such taxes on the full amount of the Transaction Bonus at the highest marginal tax rate in effect with respect to individuals for the year of payment of the Transaction Bonus) to the Company promptly following the date of such termination. For the avoidance of doubt, the return and repayment obligations set forth in the previous sentence will not apply in the event your employment with the Company terminates as a result of your death or Disability (as defined in the Employment Agreement).

 Nothing in this Letter confers upon you the right to continue to be employed by the Company or any of its affiliates for any particular period of time. The Transaction Bonus will not be taken into account to increase any benefits or compensation provided, or to continue coverage, under any other plan, program, policy, or arrangement of Enviva Holdings, LP ("Holdings"), the Company, or any of their respective affiliates, except as otherwise expressly provided in such other plan, program, policy, or arrangement.

 This Letter shall be construed and interpreted in accordance with the laws of the State of New York (without regard to the conflicts of laws principles thereof) and applicable federal law. You may not assign this Letter without the prior written consent of the Company. Further, this Letter may be executed in multiple counterparts and may be amended only by a written instrument executed by you and the Company. The terms of this Letter will be binding upon the Company, Holdings, and any

A0901

successor to the equity in, or all or substantially all of the assets of, the Company, Holdings, or any of their respective subsidiaries.

Please review this Letter carefully and, if you agree with all the terms and conditions as specified above, please sign and date this Letter in the space below and return the signed Letter to Joseph N. Lane, Executive Vice President, Human Capital at 7200 Wisconsin Avenue, Suite 1000, Bethesda, Maryland 20814 or via email at nic.lane@envivabiomass.com.

Sincerely,

**ENVIVA MANAGEMENT COMPANY, LLC**

_____

By: Joseph N. Lane
Title: Executive Vice President, Human Capital

**ACKNOWLEDGED AND AGREED:**

____

William H. Schmidt

Date: _____

2

A0902

**EXHIBIT 21.1**

**LIST OF SUBSIDIARIES OF ENVIVA PARTNERS, LP**

| Subsidiary of Enviva Partners, LP | State of Incorporation |
| --- | --- |
| Enviva, LP | Delaware |
| Enviva Pellets Waycross Holdings, LLC | Delaware |
| Enviva Pellets Waycross Holdings Sub, LLC | Delaware |
| Enviva GP, LLC | Delaware |
| Enviva Energy Services, LLC | Delaware |
| Enviva Partners Finance Corp. | Delaware |
| Enviva Pellets Ahoskie, LLC | Delaware |
| Enviva Pellets Amory, LLC | Delaware |
| Enviva Pellets Cottondale, LLC | Delaware |
| Enviva Pellets Hamlet, LLC | Delaware |
| Enviva Pellets Northampton, LLC | Delaware |
| Enviva Pellets Sampson, LLC | Delaware |
| Enviva Pellets Southampton, LLC | Delaware |
| Enviva Port of Chesapeake, LLC | Delaware |
| Enviva Port of Panama City, LLC | Delaware |
| Enviva Port of Wilmington, LLC | Delaware |
| Enviva Port of Savannah, LLC | Delaware |
| Enviva Pellets Greenwood Holdings II, LLC | Delaware |
| Enviva Pellets Greenwood Holdings, LLC | Delaware |
| Enviva Pellets Greenwood, LLC | Delaware |
| Enviva Pellets Waycross, LLC | Delaware |
| Enviva Wilmington Holdings, LLC | Delaware |
| Enviva MLP International Holdings, LLC | Delaware |
| Enviva Energy Services Coöperatief, U.A. | Netherlands |
| Enviva Energy Services (Jersey), Limited | Jersey Channel Islands |

A0903

**EXHIBIT 23.1**

**Consent of Independent Registered Public Accounting Firm**

The Board of Directors
Enviva Partners, LP:

We consent to the incorporation by reference in the registration statements (No. 333-236150 and No.333-203756) on Form S-8 and registration statements (No. 333-232247 and No. 333-239795) on Form S-3 of Enviva Partners, LP of our report dated March 1, 2019, with respect to the Enviva Partners, LP and subsidiaries consolidated statements of income, comprehensive income, changes in partners' capital, and cash flows for the year ended December 31, 2018, and the related notes (collectively, the consolidated financial statements), which report appears in the December 31, 2020 annual report on Form 10-K of Enviva Partners, LP.

(signed) KPMG LLC

McLean, Virginia

February 25, 2021

A0904

**EXHIBIT 23.2**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the following Registration Statements of Enviva Partners, LP:

  a.  333-203756 and 333-236150 on Form S-8; and
  b.  333-232247 and 333-239795 on Form S-3

of our reports dated February 25, 2021, with respect to the consolidated financial statements of Enviva Partners, LP and subsidiaries and the effectiveness of internal control over financial reporting of Enviva Partners, LP and subsidiaries included in this Annual Report (Form 10-K) of Enviva Partners, LP for the year ended December 31, 2020.

/s/ Ernst & Young LLP

Tysons, Virginia
February 25, 2021

A0905

**EXHIBIT 31.1**

**Certification of Principal Executive Officer**
**Pursuant to Rule 13a-14(a) or 15d-14(a)**
**of the Securities Exchange Act of 1934, as amended**

I, John K. Keppler, certify that:

1.    I have reviewed this annual report on Form 10-K for the year ended December 31, 2020 of Enviva Partners, LP;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements and other financial information included in this report fairly present, in all material respects, the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 25, 2021

/s/ JOHN K. KEPPLER
_____
John K. Keppler
*Chairman, President and Chief Executive Officer of Enviva Partners GP, LLC, the general partner of Enviva Partners, LP*
*(Principal Executive Officer)*

A0906

**EXHIBIT 31.2**

**Certification of Principal Financial Officer**
**Pursuant to Rule 13a-14(a) or 15d-14(a)**
**of the Securities Exchange Act of 1934, as amended**

I, Shai S. Even, certify that:

1.      I have reviewed this annual report on Form 10-K for the year ended December 31, 2020 of Enviva Partners, LP;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements and other financial information included in this report fairly present, in all material respects, the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 25, 2021

/s/ SHAI S. EVEN
Shai S. Even
*Executive Vice President and Chief Financial Officer of Enviva Partners GP, LLC, the general partner of Enviva Partners, LP*
*(Principal Financial Officer)*

A0907

**EXHIBIT 32.1**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of Enviva Partners, LP (the "Partnership") for the year ended December 31, 2020 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), John K. Keppler, Chairman, President and Chief Executive Officer of Enviva Partners GP, LLC, the general partner of the Partnership, certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to his knowledge:

(1)   the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2)   the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Partnership.

/s/ JOHN K. KEPPLER
John K. Keppler
Chairman, President and Chief Executive Officer of Enviva Partners GP, LLC, the general partner of Enviva Partners, LP
(Principal Executive Officer)

Date: February 25, 2021

A0908

**EXHIBIT 32.2**

**CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of Enviva Partners, LP (the "Partnership") for the year ended December 31, 2020 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Shai S. Even, Executive Vice President and Chief Financial Officer of Enviva Partners GP, LLC, the general partner of the Partnership, certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to his knowledge:

(1)  the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2)  the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Partnership.

/s/ SHAI S. EVEN
Shai S. Even
*Executive Vice President and Chief Financial Officer of Enviva Partners GP, LLC, the*
*general partner of Enviva Partners, LP*
*(Principal Financial Officer)*

Date: February 25, 2021

A0909