# EXHIBIT 18

A1527

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# Form 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2017**
or
☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from            to**
**Commission file number 001-37363**

# Enviva Partners, LP
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **46-4097730** |
| (State or other jurisdiction | (I.R.S. Employer |
| of incorporation or organization) | Identification No.) |

| | |
|---|---|
| **7200 Wisconsin Ave, Suite 1000** | |
| **Bethesda, MD** | **20814** |
| (Address of principal executive offices) | (Zip code) |

**(301) 657-5560**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Units Representing Limited Partner Interests | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer ☐ | Accelerated filer ☒ | Non-accelerated filer ☐ | Smaller reporting company ☐ |
| | | (Do not check if a | Emerging growth company ☒ |
| | | smaller reporting company) | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of the common units held by non-affiliates of the registrant as of June 30, 2017 was approximately $359.3 million, based upon a closing price of $27.50 per common unit as reported on the New York Stock Exchange on such date.

As of February 16, 2018, 14,445,268 common units and 11,905,138 subordinated units were outstanding.

**Documents Incorporated by Reference:** None .

A1528

**ENVIVA PARTNERS, LP**
**ANNUAL REPORT ON FORM 10-K**
**TABLE OF CONTENTS**

| | | |
|---|---|---|
| Cautionary Statement Regarding Forward-Looking Statements | | 1 |
| Glossary of Terms | | 3 |
| Part I | | 4 |
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 19 |
| Item 1B. | Unresolved Staff Comments | 44 |
| Item 2. | Properties | 44 |
| Item 3. | Legal Proceedings | 44 |
| Item 4. | Mine Safety Disclosures | 45 |
| Part II | | 46 |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 46 |
| Item 6. | Selected Financial Data | 48 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 52 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 77 |
| Item 8. | Financial Statements and Supplementary Data | 79 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 131 |
| Item 9A. | Controls and Procedures | 131 |
| Item 9B. | Other Information | 131 |
| Part III | | 132 |
| Item 10. | Directors, Executive Officers and Corporate Governance | 132 |
| Item 11. | Executive Compensation | 139 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 145 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 147 |
| Item 14. | Principal Accounting Fees and Services | 151 |
| Part IV | | 153 |
| Item 15. | Exhibits, Financial Statement Schedules | 153 |

A1529

**CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS**

Certain statements and information in this Annual Report on Form 10-K (this "Annual Report") may constitute "forward-looking statements." The words "believe," "expect," "anticipate," "plan," "intend," "foresee," "should," "would," "could" or other similar expressions are intended to identify forward-looking statements, which are generally not historical in nature. These forward-looking statements are based on our current expectations and beliefs concerning future developments and their potential effect on us. Although management believes that these forward-looking statements are reasonable as and when made, there can be no assurance that future developments affecting us will be those that we anticipate. All comments concerning our expectations for future revenues and operating results are based on our forecasts for our existing operations and do not include the potential impact of any future acquisitions. Our forward-looking statements involve significant risks and uncertainties (some of which are beyond our control) and assumptions that could cause actual results to differ materially from our historical experience and our present expectations or projections. Important factors that could cause actual results to differ materially from those in the forward-looking statements include, but are not limited to, those summarized below:

- the volume and quality of products that we are able to produce or source and sell, which could be adversely affected by, among other things, operating or technical difficulties at our plants or deep-water marine terminals;

- the prices at which we are able to sell our products;

- failure of the Partnership's customers, vendors and shipping partners to pay or perform their contractual obligations to the Partnership;

- the creditworthiness of our contract counterparties;

- the amount of low-cost wood fiber that we are able to procure and process, which could be adversely affected by, among other things, operating or financial difficulties suffered by our suppliers;

- changes in the price and availability of natural gas, coal or other sources of energy;

- changes in prevailing economic conditions;

- our inability to complete acquisitions, including acquisitions from our sponsor, or to realize the anticipated benefits of such acquisitions;

- inclement or hazardous environmental conditions, including extreme precipitation, temperatures and flooding;

- fires, explosions or other accidents;

- changes in domestic and foreign laws and regulations (or the interpretation thereof) related to renewable or low-carbon energy, the forestry products industry, the international shipping industry or power generators;

- changes in the regulatory treatment of biomass in core and emerging markets;

- our inability to acquire or maintain necessary permits or rights for our production, transportation or terminaling operations;

- changes in the price and availability of transportation;

- changes in foreign currency exchange or interest rates, and the failure of our hedging arrangements to effectively reduce our exposure to the risks related thereto;

1

A1530

- risks related to our indebtedness;

- our failure to maintain effective quality control systems at our production plants and deep-water marine terminals, which could lead to the rejection of our products by our customers;

- changes in the quality specifications for our products that are required by our customers;

- labor disputes;

- the effects of the anticipated exit of the United Kingdom ("Brexit") from the European Union on our and our customers' businesses; and

- our ability to borrow funds and access capital markets.

All forward-looking statements in this Annual Report are expressly qualified in their entirety by the foregoing cautionary statements.

Please read Part I, Item 1A. "Risk Factors." Readers are cautioned not to place undue reliance on forward-looking statements and we undertake no obligation to update or revise any such statements after the date they are made, whether as a result of new information, future events or otherwise.

A1531

**GLOSSARY OF TERMS**

*biomass:* any organic biological material, derived from living organisms, which stores energy from the sun.

*co-fire:* the combustion of two different types of materials at the same time. For example, biomass is sometimes fired in combination with coal in existing coal plants.

*cost pass-through:* a mechanism in commercial contracts that passes costs through to the purchaser.

*dry-bulk:* describes dry-bulk commodities that are shipped in large, unpackaged amounts.

*metric ton:* one metric ton, which is equivalent to 1,000 kilograms. One metric ton equals 1.1023 short tons.

*net calorific value:* the amount of usable heat energy released when a fuel is burned completely and the heat contained in the water vapor generated by the combustion process is not recovered. The European power industry typically uses net calorific value as the means of expressing fuel energy.

*off-take contract:* an agreement between a producer of a resource and a buyer of a resource to purchase a certain volume of the producer's future production.

*ramp:* a period of time of increasing production following the startup of a plant or completion of a project.

*Riverstone:* Riverstone Holdings LLC.

*Riverstone Funds:* Riverstone/Carlyle Renewable and Alternative Energy Fund II, L.P. and certain affiliated entities, collectively.

*stumpage:* the price paid to the underlying timber resource owner for the raw material.

*utility-grade wood pellets:* wood pellets meeting minimum requirements generally specified by industrial consumers and produced and sold in sufficient quantities to satisfy industrial-scale consumption.

*wood fiber:* cellulosic elements that are extracted from trees and used to make various materials, including paper. In North America, wood fiber is primarily extracted from hardwood (deciduous) trees and softwood (coniferous) trees.

*wood pellets:* energy-dense, low-moisture and uniformly-sized units of wood fuel produced from processing various wood resources or byproducts.

**PART I**

**ITEM 1.  BUSINESS**

*References in this Annual Report to the "Predecessor," "our Predecessor," "we," "our," "us" or like terms for periods prior to April 9, 2015 refer to Enviva, LP and its subsidiaries (other than Enviva Pellets Cottondale, LLC). References to the "Partnership," "we," "our," "us" or like terms for periods on and after April 9, 2015 refer to Enviva Partners, LP and its subsidiaries. References to "our sponsor" refer to Enviva Holdings, LP, and, where applicable, its wholly owned subsidiaries Enviva MLP Holdco, LLC and Enviva Development Holdings, LLC. References to "our General Partner" refer to Enviva Partners GP, LLC, a wholly owned subsidiary of Enviva Holdings, LP. References to "Enviva Management" refer to Enviva Management Company, LLC, a wholly owned subsidiary of Enviva Holdings, LP, and references to "our employees" refer to the employees of Enviva Management. References to the "First Hancock JV" and the "Second Hancock JV" refer to Enviva Wilmington Holdings, LLC and Enviva JV Development Company, LLC, respectively, which are joint ventures between our sponsor, Hancock Natural Resource Group, Inc. and certain other affiliates of John Hancock Life Insurance Company (U.S.A.). Please read Cautionary Statement Regarding Forward-Looking Statements on page 1 and Item 1A. "Risk Factors" for information regarding certain risks inherent in our business.*

**Overview**

We are the world's largest supplier by production capacity of utility-grade wood pellets to major power generators. Since our entry into this business in 2010, we have executed multiple long-term, take-or-pay off-take contracts with utilities and large scale power generators and have built and acquired the production and terminaling capacity necessary to serve them. Our existing production constitutes approximately 14% of current global utility-grade wood pellet production capacity and the product we deliver to our customers typically comprises a material portion of their fuel supply. We own and operate six industrial-scale production plants in the Southeastern United States that have a fully contracted combined wood pellet production capacity of 2.9 million metric tons per year ("MTPY"). We constructed four of our production plants using our templated design and standardized equipment. A fifth plant, our largest in terms of production capacity, has been in operation since 2008. We also own dry-bulk, deep-water marine terminal assets at the Port of Chesapeake, Virginia (the "Chesapeake terminal") and the Port of Wilmington, North Carolina (the "Wilmington terminal"), which reduce our storage and shiploading costs and enable us to reliably supply our customers. All of our facilities are located in geographic regions with low input costs and favorable transportation logistics. Owning these cost-advantaged assets in a rapidly expanding industry provides us with a platform to generate stable and growing cash flows that we anticipate will enable us to increase our per-unit cash distributions over time, which is our primary business objective.

We were formed on November 12, 2013 as a wholly owned subsidiary of our sponsor. On April 9, 2015, our sponsor contributed certain of our Predecessor's assets and liabilities to us. On May 4, 2015, we completed an initial public offering (the "IPO") of common units representing limited partner interests in the Partnership ("common units"). Our assets and operations are organized into a single reportable segment and are all located and conducted in the United States. Please read Part II, Item 8. "Financial Statements and Supplementary Data—Note 1, *Description of Business and Basis of Presentation* " for further discussion regarding our formation and organization.

We procure wood fiber and process it into utility-grade wood pellets at our production plants. We load the finished wood pellets into railcars, trucks and barges that are transported to our owned or leased deep-water marine terminal assets, where they are received, stored and ultimately loaded onto oceangoing vessels for transport to our principally European customers.

Our customers use our wood pellets as a substitute fuel for coal in dedicated biomass or co-fired coal power plants. Wood pellets serve as a suitable "drop-in" alternative to coal because of their comparable heat content, density and form. Due to the uninterruptible nature of our customers' fuel consumption, our customers require a reliable supply of wood pellets that meet stringent product specifications. We have built our operations and assets to deliver and certify the highest levels of product quality, and our proven track record enables us to charge premium prices for this certainty. In addition to our customers' focus on the reliability of supply, they are concerned about the combustion efficiency of

4

Table of Contents

the wood pellets and their safe handling. Because combustion efficiency is a function of energy density, particle size distribution, ash/inert content and moisture, our customers require that we supply wood pellets meeting minimum criteria for a variety of specifications and, in some cases, provide incentives for exceeding our contract specifications.

***Industry Overview***

Our product, utility-grade wood pellets, is used as a substitute for coal in both dedicated and co-fired power generation and combined heat and power plants. It enables major power generators to profitably generate electricity in a manner that reduces the overall cost of compliance with mandatory greenhouse gas ("GHG") emissions limits and renewable energy targets while also allowing countries to diversify their sources of electricity supply.

Unlike intermittent sources of renewable generation like wind and solar power, wood pellet-fired plants are capable of meeting baseload electricity demand and are dispatchable (that is, power output can be switched on or off or adjusted based on demand). As a result, utilities and major power generators in Europe and Asia have made and continue to make long-term, profitable investments in power-plant conversions and new builds of generating assets that either co-fire wood pellets with coal or are fully dedicated wood pellet-fired plants. Such developments help generators in European and Asian markets maintain and increase baseload generating capacity, comply with binding climate change regulations and other emissions reduction targets and increase renewable energy usage at a lower cost to consumers and taxpayers than other forms of renewable energy generation.

The capital costs required to convert a coal plant to co-fire biomass, or to burn biomass exclusively, are a fraction of the capital costs associated with implementing offshore wind and most other renewable technologies. Furthermore, the relatively quick process of converting coal-fired plants to biomass-fired generation is an attractive benefit for power generators whose generation assets are no longer viable as coal plants due to the expiration of operating permits or the introduction of taxes or other restrictions on fossil fuel usage or emissions of GHGs and other pollutants.

There also continues to be significant growth in the European and Asian demand for wood pellets as the preferred fuel source and lower-cost alternative to delivered fossil fuels for district heating loops, for heating homes and commercial buildings and for the production of process heat at industrial sites. Increasingly, wood pellets are also being sought as a raw material input for bio-based substitutes for traditional fossil fuel-based fuels and chemicals. As these markets further develop, there will continue to be opportunities for utility-grade wood pellet producers to serve this growing demand.

**Recent Developments**

*Wilmington Drop-Down*

On October 2, 2017, pursuant to the terms of a contribution agreement by and between the Partnership and the First Hancock JV (the "Wilmington Contribution Agreement"), the First Hancock JV sold to the Partnership all of the issued and outstanding limited liability company interests in Enviva Port of Wilmington, LLC ("Wilmington"), which owns the Wilmington terminal. We refer to this transaction as the "Wilmington Drop-Down."

The purchase price for Wilmington was $130.0 million, which included an initial payment of $54.6 million, net of an approximate purchase price adjustment of $1.4 million. The initial payment was funded with borrowings from revolving credit commitments and cash on hand. We accounted for the Wilmington Drop-Down as a combination of entities under common control at historical cost in a manner similar to a pooling of interests. Accordingly, the consolidated financial statements for the periods prior to the acquisition were retrospectively recast to reflect the acquisition as if it had occurred on May 15, 2013, the date Wilmington was originally organized.

The Wilmington terminal, which is capable of receiving product by rail and truck, has the capacity to store up to 90,000 metric tons ("MT") of wood pellets, and load up to Panamax-sized vessels. It utilizes state-of-the-art handling equipment and storage infrastructure designed to maintain product quality and safety with throughput capacity of up to 3.0 million MTPY of wood pellets.

A1534

Wilmington will handle up to approximately 600,000 MTPY of throughput from our wood pellet production plant located in Sampson, North Carolina (the "Sampson plant") and is party to a long-term terminal services agreement with Enviva Pellets Greenwood, LLC, a wholly owned subsidiary of the Second Hancock JV ("Greenwood"). Wilmington will handle throughput volumes sourced from Greenwood's wood pellet production plant located in Greenwood, South Carolina (the "Greenwood plant"). The terminal services agreement with Greenwood provides for deficiency payments to Wilmington if minimum throughput requirements are not met.

In addition, the Wilmington Contribution Agreement contemplates that Wilmington will enter into a long-term terminal services agreement (the "Wilmington Hamlet TSA") with the First Hancock JV and Enviva Pellets Hamlet, LLC ("Hamlet") to receive, store and load wood pellets from the First Hancock JV's proposed production plant in Hamlet, North Carolina (the "Hamlet plant") when the First Hancock JV completes construction of the Hamlet plant. The Wilmington Hamlet TSA also provides for deficiency payments to Wilmington if minimum throughput requirements are not met. Pursuant to the Wilmington Contribution Agreement, following notice of the anticipated first delivery of wood pellets to the Wilmington terminal from the Hamlet plant, Wilmington, Hamlet, and the First Hancock JV would enter into the Wilmington Hamlet TSA and the Partnership would make a final payment of $74.0 million in cash or common units to the First Hancock JV, subject to certain conditions, as deferred consideration for the Wilmington Drop-Down.

Wilmington also entered into a throughput option agreement with the sponsor granting the sponsor, subject to certain conditions, the option to obtain terminal services at the Wilmington terminal at marginal cost throughput rates for wood pellets produced by one of the sponsor's potential wood pellet production plants.

*Senior Notes Due 2021*

On November 1, 2016, we issued $300.0 million in aggregate principal amount of 8.5% senior unsecured notes due November 1, 2021 (the "Senior Notes") to eligible purchasers in a private placement transaction. In August 2017, holders of 100% of the Senior Notes tendered such notes in exchange for newly issued registered notes with terms substantially identical to the Senior Notes (except that the registered notes are not subject to restrictions on transfer).

On October 10, 2017, we completed the issuance to an institutional investor in a private placement transaction of an additional $55.0 million in aggregate principal amount of Senior Notes at a price of 106.25% of par plus accrued interest from May 1, 2017. The additional Senior Notes have the same terms as our outstanding Senior Notes.

The sale of the additional Senior Notes at a purchase price of $58.4 million resulted in gross proceeds of approximately $60.0 million, after including accrued interest of $2.1 million and deducting estimated expenses of approximately $0.5 million. The net proceeds were used to repay the borrowings on our revolving credit facility that were used to fund the Wilmington Drop-Down and for general partnership purposes.

In December 2017, the holder of the additional Senior Notes tendered such notes in exchange for newly issued registered notes with terms substantially identical to such additional Senior Notes (except that the registered notes are not subject to restrictions on transfer). The additional Senior Notes will be treated together with the outstanding Senior Notes as a single class for all purposes under the Indenture.

*Sale of the Wiggins Plant*

In December 2016, we initiated a plan to sell our 110,000 MTPY production plant located in Wiggins, Mississippi and related assets (the "Wiggins plant"). We sold the Wiggins plant to a third-party buyer for a purchase price of $0.4 million on December 27, 2017, and on December 28, 2017, Enviva Pellets Wiggins, LLC ("Wiggins"), the owner of the Wiggins plant, was dissolved. We recorded a loss on the sale of $0.8 million, net, upon deconsolidation.

*At-the-Market Offering Program*

On August 8, 2016, we filed a prospectus supplement to our shelf registration filed with the U.S. Securities Exchange Act Commission ("SEC") on June 24, 2016, for the continuous offering of up to $100.0 million of common

6

Table of Contents

units, in amounts, at prices and on terms to be determined by market conditions and other factors at the time of our offerings. In August 2016, we also entered into an equity distribution agreement (the "Equity Distribution Agreement") with certain managers pursuant to which we may offer and sell common units from time to time through or to one or more of the managers, subject to the terms and conditions set forth in the Equity Distribution Agreement, of up to an aggregate sales amount of $100.0 million (the "ATM Program").

During the years ended December 31, 2017 and 2016, we sold 71,368 and 358,593 common units, respectively, under the Equity Distribution Agreement for net proceeds of $1.9 million, net of an insignificant amount of commissions, during 2017, and net proceeds of $9.3 million, net of $0.1 million of commissions, during 2016. Accounting and other fees of approximately $0.2 million were offset against the proceeds during 2017. Deferred issuance costs of approximately $0.4 million, primarily consisting of legal, accounting and other fees, were offset against the proceeds during 2016. Net proceeds from sales under the ATM Program were used for general partnership purposes. As of February 16, 2018, $88.6 million of common units remained available for issuance under the ATM Program.

**Assets and Operations**

*Our Production Plants*

We own and operate six industrial-scale wood pellet production plants located in the Mid-Atlantic and the Gulf Coast regions of the United States, geographic areas in which wood fiber resources are plentiful and readily available. These facilities are designed to operate 24 hours per day, 365 days per year, although we schedule up to 15 days of maintenance for our plants during each calendar year. There are no regularly required major turnarounds or overhauls.

*Mid-Atlantic Region Plants*

The following table describes our four wood pellet production plants in the Mid-Atlantic region:

| Plant Location | Operations Commenced | Current Annual Production (MTPY) |
|---|---|---|
| Ahoskie, North Carolina | 2011 | 400,000 |
| Northampton, North Carolina | 2013 | 550,000 |
| Sampson, North Carolina | 2016 | 545,000 |
| Southampton, Virginia | 2013 | 550,000 |
| Total | | 2,045,000 |

*Ahoskie*

We acquired the site of the Ahoskie plant in December 2010 and constructed a dedicated wood pellet production plant in Ahoskie, North Carolina (the "Ahoskie plant") in less than one year, commencing operations in November 2011. Through an expansion completed in June 2012, we increased the plant's production from 260,000 MTPY to 350,000 MTPY and have made further improvements to increase production to its current capacity of 400,000 MTPY.

Production from the Ahoskie plant is transported by truck to our Chesapeake terminal.

*Northampton*

Our wood pellet production plant in Northampton, North Carolina (the "Northampton plant") was constructed based on the Ahoskie plant design, utilizing the same major equipment suppliers. The Northampton plant currently produces 550,000 MTPY of wood pellets.

Production from the Northampton plant is transported by truck to our Chesapeake terminal.

7

A1536

*Sampson*

The Sampson plant, which we acquired from the First Hancock JV in December 2016, commenced operations during the fourth quarter of 2016. The Sampson plant was built based on our templated design and we believe that it will produce 545,000 MTPY of wood pellets in 2018 and reach an annual production capacity of 600,000 MTPY by 2019.

Production from the Sampson plant is transported by truck to our Wilmington terminal.

*Southampton*

We acquired a wood pellet production plant in Southampton County, Virginia (the "Southampton plant") from the First Hancock JV in December 2015 (the "Southampton Drop-Down"). The Southampton plant is a build-and-copy replica of our Northampton plant and currently produces 550,000 MTPY of wood pellets.

Production from the Southampton plant is transported by truck to our Chesapeake terminal.

*Gulf Coast Region Plants*

The following table describes our two wood pellet production plants in the Gulf Coast region:

| Plant Location | Acquisition Date | Current Annual Production (MTPY) |
|---|---|---|
| Cottondale, Florida | 2015 | 730,000 |
| Amory, Mississippi | 2010 | 120,000 |
| Total | | 850,000 |

*Cottondale*

Our sponsor acquired Green Circle Bio Energy, Inc., which owns a wood pellet production plant in Cottondale, Florida (the "Cottondale Plant"), in January 2015, changed the name of this entity to Enviva Pellets Cottondale, LLC ("Cottondale") and contributed Cottondale to us in April 2015. The Cottondale plant was commissioned in 2008 and has since undergone several expansions and process improvements. Expansion projects during 2016 and 2017 increased production from 720,000 MTPY to 730,000 MTPY.

Production from the Cottondale plant is transported approximately 50 miles by short-line rail to a warehouse that can store up to 32,000 MT of wood pellet inventory at a third-party deep water marine terminal located in Port Panama City, Florida (the "Panama City terminal").

*Amory*

We purchased a wood pellet production plant in Amory, Mississippi (the "Amory plant") in August 2010. The Amory plant initially consisted of three pellet mills producing at a rate of 41,500 MTPY. Through basic operational improvements and installation of a fourth pellet mill, the Amory plant currently produces 120,000 MTPY.

Production from the Amory plant is transported by barge to a third-party deep-water marine terminal in Mobile, Alabama (the "Mobile terminal").

A1537

Table of Contents

**Logistics and Storage Capabilities**

*To-Port Logistics and Port Infrastructure*

We site our production plants to minimize wood fiber procurement and logistics costs. Our production plants are strategically located in advantaged fiber baskets and near multiple truck, rail, river and ocean transportation access points. We also have inland waterway access and rail access at our Chesapeake terminal and Wilmington terminal and the Panama City terminal. Our multi-year fixed-cost contracts with third-party logistics providers allow for long-term visibility into our to-port logistics cost structure.

The wood pellets produced at our plants must be stored, terminaled and shipped to our principally European customers. Limited deep-water, bulk terminaling assets exist in the Southeastern United States, and very few of them have the appropriate handling and storage infrastructure necessary for receiving, storing and loading wood pellets. In response to such scarcity, we have vertically integrated our Mid-Atlantic operations downstream to encompass finished product logistics and storage. As a largely fixed cost and capital intensive piece of the value chain, our port infrastructure allows us to ship incremental product from our regional plants at a small fraction of the cost of our competitors. Management of port terminal infrastructure is also a key element in reducing distribution-related costs as it allows us to manage the arrival and loading of vessels. Additionally, we are able to improve our cost position by maintaining a dedicated berth where pellets from our Mid-Atlantic region plants have priority and equipment with sufficient load-rate capabilities to turn around vessels within the allotted time windows.

In addition to terminaling wood pellets from our production plants, we will, on occasion, provide terminaling services for third- and related-party wood pellet producers as well as for owners of other dry-bulk commodities.

*Port Operation in the Mid-Atlantic Region*

We acquired the Chesapeake terminal in January 2011 and converted it into a major dry-bulk terminal. The Chesapeake terminal receives, stores and loads wood pellets for export and serves as the shipment point for products produced at our Ahoskie, Northampton and Southampton plants. The Chesapeake terminal accommodates Handysize, Supramax and Panamax-sized vessels, and has a 200-car rail yard adjacent to a Norfolk Southern track, a loading/unloading system that accommodates deliveries by truck, rail and barge and a highly automated conveying system. In May 2011, we erected a 157-foot tall, 175-foot wide storage dome that receives, stores and loads up to 45,000 MT of wood pellets. In April 2013, we placed into operation a second storage dome at the site to add an additional 45,000 MT of storage.

The Chesapeake terminal's storage and loading capacity is more than adequate to store and facilitate the loading of the wood pellets produced from our Northampton, Southampton and Ahoskie plants, and its location decreases our customers' transportation time and costs. Efficiently positioned near our Ahoskie, Northampton, and Southampton plants, the Chesapeake terminal delivers up to a three- to four-day European shipping advantage compared to other Southern or Gulf Coast ports. In addition, because we own the Chesapeake terminal, we enjoy preferential berth access and loading, which minimizes costs of shipping and logistics without the need for excess storage. Our ownership and operation of this terminal enable us to control shipment of the production of our Mid-Atlantic region plants that it serves.

Wood pellets produced at our Sampson plant are terminaled at our Wilmington terminal. The Wilmington terminal accommodates Handysize, Supramax and Panamax-sized vessels, and has a receiving system that accommodates deliveries by truck and rail, a highly automated conveying system and two wood pellet storage domes with capacities of 45,000 MT each. The Wilmington terminal's storage and loading capacity is more than adequate to store and facilitate the loading of pellets produced from our Sampson plant and its location decreases transportation time and costs through the entire supply chain. We benefit from preferential berth access and loading at our Wilmington terminal, which minimizes costs of shipping and logistics without the need for excess storage.

9

A1538

*Port Operation in the Gulf Coast Region*

Wood pellets from our Cottondale plant are transported via short-line rail to the Panama City terminal, where we store up to 32,000 MT of wood pellet inventory in a warehouse at Port Panama City. Production from the Cottondale plant is received, stored and loaded under a long-term warehouse service agreement with the Panama City Port Authority and a stevedoring contract, each of which runs through September 2023 and may be extended by us for an additional five-year period.

Wood pellets produced at our Amory plant are transported by barge to the Mobile terminal, where, pursuant to a throughput agreement with Cooper Marine & Timberlands ("Cooper"), we export from Cooper's ChipCo terminal. This privately owned and maintained deep-water, multi-berth terminal operates 24 hours per day, seven days per week and is the fleeting and loading point for production from our Amory plant. The Amory plant is sited along a major inland waterway that makes transportation to the Mobile terminal easy and efficient, thereby reducing emissions and costs. Our ability to store our wood pellets in barges provides a capital-light, flexible solution that accommodates the storage needs of the Amory plant.

Please read Part II, Item 8. "Financial Statements and Supplementary Data—Significant Accounting Policies—Segment and Geographic Information" for more information regarding our plants, terminals and other long-lived assets.

**Our Relationship with Our Sponsor**

Our sponsor, Enviva Holdings, LP, is a majority owned subsidiary of the Riverstone Funds.

Our sponsor owns approximately 9% of our common units, all of our subordinated units and our General Partner. Our General Partner owns our incentive distribution rights, which entitles our General Partner to increasing percentages of our cash distributions above certain targets. As a result, our sponsor is incentivized to facilitate our access to accretive acquisitions and organic growth opportunities, including those pursuant to the right of first offer it granted to us in connection with our IPO.

In November 2014, Enviva Development Holdings, LLC ("Development Holdings") entered into the First Hancock JV with Hancock Natural Resource Group, Inc. and certain other affiliates of John Hancock Life Insurance Company (U.S.A.) to acquire, develop and construct wood pellet production plants and deep-water marine terminals such as the Southampton, Sampson and Hamlet plants and the Wilmington terminal. In December 2017, Development Holdings entered into the Second Hancock JV with Hancock Natural Resource Group, Inc. and certain other affiliates of John Hancock Life Insurance Company (U.S.A.) to acquire, develop and construct wood pellet production plants and deep-water marine terminals in the Southeastern United States. Development Holdings is the managing member and Enviva Management is the operator of the Hancock JVs; together, they are responsible for managing the activities of the First Hancock JV and the Second Hancock JV (together, the "Hancock JVs"), including the development and construction of the development projects of the Hancock JVs.

**Our Sponsor's Assets and Development Projects**

*Hamlet Plant*

The First Hancock JV has secured permits and commenced construction of the Hamlet plant, which is strategically sited in an attractive wood fiber basket and will be constructed using our "build-and-copy" approach, using substantially the same design and equipment as the Sampson plant. Production from the Hamlet plant, once completed, will be terminaled at the Wilmington terminal.

*Greenwood Plant*

As its first investment, the Second Hancock JV, through a wholly owned subsidiary, entered into an agreement to purchase the Greenwood plant. Upon closing, the Second Hancock JV intends to make investments in the Greenwood plant to improve its operational efficiency and increase its production capacity to 600,000 MTPY. The production of the

10

A1539

Table of Contents

Greenwood plant initially will be sold to the Partnership under a take-or-pay off-take contract and will continue to be exported from the Partnership's Wilmington terminal.

*Other Sponsor Development Projects*

In addition to the projects discussed above, the Second Hancock JV is pursuing the development of additional deep-water marine terminals and production plants. The Second Hancock JV has executed an agreement with the Jackson County Port Authority granting the Second Hancock JV an option to build and operate a marine export terminal at the Port of Pascagoula, Mississippi, which would service new, regionally proximate production plants, including a potential production plant in Lucedale, Mississippi.

In connection with the closing of the IPO in 2015, we entered into a purchase rights agreement (the "Purchase Rights Agreement") with our sponsor, pursuant to which our sponsor granted us a five-year right of first offer to acquire any wood pellet production plants and associated deep-water marine terminals that it or the Hancock JVs may develop or acquire and elect to sell. We expect to continue to pursue the acquisition of such assets from our sponsor and the Hancock JVs to the extent that they are supported by long-term off-take contracts with creditworthy counterparties and have long useful lives, stable cost positions and advantaged locations.

Although we expect to continue to have the opportunity to acquire assets, including those described above, from our sponsor and the Hancock JVs, there can be no assurance that our sponsor or the Hancock JVs will complete their development projects or that our sponsor will decide to sell, or compel the Hancock JVs to sell, assets or completed development projects to us. The right of first offer under the Purchase Rights Agreement expires in May 2020.

**Customers**

For the year ended December 31, 2017, we generated substantially all of our revenues from sales under long-term take-or-pay off-take contracts with customers outside of the United States. We seek to fully contract our production capacity through long-term off-take contracts and supplement such agreements with smaller contracts of intermediate or short duration to take advantage of opportunities in the market.

Depending on the specific off‑take contract, shipping terms are either Cost, Insurance and Freight ("CIF"), Cost and Freight ("CFR") or Free on Board ("FOB"). Under a CIF contract, we procure and pay for shipping costs, which include insurance and all other charges, up to the port of destination for the customer. Under a CFR contract, we procure and pay for shipping costs, which include insurance (excluding marine cargo insurance) and all other charges, up to the port of destination for the customer. Shipping costs under CIF and CFR contracts are included in the price to the customer and, as such, are included in revenue and cost of goods sold. Under FOB contracts, the customer is directly responsible for shipping costs. We seek to enter into fixed-price shipping contracts with reputable shippers matching the terms and volumes of our contracts for which we are responsible for arranging shipping.

We have long-term, take-or-pay off-take contracts with utilities and large European power generators such as Drax Power Limited ("Drax"), Ørsted Bioenergy & Thermal Power A/S (" Ø rsted," formerly known as "DONG Energy Thermal Power A/S"), Lynemouth Power Limited ("Lynemouth Power"), Engie Energy Management SCRL ("ENGIE"), MGT Teesside Limited ("MGT") (through two contracts with the First Hancock JV) and RWE Supply and Trading GmbH ("RWE") .

*Drax Contracts.* We began selling utility-grade wood pellets pursuant to a take-or-pay off-take contract with Drax (the "First Drax Contract") on April 1, 2013. We supplied 468,750 MT for the first delivery year and will supply 1.0 million MTPY of wood pellets through 2022. In connection with the Southampton Drop-Down, the First Hancock JV assigned to us a ten-year contract with Drax (the "Second Drax Contract"). The Second Drax Contract commenced on December 1, 2015, and we supplied 385,000 MT for the first delivery year, supplied 500,000 MT for the second delivery year and will supply 500,000 MTPY for years three through ten.

*Ø rsted Contract.* In connection with the Sampson Drop-Down, the First Hancock JV assigned to us a ten-year take-or-pay off-take contract with Ø rsted. This contract commenced September 1, 2016 and provides for sales of

11

A1540

360,000 MTPY for the first delivery year and 420,000 MTPY for years two through ten. In the fourth quarter of 2017, the Partnership entered into an amendment to the contract with Ø rsted for the supply of an incremental 200,000 MT from late 2018 through mid-2021. Ø rsted's obligations under the contract are guaranteed by its parent, Ø rsted A/S.

*Lynemouth Power Contract.* We entered into a take-or-pay off-take contract to supply wood pellets to Lynemouth Power. Lynemouth Power is converting its coal-fired power station in the United Kingdom to a biomass fired power station. Deliveries under this contract commenced in late 2017, are expected to ramp to full supply of 800,000 MTPY of wood pellets in 2018, and will continue through the first quarter of 2027. The volumes under the Lynemouth Power Contract are denominated in U.S. Dollars, except for 160,000 MTPY that are denominated in British Pound Sterling ("GBP").

*ENGIE Contracts.* We began selling 480,000 MTPY of utility-grade wood pellets to Electrabel, a subsidiary of ENGIE, under a contract that commenced in June 2011 and continued through 2017. In May 2017 we entered into a new agreement to supply a total of 450,000 MT of wood pellets to ENGIE from mid-2017 through and including 2019. We recently entered into two additional agreements with ENGIE to sell 90,000 MT in 2018 and an aggregate 585,000 MT from 2019-2023.

*EVA-MGT Contracts.* We have contracted with the First Hancock JV to supply 375,000 MTPY of wood pellets (the "EVA-MGT Contract") to MGT Teesside Limited's Tees Renewable Energy Plant (the "Tees REP"). The EVA-MGT Contract commences in 2019, ramps to full supply in 2021, and continues through 2034. The EVA-MGT Contract is denominated in U.S. Dollars for commissioning volumes in 2019 and in GBP thereafter.

In connection with the Sampson Drop-Down, we entered into a second contract with the First Hancock JV to supply an additional 95,000 MTPY of the contracted volume to the Tees REP. For more information on the EVA-MGT Contracts, please read Part III, Item 13. "Certain Relationships and Related Transactions, and Director Independence—Agreements with Affiliates —EVA-MGT Contracts."

*RWE Contracts .* We have contracted with RWE pursuant to two confirmations under master agreements to sell 720,000 MT of wood pellets to RWE from our terminal locations and to purchase 720,000 MT of wood pellets from RWE in British Columbia during the period from January 2020 through December 2021.

We also have entered into several other contracts that have smaller off-take quantities than the contracts described above. We diversified our customer base during 2017; however, our three largest customers accounted for 93% of the Partnership's product sales in 2017.

We refer to the structure of our contracts as "take-or-pay" because they include a firm obligation of the customer to take a fixed quantity of product at a stated price and provisions that compensate us in the case of our customer's failure to accept all or a part of the contracted volumes or for termination by our customer. Our long-term contracts typically provide for annual inflation-based adjustments or price escalators. Certain of our long-term contracts also contain provisions that allow us to increase or decrease the volume of product that we deliver by a percentage of the base volume of the contract, as well as cost pass-through provisions related to stumpage, fuel or transportation costs and price adjustments for actual product specifications. In addition, certain of our long-term contracts and related arrangements provide for certain cost recovery and sharing arrangements in connection with certain changes in law or sustainability requirements as well as payments to us in the case of their termination as a result of such changes.

In addition to our long-term contracts, we also sell prompt deliveries of product to new and existing customers. On occasion, we will intermediate dislocations in the market by entering into back-to-back transactions with physical delivery. In some instances, a customer may request to cancel, defer, or accelerate a shipment. Contractually, we will seek to optimize our position by selling or purchasing the subject shipment to or from another party, including in some cases a related party, either within our contracted off-take portfolio or as an independent transaction on the spot market. In most instances, the original customer pays us a fee, including reimbursement of any incremental costs, which is included in "Other revenue." We also provide terminaling services for third-party wood pellet producers as well as for owners of other bulk commodities.

A1541

*Contracted Backlog*

As of February 15, 2018, we had approximately $5.8 billion of product sales backlog for firm contracted product sales to major power generators compared to approximately $5.7 billion as of February 1, 2017. Backlog represents the revenue to be recognized under existing contracts assuming deliveries occur as specified in the contract. Expected future product sales revenue denominated in foreign currencies, excluding revenue hedged with foreign currency forward contracts, are included in U.S. Dollars at February 15, 2018 forward rates. Please read Part II, Item 8. "Financial Statements and Supplementary Data—Derivative Instruments" for more information regarding our foreign currency forward contracts.

Our expected future product sales revenue under our contracted backlog as of February 15, 2018 is as follows (in millions):

| | | |
|---|---|---:|
| Period February 15, 2018 to December 31, 2018 | $ | 523 |
| Year Ended December 31, 2019 | | 582 |
| Year Ended December 31, 2020 and thereafter | | 4,691 |
| Total product sales contracted backlog | $ | 5,796 |

**Wood Fiber Procurement**

Although stumpage constitutes a small portion of our total cost of delivered products, wood fiber procurement is a vital function of our business, and cost-effective access to wood fiber is an important factor in our pricing stability. Our raw materials are byproducts of traditional timber harvesting, principally the tops and limbs of trees as well as other low-value wood materials that are generated in a harvest. We procure wood fiber directly from timber owners, loggers and other suppliers. We also opportunistically acquire industrial residuals (sawdust and shavings) and forest residuals (woodchips and slash) when they provide a cost advantage. Due to the moisture content of unprocessed wood, it cannot be transported economically over long distances. Therefore, the specific regional wood fiber resource supply and demand balance dictates the underlying economics of wood fiber procurement. For this reason, we have elected to site our facilities in some of the most robust and advantaged fiber baskets in the world.

Our customers are subject to stringent requirements regarding the sustainability of the fuels they procure. In addition to our internal sustainability policies and initiatives, our wood fiber procurement is conducted in accordance with leading forest certification standards. Our fiber supply chains are routinely audited by independent third parties. We maintain multiple forest certifications including: Forest Stewardship Council (FSC®) Chain of Custody, FSC® Controlled Wood, Programme for the Endorsement of Forest Certification (PEFC™) Chain of Custody, Sustainable Forestry Initiative (SFI®) Fiber Sourcing and SFI® Chain of Custody. We have obtained independent third-party certification for our Ahoskie, Cottondale, Northampton, Sampson and Southampton plants to the applicable Sustainable Biomass Program (SBP) Standards in 2016 and 2017. We expect that our Amory plant will obtain third-party SBP certification in early 2018.

Our wood fiber demand is complementary to, rather than in competition with, demand for high-grade wood for use by most other forest-related industries, such as lumber and furniture making. For example, improvements in the U.S. housing construction industry increase the demand for construction-quality lumber, which in turn increases the available supply of the low-cost pulpwood and mill residues that are used in wood pellet production. By using commercial thinnings and byproducts as raw materials, wood pellet production also indirectly supports other forest-related industries as well as the sustainable management of commercial forests.

The wood fiber used for wood pellet production comprises predominantly pulpwood, which derives its name from its traditional use by the pulp and paper industry and includes roundwood (typically thinnings from forest management operations and the tops and branches from sawlogs), and wood residues (primarily mill residues, a byproduct of sawmilling and veneer mill operations). Our procured wood fiber consists of:

- low-grade wood fiber: wood that is unsuitable for or rejected by the sawmilling and lumber industries because of small size, defects (e.g. crooked or knotty), disease or pest infestation;

13

A1542

Table of Contents

- tops and limbs: the parts of trees that cannot be processed into lumber;

- commercial thinnings: harvests that promote the growth of higher value timber by removing weaker or deformed trees to reduce competition for water, nutrients and sunlight; and

- mill residues: chips, sawdust and other wood industry byproducts.

Demand for the non-merchantable trees, waste products or byproducts that we use is generally low because they have few competing uses. The tops, limbs and other low-grade wood fiber we purchase would otherwise generally be left on the forest floor, impeding reforestation, or burned. Wood pellet production provides a profitable use for the residues from sawmill and furniture industries and for the trees that are thinned to make room for higher value lumber-grade timber. U.S. demand for such low grade wood fiber historically emerged from the pulp and paper industry. However, due to the decline in demand from paper and pulp, many landowners lack commercial markets for this wood fiber. Wood pellet producers help fill the gap.

As a result of the fragmented nature of tract ownership, we procure raw materials from hundreds of landowners, loggers and timber industry participants, with no individual landowner representing a material fraction of any of our production plants' needs. Our wood fiber is procured under a variety of arrangements, including (1) logging contracts for the thinnings, pulpwood and other unmerchandised chip-and-saw timber cut by a harvester, (2) in-woods chipping contracts where we may also provide the actual harvesting assets and (3) contracts with timber dealers. Via our internal Track and Trace system, we maintain 100% traceability of the primary wood that is delivered to us directly from forests. Any supplier delivering wood to one of our plants must first share the details about the forest characteristics of the tract from which the wood is sourced with our forestry staff so we can verify that it meets our strict sustainability criteria. Our supplier contracts require a certification that the relevant tract information has been entered into our database before wood may be delivered directly from a particular tract. We summarize all such tract information periodically and publish tract-level details on our website. During 2017, we sourced wood fiber from approximately 300 suppliers, including landowners growing both hardwoods and softwoods and other suppliers. The diversity of our supply base enables us to maintain stable costs, and our facilities' advantaged siting ensures consistent and reliable deliveries at lower cost than others in our region or industry.

**Competition**

We compete with other utility-grade wood pellet producers for long-term, take-or-pay off-take contracts with major power generation customers. Competition in our industry is based on the price, quality and consistency of the wood pellets produced, the reliability of wood pellet deliveries and the producer's ability to verify and document, through customer and third-party audits, that its wood pellets meet the regulatory sustainability obligations of a particular customer.

Most of the world's current wood pellet production plants are owned by small, private companies, with few companies owning or operating multiple plants. Few companies have the scale, technical expertise or commercial infrastructure necessary to supply utility-grade wood pellets under large, long-term off-take contracts with power generators.

We are the largest producer by production capacity, and consider other companies with comparable scale, technical expertise or commercial infrastructure to be our competitors, including AS Graanul Invest, Pinnacle Renewable Energy Inc., Drax Biomass Inc., Georgia Biomass, LLC, Fram Renewable Fuels, LLC, Highland Pellets LLC, Pacific BioEnergy Corporation, and The Westervelt Company.

**Employees**

We are party to a management services agreement with Enviva Management, pursuant to which Enviva Management provides us with the employees, management and services necessary for the operation of our business. As of December 31, 2017, Enviva Management had 652 employees. Please read Part II, Item 13. "Financial Statements and

14

Supplementary Data—Related-Party Transactions" for more information regarding our management services agreement with Enviva Management.

**Environmental Matters**

Our operations are subject to stringent and comprehensive federal, state and local laws and regulations governing matters including environmental protection, occupational health and safety and the release or discharge of materials into the environment, including air emissions and wastewater discharges. These laws and regulations may (i) require acquisition, compliance with and maintenance of certain permits or other approvals to conduct regulated activities, (ii) impose technology requirements or standards on our operations, (iii) restrict the amounts and types of substances that may be discharged or emitted into the environment, (iv) limit or prohibit construction or timbering activities in sensitive areas such as wetlands or areas inhabited by endangered or threatened species, (v) govern worker health and safety aspects of operations, (vi) require measures to investigate, mitigate or remediate releases of hazardous or other substances from our operations and (vii) impose substantial liabilities, including possible fines and penalties for unpermitted emissions or discharges from our operations. Failure to comply with these laws and regulations may result in the assessment of administrative, civil and criminal penalties, the imposition of investigatory and remedial obligations and the issuance of orders enjoining some or all of our operations in affected areas.

Moreover, the global trend in environmental regulation is towards increasingly broad and stringent requirements for activities that may affect the environment. Any changes in environmental laws and regulations or re-interpretation of enforcement policies that result in more stringent and costly requirements could have a material adverse effect on our operations and financial position. Although we monitor environmental requirements closely and budget for the expected costs, actual future expenditures may be different from the amounts we currently anticipate spending. Moreover, certain environmental laws impose strict joint and several liability for costs to clean up and restore sites where pollutants have been disposed or otherwise spilled or released. We cannot assure you that we will not incur significant costs and liabilities for remediation or damage to property, natural resources or persons as a result of spills or releases from our operations or those of a third party. Although we believe that our competitors will face similar environmental requirements, other market factors may prevent us from passing on any increased costs to our customers. Although we believe that we are in substantial compliance with existing environmental laws and regulations and that continued compliance with existing requirements will not materially adversely affect us, there is no assurance that the current levels of regulation will continue in the future.

The following summarizes some of the more significant existing environmental, health and safety laws and regulations applicable to our operations, the failure to comply with which could have a material adverse impact on our capital expenditures, results of operations and financial position.

*Air Emissions*

The Clean Air Act, as amended (the "CAA"), and state and local laws and regulations that implement and add to CAA requirements, regulate the emission of air pollutants from our facilities. The CAA imposes significant monitoring, recordkeeping and reporting requirements for these emissions. These laws and regulations require us to obtain pre-approval for the construction or modification of certain projects or facilities expected to produce or significantly increase air emissions, obtain and strictly comply with stringent air permits, and in certain cases utilize specific equipment or technologies to control and measure emissions. Obtaining these permits can be both costly and time intensive and has the potential to delay the opening of new plants or the significant expansion of existing plants.

The CAA requires that we obtain various construction and operating permits, including, in some cases, Title V air permits. In certain cases, the CAA requires us to incur capital expenditures to install air pollution control devices at our facilities. We are also required to control fugitive emissions from our operations and may face fines, penalties or injunctive orders in connection with fugitive emissions from our operations. We have incurred, and expect to continue to incur, substantial administrative, operating and capital expenditures to maintain compliance with CAA requirements that have been promulgated or may be promulgated or revised in the future.

15

A1544

*Climate Change and Greenhouse Gases*

In response to findings that emissions of carbon dioxide, methane and GHGs present an endangerment to public health and the environment, the U.S. Environmental Protection Agency (the "EPA") has adopted regulations under existing provisions of the CAA that require a reduction in emissions of GHGs from motor vehicles and certain stationary sources. At this time, the EPA requires biomass facilities with GHG emissions above 75,000 tons per year that are otherwise subject to CAA permitting to undergo CAA permitting for their GHG emissions. Any other legislation or regulations that require permitting or reporting of GHG emissions or limit such emissions from our equipment and operations or from biomass-fired power plants operated by our customers could require us to incur costs to reduce such emissions or negatively impact demand for wood pellets. Furthermore, scientists have concluded that increasing concentrations of GHGs in the earth's atmosphere may produce climate changes that have significant physical effects, such as increased frequency and severity of storms, floods and other climatic events. If any such effects were to occur, they could have an adverse effect on our operations.

*Water Discharges*

The Federal Water Pollution Control Act, as amended (the "Clean Water Act"), as well as state laws and regulations that implement, and may be more stringent than, the Clean Water Act, restrict the discharge of pollutants into waters of the United States. Any such discharge of pollutants must be performed in accordance with the terms of a permit issued by the EPA or the implementing state agency. In addition, the Clean Water Act and implementing state laws and regulations require individual permits or coverage under general permits for discharges of storm water runoff from certain types of facilities. Federal and state regulatory agencies can impose administrative, civil and criminal penalties for non-compliance with discharge permits or other requirements of the Clean Water Act and analogous state laws and regulations. These permits generally have a term of five years. Although our facilities are presently in compliance with these requirements, changes to the terms and conditions of our permits in future renewals or new or modified regulations could require us to incur additional capital or operating expenditures, which may be material.

Pursuant to the Clean Water Act, the EPA has adopted the Discharge of Oil regulation, which requires any person in charge of an onshore facility to report any discharge of a harmful quantity of oil into U.S. navigable waters, adjoining shorelines or the contiguous zone. A harmful quantity is any quantity of discharged oil that violates state water quality standards, causes a film or sheen on the water's surface or leaves sludge or emulsion beneath the surface. Spills from our production plants that are located along waterways or from our deep-water marine terminal facilities may result in fines, penalties and obligations to respond to and remediate any such spills.

*Spill Response and Release Reporting*

Certain of our facilities are subject to federal requirements to prepare for and respond to spills or releases from tanks and other equipment located at these facilities and provide training to employees on operation, maintenance and discharge prevention procedures and the applicable pollution control laws. At such facilities, we have developed or will develop Spill Prevention, Control and Countermeasure plans to memorialize our preparation and response plans and will update them on a regular basis. From time to time, these requirements may be made more stringent and may require us to modify our operations or expand our plans accordingly. The costs of implementing any such modifications or expansion may be significant. In addition, in the event of a spill or release, we may incur fines or penalties or incur responsibility for damage to natural resources, private property or personal injury in addition to obligations to respond to and remediate any such spill or release.

*Endangered Species Act*

The federal Endangered Species Act, as amended (the "ESA"), restricts activities that may affect endangered and threatened species or their habitats. Although some of our facilities may be located in areas that are designated as habitats for endangered or threatened species, we believe that we are in substantial compliance with the ESA. Some of our suppliers may source materials from locations that provide habitats for species that are protected under the ESA, which may extend the time required to access those areas, or may impose conditions or restrictions on accessing those areas in a way that restricts our access to raw materials. Moreover, as a result of a settlement approved by the U.S.

16

District Court for the District of Columbia on September 9, 2011, the U.S. Fish and Wildlife Service is required to make a determination regarding the listing of more than 250 species by the end of the agency's 2017 fiscal year. That process reportedly remains underway. The designation of previously unidentified endangered or threatened species could cause us to incur additional costs or become subject to operating restrictions or bans in the affected areas, which could have an adverse impact on the availability or price of raw materials.

### *Coastal Area Protection and Wetlands and Navigable Waters Activity Regulations*

Our terminals are located in areas that are subject to the various federal and state programs that regulate the conservation and development of coastal resources. At the federal level, the Coastal Zone Management Act (the "CZMA") was enacted to preserve, protect, develop and, where possible, restore or enhance valuable natural coastal resources of the U.S. coastal zone. The CZMA authorizes and provides grants for state management programs to regulate land and water use and coastal development.  Requirements under the CZMA may affect the siting of any new terminals and could impact the expansion of modification of existing terminal facilities. The CZMA process may result either in delays in obtaining the required authorizations to construct a new terminal or expand an existing terminal or conditions that may restrict the construction or operation of our terminals.

In addition to the CZMA, requirements under the Clean Water Act and related federal laws may result in federal or state regulators imposing conditions or restrictions on our operations or construction activities. For instance, the dredge and fill provisions of the Clean Water Act require a permit to conduct construction activities in protected waters and wetlands and prohibit unpermitted discharges of fill materials. Likewise, the Rivers and Harbors Act requires permits for the construction of certain port structures. We believe that we are in material compliance with these various requirements; however, any delays in obtaining future permits or renewals, or the inclusion of restrictive conditions in such permits, could adversely affect the cost of, or result in delays to, our operations and the construction of new, or expansion of existing, terminals.

### Safety and Maintenance

We are subject to a number of federal and state laws and regulations, including the federal Occupational Safety and Health Act, as amended ("OSHA"), and comparable state statutes, whose purpose is to protect the health and safety of workers. We have a corporate health and safety program that governs the way we conduct our operations at our facilities. Our employees receive OSHA training that is appropriate in light of the tasks performed at our facilities and general training on our health and safety plans. Compliance with OSHA and general training is mandatory. We perform preventive and routine maintenance on all of our manufacturing and deep-water marine terminaling systems, and make repairs and replacements when necessary or appropriate. We also conduct routine and required inspections of those assets in accordance with applicable regulations. In addition, the OSHA hazard communication standards in the Emergency Planning and Community Right-to-Know Act and comparable state statutes require that information be maintained concerning hazardous materials used or produced in our operations and that this information be provided to employees, state and local governmental authorities and citizens. Our facilities adhere to National Fire Protection Association (NFPA) standards for combustible dust and incorporate pollution control equipment such as cyclones, baghouses and electrostatic precipitators to minimize regulated emissions. Our deep-water marine terminals adhere to Homeland Security/U.S. Coast Guard regulations regarding physical security and emergency response plans. We continually strive to maintain compliance with applicable air, solid waste and wastewater regulations; nevertheless, we cannot guarantee that serious accidents will not occur in the future.

### Seasonality

Our business is affected to some extent by seasonal fluctuations. The cost of producing wood pellets tends to be higher in the winter months because the delivered cost of fiber typically increases with wet weather and our raw materials have, on average, higher moisture content during this period of the year, resulting in a lower product yield. In addition, lower ambient temperatures increase the cost of drying wood fiber. Seasonality may also impact the availability and pricing of limited-scope wood pellet purchase and sale transactions. For example, colder periods typically drive increased demand for wood pellets in the heating and industrial markets, which can increase pricing for prompt deliveries, while warmer periods typically have the opposite effect.

A1546

Table of Contents

**Principal Executive Offices**

We lease office space for our principal executive offices at 7200 Wisconsin Avenue, Suite 1000, Bethesda, Maryland 20814. The lease expires in June 2024.

**Available Information**

We file annual, quarterly and current reports and other documents with the SEC under the Securities Exchange Act of 1934 (the "Exchange Act"). You may read and copy any materials we file with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Washington, DC 20549. You may obtain information on the operations of the Public Reference Room by calling the SEC at (800) SEC-0330. In addition, the SEC maintains a website at *www.sec.gov* that contains reports and other information regarding issuers that file electronically with the SEC.

We also make available free of charge our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and any amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act, simultaneously with or as soon as reasonably practicable after filing such materials with, or furnishing such materials to, the SEC, and on or through our website, *www.envivabiomass.com* . The information on our website, or information about us on any other website, is not incorporated by reference into this Annual Report.

18

A1547

**ITEM 1A.  RISK FACTORS**

*There are many factors that could have a material adverse effect on the Partnership's business, financial condition, results of operations and cash available for distribution. New risks may emerge at any time, and the Partnership cannot predict those risks or estimate the extent to which they may affect financial performance. Each of the risks described below could adversely impact the value of the Partnership's common units.*

**Risks Inherent in Our Business**

***We may not have sufficient cash from operations following the establishment of cash reserves and payment of costs and expenses, including cost reimbursements to our General Partner and its affiliates, to enable us to pay quarterly distributions to our unitholders at our current distribution rate.***

We may not have sufficient cash each quarter to enable us to pay quarterly distributions at our current distribution rate. The amount of cash we can distribute on our common and subordinated units principally depends upon the amount of cash we generate from our operations, which fluctuates from quarter to quarter based on the following factors, some of which are beyond our control:

- the volume and quality of products that we are able to produce or source and sell, which could be adversely affected by, among other things, operating or technical difficulties at our plants or deep-water marine terminals;

- the prices at which we are able to sell our products;

- failure of the Partnership's customers, vendors and shipping partners to pay or perform their contractual obligations to the Partnership;

- the creditworthiness of our contract counterparties;

- the amount of low-cost wood fiber that we are able to procure and process, which could be adversely affected by, among other things, operating or financial difficulties suffered by our suppliers;

- changes in the price and availability of natural gas, coal or other sources of energy;

- changes in prevailing economic conditions;

- our inability to complete acquisitions, including acquisitions from our sponsor, or to realize the anticipated benefits of such acquisitions;

- inclement or hazardous environmental conditions, including extreme precipitation, temperatures and flooding;

- fires, explosions or other accidents;

- changes in domestic and foreign laws and regulations (or the interpretation thereof) related to renewable or low-carbon energy, the forestry products industry, the international shipping industry or power generators;

- changes in the regulatory treatment of biomass in core and emerging markets;

- our inability to acquire or maintain necessary permits or rights for our production, transportation or terminaling operations;

- changes in the price and availability of transportation;

A1548

- changes in foreign currency exchange or interest rates, and the failure of our hedging arrangements to effectively reduce our exposure to the risks related thereto;

- risks related to our indebtedness;

- our failure to maintain effective quality control systems at our production plants and deep-water marine terminals, which could lead to the rejection of our products by our customers;

- changes in the quality specifications for our products that are required by our customers;

- labor disputes;

- the effects of Brexit on our and our customers' businesses; and

- our ability to borrow funds and access capital markets.

In addition, the actual amount of cash we have available for distribution depends on other factors, some of which are beyond our control, including:

- the level of capital expenditures we make;

- costs associated with construction projects at our existing facilities and future construction projects;

- fluctuations in our working capital needs;

- our treatment as a pass-through entity for U.S. federal income tax purposes;

- our debt service requirements and other liabilities;

- restrictions contained in our existing or future debt agreements; and

- the amount of cash reserves established by our General Partner.

***The amount of cash we have available for distribution to holders of our units depends primarily on our cash flow and not solely on profitability, which may prevent us from making cash distributions during periods when we record net income.***

The amount of cash we have available for distribution depends primarily upon our cash flow, including cash flow from reserves and working capital or other borrowings, and not solely on profitability, which will be affected by non-cash items. As a result, we may pay cash distributions during periods when we record net losses for financial accounting purposes and may be unable to pay cash distributions during periods when we record net income.

***Substantially all of our revenues currently are generated under contracts with four customers, and the loss of any of them could adversely affect our business, financial condition, results of operations, cash flows and ability to make cash distributions. We may not be able to renew or obtain new and favorable contracts with these customers when our existing contracts expire, and we may not be able to obtain contracts with new customers, which could adversely affect our revenues and profitability.***

Our contracts with Drax, Ø rsted, Lynemouth Power and ENGIE will represent substantially all of our sales volumes in 2018. Because we have a small number of customers, we face counterparty concentration risk. The ability of each of our customers to perform its obligations under a contract with us will depend on a number of factors that are beyond our control and may include, among other things, the overall financial condition of the counterparty, the counterparty's access to capital, the condition of the regional and global power generation industry, continuing

20

A1549

regulatory and economic support for wood pellet-generated power, spot market pricing trends and general economic conditions. In addition, in depressed market conditions, our customers may no longer need the amount of our products they have contracted for or may be able to obtain comparable products at a lower price. If our customers experience a significant downturn in their business or financial condition, they may attempt to renegotiate, reject or declare force majeure under our contracts. Should any counterparty fail to honor its obligations under a contract with us, we could sustain losses, which could have a material adverse effect on our business, financial condition, results of operations and cash available for distribution. We may also decide to renegotiate our existing contracts on less favorable terms and/or at reduced volumes in order to preserve our relationships with our customers.

Upon the expiration of our off-take contracts, our customers may decide not to recontract on terms as favorable to us as our current contracts, or at all. For example, our current customers may acquire wood pellets from other providers that offer more competitive pricing or logistics or develop their own sources of wood pellets. Some of our customers could also exit their current business or be acquired by other companies that purchase wood pellets from other providers. The demand for wood pellets or their prevailing prices at the times at which our current off-take contracts expire may also render entry into new long-term off-take contracts difficult or impossible.

Any reduction in the amount of wood pellets purchased by our customers, renegotiation of our contracts on less favorable terms, or our inability to enter into new contracts on economically acceptable terms upon the expiration of our current contracts could have a material adverse effect on our results of operations, business and financial position, as well as our ability to pay distributions to our unitholders.

***Termination penalties within our off-take contracts may not fully compensate us for our total economic losses.***

Certain of our off-take contracts provide the customer with a right of termination for various events of convenience or changes in law or policy. Although some of these contracts are subject to certain protective termination payments, the termination payments made by our customers may not fully compensate us for losses resulting from a termination by such counterparty. In each case, we may be unable to re-contract our production at favorable prices or at all, and our results of operations, business and financial position, and our ability to make cash distributions to our unitholders may be materially adversely affected as a result.

***We derive substantially all of our revenues from customers in Europe. If we fail to diversify our customer base geographically in the future, our results of operations, business and financial position and ability to make cash distributions could be materially adversely affected.***

Substantially all of our revenues currently are derived from customers in Europe, and our revenues have been heavily dependent on developments in the European markets. If economic, political, regulatory or financial market conditions in Europe deteriorate, including as a result of weakness in European economies, our customers may respond by suspending, delaying or reducing their expenditures and may attempt to renegotiate, reject or declare force majeure under our contracts. Our failure to successfully penetrate markets outside of Europe in the future could have a material adverse effect on our results of operations, business and financial position, and our ability to pay distributions to our unitholders.

***The actions of certain special interest groups could adversely impact our business.***

Certain special interest groups that focus on environmental issues have expressed their opposition to the use of biomass for power generation, both publicly and directly to domestic and foreign regulators, policy makers, power generators and other industrial users of biomass. These groups are also actively lobbying, litigating and undertaking other actions domestically and abroad in an effort to increase the regulation of, reduce or eliminate the incentives and support for, or otherwise delay, interfere with or impede the production and use of biomass for power generation. Such efforts, if successful, could materially adversely affect our results of operations, business and financial condition, and our ability to make cash distributions to our unitholders.

21

A1550

***Our exposure to risks associated with foreign currency and interest rate fluctuations, as well the hedging arrangements we may enter into to mitigate those risks, could have an adverse effect on our financial condition and results of operations.***

We may experience foreign currency exchange and interest rate volatility in operating our business. We began to use hedging transactions in 2016 with respect to certain of our off-take contracts which are, in part or in whole, denominated in British Pound Sterling ("GBP"), as well as an interest rate swap with respect to a portion of our variable rate debt, in an effort to achieve more predictable cash flow and to reduce our exposure to foreign currency exchange and interest rate fluctuations. We currently do not hedge a significant portion of our overall revenue pursuant to our off-take contracts.

Fluctuations in foreign currency exchange rates could be material to us depending upon, among other things, the currency denominations of our off-take contracts. In particular, we will in the future have exposure to fluctuations in foreign currency exchange rates between the U.S. Dollar and the GBP as sales under the EVA-MGT Contract or the 95,000 MTPY contract with the First Hancock JV, which commence in 2019 and 2020, respectively, are denominated in GBP from 2020 onward and sales under the Lynemouth Power Contract, which commenced in 2017, are denominated in U.S. Dollars and GBP. Although the use of hedging transactions limits our downside risk, their use may also limit future revenues.

In addition, there may be instances in which costs and revenue will not be matched with respect to currency denomination. As a result, to the extent that existing and future off-take contracts are not denominated in U.S. Dollars, it is possible that increasing portions of revenue, costs, assets and liabilities will be subject to fluctuations in foreign currency valuations.

Our hedging transactions involve cost and risk and may not be effective at mitigating our exposure to fluctuations in foreign currency exchange and interest rates. Risks inherent in our hedging transactions include the risk that counterparties to derivative contracts may be unable to perform their obligations and the risk that the terms of such instruments will not be legally enforceable. Likewise, our hedging activities may be ineffective or may not offset more than a portion of the financial impact resulting from foreign currency exchange or interest rates fluctuations, which could have a material adverse effect on our results of operations, business and financial position, and our ability to pay distributions to our unitholders.

***Challenges to or delays in the issuance of air permits could impair our ability to expand production.***

Our pellet production facilities are subject to the requirements of the CAA and must either receive minor source permits from the states in which they are located or a major source permit, which is subject to the approval of the EPA. In general, our facilities are eligible for minor source permits following the application of pollution control technologies. However, should we be subject to any challenges to the issuance of our permits, we could experience substantial delays in the issuance of our permits, which could impair our ability to expand our production capacity. In addition, any new air permits we receive could require that we incur additional expenses to install emissions control technologies or limit operations to satisfy emission limitations.

***Changes in laws or government policies, incentives and taxes implemented to support increased generation of or otherwise regulate low-carbon and renewable energy may affect customer demand for our products.***

Consumers of utility-grade wood pellets currently use our products either as part of a binding obligation to generate a certain percentage of low-carbon energy or because they receive direct or indirect financial support or incentives to do so. Financial support is often necessary to cover the generally higher costs of wood pellets compared to conventional fossil fuels like coal. In most countries, once the government implements a tax (e.g., the United Kingdom's carbon price floor tax) or a preferable tariff or a specific renewable energy policy either supporting a renewable energy generator or the energy generating sector as a whole, such tax, tariff or policy is guaranteed for a specified period of time, sometimes for the investment lifetime of any electricity generator's project. However, governmental policies that

22

A1551

currently support the use of biomass may modify their tax, tariff or incentive regimes, and the future availability of such taxes, tariffs or policies, either in current jurisdictions beyond the prescribed timeframes or in new jurisdictions, is uncertain. Demand for wood pellets could be substantially lower than expected if government support is reduced or delayed or, in the future, is insufficient to enable successful deployment of biomass power to the levels currently projected. In addition, regulatory changes such as new requirements to install additional pollution control technology or curtail operations to meet new GHG emission limits may also affect demand for our products.

In Europe, the European Union's Renewable Energy Directive ("RED") requires that it fulfill 20% of its energy demand from renewable sources by 2020. Under the current RED framework, biofuels are subject to a set of sustainability criteria that must be met in order to qualify as renewable fuels. The European Union is currently in the process of finalizing a second Renewable Energy Directive ("RED II") that seeks to increase the renewable energy goal to 27% of energy demand by 2030. Under the RED II proposal, qualifying biofuels would be subject to new sustainability requirements, including a requirement that biofuel feedstocks be harvested from areas with increasing carbon stocks. The finalization of these requirements could cause us to incur additional compliance costs. Moreover, there can be no guarantee that the final version of RED II will be favorable to biomass producers in the United States. Finally, any actions the European Union takes to regulate biofuels may influence future regulatory actions in other countries where our customers are located. In the event that RED II limits or otherwise constrains our ability to export our product to the European Union or has other adverse consequences, it could have a material adverse effect on our results of operations and financial condition.

In the United States, on October 16, 2017, the EPA proposed a rule to repeal the Clean Power Plan (the "CPP"), the Obama Administration's rule establishing carbon pollution standards for existing power plants. Under the proposal, the CPP—which is currently subject to a judicial stay issued by the U.S. Supreme Court—would be repealed. The current repeal proposal suggests that the EPA has yet to determine when or whether it might promulgate new GHG emissions standards for existing power plants. At this time, it is not clear what impact the repeal of the CPP and any future rulemaking will have on the demand for biomass in the United States. Also, almost half of U.S. states, either individually or through multi-state regional initiatives, have begun to address GHG emissions, primarily through the planned development of GHG emission inventories and/or regional GHG cap-and-trade programs. Although neither the U.S. Congress nor the states in which our facilities are located have adopted such legislation at this time, they may do so in the future. The adoption of a different approach to the treatment of biogenic carbon in the United States could be treated as precedential by European regulators and impact the regulatory treatment of our product in our primary markets.

Moreover, many nations have agreed to limit emissions of GHGs pursuant to the United Nations Framework Convention on Climate Change and more recently, in December 2015, 195 countries met in Paris, France to approve a landmark climate accord. On November 4, 2016, the Paris Agreement entered into force, potentially providing additional incentives for participating countries to reduce their GHG emissions. While the Trump Administration has signaled its intent to withdraw from the Paris Agreement, substantially all of our current customers are located in countries that have agreed to be bound by the Paris Agreement. Although it is not possible at this time to accurately estimate how potential future laws or regulations addressing GHG emissions would impact our business, any such future laws or implementing regulations could require us to incur increased operating or maintenance costs, which, in turn, could have a material adverse effect on our business, financial condition and results of operations.

***The international nature of our business subjects us to a number of risks, including foreign exchange risk and unfavorable political, regulatory and tax conditions in foreign countries.***

Substantially all of our current product sales are to customers that operate outside of the United States. As a result, we face certain risks inherent in maintaining international operations that include, but are not limited to, the following:

- foreign exchange movements, which may make it more difficult for our customers to make payments denominated in U.S. Dollars or exert pricing pressure on new contracts compared to competitors that source in a weaker currency;

23

A1552

Table of Contents

- restrictions on foreign trade and investment, including currency exchange controls imposed by or in other countries; and

- trade barriers such as export requirements, tariffs, taxes and other restrictions and expenses, which could increase the prices of our products and make our products less competitive in some countries.

Our business in foreign countries requires us to respond to rapid changes in market conditions in these countries. Our overall success as a global business depends, in part, on our ability to succeed under differing legal, regulatory, economic, social and political conditions. There can be no assurance, however, that we will be able to develop, implement and maintain policies and strategies that will be effective in each location where our customers operate. Any of the foregoing factors could have a material adverse effect on our results of operations, business and financial position, and our ability to pay distributions to our unitholders.

***Federal, state and local legislative and regulatory initiatives relating to forestry products and the potential for related litigation could result in increased costs, additional operating restrictions or delays for our suppliers and customers, respectively, which could cause a decline in the demand for our products and negatively impact our business, financial condition and results of operations.***

Currently, our raw materials are byproducts of traditional timber harvesting, principally the tops and limbs of trees, as well as other low-value wood materials that are generated in a harvest and industrial residuals (chips, sawdust and other wood industry byproducts). Commercial forestry is regulated by complex regulatory frameworks at each of the federal, state and local levels. Among other federal laws, the Clean Water Act and the Endangered Species Act have been applied to commercial forestry operations through agency regulations and court decisions, as well as through the delegation to states to implement and monitor compliance with such laws. State forestry laws, as well as land-use regulations and zoning ordinances at the local level, are also used to manage forests in the Southeastern United States, as well as other regions from which we may need to source raw materials in the future. Any new or modified laws or regulations at any of these levels could have the effect of reducing forestry operations in areas where we procure our raw materials and consequently may prevent us from purchasing raw materials in an economic manner, or at all. In addition, future regulation of, or litigation concerning, the use of timberlands, the protection of endangered species, the promotion of forest biodiversity, and the response to and prevention of wildfires, as well as litigation, campaigns or other measures advanced by environmental activist groups, could also reduce the availability of the raw materials required for our operations.

***The enactment of derivatives legislation could have an adverse effect on our ability to use derivative instruments to reduce the effect of foreign currency, interest rate, and other risks associated with our business.***

The Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act") enacted on July 21, 2010, established federal oversight and regulation over the derivatives markets and entities, such as us, that participate in such markets. The Dodd-Frank Act requires the Commodities Futures Trading Commission ("CFTC") and the SEC to promulgate rules and regulations implementing the Dodd-Frank Act. Although the CFTC has finalized certain regulations, others remain to be finalized or implemented and it is not possible at this time to predict when this will be accomplished.

The CFTC has designated certain interest rate swaps and credit default swaps for mandatory clearing and the associated rules also require us, in connection with covered derivative activities, to comply with clearing and trade-execution requirements or take steps to qualify for an exemption to such requirements. We do not utilize credit default swaps and we qualify for, and expect to continue to qualify for, the end-user exception from the mandatory clearing requirements for swaps entered to hedge our interest rate risks. Pursuant to the Dodd-Frank Act, however, the CFTC or federal banking regulators may require the posting of collateral with respect to uncleared interest rate derivative transactions.

Certain banking regulators and the CFTC have recently adopted final rules establishing minimum margin requirements for uncleared swaps. Although we qualify for the end-user exception from such margin requirements for swaps entered into to hedge our commercial risks, the application of such requirements to other market participants, such

24

Table of Contents

as swap dealers, may change the cost and availability of the swaps that we use for hedging. Moreover, if any of our swaps do not qualify for the commercial end-user exception, we may be required to post additional cash margin or collateral, which could impact our liquidity and reduce our ability to use cash for capital expenditures or other partnership purposes.

The full impact of the Dodd-Frank Act and related regulatory requirements upon our business will not be known until the regulations are implemented and the market for derivatives contracts has adjusted. The Dodd-Frank Act and regulations could significantly increase the cost of derivative contracts, materially alter the terms of derivative contracts, reduce the availability of derivatives to protect against risks we encounter, or reduce our ability to monetize or restructure our existing derivative contracts. If we reduce our use of derivatives as a result of the Dodd-Frank Act and regulations implementing the Dodd-Frank Act our results of operations may become more volatile and our cash flows may be less predictable, which could materially adversely affect our ability to plan for and fund capital expenditures.

In addition, the European Union and other non-U.S. jurisdictions are implementing regulations with respect to the derivatives market. To the extent we transact with counterparties in foreign jurisdictions, we may become subject to such regulations. At this time, the impact of such regulations on us is uncertain.

***The vote by the United Kingdom to leave the European Union could adversely affect our results of operations, business and financial position and ability to make cash distributions.***

In March 2017, the Prime Minister of the United Kingdom ("U.K.") formally notified the European Counsel of the commencement of the process by which the United Kingdom will exit ("Brexit") from the European Union under Article 50 of the Treaty of the European Union. This notification began a two-year period pursuant to which the U.K. and the remaining European Union Member States will negotiate a withdrawal agreement. The United Kingdom is scheduled to withdraw from the European Union in March 2019.

We have take-or-pay off-take contracts with utilities and large power generators in the United Kingdom and in other European markets. For the year ended December 31, 2017, approximately 66% of our product sales were derived from contracts with customers in the United Kingdom and 34% of our product sales were derived from contracts with customers in other European markets.

Brexit may create uncertainty with respect to the legal and regulatory requirements to which we and our customers in the United Kingdom are subject and lead to divergent national laws and regulations as the United Kingdom government determines which European Union laws to replace or replicate. The absence of precedent for an exit of a European Member State from the European Union means that it is unclear how the access of United Kingdom businesses to the European Union Single Market and how the legal and regulatory environments in the United Kingdom and the European Union could be impacted by Brexit, and ultimately how Brexit could impact our business or that of our customers.

The consequences of Brexit, together with what may be protracted negotiations around the terms of Brexit, could also introduce significant uncertainties into global financial markets and adversely impact the markets in which we and our customers operate. For example, prolonged exchange rate volatility or weakness of the local currencies of our customers relative to the U.S. Dollar may impair the purchasing power of our customers and cause them to default on payment or seek modification of the terms of our off-take contracts. The impacts of Brexit may also adversely affect our ability to re-negotiate our existing contracts on terms acceptable to us as they expire or enter into new contracts with new or existing customers.

These uncertainties surrounding Brexit and risks associated with the commencement of Brexit could have a material adverse effect on our operations, business and financial position, as well as our ability to pay distributions to our unitholders.

A1554

Table of Contents

***The viability of our customers' businesses may also affect demand for our products and the results of our business and operations.***

The viability of our customers' businesses is dependent on their ability to compete in their respective electricity and heat markets. Our customers' competitiveness is a function of, among other things, the market price of electricity, the market price of competing fuels (e.g. coal and natural gas), the relative cost of carbon and the costs of generating heat or electricity using other renewable energy technologies. Changes in the values of the inputs and outputs of our customers' businesses, or of the businesses of their competitors, could have a material adverse effect on our customers and, as a result, could have a material adverse effect on our results of operations, business and financial position, and our ability to pay distributions to our unitholders.

***The growth of our business depends in part upon locating and acquiring interests in additional production plants and deep‑water marine terminals at favorable prices.***

Our business strategy includes growing our business through drop‑down and third‑party acquisitions that increase our cash generated from operations and cash available for distribution on a per unit basis. Various factors could affect the availability of attractive projects to grow our business, including:

- our sponsor's failure to complete its or the Hancock JVs' development projects in a timely manner or at all, which could result from, among other things, permitting challenges, failure to procure the requisite financing or equipment, construction difficulties or an inability to obtain an off‑take contract on acceptable terms;

- our sponsor's failure to offer its assets or the assets of the Hancock JVs for sale;

- our failure or inability to exercise our right of first offer with respect to any asset that our sponsor offers, or compels the Hancock JVs to offer, to us; and

- fewer third‑party acquisition opportunities than we expect, which could result from, among other things, available projects having less desirable economic returns, competition, anti‑trust concerns or higher risk profiles than we believe suitable for our business plan and investment strategy.

Any of these factors could prevent us from executing our growth strategy or otherwise could have a material adverse effect on our results of operations, business and financial position, and our ability to pay distributions to our unitholders.

***Any acquisitions we make may reduce, rather than increase, our cash generated from operations on a per unit basis.***

We may consummate acquisitions that we believe will be accretive, but result in a decrease in our cash available for distribution per unit. Any acquisition involves potential risks, some of which are beyond our control, including, among other things:

- mistaken assumptions about revenues and costs, including synergies;

- the inability to successfully integrate the businesses we acquire;

- the inability to hire, train or retain qualified personnel to manage and operate our business and newly acquired assets;

- the assumption of unknown liabilities;

- limitations on rights to indemnity from the seller;

A1555

- mistaken assumptions about the overall costs of equity or debt;

- the diversion of management's attention to other business concerns;

- unforeseen difficulties in connection with operating in new product areas or new geographic areas;

- customer or key employee losses at the acquired businesses; and

- the inability to meet the obligations in off-take contracts associated with acquired production plants.

If we consummate any future acquisitions, our capitalization and results of operations may change significantly, and unitholders will not have the opportunity to evaluate the economic, financial and other relevant information that we will consider in determining the application of our funds and other resources.

*If there are significant increases in the cost of raw materials or our suppliers suffer from operating or financial difficulties, we could generate lower revenue, operating profits and cash flows or lose our ability to meet commitments to our customers.*

We purchase wood fiber from third-party landowners and other suppliers for use at our production plants. Our reliance on third parties to secure wood fiber exposes us to potential price volatility and unavailability of such raw materials, and the associated costs may exceed our ability to pass through such price increases under our contracts with our customers. Further, delays or disruptions in obtaining wood fiber may result from a number of factors affecting our suppliers, including extreme weather, production or delivery disruptions, inadequate logging capacity, labor disputes, impaired financial condition of a particular supplier, the inability of suppliers to comply with regulatory or sustainability requirements or decreased availability of raw materials. In addition, other companies, whether or not in our industry, could procure wood fiber within our procurement areas and adversely change regional market dynamics, resulting in insufficient quantities of raw material or higher prices. Any of these events could increase our operating costs or prevent us from meeting our commitments to our customers, and thereby could have a material adverse effect on our results of operations, business and financial position, and our ability to make distributions to our unitholders.

Any interruption or delay in the supply of wood fiber, or our inability to obtain wood fiber at acceptable prices in a timely manner, could impair our ability to meet the demands of our customers and expand our operations, which could have a material adverse effect on our results of operations, business and financial position, and our ability to make distributions to our unitholders.

*We are exposed to the credit risk of our contract counterparties, including the customers for our products, and any material nonpayment or nonperformance by our customers could adversely affect our financial results and cash available for distribution.*

We are subject to the risk of loss resulting from nonpayment or nonperformance by our contract counterparties, including our long-term off-take customers, whose operations are concentrated in the European power generation industry. Our credit procedures and policies may not be adequate to fully eliminate counterparty credit risk. If we fail to adequately assess the creditworthiness of existing or future customers, or if their creditworthiness deteriorates unexpectedly, any resulting unremedied nonpayment or nonperformance by them could have a material adverse effect on our results of operations, business and financial position, and our ability to make cash distributions to our unitholders.

*The satisfactory delivery of substantially all of our production is dependent upon continuous access to infrastructure at our owned, leased and third-party-operated ports. Loss of access to our ports of shipment and destination, including through failure of port equipment and port closures, could adversely affect our financial results and cash available for distribution.*

A significant portion of our total production is loaded for shipment utilizing automated conveyor and ship loading equipment at the Port of Chesapeake, Port of Wilmington, and Port Panama City, and substantially all of our

27

production is dependent upon infrastructure at our owned and third-party operated ports. Should we suffer a catastrophic failure of the equipment at these ports or otherwise experience port closures, including for security or weather-related reasons, we could be unable to fulfill off-take obligations or incur substantial additional transportation costs, which would reduce our cash flow. Moreover, we rely on various ports of destination, as well as third parties who provide stevedoring or other services at our ports of shipment and destination or from whom we charter oceangoing vessels and crews, to transport our product to our customers. Loss of access to these ports for any reason, or failure of such third-party service providers to uphold their contractual obligations, may impact our ability to fulfill off-take obligations, cause interruptions to our shipping schedule, and/or cause us to incur substantial additional transportation or other costs, all of which could have a material adverse effect on our business, financial condition and results of operations.

***Fluctuations in transportation costs and the availability or reliability of shipping, rail or truck transportation could reduce revenues by causing us to reduce our production or by impairing our ability to deliver products to our customers or the ability of our customers to take delivery of our products.***

Disruptions of local or regional transportation services due to shortages of vessels, barges, railcars or trucks, weather-related problems, flooding, drought, accidents, mechanical difficulties, bankruptcy, strikes, lockouts, bottlenecks or other events could temporarily impair our ability to deliver products to our customers and might, in certain circumstances, constitute a force majeure event under our customer contracts, permitting our customers to suspend taking delivery of and paying for our products.

In addition, persistent disruptions in marine transportation may force us to halt production as we reach storage capacity at our deep-water marine terminals. Accordingly, if the transportation services we use to transport our products are disrupted, and we are unable to find alternative transportation providers, it could have a material adverse effect on our results of operations, business and financial position, and our ability to make cash distributions to our unitholders.

***Our long-term off-take contracts with our customers may only partially offset certain increases in our costs or preclude us from taking advantage of relatively high wood prices.***

Our long-term off-take contracts typically set base prices subject to annual price escalation and other pricing adjustments for changes in certain of our underlying costs of operations, including, in some cases, for stumpage or shipping fuel. However, such cost pass-through mechanisms may only pass a portion of our total costs through to our customers. If our operating costs increase significantly during the terms of our long-term off-take contracts beyond the levels of pricing and cost protection afforded to us under the terms of such contracts, our results of operations, business and financial position, and ability to make cash distributions to our unitholders could be materially adversely affected.

Moreover, during periods when the price of wood pellets exceeds the prices under our long-term off-take contracts, our revenues could be significantly lower than they otherwise could have been were we not party to such contracts for substantially all of our production. In addition, our current and future competitors may be in a better position than we are to take advantage of relatively high prices during such periods.

***We may be required to make substantial capital expenditures to maintain and improve our facilities.***

Although we currently use a portion of our cash reserves and cash generated from our operations to maintain, develop and improve our assets and facilities, such investment may, over time, be insufficient to preserve the operating profile required for us to meet our planned profitability or meet the evolving quality and product specifications demanded by our customers. Accordingly, if additional capital expenditures become necessary in the future and we are unable to execute our maintenance or improvement programs successfully and in a timely manner, our results of operations, business and financial position, and our ability to make cash distributions to our unitholders, may be materially adversely affected.

28

***We compete with other wood pellet producers and, if growth in domestic and global demand for wood pellets meets or exceeds management's expectations, the competition within our industry may grow significantly.***

We compete with other wood pellet production companies for the customers to whom we sell our products. Other current producers of utility-grade wood pellets include AS Graanul Invest, Pinnacle Renewable Energy Inc., Drax Biomass Inc., Georgia Biomass, LLC, Fram Renewable Fuels, LLC, Highland Pellets LLC, Pacific BioEnergy Corporation and The Westervelt Company. Competition in our industry is based on price, consistency and quality of product, site location, distribution and logistics capabilities, customer service, creditworthiness and reliability of supply. Some of our competitors may have greater financial and other resources than we do, may develop technology superior to ours or may have production plants that are sited in more advantageous locations from a transport or other cost perspective.

In addition, we expect global demand for solid biomass to increase significantly in the coming years. This demand growth may lead to a significant increase in the production levels of our existing competitors and may incentivize new, well-capitalized competitors to enter the industry, both of which could reduce the demand and the prices we are able to obtain under future off-take contracts. Significant price decreases or reduced demand could have a material adverse effect on our results of operations, business and financial position, and our ability to pay distributions to our unitholders.

***For our products to be acceptable to our customers, they must comply with stringent sustainability requirements, which may continue to develop and change.***

Biomass energy generation requires the use of biomass that is derived from acceptable sources and is demonstrably sustainable. This typically is implemented through biomass sustainability criteria, which either are a mandatory element of eligibility for financial subsidies to biomass energy generators or will become mandatory in the future. As a biomass fuel supplier, the viability of our business is therefore dependent upon our ability to comply with such requirements. This may restrict the types of biomass we can use and the geographic regions from which we source our raw materials, and may require us to reduce the GHG emissions associated with our supply and production processes. Currently, some elements of the criteria with which we will have to comply, including rules relating to forest management practices, are not yet finalized. If more stringent sustainability requirements are adopted in the future, demand for our products could be materially reduced in certain markets, and our results of operations, business and financial position, and our ability to make cash distributions to our unitholders, may be materially adversely affected as a result.

***Our level of indebtedness may increase and reduce our financial flexibility.***

As of December 31, 2017, our total debt was $401.0 million, which primarily consisted of $352.2 million outstanding under the Senior Notes and $43.6 million outstanding under the Senior Secured Credit Facilities. In the future, we may incur additional indebtedness in order to make acquisitions or to develop our properties. Our level of indebtedness could affect our operations in several ways, including the following:

- a significant portion of our cash flows could be used to service our indebtedness;

- the covenants contained in the agreements governing our outstanding indebtedness may limit our ability to borrow additional funds, dispose of assets, pay distributions and make certain investments;

- our debt covenants may also affect our flexibility in planning for, and reacting to, changes in the economy and in our industry;

- a high level of debt would increase our vulnerability to general adverse economic and industry conditions;

- a high level of debt may place us at a competitive disadvantage compared to our competitors that may be less leveraged and therefore may be able to take advantage of opportunities that our indebtedness would prevent us from pursuing; and

29

A1558

- a high level of debt may impair our ability to obtain additional financing in the future for working capital, capital expenditures, debt service requirements, acquisitions, general partnership or other purposes.

In addition, borrowings under the Senior Secured Credit Facilities bear, and potentially other credit facilities we or our subsidiaries may enter into in the future will bear, interest at variable rates. If market interest rates increase, such variable-rate debt will create higher debt service requirements, which could adversely affect our cash flow.

In addition to our debt service obligations, our operations require substantial expenditures on a continuing basis. Our ability to make scheduled debt payments, to refinance our obligations with respect to our indebtedness and to fund capital and non-capital expenditures necessary to maintain the condition of our operating assets and properties, as well as to provide capacity for the growth of our business, depends on our financial and operating performance. General economic conditions and financial, business and other factors affect our operations and our future performance. Many of these factors are beyond our control. We may not be able to generate sufficient cash flows to pay the interest on our debt, and future working capital borrowings or equity financing may not be available to pay or refinance such debt.

***An increase in the price or a significant interruption in the supply of electricity could have a material adverse effect on our results of operations.***

Our production plants use a substantial amount of electricity. The price and supply of electricity are unpredictable and can fluctuate significantly based on international, political and economic circumstances, as well as other events outside our control, such as changes in supply and demand due to weather conditions, regional production patterns and environmental concerns. In addition, potential climate change regulations or carbon or emissions taxes could result in higher production costs for electricity, which may be passed on to us in whole or in part. A significant increase in the price of electricity or an extended interruption in the supply of electricity to our production plants could have a material adverse effect on our results of operations, cash flows and ability to make cash distributions.

***Changes in the price of diesel fuel may adversely affect our results of operations.***

Diesel fuel costs generally fluctuate with world crude oil prices, and accordingly are subject to political, economic and market factors that are outside of our control. Our operations are dependent on rolling stock and trucks, and diesel fuel costs are a significant component of the operating expense of these vehicles. In addition, diesel fuel is consumed by our wood suppliers in the harvesting and transport of our raw material and is therefore a component of the delivered cost we pay for wood fiber. It is also consumed by the handling equipment at our plants. Some of our off-take contracts contain mechanisms that are intended to reduce the impact that changes in the price of diesel fuel would have on us, but these mechanisms may not be effective. Accordingly, changes in diesel fuel prices could have an adverse effect on our results of operations, cash flows and ability to make cash distributions.

***Our business may suffer if we lose, or are unable to attract and retain, key personnel.***

We depend to a large extent on the services of our senior management team and other key personnel. Members of our senior management and other key employees collectively have extensive expertise in designing, building and operating wood pellet production plants, negotiating long-term off-take contracts and managing businesses such as ours. Competition for management and key personnel is intense, and the pool of qualified candidates is limited. The loss of any of these individuals or the failure to attract additional personnel, as needed, could have a material adverse effect on our operations and could lead to higher labor costs or the use of less-qualified personnel. In addition, if any of our executives or other key employees were to join a competitor or form a competing company, we could lose customers, suppliers, know-how and key personnel. Our success is dependent on our ability to continue to attract, employ and retain highly skilled personnel.

***Failure to maintain effective quality control systems at our production plants and deep-water marine terminals could have a material adverse effect on our business and operations.***

Our customers require a reliable supply of wood pellets that meet stringent product specifications. We have built our operations and assets to consistently deliver and certify the highest levels of product quality and performance,

30

A1559

which is critical to the success of our business. These factors depend significantly on the effectiveness of our quality control systems which, in turn, depends on a number of factors. These include the design and efficacy of our quality control systems, the success of our quality training program and our ability to ensure that our employees and third-party contractors adhere to our quality control policies and guidelines. Any significant failure or deterioration of our quality control systems could impact our ability to deliver product that meets our customers' specifications and, in turn, could lead to rejection of our product by our customers, which could have a material adverse effect on our business, financial condition, and results of operations.

***Our business is subject to operating hazards and other operational risks, which may have a material adverse effect on our business and results of operation. We may also not be adequately insured against such events.***

Our business could be adversely affected by operating hazards and other risks to our operations. We produce a combustible product that may under certain circumstances present a risk of fires and explosions or other hazards. Severe weather, such as floods, earthquakes, hurricanes or other natural disasters, climatic phenomena, such as drought, and other catastrophic events, such as plant or shipping disasters, could impact our operations by causing damage to our facilities and equipment, affecting our ability to deliver our product to our customers and impacting our customers' ability to take delivery of our products. Such events may also adversely affect the ability of our suppliers to provide us with the raw materials we require or the ability of vessels to load, transport and unload our product.

We maintain insurance policies to mitigate against certain risks related to our business, in types and amounts that we believe are reasonable depending on the circumstances surrounding each identified risk; however, we may not be fully insured against all operating hazards and other operational risks incident to our business. Furthermore, we may be unable to maintain or obtain insurance of the type and amount we desire at reasonable rates, if at all. As a result of market conditions and certain claims we may make under our insurance policies, premiums and deductibles for certain of our insurance policies could escalate. In some instances, insurance could become unavailable or available only for reduced amounts of coverage or at unreasonable rates. If we were to incur a significant liability for which we are not fully insured, it could have a material adverse effect on our financial condition, results of operations and cash available for distribution to our unitholders.

***Our operations are subject to stringent environmental and occupational health and safety laws and regulations that may expose us to significant costs and liabilities.***

Our operations are subject to stringent federal, regional, state and local environmental, health and safety laws and regulations. These laws and regulations govern environmental protection, occupational health and safety, the release or discharge of materials into the environment, air emissions, wastewater discharges, the investigation and remediation of contaminated sites and allocation of liability for cleanup of such sites. These laws and regulations may restrict or impact our business in many ways, including by requiring us to acquire permits or other approvals to conduct regulated activities; limiting our air emissions or wastewater discharges or requiring us to install costly equipment to control, reduce or treat such emissions or discharges; imposing requirements on the handling or disposal of wastes; impacting our ability to modify or expand our operations (for example, by limiting or prohibiting construction and operating activities in environmentally sensitive areas); and imposing health and safety requirements for worker protection. We may be required to make significant capital and operating expenditures to comply with these laws and regulations. Failure to comply with these laws and regulations may result in the assessment of administrative, civil and criminal penalties, imposition of investigatory or remedial obligations, suspension or revocation of permits and the issuance of orders limiting or prohibiting some or all of our operations. Adoption of new or modified environmental laws and regulations may impair the operation of our business, delay or prevent expansion of existing facilities or construction of new facilities and otherwise result in increased costs and liabilities, which may be material.

***Our business and operating results are subject to seasonal fluctuations.***

Our business is affected to some extent by seasonal fluctuations. The cost of producing wood pellets tends to be higher in colder periods because the delivered cost of fiber typically increases with wet weather and our raw materials have, on average, higher moisture content during such period, resulting in a lower product yield. In addition, lower ambient temperatures increase the cost of drying wood fiber. Seasonality may also impact the availability and pricing of

31

A1560

limited-scope wood pellet purchase and sale transactions. For example, colder periods typically drive increased demand for wood pellets in the heating and industrial markets, which can increase pricing for prompt deliveries, while warmer periods typically have the opposite effect. While our contracts generally call for ratable deliveries throughout the year, we are party to one contract that calls for a higher percentage of deliveries during the first and fourth calendar quarters. These seasonal fluctuations could have an adverse effect on our business, financial condition and results of operations and cause comparisons of operating measures between consecutive quarters may not be as meaningful as comparisons between longer reporting periods.

***A terrorist attack or armed conflict could harm our business.***

Terrorist activities and armed conflicts could adversely affect the U.S. and global economies and could prevent us from meeting financial and other obligations or prevent our customers from meeting their obligations to us. We could experience loss of business, delays or defaults in payments from customers or disruptions of fuel supplies and markets, including if domestic and global power generators are direct targets or indirect casualties of an act of terror or war. Terrorist activities and the threat of potential terrorist activities and any resulting economic downturn could adversely affect our results of operations, impair our ability to raise capital or otherwise adversely impact our ability to realize certain business strategies.

**Risks Related to Our Partnership Structure**

***Enviva Holdings, LP owns and controls our General Partner, which has sole responsibility for conducting our business and managing our operations. Our General Partner and its affiliates, including Enviva Holdings, LP, have conflicts of interest with us and limited duties, and they may favor their own interests to our detriment and that of our unitholders.***

Enviva Holdings, LP, owns and controls our General Partner and appoints all of the directors of our General Partner. Although our General Partner has a duty to manage us in a manner that it believes is not adverse to our interest, the executive officers and directors of our General Partner have a fiduciary duty to manage our General Partner in a manner beneficial to our sponsor. Therefore, conflicts of interest may arise between our sponsor or any of its affiliates, including our General Partner, on the one hand, and us or any of our unitholders, on the other hand. In resolving these conflicts of interest, our General Partner may favor its own interests and the interests of its affiliates over the interests of our common unitholders. These conflicts include the following situations, among others:

- our General Partner is allowed to take into account the interests of parties other than us, such as our sponsor, in exercising certain rights under our partnership agreement;

- neither our partnership agreement nor any other agreement requires our sponsor to pursue a business strategy that favors us;

- our partnership agreement eliminates and replaces the fiduciary duties that would otherwise be owed by our General Partner with contractual standards governing its duties, limits our General Partner's liabilities and restricts the remedies available to our unitholders for actions that, without such eliminations and limitations, might constitute breaches of fiduciary duty;

- except in limited circumstances, our General Partner has the power and authority to conduct our business without unitholder approval;

- our General Partner determines the amount and timing of asset purchases and sales, borrowings, issuances of additional partnership securities and the level of reserves, each of which can affect the amount of cash that is distributed to our unitholders;

- our General Partner determines the amount and timing of any cash expenditure and whether an expenditure is classified as a maintenance capital expenditure, which reduces operating surplus, or an expansion capital

32

expenditure, which does not reduce operating surplus. This determination can affect the amount of cash from operating surplus that is distributed to our unitholders which, in turn, may affect the ability of the subordinated units to convert into common units;

- our General Partner may cause us to borrow funds in order to permit the payment of cash distributions;

- our partnership agreement permits us to distribute up to $39.3 million as operating surplus, even if it is generated from asset sales, borrowings other than working capital borrowings or other sources that would otherwise constitute capital surplus. This cash may be used to fund distributions on our subordinated units or the incentive distribution rights;

- our General Partner determines which costs incurred by it and its affiliates are reimbursable by us;

- our partnership agreement does not restrict our General Partner from causing us to pay it or its affiliates for any services rendered to us or entering into additional contractual arrangements with its affiliates on our behalf;

- our General Partner intends to limit its liability regarding our contractual and other obligations;

- our General Partner may exercise its right to call and purchase common units if it and its affiliates own more than 80% of the common units;

- our General Partner controls the enforcement of obligations that it and its affiliates owe to us;

- our General Partner decides whether to retain separate counsel, accountants or others to perform services for us; and

- our General Partner may elect to cause us to issue common units to it in connection with a resetting of the target distribution levels related to our General Partner's incentive distribution rights without the approval of the conflicts committee of the board of directors of our General Partner or the unitholders. This election may result in lower distributions to the common unitholders in certain situations.

In addition, we may compete directly with our sponsor and entities in which it has an interest for acquisition opportunities and potentially will compete with these entities for new business or extensions of the existing services provided by us.

***The board of directors of our General Partner may modify or revoke our cash distribution policy at any time at its discretion. Our partnership agreement does not require us to pay any distributions at all.***

Pursuant to our cash distribution policy, we intend to distribute quarterly at least $0.4125 per unit on all of our units to the extent we have sufficient cash after the establishment of cash reserves and the payment of our expenses, including payments to our General Partner and its affiliates. However, the board may change such policy at any time at its discretion and could elect not to pay distributions for one or more quarters. Please read Part II, Item 5. "Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities—Cash Distribution Policy."

In addition, our partnership agreement does not require us to pay any distributions at all. Accordingly, investors are cautioned not to place undue reliance on the permanence of such a policy in making an investment decision. Any modification or revocation of our cash distribution policy could substantially reduce or eliminate the amounts of distributions to our unitholders. The amount of distributions we make, if any, and the decision to make any distribution at all will be determined by the board of directors of our General Partner, whose interests may differ from those of our common unitholders. Our General Partner has limited duties to our unitholders, which may permit it to favor its own interests or the interests of our sponsor to the detriment of our common unitholders.

33

Table of Contents

***Our General Partner limits its liability regarding our obligations.***

Our General Partner limits its liability under contractual arrangements between us and third parties so that the counterparties to such arrangements have recourse only against our assets, and not against our General Partner or its assets. Our General Partner may therefore cause us to incur indebtedness or other obligations that are nonrecourse to our General Partner. Our partnership agreement provides that any action taken by our General Partner to limit its liability is not a breach of our General Partner's duties, even if we could have obtained more favorable terms without the limitation on liability. In addition, we are obligated to reimburse or indemnify our General Partner to the extent that it incurs obligations on our behalf. Any such reimbursement or indemnification payments would reduce the amount of cash otherwise available for distribution to our unitholders.

***We intend to distribute a significant portion of our cash available for distribution to our partners, which could limit our ability to grow and make acquisitions.***

We intend to distribute most of our cash available for distribution, which may cause our growth to proceed at a slower pace than that of businesses that reinvest their cash to expand ongoing operations. To the extent we issue additional units in connection with any acquisitions or expansion capital expenditures, the payment of distributions on those additional units may increase the risk that we will be unable to maintain or increase our per unit distribution level. There are no limitations in our partnership agreement on our ability to issue additional units, including units ranking senior to the common units. The incurrence of additional commercial borrowings or other debt to finance our growth strategy would result in increased interest expense, which, in turn, may impact the cash that we have available to distribute to our unitholders.

***Our partnership agreement eliminates and replaces our General Partner's fiduciary duties to holders of our units.***

Our partnership agreement contains provisions that eliminate and replace the fiduciary standards to which our General Partner would otherwise be held by state fiduciary duty law. For example, our partnership agreement permits our General Partner to make a number of decisions in its individual capacity, as opposed to in its capacity as our General Partner, or otherwise free of fiduciary duties to us and our unitholders. This entitles our General Partner to consider only the interests and factors that it desires and relieves it of any duty or obligation to give any consideration to any interest of, or factors affecting, us, our affiliates or our limited partners. Examples of decisions that our General Partner may make in its individual capacity include:

- how to allocate business opportunities among us and its affiliates;

- whether to exercise its call right;

- whether to seek approval of the resolutions of a conflict of interest by the conflicts committee of the board of directors of our General Partner;

- how to exercise its voting rights with respect to the units it owns;

- whether to exercise its registration rights;

- whether to elect to reset target distribution levels; and

- whether or not to consent to any merger or consolidation of the partnership or amendment to the partnership agreement.

Limited partners who own common units are treated as having consented to the provisions in the partnership agreement, including the provisions discussed above.

34

A1563

***Our partnership agreement restricts the remedies available to holders of our units for actions taken by our General Partner that might otherwise constitute breaches of fiduciary duty.***

Our partnership agreement contains provisions that restrict the remedies available to unitholders for actions taken by our General Partner that might otherwise constitute breaches of fiduciary duty under state fiduciary duty law. For example, our partnership agreement provides that:

- whenever our General Partner makes a determination or takes, or declines to take, any other action in its capacity as our General Partner, our General Partner is generally required to make such determination, or take or decline to take such other action, in good faith, and will not be subject to any higher standard imposed by our partnership agreement, Delaware law, or any other law, rule or regulation, or at equity;

- our General Partner and its officers and directors will not be liable for monetary damages or otherwise to us or our limited partners resulting from any act or omission unless there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that such losses or liabilities were the result of conduct in which our General Partner or its officers or directors engaged in bad faith, meaning that they believed that the decision was adverse to the interest of the partnership or, with respect to any criminal conduct, with knowledge that such conduct was unlawful; and

- our General Partner will not be in breach of its obligations under the partnership agreement or its duties to us or our limited partners if a transaction with an affiliate or the resolution of a conflict of interest is:

    (1) approved by the conflicts committee of the board of directors of our General Partner, although our General Partner is not obligated to seek such approval; or

    (2) approved by the vote of a majority of the outstanding common units, excluding any common units owned by our General Partner and its affiliates.

In connection with a situation involving a transaction with an affiliate or a conflict of interest, other than one where our General Partner is permitted to act in its sole discretion, any determination by our General Partner must be made in good faith. If an affiliate transaction or the resolution of a conflict of interest is not approved by our common unitholders or the conflicts committee then it will be presumed that, in making its decision, taking any action or failing to act, the board of directors acted in good faith, and in any proceeding brought by or on behalf of any limited partner or the partnership, the person bringing or prosecuting such proceeding will have the burden of overcoming such presumption.

***Our sponsor and other affiliates of our General Partner may compete with us.***

Our partnership agreement provides that our General Partner is restricted from engaging in any business activities other than acting as our General Partner, engaging in those activities incidental to its ownership interest in us and providing management, advisory and administrative services to its affiliates or to other persons. However, affiliates of our General Partner, including our sponsor, are not prohibited from engaging in other businesses or activities, including those that might be in direct competition with us. In addition, our sponsor may compete with us for investment opportunities and may own an interest in entities that compete with us.

Pursuant to the terms of our partnership agreement, the doctrine of corporate opportunity, or any analogous doctrine, does not apply to our General Partner or any of its affiliates, including its executive officers and directors and our sponsor. Any such person or entity that becomes aware of a potential transaction, agreement, arrangement or other matter that may be an opportunity for us will not have any duty to communicate or offer such opportunity to us. Any such person or entity will not be liable to us or to any limited partner for breach of any fiduciary duty or other duty by reason of the fact that such person or entity pursues or acquires such opportunity for itself, directs such opportunity to another person or entity or does not communicate such opportunity or information to us. This may create actual and potential conflicts of interest between us and affiliates of our General Partner and result in less than favorable treatment of us and our unitholders.

35

A1564

***The holder or holders of our incentive distribution rights may elect to cause us to issue common units to it in connection with a resetting of the incentive distribution without the approval of our unitholders. This election may result in lower distributions to our common unitholders in certain situations.***

The holder or holders of a majority of our incentive distribution rights (currently our General Partner) have the right, at any time when there are no subordinated units outstanding and we have made cash distributions in excess of the then-applicable third target distribution for each of the prior four consecutive fiscal quarters, to reset the initial target distribution levels at higher levels based on our cash distribution levels at the time of the exercise of the reset election. Following a reset election, a baseline distribution amount will be calculated equal to an amount equal to the prior cash distribution per common unit for the fiscal quarter immediately preceding the reset election (such amount is referred to as the "reset minimum quarterly distribution"), and the target distribution levels will be reset to correspondingly higher levels based on percentage increases above the reset minimum quarterly distribution.

We anticipate that our General Partner would exercise this reset right in order to facilitate acquisitions or internal growth projects that would not be sufficiently accretive to cash distributions per unit without such conversion. However, our General Partner may transfer the incentive distribution rights at any time. It is possible that our General Partner or a transferee could exercise this reset election at a time when we are experiencing declines in our aggregate cash distributions or at a time when the holders of the incentive distribution rights expect that we will experience declines in our aggregate cash distributions in the foreseeable future. In such situations, the holders of the incentive distribution rights may be experiencing, or may expect to experience, declines in the cash distributions they receive related to the incentive distribution rights and may therefore desire to be issued our common units, which are entitled to specified priorities with respect to our distributions and which therefore may be more advantageous for them to own in lieu of the right to receive incentive distribution payments based on target distribution levels that are less certain to be achieved. As a result, a reset election may cause our common unitholders to experience dilution in the amount of cash distributions that they would have otherwise received had we not issued new common units to the holders of the incentive distribution rights in connection with resetting the target distribution levels.

***Our general partner has certain incentive distribution rights that reduce the amount of our cash available for distribution to our common unitholders.***

Our General Partner currently holds incentive distribution rights that entitle it to receive an increasing percentage (15 percent, 25 percent and 50 percent) of the cash that we distribute to our common unitholders from available cash after the minimum quarterly distribution and certain target distribution levels have been achieved. The maximum distribution right for our General Partner to receive 50 percent of any distributions paid to our common unitholders does not include any distributions that our General Partner or its affiliates may receive on common units that they own. Effective as of our quarterly cash distribution in the fourth quarter of 2017, our General Partner was at the top tier of the incentive distribution rights scale. Given that a higher percentage of our cash flows is allocated to our general partner due to these incentive distribution rights, it may be more difficult for us to increase the amount of distributions to our unitholders and our cost of capital may be higher, making investments, capital expenditures and acquisitions, and therefore, future growth, by us potentially more costly, and in some cases, potentially prohibitively so.

***Holders of our common units have limited voting rights and are not entitled to elect our General Partner or its directors, which could reduce the price at which our common units will trade.***

Compared to the holders of common stock in a corporation, unitholders have limited voting rights and, therefore, limited ability to influence management's decisions regarding our business. Unitholders have no right on an annual or ongoing basis to elect our General Partner or its board of directors. The board of directors of our General Partner, including the independent directors, is chosen entirely by our sponsor, as a result of it owning our General Partner, and not by our unitholders. Unlike publicly traded corporations, we do not hold annual meetings of our unitholders to elect directors or consider other matters routinely addressed at annual meetings of stockholders of corporations. As a result of these limitations, the price at which the common units trade could be diminished because of the absence or reduction of a takeover premium in the trading price.

A1565

***Even if holders of our common units are dissatisfied, they cannot currently remove our General Partner without our sponsor's consent.***

If our unitholders are dissatisfied with the performance of our General Partner, they have limited ability to remove our General Partner. Unitholders are currently unable to remove our General Partner without our sponsor's consent because our sponsor and its affiliates own sufficient units to be able to prevent its removal. The vote of the holders of at least $66\,^2/_3$ % of all outstanding common and subordinated units voting together as a single class is required to remove our General Partner. As of February 16, 2018, our sponsor owned approximately 50% of our common and subordinated units, taken together. In addition, any vote to remove our General Partner during the subordination period must provide for the election of a successor General Partner by the holders of a majority of the common units and a majority of the subordinated units, voting as separate classes. Both of these conditions provide our sponsor the ability to prevent the removal of our General Partner.

***Our general partner interest or the control of our General Partner may be transferred to a third party without unitholder consent.***

Our General Partner may transfer its general partner interest to a third party without the consent of our unitholders. Furthermore, our partnership agreement does not restrict the ability of the owner of our General Partner to transfer its membership interests in our General Partner to a third party. The new owner of our General Partner would then be in a position to replace the board of directors and executive officers of our General Partner with its own designees and thereby exert significant control over the decisions taken by the board of directors and executive officers of our General Partner. This effectively permits a "change of control" without the vote or consent of the unitholders.

***The incentive distribution rights may be transferred to a third party without unitholder consent.***

Our General Partner may transfer the incentive distribution rights to a third party at any time without the consent of our unitholders. If our General Partner transfers the incentive distribution rights to a third party, our General Partner would not have the same incentive to grow our partnership and increase quarterly distributions to unitholders over time. For example, a transfer of incentive distribution rights by our General Partner could reduce the likelihood of our sponsor accepting offers made by us relating to assets owned by our sponsor, as it would have less of an economic incentive to grow our business, which in turn would impact our ability to grow our asset base.

***Our General Partner has a call right that may require unitholders to sell their common units at an undesirable time or price.***

If at any time our General Partner and its affiliates own more than 80% of the common units, our General Partner will have the right, which it may assign to any of its affiliates or to us, but not the obligation, to acquire all, but not less than all, of the common units held by unaffiliated persons at a price equal to the greater of (1) the average of the daily closing price of the common units over the 20 trading days preceding the date three days before notice of exercise of the call right is first mailed and (2) the highest per-unit price paid by our General Partner or any of its affiliates for common units during the 90-day period preceding the date such notice is first mailed. As a result, unitholders may be required to sell their common units at an undesirable time or price and may not receive any return or a negative return on their investment. Unitholders may also incur a tax liability upon a sale of their units. Our General Partner is not obligated to obtain a fairness opinion regarding the value of the common units to be repurchased by it upon exercise of the call right. There is no restriction in our partnership agreement that prevents our General Partner from causing us to issue additional common units and then exercising its call right. If our General Partner exercised its call right, the effect would be to take us private and, if the units were subsequently deregistered, we would no longer be subject to the reporting requirements of the Exchange Act.

A1566

Case 8:22-cv-02844-DKC   Document 62-21   Filed 06/02/23   Page 41 of 208

Table of Contents

***We may issue additional units without unitholder approval, which would dilute existing unitholder ownership interests.***

Our partnership agreement does not limit the number of additional limited partner interests we may issue at any time without the approval of our unitholders. The issuance of additional common units or other equity interests of equal or senior rank will have the following effects:

- our existing unitholders' proportionate ownership interest in us will decrease;

- the amount of cash available for distribution on each unit may decrease;

- because a lower percentage of total outstanding units will be subordinated units, the risk that a shortfall in the payment of the minimum quarterly distribution will be borne by our common unitholders will increase;

- the ratio of taxable income to distributions may increase;

- the relative voting strength of each previously outstanding unit may be diminished; and

- the market price of the common units may decline.

***There are no limitations in our partnership agreement on our ability to issue units ranking senior to the common units.***

In accordance with Delaware law and the provisions of our partnership agreement, we may issue additional partnership interests that are senior to the common units in right of distribution, liquidation and voting. The issuance by us of units of senior rank may (i) reduce or eliminate the amount of cash available for distribution to our common unitholders; (ii) diminish the relative voting strength of the total common units outstanding as a class; or (iii) subordinate the claims of the common unitholders to our assets in the event of our liquidation.

***The market price of our common units could be adversely affected by sales of substantial amounts of our common units in the public or private markets, including sales by our sponsor or other large holders.***

All of the subordinated units will convert into common units on a one-for-one basis at the end of the subordination period, which is expected to occur in May 2018. Our sponsor has registration rights with respect to the common units it currently holds and the common units it will hold upon conversion of the subordinated units. Sales by our sponsor or other large holders of a substantial number of our common units in the public markets, or the perception that such sales might occur, could have a material adverse effect on the price of our common units or could impair our ability to obtain capital through an offering of equity securities.

***Our partnership agreement restricts the voting rights of unitholders owning 20% or more of our common units.***

Our partnership agreement restricts unitholders' voting rights by providing that any units held by a person or group that owns 20% or more of any class of units then outstanding, other than our General Partner and its affiliates, their transferees and persons who acquired such units with the prior approval of the board of directors of our General Partner, cannot vote on any matter.

***Cost reimbursements due to our General Partner and its affiliates for services provided to us or on our behalf will reduce cash available for distribution to our unitholders. The amount and timing of such reimbursements will be determined by our General Partner.***

Under our management services agreement with Enviva Management (the "MSA"), we are obligated to reimburse Enviva Management for all direct or indirect costs and expenses incurred by, or chargeable to, Enviva Management in connection with its provision of services necessary for the operation of our business. If the MSA were

38

A1567

terminated without replacement, or our General Partner or its affiliates provided services outside of the scope of the MSA, our partnership agreement would require us to reimburse our General Partner and its affiliates for all expenses they incur and payments they make on our behalf. Our partnership agreement does not set a limit on the amount of expenses for which our General Partner and its affiliates may be reimbursed. These expenses include salary, bonus, incentive compensation and other amounts paid to persons who perform services for us or on our behalf and expenses allocated to our General Partner by its affiliates. Our partnership agreement provides that our General Partner determines the expenses that are allocable to us. The reimbursement of expenses and payment of fees, if any, to our General Partner and its affiliates will reduce the amount of cash available for distribution to our unitholders.

***The price of our common units may fluctuate significantly and unitholders could lose all or part of their investment.***

The market price of our common units may be influenced by many factors, some of which are beyond our control, including:

- our quarterly distributions;

- our quarterly or annual earnings or those of other companies in our industry;

- announcements by us or our competitors of significant contracts or acquisitions;

- changes in accounting standards, policies, guidance, interpretations or principles;

- general economic conditions;

- the failure of securities analysts to cover our common units or changes in financial estimates by analysts;

- future sales of our common units; and

- the other factors described in these "Risk Factors."

***Unitholders may have liability to repay distributions.***

Under certain circumstances, unitholders may have to repay amounts wrongfully returned or distributed to them. Under Section 17-607 of the Delaware Revised Uniform Limited Partnership Act, we may not make a distribution to our unitholders if the distribution would cause our liabilities to exceed the fair value of our assets. Delaware law provides that for a period of three years from the date of the impermissible distribution, limited partners who received the distribution and who knew at the time of the distribution that it violated Delaware law will be liable to the limited partnership for the distribution amount. Liabilities to partners on account of their partnership interests and liabilities that are non-recourse to the partnership are not counted for purposes of determining whether a distribution is permitted.

***For as long as we are an emerging growth company, we will not be required to comply with certain disclosure requirements that apply to other public companies.***

For as long as we remain an "emerging growth company" as defined in the JOBS Act, we may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies, including not being required to provide an auditor's attestation report on management's assessment of the effectiveness of our system of internal control over financial reporting pursuant to Section 404 of the Sarbanes-Oxley Act and reduced disclosure obligations regarding executive compensation in our periodic reports. We will remain an emerging growth company for up to five years, although we will lose that status earlier if we have more than $1.0 billion of revenues in a fiscal year, have more than $700.0 million in market value of our common units held by non-affiliates, or issue more than $1.0 billion of non-convertible debt over a three-year period.

To the extent that we rely on any of the exemptions available to emerging growth companies, our unitholders will receive less information about our executive compensation and internal control over financial reporting than issuers

39

that are not emerging growth companies. If some investors find our common units to be less attractive as a result, there may be a less active trading market for our common units and our trading price may be more volatile.

***The New York Stock Exchange (the "NYSE") does not require a publicly traded partnership like us to comply with certain of its corporate governance requirements.***

Our common units are listed on the NYSE. Because we are a publicly traded partnership, the NYSE does not require us to have a majority of independent directors on our General Partner's board of directors or to establish a compensation committee or a nominating and corporate governance committee. Accordingly, unitholders do not have the same protections afforded to certain corporations that are subject to all of the NYSE corporate governance requirements. Please read Part III, Item 10. "Directors, Executive Officers and Corporate Governance—Director Independence."

**Tax Risks to Common Unitholders**

***Our tax treatment depends on our status as a partnership for federal income tax purposes and not being subject to a material amount of entity-level taxation. If the Internal Revenue Service ("IRS") were to treat us as a corporation for federal income tax purposes, or we become subject to entity-level taxation for state tax purposes, our cash available for distribution to our unitholders would be substantially reduced.***

The anticipated after-tax economic benefit of an investment in our common units depends largely on our being treated as a partnership for federal income tax purposes.

Despite the fact that we are organized as a limited partnership under Delaware law, we would be treated as a corporation for U.S. federal income tax purposes unless we satisfy a "qualifying income" requirement. Based upon our current operations, we believe we satisfy the qualifying income requirement. We have requested and obtained a favorable private letter ruling from the IRS to the effect that, based on facts presented in the private letter ruling request, our income from processing timber feedstocks into pellets and transporting, storing, marketing and distributing such timber feedstocks and wood pellets constitute "qualifying income" within the meaning of Section 7704 of the Internal Revenue Code of 1986 (the "Code"). However, no ruling has been or will be requested regarding our treatment as a partnership for U.S. federal income tax purposes. Failing to meet the qualifying income requirement or a change in current law could cause us to be treated as a corporation for U.S. federal income tax purposes or otherwise subject us to taxation as an entity.

If we were treated as a corporation for federal income tax purposes, we would pay U.S. federal income tax on our taxable income at the corporate tax rate. Distributions to our unitholders would generally be taxed again as corporate distributions, and no income, gains, losses or deductions would flow through to our unitholders. Because a tax would be imposed upon us as a corporation, our cash available for distribution to our unitholders would be substantially reduced. Therefore, treatment of us as a corporation would result in a material reduction in the anticipated cash flow and after-tax return to the unitholders, likely causing a substantial reduction in the value of our common units.

Our partnership agreement provides that if a law is enacted or existing law is modified or interpreted in a manner that subjects us to taxation as a corporation or otherwise subjects us to entity-level taxation for U.S. federal, state, local or foreign income tax purposes, the minimum quarterly distribution amount and the target distribution amounts may be adjusted to reflect the impact of that law or interpretation on us. At the state level, several states have been evaluating ways to subject partnerships to entity-level taxation through the imposition of state income, franchise or other forms of taxation. Specifically, we currently own assets and conduct business in Mississippi, North Carolina, Florida and Virginia, each of which imposes a margin or franchise tax. In the future, we may expand our operations. Imposition of a similar tax on us in other jurisdictions that we may expand to could substantially reduce our cash available for distribution to our unitholders.

***The tax treatment of publicly traded partnerships or an investment in our units could be subject to potential legislative, judicial or administrative changes or differing interpretations, possibly applied on a retroactive basis.***

The present U.S. federal income tax treatment of publicly traded partnerships, including us, or an investment in our common units may be modified by administrative, legislative or judicial changes or differing interpretations at any

40

time. From time to time, members of Congress propose and consider substantive changes to the existing U.S. federal income tax laws that affect publicly traded partnerships. Although there is no current legislative proposal, a prior legislative proposal would have eliminated the qualifying income exception to the treatment of all publicly traded partnerships as corporations upon which we rely for our treatment as a partnership for U.S. federal income tax purposes.

In addition, on January 24, 2017, final regulations regarding which activities give rise to qualifying income within the meaning of Section 7704 of the Code (the "Final Regulations") were published in the Federal Register. The Final Regulations are effective as of January 19, 2017 and apply to taxable years beginning on or after January 19, 2017 and, consistent with our private letter ruling, the Final Regulations generally treat income from the production, transportation and marketing of wood pellets as qualifying income. However, there can be no assurance that there would not be further changes to the Treasury Department's interpretation of the qualifying income rules in a manner that could impact our ability to qualify as a partnership for U.S. federal income tax purposes.

Any modification to the U.S. federal income tax laws may be applied retroactively and could make it more difficult or impossible for us to meet the exception for certain publicly traded partnerships to be treated as partnerships for U.S. federal income tax purposes. We are unable to predict whether any of these changes or other proposals will ultimately be enacted. Any such changes could negatively impact the value of an investment in our common units. You are urged to consult with your own tax advisor with respect to the status of regulatory or administrative developments and proposals and their potential effect on your investment in our common units.

***If the IRS were to contest the federal income tax positions we take, it may adversely impact the market for our common units, and the costs of any such contest would reduce cash available for distribution to our unitholders.***

We have requested and obtained a favorable private letter ruling from the IRS to the effect that, based on facts presented in the private letter ruling request, our income from processing timber feedstocks into pellets and transporting, storing, marketing and distributing such timber feedstocks and wood pellets will constitute "qualifying income" within the meaning of Section 7704 of the Internal Revenue Code. However, no ruling has been or will be requested regarding our treatment as a partnership for U.S. federal income tax purposes. The IRS may adopt positions that differ from the positions we take. It may be necessary to resort to administrative or court proceedings to sustain some or all of the positions we take. A court may not agree with some or all of the positions we take. Any contest with the IRS may materially and adversely impact the market for our common units and the price at which they trade. Moreover, the costs of any contest between us and the IRS will result in a reduction in cash available for distribution to our unitholders and thus will be borne indirectly by our unitholders.

***If the IRS makes audit adjustments to our income tax returns for tax years beginning after December 31, 2017, it (and some states) may assess and collect any taxes (including any applicable penalties and interest) resulting from such audit adjustments directly from us, in which case we may require our unitholders and former unitholders to reimburse us for such taxes (including any applicable penalties or interest) or, if we are required to bear such payments, our cash available for distribution to our unitholders might be substantially reduced.***

Pursuant to the Bipartisan Budget Act of 2015, for tax years beginning after December 31, 2017, if the IRS makes audit adjustments to our income tax returns, it (and some states) may assess and collect any taxes (including any applicable penalties and interest) resulting from such audit adjustment directly from us. To the extent possible under the new rules, our General Partner may elect to either pay the taxes (including any applicable penalties and interest) directly to the IRS or, if we are eligible, issue a revised information statement to each unitholder and former unitholder with respect to an audited and adjusted return, which statement reports the items adjusted and certain other amounts. Although our General Partner may elect to have our unitholders and former unitholders take such audit adjustment into account in accordance with their interests in us during the tax year under audit, there can be no assurance that such election will be practical, permissible or effective in all circumstances. As a result, our current unitholders may bear some or all of the tax liability resulting from such audit adjustment, even if such unitholders did not own units in us during the tax year under audit. If, as a result of any such audit adjustment, we are required to make payments of taxes, penalties and interest, we may require our unitholders and former unitholders to reimburse us for such taxes (including any applicable penalties or interest) or, if we are required to bear such payments, our cash available for distribution to our unitholders might be substantially reduced. These rules are not applicable for tax years beginning on or prior to December 31, 2017.

A1570

***Even if unitholders do not receive any cash distributions from us, unitholders will be required to pay taxes on their share of our taxable income.***

Unitholders are required to pay federal income taxes and, in some cases, state and local income taxes, on unitholders' share of our taxable income, whether or not they receive cash distributions from us. For example, if we sell assets and use the proceeds to repay existing debt or fund capital expenditures, you may be allocated taxable income and gain resulting from the sale, and our cash available for distribution would not increase. Similarly, taking advantage of opportunities to reduce our existing debt, such as debt exchanges, debt repurchases, or modifications of our existing debt could result in "cancellation of indebtedness income" being allocated to our unitholders as taxable income without any increase in our cash available for distribution. Unitholders may not receive cash distributions from us equal to their share of our taxable income or even equal to the actual tax due from them with respect to that income.

***A tax gain or loss on the disposition of our common units could be more or less than unitholders expect.***

If unitholders sell their common units, they will recognize a gain or loss equal to the difference between the amount realized and their tax basis in those common units. Because distributions in excess of unitholders' allocable share of our net taxable income decrease their tax basis in their common units, the amount, if any, of such prior excess distributions with respect to the units unitholders sell will, in effect, become taxable income to our unitholders if they sell such units at a price greater than their tax basis in those units, even if the price they receive is less than their original cost. In addition, because the amount realized includes a unitholder's share of our nonrecourse liabilities, if they sell their units, unitholders may incur a tax liability in excess of the amount of cash they receive from the sale.

Furthermore, a substantial portion of the amount realized, whether or not representing gain, may be taxed as ordinary income due to potential recapture items, including depreciation recapture. Thus, you may recognize both ordinary income and capital loss from the sale of your units if the amount realized on a sale of your units is less than your adjusted basis in the units. Net capital loss may only offset capital gains and, in the case of individuals, up to $3,000 of ordinary income per year. In the taxable period in which you sell your units, you may recognize ordinary income from our allocations of income and gain to you prior to the sale and from recapture items that generally cannot be offset by any capital loss recognized upon the sale of units.

***Tax-exempt entities face unique tax issues from owning our common units that may result in adverse tax consequences to them.***

Investment in common units by tax-exempt entities, such as employee benefit plans and individual retirement accounts (known as IRAs), raises issues unique to them. For example, virtually all of our income allocated to organizations that are exempt from federal income tax, including IRAs and other retirement plans, will be unrelated business taxable income and will be taxable to them. Further, with respect to taxable years beginning after December 31, 2017, a tax-exempt entity with more than one unrelated trade or business (including by attribution from investment in a partnership such as ours that is engaged in one or more unrelated trade or business) is required to compute the unrelated business taxable income of such tax-exempt entity separately with respect to each such trade or business (including for purposes of determining any net operating loss deduction). As a result, for years beginning after December 31, 2017, it may not be possible for tax-exempt entities to utilize losses from an investment in our partnership to offset unrelated business taxable income from another unrelated trade or business and vice versa. Any tax-exempt entity should consult their tax advisor before investing in our common units.

***Unitholders may be subject to limitation on their ability to deduct interest expense incurred by us.***

Historically, we have been entitled to a full deduction for interest paid or accrued on indebtedness properly allocable to our trade or business during our taxable year. However, under the Tax Cuts and Jobs Act signed into law in December 2017, for taxable years beginning after December 31, 2017, our deduction for "business interest" is limited to the sum of our business interest income and 30% of our "adjusted taxable income." For the purposes of this limitation, our adjusted taxable income is computed without regard to any business interest expense or business interest income, and in the case of taxable years beginning before January 1, 2022, any deduction allowable for depreciation, amortization or depletion.

42

A1571

***Non-U.S. Unitholders will be subject to U.S. taxes and withholding with respect to their income and gain from owning our units.***

Non-U.S. unitholders are generally taxed and subject to income tax filing requirements by the United States on income effectively connected with a U.S. trade or business ("effectively connected income"). Income allocated to our unitholders and any gain from the sale of our units will generally be considered to be "effectively connected" with a U.S. trade or business. As a result, distributions to a non-U.S. unitholder will be subject to withholding at the highest applicable effective tax rate and a non-U.S. unitholder who sells or otherwise disposes of a unit will also be subject to U.S. federal income tax on the gain realized from the sale or disposition of such unit.

The Tax Cuts and Jobs Act imposes a withholding obligation of 10% of the amount realized upon a non-U.S. unitholder's sale or exchange of an interest in a partnership that is engaged in a U.S. trade or business. However, due to challenges of administering a withholding obligation applicable to open market trading and other complications, the IRS has temporarily suspended the application of this withholding rule to open market transfers of interests in publicly traded partnerships pending promulgation of regulations or other guidance that resolves the challenges. It is not clear if or when such regulations or other guidance will be issued. Non-U.S. unitholders should consult a tax advisor before investing in our common units.

***We treat each purchaser of our common units as having the same tax benefits without regard to the actual common units purchased. The IRS may challenge this treatment, which could adversely affect the value of the common units.***

Because we cannot match transferors and transferees of common units, we have adopted certain methods for allocating depreciation and amortization deductions that may not conform to all aspects of existing Treasury Regulations. A successful IRS challenge to the use of those methods could adversely affect the amount of tax benefits available to our unitholders. It also could affect the timing of these tax benefits or the amount of gain from our unitholders' sale of common units and could have a negative impact on the value of our common units or result in audit adjustments to their tax returns.

***We generally prorate our items of income, gain, loss and deduction between transferors and transferees of our units each month based upon the ownership of our units on the first day of each month, instead of on the basis of the date a particular unit is transferred. The IRS may challenge this treatment, which could change the allocation of items of income, gain, loss and deduction among our unitholders.***

We generally prorate our items of income, gain, loss and deduction between transferors and transferees of our units each month based upon the ownership of our units on the first day of each month (the "Allocation Date"), instead of on the basis of the date a particular unit is transferred. Similarly, we generally allocate certain deductions for depreciation of capital additions, gain or loss realized on a sale or other disposition of our assets and, in the discretion of the general partner, any other extraordinary item of income, gain, loss or deduction based upon ownership on the Allocation Date. Treasury Regulations allow a similar monthly simplifying convention, but such regulations do not specifically authorize all aspects of our proration method. If the IRS were to challenge our proration method, we may be required to change the allocation of items of income, gain, loss and deduction among our unitholders.

***A unitholder whose units are the subject of a securities loan (e.g., a loan to a "short seller" to cover a short sale of units) may be considered as having disposed of those units. If so, he would no longer be treated for tax purposes as a partner with respect to those units during the period of the loan and may recognize gain or loss from the disposition.***

Because there are no specific rules governing the U.S. federal income tax consequence of loaning a partnership interest, a unitholder whose units are the subject of a securities loan may be considered as having disposed of the loaned units. In that case, the unitholder may no longer be treated for tax purposes as a partner with respect to those units during the period of the loan to the short seller and the unitholder may recognize gain or loss from such disposition. Moreover, during the period of the loan, any of our income, gain, loss or deduction with respect to those units may not be reportable by the unitholder and any cash distributions received by the unitholder as to those units could be fully taxable as ordinary income. Unitholders desiring to assure their status as partners and avoid the risk of gain recognition from a

43

A1572

Table of Contents

securities loan are urged to consult a tax advisor to determine whether it is advisable to modify any applicable brokerage account agreements to prohibit their brokers from borrowing their units.

***We have adopted certain valuation methodologies in determining a unitholder's allocations of income, gain, loss and deduction. The IRS may challenge these methodologies or the resulting allocations, which could adversely affect the value of the common units.***

In determining the items of income, gain, loss and deduction allocable to our unitholders, we must routinely determine the fair market value of our assets. Although we may, from time to time, consult with professional appraisers regarding valuation matters, we make many fair market value estimates using a methodology based on the market value of our common units as a means to measure the fair market value of our assets. The IRS may challenge these valuation methods and the resulting allocations of income, gain, loss and deduction.

A successful IRS challenge to these methods or allocations could adversely affect the timing or amount of taxable income or loss being allocated to our unitholders. It also could affect the amount of gain from our unitholders' sale of common units and could have a negative impact on the value of the common units or result in audit adjustments to our unitholders' tax returns without the benefit of additional deductions.

***Our unitholders will likely be subject to state and local taxes and income tax return filing requirements in jurisdictions where they do not live as a result of investing in our common units.***

In addition to U.S. federal income taxes, our unitholders may be subject to other taxes, including foreign, state and local taxes, unincorporated business taxes and estate, inheritance or intangible taxes that are imposed by the various jurisdictions in which we conduct business or own property now or in the future, even if they do not live in any of those jurisdictions. Our unitholders will likely be required to file foreign, state and local income tax returns and pay state and local income taxes in some or all of these various jurisdictions. Further, our unitholders may be subject to penalties for failure to comply with those requirements.

We currently own assets in multiple states. Many of these states currently impose a personal income tax on individuals, corporations and other entities. As we make acquisitions or expand our business, we may own assets or conduct business in additional states that impose a personal income tax. It is our unitholders' responsibility to file all U.S. federal, foreign, state and local tax returns.

## ITEM 1B.  UNRESOLVED STAFF COMMENTS

None.

## ITEM 2.  PROPERTIES

Information regarding our properties is contained in Part I, Item 1. "Business" and Part II, Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations."

## ITEM 3.  LEGAL PROCEEDINGS

During the fourth quarter of 2016, we re‑purchased a shipment of wood pellets from one customer and subsequently sold it to a different customer in a back‑to‑back transaction. Smoldering was observed onboard the vessel carrying the shipment, which resulted in damage to a portion of the shipment and one of the vessel's five cargo holds (the "Shipping Event"). The disponent owner of the vessel (the "Shipowner") had directly or indirectly chartered the vessel from certain other parties (collectively, the "Head Owners") and in turn contracted with Cottondale as the charterer of the vessel. Following the mutual appointment of arbitrators in connection with the Shipping Event, on June 8, 2017, the Shipowner submitted claims against Cottondale (the "Claims") alleging damages of approximately $11.8 million (calculated using exchange rates as of December 31, 2017), together with other unquantified losses and damages. The Claims provide that the Shipowner would seek indemnification and other damages from Cottondale to the extent

44

Table of Contents

that the Shipowner is unsuccessful in its defense of claims raised by the Head Owners against it for damages arising in connection with the Shipping Event.

Although it is reasonably possible that the Shipping Event may result in additional costs and liabilities for our account, responsibility for such costs and liabilities incurred in connection with the Shipping Event is disputed among the various parties involved. If any such costs and liabilities ultimately are allocated to us, a portion may be recovered under insurance. We believe we have meritorious defenses to the Claims, but we are generally unable to predict the timing or outcome of any claims or proceedings, including the Claims, associated with the Shipping Event, or any insurance recoveries in respect thereof. Consequently, we are unable to provide an estimate of the amount or range of possible loss.

**ITEM 4.  MINE SAFETY DISCLOSURES**

Not applicable.

A1574

**PART II**

**ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

**Market Information**

Our common units representing limited partner interests in the Partnership ("common units") are traded on the New York Stock Exchange ("NYSE") under the symbol "EVA." The following tables set forth the range of high and low sales prices per unit for our common units, as reported by the NYSE, and the quarterly cash distributions for the indicated periods:

| | Price Range | | | Cash | | |
| Year Ended December 31, 2017: | High | | Low | Distributions | Record Date | Payment Date |
|---|---|---|---|---|---|---|
| Fourth Quarter | $ 31.95 | $ | 26.73 | $ 0.620 | February 15, 2018 | February 28, 2018 |
| Third Quarter | $ 30.30 | $ | 27.18 | $ 0.615 | November 15, 2017 | November 29, 2017 |
| Second Quarter | $ 30.60 | $ | 26.33 | $ 0.570 | August 15, 2017 | August 29, 2017 |
| First Quarter | $ 29.98 | $ | 24.60 | $ 0.555 | May 18, 2017 | May 30, 2017 |

| | Price Range | | | Cash | | |
| Year Ended December 31, 2016: | High | | Low | Distributions | Record Date | Payment Date |
|---|---|---|---|---|---|---|
| Fourth Quarter | $ 29.85 | $ | 24.45 | $ 0.535 | February 15, 2017 | February 28, 2017 |
| Third Quarter | $ 28.40 | $ | 21.02 | $ 0.530 | November 14, 2016 | November 29, 2016 |
| Second Quarter | $ 24.86 | $ | 19.31 | $ 0.525 | August 15, 2016 | August 29, 2016 |
| First Quarter | $ 22.60 | $ | 13.73 | $ 0.510 | May 16, 2016 | May 27, 2016 |

As of February 16, 2018, there were 14,445,268 common units outstanding held by three unitholders of record. Because many of our common units are held by brokers and other institutions on behalf of unitholders, we are unable to estimate the total number of unitholders represented by these unitholders of record. As of February 16, 2018, we also had 11,905,138 subordinated units outstanding. There is no established public market in which the subordinated units are traded. As of February 16, 2018, our sponsor held approximately 9% of the common units and all of the subordinated units.

**Cash Distribution Policy**

*General*

Our partnership agreement provides that our General Partner will make a determination as to whether to make a distribution, but our partnership agreement does not require us to pay distributions at any time or in any amount. Instead, the board of directors of our General Partner adopted a cash distribution policy that sets forth our General Partner's intention with respect to the distributions to be made to unitholders. Pursuant to our cash distribution policy, within 60 days after the end of each quarter, we intend to distribute to the holders of common and subordinated units on a quarterly basis at least the minimum quarterly distribution of $0.4125 per unit, or $1.65 on an annualized basis, to the extent we have sufficient cash after establishment of cash reserves and payment of fees and expenses, including payments to our General Partner and its affiliates.

The board of directors of our General Partner may change the foregoing distribution policy at any time and from time to time, and even if our cash distribution policy is not modified or revoked, the amount of distributions paid under our policy and the decision to make any distribution is determined by our General Partner. Our partnership agreement does not contain a requirement for us to pay distributions to our unitholders, and there is no guarantee that we will pay any specific distribution level, or any distribution, on the units in any quarter. However, our partnership agreement does contain provisions intended to motivate our General Partner to make steady, increasing and sustainable distributions over time.

A1575

Table of Contents

Please read Part II, Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations—Senior Secured Credit Facilities" for a discussion of the provisions included in our credit facility that may restrict our ability to make distributions.

### *Subordination Period*

Our partnership agreement provides that, during the subordination period, holders of our common units have the right to receive distributions from operating surplus (as defined in our partnership agreement) each quarter in an amount equal to $0.4125 per common unit, which amount is defined in our partnership agreement as the minimum quarterly distribution, plus any arrearages in the payment of the minimum quarterly distribution on the common units from prior quarters, before any distributions from operating surplus may be made to holders of the subordinated units. These units are deemed "subordinated" because for a period of time, referred to as the subordination period, the subordinated units will not be entitled to receive any distributions from operating surplus until the common units have received the minimum quarterly distribution plus any arrearages in the payment of the minimum quarterly distribution from prior quarters. Furthermore, no arrearages will be paid on the subordinated units. We expect the subordination period to expire in May 2018, at which time all of the subordinated units will convert into common units on a one-for-one basis.

### *General Partner Interest and Incentive Distribution Rights*

Our General Partner owns a non-economic general partner interest in us, which does not entitle it to receive cash distributions. However, our General Partner owns the incentive distribution rights and may in the future own common units or other equity interests in us and will be entitled to receive distributions on any such interests.

Incentive distribution rights represent the right to receive increasing percentages (15.0%, 25.0% and 50.0%) of quarterly distributions from operating surplus after the minimum quarterly distribution and the target distribution levels have been achieved. Our General Partner currently holds the incentive distribution rights, but may transfer these rights separately from its general partner interest.

### Unregistered Sales of Securities

On December 14, 2016, a joint venture between our sponsor and Hancock Natural Resource Group, Inc. and certain other affiliates of John Hancock Life Insurance Company (U.S.A.) (the "First Hancock JV") contributed to Enviva, LP all of the issued and outstanding limited liability company interests in Enviva Pellets Sampson, LLC (the "Sampson Drop-Down"). In connection with the Sampson Drop-Down, we issued a total of 1,098,415 common units at a value of $27.31 per unit, or $30.0 million of common units, to John Hancock Life Insurance Company of New York and John Hancock Life Insurance Company (U.S.A.), each an affiliate of the First Hancock JV, in reliance upon the exemption from the registration requirements in Section 4(a)(2) of the Securities Act of 1933, as amended (the "Securities Act"). For more information on the Sampson Drop-Down, please read Part II, Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations—Sampson Drop-Down."

On December 11, 2015, the First Hancock JV contributed to Enviva, LP all the issued and outstanding limited liability company interests in Enviva Pellets Southampton, LLC. In connection with the Southampton Drop-Down, we issued 942,023 common units valued at $15.0 million, to a wholly owned subsidiary of our sponsor in reliance upon the exemption from the registration requirements in Section 4(a)(2) of the Securities Act. For more information on the Southampton Drop-Down, please read Part II, Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations—Recent Developments—Southampton Drop-Down."

### Securities Authorized for Issuance under Equity Compensation Plans

Please read Part III, Item 12. "Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters" for information regarding our equity compensation plans.

47

A1576

**ITEM 6. SELECTED FINANCIAL DATA**

The following table presents our selected historical financial data, for the periods and as of the dates indicated, for us and our Predecessor.

The financial statements have been retroactively recast to reflect the contribution of our sponsor's interest in our Predecessor and Enviva GP, LLC as if the contributions occurred at the beginning of the periods presented, the contribution of Enviva Cottondale Acquisition II, LLC as if the contribution occurred on January 5, 2015, which is the date on which our sponsor acquired Green Circle Bio Energy, Inc. ("Green Circle"), which owned the Cottondale plant, the contribution of Enviva Pellets Southampton, LLC ("Southampton") as if it occurred on April 9, 2015, the date Southampton was originally conveyed to the First Hancock JV, and the contribution of Enviva Pellets Sampson, LLC ("Sampson") and Enviva Port of Wilmington, LLC ("Wilmington") as if they had occurred on May 15, 2013, the date Sampson and Wilmington were originally organized.

The selected statement of operations and statements of cash flow data for the years ended December 31, 2017, 2016 and 2015 and the balance sheet data as of December 31, 2017 and 2016 are derived from our audited consolidated financial statements included in Item 8 of this Annual Report.

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2017** | **2016 (Recast)** | **2015 (Recast)** | **2014 (Recast) (Predecessor)** | **2013 (Recast) (Predecessor)** |
| | (in thousands, except per metric ton and operating data and per unit data) | | | | |
| **Statement of Operations Data:** | | | | | |
| Product sales | $ 522,250 | $ 444,489 | $ 450,980 | $ 286,641 | $ 176,051 |
| Other revenue [(1)] | 20,971 | 19,787 | 6,394 | 3,495 | 3,836 |
| Net revenue | 543,221 | 464,276 | 457,374 | 290,136 | 179,887 |
| Costs of goods sold, excluding depreciation and amortization [(1)] | 419,616 | 357,418 | 365,061 | 251,058 | 152,720 |
| Loss on disposal of assets | 4,899 | 2,386 | 2,081 | 340 | 223 |
| Depreciation and amortization | 39,904 | 27,700 | 30,692 | 18,971 | 11,827 |
| Total cost of goods sold | 464,419 | 387,504 | 397,834 | 270,369 | 164,770 |
| Gross margin | 78,802 | 76,772 | 59,540 | 19,767 | 15,117 |
| General and administrative expenses [(1)] | 30,107 | 33,098 | 23,922 | 16,958 | 16,150 |
| Disposal and impairment of assets held for sale | 827 | 9,991 | — | — | — |
| Total general and administrative | 30,934 | 43,089 | 23,922 | 16,958 | 16,150 |
| Income (loss) from operations | 47,868 | 33,683 | 35,618 | 2,809 | (1,033) |
| Other income (expense): | | | | | |
| Interest expense | (31,744) | (15,643) | (10,558) | (8,724) | (5,460) |
| Related-party interest expense | — | (578) | (1,154) | — | — |
| Early retirement of debt obligation | — | (4,438) | (4,699) | (73) | — |
| Other income | (1,751) | 439 | 979 | 22 | 1,019 |
| Total other expense, net | (33,495) | (20,220) | (15,432) | (8,775) | (4,441) |
| Income (loss) before income tax expense | 14,373 | 13,463 | 20,186 | (5,966) | (5,474) |
| Income tax expense | — | — | 2,623 | 15 | 23 |
| Net income (loss) | 14,373 | 13,463 | 17,563 | (5,981) | (5,497) |
| Less net loss attributable to noncontrolling partners' interests | 3,140 | 5,804 | 2,859 | 304 | 58 |
| Net income (loss) attributable to Enviva Partners, LP | $ 17,513 | $ 19,267 | $ 20,422 | $ (5,677) | $ (5,439) |
| Less: Predecessor (loss) income to May 4, 2015 (prior to IPO) | $ — | $ — | (2,132) | 264 | (5,439) |
| Less: Pre-acquisition income from April 10, 2015 to December 10, 2015 from operations of Enviva Pellets Southampton, LLC Drop-Down allocated to General Partner | — | — | 6,264 | — | — |
| Less: Pre-acquisition loss from inception to December 13, 2016 from operations of Enviva Pellets Sampson, LLC Drop-Down allocated to General Partner | — | (3,231) | (1,815) | (3,440) | — |
| Less: Pre-acquisition loss from inception to October 1, 2017 from operations of Enviva Port of Wilmington, LLC Drop-Down allocated to General Partner | (3,049) | (2,110) | (937) | (2,501) | — |
| Enviva Partners, LP partners' interest in net income | $ 20,562 | $ 24,608 | $ 19,042 | $ — | $ — |
| Net income per limited partner common unit: | | | | | |
| Basic | $ 0.65 | $ 0.95 | $ 0.80 | | |
| Diluted | $ 0.61 | $ 0.91 | $ 0.79 | | |
| Net income per limited partner subordinated unit: | | | | | |
| Basic | $ 0.65 | $ 0.93 | $ 0.80 | | |
| Diluted | $ 0.65 | $ 0.93 | $ 0.79 | | |

[(1)] See Part II, Item 8. "Financial Statements and Supplementary Data—Note 13, *Related-Party Transactions*

A1577

| | | 2017 | 2016 (Recast) | 2015 (Recast) | 2014 (Recast) (Predecessor) | 2013 (Recast) (Predecessor) |
|---|---|---|---|---|---|---|
| | | **Year Ended December 31,** | | | | |
| | | *(in thousands, except per metric ton and operating data and per unit data)* | | | | |
| **Statement of Cash Flow Data:** | | | | | | |
| Net cash provided by (used in): | | | | | | |
| Operating activities | $ | 87,095 | $ 55,804 | $ 65,857 | $ 28,992 | $ (7,557) |
| Investing activities | | (28,601) | (111,124) | (103,490) | (17,174) | (115,799) |
| Financing activities | | (58,436) | 53,658 | 39,173 | (14,789) | 115,235 |
| **Other Financial Data:** | | | | | | |
| Adjusted EBITDA(1) | $ | 102,381 | $ 79,291 | $ 71,710 | $ 22,182 | $ 12,101 |
| Adjusted gross margin per metric ton(1) | $ | 45.38 | $ 45.55 | $ 38.89 | $ 25.91 | $ 29.18 |
| Maintenance capital expenditures(2) | | 4,353 | 5,187 | 4,359 | 515 | — |
| Distributable cash flow(1) | | 67,731 | 59,775 | 57,245 | 14,964 | 7,650 |
| **Operating Data:** | | | | | | |
| Total metric tons sold | | 2,724 | 2,346 | 2,374 | 1,508 | 931 |
| **Balance Sheet Data (at period end):** | | | | | | |
| Cash and cash equivalents | $ | 524 | $ 466 | $ 2,128 | $ 592 | $ 3,558 |
| Total assets | | 760,111 | 801,376 | 688,209 | 388,395 | 395,018 |
| Long-term debt and capital lease obligations (including current portion) | | 401,017 | 351,080 | 207,632 | 90,481 | 95,539 |
| Total liabilities | | 549,742 | 424,514 | 266,539 | 110,781 | 123,607 |
| Partners' capital | | 210,369 | 376,862 | 421,670 | 277,614 | 271,411 |

———————————————

(1)   For more information, please read "—Non‑GAAP Financial Measures" and Part II, Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations—How We Evaluate Our Operation s."

(2)   Maintenance capital expenditures are cash expenditures made to maintain our long‑term operating capacity or net income.

**Non‑GAAP Financial Measures**

Adjusted gross margin per metric ton, adjusted EBITDA and distributable cash flow are not financial measures presented in accordance with accounting principles generally accepted in the United States ("GAAP"). We believe that the presentation of these non‑GAAP financial measures provides useful information to investors in assessing our financial condition and results of operations. Our non‑GAAP financial measures should not be considered as alternatives to the most directly comparable GAAP financial measures. Each of these non‑GAAP financial measures has important limitations as an analytical tool because they exclude some, but not all, items that affect the most directly comparable GAAP financial measures. You should not consider adjusted gross margin per metric ton, adjusted EBITDA or distributable cash flow in isolation or as substitutes for analysis of our results as reported under GAAP.

Our definitions of these non‑GAAP financial measures may not be comparable to similarly titled measures of other companies, thereby diminishing their utility.

*Adjusted Gross Margin per Metric Ton*

We use adjusted gross margin per metric ton to measure our financial performance. We define adjusted gross margin as gross margin excluding asset disposals and depreciation and amortization included in cost of goods sold. We believe adjusted gross margin per metric ton is a meaningful measure because it compares our revenue‑generating activities to our operating costs for a view of profitability and performance on a per metric ton basis. Adjusted gross margin per metric ton will primarily be affected by our ability to meet targeted production volumes and to control direct and indirect costs associated with procurement and delivery of wood fiber to our production plants and the production and distribution of wood pellets.

49

A1578

*Adjusted EBITDA*

We view adjusted EBITDA as an important indicator of our financial performance. We define adjusted EBITDA as net income or loss excluding depreciation and amortization, interest expense, income tax expense, early retirement of debt obligations, non-cash unit compensation expense, asset impairments and disposals, changes in the fair value of derivative instruments and certain items of income or loss that we characterize as unrepresentative of our ongoing operations. Adjusted EBITDA is a supplemental measure used by our management and other users of our financial statements, such as investors, commercial banks and research analysts, to assess the financial performance of our assets without regard to financing methods or capital structure.

*Distributable Cash Flow*

We define distributable cash flow as adjusted EBITDA less maintenance capital expenditures and interest expense net of amortization of debt issuance costs, debt premium and original issue discount. We use distributable cash flow as a performance metric to compare the cash-generating performance of the Partnership from period to period and to compare the cash-generating performance for specific periods to the cash distributions (if any) that are expected to be paid to our unitholders. We do not rely on distributable cash flow as a liquidity measure.

50

A1579

The following tables present a reconciliation of each of adjusted gross margin per metric ton, adjusted EBITDA and distributable cash flow to the most directly comparable GAAP financial measure for each of the periods indicated.

| | 2017 | | 2016 (Recast) | | 2015 (Recast) | | 2014 (Recast) (Predecessor) | | 2013 (Recast) (Predecessor) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | (in thousands, except per metric ton) | | | | |
| Reconciliation of gross margin to adjusted gross margin per metric ton: | | | | | | | | | |
| Metric tons sold | 2,724 | | 2,346 | | 2,374 | | 1,508 | | 931 |
| Gross margin | $ 78,802 | $ | 76,772 | $ | 59,540 | $ | 19,767 | $ | 15,117 |
| Loss on disposal of assets | 4,899 | | 2,386 | | 2,081 | | 340 | | 223 |
| Depreciation and amortization | 39,904 | | 27,700 | | 30,692 | | 18,971 | | 11,827 |
| Adjusted gross margin | $ 123,605 | $ | 106,858 | $ | 92,313 | $ | 39,078 | $ | 27,167 |
| Adjusted gross margin per metric ton | $ 45.38 | $ | 45.55 | $ | 38.89 | $ | 25.91 | $ | 29.18 |

| | 2017 | | 2016 (Recast) | | 2015 (Recast) | | 2014 (Recast) (Predecessor) | | 2013 (Recast) (Predecessor) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | (in thousands) | | | | |
| Reconciliation of adjusted EBITDA and distributable cash flow to net income: | | | | | | | | | |
| Net income (loss) | $ 14,373 | $ | 13,463 | | 17,563 | $ | (5,981) | $ | (5,497) |
| Add: | | | | | | | | | |
| Depreciation and amortization | 40,361 | | 27,735 | | 30,738 | | 19,009 | | 11,887 |
| Interest expense | 31,744 | | 16,221 | | 11,712 | | 8,724 | | 5,460 |
| Early retirement of debt obligation | — | | 4,438 | | 4,699 | | 73 | | — |
| Purchase accounting adjustment to inventory | — | | — | | 697 | | — | | — |
| Non-cash unit compensation expense | 5,014 | | 4,230 | | 704 | | 2 | | 5 |
| Income tax expense | — | | — | | 2,623 | | 15 | | 23 |
| Asset impairments and disposals | 5,726 | | 12,377 (1) | | 2,081 | | 340 | | 223 |
| Changes in the fair value of derivative instruments | 1,565 | | — | | — | | — | | — |
| Transaction expenses | 3,598 | | 827 | | 893 | | — | | — |
| Adjusted EBITDA | $ 102,381 | $ | 79,291 | $ | 71,710 | $ | 22,182 | $ | 12,101 |
| Less: | | | | | | | | | |
| Interest expense, net of amortization of debt issuance costs, debt premium and original issue discount | 30,297 | | 14,329 | | 10,106 | | 6,703 | | 4,451 |
| Maintenance capital expenditures | 4,353 | | 5,187 | | 4,359 | | 515 | | — |
| Distributable cash flow attributable to Enviva Partners, LP | $ 67,731 | $ | 59,775 | $ | 57,245 | $ | 14,964 | $ | 7,650 |
| Less: Distributable cash flow attributable to incentive distribution rights | 3,398 | | 1,077 | | — | | — | | — |
| Distributable cash flow attributable to Enviva Partners, LP limited partners | $ 64,333 | $ | 58,698 | $ | 57,245 | $ | 14,964 | $ | 7,650 |

(1) In December 2016, we initiated a plan to sell the Wiggins plant. The carrying amount of the assets held for sale exceeded the estimated fair value of the Wiggins plant, which resulted in a $10.0 million non-cash impairment charge to earnings. In December 2017, we sold the Wiggins plant for $0.4 million and recorded a loss on the sale $0.8 million, net, upon deconsolidation.

51

A1580

**ITEM 7.  MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion of our historical performance, financial condition and future prospects should be read in conjunction with Part I, Item 1. "Business" and the consolidated financial statements in Part II, Item 8. "Financial Statements and Supplementary Data."*

*References in this Annual Report to the "Predecessor," "our Predecessor," "we," "our," "us" or like terms for periods prior to April 9, 2015 refer to Enviva, LP and its subsidiaries (other than Enviva Pellets Cottondale, LLC). References to the "Partnership," "we," "our," "us" or like terms for periods on and after April 9, 2015 refer to Enviva Partners, LP and its subsidiaries. References to "our sponsor" refer to Enviva Holdings, LP, and, where applicable, its wholly owned subsidiaries Enviva MLP Holdco, LLC and Enviva Development Holdings, LLC. References to "our General Partner" refer to Enviva Partners GP, LLC, a wholly owned subsidiary of Enviva Holdings, LP. References to "Enviva Management" refer to Enviva Management Company, LLC, a wholly owned subsidiary of Enviva Holdings, LP, and references to "our employees" refer to the employees of Enviva Management. References to the "First Hancock JV" and the "Second Hancock JV" refer to Enviva Wilmington Holdings, LLC and Enviva JV Development Company, LLC, respectively, which are joint ventures between our sponsor, Hancock Natural Resource Group, Inc. and certain other affiliates of John Hancock Life Insurance Company (U.S.A.). Please read Cautionary Statement Regarding Forward-Looking Statements on page 1 and Part 1, Item 1A. "Risk Factors" for information regarding certain risks inherent in our business.*

**Basis of Presentation**

The following discussion of our historical performance and financial condition is derived from our audited consolidated financial statements and the audited financial statements of our Predecessor and Enviva Pellets Cottondale, LLC ("Cottondale"). On April 9, 2015, we, the Predecessor and our sponsor executed a series of transactions that were accounted for as common control transactions (the "Reorganization"). On April 9, 2015, our sponsor contributed some, but not all, of our Predecessor's assets and liabilities to us. Specifically, our sponsor's interest in Enviva Pellets Southampton, LLC ("Southampton") was excluded from the April 9, 2015 contribution as it was conveyed to the First Hancock JV, a consolidated entity of the sponsor, on April 9, 2015. Our sponsor contributed its interest in Cottondale, which owns a wood pellet production plant in Cottondale, Florida (the "Cottondale plant"), to us on April 9, 2015.

On December 11, 2015, the First Hancock JV contributed to Enviva, LP all of the issued and outstanding limited liability company interests in Southampton together with an off-take contract and a related third-party shipping contract for total consideration of $131.0 million pursuant to the terms of a contribution agreement between the Partnership and the First Hancock JV (the "Southampton Drop-Down").

On December 14, 2016, the First Hancock JV contributed to Enviva, LP all of the issued and outstanding limited liability company interests in Enviva Pellets Sampson, LLC ("Sampson") for total consideration of $175.0 million (the "Sampson Drop-Down"). The Sampson Drop-Down also included two off-take contracts and related third-party shipping contracts.

On October 2, 2017, the First Hancock JV contributed to Enviva, LP all of the issued and outstanding limited liability company interests in Enviva Port of Wilmington, LLC ("Wilmington") for total consideration of $130.0 million (the "Wilmington Drop-Down").

The consolidated financial statements for periods prior to our initial public offering ("the IPO") include the results of our Predecessor and its subsidiaries and include all revenues, costs, assets and liabilities attributed to our Predecessor after the elimination of all intercompany accounts and transactions. The consolidated financial statements for the period after the IPO pertain to our operations. Our consolidated financial statements have been retroactively recast to reflect the contribution of our sponsor's interest in our Predecessor and Enviva GP, LLC as if the contributions had occurred at the beginning of the periods presented, the contribution of Enviva Cottondale Acquisition II, LLC ("Acquisition II") as if the contribution had occurred on January 5, 2015, which is the date on which our sponsor

52

A1581

acquired Green Circle Bio Energy, Inc. ("Green Circle"), which owned the Cottondale plant, the Southampton Drop-Down as if it occurred on April 9, 2015, the date Southampton was originally conveyed to the First Hancock JV and the Sampson Drop-Down and the Wilmington Drop-Down as if they had occurred on May 15, 2013, the date Sampson and Wilmington were originally organized. Entities contributed by or distributed to our sponsor or the First Hancock JV are considered entities under common control and are recorded at historical cost.

**Business Overview**

We are the world's largest supplier by production capacity of utility-grade wood pellets to major power generators. We own and operate six industrial-scale production plants in the Southeastern United States that have a combined wood pellet production capacity of 2.9 million MTPY. We also own dry-bulk, deep-water marine terminal assets at the Port of Chesapeake (the "Chesapeake terminal") and the Port of Wilmington, North Carolina (the "Wilmington terminal"). All of our facilities are located in geographic regions with low input costs and favorable transportation logistics. Owning these cost-advantaged assets, the output from which is fully contracted, in a rapidly expanding industry provides us with a platform to generate stable and growing cash flows that should enable us to increase our per-unit cash distributions over time, which is our primary business objective. For a more complete description of our business, please read Part I, Item 1. "Business."

Our sales strategy is to fully contract the production capacity of the Partnership. During 2017, contracted volumes under our existing off-take contracts are approximately equal to the full production capacity of our production plants.

Our off-take contracts provide for sales of 2.9 million metric tons ("MT") of wood pellets in 2018 and have a weighted-average remaining term of 9.5 years from February 15, 2018. We intend to continue expanding our business by taking advantage of the growing demand for our product that is driven by the conversion of coal-fired power generation and combined heat and power plants to co-fired or dedicated biomass-fired plants, principally in Europe and, increasingly, in South Korea and Japan.

**Recent Developments**

*Wilmington Drop-Down*

On October 2, 2017, pursuant to the terms of a contribution agreement between the Partnership and the First Hancock JV (the "Wilmington Contribution Agreement"), the First Hancock JV sold to the Partnership all of the issued and outstanding limited liability company interests in Wilmington, which owns the Wilmington terminal.

The purchase price for Wilmington was $130.0 million, which included an initial payment of $54.6 million, net of an approximate purchase price adjustment of $1.4 million. The initial payment was funded with borrowings from revolving credit commitments and cash on hand. We accounted for the Wilmington Drop-Down as a combination of entities under common control at historical cost in a manner similar to a pooling of interests. Accordingly, the consolidated financial statements for the periods prior to the acquisition were retrospectively recast to reflect the acquisition as if it had occurred on May 15, 2013, the date Wilmington was originally organized.

The Wilmington terminal, which is capable of receiving product by rail and truck, has the capacity to store up to 90,000 MT of wood pellets, and load up to Panamax-sized vessels. It utilizes state-of-the-art handling equipment and storage infrastructure designed to maintain product quality and safety with throughput capacity of up to 3.0 million MTPY of wood pellets.

Wilmington will handle up to approximately 600,000 MTPY of throughput from the Sampson plant and is party to a long-term terminal services agreement with Enviva Pellets Greenwood, LLC, a wholly owned subsidiary of the Second Hancock JV ("Greenwood"). Wilmington will handle throughput volumes sourced from Greenwood's wood pellet production plant located in Greenwood, South Carolina (the "Greenwood plant"). The terminal services agreement with Greenwood provides for deficiency payments to Wilmington if minimum throughput requirements are not met.

A1582

In addition, the Wilmington Contribution Agreement contemplates that Wilmington will enter into a long-term terminal services agreement (the "Wilmington Hamlet TSA") with the First Hancock JV and Enviva Pellets Hamlet, LLC ("Hamlet") to receive, store and load wood pellets from the First Hancock JV's proposed production plant in Hamlet, North Carolina (the "Hamlet plant") when the First Hancock JV completes construction of the Hamlet plant. The Wilmington Hamlet TSA also provides for deficiency payments to Wilmington if minimum throughput requirements are not met. Pursuant to the Wilmington Contribution Agreement, following notice of the anticipated first delivery of wood pellets to the Wilmington terminal from the Hamlet plant, Wilmington, Hamlet, and the First Hancock JV would enter into the Wilmington Hamlet TSA and the Partnership would make a final payment of $74.0 million in cash or common units representing limited partnership interests in the Partnership ("common units") to the First Hancock JV, subject to certain conditions, as deferred consideration for the Wilmington Drop-Down.

Wilmington also entered into a throughput option agreement with the sponsor granting the sponsor, subject to certain conditions, the option to obtain terminal services at the Wilmington terminal at marginal cost throughput rates for wood pellets produced by one of the sponsor's potential wood pellet production plants.

### Senior Notes Due 2021

On November 1, 2016, we issued $300.0 million in aggregate principal amount of 8.5% senior unsecured notes due November 1, 2021 (the "Senior Notes") to eligible purchasers in a private placement transaction. In August 2017, holders of 100% of the Senior Notes tendered such notes in exchange for newly issued registered notes with terms substantially identical in all material respects to the Senior Notes (except that the registered notes are not subject to restrictions on transfer).

On October 10, 2017, we completed the issuance to an institutional investor in a private placement transaction of an additional $55.0 million in aggregate principal amount of Senior Notes at a price of 106.25% of par plus accrued interest from May 1, 2017. The additional Senior Notes have the same terms as our outstanding Senior Notes. The sale of the additional Senior Notes at a purchase price of $58.4 million resulted in gross proceeds of approximately $60.0 million after including accrued interest of $2.1 million and deducting estimated expenses of approximately $0.5 million. The net proceeds were used to repay the borrowings on our revolving credit facility that were used to fund the Wilmington Drop-Down and for general partnership purposes.

In December 2017, the holder of 100% of the additional Senior Notes tendered such notes in exchange for newly issued registered notes with terms substantially identical in all material respects to the additional Senior Notes (except that the registered notes are not subject to restrictions on transfer). The additional Senior Notes will be treated together with the outstanding Senior Notes as a single class for all purposes under the Indenture.

### Sale of the Wiggins Plant

In December 2016, we initiated a plan to sell our 110,000 MTPY production plant located in Wiggins, Mississippi and related assets (the "Wiggins plant"). We sold the Wiggins plant to a third-party buyer for a purchase price of $0.4 million on December 27, 2017, and on December 28, 2017, Enviva Pellets Wiggins, LLC ("Wiggins"), the owner of the Wiggins plant, was dissolved. We recorded a loss on the sale of $0.8 million, net, upon deconsolidation.

### At-the-Market Offering Program

On August 8, 2016, we filed a prospectus supplement to our shelf registration filed with the U.S. Securities Exchange Act Commission ("SEC") on June 24, 2016, for the continuous offering of up to $100.0 million of common units, in amounts, at prices and on terms to be determined by market conditions and other factors at the time of our offerings. In August 2016, we also entered into an equity distribution agreement (the "Equity Distribution Agreement") with certain managers pursuant to which we may offer and sell common units from time to time through or to one or more of the managers, subject to the terms and conditions set forth in the Equity Distribution Agreement, of up to an aggregate sales amount of $100.0 million (the "ATM Program").

54

A1583

During the years ended December 31, 2017 and 2016, we sold 71,368 and 358,593, respectively, under the Equity Distribution Agreement for net proceeds of $1.9 million, net of an insignificant amount of commissions, during 2017, and net proceeds of $9.3 million, net of $0.1 million of commissions, during 2016. Accounting and other fees of approximately $0.2 million were offset against the proceeds during 2017. Deferred issuance costs of approximately $0.4 million, primarily consisting of legal, accounting and other fees, were offset against the proceeds during 2016. Net proceeds from sales under the ATM Program were used for general partnership purposes. As of February 16, 2018, $88.6 million of common units remained available for issuance under the ATM Program.

**How We Evaluate Our Operations**

*Adjusted Gross Margin per Metric Ton*

We use adjusted gross margin per metric ton to measure our financial performance. We define adjusted gross margin as gross margin excluding asset disposals and depreciation and amortization included in cost of goods sold. We believe adjusted gross margin per metric ton is a meaningful measure because it compares our revenue-generating activities to our operating costs for a view of profitability and performance on a per metric ton basis. Adjusted gross margin per metric ton will primarily be affected by our ability to meet targeted production volumes and to control direct and indirect costs associated with procurement and delivery of wood fiber to our production plants and the production and distribution of wood pellets.

*Adjusted EBITDA*

We view adjusted EBITDA as an important indicator of our financial performance. We define adjusted EBITDA as net income or loss excluding depreciation and amortization, interest expense, income tax expense, early retirement of debt obligations, non-cash unit compensation expense, asset impairments and disposals, changes in the fair value of derivative instruments and certain items of income or loss that we characterize as unrepresentative of our ongoing operations. Adjusted EBITDA is a supplemental measure used by our management and other users of our financial statements, such as investors, commercial banks and research analysts, to assess the financial performance of our assets without regard to financing methods or capital structure.

*Distributable Cash Flow*

We define distributable cash flow as adjusted EBITDA less maintenance capital expenditures and interest expense net of amortization of debt issuance costs, debt premium and original issue discounts. We use distributable cash flow as a performance metric to compare the cash-generating performance of the Partnership from period to period and to compare the cash-generating performance for specific periods to the cash distributions (if any) that are expected to be paid to our unitholders. We do not rely on distributable cash flow as a liquidity measure.

*Non-GAAP Financial Measures*

Adjusted gross margin per metric ton, adjusted EBITDA and distributable cash flow are not financial measures presented in accordance with accounting principles generally accepted in the United States ("GAAP"). We believe that the presentation of these non-GAAP financial measures provides useful information to investors in assessing our financial condition and results of operations. Our non-GAAP financial measures should not be considered as alternatives to the most directly comparable GAAP financial measures. Each of these non-GAAP financial measures has important limitations as an analytical tool because they exclude some, but not all, items that affect the most directly comparable GAAP financial measures. You should not consider adjusted gross margin per metric ton, adjusted EBITDA or distributable cash flow in isolation or as substitutes for analysis of our results as reported under GAAP.

Our definitions of these non-GAAP financial measures may not be comparable to similarly titled measures of other companies, thereby diminishing their utility. Please read Part II, Item 6. "Selected Financial Data—Non-GAAP Financial Measures" for a reconciliation of each of adjusted gross margin per metric ton, adjusted EBITDA and distributable cash flow to the most directly comparable GAAP financial measure.

55

A1584

**Factors Impacting Comparability of Our Financial Results**

Our future results of operations and cash flows may not be comparable to our historical consolidated results of operations and cash flows, principally for the following reasons:

*Our sponsor contributed its interest in Wilmington to us on October 2, 2017.*    Our consolidated financial statements have been retroactively recast to reflect the contribution of our sponsor's interest in Wilmington as if the contribution had occurred on May 15, 2013, the date Wilmington was originally organized. The recast amounts for the years ended December 31, 2017, 2016 and 2015 primarily include general and administrative expenses associated with terminal development costs incurred during the construction of the Wilmington terminal. We do not expect to incur these costs going forward as the terminal began operations during the fourth quarter of 2016. The amount paid in excess of historical cost is recorded as a deemed dividend to the General Partner.

*We increased our production capacity with the Sampson Drop-Down and began deliveries under a new long‑term off‑take contract in December 2016.*  In connection with the Sampson Drop‑Down, the First Hancock JV assigned to us a ten‑year, take‑or‑pay off‑take contract with Ø rsted (the "Ø rsted Contract"). The Ø rsted Contract commenced on September 1, 2016 and provides for sales of 360,000 MTPY for the first delivery year and 420,000 MTPY for years two through ten .  In the fourth quarter of 2017, we entered into an amendment to the Ø rsted Contract for the supply of an incremental 200,000 MT from late 2018 through mid-2021. Ø rsted's obligations under the Ø rsted Contract are guaranteed by its parent, Ø rsted A/S.  The Ø rsted Contract, accompanied by our increased production capacity from the Sampson plant, will have a material effect on our product sales and resulting gross margin.

*We issued $300.0 million in aggregate principal amount of senior unsecured notes in a private placement to eligible purchasers.*    On November 1, 2016, we and Enviva Partners Finance Corp., a wholly owned subsidiary of the Partnership formed on October 3, 2016 for the purpose of being the co‑issuer of the notes, issued $300.0 million in aggregate principal amount of Senior Notes to eligible purchasers in a private placement under Rule 144A and Regulation S of the Securities Act of 1933, as amended (the "Securities Act"), which resulted in net proceeds of $293.6 million after deducting estimated expenses and underwriting discounts of $6.4 million. On December 14, 2016, a portion of the net proceeds from the Senior Notes Offering, together with cash on hand and the issuance of 1,098,415 unregistered common units at a value of $27.31 per unit, or $30.0 million of common units, to affiliates of John Hancock Life Insurance Company (U.S.A.), funded the consideration payable for the Sampson Drop-Down. The remainder of the net proceeds from the Senior Notes Offering was used to repay certain outstanding term loan indebtedness under our Senior Secured Credit Facilities.  As a result, our consolidated financial statements reflect the outstanding debt and interest expense associated with the Senior Notes .

*We issued $55.0 million in aggregate principal amount of senior unsecured notes in a private placement to eligible purchasers.*  On October 10, 2017, we completed the issuance to an institutional investor in a private placement transaction of an additional $55.0 million in aggregate principal amount of Senior Notes. The additional Senior Notes have the same terms as our outstanding Senior Notes. The additional Senior Notes will be treated together with the Senior Notes as a single class for all purposes under the Indenture.

The sale of the additional Senior Notes at a purchase price of $58.4 million resulted in gross proceeds of approximately $60.0 million, after including accrued interest of $2.1 million and deducting estimated expenses of approximately $0.5 million. The proceeds were used to repay borrowings on our revolving credit facility, which were used to fund the Wilmington Drop-Down, and for general partnership purposes.

In December 2017, the holder of 100% of the additional Senior Notes tendered such notes in exchange for newly issued registered notes with terms substantially identical in all material respects to the additional Senior Notes (except that the registered notes are not subject to restrictions on transfer).

*We repaid a portion of the Original Credit Facilities and increased the capacity of our revolving credit facility.*    On April 9, 2015, we entered into a credit agreement (the "Credit Agreement") providing for a $199.5 million aggregate principal amount of senior secured credit facilities (the "Original Credit Facilities"). We entered into an

56

assumption agreement on December 11, 2015, providing for $36.5 million of incremental term loan borrowings (the "Incremental Term Borrowings" and, together with the Original Credit Facilities, the "Senior Secured Credit Facilities") under the Credit Agreement. In October 2016, we entered into a second amendment to the Credit Agreement (the "Second Amendment"), which became effective upon the closing of the Sampson Drop‑Down. Upon the consummation of the Sampson Drop‑Down, a portion of the net proceeds from the Senior Notes Offering, together with cash on hand, was used to repay in full the outstanding principal and accrued interest on the Tranche A‑2 and Tranche A‑4 borrowings and to repay a portion of the outstanding principal and accrued interest on the Tranche A‑1 and Tranche A‑3 borrowings under the Senior Secured Credit Facilities. Following the consummation of the Sampson Drop‑Down and repayment of a portion of the Senior Secured Credit Facilities, the limit under our revolving credit commitments was increased from $25.0 million to $100.0 million pursuant to the Second Amendment .

*Revenue and costs for deliveries to customers can vary significantly between periods depending upon the mix of customers and specific shipment and reimbursement for expenses, including the then‑current cost of fuel.* Depending on the specific off‑take contract, shipping terms are either Cost, Insurance and Freight ("CIF"), Cost and Freight ("CFR") or Free on Board ("FOB"). Under a CIF contract, we procure and pay for shipping costs, which include insurance and all other charges, up to the port of destination for the customer. Under a CFR contract, we procure and pay for shipping costs, which include insurance (excluding marine cargo insurance) and all other charges, up to the port of destination for the customer. Shipping costs under CIF and CFR contracts are included in the price to the customer and, as such, are included in revenue and cost of goods sold. Under FOB contracts, the customer is directly responsible for shipping costs. We have entered into fixed-price shipping contracts with reputable shippers matching the terms and volumes of our contracts for which we are responsible for arranging shipping.

**How We Generate Revenue**

*Overview*

We primarily earn revenue by supplying wood pellets to our customers under off-take contracts, the majority of the commitments under which are long term in nature. We refer to the structure of our contracts as "take-or-pay" because they include a firm obligation of the customer to take a fixed quantity of product at a stated price and provisions that ensure we will be compensated in case a customer fails to accept all or a part of the contracted volumes or terminates the contract. Each contract defines the annual volume of wood pellets that a customer is required to purchase and we are required to sell, the fixed price per MT for product satisfying a base net calorific value and other technical specifications. These prices are fixed for the entire term, subject to annual inflation-based adjustments and price escalators, as well as, in some instances, price adjustments for product specifications and changes in underlying costs. In addition to sales of our product under these long-term, take-or-pay contracts, we routinely sell wood pellets under shorter-term contracts, which range in volume and tenor and, in some cases, may include only one specific shipment. Because each of our contracts is a bilaterally negotiated agreement, our revenue over the duration of these contracts does not generally follow spot market pricing trends. Our revenue from the sale of wood pellets is recognized when the goods are shipped, title and risk of loss passes to the customer, the sales price to the customer is fixed and determinable, and collectability is reasonably assured.

Depending on the specific off-take contract, shipping terms are either CIF, CFR or FOB. Under a CIF contract, we procure and pay for shipping costs, which include insurance and all other charges, up to the port of destination for the customer. Under a CFR contract, we procure and pay for shipping costs, which include insurance (excluding marine cargo insurance) and all other charges, up to the port of destination for the customer. Shipping costs under CIF and CFR contracts are included in the price to the customer and, as such, are included in revenue and cost of goods sold. Under FOB contracts, the customer is directly responsible for shipping costs. Our customer shipping terms, as well as the timing and size of shipments during the year, can result in material fluctuations in our revenue recognized between periods but generally have little impact on gross margin.

The majority of the wood pellets we supply to our customers is produced at our production plants, the sales of which are included in "Product Sales." We also fulfill our contractual commitments and take advantage of dislocations in market supply and demand by purchasing from and selling to third-party market participants, including, in some

A1586

cases, our customers. In these back-to-back transactions where title and risk of loss are immediately transferred to the ultimate purchaser, revenue is recorded net of costs paid to the third-party supplier. This revenue is included in "Other revenue."

In some instances, a customer may request to cancel, defer, or accelerate a shipment. Contractually, we will seek to optimize our position by selling or purchasing the subject shipment to or from another party, including in some cases a related party, either within our contracted off-take portfolio or as an independent transaction on the spot market. In most instances, the original customer pays us a fee, including reimbursement of any incremental costs, which is included in "Other revenue."

### Contracted Backlog

As of February 15, 2018, we had approximately $5.8 billion of product sales backlog for firm contracted product sales to power generators compared to approximately $5.7 billion as of February 1, 2017. Backlog represents the revenue to be recognized under existing contracts assuming deliveries occur as specified in the contract. Contracted future product sales denominated in foreign currencies, excluding revenue hedged with foreign currency forward contracts, are included in U.S. Dollars at February 1, 2018 forward rates. Please read Part II, Item 8. "Financial Statements and Supplementary Data—Derivative Instruments" for more information regarding our foreign currency forward contracts.

Our expected future product sales revenue under our contracted backlog as of February 15, 2018 is as follows (in millions):

| | | |
|---|---|---|
| Period from February 15, 2018 to December 31, 2018 | $ | 523 |
| Year ending December 31, 2019 | | 582 |
| Year ending December 31, 2020 and thereafter | | 4,691 |
| Total product sales contracted backlog | $ | 5,796 |

### Costs of Conducting Our Business

### Cost of Goods Sold

Cost of goods sold includes the costs to produce and deliver our wood pellets to customers. The principal expenses incurred to produce and deliver our wood pellets consist of raw material, production and distribution costs.

We have strategically located our plants in the Southeastern United States, a region with plentiful wood fiber resources. We manage the supply of raw materials into our plants through a mixture of short-term and long-term contracts. Delivered wood fiber costs include stumpage as well as harvesting, transportation and, in some cases, size reduction services provided by our suppliers. The majority of our product volumes are sold under off-take contracts that include cost pass-through mechanisms to mitigate increases in raw material and distribution costs.

Production costs at our production plants consist of labor, energy, tooling, repairs and maintenance and plant overhead costs. Production costs also include depreciation expense associated with the use of our plants and equipment and any gain or loss on disposal of associated assets. Some of our off-take contracts include price escalators that mitigate inflationary pressure on certain components of our production costs. In addition to the wood pellets that we produce at our owned and operated production plants, we selectively purchase additional quantities of wood pellets from our sponsor and third-party wood pellet producers.

Distribution costs include all transportation costs from our plants to our port locations, any storage or handling costs while the product remains at port and shipping costs related to the delivery of our product from our port locations to our customers. Both the strategic location of our plants and our ownership or control of our deep-water terminals have allowed for the efficient and cost-effective transportation of our wood pellets. We seek to mitigate shipping risk by entering into long-term, fixed-price shipping contracts with reputable shippers matching the terms and volumes of our off-take contracts pursuant to which we are responsible for arranging shipping. Certain of our off-take contracts include

58

A1587

Table of Contents

pricing adjustments for volatility in fuel prices, which allow us to pass the majority of the fuel price risk associated with shipping through to our customers.

Additionally, as deliveries are made, we amortize the purchase price of acquired customer contracts that were recorded as intangible assets during the applicable contract term.

Raw material, production and distribution costs associated with delivering our wood pellets to our owned and leased marine terminals and related- and third-party wood pellet purchase costs are capitalized as a component of inventory. Fixed production overhead, including the related depreciation expense, is allocated to inventory based on the normal capacity of the facilities. These costs are reflected in cost of goods sold when inventory is sold. Distribution costs associated with shipping our wood pellets to our customers and amortization of favorable acquired customer contracts are expensed as incurred. Our inventory is recorded using the first-in, first-out method ("FIFO"), which requires the use of judgment and estimates. Given the nature of our inventory, the calculation of cost of goods sold is based on estimates used in the valuation of the FIFO inventory and in determining the specific composition of inventory that is sold to each customer.

### General and Administrative Expenses

We and our General Partner are party to a Management Services Agreement (the "MSA") with Enviva Management. Under the MSA, direct or indirect internal or third-party expenses incurred are either directly identifiable or allocated to us. Enviva Management estimates the percentage of employee salaries and related benefits, third-party costs, office rent and expenses and any other overhead costs to be provided to us. Each month, Enviva Management allocates the actual costs accumulated in the financial accounting system using these estimates. Enviva Management also charges us for any directly identifiable costs such as goods or services provided at our request. We believe Enviva Management's assumptions and allocations have been made on a reasonable basis and are the best estimate of the costs that we would have incurred on a stand-alone basis.

Our consolidated financial statements have been recast to reflect the contribution of our sponsor's interest in Wilmington as if the contribution had occurred on May 15, 2013, the date Wilmington was originally organized. We do not develop plants or ports within the Partnership and therefore we do not incur startup and commissioning costs or overhead costs related to construction activities. Prior to the consummation of the Wilmington Drop-Down, Wilmington incurred general and administrative costs related to development activities which included startup and commissioning activities prior to beginning production as well as incremental overhead costs related to construction activities. We do not expect to incur these costs going forward.

A1588

**Results of Operations**

***Year Ended December 31, 2017 Compared to Year Ended December 31, 2016***

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 (Recast) | Change |
| | (in thousands) | | |
| Product sales | $ 522,250 | $ 444,489 | $ 77,761 |
| Other revenue [1] | 20,971 | 19,787 | 1,184 |
| Net revenue | 543,221 | 464,276 | 78,945 |
| Cost of goods sold, excluding depreciation and amortization [1] | 419,616 | 357,418 | 62,198 |
| Loss on disposal of assets | 4,899 | 2,386 | 2,513 |
| Depreciation and amortization | 39,904 | 27,700 | 12,204 |
| Total cost of goods sold | 464,419 | 387,504 | 76,915 |
| Gross margin | 78,802 | 76,772 | 2,030 |
| General and administrative expenses [1] | 30,107 | 33,098 | (2,991) |
| Disposal and impairment of assets held for sale | 827 | 9,991 | (9,164) |
| Total general and administrative | 30,934 | 43,089 | (12,155) |
| Income from operations | 47,868 | 33,683 | 14,185 |
| Interest expense | (31,744) | (15,643) | (16,101) |
| Related-party interest expense | — | (578) | 578 |
| Early retirement of debt obligation | — | (4,438) | 4,438 |
| Other (expense) income | (1,751) | 439 | (2,190) |
| Net income | 14,373 | 13,463 | 910 |
| Less net loss attributable to noncontrolling partners' interests | 3,140 | 5,804 | (2,664) |
| Net income attributable to Enviva Partners, LP | $ 17,513 | $ 19,267 | $ (1,754) |

[1] See Part II, Item 8. "Financial Statements and Supplementary Data—Note 13, *Related-Party Transactions*

*Product sales*

Revenue related to product sales (either produced by us or procured from a third party) increased to $522.3 million in 2017 from $444.5 million in 2016. The $77.8 million increase was largely attributable to greater sales volumes, primarily relating to tons sold under the contract acquired in connection with the Sampson Drop-Down. In 2017, we sold 2,724,000 MT of wood pellets compared to 2,346,000 in 2016, a 16% increase.

*Other revenue*

Other revenue increased to $21.0 million for the year ended December 31, 2017 compared to $19.8 million for the year ended December 31, 2016. The $1.2 million increase was primarily attributable to a $2.8 million increase in related-party terminal services as a result of the Wilmington Drop-Down. Other revenue includes sales of wood pellets sourced from third-party pellet producers and delivered to our customers. In these back-to-back transactions, title and risk of loss immediately transfers to the ultimate purchasers; accordingly, such transactions are presented on a net basis. Other revenue also includes revenue derived from terminal services.

*Cost of goods sold*

Cost of goods sold increased to $464.4 million for the year ended December 31, 2017 from $387.5 million for the year ended December 31, 2016. The $76.9 million increase was primarily attributable to an increase in sales volumes and depreciation expense. In 2017, there was approximately $12.6 million of incremental depreciation expense, related to machinery and equipment at the Sampson plant and Wilmington terminal.

60

A1589

*Loss on disposal of assets*

We incurred $4.9 million and $2.4 million of expense associated with the disposal of assets during the years ended December 31, 2017 and 2016, respectively, which was primarily attributable to the disposal of assets replaced in connection with growth and maintenance capital projects at two of our plants.

*Gross margin*

We earned gross margin of $78.8 million and $76.8 million for the years ended December 31, 2017 and 2016, respectively. The gross margin increase of $2.0 million was primarily attributable to the following:

- A $14.2 million increase in gross margin due to higher sales volumes. Our wood pellet sales volumes increased by approximately 378,000 MT during 2017 as compared to 2016, representing a 16% increase, which is principally attributable to sales under the contract acquired in connection with the Sampson Drop-Down.

- A $1.4 million increase in gross margin during 2017 as compared to 2016 due primarily to lower raw material costs during 2017 as compared to 2016 .

- A $0.8 million increase in gross margin due to lower amortization costs as acquired contracts reach the end of their respective contract terms.

Offsetting the above was:

- An increase in depreciation expense during 2017, which decreased gross margin by $13.0 million as compared to 2016. The increase in depreciation expense primarily related to machinery and equipment at the Sampson plant and Wilmington terminal .

- An increase of $2.5 million in loss on the disposal of assets during 2017, which is primarily attributable to the disposal of assets replaced in connections with growth and maintenance capital projects at our wood pellet production plants.

- A $0.4 million decrease in gross margin due to the mix of customer and shipping contracts during 2017 as compared to 2016.

*Adjusted gross margin per metric ton*

| | Year Ended December 31, | | |
| | 2017 | 2016 (Recast) | Change |
| | (in thousands except per metric ton) | | |
| Metric tons sold | 2,724 | 2,346 | 378 |
| Gross margin | $ 78,802 | $ 76,772 | $ 2,030 |
| Loss on disposal of assets | 4,899 | 2,386 | 2,513 |
| Depreciation and amortization | 39,904 | 27,700 | 12,204 |
| Adjusted gross margin | $ 123,605 | $ 106,858 | $ 16,747 |
| Adjusted gross margin per metric ton | $ 45.38 | $ 45.55 | $ (0.17) |

We earned an adjusted gross margin of $123.6 million, or $45.38 per metric ton, for the year ended December 31, 2017 and an adjusted gross margin of $106.9 million, or $45.55 per metric ton, for the year ended December 31, 2016. The factors impacting adjusted gross margin are detailed above under the heading "Gross margin."

61

*General and administrative expenses*

General and administrative expenses were $30.1 million for the year ended December 31, 2017 and $33.1 million for the year ended December 31, 2016. During the year ended December 31, 2017, general and administrative expenses included allocated expenses of $14.6 million that were incurred under the MSA, $0.2 million related to development activities prior to the Wilmington Drop-Down, $6.7 million of direct expenses, $5.0 million of non-cash unit compensation expense associated with unit-based awards and $3.5 million related to acquisition transaction expenses. During the year ended December 31, 2016, we incurred $14.2 million under the MSA, $2.4 million and $7.0 million related to development activities prior to the Wilmington Drop-Down and the Sampson Drop-Down, respectively, $4.5 million of direct expenses, $4.2 million of non-cash unit compensation expense associated with unit-based awards, and $0.8 million of expenses related to acquisition transaction expenses.

*Disposal and impairment of assets held for sale*

During the year ended December 31, 2017, we recorded a loss on the sale of $0.8 million, net, upon deconsolidation of the Wiggins plant. For more information, please read "—Recent Developments—Sale of Wiggins Plant" above. During the year ended December 31, 2016, we incurred a $10.0 million non-cash impairment charge related to the sale of the Wiggins plant.

*Interest expense*

We incurred $31.7 million of interest expense during the year ended December 31, 2017 and $15.6 million during the year ended December 31, 2016. The increase in interest expense from the prior year was primarily attributable to our increase in long-term debt outstanding. Please read "—Senior Notes Due 2021" below.

*Related-party interest expense*

On December 11, 2015, under our Senior Secured Credit Facilities, we obtained incremental borrowings in the amount of $36.5 million and Enviva FiberCo, LLC, a wholly owned subsidiary of our sponsor ("FiberCo"), became a lender with the purchase of $15.0 million aggregate principal amount of the incremental borrowings. On June 30, 2016, FiberCo assigned all of its rights and obligations in its capacity as a lender to a third party. During 2016, we incurred $0.4 million of related-party interest expense associated with this related-party debt. We did not incur related-party interest expense during 2017. Please read "—Senior Secured Credit Facilities" below.

*Early retirement of debt obligation*

We incurred a $4.4 million charge during the year ended December 31, 2016 for the partial write-off of debt issuance costs and original issue discount associated with the existing Senior Secured Credit Facilities. The amounts were amortized over the term of the debt and were expensed on December 14, 2016 when we repaid $158.1 million outstanding under the existing Senior Secured Credit Facilities.

*Other (expense) income*

Certain cash flow hedges related to foreign currency exchange risk previously designated as hedges ceased to qualify for hedge accounting treatment and we discontinued hedge accounting for such hedge transactions on December 31, 2017. A $1.6 million loss included in accumulated other comprehensive income was reclassified to other expense.

62

*Adjusted EBITDA*

| | Year Ended December 31, | | | | |
| | 2017 | | 2016 (Recast) | | Change |
| | | | (in thousands) | | |
|---|---|---|---|---|---|
| Reconciliation of adjusted EBITDA to net income: | | | | | |
| Net income | $ | 14,373 | $ | 13,463 | $ 910 |
| Add: | | | | | |
| Depreciation and amortization | | 40,361 | | 27,735 | 12,626 |
| Interest expense | | 31,744 | | 16,221 | 15,523 |
| Early retirement of debt obligation | | — | | 4,438 | (4,438) |
| Non-cash unit compensation expense | | 5,014 | | 4,230 | 784 |
| Asset impairments and disposals | | 5,726 | | 12,377 | (6,651) |
| Changes in the fair value of derivative instruments | | 1,565 | | — | 1,565 |
| Transaction expenses | | 3,598 | | 827 | 2,771 |
| Adjusted EBITDA | $ | 102,381 | $ | 79,291 | $ 23,090 |

We generated adjusted EBITDA of $102.4 million for the year ended December 31, 2017 compared to $79.3 million for the year ended December 31, 2016. The $23.1 million increase in adjusted EBITDA was attributable to the $16.7 million increase in adjusted gross margin described above and a decrease in general and administrative expenses primarily attributable to the $2.4 million and $7.0 million of development activities related to the Wilmington terminal and Sampson plant, respectively, incurred during 2016.

*Distributable cash flow*

The following is a reconciliation of adjusted EBITDA to distributable cash flow:

| | Year Ended December 31, | | | | |
| | 2017 | | 2016 (Recast) | | Change |
| | | | (in thousands) | | |
|---|---|---|---|---|---|
| Adjusted EBITDA | $ | 102,381 | $ | 79,291 | $ 23,090 |
| Less: | | | | | |
| Interest expense, net of amortization of debt issuance costs, debt premium and original issue discount | | 30,297 | | 14,329 | 15,968 |
| Maintenance capital expenditures | | 4,353 | | 5,187 | (834) |
| Distributable cash flow attributable to Enviva Partners, LP | | 67,731 | | 59,775 | 7,956 |
| Less: Distributable cash flow attributable to incentive distribution rights | | 3,398 | | 1,077 | 2,321 |
| Distributable cash flow attributable to Enviva Partners, LP limited partners | $ | 64,333 | $ | 58,698 | $ 5,635 |

63

A1592

*Year Ended December 31, 2016 Compared to Year Ended December 31, 2015*

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 (Recast) | 2015 (Recast) | Change |
| | (in thousands) | | |
| Product sales | $ 444,489 | $ 450,980 | $ (6,491) |
| Other revenue [1] | 19,787 | 6,394 | 13,393 |
| Net revenue | 464,276 | 457,374 | 6,902 |
| Cost of goods sold, excluding depreciation and amortization [1] | 357,418 | 365,061 | (7,643) |
| Loss on disposal of assets | 2,386 | 2,081 | 305 |
| Depreciation and amortization | 27,700 | 30,692 | (2,992) |
| Total cost of goods sold | 387,504 | 397,834 | (10,330) |
| Gross margin | 76,772 | 59,540 | 17,232 |
| General and administrative expenses [1] | 33,098 | 23,922 | 9,176 |
| Impairment of assets held for sale | 9,991 | — | 9,991 |
| Total general and administrative expenses | 43,089 | 23,922 | 19,167 |
| Income from operations | 33,683 | 35,618 | (1,935) |
| Interest expense | (15,643) | (10,558) | (5,085) |
| Related-party interest expense | (578) | (1,154) | 576 |
| Early retirement of debt obligation | (4,438) | (4,699) | 261 |
| Other income (expense) | 439 | 979 | (540) |
| Net income (loss) before income tax expense | 13,463 | 20,186 | (6,723) |
| Income tax expense | — | 2,623 | (2,623) |
| Net income | 13,463 | 17,563 | (4,100) |
| Less net loss attributable to noncontrolling partners' interests | 5,804 | 2,859 | 2,945 |
| Net income attributable to Enviva Partners, LP | $ 19,267 | $ 20,422 | $ (1,155) |

[1] See Part II, Item 8. "Financial Statements and Supplementary Data—Note 13, *Related-Party Transactions*

*Product sales*

Revenue related to product sales (either produced by us or procured from a third party) were largely consistent for the year ended December 31, 2016 as compared to the year ended December 31, 2015.

*Other revenue*

Other revenue increased to $19.8 million for the year ended December 31, 2016 compared to $6.4 million for the year ended December 31, 2015. The $13.4 million increase was primarily attributable to the following:

- A $7.2 million increase in fees received from third-party pellet producers who had committed to purchase shipments of wood pellets from us on a short-term basis to meet volume, quality or sustainability commitments under their customer contracts. The third-party pellet producers cancelled shipments in return for make-whole payments.

- A $4.4 million increase in fees earned for modifications to scheduled shipments as well as shipments purchased from and sold to third-party market participants, including, in some cases, our customers. These back-to-back transactions, in which title and risk of loss immediately transferred to the ultimate purchasers, are presented on a net basis.

- A $1.7 million increase for a payment received from a third-party supplier as a result of its decision to terminate a short-term wood pellet supply agreement.

64

*Cost of goods sold*

Cost of goods sold decreased to $387.5 million for the year ended December 31, 2016 from $397.8 million for the year ended December 31, 2015. The $10.3 million decrease was primarily attributable to lower raw material and production costs and lower amortization expense as acquired customer contracts reach the end of their respective contract terms.

*Gross margin*

We earned gross margin of $76.8 million and $59.5 million for the years ended December 31, 2016 and 2015, respectively. The gross margin increase of $17.2 million was primarily attributable to the following:

- A $13.4 million increase in Other revenues as described above.

- The favorable cost position of our wood pellets, excluding production from our Sampson plant, during the year ended December 31, 2016 as compared to the year ended December 31, 2015 increased gross margin by $4.9 million. The cost improvements primarily related to increased plant utilization, lower raw material costs and lower fuel costs that reduced our to-port logistics costs for all plants during 2016 as compared to 2015.

- A $3.0 million decrease in depreciation and amortization expense during the year ended December 31, 2016 as compared to the year ended December 31, 2015 attributable to lower amortization expense as acquired customer contracts reach the end of their respective contract terms.

Offsetting the above was:

- A $1.8 million decrease in estimated incremental costs to deliver a shipment that we purchased back from a customer and sold to another customer during the fourth quarter of 2016.

- A $2.1 million decrease in gross margin due to the cost position of our Sampson plant during its first months of production.

*Adjusted gross margin per metric ton*

| | Year Ended December 31, | | |
| | 2016 (Recast) | 2015 (Recast) | Change |
|---|---|---|---|
| | (in thousands except per metric ton) | | |
| Metric tons sold | 2,346 | 2,374 | (28) |
| Gross margin | $ 76,772 | $ 59,540 | $ 17,232 |
| Loss on disposal of assets | 2,386 | 2,081 | 305 |
| Depreciation and amortization | 27,700 | 30,692 | (2,992) |
| Adjusted gross margin | $ 106,858 | $ 92,313 | $ 14,545 |
| Adjusted gross margin per metric ton | $ 45.55 | $ 38.89 | $ 6.66 |

We earned an adjusted gross margin of $106.9 million, or $45.55 per metric ton, for the year ended December 31, 2016 and an adjusted gross margin of $92.3 million, or $38.89 per metric ton, for the year ended December 31, 2015. The factors impacting adjusted gross margin are detailed above under the heading "Gross margin."

*General and administrative expenses*

General and administrative expenses were $33.1 million for the year ended December 31, 2016 and $23.9 million for the year ended December 31, 2015. During the year ended December 31, 2016, general and administrative expenses included allocated expenses of $14.2 million that were incurred under the MSA, $2.4 and $7.0 million related to development activities prior to the Wilmington Drop-Down and the Sampson Drop-Down,

65

A1594

respectively, $4.5 million of direct expenses, $4.2 million of non-cash unit compensation expense associated with unit-based awards and $0.8 million related to acquisition transaction expenses. During the year ended December 31, 2015, we incurred $16.2 million under the MSA, $0.6 million and $1.6 million related to development activities prior to the Wilmington Drop-Down and Sampson Drop-Down, respectively, $3.6 million of direct expenses, $0.7 million of compensation expense associated with unit-based awards, $0.4 million of accounting, legal and other expenses related to our Reorganization activities and $0.9 million of expenses related to acquisition transaction expenses.

*Impairment of assets held for sale*

During the year ended December 31, 2016, we incurred a $10.0 million non-cash impairment charge related to the sale of the Wiggins plant.

*Interest expense*

We incurred $15.6 million of interest expense during the year ended December 31, 2016 and $10.6 million during the year ended December 31, 2015. On November 1, 2016, the proceeds from the Senior Notes were deposited into an escrow account pending completion of the Sampson Drop-Down. On December 14, 2016, a portion of the proceeds, together with cash on hand, were used to repay a portion of the Senior Secured Credit Facilities. As a result, we incurred interest expense on both the Senior Notes and the Senior Secured Credit Facilities during the escrow period. Please read "—Senior Notes Due 2021" below.

*Related-party interest expense*

We incurred $0.6 million of related-party interest expense during the year ended December 31, 2016 and $1.2 million of related-party interest expense during the year ended December 31, 2015. On December 11, 2015, under our Senior Secured Credit Facilities, we obtained incremental borrowings in the amount of $36.5 million. FiberCo became a lender with the purchase of $15.0 million aggregate principal amount of the incremental borrowing advances. On June 30, 2016, FiberCo assigned all of its rights and obligations in its capacity as a lender to a third party. During the year ended December 31, 2016, we incurred $0.4 million of related-party interest expense associated with this related-party debt.

In connection with the January 5, 2015 acquisition of Cottondale (formerly owned by Green Circle), the sponsor made a term advance of $36.7 million to Cottondale under a revolving note and advanced Acquisition II $50.0 million under a note payable. Cottondale repaid $4.8 million of the outstanding principal of the term advance in March 2015. As a result of the sponsor's contribution of Acquisition II, which owned Cottondale, to the Partnership on April 9, 2015, we recorded $81.9 million of outstanding principal and $0.9 million of accrued interest related to the term advance and note payable. In connection with the closing of the IPO on May 4, 2015, we repaid the term advance and note payable outstanding principal of $81.9 million and accrued interest of $1.1 million to the sponsor. We incurred $1.1 million of related-party interest expense for the term advance and note payable for the year ended December 31, 2015.

*Early retirement of debt obligation*

We incurred a $4.4 million charge during the year ended December 31, 2016 for the partial write-off of debt issuance costs and original issue discount associated with the existing Senior Secured Credit Facilities. The amounts were amortized over the term of the debt and were expensed on December 14, 2016 when we repaid $158.1 million outstanding under the existing Senior Secured Credit Facility.

We incurred a $4.7 million charge during the year ended December 31, 2015 for the write-off of debt issuance costs and original issue discount associated with the $120.0 million aggregate principal amount of senior secured credit facilities (the "Prior Senior Secured Credit Facilities"). The amounts were amortized over the term of the debt and were expensed on April 9, 2015 when we repaid all amounts outstanding under the Prior Senior Secured Credit Facilities.

66

A1595

*Income tax expense*

During the year ended December 31, 2016, we incurred no income tax expense. During the year ended December 31, 2015, we incurred income tax expense of $2.7 million related to the separate activity of the Cottondale plant from the date of acquisition on January 5, 2015 through April 8, 2015. During this period, Green Circle was a corporate subsidiary of the predecessor entity of Acquisition II. Green Circle, which is now Cottondale, and Acquisition II were each treated as corporations for federal income tax purposes until April 7, 2015 and April 8, 2015, respectively. Prior to the contribution of Acquisition II to us on April 9, 2015, the financial results of the predecessor entity of each of Acquisition II and Green Circle were included in the consolidated federal income tax return of the tax paying entity, Acquisition I.

*Adjusted EBITDA*

|  | 2016 (Recast) | 2015 (Recast) | Change |
|---|---|---|---|
| | | (in thousands) | |
| Reconciliation of adjusted EBITDA to net income: | | | |
| Net income | $ 13,463 | $ 17,563 | $ (4,100) |
| Add: | | | |
| Depreciation and amortization | 27,735 | 30,738 | (3,003) |
| Interest expense | 16,221 | 11,712 | 4,509 |
| Early retirement of debt obligation | 4,438 | 4,699 | (261) |
| Purchase accounting adjustment to inventory | — | 697 | (697) |
| Non-cash unit compensation expense | 4,230 | 704 | 3,526 |
| Income tax expense | — | 2,623 | (2,623) |
| Asset impairments and disposals | 12,377 | 2,081 | 10,296 |
| Transaction expenses | 827 | 893 | (66) |
| Adjusted EBITDA | $ 79,291 | $ 71,710 | $ 7,581 |

Column header: Year Ended December 31,

We generated adjusted EBITDA of $79.3 million for the year ended December 31, 2016 compared to $71.7 million for the year ended December 31, 2015. The $7.6 million improvement in adjusted EBITDA was primarily attributable to the $14.5 million increase in adjusted gross margin discussed in further detail above. Offsetting the increase to adjusted gross margin was a $7.3 million increase in general and administrative expenses related to development activities prior to the Wilmington Drop-Down and the Sampson Drop-Down as discussed above under "—General and administrative expenses."

*Distributable cash flow*

The following is a reconciliation of adjusted EBITDA to distributable cash flow:

|  | 2016 (Recast) | 2015 (Recast) | Change |
|---|---|---|---|
| | | (in thousands) | |
| Adjusted EBITDA | $ 79,291 | $ 71,710 | $ 7,581 |
| Less: | | | |
| Interest expense, net of amortization of debt issuance costs, debt premium costs and original issue discount | 14,329 | 10,106 | 4,223 |
| Maintenance capital expenditures | 5,187 | 4,359 | 828 |
| Distributable cash flow to Enviva Partners, LP limited partners | 59,775 | 57,245 | 2,530 |
| Less: Distributable cash flow attributable to incentive distribution rights | 1,077 | — | 1,077 |
| Distributable cash flow attributable to Enviva Partners, LP limited partners | $ 58,698 | $ 57,245 | $ 1,453 |

Column header: Year Ended December 31,

67

Table of Contents    Case 8:22-cv-02844-DKC    Document 62-21    Filed 06/02/23    Page 71 of 208

**Liquidity and Capital Resources**

*Overview*

Our principal liquidity requirements for 2017 were to fund working capital, service our debt, maintain cash reserves, finance growth and maintenance capital expenditures, pay distributions and fund a portion of the Wilmington Drop-Down. We met our liquidity needs in 2017 with a combination of funds generated through operations, net proceeds from the sales of our additional Senior Notes, borrowings under our revolving credit commitments and proceeds from the sales of common units under our ATM Program.

Our principal liquidity requirements for the year ended December 31, 2016 were to fund working capital, service our debt, maintain cash reserves, finance growth and maintenance capital expenditures, pay distributions and fund a portion of the Sampson Drop-Down. We met our liquidity needs in 2016 with a combination of funds generated through operations, net proceeds from the Senior Notes Offering, borrowings under our revolving credit commitments and proceeds from the sales of common units under our ATM Program.

We expect our sources of liquidity to include cash generated from operations, borrowings under our revolving credit commitments and, from time to time, debt and equity offerings, including under our ATM Program. We operate in a capital-intensive industry, and our primary liquidity needs are to fund working capital, service our debt, maintain cash reserves, finance maintenance capital expenditures and pay distributions. We believe cash generated from our operations will be sufficient to meet the short-term working capital requirements of our business. However, future capital expenditures and other cash requirements could be higher than we currently expect as a result of various factors. Additionally, our ability to generate sufficient cash from our operating activities depends on our future performance, which is subject to general economic, political, financial, competitive and other factors beyond our control.

Our minimum quarterly distribution is $0.4125 per common and subordinated unit per quarter, which equates to approximately $10.9 million per quarter, or approximately $43.4 million per year, based on the number of common and subordinated units outstanding as of February 16, 2018, to the extent we have sufficient cash from our operations after establishment of cash reserves and payment of fees and expenses. Because it is our intent to distribute at least the minimum quarterly distribution on all of our units on a quarterly basis, we expect that we will rely upon external financing sources, including bank borrowings and the issuance of debt and equity securities, to fund future acquisitions and expansions.

*Non-Cash Working Capital*

Non-cash working capital is the amount by which current assets, excluding cash, exceed current liabilities and is a measure of our ability to pay our liabilities as they become due. Our non-cash working capital was $34.6 million at December 31, 2017 and $45.9 million at December 31, 2016. The primary components of changes in non-cash working capital were the following:

*Accounts receivable, net and related-party receivables*

Accounts receivable, net and related-party receivables decreased non-cash working capital by $1.3 million during the year ended December 31, 2017 as compared to December 31, 2016. The decrease in accounts receivable was primarily attributable to the number of shipments from our own production plants and shipments purchased and sold during December 2017. Related-party receivables at December 31, 2017 included $4.9 million due from the First Hancock JV related to the Sampson Drop-Down and the Wilmington Drop-Down.

*Inventories*

Our inventories consist of raw materials, work-in-process, consumable tooling and finished goods. Inventories decreased to $23.5 million at December 31, 2017 from $29.9 million at December 31, 2016. The decrease in inventory was attributable to a $5.5 million decrease in finished goods inventory due to the timing, volume and size of product shipments and a $3.2 million decrease in raw material inventories to support the reliability of our planned production

68

A1597

levels. The decrease in inventory was partially offset by a $2.3 million increase in consumable tooling and spare parts inventory.

*Assets held for sale*

Assets held for sale decreased $3.0 million at December 31, 2017. At December 2016, we initiated a plan to sell the Wiggins plant and reflected $3.0 million as the carrying amount of the assets held for sale. We sold the Wiggins plant to a third-party buyer on December 27, 2017, and on December 28, 2017, Wiggins was dissolved and deconsolidated.

*Accounts payable, related-party payables, accrued liabilities and related-party accrued liabilities*

The decrease in accounts payable, related-party payables, accrued liabilities and related-party accrued liabilities at December 31, 2017 as compared to December 31, 2016 increased non-cash working capital by $3.1 million and was primarily attributable to a decrease in shipping and trading sales liabilities due to timing and volume of product shipments. Related-party payables at December 31, 2017 included $19.6 million related to the MSA, compared to $10.9 million related to the MSA at December 31, 2016. The increase is attributable to the timing of payments at year end.

*Current portion of interest payable*

An increase in the current portion of interest payable at December 31, 2017 compared to December 31, 2016 decreased non-cash working capital by $0.6 million. The current portion of interest payable is primarily related to accrued interest on our Senior Notes. Please read "—Senior Notes Due 2021" below.

*Current portion of long-term debt and capital lease obligations*

An increase in the current portion of long-term debt and capital lease obligations at December 31, 2017 compared to December 31, 2016 decreased non-cash working capital by $2.0 million due to payments related to the Senior Secured Credit Facilities.

**Cash Flows**

The following table sets forth a summary of our net cash flows from operating, investing and financing activities for the years ended December 31, 2017, 2016 and 2015:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2017** | **2016 (Recast)** | **2015 (Recast)** |
| | (in thousands) | | |
| Net cash provided by operating activities | $ 87,095 | $ 55,804 | $ 65,857 |
| Net cash used in investing activities | (28,601) | (111,124) | (103,490) |
| Net cash (used in) provided by financing activities | (58,436) | 53,658 | 39,173 |
| Net increase (decrease) in cash and cash equivalents | $ 58 | $ (1,662) | $ 1,540 |

*Cash Provided by Operating Activities*

Net cash provided by operating activities was $87.1 million, $55.8 million and $65.9 million for the years ended December 31, 2017, 2016 and 2015, respectively. The changes were primarily attributable to the following:

- A $30.5 million favorable change in operating assets and liabilities during the year ended 2017 compared to 2016 primarily attributable to a decrease in accounts receivable, net, related-party receivables and inventories. The favorable change was partially offset by a decrease in accounts payable, related-party

69

A1598

payables and accrued liabilities. The change was primarily attributable to the timing, volume and size of product shipments.

- A $14.9 million unfavorable change in operating assets and liabilities during the year ended 2016 compared to 2015 primarily attributable to an increase in accounts receivable, net. The accounts receivable, net, increase was due to the number of shipments from our own production plants and shipments purchased and sold during December 2016 combined with partially loaded shipments at the end of 2016 for which title and risk of loss had passed to the customer. The increase in accounts receivable, net, was partially offset by an increase in accrued expenses primarily attributable to the aforementioned shipments and purchase and sale transactions.

*Cash Used in Investing Activities*

Net cash used in investing activities was $28.6 million, $111.1 million and $103.5 million for the years ended December 31, 2017, 2016 and 2015, respectively. The cash used in investing activities from the year ended December 31, 2016 and 2015 related primarily to the construction of the Sampson plant and Wilmington terminal. Of the $28.7 million used for property, plant and equipment during the year ended December 31, 2017, approximately $5.7 million related to projects intended to increase the production capacity of our plants and $4.4 million was used to maintain our equipment and machinery. Of the remaining amount in 2017, $10.2 million was used for the construction of the Sampson plant and $8.4 million was used for the construction of the Wilmington terminal.

*Cash (Used in) Provided by Financing Activities*

Net cash (used in) provided by financing activities was $(58.4) million, $53.7 million and $39.2 million for the years ended December 31, 2017, 2016 and 2015, respectively. Net cash used in financing activities during the year ended December 31, 2017 related primarily to distributions paid to our unitholders of $64.3 million, distributions to our sponsor of $55.9 million related to the Wilmington Drop-Down and $83.0 million of repayments, net, on our debt and capital lease obligations. The net cash used in financing activities was partially offset by proceeds of $60.0 million from the additional Senior Notes and $72.0 million of borrowings under our revolving credit commitments.

Net cash provided by financing activities during the year ended December 31, 2016 related primarily to proceeds from the Partnership's Senior Notes offering and the Sampson Drop-Down. Net proceeds of $293.6 million from our Senior Notes were used to repay debt, including $158.1 million due under the Senior Secured Credit Facilities and to distribute $139.6 million to our sponsor related to the Sampson Drop-Down.

Net cash provided by financing activities during the year ended December 31, 2015 related primarily to borrowings under our Senior Secured Credit Facilities of $230.1 million and IPO proceeds of $215.1 million. Also contributing to net cash provided by financing activities were capital contributions made by the First Hancock JV prior to the Wilmington Drop-Down and the Sampson Drop-Down of $43.6 million and $62.0 million, respectively. These amounts were partially offset by $199.6 million of repayments, net, to our debt and capital lease obligations, $297.2 million in distributions to our sponsor and the payment of cash distributions to unitholders of $16.9 million.

**Senior Notes Due 2021**

On November 1, 2016, we and our wholly owned subsidiary, Enviva Partners Finance Corp. (together, the "Issuers"), Wilmington Trust, National Association, as trustee, and the guarantors thereto entered into an indenture, as amended or supplemented (the "Indenture"), pursuant to which we issued $300.0 million in aggregate principal amount of Senior Notes to eligible purchasers (the "Senior Notes Offering") in a private placement under the Securities Act, which resulted in net proceeds of $293.6 million after deducting expenses and underwriting discounts of $6.4 million. On December 14, 2016, a portion of the net proceeds from the Senior Notes, together with cash on hand and the issuance of $30.0 million in common units to the First Hancock JV, funded the consideration payable in connection with the Sampson Drop‑Down. The remainder of the net proceeds from the Senior Notes was used to repay certain outstanding term loan indebtedness under our Senior Secured Credit Facilities. We were in compliance with the covenants and restrictions associated with, and no events of default existed under, the Indenture as of December 31, 2017. The Senior

A1599

Notes are guaranteed jointly and severally, on a senior unsecured basis by substantially all of our existing subsidiaries and our future restricted subsidiaries that guarantee certain of our indebtedness. In August 2017, holders of 100% of the Senior Notes tendered such notes in exchange for newly issued registered notes with terms substantially identical in all material respects to the Senior Notes (except that such registered notes are not subject to restrictions on transfer).

On October 10, 2017, pursuant to the Indenture, the Issuers issued and sold an additional $55.0 million in aggregate principal amount of the Senior Notes to a purchaser (the "Additional Notes Purchaser") at 106.25% of par value plus accrued interest from May 1, 2017. The additional Senior Notes were issued pursuant to the Indenture and have the same terms as the Senior Notes. The sale of the additional Senior Notes resulted in gross proceeds to the Issuers of approximately $60.0 million. The proceeds were used to repay borrowings under the Partnership's revolving credit commitments under the Senior Secured Credit Facilities, which were used to fund the Wilmington Drop-Down, and for general partnership purposes.

In December 2017, the Additional Notes Purchaser tendered such notes in exchange for newly issued registered notes with terms substantially identical in all material respects to the Senior Notes (except that the registered notes are not subject to restrictions on transfer). The additional Senior Notes will be treated together with the Senior Notes as a single class for all purposes under the Indenture. We recorded $0.9 million in issue discounts and costs and $3.4 million in premiums associated with the issuance of the additional Senior Notes, which have been recorded as a net addition to long-term debt and capital lease obligations.

**Senior Secured Credit Facilities**

On April 9, 2015, we entered into the Credit Agreement providing for the Original Credit Facilities. The Original Credit Facilities consisted of (i) $99.5 million aggregate principal amount of Tranche A-1 borrowings, (ii) $75.0 million aggregate principal amount of Tranche A-2 borrowings and (iii) up to $25.0 million aggregate principal amount of revolving credit commitments. We are also able to request loans under incremental facilities under the Credit Agreement on the terms and conditions and in the maximum aggregate principal amounts set forth therein, provided that lenders provide commitments to make loans under such incremental facilities.

On December 11, 2015, we entered into the First Incremental Term Loan Assumption Agreement (the "Assumption Agreement") providing for the Incremental Term Borrowings under the Credit Agreement. The Incremental Term Borrowings consist of (i) $10.0 million aggregate principal amount of Tranche A-3 borrowings and (ii) $26.5 million aggregate principal amount of Tranche A-4 borrowings.

On December 11, 2015, FiberCo became a lender pursuant to the Credit Agreement with a purchase of $15.0 million aggregate principal amount of the Tranche A-4 borrowings, net of a 1.0% lender fee. On June 30, 2016, FiberCo assigned all of its rights and obligations in its capacity as a lender to a third party. The Partnership recorded $0 and $0.4 million as interest expense related to this indebtedness during the three and nine months ended September 30, 2016, respectively.

On October 17, 2016, we entered into the Second Amendment. The Second Amendment provided for an increase in the revolving credit commitments under our Senior Secured Credit Facilities from $25.0 million to $100.0 million upon the consummation of the Sampson Drop-Down, the repayment of outstanding principal and accrued interest on the Tranche A-2 and Tranche A-4 borrowings and the receipt of certain associated deliverables.

On December 14, 2016, proceeds from the Senior Notes were used to repay all outstanding indebtedness, including accrued interest, in the amount of $74.7 million for Tranche A‑2 and $26.5 million for Tranche A‑4 under the Senior Secured Credit Facilities and to repay a portion of the outstanding indebtedness, including accrued interest, in the amount of $53.6 million for Tranche A‑1 and $5.1 million for Tranche A‑3, under the Senior Secured Credit Facilities. For the year ended December 31, 2017, the Partnership recorded a $4.4 million loss on early retirement of debt obligations related to the repayments.

71

A1600

The Senior Secured Credit Facilities mature in April 2020. Borrowings under the Senior Secured Credit Facilities bear interest, at our option, at either a base rate plus an applicable margin or at a Eurodollar rate (with a 1.00% floor for term loan borrowings) plus an applicable margin. Principal and interest are payable quarterly.

We had $4.0 million outstanding under the letter of credit facility as of December 31, 2017. The letter of credit was issued in connection with a contract between us and a third party, in the ordinary course of business. The amount required to be secured with the letter of credit under the contract may be adjusted or cancelled based on the specific third-party contract terms. The amount outstanding as of December 31, 2017 is subject to automatic extensions through the termination date of the letter of credit facility. The letter of credit is not cash collateralized, and there are no unreimbursed drawings under the letter of credit as of December 31, 2017. On January 11, 2018, the letter of credit was cancelled as it was no longer contractually required.

The Credit Agreement contains certain covenants, restrictions and events of default including, but not limited to, a change of control restriction and limitations on our ability to (i) incur indebtedness, (ii) pay dividends or make other distributions, (iii) prepay, redeem or repurchase certain debt, (iv) make loans and investments, (v) sell assets, (vi) incur liens, (vii) enter into transactions with affiliates, (viii) consolidate or merge and (ix) assign certain material contracts to third parties or unrestricted subsidiaries. An event of default could result in the acceleration of our obligation to repay our borrowings and may cause a net settlement of our derivative instruments with the respective counterparties. We will be restricted from making distributions if an event of default exists under the Credit Agreement or if the interest coverage ratio (determined as the ratio of consolidated EBITDA, as defined in the Credit Agreement, to consolidated interest expense, determined quarterly) is less than 2.25:1.00 at such time.

Pursuant to the Credit Agreement, we are required to maintain, as of the last day of each fiscal quarter, a ratio of total debt to consolidated EBITDA ("Total Leverage Ratio"), as defined in the Credit Agreement, of not more than a maximum ratio, initially set at 4.25:1.00 and stepping down to 3.75:1.00 during the term of the Credit Agreement; provided that the maximum permitted Total Leverage Ratio will be increased by 0.50:1.00 for the period from the consummation of certain qualifying acquisitions through the end of the second full fiscal quarter thereafter.

As of December 31, 2017, our Total Leverage Ratio was 3.67:1.00, as calculated in accordance with the Credit Agreement, which was less than the maximum ratio of 4.75:1.00. As of December 31, 2017, we were in compliance with all covenants and restrictions associated with, and no events of default existed under, the Credit Agreement. Our obligations under the Credit Agreement are guaranteed by certain of our subsidiaries and secured by liens on substantially all of our and their assets.

**At-the-Market Offering Program**

On August 8, 2016, we filed a prospectus supplement to our shelf registration filed with the SEC on June 24, 2016, for the registration of the continuous offering of up to $100.0 million of common units, in amounts, at prices, and on terms to be determined by market conditions and other factors at the time of our offerings. In August 2016, we also entered into the Equity Distribution Agreement with certain managers pursuant to which we may offer and sell common units from time to time through or to one or more of the managers, subject to the terms and conditions set forth in the Equity Distribution Agreement, of up to an aggregate sales amount of $100.0 million.

During the year ended December 31, 2017, we sold 71,368 common units under the Equity Distribution Agreement for net proceeds of $1.9 million, net of an insignificant amount of commissions. Accounting and other fees of approximately $0.2 million were offset against the proceeds during 2017. Net proceeds from sales under the ATM Program were used for general partnership purposes. As of February 16, 2018, $88.6 million remained available for issuance under the ATM Program.

72

A1601

Table of Contents

**Contractual Obligations**

| Contractual Obligations | Total | 2018 | 2019 - 2020 | 2021 - 2022 | 2023 and Beyond |
|---|---|---|---|---|---|
| | | | (in thousands) | | |
| Long-term debt(1) | $ 399,756 | $ 4,927 | $ 39,829 | $ 355,000 | $ — |
| Other loans and capital leases | 5,158 | 3,283 | 1,382 | 493 | — |
| Operating leases | 76,087 | 3,737 | 5,567 | 5,258 | 61,525 |
| Interest expense(2) | 123,794 | 33,171 | 64,430 | 26,193 | — |
| Purchase obligations(3) | 3,514 | 3,514 | — | — | — |
| Shipping commitments (4) | 443,584 | 58,690 | 115,194 | 117,479 | 152,221 |
| Other purchase commitments(5) | 202,971 | 31,034 | 74,371 | 90,992 | 6,574 |
| | $ 1,254,864 | $ 138,356 | $ 300,773 | $ 595,415 | $ 220,320 |

(1)  Our long-term debt as of December 31, 2017 consisted of $352.2 million of outstanding indebtedness, increased by a premium of $3.2 million and offset by an unamortized discount and debt issuance costs of $6.0 million, under our Senior Notes, and $43.6 million of outstanding indebtedness, offset by an unamortized discount and debt issuance costs of $1.1 million, under our Senior Secured Credit Facilities.

(2)  The cash obligations for interest expense reflect, as of December 31, 2017, (i) interest expense related to $355.0 million of Senior Notes bearing interest at 8.50%, $43.0 million of Tranche A-1 advances and $4.75 million of Tranche A-3 advances bearing interest at a Eurodollar rate (with a 1.00% floor) plus an applicable margin, adjusted for the Partnership's pay-fixed, receive-variable interest rate swap, and (ii) interest expense related to the Amory Note, which bears interest at a rate of 6.0%.

(3)  At December 31, 2017, we had $3.5 million of purchase obligations which consisted of commitments for the purchase of materials, supplies and the engagement of services for the operation of our plants and facilities to be used in the normal course of business. The amounts presented in the table do not include items already recorded in accounts payable or accrued liabilities at December 31, 2017.

(4)  In order to mitigate volatility in our shipping costs, we have entered into fixed-price shipping contracts with reputable shippers matching the terms and volumes of certain of our off-take contracts for which we are responsible for arranging shipping. Our contracts with shippers include provisions as to the minimum amount of metric tons per year to be shipped and may also stipulate the number of shipments. Pursuant to these contracts, the terms extend to up to fifteen years, charges are based on a fixed-price per metric ton and, in some cases, there are adjustment provisions for increases in the price of fuel or for other distribution-related costs. The price per metric ton may also vary depending on the loading port and the discharge port. Our shippers commit their resources based on our planned shipments, and we would likely be liable for a portion of their expenses if we deviated from our communicated plans. As of December 31, 2017, we estimate our obligations related to these shipping contracts to be approximately $444.0 million through 2026. These amounts will be offset by the related sales transactions in the same period, which are not included in the table above.

(5)  Purchase and other commitments consist primarily of commitments under certain wood fiber and wood pellet purchases, handling and terminal and stevedoring service contracts. Some of our suppliers and service providers commit resources based on our planned purchases and require minimum levels of commitments. One supply agreement for the purchase of 720,000 MT of wood pellets from British Columbia is fully offset by an agreement to sell 720,000 MT of wood pellets to the same counterparty from our terminal locations. The amounts in the table represent an estimate of the costs we would incur under these contracts as of December 31, 2017. Many of our contracts are requirement contracts and currently do not represent a firm commitment to purchase from our suppliers; therefore, they are not reflected in the table above. Under these contracts, we may be liable for the costs incurred on services rendered until termination and the costs of any supplies on hand.

73

A1602

**Off-Balance Sheet Arrangements**

As of December 31, 2017, we did not have any off-balance sheet arrangements, as defined in Item 303(a)(4)(ii) of Regulation S-K, such as the use of unconsolidated subsidiaries, structured finance, special purpose entities or variable interest entities.

**Recently Issued Accounting Pronouncements**

See Note 3, " *Significant Accounting Policies —Recent and Pending Accounting Pronouncements* ," in the Notes to our Consolidated Financial Statements included in this Annual Report on Form 10-K for a description of recently issued and adopted accounting pronouncements.

**Critical Accounting Policies and Estimates**

The discussion and analysis of our financial condition and results of operations is based on our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of these consolidated financial statements requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the dates of the consolidated financial statements and the reported revenues and expenses during the reporting periods. We evaluate these estimates and assumptions on an ongoing basis and base our estimates on historical experience, current conditions and various other assumptions that we believe to be reasonable under the circumstances. The results of these estimates form the basis for making judgments about the carrying values of assets and liabilities as well as identifying and assessing the accounting treatment with respect to commitments and contingencies. Our actual results may materially differ from these estimates.

Listed below are accounting policies we believe are critical to our consolidated financial statements due to the degree of uncertainty regarding the estimates or assumptions involved, which we believe are critical to the understanding of our operations.

*Revenue Recognition*

We primarily earn revenue by supplying wood pellets to our customers under off-take contracts, the majority of the commitments under which are long-term in nature. We refer to the structure of our contracts as "take-or-pay" because they include a firm obligation of the customer to take a fixed quantity of product at a stated price and provisions that ensure we will be compensated in the case of a customer's failure to accept all or a part of the contracted volumes or for termination by a customer. Each contract defines the annual volume of wood pellets that a customer is required to purchase and we are required to sell, the fixed price per metric ton for product satisfying a base net calorific value and other technical specifications. These prices are fixed for the entire term, subject to annual inflation-based adjustments and price escalators, as well as, in some instances, price adjustments for product specifications and changes in underlying costs. In addition to sales of our product under these long-term, take-or-pay contracts, we routinely sell wood pellets under shorter-term contracts, which range in volume and tenor and, in some cases, may include only one specific shipment. Because each of our contracts is a bilaterally negotiated agreement, our revenue over the duration of these contracts does not generally follow spot market pricing trends. Our revenue from the sale of wood pellets is recognized when the goods are shipped, title and risk of loss passes to the customer, the sales price to the customer is fixed and determinable, and collectability is reasonably assured.

Depending on the specific off-take contract, shipping terms are either CIF, CFR or FOB. Under a CIF contract, we procure and pay for shipping costs, which include insurance and all other charges, up to the port of destination for the customer. Under a CFR contract, we procure and pay for shipping costs, which include insurance (excluding marine cargo insurance) and all other charges, up to the port of destination for the customer. Shipping costs under CIF and CFR contracts are included in the price to the customer and, as such, are included in revenue and cost of goods sold. Under FOB contracts, the customer is directly responsible for shipping costs. Our customer shipping terms, as well as the timing and size of shipments during the year, can result in material fluctuations in our revenue recognition between periods but generally have little impact on gross margin.

A1603

In some cases, we may purchase shipments of product from a third-party supplier and resell them in back-to-back transactions that immediately transfer title and risk of loss to the ultimate purchaser. Thus, the revenue from these transactions is recorded net of costs paid to the third-party supplier. We record this revenue as "Other revenue."

In instances when a customer requests the cancellation, deferral or acceleration of a shipment, the customer may pay a fee, including reimbursement of any incremental costs incurred by us, which is included in "Other revenue."

Other revenue also includes third- and related-party terminal services fees.

### Cost of Goods Sold

Cost of goods sold includes the costs to produce and deliver our wood pellets to customers. The principal expenses incurred to produce and deliver our wood pellets consist of raw material, production and distribution costs.

We have strategically located our plants in the Southeastern United States, a region with plentiful wood fiber resources. We manage the supply of raw materials into our plants primarily through short-term contracts. Delivered wood fiber costs include stumpage as well as harvesting, transportation and, in some cases, size reduction services provided by our suppliers. The majority of our product volumes are sold under long-term off-take contracts that include cost pass-through mechanisms to mitigate increases in raw material and distribution costs.

Production costs at our production plants consist of labor, energy, tooling, repairs and maintenance and plant overhead costs. Production costs also include depreciation expense associated with the use of our plants and equipment and any gain or loss on disposal of associated assets. Some of our off-take contracts include price escalators that mitigate inflationary pressure on certain components of our production costs. In addition to the wood pellets that we produce at our owned and operated production plants, we selectively purchase additional quantities of wood pellets from third-party wood pellet producers.

Distribution costs include all transportation costs from our plants to our port locations, any storage or handling costs while the product remains at port and shipping costs related to the delivery of our product from our port locations to our customers. Both the strategic location of our plants and our ownership or control of our marine terminals has allowed for the efficient and cost-effective transportation of our wood pellets. We seek to mitigate shipping risk by entering into long-term, fixed-price shipping contracts with reputable shippers matching the terms and volumes of our off-take contracts pursuant to which we are responsible for arranging shipping. Certain of our off-take contracts include pricing adjustments for volatility in fuel prices, which allows us to pass the majority of the fuel price risk associated with shipping through to our customers under those contracts.

Additionally, as deliveries are made, we amortize the purchase price of acquired customer contracts that were recorded as intangible assets during the applicable contract term.

Raw material, production and distribution costs associated with delivering our wood pellets to our owned and leased marine terminals and related- and third-party wood pellet purchase costs are capitalized as a component of inventory. Fixed production overhead, including the related depreciation expense, is allocated to inventory based on the normal capacity of the facilities. These costs are reflected in cost of goods sold when inventory is sold. Distribution costs associated with shipping our wood pellets to our customers and amortization of favorable acquired customer contracts are expensed as incurred. Our inventory is recorded using FIFO, which requires the use of judgment and estimates. Given the nature of our inventory, the calculation of cost of goods sold is based on estimates used in the valuation of the FIFO inventory and in determining the specific composition of inventory that is sold to each customer.

### Property, Plant and Equipment

Property, plant and equipment are recorded at cost, which includes the fair values of assets acquired. Equipment under capital leases is stated at the present value of minimum lease payments. Useful lives of assets are based on historical experience and are adjusted when changes in the expected physical life of the asset, its planned use,

75

technological advances or other factors show that a different life would be more appropriate. Changes in useful lives are recognized prospectively.

Depreciation is calculated using the straight-line method based on the estimated useful lives of the related assets. Plant and equipment held under capital leases are amortized on a straight-line basis over the shorter of the lease term or estimated useful life of the asset.

Construction in progress primarily represents expenditures for the development and expansion of facilities. Capitalized interest cost and all direct costs, which include equipment and engineering costs related to the development and expansion of facilities, are capitalized as construction in progress. Depreciation is not recognized for amounts in construction in progress.

Normal repairs and maintenance costs are expensed as incurred. Amounts incurred that extend an asset's useful life, increase its productivity or add production capacity are capitalized. Direct costs, such as outside labor, materials, internal payroll and benefits costs incurred during the construction of a new plant are capitalized; indirect costs are not capitalized. Repairs and maintenance costs were $21.4 million, $15.9 million and $12.3 million for the years ended December 31, 2017, 2016 and 2015, respectively.

### Asset Impairment Assessments

*Long-Lived Assets*

Long-lived assets, such as property, plant and equipment and amortizable intangible assets, are tested for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If circumstances require that a long-lived asset or asset group be tested for possible impairment, we first compare undiscounted cash flows expected to be generated by that asset or asset group to such asset or asset group's carrying value. If the carrying value of the long-lived asset or asset group is not recoverable on an undiscounted cash flow basis, an impairment is recognized to the extent that the carrying value exceeds its fair value. Fair value is determined through various valuation techniques including discounted cash flow models, quoted market values and third-party independent appraisals, as considered necessary.

*Goodwill*

Goodwill represents the purchase price paid for acquired businesses in excess of the identifiable acquired assets and assumed liabilities. Goodwill is not amortized, but is tested for impairment annually on December 1 and whenever an event occurs or circumstances change such that it is more likely than not that the fair value of the reporting unit is less than its carrying amounts. At December 31, 2017 and 2016, the Partnership identified one reporting unit that corresponded to the Partnership's one segment and selected the fourth fiscal quarter to perform its annual goodwill impairment test.

The Partnership first performs a qualitative assessment to determine whether it is necessary to perform quantitative testing. If this initial qualitative assessment indicates that it is more likely than not that the fair value of a reporting unit is more than its carrying value, goodwill is not considered impaired and the Partnership is not required to perform the two-step impairment test. Qualitative factors considered in this assessment include (i) macroeconomic conditions, (ii) past, current and projected future financial performance, (iii) industry and market considerations, (iv) changes in the costs of raw materials, fuel and labor and (v) entity-specific factors such as changes in management or customer base.

If the results of the qualitative assessment indicate that it is more likely than not that goodwill is impaired, the Partnership will perform a two-step impairment test. Under the first step, the fair value of the reporting unit is compared with its carrying value (including goodwill). If the fair value of the reporting unit exceeds its carrying value, step two does not need to be performed.

76

If the fair value of the reporting unit is less than its carrying value, an indication of goodwill impairment exists for the reporting unit and the entity must perform step two of the impairment test (measurement). Under step two, an impairment loss is recognized for any excess of the carrying amount of the reporting unit's goodwill over the implied fair value of that goodwill.

For the years ended December 31, 2017 and 2016, the Partnership applied the qualitative test and determined that it was more likely than not that the estimated fair value of the reporting unit substantially exceeded the related carrying value, and, accordingly, was not required to apply the two-step impairment test. The Partnership did not record any goodwill impairment for the years ended December 31, 2017 and 2016 (see Note 10, *Goodwill and Other Intangible Assets*) .

**ITEM 7A.  QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

Market risk is the risk of loss arising from adverse changes in market rates and prices. Historically, our risks have been predominantly related to potential changes in the fair value of our long-term debt due to fluctuations in applicable market interest rates. Our market risk exposure is expected to be limited to risks that arise in the normal course of business, as we do not engage in speculative, non-operating transactions, nor do we use financial instruments or derivative instruments for trading purposes.

*Interest Rate Risk*

At December 31, 2017, our total debt had a carrying value of $401.0 million and fair value of $423.4 million.

Although we seek to mitigate our interest rate risk through interest rate swaps (as discussed below), we are exposed to fluctuations in interest rates on borrowings under the Senior Secured Credit Facilities. Borrowings under the Senior Secured Credit Facilities bear interest, at our option, at either a base rate plus an applicable margin or at a Eurodollar rate (with a 1.00% floor for term loan borrowings) plus an applicable margin.

The applicable margin is (i) for Tranche A-1 and Tranche A-3 base rate borrowings, 2.95% through April 2018 and 2.80% thereafter, (ii) for Tranche A-1 and Tranche A-3 Eurodollar rate borrowings, 3.95% through April 2018 and 3.80% thereafter, (iii) for revolving facility base rate borrowings, 3.25%, and (iv) for revolving facility Eurodollar rate borrowings, 4.25%. We repaid in full the outstanding principal and accrued interest on the Tranche A-2 and Tranche A-4 borrowings upon the consummation of the Sampson Drop-Down. As of December 31, 2017, $43.6 million, net of unamortized discount of $1.1 million, of Tranche A-1 and Tranche A-3 borrowings remained outstanding under our Senior Secured Credit Facilities.

In September 2016, we entered into a pay-fixed, receive-variable interest rate swap agreement to fix our exposure to fluctuations in London Interbank Offered Rate-based interest rates (the "interest rate swap"). The interest rate swap commenced on September 30, 2016 and expires concurrently with the maturity of the Senior Secured Credit Facilities in April 2020. We elected to discontinue hedge accounting as of December 14, 2016 following repayment of a portion of our outstanding indebtedness under the Senior Secured Credit Facilities, and subsequently re-designated the interest rate swap for the remaining portion of such indebtedness during the year ended December 31, 2017. We enter into derivative instruments to manage cash flow. We do not enter into derivative instruments for speculative or trading purposes. The counterparty to our interest rate swap agreement is a major financial institution. As a result, we have no significant interest rate risk on our Tranche A-1 and Tranche A-3 borrowings as of December 31, 2017.

There can be no assurance that our interest rate risk-management practices, if any, will eliminate or substantially reduce risks associated with fluctuating interest rates. For more information, please read Part I, Item 1A "Risk Factors— *Our exposure to risks associated with foreign currency and interest rate fluctuations, as well the hedging arrangements we may enter into to mitigate those risks, could have an adverse effect on our financial condition and results of operations* ."

A1606

***Credit Risk***

Substantially all of our revenue was from long-term, take-or-pay off-take contracts with three customers for the years ended December 31, 2017 and 2015, and two customers for the year ended December 31, 2016. Most of our customers are major power generators in Europe. This concentration of counterparties operating in a single industry and geographic area may increase our overall exposure to credit risk, in that the counterparties may be similarly affected by changes in economic, political, regulatory or other conditions. If a customer defaults or if any of our contracts expire in accordance with their terms, and we are unable to renew or replace these contracts, our gross margin and cash flows and our ability to make cash distributions to our unitholders may be adversely affected. Although we have entered into hedging arrangements in order to minimize our exposure to fluctuations in foreign currency exchange and interest rates, our derivatives also expose us to credit risk to the extent that counterparties may be unable to meet the terms of our hedging agreements. For more information, please read Part I, Item 1A "Risk Factors— *Our exposure to risks associated with foreign currency and interest rate fluctuations, as well the hedging arrangements we may enter into to mitigate those risks, could have an adverse effect on our financial condition and results of operations* and *— Substantially all of our revenues currently are generated under contracts with four customers, and the loss of any of them could adversely affect our business, financial condition, results of operations, cash flows and ability to make cash distributions. We may not be able to renew or obtain new and favorable contracts with these customers when our existing contracts expire, which could adversely affect our revenues and profitability.* "

***Foreign Currency Exchange Risk***

We primarily are exposed to fluctuations in foreign currency exchange rates related to contracts pursuant to which deliveries of wood pellets will be settled in British Pound Sterling ("GBP"). Deliveries under the Lynemouth Contract began in late 2017 and deliveries under the EVA-MGT Contract and the 95,000 MTPY contract with the First Hancock JV begin in 2019. We have entered into forward contracts and purchased options to hedge a portion of our forecasted revenue for these customer contracts. We have designated and accounted for the forward contracts and purchased options as cash flow hedges of anticipated GBP-denominated revenue and, therefore, the effective portion of the changes in fair value on these instruments will be recorded as a component of accumulated other comprehensive income in partners' capital and will be reclassified to revenue in the consolidated statements of income in the same period in which the underlying revenue transactions occur. During December 2017, we determined that certain transactions were no longer probable of occurring within the forecasted time period. We discontinued hedge accounting and a $1.6 million loss included in other comprehensive income related to these hedging relationships was reclassified to other expense on the consolidated statements of income.

As of December 31, 2017, we had notional amounts of 46.5 million GBP under foreign currency forward contracts and 34.1 million GBP under foreign currency purchased options that expire between 2018 and 2022. At December 31, 2017, the unrealized loss associated with foreign currency forward contracts and foreign currency purchased options of approximately $2.1 million and $1.2 million, respectively, are included in other comprehensive income.

We do not utilize foreign exchange contracts for speculative or trading purposes. The counterparties to our foreign exchange contracts are major financial institutions. There can be no assurance that our hedging arrangements or other foreign exchange rate risk-management practices, if any, will eliminate or substantially reduce risks associated with our exposure to fluctuating foreign exchange rates. For more information, please read Part I, Item 1A "Risk Factors— *Our exposure to risks associated with foreign currency and interest rate fluctuations, as well the hedging arrangements we may enter into to mitigate those risks, could have an adverse effect on our financial condition and results of operations* ."

78

A1607

Table of Contents

**ITEM 8.  FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

**INDEX TO FINANCIAL STATEMENTS**

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | 80 |
| Consolidated Balance Sheets | 81 |
| Consolidated Statements of Income | 82 |
| Consolidated Statements of Comprehensive Income | 83 |
| Consolidated Statements of Changes in Partners' Capital | 84 |
| Consolidated Statements of Cash Flows | 85 |
| Consolidated Statements of Cash Flows (continued) | 86 |
| Notes to Consolidated Financial Statements | 87 |

79

A1608

**Report of Independent Registered Public Accounting Firm**

The Unitholders and Board of Directors
Enviva Partners, LP:

*Opinion on the Consolidated Financial Statements*

We have audited the accompanying consolidated balance sheets of Enviva Partners, LP and subsidiaries (the "Partnership") as of December 31, 2017 and 2016, and the related consolidated statements of income, comprehensive income, changes in partners' capital, and cash flows for each of the years in the three-year period ended December 31, 2017, and the related notes (collectively, the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Partnership as of December 31, 2017 and 2016, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2017, in conformity with U.S. generally accepted accounting principles.

*Basis for Opinion*

These consolidated financial statements are the responsibility of the Partnership's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Partnership in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Partnership is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Partnership's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

(signed) KPMG LLP

We have served as the Partnership's auditor since 2010

McLean, Virginia
February 22, 2018

80

A1609

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**
**Consolidated Balance Sheets**
**December 31, 2017 and 2016**
**(In thousands, except number of units)**

| | | 2017 | | 2016 (Recast) |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets: | | | | |
|   Cash and cash equivalents | $ | 524 | $ | 466 |
|   Accounts receivable, net of allowance for doubtful accounts of $0 as of December 31, 2017 and $24 as of December 31, 2016 | | 79,185 | | 77,868 |
|   Related-party receivables | | 5,412 | | 8,056 |
|   Inventories | | 23,536 | | 29,936 |
|   Assets held for sale | | — | | 3,044 |
|   Prepaid expenses and other current assets | | 1,006 | | 1,979 |
|     Total current assets | | 109,663 | | 121,349 |
| Property, plant and equipment, net of accumulated depreciation of $117.1 million as of December 31, 2017 and $80.8 million as of December 31, 2016 | | 562,330 | | 590,916 |
| Intangible assets, net of accumulated amortization of $10.3 million as of December 31, 2017 and $9.1 million as of December 31, 2016 | | 109 | | 1,371 |
| Goodwill | | 85,615 | | 85,615 |
| Other long-term assets | | 2,394 | | 2,125 |
|     Total assets | $ | 760,111 | $ | 801,376 |
| **Liabilities and Partners' Capital** | | | | |
| Current liabilities: | | | | |
|   Accounts payable | $ | 7,554 | $ | 9,993 |
|   Related-party payables | | 26,398 | | 11,472 |
|   Accrued and other current liabilities | | 29,363 | | 44,531 |
|   Related-party accrued liabilities | | — | | 382 |
|   Current portion of interest payable | | 5,029 | | 4,414 |
|   Current portion of long-term debt and capital lease obligations | | 6,186 | | 4,165 |
|     Total current liabilities | | 74,530 | | 74,957 |
| Long-term debt and capital lease obligations | | 394,831 | | 346,915 |
| Related-party long-term payable | | 74,000 | | — |
| Long-term interest payable | | 890 | | 770 |
| Other long-term liabilities | | 5,491 | | 1,872 |
|     Total liabilities | | 549,742 | | 424,514 |
| Commitments and contingencies | | | | |
| Partners' capital: | | | | |
| Limited partners: | | | | |
|   Common unitholders—public (13,073,439 and 12,980,623 units issued and outstanding at December 31, 2017 and December 31, 2016, respectively) | | 224,027 | | 239,902 |
|   Common unitholder—sponsor (1,347,161 units issued and outstanding at December 31, 2017 and December 31, 2016) | | 16,050 | | 18,197 |
|   Subordinated unitholder—sponsor (11,905,138 units issued and outstanding at December 31, 2017 and December 31, 2016) | | 101,901 | | 120,872 |
| General partner (no outstanding units) | | (128,569) | | (40,713) |
| Accumulated other comprehensive (loss) income | | (3,040) | | 595 |
|     Total Enviva Partners, LP partners' capital | | 210,369 | | 338,853 |
| Noncontrolling partners' interests | | — | | 38,009 |
|     Total partners' capital | | 210,369 | | 376,862 |
|     Total liabilities and partners' capital | $ | 760,111 | $ | 801,376 |

See accompanying notes to consolidated financial statements.

A1610

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**
**Consolidated Statements of Income**
**Years ended December 31, 2017, 2016 and 2015**
**(In thousands, except per unit amounts)**

| | 2017 | 2016 (Recast) | 2015 (Recast) |
|---|---|---|---|
| Product sales | $ 522,250 | $ 444,489 | $ 450,980 |
| Other revenue [(1)] | 20,971 | 19,787 | 6,394 |
| Net revenue | 543,221 | 464,276 | 457,374 |
| Cost of goods sold, excluding depreciation and amortization [(1)] | 419,616 | 357,418 | 365,061 |
| Loss on disposal of assets | 4,899 | 2,386 | 2,081 |
| Depreciation and amortization | 39,904 | 27,700 | 30,692 |
| Total cost of goods sold | 464,419 | 387,504 | 397,834 |
| Gross margin | 78,802 | 76,772 | 59,540 |
| General and administrative expenses [(1)] | 30,107 | 33,098 | 23,922 |
| Disposal and impairment of assets held for sale | 827 | 9,991 | — |
| Total general and administrative expenses | 30,934 | 43,089 | 23,922 |
| Income from operations | 47,868 | 33,683 | 35,618 |
| Other income (expense): | | | |
| Interest expense | (31,744) | (15,643) | (10,558) |
| Related-party interest expense | — | (578) | (1,154) |
| Early retirement of debt obligation | — | (4,438) | (4,699) |
| Other (expense) income | (1,751) | 439 | 979 |
| Total other expense, net | (33,495) | (20,220) | (15,432) |
| Income before income tax expense | 14,373 | 13,463 | 20,186 |
| Income tax expense | — | — | 2,623 |
| Net income | 14,373 | 13,463 | 17,563 |
| Less net loss attributable to noncontrolling partners' interests | 3,140 | 5,804 | 2,859 |
| Net income attributable to Enviva Partners, LP | $ 17,513 | $ 19,267 | $ 20,422 |
| Less: Predecessor loss to May 4, 2015 (prior to IPO) | $ — | $ — | $ (2,132) |
| Less: Pre-acquisition income from April 10, 2015 to December 10, 2015 from operations of Enviva Pellets Southampton, LLC Drop-Down allocated to General Partner | — | — | 6,264 |
| Less: Pre-acquisition loss from inception to December 13, 2016 from operations of Enviva Pellets Sampson, LLC Drop-Down allocated to General Partner | — | (3,231) | (1,815) |
| Less: Pre-acquisition loss from inception to October 1, 2017 from operations of Enviva Port of Wilmington, LLC Drop-Down allocated to General Partner | (3,049) | (2,110) | (937) |
| Enviva Partners, LP limited partners' interest in net income | $ 20,562 | $ 24,608 | $ 19,042 |
| Net income per limited partner common unit: | | | |
| Basic | $ 0.65 | $ 0.95 | $ 0.80 |
| Diluted | $ 0.61 | $ 0.91 | $ 0.79 |
| Net income per limited partner subordinated unit: | | | |
| Basic | $ 0.65 | $ 0.93 | $ 0.80 |
| Diluted | $ 0.65 | $ 0.93 | $ 0.79 |
| Weighted-average number of limited partner units outstanding: | | | |
| Common—basic | 14,403 | 13,002 | 11,988 |
| Common—diluted | 15,351 | 13,559 | 12,258 |
| Subordinated—basic and diluted | 11,905 | 11,905 | 11,905 |

[(1)] See Note 13, *Related-Party Transactions*

See accompanying notes to consolidated financial statements.

82

A1611

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**
**Consolidated Statements of Comprehensive Income**
**Years ended December 31, 2017, 2016, 2015**
**(In thousands)**

| | 2017 | | 2016 (Recast) | | 2015 (Recast) |
|---|---|---|---|---|---|
| Net income | $ 14,373 | $ | 13,463 | $ | 17,563 |
| Other comprehensive loss: | | | | | |
| Net unrealized losses on cash flow hedges | (5,463) | | (246) | | — |
| Reclassification of net losses realized into net income | 1,828 | | — | | — |
| Total other comprehensive loss | (3,635) | | (246) | | — |
| Total comprehensive income | 10,738 | | 13,217 | | 17,563 |
| Less: | | | | | |
| Predecessor loss prior to IPO | — | | — | | (2,132) |
| Pre-acquisition income from April 10, 2015 to December 10, 2015 from operations of Enviva Pellets Southampton, LLC Drop-Down allocated to General Partner | — | | — | | 6,264 |
| Pre-acquisition loss from inception to December 13, 2016 from operations of Enviva Pellets Sampson, LLC Drop-Down allocated to General Partner | — | | (3,231) | | (1,815) |
| Pre-acquisition loss from inception to October 1, 2017 from operations of Enviva Port of Wilmington, LLC Drop-Down allocated to General Partner | (3,049) | | (2,110) | | (937) |
| Total comprehensive income subsequent to IPO, Enviva Pellets Southampton, LLC Drop-Down, Enviva Pellets Sampson, LLC Drop-Down and Enviva Port of Wilmington, LLC Drop-Down | 13,787 | | 18,558 | | 16,183 |
| Less: | | | | | |
| Comprehensive loss attributable to noncontrolling partners' interests | (3,140) | | (5,804) | | (2,859) |
| Comprehensive income attributable to Enviva Partners, LP partners | $ 16,927 | $ | 24,362 | $ | 19,042 |

See accompanying notes to consolidated financial statements.

83

A1612

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**
**Consolidated Statements of Changes in Partners' Capital**
**Years ended December 31, 2017, 2016 and 2015**
**(In thousands)**

| | Net Parent Investment | General Partner Interest | Common Units—Public Units | Amount | Common Units—Sponsor Units | Amount | Subordinated Units—Sponsor Units | Amount | Accumulated Other Comprehensive Income | Non-controlling Interests | Total Partners' Capital |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Partners' capital December 31, 2014 (Recast) | 271,495 | (1,661) | — | — | — | — | — | — | — | 7,780 | 277,614 |
| Contribution of Enviva Cottondale Acquisition II, LLC | 132,765 | — | — | — | — | — | — | — | — | — | 132,765 |
| Expenses incurred by sponsor | 3,088 | — | — | — | — | — | — | — | — | — | 3,088 |
| Net proceeds from IPO, net of deferred IPO costs | — | — | 11,500 | 208,911 | — | — | — | — | — | — | 208,911 |
| Distribution to sponsor associated with IPO | (176,702) | — | — | — | — | — | — | — | — | — | (176,702) |
| Allocation of net Parent investment to sponsor | (228,514) | — | — | — | 405 | 7,518 | 11,905 | 220,996 | — | — | — |
| Distribution to sponsor associated with Enviva Pellets Southampton, LLC Drop-Down | — | (46,637) | — | — | — | (3,015) | — | (88,681) | — | — | (138,333) |
| Issuance of units associated with Enviva Pellets Southampton, LLC Drop-Down | — | — | — | — | 942 | 15,000 | — | — | — | — | 15,000 |
| Issuance of units through Long-Term Incentive Plan | — | — | 3 | 42 | — | — | — | — | — | — | 42 |
| Distributions to unitholders and distribution equivalent rights | — | — | — | (8,287) | — | (285) | — | (8,369) | — | — | (16,941) |
| Non-cash Management Services Agreement expenses | — | — | — | 662 | — | — | — | — | — | — | 662 |
| Contribution of Enviva Pellets Sampson, LLC | — | 35,433 | — | — | — | — | — | — | — | 36,267 | 71,700 |
| Contribution of Enviva Port of Wilmington, LLC | — | 12,997 | — | — | — | — | — | — | — | 13,304 | 26,301 |
| Net (loss) income | (2,132) | 3,512 | — | 9,160 | — | 401 | — | 9,481 | — | (2,859) | 17,563 |
| Balance as of December 31, 2015 (Recast) | — | 3,644 | 11,503 | 210,488 | 1,347 | 19,619 | 11,905 | 133,427 | — | 54,492 | 421,670 |
| Cash distributions | — | (716) | — | (24,779) | — | (2,729) | — | (24,107) | — | — | (52,331) |
| Issuance of units associated with Enviva Pellets Sampson, LLC Drop-Down | — | — | 1,098 | 30,000 | — | — | — | — | — | — | 30,000 |
| Issuance of units through Long-Term Incentive Plan | — | — | 21 | 411 | — | — | — | — | — | — | 411 |
| Issuance of common units, net | — | — | 359 | 8,929 | — | — | — | — | — | — | 8,929 |
| Non-cash Management Services Agreement expenses | — | — | — | 3,820 | — | — | — | — | — | — | 3,820 |
| Contribution of Enviva Pellets Sampson, LLC | — | 95,391 | — | — | — | — | — | — | — | (33,759) | 61,632 |
| Distribution to sponsor | — | (138,505) | — | — | — | — | — | — | — | — | (138,505) |
| Excess consideration over Enviva Pellets Sampson, LLC net assets | — | (18,534) | — | — | — | — | — | — | — | — | (18,534) |
| Contribution of Enviva Port of Wilmington, LLC | — | 22,632 | — | — | — | — | — | — | — | 23,080 | 45,712 |
| Other comprehensive loss | — | — | — | — | — | — | — | — | 595 | — | 595 |
| Net (loss) income | — | (4,625) | — | 11,033 | — | 1,307 | — | 11,552 | — | (5,804) | 13,463 |
| Partners' capital, December 31, 2016 (Recast) | — | (40,713) | 12,981 | 239,902 | 1,347 | 18,197 | 11,905 | 120,872 | 595 | 38,009 | 376,862 |
| Distributions to unitholders, distribution equivalent and incentive distribution rights | — | (2,630) | — | (31,533) | — | (3,065) | — | (27,084) | — | — | (64,312) |
| Issuance of units through Long-Term Incentive Plan | — | — | 21 | 503 | — | — | — | — | — | — | 503 |
| Issuance of common units, net | — | — | 71 | 1,744 | — | — | — | — | — | — | 1,744 |
| Non-cash Management Services Agreement expenses | — | 441 | — | 4,511 | — | — | — | — | — | — | 4,952 |
| Other comprehensive loss | — | — | — | — | — | — | — | — | (3,635) | — | (3,635) |
| Excess consideration over Enviva Pellets Sampson, LLC net assets | — | (744) | — | — | — | — | — | — | — | — | (744) |
| Contribution of Enviva Port of Wilmington, LLC Drop-Down | — | 29,513 | — | — | — | — | — | — | — | (32,270) | (2,757) |
| Enviva Port of Wilmington, LLC net assets | — | (73,335) | — | — | — | — | — | — | — | — | (73,335) |
| Excess consideration over Enviva Port of Wilmington, LLC net Assets | — | (40,683) | — | — | — | — | — | — | — | — | (40,683) |
| Enviva Pellets Wiggins, LLC dissolution | — | — | — | — | — | — | — | — | — | (2,599) | (2,599) |
| Net (loss) income | — | (418) | — | 8,900 | — | 918 | — | 8,113 | — | (3,140) | 14,373 |
| Partners' capital, December 31, 2017 | $ — | $ (128,569) | 13,073 | $ 224,027 | 1,347 | $ 16,050 | 11,905 | $ 101,901 | $ (3,040) | $ — | $ 210,369 |

See accompanying notes to consolidated financial statements.

84

A1613

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**
**Consolidated Statements of Cash Flows**
**Years ended December 31, 2017, 2016 and 2015**
**(In thousands)**

| | 2017 | | 2016 (Recast) | | 2015 (Recast) |
|---|---|---|---|---|---|
| Cash flows from operating activities: | | | | | |
| Net income | $ | 14,373 | $ | 13,463 | $ 17,563 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | | |
| Depreciation and amortization | | 40,361 | | 27,735 | 30,738 |
| Amortization of debt issuance costs, debt premium and original issue discounts | | 1,448 | | 1,893 | 1,606 |
| Impairment of inventory | | — | | 890 | — |
| Impairment of assets held for sale | | — | | 9,991 | — |
| General and administrative expense incurred by sponsor | | — | | — | 475 |
| General and administrative expense incurred by the First Hancock JV prior to Enviva Pellets Sampson, LLC Drop-Down | | — | | 2,343 | 2,364 |
| General and administrative expense incurred by the First Hancock JV prior to Enviva Port of Wilmington, LLC Drop-Down | | 1,343 | | 1,744 | 1,396 |
| Allocation of income tax expense from Enviva Cottondale Acquisition I, LLC | | — | | — | 2,663 |
| Early retirement of debt obligation | | — | | 4,438 | 4,699 |
| Loss on assets held for sale | | 827 | | — | — |
| Loss on disposal of assets | | 4,899 | | 2,386 | 2,081 |
| Unit-based compensation | | 5,014 | | 4,230 | 704 |
| De-designation of foreign currency forwards and options | | 1,593 | | — | — |
| Unrealized loss on foreign currency transactions | | (3) | | — | — |
| Change in fair value of interest rate swap derivatives | | — | | — | 23 |
| Change in operating assets and liabilities: | | | | | |
| Accounts receivable, net | | (1,317) | | (39,218) | (3,577) |
| Related-party receivables | | 1,577 | | 237 | (176) |
| Prepaid expenses and other assets | | 341 | | 768 | (115) |
| Assets held for sale | | (479) | | — | — |
| Inventories | | 5,758 | | (8,411) | (22) |
| Other long-term assets | | — | | 6,698 | (6,051) |
| Derivatives | | (1,720) | | (1,284) | — |
| Accounts payable, accrued liabilities and other current liabilities | | (2,331) | | 19,379 | 6,718 |
| Related-party payables | | 15,733 | | 3,625 | 4,121 |
| Accrued interest | | (1,330) | | 4,433 | 105 |
| Deferred revenue and deposits | | — | | (486) | 425 |
| Other long-term liabilities | | 1,008 | | 950 | 117 |
| Net cash provided by operating activities | | 87,095 | | 55,804 | 65,857 |
| Cash flows from investing activities: | | | | | |
| Purchases of property, plant and equipment | | (28,744) | | (112,887) | (100,216) |
| Payment of acquisition related costs | | — | | — | (3,573) |
| Proceeds from the sale of property, plant and equipment | | 143 | | 1,763 | 299 |
| Net cash used in investing activities | | (28,601) | | (111,124) | (103,490) |
| Cash flows from financing activities: | | | | | |
| Principal payments on debt and capital lease obligations | | (82,954) | | (204,216) | (199,638) |
| Principal payments on related-party debt | | — | | (3,391) | — |
| Cash paid related to debt issuance costs | | (540) | | (6,390) | (6,287) |
| Termination payment for interest rate swap derivatives | | — | | — | (146) |
| Cash restricted for debt service | | — | | — | 11,640 |
| IPO proceeds, net | | — | | — | 215,050 |
| Distributions to sponsor | | — | | (5,002) | (297,185) |
| Proceeds from common unit issuance under the At-the-Market Offering Program, net | | 1,938 | | 9,300 | — |
| Distributions to unitholders, distribution equivalent rights and incentive distribution rights holder | | (64,325) | | (51,376) | (16,883) |
| Proceeds from debt issuance | | 131,952 | | 349,500 | 230,140 |
| Proceeds from contributions from sponsor | | — | | — | 12,387 |
| Distribution to sponsor related to Enviva Pellets Sampson, LLC Drop-Down | | — | | (139,604) | — |
| Proceeds from contributions from the First Hancock JV prior to Enviva Pellets Sampson, LLC Drop-Down | | — | | 61,972 | 68,059 |
| Distributions to sponsor related to Enviva Port of Wilmington, LLC Drop-Down | | (55,929) | | — | — |
| Contributions from sponsor related to Enviva Pellets Sampson, LLC Drop-Down | | 1,652 | | — | — |
| Proceeds from contributions from the First Hancock JV prior to Enviva Port of Wilmington, LLC Drop-Down | | 9,965 | | 43,574 | 24,000 |
| Payment of deferred offering costs | | (195) | | (709) | (1,964) |
| Net cash (used in) provided by financing activities | | (58,436) | | 53,658 | 39,173 |
| Net increase (decrease) in cash and cash equivalents | | 58 | | (1,662) | 1,540 |
| Cash and cash equivalents, beginning of period | | 466 | | 2,128 | 588 |
| Cash and cash equivalents, end of period | $ | 524 | $ | 466 | $ 2,128 |

See accompanying notes to consolidated financial statements.

85

A1614

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**
**Consolidated Statements of Cash Flows (Continued)**
**Years ended December 31, 2017, 2016 and 2015**
**(In thousands)**

| | 2017 | | 2016 (Recast) | | 2015 (Recast) |
|---|---|---|---|---|---|
| Non-cash investing and financing activities: | | | | | |
| The Partnership acquired property, plant and equipment in non-cash transactions as follows: | | | | | |
| Property, plant and equipment acquired included in accounts payable and accrued liabilities | $ 2,653 | $ | 14,255 | $ | 23,222 |
| Property, plant and equipment acquired under capital leases | 1,956 | | 1,753 | | 39 |
| Property, plant and equipment transferred from inventories | 226 | | 926 | | 319 |
| Contribution of Enviva Pellets Cottondale, LLC non-cash assets | — | | — | | 122,529 |
| Transfer of Enviva Pellets Wiggins, LLC assets to assets held for sale | — | | 13,035 | | — |
| Application of deferred IPO costs to partners' capital | — | | — | | 5,913 |
| Related-party long-term debt transferred to third-party long-term debt | — | | 14,757 | | — |
| Third-party long-term debt transferred to related-party long-term debt | — | | 3,316 | | — |
| Deferred consideration to sponsor included in long-term related-party payable | 74,000 | | — | | — |
| Retained matters from the First Hancock JV included in related-party receivables | 585 | | — | | — |
| Distributions included in liabilities | 741 | | 955 | | 58 |
| Application of short-term deposit to fixed assets | 258 | | — | | — |
| Distribution due to sponsor | — | | — | | 5,002 |
| Debt issuance costs included in accrued liabilities | — | | 139 | | 36 |
| Distribution of Enviva Pellets Cottondale, LLC assets to sponsor | — | | — | | 319 |
| Non-cash adjustments to financed insurance and prepaid expenses | — | | — | | 105 |
| Application of sales tax accrual to fixed assets | — | | — | | 73 |
| Contribution to tax accounts of sponsor | — | | — | | 35 |
| Depreciation capitalized to inventories | (427) | | 344 | | 211 |
| Due from the First Hancock JV for Enviva Pellets Sampson, LLC Drop-Down | — | | 1,652 | | — |
| Non-cash capital contributions from sponsor | — | | — | | 339 |
| Non-cash capital contributions from the First Hancock JV prior to Enviva Pellets Sampson, LLC Drop-Down | — | | 8,230 | | 1,277 |
| Non-cash capital contributions from the First Hancock JV prior to Enviva Port of Wilmington, LLC Drop-Down | — | | 393 | | 906 |
| Supplemental information: | | | | | |
| Interest paid | $ 31,513 | $ | 11,191 | $ | 9,935 |

See accompanying notes to consolidated financial statements.

86

A1615

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

**(1) Description of Business and Bas is of Presentation**

Enviva Partners, LP (the "Partnership") is a publicly traded Delaware limited partnership formed on November 12, 2013 as a wholly owned subsidiary of Enviva Holdings, LP (together with its wholly owned subsidiaries Enviva MLP Holdco, LLC and Enviva Development Holdings, LLC, where applicable, the "sponsor"). Enviva Partners GP, LLC, a wholly owned subsidiary of Enviva Holdings, LP, is the General Partner (the "General Partner") of the Partnership. Through its interests in Enviva, LP and its subsidiaries (other than Enviva Pellets Cottondale, LLC) (the "Predecessor") and Enviva GP, LLC, the general partner of Enviva, LP, the Partnership supplies utility-grade wood pellets primarily to major power generators under long-term, take-or-pay off-take contracts. The Partnership procures wood fiber and processes it into utility-grade wood pellets and loads the finished wood pellets into railcars, trucks and barges that are transported to deep-water marine terminals, where they are received, stored and ultimately loaded onto oceangoing vessels for transport to the Partnership's principally European customers.

The Partnership owns and operates six industrial-scale wood pellet production plants located in the Mid-Atlantic and Gulf Coast regions of the United States. Wood pellets are exported from the Partnership's wholly owned deep-water marine terminals in Chesapeake, Virginia (the "Chesapeake terminal") and Wilmington, North Carolina (the "Wilmington terminal"), and from third-party deep-water marine terminals in Mobile, Alabama and Panama City, Florida, under a short-term and a long-term contract, respectively. The Partnership acquired the Wilmington terminal from a joint venture between the sponsor and certain affiliates of John Hancock Life Insurance Company (U.S.A.) (the "First Hancock JV") controlled by our sponsor on October 2, 2017 (see Note 4, *Transactions Between Entities Under Common Control* ).

**Basis of Presentation**

On January 5, 2015, the sponsor acquired Green Circle, which owned the wood pellet production plant located in Cottondale, Florida (the "Cottondale plant"). The sponsor converted Green Circle into a Delaware limited liability company and changed the name of the entity to "Enviva Pellets Cottondale, LLC."

In April 2015, the Partnership became the owner of the Predecessor, Enviva GP, LLC and Enviva Cottondale Acquisition II, LLC ("Acquisition II"), the former owner of Enviva Pellets Cottondale, LLC ("Cottondale") through a contribution by the sponsor. The primary assets contributed to the Partnership by the sponsor included five industrial-scale wood pellet production plants, a wholly owned deep-water marine terminal and long-term contractual arrangements to sell the wood pellets produced at the plants to third parties and associated shipping contracts.

On May 4, 2015, the Partnership completed its IPO (see Note 2, *Initial Public Offering* ). In connection with the IPO, under a contribution agreement between the sponsor, Enviva MLP Holdco, LLC, Enviva Cottondale Acquisition I, LLC, a wholly owned subsidiary of the sponsor, the Predecessor and the Partnership, Acquisition II merged into the Partnership and the Partnership contributed its interest in Cottondale to the Predecessor. Cottondale was contributed by the sponsor in exchange for subordinated units representing limited partner interests in the Partnership.

On December 11, 2015, under the terms of a contribution agreement between the Partnership and the First Hancock JV, the Partnership acquired from the First Hancock JV all of the issued and outstanding limited liability company interests in Enviva Pellets Southampton, LLC ("Southampton") for total consideration of $131.0 million. The acquisition (the "Southampton Drop-Down") included a wood pellet production plant in Southampton County, Virginia (the "Southampton plant"), a ten-year 500,000 metric tons per year ("MTPY") take-or-pay off-take contract and a related third-party ten-year shipping contract. The Partnership accounted for the Southampton Drop-Down as a combination of entities under common control at historical cost in a manner similar to a pooling of interests. Accordingly, the consolidated financial statements for the periods prior to December 11, 2015 were retrospectively recast to reflect the

87

A1616

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

acquisition as if it had occurred on April 9, 2015, the date Southampton was originally conveyed to the First Hancock JV.

On December 14, 2016, under the terms of a contribution agreement between the Partnership and the First Hancock JV (the "Sampson Contribution Agreement"), the First Hancock JV sold to the Partnership all of the issued and outstanding limited liability company interests in Enviva Pellets Sampson, LLC ("Sampson") for total consideration of $175.0 million. Sampson owns a wood pellet production plant in Sampson County, North Carolina (the "Sampson plant"). The acquisition (the "Sampson Drop-Down") included the Sampson plant, an approximate ten-year, 420,000 MTPY take-or-pay off-take contract with Ørsted Bioenergy & Thermal Power A/S (formerly "DONG Energy Thermal Power A/S"), an approximate 15-year, 95,000 MTPY off-take contract with the First Hancock JV and related third-party shipping contracts. The Sampson Drop-Down included the payment of $139.6 million in cash, net of a purchase price adjustment of $5.4 million, to the First Hancock JV, the issuance of 1,098,415 unregistered common units at a value of $27.31 per unit, or $30.0 million of common units, to affiliates of John Hancock Life Insurance Company (U.S.A.) , and the elimination of $1.2 million of net related-party receivables and payables included in the net assets on the date of acquisition. The Partnership accounted for the Sampson Drop-Down as a combination of entities under common control at historical cost in a manner similar to a pooling of interests. Accordingly, the consolidated financial statements for the periods prior to December 14, 2016 were retrospectively recast to reflect the Sampson Drop-Down as if it had occurred on May 15, 2013, the date Sampson was originally organized.

On October 2, 2017, pursuant to the terms of a contribution agreement between the Partnership and the First Hancock JV (the "Wilmington Contribution Agreement"), the Partnership acquired from the First Hancock JV all of the issued and outstanding limited liability company interests in Enviva Port of Wilmington, LLC ("Wilmington"), which owns the Wilmington terminal assets. The purchase price, which was $130.0 million, included an initial payment of $54.6 million, net of an approximate purchase price adjustment of $1.4 million. The initial payment was funded with borrowings from revolving credit commitments (see Note 12, *Long-Term Debt and Capital Lease Obligations* )   and cash on hand. The acquisition (the "Wilmington Drop-Down") included the Wilmington terminal and a long-term terminal services agreement with the Partnership's sponsor to handle throughput volumes sourced by the sponsor from a wood pellet production plant in Greenwood, South Carolina (see N ote 13, *Related-Party Transactions* ) . The terminal services agreement with the sponsor provides for deficiency payments to Wilmington if quarterly minimum throughput requirements are not met. The Wilmington terminal will handle up to approximately 600,000 MTPY of throughput from the Sampson plant.

In addition, the Wilmington Contribution Agreement contemplates that Wilmington will enter into a long-term terminal services agreement (the "Wilmington Hamlet TSA") with the First Hancock JV and Enviva Pellets Hamlet, LLC ("Hamlet") to receive, store and load wood pellets from the First Hancock JV's proposed production plant in Hamlet, North Carolina (the "Hamlet plant") when the First Hancock JV completes construction of the Hamlet plant. The Wilmington Hamlet TSA also provides for deficiency payments to Wilmington if minimum throughput requirements are not met. Pursuant to the Wilmington Contribution Agreement, following notice of the anticipated first delivery of wood pellets to the Wilmington terminal from the Hamlet plant, Wilmington, Hamlet, and the First Hancock JV will enter into the Wilmington Hamlet TSA and the Partnership will make a final payment of $74.0 million in cash or common units to the First Hancock JV, subject to certain conditions, as deferred consideration for the Wilmington Drop-Down. At December 31, 2017, the $74.0 million is included in related-party long-term payable on the consolidated balance sheets.

Wilmington also entered into a throughput option agreement with the sponsor granting the sponsor, subject to certain conditions, the option to obtain terminal services at the Wilmington terminal at marginal cost throughput rates for wood pellets produced by one of the sponsor's potential wood pellet production plants.

The Partnership accounted for the Wilmington Drop-Down as a combination of entities under common control at historical cost in a manner similar to a pooling of interests. Accordingly, the consolidated financial statements for the periods prior to October 2, 2017, have been retrospectively recast to reflect the acquisition of the First Hancock JV's

88

A1617

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

interests in Wilmington as if it had occurred on May 15, 2013, the date Wilmington was originally organized (see Note 4, *Transactions Between Entities Under Common Control* ).

Prior to December 28, 2017, the Partnership held a controlling interest in Enviva Pellet, LLC ("Wiggins"), which owned a wood pellet plant in Stone County, Mississippi (the "Wiggins plant"). On December 27, 2017, the Partnership sold the Wiggins plant to a third party buyer for a purchase price of $0.4 million and recorded a loss on the sale of $0.8 million, net, upon deconsolidation. On December 28, 2017 Wiggins was dissolved.

As of December 31, 2017, the Partnership has 100% ownership of the following:

- Enviva Partners Finance Corp. ("Enviva Finance Corp."), a wholly owned subsidiary of the Partnership formed on October 3, 2016 for the purpose of being a co-issuer of some of the Partnership's indebtedness

- Enviva GP, LLC

The Partnership has 99.999% ownership of Enviva, LP

Enviva GP, LLC has 0.001% ownership of Enviva, LP

Enviva, LP has 100% ownership of the following:

- Enviva Pellets Amory, LLC ("Enviva Pellets Amory")

- Enviva Pellets Ahoskie, LLC

- Enviva Port of Chesapeake, LLC

- Enviva Pellets Northampton, LLC

- Enviva Pellets Southampton, LLC ("Southampton")

- Enviva Pellets Cottondale, LLC ("Cottondale")

- Enviva Materials, LLC

- Enviva Energy Services, LLC

- Enviva Pellets Perkinston, LLC

- Enviva Pellets Sampson, LLC ("Sampson")

- Enviva Port of Wilmington, LLC ("Wilmington")

- Enviva Port of Panama City, LLC

- Enviva MLP International Holdings, LLC

Enviva, LP has 99% ownership of the following:

- Enviva Energy Services Coöperatief, U.A.

89

A1618

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

Enviva MLP International Holdings has 100% ownership of the following:

• Enviva Energy Services (Jersey), Limited

Enviva MLP International Holdings has 1% ownership of the following:

• Enviva Energy Services Coöperatief, U.A.

The accompanying consolidated financial statements ("financial statements") include the accounts of the Predecessor and its subsidiaries and were prepared using the Predecessor's historical basis. Prior to the IPO, certain of the assets and liabilities of the Predecessor were transferred to the Partnership within the sponsor's consolidated group in a transaction under common control and, as such, the consolidated historical financial statements of the Predecessor are presented as the Partnership's historical financial statements as the Partnership believes they provide a representation of management's ability to execute and manage its business plan. The financial statements include all revenues, costs, assets and liabilities attributed to the Predecessor. The financial statements for periods prior to April 9, 2015, have been retroactively recast to reflect the contribution of the sponsor's interests in the Predecessor and Enviva GP, LLC as if the contributions had occurred at the beginning of the periods presented and the contribution of the sponsor's interests in Acquisition II as if the contribution occurred on January 5, 2015, the date Acquisition II was acquired by the sponsor. The financial statements for the periods prior to December 14, 2016, have been retroactively recast to reflect the acquisition of the First Hancock JV's interests in Sampson and Wilmington as if the contributions occurred on May 15, 2013, the date Sampson and Wilmington were originally organized.

**(2) Initial Public Offering**

On May 4, 2015, the Partnership completed an initial public offering ("IPO") of 11,500,000 common units, which included a 1,500,000 common unit over-allotment option that was exercised in full by the underwriters at a price to the public of $20.00 per unit ($18.80 per common unit, net of underwriting discounts and commissions) and constituting approximately 48.3% of the Partnership's outstanding limited partner interests. The net proceeds from the IPO of approximately $215.1 million after deducting the underwriting discount and structuring fee were used to (i) repay intercompany indebtedness related to the acquisition of Green Circle in the amount of approximately $83.0 million and (ii) distribute approximately $86.7 million to the sponsor related to its contribution of assets to the Partnership in connection with the IPO, with the Partnership retaining $45.4 million for general partnership purposes, including offering expenses.

**(3) Significant Accounting Policies**

*Principles of Consolidation*

The accompanying consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("GAAP"). The consolidated financial statements include the accounts of the Partnership and its wholly owned and controlled subsidiaries. All intercompany accounts and transactions have been eliminated.

*Reclassifications*

Certain prior period amounts related to loss on disposal of assets have been reclassified to cost of goods sold from general and administrative expenses to conform to current period presentation. Certain prior period amounts related to the contribution of Sampson included in general partner interest have been reclassified on the consolidated statements of changes in partners' capital to non-controlling interests from the general partner interest to conform to current period presentation.

90

A1619

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

*Common Control Transactions*

Assets and businesses acquired from the Partnership's sponsor and its controlled subsidiaries are accounted for as common control transactions whereby the net assets acquired are combined at their historical costs and the Partnership's consolidated financial statements are adjusted retrospectively to reflect the transaction as if it occurred on the earliest date during which the entities were under common control. If any recognized consideration transferred in such a transaction exceeds the carrying value of the net assets acquired, the excess is treated as a capital distribution to the General Partner. If the carrying value of the net assets acquired exceeds any recognized consideration transferred including, if applicable, the fair value of any limited partner units issued, then that excess is treated as a capital contribution from the General Partner. To the extent that such transactions require prior periods to be recast, historical net equity amounts prior to the transaction date are attributed to the General Partner and any noncontrolling partner interest at the historical amount.

As the acquisition of Cottondale, the Southampton Drop-Down, the Sampson Drop-Down and the Wilmington Drop-Down represented transfers of entities under common control, the consolidated financial statements and related information presented have been recast to include the historical results of Cottondale effective January 5, 2015, the date the Partnership's sponsor acquired Acquisition II, Southampton effective April 9, 2015, the date Southampton was originally conveyed to the First Hancock JV and Sampson and Wilmington effective May 15, 2013, the date Sampson and Wilmington were originally organized.

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make judgments, estimates and assumptions that affect the amounts reported in the Partnership's consolidated financial statements and accompanying notes. Actual results could differ materially from those estimates.

*Segment and Geographic Information*

Operating segments are defined as components of an enterprise about which discrete financial information is available and regularly reviewed by the chief operating decision maker in deciding how to allocate resources and in assessing performance. The Partnership views its operations and manages its business as one operating segment. All long-lived assets of the Partnership are located in the United States.

*Other Comprehensive Income (Loss)*

Comprehensive income (loss) consists of two components, net income (loss) and other comprehensive income (loss). Other comprehensive income (loss) refers to revenue, expenses, and gains and losses that under GAAP are included in comprehensive income (loss) but excluded from net income (loss). The Partnership's other comprehensive income consists of unrealized gains and losses related to derivative instruments accounted for as cash flow hedges.

91

A1620

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

*Cash and Cash Equivalents*

Cash and cash equivalents consist of short-term, highly liquid investments readily convertible into cash with an original maturity of three months or less.

*Accounts Receivable*

Accounts receivable are recorded at the invoiced amount and do not bear interest. In establishing an allowance for doubtful accounts, management considers historical losses adjusted to take into account current market conditions and customers' financial condition, the amount of receivables in dispute, the current receivables aging and current payment patterns. The Partnership does not have any off-balance-sheet credit exposure related to its customers.

*Inventories*

Inventories consist of raw materials, work-in-progress, consumable tooling and finished goods. Fixed production overhead, including related depreciation expense, is allocated to inventory based on the normal production capacity of the facilities. To the extent the Partnership does not achieve normal production levels, the Partnership charges such under absorption of fixed overhead to cost of sales in the period incurred.

Consumable tooling consists of spare parts and tooling to be consumed in the production process. Spare parts are expected to be used within a year and are expensed as used. Tooling items are amortized to expense over an estimated service life generally less than one year.

Inventories are stated at the lower of cost or market using the first-in, first-out method ("FIFO") for all inventories.

*Revenue Recognition*

The Partnership primarily earns revenue by supplying wood pellets to its customers under off-take contracts, the majority of the commitments under which are long-term in nature. The Partnership refers to the structure of its contracts as "take-or-pay" because they include a firm obligation of the customer to take a fixed quantity of product at a stated price and provisions that ensure the Partnership will be compensated in the case of a customer's failure to accept all or a part of the contracted volumes or for termination by a customer. Each contract defines the annual volume of wood pellets that a customer is required to purchase and the Partnership is required to sell, the fixed price per metric ton for product satisfying a base net calorific value and other technical specifications. These prices are fixed for the entire term, subject to annual inflation-based adjustments and price escalators, as well as, in some instances, price adjustments for product specifications and changes in underlying costs, which have historically been immaterial. In addition to sales of the Partnership's product under these long-term, take-or-pay contracts, the Partnership routinely sells wood pellets under shorter-term contracts, which range in volume and tenor and, in some cases, may include only one specific shipment. Because each of the Partnership's contracts is a bilaterally negotiated agreement, the Partnership's revenue over the duration of these contracts does not generally follow spot market pricing trends. The Partnership's revenue from the sale of wood pellets is recognized as "Product Sales" when title and risk of loss has passed to the customer, the sales price to the customer is fixed and determinable, and collectability is reasonably assured.

Depending on the specific off-take contract, shipping terms are either CIF, CFR or FOB. Under a CIF contract, we procure and pay for shipping costs, which include insurance and all other charges, up to the port of destination for the customer. Under a CFR contract, we procure and pay for shipping costs, which include insurance (excluding marine cargo insurance) and all other charges, up to the port of destination for the customer. Shipping costs under CIF and CFR contracts are included in the price to the customer and, as such, are included in revenue and cost of goods sold. Under FOB contracts, the customer is directly responsible for shipping costs. Our customer shipping terms, as well as the

92

A1621

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

timing and size of shipments during the year, can result in material fluctuations in our revenue recognized between periods but generally have little impact on gross margin.

In some cases, the Partnership may purchase shipments of product from third-party suppliers and resell them in back-to-back transactions that immediately transfer title and risk of loss to the ultimate purchaser. Thus, the revenue from these transactions is recorded net of costs paid to the third-party supplier. The Partnership records this revenue as "Other revenue."

In instances when a customer requests the cancellation, deferral or acceleration of a shipment, the customer may pay a fee, including reimbursement of any incremental costs incurred by the Partnership, which is included in "Other revenue."

Other revenue also includes third- and related-party terminal services fees.

### Cost of Goods Sold

Cost of goods sold includes the costs to produce and deliver wood pellets to customers. Raw material, production and distribution costs associated with delivering wood pellets to our owned and leased marine terminals and third- and related-party wood pellet purchase costs are capitalized as a component of inventory. Fixed production overhead, including the related depreciation expense, is allocated to inventory based on the normal capacity of the production plants. These costs are reflected in cost of goods sold when inventory is sold. Distribution costs associated with shipping wood pellets to customers and amortization of favorable acquired customer contracts are expensed as incurred. Inventory is recorded using FIFO, which requires the use of judgment and estimates. Given the nature of the inventory, the calculation of cost of goods sold is based on estimates used in the valuation of the FIFO inventory and in determining the specific composition of inventory that is sold to each customer.

### Derivative Instruments

The Partnership uses derivative instruments to partially offset its exposure to foreign currency exchange and interest rate risk. The Partnership enters into foreign currency forward and option contracts, a portion of which have been designated as cash flow hedges, to offset foreign currency exchange risk on a portion of forecasted revenue and enters into interest rate swaps to offset the variable interest rate risk associated with borrowings. The Partnership does not hold or issue derivative financial instruments for trading or speculative purposes.

Derivative instruments are classified as either assets or liabilities on a gross basis and carried at fair value and included in prepaid expenses and other current assets, other long-term assets, accrued and other current liabilities, and . other long-term liabilities on the consolidated balance sheets. Changes in fair value are either recognized as unrealized gains and losses in accumulated other comprehensive income in partners' capital or net income depending on the nature of the underlying exposure, whether the derivative is formally designated as a hedge, and, if designated, the extent to which the hedge is effective. To receive hedge accounting treatment, cash flow hedges must be highly effective in offsetting changes to expected future cash flows on hedged transactions.

The effective portion of foreign currency forward and option contracts designated as cash flow hedges is reported as a component of accumulated other comprehensive income in partners' capital and reclassified into revenue in the same period or periods during which the hedged revenue affects earnings. The effective portion of interest rate swaps designated as cash flow hedges is reported as a component of accumulated other comprehensive income in partners' capital and reclassified into interest expense in the same period or periods during which the hedged interest expense affects earnings. The ineffective portion of cash flow hedges, if any, is recognized in earnings in the current period. The Partnership links all derivative instruments that are designated as cash flow hedges to specific assets and liabilities on the consolidated balance sheets or to specific forecasted transactions.

93

A1622

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

To qualify for hedge accounting, the item to be hedged must cause an exposure risk and the Partnership must have an expectation that the related hedging instrument will be effective at reducing or mitigating that exposure. In accordance with the hedging requirements, the Partnership documents all hedging relationships at inception and includes a description of the risk management objective and strategy for undertaking the hedge, identification of the hedging instrument, the hedged item, the nature of the risk being hedged, the method for assessing effectiveness of the hedging instrument in offsetting the hedged risk and the method of measuring any ineffectiveness. When an event or transaction occurs or the derivative contract expires or the forecasted transaction is no longer probable of occurring, hedge accounting is discontinued. The Partnership also formally assesses, both at the hedge's inception and on an ongoing basis, whether the derivative instruments are highly effective in offsetting changes in cash flows of hedged items. If it is determined that a derivative instrument has ceased to be a highly effective hedge, hedge accounting is discontinued prospectively.

Hedge effectiveness for foreign exchange forward contracts designated as cash flow hedges is assessed by comparing the change in the fair value of the hedge contract with the change in the fair value of the forecasted cash flows of the hedged item. For foreign exchange option contracts, hedge effectiveness is assessed based on the hedging instrument's entire change in fair value. Hedge effectiveness for interest rate swaps is assessed by comparing the change in fair value of the swap with the change in the fair value of the hedged item due to changes in the benchmark interest rate.

Derivative instruments that do not qualify, or no longer qualify, as hedges are adjusted to fair value through earnings in the current period.

*Foreign Currency Hedges*

The Partnership may hedge a portion of its foreign currency exposure associated with revenue under off-take contracts not denominated in U.S. Dollars. The Partnership has designated a portion of its foreign currency forward contracts and foreign currency purchased options as cash flow hedges. These derivatives are used to hedge certain revenue transactions forecasted generally within the next 60-month period.

*Interest Rate Hedges*

The Partnership utilizes an interest rate swap to hedge its cash flow exposure to fluctuations in variable-based interest rates under borrowings. The Partnership entered into a pay-fixed, receive-variable interest rate swap in September 2016 to hedge the interest rate risk associated with Tranche A-1 and Tranche A-3 of the Senior Secured Credit Facilities. The Partnership discontinued hedge accounting as of December 14, 2016 following the repayment of Tranche A-1 and A-3 of the Senior Secured Credit Facilities (see Note 12, *Long-Term Debt and Capital Lease Obligations* ). Interest expense for the year ended December 31, 2017 included the reclassification of an insignificant amount representing the effective portion reported as a component of accumulated other comprehensive income.

The Predecessor previously used derivative financial instruments to manage its exposure to fluctuations in interest rates on long-term debt as required per the terms of the Prior Senior Secured Credit Facilities (see Note 12, *Long-Term Debt and Capital Lease Obligations* ). The Predecessor recognized the interest rate swaps on the consolidated balance sheet at fair value. The Predecessor's interest rate swap agreements were not designated as hedges; therefore, the gain or loss was recognized in the consolidated statement of income in interest expense. In connection with the repayment of the Prior Senior Secured Credit Facilities in April 2015 (see Note 12, *Long-Term Debt and Capital Lease Obligations* ), the Predecessor terminated the interest rate swaps and paid a termination fee of $0.1 million.

**Property, Plant and Equipment**

Property, plant and equipment are recorded at cost, which includes the fair values of assets acquired. Equipment under capital leases is stated at the present value of minimum lease payments. Useful lives of assets are based on

94

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

historical experience and are adjusted when changes in the expected physical life of the asset, its planned use, technological advances, or other factors show that a different life would be more appropriate. Changes in useful lives are recognized prospectively.

Depreciation is calculated using the straight-line method based on the estimated useful lives of the related assets. Plant and equipment held under capital leases are amortized on a straight-line basis over the shorter of the lease term or estimated useful life of the asset.

Construction in progress primarily represents expenditures for the development and expansion of facilities. Capitalized interest cost and all direct costs, which include equipment and engineering costs related to the development and expansion of facilities, are capitalized as construction in progress. Depreciation is not recognized for amounts in construction in progress.

Normal repairs and maintenance costs are expensed as incurred. Amounts incurred that extend an asset's useful life, increase its productivity or add production capacity are capitalized. Direct costs, such as outside labor, materials, internal payroll and benefit costs, incurred during the construction of a new plant are capitalized; indirect costs are not capitalized.

The principal useful lives are as follows:

| Asset | Estimated useful life |
|---|---|
| Land improvements | 15 to 17 years |
| Buildings | 5 to 40 years |
| Machinery and equipment | 2 to 25 years |
| Vehicles | 5 to 6 years |
| Furniture and office equipment | 2 to 10 years |
| Leasehold improvements | Shorter of estimated useful life or lease term, generally 10 years |

Costs and accumulated depreciation applicable to assets retired or sold are removed from the accounts, and any resulting gain or loss is included in the consolidated statement of operations.

***Debt Issuance Costs and Original Issue Discount***

Debt issuance costs represent legal fees, underwriter fees and other direct expenses associated with securing the Partnership's borrowings and are capitalized on the consolidated balance sheets as a direct deduction from the carrying amount of the related long-term debt. Original issue discounts are recorded on the consolidated balance sheets within the carrying amount of long-term debt. Debt issuance costs and original issue discount are amortized over the term of the related debt using straight line amortization, which approximates the effective interest rate method. If a debt instrument is retired before its scheduled maturity date, any unamortized debt issuance costs and original issue discount associated with that debt instrument are expensed in the same period. Debt issuance costs and original issue discount at December 31, 2017 and 2016, were $7.1 million and $7.8 million, respectively.

Gains or losses on debt extinguishment include any associated unamortized debt issuance costs and original issue discount.

***Goodwill***

Goodwill represents the purchase price paid for acquired businesses in excess of the identifiable acquired assets and assumed liabilities. Goodwill is not amortized, but is tested for impairment annually and whenever an event occurs or circumstances change such that it is more likely than not that the fair value of the reporting unit is less than its carrying amounts. At December 31, 2017 and 2016, the Partnership identified one reporting unit that corresponded to the

95

A1624

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

Partnership's one segment. The Partnership has selected the fourth fiscal quarter to perform its annual goodwill impairment test.

The Partnership first performs a qualitative assessment to determine whether it is necessary to perform quantitative testing. If this initial qualitative assessment indicates that it is more likely than not that the fair value of a reporting unit is more than its carrying value, goodwill is not considered impaired and the Partnership is not required to perform the two-step impairment test. Qualitative factors considered in this assessment include (i) macroeconomic conditions, (ii) past, current and projected future financial performance, (iii) industry and market considerations, (iv) changes in the costs of raw materials, fuel and labor and (v) entity-specific factors such as changes in management or customer base.

If the results of the qualitative assessment indicate that it is more likely than not that goodwill is impaired, the Partnership will perform a two-step impairment test. Under the first step, the fair value of the reporting unit is compared with its carrying value (including goodwill). If the fair value of the reporting unit exceeds its carrying value, step two does not need to be performed.

If the fair value of the reporting unit is less than its carrying value, an indication of goodwill impairment exists for the reporting unit and the entity must perform step two of the impairment test (measurement). Under Step 2, an impairment loss is recognized for any excess of the carrying amount of the reporting unit's goodwill over the implied fair value of that goodwill.

For the years ended December 31, 2017 and 2016, the Partnership applied the qualitative test and determined that it was more likely than not that the estimated fair value of the reporting unit substantially exceeded the related carrying value, and, accordingly, was not required to apply the two-step impairment test. The Partnership did not record any goodwill impairment for the years ended December 31, 2017 and 2016 (see Note 10, *Goodwill and Other Intangible Assets* ).

In making this qualitative analysis for the years ended December 31, 2017, and 2016, the Partnership evaluated the following economic factors:

- The Partnership's consolidated financial results reflect continued improved financial performance in 2017 compared to 2016 as reflected by increases in gross margin as well as the generation of positive net income in 2017 and 2016.

- The Partnership continued its expansion with the Wilmington Drop-Down.

- In 2017, the Partnership entered into agreements for incremental volumes with new and existing customers.

- In October 2017, the Partnership issued $55.0 million in aggregate principal amount of 8.5% senior unsecured notes due 2021 at a premium of 106.25% to par value.

- The Partnership's market capitalization exceeds the carrying value of its net assets as of December 31, 2017.

***Intangible Assets***

In April 2015, the sponsor contributed net assets to the Partnership associated with the acquisition of Green Circle in January 2015, which included intangible assets related to favorable customer contracts (see Note 1, *Description of Business and Basis of Presentation* ). The Partnership also recorded payments made to acquire a six-year wood pellet off-take contract with a European utility in 2010 as an intangible asset. These costs are recoverable through the future revenue streams generated from the customer contracts and are closely related to the revenue from the customer

96

A1625

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

contracts. These costs are recorded as an asset and charged to expense as the revenue is recognized (see Note 10, *Goodwill and Other Intangible Assets* ). All other costs, such as general and administrative expenses and costs associated with the negotiation of a contract that is not consummated, are charged to expense as incurred.

*Unit-Based Compensation*

Employees, consultants and directors of the General Partner and any of its affiliates are eligible to receive awards under the Enviva Partners, LP Long-Term Incentive Plan. For accounting purposes, units granted to employees of the Partnership's affiliates are treated as if they are distributed by the Partnership. Phantom units issued in tandem with corresponding distribution equivalent rights ("DERs") are granted to employees of Enviva Management who provide services to the Partnership and to certain non-employee directors of the General Partner. These awards vest subject to the satisfaction of service requirements or the achievement of certain performance goals, following which common units in the Partnership will be delivered to the holder of the phantom units. Affiliate entities recognize compensation expense for the phantom units awarded to their employees and a portion of that expense is allocated to the Partnership (see Note 13, *Related-Party Transactions-Management Services Agreement* and Note 16, *Equity-Based Awards* ). The Partnership's outstanding unit-based awards do not have a cash option and are classified as equity on the Partnership's consolidated balance sheets. The Partnership also recognizes compensation expense for units awarded to non-employee directors.

*Impairment of Long-Lived Assets*

Long-lived assets, such as property, plant and equipment and amortizable intangible assets, are tested for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If circumstances require that a long-lived asset or asset group be tested for possible impairment, the Partnership first compares undiscounted cash flows expected to be generated by that asset or asset group to such asset or asset group's carrying value. If the carrying value of the long-lived asset or asset group is not recoverable on an undiscounted cash flow basis, an impairment is recognized to the extent that the carrying value exceeds its fair value. Fair value is determined through various valuation techniques including discounted cash flow models, quoted market values and third-party independent appraisals, as considered necessary.

*Commitments and Contingencies*

Liabilities for loss contingencies arising from claims, assessments, litigation, fines, and penalties and other sources are recorded when it is probable that a liability has been incurred and the amount can be reasonably estimated. Legal costs incurred in connection with loss contingencies are expensed as incurred.

*Fair Value Measurements*

The Partnership applies authoritative accounting guidance for fair value measurements of financial and nonfinancial assets and liabilities. The Partnership uses valuation techniques that maximize the use of observable inputs and minimize the use of unobservable inputs to the extent possible. The Partnership determines fair value based on assumptions that market participants would use in pricing an asset or liability in the principal or most advantageous market. When considering market participant assumptions in fair value measurements, the following fair value hierarchy distinguishes between observable and unobservable inputs, which are categorized in one of the following levels:

- Level 1 Inputs: Unadjusted, quoted prices in active markets for identical assets or liabilities accessible to the reporting entity at the measurement date.

- Level 2 Inputs: Other than quoted prices included in Level 1 inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the asset or liability.

97

A1626

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

- Level 3 Inputs: Unobservable inputs for the asset or liability used to measure fair value to the extent that observable inputs are not available, thereby allowing for situations in which there is little, if any, market activity for the asset or liability at the measurement date.

**Recent and Pending Accounting Pronouncements**

In August 2017, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2017-12, *Derivatives and Hedging: Targeted Improvements to Accounting for Hedging Activities (Topic 815)-Targeted Improvements to Accounting for Hedging Activities* . ASU 2017-12 expands and refines hedge accounting for both financial and non-financial risk components, aligns the recognition and presentation of the effects of hedging instruments and hedge items in the financial statements, and includes certain targeted improvements to ease the application of current guidance related to the assessment of hedge effectiveness. ASU 2017-12 requires a modified retrospective transition method which requires the recognition of the cumulative effect of the change on the opening balance of each affected component of equity in the statement of financial position as of the date of adoption. The new guidance is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2018, with early adoption permitted. The Partnership is in the process of evaluating the impact of the adoption of ASU No. 2017-12 on its consolidated financial statements.

In January 2017, the FASB issued ASU 2017-04, *Intangibles - Goodwill and Other* . ASU 2017-04 simplifies the accounting for goodwill impairment by eliminating Step 2 of the current goodwill impairment test. In computing the implied fair value of goodwill under Step 2, an entity had to perform procedures to determine the fair value at the impairment testing date of its assets and liabilities (including unrecognized assets and liabilities) following the procedure that would be required in determining the fair value of assets acquired and liabilities assumed in a business combination. Instead, under the new standard, an entity should perform its annual, or interim, goodwill impairment test by comparing the fair value of a reporting unit with its carrying amount. An entity should recognize an impairment charge for the amount by which the carrying amount exceeds the reporting unit's fair value; however, the loss recognized should not exceed the total amount of goodwill allocated to that reporting unit. An entity still has the option to perform the qualitative assessment for a reporting unit to determine if the quantitative impairment test is necessary. The new guidance should be adopted for annual or any interim goodwill impairment tests in fiscal years beginning after December 15, 2019. Early adoption is permitted for interim or annual goodwill impairment tests performed on testing dates after January 1, 2017. This standard will be implemented prospectively in 2018 for all future goodwill impairment tests and will simplify such evaluations.

In January 2017, the FASB issued ASU No. 2017-01, *Business Combinations (Topic 805): Clarifying the Definition of a Business* , in an effort to clarify the definition of a business with the objective of adding guidance to assist entities with evaluating whether transactions should be accounted for as acquisitions (or disposals) of assets or businesses. The amendments in this standard provide a screen to determine when an integrated set of assets and activities is not a business. The screen requires that when substantially all of the fair value of the gross assets acquired (or disposed of) is concentrated in a single identifiable asset or a group of similar identifiable assets, the integrated set of assets and activities is not a business. The new guidance is effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years. Early adoption is allowed for transactions for which the acquisition date occurs before the issuance date or effective date of the amendments, only when the transaction has not been reported in financial statements that have been issued or made available for issuance and for transactions in which a subsidiary is deconsolidated or a group of assets is derecognized that occur before the issuance date or effective date of the amendments, only when the transaction has not been reported in financial statements that have been issued or made available for issuance. The ASU is effective for the Partnership's fiscal year 2018, including interim periods. The adoption of this standard may have an impact on the accounting for future acquisitions.

In November 2016, the FASB issued ASU No. 2016-18, *Statement of Cash Flows (Topic 230) — Restricted Cash: A Consensus of the FASB Emerging Issues Task Force* , which requires that a statements of cash flows explain the change during the period in the total of cash, cash equivalents, and amounts generally described as restricted cash or restricted cash equivalents. As a result, entities will no longer present transfers between cash and cash equivalents and

98

A1627

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

restricted cash and restricted cash equivalents in the statements of cash flows. The guidance addresses the presentation of changes in restricted cash and restricted cash equivalents in the statements of cash flows. When cash, cash equivalents, restricted cash and restricted cash equivalents are presented in more than one line item on the balance sheet, the new guidance requires a reconciliation of the totals in the statements of cash flows to the related captions in the balance sheet. This reconciliation can be presented either on the face of the statements of cash flows or in the notes to the financial statements. Entities will also have to disclose the nature of their restricted cash and restricted cash equivalent balances. The new guidance is effective for public business entities for fiscal years and interim periods within those years beginning after December 15, 2017. Early adoption in an interim period is permitted, but any adjustments must be reflected as of the beginning of the fiscal year that includes that interim period. Entities will be required to apply the guidance retrospectively when adopted. The ASU is effective for the Partnership's fiscal year 2018, including interim periods. As a result of the adoption of this standard, restricted cash and restricted cash equivalents will be included with cash and cash equivalents on the consolidated statements of cash flows. Transfers between cash, cash equivalents, restricted cash and restricted cash equivalents will not be presented separately in the statements of cash flows. If cash and restricted cash are presented in more than one line item on the balance sheet, a reconciliation of these amounts to the total shown on the statements of cash flow must be presented in either a narrative or tabular form on the face of the statements of cash flows or in the notes to the financial statements. The Partnership does not expect the adoption of the new standard to have a material effect on how cash receipts and cash payments are presented and classified in the consolidated statements of cash flows.

In August 2016, the FASB issued ASU No. 2016-15, *Statement of Cash Flows (Topic 230) — Classification of Certain Cash Receipts and Cash Payments* , which will make eight targeted changes to how cash receipts and cash payments are presented and classified in the statements of cash flows with the objective of reducing the existing diversity in practice. The guidance addresses the classification of cash flows related to (1) debt prepayment or extinguishment costs, (2) settlement of zero-coupon debt instruments or other debt instruments with coupon rates that are insignificant in relation to the effective interest rate of the borrowing, (3) contingent consideration payments made after a business combination, (4) proceeds from the settlement of insurance claims, (5) proceeds from the settlement of corporate-owned life insurance, including bank-owned life insurance, (6) distributions received from equity method investees and (7) beneficial interests in securitization transactions. The guidance also clarifies how the predominance principle should be applied when cash receipts and cash payments have aspects of more than one class of cash flows. An entity will first apply any relevant guidance. If there is no guidance that addresses those cash receipts and cash payments, an entity will determine each separately identifiable source or use and classify the receipt or payment based on the nature of the cash flow. If a receipt or payment has aspects of more than one class of cash flows and cannot be separated, classification will depend on the predominant source of use. The new guidance is effective for public business entities for fiscal years and interim periods within those years beginning after December 15, 2017. The new guidance will require adoption on a retroactive basis unless it is impracticable to apply, in which case it would be required to apply the amendments prospectively as of the earliest date practicable. The ASU is effective for the Partnership's fiscal year 2018, including interim periods. The Partnership does not expect the adoption of the new standard to have a material effect on how cash receipts and cash payments are presented and classified in the consolidated statements of cash flows.

In February 2016, the FASB issued ASU No. 2016-02, *Leases* . Under the new pronouncement, an entity is required to recognize assets and liabilities arising from a lease for all leases with a maximum possible term of more than 12 months. A lessee is required to recognize a liability to make lease payments (the lease liability) and a right-of-use asset representing its right to use the leased asset (the underlying asset) for the lease term. For most leases of assets other than property (for example, equipment, aircraft, cars, trucks), a lessee would recognize a right-of-use asset and a lease liability, initially measured at the present value of lease payments and recognize the unwinding of the discount on the lease liability as interest separately from the amortization of the right-of-use asset. For most leases of property (that is, land and/or a building or part of a building), a lessee would recognize a right-of-use asset and a lease liability, initially measured at the present value of lease payments and recognize a single lease cost, combining the unwinding of the discount on the lease liability with the amortization of the right-of-use asset, on a straight-line basis. The new guidance is effective for public entities for fiscal year and interim periods within those fiscal years beginning after December 15, 2018. Upon adoption, a lessee and a lessor would recognize and measure leases at the beginning of the earliest period

99

A1628

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

presented using a modified retrospective approach. Early adoption is permitted. The Partnership is in the process of evaluating the impact of adoption on its consolidated financial statements.

In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers* . ASU 2014-09 provides new guidance on the recognition of revenue and states that an entity should recognize revenue when control of the goods or services transfers to the customer in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. ASU 2014-09 also requires significantly expanded disclosure regarding qualitative and quantitative information about the nature, timing and uncertainty of revenue and cash flows arising from contracts with customers. In March 2016, the FASB issued ASU No. 2016-08, *Revenue from Contracts with Customers—Principal versus Agent Considerations* . ASU No. 2016-08 clarifies the implementation guidance on principal versus agent considerations. In May 2016, the FASB issued ASU No. 2016-12, *Revenue from Contracts with Customers* , which provides narrow scope improvements and practical expedients related to ASU No. 2014-09. ASU No. 2014-09 and subsequent amendments have been codified as Accounting Standards Codification ("ASC") 606, *Revenue from Contracts with Customers* .

ASC 606 is effective for annual reporting periods beginning after December 15, 2017, including interim periods within that reporting period. The Partnership will adopt ASC 606 effective January 1, 2018. The Partnership currently expects to utilize the modified retrospective method of adoption, which will result in the presentation of the cumulative effect of initially applying ASC 606 at the date of initial application. The Partnership has established a cross-functional team to lead the assessment and implementation of ASC 606 and has finalized its implementation plans. In connection with the implementation plan, the Partnership has completed its evaluation of its off-take contracts to identify material performance obligations. The Partnership has concluded that the delivery of wood pellets to the customer is the material performance obligation under its off-take contracts. The Partnership also concluded it will aggregate wood pellets into metric tons and account for each metric ton as a single performance obligation. The Partnership has determined that revenue related to its off-take contracts will be recognized at the point in time at which control of the wood pellets passes to the customer, as the wood pellets are loaded onto shipping vessels, which is consistent with the timing of revenue recognition under the Partnership's current accounting policy. Additionally, the Partnership has concluded that revenue from certain transactions currently presented on a net basis in other revenue will be recognized as principal sales on a gross basis under ASC 606. The Partnership based its conclusion on the fact that in certain instances it controls wood pellets supplied by third parties before control is transferred to customers, even in cases of "flash title". ASC 606 requires revenue to be recognized on a gross basis when control of goods or services is established before transfer to customers.

Certain costs incurred at the discharge port and recoverable from customers were reported in revenue under legacy revenue guidance. Under ASC 606, these costs are not considered a part of the transaction price, and therefore will be excluded from revenue.

ASC 606 permits an entity to account for shipping and handling activities occurring after control has passed to the customer as a fulfillment activity rather than as a revenue element. The Partnership has elected to account for shipping and handling activities as a fulfillment activity, consistent with its current policy. The Partnership does not expect to have a material cumulative effect adjustment upon adoption of ASC 606.

**(4) Transactions Between Entities Under Common Control**

***Wilmington Drop-Down***

On October 2, 2017, the Partnership acquired from the First Hancock JV all of the issued and outstanding limited liability company interests in Wilmington for total consideration of $130.0 million (see Note 1, *Description of Business and Basis of Presentation* ). The acquisition included an initial payment of $54.6 million in cash, net of a purchase price adjustment of $1.4 million, and deferred consideration of $74.0 million in cash or common units, to the First Hancock JV, and the elimination of $1.0 million of related-party receivables and payables, net, included in the net assets on the date of acquisition.

100

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

*Recast of Historical Financial Statements*

The Partnership accounted for the Wilmington Drop-Down as a combination of entities under common control at historical cost in a manner similar to a pooling of interests. Accordingly, the consolidated financial statements for the periods prior to October 2, 2017 were retrospectively recast to reflect the acquisition as if it had occurred on May 15, 2013, the date Wilmington was originally organized.

The following table outlines the changes in consolidated net assets resulting from the acquisition of Wilmington on October 2, 2017.

| Assets: | | |
|---|---|---|
| Cash | $ | — |
| Related-party receivables | | 2,914 |
| Inventories | | 96 |
| Prepaid expenses and other current assets | | 94 |
| Property, plant and equipment, net | | 75,474 |
| Total assets | | 78,578 |
| | | |
| Liabilities: | | |
| Accounts payable | | 195 |
| Related-party payables | | 319 |
| Accrued and other current liabilities | | 2,864 |
| Long-term debt and capital lease obligations | | 243 |
| Long-term liabilities | | 1,622 |
| Total liabilities | | 5,243 |
| Net assets contributed to Partnership | $ | 73,335 |

101

A1630

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

The following table presents the changes to previously reported amounts in the audited consolidated balance sheet as of December 31, 2016 included in the Partnership's annual report on Form 10-K for the year ended December 31. 2016:

| | As of December 31, 2016 | | |
| --- | --- | --- | --- |
| | As Reported | Enviva Port Of Wilmington, LLC | Total (Recast) |
| Cash and cash equivalents | $ 466 | $ — | $ 466 |
| Accounts receivable, net | 77,868 | — | 77,868 |
| Related-party receivables | 7,634 | 422 | 8,056 |
| Inventories | 29,764 | 172 | 29,936 |
| Prepaid expenses and other current assets | 4,983 | 40 | 5,023 |
| Total current assets | 120,715 | 634 | 121,349 |
| Property, plant and equipment, net of accumulated depreciation | 516,418 | 74,498 | 590,916 |
| Goodwill | 85,615 | — | 85,615 |
| Other assets | 3,420 | 76 | 3,496 |
| Total assets | $ 726,168 | $ 75,208 | $ 801,376 |
| | | | |
| Accounts payable | $ 9,869 | $ 124 | $ 9,993 |
| Related-party payables | 11,118 | 354 | 11,472 |
| Accrued and other current liabilities | 47,337 | 6,155 | 53,492 |
| Total long-term debt and capital lease obligations | 346,686 | 229 | 346,915 |
| Other liabilities | 1,641 | 1,001 | 2,642 |
| Total liabilities | 416,651 | 7,863 | 424,514 |
| Total partners' capital | 309,517 | 67,345 | 376,862 |
| Total liabilities and partners' capital | $ 726,168 | $ 75,208 | $ 801,376 |

The following table presents the changes to previously reported amounts in the audited consolidated statements of income for the years ended December 31, 2016 and 2015 included in the Partnership's annual report on Form 10-K for the year ended December 31, 2016:

| | Year Ended December 31, 2016 | | |
| --- | --- | --- | --- |
| | As Reported | Enviva Port Of Wilmington, LLC | Total (Recast) |
| Net revenue | $ 464,276 | $ — | $ 464,276 |
| Total cost of goods sold | 387,289 | 215 | 387,504 |
| Gross margin | 76,987 | (215) | 76,772 |
| Net income (loss) | 17,723 | (4,260) | 13,463 |
| Less net loss attributable to noncontrolling partners' interests | 3,654 | 2,150 | 5,804 |
| Net loss attributable to general partner | (3,231) | (2,110) | (5,341) |
| Net income attributable to Enviva Partners, LP limited partners' interest in net income | 24,608 | — | 24,608 |

102

A1631

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

| | Year Ended December 31, 2015 | | |
| --- | --- | --- | --- |
| | As Reported | Enviva Port Of Wilmington, LLC | Total (Recast) |
| Net revenue | $ 457,374 | $ — | $ 457,374 |
| Total cost of goods sold | 397,834 | — | 397,834 |
| Gross margin | 59,540 | — | 59,540 |
| Net income (loss) | 19,460 | (1,897) | 17,563 |
| Less net income attributable to noncontrolling partners' interests | 1,899 | 960 | 2,859 |
| Net loss attributable to Predecessor | (2,132) | — | (2,132) |
| Net income (loss) attributable to general partner | 4,449 | (937) | 3,512 |
| Net income attributable to Enviva Partners, LP limited partners' interest in net income | 19,042 | — | 19,042 |

The following table presents the changes to previously reported amounts in the audited consolidated statements of cash flows for the years ended December 31, 2016 and 2015 included in the Partnership's annual report on Form 10-K for the year ended December 31, 2016:

| | Year Ended December 31, 2016 | | |
| --- | --- | --- | --- |
| | As Reported | Enviva Port Of Wilmington, LLC | Total (Recast) |
| Net cash provided by (used in) operating activities | $ 57,393 | $ (1,589) | $ 55,804 |
| Net cash used in investing activities | (69,147) | (41,977) | (111,124) |
| Net cash provided by financing activities | 10,092 | 43,566 | 53,658 |
| Net decrease in cash and cash equivalents | $ (1,662) | $ — | $ (1,662) |

| | Year Ended December 31, 2015 | | |
| --- | --- | --- | --- |
| | As Reported | Enviva Port Of Wilmington, LLC | Total (Recast) |
| Net cash provided by (used in) operating activities | $ 66,413 | $ (556) | $ 65,857 |
| Net cash used in investing activities | (80,046) | (23,444) | (103,490) |
| Net cash provided by financing activities | 15,173 | 24,000 | 39,173 |
| Net increase in cash and cash equivalents | $ 1,540 | $ — | $ 1,540 |

**(5) Significant Risks and Uncertainties, Including Business and Credit Concentrations**

The Partnership's business is significantly impacted by GHG emission and renewable energy legislation and regulations in the European Union as well as its member states. If the European Union or its member states significantly modify such legislation or regulations, then the Partnership's ability to enter into new contracts as the current contracts expire may be materially affected.

The Partnership's primary industrial customers are located in the United Kingdom, Denmark and Belgium. Three customers accounted for 93% of the Partnership's product sales in 2017, two customers accounted for 90% of the Partnership's product sales in 2016 and three customers accounted for 93% of the Partnership's product sales in 2015.

103

ENVIVA PARTNERS, LP AND SUBSIDIARIES

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

The following table shows product sales to third-party customers that accounted for 10% or a greater share of consolidated product sales for each of the years ended December 31:

|  | 2017 | 2016 (Recast) | 2015 (Recast) |
|---|---|---|---|
| Customer A | 66 % | 75 % | 56 % |
| Customer  B | 12 % | 15 % | 19 % |
| Customer  C | — % | — % | 18 % |
| Customer E | 15 % | — % | — % |

The Partnership's cash and cash equivalents are placed in or with various financial institutions. The Partnership has not experienced any losses on such accounts.

**(6) Property, Plant and Equipment**

Property, plant and equipment consisted of the following at December 31:

|  | 2017 | 2016 (Recast) |
|---|---|---|
| Land | $ 13,492 | $ 13,492 |
| Land improvements | 42,962 | 42,322 |
| Buildings | 196,153 | 186,479 |
| Machinery and equipment | 413,349 | 400,867 |
| Vehicles | 635 | 522 |
| Furniture and office equipment | 5,970 | 5,604 |
| Leasehold improvements | 987 | 742 |
|  | 673,548 | 650,028 |
| Less accumulated depreciation | (117,067) | (80,781) |
|  | 556,481 | 569,247 |
| Construction in progress | 5,849 | 21,669 |
| Total property, plant and equipment, net | $ 562,330 | $ 590,916 |

Total depreciation expense was $39.1 million, $25.7 million and $24.7 million for the years ended December 31, 2017, 2016 and 2015, respectively. At December 31, 2017, the Partnership had assets under capital leases with a cost and related accumulated depreciation of $4.7 million and $1.2 million, respectively. At December 31, 2016, the Partnership had assets under capital leases with a cost and related accumulated depreciation of $2.4 million and $0.7 million, respectively.

**(7) Inventories**

Inventories consisted of the following at December 31:

|  | 2017 | 2016 (Recast) |
|---|---|---|
| Raw materials and work-in-process | $ 4,516 | $ 7,689 |
| Consumable tooling | 14,447 | 12,150 |
| Finished goods | 4,573 | 10,097 |
| Total inventories | $ 23,536 | $ 29,936 |

104

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

**(8) Derivative Instruments**

The Partnership uses derivative instruments to partially offset its business exposure to foreign currency exchange and interest rate risk. The Partnership may enter into foreign currency forward and option contracts to offset some of the foreign currency exchange risk on expected future cash flows and interest rate swaps to offset some of the interest rate risk on expected future cash flows on certain borrowings. The Partnership's derivative instruments expose it to credit risk to the extent that hedge counterparties may be unable to meet the terms of the applicable derivative instrument. The Partnership seeks to mitigate such risks by limiting its counterparties to major financial institutions. In addition, the Partnership monitors the potential risk of loss with any one counterparty resulting from credit risk. Management does not expect material losses as a result of defaults by counterparties. The Partnership uses derivative instruments to manage cash flow and does not enter into derivative instruments for speculative or trading purposes.

***Cash Flow Hedges***

*Foreign Currency Exchange Risk*

The Partnership is primarily exposed to fluctuations in foreign currency exchange rates related to off-take contracts that require future deliveries of wood pellets to be settled in British Pound Sterling ("GBP"). Deliveries under one of these contracts began in late 2017. The Partnership has and may continue to enter into foreign currency forward contracts, purchased option contracts or other instruments to partially manage this risk and has designated and may continue to designate these instruments as cash flow hedges. During December 2017, the Partnership determined that certain transactions were no longer probable of occurring within the forecasted time period. The Partnership discontinued hedge accounting and recognized gains and losses accumulated in other comprehensive income related to these hedging relationships in other expense on the consolidated statements of income.

For the qualifying cash flow hedges, the effective portion of the gain or loss on the change in fair value is initially reported as a component of accumulated other comprehensive income in partners' capital and subsequently reclassified into earnings when the hedged exposure affects earnings. The ineffective portion of the gain or loss, if any, is reported in earnings in the current period. The Partnership considers its cash flow hedges to be highly effective at inception and as of December 31, 2017.

The Partnership's outstanding cash flow hedges at December 31, 2017 expire on dates between 2019 and 2022.

*Interest Rate Risk*

The Partnership is exposed to fluctuations in interest rates on borrowings under its Senior Secured Credit Facilities. The Partnership entered into a pay-fixed, receive-variable interest rate swap in September 2016 to hedge the interest rate risk associated with its variable rate borrowings under its Senior Secured Credit Facilities. The Partnership elected to discontinue hedge accounting as of December 14, 2016 following the repayment of a portion of its outstanding indebtedness under its Senior Secured Credit Facilities, and subsequently re-designated the interest rate swap for the remaining portion of such outstanding indebtedness during the three months ended March 31, 2017. The Partnership's interest rate swap expires concurrently with the maturity of the Senior Secured Credit Facilities in April 2020.

The counterparty to the Partnership's interest rate swap is a major financial institution.

The fair values of cash flow hedging instruments included in the consolidated balance sheet as of December 31, 2017 were as follows:

| | Balance Sheet Location | Asset Derivatives | Liability Derivatives |
|---|---|---|---|
| Derivatives designated as hedging instruments: | | | |
| Forward contracts: | | | |

105

A1634

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

| | Balance Sheet Location | Asset Derivatives | Liability Derivatives |
|---|---|---|---|
| Foreign currency exchange forward contracts | Other long-term liabilities | $ — | $ 2,118 |
| Purchased options: | | | |
| Foreign currency purchased option contracts | Prepaid and other current assets | 1,024 | — |
| Interest rate swap: | | | |
| Interest rate swap | Other current assets | 220 | — |
| Interest rate swap | Other long-term assets | 407 | — |
| Total derivatives designated as hedging instruments | | $ 1,651 | $ 2,118 |
| | | | |
| Derivatives not designated as hedging instruments: | | | |
| Forward contracts: | | | |
| Foreign currency exchange forward contracts | Prepaid and other current assets | $ 124 | $ — |
| Foreign currency exchange forward contracts | Accrued and other current liabilities | — | 806 |
| Foreign currency exchange forward contracts | Other long-term liabilities | — | 528 |
| Purchased options: | | | |
| Foreign currency purchased option contracts | Prepaid and other current assets | 3 | — |
| Foreign currency purchased option contracts | Other long-term assets | 45 | — |
| Total derivatives not designated as hedging instruments | | $ 172 | $ 1,334 |

The fair values of cash flow hedging instruments included in the condensed consolidated balance sheet as of December 31, 2016 were as follows:

| | Balance Sheet Location | Asset Derivatives | Liability Derivatives |
|---|---|---|---|
| Derivatives designated as hedging instruments: | | | |
| Forward contracts: | | | |
| Foreign currency exchange forward contracts | Prepaid and other current assets | $ 188 | $ — |
| Foreign currency exchange forward contracts | Other long-term assets | 632 | — |
| Foreign currency exchange forward contracts | Other long-term liabilities | 626 | — |
| Purchased options: | | | |
| Foreign currency purchased option contracts | Other long-term liabilities | — | 51 |
| Total derivatives designated as hedging instruments | | $ 1,446 | $ 51 |
| Derivatives not designated as hedging instruments: | | | |
| Interest rate swap | Other long-term assets | $ 484 | $ — |

106

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

The effects of instruments designated as cash flow hedges and the related changes in accumulated other comprehensive income and the gains and losses recognized in income for the year ended December 31, 2017 were as follows:

| | Amount of Gain (Loss) in Other Comprehensive Income on Derivative (Effective Portion) | Location of Gain (Loss) Reclassified from Accumulated Other Comprehensive Income (Effective Portion) | Amount of Gain (Loss) Reclassified from Accumulated Other Comprehensive Income into Income (Effective Portion) | Location of Gain (Loss) Recognized in Income on Derivative (Ineffective Portion and Amount Excluded from Effectiveness Testing) | Amount of Gain (Loss) Recognized in Income on Derivative (Ineffective Portion and Amount Excluded from Effectiveness Testing) |
|---|---|---|---|---|---|
| Foreign currency exchange forward contracts | $ (4,126) | Product sales | $ (15) | Other income (expense) | $ (1,237) |
| Foreign currency exchange purchased option contracts | (1,411) | Other revenue | — | Other income (expense) | (368) |
| Interest rate swap | 74 | Other income (expense) | (221) | Other income (expense) | 13 |

The effects of instruments designated as cash flow hedges and the related changes in accumulated other comprehensive income and the gains and losses in income for the year ended December 31, 2016 were as follows:

| | Amount of Gain (Loss) in Other Comprehensive Income on Derivative (Effective Portion) | Location of Gain (Loss) Reclassified from Accumulated Other Comprehensive Income (Effective Portion) | Amount of Gain (Loss) Reclassified from Accumulated Other Comprehensive Income into Income (Effective Portion) | Location of Gain (Loss) Recognized in Income on Derivative (Ineffective Portion and Amount Excluded from Effectiveness Testing) | Location of Gain (Loss) Recognized in Income on Derivative (Ineffective Portion and Amount Excluded from Effectiveness Testing) |
|---|---|---|---|---|---|
| Foreign currency exchange forward contracts | $ 770 | Product sales | $ — | Product sales | $ 1 |
| Foreign currency exchange forward contracts | — | Other revenue | — | Other revenue | — |
| Interest rate swap | — | Other income (expense) | — | Other income (expense) | — |
| Foreign currency exchange purchased option contracts | (175) | Product sales | — | Product sales | — |

Certain cash flow hedges related to foreign currency exchange risk previously designated as hedges ceased to qualify for hedge accounting treatment and the Partnership discontinued hedge accounting for such hedged transactions on December 31, 2017. As of December 31, 2017, $1.6 million of loss included in accumulated other comprehensive income was reclassified to earnings. As of December 31, 2017, the estimated net amounts of existing gains and losses in accumulated other comprehensive income associated with derivative instruments expected to be transferred to the consolidated statement of income is a gain of $0.1 million during the next twelve months.

The Partnership enters into master netting arrangements, which are designed to permit net settlement of derivative transactions among the respective counterparties. If the Partnership had settled all transactions with its respective counterparties at December 31, 2017, the Partnership would have made a net settlement termination payment of $1.6 million, which differs from the recorded fair value of the derivatives. The Partnership presents its derivative assets and liabilities at their gross fair values.

A1636

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

The notional amounts of outstanding derivative instruments associated with outstanding or unsettled derivative instruments as of December 31, 2017 were as follows:

| | | |
|---|---|---|
| Foreign exchange forward contracts in GBP | £ | 46,465 |
| Foreign exchange purchased option contracts in GBP | £ | 34,050 |
| Foreign exchange forward contracts in EUR | € | 5,350 |
| Interest rate swap | $ | 44,756 |

The Prior Credit Agreement required the Predecessor to swap a minimum of 50% of the term loan balance outstanding under the Prior Senior Secured Credit Facilities. In connection with the issuance of the Prior Senior Secured Credit Facilities (see Note 12, *Long-Term Debt and Capital Lease Obligations* ), the Predecessor entered into floating-to-fixed interest rate swaps (the Partnership received a floating market rate and paid a fixed interest rate) to manage the interest rate exposure related to the Prior Senior Secured Credit Facilities. All indebtedness outstanding under the Prior Senior Secured Credit Facilities was repaid in full on April 9, 2015, and the Partnership terminated the related rate interest rate swaps and paid a termination fee of $0.1 million.

The Partnership did not have derivative instruments designated as cash flow hedges during the year ended December 31, 2015.

**(9) Fair Value Measurements**

The amounts reported in the consolidated balance sheets as cash and cash equivalents, accounts receivable, related-party receivables, prepaid expenses and other current assets, accounts payable, related-party payables and accrued liabilities, related-party accrued liabilities and other current liabilities approximate fair value because of the short-term nature of these instruments.

Derivative instruments and long-term debt and capital lease obligations including the current portion are classified as Level 2 instruments. The fair value of the Senior Notes (see Note 12, *Long-Term Debt and Capital Lease Obligations – Senior Notes* ) was determined based on observable market prices in a less active market and was categorized as Level 2 in the fair value hierarchy. The fair value of other long-term debt and capital lease obligations classified as Level 2 was determined based on the usage of market prices not quoted on active markets and other observable market data. The carrying amount of derivative instruments approximates fair value as of December 31, 2017 and December 31, 2016 were as follows:

| | December 31, 2017 | | December 31, 2016 | |
|---|---|---|---|---|
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| Senior Notes | $ 352,224 | $ 374,624 | $ 293,797 | $ 306,547 |
| Other long-term debt and capital lease obligations | 48,793 | 48,793 | 57,283 | 57,283 |
| Total long-term debt and capital lease obligations | $ 401,017 | $ 423,417 | $ 351,080 | $ 363,830 |

The fair value of the long-term debt and capital lease obligations are estimated based upon rates currently available for debt and capital lease obligations with similar terms and remaining maturities.

108

A1637

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

**(10) Goodwill and Other Intangible Assets**

**Intangible Assets**

Intangible assets consisted of the following at:

|  | Amortization Period | December 31, 2017 | | | December 31, 2016 | | |
|---|---|---|---|---|---|---|---|
|  |  | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Favorable customer contracts | 3 years | $ 8,700 | $ (8,591) | $ 109 | $ 8,700 | $ (7,468) | $ 1,232 |
| Wood pellet contract | 6 years | 1,750 | (1,750) | — | 1,750 | (1,611) | 139 |
| Total intangible assets |  | $ 10,450 | $ (10,341) | $ 109 | $ 10,450 | $ (9,079) | $ 1,371 |

Intangible assets include favorable customer contracts acquired in connection with the Partnership's purchase of Green Circle in January 2015. The Partnership also recorded payments made to acquire a six-year wood pellet contract with a European utility in 2010 as an intangible asset. These costs are recoverable through the future revenue streams generated from the associated contract and are closely related to the revenue from the customer contracts. The Partnership amortizes the customer contract intangible assets as deliveries are completed during the respective contract terms. During the years ended December 31, 2017, 2016 and 2015, of $1.3 million, $2.0 million and $6.0 million, respectively, of amortization was included in cost of goods sold in the accompanying consolidated statements of income. The remaining amortization expense of $0.1 million will be recognized in 2018.

**Goodwill**

In 2015, the Partnership recorded an addition to goodwill of $80.7 million as part of the acquisition of Cottondale by the sponsor and its contribution to the Partnership as part of the Reorganization. Goodwill also includes $4.9 million from the acquisitions in 2010 of a business from IN Group Companies and of a company now known as Enviva Pellets Amory. The Partnership's reported goodwill balance of $85.6 million at December 31, 2017 and 2016 was allocated to the Partnership's one reporting unit, which also represents the Partnership's one segment.

**(11) Assets Held for Sale**

The Partnership had a controlling interest in Wiggins, an entity that owned a wood pellet plant in Stone County, Mississippi. In December 2016, the Partnership, with the authorization of the Partnership's board of directors, initiated a plan to sell the Wiggins plant, which triggered an evaluation of a potential asset impairment. The Partnership reclassified the Wiggins plant assets to current assets held for sale and ceased depreciation. Also in December 2016, the Partnership executed an agreement to sell Wiggins, with the closing of the transaction scheduled for January 20, 2017. The carrying amount of the assets held for sale exceeded the estimated fair value which resulted in a $10.0 million non-cash charge to earnings, which is included in impairment of assets held for sale on the consolidated statements of income. On January 20, 2017, the sales agreement terminated when the prospective buyer failed to pay the purchase price. Subsequently, the Partnership ceased operations but the Wiggins plant remained available for immediate sale.

The Partnership worked with prospective buyers throughout 2017, including the buyer from the December 2016 agreement. On December 27, 2017, the Partnership sold the Wiggins plant to a third-party buyer for a purchase price of $0.4 million and recorded a loss on the sale of $0.8 million, net, upon deconsolidation, consisting of a loss on the sale of $3.4 million and a $2.6 million gain upon deconsolidation, which is included in general and administrative expenses on the consolidated statements of income. On December 28, 2017, Wiggins was dissolved.

During December 2016, the Partnership recorded an impairment of $10.0 million related to the fixed assets at the Wiggins plant (see Note 11, *Assets Held for Sale*). The Partnership did not record any impairments related to assets held for sale for the years ended December 31, 2017 and 2015 (see Note 10, *Goodwill and Other Intangible Assets*).

A1638

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

**(12) Long-Term Debt and Capital Lease Obligations**

*Senior Notes Due 2021*

On November 1, 2016, the Partnership and Enviva Finance Corp. (together with the Partnership, the "Issuers"), Wilmington Trust, National Association, as trustee, and the guarantors party thereto entered into an indenture, as amended or supplemented (the "Indenture") pursuant to which the Issuers issued $300.0 million in aggregate principal amount of 8.5% senior unsecured notes due November 1, 2021 (the "Senior Notes") to eligible purchasers (the "Senior Notes Offering") in a private placement under Rule 144A and Regulation S of the Securities Act of 1933, as amended (the "Securities Act"). Interest payments commenced on May 1, are due semi-annually in arrears on May 1 and November 1. In August 2017, holders of 100% of the Senior Notes tendered such notes in exchange for newly issued registered notes with terms substantially identical in all material respects to the Senior Notes (except that the registered notes are not subject to restrictions on transfer). The Partnership recorded $6.4 million in issue discounts and costs associated with the issuance of the Senior Notes, which have been recorded as a deduction to long-term debt and capital lease   obligations.

The Partnership used $139.6 million of the net proceeds from the Senior Notes, together with cash on hand, to pay a portion of the purchase price for the Sampson Drop-Down and $159.8 million to repay borrowings, including accrued interest, under the Senior Secured Credit Facilities.

On October 10, 2017, pursuant to the Indenture, the Issuers issued and sold an additional $55.0 million in aggregate principal amount of Senior Notes to a purchaser (the "Additional Notes Purchaser") at 106.25% of par value plus accrued interest from May 1, 2017. The additional Senior Notes have the same terms as the Senior Notes. The sale of the additional Senior Notes resulted in gross proceeds to the Issuers of approximately $60.0 million. The proceeds were used to repay borrowings under the Partnership's revolving credit commitments under the Senior Secured Credit Facilities, which were used to fund the Wilmington Drop-Down, and for general partnership purposes.

In December 2017, the Additional Notes Purchaser tendered such notes in exchange for newly issued registered notes with terms substantially identical in all material respects to the Senior Notes (except that the registered notes are not subject to restrictions on transfer). The additional Senior Notes will be treated together with the Senior Notes as a single class for all purposes under the Indenture. The Partnership recorded $0.9 million in original issue discounts and costs and $3.4 million in premiums associated with the issuance of the additional Senior Notes, which have been recorded as a net addition to long-term debt and capital lease obligations.

At any time prior to November 1, 2018, the Issuers may redeem up to 35% of the aggregate principal amount of the Senior Notes (including any additional notes) issued under the Indenture at a redemption prices of 108.5% of the principal amount, plus accrued and unpaid interest, if any, to the redemption date, in an amount not greater than the net cash proceeds of one or more equity offerings by the Partnership, provided that:

- at least 65% of the aggregate principal amount of the Senior Notes issued under the Indenture on November 1, 2016, remains outstanding immediately after the occurrence of such redemption (excluding notes held by the Partnership and its subsidiaries); and

- the redemption occurs within 120 days of the date of the closing of such equity offering(s).

On and after November 1, 2018, the Issuers may redeem all or a portion of the Senior Notes at the redemption prices (expressed as percentages of principal amount) set forth below, plus accrued and unpaid interest, if any, on the Senior Notes redeemed to the applicable redemption date (subject to the right of holders of record on the relevant record date to receive interest due on an interest payment date that is on or prior to the redemption date), if redeemed during the twelve-month period beginning November 1 on the years indicated below:

A1639

ENVIVA PARTNERS, LP AND SUBSIDIARIES

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

| Year: | Percentages |
|---|---|
| 2018 | 104.250 % |
| 2019 | 102.125 % |
| 2020 and thereafter | 100.000 % |

The Senior Notes contain certain non-financial covenants applicable to the Partnership including, but not limited to (1) restricted payments, (2) incurrence of indebtedness and issuance of preferred securities, (3) liens, (4) dividend and other payment restrictions affecting subsidiaries, (5) merger, consolidation or sale of assets, (6) transactions with affiliates, (7) designation of restricted and unrestricted subsidiaries, (8) additional subsidiary guarantees, (9) business activities and (10) reporting obligations.

As of December 31, 2017 and 2016, the Partnership was in compliance with all covenants and restrictions associated with, and no events of default existed under, the Indenture. The Partnership's obligations under the Indenture are guaranteed by certain of the Partnership's subsidiaries and secured by liens on substantially all of the Partnership's assets.

***Senior Secured Credit Facilities***

On April 9, 2015, the Partnership entered into a Credit Agreement (the "Credit Agreement") providing for $199.5 million aggregate principal amount of senior secured credit facilities (the "Original Credit Facilities"). The Original Credit Facilities consisted of $174.5 million aggregate principal amount of borrowings and revolving credit commitments in an aggregate principal amount at any time outstanding, taken together with the face amount of letters of credit, not in excess of $25.0 million.

On December 11, 2015, the Partnership entered into the First Incremental Term Loan Assumption Agreement (the "Assumption Agreement") providing for $36.5 million aggregate principal amount of incremental borrowings (the "Incremental Term Advances" and, together with the Original Credit Facilities, the "Senior Secured Credit Facilities") under the Credit Agreement. In addition, on December 11, 2015, FiberCo, an affiliate and a wholly owned subsidiary of the Partnership's sponsor, purchased $15.0 million aggregate principal amount of the borrowings, net of a 1.0% lender fee. On June 30, 2016, FiberCo assigned all of its rights and obligations in its capacity as a lender to a third party. The Partnership recorded $0.4 million as interest expense to this indebtedness during the year ended December 31, 2016.

On October 17, 2016, the Partnership entered into the Second Amendment to the Credit Agreement (the "Second Amendment") under the Partnership's Senior Secured Credit Facilities. Following the Sampson Drop-Down, the Second Amendment provided for an increase from $25.0 million to $100.0 million of the revolving credit commitments.

On December 14, 2016, proceeds from the Senior Notes were used to repay outstanding indebtedness, including accrued interest of $159.9 million under the Senior Secured Credit Facilities. For the year ended December 31, 2016, the Partnership recorded a $4.4 million loss on early retirement of debt obligation related to the repayments.

The Senior Secured Credit Facilities include a commitment fee payable on undrawn revolving credit facility commitments of 0.50% per annum (subject to a stepdown of 0.375% per annum if the Total Leverage Ratio is less than or equal to 2.00:1.00). Letters of credit issued under the revolving credit facility are subject to a fee calculated at the applicable margin for revolving credit facility Eurodollar rate borrowings. The Partnership had $0 outstanding under the revolving credit commitments as of December 31, 2017 and $6.5 million at December 31, 2016.

The Partnership had a $4.0 million letter of credit outstanding under the letters of credit facility as of December 31, 2017 and 2016. The letter of credit was issued in connection with a contract between the Partnership and third parties, in the ordinary course of business. On January 11, 2018, the letter of credit was cancelled as it was no longer contractually required.

A1640

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

The Senior Secured Credit Facilities mature in April 2020. Borrowings under the Senior Secured Credit Facilities bear interest, at the Partnership's option, at either a base rate plus an applicable margin or at a Eurodollar rate (with a 1.00% floor for term loan borrowings) plus an applicable margin. Principal and interest are payable quarterly.

The Partnership can request loans under incremental facilities under the Credit Agreement on the terms and conditions and in the maximum aggregate principal amounts set forth therein, provided that lenders provide commitments to make loans under such incremental facilities. The Partnership is required to make mandatory prepayments of the Senior Secured Credit Facilities with the proceeds of certain asset sales and debt incurrences. The Partnership may voluntarily prepay the Senior Secured Credit Facilities in whole or in part at any time without premium or penalty.

The Credit Agreement contains certain covenants, restrictions and events of default including, but not limited to, a change of control restriction and limitations on the Partnership's ability to (i) incur indebtedness, (ii) pay dividends or make other distributions, (iii) prepay, redeem or repurchase certain debt, (iv) make loans and investments, (v) sell assets, (vi) incur liens, (vii) enter into transactions with affiliates, (viii) consolidate or merge and (ix) assign certain material contracts to third parties or unrestricted subsidiaries. The Partnership will be restricted from making distributions if an event of default exists under the Credit Agreement or if the interest coverage ratio (determined as the ratio of consolidated EBITDA, as defined in the Credit Agreement, to consolidated interest expense, determined quarterly) is less than 2.25:1.00 at such time.

Pursuant to the Credit Agreement, the Partnership is required to maintain, as of the last day of each fiscal quarter, a ratio of total debt to consolidated EBITDA ("Total Leverage Ratio"), as defined in the Credit Agreement, of not more than a maximum ratio, initially set at 4.25:1.00 and stepping down to 3.75 :1.00 during the term of the Credit Agreement; provided that the maximum permitted Total Leverage Ratio will be increased by 0.50:1.00 for the period from the consummation of certain qualifying acquisitions through the end of the second full fiscal quarter thereafter.

As of December 31, 2017 and December 31, 2016, the Partnership was in compliance with all covenants and restrictions associated with, and no events of default existed under, the Credit Agreement. The obligations under the Credit Agreement are guaranteed by certain of the Partnership's subsidiaries and secured by liens on substantially all assets.

### Prior Senior Secured Credit Facilities

In November 2012, the Predecessor entered into the Credit and Guaranty Agreement (the "Prior Credit Agreement") that provided for a $120.0 million aggregate principal amount of senior secured credit facilities (the "Prior Senior Secured Credit Facilities"). All outstanding indebtedness under the Prior Senior Secured Credit Facilities was repaid in full, including related accrued interest, in the amount of $82.2 million on April 9, 2015. The Partnership funded the repayment with a portion of borrowings under the Original Credit Facilities. For the year ended December 31, 2015, the Partnership recorded a $4.7 million loss on early retirement of debt obligation related to the repayment.

### Related-Party Notes Payable

On January 22, 2016, a non-controlling interest holder in Wiggins became the holder of the $3.3 million Wiggins construction loan and working capital line. Related-party interest expense associated with the related-party notes payable was insignificant during the year ended December 31, 2016. The construction loan and working capital line outstanding principal of $3.1 million and an insignificant amount of accrued interest were repaid in full by Wiggins on the October 18, 2016 maturity date.

In connection with the January 5, 2015 acquisition of Cottondale (formerly owned by Green Circle), the sponsor made a term advance of $36.7 million to Cottondale under a revolving note. The revolving note accrued interest at an annual rate of 4.0%. In connection with the acquisition, the sponsor also advanced its wholly owned subsidiary,

112

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

Acquisition II, $50.0 million under a note payable accruing interest at an annual rate of 4.0%. Cottondale repaid $4.8 million of the outstanding principal in March 2015. As a result of the sponsor's contribution of Acquisition II, which owned Cottondale, to the Partnership on April 9, 2015, the Partnership recorded $81.9 million of outstanding principal and $0.9 million of accrued interest related to these notes.

In connection with the closing of the IPO on May 4, 2015, the related-party notes payable outstanding principal of $81.9 million and related accrued interest of $1.1 million were repaid by the Partnership to the sponsor. During the year ended December 31, 2015, $1.1 million of related-party interest expense associated with the related-party notes payable was incurred.

Long-term debt, at carrying value are composed of the following at December 31:

| | 2017 | 2016 (Recast) |
|---|---|---|
| Senior Notes, net of unamortized discount, premium and debt issuance of $2.8 million as of December 31, 2017 and $6.2 million as of December 31, 2016 | $ 352,224 | $ 293,797 |
| Senior Secured Credit Facilities, Tranche A-1 Advances, net of unamortized discount and debt issuance costs of $1.0 million as of December 31, 2017 and $1.4 million as of December 31, 2016 | 39,263 | 41,651 |
| Senior Secured Credit Facilities, Tranche A-3 Advances, net of unamortized discount and debt issuance costs of $0.1 million as of December 31, 2017 and $0.2 million as of December 31, 2016 | 4,372 | 4,489 |
| Senior Secured Credit Facilities, revolving credit commitments, at a Eurodollar Rate of 7.0% at December 31, 2016 | — | 6,500 |
| Other loans | 2,023 | 2,759 |
| Capital leases | 3,135 | 1,884 |
| Total long-term debt and capital lease obligations | 401,017 | 351,080 |
| Less current portion of long-term debt and capital lease obligations | (6,186) | (4,165) |
| Long-term debt and capital lease obligations, excluding current installments | $ 394,831 | $ 346,915 |

The aggregate maturities of long-term debt and capital lease obligations, net of unamortized discount and debt issuance costs, are as follows:

| Year Ended December 31: | |
|---|---|
| 2018 | $ 5,097 |
| 2019 | 5,301 |
| 2020 | 35,828 |
| 2021 | 354,788 |
| 2022 | 3 |
| Thereafter | — |
| Total long-term debt and capital lease obligations | $ 401,017 |

Depreciation expense relating to assets held under capital lease obligations was $0.7 million, $0.2 million and $0.1 million for each of the years ended December 31, 2017, 2016 and 2015, respectively.

113

A1642

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

**(13) Related-Party Transactions**

Related-party amounts included on the consolidated statements of income were the following for each of the years ended December 31, :

|                                     | 2017      | 2016 (Recast) | 2015 (Recast) |
|-------------------------------------|-----------|---------------|---------------|
| Other revenue                       | $   5,912 | $        —    | $        —    |
| Cost of goods sold                  | 69,445    | 41,467        | 22,268        |
| General and administrative expenses | 15,132    | 17,236        | 16,587        |

*Management Services Agreement*

On April 9, 2015, the Partnership, the General Partner, Enviva, LP, Enviva GP, LLC and certain subsidiaries of Enviva, LP (collectively, the "Service Recipients") entered into a five-year Management Services Agreement (the "MSA") with Enviva Management (the "Provider"), a wholly owned subsidiary of the sponsor, pursuant to which the Provider provides the Service Recipients with operations, general administrative, management and other services (the "Services"). Under the terms of the MSA, the Service Recipients are required to reimburse the Provider the amount of all direct or indirect internal or third-party expenses incurred by the Provider in connection with the provision of the Services, including, without limitation: (i) the portion of the salary and benefits of the employees engaged in providing the Services reasonably allocable to the Service Recipients; (ii) the charges and expenses of any third party retained to provide any portion of the Services; (iii) office rent and expenses and other overhead costs incurred in connection with, or reasonably allocable to, providing the Services; (iv) amounts related to the payment of taxes related to the business of the Service Recipients; and (v) costs and expenses incurred in connection with the formation, capitalization, business or other activities of the Provider pursuant to the MSA .

Direct or indirect internal or third-party expenses incurred are either directly identifiable or allocated to the Partnership by the Provider. The Provider estimates the percentage of salary, benefits, third-party costs, office rent and expenses and any other overhead costs incurred by the Provider associated with the Services to be provided to the Partnership. Each month, the Provider allocates the actual costs accumulated in the financial accounting system using these estimates. The Provider also charges the Partnership for any directly identifiable costs such as goods or services provided at the Partnership's request .

During the year ended December 31, 2017, the Partnership incurred $65.5 million related to the MSA. Of this amount, $49.9 million is included in cost of goods sold and $15.1 million is included in general and administrative expenses on the consolidated statements of income. At December 31, 2017, $0.5 million incurred under the MSA is included in finished goods inventory.

During the year ended December 31, 2016, the Partnership incurred $56.0 million related to the MSA. Of this amount, $37.9 million is included in cost of goods sold and $17.2 million is included in general and administrative expenses on the consolidated statements of income. At December 31, 2016, $0.9 million incurred under the MSA is included in finished goods inventory.

During the year ended December 31, 2015, the Partnership incurred $39.4 million related to the MSA. Of this amount, $22.3 million is included in cost of goods sold and $16.6 million is included in general and administrative expenses on the consolidated statements of income.

As of December 31, 2017, the Partnership had $19.6 million included in related-party payables primarily related to the MSA. As of December 31 2016, the Partnership had $10.9 million included in related-party payables primarily related to the MSA.

A1643

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

### Common Control Transactions

*Cottondale*

On January 5, 2015, the sponsor acquired Green Circle, which owned the Cottondale plant. Acquisition I contributed Green Circle to the Partnership in April 2015 in exchange for subordinated units in the Partnership. Prior to such contribution, the sponsor converted Green Circle into a Delaware limited liability company and changed the name of the entity to "Enviva Pellets Cottondale, LLC" (see Note 1, *Description of Business and Basis of Presentation* ).

*Southhampton Drop-Down*

In connection with the closing of the Senior Secured Credit Facilities (see Note 12, *Long-Term Debt and Capital Lease Obligations* ), on December 11, 2015, under the terms of a contribution agreement between the Partnership and the First Hancock JV, the First Hancock JV contributed to Enviva, LP, all of the issued and outstanding limited liability company interests in Southampton for total consideration of $131.0 million (see Note 1, *Description of Business and Basis of Presentation* ).

*Sampson Drop-Down*

On December 14, 2016, the First Hancock JV contributed to Enviva, LP all of the issued and outstanding limited liability company interests in Sampson for total consideration of $175.0 million (see Note 1, *Description of Business and Basis of Presentation* ).

*Wilmington Drop-Down*

On October 2, 2017, the First Hancock JV contributed to Enviva, LP all of the issued and outstanding limited liability company interests in Wilmington for total consideration of $130.0 million (see Note 1, *Description of Business and Basis of Presentation* ).

### Related-Party Indemnification

In connection with the Sampson Drop-Down, the First Hancock JV agreed to indemnify the Partnership, its affiliates, and its respective officers, directors, managers, counsel, agents and representatives from all costs and losses arising from certain vendor liabilities and claims ("Retained Matters") related to the construction of the Sampson plant that were included in the net assets contributed. At December 31, 2016, accrued liabilities related to such indemnifiable amounts included $6.4 million related to work performed by certain vendors. The Partnership recorded a corresponding related-party receivable from the First Hancock JV of $6.4 million for reimbursement of such indemnifiable amounts. At December 31, 2017, the related-party receivable associated with such amounts was $3.0 million.

In connection with the Wilmington Drop-Down, the First Hancock JV agreed to indemnify the Partnership, its affiliates, and its respective officers, directors, managers, counsel, agents and representatives from all costs and losses arising from certain vendor liabilities and claims related to the construction of the Port of Wilmington that were included in the net assets contributed. The Partnership recorded a corresponding related-party receivable from the First Hancock JV of $1.8 million for reimbursement of such indemnifiable amounts. At December 31, 2017, the related-party receivable associated with such amounts was $1.3 million.

### Sampson Construction Payments

Pursuant to three payment agreements between the Partnership and the First Hancock JV dated effective as of July 27, 2017, September 30, 2017, and December 31, 2017 (together, the "Payment Agreements"), the First Hancock JV agreed to pay an aggregate amount of $1.4 million to the Partnership in consideration for costs incurred by the

115

A1644

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

Partnership to repair or replace certain equipment at the Sampson plant following the consummation of the Sampson Drop-Down.

*Terminal Services Agreements*

On December 14, 2016, Enviva, LP and Wilmington entered into a terminal services agreement (the "Sampson TSA") regarding wood pellets produced at the Sampson plant and transported by truck to the Wilmington terminal. Pursuant to the Sampson TSA, the wood pellets were received, stored and ultimately loaded onto oceangoing vessels for transport to the Partnership's customers. The Sampson TSA was terminated in connection with the Wilmington Drop-Down on October 2, 2017.

In connection with the Wilmington Drop-Down, Wilmington and the sponsor entered into a terminal services agreement dated October 2, 2017 providing for wood pellet receipt, storage, handling and loading services by the Wilmington terminal on behalf of the sponsor (the "Holdings TSA"). Pursuant to the Holdings TSA, which remains in effect until September 1, 2026, the sponsor agreed to deliver a minimum of 125,000 MT per quarter and pay a fixed fee on a per-ton basis for the terminal services. During the year ended December 31, 2017, the Partnership recorded $2.8 million as terminal services revenue, which is included in "Other revenue." The Partnership had no terminal services revenue under the Holdings TSA during the years ended December 31, 2016 and 2015.

The Holdings TSA was amended and assigned to Enviva Pellets Greenwood, LLC, a wholly owned subsidiary of Enviva JV Development Company, LLC, a joint venture between the Partnership's sponsor, Hancock Natural Resource Group, Inc. and certain other affiliates of John Hancock Life Insurance Company (U.S.A.) (the "Second Hancock JV").

*Enviva FiberCo, LLC*

The Partnership purchases raw materials from FiberCo. Raw material purchases during the years ended December 31, 2017 and 2016 from FiberCo were $8.5 million and $3.7 million, respectively. Raw material purchases from FiberCo were insignificant for the year ended December 31, 2015.

*Biomass Purchase Agreement – Hancock JV*

On April 9, 2015, Enviva, LP entered into a master biomass purchase and sale agreement (the "Biomass Purchase Agreement") and a confirmation thereunder with the First Hancock JV pursuant to which the First Hancock JV sold to Enviva, LP, at a fixed price per metric ton, certain volumes of wood pellets per month. The Partnership sold the wood pellets purchased from the First Hancock JV to customers under the Partnership's existing off-take contracts. Such confirmation was terminated on December 11, 2015.

On September 7, 2016, Sampson entered into a confirmation under the Biomass Purchase Agreement pursuant to which Sampson agreed to sell to the sponsor 60,000 MT of wood pellets through August 31, 2017. On June 23, 2017, the sponsor satisfied its take-or-pay obligation under the agreement with a $2.7 million payment to the Partnership, which is included in "Other revenue."

On September 26, 2016, Enviva, LP and Sampson entered into two confirmations under the Biomass Purchase Agreement pursuant to which Enviva, LP agreed to sell to Sampson 140,000 MT of wood pellets, and Sampson agreed to sell to Enviva, LP 140,000 MT of wood pellets. The confirmation pursuant to which Enviva, LP agreed to sell wood pellets to Sampson under the Biomass Purchase Agreement was terminated in connection with the Sampson Drop-Down.

116

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

*Biomass Option Agreement – Enviva Holdings, LP*

On February 3, 2017, Enviva, LP entered into a master biomass purchase and sale agreement and a confirmation thereunder, which confirmation was amended on April 1, 2017, each with the sponsor (together, the "Option Contract"), pursuant to which Enviva, LP has the option to purchase certain volumes of wood pellets from the sponsor, from time to time at a price per metric ton determined by reference to a market index. The sponsor has a corresponding right to re-purchase volumes purchased by Enviva, LP pursuant to the Option Contract at a price per metric ton determined by reference to such market index at then-prevailing rates in the event that Enviva, LP purchases more than 45,000 MT of wood pellets pursuant to the Option Contract.

During the year ended December 31, 2017, pursuant to the Option Contract, Enviva, LP purchased $11.1 million of wood pellets from the sponsor, which amount is included in cost of goods sold in the Partnership's consolidated statements of income. The Partnership did not purchase wood pellets from the sponsor during the years ended December 31, 2016 and 2015.

*EVA-MGT Contracts*

In January 2016 the Partnership entered into a contract with the First Hancock JV to supply 375,000 MTPY of wood pellets (the "EVA‑MGT Contract") to MGT Teesside Limited's Tees Renewable Energy Plant (the "Tees REP"), which is under development. The EVA‑MGT Contract commences in 2019, ramps to full supply in 2021 and continues through 2034. The EVA-MGT Contract is denominated in U.S. Dollars for commissioning volumes in 2019 and in GBP thereafter.

The Partnership entered into a second supply agreement with the First Hancock JV in connection with the Sampson Drop‑Down to supply an additional 95,000 MTPY of the contracted volume to the Tees REP. The contract, which is denominated in GBP, commences in 2019 and continues through 2034.

**(14) Income Taxes**

The Partnership's operations are organized as limited partnerships and entities that are disregarded entities for federal and state income tax purposes. As a result, the Partnership is not subject to U.S. federal and most state income taxes. The partners and unitholders of the Partnership are liable for these income taxes on their share of the Partnership's taxable income. Some states impose franchise and capital taxes on the Partnership. Such taxes are not material to the consolidated financial statements and have been included in other income (expense) as incurred.

For calendar year 2017, the only periods subject to examination for federal and state income tax returns are 2015 through 2017. The Partnership believes its income tax filing positions, including its status as a pass-through entity, would be sustained on audit and does not anticipate any adjustments that would result in a material change to its consolidated balance sheet. Therefore, no reserves for uncertain tax positions, nor interest and penalties, have been recorded. For the years ended December 31, 2017 and 2016, no provision for federal or state income taxes has been recorded in the consolidated financial statements.

The Partnership's consolidated financial statements include Enviva Finance Corp., which is a wholly owned C corporation that was formed for the purpose of being the co-issuer of the Partnership's Senior Notes. There were no activities generated by Enviva Finance Corp. during 2017 and 2016, as a result, no provision for federal or state income taxes has been recorded in the consolidated financial statements.

The Partnership's consolidated statement of income for the year ended December 31, 2015, includes income tax expense of $2.7 million related to the activities of the Cottondale plant from the date of acquisition on January 5, 2015 through April 8, 2015. This amount is reflected as a capital contribution. During this period, Green Circle was a corporate subsidiary of the predecessor entity of Acquisition II. Green Circle, which is now Enviva Cottondale

117

A1646

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

Acquisition I, LLC, and Acquisition II were each treated as a corporation for federal income tax purposes until April 7, 2015 and April 8, 2015, respectively. Prior to the contribution of Acquisition II to the Partnership on April 9, 2015, the financial results of the predecessor entity of each of Acquisition II and Green Circle were included in the consolidated federal income tax return of the tax paying entity, Acquisition I.

**(15) Partners' Capital**

In connection with the closing of the IPO, the Partnership recapitalized the outstanding limited partner interests held by the sponsor into 405,138 common units and 11,905,138 subordinated units representing a 51.7% ownership interest in the Partnership as of the closing of the IPO. On December 11, 2015, the Partnership issued 942,023 common units to a wholly owned subsidiary of the sponsor in connection with the Southampton Drop-Down. In addition, the sponsor is the owner of the General Partner and the General Partner holds the IDRs.

*Subordinated Units*

All of the subordinated units will convert into common units on a one-for-one basis at the end of the subordination period, which is expected to occur in May 2018. Our sponsor has registration rights with respect to the common units it currently holds and the common units it will hold upon conversion of the subordinated units.

*Allocations of Net Income*

The First Amended and Restated Agreement of Limited Partnership of the Partnership (the "Partnership Agreement") contains provisions for the allocation of net income and loss to the unitholders of the Partnership and the General Partner. For purposes of maintaining partner capital accounts, the Partnership Agreement specifies that items of income and loss shall be allocated among the partners of the Partnership in accordance with their respective percentage ownership interest. Such allocations are made after giving effect, if any, to priority income allocations in an amount equal to incentive cash distributions, which are allocated 100% to the General Partner.

*Incentive Distribution Rights*

Incentive distribution rights ("IDRs") represent the right to receive increasing percentages (from 15.0% to 50.0%) of quarterly distributions from operating surplus after distributions in amounts exceeding specified target distribution levels have been achieved by the Partnership. The General Partner currently holds the IDRs, but may transfer these rights at any time.

*At-the-Market Offering Program*

On August 8, 2016, the Partnership filed a prospectus supplement to the shelf registration filed with the SEC on June 24, 2016, for the registration of the continuous offering of up to $100.0 million of common units, in amounts, at prices, and on terms to be determined by market conditions and other factors at the time of the offerings. In August 2016, the Partnership entered into an equity distribution agreement (the "Equity Distribution Agreement") with certain managers pursuant to which the Partnership may offer and sell common units from time to time through or to one or more of the managers, subject to the terms and conditions set forth in the Equity Distribution Agreement, of up to an aggregate sales amount of $100.0 million (the "ATM Program").

During the year ended December 31, 2017, the Partnership sold 71,368 common units under the Equity Distribution Agreement for net proceeds of $1.9 million, net of an insignificant amount of commissions. Accounting and other fees of approximately $0.2 million were offset against the proceeds. Net proceeds from sales under the ATM Program were used for general partnership purposes.

A1647

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

During the year ended December 31, 2016, the Partnership sold 358,593 common units under the Equity Distribution Agreement for net proceeds of $9.3 million, net of $0.1 million of commissions. Deferred issuance costs of approximately $0.4 million, primarily consisting of legal, accounting and other fees, were offset against the proceeds. Net proceeds from sales under the ATM Program were used for general partnership purposes.

***Sampson Drop-Down***

As partial consideration for the Sampson Drop-Down, the Partnership issued 1,098,415 unregistered common units at a price of $27.31 per unit, or $30.0 million of common units, to affiliates of John Hancock Life Insurance Company (U.S.A.) (see Note 4, *Transactions Between Entities Under Common Control* ).

***Cash Distributions to Unitholders***

The partnership agreement sets forth the calculation to be used to determine the amount of cash distributions that the common and subordinated unitholders and sponsor will receive.

Distributions that have been paid or declared related to the reporting period are considered in the determination of earnings per unit. The following table details the cash distribution paid or declared (in millions, except per unit amounts):

| Quarter Ended | Declaration Date | Record Date | Payment Date | Distribution Per Unit | | Total Cash Distribution | | Total Payment to General Partner for Incentive Distribution Rights | |
|---|---|---|---|---|---|---|---|---|---|
| March 31, 2016 | May 4, 2016 | May 16, 2016 | May 27, 2016 | $ | 0.5100 | $ | 12.6 | $ | 0.2 |
| June 30, 2016 | August 3, 2016 | August 15, 2016 | August 29, 2016 | $ | 0.5250 | $ | 13.0 | $ | 0.3 |
| September 30, 2016 | November 2, 2016 | November 14, 2016 | November 29, 2016 | $ | 0.5300 | $ | 13.3 | $ | 0.3 |
| December 31, 2016 | February 1, 2017 | February 15, 2017 | February 28, 2017 | $ | 0.5350 | $ | 14.1 | $ | 0.4 |
| March 31, 2017 | May 3, 2017 | May 18, 2017 | May 30, 2017 | $ | 0.5550 | $ | 14.6 | $ | 0.5 |
| June 30, 2017 | August 2, 2017 | August 15, 2017 | August 29, 2017 | $ | 0.5700 | $ | 15.0 | $ | 0.7 |
| September 30, 2017 | November 2, 2017 | November 15, 2017 | November 29, 2017 | $ | 0.6150 | $ | 16.2 | $ | 1.1 |
| December 31, 2017 | January 31, 2018 | February 15, 2018 | February 28, 2018 | $ | 0.6200 | $ | 16.3 | $ | 1.1 |

For purposes of calculating the Partnership's earnings per unit under the two-class method, common units are treated as participating preferred units, and the subordinated units are treated as the residual equity interest, or common equity. IDRs are treated as participating securities.

Distributions made in future periods based on the current period calculation of cash available for distribution are allocated to each class of equity that will receive the distribution. Any unpaid cumulative distributions are allocated to the appropriate class of equity.

The Partnership determines the amount of cash available for distribution for each quarter in accordance with the Partnership Agreement. The amount to be distributed to common unitholders, subordinated unitholders and IDR holders is based on the distribution waterfall set forth in the Partnership Agreement. Net earnings for the quarter are allocated to each class of partnership interest based on the distributions to be made. Additionally, if, during the subordination period, the Partnership does not have enough cash available to make the required minimum distribution to the common unitholders, the Partnership will allocate net earnings to the common unitholders based on the amount of distributions in arrears. When actual cash distributions are made based on distributions in arrears, those cash distributions will not be allocated to the common unitholders, as such earnings were allocated in previous quarters.

119

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

*Accumulated Other Comprehensive Income*

Comprehensive income consists of two components, net income and other comprehensive income. Other comprehensive income refers to revenue, expenses, and gains and losses that under GAAP are included in comprehensive income but excluded from net income. The Partnership's other comprehensive income for 2017 and 2016 consists of unrealized gains and losses related to derivative instruments accounted for as cash flow hedges. There was no other comprehensive income for the year ended December 31, 2015.

The following table presents the changes in accumulated other comprehensive income:

|  | Unrealized Losses on Derivative Instruments |
| --- | --- |
| Balance at December 31, 2015 | $ — |
| Net unrealized losses | (246) |
| Reclassification of net losses realized into net income | 841 |
| Accumulated other comprehensive income at December 31, 2016 | 595 |
| Net unrealized losses | (5,463) |
| Reclassification of net losses realized into net income | 1,828 |
| Accumulated other comprehensive loss at December 31, 2017 | $ (3,040) |

*Noncontrolling Interests—Enviva Pellets Wiggins, LLC*

Prior to December 28, 2017, the Partnership held a 67% controlling interest in Wiggins. In December 2016, the Partnership, with the authorization of the Partnership's board of directors, initiated a plan, and entered into a purchase and sale agreement, to sell the Wiggins plant. At such time, the Partnership reclassified the Wiggins plant assets to current assets held for sale and ceased depreciation. On January 20, 2017, the purchase and sale agreement terminated when the buyer failed to pay the purchase price.

On December 27, 2017, the Partnership sold the Wiggins plant to a third-party buyer for a purchase price of $0.4 million and recorded a loss on the sale of $0.8 million, net, which is included in general and administrative expenses. On December 28, 2017, Wiggins was dissolved along with associated noncontrolling interests. Upon dissolution, no amounts were distributed to the non-controlling interest holders and all intercompany balances were forgiven (see Note 11, *Assets Held for Sale* ).

*Noncontrolling Interests—First Hancock JV*

Sampson and Wilmington were wholly owned subsidiaries of the First Hancock JV prior to the consummation of the Sampson Drop-Down and the Wilmington Drop-Down. The Partnership's financial statements have been recast to include the financial results of Sampson and Wilmington as if the consummation of the Sampson Drop-Down and Wilmington Drop-Down had occurred on May 15, 2013, the date Sampson and Wilmington were originally organized. The interests of the First Hancock JV's third-party investors in Sampson and Wilmington for periods prior to the related drop-down transactions have been reflected as a non-controlling interest in the Partnership's financial statements. The Partnership's consolidated statements of income for the years ended December 31, 2017, 2016, and 2015 include net losses of $0,  $3.3 million and $1.9 million, respectively, attributable to the non-controlling interests in Sampson. The Partnership's consolidated statements of operations for the years ended December 31, 2017, 2016, and 2015 include net losses of $3.1 million, $2.2 million and $1.0 million, respectively, attributable to the non-controlling interests in Wilmington.

120

A1649

ENVIVA PARTNERS, LP AND SUBSIDIARIES

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

**(16) Equity-Based Awards**

*Long-Term Incentive Plan*

The General Partner maintains the Enviva Partners, LP Long-Term Incentive Plan ("LTIP") for employees, consultants and directors of the General Partner and any of its affiliates that perform services for the Partnership. The LTIP provides for the grant, from time to time, at the discretion of the board of directors of the General Partner or a committee thereof, of unit options, unit appreciation rights, restricted units, phantom units, DERs unit awards, and other unit-based awards. The LTIP limits the number of common units that may be delivered pursuant to awards under the plan to 2,738,182 common units. Common units subject to awards that are forfeited, cancelled, exercised, paid, or otherwise terminate or expire without the actual delivery of common units will be available for delivery pursuant to other awards. The common units under the LTIP will consist, in whole or in part, of common units acquired in the open market or from any affiliate or any other person, newly issued common units or any combination of the foregoing as determined by the board of directors of the General Partner or a committee thereof.

During 2017, 2016 and 2015, the board of directors of the General Partner granted phantom units in tandem with corresponding DERs to employees of the Provider who provide services to the Partnership (the "Affiliate Grants"), and phantom units in tandem with corresponding DERs to certain non-employee directors of the General Partner (the "Director Grants"). The phantom units and corresponding DERs are subject to certain vesting and forfeiture provisions. Award recipients do not have all the rights of a unitholder with respect to the phantom units until the phantom units have vested and been settled. Awards of the phantom units are settled in common units within 60 days after the applicable vesting date. If a phantom unit award recipient experiences a termination of service under certain circumstances set forth in the applicable award agreement, the unvested phantom units and corresponding DERs are forfeited. Forfeitures are recognized when the actual forfeiture occurs.

A summary of the Affiliate Grants for the years ended December 31, 2017, 2016 and 2015 is as follows:

| | Phantom Units | | Performance-Based Phantom Units | | Total Affiliate Grant Phantom Units | |
|---|---|---|---|---|---|---|
| | Units | Weighted-Average Grant Date Fair Value (per unit)(1) | Units | Weighted-Average Grant Date Fair Value (per unit)(1) | Units | Weighted-Average Grant Date Fair Value (per unit)(1) |
| Nonvested December 31, 2014 | — | $ — | — | $ — | — | $ — |
| Granted | 200,351 | $ 20.62 | 81,803 | $ 20.36 | 282,154 | $ 20.54 |
| Forfeitures | (12,230) | $ 21.26 | — | $ — | (12,230) | $ 21.26 |
| Vested | — | $ — | — | $ — | — | $ — |
| Nonvested December 31, 2015 | 188,121 | $ 20.58 | 81,803 | $ 20.36 | 269,924 | $ 20.51 |
| Granted | 207,404 | $ 18.32 | 174,045 | $ 19.16 | 381,449 | $ 18.71 |
| Forfeitures | (49,372) | $ 19.93 | (20,493) | $ 20.57 | (69,865) | $ 20.11 |
| Vested | — | $ — | — | $ — | — | $ — |
| Nonvested December 31, 2016 | 346,153 | $ 19.32 | 235,355 | $ 19.46 | 581,508 | $ 19.37 |
| Granted | 301,400 | $ 25.67 | 111,104 | $ 25.51 | 412,504 | $ 25.63 |
| Forfeitures | (51,687) | $ 21.77 | (95,545) | $ 18.36 | (147,232) | $ 18.36 |
| Vested | — | $ — | (139,810) | $ 20.20 | (139,810) | $ 20.20 |
| Nonvested December 31, 2017 | 595,866 | $ 22.32 | 111,104 | $ 25.52 | 706,970 | $ 22.82 |

(1) Determined by dividing the aggregate grant date fair value of awards by the number of awards issued.

Phantom units subject to the Affiliate Grants vest on the third anniversary of the grant date except for performance-based phantom units which vest on the achievement of specific performance milestones. The fair value of

121

A1650

ENVIVA PARTNERS, LP AND SUBSIDIARIES

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

the Affiliate Grants granted during 2017 was $10.6 million based on the market price per unit on the applicable date of grant. These units are accounted for as if they are distributed by the Partnership. The fair value of the Affiliate Grants is remeasured by the Provider at each reporting period until the award is settled. Compensation cost recorded each period will vary based on the change in the award's fair value. For awards with performance goals, the expense is accrued only if the performance goals are considered to be probable of occurring. The Provider recognizes unit-based compensation expense for the units awarded and a portion of that expense is allocated to the Partnership. During the fourth quarter of 2017, $1.6 million of unit-based compensation was reversed as performance goals were not met. The Provider allocates unit-based compensation expense to the Partnership in the same manner as other corporate expenses. The Partnership's portion of the unit-based compensation expense is included in general and administrative expenses. The Partnership recognized $3.4 million, $3.1 million and $0.4 million of general and administrative expense associated with the Affiliate Grants during the years ended December 31, 2017, 2016 and 2015, respectively.

A summary of the Director Grant unit awards subject to vesting for the years ended December 31, 2017, 2016 and 2015, is as follows:

| | Phantom Units | | Performance-Based Phantom Units | | Total Director Grant Phantom Units | |
|---|---|---|---|---|---|---|
| | Units | Weighted-Average Grant Date Fair Value (per unit)(1) | Units | Weighted-Average Grant Date Fair Value (per unit)(1) | Units | Weighted-Average Grant Date Fair Value (per unit)(1) |
| Nonvested December 31, 2014 | — | $ — | — | $ — | — | $ — |
| Granted | 14,112 | $ 21.26 | — | $ — | 14,112 | $ 21.26 |
| Forfeitures | — | $ — | — | $ — | — | $ — |
| Vested | — | $ — | — | $ — | — | $ — |
| Nonvested December 31, 2015 | 14,112 | $ 21.26 | — | $ — | 14,112 | $ 21.26 |
| Granted | 17,724 | $ 22.57 | — | $ — | 17,724 | $ 22.57 |
| Forfeitures | — | $ — | — | $ — | — | $ — |
| Vested | (14,112) | $ 21.26 | — | $ — | (14,112) | $ 21.26 |
| Nonvested December 31, 2016 | 17,724 | $ 22.57 | — | $ — | 17,724 | $ 22.57 |
| Granted | 15,840 | $ 25.25 | — | $ — | 15,840 | $ 25.25 |
| Forfeitures | — | $ — | — | $ — | — | $ — |
| Vested | (17,724) | $ 22.57 | — | $ — | (17,724) | $ 22.57 |
| Nonvested December 31, 2017 | 15,840 | $ 25.25 | — | $ — | 15,840 | $ 25.25 |

(1)   Determined by dividing the aggregate grant date fair value of awards by the number of awards issued.

On February 3, 2017, Director Grants valued at $0.4 million were granted and vest on the first anniversary of the grant date, February 3, 2018. On May 4, 2017, the Director Grants that were nonvested at December 31, 2016 vested and common units were issued. In addition, 3,724 common units were granted and issued to non-employee directors of the General Partner as compensation for services performed on the General Partner's board of directors during the year ended December 31, 2017. For the years ended December 31, 2017 and 2016 the Partnership recorded $0.5 million and $0.4 million, respectively, of compensation expense with respect to the Director Grants. For the year ended December 31, 2015, an insignificant amount of compensation expense with respect to the Director Grants was recorded.

The DERs associated with the Affiliate Grants and the Director Grants subject to time-based vesting entitle the recipients to receive payments equal to any distributions made by the Partnership to the holders of common units within 60 days following the record date for such distributions. The DERs associated with the Affiliate Grants subject to performance-based vesting will remain outstanding and unpaid from the grant date until the earlier of the settlement or forfeiture of the related performance-based phantom units.

122

A1651

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

Unpaid DER amounts related to the performance-based Affiliate Grants at December 31, 2017 were $0.9 million. Unpaid DER amounts of $0.7 million are included in accrued liabilities and $0.2 million are included in other long-term liabilities on the consolidated balance sheets. Unpaid DER amounts related to the performance-based Affiliate Grants at December 31, 2016 were $0.6 million. Unpaid DER amounts of $0.4 million are included in accrued liabilities and $0.2 million are included in other long-term liabilities on the consolidated balance sheets. DER distributions are paid by an affiliate and were $1.0 million and $0.7 million for the years ended December 31, 2017 and 2016, respectively, and were insignificant for the year ended December 31, 2015. At December 31, 2017 and 2016, $0 and $0.4 million, respectively, of DER distributions are included in related-party accrued liabilities.

**(17) Net Income per Limited Partner Unit**

Net income per unit applicable to limited partners (including subordinated unitholders) is computed by dividing limited partners' interest in net income, after deducting any incentive distributions, by the weighted-average number of outstanding common and subordinated units. The Partnership's net income is allocated to the limited partners in accordance with their respective ownership percentages, after giving effect to priority income allocations for incentive distributions, if any, to the holder of the IDRs, pursuant to the Partnership Agreement, which are declared and paid following the close of each quarter. Earnings in excess of distributions are allocated to the limited partners based on their respective ownership interests. Payments made to the Partnership's unitholders are determined in relation to actual distributions declared and are not based on the net income allocations used in the calculation of earnings per unit.

In addition to the common and subordinated units, the Partnership has also identified the IDRs and phantom units as participating securities and uses the two-class method when calculating the net income per unit applicable to limited partners, which is based on the weighted-average number of common units and subordinated units outstanding during the period. Diluted net income per unit includes the effects of potentially dilutive time-based and performance-based phantom units on the Partnership's common units. Basic and diluted earnings per unit applicable to subordinated limited partners are the same because there are no potentially dilutive subordinated units outstanding.

123

A1652

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

The computation of net income (loss) per limited partner unit is a follows for the years ended December 31:

|  | 2017 | 2016 (Recast) | 2015 (Recast) |
|---|---|---|---|
| Net income | $ 14,373 | $ 13,463 | $ 17,563 |
| Less net loss attributable to noncontrolling partners' interests | 3,140 | 5,804 | 2,859 |
| Net income attributable to Enviva Partners, LP | $ 17,513 | $ 19,267 | $ 20,422 |
| Less: Predecessor loss to May 4, 2015 (prior to IPO) | $ — | $ — | (2,132) |
| Less: Pre-acquisition income from April 10, 2015 to December 10, 2015 from operations of Enviva Pellets Southampton, LLC Drop-Down allocated to General Partner | — | — | 6,264 |
| Less: Pre-acquisition income from inception to December 13, 2016 from operations of Enviva Pellets Sampson, LLC Drop-Down allocated to General Partner | — | (3,231) | (1,815) |
| Less: Pre-acquisition income from inception to October 1, 2017 from operations of Enviva Port of Wilmington, LLC Drop-Down allocated to General Partner | (3,049) | (2,110) | (937) |
| Enviva Partners, LP limited partners' interest in net income | $ 20,562 | $ 24,608 | $ 19,042 |
| Less: Distributions declared on: |  |  |  |
| Common units | $ 34,033 | $ 26,933 | $ 14,282 |
| Subordinated units | 28,096 | 24,167 | 13,846 |
| IDRs | 3,398 | 1,077 | — |
| Total distributions declared | 65,527 | 52,177 | 28,128 |
| Earnings less than distributions | $ (44,965) | $ (27,569) | $ (9,086) |

Basic and diluted net income per limited partner unit is follows:

|  | Year Ended December 31, 2017 | | |
|---|---|---|---|
|  | Common Units | Subordinated Units | General Partner |
| Weighted-average common units outstanding—basic | 14,403 | 11,905 | — |
| Effect of nonvested phantom units | 948 | — | — |
| Weighted-average common units outstanding—diluted | 15,351 | 11,905 | — |

|  | Year Ended December 31, 2017 | | | |
|---|---|---|---|---|
|  | Common Units | Subordinated Units | General Partner | Total |
| Distributions declared | $ 34,033 | $ 28,096 | $ 3,398 | $ 65,527 |
| Earnings less than distributions | (24,631) | (20,334) | — | (44,965) |
| Net income attributable to partners | $ 9,402 | $ 7,762 | $ 3,398 | $ 20,562 |
| Weighted-average units outstanding—basic | 14,403 | 11,905 |  |  |
| Weighted-average units outstanding—diluted | 15,351 | 11,905 |  |  |
| Net income per limited partner unit—basic | $ 0.65 | $ 0.65 | — | $ 1.30 |
| Net income per limited partner unit—diluted | $ 0.61 | $ 0.65 | — | $ 1.26 |

124

A1653

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

|  | Year Ended December 31, 2016 | | |
|  | Common Units | Subordinated Units | General Partner |
|---|---|---|---|
| Weighted-average common units outstanding—basic | 13,002 | 11,905 | — |
| Effect of nonvested phantom units | 557 | — | — |
| Weighted-average common units outstanding—diluted | 13,559 | 11,905 | — |

|  | Year Ended December 31, 2016 | | | |
|  | Common Units | Subordinated Units | General Partner | Total |
|---|---|---|---|---|
| Distributions declared | $ 26,933 | $ 24,167 | $ 1,077 | $ 52,177 |
| Earnings less than distributions | (14,531) | (13,038) | — | (27,569) |
| Net income attributable to partners | $ 12,402 | $ 11,129 | $ 1,077 | $ 24,608 |
| Weighted-average units outstanding—basic | 13,002 | 11,905 |  |  |
| Weighted-average units outstanding—diluted | 13,559 | 11,905 |  |  |
| Net income per limited partner unit—basic | $ 0.95 | $ 0.93 | $ — | $ 1.88 |
| Net income per limited partner unit—diluted | $ 0.91 | $ 0.93 | $ — | $ 1.84 |

|  | Year Ended December 31, 2015 | | |
|  | Common Units | Subordinated Units | General Partner |
|---|---|---|---|
| Weighted-average common units outstanding—basic | 11,988 | 11,905 | — |
| Effect of nonvested phantom units | 270 | — | — |
| Weighted-average common units outstanding—diluted | 12,258 | 11,905 | — |

|  | Year Ended December 31, 2015 | | | |
|  | Common Units | Subordinated Units | General Partner | Total |
|---|---|---|---|---|
| Distributions declared | $ 14,282 | $ 13,846 | $ — | $ 28,128 |
| Earnings less than distributions | (4,721) | (4,365) | — | (9,086) |
| Net income attributable to partners | $ 9,561 | $ 9,481 | $ — | $ 19,042 |
| Weighted-average units outstanding—basic | 11,988 | 11,905 |  |  |
| Weighted-average units outstanding—diluted | 12,258 | 11,905 |  |  |
| Net income per limited partner unit—basic | $ 0.80 | $ 0.80 | $ — | $ 1.60 |
| Net income per limited partner unit—diluted | $ 0.79 | $ 0.79 | $ — | $ 1.58 |

125

A1654

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

**(18) Commitments and Contingencies**

***Shipping Event***

During the fourth quarter of 2016, the Partnership re-purchased a shipment of wood pellets from one customer and subsequently sold it to another customer in a back-to-back transaction. Smoldering was observed onboard the vessel carrying the shipment, which resulted in damage to a portion of the shipment and one of the vessel's five cargo holds (the "Shipping Event"). The disponent owner of the vessel (the "Shipowner") had directly or indirectly chartered the vessel from certain other parties (collectively, the "Head Owners") and in turn contracted with Cottondale as the charterer of the vessel. Following the mutual appointment of arbitrators in connection with the Shipping Event, on June 8, 2017, the Shipowner submitted claims against Cottondale (the "Claims") alleging damages of approximately $11.8 million (calculated using exchange rates as of December 31, 2017), together with other unquantified losses and damages. The Claims provide that the Shipowner would seek indemnification and other damages from Cottondale to the extent that the Shipowner is unsuccessful in its defense of claims raised by the Head Owners against it for damages arising in connection with the Shipping Event.

Although it is reasonably possible that the Shipping Event may result in additional costs and liabilities for the Partnership's account, responsibility for such costs and liabilities incurred in connection with the Shipping Event is disputed among the various parties involved. If any such costs and liabilities ultimately are allocated to the Partnership, a portion may be recovered under insurance. The Partnership believes it has meritorious defenses to the Claims, but is generally unable to predict the timing or outcome of any claims or proceedings, including the Claims, associated with the Shipping Event, or any insurance recoveries in respect thereof. Consequently, the Partnership is unable to provide an estimate of the amount or range of possible loss.

***Operating Leases***

The MSA fee charged by Enviva Holdings, LP to the Partnership includes rent related amounts for a noncancelable operating lease for office space in Maryland and North Carolina held by Enviva Holdings, LP. Other rent expense was insignificant for the years ended December 31, 2017, 2016 and 2015.

On February 20, 2015, the Wilmington terminal entered into a Deed of Lease Agreement (the "Lease") with North Carolina State Ports Authority ("NCSPA") to lease certain real property at NCSPA's Wilmington, North Carolina marine terminal for the Wilmington terminal. The Lease has a twenty-one year term, with two five-year renewal options, with annual base rent of $0.2 million which is payable monthly or annually, subject to an annual increase in the producer's price index for industrial commodities less fuel. No payments are due until September 15, 2021. The total estimated base rent payments over the life of the lease are estimated at $4.7 million.

On May 4, 2016, the Wilmington terminal and NCSPA entered into a second amendment to the Lease, which includes a minimum annual throughput ton fee, subject to an annual increase in producer's price index up to 1%. The total estimated minimum annual throughput ton fee is estimated at $1.9 million annually.

Future minimum lease payments, excluding those charged under the MSA fee, for noncancelable operating leases (with initial or remaining lease terms in excess of one year) as of December 31, 2017 are as follows:

| | | |
|---|---|---:|
| 2018 | $ | 3,737 |
| 2019 | | 2,829 |
| 2020 | | 2,738 |
| 2021 | | 2,723 |
| 2022 | | 2,535 |
| Thereafter | | 61,525 |
| Total future minimum lease payments | $ | 76,087 |

126

A1655

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

*Commitments*

The Partnership has entered into throughput agreements, expiring between 2021 through 2023, to receive terminal and stevedoring services at the Partnership's port facilities. The agreements specify a minimum cargo throughput requirement at a fixed price per ton or a fixed fee, subject to an adjustment based on the consumer price index or the producer prices index, for a defined period of time, ranging from monthly to annual basis. At December 31, 2017, the Partnership had approximately $35.3 million related to firm commitments under the terminal services and stevedoring agreements. For the years ended December 31, 2017, 2016 and 2015, terminal services and stevedoring expenses were $10.6 million, $10.3 million, and $7.1 million, respectively.

The Partnership has entered into long-term arrangements to secure transportation from its plants to the port facilities. Under certain of these agreements, expiring between 2019 through 2023, the Partnership committed to various annual minimum volumes under multi-year fixed-cost contracts with third-party logistics providers for trucking and rail transportation, subject to increases in the consumer price index and certain fuel price adjustments. For the years ended December 31, 2017, 2016 and 2015, transportation expenses were $23.8 million, $21.7 million and $20.9 million, respectively.

The Partnership has entered into long-term supply arrangements, expiring between 2019 through 2021, to secure the supply of wood pellets from third-party vendors. The minimum annual purchase volumes are at a fixed price per metric ton adjusted for volume, pellet quality and certain shipping-related charges. The supply agreement for the purchase of 720,000 MT of wood pellets from British Columbia is fully offset by an agreement to sell 720,000 MT of wood pellets to the same counterparty from the Partnership's terminal locations. As of December 31, 2017 the Partnership purchased approximately $3.5 million under these long-term supply agreements. No amounts were incurred related to these agreements for the years ended December 31, 2016 and 2015.

Fixed and determinable portions of the minimum aggregate future payments under these firm terminal services, stevedoring, transportation, and supply agreements obligations for the next five years are as follows:

| | | |
|---|---|---:|
| 2018 | $ | 25,244 |
| 2019 | | 27,294 |
| 2020 | | 56,313 |
| 2021 | | 93,033 |
| 2022 | | 6,674 |
| Thereafter | | 6,674 |
| Total | $ | 215,232 |

In order to mitigate volatility in the Partnership's shipping costs, it has entered into fixed-price shipping contracts with reputable shippers matching the terms and volumes of certain of the Partnership's off-take contracts for which the Partnership is responsible for arranging shipping. Contracts with shippers, expiring between 2019 through 2034, include provisions as to the minimum amount of metric tons per year to be shipped and may also stipulate the number of shipments. Pursuant to these contracts, the terms extend up to fifteen years, charges are based on a fixed-price per metric ton and, in some cases, there are adjustment provisions for increases in the price of fuel or for other distribution-related costs. The charge per metric ton varies depending on the loading port and the discharge port. For the years ended December 31, 2017, 2016 and 2015, shipping expenses were approximately $52.2 million, $41.5 million, and $44.9 million, respectively, and were included in cost of sales.

127

A1656

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

**(19) Subsequent Events**

*Long-Term Incentive Plan*

On January 31, 2018, 2018, the Board granted 13,964 Director Grants and 359,843 Affiliate Grants in tandem with corresponding DERs. The Director Grants vest on the first anniversary of the grant date. Of the total Affiliate Grants, 243,442 phantom units vest on the third anniversary of the grant date and 116,401 phantom units vest on the performance of specific milestones. The fair value of the Director Grants and Affiliate Grants was $10.7 million based on the market price per unit on the date of the grant.

*Greenwood Contract*

On February 16, 2018, the Partnership entered into a contract with a wholly owned subsidiary of the Second Hancock JV to purchase wood pellets produced by the Greenwood plant (the "Greenwood Contract"). Pursuant to the Greenwood Contract, the Partnership has agreed, subject to certain conditions, to purchase all of the production from the Greenwood plant from the date of acquiring the Greenwood plant through March 2022 and has a take-or-pay obligation for 550,000 MTPY (prorated for partial contract years) beginning in mid-2019.

**(20) Quarterly Financial Data (Unaudited)**

The following table presents the Partnership's unaudited quarterly financial data. This information has been prepared on a basis consistent with that of the Predecessor's audited consolidated financial statements and all necessary material adjustments, consisting of normal recurring accruals and adjustments, have been included to present fairly the unaudited quarterly financial data. As discussed in Note 1, *Description of Business and Basis of Presentation* , the consolidated financial statements for the periods prior to the Wilmington Drop-Down have been retroactively recast. The quarterly information presented below has also been recast accordingly. The quarterly results of operations for these periods are not necessarily indicative of future results of operations. Basic and diluted earnings per unit are computed independently for each of the quarters presented. Therefore, the sum of quarterly basic and diluted per unit information may not equal annual basic and diluted earnings per unit.

| For the Year Ended December 31, 2017 | First Quarter (Recast) | | Second Quarter (Recast) | | Third Quarter (Recast) | | Fourth Quarter | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Net revenue | $ | 122,443 | $ | 127,547 | $ | 132,223 | $ | 161,008 | $ | 543,221 |
| Gross margin | | 16,368 | | 16,331 | | 20,382 | | 25,721 | | 78,802 |
| Net (loss) income | | (45) | | 1,497 | | 5,023 | | 7,898 | | 14,373 |
| Enviva Partners, LP limited partners' interest in net income | | 2,535 | | 3,862 | | 6,339 | | 7,826 | | 20,562 |
| Basic income per limited partner common unit | $ | 0.08 | $ | 0.12 | $ | 0.20 | $ | 0.25 | $ | 0.65 |
| Diluted income per limited partner common unit | $ | 0.07 | $ | 0.11 | $ | 0.19 | $ | 0.24 | $ | 0.61 |
| Basic income per limited partner subordinated unit | $ | 0.08 | $ | 0.12 | $ | 0.20 | $ | 0.25 | $ | 0.65 |
| Diluted income per limited partner subordinated unit | $ | 0.08 | $ | 0.12 | $ | 0.20 | $ | 0.25 | $ | 0.65 |

128

A1657

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

| For the Year Ended December 31, 2016 | First Quarter (Recast) | | Second Quarter (Recast) | | Third Quarter (Recast) | | Fourth Quarter (Recast) | | Total (Recast) | |
|---|---|---|---|---|---|---|---|---|---|---|
| Net revenue | $ | 107,252 | $ | 119,709 | $ | 110,794 | $ | 126,521 | $ | 464,276 |
| Gross margin | | 15,754 | | 19,457 | | 22,417 | | 19,144 | | 76,772 |
| Net income (loss) | | 4,933 | | 9,144 | | 9,028 | | (9,642) | | 13,463 |
| Enviva Partners, LP limited partners' interest in net income (loss) | | 7,494 | | 12,053 | | 13,033 | | (7,972) | | 24,608 |
| Basic income (loss) per limited partner common unit | $ | 0.30 | $ | 0.48 | $ | 0.51 | $ | (0.34) | $ | 0.95 |
| Diluted income (loss) per limited partner common unit | $ | 0.29 | $ | 0.47 | $ | 0.50 | $ | (0.34) | $ | 0.91 |
| Basic income (loss) per limited partner subordinated unit | $ | 0.30 | $ | 0.48 | $ | 0.51 | $ | (0.32) | $ | 0.93 |
| Diluted income (loss) per limited partner subordinated unit | $ | 0.29 | $ | 0.47 | $ | 0.50 | $ | (0.32) | $ | 0.93 |

129

A1658

**ENVIVA PARTNERS, LP AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of units, per unit amounts and unless otherwise noted)**

**(21) Supplemental Guarantor Information**

The Partnership and its wholly owned finance subsidiary, Enviva Partners Finance Corp., are the co-issuers of the Senior Notes on a joint and several basis. The Partnership has no material independent assets or operations. The Senior Notes are guaranteed on a senior unsecured basis by certain of the Partnership's direct and indirect wholly owned subsidiaries (excluding Enviva Partners Finance Corp. and certain recently formed immaterial subsidiaries) and will be guaranteed by the Partnership's future restricted subsidiaries that guarantee certain of its other indebtedness (collectively, the "Subsidiary Guarantors"). The guarantees are full and unconditional and joint and several. Each of the Subsidiary Guarantors is directly or indirectly 100% owned by the Partnership. Enviva Partners Finance Corp. is a finance subsidiary formed for the purpose of being the co-issuer of the Senior Notes. Other than certain restrictions arising under the Credit Agreement and the Indenture (see Note 12 , *Long-Term Debt and Capital Lease Obligations* ), there are no significant restrictions on the ability of any restricted subsidiary to (i) pay dividends or make any other distributions to the Partnership or any of its restricted subsidiaries or (ii) make loans or advances to the Partnership or any of its restricted subsidiaries.

130

A1659

**ITEM 9.   CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

**ITEM 9A.   CONTROLS AND PROCEDURES**

***Disclosure Controls and Procedures***

An evaluation of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13(a)‑15(e) and 15(d)‑15(e) under the Exchange Act) was carried out under the supervision and with the participation of management, including the Chief Executive Officer and Chief Financial Officer of our General Partner. Our disclosure controls and procedures are designed to provide reasonable assurance that the information required to be disclosed by us in reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure and is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC. Based upon their evaluation, the Chief Executive Officer and Chief Financial Officer of our General Partner concluded that the design and operation of our disclosure controls and procedures were effective as of December 31, 2017, the end of the period covered by this Annual Report.

***Internal Control over Financial Reporting***

*Management's Annual Report on Internal Control over Financial Reporting*

The management of our General Partner is responsible for establishing and maintaining adequate internal control over financial reporting for us as defined in Rules 13a‑15(f) and 15d‑15(f) of the Exchange Act. Under the supervision of, and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework and criteria established in *Internal Control—Integrated Framework* in 2013, issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, management of our General Partner concluded that our internal control over financial reporting was effective as of December 31, 2017. This Annual Report on Form 10‑K does not include an attestation report of our independent registered public accounting firm due to a transition period established by rules of the SEC for emerging growth companies.

*Inherent Limitations on Effectiveness of Controls*

Control systems, no matter how well conceived and operated, are designed to provide a reasonable, but not an absolute, level of assurance that the objectives of the control system are met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected. Because of the inherent limitations in any control system, misstatements due to error or fraud may occur and not be detected.

*Changes in Internal Control over Financial Reporting*

There were no changes in our internal control over financial reporting (as defined in Rules 13a‑15(e) and 15d‑15(e) under the Exchange Act) that occurred during the three months ended December 31, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**ITEM 9B.   OTHER INFORMATION**

Not applicable.

A1660

**PART III**

**ITEM 10.  DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

We are managed and operated by the board of directors and executive officers of our General Partner. Our unitholders are not entitled to elect our General Partner or its directors or otherwise directly participate in our management or operations. Our General Partner owes certain contractual duties to our unitholders as well as a fiduciary duty to its owners.

As a result of owning our General Partner, our sponsor has the right to appoint all members of the board of directors of our General Partner. In evaluating director candidates, our sponsor will assess whether a candidate possesses the integrity, judgment, knowledge, experience, skill and expertise that are likely to enhance the board's ability to manage and direct our affairs and business, including, when applicable, to enhance the ability of committees of the board to fulfill their duties.

The board of directors of our General Partner has ten directors, including four directors meeting the independence standards established by the NYSE and the Exchange Act. The board of directors met eight times during 2017.

All of the executive officers of our General Partner listed below allocate their time between managing the business and affairs of us and our sponsor. The amount of time that our executive officers devote to our business and the business of our sponsor varies in any given year based on a variety of factors. Our executive officers devote as much time to the management of our business as is necessary for the proper conduct of our business and affairs. However, our executive officers' fiduciary duties to our sponsor and other obligations may prevent them from devoting sufficient time to our business and affairs.

We incur general and administrative costs related to our MSA with Enviva Management that cover the corporate salary and overhead expenses associated with our business. If the MSA were terminated without replacement, or our General Partner or its affiliates provided services outside of the scope of the MSA, our partnership agreement would require us to reimburse our General Partner and its affiliates, including our sponsor, for all expenses incurred and payments made on our behalf.

**Executive Officers and Directors of Our General Partner**

The following table shows information for the executive officers and directors of our General Partner. As the owner of our General Partner, our sponsor appoints all members of the board of directors of our General Partner. Directors hold office until their successors have been appointed or qualified or until the earlier of their death, resignation, removal or disqualification. Executive officers are appointed by and serve at the discretion of the board. There are no family relationships among any of our directors or executive officers. One of our directors and all of our executive officers also serve as executive officers of our sponsor.

132

| Name of Beneficial Owner | Age | Position With Our General Partner |
|---|---|---|
| John K. Keppler | 47 | Chairman, President and Chief Executive Officer |
| Stephen F. Reeves | 58 | Executive Vice President and Chief Financial Officer |
| Thomas Meth | 45 | Executive Vice President, Sales and Marketing |
| William H. Schmidt, Jr. | 45 | Executive Vice President, Corporate Development and General Counsel |
| E. Royal Smith | 45 | Executive Vice President, Operations |
| James P. Geraghty | 40 | Vice President and Controller |
| Raymond J. Kaszuba, III | 39 | Vice President and Treasurer |
| Ralph Alexander | 62 | Director |
| John C. Bumgarner, Jr. | 75 | Director |
| Robin J. A. Duggan | 51 | Director |
| Michael B. Hoffman | 67 | Director |
| Christopher B. Hunt | 54 | Director |
| William K. Reilly | 78 | Director |
| Gary L. Whitlock | 68 | Director |
| Carl L. Williams | 41 | Director |
| Janet S. Wong | 59 | Director |

*John K. Keppler.*  Mr. Keppler has served as Chairman of the board of directors and President and Chief Executive Officer of our General Partner since our inception in November 2013. Mr. Keppler co‑founded Intrinergy, the predecessor to our sponsor, in 2004, and has been responsible for setting Enviva's strategic direction and leading the company's growth. From 2002 to 2004, Mr. Keppler was the Director of Corporate Strategy in the Office of the Vice Chairman with America Online and, prior to that, he was Senior Manager, Business Affairs and Development with America Online from 2001 to 2002. Mr. Keppler holds a B.A. in political economy from the University of California, Berkeley, as well as an MBA from The Darden Graduate School of Business Administration at The University of Virginia. Over the course of Mr. Keppler's career, he has gained extensive experience growing innovative ideas into successful businesses across a broad range of industries and has developed a wealth of experience in business strategy and operations and a keen knowledge of the renewable energy sector. For the past ten years, Mr. Keppler has been responsible for setting our strategic direction and leading the company's growth from a start-up company to the world's leading producer of wood biomass fuels. In light of this experience, we believe that he has the requisite set of skills to serve as a director, as well as Chairman, President and Chief Executive Officer.

*Stephen F. Reeves.*  Mr. Reeves has served as Executive Vice President and Chief Financial Officer of our General Partner since our inception in November 2013. Mr. Reeves has served in the same capacity at our sponsor and Enviva, LP since 2012. He served as Senior Vice President and Chief Financial Officer of The Black & Decker Corporation, a global manufacturer and marketer of power tools, home improvement products and industrial fastening equipment, from 2008 through 2010, and prior to that served in the Worldwide Power Tools and Accessories division of Black and Decker as Vice President—Global Finance from April 2000. Mr. Reeves was previously with the audit firm of Ernst & Young LLP. Mr. Reeves earned a B.S. in Accounting from the Pennsylvania State University.

A1662

*Thomas Meth.* Mr. Meth has served as Executive Vice President, Sales and Marketing of our General Partner since our inception in November 2013. He was also a co-founder of Intrinergy. Mr. Meth is responsible for our commercial customer relations as well as our marketing, sustainability, communications and public relations initiatives. Prior to Intrinergy, Mr. Meth was Head of Sales and Marketing in Europe, the Middle East and Africa for the Colfax Corporation from 2002 to 2004. From 1993 to 2000, Mr. Meth was the Director of Sales for Europay Austria, a consumer financial services company that offered MasterCard, Maestro and Electronic Purse services. Mr. Meth holds a bachelor of commerce from Vienna University of Economics and Business Administration in Austria as well as an MBA from The Darden Graduate School of Business Administration at The University of Virginia. Mr. Meth was an executive officer of Intrinergy Deutschland Management GmbH ("IDM") and Enviva Pellets GmbH and Co. KG ("EPD"), which were engaged in pellet manufacturing in Germany unrelated to our core business. Both entities filed for insolvency in Amtsgerichts Straubing, a district court located in Germany, in November 2010. Our predecessor distributed its indirect interests in IDM and EPD to our sponsor as part of the Reorganization.

133

*William H. Schmidt, Jr.* Mr. Schmidt has served as Executive Vice President, Corporate Development and General Counsel of our General Partner since February 2018 and prior to that as Executive Vice President, General Counsel and Secretary since our inception in November 2013. He has served in the same capacity at our sponsor and Enviva, LP since March 2013. Mr. Schmidt is responsible for our and our sponsor's legal affairs and, as President of Enviva Development Holdings, LLC, for our sponsor's corporate development activities. Prior to joining us, Mr. Schmidt was the Senior Vice President and General Counsel of Buckeye GP LLC, the general partner of Buckeye Partners, L.P., a master limited partnership that owned and operated petroleum pipelines and terminals in the United States, marine terminals serving international petroleum markets, natural gas storage facilities, and a petroleum products marketing business. From November 2010 to February 2013, he was Vice President and General Counsel of Buckeye GP LLC and, from November 2007 to November 2010, he was Vice President, General Counsel and Secretary of Buckeye GP LLC. Prior to November 2007, Mr. Schmidt served as Vice President and General Counsel of Buckeye Pipe Line Services Company, an affiliate of Buckeye Partners, L.P., since February 2007 and as Associate General Counsel since September 2004. Mr. Schmidt also was the President of Lodi Gas Storage, L.L.C., a subsidiary of Buckeye Partners, L.P., from August 2009 to January 2012. Prior to joining Buckeye, Mr. Schmidt practiced law at Chadbourne & Parke LLP, an international law firm.

*E. Royal Smith.* Mr. Smith has served as Executive Vice President, Operations of our General Partner, Enviva, LP and our sponsor since August 2016 and prior to that as Vice President, Operations since April 2014. Prior to joining Enviva, LP, he served as Director of Operations, NAA Division of Guilford Performance Textiles, a global textile manufacturing company, from March 2012 to July 2014. From August 2010 to March 2012, Mr. Smith also served as Director of Quality, NAA Division. Prior to joining Guilford, Mr. Smith worked as a Plant Manager at Pactiv, a food packaging manufacturer, from May 2009 to August 2010. Mr. Smith served as General Manager of a facility operated by United Plastics Group International from December 2005 to May 2009, after serving in other roles at the company from April 2002. From January 1999 to September 1999, he served as Production Supervisor of The General Motors Corporation, before serving as Mechanical Device/Tool and Die Supervisor from September 1999 to August 2000. Mr. Smith holds a B.S. in Mechanical Engineering from GMI Engineering and Management Institute.

*James P. Geraghty.* Mr. Geraghty has served as Vice President and Controller of our General Partner since our inception in November 2013, and has served in the same capacity at our sponsor and Enviva, LP since January 2011. From July 2008 to January 2011, Mr. Geraghty was Project Manager at Rose Financial Services, a consulting firm that specializes in assisting early stage high-growth companies to scale their finance functions in preparation for private and public debt and equity offerings. Prior to that, he was the Controller at The George Washington University Hospital since July 2002. From September 1999 to July 2002, Mr. Geraghty worked in the Assurance and Business Advisory Services of Arthur Andersen, LLP. Mr. Geraghty holds a B.S. in Accounting from Mount Saint Mary's University, an MBA from the George Washington University School of Business and holds a Certified Public Accountant accreditation.

*Raymond J. Kaszuba, III.* Mr. Kaszuba has served as Vice President and Treasurer of our General Partner and Enviva, LP since July 2015. Prior to joining Enviva, LP, he worked in several Treasury and finance-related positions at Exxon Mobil Corporation, a leading oil and natural gas company, for 8 years. Mr. Kaszuba holds a B.S. in Finance and Economics from the University of Dayton and an MBA from the Tepper School of Business at Carnegie Mellon University.

*Michael B. Hoffman.* Mr. Hoffman has served as a director on the board of directors of our General Partner since our inception in November 2013. Mr. Hoffman is a partner of Riverstone, where he is principally responsible for investments in power and renewable energy for Riverstone's funds. Mr. Hoffman is co-head of Riverstone's Renewable Energy Funds I and II. Before joining Riverstone in 2003, Mr. Hoffman was senior managing director and head of the mergers and acquisitions advisory business of The Blackstone Group for 15 years, where he also served on the firm's principal group investment committee as well as its executive committee. Prior to joining Blackstone, Mr. Hoffman was managing director and co-head of the mergers and acquisitions department of Smith Barney, Harris Upham & Co. In addition to serving on the boards of a number of Riverstone portfolio companies and their affiliates, Mr. Hoffman is chairman of the board of directors of Onconova Therapeutics Inc. He is also a member of the board of trustees of The Rockefeller University. We believe Mr. Hoffman's extensive leadership and financial expertise enable him to contribute significant managerial, strategic and financial oversight skills to the board of directors of our General Partner and our management team.

134

*Ralph Alexander.*  Mr. Alexander has served as director on the board of directors of our General Partner since our inception in November 2013. Mr. Alexander has served as the President and CEO of Talen Energy since December 2016. He became affiliated with Riverstone Holdings LLC in September 2007. For nearly 25 years, Mr. Alexander served in various positions with subsidiaries and affiliates of BP plc, one of the world's largest oil and gas companies. From June 2004 until December 2006, he served as Chief Executive Officer of Innovene, BP's $20 billion olefins and derivatives subsidiary. From 2001 until June 2004, he served as Chief Executive Officer of BP's Gas, Power and Renewables and Solar segment and was a member of the BP group executive committee. Prior to that, Mr. Alexander served as a Group Vice President in BP's Exploration and Production segment and BP's Refinery and Marketing segment. He held responsibilities for various regions of the world, including North America, Russia, the Caspian, Africa, and Latin America. Prior to these positions, Mr. Alexander held various positions in the upstream, downstream and finance groups of BP. Mr. Alexander currently serves on the board of Talen Energy Corporation since June 2015. From December 2014 through December 2016, Mr. Alexander served on the board of EP Energy Corporation. He has previously served on the boards of Foster Wheeler, Stein Mart, Inc., Amyris and Anglo-American plc. Mr. Alexander holds an M.S. in Nuclear Engineering from Brooklyn Polytech (now NYU School of Engineering—Polytechnic) and an M.S. in Management Science from Stanford University.

*Carl L. Williams.*  Mr. Williams has served as a director on the board of directors of our General Partner since our inception in November 2013. Mr. Williams is a Managing Director at Riverstone. He also serves on the boards of a number of Riverstone portfolio companies and their affiliates. Prior to joining Riverstone in 2008, Mr. Williams was in the Global Natural Resources investment banking group at Goldman, Sachs & Co. from 2005 to 2008. While at Goldman, he focused on mergers and acquisitions and financing transactions in the power generation, alternative energy, oil and gas and refining industries. Prior to that, he held various positions in engineering and strategic sourcing with Lyondell Chemical Company, a supplier of raw materials and technology to the coatings industry, from 1999 to 2004. He received his MBA from Columbia Business School, and holds a B.S. in chemical engineering and a B.A. in economics and managerial studies from Rice University. We believe that Mr. Williams' extensive experience in, and knowledge of, each of the finance and energy sectors enable him to provide essential guidance to the board of directors of our General Partner and our management team.

*Robin J. A. Duggan.*  Mr. Duggan has served as a director on the board of directors of our General Partner since our inception in November 2013. Mr. Duggan has been a Managing Director of Riverstone since 2014, and previously served as a Principal of Riverstone for seven years. Prior to joining Riverstone, Mr. Duggan was the founder of Commodity Optimization Ventures Ltd., a business that provided advice to clients in the private equity industry, including Texas Pacific Group. Before founding his business, he served for over 17 years in various positions with subsidiaries and affiliates of BP plc. From 2004 to 2005, Mr. Duggan was the Vice President of European Business Optimization at Innovene, BP's olefins and derivatives subsidiary, where he was responsible for commercial activity for olefins and refining in Europe and also oversaw Innovene's successful separation from BP in Europe. From 1999 to 2003, Mr. Duggan held a number of senior level positions in BP's Petrochemicals segment, including serving as the Performance Unit Leader of the Aromatics and Olefins division, Global Business Manager of the Styrene business unit, and the Planning, Performance and Strategy Manager of the Acetyls business unit. Prior to that time, Mr. Duggan held various positions in BP's Upstream segment in the United Kingdom, Australia and Venezuela over a period of ten years. Mr. Duggan serves on the boards of a number of Riverstone portfolio companies and their affiliates. He holds a B.A in biochemistry from Oxford University and an M.S. in management science from Stanford University. Based upon his strong background in various aspects of the energy industry, we believe Mr. Duggan has the requisite set of skills to serve as a director.

*John C. Bumgarner, Jr.*  Mr. Bumgarner has served as a director on the board of directors of our General Partner since April 2015. Mr. Bumgarner has been engaged in private investment since November 2002, and currently assists in operating a family-owned, multi-faceted real estate company. Mr. Bumgarner previously served as Co-Chief Operating Officer and President of Strategic Investments for Williams Communications Group, Inc., a high technology company, from May 2001 to November 2002. Williams Communications Group, Inc. filed a Plan of Reorganization with the U.S. Bankruptcy Court in August 2002. Mr. Bumgarner joined The Williams Companies, Inc., in 1977 and, prior to working at Williams Communications Group, Inc., served as Senior Vice President of Williams Companies Corporate Development and Planning, President of Williams International Company and President of Williams Real Estate Company. He most recently served as a director of Energy Partners, Ltd., an oil and natural gas exploration and production company, from January 2000 to February 2009, and at Market Planning Solutions Inc. from February 1982 until April 2011. Energy Partners, Ltd. filed a Plan of Reorganization with the U. S. Bankruptcy Court in May 2009.

135

Mr. Bumgarner holds a B.S. from the University of Kansas and an M.B.A. from Stanford University. Mr. Bumgarner's substantial experience as an executive at a conglomerate and as a director on boards of public and private companies engaged in a variety of industries provide him with unique insight that is particularly helpful and valuable to the board of directors of our General Partner.

*William K. Reilly.*   Mr. Reilly has served as a director on the board of directors of our General Partner since April 2015. Mr. Reilly served as Administrator of the U.S. Environmental Protection Agency from 1989 to 1993. From October 1997 to December 2009, Mr. Reilly served as President and Chief Executive Officer of Aqua International Partners, an investment group which finances water improvements in emerging markets. He also served as Senior Advisor to TPG Capital from September 1994 to December 2016. In 2010, Mr. Reilly was appointed by President Obama as co-chair of the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling. He currently serves on the board of directors of Royal Caribbean Cruises Ltd. Mr. Reilly served as a director of Conoco Inc. from 1998 until its merger with Phillips Petroleum Company in 2002, and thereafter served as a director of ConocoPhillips until May 2013. From 1993 until April 2012, Mr. Reilly also served on the board of directors of E.I. duPont de Nemours and Company. He has also previously served as the first Payne Visiting Professor at Stanford University, President of the World Wildlife Fund and President of The Conservation Foundation. He is Chairman Emeritus of the World Wildlife Fund and Chairman of the Nicholas Institute for Environmental Policy Solutions at Duke University. Mr. Reilly's extensive environmental regulatory experience and his service on various other boards make him well qualified to serve as a member of the board of directors of our General Partner, and allow him to provide unique and valuable perspective on matters critical to our operations.

*Janet S. Wong.*   Ms. Wong has served as a director on the board of directors of our General Partner since April 2015. Since January 2013, Ms. Wong has served as an Executive Advisor for Ascend, a non-profit professional organization that enables its members, corporate partners and the community to realize the leadership potential of Pan-Asians in global corporations. At Ascend, Ms. Wong has been a co-developer and instructor for its Executive Insight courses. In 2015, Ms. Wong was elected to serve on the Audit Committee for the American Heart Association as well as the Budget Review Subcommittee. In addition, she serves on the Louisiana Tech University Foundation Board and the College of Business Advisory Board where she is the immediate past-Chairman. Ms. Wong served as a Partner at Grant Thornton LLP from August 2008 through July 2012, where she was the Central Region Corporate and Partnership Services Lead Partner. In 2008, Ms. Wong retired from the partnership of KPMG, culminating a career with the global firm from 1985 through 2008, where she served as a National Industry Practice Lead Partner. Ms. Wong has extensive experience working with clients in the consumer markets, energy, financial services, manufacturing, and technology sectors. She is a Certified Public Accountant. She holds a Master of Professional Accountancy from Louisiana Tech University and a Master of Taxation from Golden Gate University. We believe Ms. Wong's audit expertise and her professional and leadership experience enable her to provide essential guidance to the board of directors of our General Partner and our management team.

*Christopher B. Hunt.*   Mr. Hunt has served as a director on the board of directors of our General Partner since April 2016. Mr. Hunt is a managing director of Riverstone and joined Riverstone in 2008. In addition to serving on the boards of a number of Riverstone portfolio companies and their affiliates, he also currently serves on the board of directors of NTR Plc. Prior to joining Riverstone, Mr. Hunt ran international power development and generation businesses for BP plc and Enron Corporation. Mr. Hunt received his BA from Wesleyan University and his MBA from Columbia University. He has also completed various post-graduate programs at Harvard University, Stanford University, the Massachusetts Institute of Technology and Oxford University. Mr. Hunt brings extensive experience in the renewable energy, conventional power and natural gas industries to the board of directors of our General Partner.

*Gary L. Whitlock.*   Mr. Whitlock has served as a director on the board of directors of our General Partner since April 2016. Mr. Whitlock served as Executive Vice President and Chief Financial Officer of CenterPoint Energy, Inc. ("CenterPoint") from September 2002 until April 2015. From April 2015 until his retirement on October 1, 2015, he served as Special Advisor to the Chief Executive Officer of CenterPoint. While at CenterPoint, Mr. Whitlock was responsible for accounting, treasury, risk management, tax, strategic planning, business development, emerging businesses and investor relations. From July 2001 to September 2002, Mr. Whitlock served as Executive Vice President and Chief Financial Officer of the Delivery Group of Reliant Energy, Incorporated ("Reliant"). Prior to joining Reliant, Mr. Whitlock served as Vice President of Finance and Chief Financial Officer of Dow AgroSciences LLC, a subsidiary of The Dow Chemical Company ("Dow"), from 1998 to 2001. He began his career with Dow in 1972, where he held a number of financial leadership positions, both in the United States and globally. While at Dow, Mr. Whitlock served on

136

the boards of directors of various Dow entities. Mr. Whitlock is a Certified Public Accountant and received a BBA in accounting from Sam Houston State University in 1972. He has previously served on the board of directors of Texas Genco Holdings, Inc., the board of directors of the general partner of Enable Midstream Partners, LP from March 2013 to August 2015, the board of directors of KiOR, Inc. from December 2010 to June 2015, the board of directors of CHI St. Luke's Health System, The Woodlands, and the Leadership Cabinet of Texas Children's Hospital. Mr. Whitlock brings extensive experience in public company financial management and reporting to the board of directors of our General Partner.

**Director Independence**

The board of directors of our General Partner has four independent directors: John C. Bumgarner, Jr., William K. Reilly, Gary L. Whitlock and Janet S. Wong. The NYSE does not require a publicly traded partnership such as ours to have a majority of independent directors on the board or to establish a compensation committee or a nominating committee. However, our General Partner is required to have an audit committee of at least three members, and all its members are required to meet the independence and experience standards established by the NYSE and the Exchange Act.

**Committees of the Board of Directors**

The board of directors of our General Partner has three standing committees: an audit committee, a compensation committee and a health, safety, sustainability and environmental committee. The board of directors of our General Partner may also form a conflicts committee from time to time. Due to the related-party nature of the Sampson Drop-Down, the board of directors of our General Partner formed a conflicts committee comprised solely of independent directors to evaluate the Sampson Drop-Down.

*Audit Committee*

We are required to have an audit committee of at least three members, and all the members of the audit committee are required to meet the independence and experience standards established by the NYSE and the Exchange Act. Mr. Bumgarner, Ms. Wong and Mr. Whitlock currently serve as members of the audit committee. The board determined that all members of the audit committee are financially literate and are "independent" under the standards of the NYSE and SEC regulations currently in effect. SEC rules also require that a public company disclose whether or not its audit committee has an "audit committee financial expert" as a member. An "audit committee financial expert" is defined as a person who, based on his or her experience, possesses the attributes defined by Regulation S-K Item 407(d)(s)(ii). The board of directors of our General Partner believes Ms. Wong satisfies the definition of "audit committee financial expert."

The audit committee assists the board of directors in its oversight of the integrity of our financial statements and our compliance with legal and regulatory requirements and partnership policies and controls. The audit committee has the sole authority to (1) retain and terminate our independent registered public accounting firm, (2) approve all auditing services and related fees and the terms thereof performed by our independent registered public accounting firm, and (3) pre-approve any non-audit services and tax services to be rendered by our independent registered public accounting firm. The audit committee is also responsible for confirming the independence and objectivity of our independent registered public accounting firm. Our independent registered public accounting firm has been given unrestricted access to the audit committee and our management.

*Conflicts Committee*

Our General Partner's board of directors may, from time to time, establish a conflicts committee to which the board will appoint at least one director and which may be asked to review specific matters that the board believes may involve conflicts of interest and determines to submit to the conflicts committee for review. The conflicts committee determines if the resolution of the conflict of interest is adverse to the interest of the partnership. The members of the conflicts committee may not be officers or employees of our General Partner or directors, officers or employees of its affiliates, including our sponsor, and must meet the independence standards established by the NYSE and the Exchange Act to serve on an audit committee of a board of directors, along with other requirements in our partnership agreement.

137

A1667

Any matters approved by the conflicts committee will be conclusively deemed to be approved by us and all of our partners and not a breach by our General Partner of any duties it may owe us or our unitholders. Due to the related-party nature of the Wilmington Drop-Down, the board of directors of our General Partner formed a conflicts committee comprised of Mr. Bumgarner, Mr. Whitlock and Ms. Wong to evaluate the Wilmington Drop-Down.

### *Compensation Committee*

As a limited partnership listed on the NYSE, we are not required to have a compensation committee. However, in connection with our IPO, the board of directors of our General Partner established a compensation committee consisting of Mr. Alexander, Mr. Bumgarner and Mr. Hoffman to, among other things, administer our long-term incentive plan and establish and review general policies related to, and determine and approve, or make recommendations to the board with respect to, the compensation and benefits of the non-employee members of the board.

### *Health, Safety, Sustainability and Environmental Committee*

In connection with our IPO, the board of directors of our General Partner formed a Health, Safety, Sustainability and Environmental Committee (the "HSSE committee") consisting of Mr. Duggan and Mr. Reilly. The HSSE committee assists the board of directors of our General Partner in fulfilling its oversight responsibilities with respect to the board's and our continuing commitment to (i) ensuring the safety of our employees and the public and assuring that our businesses and facilities are operated and maintained in a safe and environmentally sound manner, (ii) sustainability, including sustainable forestry practices, (iii) delivering environmental benefits to our customers, the forests from which we source our wood fiber and the communities in which we operate and (iv) minimizing the impact of our operations on the environment. The HSSE committee reviews and oversees our health, safety, sustainability and environmental policies, programs, issues and initiatives, reviews associated risks that affect or could affect us, our employees and the public and ensures proper management of those risks and reports to the board on health, safety, sustainability and environmental matters affecting us, our employees and the public. The members of the HSSE committee are non-employee directors of our General Partner.

### Executive Sessions of Non-Management Directors

The board of directors of our General Partner holds regular executive sessions in which the non-management directors meet without any members of management present. The purpose of these executive sessions is to promote open and candid discussion among the non-management directors. In the event that the non-management directors include directors who are not independent under the listing requirements of the NYSE, then at least once a year, there will be an executive session including only independent directors. The director who presides at these meetings is John C. Bumgarner, Jr. Unitholders and any other interested parties may also communicate directly with the presiding director or with the non-management directors as a group, by mail addressed to:

Presiding Director c/o General Counsel
Enviva Partners, LP
7200 Wisconsin Avenue, Suite 1000
Bethesda, Maryland 20814

### Communication with the Board of Directors

As set forth in the Communications Policy adopted by the board of directors of our General Partner, a holder of our units or other interested party who wishes to communicate with any director of our General Partner may do so by sending communications to the board, any committee of the board, the Chairman of the board or any other director to:

General Counsel
Enviva Partners, LP
7200 Wisconsin Avenue, Suite 1000
Bethesda, Maryland 20814

138

and marking the envelope containing each communication as "Unitholder Communication with Directors" and clearly identifying the intended recipient(s) of the communication. Communications will be relayed to the intended recipient of the board of directors of our General Partner pursuant to the Communications Policy, which is available on the "Investors Relations" section of our website at *http://www.envivabiomass.com* . Any communications withheld under the Communications Policy will nonetheless be recorded and available for any director who wishes to review them.

**Corporate Governance**

Our General Partner has adopted a Code of Business Conduct and Ethics that applies to our General Partner's directors, officers and employees, as well as to employees of our subsidiaries or affiliates that perform work for us. The Code of Business Conduct and Ethics also serves as the financial code of ethics for our Chief Executive Officer, Chief Financial Officer, controller and other senior financial officers. Our General Partner has also adopted Corporate Governance Guidelines that outline the important policies and practices regarding our governance.

We make available free of charge, within the "Investors Relations" section of our website at http://www.envivabiomass.com and in print to any interested party who so requests, our Code of Business Conduct and Ethics, Corporate Governance Guidelines, Audit Committee Charter, Compensation Committee Charter and HSSE Committee Charter. Requests for print copies may be directed to Investor Relations, Enviva Partners, LP, 7200 Wisconsin Ave., Suite 1000, Bethesda, Maryland 20814, or by telephone at (301) 657-5560. We will post on our website all waivers to or amendments of the Code of Business Conduct and Ethics, which are required to be disclosed by applicable law and the listing requirements of the NYSE. The information contained on, or connected to, our website is not incorporated by reference into this Annual Report on Form 10-K and should not be considered part of this or any other report we file with or furnish to the SEC.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires that the directors and executive officers of our General Partner and all persons who beneficially own more than 10% of our common units file initial reports of ownership and reports of changes in ownership of our common units with the SEC. As a practical matter, we assist the directors and executive officers of our General Partner by monitoring transactions and completing and filing Section 16 reports on their behalf.

Based solely upon our review of copies of filings or written representations from the reporting persons, we believe that, for the year ended December 31, 2017, Mr. Gary Whitlock, a member of the board of directors of our General Partner, failed to file, on a timely basis, one report on Form 4 required to be filed under Section 16(a) of the Exchange Act with respect to one transaction. On August 2, 2017, Mr. Whitlock was issued 505 common units in connection with his annual compensation. The Form 4 required to be filed by Mr. Whitlock in connection with this issuance was filed on October 27, 2017.

**ITEM 11.  EXECUTIVE COMPENSATION**

Neither we nor our General Partner have any employees. All of our executive officers are currently employed by Enviva Management.

We are providing compensation disclosure that satisfies the requirements applicable to emerging growth companies. For 2017, we determined our named executive officers ("Named Executive Officers" or "NEOs") to be:

- John K. Keppler, Chairman of the Board of Directors, President and Chief Executive Officer,

- E. Royal Smith, Executive Vice President, Operations, and

- Stephen F. Reeves, Executive Vice President and Chief Financial Officer.

The executive officers of our General Partner split their time between managing our business and the other businesses of our sponsor that are unrelated to us. Except with respect to awards that may be granted under the LTIP, all responsibility and authority for compensation-related decisions for the NEOs remains with Enviva Management and its

139

A1669

affiliates, and such decisions are not subject to any approval by us, our General Partner's board of directors or any committees thereof. Other than awards that may be granted under the LTIP, Enviva Management and its affiliates have the ultimate decision-making authority with respect to the total compensation of our executive officers and employees.

The compensation disclosed below with respect to the NEOs reflects only the portion of compensation expense that is allocated to us pursuant to the MSA among us, our General Partner and Enviva Management. For more information about the MSA, please read Item 13. "Certain Relationships and Related Transactions, and Director Independence—Other Transactions with Related Persons—Management Services Agreement."

The disclosures below relating to cash compensation paid by Enviva Management are based on information provided to us by Enviva Management. With the exception of the grants made under the LTIP, the elements of compensation discussed below are not subject to approvals by the board of directors of our General Partner or any of its committees.

**SUMMARY COMPENSATION TABLE**

The table below sets forth the annual compensation expensed by us for our Named Executive Officers for the fiscal years ended December 31, 2017 and December 31, 2016. As noted above, the amounts included in the table below reflect only the portion of compensation expense that is allocated to us pursuant to the MSA.

| Name and Principal Position | Year | Salary ($) | Bonus ($)(1) | Unit Awards(2) | All Other Compensation(3) | Total ($) |
|---|---|---|---|---|---|---|
| John K. Keppler | 2017 | $ 214,000 | $ 313,200 | $ 534,997 | $ 4,889 | $1,067,086 |
| (Chairman of the Board of | 2016 | $ 212,913 | $ 433,350 | $ 440,998 | $ — | $1,087,261 |
| Directors, President and Chief | | | | | | |
| Executive Officer) | | | | | | |
| | | | | | | |
| E. Royal Smith | 2017 | $ 255,000 | $ 191,250 | $ 382,505 | $ 9,925 | $ 838,680 |
| (Executive Vice President, | 2016 | $ 253,758 | $ 261,900 | $ 146,881 | $ 6,600 | $ 669,139 |
| Operations) | | | | | | |
| | | | | | | |
| Stephen F. Reeves | 2017 | $ 193,000 | $ 142,500 | $ 385,997 | $ 5,368 | $ 726,865 |
| (Executive Vice President and | 2016 | $ 250,075 | $ 243,875 | $ 376,342 | $ 5,168 | $ 875,460 |
| Chief Financial Officer) | | | | | | |

(1) Pursuant to the Enviva Management Annual Incentive Compensation Plan, bonus compensation for fiscal 2017 represents the aggregate amount of the annual discretionary cash bonuses paid to each Named Executive Officer.

(2) The amounts reflected in this column represent the grant date fair value of phantom units (which include tandem distribution equivalent rights ("DERs")) granted to the NEOs pursuant to the LTIP, computed in accordance with Financial Accounting Standards Board ("FASB") Accounting Standard Codification ("ASC") Topic 718. The grant date fair value for time-based phantom unit awards is based on the closing price of our common units, which was (i) $25.25 per unit for awards granted on February 1, 2017 with respect to the 2017 fiscal year and (ii) $18.19 per unit for awards granted on February 3, 2016 with respect to the 2016 fiscal year. The grant date fair value of performance-based phantom unit awards is reported based on the probable outcome of the performance conditions on the grant date. The value of the performance-based phantom unit awards granted in 2017, assuming achievement of the maximum performance level, was (i) $534,997 for Mr. Keppler, (ii) $382,505 for Mr. Smith and (iii) $385,997 for Mr. Reeves. The value of the performance-based phantom unit awards granted in 2016, assuming achievement of the maximum performance level, was (i) $440,998 for Mr. Keppler, (ii) $146,881 for Mr. Smith and (iii) $376,342 for Mr. Reeves. See Note 16, *Equity-Based Awards* , to our consolidated financial statements for additional detail regarding assumptions underlying the value of these awards.

(3) Amounts reported in the "All Other Compensation" column reflect employer contributions to the Named Executive Officers' accounts under the 401(k) plan in which the Named Executive Officers participate.

A1670

**NARRATIVE DISCLOSURE TO THE SUMMARY COMPENSATION TABLE**

**Management Services Agreement**

Effective April 9, 2015, the executive officers of our General Partner became employed by Enviva Management and split their time between managing our business and the other businesses of our sponsor. The amount of time that each executive officer devotes to our business and the other businesses of our sponsor is determined based on a variety of factors. In April 2015, we and our General Partner entered into the MSA with Enviva Management. For more information about the MSA, please read Item 13. "Certain Relationships and Related Transactions, and Director Independence—Other Transactions with Related Persons—Management Services Agreement."

**Phantom Unit Awards**

On February 1, 2017, the board of directors of our General Partner granted phantom units under the LTIP to each of our Named Executive Officers. One-half of these awards are subject to time-based vesting conditions ("time-based phantom units") and will become vested on the third anniversary of the grant date so long as the applicable Named Executive Officer remains continuously employed by Enviva Management or one of our affiliates from the grant date through the applicable vesting date. The other half of these awards vest based on the achievement of specific performance metrics ("performance-based phantom units"). Vested phantom units (less any phantom units withheld to satisfy applicable tax withholding obligations) will be settled through the issuance of common units within 60 days following the applicable vesting date. While a Named Executive Officer holds unvested phantom units, he is entitled to receive DER credits equal to the amount of cash distributions paid in respect of a common unit of the Partnership. The DERs included with performance-based phantom units are paid in cash within 60 days following the vesting of the associated phantom units (and are forfeited at the same time the associated phantom units are forfeited). The DERs included with time-based phantom units are paid in cash within 60 days following a cash distribution with respect to our common units. The potential acceleration and forfeiture events relating to these phantom units are described in greater detail under "—Potential Payments Upon Termination or a Change of Control" below.

**Employment Agreements**

Each of our NEOs is a party to an employment agreement with Enviva Management. We refer to these employment agreements herein collectively as the "Employment Agreements." The Employment Agreements of Messrs. Keppler, Smith and Reeves were each amended and restated as of December 1, 2016, August 19, 2016 and May 29, 2015, respectively. Mr. Keppler's Employment Agreement has a three-year initial term, Mr. Reeves's Employment Agreement has a two-year initial term and Mr. Smith's Employment Agreement has a one-year initial term. Each Employment Agreement's initial term automatically renews annually for successive 12-month periods unless either party provides written notice of non-renewal at least 60 days prior to a renewal date. Under the Employment Agreements, our NEOs are each entitled to an annualized base salary and are eligible for discretionary annual bonuses based on performance targets established annually by the board of directors of the general partner of our sponsor or a committee thereof, in its sole discretion. Mr. Keppler's, Mr. Reeves' and Mr. Smith's Employment Agreements provided that each such annual bonus would have a target value of not less than 150% (in the case of Mr. Keppler), 90% (in the case of Mr. Reeves) or 75% (in the case of Mr. Smith) of the applicable NEO's annualized base salary. The Employment Agreements also provide that the NEOs will be eligible to receive annual awards based upon our common units under the LTIP. For fiscal year 2016, the Employment Agreements provided that such annual LTIP awards would have target values equal to 210%, 150% and 60% of the annualized base salary of Messrs. Keppler, Reeves and Smith, respectively, as in effect of the first day of the 2016 fiscal year. Pursuant to Mr. Keppler's amended and restated Employment Agreement, effective for 2017, the target value of Mr. Keppler's LTIP awards increased from 210% to 250% of his annualized base salary in effect on January 1, 2017. In addition, pursuant to Mr. Smith's amended and restated Employment Agreement, effective for 2017, the target value of Mr. Smith's LTIP awards increased from 60% to 100% of his annualized base salary in effect on January 1, 2017. As discussed below under "—Potential Payments Upon Termination or a Change in Control," the Employment Agreements also provide for certain severance payments in the event an NEO's employment is terminated under certain circumstances.

141

A1671

**OUTSTANDING EQUITY AWARDS AT 2017 FISCAL YEAR-END**

The following table reflects information regarding outstanding equity-based awards held by our Named Executive Officers as of December 31, 2017.

| | Option Awards(1) | | | | Unit Awards | | | |
| Name | Number of Securities Underlying Unexercised Options Unexercisable (#)(2) | Number of Securities Underlying Unexercised Options Exercisable (#)(3) | Option Exercise Price ($) | Option Expiration Date ($) | Number of Units That Have Not Vested(#) (5) | Market Value of Units That Have Not Vested($)(6) | Equity Incentive Plan Awards: Number of Unearned Performance-based Units That Have Not Vested(#) | Equity Incentive Plan Awards: Market Value of Unearned Units That Have Not Vested($)(7) |
|---|---|---|---|---|---|---|---|---|
| **John K. Keppler** | | | | | | | | |
| Class C-1 Units | — | 232,941 | N/A (4) | N/A (4) | | | | |
| Class C-2 Units | — | 666,000 | N/A (4) | N/A (4) | | | | |
| Class E-1 Units | — | 275,000 | N/A (4) | N/A (4) | | | | |
| Phantom Units | | | | | 69,544 | $1,922,892 | 34,772 | $ 961,446 |
| **E. Royal Smith** | | | | | | | | |
| Class C-4 Units | — | 175,000 | N/A (4) | N/A (4) | | | | |
| Class E-1 Units | — | 25,000 | N/A (4) | N/A (4) | | | | |
| Phantom Units | | | | | 17,130 | $ 487,470 | 8,815 | $ 243,735 |
| **Stephen F. Reeve**s | | | | | | | | |
| Class C-2 Units | — | 200,000 | N/A (4) | N/A (4) | | | | |
| Class E-1 Units | — | 225,000 | N/A (4) | N/A (4) | | | | |
| Phantom Units | | | | | 41,256 | $1,140,728 | 20,628 | $ 570,364 |

(1) The equity awards that are disclosed in this Outstanding Equity Awards at 2017 Fiscal Year-End table under Option Awards are incentive units in Enviva Holdings, LP ("Holdings") that are intended to constitute profits interests for federal tax purposes rather than traditional option awards.

(2) Awards reflected as "Unexercisable" are Holdings incentive units that have not yet become vested.

(3) Awards reflected as "Exercisable" are Holdings incentive units that have become vested, but have not yet been settled.

(4) These equity awards are not traditional options and, therefore, there is no exercise price or expiration date associated with them.

(5) The phantom units subject to time-based vesting conditions will vest on (i) February 1, 2020 with respect to awards granted in 2017 (ii) February 3, 2019 with respect to awards granted in 2016 and (iii) May 4, 2018 with respect to awards granted in 2015, each so long as the applicable Named Executive Officer remains continuously employed by Enviva Management or one of our affiliates from the grant date through such vesting date.

(6) The amounts reflected in this column represent the market value of our common units underlying the phantom unit awards granted to the Named Executive Officers, computed based on the closing price of our common units on December 29, 2017, which was $27.65 per unit.

(7) The values reported in this column are calculated by multiplying the market value of our common units on December 29, 2017 ($27.65) by the number of common units that would be earned if the threshold (rather than target) performance targets were met for those awards. The actual payout values may increase or decrease based upon the value of our common units and the settlement requirements set forth in the award agreements.

**ADDITIONAL NARRATIVE DISCLOSURE**

**Retirement Benefits**

We have not maintained, and do not currently maintain, a defined benefit pension plan or a nonqualified deferred compensation plan providing for retirement benefits. Our Named Executive Officers currently participate in a

142

A1672

401(k) plan maintained by Enviva Management. The 401(k) plan permits all eligible employees, including the Named Executive Officers, to make voluntary pre-tax contributions and/or Roth after-tax contributions to the plan. In addition, Enviva Management is permitted to make discretionary matching contributions under the plan. Matching contributions under the plan are subject to a three-year cliff vesting schedule. All contributions under the plan are subject to certain annual dollar limitations, which are periodically adjusted for changes in the cost of living.

**Potential Payments Upon Termination or a Change in Control**

Under the Employment Agreements, if the applicable NEO's employment is terminated without "cause," by the applicable NEO for "good reason" or due to the applicable NEO's "disability," then so long as the applicable NEO executes (and does not revoke within the time provided to do so) a release in a form satisfactory to Enviva Management within the time period specified in the Employment Agreements, such NEO will receive the following severance benefits: (i) in the case of Mr. Keppler, a severance payment (generally payable in installments) in an aggregate amount equal to 1.5 (or, if such termination occurs within 12 months following a "change in control," 2.0) times the sum of his annualized based salary and target annual bonus as in effect on the date of such termination; (ii) in the case of Messrs. Reeves and Smith, a severance payment (generally payable in installments) in an aggregate amount equal to the sum of his annualized based salary and target annual bonus as in effect on the date of such termination; (iii) full vesting of outstanding awards under our LTIP (which vesting for awards that include a performance requirement (other than continued service) will be based on (1) actual performance if such termination occurs within the six-month period preceding to the expiration of the performance period or (2) target performance if such termination occurs at any other time during the performance period); and (iv) monthly reimbursement for the amount the NEO pays for continuation coverage under the employer's group health plans for up to 12 months following such termination (or, in the case of Mr. Keppler, up to 18 months following such termination, plus Mr. Keppler would be entitled to an additional cash payment equal to six times his monthly premium for such coverage in the event his employment terminates within 12 months following a change in control and he has not obtained coverage under a group health plan sponsored by another employer within the time period specified in his Employment Agreement).

Under the Employment Agreements, "cause" means the applicable NEO's: (i) material breach of any policy established by Enviva Management or its affiliates that pertains to drug and/or alcohol abuse (or health and safety in the case of Mr. Keppler) and is applicable to the NEO; (ii) engaging in acts of disloyalty to the employer or its affiliates, including fraud, embezzlement, theft, commission of a felony, or proven dishonesty; or (iii) willful misconduct in the performance of, or willful failure to perform a material function of, the NEO's duties under the Employment Agreement. In addition, "good reason," for purposes of the Employment Agreements, means, without the applicable NEO's consent and subject to certain notice and cure periods, (w) the material diminution in such NEO's authority, duties, title or responsibilities, (x) the material diminution in such NEO's annualized base salary, minimum target annual bonus opportunity or target annual long-term incentive award, (y) the relocation of the geographic location of such NEO's principal place of employment by more than 100 miles from the location of his principal place of employment as of the effective date of the Employment Agreement or (z) the employer's delivery of a written notice of non-renewal of the Employment Agreement. "Disability" is defined for purposes of the Employment Agreements as existing if the applicable NEO is unable to perform the essential functions of his position, with reasonable accommodation, due to an illness or physical or mental impairment or other incapacity that continues for a period in excess of 90 days, whether consecutive or not, in any period of 365 consecutive days. The determination of a disability will be made by the employer after obtaining an opinion from a doctor selected by the employer. A "change in control" is defined in Mr. Keppler's Employment Agreement as (1) the sale or disposal by Holdings of all or substantially all of its assets to any person other than an affiliate of Holdings, (2) the merger or consolidation of Holdings with or into another entity (other than a merger or consolidation in which unitholders in Holdings immediately prior to such transaction retain a greater than 50% equity interest in the surviving entity), (3) the failure of the Riverstone Funds and its affiliates to possess the power to direct the management and policies of Holdings, or (4) (A) the sale of all or substantially all of our assets to any person other than one of our affiliates, (B) our merger or consolidation with or into another entity (other than a merger or consolidation in which our unitholders immediately prior to such transaction retain a greater than 50% equity interest in the surviving entity), or (C) the failure of the Riverstone Funds and its affiliates to possess the power to direct our management and policies.

The Employment Agreements also contain certain restrictive covenants pursuant to which our NEOs have recognized an obligation to comply with, among other things, certain confidentiality covenants as well as covenants not

143

to compete in a defined market area with Enviva Management (or any of its affiliates to which they have provided services or about which they have obtained confidential information) or solicit their employer's or its affiliates' employees, in each case, during the term of the agreement and for a period of one year thereafter.

**Director Compensation**

Officers or employees of our predecessor or our sponsor or its affiliates who also serve as directors of our General Partner do not receive additional compensation for such service. Directors of our General Partner who are not also officers or employees of our predecessor or our sponsor or its affiliates ("independent directors") receive compensation for their service on our General Partner's board of directors and committees thereof consisting of an annual retainer of $75,000, an additional annual retainer of $15,000 for service as the chair of any standing committee, an additional payment of $1,500 each time such independent director attends a board or committee meeting, and one or more awards under the LTIP relating to our common units that, in the aggregate, result in approximately $100,000 of annual compensation (based on the value of our common units on the date of grant of such awards). As compensation for service on the Conflicts Committee, established by the board of directors of our General Partner to evaluate the Wilmington Drop-Down, each Conflicts Committee Director was paid a fee of $1,500 per meeting of the Conflicts Committee and Mr. Bumgarner, as Chairman was paid a flat fee of $25,000, which fee was in addition to the per meeting fee payable to the Chairman. Until the earlier of (i) four years after an independent director is appointed to the board of directors of our General Partner or (ii) the date on which such independent director first holds an amount of our common units with an aggregate value equal to at least $250,000, one-half of all annual retainers and payments for attending board or committee meetings are paid to such independent director in the form of common units pursuant to the LTIP and the remainder are paid in cash. Each non-employee director is reimbursed for out-of-pocket expenses incurred in connection with attending board and committee meetings. Each director will be fully indemnified by us for actions associated with serving as a director to the fullest extent permitted under Delaware law.

The following table provides information concerning the compensation of our non-employee directors for the fiscal year ended December 31, 2017.

| Name | Fees Earned or Paid in Cash ($)(1) | Common Unit Awards ($)(2) | Phantom Unit Awards ($)(3) | Total ($) |
|---|---|---|---|---|
| John C. Bumgarner, Jr. | $ 191,000 | $ — | $ 99,990 | $ 290,990 |
| William K. Reilly | $ 76,500 | $ 22,618 | $ 99,990 | $ 199,108 |
| Gary L. Whitlock | $ 60,000 | $ 56,009 | $ 99,990 | $ 215,999 |
| Janet S. Wong | $ 119,250 | $ 17,259 | $ 99,990 | $ 236,499 |

(1) Includes annual cash retainer fee and committee chair fees for each independent director during fiscal 2016, as more fully explained above.

(2) Reflects the aggregate grant date fair value of common units granted to the independent directors pursuant to the LTIP, as part of the compensation paid to independent directors who do not hold common units with an aggregate value equal to at least $250,000.

(3) Reflects the aggregate grant date fair value of phantom units (which include tandem DERs) granted to the independent directors pursuant to the LTIP, computed in accordance with FASB ASC Topic 718. See Note 16, *Equity-Based Awards* , to our consolidated financial statements on Form 10-K for the year ended December 31, 2017 for additional detail regarding assumptions underlying the value of these equity awards. The grant date fair value for the phantom unit awards is based on the closing price of our common units on the grant date of February 1, 2017, which was $25.25 per unit. Each independent director's phantom unit awards vest in full on February 1, 2018, in each case, so long as the director continues to serve on the board of directors of our General Partner through such date.

**ITEM 12.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

The following table sets forth the beneficial ownership of common units and subordinated units of Enviva Partners, LP as of February 16, 2018 held by:

- beneficial owners of 5% or more of our common units;

- each director and named executive officer; and

- all of our directors and executive officers as a group.

Unless otherwise noted, the address for each beneficial owner listed below is 7200 Wisconsin Ave., Suite 1000, Bethesda, MD 20814.

| Name of Beneficial Owner | Common Units Beneficially Owned(1) | Percentage of Common Units Beneficially Owned | Subordinated Units Beneficially Owned | Percentage of Subordinated Units Beneficially Owned | Percentage of Common and Subordinated Units Beneficially Owned |
|---|---|---|---|---|---|
| Enviva Holdings, LP(2)(3)(4) | 1,265,453 | 8.8 % | 11,905,138 | 100 % | 50.0 % |
| Enviva Partners GP, LLC | — | — % | — | — | — % |
| Goldman Sachs Asset Management(5) | 905,988 | 6.3 % | — | — | 3.4 % |
| ClearBridge Investments, LLC(6) | 665,000 | 4.6 % | — | — | 2.5 % |
| FS Global Credit Opportunities Fund(7) | 656,974 | 4.6 % | — | — | 2.5 % |
| John K. Keppler | 24,558 | * | — | — | * % |
| Stephen F. Reeves | 12,492 | * | — | — | * % |
| E. Royal Smith | 4,205 | * | — | — | * % |
| Ralph Alexander | — | — % | — | — | — % |
| John C. Bumgarner, Jr.(8) | 179,023 | 1.2 % | — | — | * % |
| Robin J. A. Duggan | — | — % | — | — | — % |
| Michael B. Hoffman | — | — % | — | — | — % |
| Christopher B. Hunt | — | — % | — | — | — % |
| William K. Reilly | 23,598 | * | — | — | * % |
| Gary L. Whitlock | 11,903 | * | — | — | * % |
| Carl L. Williams | — | — % | — | — | — % |
| Janet S. Wong | 20,727 | * | — | — | * % |
| All directors and executive officers as a group (16 persons) | 306,124 | 2.1 % | — | — | 1.2 % |

\*    Less than 1% of common units outstanding.

(1)   This column does not include phantom units granted to our directors and officers pursuant to the LTIP.

(2)   Of this aggregate amount beneficially owned, (i) Enviva Development Holdings, LLC, a wholly owned subsidiary of Enviva Holdings, LP, has shared voting power over 860,315 common units and shared dispositive power over 860,315 common units, (ii) Enviva Holdings, LP has shared voting power over 1,265,453 common units and shared dispositive power over 1,265,453 common units, (iii) Enviva Holdings GP, LLC has shared voting power over 1,265,453 common units and shared dispositive power over 1,265,453 common units, (iv) R/C Wood Pellet Investment Partnership, L.P. has shared voting power over 1,265,453 common units and shared dispositive power over 1,265,453 common units, (v) Riverstone/Carlyle Renewable Energy Partners II, L.P. has shared voting power over 1,265,453 common units and shared dispositive power over 1,265,453 units and (vi) R/C Renewable Energy GP II, L.L.C. has shared voting power over 1,265,453  common units and shared dispositive power over 1,265,453 common units.

145

A1675

(3)  R/C Renewable Energy GP II, L.L.C is the general partner of Riverstone/Carlyle Renewable Energy Partners II, L.P., which is the general partner of R/C Wood Pellet Investment Partnership, L.P., which is the sole member of Enviva Holdings GP, LLC, which is the general partner of Enviva Holdings, LP, which is the sole member of Enviva MLP Holdco, LLC and Enviva Cottondale Acquisition I, LLC. R/C Renewable Energy GP II, L.L.C. is managed by a six-person investment committee. Pierre F. Lapeyre, Jr., David M. Leuschen, Ralph Alexander, Michael B. Hoffman, Daniel A. D'Aniello and Edward J. Mathias are the members of the investment committee of R/C Renewable Energy GP II, L.L.C.

(4)  The address for each of R/C Renewable Energy GP II, L.L.C., Riverstone/Carlyle Renewable Energy Partners II, L.P. and R/C Wood Pellet Investment Partnership, L.P. is c/o Riverstone Holdings, LLC, 712 Fifth Avenue, 36th Floor, New York, New York 10019.

(5)  As reported on Schedule 13G/A as of December 31, 2017 and filed with the SEC on January 24, 2018 by GS Investment Strategies, LLC and Goldman Sachs Asset Management, L.P. (collectively, "Goldman Sachs Asset Management"), Goldman Sachs Asset Management discloses that it beneficially owns in the aggregate 905,988 common units. Of this aggregate amount beneficially owned, (i) GS Investment Strategies, LLC is reported to have shared voting power over 905,988 common units and shared dispositive power over 905,988 common units and (ii) Goldman Sachs Asset Management, L.P. is reported to have shared voting power over 905,988 common units and shared dispositive power over 905,988 common units. The address of Goldman Sachs Asset Management is 200 West Street, New York, NY 10282.

(6)  As reported on Schedule 13G /A as of December 31, 2017 and filed with the SEC on February 14, 2017 by ClearBridge Investments, LLC, ClearBridge Investments, LLC discloses that it beneficially owns in the aggregate 665,000 common units. Of this aggregate amount beneficially owned, ClearBridge Investments, LLC is reported to have sole voting power over 665,000 common units and sole dispositive power over 665,000 common units. The address of ClearBridge Investments, LLC is 620 8th Avenue, New York, NY 10018.

(7)  As reported on Schedule 13G as of December 31, 2017 and filed with the SEC on January 13, 2017 by (i) FS Global Credit Opportunities Fund, (ii) FS Global Advisor, LLC, which serves as the investment adviser to FS Global Credit Opportunities Fund, (iii) Michael C. Forman, who is a control person of FS Global Advisor, LLC and (iv) David J. Adelman, who is a control person of FS Global Advisor, LLC (collectively, the "FS Global Reporting Persons"), the FS Global Reporting Persons disclose that they beneficially own in the aggregate 656,974 common units. Of this aggregate amount beneficially owned, (i) FS Global Credit Opportunities Fund is reported to have shared voting power over 656,974 common units and shared dispositive power over 656,974 common units; (ii) FS Global Advisor, LLC is reported to have shared voting power over 656,974 common units and shared dispositive power over 656,974 common units; (iii) Michael C. Forman is reported to have shared voting power over 656,974 common units and shared dispositive power over 656,974 common units; and (iv) David J. Adelman is reported to have shared voting power over 656,974 common units and shared dispositive power over 656,974 common units. The address of the FS Global Reporting Persons is 201 Rouse Boulevard, Philadelphia, PA 19112.

(8)  These 170,632 common units are held by the Bumgarner Family Trust. Mr. Bumgarner has investment control over these units.

146

A1676

**Equity Compensation Plan Information**

The following table sets forth information with respect to the securities that may be issued under the LTIP as of December 31, 2017.

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a)(2) | Weighted-average exercise price of outstanding options, warrants and rights ($) (b)(3) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c)(4) |
|---|---|---|---|
| Equity compensation plans approved by security holders(1) | 1,091,947 | n/a | 2,738,182 |
| Equity compensation plans not approved by security holders | — | — | — |
| Total | 1,091,947 | n/a | 2,738,182 |

(1)   The LTIP was approved by the board of directors of our General Partner prior to the IPO.

(2)   The amount in column (a) of this table reflects the aggregate number of outstanding phantom units under the LTIP as of December 31, 2017.

(3)   This column is not applicable because only phantom units have been granted under the LTIP and phantom units do not have an exercise price.

(4)   The amount in this column reflects the total number of common units remaining available for future issuance under the LTIP as of December 31, 2017. For additional information about the LTIP and the awards granted thereunder, please read Part III, Item 11. "Executive Compensation."

**ITEM 13.   CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

As of February 16, 2018, our sponsor owned 1,265,453 common units and 11,905,138 subordinated units representing approximately 50% limited partner interest in us. In addition, our sponsor owns and controls (and appoints all the directors of) our General Partner, which maintains a non-economic general partner interest in us and owns all our incentive distribution rights.

The terms of the transactions and agreements disclosed in this section were determined by and among affiliated entities and, consequently, are not the result of arm's-length negotiations. These terms are not necessarily at least as favorable to the parties to these transactions and agreements as the terms that could have been obtained from unaffiliated third parties.

**Distributions and Payments to Our General Partner and Its Affiliates**

We generally make 100% of our cash distributions to our unitholders, including affiliates of our General Partner. In addition, if distributions exceed the minimum quarterly distribution and other higher target distribution levels, our General Partner, or the holder of our incentive distribution rights, will be entitled to increasing percentages of the distributions, up to 50.0% of the distributions above the highest target distribution level.

Assuming we have sufficient cash available for distribution to pay the full minimum quarterly distribution on all of our outstanding common units and subordinated units for four quarters, our General Partner and its affiliates would receive an annual distribution of approximately $21.9 million on their units.

147

A1677

Our General Partner does not receive a management fee or other compensation for its management of our partnership, but we reimburse our General Partner and its affiliates for all direct and indirect expenses they incur and payments they make on our behalf. These expenses include salary, bonus, incentive compensation and other amounts paid to persons who perform services for us or on our behalf and expenses allocated to our General Partner by its affiliates. Under our MSA, we are obligated to reimburse Enviva Management for all direct or indirect costs and expenses incurred by, or chargeable to, Enviva Management in connection with its provision of services necessary for the operation of our business. If the MSA were terminated without replacement, or our General Partner or its affiliates provided services outside of the scope of the MSA, our partnership agreement would require us to reimburse our General Partner and its affiliates for all expenses they incur and payments they make on our behalf. Our partnership agreement does not set a limit on the amount of expenses for which our General Partner and its affiliates may be reimbursed.

If our General Partner withdraws or is removed, its non-economic general partner interest and its incentive distribution rights will either be sold to the new general partner for cash or converted into common units, in each case for an amount equal to the fair market value of those interests.

If we are ever liquidated, the partners, including our General Partner, will be entitled to receive liquidating distributions according to their respective capital account balances.

**Agreements with Affiliates**

*Sampson Contribution Agreement*

On December 14, 2016, we consummated the transactions contemplated by a contribution agreement (the "Sampson Contribution Agreement") with the First Hancock JV, which is a joint venture between our sponsor, Hancock Natural Resource Group, Inc., and certain other affiliates of John Hancock Life Insurance Company (U.S.A.). Under the terms of the Contribution Agreement, we acquired from the First Hancock JV all of the issued and outstanding limited liability company interests in Enviva Pellets Sampson, LLC ("Sampson") for total consideration of $175.0 million. Sampson owns a wood pellet production plant in Sampson Country, North Carolina (the "Sampson plant"), that is expected to produce 500,000 MTPY of wood pellets in 2017 and to reach its full production capacity of approximately 600,000 MTPY in 2019. The acquisition (the "Sampson Drop-Down") included the Sampson plant, a ten-year 420,000 MTPY take-or-pay off-take contract, a 15-year, 95,000 MTPY off-take contract with the First Hancock JV, and related third-party shipping contracts. The Sampson Drop-Down included the payment of $139.6 million in cash, net of a purchase price adjustment of $5.4 million, to the First Hancock JV, the issuance of 1,098,415 common units at a value of $27.31, or an aggregate value of $30.0 million, to affiliates of John Hancock Life Insurance Company (U.S.A.).

We also entered into the Terminal Services Agreement by and between Enviva, LP and Wilmington pursuant to which Wilmington agreed to provide terminal services at the Wilmington terminal for production from the Sampson plant.

*Wilmington Contribution Agreement*

On October 2, 2017, pursuant to the terms of a contribution agreement with the First Hancock JV (the "Wilmington Contribution Agreement"), we acquired from the First Hancock JV all of the issued and outstanding limited liability company interests in Enviva Port of Wilmington, LLC ("Wilmington") for a purchase price of $130.0 million. T he purchase price included an initial payment of $54.6 million, net of an approximate purchase price adjustment of $1.4 million. The acquisition (the "Wilmington Drop-Down") included the Wilmington terminal and a long-term terminal services agreement with the Partnership's sponsor to handle throughput volumes sourced by the sponsor from a wood pellet production plant in Greenwood, South Carolina. The terminal services agreement with the Partnership's sponsor provides for deficiency payments to Wilmington if quarterly minimum throughput requirements are not met. The Wilmington terminal will handle up to approximately 600,000 MTPY of throughput from the Partnership's production plant in Sampson County, North Carolina.

In addition, the Wilmington Contribution Agreement contemplates that Wilmington will enter into a long-term terminal services agreement (the "Wilmington Hamlet TSA") with the First Hancock JV and Enviva Pellets Hamlet, LLC ("Hamlet") to receive, store and load wood pellets from the First Hancock JV's proposed production plant in

148

Hamlet, North Carolina (the "Hamlet plant") when the First Hancock JV completes construction of the Hamlet plant. The Wilmington Hamlet TSA also provides for deficiency payments to Wilmington if minimum throughput requirements are not met. Pursuant to the Wilmington Contribution Agreement, following notice of the anticipated first delivery of wood pellets to the Wilmington terminal from the Hamlet plant, Wilmington, Hamlet, and the First Hancock JV will enter into the Wilmington Hamlet TSA and we will make a final payment of $74.0 million in cash or common units representing limited partner interests in the Partnership to the First Hancock JV, subject to certain conditions, as deferred consideration for the Wilmington Drop-Down.

Wilmington also entered into a throughput option agreement with the our sponsor granting the sponsor, subject to certain conditions, the option to obtain terminal services at the Wilmington terminal at marginal cost throughput rates for wood pellets produced by one of our sponsor's potential wood pellet production plants.

***Related-Party Indemnification***

In connection with the Sampson Drop-Down, the First Hancock JV agreed to indemnify us, our affiliates, and our respective officers, directors, managers, counsel, agents and representatives from all costs and losses arising from certain vendor liabilities and claims ("Retained Matters") related to the construction of the Sampson plant that were included in the net assets contributed.

In connection with the Wilmington Drop-Down, the First Hancock JV agreed to indemnify us, our affiliates, and our respective officers, directors, managers, counsel, agents and representatives from all costs and losses arising from certain vendor liabilities and claims related to the construction of the Port of Wilmington that were included in the net assets contributed.

***Sampson Construction Payments***

Pursuant to three payment agreements with the First Hancock JV dated effective as of July 27, 2017, September 30, 2017, and December 31, 2017 (together, the "Payment Agreements"), the First Hancock JV agreed to pay an aggregate amount of $1.4 million in consideration for costs incurred by us to repair or replace certain equipment at the Sampson plant following the consummation of the Sampson Drop-Down.

***Terminal Services Agreements***

In connection with the Wilmington Drop-Down, Wilmington and the sponsor entered into a terminal services agreement dated October 2, 2017 providing for wood pellet receipt, storage, handling and loading services by the Wilmington terminal on behalf of the sponsor (the "Holdings TSA"). Pursuant to the Holdings TSA, which remains in effect until September 1, 2026, the sponsor agreed to deliver a minimum of 125,000 MT per quarter and pay a fixed fee on a per-ton basis for the terminal services.

The Holdings TSA was amended and assigned to Enviva Pellets Greenwood, LLC, a wholly owned subsidiary of Enviva JV Development Company, LLC, a joint venture between our sponsor, Hancock Natural Resource Group, Inc. and certain other affiliates of John Hancock Life Insurance Company (U.S.A.) ("Second Hancock JV").

***EVA‑MGT Contracts***

In January 2016 we entered into a contract with the First Hancock JV to supply 375,000 MTPY of wood pellets (the "EVA-MGT Contract") to MGT Teesside Limited's Tees Renewable Energy Plant (the "Tees REP"), which is under development. The EVA‑MGT Contract commences in 2019, ramps to full supply in 2021 and continues through 2034. The EVA‑MGT Contract is denominated in U.S. Dollars for commissioning volumes in 2019 and in British Pound Sterling ("GBP") thereafter.

We entered into a second supply agreement with the First Hancock JV in connection with the Sampson Drop‑Down to supply an additional 95,000 MTPY of the contracted volume to the Tees REP. The contract, which is denominated in GBP, commences in 2019 and continues through 2034 .

149

A1679

Table of Contents

*Registration Rights Agreement*

In connection with the IPO, on May 4, 2015, we entered into a registration rights agreement with our sponsor pursuant to which we may be required to register the sale of the (i) common units issued (or issuable) to our sponsor pursuant to the IPO Contribution Agreement, (ii) subordinated units and (iii) common units issuable upon conversion of the subordinated units pursuant to the terms of the partnership agreement (together, the "Registrable Securities") it holds. Under the registration rights agreement, our sponsor will have the right to request that we register the sale of Registrable Securities held by it, and our sponsor will have the right to require us to make available shelf registration statements permitting sales of Registrable Securities into the market from time to time over an extended period, subject to certain limitations. In addition, the registration rights agreement gives our sponsor piggyback registration rights under certain circumstances. The registration rights agreement also includes provisions dealing with indemnification and contribution and allocation of expenses. All of the Registrable Securities held by our sponsor and any permitted transferee will be entitled to these registration rights.

*Purchase Rights Agreement*

In connection with the IPO, on May 4, 2015, we entered into a the Purchase Rights Agreement with our sponsor pursuant to which our sponsor will provide to us, for a period of five years following the closing of our IPO, a right of first offer to purchase any wood pellet production plant or deep‑water marine terminal that it, its subsidiaries or any other entity that it controls (including the Hancock JVs) owns and proposes to sell (each, a "ROFO Asset"). We will have thirty days following receipt of the sponsor entity's intention to sell a ROFO Asset to propose an offer for the ROFO Asset. If we submit an offer, our sponsor will negotiate with us exclusively and in good faith to enter into a letter of intent or definitive documentation for the purchase of the ROFO Asset on mutually acceptable terms. If we are unable to agree to terms within 45 days, the sponsor entity will have 150 days to enter into definitive documentation with a third party purchaser on terms that are, in the good faith judgment of the sponsor entity selling such ROFO Assets, superior to the most recent offer proposed by us.

*Biomass Purchase Agreement – Hancock JV*

On September 7, 2016, Sampson entered into a confirmation under the Biomass Purchase Agreement pursuant to which Sampson agreed to sell to the sponsor 60,000 MT of wood pellets through August 31, 2017. On June 23, 2017, the sponsor satisfied its take-or-pay obligation under the agreement.

*Biomass Option Agreement – Enviva Holdings, LP*

On February 3, 2017, we entered into a master biomass purchase and sale agreement and a confirmation thereunder, which confirmation was amended on April 1, 2017, each with the sponsor (together, the "Option Contract"), pursuant to which we have the option to purchase certain volumes of wood pellets from the sponsor, from time to time at a price per metric ton determined by reference to a market index. The sponsor has a corresponding right to re-purchase volumes purchased by us pursuant to the Option Contract at a price per metric ton determined by reference to such market index at then-prevailing rates in the event that we purchase more than 45,000 MT of wood pellets pursuant to the Option Contract.

*Management Services Agreement*

On April 9, 2015, all of our employees and management became employed by Enviva Management, and we and our General Partner entered into the MSA with Enviva Management, pursuant to which Enviva Management provides us with all services necessary for the operation of our business. The MSA has a term of five years, which is automatically renewed unless terminated by us for cause. Enviva Management is also able to terminate the agreement if we fail to reimburse it for its costs and expenses allocable to us.

Pursuant to the MSA, we reimburse Enviva Management for all direct or indirect costs and expenses incurred by, or chargeable to, Enviva Management in connection with the provision of the services, including, without limitation, salary and benefits of employees engaged in providing such services, as well as office rent, expenses and other overhead costs of Enviva Management. Enviva Management determines the amount of costs and expenses that is allocable to us.

150

A1680

**Other Transactions with Related Persons**

*Enviva FiberCo, LLC*

We purchase raw materials from Enviva FiberCo, LLC ("FiberCo"), a wholly owned subsidiary of the sponsor. Raw material purchases from FiberCo during 2017 and 2016 were $8.5 million and $3.7 million, respectively.

*Procedures for Review, Approval and Ratification of Transactions with Related Persons*

In connection with the closing of our IPO, the board of directors of our General Partner adopted policies for the review, approval and ratification of transactions with related persons. The board adopted a written Code of Business Conduct and Ethics, under which a director is expected to bring to the attention of the chief executive officer or the board any conflict or potential conflict of interest that may arise between the director or any affiliate of the director, on the one hand, and us or our General Partner on the other. The resolution of any such conflict or potential conflict should, at the discretion of the board in light of the circumstances, be determined by a majority of the disinterested directors.

Under the provisions of our Code of Business Conduct and Ethics, any executive officer will be required to avoid conflicts of interest unless approved by the board of directors of our General Partner.

The Code of Business Conduct and Ethics described above was adopted in connection with the closing of our IPO and, as a result, the transactions described above that were entered into prior to or in connection with the IPO were not reviewed according to such procedures.

The board has also adopted a Conflicts of Interest Policy, under which if a conflict or potential conflict of interest arises between our General Partner or its affiliates, on the one hand, and us or our unitholders, on the other hand, the resolution of any such conflict or potential conflict should be addressed by the board of directors of our General Partner in accordance with the provisions of our partnership agreement. At the discretion of the board in light of the circumstances, the resolution may be determined by the board in its entirety or by a conflicts committee meeting the definitional requirements for such a committee under our partnership agreement.

The Conflicts of Interest Policy also provides that the board may determine on our behalf that certain contracts between us, on the one hand, and the General Partner and any of its affiliates, on the other hand, are fair and reasonable and in our best interests, so long as the board reasonably determines that such contracts are on terms and conditions not less favorable to us than could be obtained on an arm's-length basis from an unrelated third party, taking into account the totality of the relationships between all parties involved. Transactions described above that were entered into prior to or in connection with the IPO were not reviewed according to such procedures.

*Director Independence*

See Part III, Item 10. "Directors, Executive Officers and Corporate Governance" for information regarding the directors of our General Partner and independence requirements applicable to the board of directors of our General Partner and its committees.

**ITEM 14.  PRINCIPAL ACCOUNTING FEES AND SERVICES**

KPMG LLP ("KPMG") served as our independent auditor for the years ended December 31, 2017, 2016 and 2015. The following table presents fees paid for professional audit services rendered by KPMG for the audit of our

151

A1681

annual financial statements for the years ended December 31, 2017, 2016 and 2015, and fees for other services rendered by KPMG:

| (in thousands) | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2017 | | 2016 | | 2015 | |
| Audit Fees(1) | $ | 1,902 | $ | 1,205 | $ | 1,040 |
| Audit-Related Fees | | — | | — | | — |
| Tax Fees | | — | | — | | — |
| All Other Fees | | — | | — | | — |
| Total | $ | 1,902 | $ | 1,205 | $ | 1,040 |

_____

(1)    Fees for audit services related to the fiscal year consolidated audit, quarterly reviews, registration statements and services that were provided in connection with statutory and regulatory filings.

**Policy for Approval of Audit and Permitted Non‑Audit Services**

Before the independent registered public accounting firm is engaged by us or our subsidiaries to render audit or non-audit services, the audit committee must pre-approve the engagement. Audit committee pre-approval of audit and non-audit services is not required if the engagement for the services is entered into pursuant to pre-approval policies and procedures established by the audit committee. The chairman of the audit committee has the authority to grant pre-approvals, provided such approvals are within the pre-approval policy and presented to the audit committee at a subsequent meeting.

The audit committee approved the appointment of KPMG as our independent auditor to conduct the audit of our consolidated financial statements for the year ended December 31, 2017 and all of the services described above.

152

A1682

**PART IV**

**ITEM 15.  EXHIBITS, FINANCIAL STATEMENT SCHEDULES**

(a)    Certain documents are filed as a part of this Annual Report and are incorporated by reference and found on the pages below.

1.    Financial Statements—Please read Part II, Item 8. "Financial Statements and Supplementary Data—Index to Financial Statements."

2.    All schedules have been omitted because they are either not applicable, not required or the information called for therein appears in the consolidated financial statements or notes thereto.

3.    Exhibits—Exhibits required to be filed by Item 601 of Regulation S-K set forth below are incorporated herein by reference.

153

A1683

**EXHIBIT INDEX**

| Exhibit Number | Exhibit |
|---|---|
| 2.1 | Contribution Agreement by and between Enviva Wilmington Holdings, LLC and Enviva Partners, LP dated May 8, 2017 (Exhibit 2.1, Form 8-K filed May 12, 2017, File No. 001-37363) |
| 3.1 | Certificate of Limited Partnership of Enviva Partners, LP (Exhibit 3.1, Form S-1 Registration Statement filed October 28, 2014, File No. 333-199625) |
| 3.2 | First Amended and Restated Agreement of Limited Partnership of Enviva Partners, LP, dated May 4, 2015, by Enviva Partners GP, LLC (Exhibit 3.1, Form 8-K filed May 4, 2015, File No. 001-37363) |
| 3.3 | Amendment No. 1 to the First Amended and Restated Agreement of Limited Partnership of Enviva Partners, LP, effective as of December 18, 2017, by Enviva Partners GP, LLC (Exhibit 3.1, Form 8-K filed December 21, 2017) |
| 4.1 | Indenture, dated as of November 1, 2016, by and among Enviva Partners, LP, Enviva Partners Finance Corp., the subsidiary guarantors party thereto and Wilmington Trust, National Association, as trustee (Exhibit 4.1, Form 8-K filed November 3, 2016, File No. 001-37363) |
| 4.2 | Form of 8.5% Senior Note due 2021 (Exhibit 4.2, Form 8-K filed November 3, 2016, File No. 001-37363 ) |
| 4.3 | Registration Rights Agreement, dated May 4, 2015, by and among Enviva Partners, LP, Enviva MLP Holdco, LLC and Enviva Cottondale Acquisition I, LLC (Exhibit 4.1, Form 8-K filed May 4, 2015, File No. 001-37363) |
| 10.1 | Purchase Rights Agreement, dated May 4, 2015, by and among Enviva Partners, LP, Enviva Partners GP, LLC and Enviva Holdings, LP (Exhibit 10.2, Form 8-K filed May 4, 2015, File No. 001-37363) |
| 10.2† | Enviva Partners, LP Long-Term Incentive Plan (Exhibit 4.3, Form S-8 Registration Statement filed April 30, 2015, File No. 333-203756) |
| 10.3† | Management Services Agreement by and among Enviva Partners, LP, Enviva Partners GP, LLC, Enviva, LP, Enviva GP, LLC, the subsidiaries of Enviva, LP party thereto and Enviva Management Company, LLC, dated as of April 9, 2015 (Exhibit 10.12, Form S-1 Registration Statement filed April 15, 2015, File No. 333-199625) |
| 10.4 | Credit Agreement, dated as of April 9, 2015, among Enviva Partners, LP, as Borrower, the Lenders party thereto and Barclays Bank PLC, as Administrative Agent and Collateral Agent (Exhibit 10.13, Form S-1 Registration Statement filed April 15, 2015, File No. 333-199625) |
| 10.5 | Master Biomass Purchase and Sale Agreement, dated as of April 9, 2015, by and between Enviva, LP and Enviva Wilmington Holdings, LLC (Exhibit 10.8, Form 8-K filed May 4, 2015, File No. 001-37363) |
| 10.6 | Terminal Services Agreement, dated April 9, 2015, by and between Enviva Port of Chesapeake, LLC and Enviva Wilmington Holdings, LLC (Exhibit 10.7, Form 8-K filed May 4, 2015, File No. 001-37363) |
| 10.7 | License Agreement, dated April 9, 2015, by and among Enviva Holdings, LP, Enviva Partners GP, LLC and Enviva Partners, LP (Exhibit 10.3, Form 8-K filed May 4, 2015, File No. 001-37363) |
| 10.8† | Form of Phantom Unit Award Grant Notice and Award Agreement (performance-based vesting for employees) (Exhibit 10.21, Form S-1 Registration Statement filed April 3, 2015, File No. 333-199625) |
| 10.9† | Form of Phantom Unit Award Grant Notice and Award Agreement (time-based vesting for employees) (Exhibit 10.20, Form S-1 Registration Statement filed April 3, 2015, File No. 333-199625) |
| 10.10† | Form of Phantom Unit Award Grant Notice and Award Agreement (non-employee directors) (Exhibit 10.22, Form S-1 Registration Statement filed April 3, 2015, File No. 333-199625) |
| 10.11† | First Amended and Restated Employment Agreement between Stephen F. Reeves and Enviva Management Company, LLC, dated May 29, 2015 (Exhibit 10.1, Form 8-K filed May 29, 2015, File No. 001-37363) |
| 10.12† | First Amended and Restated Employment Agreement between William H. Schmidt, Jr. and Enviva Management Company, LLC, dated May 29, 2015 (Exhibit 10.2, Form 8-K filed May 29, 2015, File No. 001-37363) |
| 10.13† | Form of Unit Award Grant Notice and Award Agreement (non-employee directors) (Exhibit 10.15, Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2015 filed July 31, 2015, File No. 001-37363) |

| Exhibit Number | Exhibit |
|---|---|
| 10.14 | First Incremental Term Loan Assumption Agreement, by and among Enviva Partners, LP, certain subsidiaries of Enviva Partners, LP, as Guarantors, the Lenders party thereto, and Barclays Bank PLC, as administrative agent, dated as of December 11, 2015, (Exhibit 10.1, Form 8-K filed December 17, 2015, File No. 001-37363) |
| 10.15† | Form of Assignment, Assumption and Amendment Agreement (relating to employment agreements) (Exhibit 10.19, Form S-1 Registration Statement filed April 3, 2015, File No. 333-199625) |
| 10.16 | Second Amended and Restated Employment Agreement between Edward R. Smith and Enviva Management Company, LLC, dated August 19, 2016 (Exhibit 10.1, Form 8-K filed August 25, 2016, File No. 001-37363) |
| 10.17 | First Amended and Restated Employment Agreement between John K. Keppler and Enviva Management Company, LLC, dated December 1, 2016 (Exhibit 10.1, Form 8-K filed December 1, 2016, File No. 001-37363) |
| 10.18 | Second Amendment to Credit Agreement and First Amendment to Guarantee and Collateral Agreement, dated as of October 17, 2016, by and among Enviva Partners, LP, as borrower, certain subsidiaries of Enviva Partners, LP, as guarantors, the lenders party thereto, the increasing revolving lenders party thereto and Barclays Bank PLC, as administrative agent and collateral agent (Exhibit 10.2, Form 8-K filed October 24, 2016, File No. 001-37363) |
| 10.19 | Biomass Supply Agreement between Enviva Partners, LP and Enviva Wilmington Holdings, LLC, dated January 22, 2016 (Exhibit 10.22, Form 10-K filed March 8, 2016, File No. 001-37363) |
| 10.20* | Terminal Services Agreement between Enviva, LP and Enviva Port of Wilmington, LLC, dated December 14, 2016 |
| 21.1* | List of Subsidiaries of Enviva Partners, LP |
| 23.1* | Consent of KPMG LLP |
| 24.1* | Power of Attorney (incorporated by reference to the signature page of this Annual Report on Form 10-K) |
| 31.1* | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2* | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1** | Certification of Chief Executive Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2** | Certification of Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Schema Document |
| 101.CAL | XBRL Calculation Linkbase Document |
| 101.DEF | XBRL Definition Linkbase Document |
| 101.LAB | XBRL Labels Linkbase Document. |
| 101.PRE | XBRL Presentation Linkbase Document |

\*     Filed herewith.

\*\*     Furnished herewith.

†     Management Contract or Compensatory Plan or Arrangement

155

A1685

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized.

ENVIVA PARTNERS, LP

By:  Enviva Partners GP, LLC, its general partner

Date: February 22, 2018

By: /s/ John K. Keppler
John K. Keppler
Title: *Chairman, President and Chief Executive Officer*

156

A1686

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints each of William H. Schmidt, Jr. and Stephen F. Reeves as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, for him and in his name, place, and stead, in any and all capacities, to sign any and all amendments to this Annual Report, and to file the same, with all exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, and each of them, or their or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Name | Title | Date |
| --- | --- | --- |
| /s/ JOHN K. KEPPLER<br>John K. Keppler | Chairman, President and Chief Executive Officer (Principal Executive Officer) | February 22, 2018 |
| /s/ STEPHEN F. REEVES<br>Stephen F. Reeves | Executive Vice President and Chief Financial Officer (Principal Financial Officer) | February 22, 2018 |
| /s/ JAMES P. GERAGHTY<br>James P. Geraghty | Vice President and Controller (Principal Accounting Officer) | February 22, 2018 |
| /s/ MICHAEL B. HOFFMAN<br>Michael B. Hoffman | Director | February 22, 2018 |
| /s/ RALPH ALEXANDER<br>Ralph Alexander | Director | February 22, 2018 |
| /s/ CARL L. WILLIAMS<br>Carl L. Williams | Director | February 22, 2018 |
| /s/ ROBIN J. A. DUGGAN<br>Robin J. A. Duggan | Director | February 22, 2018 |
| /s/ JOHN C. BUMGARNER, JR.<br>John C. Bumgarner, Jr. | Director | February 22, 2018 |
| /s/ WILLIAM K. REILLY<br>William K. Reilly | Director | February 22, 2018 |
| /s/ JANET S. WONG<br>Janet S. Wong | Director | February 22, 2018 |
| /s/ CHRISTOPHER B. HUNT<br>Christopher B. Hunt | Director | February 22, 2018 |
| /s/ GARY L. WHITLOCK<br>Gary L. Whitlock | Director | February 22, 2018 |

157

A1687

Exhibit 10.20

**EXECUTION VERSION**

# TERMINAL SERVICES AGREEMENT

## by and between

## ENVIVA PORT OF WILMINGTON, LLC

## and

## ENVIVA, LP

# Dated:  December 14, 2016

A1688

**TABLE OF CONTENTS**

**Section 1.    Definitions**                                                                1

**Section 2.    Term**                                                                       6

**Section 3.    Terminal Services; Shipment Commitment**                                     6
   3.1    Terminal Services                                                    6
   3.2    Shipment Commitment                                                  6

**Section 4.    Fees; Invoices and Payments**                                                6
   4.1    Terminal Services Fee; Included Services                             6
   4.2    Payment of Terminal Services Fee; Escalation                         7
   4.3    Taxes and Other Charges                                              7
   4.4    Monthly Statements and Invoices                                      8
   4.5    Payment of Fees                                                      8
   4.6    Records and Audits                                                   8
   4.7    Inventory Accounting                                                 8
   4.8    Shrinkage                                                            9

**Section 5.    Operations; Deliveries; Loading**                                            9
   5.1    Inbound Railcar Deliveries                                           9
   5.2    Inbound Truck Deliveries                                             9
   5.3    Use of Berth                                                         10
   5.4    Notification of Arrival of Vessels                                   10
   5.5    Vessels                                                              10
   5.6    Demurrage                                                            10
   5.7    Compliance                                                           11
   5.8    Filings, Disclosure and Reports                                      11
   5.9    Berth Operating Hours                                                11
   5.10   Terminal Maintenance                                                 11
   5.11   Credentials                                                          11
   5.12   Minimum Rate of Loading Requirements; Despatch                       11
   5.13   Limitation of Services                                               12
   5.14   Required Improvements                                                12
   5.15   Ownership of Equipment                                               12
   5.16   Title                                                                12

**Section 6.    Biomass Quality Standards; Measurement**                                     12
   6.1    Quality Requirements                                                 12
   6.2    Deliveries Not Meeting Quality Requirements                          13
   6.3    Commingling                                                          13
   6.4    Biomass Loss or Damage                                               13
   6.5    Measurement                                                          14

A1689

**Section 7.    Consequential Damages Waiver**                                    **14**

**Section 8.    Force Majeure Event**                                             **14**
  8.1      General                                                      14
  8.2      Notice                                                       14
  8.3      Make-up                                                      15
  8.4      Termination                                                  15

**Section 9.    Inspection of and Access to Terminal**                           **15**
  9.1      Inspections                                                  15
  9.2      Nature of Access Right                                       15

**Section 10.   Assignment**                                                     **16**
  10.1     Assignment Generally                                         16
  10.2     Permitted Assignments                                        16

**Section 11.   Compliance with Law and Safety**                                 **16**

**Section 12.   Default, Termination and Other Remedies**                        **17**
  12.1     Customer Default                                             17
  12.2     Owner Remedies for Customer Default                          17
  12.3     Owner Default                                                17
  12.4     Customer Remedies for Owner Default                          18
  12.5     Remedies of Each Party Generally                             18
  12.6     Lien on Biomass                                              18

**Section 13.   Insurance**                                                      **19**
  13.1     Customer's Required Insurance                                19
  13.2     Customer Certificates of Insurance; Notification of Changes or Lapse    19
  13.3     Owner's Required Insurance                                   19
  13.4     Owner Certificates of Insurance; Notification of Changes or Lapse    20
  13.5     Reports of Accidents and Injuries                            20
  13.6     Application of Insurance Proceeds                            20

**Section 14.   Indemnity and Liability**                                        **20**
  14.1     Indemnification of Customer Group                            20
  14.2     Indemnification of Owner Group                               21
  14.3     Notice; Procedure                                            21

**Section 15.   Other Representations, Warranties and Covenants**                **21**

**Section 16.   Miscellaneous**                                                  **22**
  16.1     Notices                                                      22
  16.2     Interpretation                                               23
  16.3     Amendment                                                    23
  16.4     Severability of Provisions                                   23
  16.5     Entire Agreement                                             24
  16.6     Counterparts; Electronic Signatures                          24

A1690

16.7     Third Parties                                                                24
16.8     Non-Recourse                                                             24
16.9     Attorneys' Fees                                                          24
16.10    No Waiver                                                                 24
16.11    No Agency                                                                24
16.12    Governing Law                                                         24
16.13    Dispute Resolution                                                 25

**Section 17.   Confidentiality**                                         **25**
17.1     Confidentiality                                                        25
17.2     Confidentiality Carve-outs                                      26
17.3     Securities Filings                                                    26
17.4     Press Releases                                                        26

**Exhibit A COMMERCIAL DETAILS**                               **A-1**

**Exhibit B MARINE NOMINATIONS AND SCHEDULING**    **B-1**

**Exhibit C SPECIFICATIONS**                                          **C-1**

- iii -

A1691

**TERMINAL SERVICES AGREEMENT**

This Terminal Services Agreement (this " Agreement ") is made effective this 14th day of December, 2016 (" Effective Date ") by and between Enviva Port of Wilmington, LLC, a Delaware limited liability company (" Owner "), and Enviva, LP, a Delaware limited partnership (" Customer "), sometimes referred to individually as " Party " and collectively as " Parties ."  In consideration of the mutual promises contained in this Agreement, the Parties agree to the following terms and conditions relating to the provision of marine terminal services related to the Biomass (as hereinafter defined).

### RECITALS

A.        Owner operates a wood pellet export facility located within the marine terminal under the jurisdiction of the North Carolina State Ports Authority (the " Port Authority ") in Wilmington, North Carolina (the " Terminal ") for the receipt, discharge and loading of Biomass for export by ocean-going vessel.

B.        Customer is in the business of processing, purchasing and selling Biomass.

C.        Owner and Customer desire to enter into this Agreement to memorialize the terms and conditions whereby Customer will deliver, or cause to be delivered, Biomass to the Terminal for the receipt, discharge and loading for export by ocean-going vessels, and Owner will provide such services for Customer, on and subject to the terms and conditions of this Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, Owner and Customer agree as follows:

### AGREEMENT

**Section 1.**        **Definitions** .  In this Agreement, unless the context requires otherwise, the terms defined in the preamble have the meanings indicated and the following terms will have the meanings indicated below:

" Affected Party " has the meaning indicated in Section 8.1 .

" Affiliate " means, with respect to any Person, any other Person that is directly or indirectly controlling, controlled by or under common control with, such Person; provided , that for purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting interests, by contract or otherwise, and "controlling", "controlled by" and "under common control with" have corresponding meanings.

" Agent " means any contractor, agent, employee or other representative accessing the Terminal in connection with this Agreement on behalf of, at the request of or for the benefit of Customer.

A1692

" Bankrupt " means with respect to any Person, such Person (a) files a petition or otherwise commences, authorizes or acquiesces in the commencement of a proceeding or cause of action under any bankruptcy, insolvency, reorganization or similar Law; (b) has any such petition, action or proceeding filed or commenced against it and such petition, action or proceeding is not stayed or dismissed within sixty (60) Days after filing; (c) makes an assignment or any general arrangement for the benefit of creditors; (d) otherwise becomes insolvent; (e) has a liquidator, administrator, receiver, trustee, conservator or similar official appointed with respect to it or any substantial portion of its property or assets; or (f) is generally unable to pay its debts as they become due.

" Base Index " has the meaning indicated in Section 4.2(b) .

" Berth " has the meaning set forth in the Operation and Services Agreement.

" Biomass " means free-flowing wood pellets comprised of wood fiber from pulpwood, timber harvest byproducts, and industrial residuals.

" Business Day " means any Day that is not a Saturday, a Sunday or any other Day on which banks in the State of New York are permitted to close.

" Charter " means a contract whereby an owner or operator of a Vessel contracts with Customer for the transportation of one or more Shipments.

" Claims " means claims, demands, suits, or causes of action, whether at law or in equity, and whether based on statute, regulation, rule, ordinance, code or standard or on theories of contract, tort, strict liability or otherwise.

" Collateral " has the meaning indicated in Section 12.6(a) .

" Confidential Information " has the meaning indicated in Section 17.1 .

" Contract Year " means each twelve (12) month period commencing on January 1; provided , that the first Contract Year shall begin on the Effective Date and end on December 31, 2016.

" Current Index " has the meaning indicated in Section 4.2(b) .

" Customer Event of Default " has the meaning indicated in Section 12 .

" Customer Group " means, collectively, Customer, its parents and Affiliates, its Agents, and its and their respective managing members, general and limited partners, officers, directors, employees, and other representatives.

" Customer Notice of Termination " has the meaning indicated in Section 12.4 .

" Days " means the consecutive twenty-four (24) hour period beginning at the start of the hour ending 01:00 Eastern prevailing time on any calendar day and ending at the completion of the hour ending 24:00 Eastern prevailing time on such calendar day .

- 2 -

A1693

" <u>Default Interest Rate</u> " means, for any date, the lesser of (i) a per month rate of interest equal to one and one-half percent (1.5%) and (ii) the maximum rate permitted by Law.

" <u>Delivery Point</u> " means, with respect to any delivery of Biomass by rail, the railcar unloading facility at the Terminal or, with respect to any delivery of Biomass by truck, Owner's truck scale at the Terminal.

" <u>Domes</u> " means each of the concrete structures at the Terminal used to protect Biomass pending its being loaded onto Vessels for transportation from the Terminal in accordance herewith.

" <u>Event of Default</u> " means either a Customer Event of Default or an Owner Event of Default, as applicable.

" <u>Excluded Period</u> " has the meaning indicated in <u>Section 5.12</u> .

" <u>FIFO</u> " means the First-In-First-Out method for costing inventory, which method assumes that the first Biomass placed in inventory in a Dome is the first Biomass unloaded from such Dome.

" <u>Financing Party</u> " means any and all banks or other providers of capital to Owner or Customer.

" <u>FOB</u> " means "FOB" or "Free on Board" as defined in Incoterms 2010 as published by the International Chamber of Commerce.

" <u>Force Majeure Event</u> " has the meaning set forth in <u>Section 8.1</u> .

" <u>Good Industry Practices</u> " means using the standards, practices, methods and procedures and exercising the degree of skill, care, diligence, prudence and foresight that would be expected to be observed by a skilled and experienced operator in carrying out activities the same as or similar to the Terminal Services under the same or similar circumstances as those contemplated by this Agreement.

" <u>Governmental Entity</u> " means any national, regional, state, provincial, municipal or local authority (including the Port Authority), department, body, board, instrumentality, commission, corporation, branch, directorate, agency, ministry, court, tribunal, judicial authority, legislative body, administrative body, regulatory body, autonomous or quasi-autonomous entity or taxing authority or any political subdivision of any of the foregoing and any Person (whether autonomous or not) exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any of the foregoing entities, having jurisdiction over the Person or matter in question.

" <u>Indemnified Party</u> " has the meaning indicated in <u>Section 14.3</u> .

" <u>Indemnifying Party</u> " has the meaning indicated in <u>Section 14.3</u> .

" <u>Index</u> " has the meaning indicated in <u>Section 4.2(b)</u> .

" <u>Indirect Taxes</u> " has the meaning indicated in <u>Section 4.3</u> .

A1694

" Interest Rate " means, for any date, the lesser of (i) the per annum rate of interest equal to the prime lending rate as may from time to time be published in *The Wall Street Journal* under "Money Rates" on such Day (or if not published on such Day on the most recent preceding Day on which published), plus one percent (1%) and (ii) the maximum rate permitted by Law.

" Laws " means all statutes, laws, ordinances, rules, regulations, permits, authorizations, codes, decrees, judgments, proclamations, injunctions, constitutions, decisions, orders and directives of the applicable Governmental Entity, in each case applicable to the relevant Party, the Terminal Services, the Terminal, the Berth or the location of the performance of the obligations hereunder.

" Laycan " means the defined period during which Customer must tender a Notice of Readiness to Owner that the Vessel has arrived at the anchorage or customary place of waiting and is in all regards ready to commence loading.

" Losses " means any and all losses, liabilities, fines, penalties, damages, costs and injuries, including the costs of settlements, litigation, arbitration, judgments and expenses and documented attorneys' fees (including documented attorneys' fees and litigation expenses in establishing the right to indemnity hereunder).

" Market Price " means, for purposes of Section 6.4 , at the sole option and risk of Customer, either (a) the reasonable and documented price actually paid or received by Customer to procure or sell, as the case may be, wood pellets of similar quality and quantity; or (b) the market price for the relevant date as determined by averaging the market prices from the relevant market indices for wood pellets of similar quality delivered CIF to Antwerp, Belgium, or Rotterdam or Amsterdam, Netherlands, with equitable adjustments to such indices to conform to this Agreement, including by eliminating the built-in cost components of such indices inapplicable to the relevant Biomass, including oceangoing freight costs, loading and storage costs, and truck or rail freight costs, as applicable. An index must exhibit a minimum liquidity threshold as determined by completion of at least four (4) transactions of at least twenty-five thousand (25,000) MT per week to be used in determining the Market Price. Where there are not at least two (2) relevant indices for the relevant date or where wood pellets of similar quality are not available in the market, the market price may be determined or augmented, as the case may be, based upon the price at which Customer would be able to sell or purchase, as the case may be, the quantity of wood pellets in the market acting in a reasonable manner as determined by taking the average of price quotations for wood pellets of similar quality and quantity as of the relevant date from at least two (2) and no more than three (3) independent internationally recognized dealers/brokers or counterparties (such dealers/brokers or counterparties to be appointed by Customer).

" Master " means the captain of the relevant Vessel.

" Month " means each full calendar month during the Term of this Agreement.

" Non-Affected Party " has the meaning indicated in Section 8.1 .

" Notice of Readiness " or " NOR " means a notice of readiness tendered by a Master confirming a Vessel's arrival at the anchorage or customary place of waiting and readiness to load cargo.

- 4 -

" Office Hours " means the period between 09:00 and 17:00 hours Eastern prevailing time on a Business Day.

" Operation and Services Agreement " means the Operation and Services Agreement, dated as of September 12, 2013, by and between the Port Authority and Owner (as assignee of Enviva Holdings, LP).

" Owner Event of Default " has the meaning indicated in Section 12 .

" Owner Group " means, collectively, Owner, its parents and Affiliates, and its and their respective managing members, general and limited partners, officers, directors, employees, agents, and other representatives, including Enviva Management Company, LLC in its capacity as the contract operator of Owner's assets.

" Owner Notice of Termination " has the meaning indicated in Section 12.2 .

" Person " means any natural person, trustee, corporation, general partnership, limited partnership, limited liability company, joint stock company, trust, unincorporated organization, bank, business association, firm, joint venture, Governmental Entity, company or other entity.

" Port Authority " has the meaning set forth in the recitals.

" Railroad " means any common rail carrier with lines and track providing inbound railroad transportation to the Terminal, including CSX Transportation, Inc. and the Wilmington Terminal Railroad, Limited Partnership, a short line freight railroad.

" Required Vessel Specifications " has the meaning indicated in Section 5.5 .

" Rules " has the meaning indicated in Section 16.13 .

" Shipment " means a consignment of Biomass loaded onto Vessel(s).

" Source Plants " means the wood pellet biomass production facility located in Sampson County, North Carolina and the wood pellet biomass production facility located in Hamlet, North Carolina, in each case, to the extent such facility is then owned and operated by Customer or one of its Subsidiaries.

" Specifications " has the meaning indicated in Section 3.1 .

" Subsidiary " means, with respect to any Person, any Person that is controlled by such Person.  As used in this definition, "control" and its derivatives with respect to any Person mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting interests, by contract or otherwise.

" Super Holidays " has the meaning indicated in Section 5.9 .

" Term " has the meaning indicated in Section 2 .

- 5 -

A1696

" Terminal " has the meaning set forth in the recitals.

" Terminal Services " has the meaning indicated in Section 3.1 .

" Terminal Services Fee " has the meaning indicated in Section 4.1 .

" Vessel " means any bulk carrier or barge (including any attending tug or towboat), or other watercraft that is capable of receiving Biomass at the Terminal on behalf of, at the request of, or for the benefit of Customer.

" Weather Working Day " means a day for which vessel operations is normally conducted at a port without the interference of inclement weather.

Section 2.      **Term** .  This Agreement is effective from the Effective Date, and shall continue in full force and effect until the termination of the Operation and Services Agreement (the " Term "), unless earlier terminated in accordance with the express provisions of this Agreement.  This Agreement shall terminate automatically at such time (if any) at which Customer ceases to own any interest in, directly or indirectly, any Source Plant.

Section 3.      **Terminal Services; Shipment Commitment** .

3.1      Terminal Services .  Owner will make its loading and unloading facilities at the Terminal available for the receipt and handling of Biomass that conforms to the specifications and sustainability criteria set forth on Exhibit C (collectively, the " Specifications ").  Owner may allocate use of the Terminal facilities among its customers, including Affiliates, at its discretion, which it shall exercise in a reasonable manner.  Subject to Owner's rights to suspend hereunder in accordance with Exhibit B hereto, Owner agrees to perform the following services for Customer at the Terminal: (i) coordination of inbound Biomass-loaded railcars and trucks to, and the outbound dispatch of railcars and coordination of outbound trucks from, the Terminal; (ii) receipt of Biomass by railcar or truck at the Delivery Point, (iii) the temporary receipt, storage, and handling of Biomass at the Terminal in connection with the offloading of railcars and trucks and pending the redelivery of same onto Vessels designated by Customer; (iv) the re-delivering and loading of Biomass at the Berth onto Vessels designated by Customer; (v) such regulatory compliance reporting that Owner is required to perform as the Terminal operator; and (vi) such other services, including those set forth in Exhibit B hereto, expressly set forth herein (collectively, the " Terminal Services ").  All Terminal Services performed hereunder by Owner shall be performed in a commercially reasonable manner consistent with Good Industry Practices and in compliance with Laws.  For the avoidance of doubt, Terminal Services shall not include making arrangements for the transportation of Biomass by Vessel, for which, as between the Parties, Customer shall be solely responsible to make at its own cost.

A1697

3.2     <u>Shipment Commitment</u> .  Customer shall cause all Biomass produced from the Source Plant(s) to be delivered into the Terminal.

**Section 4.     <u>Fees; Invoices and Payments</u> .**

4.1     <u>Terminal Services Fee; Included Services</u> .  The fee for Terminal Services shall be invoiced at $14.00 per metric ton of Customer's Biomass that is received by Owner at the Delivery Point (such fee, as discounted or escalated in accordance with <u>Section 4.2(b)</u> , the " <u>Terminal Services Fee</u> ").  Each of Owner and Customer hereby acknowledges and agrees that, except as expressly set forth in this <u>Section 4.1</u> , the Terminal Services Fee constitutes payment for all Terminal Services.  Notwithstanding the foregoing, Customer or its Agents, as applicable, shall be obligated to pay all additional dockage and security fees imposed by the Port Authority in connection with the use of the Terminal or the Berth by any Vessel, as the same are incurred by Customer or its Agents, as applicable.  The Terminal and the Berth are within the jurisdiction of the Port Authority.  Customer and its Vessels may be subject to the applicable rules and fees issued by the Port Authority, including any of its tariffs, as same may be amended or revised from time to time.  Accordingly, Customer and its Vessel are subject to any such applicable rules issued and fees required by the Port Authority, independent and apart from, and in addition to, Customer's obligations to Owner under this Agreement.

4.2     <u>Payment of Terminal Services Fee; Escalation</u> .

(a)     Customer agrees to utilize, or pay for, the Terminal Services as contemplated by this Agreement as outlined in this <u>Section 4.2</u> .

(b)     The Terminal Services Fee will automatically adjust annually, beginning on January 1, 2015, and on January 1 of each year thereafter, to reflect the rate of increase, if any, in the Chained Consumer Price Index for All Urban Consumers (C-CPI-U), all items, U.S. city average, as published by the Bureau of Labor Statistics (the " <u>Index</u> "), and the Terminal Services Fee as so adjusted shall in each case be effective for the subsequent twelve (12) month period; <u>provided</u> ,   <u>however</u> that the Terminal Services Fee for the twenty-four (24) month period beginning on the Effective Date shall be discounted by $4 per metric ton of Customer's Biomass that is received by Owner at the Delivery Point during such period. For purposes of such adjustments, the " <u>Base Index</u> " shall be the Index for the month immediately preceding the month in which the Effective Date occurs and the " <u>Current Index</u> " shall be the Index for the last month of the prior Contract Year.  The percentage change from the Base Index to the Current Index will be calculated to the third decimal place and applied to the Terminal Services Fee to determine the change to the Terminal Services Fee in accordance with the following formula; <u>provided</u> , that in no event shall the operation of this <u>Section 4.2(b)</u> result in a reduction in any charges applicable during any period beginning on or after January 1, 2015 as compared with the charges that were applicable at any time prior to such period:

- 7 -

((Current Index - Base Index)/Base Index) * Terminal Services Fee = Change to Terminal Services Fee

In the event the Bureau of Labor Statistics no longer keeps or publishes the Index, the Parties agree to establish an alternative method of adjusting the Terminal Services Fee based on a currently published U.S. Government index that reflects changes in the prices paid by urban consumers for a representative basket of goods and services.

4.3     Taxes and Other Charges . In consideration of Owner's agreement to provide Terminal Services to Customer hereunder, in addition to the other amounts owed to Owner hereunder, Customer shall be responsible for, and shall indemnify, defend and hold harmless Owner against, all taxes, assessments and fees, including ad valorem taxes, now or in the future assessed against the Biomass and the provision of Terminal Services, including any sales and use tax (collectively, " Indirect Taxes "). Customer further agrees to provide proper documentation for all claimed exemptions to Indirect Taxes.

4.4     Monthly Statements and Invoices . Within ten (10) Days following the end of each Month during the Term of this Agreement, Owner will submit to Customer a statement recording the volume of Customer's Biomass received at the Delivery Point during the preceding Month, together with an invoice for the Terminal Services Fee and Indirect Taxes for the preceding Month. This Monthly statement and invoice will be mailed or sent by facsimile to Customer at the address indicated in Exhibit A . Each such Monthly statement will include, in addition to the identity and volume of Biomass, (i) a consecutive number, (ii) date of issuance, and (iii) a reference to the rate of Terminal Services Fee included in this Agreement.

4.5     Payment of Fees . The Terminal Services Fee and Indirect Taxes reflected in Owner's invoices are due and payable within ten (10) Business Days after the date of receipt of Owner's invoice by Customer. A Party may, in good faith, dispute the correctness of any invoice or any adjustment to an invoice rendered under this Agreement, or adjust any invoice for any arithmetic or computational error. Neither Party may dispute or adjust any invoice delivered more than twelve (12) months from the date of delivery of such invoice. In the event an invoice or portion thereof, or any other claim or adjustment arising hereunder, is disputed, payment of the undisputed portion of the invoice shall be required to be made when due. Any invoice dispute or invoice adjustment shall be in writing and shall state the basis for the dispute or adjustment. Payment of the disputed amount shall not be required until the dispute is resolved. Upon resolution of the dispute, any required payment shall be made within five (5) Business Days after such resolution along with interest accrued at the Interest Rate from and including the due date to but excluding the date paid. Any overpayments shall, at the option of the Party making the overpayment, be returned upon request or deducted by the Party receiving such overpayment from subsequent payments, with interest accrued at the Interest Rate from and including the date of such overpayment to but excluding the date repaid or deducted by the Party receiving such overpayment. Any dispute with respect to an invoice is

- 8 -

A1699

waived unless the other Party is timely notified of such dispute in accordance with this Section 4.5 . Any overdue amount hereunder not disputed in good faith in accordance with this Section 4.5 shall bear interest at the Default Interest Rate from and including the date due to but excluding the date paid.

4.6     Records and Audits . During the Term and for up to one (1) year after the end of the Term, Customer may, at its own expense, during Office Hours and upon reasonable advance notice so as to not unreasonably interfere with the Terminal's or Owner's normal business operations, inspect, copy and audit, to the extent each of the following is relevant to Owner's obligations hereunder, Owner's books, records, accounts, ledgers, schedules, correspondence and any other documents. Customer shall reimburse reasonable and documented out-of-pocket costs incurred by Owner in connection with this Section 4.6 . Owner shall reasonably cooperate with Customer and shall provide such information as may be reasonably requested by Customer under this Section 4.6 .

4.7     Inventory Accounting . The Parties agree to follow Owner's inventory accounting policies on a per Dome basis with respect to FOB deliveries of Biomass terminaled hereunder to any customers of Customer, which may vary by Dome and shall be FIFO unless Customer is notified otherwise.

4.8     Shrinkage . Given the nature of terminal operations and the varying temperatures, Vessel configurations and other factors affecting the volume and other attributes of Biomass as it is offloaded from railcars and trucks, handled through the Terminal, and subsequently loaded onto Vessels, Customer agrees that the Biomass will be subject to shrinkage. Following Customer's request for such calculation to the extent commercially reasonable and in any event at least once per Contract Year, Owner shall calculate the total rate of shrinkage of all Biomass in storage since the last such measurement was taken for purposes of this Agreement. Such calculation shall be made by dividing the tonnage loaded onto Vessels since the last such measurement was taken for purposes of this Agreement by the weight of all deliveries of Biomass by railcar and truck to the Delivery Point during the same period as measured upon arrival of such railcars and trucks. Customer shall bear its pro rata portion of any shrinkage based upon the weight of its Shipments during each such calculation period; provided , that Owner shall bear the risk of any shrinkage in excess of one percent (1.0%) of the weight of all deliveries of Biomass to the Delivery Point.

- 9 -

A1700

**Section 5.**        **Operations; Deliveries; Loading** .

5.1      Inbound Railcar Deliveries .

(a)        Customer understands and agrees that Owner has no control over the performance of the Railroad, including, but not limited to, railcar switching frequency, and that Owner shall not be responsible for the same.

(b)        Owner guarantees to Customer a minimum available railcar unloading rate at the Terminal of 400 metric tons per hour, Weather Working Day, Saturdays, Sundays, Holidays included (WWDSSHINC), excluding Super Holidays and subject to the Railroad's frequency of switching and Force Majeure Events.

(c)        Prior to railcars being picked up by the Railroad, Customer shall provide electronically, via a Microsoft Excel spreadsheet or other reasonably acceptable format, to Owner the railcar identification number and the corresponding empty weight, full weight, and volume for each railcar unloaded.

(d)        Owner will be under no obligation to make any arrangements with, or pay any fees to, the Railroad with respect to the transportation of railcars to or from the Terminal.  Customer will be solely responsible for making arrangements with, entering into any necessary agreement with, and the payment for any services due to the Railroad with respect to the transportation of railcars to and from the Terminal.  Customer will issue orders pertaining to railcars to both the Railroad and Owner simultaneously.

5.2      Inbound Truck Deliveries .

(a)        Customer understands and agrees that Owner has no control over the performance of any trucking company delivering Biomass to the Terminal and that Owner shall not be responsible for the same.

(b)        Owner guarantees to Customer a minimum truck unloading rate at the Terminal of 300 metric tons per hour, Weather Working Day, Saturdays, Sundays, Holidays included (WWDSSHINC), excluding Super Holidays and subject to Force Majeure Events.

(c)        Owner will be under no obligation to make any arrangements with, or pay any fees to, any trucking company or otherwise with respect to the transportation of trucks to or from the Terminal.  Customer will be solely responsible for making arrangements with, entering into any necessary agreement with, and the payment for any services due to trucking companies with respect to the transportation of trucks to and from the Terminal.  Owner shall provide a safe weighing and unloading area and use commercially reasonable efforts to maintain an efficient traffic flow at the Delivery Point.

- 10 -

A1701

(d)       Owner shall ensure that its truck weighing scales at the Delivery Point have been certified no less frequently than once every twelve (12) months in accordance with applicable Laws and that any operators of Owner's scales are bonded weight masters.

5.3       Use of Berth .  Customer shall have non-exclusive use of the Berth from and after the Effective Date throughout the Term.  Owner shall use due diligence to make the Berth safe and capable of accommodating Vessels with mean draft, maximum length overall and maximum beam consistent with the Berth 's dimensions and depths; provided ,   however , that in the event of severe weather conditions, Owner's obligation to make the Berth available to Customer shall be limited in accordance with Good Industry Practice and applicable Laws.

5.4       Notification of Arrival of Vessels .  Customer must provide Owner with and maintain updated forecasts of scheduled arrivals of its Vessels at the Terminal, which forecasts must include details as to the quantity of Biomass to be loaded aboard such Vessels.  Customer must notify Owner of tentative Biomass Vessel loading dates reasonably in advance of anticipated Vessel loadings and of any revision of those dates as soon as practicable.

5.5       Vessels .  Customer shall nominate Vessels to load Biomass only if they fully comply with (or hold necessary waivers from) all applicable requirements of Law and comply with the requirements set forth in Exhibit A (the " Required Vessel Specifications ").  Each Vessel scheduled to load Biomass at the Berth must satisfy the requirements of the Required Vessel Specifications; provided , that Owner shall accept or reject any Vessel within one (1) Business Day of receiving such nomination and any other information required by the Required Vessel Specifications; and provided further, that Owner's acceptance of such Vessel shall not be unreasonably withheld.  In addition, Owner may screen any Vessel scheduled for loading at the Berth to ensure such Vessel is in compliance with the Required Vessel Specifications.  Customer shall indemnify Owner in accordance with Section 14.2 for any loss, cost or damage resulting from failure to comply with any of the Required Vessel Specifications.  Owner shall have the right to refuse to berth any Vessel or to order any Vessel to vacate the Berth if the presence or condition of any such Vessel, its cargo or its crew shall in Owner's reasonable opinion threaten the safety of, or pose a hazard to, the Terminal, the Berth or the area surrounding the same or any Person or property thereon; provided , that Owner shall provide Customer written notice of any such refusal.

5.6       Demurrage .  In the event that demurrage is payable to the applicable owner or operator of any Vessel, pursuant to the applicable Charter, and such demurrage is attributable solely to delay caused by Owner's breach of its obligations pursuant to Section 5.12 of this Agreement, then Owner shall reimburse Customer for the amount of such demurrage paid to the applicable owner or operator with respect to the delayed Vessel; provided , that the cost of demurrage shall not exceed $15,000 per day.  In all other cases, Customer shall be responsible for and shall pay demurrage to the applicable owner or operator of any Vessel in connection with this Agreement.

- 11 -

5.7     Compliance .  Customer will provide Owner with any information, documentation, or other materials as required by Law for the unloading or loading of Biomass.

5.8     Filings, Disclosure and Reports .  Each Party acknowledges that the other Party may have an obligation under Law to disclose information regarding Biomass to Governmental Authorities, parties handling Biomass, parties exposed to Biomass, and to the general public, and each Party will promptly upon the request of any such obligated Party provide such Party with any information required by Law for such disclosures.  Each Party will prepare, file and maintain copies of all reports required by Law to be filed with any federal, state or local Governmental Entity concerning such Party's activities under this Agreement and each Party will promptly provide a copy of any such reports to the other Party upon request.

5.9     Berth Operating Hours .  The Berth shall be in operation for the loading of Biomass twenty-four (24) hours a Day, seven (7) Days a week, and every Day during the applicable year, except on Christmas Day, Thanksgiving Day, Labor Day, Independence Day, and New Year's Day (collectively, " Super Holidays ").  Subject to the terms and conditions of Section 5.10 , Owner may take the Berth, or any portion or part thereof, out of service during the Term in order to perform routine dredging, restoration, inspections, maintenance or repairs.

5.10    Terminal Maintenance .  Owner may take any facility or equipment at the Terminal, or any portion or part thereof, out of service during the Term in order to perform inspections, maintenance, or repairs.  Except for any emergency in which providing advance notice is not practicable, Owner will provide Customer with at least thirty-five (35) days prior written notice of any such scheduled maintenance that may impact any Terminal Services hereunder.  On or before December 1st of each year during the remaining term following the Effective Date, Owner will provide Customer a non-binding schedule reflecting planned maintenance for the upcoming calendar year and shall provide Customer updates from time to time based on any changes to such schedule.

5.11    Credentials .  Owner will require each of Customer's carriers and contractors to execute an access agreement and, if applicable, require each employee or invitee of any such carrier or contractor to produce a valid Transportation Worker Identification Credential (TWIC) card to the extent required under Law prior to entering the Terminal and unloading or loading Biomass.

5.12    Minimum Rate of Loading Requirements; Despatch .  Owner will provide equipment and facilities reasonably necessary for the loading of Biomass at the minimum rate of 18,000 metric tons per Weather Working Day, Saturdays, Sundays, Holidays included (WWDSSHINC), excluding Super Holidays (or such other loading

- 12 -

A1703

rate as may be otherwise agreed to in writing by the Parties), subject to any Vessel limitations, and, in addition, excluding the following periods:  the time taken from anchorage to the discharge berth(s), the time taken for ballasting or deballasting unless discharge is possible while maintaining the stipulated minimum rate, the time lost due to any cause attributable to the Vessel, her master, her crew or owners, that affects the working or berthing of the Vessel, the period of delay caused by any Force Majeure Event(s), any weather related delay affecting the safe loading of the Biomass in a dry condition as required, the period of stoppage of loading activities by stevedores due to strike, time taken due to disputes between master and men occasioning a stoppage of stevedores, Vessel crew, pilots or other workmen essential to the movement, working or unloading of the Vessel or the period of physical inability by the Vessel to load the cargo, including but not limited to ballasting or deballasting capacity, and each period during which such minimum rate cannot be maintained due to (i) Customer's Biomass failing to meet the Specifications, (ii) Customer's failure to deliver sufficient volumes of Biomass, or (iii) any action or omission of Customer or any third party not within Owner's control (each such excluded period, including Super Holidays, an " Excluded Period "). If Owner's actual loading rate is less than such applicable minimum rate during any Excluded Period or as a result of Vessel limitations, then, in such event, Owner will have no liability for demurrage.  Customer shall be liable to pay Owner for despatch at a per diem rate (or pro-rated portion thereof) equal to fifty percent (50%) of the demurrage rate applicable to the applicable Vessel in the event that Owner loads (or causes the loading of) Biomass onto a Vessel at a rate greater than 18,000 metric tons per Weather Working Day, Saturdays, Sundays, Holidays included (WWDSSHINC), excluding Super Holidays (or such other loading rate as may be otherwise agreed to in writing by the Parties), subject to any Vessel limitations and excluding Excluded Periods.  For the avoidance of doubt, such despatch payment obligations shall accrue to the extent such minimum rate is exceeded even if the related loading occurs (at Owner's sole discretion) during any Excluded Period.

5.13    Limitation of Services .  The Terminal Services hereunder are being provided to Customer only with respect to the Biomass and no other products.

5.14    Required Improvements .  Owner shall perform routine maintenance and repair of the Terminal in accordance with Good Industry Practices, but will not be required to make any improvements, alterations or additions to the Terminal.

5.15    Ownership of Equipment .  All fixtures, equipment and appurtenances attached to the Terminal are and shall remain the property of Owner or the Port Authority, as applicable.

5.16    Title .  Subject to Section 12.6 , title to the Biomass handled hereunder shall always remain with Customer.  Notwithstanding anything to the contrary herein, title to the Biomass shall in no event pass to Owner at any time under or pursuant to this Agreement.  Owner shall be deemed to have custody of the Biomass from the time it passes from the delivery facilities of the railcars or trucks

- 13 -

A1704

into Owner's receiving facilities and until it passes from the delivery facilities of Owner into the receiving facilities of a Vessel.

**Section 6.        Biomass Quality Standards; Measurement** .

6.1        Quality Requirements . Customer represents and warrants to Owner that all Biomass tendered by or for the account of Customer for Terminal Services will conform to the Specifications. Owner will not be obligated to load or unload Biomass that fails to meet the Specifications at the time tendered by Customer, but, to the extent that Owner loads or unloads Biomass that fails to meet the Specifications, in no event will Owner have any liability whatsoever for loading or unloading such Biomass. Owner may, upon prior written notice to Customer, impose other limitations on the Biomass delivered to the Terminal in order to (a) comply with applicable Laws, (b) protect health and safety, and (c) protect the premises, equipment or facilities at the Terminal.

6.2        Deliveries Not Meeting Quality Requirements . Owner may rely upon the representations of Customer set forth below as to Biomass quality. In the event that Customer knows, or has reason to believe, that any Biomass tendered to Owner does not conform with the Specifications when tendered, it shall be the responsibility of Customer to notify Owner to such effect as soon as reasonably possible, whereupon Owner may elect to refuse tender, or, if Owner has already received such Biomass into the Terminal, cause Customer to take redelivery or otherwise dispose of the nonconforming Biomass, at Customer's expense. Owner shall also have the right, without prejudice to any other remedy available to Owner, to reject and return to Customer any quantities of Biomass that fail to meet the Specifications, even after receipt by Owner. Notwithstanding anything in this Agreement to the contrary, Customer shall be responsible for, and shall indemnify and hold harmless the Owner Group from and against, any Claims, including damage to the biomass of others and all documented costs resulting from any Biomass received at the Terminal for Customer's account that does not conform to the Specifications.

6.3        Commingling . Customer acknowledges and agrees that, in connection with the Terminal Services, its Biomass may be commingled or intermixed with other, similar biomass at the Terminal within the Specifications. Owner is not obligated to redeliver the identical Biomass (or Biomass matching any identical specifications) delivered by Customer into the Terminal.

6.4        Biomass Loss or Damage . Subject to Section 4.8 , Owner will not be liable to Customer for any contamination, damage, degradation, misdelivery or loss of Biomass, unless and only to the extent such contamination, damage, degradation, misdelivery or loss results from Owner's negligence. If Customer desires to protect any Biomass against insurable losses relating to contamination, damage, degradation, misdelivery or loss other than as may be attributable to Owner's gross

- 14 -

A1705

negligence, Customer may secure insurance at its own cost and expense.  Customer must make any claims against Owner for such contamination, damage, degradation, misdelivery or loss of Biomass by notice to Owner within ninety (90) Days after the date that Customer becomes aware of such contamination, damage, degradation, misdelivery or loss, and Customer irrevocably waives any claim for which the required notice is not provided within such required time.  **NOTWITHSTANDING ANY PROVISION IN THIS AGREEMENT TO THE CONTRARY, OWNER'S LIABILITY ARISING OUT OF CONTAMINATION, DAMAGE, DEGRADATION, MISDELIVERY OR LOSS OF BIOMASS SHALL NEVER IN ANY EVENT EXCEED AN AMOUNT EQUAL TO (i) THE MARKET PRICE OF THE CONTAMINATED, DAMAGED, DEGRADED, MISDELIVERED OR LOST BIOMASS, LESS (ii) THE SALVAGE VALUE, IF ANY, OF THE CONTAMINATED, DAMAGED, DEGRADED, MISDELIVERED OR LOST BIOMASS, AND OWNER SHALL NOT IN ANY EVENT BE RESPONSIBLE OR LIABLE FOR ANY CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO, LOSS OF REVENUES OR LOSS OF BUSINESS, NOR FOR PUNITIVE OR EXEMPLARY DAMAGES, NO MATTER HOW SUCH CONTAMINATION, DAMAGE, DEGRADATION, MISDELIVERY OR LOSS OF BIOMASS SHALL HAVE OCCURRED OR BEEN CAUSED.**

6.5     Measurement .

(a)     The weight of each delivery of Biomass shall be determined upon arrival at the Delivery Point using scales maintained and operated in accordance with procedures reasonably acceptable to Owner and Customer and professionally certified at intervals of no less than six (6) months to be in conformity with the most current, industry accepted standard.

(b)     The weight of each Shipment shall be determined upon completion of loading.  Customer shall appoint an independent marine surveyor, at its own expense but on behalf of both Parties jointly, to conduct a draft survey and to issue a certificate to both Parties certifying the weight of the Shipment.  Shipments shall be in cargo lots of 30,000 metric tons +/-10%, at Customer's option, or such larger vessel sizes as the Parties may mutually agree in writing.

**Section 7.     Consequential Damages Waiver .  EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY BE LIABLE UNDER ANY CIRCUMSTANCES TO THE OTHER PARTY FOR SPECIAL, INDIRECT, PUNITIVE, INCIDENTAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES OR LOSSES, INCLUDING LOST PROFITS, LOSS OF BUSINESS OPPORTUNITY OR OTHER SIMILAR DAMAGES RESULTING FROM OR ARISING OUT OF THIS AGREEMENT, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE (EXCEPT WITH RESPECT TO INDEMNITY OBLIGATIONS FOR THIRD-PARTY CLAIMS AND LOSSES).**

- 15 -

A1706

**Section 8.**    **Force Majeure Event** .

8.1    General .   A Party is not responsible or liable for any delay or failure in the performance of its obligations under this Agreement to the extent such performance is prevented by a Force Majeure Event.  A " Force Majeure Event " is any event or circumstance that is beyond the control of, and occurs without the fault or negligence of, the Party claiming force majeure (the " Affected Party ", and the other Party being the " Non-Affected Party "), that could not reasonably have been avoided or overcome, and was not reasonably foreseeable.  A Force Majeure Event may include the following, to the extent that each satisfies the foregoing requirements: any act of God or the elements, earthquakes, floods, landslides, hurricanes, civil disturbances, sabotage, acts of public enemies, terrorism, war, blockades, insurrections, riots, epidemics, fires or explosions.  For the avoidance of doubt, a lack of funds, changes in market conditions, loss of markets, changes in market pricing, changes in Laws, or the availability of subsidies or inefficiencies in operations shall not constitute a Force Majeure Event.

8.2    Notice .   The Affected Party shall give the Non-Affected Party written notice within five (5) Days of the date on which the Affected Party becomes aware of the occurrence of a Force Majeure Event, describing the particulars and estimated duration of the Force Majeure Event and the proposed cure; provided ,   however , that failure to timely provide such notice shall not preclude the Affected Party from obtaining the relief contemplated in Section 8.1 as a result of a Force Majeure Event except to the extent that the Non-Affected Party would be materially and adversely affected as a result of the Affected Party's failure to timely deliver such notice.  Any suspension of performance as a result of a Force Majeure Event shall be of no greater scope and of no longer duration than is reasonably attributable to the Force Majeure Event; further, the Affected Party shall use commercially reasonable efforts to remedy its inability to perform its obligations under this Agreement, and shall promptly notify the Non-Affected Party when the Affected Party is able to resume performance of its obligations under this Agreement.

8.3    Make-up .   In addition to the Affected Party's obligations under Section 8.2 , the Parties may mutually agree to make-up resulting delays or deficiencies due to a Force Majeure Event through an adjustment, as necessary, to the Terminal Services Fee.

8.4    Termination .   Notwithstanding any other provision of this Section 8 , if a Force Majeure Event lasts for more than one hundred eighty (180) consecutive Days or for more than hundred eighty (180) Days in the aggregate during any twelve (12) month period, the Non-Affected Party may terminate this Agreement upon written notice to the Affected Party; provided ,   however , that such one hundred eighty (180) Day period, in either case, shall be extended by an additional ninety (90) Days if the Affected Party shall, prior to the expiration of such ninety (90) Day period, have submitted to the

- 16 -

A1707

Non-Affected Party a remedial action plan that sets forth a reasonably feasible course of repairs, improvements, changes to operations, or other actions that would permit the Affected Party to perform its obligations under this Agreement as soon as reasonably practicable and such Party pursues the remedial action plan in a commercially reasonable and diligent manner. Termination of this Agreement by a Party under this Section 8 shall be without liability to such Party; provided that such termination shall not affect any rights or obligations that may have accrued prior to such termination or that expressly or by implication are intended to survive termination, whether resulting from the event giving rise to the right to terminate or otherwise.

**Section 9.      Inspection of and Access to Terminal** .

9.1      Inspections . Subject to Customer meeting Owner's safety requirements and its other reasonable rules and regulations concerning activities in and around the Terminal, Owner grants to Customer and its inspectors and other Agents the right to enter the Terminal (a) for purposes of observing and verifying Owner's performance hereunder, and (b) during normal business hours and upon reasonable prior notice, for purposes of examination, testing and audit of any scale or other equipment, Terminal records pertaining to the loading of Biomass and Owner's operational procedures and practices from time to time, which rights under both clauses (a) and (b) will be exercised in a way that will not interfere with or diminish Owner's control over or its operation of the Terminal or the Berth and will be subject to reasonable rules and regulations from time to time promulgated by Owner.

9.2      Nature of Access Right . Customer acknowledges that any grant of the right of access to the Terminal or the Berth under this Agreement or under any document related to this Agreement is a grant of merely a license and conveys no interest in or to the Terminal or any part thereof.

**Section 10.   Assignment** .

10.1   Assignment Generally . Except as otherwise expressly provided in this Section 10 , neither Party may directly or indirectly assign its rights and obligations under this Agreement, in whole or in part, by operation of law or otherwise, without the prior written consent of the other Party (such consent not to be unreasonably withheld, conditioned or delayed), and any purported assignment made other than in accordance with this Section 10 shall be null and void *ab initio* .

- 17 -

10.2    Permitted Assignments . Notwithstanding Section 10.1 , the following are permitted, subject to the following terms and conditions:

(a)    collateral assignment by a Party to its Financing Parties, and further assignment by such Financing Parties following any foreclosure of their security interest in this Agreement, in which case neither such Party nor, following any post-foreclosure assignments, its Financing Parties shall have any liability with respect to the future performance of this Agreement;

(b)    assignment by a Party to an Affiliate of such Party; provided , however , that, in the case of any assignment by a Party to an Affiliate without the express consent of the other Party to such specific assignment, the assigning Party shall remain jointly and severally liable for the assigned obligations and shall notify the other Party of the assignment (and identify the name of, and notice address information for, such Affiliate), unless (i) in the case of an assignment by either Party, the assignment is made to the successor to all or substantially all of the assets of Owner or Customer, or (ii) in the case of an assignment by Customer, the assignment is made to a direct or indirect wholly-owned Subsidiary of Customer (or such successor), so long as the performance of all such Subsidiary's obligations under this Agreement is guaranteed by Customer (or such successor) under a guaranty that is in form and substance reasonably satisfactory to Owner; and

(c)    subcontracting and the assignment of rights and delegation of obligations by Owner (without relieving Owner of its obligations to Customer hereunder), including to (i) Enviva Management Company, LLC from time to time consistent with any Management Services Agreement between Enviva Management Company, LLC and Owner (or an Affiliate of Owner) under which Owner is a "Service Recipient" or (ii) the Port Authority in accordance with the Operation and Services Agreement.

**Section 11.    Compliance with Law and Safety** .  Customer warrants that the Biomass tendered by it is produced and transported, and Owner warrants that the Terminal and the Terminal Services provided by it under this Agreement are, in material compliance with all applicable Laws and the then-current version of *NFPA 664: Standard for the Prevention of Fires and Explosions in Wood Processing and Woodworking Facilities* or any successor publication.  Each Party also warrants that it may lawfully receive and handle the Biomass, and it will furnish to the other Party any evidence required to provide compliance with such Laws, and will file with governmental agencies any required reports evidencing such compliance with those Laws.

- 18 -

**Section 12.        Default, Termination and Other Remedies** .

12.1        <u>Customer Default</u> .    Each of the following shall be deemed an event of default by Customer hereunder (each, a " <u>Customer Event of Default</u> "):

(a)        Customer fails to perform any of its material obligations under this Agreement (not otherwise provided for as a separate Customer Event of Default under this Agreement), for a period of thirty (30) Days after Customer's receipt of written notice thereof; <u>provided</u> , that such period shall be extended for an additional reasonable period if such failure is capable of being cured but a cure cannot be reasonably effected within thirty (30) Days, corrective action is instituted by Customer within the thirty (30) Day period and such action is diligently pursued until such default is corrected; <u>provided</u> further, that the cure period shall in no event exceed ninety (90) Days from Customer's receipt of the written notice of the performance failure;

(b)        Except for disputed fees or charges under this Agreement, if Customer fails to pay any amounts due hereunder, which failure continues for a period of ten (10) Days after the date on which written notice of a failure to pay is received by Customer; or

(c)        Customer becomes Bankrupt.

12.2        <u>Owner Remedies for Customer Default</u> .    Upon the occurrence and during the continuation of a Customer Event of Default, and at any time following the expiration of the respective periods referred to in <u>Section 12.1</u> , in addition to any other rights set forth elsewhere in this Agreement or provided by Law, Owner may serve a written notice upon Customer (an " <u>Owner Notice of Termination</u> ") that Owner elects to terminate this Agreement upon a specified date which shall be no earlier than one (1) Day and no later than twenty (20) Days after the date of serving such Owner Notice of Termination, and this Agreement shall then expire on the date so specified as if that date had been originally fixed as the expiration date of the term herein granted, without waiving any other remedies that Owner may have.    No Customer Event of Default shall be deemed waived unless in writing and signed by Owner.

12.3        <u>Owner Default</u> .    Each of the following shall be deemed an event of default by Owner hereunder (each, an " <u>Owner Event of Default</u> "):

(a)        Owner fails to perform any of its material obligations under this Agreement (not otherwise provided for as a separate Owner Event of Default under this Agreement) for a period of thirty (30) Days after Owner's receipt of written notice thereof; <u>provided</u> , that such period shall be extended for an additional reasonable period if a cure cannot be reasonably effected within thirty (30) Days, corrective action is instituted by Owner within the thirty (30) Day period and such action is diligently pursued until such default is corrected; <u>provided</u> further , that the cure

- 19 -

A1710

period shall in no event exceed ninety (90) Days from Owner's receipt of the written notice of the performance failure;

(b)    Except for disputed fees or charges under this Agreement, if Owner fails to pay any amounts due hereunder, which failure continues for a period of ten (10) Days after the date on which written notice of a failure to pay is received by Owner; or

(c)    Owner becomes Bankrupt.

12.4    <u>Customer Remedies for Owner Default</u>.  Upon the occurrence and during the continuation of an Owner Event of Default, and at any time following the expiration of the respective periods referred to in <u>Section 12.3</u>, in addition to any other rights set forth elsewhere in this Agreement or provided by Law, Customer may serve a written notice upon Owner that Customer elects to terminate this Agreement upon a specified date (a "<u>Customer Notice of Termination</u>") which shall be no earlier than one (1) Day and no later than twenty (20) Days after the date of serving such Customer Notice of Termination.  This Agreement shall expire on the date specified in such Customer Notice of Termination as if that date had been originally fixed as the expiration date of the term herein granted, without waiving any other remedies that Customer may have.  No Owner Event of Default shall be deemed waived unless in writing and signed by Customer.

12.5    <u>Remedies of Each Party Generally</u>.  Without limiting its rights under this Agreement, after an Event of Default, the non-defaulting Party may set off any or all amounts due and owing to it by the defaulting Party against any or all amounts due and owing by it or any of its wholly-owned Affiliates to the defaulting Party (whether under this Agreement or otherwise and whether or not then due).  Nothing in this <u>Section 12.5</u> is intended in any way to limit or prejudice any other rights or remedies the non-defaulting Party may have under this Agreement or at law.  The remedies of the non-defaulting Party provided in this Agreement are not exclusive and, except as otherwise expressly limited by this Agreement, are in addition to all other remedies of the non-defaulting Party at law or in equity.

12.6    <u>Lien on Biomass</u>.

(a)    Owner, as operator of the Terminal and bailee of Customer's Biomass, is hereby granted a first and preferred lien on: (i) the Biomass from the time of receipt until delivery to Customer; and (ii) any property of Customer located at the Terminal or any other terminal facility owned or operated by Owner or its Affiliates or otherwise in the custody of Owner or its affiliates to secure the payment of all sums due from Customer under this Agreement (the "<u>Collateral</u>").  Customer hereby authorizes Owner to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Collateral without the signature of Customer, in each case where permitted by law, and to take any and all other actions necessary to secure its interest in the Collateral.  In addition, Customer agrees that from time to time it will promptly execute and deliver all instruments and documents, and take all further action, that Owner may reasonably request as being necessary or desirable in order to perfect and protect

- 20 -

any security interest granted or purported to be granted hereby or to enable Owner to exercise and enforce its rights and remedies hereunder with respect to any Collateral.  Without limiting the generality of the foregoing, Customer will execute and file such financing or continuation statements, or amendments thereto, and such other instruments or notices, as Owner may request as being necessary or desirable in order to perfect and preserve the security interests granted or purported to be granted hereby.

(b)     In the event Customer should fail to pay sums owed by it to Owner, after notice in accordance with Section 12.1(b) , Owner may proceed in law to enforce its lien to satisfy all contractual and statutory obligations of Customer, including all costs, attorneys' fees, and expense incurred by Owner in the enforcement of its lien and the recovery of monies owed to it by Customer.  Customer hereby agrees that in the event of any such default, in addition to other remedies set forth herein and as may be available under law, Owner may sell, on commercially reasonable terms, any such Collateral upon which Owner has a lien to satisfy any debt owed by Customer to Owner out of the proceeds thereof.  Customer hereby waives any right to notice or otherwise associated with any such sale to which it may be entitled under this Agreement or at law or in equity.

**Section 13.      Insurance** .

13.1     <u>Customer's Required Insurance</u> .  Customer, at Customer's sole cost and expense, shall carry and maintain the following insurance with companies authorized to do business in the applicable jurisdictions and possessing a minimum A.M. Best rating of A-VIII:

(a)      Commercial General Liability insurance with minimum limits of $1,000,000 per occurrence, $2,000,000 aggregate, covering bodily injury liability, personal injury liability and property damage liability, and including contractual liability, products and completed operations coverage;

(b)      Statutory Worker's Compensation insurance;

(c)      Employer's Liability insurance with a minimum limit of $1,000,000 each accident; and

(d)      Automobile Liability insurance with a minimum limit of $1,000,000 each accident; and

(e)       Umbrella policy with a minimum limit of $5,000,000, scheduling General Liability, Automobile Liability and Employers Liability coverages.

13.2     <u>Customer Certificates of Insurance; Notification of Changes or Lapse</u> .  Customer shall submit certificates of all insurance required under Section 13.1 to Owner.  All policies shall contain a waiver of subrogation against Owner.  All such general liability policies

- 21 -

A1712

with the exception of Workers Compensation and the required certificates relating thereto shall name Owner (including its officers and directors), Owner's consultants, lenders, and the agents and employees of any of them, as additional insured. The additional insured clause shall be ISO Additional Insured Endorsement CG 20 10 11 85 or a substitute providing equivalent coverage under the general liability and umbrella program. All policies shall provide that the insurance carrier will give Owner thirty (30) Days prior written notice of the expiration or any cancellation or change in coverage of such policies.

13.3    Owner's Required Insurance . Owner, at Owner's sole cost and expense, shall carry and maintain the following insurance with companies authorized to do business in the applicable jurisdictions and possessing a minimum A.M. Best rating of A-VIII:

(a)    Commercial General Liability insurance with minimum limits of $5,000,000 per occurrence, $10,000,000 aggregate, covering bodily injury liability, personal injury liability and property damage liability, and including contractual liability, products and completed operations coverage;

(b)    Statutory Worker's Compensation insurance;

(c)    Employer's Liability insurance with a minimum limit of $5,000,000 each accident; and

(d)    Automobile Liability insurance with a minimum limit of $5,000,000 each accident;

(e)    Umbrella policy, with a minimum limit of $5,000,000, scheduling General Liability, Automobile Liability and Employers Liability coverages; and

(f)    so called "All Risk" physical damage insurance, including flood and earthquake, covering loss or damage to the Terminal, including with respect to any trade fixtures, machinery, equipment, and other personal property located in or about the Terminal in an amount not less than one hundred percent (100%) of the full replacement cost thereof from time to time.

13.4    Owner Certificates of Insurance; Notification of Changes or Lapse . Owner shall submit certificates of insurance required under Section 13.3 to Customer. All policies shall contain a waiver of subrogation against Customer. All such general liability policies with the exception of Workers Compensation and the required certificates relating thereto shall name Customer (including its officers and directors), Customer's consultants, lenders, and the agents and employees of any of them, as additional insured. The additional insured clause shall be ISO Additional Insured Endorsement CG 20 10 11 85 or a substitute providing equivalent coverage under the general liability and umbrella program. All policies shall provide that the insurance carrier will give Customer thirty (30) Days prior written notice of the expiration or any cancellation or change in coverage of such policies.

- 22 -

A1713

13.5     Reports of Accidents and Injuries .  Owner and Customer will provide prompt written notice to each other of all accidents or occurrences resulting in injuries to employees or third parties, or damage to property arising out of or during the course of the performance under this Agreement and, as soon as practical, will furnish each other with a copy of all reports made by any insurance underwriter or non-privileged reports to others of such accidents or occurrences.

13.6     Application of Insurance Proceeds .  Owner shall apply any insurance proceeds directly to the replacement or repair of damaged assets to which such insurance proceeds relate.

**Section 14.     Indemnity and Liability** .

14.1     Indemnification of Customer Group .  To the fullest extent permitted by law, and except as otherwise provided herein this Agreement (including Section 6.4 ), Owner hereby agrees to release, protect, defend, indemnify, and hold harmless the Customer Group from and against any and all Claims and Losses (inclusive of Claims made by or Losses of, directly or indirectly, a Third Party) resulting from injury to or death of individuals or loss or destruction of or damage to tangible property (including Vessel damage), to the extent such Claims and Losses arise as a result of or in connection with the negligence or willful misconduct of Owner in connection with or related to the Terminal Services or this Agreement; provided ,   however , that Owner shall not be required to defend, indemnify or hold harmless any member of the Customer Group for any Claims and Losses to the extent such Claims and Losses are due to the negligence or willful misconduct of Customer.

14.2     Indemnification of Owner Group .  To the fullest extent permitted by law, and except as otherwise provided herein this Agreement, Customer hereby agrees to release, protect, defend, indemnify, and hold harmless the Owner Group from and against any and all Claims and Losses (inclusive of Claims made by or Losses of, directly or indirectly, a Third Party) resulting from injury to or death of individuals or loss or destruction of or damage to tangible property (including damage to Terminal equipment and facilities), to the extent such Claims and Losses arise as a result of or in connection with the negligence or willful misconduct of Customer in connection with or related to the Terminal Services or this Agreement; provided ,   however , that Customer shall not be required to defend, indemnify or hold harmless any member of the Owner Group for any Claims and Losses to the extent such Claims and Losses are due to the negligence or willful misconduct of Owner.

14.3     Notice; Procedure .  Not later than fifteen (15) Days after receipt of written notice from either Party of any Claim or Losses related to any Claim for which such Party or a member of such Party's Owner Group or Customer Group, as applicable, is seeking indemnification under this Agreement (such Party or member of such Party's Owner Group or Customer Group seeking indemnification, collectively, the " Indemnified Party "), the Party receiving such notice (the " Indemnifying Party ")

- 23 -

A1714

shall, to the extent that such Claim or Losses are indemnifiable by the Indemnifying Party hereunder, affirm in writing by notice to the Indemnified Party that the Indemnifying Party will indemnify, defend and hold harmless the Indemnified Party in accordance with this Agreement and will, at its own cost and expense, assume on behalf of the Indemnified Party and conduct with due diligence and in good faith the defense thereof with counsel selected by the Indemnifying Party that is reasonably satisfactory to the Indemnified Party; provided , however , that the Indemnified Party shall have the right to be represented therein by counsel of its own selection at its own expense or, in the event that the Indemnifying Party breaches any of its obligations hereunder to timely and diligently assume and conduct the defense of such Claim, at the expense of the Indemnified Party.  The Indemnifying Party shall not, without the prior written consent of the Indemnified Party, settle or compromise or permit a default judgment or a consent to entry of any judgment with respect to any Claim for which it has indemnification obligations hereunder unless such settlement or compromise or judgment is solely for the payment of money and includes a complete and unconditional release of the Indemnified Party with respect to all liability related to such Claim and Losses related to such Claim upon the making of such payment.

**Section 15.    Other Representations, Warranties and Covenants** .

15.1    Representations and Warranties .  As a material inducement to entering into this Agreement, each Party, with respect to itself, represents and warrants to the other Party as of the Effective Date of this Agreement as follows:

(a)    it is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its formation and is qualified to conduct its business in those jurisdictions necessary to perform its obligations hereunder, other than those jurisdictions as to which the failure to be so qualified or in good standing could not, individually or in the aggregate, reasonably be expected to materially adversely affect its ability to perform this Agreement;

(b)    the execution, delivery and performance of this Agreement are within its powers, have been duly authorized by all necessary action and do not conflict with or violate any of the terms or conditions in its governing documents or any agreement to which it is a party, or any law, rule, regulation, order, writ, judgment, decree or other legal or regulatory determination applicable to such Party;

(c)    this Agreement constitutes a legal, valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as limited by bankruptcy, insolvency, reorganization and other Laws affecting creditor's rights generally, or by the exercise of judicial discretion in accordance with general principles of equity;

(d)    to such Party's knowledge, there are no actions, proceedings, judgments, rulings or orders, issued by or pending before any court or arbitral body that would materially adversely affect its ability to perform its obligations under this Agreement; and

- 24 -

A1715

(e)       no consent, approval or authorization of, or registration, filing or declaration with, any Governmental Entity or any other Person required as of the date hereof, which has not been received, waived or satisfied as of the Effective Date, is required for the valid execution and delivery of this Agreement.

**Section 16.       Miscellaneous** .

16.1       Notices . Except as expressly provided in this Agreement, any notice, demand, offer, or other communication required or permitted to be given pursuant hereto shall be in writing signed by the Party giving such notice, demand, offer, or other communication and shall be hand delivered or sent by registered mail, overnight courier or facsimile to the other Party at its address set forth below. Each Party may change its address by providing notice under this Section 16.1 to the other Party. Unless otherwise provided herein, all notices, requests or other communications hereunder shall be effective at the end of Office Hours on the Day actually received, if received during Office Hours, and otherwise shall be effective at the close of Office Hours on the first Business Day after the Day on which received.

If to Owner:                    Enviva Port of Wilmington, LLC
                                7200 Wisconsin Avenue
                                Suite 1000
                                Bethesda, MD  20815
                                Attention:  General Counsel
                                Facsimile:  (240) 482-3774


If to Customer:                 Enviva, LP
                                c/o Enviva Partners GP, LLC (as General Partner of its sole member)
                                7200 Wisconsin Avenue
                                Suite 1000
                                Bethesda, MD  20814
                                Attn: General Counsel
                                Facsimile No.:  (918) 747-2150

16.2       Interpretation . Except as otherwise set forth herein, or where the context of this Agreement otherwise requires:

(a)       headings and titles are for convenience only and do not affect the interpretation of this Agreement;

- 25 -

(b)      the gender of all words used herein shall include the masculine, feminine and neuter and the number of all words shall include the singular and plural;

(c)      the terms "hereof", "herein," "hereto" and similar words refer to this entire Agreement and not any particular Section, Exhibit or any other subdivision of this Agreement;

(d)      references to "Section" or "Exhibit" are to this Agreement unless specified otherwise;

(e)      reference to "this Agreement" (including any Exhibit hereto) or any other agreement or document shall be construed as a reference to such agreement or document as the same may be amended, modified, supplemented or restated, and shall include a reference to any agreement or document that amends, modifies, supplements or restates, or is entered into, made or given pursuant to or in accordance with its terms;

(f)      references to any law, statute, rule, regulation, standard (including for testing and sampling), notification or statutory provision shall be construed as a reference to the same as it may have been, or may from time to time be, amended, modified or re-enacted;

(g)      references to any Person shall be construed as a reference to such Person's successors and permitted assigns;

(h)      "includes", "including" and similar phrases mean "including, without limitation";

(i)      all Exhibits are incorporated herein and made a part of this Agreement for all purposes; and

(j)      references to "or" will be deemed to be disjunctive but not necessarily exclusive (i.e., unless the context dictates otherwise, "or" will be interpreted to mean "and/or" rather than "either/or").

16.3    Amendment . No amendment, supplement or other modification of this Agreement shall be valid unless evidenced in writing and signed by both Parties.

16.4    Severability of Provisions . If any provision of this Agreement is found to be void and unenforceable, such provision shall be deemed to be deleted from this Agreement and the remaining provisions of this Agreement shall continue to have full force and effect. The Parties shall, in such event, negotiate in good faith to agree to a mutually satisfactory valid and enforceable substitute provision implementing to the fullest extent possible the intentions of the Parties at the Effective Date.

A1717

16.5    Entire Agreement . This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and, except as herein stated and in the instruments and documents to be executed and delivered pursuant hereto, contains all of the representations, undertakings and agreements of the Parties in respect of the subject matter hereof.  This Agreement supersedes all prior meetings, correspondence, and negotiations between the Parties. There are no representations, warranties, covenants, agreements or collateral understandings, oral or otherwise (express or implied) of any kind between the Parties in respect of the subject matter hereof, except as contained herein.

16.6    Counterparts; Electronic Signatures . This Agreement may be executed in counterparts, each of which shall be considered an original, but all of which shall together constitute one and the same instrument.  Any executed counterpart may be delivered in portable document format (.pdf) or by other electronic means and, when so delivered, shall be legally enforceable in accordance with its terms.

16.7    Third Parties . This Agreement and all rights hereunder are intended for the sole benefit of the Parties and shall not imply or create any rights on the part of, or obligations to, any other Person (other than to members of the Customer Group and Owner Group pursuant to and in accordance with Section 6.2 and Section 14 ).

16.8    Non-Recourse . The Parties' respective obligations hereunder are intended to be the obligations of the respective Parties only and no recourse for any obligation of a Party hereunder, or for any claim based thereon or otherwise in respect thereof, shall be had against any incorporator, shareholder, partner, member, officer or director, or Affiliate, as such, past, present or future of such Party.

16.9    Attorneys' Fees . The Parties agree that in the event either of the Parties institutes legal proceedings to enforce any of the terms of this Agreement, all court costs and reasonable attorneys' fees incurred by the substantially prevailing Party shall be reimbursed by the other Party.

16.10    No Waiver . Either Party's waiver of any breach or failure to enforce any of the terms of this Agreement at any time shall not in any way affect, limit, modify, or waive such Party's right thereafter to enforce or compel strict compliance with every term hereof, notwithstanding such waiver or failure or any course of dealing or custom of the trade.

16.11    No Agency . No Party shall be deemed hereunder to be an agent of, or partner or joint venturer with, any other Party.

- 27 -

A1718

16.12    <u>Governing Law</u> .

(a)        THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE SUBSTANTIVE LAWS OF THE STATE OF NEW YORK AND, WHERE APPLICABLE, THE GENERAL MARITIME LAW OF THE UNITED STATES, WITHOUT REFERENCE TO ANY CHOICE OF LAW PRINCIPLE THAT WOULD RESULT IN THE APPLICATION OF ANY OTHER LAW.

(b)        The United Nations Convention on Contracts for International Sale of Goods shall not apply to this Agreement.

(c)        The Parties acknowledge and agree that: (i) this Agreement is for the purpose of providing terminalling services, which shall not include storage services except as may be incidental to providing such terminalling services, (ii) each of the Domes used in connection with the provision of the Terminal Services is not intended to provide storage or constitute a warehouse but rather is intended to protect the Biomass from the elements for a very limited amount of time prior to its being loaded onto a Vessel for overseas or other transport, (iii) any incidental storage services provided by Owner during any time in which Biomass occupies a space in the Terminal are free of charge, and (iv) the Parties waive to the maximum extent permitted by applicable Laws any application of the terms of the Uniform Commercial Code of the State of North Carolina in respect of warehouses.

16.13    <u>Dispute Resolution</u> .  Any dispute arising from this Agreement (including a dispute regarding the existence, validity or termination of this Agreement or the consequences of its nullity), shall be referred to and finally resolved by arbitration under the rules of the American Arbitration Association (the " <u>Rules</u> "), which Rules are deemed to be incorporated by reference into this <u>Section 16.13</u> except as expressly amended by this <u>Section 16.13</u> .  The tribunal shall consist of three (3) arbitrators, two (2) of whom shall be nominated by the respective Parties and the third of whom shall be jointly selected by the two arbitrators selected by the Parties.  The seat of the arbitration and the venue of all hearings shall be New York, NY and the language of the arbitration shall be English.  The arbitral tribunal shall have power to award on a provisional basis any relief that it would have power to grant on a final award.  Without prejudice to the powers of an arbitrator provided by the Rules, by statute or otherwise, the arbitral tribunal shall have power at any time, on the basis of written evidence and the submissions of the Parties alone, to make an award in favor of the claimant (or the respondent if a counterclaim) in respect of any claims or counterclaims to which there is no reasonably arguable defense (either substantively or as to the amount of any damages or other sums to be awarded).  To the extent permitted by applicable Law, the Parties hereby agree to waive any rights to refer points of law, or to appeal, to the courts; <u>provided</u> , that nothing in this <u>Section 16.13</u> shall be construed as preventing either Party from seeking conservatory or similar interim relief in any court of competent jurisdiction.

- 28 -

A1719

**Section 17.      Confidentiality** .

17.1      <u>Confidentiality</u> .  The existence and terms of this Agreement and information disclosed by or on behalf of either Party to the other Party or its representatives in connection with this Agreement (hereinafter referred to as " <u>Confidential Information</u> ") shall, during the Term and until the expiration of twelve (12) months after this Agreement has terminated, be treated as confidential by each Party and shall not be disclosed in whole or part by either Party to any third party without the prior written consent of the other Party.  No breach of this <u>Section 17.1</u> shall entitle the other Party to terminate this Agreement.

17.2      <u>Confidentiality Carve-outs</u> .  Notwithstanding <u>Section 17.1</u> , neither Party shall be required to obtain the prior written consent of the other Party in respect of disclosure of Confidential Information:

(a)      to Affiliates of such Party; <u>provided</u> , that such Party shall require such Affiliates to keep the Confidential Information confidential on the same terms as are provided in this <u>Section 17</u> ;

(b)      to Persons professionally engaged by or on behalf of such Party;

(c)      to any Government Entity having jurisdiction over such Party, but only to the extent that such Party is required by such Government Entity to make disclosure;

(d)      to any investors or potential investors in such Party or any affiliate thereof; <u>provided</u> , that such Party shall require such investor or potential investor to keep the Confidential Information confidential on the same terms as are provided in this <u>Section 17</u> ;

(e)      to any lenders or prospective lenders in connection with the financing of such Party's operations;

(f)      to the extent reasonably required by any Laws or rule of any relevant stock exchange or to the extent required by any juridical, arbitral or administrative proceeding; or

(g)      to the extent any disclosure is required to be made in the financial statements of either Party or any of its Affiliates or in publicly filed documents to effect the transactions contemplated by this Agreement;

<u>provided</u> , that the disclosing Party shall keep the disclosure of the Confidential Information to the minimum necessary for the purpose for which it is disclosed.

- 29 -

17.3     Securities Filings .  Notwithstanding anything to the contrary herein, either Party and its Affiliates shall be permitted to include in documents filed with regulators regarding securities offered or to be offered of such Party or an Affiliate of such Party (and in any amendments thereto or related offering documents) any information regarding the Parties, this Agreement and the transactions contemplated by this Agreement.

17.4     Press Releases .  Neither Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement without the prior written consent of the other Party.

(Signature page follows)

- 30 -

A1721

This Agreement has been executed by the authorized representatives of each Party as indicated below effective as of the Effective Date.

**Enviva Port of Wilmington, LLC**

By: Enviva Wilmington Holdings, LLC, as its sole member

By: Enviva Development Holdings, LLC, as its managing member

By:     /s/ William H. Schmidt, jr.

Name:    William H. Schmidt, Jr.

Title:    *President, General Counsel and Secretary*

**Enviva, LP**

By: Enviva GP, LLC, as its general partner

By:     /s/ STEPHEN F. REEVES

Name:    Stephen F. Reeves

Title:    *Executive Vice President and Chief Financial Officer*

- 31 -

A1722

**EXHIBIT A**

**COMMERCIAL DETAILS**

1.      **Customer Addresses for Invoices**

Enviva, LP
c/o Enviva Partners GP, LLC
7200 Wisconsin Ave., Suite 1000
Attention: Vonetta T. Brown
Corporate Accounts Payable Manager
Phone: +1 240 482 3837
Fax: +1 301 657 5567
Email: accounting@envivabiomass.com and vonetta.brown@envivabiomass.com

2.      **Requirements of Owner's Vetting Process.**

(a)      Vessel Requirements .  Performing Vessel to be/have:

(i)      Singledeck Bulkcarrier engines./bridge aft BoxShaped or Self trimming supramax or smaller;
(ii)     Maximum Vessel age of 20 years;
(iii)    Geared with 20 metric ton cranes for use at load as required for load operations by Owner;
(iv)     Fully suitable for all load/discharge berths/ports/facilities including but not limited to LOA/Beam/Draft/WLTHC;
(v)      Classed highest Lloyds or equivalent for the duration of the voyage by a member of the IACS;
(vi)     $CO_2$ fitted as required by the trade (mandatory);
(vii)    Entered with a first class P & I Club with full coverage and to remain so for duration of voyage;
(viii)   ITF or ITF Equivalent;
(ix)     stanchions, if any, to be fully collapsible except in front of Vessel's crane houses and in no way interfere with the loading operations; and
(x)      Rightship approval as per receiver vetting requirements

(b)      With Vessel nomination, Customer to provide Owner the following:

(i)      Full description of Vessel;
(ii)     Present position, intended itinerary prior arrival loading port and ETA loading port;
(iii)    Last 3 cargoes and last 3 load/discharge ports;
(iv)     Copies of valid class/ISPS/Gear/P+I/ISM/DOC/SMC certificates by email attachment;
(v)      Ownership chain;
(vi)     Pictures of Vessel holds when available, and Owner requires Customer's efforts on this for each vessel nomination; and
(vii)    Declared cargo quantity and intended stow plan for that shipment.

A-1

**EXHIBIT B**

**MARINE NOMINATIONS AND SCHEDULING**

1.        Interpretation .  In the event of any inconsistency between this Exhibit B and Section 5 of the Agreement, the terms and conditions of Section 5 shall prevail.

2.        Laycan and Vessel Nominations .

(a)        Shipping Schedule .  By the first Business Day of each month from and after the Effective Date, Customer shall provide Owner a non-binding, indicative schedule of the Shipment size and 15 day windows of each Shipment to be delivered to Customer over the following 3-month period.

(b)        Laycan Nominations .  At least 30 days prior to the start of the applicable Laycan, Customer shall nominate to Owner a 10-day window for such Laycan, which Customer shall narrow to a 7-day Laycan at least 21 days prior to the start of such Laycan.  For the avoidance of doubt, the final 7-day Laycan must be within the foregoing 10-day window.

(c)        Vessel Nominations .  Customer shall nominate the final performing Vessel for Shipments to be loaded by Owner at least 10 days before the first day of the applicable Laycan.  Owner shall have one (1) Business Day to accept or reject such nominated Vessel, in writing to Customer.  Upon any such rejection, Customer shall have the right to nominate a different Vessel within 2 Business Days of its receipt of such rejection in accordance with, and conforming to, the requirements of this Agreement.  In the event that Customer does not nominate a Vessel when required hereunder and such failure continues for 5 days following Customer's receipt of notice thereof from Owner, Owner shall have the right, upon two (2) Business Days' written notice to Customer, to suspend Terminal Services until such failure has been cured or remedied to Owner's reasonable satisfaction.

3.        Estimated Time of Arrival .  Customer or its designee will notify Owner of the estimated date and time of arrival at the Terminal of each Vessel with an approved nomination notice as soon as this information is available, but no later than forty-eight (48) hours in advance of the estimated time of arrival.  The Vessel will be required to send Owner answers to pre-berthing questions at least forty-eight (48) hours prior to the estimated time of arrival.  Owner will provide pre-berthing questions to the Vessel early enough to allow it a reasonable time to respond.

4.        Notice of Readiness .  After a Vessel has arrived at the customary anchorage or place of waiting, received all required clearances from Governmental Entities and is otherwise in all respects ready to proceed to berth and commence loading a Shipment, it will tender a Notice of Readiness to Owner in writing or via other available means acceptable to Owner.  The Notice of Readiness will state the estimated time the Vessel will arrive at the Terminal wharf given any tidal or other constraints.

5.        Vessel Berth .  Owner shall use due diligence to designate a safe berth for the Vessel at which it can remain safely afloat and conduct cargo operations; provided ,   however , that Owner is not responsible or liable for maintaining the depth of the channel leading to the berth.  Customer

B-1

A1724

shall ensure all Vessels will be dimensionally acceptable and meet all requirements of the Terminal's wharf facilities and governmental agencies.

6.    <u>Berthing Order</u> .  Vessels arriving and issuing valid Notices of Readiness within the Laycan confirmed by Owner will be berthed at the Berth in the order of their tendering of valid notices of readiness, on a "first come, first served" basis.  A Vessel shall be deemed to have arrived at such time as it has given a valid Notice of Readiness to Owner.

7.    <u>Berth Shifting & Vacating</u> .  Owner may require any Vessel to shift from one berth to another at the Terminal at any time.  Owner may require any Vessel to vacate its berth if such action is reasonably required for the safe operation of the Terminal.  If the Vessel is required to so vacate its berth, the Vessel, after tendering Notice of Readiness to recommence loading or discharging, will be re-berthed in the next open time slot on the Terminal dock schedule.  If any Vessel fails to vacate its berth at the Terminal upon completion of loading Customer's Shipment, then Customer shall be responsible for the costs incurred by other vessels that otherwise would be occupying the Berth but for the failure of Customer's Vessel to vacate same.

8.    <u>Pollution, Prevention and Responsibility</u> .  Customer or its Agent will require all Vessels promptly and diligently to prevent, mitigate and remediate all pollution emanating from said Vessels.  Customer or its Agent will require all Vessels to comply with Law and to carry all liability and pollution insurance required by Law.  In the event of any Biomass spills or other environmentally polluting discharge caused by the fault of Customer's Vessel, Owner shall immediately notify Customer, and, subject to Customer's consent, is authorized to commence containment or cleanup operations as deemed appropriate or necessary by Owner (and consented to by Customer).  All reasonable costs of containment or cleanup for such spill or discharge shall be borne by Customer, except that, in the event a spill or discharge is the result of joint negligence or misconduct of both Owner and Customer's Vessel, costs of containment or cleanup shall be borne jointly by Owner and Customer in proportion to each Party's or its Vessel's negligence or misconduct.

9.    <u>International Ship and Port Facility Security Code Compliance</u> .  Customer shall ensure that any Vessel receiving Customer's Biomass under this Agreement is in compliance with the International Ship and Port Facility Security Code and any relevant amendments to Chapter XI of SOLAS ("ISPS code") or the Maritime Transportation Security Act ("MTSA") of 2002, as applicable, and similar laws and regulations pertaining to the security of ports, facilities, or terminals.  The Terminal will operate in compliance with all applicable Laws for the activities as contemplated herein this Agreement.

B-2

**EXHIBIT C**

**SPECIFICATIONS**

| PARAMETER | UNITS | LIMIT | | TOLERANCE | METHOD | PERFORMED BY |
|---|---|---|---|---|---|---|
| **Composition** | | | | | EN 14961-1 | Seller Decl. |
| Origin and Source | Only Forest, plantation, and other virgin (chemically untreated) wood | | | | | |
| Bark | % wt, arb | < | 8% | none | | Seller Decl. |
| Additives or Binders [1] | % wt, arb | < | 3% | none | | Seller Decl. |
| Extraneous Materials | | | none | none | | Insp |
| Burned or Charred Pellets | | | none | none | | Insp |
| Water Damage | | | none | none | | Insp |
| **Sampling & Sample Prep** | | | | | EN 14778, EN 14780 | Insp & Lab |
| **Bulk Physical Parameters** | | | | | | |
| Temperature [2] | deg C | ≤ | 60 | 1 deg C | EN15234 | Insp |
| Fines <3.15 mm (round-hole) | %wt, atb | ≤ | 3.0 | none | EN 15149 | Insp |
| Diameter | mm | | 6 to 10 | none | EN 16127 | Lab |
| Average Length | mm | | 10-40 | none | EN 16127 | Lab |
| Pellets < 40mm in Length | %wt, atb | ≥ | 99.0 | none | EN 16127 | Lab |
| Pellets < 50mm in Length | %wt, atb | ≥ | 99.9 | | | |
| Bulk Density | kg/m3 | ≥ | 645-750 | 2% of limit | EN 15103 | Lab |
| Durability | %wt, atb | | 97.5-99 | 0.5% absolute | EN 15210-1 | Lab |
| **DSEAR Information** | | | | | | |
| Cloud Ignition Temp | deg C | ≥ | 400 | none | | Lab** |
| 5mm Layer Ignition Temp | deg C | ≥ | 210 | none | EN 13821 | Lab** |
| Ignition Energy (capacitive) [3] | mJ | ≥ | 30 | none | or | Lab** |
| Explosion Pressure | bar | ≤ | 10.5 | none | ASTM E2019 | Lab** |
| Specific Dust Constant, KSt | bar x m/s | ≤ | 200 | none | | Lab** |
| Explosive Ratio, ST | ST | | ST-1 | none | | Lab** |
| **Proximate Analysis** | | | | | | |
| Volatiles | % wt, arb | | 70 – 82 | 4% of mean | EN 15148 | Lab |
| Total Moisture | % wt, arb | | 4 – 10 | 0.5% absolute | EN 14774-1 | Lab |
| Ash | % wt, db | ≤ | 1.5 | 0.1% absolute | EN 14775 | Lab |
| NCV (at const. pressure) | GJ/mt, arb | ≥ | 16.5 | 0.3 GJ/mt | EN 14918 | Lab |
| **Ultimate Analysis** | | | | | | |
| Oxygen | %wt, arb | | 28 to 42 | 1.5% absolute | EN 15296 | Lab |
| Nitrogen | %wt, db | ≤ | 0.4 | 0.05% absolute | EN 15104 | Lab |
| Sulfur (any ship) | %wt, db | ≤ | 0.05 | 0.01% absolute | EN 15289 | Lab |
| Sulfur (annual avg) | %wt, db | ≤ | 0.02 | 0.01% absolute | EN 15289 | Lab |

C-1

| | | | | | | |
|---|---|---|---|---|---|---|
| Chlorine (any ship) | %wt, db | ≤ | 0.02 | 0.01% absolute | EN 15289 | Lab |
| Chlorine (annual avg) | %wt, db | ≤ | 0.018 | 0.01% absolute | EN 15289 | Lab |
| Flourine | mg/kg, db | ≤ | 70 | none | EN 15289 | Lab* |
| **Ash Fusion** | | | | | | |
| DT (Oxidizing) | deg C | ≥ | 1200 | 50 | CEN/TS 15370-1 | Lab* |
| DT (Reducing) | deg C | ≥ | 1150 | 50 | CEN/TS 15370-1 | Lab* |
| **Major and Minor Metals** | | | | | | |
| As,Co,Cr,Cu,Mn,Ni,Pb,Sb,V | mg/kg, db | ≤ | 800 | none | EN 15297 | Lab* |
| As | mg/kg, db | ≤ | 1.3 | 0.064 absolute | EN 15297 | Lab* |
| Al | mg/kg, db | ≤ | 800 | n/a | EN 15290 | Lab* |
| Ca | mg/kg, db | ≤ | 5250 | n/a | EN 15290 | Lab* |
| Cd | mg/kg, db | ≤ | 0.3 | 0.06 | EN 15297 | Lab* |
| Cr | mg/kg, db | ≤ | 15.0 | 0.032 absolute | EN 15297 | Lab* |
| Cu | mg/kg, db | ≤ | 16.0 | 0.043 absolute | EN 15297 | Lab* |
| Fe | mg/kg, db | ≤ | 700 | n/a | EN 15290 | Lab* |
| Pb | mg/kg, db | ≤ | 10.0 | 0.033 absolute | EN 15297 | Lab* |
| Mg | mg/kg, db | ≤ | 750 | n/a | EN 15290 | Lab* |
| Hg | mg/kg, db | ≤ | 0.1 | 0.0046 absol. | EN 15297 | Lab* |
| Ni | mg/kg, db | ≤ | 10.0 | n/a | EN 15297 | Lab* |
| K | mg/kg, db | ≤ | 2100 | n/a | EN 15290 | Lab* |
| P | mg/kg, db | ≤ | 300 | 14 | EN 15290 | Lab* |
| Si | mg/kg, db | ≤ | 3400 | n/a | EN 15290 | Lab* |
| Na | mg/kg, db | ≤ | 590 | n/a | EN 15290 | Lab* |
| Sn | mg/kg, db | ≤ | 1.0 | n/a | EN 15297 | Lab* |
| Ti | mg/kg, db | ≤ | 100 | n/a | EN 15290 | Lab* |
| V | mg/kg, db | ≤ | 4.0 | n/a | EN 15297 | Lab* |
| Zn | mg/kg, db | ≤ | 20 | 5.43 absolute | EN 15297 | Lab* |
| **Halogenated Organics** | | | | | | |
| Benzo-a-pyrene | mg/kg, db | ≤ | 0.5 | None | GCMS | Lab* |
| Pentachlorphenol | mg/kg, db | ≤ | 3.0 | None | ECD | Lab* |
| **Particle Size Distribution in Pellets** | | | | | | |
| % < 4.0mm | % wt, atb | ≥ | 99.5 [4] | 0.5% absolute | EN 16126 | Lab |
| % < 3.15mm | % wt, atb | ≥ | 98.0 | 0.5% absolute | EN 16126 | Lab |
| % < 2.0mm | % wt, atb | ≥ | 92.5 | 1% absolute | EN 16126 | Lab |
| % < 1.0mm | % wt, atb | ≥ | 50.0 | 5% absolute | EN 16126 | Lab |
| % < 0.1mm | % wt, atb | ≤ | 7.0 | 2% absolute | EN 16126 | Lab |
| Mean Particle Size [4] | microns | ≥ | 420 | none | see note | Lab |

*atb = as-tested basis; arb = as-received basis; db = dry basis*

*Tolerances are expressed in the same units as the limits, except where noted otherwise.  Where tolerances are not currently declared in the referenced EN method (as indicated by n/a in the*

C-2

A1727

*table above), at such a time as said tolerances are officially declared by the relevant governing body, those tolerances will be adopted in the table above.*

*1 – Additives or binders shall be of vegetal origin only and shall meet all sustainability requirements applicable to the Biomass*

*2 – Maximum bulk temperature shall be checked at the delivery point.*

*3 – Particles having at least one dimension less than 600 microns shall be deemed acceptable.*

*4 - The MIE shall be carried out on a sample seived to an average particle size of 75 micron and dried to a moisture content of 4%.*

*\* - Once each quarter, or as requested by Buyer*

*\*\* - Once before first shipment, or as requested by Buyer*

*"Lab" analysis shall be performed by an independent laboratory and "Insp" test shall be performed by an independent inspector. "Insp & Lab" shall mean that a field test shall be performed by the independent inspector and a lab value shall be analyzed by the independent laboratory.*

C-3

A1728

Exhibit 21.1

**LIST OF SUBSIDIARIES OF ENVIVA PARTNERS, LP**

| Subsidiary of Enviva Partners, LP | State of Incorporation |
| --- | --- |
| Enviva, LP | Delaware |
| Enviva GP, LLC | Delaware |
| Enviva Energy Services, LLC | Delaware |
| Enviva Materials, LLC | Delaware |
| Enviva Partners Finance Corp. | Delaware |
| Enviva Pellets Ahoskie, LLC | Delaware |
| Enviva Pellets Amory, LLC | Delaware |
| Enviva Pellets Cottondale, LLC | Delaware |
| Enviva Pellets Northampton, LLC | Delaware |
| Enviva Pellets Perkinston, LLC | Delaware |
| Enviva Pellets Sampson, LLC | Delaware |
| Enviva Pellets Southampton, LLC | Delaware |
| Enviva Port of Chesapeake, LLC | Delaware |
| Enviva Port of Panama City, LLC | Delaware |
| Enviva Port of Wilmington, LLC | Delaware |
| Enviva MLP International Holdings, LLC | Delaware |
| Enviva Energy Services Coöperatief, U.A. | Netherlands |
| Enviva Energy Services (Jersey), Limited | Jersey Channel Islands |

A1729

**Exhibit 23.1**

**Consent of Independent Registered Public Accounting Firm**

The Board of Directors
Enviva Partners, LP:

We consent to the incorporation by reference in the registration statement (No. 333-203756) on Form S-8 and registration statement (No. 333-211136) on Form S-3, as amended by Form S-3/A, of Enviva Partners, LP and subsidiaries of our report dated February 22, 2018, with respect to the consolidated balance sheets of Enviva Partners, LP and subsidiaries as of December 31, 2017 and 2016, and the related consolidated statements of income, comprehensive income, changes in partners' capital, and cash flows for each of the years in the years in the three-year period ended December 31, 2017,  and the related notes (collectively, the "consolidated financial statements"), which report appears in the December 31, 2017 annual report on Form 10-K of Enviva Partners, LP.

(signed) KPMG LLP

McLean, Virginia
February 22, 2018

A1730

EXHIBIT 31.1

**Certification of Principal Executive Officer**
**Pursuant to Exchange Act Rule 13a-14(a) or 15d-14(a)**

I, John K. Keppler, certify that:

1.      I have reviewed this annual report on Form 10-K for the year ended December 31, 2017 of Enviva Partners, LP;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

    (a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 22, 2018

                                                /s/ JOHN K. KEPPLER
                                                John K. Keppler
                                                *Chairman, President and Chief Executive Officer*
                                                *(Principal Executive Officer)*

A1731

EXHIBIT 31.2

**Certification of Chief Financial Officer**
**Pursuant to Exchange Act Rule 13a‑14(a) or 15d‑14(a)**

I, Stephen F. Reeves, certify that:

1. I have reviewed this annual report on Form 10-K for the year ended December 31, 2017 of Enviva Partners, LP;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a‑15(e) and 15d‑15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a‑15(f) and 15d‑15(f) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 22, 2018

/s/ STEPHEN F. REEVES
Stephen F. Reeves
*Executive Vice President and Chief Financial Officer*
*(Principal Financial Officer)*

A1732

EXHIBIT 32.1

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES‑OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10‑K of Enviva Partners, LP (the "Partnership") for the year ended December 31, 2017 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, John K. Keppler, Chairman, President and Chief Executive Officer of the Partnership, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to § 906 of the Sarbanes‑Oxley Act of 2002, that to the best of my knowledge:

(1)    the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Partnership.

/s/ JOHN K. KEPPLER

John K. Keppler
*Chairman, President and Chief Executive Officer*
*(Principal Executive Officer)*

Date: February 22, 2018

A1733

EXHIBIT 32.2

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES‑OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10‑K of Enviva Partners, LP (the "Partnership") for the year ended December 31, 2017 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Stephen F. Reeves, Executive Vice President and Chief Financial Officer of the Partnership, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to § 906 of the Sarbanes‑Oxley Act of 2002, that to the best of my knowledge:

(1)     the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Partnership.

/s/ STEPHEN F. REEVES
Stephen F. Reeves
*Executive Vice President and Chief Financial Officer*
*(Principal Financial Officer)*

Date: February 22, 2018

A1734