# EXHIBIT 20

A2002

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**
## Form 10-K

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2022**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**Commission file number 001-37363**

## Enviva Inc.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **46-4097730** |
| (State or other jurisdiction | (I.R.S. Employer |
| of incorporation or organization) | Identification No.) |
| **7272 Wisconsin Ave. Suite 1800** | |
| **Bethesda, MD** | **20814** |
| (Address of principal executive offices) | (Zip code) |

**(301) 657-5560**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common Stock | EVA | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to § 240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of the registrant's common stock held by non-affiliates of the registrant as of June 30, 2022 was approximately $2,103,158,559 based upon a closing price of $57.22 per share of the registrant's common stock as reported on the New York Stock Exchange on such date.

As of February 24, 2023, 67,610,102 shares of the registrant's common stock were outstanding.

**Documents Incorporated by Reference:**

Portions of the registrant's definitive proxy statement relating to the registrant's 2023 Annual Meeting of Stockholders to be filed hereafter are incorporated by reference into Part III of this Annual Report on Form 10-K.

**ENVIVA INC.**
**ANNUAL REPORT ON FORM 10-K**
**TABLE OF CONTENTS**

| | | |
|---|---|---|
| Cautionary Statement Regarding Forward-Looking Statements | | 1 |
| Glossary of Terms | | 3 |
| Part I | | 4 |
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 11 |
| Item 1B. | Unresolved Staff Comments | 26 |
| Item 2. | Properties | 26 |
| Item 3. | Legal Proceedings | 26 |
| Item 4. | Mine Safety Disclosures | 26 |
| Part II | | 27 |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 27 |
| Item 6. | Reserved | 29 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 30 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 45 |
| Item 8. | Financial Statements and Supplementary Data | 47 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 84 |
| Item 9A. | Controls and Procedures | 85 |
| Item 9B. | Other Information | 87 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 87 |
| Part III | | 88 |
| Item 10. | Directors, Executive Officers and Corporate Governance | 88 |
| Item 11. | Executive Compensation | 88 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 88 |
| Item 13. | Certain Relationships and Related Transactions and Director Independence | 88 |
| Item 14. | Principal Accounting Fees and Services | 88 |
| Part IV | | 89 |
| Item 15. | Exhibits, Financial Statement Schedules | 91 |

A2004

**CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS**

Certain statements and information in this Annual Report on Form 10-K (this "Annual Report") may constitute "forward-looking statements." The words "believe," "expect," "anticipate," "plan," "intend," "foresee," "should," "would," "could," or other similar expressions are intended to identify forward-looking statements, which are generally not historical in nature. These forward-looking statements are based on our current expectations and beliefs concerning future developments and their potential effect on us. Although management believes that these forward-looking statements are reasonable as and when made, there can be no assurance that future developments affecting us will be those that we anticipate. All comments concerning our expectations for future revenues and operating results are based on our forecasts of our existing operations and do not include the potential impact of any future acquisitions. Our forward-looking statements involve significant risks and uncertainties (some of which are beyond our control) and assumptions that could cause actual results to differ materially from those in our historical experience and our present expectations or projections. Factors that could cause our actual results to differ materially from those in the forward-looking statements include, but are not limited to, those summarized below:

- the volume and quality of products that we are able to produce or source and sell, which could be adversely affected by, among other things, operating or technical difficulties at our wood pellet production plants or deep-water marine terminals;

- the prices at which we are able to sell our products;

- our ability to capitalize on higher spot prices and contract flexibility in the future, which is subject to fluctuations in pricing and demand;

- the possibility that current market prices may not continue and therefore, in the future, we may not be able to make spot sales and may need to make spot purchases at higher prices;

- failure of our customers, vendors, and shipping partners to pay or perform their contractual obligations to us;

- our inability to successfully execute our project development, capacity expansion, and new facility construction activities on time and within budget;

- the creditworthiness of our contract counterparties;

- the amount of low-cost wood fiber that we are able to procure and process, which could be adversely affected by, among other things, disruptions in supply or operating or financial difficulties suffered by our suppliers;

- our ability to successfully negotiate, complete, and integrate third-party acquisitions, or to realize the anticipated benefits of such acquisitions;

- changes in the price and availability of natural gas, coal, diesel, oil, gasoline, or other sources of energy;

- changes in prevailing domestic and global economic, political, and market conditions, including the imposition of tariffs or trade or other economic sanctions, political instability or armed conflict, rising inflation levels and government efforts to reduce inflation, or a prolonged recession;

- inclement or hazardous environmental conditions, including extreme precipitation, temperatures, and flooding;

- fires, explosions, or other accidents;

- changes in domestic and foreign laws and regulations (or the interpretation thereof) related to renewable or low-carbon energy, the forestry products industry, the international shipping industry, or power, heat, or combined heat and power generators;

- changes in domestic and foreign tax laws and regulations affecting the taxation of our business, and investors;

- changes in the regulatory treatment of biomass in core and emerging markets;

- our inability to acquire or maintain necessary permits or rights for our production, transportation, or terminaling operations;

- changes in the price and availability of transportation;

- changes in foreign currency exchange or interest rates and the failure of our hedging arrangements to effectively reduce our exposure to related risks;

A2005

- risks related to our indebtedness, including the levels, and maturity date of such indebtedness;

- our failure to maintain effective quality control systems at our wood pellet production plants and deep-water marine terminals, which could lead to the rejection of our products by our customers;

- changes in the quality specifications for our products required by our customers;

- labor disputes, unionization, or similar collective actions;

- our inability to hire, train, or retain qualified personnel to manage and operate our business;

- the possibility of cyber and malware attacks;

- our inability to borrow funds and access capital markets;

- viral contagions or pandemic diseases, such as COVID-19;

- potential liability resulting from pending or future litigation, investigations, or claims; and

- governmental actions and actions by other third parties that are beyond our control.

All forward-looking statements in this Annual Report are expressly qualified in their entirety by the foregoing cautionary statements.

Please read Part I, Item 1A. "Risk Factors." Readers are cautioned not to place undue reliance on forward-looking statements and we undertake no obligation to update or revise any such statements after the date they are made, whether as a result of new information, future events or otherwise.

A2006

**GLOSSARY OF TERMS**

***biomass:*** any organic biological material derived from living organisms that stores energy from the sun.

***co-fire:*** the combustion of two different types of materials at the same time. For example, biomass is sometimes fired in combination with coal in existing coal plants.

***cost pass-through mechanism:*** a provision in commercial contracts that passes costs through to the purchaser.

***dry-bulk***: describes dry-bulk commodities that are shipped in large, unpackaged amounts.

***metric ton:*** one metric ton, which is equivalent to 1,000 kilograms and 1.1023 short tons.

***nameplate:*** the intended full-load sustained maximum rated output of production.

***net calorific value:*** the amount of usable heat energy released when a fuel is burned completely and the heat contained in the water vapor generated by the combustion process is not recovered. The European power industry typically uses net calorific value as the means of expressing fuel energy.

***off-take contract:*** an agreement concerning the purchase and sale of a certain volume of future production of a given resource such as wood pellets.

***stumpage***: the price paid to the underlying timber resource owner for the raw material.

***utility-grade wood pellets:*** wood pellets meeting minimum requirements generally specified by industrial consumers and produced and sold in sufficient quantities to satisfy industrial-scale consumption.

***wood fiber:*** cellulosic elements that are extracted from trees and used to make various materials, including paper. In North America, wood fiber is primarily extracted from hardwood (deciduous) trees and softwood (coniferous) trees.

***wood pellets:*** energy-dense, low-moisture, and uniformly sized units of wood fuel produced from processing various wood resources or byproducts.

3

A2007

**PART I**

## ITEM 1.   BUSINESS

*This Annual Report on Form 10-K presents information for Enviva Inc., a Delaware corporation. References to "Enviva," the "Company," "we," "us," or "our," or similar expressions refer to Enviva Inc. and its subsidiaries. Please read Cautionary Statement Regarding Forward-Looking Statements beginning on page 1 and Item 1A. "Risk Factors" for information regarding certain risks inherent in our business.*

### Overview

We are a growth-oriented company originally formed in 2013 as a limited partnership that converted to a corporation on December 31, 2021. We develop, construct, acquire, and own and operate, fully contracted wood pellet production plants where we aggregate a natural resource, wood fiber, and process it into dry, densified, uniform pellets that can be effectively stored and transported around the world. We primarily sell our wood pellets through long-term, take-or-pay off-take contracts with creditworthy customers in the United Kingdom (the "U.K."), the European Union (the "EU"), and Japan, who use our pellets to displace coal and other fossil fuels to generate power and heat as part of their efforts to accelerate the energy transition away from conventional energy sources. Our wood pellets meet the criteria put forth by the European Union's Renewable Energy Directive II ("RED II") which includes biomass in its definition of renewable energy. The wood pellets we produce are viewed by our customers as a critical component of their efforts to reduce life-cycle greenhouse gas emissions in their core energy generation or industrial manufacturing processes and to mitigate the impact of climate change. We believe that our pellets also have potential applicability to hard-to-abate sectors as bio-based raw material feedstock to industrial processes formerly provided by fossil fuels where their use could reduce greenhouse gas emissions on a lifecycle basis and to generate process steam and heat in heavy industrial manufacturing like lime, sugar, steel, and cement, and to generate aviation fuels and other liquids.

We own and operate ten plants (collectively, "our plants") with a combined production capacity of approximately 6.2 million metric tons per year ("MTPY") of wood pellets in Virginia, North Carolina, South Carolina, Georgia, Florida, and Mississippi, the production of which is fully contracted with a few of our contracts extending well into the 2040s. We export our wood pellets to global markets through our deep-water marine terminal at the Port of Chesapeake, Virginia, terminal assets at the Port of Wilmington, North Carolina, and the Port of Pascagoula, Mississippi, and from third-party deep-water marine terminals in Savannah, Georgia, Mobile, Alabama, and Panama City, Florida. In 2022, we commenced construction of our fully contracted wood pellet production plant in Epes, Alabama (the "Epes plant") which is designed and permitted to produce more than one million MTPY of wood pellets. Additionally, in 2022, we commenced the development of a wood pellet production plant in Bond, Mississippi (the "Bond plant") which is designed to produce one million MTPY of wood pellets. All of our facilities are located in geographic regions with low input costs and favorable transportation logistics. Owning these cost-advantaged assets in a rapidly expanding industry provides us with a platform to generate stable cash flows. Our plants are sited in robust fiber baskets providing stable pricing for the low-grade fiber used to produce wood pellets. Our raw materials are byproducts of the sawmilling process or traditional timber harvesting, principally low-value wood materials, such as trees generally not suited for sawmilling or other manufactured forest products, tree tops and limbs, understory, brush, and slash that are generated in a harvest.

Our primary sales strategy is to fully contract the wood pellet production from our plants under long-term, take-or-pay off-take contracts with a diversified and creditworthy customer base. Our long-term off-take contracts typically provide for fixed-price deliveries that often include provisions that escalate the price over time and provide for other margin protection. For 2022, our production capacity from our wood pellet production plants was contracted under our existing long-term, take-or-pay off-take contracts. In addition to generating durable cash flow from long-term take-or-pay off-take contracts, we monitor sustained dislocations in the marketplace, and opportunistically transact when pricing dynamics and contract flexibility provide avenues to generate incremental gross margin. Furthermore, our off-take contracts generally provide us with the opportunity to flex a certain percentage of contracted shipments up or down. That flexibility, enabled by our multi-plant profile, multi-deep water marine terminals and our long-term shipping contracts, can create opportunities to optimize our gross margin when we sell under short-term contracts in times when spot market prices are elevated or, conversely, when we purchase third-party volumes during times when spot market prices are depressed.

Our volumes under our firm and contingent long-term, take-or-pay off-take contracts provide for a product sales backlog of $23.5 billion and our contracts have a total weighted-average remaining term of 13.7 years from January 1, 2023.

Due to the uninterruptible nature of our customers' fuel and other raw material consumption, our customers require a reliable supply of wood pellets that meet stringent product specifications. We have built our operations and assets to deliver and

A2008

certify the highest levels of product quality and our track record of reliable deliveries enables us to charge premium prices for this certainty.

**Our Production Plants, Logistics and Storage Capabilities**

We procure low-grade wood fiber and process it into utility-grade wood pellets and load the finished wood pellets into railcars, trucks, and barges for transportation to deep-water marine terminals, where we receive, store, and ultimately load our products onto dry bulk cargo oceangoing vessels for delivery to our customers.

We own and operate ten industrial-scale wood pellet production plants strategically located in the Mid-Atlantic and Gulf Coast regions of the United States, geographic areas in which wood fiber resources are plentiful and readily available. We employ a "build-and-copy" approach to the construction of new capacity, which allows for efficiencies in the engineering, design, construction, and operation of our facilities. Furthermore, our multi-plant profile and scale provide us with flexibility under our portfolio of off-take contracts that enhances the reliability of our deliveries and provides for opportunities for optimization as detailed above.

Our facilities are designed to operate 24 hours per day, 365 days per year, although we schedule up to 15 days of planned maintenance for our wood pellet production plants during each calendar year. There are no regularly required major turnarounds or overhauls.

The following table describes our wood pellet production plants, all of which we wholly own:

| Plant Location | Year of Acquisition or Operations Commenced | Nameplate Production (MTPY) | Receiving Terminal Location |
|---|---|---|---|
| Ahoskie, North Carolina | 2011 | 410,000 | Chesapeake |
| Amory, Mississippi | 2010 | 115,000 | Mobile |
| Cottondale, Florida | 2015 | 780,000 | Panama City |
| Greenwood, South Carolina | 2020 | 600,000 | Wilmington |
| Hamlet, North Carolina | 2019 | 600,000 | Wilmington |
| Lucedale, Mississippi | 2022 | 750,000 | Pascagoula |
| Northampton, North Carolina | 2013 | 750,000 | Chesapeake |
| Sampson, North Carolina | 2016 | 600,000 | Wilmington |
| Southampton, Virginia | 2013 | 760,000 | Chesapeake |
| Waycross, Georgia | 2020 | 800,000 | Savannah |
| Total | | 6,165,000 | |

*Wood Fiber Procurement and Sustainability*

We and our customers are subject to stringent requirements regarding the sustainability of the fuels we procure. In addition to our internal sustainability policies and initiatives like our Responsible Sourcing Policy, our wood fiber procurement is conducted in accordance with leading forest certification standards, and we maintain multiple forest certifications. Our fiber supply chains are routinely audited by independent third parties, and we maintain the traceability of, and make public, information concerning the primary wood that is delivered to us directly from forests via our proprietary Track & Trace® system.

Our wood fiber demand is complementary to, rather than in competition with, demand for high-grade wood from most other forest-related industries, such as lumber and furniture. Demand for the non-merchantable fiber, waste products, or byproducts that we use is generally low; accordingly, the tops, limbs, and other low-grade wood fiber we purchase would otherwise generally be left unused, impeding reforestation, or burned.

Our fleet of production plants is sited in robust fiber baskets in the southeast United States that sustainably support our growing operations with low-grade fiber. As a result of the fragmented nature of tract ownership in our sourcing areas, we procure raw materials from hundreds of landowners, loggers, and timber industry participants, with no individual landowner representing a material fraction of any of our plants' needs. Our wood fiber is procured under a variety of arrangements, including (1) logging contracts for the thinnings, pulpwood, and other unmerchandised low-grade fiber, (2) in-woods chipping contracts, (3) contracts with timber dealers, and (4) purchases from sawmills.

A2009

**Port Operations**

The following table describes our owned and leased ports. Wood pellets are exported from our owned or leased deep-water, marine terminals and are stored in domes, barges, and warehouses at the ports. Our terminals operate 24 hours per day, seven days per week.

| Port Location | Throughput Capacity (MTPY) | Storage Capacity (MT) | Storage Facility Type at Port Location | Terminal Facility Own/Lease |
|---|---|---|---|---|
| Chesapeake, Virginia | 2,500,000 | 90,000 | Owned domes | Owned terminal |
| Mobile, Alabama | 115,000 | 45,000 | Third-party barges | Leased terminal assets |
| Panama City, Florida | 780,000 | 32,000 | Third-party warehouse | Owned terminal assets |
| Pascagoula, Mississippi | 3,000,000 | 90,000 | Owned domes | Owned terminal assets |
| Wilmington, North Carolina | 3,000,000 | 90,000 | Owned domes | Owned terminal assets |
| Savannah, Georgia | 1,500,000 | 50,000 | Third-party domes | Leased terminal assets |
| Total | 10,895,000 | 397,000 | | |

**Our Contracts and Marketing Activities**

We refer to the structure of our long-term sales contracts as "take-or-pay" because they include a firm obligation of the customer to take a fixed quantity of product at a stated price and provides for us to be compensated in the event of the customer's failure to accept all or a part of the contracted volumes or for termination of a contract by the customer.

We also have entered into several other contracts that have smaller off-take quantities than the contracts described above. In total, as of January 1, 2023, our backlog of fully contracted volumes under our existing take-or-pay contracts is $23.5 billion with a weighted-average remaining contract term of 13.7 years. Included in the backlog are contracts with 18 customers in jurisdictions ranging from the U.K., Denmark, the Netherlands, Belgium, Japan, and the United States of America.

In some cases, we may purchase shipments of product from third-party suppliers and resell them in back-to-back transactions.

**Industry Overview**

Our product, utility-grade wood pellets, is used in an increasing variety of applications around the world to help reduce the life-cycle greenhouse gas emissions generated by our customers in energy generation and industrial processes.

For many of our customers, our wood pellets are used as a substitute for coal in both dedicated and co-fired power generation and combined heat and power plants. It enables major power, heat or combined heat and power generators ("generators") to profitably generate electricity and heat in a manner that reduces the overall cost of compliance with certain mandatory greenhouse gas ("GHG") emissions limits and renewable energy targets while also allowing companies to diversify their secure sources of renewable feedstock supply.

Unlike intermittent sources of renewable generation like wind and solar power, wood pellet-fired plants are capable of meeting baseload electricity demand and are dispatchable (that is, power output can be switched on or off or adjusted based on demand). As a result, utilities and major generators in Europe, Asia, and other areas have made and continue to make long-term, profitable investments in power plant conversions and new builds of generating assets that either co-fire wood pellets with coal or are fully dedicated wood pellet-fired plants. Such developments help generators maintain and increase baseload generating capacity and comply with binding climate change regulations and other emissions reduction targets.

The capital costs required to convert a coal plant to co-fire biomass, or to burn biomass exclusively, are a fraction of the capital costs associated with implementing offshore wind and most other renewable technologies. Furthermore, the relatively quick process of converting coal-fired plants to biomass-fired generation can be an attractive benefit for generators whose generation assets are no longer viable as coal plants due to the expiration of operating permits, regulatory phase-out of coal-fired power generation, the introduction of taxes, or other restrictions on fossil fuel usage or emissions of GHGs and other pollutants. Additionally, the European Union's Emissions Trading System continues to demonstrate a durable, constructive market for carbon, which assists biomass in being more cost effective for energy generation than carbon-intensive feedstocks such as coal and natural gas, even in markets where there are no direct incentives or subsidies for renewable energy generation.

A2010

There also continues to be significant demand growth in Europe and Asia for wood pellets as a preferred fuel source and renewable alternative to fossil fuels for district heating loops, residential and commercial heating, and the production of heat for industrial sites.

Our wood pellets also have potential applicability to hard-to-abate sectors as bio-based raw material feedstock to displace inputs to industrial processes formerly provided by fossil fuels, where their use could reduce greenhouse gas emissions on a lifecycle basis. In addition to the customer applications outlined above, we have long-term, take-or-pay off-take contracts in place with customers who intend to utilize our wood pellets as a raw material input in the refinement of bio-liquids like biodiesel and sustainably produced aviation fuel as well as to generate process steam and heat in heavy industrial manufacturing like lime, sugar, etc. As these markets further develop, we believe we will continue to have opportunities to serve this growing material demand beyond our current product sales backlog.

**Competition**

We compete with other utility-grade wood pellet producers for long-term, take-or-pay off-take contracts with major power and heat generation customers, trading houses, and increasingly with customers in hard-to-abate sectors. Competition in our industry is based on the price, quantity, quality, and consistency of the wood pellets produced, the reliability and scale of wood pellet deliveries and the producer's ability to verify and document, through customer and third-party audits, that their wood pellets meet the regulatory sustainability, and use requirements of a particular customer.

Most of the world's current wood pellet production plants are owned by small, private companies, with few companies owning or operating multiple plants. Few companies have the scale, production, technical expertise, access to sustainable fiber baskets, or commercial infrastructure necessary to supply utility-grade wood pellets under large, long-term off-take contracts to creditworthy counterparties. We are the largest producer by production capacity and consider other companies with production capacity, technical expertise, or commercial infrastructure to be our competitors, including Drax Biomass Inc., AS Graanul Invest, Fram Renewable Fuels, LLC, An Viet Phat Energy Co., LTD, and Highland Pellets LLC.

**Development and Construction Projects**

Demand for our product continues to exceed available supply, industry-wide. To meet growing demand, our development strategy is to identify potentially attractive new locations for wood pellet production, and deep-water terminal operations, and secure control or ownership of these sites. The process of developing these sites includes permitting, designing, engineering, and ultimately constructing, commissioning, and operating new wood pellet production or terminaling capacity consistent with our "build and copy" strategy, whereby we replicate production, and terminaling assets consistent with the design and equipment selection of our then-current operating assets. We are currently constructing the Epes plant, developing the Bond plant, and maintain a portfolio of additional sites under development or consideration.

**Governmental Regulations**

Our operations are subject to stringent and comprehensive federal, state, and local laws and regulations governing matters including protection of the environment and natural resources, occupational health and safety, and the release or discharge of materials into the environment, including air emissions. Such laws and regulations may require us to obtain permits, limit or avoid certain operational practices, and incur costs for compliance or remediation. Failure to comply with such laws may also result in substantial liabilities, including possible fines and penalties, for unpermitted emissions or discharges from our operations. Failure to comply with these laws and regulations may result in the assessment of administrative, civil, and criminal penalties, the imposition of investigatory and remedial obligations, and the issuance of orders enjoining some or all of our operations in affected areas.

Moreover, the global trend in environmental regulation is towards increasingly broad and stringent requirements for activities that may affect the environment. Any changes in environmental laws and regulations or re-interpretation of enforcement policies that result in more stringent and costly requirements could have a material adverse effect on our operations and financial position. Although we monitor environmental requirements closely and budget for the expected costs, actual future expenditures may be different from the amounts we currently anticipate spending. Moreover, certain environmental laws impose strict joint and several liability for costs to clean up and restore sites where pollutants have been disposed or otherwise spilled or released, potentially resulting in significant costs and liabilities for remediation of resulting damage to property, natural resources, or persons. Although we believe that our competitors face similar environmental requirements, market factors may prevent us from passing on any increased costs to our customers. Additionally, although we believe that continued compliance with existing requirements will not materially adversely affect us, there is no assurance that the current levels of regulation will continue in the future.

A2011

The following summarizes some of the more significant existing environmental, health, and safety laws and regulations applicable to our operations, the failure to comply with which could have a material adverse impact on our capital expenditures, results of operations and financial position.

*Air Emissions*

The federal Clean Air Act, as amended (the "CAA"), and state and local laws and regulations that implement and add to CAA requirements, regulate the emission of air pollutants from our facilities. The CAA and state and local laws and regulations impose significant monitoring, testing, recordkeeping, and reporting requirements for these emissions. These laws and regulations require us to obtain pre-approval for the construction or modification of certain projects or facilities expected to produce or significantly increase air emissions, obtain, and strictly comply with stringent air permit emission limits, and in certain cases utilize specific equipment or technologies to control and measure emissions. Obtaining these permits can be both costly and time intensive and has the potential to delay opening of new plants or significant expansion of existing plants; moreover, complying with these permits, including satisfying testing requirements, can be costly and time-intensive. Failure to comply with these laws, regulations and permit requirements may cause us to face fines, penalties, or injunctive orders in connection with air pollutant emissions from our operations.

The CAA requires that we obtain various construction and operating permits, including, in some cases, Title V air permits. In certain cases, the CAA requires us to incur capital expenditures to install air pollution control devices at our facilities. We are also required to control fugitive emissions from our operations and may face fines, penalties, or injunctive orders in connection with fugitive emissions. We have incurred, and expect to continue to incur, substantial administrative, operating and capital expenditures to maintain compliance with CAA requirements that have been promulgated or may be promulgated or revised in the future.

*Climate Change and Greenhouse Gases*

Our operations are subject to limited direct regulation with respect to emissions of GHGs. For example, at this time, the U.S. Environmental Protection Agency (the "EPA") requires certain large facilities to undergo CAA pre-construction review and obtain operating permits for their GHG emissions. Our operations are also indirectly affected by regulations regarding the carbon treatment of biomass. Several jurisdictions to which we ship our product have imposed regulations on the characterization of biomass as a carbon-neutral fuel, and any change that imposes more stringent regulations on the characterization of biomass as carbon-neutral could negatively impact demand for our products or require us to incur additional costs to achieve such characterization of our products. For more information, see our risk factor titled "Changes in the treatment of biomass could adversely impact our business." Additionally, in March 2022, the U.S. Securities and Exchange Commission ("SEC") released a proposed rule that would establish a framework for reporting of climate risks, targets, and metrics. A final rule is anticipated in Q2 2023. Although the final form and substance of the rule is not yet known, it could result in additional compliance costs. Finally, scientists have concluded that increasing concentrations of GHGs in the earth's atmosphere may produce climate changes that have significant physical effects, such as sea-level rise, increased frequency and severity of storms, floods, and other climatic events, including forest fires. If any such effects were to occur, they could have an adverse effect on our operations.

## Safety and Maintenance

We are subject to a number of federal and state laws and regulations, including the Federal Occupational Safety and Health Act, as amended ("OSHA"), and comparable state statutes, which are intended to protect the health and safety of employees and contractors. OSHA imposes various requirements, including safety-related training, policies, and programs. In addition, the OSHA Hazard Communication Standards and the EPA's Emergency Planning and Community Right-to-Know Act statutes require that information be maintained concerning hazardous materials used or produced in our operations and that this information be provided to employees, state and local governmental authorities and citizens. National Fire Protection Association (NFPA) standards require affected facilities to develop and implement plans and controls to minimize combustible dust. EPA regulations mandate the utilization of pollution control equipment such as cyclones, baghouses, and electronic precipitators to minimize regulated air emissions at affected facilities. Additionally, we continually strive to maintain compliance with applicable air, solid waste, and wastewater regulations as required by EPA regulations, state and local laws and ordinances. Our deep-water marine terminals are required to adhere to Homeland Security/U.S. Coast Guard regulations regarding physical security and emergency response plans.

## Seasonality

Our business is affected by seasonal fluctuations. During the first half of the year, the cost of producing wood pellets tends to be higher because during the winter months, the cost of delivered raw materials are higher, primarily due to a reduction in

8

accessibility during cold and wet weather conditions, which results in our need to extend the procurement radius around our plants. Our raw materials typically have higher moisture content during this period, resulting in lower production levels; moreover, the cost of drying wood fiber increases during periods of lower ambient temperatures given greater energy required in the process of heating. Our operating costs are primarily fixed, resulting in low fixed cost absorption or higher operating cost per metric ton ("MT"). Additionally, our customer contract price mix is typically higher during the second half of the year as we increase the sales volumes delivered to customers using wood pellets for heating.

**Human Resources**

Our employees are our greatest resource and keeping them safe is considered a moral obligation for all of us. We have been unrelenting in our commitment to our health and safety standards and processes. Moreover, we continue to build and foster diversity and inclusion among our employees and other stakeholders and making a long-lasting, positive impact in the communities in which we operate. As a company, we value keeping promises, acting with integrity, the determination to make a difference, and the qualities of openness, humility, and respect.

Through our human resources practices, we focus on attracting, developing, and retaining talent to help enable our growth consistent with our values. In addition, we apply a talent framework to support our human resources objectives of recruiting and nurturing top talent, strengthening our succession planning to develop a pipeline of future leaders for key roles and driving a culture of accountability through a robust performance management process.

We had 1,386 employees as of December 31, 2022. None of our employees are represented by a labor union. We have not experienced any employment-related work stoppages, and we consider relations with our employees to be positive.

We maintain daily 24/7 operations and to do so, we bring Enviva's best minds, systems, processes, and team back-up culture, together. Enviva finished 2022 with a Total Recordable Incident Rate of .76 compared to an industry average of 3.0. This incident rate is the second lowest in the company's history.

We focus on attracting, developing, and retaining a team of highly talented and motivated employees. We offer our employees competitive pay and benefits including paid time off, multiple healthcare and insurance coverage options including premium free offerings, paid company holidays, and a 401(k) retirement plan. Employee performance is measured in part based on goals that are aligned with our annual objectives, and we recognize that our success is based on the talents and dedication of those we employ. Additionally, we look to support our employees both on and off the job site by offering benefits such as paid parental leave, a wellness reimbursement program, FSA dependent care, paid disability (short term/long term), and educational assistance. All of our full-time employees are bonus eligible and 20% of our employees are currently eligible for equity-based awards under the Enviva Inc. Long-Term Incentive Plan (the "LTIP"). We evaluate these programs annually to ensure our employees are compensated fairly and competitively.

In 2022, our commitment to career growth and development led us to deploy various in-person and online courses and presentations to give employees the opportunity to learn new skills, hone existing ones and deepen their understanding of our business as well as expose them to new ideas that challenge their way of thinking. We offered 20 technical skill trainings for our operators in our plants. We hosted our annual program called Enviva Days which is a development initiative focused on driving career development and employee engagement. In 2022, this event included 15 learning sessions over the course of one week. More than 500 Enviva employees participated.

To achieve operational discipline in our hiring efforts, we follow a consistent hiring process across the organization. We recognize the need to fill roles and strive for a time-to-fill rate that aligns with internal benchmarks. Our current hiring process includes a pre-screen interview and cross-functional panel interview. Following recruitment, our onboarding program provides our new hires with the tools and information needed to succeed. These processes helped us maintain a total voluntary turnover rate of 31% against a very challenging labor market.

We are an equal opportunity employer with a commitment to diversity and inclusion. We believe in a workplace that promotes equality, transparency, and accountability. Our policies and procedures seek to foster these values through regular trainings and employee engagement, such as annual trainings for 100% of our employees on workplace conduct and non-discrimination. We strive to engage with the local communities where our operations are based so that we can locate and support a diverse talent pool.

Additional information regarding our human resources initiatives can be found under the "People" section of our 2021 Corporate Sustainability Report which can be found on our website in the Sustainability section.

A2013

**Principal Executive Offices**

Our principal executive offices are located at 7272 Wisconsin Avenue, Suite 1800, Bethesda, Maryland 20814.

**Available Information**

We file annual, quarterly, and current reports and other documents with the SEC under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The SEC maintains a website at *www.sec.gov* that contains reports and other information regarding issuers that file electronically with the SEC.

We also make available free of charge our Annual Reports on Form 10‑K, Quarterly Reports on Form 10-Q, Current Reports on Form 8‑K, and any amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act, simultaneously with or as soon as reasonably practicable after filing such materials with, or furnishing such materials to, the SEC and on or through our website, *www.envivabiomass.com*. The information on our website, or information about us on any other website, is not incorporated by reference into this Annual Report.

A2014

## ITEM 1A.    RISK FACTORS

*There are many factors that could have a material adverse effect on our business, financial condition, results of operations and cash available for dividends. New risks may emerge at any time, and we cannot predict those risks or estimate the extent to which they may affect financial performance. Each of the risks described below could adversely impact the value of our common stock.*

**Summary Risk Factors**

Our business is subject to numerous risks and uncertainties, including those described in this Item 1A "Risk Factors." These risks include the following:

- The Company's ability to declare and pay dividends, and repurchase shares is subject to certain conditions.

- We expect to derive substantially all our revenues from six customers in 2023, four of which are located in Europe. If we fail to continue to diversify our customer base, our results of operations, business and financial position, and ability to pay dividends to our stockholders could be materially adversely affected.

- Changes in laws or government policies, incentives and taxes related to low-carbon and renewable energy may affect customer demand for our products.

- Challenges to or delays in the issuance of air permits, or our failure to comply with our permits, could impair our operations and ability to expand our production.

- Federal, state, and local legislative and regulatory initiatives relating to forestry products and the potential for related litigation could result in increased costs, and additional operating restrictions and delays, which could cause a decline in the demand for our products and negatively impact our business, financial condition, and results of operations.

- Increasing attention to environmental, social, and governance ("ESG") matters, including our net-zero goals or our failure to successfully achieve such goals, could adversely affect our business.

- We may be unable to complete our construction projects on time, and our construction costs could increase to levels that make the return on our investment less than expected.

- The satisfactory delivery of substantially all of our production is dependent on continuous access to infrastructure at our owned, leased, and third-party-operated terminals. Loss of access to our ports of shipment and destination, including through failure of terminal equipment and port closures, could adversely affect our financial results and cash flows.

- Failure to maintain effective quality control systems at our production plants and deep-water marine terminals could have a material adverse effect on our business and operations.

- Our business is subject to operating hazards and other operational risks, which may have a material adverse effect on our business and results of operations. We may also not be adequately insured against such events.

- Significant increases in the cost, or decreases in the availability, of raw materials or sourced wood pellets could result in lower revenue, operating profits, and cash flows, or impede our ability to meet commitments to our customers.

- We are exposed to the credit risk of our contract counterparties, including the customers for our products, and any material nonpayment or nonperformance by our customers could adversely affect our business and results of operations.

- The international nature of our business subjects us to a number of risks, including foreign exchange risk and unfavorable political, regulatory, and tax conditions in foreign countries.

- Changes to applicable tax laws and regulations or exposure to additional tax liabilities could affect our business, cash flows, and future profitability.

- We may issue additional shares without stockholder approval, which would dilute existing stockholder ownership interests.

- System security vulnerabilities, data breaches, and cyber-attacks could compromise proprietary or otherwise sensitive information or disrupt operations, which could adversely affect our business, reputation, and stock price.

11

A2015

**Risks Related to Our Business**

*We expect to derive substantially all our revenues from six customers in 2023, four of which are located in Europe. If we fail to continue to diversify our customer base, our results of operations, business and financial position and ability to pay dividends to our stockholders could be materially adversely affected.*

Our contracts with Drax, Lynemouth Power, MGT, Ørsted, Sumitomo, and Mitsubishi, four of which are located in Europe, represent substantially all of our expected product sales volumes in 2023; as a result, we face counterparty and geographic concentration risk. The ability of each of our customers to perform its obligations under a contract with us will depend on a number of factors that are beyond our control and may include the overall financial condition of the counterparty, the counterparty's access to capital, the condition of the regional and global power, heat, and combined heat and power generation industry, continuing regulatory and economic support for wood pellets as a fuel source, pricing trends in the spot market for wood pellets and general economic conditions. In addition, in depressed market conditions, our customers may no longer need the amount of our products they have contracted for or may be able to obtain comparable products at a lower price. Should any counterparty fail to honor its obligations under a contract with us, we could sustain losses, which could have a material adverse effect on our business, financial condition, results of operations, and cash available for dividends.

Currently, we derive a majority of our revenues from customers in Europe. If economic, political, regulatory, or financial market conditions in Europe deteriorate and/or our customers experience a significant downturn in their business or financial condition, they may attempt to renegotiate, reject, or declare force majeure under our contracts. If we fail to continue to diversify our customer base geographically within and outside of Europe in the future, our results of operations, business and financial position, and ability to pay dividends to our stockholders could be materially adversely affected.

Upon the expiration of our off-take contracts, our customers may decide not to recontract on terms as favorable to us as our current contracts, or at all. For example, our current customers may acquire wood pellets from other providers that offer more competitive pricing or logistics or develop their own sources of wood pellets. Some of our customers could also exit their current business or be acquired by other companies that purchase wood pellets from other providers. The demand for wood pellets or their prevailing prices at the times at which our current off-take contracts expire may also render entry into new long-term-off-take contracts difficult or impossible. We may also decide to renegotiate our existing contracts on less favorable terms and/or at reduced volumes in order to preserve our relationships with our customers.

Any reduction in the amount of wood pellets purchased by our customers or our inability to renegotiate or replace our existing contracts on economically acceptable terms, or our failure to successfully penetrate new markets within and outside of Europe in the future, could have a material adverse effect on our results of operations, business and financial position, as well as our ability to pay dividends to our stockholders.

*Termination penalties within our off-take contracts may not fully compensate us for our total economic losses.*

Certain of our off-take contracts provide the customer with a right of termination for various events of convenience or changes in law or policy. Although some of these contracts are subject to certain protective termination payments, the termination payments made by our customers may not fully compensate us for losses. We may be unable to re-contract our production at favorable prices or at all, and our results of operations, business and financial position, and our ability to pay dividends to our stockholders, may be materially adversely affected as a result.

*Our long-term off-take contracts with our customers may only partially offset certain increases in our costs or preclude us from taking advantage of relatively high wood pellet prices in the broader markets.*

Our long-term off-take contracts typically set base prices subject to annual price escalation and other pricing adjustments for changes in certain of our underlying costs of operations, including, in some cases, for stumpage or diesel fuel. However, such cost pass-through mechanisms may only pass a portion of our total costs through to our customers. If our operating costs increase significantly during the terms of our long-term off-take contracts beyond the levels of pricing and cost protection afforded to us under the terms of such contracts, our results of operations, business and financial position, and ability to pay dividends to our stockholders, could be adversely affected. Continued and increased inflation could decrease the profitability of our long-term off-take contracts.

Moreover, during periods when the prevailing market price of wood pellets exceeds the prices under our long-term off-take contracts, our revenues could be significantly lower than they otherwise would have been were we not party to such contracts for substantially all our production. In addition, our current and future competitors may be in a better position than we are to take advantage of relatively high prices during such periods.

12

A2016

*The growth of our business depends in part on locating, developing, and acquiring interests in additional wood pellet production plants and marine terminals at favorable prices.*

Our business strategy includes growing our business through constructing new greenfield and brownfield facilities, capacity expansion of existing facilities, and third-party acquisitions that increase our cash generated from operations. Our ability to successfully achieve our organic growth plan will require us to acquire or construct several additional plants over the next five years. Various factors could affect our ability to achieve our organic growth plan and continue to grow our business, including:

- inability to identify or develop attractive projects, which could result from, among other things, inability to identify communities with optimal proximity to feedstock and access to labor and transportation, competition for attractive locations, regulatory challenges or reputational risks;

- our failure to complete development projects in a timely manner or at all, which could result from, among other things, permitting challenges, failure to procure requisite financing or equipment, construction difficulties, or an inability to obtain off-take contracts on acceptable terms; and

- fewer accretive third-party acquisition opportunities than we expect, which could result from, among other things, available projects having less desirable economic returns, competition, anti-trust concerns, or higher risk profiles than we believe suitable for our business plan and investment strategy.

In addition, changes to our business plans, financial condition or other factors could result in changes or delays to our organic growth plan. For example, in late 2022, we updated the standard plant design to improve plant utilization to execute the Design One, Build Many strategy, which has delayed the planned commencement dates of our new Epes and Bond plants by roughly a year. Any of these factors could prevent us from executing our growth strategy or otherwise could have a material adverse effect on our results of operations, business and financial position, and our ability to pay dividends to our stockholders.

*We may be unable to make attractive acquisitions, and any acquisitions we make will be subject to substantial risks that could adversely impact our business.*

We may consummate acquisitions that we believe will be attractive but that ultimately result in a decrease in our financial condition and results of operations. Any acquisition involves potential risks, some of which are beyond our control, including:

- mistaken assumptions about revenues and costs, including synergies;

- the inability to successfully integrate businesses we acquire;

- the inability to hire, train, or retain qualified personnel to manage and operate our business and newly acquired assets;

- the assumption of unknown liabilities;

- limitations on our access to indemnification from the seller;

- incorrect assumptions about the overall costs of equity or debt;

- the diversion of management's attention from other business concerns;

- unforeseen difficulties in connection with operating newly acquired assets or in new geographic areas;

- customer or key employee losses at acquired businesses; and

- the inability to meet obligations in off-take or other contracts associated with acquisitions.

If we consummate any future acquisitions, our capitalization and results of operations may change significantly, and our stockholders may not have the opportunity to evaluate the economic, financial, and other relevant information that we will consider in determining the application of our funds and other resources to acquisitions.

*The Company's ability to declare and pay dividends, and to repurchase shares, is subject to certain considerations.*

Dividends are authorized and determined by the Company's board of directors in its sole discretion. Decisions regarding the payment of dividends and the repurchase of shares are subject to a number of considerations, including:

- cash available for dividends or repurchases;

- the Company's results of operations and anticipated future results of operations;

A2017

- the Company's financial condition, especially in relation to anticipated future capital needs;

- the level of cash reserves the Company may establish to fund future capital expenditures, including potential acquisitions or development projects;

- the Company's ability to access other sources of financing to fund potential acquisitions and development projects;

- the Company's stock price;

- excise taxes that may be imposed on the Company with respect to certain repurchases of the Company's stock; and

- other factors the board of directors deems relevant.

The Company can provide no assurance that it will continue to pay dividends or authorize stock repurchases at the current rate or at all. Any elimination of or downward revision in the Company's dividend payout or stock repurchase program could have a material adverse effect on the market price of the Company's common stock.

### Regulatory and Litigation Risks

*Our business is subject to risks related to legal proceedings and governmental inquiries.*

Our business is subject to litigation, regulatory investigations, and claims arising in the normal course of operations. The risks associated with these matters often may be difficult to assess or quantify and the existence and magnitude of potential claims often remain unknown for substantial periods of time. Our involvement in any investigations and lawsuits would cause us to incur additional legal and other costs and, if we were found to have violated any laws, we could be required to pay fines, damages, and other costs, perhaps in material amounts. Regardless of final costs, these matters could have an adverse effect on our business by exposing us to negative publicity, reputation damage, or diversion of personnel and management resources.

*Changes in laws or government policies, incentives, and taxes related to low-carbon and renewable energy may affect customer demand for our products.*

Consumers of utility-grade wood pellets currently use our products either as part of a binding obligation to generate a certain percentage of renewable energy or because they receive direct or indirect financial support or incentives to do so. Financial support is often necessary to cover the generally higher costs of wood pellets compared to conventional fossil fuels like coal. In most countries, once the government implements a tax (*e.g.*, the U.K.'s carbon price floor tax) or a preferable tariff or specific renewable energy policy either supporting a renewable energy generator or the energy generating sector as a whole, such tax, tariff, or policy is guaranteed for a specified period of time, sometimes for the investment lifetime of a generator's project. However, governmental policies that currently support the use of biomass may adversely modify their tax, tariff, or incentive regimes, and the future availability of such taxes, tariffs, or incentive regimes, either in current jurisdictions beyond the prescribed timeframes or in new jurisdictions, is uncertain. Demand for wood pellets could be substantially lower than expected if government support is removed, reduced, or delayed or, in the future, is insufficient to enable successful deployment of biomass power at the levels currently projected.

In addition, regulatory changes such as new requirements to install additional pollution control technology could require us to curtail or amend operations to meet new GHG and other emission limits. This may also affect demand for our products in addition to increasing our operational costs. Regulatory directives may require certain biomass standards to be satisfied in order for our customers to capture any available direct or indirect regulatory incentives from the use of our products. This typically is implemented through biomass sustainability criteria, which either are a mandatory element of eligibility for financial subsidies to biomass energy generators or may be expected to become mandatory in the future. For more information, see our risk factor titled "Changes in the treatment of biomass could adversely impact our business." As a biomass fuel supplier, the viability of our business is therefore dependent on our ability to comply with such requirements. These requirements may restrict the types of biomass we can use and the geographic regions from which we source our raw materials and may require us to reduce GHG emissions associated with our supply and production processes.

Currently, some criteria with which we must comply, including rules relating to forest management practices and carbon accounting, are under revision. If different sustainability requirements are adopted in the future, demand for our products could be materially reduced in certain markets, and our results of operations, business and financial position, and our ability to pay dividends to our stockholders, may be materially adversely affected.

A2018

***Challenges to or delays in the issuance of air permits, or our failure to comply with our permits, could impair our operations and ability to expand our production.***

Our plants are subject to the requirements of the Clean Air Act and must either receive minor source permits from the states in which they are located or a major source permit, which the U.S. Environmental Protection Agency has the right to object to if it determines any proposed permit is not in compliance with applicable requirements. In general, our facilities are eligible for minor source permits following the application of pollution control technologies. However, we could experience substantial delays with respect to obtaining such permits, including as a result of any challenges to the issuance of our permits or other factors, which could impair our ability to operate our wood pellet production plants or expand our production capacity. In addition, any new air permits we receive could require that we incur additional expenses to install emissions control technologies or limit our operations. Such new permits could also impede our ability to satisfy emission limitations and/or stringent testing requirements to demonstrate compliance therewith. Failure to meet such requirements could have a material adverse effect on our results of operations, business and financial position, and our ability to pay dividends to our stockholders.

***Federal, state, and local legislative and regulatory initiatives relating to forestry products and the potential for related litigation could result in increased costs and additional operating restrictions and delays, which could cause a decline in the demand for our products and negatively impact our business, financial condition, and results of operations.***

Our raw materials are byproducts of traditional timber management and harvesting, principally the parts of the harvested wood that are not utilized in higher-value markets, such as the tops and limbs of trees, crooked or diseased trees, slash, understory, and thin tree lengths. Commercial forestry is regulated by complex regulatory frameworks at the federal, state, and local levels. Among other federal laws, the Clean Water Act and the Endangered Species Act have been applied to commercial forestry operations through agency regulations and court decisions, as well as through the delegation to states to implement and monitor compliance with such laws. State forestry laws, as well as land-use regulations and zoning ordinances at the local level, are also used to manage forests in the Southeastern United States, as well as other regions from which we may need to source raw materials in the future. Any new or modified laws or regulations at any of these levels could have the effect of reducing forestry operations in areas where we procure our raw materials and consequently may prevent us from purchasing raw materials in an economic manner, or at all. In addition, future regulation of, or litigation concerning, the use of timberlands, the protection of endangered species, the promotion of forest biodiversity and the response to and prevention of wildfires, as well as litigation, campaigns or other measures advanced by special interest groups, could also reduce the availability of the raw materials required for our operations.

***Changes in the treatment of biomass could adversely impact our business.***

Various rules have been issued or may be issued in the future by government agencies, including in the jurisdictions where we sell our products, to regulate the sustainability criteria associated with the use of biomass, which in turn may require us to adopt certain practices in our operations.

Biomass and our wood products are considered renewable under RED II. However, the EU is currently in the process of negotiating RED III and will determine whether the use of woody biomass will continue to be considered renewable in the EU and, therefore, can be used in meeting the EU's climate targets. The EU's directives establish, among other things, targets for renewable energy supply and certain sustainability requirements for biomass, including requirements related to carbon stocks and land use. If the wood pellets we produce do not conform to these or future requirements, our customers would not be able to count energy generated therefrom towards these renewable energy goals, which could decrease demand for our products. Biomass has been under additional regulatory scrutiny in recent years to develop standards to safeguard against adverse environmental effects from its use, and certain special interest groups that focus on environmental issues have expressed their opposition to the use of biomass, both publicly and directly, to domestic and foreign regulators, policy makers, power, heat or combined heat, and power generators ("generators") and other industrial users of biomass. These groups are also actively lobbying, litigating, and undertaking other actions domestically and abroad in an effort to increase the regulation of, reduce or eliminate the incentives and support for, or otherwise delay, interfere with, or impede the production and use of biomass for or by generators. In response to such concerns, the Biden Administration withdrew from pre-publication review a pending rulemaking to characterize biomass as carbon-neutral for CAA purposes in the United States. While we do not currently sell a significant portion of our products in the United States, any changes in the treatment of biomass in jurisdictions where we sell or plan to sell our products could materially adversely affect our results of operations, business and financial condition, and our ability to pay dividends to our stockholders.

Notwithstanding the above, we cannot guarantee that our products will continue to be considered renewable in all jurisdictions where our customers consume them or meet future standards or the expectations of third parties, governmental authorities, and stakeholders, related to the same, especially with respect to potential regulatory changes. This may adversely

15

A2019

impact our business, harming our reputation, restricting or limiting access to and the cost of capital, and subjecting us to potential litigation risk.

***Our operations are subject to stringent environmental and occupational health and safety laws and regulations that may expose us to significant costs and liabilities.***

Our operations are subject to stringent federal, regional, state, and local environmental, health, and safety laws and regulations. These laws and regulations govern environmental protection, occupational health and safety, the release or discharge of materials into the environment, air emissions, wastewater discharges, the investigation and remediation of contaminated sites, and allocation of liability for cleanup of such sites. These laws and regulations may restrict or impact our business in many ways, including by requiring us to acquire permits or other approvals to conduct regulated activities, limiting our air emissions or wastewater discharges or requiring us to install costly equipment to control, reduce, or treat such emissions or discharges and impacting our ability to modify or expand our operations. We may be required to make significant capital and operating expenditures to comply with these laws and regulations. Failure to comply with these laws and regulations may result in the assessment of administrative, civil, and criminal penalties, imposition of investigatory or remedial obligations, suspension or revocation of permits, and the issuance of orders limiting or prohibiting some or all of our operations. Adoption of new or modified environmental laws and regulations may impair the operation of our business, delay or prevent expansion of existing facilities or construction of new facilities, and otherwise result in increased costs and liabilities, which may be material.

***The actions of certain special interest groups could adversely impact our business.***

Certain special interest groups that focus on environmental issues have expressed their opposition to the use of biomass, both publicly and directly to domestic and foreign regulators, policy makers, power, heat or combined heat and power generators, and other industrial users of biomass. These groups are also actively lobbying, litigating, and undertaking other actions domestically and abroad in an effort to increase the regulation of, reduce or eliminate the incentives and support for, or otherwise delay, interfere with, or impede the production and use of biomass for or by heat and power generators. Such efforts, if successful, could materially adversely affect our results of operations, business and financial condition, and our ability to pay dividends to our stockholders.

***Increasing attention to ESG matters, including our net-zero goals or our failure to achieve such goals, could adversely affect our business.***

Increasing social and political attention to climate change and other environmental and social impacts may result in increased costs, changes in demand for certain types of products or means of production, enhanced compliance obligations, or other negative impacts to our business or our financial condition. Although we may participate in various voluntary frameworks and certification programs to improve the ESG profile of our operations and product, we cannot guarantee that such participation or certification will have the intended results on our ESG profile.

We create and publish voluntary disclosures regarding ESG matters from time to time, but many of the statements in those voluntary disclosures are based on our expectations and assumptions, which may require substantial discretion and forecasts about costs and future developments. Such expectations and assumptions are also complicated by the lack of an established framework for identifying, measuring, and reporting on many ESG matters. Moreover, in February 2021, we announced our intention to reduce, eliminate, or offset our direct (Scope 1) GHG emissions by 2030 and to publicly report our progress against this goal. We have also made commitments to aim to source 100% renewable energy (Scope 2 GHG emissions) for our operations and to work with our partners to adopt clean energy solutions. For more information, see "Recent Developments—Commitment to Achieve Carbon Neutral Operations." Our estimates concerning the timing and cost of implementing our goals are subject to risks and uncertainties, some of which are outside of our control. Given the evolving nature of GHG emissions accounting methodologies and climate science, we cannot guarantee that such factors may not give rise to the need to restate or revise our emissions reduction goals, cause us to miss them altogether, or limit the impact of success of achieving our goals. Additionally, we cannot guarantee that there will be sufficient offsets available for purchase given the increased demand from numerous businesses implementing net zero goals, or that, notwithstanding our reliance on any reputable third party registries, that the offsets we do purchase will successfully achieve the emissions reductions they represent. We also may face greater scrutiny as a result of our announcement and publication of our progress, and any failure to successfully achieve our voluntary net-zero goals, or the manner in which we achieve some or any portion of our goals, could lead to adverse press coverage or other public attention. Moreover, despite the voluntary nature of our net-zero goals, we may receive pressure from external sources, such as lenders, investors, or other groups, to adopt more aggressive climate or other ESG-related goals; however, we may not agree that such goals will be appropriate for our business, and we may not be able to implement such goals because of potential costs or technical or operational obstacles.

In March 2022, the SEC released a proposed rule that would establish a framework for the reporting of climate risks, targets, and metrics. A final rule is expected in April 2023, but we cannot predict what any such final rule may require. As

16

A2020

proposed, the SEC climate rule would impose burdensome and potentially costly emissions and other data gathering and reporting requirements on our operations, including, but not limited to, those related to the risks of our operations arising from the physical impacts of climate change (*e.g.*, flooding and water stress). Separately, the SEC has announced that it is scrutinizing existing climate-change related disclosures in public filings, increasing the potential for enforcement if the SEC were to allege an issuer's climate disclosures are misleading or deficient.

Relatedly, organizations that provide information to investors on corporate governance and related matters have developed rating processes on evaluating companies on their approach to ESG matters. Such ratings are used by some investors to inform their investment and voting decisions. Unfavorable ESG ratings could lead to increased negative investor sentiment toward us, our customers, or our industry, which could negatively impact our share price as well as our access to and cost of capital. Finally, to the extent ESG matters negatively impact our reputation, we may not be able to compete as effectively to recruit or retain employees, which may adversely affect our operations.

Further, public statements with respect to ESG matters, such as emissions reduction goals, other environmental targets, or other commitments addressing certain social issues, are becoming increasingly subject to heightened scrutiny from public and governmental authorities related to the risk of potential "greenwashing," i.e., misleading information or false claims overstating potential ESG benefits. For example, in March 2021, the SEC established the Climate and ESG Task Force in the Division of Enforcement to identify and address potential ESG-related misconduct, including greenwashing. Certain non-governmental organizations and other private actors have also filed lawsuits under various securities and consumer protection laws alleging that certain ESG-related statements, goals, or standards were misleading, false, or otherwise deceptive. As a result, we may face increased litigation risks from private parties and governmental authorities related to our ESG efforts. We could also face increasing costs as we attempt to comply with and navigate further regulatory focus and scrutiny.

Finally, any alleged claims of greenwashing against us or others in our industry may lead to further negative sentiment and diversion of investments. For example, on November 3, 2022, a putative securities class action lawsuit was filed in federal district court in the District of Maryland against Enviva, John Keppler, and Shai Even. The lawsuit asserts claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 thereunder based on allegations that the Company made materially false and misleading statements regarding the Company's business, operations, and compliance policies, particularly relating to its ESG practices. Specifically, the lawsuit alleges that the Company's statements were misleading as to the environmental sustainability of the Company's wood pellet production and procurement and the impact such statements would have on the Company's financials and growth potential. The lawsuit seeks unspecified damages, equitable relief, interest and costs, and attorneys' fees. Lead plaintiff and lead counsel were appointed on January 31, 2023, and their amended complaint is due to be filed on or before April 3, 2023. Enviva believes the case is without merit and intends to vigorously defend the matter.

## Operational Risks

***We may be unable to complete our construction projects on time, and our construction costs could increase to levels that make the return on our investment less than expected.***

We may face delays or unexpected developments in completing our current or future construction projects, including as a result of ongoing supply chain issues, our failure to timely obtain the equipment, services, or access to infrastructure necessary for the operation of our projects at budgeted costs, maintain all necessary rights to land access and use and/or obtain and/or maintain environmental and other permits or approvals. These circumstances could prevent our construction projects from commencing operations or from meeting our original expectations concerning timing, operational performance, the capital expenditures necessary for their completion, and the returns they will achieve. Our inability to complete and transition our construction projects into financially successful operating projects on time and within budget could have a material adverse effect on our results of operations, business, and financial position, and cash flows.

***The satisfactory delivery of substantially all of our production is dependent on continuous access to infrastructure at our owned, leased, and third-party-operated terminals. Loss of access to our ports of shipment and destination, including through failure of terminal equipment and port closures, could adversely affect our financial results and cash available for dividends.***

Substantially all of our production is dependent on infrastructure at our owned, leased, and third-party-operated terminals. Should we suffer a catastrophic failure of the equipment at these terminals or otherwise experience port closures, including for security or weather-related reasons, or suffer the effects of ongoing supply chain issues, we could be unable to fulfill off-take obligations or incur substantial additional transportation costs, which would reduce our cash flow. Moreover, we rely on various ports of destination, as well as third parties who provide stevedoring or other services at our ports of shipment and destination or from whom we charter oceangoing vessels and crews, to transport our product to our customers. Loss of access to these ports for any reason, or failure of such third-party service providers to uphold their contractual obligations, may impact our ability to

17

A2021

fulfill our obligations under our off-take contracts, cause interruptions to our shipping schedule and cause us to incur substantial additional transportation or other costs, all of which could have a material adverse effect on our business, financial condition, and results of operations.

***Failure to maintain effective quality control systems at our production plants and deep-water marine terminals could have a material adverse effect on our business and operations.***

Our customers require a reliable supply of wood pellets that meet stringent product specifications. We have built our operations and assets to consistently deliver and certify the highest levels of product quality and performance, which is critical to the success of our business and depends significantly on the effectiveness of our quality control systems, including the design and efficacy of such systems, the success of our quality training program and our ability to ensure that our employees and contract counterparties adhere to our quality control policies and guidelines. Moreover, any significant failure or deterioration of our quality control systems could impact our ability to deliver product that meets our customers' specifications and, in turn, could lead to rejection of our product by our customers, which could have a material adverse effect on our business, financial condition, and results of operations.

***Our business is subject to operating hazards and other operational risks, which may have a material adverse effect on our business and results of operations. We may also not be adequately insured against such events.***

Our business could be materially adversely affected by operating hazards and other risks to our operations. We produce a combustible product that may under certain circumstances present a risk of fires and explosions or other hazards. Moreover, severe weather, such as floods, earthquakes, hurricanes, or other natural disasters, climatic phenomena, such as drought, and other catastrophic events, such as plant or shipping disasters, could impact our operations by causing damage to our facilities and equipment, affecting our ability to deliver our product to our customers and impacting our customers' ability to take delivery of our products. Such events may also adversely affect the ability of our suppliers or service providers to provide us with the raw materials or services we require or the ability to load, transport, and unload our product.

In addition, the scientific community has concluded that severe weather will increase in frequency and intensity as result of increasing concentrations of GHGs in the Earth's atmosphere, and that climate change will have significant physical effects, including sea-level rise, increased frequency and severity of hurricanes and other storms, flooding, drought, and forest fires. We and our suppliers operate in coastal and wooded areas in geographic regions that are susceptible to such climate impacts.

We maintain insurance policies to mitigate against certain risks related to our business, in types and amounts that we believe are reasonable depending on the circumstances surrounding each identified risk; however, we may not be fully insured against all operating hazards and other operational risks incident to our business. Furthermore, we may be unable to maintain or obtain insurance of the type and amount we desire at reasonable rates, if at all. As a result of market conditions and certain claims we may make under our insurance policies, premiums and deductibles for certain of our insurance policies could escalate. In some instances, insurance could become unavailable or available only for reduced amounts of coverage or at unreasonable rates. If we were to incur a significant liability for which we are not fully insured, it could have a material adverse effect on our financial condition, results of operations, and cash available for dividends to our stockholders.

***We may be required to make substantial capital expenditures to maintain and improve our facilities.***

Although we currently use a portion of our cash generated from our operations to maintain, develop, and improve our assets and facilities, such investment may, over time, be insufficient to preserve the operating profile required for us to meet our planned profitability or meet the evolving quality and product specifications demanded by our customers. Moreover, our current and future construction and other capital projects may be capital-intensive or suffer cost overruns. Accordingly, if we exceed our budgeted capital expenditures and/or additional capital expenditures become necessary in the future and we are unable to execute our construction, maintenance, or improvement programs successfully, within budget, and in a timely manner, our results of operations, business and financial position, and our ability to generate cash flows, may be materially adversely affected. Our future success depends on our ability to continuously improve and upgrade our existing plants to meet customer demands while at the same time maintaining the reliability and integrity of our existing plants. We may not be able to maintain or replace key technology and infrastructure at our existing plants as quickly as we would like or in a cost-effective manner. The profitability of our business is dependent on the continuous improvement of both our supply and maintenance costs. We may not be able to continuously reduce costs as effectively as we need to increase profitability.

***Our business and operating results are subject to seasonal fluctuations.***

Our business is affected by seasonal fluctuations. The cost of producing wood pellets tends to be higher in the winter months because of increases in the cost of delivered raw materials, primarily due to a reduction in accessibility during cold and

18

A2022

wet weather conditions. Our raw materials typically have higher moisture content during this period, resulting in a lower product yield; moreover, the cost of drying wood fiber increases during periods of lower ambient temperatures.

The increase in demand for power and heat during the winter months drives greater customer demand for wood pellets. As some of our wood pellet supply to our customers are sourced from third-party purchases, we may experience higher wood pellet costs and a reduction in our gross margin during the winter months. These seasonal fluctuations could have an adverse effect on our business, financial condition, and results of operations and cause comparisons of operating measures between consecutive quarters to not be as meaningful as comparisons between longer reporting periods.

***We are exposed to construction and development risks related to our projects.***

Historically, we acquired wood pellet production plants and marine export terminals that had either already commenced commercial operations or received financial support from our former sponsor to mitigate the risk associated with the construction and ramp of such assets. Following the Simplification Transaction (as defined below), we have received certain fixed payments from certain owners of our former sponsor associated with its obligations related to prior drop-downs and other transactions; however, such payments may be insufficient to fully compensate us for cost overruns, production delays, supply chain disruptions, or other adverse developments. Furthermore, we remain exposed to the risks associated with our organic growth initiatives and will be fully exposed to the risks associated with any new development or construction activities.

We expect to experience an increase in capital expenditures and general and administrative expenses related to our development and construction activities, which may be substantial. We may face delays or unexpected developments in completing our current or future construction projects, including as a result of our failure to timely obtain the equipment, services, or access to infrastructure necessary for the operation of our projects at budgeted costs, maintain all necessary rights to land access and use, and obtain and maintain environmental and other permits or approvals. These circumstances could prevent our construction projects from commencing operations or meeting our original expectations concerning timing, operational performance, the capital expenditures necessary for their completion, and the returns they will achieve. Moreover, design, development, and construction activities associated with a project may occur over an extended period of time but may generate little or no revenue or cash flow until the project is placed into commercial service. This mis-match in timing could reduce our available liquidity. Our inability to complete and transition our construction projects into financially successful operating projects on time and within budget or the failure of our projects to generate expected returns could have a material adverse impact our liquidity, results of operations, business, and financial position, as well as our ability to pay dividends to our stockholders.

**Market and Credit Risks**

***Significant increases in the cost, or decreases in the availability, of raw materials or sourced wood pellets could result in lower revenue, operating profits, and cash flows, or impede our ability to meet commitments to our customers.***

We purchase wood fiber from third-party landowners and other suppliers for use at our plants. Our reliance on third parties to secure wood fiber exposes us to potential price volatility and unavailability of such raw materials, and the associated costs may exceed our ability to pass through such price increases under our contracts with our customers. Further, delays or disruptions in obtaining wood fiber may result from a number of factors affecting our suppliers, including extreme weather, production or delivery disruptions, inadequate logging capacity, labor disputes, impaired financial condition of a particular supplier, the inability of suppliers to comply with regulatory or sustainability requirements, or decreased availability of raw materials. In addition, other companies, whether or not in our industry, could procure wood fiber within our procurement areas and adversely change regional market dynamics, resulting in insufficient quantities of raw material or higher prices.

Any interruption or delay in the supply of wood fiber, or our inability to obtain wood fiber at acceptable prices in a timely manner, could impair our ability to meet the demands of our customers and expand our operations

In addition to our production, we purchase wood pellets produced by other suppliers to fulfill our obligations under our portfolio of long-term off-take contracts or take advantage of market dislocations on an opportunistic basis. Any reliance on other wood pellet producers exposes us to the risk that such suppliers will fail to satisfy their obligations to us pursuant to the associated off-take contracts, including by failing to timely meet quality specifications and volume requirements. Any such failure could increase our costs or prevent us from meeting our commitments to our customers.

The materialization of any of the foregoing risks could have an adverse effect on our results of operations, business, and financial position, and cash generated from our operations.

A2023

***We are exposed to the credit risk of our contract counterparties, including the customers for our products, and any material nonpayment or nonperformance by our customers could adversely affect our financial results and cash generated from our operations.***

We are subject to the risk of loss resulting from nonpayment or nonperformance by our contract counterparties, including our long-term off-take customers and suppliers. Our credit procedures and policies may not be adequate to fully eliminate counterparty credit risk. If we fail to adequately assess the creditworthiness of existing or future customers or suppliers, or if their creditworthiness deteriorates unexpectedly, any resulting nonpayment or nonperformance by them could have an adverse impact on our results of operations, business and financial position, and cash generated from our operations.

***Impacts to the cost or availability of transportation and other infrastructure could reduce our revenues.***

Disruptions to or increases in the cost of local or regional transportation services and other forms of infrastructure, such as electricity, due to shortages of vessels, barges, railcars, or trucks, weather-related problems, flooding, drought, accidents, mechanical difficulties, bankruptcy, inflationary pressures, strikes, lockouts, bottlenecks, or other events could increase our costs, temporarily impair our ability to deliver products to our customers, and might, in certain circumstances, constitute a force majeure event under our customer contracts, permitting our customers to suspend taking delivery of and paying for our products.

In addition, persistent disruptions in our access to infrastructure may force us to halt production as we reach storage capacity at our facilities. Accordingly, if the primary transportation services we use to transport our products are disrupted, and we are unable to find alternative transportation providers, it could have a material adverse effect on our results of operations, business and financial position, and cash generated from our operations.

***We compete with other wood pellet producers and, if growth in domestic and global demand for wood pellets meets or exceeds management's expectations, the competition within our industry may grow significantly.***

We compete with other wood pellet production companies for the customers to whom we sell our products. Other current producers of utility-grade wood pellets include Drax Biomass Inc., AS Graanul Invest, Fram Renewable Fuels, LLC, An Viet Phat Energy Co., LTD, and Highland Pellets LLC. Competition in our industry is based on price, consistency and quality of product, site location, distribution and logistics capabilities, customer service, creditworthiness and reliability of supply. Some of our competitors may have greater financial and other resources than we do, may develop technology superior to ours, or may have production plants sited in more advantageous locations from a logistics, procurement, or other cost perspective.

In addition, we expect global demand for solid biomass to increase significantly in the coming years. This demand growth may lead to a significant increase in the production levels of our existing competitors and may incentivize new, well-capitalized competitors to enter the industry, both of which could reduce the demand for our products and the prices we are able to obtain under future off-take contracts. Significant price decreases or reduced demand could have a material adverse effect on our results of operations, business and financial position, and cash generated from our operations.

***A portion of our product sales are based on spot prices for wood pellets. Extended periods of low market prices, or high prices at a time that we need to supplement our production, could adversely affect our financial condition, results of operations, and cash flows.***

In addition to generating cash flow from long-term, take-or-pay off-take contracts, we generate cash flows through spot or short term sales when pricing dynamics and our contract terms allow it. Enviva has the opportunity to flex down or delay a certain percentage of contracted shipments and sell on spot. Conversely, when the spot market dynamics shift, Enviva may have the opportunity to purchase third-party volumes and deliver under its long-term contracts. Spot prices are subject to wide fluctuations in response to relatively minor changes in supply and demand, and our ability to capitalize on higher spot prices and contract flexibility is dependent upon such fluctuations in pricing and demand. However, such cash flows may not be sustainable during periods of lower demand or pricing, which may adversely affect our financial results on a period-over-period basis. Similarly, under certain circumstances, we purchase pellets on the spot market to supplement our production. If we need to purchase pellets at a time when prices are elevated, this could adversely affect our gross margins and our financial results.

A2024

**Financial Risks**

*Our level of indebtedness may increase, thereby reducing our financial flexibility.*

As of December 31, 2022, our total debt was $1.6 billion, which primarily consisted of $750.0 million aggregate principal amount outstanding under our 6.5% senior unsecured notes due 2026, $436.0 million aggregate principal outstanding under our senior secured credit facility, and $350.0 million aggregate principal amount of municipal notes issued in July and November 2022 to fund the construction of our plant in Epes, Alabama and our plant near Bond, Mississippi. In addition, in January 2023, we entered into a $105.0 million senior secured term loan facility, which matures in June 2027. In the future, we may incur additional indebtedness in order to make acquisitions or to develop our properties. Our level of indebtedness could affect our operations in several ways, including the following:

- a significant portion of our cash flows could be used to service our indebtedness;

- the covenants contained in the agreements governing our outstanding indebtedness may limit our ability to borrow additional funds, dispose of assets, pay dividends, and make certain investments;

- our debt covenants may also affect our flexibility in planning for, and reacting to, changes in the economy and in our industry;

- a high level of debt would increase our vulnerability to general adverse economic and industry conditions, including increasing interest rates and inflationary pressures;

- a high level of debt may place us at a competitive disadvantage compared to our competitors that may be less leveraged and therefore may be able to take advantage of opportunities that our indebtedness would prevent us from pursuing; and

- a high level of debt may impair our ability to obtain additional financing in the future for working capital, capital expenditures, debt service requirements, acquisitions, or general corporate or other purposes.

In addition, borrowings under our senior secured credit facility bear, and potentially other debt instruments and credit facilities we or our subsidiaries may enter into in the future will bear, interest at variable rates. If market interest rates continue to increase, such variable-rate debt will create higher debt service requirements. Additionally, higher market interest rates can also increase borrowing costs on fixed rate debt instruments to be issued in the future, or the refinancing of existing fixed-rate debt. As such higher interest rate could adversely affect our cash flow and reduce funds available for organic growth or to return capital to investors.

In addition to our debt service obligations, our operations require substantial expenditures on a continuing basis. Our ability to make scheduled debt payments, to refinance our obligations with respect to our indebtedness, and to fund capital and non-capital expenditures necessary to maintain the condition of our operating assets and properties, as well as to provide capacity for the growth of our business, depends on our financial and operating performance. General economic conditions and financial, business, and other factors affect our operations and our future performance. Many of these factors are beyond our control. We may not be able to generate sufficient cash flows to pay the interest on our debt, and future working capital borrowings or debt or equity financing may not be available to pay or refinance such debt.

*Our exposure to risks associated with foreign currency and interest rate fluctuations, as well as the hedging arrangements we may enter into to mitigate those risks, could have an adverse effect on our financial condition and results of operations.*

We may experience foreign currency exchange and interest rate volatility in our business. We use hedging transactions with respect to certain of our off-take contracts which are, in part or in whole, denominated in foreign currencies, and are party to interest rate swaps with respect to a portion of our variable-rate debt, in an effort to achieve more predictable cash flow and to reduce our exposure to foreign currency exchange and interest rate fluctuations.

In addition, there may be instances in which costs and revenue will not be matched with respect to currency denomination. As a result, to the extent that existing and future off-take contracts are not denominated in U.S. Dollars, it is possible that increasing portions of our revenue, costs, assets, and liabilities will be subject to fluctuations in foreign currency valuations.

Our hedging transactions involve cost and risk and may not be effective at mitigating our exposure to fluctuations in foreign currency exchange and interest rates. Although the use of hedging transactions limits our downside risk, their use may also limit future revenues. Risks inherent in our hedging transactions include the risk that counterparties to hedging contracts may be unable to perform their obligations and the risk that the terms of such contracts will not be legally enforceable. Likewise, our hedging activities may be ineffective or may not fully offset the financial impact of foreign currency exchange or

21

A2025

interest rates fluctuations, which could have an adverse impact on our results of operations, business and financial position, and our ability to pay dividends to our stockholders.

**General Risk Factors**

*Our business may suffer if we lose, or are unable to attract and retain, key personnel, or if we are unable to successfully adapt to the new leadership team.*

We depend to a large extent on the services of our senior management team and other key personnel. Members of our senior management and other key employees collectively have extensive expertise in designing, building, and operating wood pellet production plants or marine terminals, negotiating long-term off-take contracts and managing businesses such as ours. Competition for management and key personnel is intense, and the pool of qualified candidates is limited. The loss of any of these individuals or the failure to attract additional personnel, as needed, could have a material adverse effect on our operations and could lead to higher labor costs or reliance on less qualified personnel. In addition, if any of our executives or other key employees were to join a competitor or form a competing company, we could lose customers, suppliers, know-how, and key personnel. Our success is dependent on our ability to continue to attract, employ, and retain highly skilled personnel.

In November 2022, our co-founder, Chief Executive Officer and board Chairman, John K. Keppler stepped down from his responsibilities for medical reasons. In connection with Mr. Keppler's departure and consistent with the succession plan developed by the Board, Thomas Meth was appointed as Chief Executive Officer and Ralph Alexander assumed Mr. Keppler's role as Chairman of the Board. Although Mr. Meth and Mr. Alexander have extensive experience with the Company, this leadership transition may result in changes to our management style, operations, and strategies. Any significant leadership change or senior management transition involves inherent risk and could hinder our strategic planning, business execution and future performance. In particular, this or any future leadership transition may result in a loss of personnel with deep institutional or technical knowledge and changes in business strategy or objectives, and has the potential to disrupt our operations and relationships with employees and customers due to added costs, operational inefficiencies, changes in strategy, decreased employee morale and productivity, and increased turnover. Failure to successfully transition to the new leadership team could affect our ability to attract and retain skilled personnel and may have an adverse effect on our results of operations, business, and financial position.

*The international nature of our business subjects us to a number of risks, including foreign exchange risk and unfavorable political, regulatory and tax conditions in foreign countries.*

Substantially all of our current product sales are to customers that operate outside of the United States. As a result, we face certain risks inherent in maintaining international operations that include foreign exchange movements, restrictions on foreign trade and investment, including currency exchange controls imposed by or in other countries and trade barriers such as export requirements, tariffs, taxes and other restrictions and expenses, which could increase the prices of our products and make our products less competitive in some countries.

*Changes to applicable tax laws and regulations or exposure to additional tax liabilities could affect our business, cash flows, and future profitability.*

We are subject to various complex and evolving U.S. federal, state, and local and non-U.S. taxes. U.S. federal, state, and local and non-U.S. tax laws, policies, statutes, rules, regulations, or ordinances could be interpreted, changed, modified, or applied adversely to us, in each case, possibly with retroactive effect, and may have an adverse effect on our business, cash flows and future profitability.

*Labor strikes or work stoppages by our employees could harm our business.*

As of December 31, 2022, none of our employees were represented by a labor union. However, unionization activities could occur among our employees. If employees strike, participate in a work stoppage or slowdown or engage in other forms of labor strike, it could lead to disruptions in our business, increases in our operating costs and constraints on our operating flexibility. Strikes, work stoppages or an inability to negotiate collective bargaining agreements on commercially reasonable terms could have a material adverse effect on our business, results of operations, financial condition, and cash flows.

*Borrowings under our senior secured credit facility exposes us to interest rate risk.*

Borrowings under our senior secured credit facility bear interest at a rate derived from the Secured Overnight Financing Rate ("SOFR"). SOFR is a relatively new reference rate and has a very limited history. The future performance of SOFR cannot be predicted based on its limited historical performance. Since the initial publication of SOFR in April 2018, changes in SOFR have, on occasion, been more volatile than changes in other benchmark or market rates, such as United States dollar LIBOR.

A2026

Additionally, any successor rate to SOFR under our senior secured credit facility may not have the same characteristics as SOFR or LIBOR. As a result, the amount of interest we may pay on our revolving credit facility is difficult to predict.

***Our business is subject to cybersecurity risks.***

As is typical of modern businesses, we are reliant on the continuous and uninterrupted operation of our information technology ("IT") systems. User access and security of our sites and IT systems are critical elements of our operations, as are cloud security and protection against cybersecurity incidents. Any IT failure pertaining to availability, access, or system security could potentially result in disruption of our activities and personnel, and could adversely affect our reputation, operations, or financial performance. The energy industry has become increasingly dependent on digital technologies to conduct day-to-day operations, and the use of mobile communication devices has rapidly increased. Industrial control systems such as supervisory control and data acquisition ("SCADA") systems now control large-scale processes that can include multiple sites across long distances. The Company's technologies, systems, networks, including its SCADA system, and those of its business partners may become the target of cybersecurity attacks or security breaches.

We have experienced attempted cybersecurity attacks, but have not suffered any material adverse impacts to our business and operations as a result of such unsuccessful attempts. We have implemented security measures that are designed to detect and protect against cyberattacks. No security measure is infallible. Despite these measures and any additional measures we may implement or adopt in the future, our facilities and systems, and those of our third-party service providers, have been and are vulnerable to security breaches, computer viruses, lost or misplaced data, programming errors, scams, burglary, human errors, misdirected wire transfers, and other adverse events. Our efforts to improve security and protect data may also identify previously undiscovered instances of security breaches or bad actors with present access to our systems.

Potential risks to our IT systems could include unauthorized attempts to extract business-sensitive, proprietary, confidential, or personal information, unauthorized attempts to perpetrate denial of service attacks, extortion, corruption of information, or disruption of business processes. A cybersecurity incident resulting in a security breach or failure to identify a security threat could disrupt our business and could result in the loss of sensitive, confidential information or other assets, as well as litigation, including individual claims or class actions, regulatory enforcement, violation of privacy or securities laws and regulations, and remediation costs, all of which could materially impact our reputation, operations, or financial performance.

***Our business is subject to privacy and data protection legislation compliance risks.***

The European Union has enacted the General Data Protection Regulation (EU 2016/679) (the "EU GDPR"), and the United Kingdom has implemented the Data Protection Act 2018 and the EU GDPR as it forms part of the laws of England and Wales, Scotland, and Northern Ireland by virtue of section 3 of the European Union (Withdrawal) Act 2018 (the "UK GDPR"), each of which (to the extent such laws apply) broadly impacts businesses that handle various types of personal data, including employee personal data.

The EU GDPR and UK GDPR impose stringent legal and operational obligations on businesses, as well as the potential for fines, sanctions, or other penalties, which could materially and adversely affect operations and business, as well as adversely impact the reputation of the Company.

Additionally, as a result of recent case law and regulatory guidance in the EU, organizations with a nexus to the UK or the EU will likely need to dedicate compliance costs and resources to implement appropriate mechanisms and safeguards (e.g., standard contractual clauses, pseudonymization techniques, encryption, or impact assessments) to legitimize transfers of personal data from the EU and the UK to third countries that have not been deemed by the European Commission or the Secretary of State of the UK (as applicable) to provide adequate protection for personal data. This includes transfers to the United States.

As a result of the UK's departure from the EU, the EU GDPR and the UK GDPR are now dual regimes and may diverge over time. Any such divergence may lead to an increase in compliance costs and may require the dedication of additional time and resources.

***A terrorist attack or armed conflict could harm our business.***

Terrorist activities and armed conflicts could adversely affect the U.S. and global economies and could prevent us from meeting financial and other obligations or prevent our customers from meeting their obligations to us. The war in Ukraine impacted our operations in the year ended December 31, 2022, resulting in $5.1 million of incremental costs during the first quarter of 2022, due to severe dislocations within our third-party shipping partners' operations related to demurrage and to loading, transporting, and unloading our wood pellets and the immediate spike in energy prices that impacted the cost of our

A2027

operations including incremental costs to support continued services from our third-party fiber suppliers and trucking service providers. We could experience loss of business, delays, or defaults in payments from customers or disruptions of fuel supplies and markets, including if domestic and global generators are direct targets or indirect casualties of an act of terror or war. Terrorist activities, the threat of potential terrorist activities, global conflict, and any resulting economic downturn could adversely affect our results of operations, impair our ability to raise capital, or otherwise adversely impact our ability to realize certain business strategies.

**If the price of our common stock fluctuates significantly, your investment could lose value.**

Although our common stock is listed on the New York Stock Exchange, we cannot assure you that an active public market will continue for our common stock. If an active public market for our common stock does not continue, the trading price and liquidity of our common stock will be materially and adversely affected. If there is a thin trading market or "float" for our stock, the market price for our common stock may fluctuate significantly more than the stock market as a whole. Without a large float, our common stock would be less liquid than the stock of companies with broader public ownership and, as a result, the trading prices of our common stock may be more volatile. In addition, in the absence of an active public trading market, investors may be unable to liquidate their investment in us. Furthermore, the stock market is subject to significant price and volume fluctuations, and the price of our common stock could fluctuate widely in response to several factors, including: our quarterly or annual operating results; changes in our earnings estimates; investment recommendations by securities analysts following our business or our industry; additions or departures of key personnel; changes in the business, earnings estimates, or market perceptions of our competitors; our failure to achieve operating results consistent with securities analysts' projections; changes in industry, general market, or economic conditions; and announcements of legislative or regulatory changes.

The stock market has experienced extreme price and volume fluctuations in recent years that have significantly affected the quoted prices of the securities of many companies, including companies in our industry. The changes often appear to occur without regard to specific operating performance. The price of our common stock could fluctuate based upon factors that have little or nothing to do with our company and these fluctuations could materially reduce our stock price.

**If securities or industry analysts do not publish research or reports about our business, if they adversely change their recommendations regarding our stock, or if our operating results do not meet their expectations, our stock price could decline.**

The trading market for our common stock will be influenced by the research and reports that industry or securities analysts publish about us or our business. If one or more of these analysts cease coverage of our company or fail to publish reports on us regularly, we could lose visibility in the financial markets, which in turn could cause our stock price or trading volume to decline. Moreover, if one or more of the analysts who cover our company downgrade our stock or if our operating results do not meet their expectations, our stock price could decline.

**Our certificate of incorporation and bylaws, as well as Delaware law, contain provisions that could discourage acquisition bids or merger proposals, which may adversely affect the market price of our common stock.**

Our certificate of incorporation authorizes our board of directors to issue preferred stock without stockholder approval. If our board of directors elects to issue preferred stock, it could be more difficult for a third party to acquire us. In addition, some provisions of our certificate of incorporation and bylaws could make it more difficult for a third party to acquire control of us, even if the change of control would be beneficial to our stockholders, including:

- advance notice provisions for stockholder proposals and nominations for elections to the board of directors to be acted upon at meetings of stockholders; and

- limitations on the ability of our stockholders to call special meetings.

Delaware law prohibits us from engaging in any business combination with any "interested stockholder," meaning generally that a stockholder who beneficially owns more than 15% of our stock cannot acquire us for a period of three years from the date this person became an interested stockholder, unless various conditions are met, such as approval of the transaction by our board of directors.

**The corporate opportunity provisions in our certificate of incorporation could enable affiliates of ours to benefit from corporate opportunities that might otherwise be available to us.**

Subject to the limitations of applicable law, our certificate of incorporation, among other things; permits us to enter into transactions with entities in which one or more of our officers or directors are financially or otherwise interested; permits any of our stockholders, officers or directors, to conduct business that competes with us and to make investments in any kind of

24

A2028

property in which we may make investments; and provides that if any director or officer of one of our affiliates who is also one of our officers or directors becomes aware of a potential business opportunity, transaction, or other matter (other than one expressly offered to that director or officer in writing solely in his or her capacity as our director or officer), that director or officer will have no duty to communicate or offer that opportunity to us, and will be permitted to communicate or offer that opportunity to such affiliates and that director or officer will not be deemed to have (i) acted in a manner inconsistent with his or her fiduciary or other duties to us regarding the opportunity or (ii) acted in bad faith or in a manner inconsistent with our best interests.

These provisions create the possibility that a corporate opportunity that would otherwise be available to us may be used for the benefit of one of our affiliates.

***Effects of COVID-19 pandemic and other health epidemics and outbreaks, including economic, regulatory, legal, workforce, and cybersecurity risks, could adversely impact our financial condition.***

Our business is subject to ongoing risks associated with the COVID-19 pandemic and novel variants. Our contractors and supply chain partners have experienced labor-related and other challenges associated with COVID-19 that had a more pronounced than anticipated impact on our operations and project execution schedule. In addition, the prevalence of certain variants of COVID-19 and increased rates of infection across areas in which we operate affected the availability of healthy workers from time to time at our facilities and we experienced increased rates of absence in our hourly workforce as workers who contracted COVID-19 quarantined at home. These absences contributed to reduced facility availability and, in some cases, reduced aggregate production levels. At this time, we cannot predict the extent or duration of the COVID-19 pandemic or its effects on the economy, including the impact on demand for our services and workforce, nor can we estimate the ongoing potential adverse impact from COVID-19 on our financial condition, results of operations, cash flows, and liquidity.

***We have identified a material weakness in our internal control over financial reporting as of December 31, 2022. If we are unable to develop and maintain an effective system of internal control over financial reporting, we may not be able to accurately report our financial results in a timely manner.***

In the fourth quarter of 2022, management identified a material weakness in our internal control over financial reporting whereby the Company did not design and execute controls to assess the recoverability of recognized customer assets in accordance with U.S. generally accepted accounting principles .

The existence of material weaknesses in internal control over financial reporting could adversely affect our reputation or investor perceptions of us, which could have a negative effect on the trading price of our shares. We can give no assurance that the measures we have taken and plan to take in the future will remediate the material weakness identified or that any additional material weaknesses or restatements of financial results will not arise in the future due to a failure to implement and maintain adequate internal control over financial reporting or circumvention of these controls. Even if we are successful in strengthening our controls and procedures, in the future those controls and procedures may not be adequate to prevent or identify irregularities or errors or to facilitate the fair presentation of our financial statements.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented, or detected and corrected on a timely basis. Effective internal controls are necessary for us to provide reliable financial reports and prevent fraud.

A2029

**ITEM 1B.   UNRESOLVED STAFF COMMENTS**

None.

**ITEM 2.   PROPERTIES**

Information regarding our properties is contained in Part I, Item 1. "Business" and Part II, Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**ITEM 3.   LEGAL PROCEEDINGS**

On November 3, 2022, a putative securities class action lawsuit was filed in federal district court in the District of Maryland against Enviva, John Keppler, and Shai Even. The lawsuit asserts claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 thereunder based on allegations that the Company made materially false and misleading statements regarding the Company's business, operations, and compliance policies, particularly relating to its ESG practices. Specifically, the lawsuit alleges that the Company's statements were misleading as to the environmental sustainability of the Company's wood pellet production and procurement and the impact such statements would have on the Company's financials and growth potential. The lawsuit seeks unspecified damages, equitable relief, interest and costs, and attorneys' fees. Lead plaintiff and lead counsel were appointed on January 31, 2023, and their amended complaint is due to be filed on or before April 3, 2023. Enviva has insurance coverage that, we believe, will cover some or all of its liabilities related to the defense of this matter. However, litigation is inherently uncertain and we cannot be certain that our coverage will be adequate for liabilities actually incurred. Enviva believes the case is without merit and intends to vigorously defend the matter.

Although we may, from time to time, be involved in litigation and claims arising out of our operations in the normal course of business, we do not believe that we are a party to any other litigation that will have a material adverse impact on our financial condition or results of operations.

**ITEM 4.   MINE SAFETY DISCLOSURES**

Not applicable.

26

A2030

**PART II**

**ITEM 5.    MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

**Market Information**

Our common stock is traded on the New York Stock Exchange under the symbol "EVA."

**Holders of Record**

As of February 24, 2023, there were 67.6 million shares of common stock outstanding held by 39 stockholders of record. Because many shares of our common stock are held by brokers and other institutions on behalf of our stockholders, we are unable to estimate the total number of stockholders represented by these stockholders of record.

**Dividend Policy**

We intend to continue to pay quarterly dividends from positive cash flow from operations to our stockholders. However, the decision to pay future dividends is solely within the discretion of, and subject to approval by, our board of directors. Our board of directors' determination with respect to any such dividends, including the record date, the payment date and the actual amount of the dividend, will depend upon our results of operations, financial condition, liquidity, capital requirements, contractual restrictions, restrictions imposed by applicable law and other factors that the board deems relevant at the time of such determination.

**Performance Graph**

The graph below compares our cumulative total stockholder return since December 31, 2017 with the S&P 500 Index and Dow Jones Industrial Average Index. The graph assumes that the value of the investment in our common stock and each index (including reinvestment of dividends) was $100 on December 31, 2017.



**Comparison of Five-Year Total Returns**

**Securities Authorized for Issuance under Equity Compensation Plans**

The information relating to our equity compensation plans required by Item 5 is incorporated by reference to such information as set forth in Part III, Item 12. "Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters."

27

A2031

**Unregistered Sales of Securities.**

We did not have any sales of unregistered equity securities during the fiscal year ended December 31, 2022 that we have not previously reported on a Quarterly Report on Form 10-Q or a Current Report on Form 8-K.

28

A2032

**ITEM 6. RESERVED**

Not applicable.

29

A2033

**ITEM 7.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*On December 31, 2021, Enviva Partners, LP (the "Partnership") converted from a Delaware limited partnership to a Delaware corporation (the "Conversion") named "Enviva Inc." References to "Enviva," the "Company," "we," "us," or "our" refer to (i) Enviva Inc. and its subsidiaries for the periods following the Conversion and (ii) Enviva Partners, LP and its subsidiaries for periods prior to the Conversion, except where the context otherwise requires. References to "our former sponsor" refer to Enviva Holdings, LP, and, where applicable, its wholly owned subsidiaries Enviva MLP Holdco, LLC and Enviva Development Holdings, LLC. References to "our former General Partner" refer to Enviva Partners GP, LLC, a wholly owned subsidiary of Enviva Holdings, LP. Please read Item 7, "Basis of Presentation," "Corporate Conversion" for information regarding the Conversion. Please read Cautionary Statement Regarding Forward‑Looking Statements beginning on page 1 and Item 1A. "Risk Factors" for information regarding certain risks inherent in our business.*

**Business Overview**

We are a growth-oriented company originally formed as a Delaware limited partnership in 2013 that converted to a Delaware corporation named "Enviva Inc." We develop, construct, acquire, and own and operate, fully contracted wood pellet production plants where we aggregate a natural resource, wood fiber, and process it into dry, densified, uniform pellets that can be effectively stored and transported around the world. We primarily sell our wood pellets through long-term, take-or-pay off-take contracts with creditworthy customers in the United Kingdom, the European Union (the "EU"), and Japan, who use our pellets to displace coal and other fossil fuels to generate power and heat as part of their efforts to accelerate the energy transition away from conventional energy sources. Our wood pellets meet the criteria put forth by the European Union's Renewable Energy Directive ("RED II") which includes biomass in its definition of renewable energy. The wood pellets we produce are viewed by our customers as a critical component of their efforts to reduce life-cycle greenhouse gas emissions in their core energy generation or industrial manufacturing processes and mitigate the impact of climate change. We believe that our wood pellets also have potential applicability to hard-to-abate sectors like steel, cement, lime, chemicals, and aviation fuels, where their use could reduce greenhouse gas emissions on a lifecycle basis.

We own and operate ten plants (collectively, "our plants") with a combined production capacity of approximately 6.2 million MT of wood pellets per year ("MTPY") in Virginia, North Carolina, South Carolina, Georgia, Florida, and Mississippi, the production of which is fully contracted, with a few of our contracts extending well into the 2040s. We export our wood pellets to global markets through our deep-water marine terminal at the Port of Chesapeake, Virginia, terminal assets at the Port of Wilmington, North Carolina, the Port of Pascagoula, Mississippi, and from third-party deep-water marine terminals in Savannah, Georgia, Mobile, Alabama, and Panama City, Florida. In 2022, we commenced construction of our fully contracted wood pellet production plant in Epes, Alabama (the "Epes plant") which is designed and permitted to produce more than one million MTPY of wood pellets. In addition, in 2022, we commenced the development, subject to receiving the necessary permits, of a wood pellet production plant in Bond, Mississippi (the "Bond plant") which is designed to produce more than one million MTPY of wood pellets. All of our facilities are located in geographic regions with low input costs and favorable transportation logistics. Owning these cost-advantaged assets in a rapidly expanding industry provides us with a platform to generate stable cash flows. Our plants are sited in robust fiber baskets providing stable pricing for the low-grade fiber used to produce wood pellets. Our raw materials are byproducts of the sawmilling process or traditional timber harvesting, principally low-value wood materials, such as trees generally not suited for sawmilling or other manufactured forest products, and tree tops and limbs, understory, brush, and slash that are generated in a harvest.

Our primary sales strategy is to fully contract the wood pellet production from our plants under long-term, take-or-pay off-take contracts with a diversified and creditworthy customer base. Our long-term off-take contracts typically provide for fixed-price deliveries that often include provisions that escalate the price over time and provide for other margin protection. For 2022, our production capacity from our wood pellet production plants was contracted under our existing long-term, take-or-pay off-take contracts. In addition to generating durable cash flow from long-term, take-or-pay off-take contracts, we monitor sustained dislocations in the marketplace, and opportunistically transact when pricing dynamics and contract flexibility provide avenues to generate incremental gross margin. These commercial activities are aligned with the terms of many of our off-take contracts, which generally provide us with the opportunity to flex a certain percentage of contracted shipments up or down. That flexibility, enabled by our multi-plant profile and scale, can create opportunities to optimize our gross margin when we sell under short-term contracts in times when spot market prices are elevated or, conversely, to purchase third-party volumes during times when spot market prices are depressed. However, these commercial activities are subject to market dynamics that can vary drastically; as a result, the financial impact of these activities may vary significantly from period to period.

Our largest customers use our wood pellets as a substitute fuel for coal in dedicated biomass or co-fired coal power plants. Wood pellets serve as a suitable "drop-in" alternative to coal because of their comparable heat content, density, and form. Due

A2034

to the uninterruptible nature of our customers' fuel consumption, our customers require a reliable supply of wood pellets that meet stringent product specifications. We have built our operations and assets to deliver and certify the highest levels of product quality and our track record of reliable deliveries enables us to charge premium prices for this certainty. In addition to our customers' focus on the reliability of supply, they are concerned about the combustion efficiency of the wood pellets and their safe handling. Because combustion efficiency is a function of energy density, particle size distribution, ash/inert content, and moisture, our customers require that we supply wood pellets meeting minimum criteria for a variety of specifications and, in some cases, provide incentives for exceeding our contract specifications.

## Basis of Presentation

### *Corporate Conversion*

We converted from a Delaware limited partnership to a Delaware corporation effective December 31, 2021; consequently, results for periods through December 31, 2021 reflect Enviva as a limited partnership, not a corporation. The primary financial impacts of the Conversion to the consolidated financial statements were (i) reclassification of partnership capital accounts to equity accounts reflective of a corporation and (ii) income tax effects. On the date of the Conversion, each common unit representing a limited partner interest in the Partnership issued and outstanding immediately prior to the Conversion was exchanged for one share of common stock of the Company, par value $0.001 per share.

### *Simplification Transaction*

On October 14, 2021, the Partnership acquired our former sponsor and our former General Partner, and the incentive distribution rights held by our former sponsor were cancelled and eliminated (collectively, the "Simplification Transaction") in exchange for 16.0 million common units, which were distributed to the owners of our former sponsor. In connection with the Simplification Transaction, we acquired certain assets under development, as well as off-take contracts in varying stages of negotiation. Additionally, our existing management services fee waivers and other support agreements with our former sponsor were consolidated, fixed, and novated to certain owners of our former sponsor. Under the consolidated support agreement, we are entitled to receive quarterly payments (the "Support Payments") in an aggregate amount of $55.5 million with respect to periods from the fourth quarter of 2021 through the first quarter of 2024. The owners of our former sponsor agreed to reinvest in our common stock all dividends from 9.0 million of the 16.0 million common units issued in connection with the Simplification Transaction during the period beginning with the distribution for the third quarter of 2021 through the fourth quarter of 2024.

### *Enviva Wilmington Holdings, LLC*

We own all of the Class B units of Enviva Wilmington Holdings, LLC (the "Hamlet JV"). The Hamlet JV owns a wood pellet production plant in Hamlet, North Carolina (the "Hamlet plant"). We are the managing member of the Hamlet JV, which is a consolidated subsidiary partially owned by a third party. For more information regarding our rights and obligations with respect to the Hamlet JV, see Note 15, *Equity-Hamlet JV*.

## Recent Developments

### *Leadership Transition*

In November 2022, John Keppler, Chairman and Chief Executive Officer, stepped down from his responsibilities to pursue medical and surgical treatment to address a cardiac valve issue, effective November 14, 2022. In connection with the termination of his employment with the Company, Mr. Keppler also resigned from his role as Chairman of the board of directors of the Company (the "Board"). The Company expects Mr. Keppler to return as an active Executive Chairman during the first half of 2023 and to remain available to the Company until his return. The Company entered into a consulting agreement with respect to his ongoing service as a strategic advisor to the Company. In connection with Mr. Keppler's separation from the Company, the board of directors appointed Thomas Meth as Chief Executive Officer, effective November 14, 2022. In addition, in January 2023, the Company announced the promotion of Jason E. Paral to Senior Vice President, General Counsel, and Secretary. Mr. Paral's promotion completes the succession plan for William H. Schmidt, Jr., whereby Mr. Schmidt's responsibilities leading the Company's legal and development functions would be assumed by two executives, including by Mr. Paral and by Mark A. Coscio. Simultaneous with Mr. Paral's appointment, Mr. Schmidt stepped down from his position as Executive Vice President, Corporate Development and General Counsel, but continues to be employed by the Company as Senior Advisor for a transition period.

A2035

*Financing Activities*

In June 2022, we amended our senior secured credit facility to extend the maturity date from April 2026 to June 2027, and to increase the maximum Total Leverage Ratio (as defined in the credit agreement) from 5.00:1.00 to 5.50:1.00 (and from 5.25:1.00 to 5.75:1.00 during a Material Transaction Period (as defined in the credit agreement)).

*New Markets Tax Credit ("NMTC") Loans*

In June 2022, we borrowed $42.0 million pursuant to which the net proceeds of such loans are generally restricted to funding a portion of the costs of the acquisition, construction, equipping, and financing of the Epes plant. The NMTC financing accrues interest at a weighted average rate of 2.9% per annum. Of the $42.0 million, $34.1 million matures in its entirety in June 2029, while $7.9 million could be prepaid quarterly starting in 2029 and through 2052.

*Epes Tax-Exempt Green Bonds*

In July 2022, The Industrial Development Authority of Sumter County, Alabama issued its Exempt Facilities Revenue Bonds (Enviva Inc. Project), Series 2022 (Green Bonds) (the "Epes Tax-Exempt Green Bonds") in the aggregate principal amount of $250.0 million. The proceeds of the offering were loaned to us pursuant to a loan and guaranty agreement constituting a senior unsecured obligation to fund a portion of the costs of the acquisition, construction, equipping, and financing of the Epes plant and to pay costs of the offering. The Epes Tax-Exempt Green Bonds, which were issued at par, bear interest at an annual rate of 6.00%, and mature in 2052, subject to mandatory tender in July 2032 by The Industrial Development Authority of Sumter County, Alabama with the corresponding acceleration of payment under the loan to the Company.

*Bond Tax-Exempt Green Bonds*

In November 2022, the Mississippi Business Finance Corporation issued its Exempt Facilities Revenue Bonds (Enviva Inc.), Series 2022 (Green Bonds) (the "Bond Tax-Exempt Green Bonds") in the aggregate principal amount of $100.0 million. The proceeds of the offering were loaned to us pursuant to a loan and guaranty agreement constituting a senior unsecured obligation to fund a portion of the costs of acquiring, constructing, equipping, and financing of the Bond plant and to pay costs of the offering. The Bond Tax-Exempt Green Bonds which were issued at par, bear interest at an annual rate of 7.75%, and mature in 2047, subject to mandatory tender in July 2032 by the Mississippi Business Finance Corporation with a corresponding acceleration of payment under the loan to the Company.

*Term Loan*

In January 2023, under our senior secured credit facility, we entered into a senior secured term loan facility in the amount of $105.0 million, maturing in June 2027. Borrowing rates are variable and calculated as SOFR plus 4.00% per annum. We used the net proceeds to reduce borrowings under our revolver.

*Commitment to Achieve Carbon-Neutral Operations*

Consistent with our mission to displace coal, grow more trees, and fight climate change, we recently announced our intention to reduce, eliminate, or offset our Scope 1 GHG emissions and to source 100% renewable energy (Scope 2 GHG emissions) by 2030. The product we manufacture helps reduce the lifecycle GHG emissions of our customers, but we believe we must also do our part within our operations to mitigate the impacts of climate change. We seek to accomplish neutrality with respect to our Scope 1 emissions (i.e., direct emissions from our manufacturing) by improving energy efficiency and adopting lower-carbon processes, as well as through investment in carbon offsets. We also aim to neutralize our Scope 2 emissions (i.e., indirect emissions from energy we purchase) by using 100% renewable energy by 2030 through the purchase of renewable electricity and/or onsite generation where practicable. Moreover, we will seek to proactively engage with our suppliers, transportation partners, and other stakeholders to drive innovative improvements in our supply chain to reduce our Scope 3 emissions (i.e., indirect emissions in our value chain). We intend to report our Scopes 1, 2, and 3 emissions annually. Although it is difficult to project the incremental cost to our operations in 2030, we do not expect any material impact to our financial performance as a result of our efforts to achieve "net-zero" in GHG emissions from our operations. For more information, refer to the risk factor titled "Increasing attention to ESG matters, including our net-zero goals and our failure to successfully achieve them, could adversely affect our business."

A2036

**Factors Impacting Comparability of Our Financial Results**

*Executive Separation*

In connection with the previously mentioned leadership transition in November 2022, we entered into a separation agreement with Mr. Keppler. The separation agreement included: (1) the bonus he would have been entitled to for the year ended December 31, 2022, pro-rated based on 2022 service through November 14, 2022, and paid with respect to targeted individual performance of Mr. Keppler and actual performance of the Company at the same time bonuses are paid to executives generally during the first quarter of 2023, (2) a severance payment of $3.8 million, paid in 36 equal installments, (3) accelerated vesting of unvested time-based Enviva Inc. Long-Term Incentive Plans (the "LTIPs"), occurring during the first quarter of 2023, and (4) vesting of unvested performance-based LTIPs, occurring during the first quarter of 2023. In addition, we executed a consulting agreement pursuant to which with Mr. Keppler is paid $25,000 per month through March 31, 2023, which includes automatic monthly extensions thereafter until termination by Mr. Keppler or us.

*Omicron Variant of Novel Coronavirus*

During the three months ended March 31, 2022, the Omicron variant of COVID-19 significantly impacted our operations and resulted in $15.2 million of incremental costs. Our contractors and supply chain partners experienced labor-related and other challenges associated with COVID-19 that had a more pronounced than anticipated impact on our operations and project execution schedule. In addition, the prevalence of the Omicron variant of COVID-19 and increased rates of infection across areas in which we operate affected the availability of healthy workers from time to time at our facilities and we experienced increased rates of absence in our hourly workforce as workers who contracted COVID-19 quarantined at home. These absences contributed to reduced facility availability and, in some cases, reduced aggregate production levels. For more information about the effects of COVID-19 on the year ended December 31, 2022, please see below under "Results of Operations."

*War in Ukraine*

The war in Ukraine impacted our operations and resulted in $5.1 million of incremental costs during the year ended December 31, 2022, all of which were incurred during the first quarter of 2022. Our third-party shipping partners' operations experienced severe dislocations which incrementally impacted our distribution costs related to demurrage and to loading, transporting, and unloading our wood pellets. In addition, the immediate spike in energy prices negatively impacted the cost of our operations including incremental costs to support continued services from our third-party fiber suppliers and trucking service providers.

*Accounting for Wood Pellets Sale Contracts as a Financing Arrangement ("Deferred Gross Margin Transactions")*

We have wood pellets sale contracts with a customer for the sale of approximately 2.8 million MT between the fourth quarter of 2022 through 2026 (the "existing sale contracts"). In the fourth quarter of 2022, the Company entered into agreements with the customer to purchase approximately 1.8 million MT of wood pellets between 2023 and 2025 (the "new purchase agreements").

Under accounting principles generally accepted in the United States ("GAAP"), the fourth quarter 2022 new purchase agreements constituted a contract modification. Because the scope of the modification resulted in a net decrease in future sales volumes to the customer, the Company was required to account for the modification as if it had terminated the existing sale contracts and created a new, single contract. Accordingly, the amount of consideration to be received for the sale of approximately 2.8 million MT under the existing sale contracts will be allocated to the remaining sales during the life of the new purchase agreements base on an average sale price per MT.

Additionally, the fourth quarter 2022 new purchase agreements to purchase approximately 1.8 million MT of wood pellets during 2023 through 2025 constitute, for GAAP purposes, a repurchase agreement. Under GAAP, we are required to account for the new purchase agreements as a financing arrangement.

Accordingly, approximately 450,000 MT of wood pellets sold and delivered to the customer in the fourth quarter of 2022 are reflected as a financing transaction in our consolidated financial statements instead of as product sales. Gross proceeds of $175.1 million from the sales are reflected as financing liabilities and deferred revenue on our consolidated balance sheets, and the cost of goods sold of $95.3 million inclusive of depreciation and amortization expense of $9.3 million are reflected as inventory. In addition, interest expense of $9.6 million has been recorded based on the difference between the future purchase price per MT of the approximately 1.8 million MT under the new purchase agreements and the new blended sale price per MT of the volumes sold in the fourth quarter under the existing sales contracts only for the time that passed during the fourth quarter of 2022 between the sale and expected purchase dates. The cash received from the customer of $102.3 million during the fourth

33

A2037

quarter of 2022 under the existing sale contracts is included in net cash provided by financing activities instead of in cash provided by operating activities.

Our 2022 gross margin excluding depreciation and amortization was negatively impacted by $89.0 million, and interest expense was increased by $9.6 million, in each case by the impact of the Deferred Gross Margin Transactions. In addition, net cash provided by operating activities was reduced by $102.3 million due to the impact of the Deferred Gross Margin Transactions.

We expect to recognize the product sales associated with these transactions primarily in 2024 and 2025.

*Polar Vortex*

During late December 2022, the U.S. southeast experienced extremely cold temperatures for a short period. Our operations are built to withstand severe weather events, and our team prepared in advance to keep employees safe and limit operational disruption. During the period of freezing temperatures, production at several plants was curtailed for approximately a week and resulted in approximately $4.0 million of incremental costs.

*Increased Borrowing under Senior Secured Credit Facility and Higher Interest Rate*

During 2022, we had higher amounts borrowed and higher interest rates on our senior secured credit facility.

*Inflationary Pressures*

Heightened levels of inflation and the potential worsening of macro-economic conditions present risks for the Company, our suppliers and our customers. During 2022, we have experienced impacts to our labor rates and suppliers have signaled inflation related cost pressures, which flowed through to our costs and pricing. Although inflation impacted our financial results in 2022, if inflation remains at current levels for an extended period, or increases, and we are unable to successfully mitigate the impact, our costs are likely to increase, resulting in pressure on our profits, margins and cash flows, particularly for existing fixed-price contracts. We are not able to quantify the effects of inflation during 2022. In addition, inflation and the increases in the cost of borrowing from rising interest rates could constrain the overall purchasing power of our customers for our products, in particular in the near term to the extent inflation assumptions are less than current inflationary pressures. Rising interest rates will also increase our borrowing costs on new debt and could affect the fair value of our investments. We remain committed to our ongoing efforts to increase the efficiency of our operations and improve the cost competitiveness and affordability of our products and services, which may, in part, offset cost increases from inflation.

*Senior Secured Green Term Loan Facility*

In February 2021, our former sponsor entered into a senior secured green term loan facility (the "Green Term Loan") providing for $325.0 million principal amount, maturing in February 2026. Interest was priced at LIBOR plus 5.50% with a LIBOR floor of 1.00%. Our former sponsor received gross proceeds of $325.0 million and net proceeds of approximately $317.2 million after deducting original issue discount, commissions, and expenses. Our former sponsor used the net proceeds (1) to purchase the noncontrolling interest in Enviva JV Development Company, LLC (the "Development JV"), (2) to repay the Riverstone Loan (see Item 8. "Financial Statements and Supplemental Data," Note 13, "*Related-Party Transactions*"), (3) to fund capital expenditures and liquidity reserve cash accounts, and (4) for general purposes.

In October 2021, our former sponsor repaid in full the Green Term Loan and recognized a $9.4 million loss on early retirement of debt resulting from the write-off of unamortized debt issuance costs and original issue discount.

**How We Generate Revenue**

*Overview*

We primarily earn revenue by supplying wood pellets to our customers under off-take contracts, the majority of which are long-term in nature. Our off-take contracts are considered "take-or-pay" because they include a firm obligation of the customer to take a fixed quantity of product at a stated price and provisions that require that we be compensated in the case of a customer's failure to accept all or a part of the contracted volumes or termination of a contract by a customer. Each of our long-term off-take contracts defines the annual volume of wood pellets that a customer is required to purchase, and we are required to sell, the fixed price per MT for product satisfying a base net calorific value and other technical specifications. These prices are fixed for the entire term and are subject to adjustments which may include annual inflation-based adjustments or price escalators, price adjustments for product specifications, as well as, in some instances, price adjustments due to changes in underlying indices. Additionally, the majority of our long-term, off-take contracts include cost pass-through mechanisms for bunker fuel adjustments in our long-term shipping contracts. Some of our product volumes are sold under off-take contracts that

A2038

include cost pass-through mechanisms to mitigate increases in raw material and distribution costs. In addition to generating durable cash flow from long-term take-or-pay off-take contracts, we monitor sustained dislocations in the marketplace, and opportunistically transact when pricing dynamics and contract flexibility provide avenues to generate incremental gross margin. These commercial activities are aligned with the terms of many of our off-take contracts, which generally provide us with the opportunity to flex a certain percentage of contracted shipments up or down. That flexibility, enabled by our multi-plant profile, multi-deep water marine terminals and our long-term shipping contracts, can create opportunities to optimize our gross margin when we sell under short-term contracts in times when spot market prices are elevated or, conversely, to purchase third-party volumes during times when spot market prices are depressed. However, these commercial activities are subject to market dynamics that can vary drastically; as a result, the financial impact of these activities may vary significantly from period to period. Because each of our off-take contracts is a bilaterally negotiated agreement, our revenue from such contracts does not generally follow observable current market pricing trends. Our performance obligations under these contracts include the delivery of wood pellets, which are aggregated into MT. We account for each MT as a single performance obligation. Our revenue from the sale of wood pellets we produce is recognized upon satisfaction of the performance obligation when control transfers to the customer at the time of loading wood pellets onto a ship.

Depending on the specific off-take contract, shipping terms under our long-term contracts are either Cost, Insurance and Freight ("CIF"), Cost and Freight ("CFR"), or Free On Board ("FOB"). Under a CIF contract, we procure and pay for shipping costs, which include insurance and all other charges, up to the port of destination for the customer. Under a CFR contract, we procure and pay for shipping costs, which include insurance (excluding marine cargo insurance) and all other charges, up to the port of destination for the customer. Shipping under CIF and CFR contracts after control has passed to the customer is considered a fulfillment activity rather than a performance obligation and associated expenses are accrued and included in the price to the customer. Under FOB contracts, the customer is directly responsible for shipping costs.

In some cases, we may purchase shipments of product from third-party suppliers and resell them in back-to-back transactions ("purchase and sale transactions"). We typically are the principal in such transactions because we control the wood pellets prior to transferring them to the customer and therefore recognize related revenue on a gross basis.

***Other Revenue***

Other revenue includes fees from customers related to cancellations, deferrals, or accelerations of shipments and certain sales and marketing, scheduling, sustainability, consultation, shipping, and risk management services.

We recognize third-party terminal services revenue ratably over the contract term. Terminal services are performance obligations that are satisfied over time, as customers simultaneously receive and consume the benefits of the terminal services we perform. The consideration is generally fixed for minimum quantities and services beyond minimum quantities are generally billed on a per-MT rate.

***Contracted Backlog***

As of January 1, 2023, we had approximately $23.5 billion of product sales backlog for firm and contingent contracted product sales to our long-term off-take customers and our long-term contracts have a total weighted-average remaining term of 13.7 years compared to approximately $21.1 billion and a total weighted-average remaining term of 14.6 years as of January 1, 2021. The contingent contracted product sales include contracts or memoranda of understanding subject to certain conditions precedent. Firm contracted backlog represents the revenue to be recognized under existing contracts assuming deliveries occur as specified in the contracts. Contingent contracted backlog includes memoranda of understanding that include agreed pricing and volume terms, as well as firm contracts that are subject to conditions precedent with respect to financing, potential government regulation enactment, or technological feasibility. Contracted future product sales denominated in foreign currencies, excluding revenue hedged with foreign currency forward contracts, are included in U.S. Dollars at January 1, 2023 forward rates. The contracted backlog includes forward prices, including inflation, as well as foreign currency and commodity prices. The contracted backlog also includes the effects of related foreign currency derivative contracts. Please read Part II, Item 7A "Quantitative and Qualitative Disclosures About Market Risk" and Item 8. "Financial Statements and Supplementary Data"—Note 8, "*Derivative Instruments*", for more information regarding our foreign currency forward contracts.

Our expected future product sales revenue under our contracted backlog as of January 1, 2023 is as follows (in millions):

| | | |
|---|---|---|
| Year ending December 31, 2023 | $ | 1,568 |
| Year ending December 31, 2024 | | 1,618 |
| Year ending December 31, 2025 and thereafter | | 20,333 |
| Total product sales contracted backlog | $ | 23,519 |

A2039

**Costs of Conducting Our Business**

*Cost of Goods Sold*

Cost of goods sold includes the costs to produce and deliver our wood pellets to customers, reimbursable shipping-related costs associated with specific off-take contracts with CIF or CFR shipping terms, and costs associated with purchase and sale transactions. The primary expenses incurred to produce and deliver our wood pellets consist of raw material, production, and distribution costs.

We have strategically located our plants in the Mid-Atlantic and Gulf Coast regions of the United States, geographic areas in which wood fiber sources are plentiful and readily available. We have short-term and long-term contracts to manage the supply of raw materials into our plants. Delivered wood fiber costs include stumpage as well as harvesting, transportation, and in some cases, size-reduction services provided by our suppliers.

Production costs at our production plants consist of labor, energy, tooling, repairs and maintenance, and plant overhead costs. Production costs also include depreciation expense associated with the use of our plants and equipment and any gain or loss on disposal of associated assets. Some of our off-take contracts include price escalators that mitigate inflationary pressure on certain components of our production costs. In addition to the wood pellets that we produce at our owned and operated production plants, we selectively purchase additional quantities of wood pellets from other wood pellet producers. Costs associated with purchase and sale transactions are included in cost of goods sold.

Distribution costs include all transportation costs from our plants to our port locations, any storage or handling costs while the product remains at port, and shipping costs related to the delivery of our product from our port locations to our customers. Both the strategic location of our plants and our ownership or control of our deep-water terminals have allowed for the efficient and cost-effective transportation of our wood pellets. We seek to mitigate shipping risk by entering into long-term, fixed-price shipping contracts with reputable shippers matching the terms and volumes of our off-take contracts pursuant to which we are responsible for arranging shipping. Certain of our off-take contracts include pricing adjustments for volatility in fuel prices, which allow us to pass the majority of the fuel price-risk associated with shipping through to our customers.

Raw material, production, and distribution costs associated with delivering our wood pellets to our owned and leased marine terminals and third-party wood pellet purchase costs are capitalized as a component of inventory. Fixed production overhead, including the related depreciation expense, is allocated to inventory based on the normal capacity of the production plants. When the inventory is sold, the depreciation allocated to it is reflected as depreciation and amortization expense in our consolidated statements of operations, while the other fixed production overhead allocated to inventory is reflected in cost of goods sold, excluding depreciation and amortization. Distribution costs associated with shipping our wood pellets to our customers are expensed as incurred. Our inventory is recorded using the first-in, first-out method ("FIFO"). Given the nature of our inventory, the calculation of cost of goods sold is based on estimates used in the valuation of the FIFO inventory and in determining the specific composition of inventory that is sold to each customer.

Recoveries from customers for certain costs incurred at the discharge port under our off-take contracts are not considered a part of the transaction price, and therefore are excluded from product sales and included as an offset to cost of goods sold.

**Recently Issued Accounting Pronouncements**

See Part II, Item 8. "Financial Statements and Supplementary Data"—Note 2, "*Significant Accounting Policies—Recently Adopted Accounting Standards and Recently Issued Accounting Standards not yet Adopted*," in the Notes to our Consolidated Financial Statements included in this Annual Report on Form 10-K for a description of recently issued and adopted accounting pronouncements.

**Critical Accounting Policies and Estimates**

The discussion and analysis of our financial condition and results of operations is based on our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of these consolidated financial statements requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the dates of the consolidated financial statements and the reported revenues and expenses during the reporting periods. We evaluate these estimates and assumptions on an ongoing basis and base our estimates on historical experience, current conditions, and various other assumptions that we believe to be reasonable under the circumstances. The results of these estimates form the basis for making judgments about the carrying values of assets and liabilities as well as identifying and assessing the accounting treatment with respect to commitments and contingencies. Our actual results may materially differ from these estimates.

A2040

For accounting policies and estimates that we believe are critical to our consolidated financial statements due to the degree of uncertainty regarding the estimates or assumptions involved, please see the following disclosures within the Notes to our Consolidated Financial Statements included in Part II, Item 8. of this Annual Report on Form 10-K: Note 2, "*Significant Accounting Policies"*, specifically about "*Inventories*", "*Revenue Recognition*", "*Cost of Goods Sold*", and "*Property, Plant and Equipment*".

**How We Evaluate Our Operations**

*Adjusted Net Income (Loss)*

We define adjusted net income (loss) as net income (loss) excluding acquisition and integration costs and other, effects of COVID-19 and the war in Ukraine, Support Payments, Executive separation, and early retirement of debt obligation. We believe that adjusted net income (loss) enhances investors' ability to compare the past financial performance of our underlying operations with our current performance separate from certain items of gain or loss that we characterize as unrepresentative of our ongoing operations.

*Adjusted Gross Margin and Adjusted Gross Margin per Metric Ton*

We define adjusted gross margin as gross margin excluding loss on disposal of assets and impairment of assets, non-cash equity-based compensation and other expense, depreciation and amortization, changes in unrealized derivative instruments related to hedged items, acquisition and integration costs and other, effects of COVID-19 and the war in Ukraine, and Support Payments. We define adjusted gross margin per metric ton as adjusted gross margin per metric ton of wood pellets sold. We believe adjusted gross margin and adjusted gross margin per metric ton are meaningful measures because they compare our revenue-generating activities to our cost of goods sold for a view of profitability and performance on a total-dollar and a per-metric ton basis. Adjusted gross margin and adjusted gross margin per metric ton primarily will be affected by our ability to meet targeted production volumes and to control direct and indirect costs associated with procurement and delivery of wood fiber to our wood pellet production plants and our production and distribution of wood pellets.

*Adjusted EBITDA*

We define adjusted EBITDA as net income (loss) excluding depreciation and amortization, interest expense, income tax expense (benefit), early retirement of debt obligation, non-cash equity-based compensation and other expense, loss on disposal of assets and impairment of assets, changes in unrealized derivative instruments related to hedged items, acquisition and integration costs and other, effects of COVID-19 and the war in Ukraine, Support Payments, and Executive separation. Adjusted EBITDA is a supplemental measure used by our management and other users of our financial statements, such as investors, commercial banks, and research analysts, to assess the financial performance of our assets without regard to financing methods or capital structure.

*Distributable Cash Flow*

We define distributable cash flow as adjusted EBITDA less cash income tax expenses, interest expense net of amortization of debt issuance costs, debt premium and original issue discounts. non-cash interest expense from the Deferred Gross Margin Transactions (see above, "Contracts as a Financing Arrangement ("Deferred Gross Margin Transactions")"), and maintenance capital expenditures. We use distributable cash flow as a performance metric to compare our cash-generating performance from period to period and to compare the cash-generating performance for specific periods to the cash dividends (if any) that are expected to be paid to our shareholders. We do not rely on distributable cash flow as a liquidity measure.

*Limitations of Non-GAAP Financial Measures*

Adjusted net income (loss), adjusted gross margin, adjusted gross margin per metric ton, adjusted EBITDA, and distributable cash flow are not financial measures presented in accordance with accounting principles generally accepted in the United States ("GAAP"). We believe that the presentation of these non-GAAP financial measures provides useful information to investors in assessing our financial condition and results of operations. Our non-GAAP financial measures should not be considered as alternatives to the most directly comparable GAAP financial measures. Each of these non-GAAP financial measures has important limitations as an analytical tool because they exclude some, but not all, items that affect the most directly comparable GAAP financial measures. You should not consider adjusted net income (loss), adjusted gross margin, adjusted gross margin per metric ton, adjusted EBITDA, or distributable cash flow in isolation or as substitutes for analysis of our results as reported in accordance with GAAP.

Our definitions of these non-GAAP financial measures may not be comparable to similarly titled measures of other companies, thereby diminishing their utility. Please see below for a reconciliation of each of adjusted net income (loss),

37

A2041

adjusted gross margin and adjusted gross margin per metric ton, adjusted EBITDA, and distributable cash flow to the most directly comparable GAAP financial measure.

**Results of Operations**

*Year Ended December 31, 2022 Compared to Year Ended December 31, 2021*

| | Year Ended December 31, | | Change |
|---|---|---|---|
| | 2022 | 2021 | |
| | (in thousands) | | |
| Product sales | $ 1,079,814 | $ 999,190 | $ 80,624 |
| Other revenue | 14,462 | 42,488 | (28,026) |
| Net revenue | 1,094,276 | 1,041,678 | 52,598 |
| Cost of goods sold, excluding items below | 927,453 | 861,703 | 65,750 |
| Loss on disposal of assets | 8,607 | 10,153 | (1,546) |
| Selling, general, administrative, and development expenses | 119,713 | 175,108 | (55,395) |
| Executive separation | 20,813 | — | 20,813 |
| Depreciation and amortization | 113,177 | 91,966 | 21,211 |
| Total operating costs and expenses | 1,189,763 | 1,138,930 | 50,833 |
| Loss from operations | (95,487) | (97,252) | 1,765 |
| Interest expense | (71,585) | (56,497) | (15,088) |
| Early retirement of debt obligation | — | (9,377) | 9,377 |
| Other income, net | 1,198 | 880 | 318 |
| Net loss before income taxes | (165,874) | (162,246) | (3,628) |
| Income tax expense (benefit) | 2,494 | (16,975) | 19,469 |
| Net loss | $ (168,368) | $ (145,271) | $ (23,097) |

*Net revenue*

Revenue related to product sales for wood pellets produced or procured by us increased to $1,079.8 million in 2022 from $999.2 million in 2021. The $80.6 million, or 8%, increase was primarily attributable to a 17% increase in average sale price per MT and a 8% decrease in product sales volumes for the year ended December 31, 2022 as compared to the year ended December 31, 2021. Product sales exclude the gross proceeds of $175.1 million related to the sale of approximately 450,000 MT of wood pellets in the fourth quarter of 2022 pursuant to the Deferred Gross Margin Transactions (see above, "Contracts as a Financing Arrangement ("Deferred Gross Margin Transactions")").

The increase in average sales price per MT was primarily driven by our commercial activities, which allowed us to address dislocations in our customers' and other producers' supply chains. These activities included completing incremental deliveries at elevated spot pricing, applying pricing escalators and cost pass-through mechanisms inclusive of bunker fuel adjustments in our existing contracts, and repricing existing contracts and entering into new contracts at higher prices compared to historical prices. Recent biomass spot market prices, as well as the forward curve pricing of certain European indices, have exceeded $345 per MT, representing a substantial premium to the current long-term contracted pricing of roughly $200 to $235 per MT weighted average across our portfolio, and we were able to capture some of that differential during the year ended December 31, 2022.

Product sales volumes decreased 379,000 MT for the year ended December 31, 2022 as compared to the year ended December 31, 2021. The decrease of 379,000 MT in product sales volumes is primarily due to the approximately 825,000 MT decrease in procured volumes due to a lower availability of third-party wood pellets resulting from the war in Ukraine and related sanctions and approximately 450,000 MT sold and delivered in the fourth quarter of 2022 that were treated as a financing arrangement pursuant to the Deferred Gross Margin Transactions (see above, "Contracts as a Financing Arrangement ("Deferred Gross Margin Transactions")"), partially offset by an increase in produced wood pellets of approximately 900,000 MT.

38

A2042

Other revenue for the years ended December 31, 2022 and 2021 included $6.4 million and $37.3 million, respectively, in payments to us for adjusting deliveries under our take-or-pay off-take contracts, which otherwise would have been included in product sales and was recognized under a breakage model based on when the pellets would have been loaded.

*Cost of goods sold*

Cost of goods sold increased to $927.5 million for the year ended December 31, 2022 from $861.7 million for the year ended December 31, 2021, an increase of $65.8 million, or 8%. The increase in cost of goods sold was primarily a result of incremental fiber logistics, energy, and wood pellet distribution costs inclusive of bunker fuel adjustments. In particular, during the first quarter of 2022, we experienced labor-related and other challenges associated with COVID-19 with our employees, contractors and supply chain partners that had a more pronounced than anticipated impact on our operations and project execution. Furthermore, we incurred incremental cost of goods sold from the on-going ramp of the Lucedale plant and the commencement of operations of the Pascagoula terminal. The cost of goods sold exclude $95.3 million inclusive of depreciation and amortization of approximately $9.3 million, which are reflected as inventory in connection with the Deferred Gross Margin Transactions (see above, "Contracts as a Financing Arrangement ("Deferred Gross Margin Transactions")").

*Adjusted gross margin and adjusted gross margin per metric ton*

| | Year Ended December 31, | | | | Change | |
|---|---|---|---|---|---|---|
| | **2022** | | **2021** | | | |
| | (in thousands, except per metric ton) | | | | | |
| Reconciliation of gross margin to adjusted gross margin and adjusted gross margin per metric ton: | | | | | | |
| Gross margin[1] | $ | 53,906 | $ | 83,362 | $ | (29,456) |
| Loss on disposal of assets and impairment of assets | | 10,478 | | 10,143 | | 335 |
| Non-cash equity-based compensation and other expense | | 2,944 | | 2,271 | | 673 |
| Depreciation and amortization | | 105,179 | | 86,471 | | 18,708 |
| Changes in unrealized derivative instruments | | (59) | | (2,673) | | 2,614 |
| Acquisition and integration costs and other | | 1,664 | | 397 | | 1,267 |
| Effects of COVID-19 | | 13,942 | | — | | 13,942 |
| Effects of the war in Ukraine | | 5,051 | | — | | 5,051 |
| Support Payments | | 23,985 | | 25,100 | | (1,115) |
| Adjusted gross margin | $ | 217,090 | $ | 205,071 | $ | 12,019 |
| Metric tons sold | | 4,654 | | 5,033 | | (379) |
| Adjusted gross margin per metric ton | $ | 46.65 | $ | 40.75 | $ | 5.90 |

[1] Gross margin is defined as net revenue less cost of goods sold (including related depreciation and amortization and loss on disposal of assets).

We earned adjusted gross margin of $217.1 million, or $46.65 per MT, for the year ended December 31, 2022 compared to $205.1 million, or $40.75 per MT, for the year ended December 31, 2021. The increase in adjusted gross margin was primarily due increases in net revenue driven by our ability to capitalize on higher spot prices through our commercial activities in 2022, partially offset by incremental fiber logistics, energy, and wood pellet distribution costs. The increase in adjusted gross margin of $12.0 million excludes $89.0 million of adjusted gross margin deferred in connection with the Deferred Gross Margin Transactions (see above, "Contracts as a Financing Arrangement ("Deferred Gross Margin Transactions")").

The Omicron variant of COVID-19 significantly impacted our operations and resulted in $13.9 million of incremental costs during the year ended December 31, 2022, all of which were incurred during the first quarter of 2022.

- The impact on our supply chain logistics within our fiber supply base as well as our truck and rail service providers was more pronounced than anticipated. Our third-party service providers' failure to perform resulted in unprecedented incremental costs to procure raw materials and produce and deliver our wood pellets to customers.

- We incurred incremental costs related to increased employee overtime and significant contract labor to partially offset plant employee absenteeism.

- We incurred incremental costs related to obtaining short-term rentals of equipment due to delayed delivery of acquired equipment to ensure continued operations.

A2043

The war in Ukraine impacted our operations and resulted in $5.1 million of incremental costs during the year ended December 31, 2022, all of which were incurred during the first quarter of 2022.

- Severe dislocations within our third-party shipping partners' operations resulted in incremental distribution costs related to demurrage and to loading, transporting, and unloading our wood pellets.

- The immediate spike in energy prices negatively impacted the cost of our operations including incremental costs to support continued services from our third-party fiber suppliers and trucking service providers.

During the fourth quarter of 2022, the polar vortex impacted our operations and resulted in $4.0 million of incremental costs during the year ended December 31, 2022.

Due to the increased average sales price per MT and the increase in sales volumes as described above and after excluding the aforementioned incremental fiber logistics, energy, and wood pellet distribution costs, adjusted gross margin increased during the year ended December 31, 2022 compared to the year ended December 31, 2021.

*Selling, general, administrative, and development expenses*

Selling, general, administrative, and development expenses were $119.7 million for the year ended December 31, 2022 and $175.1 million for the year ended December 31, 2021. Selling, general, administrative, and development expenses include costs to develop new markets, corporate and other overhead expenses, and costs of developing new plants or ports (for those that have not yet met the capitalization threshold or costs that are not eligible for capitalization). Once a significant component of the plant or port is placed in-service, the associated expense component is classified as cost of goods sold. The $55.4 million decrease in total selling, general, administrative, and development expenses is primarily associated with a decrease in consulting and management fee expenses, non-cash equity-based compensation and other expense, and due to the elimination of activities resulting from the Simplification Transaction.

*Executive separation*

In November 2022, John Keppler, our former Chairman and Chief Executive Officer and Chairman of the Board, stepped down from his responsibilities to pursue medical and surgical treatment to address a cardiac valve issue. Mr. Keppler's separation agreement included: (1) the bonus he would have been entitled to for the year ended December 31, 2022, pro-rated based on 2022 service through November 14, 2022, and paid with respect to targeted individual performance of Mr. Keppler and actual performance of the Company at the same time bonuses are paid to executives generally during the first quarter of 2023, (2) a severance payment of $3.8 million, paid in 36 equal installments, (3) accelerated vesting of unvested time-based LTIPs, occurring during the first quarter of 2023, and (4) vesting of unvested performance-based LTIPs, occurring during the first quarter of 2023.

*Depreciation and amortization*

Depreciation and amortization expense increased to $113.2 million for the year ended December 31, 2022 from $92.0 million for the year ended December 31, 2021, an increase of $21.2 million or 23%, primarily due to the Lucedale plant, Pascagoula terminal, and expansion assets placed in service.

*Interest expense*

We incurred $71.6 million of interest expense during the year ended December 31, 2022 and $56.5 million during the year ended December 31, 2021. The increase in interest expense of $15.1 million from the prior year was primarily attributable to the $9.6 million of non-cash interest recognized in connection with the the Deferred Gross Margin Transactions (see above, "Contracts as a Financing Arrangement ("Deferred Gross Margin Transactions")"), and a higher outstanding borrowing amount and higher floating interest rate on our senior secured credit facility, partially offset by the extinguishment of the senior secured green term loan facility for the year ended December 31, 2021 as part of the Simplification Transaction.

*Early retirement of debt obligation*

In October 2021, our former sponsor repaid in full the Green Term Loan, which had a principal balance of $318.4 million at the time, and recognized a $9.4 million loss on early retirement of debt resulting from the write-off of unamortized debt issuance costs and original issue discount.

*Income tax*

We recorded $2.5 million of income tax expense during the year ended December 31, 2022 and $17.0 million of income tax benefit during the year ended December 31, 2021. The $2.5 million of income tax expense during the year ended December

A2044

31, 2022 was primarily due to a change in valuation allowance for deferred tax assets. The income tax benefit of $17.0 million for the year ended December 31, 2021 was due to the Conversion.

*Adjusted net loss*

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2022 | | 2021 | | Change |
| | | (in thousands) | | | | |
| Reconciliation of net loss to adjusted net loss: | | | | | | |
| Net loss | $ | (168,368) | $ | (145,271) | $ | (23,097) |
| Acquisition and integration costs and other | | 21,745 | | 32,608 | | (10,863) |
| Effects of COVID-19 | | 15,189 | | — | | 15,189 |
| Effects of the war in Ukraine | | 5,051 | | — | | 5,051 |
| Support Payments | | 23,985 | | 25,100 | | (1,115) |
| Executive separation | | 20,813 | | — | | 20,813 |
| Early retirement of debt obligation | | — | | 9,377 | | (9,377) |
| Adjusted net loss | $ | (81,585) | $ | (78,186) | $ | (3,399) |

*Adjusted EBITDA*

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2022 | | 2021 | | Change |
| | | (in thousands) | | | | |
| Reconciliation of net loss to adjusted EBITDA: | | | | | | |
| Net loss | $ | (168,368) | $ | (145,271) | $ | (23,097) |
| Add: | | | | | | |
| Depreciation and amortization | | 113,177 | | 91,966 | | 21,211 |
| Interest expense | | 71,585 | | 56,497 | | 15,088 |
| Income tax expense (benefit) | | 2,494 | | (16,975) | | 19,469 |
| Early retirement of debt obligation | | — | | 9,377 | | (9,377) |
| Non-cash equity-based compensation and other expense | | 38,260 | | 55,924 | | (17,664) |
| Loss on disposal of assets and impairment of assets | | 11,347 | | 10,153 | | 1,194 |
| Changes in unrealized derivative instruments | | (59) | | (2,673) | | 2,614 |
| Acquisition and integration costs and other | | 21,745 | | 32,608 | | (10,863) |
| Effects of COVID-19 | | 15,189 | | — | | 15,189 |
| Effects of the war in Ukraine | | 5,051 | | — | | 5,051 |
| Support Payments | | 23,985 | | 25,100 | | (1,115) |
| Executive separation | | 20,813 | | — | | 20,813 |
| Adjusted EBITDA | $ | 155,219 | $ | 116,706 | $ | 38,513 |

We generated adjusted EBITDA of $155.2 million for the year ended December 31, 2022 compared to $116.7 million for the year ended December 31, 2021. The $38.5 million increase was primarily attributable to the factors described above under the heading "Adjusted gross margin and adjusted gross margin per metric ton." The increase in adjusted EBITDA of $38.5 million excludes $89.0 million recognized as inventory in connection with the Deferred Gross Margin Transactions.

41

*Distributable cash flow*

The following is a reconciliation of adjusted EBITDA to distributable cash flow:

| | Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | | Change |
| | (in thousands) | | | |
| Reconciliation of adjusted EBITDA to distributable cash flow attributable to Enviva: | | | | |
| Adjusted EBITDA | $ 155,219 | $ 116,706 | $ | 38,513 |
| Less: | | | | |
| Interest expense, net of amortization of debt issuance costs, debt premium, original issue discount, and non-cash interest expense from the Deferred Gross Margin Transactions[1] | 59,508 | 52,574 | | 6,934 |
| Maintenance capital expenditures | 14,375 | 13,981 | | 394 |
| Distributable cash flow attributable to Enviva Inc. | 81,336 | 50,151 | | 31,185 |
| Less: Distributable cash flow attributable to incentive distribution rights | — | 19,030 | | (19,030) |
| Distributable cash flow attributable to Enviva Inc. | $ 81,336 | $ 31,121 | $ | 50,215 |

[1] See above, "Contracts as a Financing Arrangement ("Deferred Gross Margin Transactions")"

## Liquidity and Capital Resources

### *Overview*

Our primary sources of liquidity include cash and cash equivalent balances, cash generated from operations, availability under our senior secured credit facility, and, from time to time, debt and equity offerings. Our primary liquidity needs are to fund working capital, service our debt, finance greenfield construction projects, growth initiatives, and maintenance capital expenditures, and pay dividends. We believe cash on hand, cash generated from our operations, and the availability of our senior secured credit facility will be sufficient to meet our primary liquidity requirements. However, future capital expenditures, such as expenditures made in relation to acquisitions of plants or terminals, plant development and/or plant expansion projects, and other cash requirements could be higher than we currently expect as a result of various factors. We regularly monitor market conditions and our liquidity needs and from time to time may raise additional funds through debt or equity financing, through private investments in the company, or through other financing opportunities. Additionally, our ability to generate sufficient cash from our operating activities depends on our future performance, which is subject to general economic, political, financial, competitive, and other factors beyond our control.

Our liquidity as of December 31, 2022, which included cash on hand and availability under our $570.0 million senior secured credit facility, was $384.1 million.

### *Cash Dividends*

We expect to continue to pay regular cash dividends to holders of our common stock. However, the decision to pay future cash dividends is solely within the discretion of, and subject to approval by, our board of directors. Our board of directors' determination with respect to any such dividends, including the record date, the payment date and the actual amount of the dividend, will depend upon our results of operations, financial condition, liquidity, capital requirements, contractual restrictions, restrictions imposed by applicable law and other factors that the board deems relevant at the time of such determination.

The former owners of our former sponsor have agreed to reinvest in our common stock all dividends from 9.0 million of the 16.0 million common units issued in connection with the Simplification Transaction for the dividends paid for the period beginning with the third quarter of 2021 through the fourth quarter of 2024.

### *Capital Requirements*

We operate in a capital-intensive industry, which requires significant investments to develop and construct new production and terminal facilities, and maintain and upgrade our existing facilities. Our capital requirements primarily have consisted, and we anticipate will continue to consist, of the following:

- Maintenance capital expenditures, which are cash expenditures incurred to maintain our long-term operating income or operating capacity. These expenditures typically include certain system integrity, compliance, and safety improvements; and

A2046

- Growth capital expenditures, which are cash expenditures we expect will increase our operating income or operating capacity over the long term. Growth capital expenditures include acquisitions or construction of new capital assets or capital improvements such as additions to or improvements on our existing capital assets as well as projects intended to extend the useful life of assets.

The classification of capital expenditures as either maintenance or growth is made at the individual asset level during our budgeting process and as we approve, execute, and monitor our capital spending.

We plan to invest $365.0 million to $415.0 million in capital expenditures in 2023. Of that amount, we expect to invest (1) $295.0 million to $325.0 million primarily on the development and construction of the Epes and Bond plants, (2) $50.0 million to $70.0 million primarily on growth projects, and (3) $20.0 million on maintenance capital expenditures. During the year ended December 31, 2022, we invested $217.8 million in capital expenditures.

Our current financing strategy is to fund acquisitions and construction activities with a combination of cash from operations and debt.

***Long-Term Debt***

As of December 31, 2022, our total debt was $1.6 billion and primarily consisted of:

- $750.0 million aggregate principal amount of 6.5% senior unsecured notes due in January 2026;

- $436.0 million of revolver credit facility borrowings under a senior secured credit facility maturing in June 2027, bearing interest, at our option, at either a Term SOFR rate or at a base rate, in each case, plus an applicable margin;

- $31.4 million qualified New Markets Tax Credit Loans at a weighted average interest rate of 2.9%, maturing in June 2029;

- $250.0 million aggregate principal amount of 6.0% Exempt Facilities Revenue Bonds issued by The Industrial Development Authority of Sumter County, Alabama, the proceeds of which were loaned to the Company pursuant to a loan and guaranty agreement constituting a senior unsecured obligation, maturing in July 2052 with the option for holders to redeem at par 2032;

- $100.0 million aggregate principal amount of 7.75% Exempt Facilities Revenue Bonds issued by the Mississippi Business Finance Corporations, the proceeds of which were loaned to the Company pursuant to a loan and guaranty agreement constituting a senior unsecured obligation, maturing July 2047 with the option for holders to redeem at part in 2032; and

- $8.8 million 2.5 % promissory note, maturing in February 2023.

For additional information on our long-term debt, see Item 8. "Financial Statements and Supplemental Data," Note 12, "*Long-Term Debt and Finance Lease Obligations.*"

**Cash Flows**

The following table sets forth a summary of our net cash flows from operating, investing, and financing activities for the years ended December 31, 2022 and 2021:

|  | Year Ended December 31, | |
|---|---|---|
|  | 2022 | 2021 |
|  | (in thousands) | |
| Net cash (used in) provided by operating activities | $ (88,767) | $ 33,390 |
| Net cash used in investing activities | (222,847) | (332,322) |
| Net cash provided by financing activities | 544,173 | 249,775 |
| Net increase (decrease) in cash, cash equivalents and restricted cash | $ 232,559 | $ (49,157) |

*Cash (Used in) Provided by Operating Activities*

Net cash used in operating activities was $88.8 million and net cash provided by operating activities was $33.4 million for the years ended December 31, 2022 and 2021, respectively. The $122.2 million decrease in cash provided by operating activities during the year ended December 31, 2022 compared to the year ended December 31, 2021 was primarily due to a

43

A2047

decrease in cash from changes in operating assets and liabilities of $133.9 million. The decrease in cash from operating assets and liabilities is composed primarily of $95.3 million related to finished goods inventory resulting from the Deferred Gross Margin Transactions (see above, "Contracts as a Financing Arrangement ("Deferred Gross Margin Transactions")"), a $87.4 million decrease related to accounts receivable due to the timing of product delivery, and $39.2 million paid to certain customers during 2022 to reschedule and/or re-price their take-or-pay off-take contracts. The projected product sales to these certain customers and the weighted-average remaining term under these customers' contracts are $14.6 billion and 13.8 years, respectively. These outflows of cash were offset by cash generated from changes in other operating assets and liabilities, primarily composed of a $38.5 million change in accounts payable, accrued liabilities, and other current liabilities, a $19.3 million change in inventories not related to the Deferred Gross Margin Transactions (see above, "Contracts as a Financing Arrangement ("Deferred Gross Margin Transactions")"), and a $18.9 million increase in interest payable. The overall decrease in cash from changes in operating assets and liabilities was partially offset by an increase in cash from net loss adjusted for non-cash items of $21.3 million. Additionally, $102.3 million of cash received as payment for approximately 450,000 MT of wood pellets sold and delivered in the fourth quarter of 2022 in connection with the Deferred Gross Margin Transactions (see above, "Contracts as a Financing Arrangement ("Deferred Gross Margin Transactions")") is included in cash provided by financing activities.

*Cash Used in Investing Activities*

Net cash used in investing activities was $222.8 million and $332.3 million for the years ended December 31, 2022 and 2021, respectively. The $109.5 million decrease in cash used in investing activities during the year ended December 31, 2022 compared to the year ended December 31, 2021 was primarily due to the timing of capital expenditures at the Lucedale plant, Pascagoula terminal, construction at the Epes plant, and on various expansion projects.

*Cash Provided by Financing Activities*

Net cash provided by financing activities was $544.2 million and $249.8 million for the years ended December 31, 2022 and 2021, respectively. The $294.4 million increase in net cash provided by financing activities in 2022, as compared to 2021, was primarily attributable to a decrease in cash used to acquire a noncontrolling interest of $153.3 million, an increase in proceeds from the issuance of common shares or units of $118.2 million, an increase in proceeds from the sale of approximately 450,000 MT of wood pellets sold and delivered in the fourth quarter of 2022 in connection with the Deferred Gross Margin Transactions (see above, "Contracts as a Financing Arrangement ("Deferred Gross Margin Transactions")") of $102.3 million, a $12.8 million capital contribution in the NMTC financing transaction, partially offset by a decrease of $13.1 million in proceeds from debt issuance net of repayment of debt, an increase in cash dividends or distributions and equivalent rights of $95.1 million, a $5.9 million increase of tax withholding payments associated with the settlement of restricted stock unit awards that vested pursuant to our LTIP, and a $2.5 million increase in debt issuance costs.

**Off-Balance Sheet Arrangements**

As of December 31, 2022, we did not have any off-balance sheet arrangements, as defined in Item 303(a)(4)(ii) of Regulation S-K, such as the use of unconsolidated subsidiaries, structured finance, special purpose entities or a variable interest in unconsolidated entities.

A2048

**ITEM 7A.    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

Market risk is the risk of loss arising from adverse changes in market rates and prices. Historically, our risks have been predominantly related to potential changes in the fair value of our long-term debt due to fluctuations in applicable market interest rates. Our market risk exposure is expected to be limited to risks that arise in the normal course of business, as we do not engage in speculative, non-operating transactions, nor do we use financial instruments or derivative instruments for trading purposes.

*Interest Rate Risk*

As of December 31, 2022, our total debt had a carrying and fair value of $1.6 billion and $1.5 billion, respectively.

We are exposed to fluctuations in interest rates on borrowings under our senior secured credit facility. Borrowings under the senior secured credit facility bear interest, at our option, at either a base rate plus an applicable margin or at a Term SOFR rate plus an applicable margin.

We enter into derivative instruments to manage cash flow. We do not enter into derivative instruments for speculative or trading purposes. We may seek to mitigate a portion of our interest rate risk through interest rate swaps. As of December 31, 2022, we had no interest rate swaps outstanding. Previously, we entered into pay-fixed, receive-variable interest rate swaps that expired in September 2021 and October 2021 to hedge interest rate risk associated with variable rate borrowings under our senior secured credit facility. The interest rate swaps are not designated and accounted for as cash flow hedges. The counterparty to our interest rate swap agreements are major financial institutions.

There can be no assurance that our interest rate risk-management practices, if any, will eliminate or substantially reduce risks associated with fluctuating interest rates. For more information, please read Part I, Item 1A "Risk Factors—*Our exposure to risks associated with foreign currency and interest rate fluctuations, as well as the hedging arrangements we may enter into to mitigate those risks, could have an adverse effect on our financial condition and results of operations*."

*Credit Risk*

Substantially all of our revenue was from long-term, take-or-pay off-take contracts with seven customers for the year ended December 31, 2022 and five customers for the years ended December 31, 2021 and 2020. During the year ended December 31, 2022, most of our customers were major power generators in Europe. This concentration of counterparties operating in a single industry and geographic area results in an exposure to credit risk, in that the counterparties may be similarly affected by changes in economic, political, regulatory or other conditions. If a customer defaults or if any of our contracts expire in accordance with their terms, and we are unable to renew or replace these contracts, our gross margin and cash flows, as well as our ability to make cash dividends to our stockholders, may be adversely affected. Although we have entered into hedging arrangements in order to minimize our exposure to fluctuations in foreign currency exchange and interest rates, our derivatives also expose us to credit risk to the extent that counterparties may be unable to meet the terms of our hedging agreements. For more information, please read Part I, Item 1A "Risk Factors—*Our exposure to risks associated with foreign currency and interest rate fluctuations, as well as the hedging arrangements we may enter into to mitigate those risks, could have an adverse effect on our financial condition and results of operations*" and — "*We expect to derive substantially all of our revenues from six customers in 2023, four of which are located in Europe. If we fail to continue to diversify our customer base, our results of operations, business and financial position and ability to pay dividends to our stockholders could be materially adversely affected.*"

*Foreign Currency Exchange Risk*

We primarily are exposed to fluctuations in foreign currency exchange rates related to contracts pursuant to which deliveries of wood pellets will be settled in foreign currency. We have entered into forward contracts and purchased options to hedge a portion of our forecasted revenue for these customer contracts.

As of December 31, 2022, we had notional amounts of 15.3 million British Pound Sterling ("GBP") and 2.3 million Euro ("EUR") under foreign currency forward contracts that expire between 2023 and 2024.

Historically, we designated and accounted for forward contracts and purchased options as cash flow hedges of anticipated foreign currency denominated revenue and, therefore, the effective portion of the changes in fair value on these instruments was recorded as a component of accumulated other comprehensive income in equity and was reclassified to revenue in the consolidated statements of operations in the same period in which the underlying revenue transactions occurred. During the third quarter of 2018, we elected to discontinue hedge accounting for all designated foreign currency cash flow hedges and, as a result, we had no unrealized loss (gain) associated with foreign currency forward contracts and foreign currency purchased

45

A2049

options in accumulated other comprehensive income. At December 31, 2022 and 2021, no unrealized amounts associated with foreign currency forward contracts and foreign currency purchased options were included in other comprehensive income.

We do not utilize foreign exchange contracts for speculative or trading purposes. The counterparties to our foreign exchange contracts are major financial institutions. There can be no assurance that our hedging arrangements or other foreign exchange rate risk-management practices, if any, will eliminate or substantially reduce risks associated with our exposure to fluctuating foreign exchange rates. For more information, please read Part I, Item 1A "Risk Factors— *Our exposure to risks associated with foreign currency and interest rate fluctuations, as well as the hedging arrangements we may enter into to mitigate those risks, could have an adverse effect on our financial condition and results of operations.*"

A2050

**ITEM 8.    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

**INDEX TO FINANCIAL STATEMENTS**

**ENVIVA INC. AND SUBSIDIARIES**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB ID: 42) | 48 |
| Consolidated Balance Sheets | 50 |
| Consolidated Statements of Operations | 51 |
| Consolidated Statements of Comprehensive Loss | 52 |
| Consolidated Statements of Changes in Equity | 53 |
| Consolidated Statements of Changes in Equity (continued) | 54 |
| Consolidated Statements of Cash Flows | 55 |
| Consolidated Statements of Cash Flows (continued) | 56 |
| Notes to Consolidated Financial Statements | 57 |

47

A2051

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of Enviva Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Enviva Inc. and subsidiaries (the Company) as of December 31, 2022 and 2021, the related consolidated statements of operations, comprehensive loss, changes in equity and cash flows for each of the three years in the period ended December 31, 2022, and the related notes and the financial statement schedule listed in the Index at Item 15(a)(2) (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2022 and 2021, and the results of its operations and cash flows for each of the three years in the period ended December 31, 2022, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2022, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated March 1, 2023 expressed an adverse opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matters**

The critical audit matters communicated below are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing a separate opinion on the critical audit matters or on the accounts or disclosures to which they relate.

|  | *Completeness of Revenue from Off-Take Contracts* |
|---|---|
| | As discussed in Note 2 to the consolidated financial statements, the Company earns revenue through off-take contracts that are primarily long-term take-or-pay contracts that include a defined volume of wood pellets that the customer is required to purchase on an annual basis as well as through shorter-term contracts, which may only include one specific shipment. Revenue on these contracts is recognized when control transfers to the customer at the time of loading wood pellets onto a ship. |
| *Description of the Matter* | |
| | Auditing the measurement of revenue at year-end required especially challenging auditor judgment and more extensive audit procedures, including the use of specialists, due to the complexity of determining the quantity of wood pellets transferred to the customer at the end of the year. |

48

A2052

We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over revenue cut-off for off-take contracts. For example, we tested controls over management's review of third-party survey results and inventory cutoff at year-end.

| | |
|---|---|
| *How We Addressed the Matter in Our Audit* | Our audit procedures included, among others, evaluating the work of management's third-party specialist to survey all partially loaded ships at year end to assist in determining the amount of pellets transferred to customers at the end of year. We also performed observations of finished goods held by the Company at or near year-end, and tested management's roll-forward of pellets to year-end. We also made inquiries of employees outside of the accounting department to corroborate the completeness of the vessels being loaded at year-end and inspected a sample of shipping and receiving documentation to test that pellets shipped near year-end were recognized in the appropriate period based on the date of shipment. |

**Recoverability Assessment for Customer Assets**

| | |
|---|---|
| *Description of the Matter* | As discussed in Note 3 to the consolidated financial statements, the Company has recognized customer assets of $140.8 million related to payments made, or payable, to certain customers to modify the terms of long-term take-or-pay contracts to cancel, reschedule and/or re-price volumes. The Company amortizes these customer assets as a reduction to transaction price as control of the related pellets under the contract are transferred to the customer. The Company tests these assets for recoverability by comparing the amount of consideration expected to be received in the future from the modified take-or-pay contract to the estimated future costs that relate directly to providing the remaining volume of pellets under the contract.

Auditing management's assessment of the recoverability of the customer assets involved a high degree of subjective auditor judgment due to the estimation uncertainty in determining the expected future cost of producing and delivering the remaining pellets under the respective long-term take-or-pay contracts. Significant assumptions used in the Company's recoverability test included estimates of commodity prices, supply sources, and shipping and distribution costs. Auditing of these assets was also especially challenging due to the material weakness identified by the Company over the recoverability assessment of these assets. The material weakness required an increased extent of audit effort to test the reasonableness of the assumptions used in the recoverability assessment. |
| *How We Addressed the Matter in Our Audit* | To test the customer asset recoverability assessment, we performed audit procedures that included, among others, assessing the methodologies and testing the significant assumptions, including the estimates of commodity prices, supply sources, and shipping and distribution costs, used by the Company in its analysis. We compared the significant assumptions used by management to current and historical shipping and distribution costs, sources of supply, and forward commodity pricing. We also performed sensitivity analyses to determine if changes in the significant assumptions would impact management's conclusions on the recoverability of the customer assets. Because of the material weakness, we performed incremental audit procedures, for instance, by increasing our sample size related to customer asset and performing additional sensitivity analysis. |

/s/ Ernst & Young LLP

We have served as the Company's auditor since 2019.

Tysons, Virginia
March 1, 2023

49

A2053

**ENVIVA INC. AND SUBSIDIARIES**
**Consolidated Balance Sheets**
**December 31, 2022 and 2021**
**(In thousands, except par value and number of shares)**

|  | 2022 | 2021 |
|---|---:|---:|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 3,417 | $ 16,801 |
| Restricted cash | — | 1,717 |
| Accounts receivable | 169,847 | 97,439 |
| Other accounts receivable | 8,950 | 17,826 |
| Inventories | 158,884 | 57,717 |
| Short-term customer assets | 21,546 | — |
| Prepaid expenses and other current assets | 7,695 | 7,230 |
| Total current assets | 370,339 | 198,730 |
| Property, plant, and equipment, net | 1,584,875 | 1,498,197 |
| Operating lease right-of-use assets | 102,623 | 108,846 |
| Goodwill | 103,928 | 103,928 |
| Long-term restricted cash | 247,660 | — |
| Long-term customer assets | 118,496 | — |
| Other long-term assets | 23,519 | 14,446 |
| Total assets | $ 2,551,440 | $ 1,924,147 |
| **Liabilities and Equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 37,456 | $ 29,535 |
| Accrued and other current liabilities | 146,497 | 163,306 |
| Customer liabilities | 75,230 | — |
| Current portion of interest payable | 32,754 | 25,060 |
| Current portion of long-term debt and finance lease obligations | 20,993 | 39,105 |
| Deferred revenue | 32,840 | — |
| Financial liability pursuant to repurchase accounting | 111,913 | — |
| Total current liabilities | 457,683 | 257,006 |
| Long-term debt and finance lease obligations | 1,571,766 | 1,232,441 |
| Long-term operating lease liabilities | 115,294 | 122,252 |
| Deferred tax liabilities, net | 2,107 | 36 |
| Long-term deferred revenue | 41,728 | 594 |
| Other long-term liabilities | 76,106 | 41,154 |
| Total liabilities | 2,264,684 | 1,653,483 |
| Commitments and contingencies | | |
| Equity: | | |
| Preferred stock, $0.001 par value, 100,000,000 shares authorized, none issued and outstanding at December 31, 2022 and 2021. | — | — |
| Common stock, $0.001 par value, 600,000,000 shares authorized, 66,966,092 and 61,137,744 issued and outstanding at December 31, 2022 and 2021, respectively. | 67 | 61 |
| Additional paid-in capital | 502,554 | 317,998 |
| Accumulated deficit | (168,307) | — |
| Accumulated other comprehensive income | 197 | 299 |
| Total Enviva Inc.'s equity | 334,511 | 318,358 |
| Noncontrolling interests | (47,755) | (47,694) |
| Total equity | 286,756 | 270,664 |
| Total liabilities and equity | $ 2,551,440 | $ 1,924,147 |

See accompanying notes to consolidated financial statements.

A2054

**ENVIVA INC. AND SUBSIDIARIES**
**Consolidated Statements of Operations**
**Years ended December 31, 2022, 2021, and 2020**
**(In thousands, except per share or per unit amounts)**

| | | 2022 | | 2021 | | 2020 |
|---|---|---|---|---|---|---|
| Product sales | $ | 1,079,814 | $ | 999,190 | $ | 830,528 |
| Other revenue | | 14,462 | | 42,488 | | 44,434 |
| Net revenue | | 1,094,276 | | 1,041,678 | | 874,962 |
| Operating costs and expenses: | | | | | | |
| Cost of goods sold, excluding items below | | 927,453 | | 861,703 | | 711,248 |
| Loss on disposal of assets | | 8,607 | | 10,153 | | 8,715 |
| Selling, general, administrative, and development expenses | | 119,713 | | 175,108 | | 129,537 |
| Executive separation | | 20,813 | | — | | — |
| Depreciation and amortization | | 113,177 | | 91,966 | | 85,892 |
| Total operating costs and expenses | | 1,189,763 | | 1,138,930 | | 935,392 |
| Loss from operations | | (95,487) | | (97,252) | | (60,430) |
| Other (expense) income: | | | | | | |
| Interest expense | | (71,585) | | (56,497) | | (45,996) |
| Early retirement of debt obligation | | — | | (9,377) | | — |
| Other income, net | | 1,198 | | 880 | | 271 |
| Total other expense, net | | (70,387) | | (64,994) | | (45,725) |
| Net loss before income taxes | | (165,874) | | (162,246) | | (106,155) |
| Income tax expense (benefit) | | 2,494 | | (16,975) | | 169 |
| Net loss | | (168,368) | | (145,271) | | (106,324) |
| Less net loss attributable to noncontrolling interests | | 61 | | 23,202 | | 20,034 |
| Net loss attributable to Enviva Inc. | $ | (168,307) | $ | (122,069) | $ | (86,290) |
| Net loss per Enviva Inc. common share or unit:[1] | | | | | | |
| Basic and diluted | $ | (2.59) | $ | (4.76) | $ | (5.39) |
| Weighted-average number of common shares or units outstanding: | | | | | | |
| Basic and diluted | | 66,312 | | 25,632 | | 16,000 |

[1] Effective December 31, 2021, common units were converted into common shares due to the conversion from a partnership to a corporation.

See accompanying notes to consolidated financial statements.

51

A2055

**ENVIVA INC. AND SUBSIDIARIES**
**Consolidated Statements of Comprehensive Loss**
**Years ended December 31, 2022, 2021 and 2020**
**(In thousands)**

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Net loss | $ (168,368) | $ (145,271) | $ (106,324) |
| Other comprehensive income (loss), net of tax of $0: |  |  |  |
| Currency translation adjustment | (102) | 37 | 98 |
| Reclassification of net gains on cash flow hedges realized into net loss | — | — | (22) |
| Total other comprehensive (loss) income | (102) | 37 | 76 |
| Total comprehensive loss | (168,470) | (145,234) | (106,248) |
| Less comprehensive loss attributable to noncontrolling interests | 61 | 23,202 | 20,034 |
| Comprehensive loss attributable to Enviva Inc. | $ (168,409) | $ (122,032) | $ (86,214) |

See accompanying notes to consolidated financial statements.

52

A2056

**ENVIVA INC. AND SUBSIDIARIES**
**Consolidated Statements of Changes in Equity**
**Year Ended December 31, 2022**
**(In thousands)**

| | Common Shares | | Additional Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive Income | Equity Attributable to Enviva Inc. | Noncontrolling Interests | Total Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | | |
| Equity, December 31, 2021 | 61,138 $ | 61 $ | 317,998 $ | — $ | 299 $ | 318,358 $ | (47,694) $ | 270,664 |
| Dividends declared | — | — | (244,857) | — | — | (244,857) | — | (244,857) |
| Issuance of common shares, net | 4,945 | 5 | 332,720 | — | — | 332,725 | — | 332,725 |
| Common shares issued in lieu of dividends | 496 | — | 33,187 | — | — | 33,187 | — | 33,187 |
| Payments for withholding tax and number of shares issued associated with Long-Term Incentive Plan vesting | 387 | 1 | (16,908) | — | — | (16,907) | — | (16,907) |
| Non-cash equity-based compensation and other costs | — | — | 56,575 | — | — | 56,575 | — | 56,575 |
| Support Payments | — | — | 23,839 | — | — | 23,839 | — | 23,839 |
| Other comprehensive loss | — | — | — | — | (102) | (102) | — | (102) |
| Net loss | — | — | — | (168,307) | — | (168,307) | (61) | (168,368) |
| Equity, December 31, 2022 | 66,966 $ | 67 $ | 502,554 $ | (168,307) $ | 197 $ | 334,511 $ | (47,755) $ | 286,756 |

See accompanying notes to consolidated financial statements.

53

A2057

Table of Contents

**ENVIVA INC. AND SUBSIDIARIES**
**Consolidated Statements of Changes in Equity (Continued)**
**Years ended December 31, 2021 and 2020**
**(In thousands)**

| | Previous Units Existing until the Recapitalization of Enviva Inc.[1] | | | | | | | | | | Current Units Created by the Recapitalization[1] | | | | Equity Attributable to Enviva Inc. | Noncontrolling Interests | Total Equity |
| | Series A | | Series B | | Series C | | Series D | | Series E | | Series A | | Series B[2] | | | | |
| | Units | Amount | Units | Amount | Units | Amount | Units | Amount | Units | Amount | Units | Amount | Units | Amount | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Equity, December 31, 2019 | 250,000 | $74,031 | 14,063 | $(5,274) | 6,045 | $1,200 | 113,172 | $(14,256) | 1,115 | $386 | — | — | — | — | $56,087 | $301,169 | $357,256 |
| Acquisition of noncontrolling interest in Greenwood | — | (41,445) | — | (2,331) | — | — | — | (18,762) | — | — | — | — | — | — | (62,538) | (31,121) | (93,659) |
| Other comprehensive income prior to recapitalization | — | 18 | — | 1 | — | — | — | 9 | — | — | — | — | — | — | 28 | — | 28 |
| Net loss prior to recapitalization | — | (32,597) | — | (1,834) | — | — | — | (14,756) | — | — | — | — | — | — | (49,187) | — | (49,187) |
| Recapitalization of Enviva Inc. | (250,000) | (7) | (14,063) | 9,438 | (6,045) | (1,200) | (113,172) | 47,765 | (1,115) | (386) | 784,980 | (55,610) | — | — | — | — | — |
| Issuance of Enviva Partners, LP common units, net | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | 190,529 | 190,529 |
| Cash distributions | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | (74,169) | (74,169) |
| Enviva Partners, LP unit-based compensation | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | 21,311 | 21,311 |
| Enviva Inc. unit-based compensation | — | — | — | — | — | — | — | — | — | — | — | — | 2,500 | 13,865 | 13,865 | — | 13,865 |
| Contributed capital | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | 100,775 | 100,775 |
| Other comprehensive income | — | — | — | — | — | — | — | — | — | — | — | 10 | — | — | 10 | 38 | 48 |
| Net loss | — | — | — | — | — | — | — | — | — | — | — | (37,103) | — | — | (37,103) | (20,034) | (57,137) |
| Equity, December 31, 2020 | — | $— | — | $— | — | $— | — | $— | — | $— | 784,980 | $(92,703) | 2,500 | $13,865 | $(78,838) | $488,498 | $409,660 |

[1]See Note 15, *Equity*
[2]Series B Units not in thousands

| | Series A | | Series B[1] | | Common Units | | Common Shares | | Additional Paid-In Capital | Retained Earnings | Accumulated Other Comprehensive Income | Equity Attributable to Enviva Inc. | Noncontrolling Interests | Total Equity |
| | Units | Amount | Units | Amount | Units | Amount | Shares | Amount | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Equity, December 31, 2020 | 784,980 | $(92,703) | 2,500 | $13,865 | — | $— | — | $— | — | $— | — | $— | — $ | (78,838) $ | 488,498 $ | 409,660 |
| Acquisition of noncontrolling interest | — | (45,388) | — | — | — | — | — | — | — | — | — | (45,388) | (108,031) | (153,419) |
| Issuance of Enviva Partners, LP common units prior to the Simplification Transaction, net | — | $— | — | — | — | — | — | — | — | — | — | — | 214,510 | 214,510 |
| Cash distributions prior to the Simplification Transaction | — | — | — | — | — | — | — | — | — | — | — | — | (71,471) | (71,471) |
| Non-cash equity-based compensation and other costs prior to the Simplification Transaction | — | — | 6,900 | 23,833 | — | — | — | — | — | — | — | 23,833 | 5,191 | 29,024 |
| Contribution of assets | — | — | — | — | — | — | — | — | — | — | — | — | 389 | 389 |
| Other comprehensive income prior to the Simplification Transaction | — | 12 | — | — | — | — | — | — | — | — | — | 12 | 11 | 23 |
| Net loss prior to the Simplification Transaction | — | (102,284) | — | — | — | — | — | — | — | — | — | (102,284) | (23,229) | (125,513) |
| Simplification Transaction | (784,980) | 240,363 | (9,400) | (37,698) | 16,000 | 350,924 | — | — | — | — | — | 553,589 | (553,589) | — |
| Distributions after the Simplification Transaction | — | — | — | — | — | (52,145) | — | — | — | — | — | (52,145) | — | (52,145) |
| Common units issued in lieu of distributions | — | — | — | — | 115 | 7,560 | — | — | — | — | — | 7,560 | — | 7,560 |
| Non-cash equity-based compensation and other costs after the Simplification Transaction | — | — | — | — | 6 | 12,813 | — | — | — | — | — | 12,813 | — | 12,813 |
| Support Payments | — | — | — | — | — | 15,446 | — | — | — | — | — | 15,446 | — | 15,446 |
| Other comprehensive income after the Simplification Transaction | — | — | — | — | — | 14 | — | — | — | — | — | 14 | — | 14 |
| Net loss after the Simplification Transaction | — | — | — | — | — | (19,785) | — | — | — | — | — | (19,785) | 27 | (19,758) |
| C-Corporation Conversion | — | — | — | — | (16,121) | (314,827) | 61,138 | 61 | 317,998 | — | 299 | 3,531 | — | 3,531 |
| Equity, December 31, 2021 | — | $— | — | $— | — | $— | 61,138 | $61 | $317,998 | — $ | 299 $ | 318,358 $ | (47,694) $ | 270,664 |

[1]Series B Units not in thousands

See accompanying notes to consolidated financial statements.

54

A2058

**ENVIVA INC. AND SUBSIDIARIES**
**Consolidated Statement of Cash Flows**
**Years ended December 31, 2022, 2021 and 2020**
**(In thousands)**

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| **Cash flows from operating activities:** | | | |
| Net loss | $ (168,368) | $ (145,271) | $ (106,324) |
| Adjustments to reconcile net loss to net cash (used in) provided by operating activities: | | | |
| Depreciation and amortization | 113,177 | 92,919 | 82,436 |
| Interest expense pursuant to repurchase accounting | 9,572 | — | — |
| Amortization of debt issuance costs, debt premium, and original issue discounts | 2,505 | 764 | 2,506 |
| Early retirement of debt obligation | — | 9,377 | — |
| Loss on disposal of assets | 8,607 | 10,153 | 8,715 |
| Deferred taxes | 2,074 | (21,629) | 336 |
| Non-cash equity-based compensation and other expense | 54,148 | 55,924 | 39,528 |
| Fair value changes in derivatives | 3,935 | 1,829 | 5,294 |
| Unrealized (gain) loss on foreign currency transactions, net | (234) | 22 | 10 |
| Change in operating assets and liabilities: | | | |
| Accounts and other receivables | (63,343) | 24,088 | (60,276) |
| Prepaid expenses and other current and long-term assets | (25,534) | 1,723 | (12,892) |
| Inventories | 3,909 | (15,398) | (1,903) |
| Finished goods subject to repurchase accounting | (95,353) | — | — |
| Derivatives | (3,983) | (5,792) | (249) |
| Accounts payable, accrued liabilities, and other current liabilities | 79,733 | 50,797 | 62,080 |
| Related-party payables | — | (440) | 464 |
| Deferred revenue | — | (4,324) | (4,139) |
| Accrued interest | 7,694 | (11,241) | 8,630 |
| Other long-term liabilities | (17,306) | (10,111) | (9,817) |
| Net cash (used in) provided by operating activities | (88,767) | 33,390 | 14,399 |
| **Cash flows from investing activities:** | | | |
| Purchases of property, plant, and equipment | (217,847) | (332,322) | (220,998) |
| Payments in relation to the Georgia Biomass Acquisition, net of cash acquired | — | — | (163,299) |
| Payment for acquisition of a business | (5,000) | — | — |
| Other | — | — | 328 |
| Net cash used in investing activities | (222,847) | (332,322) | (383,969) |
| **Cash flows from financing activities:** | | | |
| Proceeds from senior secured credit facility | 780,000 | 1,025,000 | 755,500 |
| Principal payments on senior secured credit facility | (810,000) | (679,000) | (635,500) |
| Principal payments on Green Term Loan | — | (325,000) | — |
| Proceeds from debt issuance | 377,319 | 321,750 | 155,625 |
| Support payments received | 23,839 | 15,446 | — |
| Proceeds from sale of finished goods subject to repurchase accounting | 102,341 | — | — |
| Proceeds from capital contribution of New Market Tax Credit financing | 12,763 | — | — |
| Principal payments on other long-term debt and finance lease obligations | (39,915) | (13,188) | (10,951) |
| Cash paid related to debt issuance costs and deferred offering costs | (6,931) | (9,401) | (3,858) |
| Proceeds from issuance of Enviva Inc. common shares, net | 332,725 | 214,501 | 190,529 |
| Payments for acquisition of noncontrolling interests | — | (153,348) | (93,659) |
| Principal payments on related-party note payable | — | (20,000) | — |
| Proceeds from related-party note payable | — | — | 20,000 |
| Contributed capital to common control entities acquired | — | — | 105,000 |
| Cash dividends or distributions and equivalent rights | (211,061) | (116,006) | (71,169) |
| Payment for withholding tax associated with Long-Term Incentive Plan vesting | (16,907) | (10,979) | (4,996) |
| Net cash provided by financing activities | 544,173 | 249,775 | 406,521 |
| Net increase (decrease) in cash, cash equivalents, and restricted cash | 232,559 | (49,157) | 36,951 |
| Cash, cash equivalents, and restricted cash, beginning of period | 18,518 | 67,675 | 30,724 |
| Cash, cash equivalents, and restricted cash, end of period | $ 251,077 | $ 18,518 | $ 67,675 |

See accompanying notes to consolidated financial statements.

A2059

**ENVIVA INC. AND SUBSIDIARIES**
**Consolidated Statement of Cash Flows (Continued)**
**Years ended December 31, 2022, 2021 and 2020**
**(In thousands)**

|  | 2022 | | 2021 | | 2020 |
|---|---|---|---|---|---|
| Non-cash investing and financing activities: | | | | | |
| Property, plant, and equipment acquired included in accounts payable and accrued liabilities | $ | (4,303) | $ | 20,105 | $ | 28,231 |
| Supplemental information: | | | | | |
| Interest paid, net of capitalized interest | $ | 50,910 | $ | 14,884 | $ | 28,351 |

56

A2060

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

## (1) Description of Business and Basis of Presentation

Enviva Inc. was formed on November 12, 2013 as Enviva Partners, LP (the "Partnership"). The Partnership converted from a Delaware limited partnership to a Delaware corporation (the "Conversion") named "Enviva Inc." effective December 31, 2021. The Partnership was a subsidiary of Enviva Holdings, LP (our "former sponsor" or "Holdings"). Enviva Partners GP, LLC, a subsidiary of our former sponsor, was our former general partner (the "former GP"). References to "Enviva," the "Company," "we," "us," or "our" refer to (i) Enviva Inc. and its subsidiaries for the periods following the Conversion and (ii) Enviva Partners, LP and its subsidiaries for periods prior to the Conversion, except where the context otherwise requires.

We procure wood fiber and process it into utility-grade wood pellets and load the finished wood pellets into railcars, trucks and barges for transportation to deep-water marine terminals, where they are received, stored, and ultimately loaded onto oceangoing vessels for delivery under long-term, take-or-pay off-take contracts to our customers principally in the United Kingdom (the "U.K."), the European Union, and Japan.

We own and operate ten industrial-scale wood pellet production plants located in the Southeastern United States. In addition to the volumes from our plants, we also procure wood pellets from third parties. Wood pellets are exported from our wholly owned deep-water marine terminal at the Port of Chesapeake, Virginia, terminal assets at the Port of Wilmington, North Carolina, and at the Port of Pascagoula, Mississippi, and from third-party deep-water marine terminals in Mobile, Alabama, Panama City, Florida, and Savannah, Georgia under a short-term contract, a long-term contract, and a lease and associated terminal services agreement, respectively.

### Basis of Presentation

#### *Principles of Consolidation*

The accompanying consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("GAAP"). Our consolidated financial statements include the accounts of Enviva and its wholly owned subsidiaries and controlled subsidiaries, including variable interest entities in which we are the primary beneficiary. As managing member, we have the sole power to direct the activities that most impact the economics of the variable interest entities. All intercompany accounts and transactions have been eliminated. We operate and manage our business as one operating segment.

#### *Reclassification*

Certain prior year amounts have been reclassified from operating lease liabilities to other long-term liabilities to conform to current period presentation on the consolidated statements of cash flows.

#### *Corporate Conversion*

As a result of the Conversion, periods prior to December 31, 2021 reflect Enviva as a limited partnership, not a corporation. References to common units for periods prior to the Conversion refer to common units of Enviva Partners, LP, and references to common stock for periods following the Conversion refer to shares of common stock of Enviva Inc. The primary financial impacts of the Conversion to the consolidated financial statements were (i) reclassification of partnership capital accounts to equity accounts reflective of a corporation and (ii) income tax effects.

On the date of the Conversion, each common unit representing a limited partner interest in the Partnership issued and outstanding immediately prior to the Conversion was exchanged for one share of common stock of the Company, par value $0.001 per share.

#### *Simplification Transaction*

On October 14, 2021, the Partnership acquired our former sponsor and the former GP, and the incentive distribution rights held by our former sponsor were cancelled and eliminated (collectively, the "Simplification Transaction") in exchange for 16.0 million common units, which were distributed to the owners of our former sponsor. The owners of our former sponsor agreed to reinvest in our common stock all dividends from 9.0 million of the 16.0 million common units issued in connection with the Simplification Transaction during the period beginning with dividends paid for the third quarter of 2021 through the fourth quarter of 2024.

A2061

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

**(2) Significant Accounting Policies**

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make judgments, estimates and assumptions that affect the amounts reported in our consolidated financial statements and accompanying notes. Actual results could differ materially from those estimates.

*Noncontrolling Interests*

Noncontrolling interest balances are presented as a component of equity in the accompanying consolidated balance sheets. Noncontrolling interests include third-party equity ownership in Enviva Wilmington Holdings, LLC (the "Hamlet JV") and Enviva JV Development Company, LLC (the "Development JV"), each of which are limited liability companies. Prior to the Simplification Transaction, noncontrolling interests also included the third-party, public equity ownership in the Partnership. The noncontrolling interest balance related to the Hamlet JV resulted from the allocation of income or loss for the Hamlet JV was based on the percentage of units held by third-parties and the Partnership until April 1, 2019, after which there has been no allocation to third parties primarily as their capital contributions had all been repaid and substantially all of their preferred return on those capital contributions had been paid. For the Development JV, the allocation of income (loss) is based on the percentage of capital contributions from third-parties and the Partnership. In February 2021, the Partnership purchased the third-party member's interest in the Development JV. See Note 15, *Equity.*

*Other Comprehensive Income (Loss)*

Comprehensive income (loss) consists of two components, net income (loss) and other comprehensive income (loss). Other comprehensive income (loss) refers to revenue, expenses, and gains and losses that under GAAP are included in comprehensive income (loss) but excluded from net income (loss). Other comprehensive income (loss) consists of net unrealized gains and losses related to derivative instruments accounted for as cash flow hedges and foreign currency translation adjustments.

*Cash and Cash Equivalents and Restricted Cash*

Cash and cash equivalents consist of short-term, highly liquid investments readily convertible into cash with an original maturity of three months or less. Restricted cash is comprised only of cash whose use is limited by contractual restrictions; see Note 12, *Long-Term Debt and Finance Lease Obligations*.

*Accounts Receivable*

Accounts receivable represent amounts billed that are recorded at the invoiced amount and billable under our contracts that are pending finalization of prerequisite billing documentation and do not bear interest. As of December 31, 2022 and 2021, we had no amounts in allowance for credit losses given the lack of historical credit losses and no current expectations of credit losses.

*Inventories*

Inventories consist of raw materials, work-in-progress, consumable tooling and finished goods. Fixed production overhead, including related depreciation expense, is allocated to inventory based on the normal production capacity of the facilities. To the extent we do not achieve normal production levels, we charge such under-absorption of fixed overhead to cost of goods sold in the period incurred.

Consumable tooling consists of spare parts and tooling to be consumed in the production process. Spare parts are expected to be used within a year and are expensed as used. Tooling items are amortized to expense over an estimated service life generally less than one year.

Inventories are stated at the lower of cost or net realizable value using the first-in, first-out method ("FIFO") for all inventories. Raw material, production and distribution costs associated with delivering wood pellets to marine terminals and third-party wood pellet purchase costs are capitalized as a component of inventory. These costs and the finished production overhead allocated to inventory are reflected in cost of goods sold when inventory is sold.

58

A2062

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

*Revenue Recognition*

We primarily earn revenue by supplying wood pellets to customers under off-take contracts, the majority of the commitments under which are long-term in nature. Our off-take contracts are considered "take-or-pay" because they include a firm obligation of the customer to take a fixed quantity of product at a stated price and provisions that require that we be compensated in the case of a customer's failure to accept all or a part of the contracted volumes or termination of a contract by a customer. Each of our long-term off-take contracts defines the annual volume of wood pellets that a customer is required to purchase, and we are required to sell, the fixed price per MT for product satisfying a base net calorific value and other technical specifications. These prices are generally fixed for the entire term; however, some may be subject to adjustments which may include annual inflation-based adjustments or price escalators, price adjustments for product specifications, as well as, in some instances, price adjustments due to changes in underlying indices. In addition to sales of our product under these long-term off-take contracts, we routinely sell wood pellets under shorter-term contracts, which range in volume and tenor and, in some cases, may include only one specific shipment. Because each of our off-take contracts is a bilaterally negotiated agreement, our revenue over the duration of such contracts does not generally follow observable current market pricing trends. Our performance obligations under these contracts are the delivery of wood pellets, which we aggregate into MT. We account for each MT as a single performance obligation. Our revenue from the sales of wood pellets we produce is recognized as product sales upon satisfaction of our performance obligation when control transfers to the customer at the time of loading wood pellets onto a ship. The amount of wood pellets loaded onto a ship is determined by management with the assistance of a third-party specialist.

Depending on the specific off-take contract, shipping terms are either Cost, Insurance and Freight ("CIF"), Cost and Freight ("CFR") or Free on Board ("FOB"). Under a CIF contract, we procure and pay for shipping costs, which include insurance and all other charges, up to the port of destination for the customer. Under a CFR contract, we procure and pay for shipping costs, which include insurance (excluding marine cargo insurance) and all other charges, up to the port of destination for the customer. Shipping under CIF and CFR contracts after control has passed to the customer is considered a fulfillment activity rather than a performance obligation and associated expenses are included in the price to the customer. Under FOB contracts, the customer is directly responsible for shipping costs.

In some cases, we may purchase shipments of product from third-party suppliers and resell them to other parties in back-to-back transactions ("purchase and sale transactions"). We recognize revenue on a gross basis in product sales when we determine that we act as a principal by having control of the wood pellets before they are transferred to the customer. Indicators of control have included being primarily responsible for fulfilling the promise to provide the wood pellets (such as by contracting to sell wood pellets before contracting to buy them), having inventory risk, or having discretion in establishing the sales price for the wood pellets. The decision as to whether to recognize revenue on a gross or net basis requires significant judgment.

We recognize terminal services revenue ratably over the related contract term, which is included in other revenue. Terminal services are performance obligations that are satisfied over time, as customers simultaneously receive and consume the benefits of the terminal services we perform. The consideration is generally fixed for minimum quantities and any services above the minimum are generally billed based on a per-MT rate as variable consideration and recognized as services are performed. Any deficiency payments receivable and probable of being collected from a customer not meeting quarterly minimum throughput requirements are recognized during the related quarter in satisfaction of the related performance obligation.

Variable consideration from off-take contracts arises from several pricing features outlined in our off-take contracts, pursuant to which such contract pricing may be adjusted in respect of particular shipments to reflect differences between certain contractual quality specifications of the wood pellets as measured both when the wood pellets are loaded onto ships and unloaded at the discharge port as well as certain other contractual adjustments.

Variable consideration from terminal services contracts arises from price increases based on agreed inflation indices and from above-minimum throughput quantities or services.

We allocate variable consideration under our off-take and terminal services contracts entirely to each performance obligation to which variable consideration relates. The estimate of variable consideration represents the amount that is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty is resolved.

Under our off-take contracts, customers are obligated to pay the majority of the purchase price prior to the arrival of the ship at the customers' discharge port. The remaining portion is paid after the wood pellets are unloaded at the discharge port. We generally recognize revenue prior to the issuance of an invoice to the customer.

A2063

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

In instances where we have contracts to exchange wood pellets held for sale in the ordinary course of business for similar wood pellets to be sold in the same line of business to facilitate sales to customers other than the parties to the exchange, we account for these exchanges as nonmonetary transactions at the carrying amount of the wood pellets transferred, with no impact to revenue and with no net impact to cost of goods sold once an equal amount of wood pellets have been exchanged. For the sale of the wood pellets received to customers not parties to the exchange, we recognize product sales revenue as described above for off-take contracts. To the extent that these exchanges also include compensation to us for shipping wood pellets, we recognize it as product sales revenue as those wood pellets are loaded and we recognize the shipping costs in cost of goods sold.

*Cost of Goods Sold*

Cost of goods sold includes the cost to produce and deliver wood pellets to customers, reimbursable shipping-related costs associated with specific off-take contracts with CIF and CFR shipping terms and costs associated with purchase and sale transactions. Distribution costs associated with shipping wood pellets to customers are expensed as incurred. The calculation of cost of goods sold is based on estimates used in the valuation of the FIFO inventory and in determining the specific composition of inventory that is sold to each customer.

*Accrued and Other Current Liabilities*

Accrued and other current liabilities primarily include liabilities related to construction in progress, amounts related to cost of goods sold such as utility costs at our production facilities, distribution costs associated with shipping wood pellets to customers, costs associated with the purchase of wood fiber and wood pellets not yet invoiced and compensation and benefits.

*Derivative Instruments*

Derivative instruments are classified as either assets or liabilities on a gross basis and carried at fair value and included in prepaid expenses and other current assets, other long-term assets, accrued and other current liabilities and other long-term liabilities on the consolidated balance sheets. During the three years ended December 31, 2022 and since and March 2020, we have no longer applied hedge accounting treatment to any foreign currency and interest rate derivatives, respectively. Derivative instruments that did not or ceased to qualify, or are no longer designated, as accounting hedges are adjusted to fair value through earnings in the current period.

*Property, Plant, and Equipment*

Property, plant, and equipment are recorded at cost, which includes the fair values of assets acquired. Equipment under finance leases is stated at the present value of minimum lease payments. Useful lives of assets are based on historical experience and other relevant information. The useful lives of assets are adjusted when changes in the expected physical life of the asset, its planned use, technological advances, or other factors show that a different life would be more appropriate. Changes in useful lives are recognized prospectively.

Depreciation is calculated using the straight-line method based on the estimated useful lives of the related assets. Plant and equipment held under finance leases are amortized on a straight-line basis over the shorter of the lease term or estimated useful life of the asset.

Construction in progress primarily represents expenditures for the development and expansion of facilities. Capitalized interest cost and all direct costs, which include equipment and engineering costs related to the development and expansion of facilities, are capitalized as construction in progress. Depreciation is not recognized for amounts in construction in progress.

Normal repairs and maintenance costs are expensed as incurred. Amounts incurred that extend an asset's useful life, increase its productivity, or add production capacity are capitalized. Direct costs, such as outside labor, materials, internal payroll, and benefit costs, incurred during the construction of a new plant are capitalized; indirect costs are not capitalized.

A2064

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

The principal useful lives are as follows:

| Asset | Estimated useful life |
|---|---|
| Land improvements | 3 to 25 years |
| Buildings | 5 to 40 years |
| Machinery and equipment | 2 to 30 years |
| Vehicles | 2 to 10 years |
| Furniture and office equipment | 2 to 13 years |
| Leasehold improvements | Shorter of estimated useful life or lease term, generally 10 years |

Costs and accumulated depreciation applicable to assets retired or sold are removed from the accounts and any resulting gain or loss is included in the consolidated statements of operations.

A long-lived asset (group), such as property, plant and equipment and amortizable intangible assets, is tested for impairment whenever events or changes in circumstances indicate that the carrying amount of a long-lived asset (group) may not be recoverable. There were no such indicators that would require impairment testing to be performed during the years ended December 31, 2022 and 2021.

*Leases*

We have operating and finance leases related to real estate, machinery, equipment, and other assets where we are the lessee. Operating leases with an initial term of 12 months or less are not recorded on the balance sheet but are recognized as lease expense on a straight-line basis over the applicable lease terms. Operating and finance leases with an initial term longer than 12 months are recorded on the balance sheet and classified as either operating or finance.

Right-of-use ("ROU") assets represent our right to use an underlying asset for the lease term and lease liabilities represent our obligation to make lease payments arising from the lease. Our leases do not contain any material residual value guarantees or restrictive covenants. In addition to fixed lease payments, we have contracts that incur variable lease expense related to usage (e.g., throughput fees, maintenance and repair and machine hours), which are expensed as incurred. Our leases have remaining terms of one to 39 years, some of which include options to extend the leases by up to multiple five-year extensions. Our leases are generally noncancelable. Certain leases also include options to purchase the leased property. The depreciable life of assets and leasehold improvements are limited by the expected lease term unless there is a transfer of title or purchase option reasonably certain of exercise.

An incremental borrowing rate is applied to our leases for balance sheet measurement. As most of our leases do not provide an implicit rate, we generally use our incremental borrowing rate based on the estimated rate of interest for a collateralized borrowing over a similar term of the lease payments as of the commencement date.

For contracts that contain lease and nonlease components, nonlease components are separated and accounted for under other relevant accounting standards. We made an accounting policy election to not separate nonlease components from lease components for heavy machinery and equipment and buildings.

Operating leases are included in operating lease ROU assets, accrued and other current liabilities and long-term operating lease liabilities on our consolidated balance sheets. Finance leases are included in property, plant and equipment, the current portion of long-term debt and finance lease obligations and long-term debt and finance lease obligations on our consolidated balance sheets. Changes in ROU assets and operating lease liabilities are included net in change in operating lease liabilities on the consolidated statement of cash flows.

*Debt Issuance Costs and Original Issue Discounts and Premiums*

Debt issuance costs and original issue discounts and premiums incurred with debt financing are capitalized and amortized over the life of the debt. Amortization expense is included in interest expense. If a debt instrument is retired before its scheduled maturity date, any related unamortized debt issuance costs and original issue discounts and premiums are written-off as gain or loss on debt extinguishment in the same period.

A2065

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

Unamortized debt issuance costs and original issue discounts and premiums related to a recognized debt liability are recognized as a direct deduction from the carrying amount of the related long-term debt and are amortized using the effective interest method. Unamortized debt issuance costs related to our revolving credit commitments are recognized as an asset and are amortized using the straight-line method.

### *Goodwill*

Goodwill represents the purchase price paid for acquired businesses in excess of the identifiable acquired assets and assumed liabilities. Goodwill is not amortized but is tested for impairment annually and whenever an event occurs, or circumstances change such that it is more likely than not that the fair value of the reporting unit is less than its carrying amounts.

Impairment testing for goodwill is required to be done at the reporting unit level. A reporting unit is an operating segment or one level below an operating segment (also known as a component). A component of an operating segment is a reporting unit if the component constitutes a business for which discrete financial information is available and segment management regularly reviews the operating results of that component. Enviva Inc. represents a single operating segment that has been deemed to be a single reporting unit.

For the years ended December 31, 2022 and 2021, we performed a quantitative assessment using the market approach and determined the fair value of the reporting unit exceeded its carrying amount. There have been no impairments to the carrying value of our goodwill during the periods presented. See Note 10, *Goodwill.*

### *Non-Cash Equity-Based Compensation and Other Expense*

Our employees, consultants and directors are eligible to receive equity awards and other forms of compensation under the Enviva Inc. Long-Term Incentive Plan (the "LTIP"). Restricted stock units issued in tandem with corresponding dividend equivalent rights ("DERs") are granted to our employees and independent directors. These equity awards vest subject to the satisfaction of service requirements and/or the achievement of certain performance goals and the grant fair-value of these equity awards are recognized as non-cash equity-based compensation and other expense on a ratable basis over their vesting period. Once these conditions have been met, common stock in the Company will be delivered to the holder of these equity awards. Forfeitures are recognized as they occur. Modifications to these equity awards resulting in incremental fair value over the pre-modification fair value are recognized as non-cash equity-based compensation and other expense over the remaining vesting period. We also recognize non-cash equity-based compensation and other expense for restricted stock units awarded to independent directors. As of December 31, 2022 and 2021, we have the ability to settle certain of our outstanding restricted stock unit awards under the LTIP in either cash or common stock at our election. As we reasonably expect to be able to deliver common stock at the settlement date, we have classified all of our outstanding restricted stock unit awards as equity on our balance sheets. For the year ended December 31, 2022, the performance-based restricted stock awards granted vest dependent on the total shareholder return for Enviva Inc. relative to the constituents of the S&P 500 index over their respective performance periods. Their grant date fair values were determined using a Monte Carlo multivariate pricing model following standard assumptions. See Note 16, *Equity-Based Awards*.

### *Commitments and Contingencies*

Liabilities for loss contingencies arising from claims, assessments, litigation, fines, penalties, and other sources are recorded when it is probable that a liability has been incurred and the amount can be reasonably estimated. Legal costs incurred in connection with loss contingencies are expensed as incurred.

### *Fair Value Measurements*

We apply authoritative accounting guidance for fair value measurements of financial and nonfinancial assets and liabilities. We use valuation techniques that maximize the use of observable inputs and minimize the use of unobservable inputs to the extent possible. We determine fair value based on assumptions that market participants would use in pricing an asset or liability in the principal or most advantageous market. When considering market participant assumptions in fair value measurements, the following fair value hierarchy distinguishes between observable and unobservable inputs, which are categorized in one of the following levels:

- Level 1 Inputs: Unadjusted, quoted prices in active markets for identical assets or liabilities accessible to the reporting entity at the measurement date.

A2066

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

- Level 2 Inputs: Other than quoted prices included in Level 1, inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the asset or liability.

- Level 3 Inputs: Unobservable inputs for the asset or liability used to measure fair value to the extent that observable inputs are not available, thereby allowing for situations in which there is little, if any, market activity for the asset or liability at the measurement date.

*Income taxes*

Effective December 31, 2021, Enviva Partners, LP converted from a Delaware limited partnership to a Delaware corporation named Enviva Inc. (the "Conversion"). Following the Conversion, we became subject to U.S. federal, foreign, state, and local corporate income tax. In addition, certain of Enviva's subsidiaries are subject to federal, state, and local income, franchise, or capital taxes at the entity level and the related tax provision is reflected in the Consolidated Financial Statements. Prior to the Conversion, substantially all of Enviva's operating subsidiaries were organized as limited partnerships and entities that were disregarded entities for U.S. federal and applicable state income tax purposes. As a result, for taxable periods ending on or prior to the Conversion, Enviva's unitholders are liable for income taxes on their share of Enviva's taxable income.

As a result of the Conversion, Enviva recognized a step-up in the tax basis of certain assets that will be recovered as the assets are sold or the basis is amortized. The calculation and allocation of the step-up in tax basis to the various assets of the company was determined by management with the assistance of a third-party specialist. The tax basis information was finalized in 2022 after the filing of the 2021 income tax returns.

Income taxes are accounted for using the asset and liability method of accounting. Under this method, deferred income taxes reflect the net tax effects of temporary differences between the financial reporting and tax bases of assets and liabilities and are measured using the applicable enacted tax rates and laws that will be in effect when such differences are expected to reverse.

Deferred tax assets are reduced by a valuation allowance when, based on the weight of available evidence, it is more likely than not that some portion or all of the deferred tax assets will not be realized. When evaluating the realizability of the deferred tax assets, all evidence, both positive and negative, is considered. Items considered when evaluating the need for a valuation allowance include historical book losses, future reversals of existing temporary differences, tax planning strategies and expectations of future earnings.

For a particular tax-paying component of an entity and within a particular tax jurisdiction, deferred tax assets and liabilities are offset and presented as a single amount, as applicable, in the accompanying statements of financial condition.

*Government Grants*

We receive and then earn government grants based on the expected economic development and other benefits that communities expect to receive as a result of us constructing and operating a plant and/or port and/or employing at least a specific number of people at specified levels of compensation. We referred to International Accounting Standard 20, *Accounting for Government Grants and Disclosure of Government Assistance*, for guidance in determining the appropriate recognition, measurement, and presentation for government assistance received by business entities as there is no specific topical authoritative guidance in GAAP. A government grant is recognized only when there is reasonable assurance that the grant will be received and that we will comply with the conditions attached to the grant received. The grant receivable is included in other accounts receivable or other long-term assets, based on the extent to which it is expected to be received within or after one year. For the government grants acquired in either a business combination or an asset acquisition, their fair value was determined to then be no more than nominal and thus not recognized.

Each of our government grants is generally a combination of a grant related to an asset and a grant related to income. To allocate each grant between what is related to an asset (a plant or port) versus income (compensation cost), we use a proportion at recognition of the grant of the estimated minimum cost that we incurred or expect to incur to comply with the conditions of each type of grant. To the extent that each grant relates to an asset (which has been a majority of the total of each grant), its relative proportion is deducted from the carrying amount of the related property, plant, and equipment where depreciation expense is ultimately reduced over the estimated weighted-average useful life of the asset. To the extent that each grant relates to income, its relative proportion is recorded as a deferred credit where cost of goods sold is ultimately reduced in proportion to the cost to be incurred to comply with the compensation-related conditions. The deferred credit is included in either accrued and

63

A2067

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

other current liabilities or other long-term liabilities, based on the extent to which it is expected to reduce cost of goods sold within or after one year.

### Net Loss per Enviva Inc. Common Share

Net loss per Enviva Inc. common share is computed by dividing the net loss attributable to Enviva Inc., after reducing it by the amounts paid for dividend equivalent rights on outstanding time-based restricted stock awards, by the weighted-average number of outstanding Enviva Inc. common shares.

### Recently Adopted Accounting Standards

On January 1, 2021, we adopted ASU 2019-12, Income Taxes (Topic 740): *Simplifying the Accounting for Income Taxes*, which removes certain exceptions for recognizing deferred taxes for investments, performing intraperiod allocation, and calculating income taxes in interim periods. The ASU also adds guidance to reduce complexity in certain areas, including recognizing deferred taxes for tax goodwill, and allocating taxes to members of a consolidated group. The adoption did not have a material impact on the financial statements.

### Recently Issued Accounting Standards not yet Adopted

Currently, there are no recently issued accounting standards not yet adopted by us that we expect to be reasonably likely to materially impact our financial position, results of operations or cash flows.

### (3) Revenue

We disaggregate our revenue into two categories: product sales and other revenue. Product sales includes sales of wood pellets. Other revenue includes fees associated with customer requests to cancel, defer, or accelerate shipments in satisfaction of the related performance obligation and third-party terminal services fees.

### Performance Obligations

As of December 31, 2022, the aggregate amount of consideration from contracts with customers allocated to the performance obligations that were unsatisfied or partially satisfied was approximately $19.7 billion. This amount excludes forward prices related to variable consideration including inflation, foreign currency and commodity prices. Also, this amount excludes the effects of the related foreign currency derivative contracts as they do not represent contracts with customers. We expect to recognize approximately 7.0% of our remaining performance obligations as revenue in each of the years ending 2023 and 2024 and the balance thereafter. Our off-take contracts expire at various times through 2045 and our terminal services contract expires in 2023.

### Variable Consideration

Variable consideration from off-take contracts arises from several pricing features in our off-take contracts, pursuant to which such contract pricing may be adjusted in respect of particular shipments to reflect differences between certain contractual quality specifications of the wood pellets as measured both when the wood pellets are loaded onto ships and unloaded at the discharge port as well as certain other contractual adjustments.

Variable consideration from our terminal services contract arises from price increases based on agreed inflation indices and from above-minimum throughput quantities or services. There was no variable consideration from our terminal services contract for the year ended December 31, 2022 and 2021. For the year ended December 31, 2020, variable consideration from our terminal service contract was insignificant.

For each of the years ended December 31, 2022 and 2021, we recognized $0.3 million of product sales revenue, related to performance obligations satisfied in previous periods. For the year ended December 31, 2020, we recognized $0.1 million of product sales revenue, related to performance obligations satisfied in previous periods.

### Contract Balances, Customer Assets, and Repurchase Accounting

Accounts receivable related to product sales as of December 31, 2022 and 2021 were $160.4 million and $91.3 million, respectively. Of these amounts, $136.1 million and $61.3 million, as of December 31, 2022 and 2021 respectively, related to amounts that were not yet billable under our contracts with customers pending finalization of prerequisite billing documentation.

A2068

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

The amounts that had not been billed are billed upon receipt of prerequisite billing documentation, where substantially all is typically billed one to two weeks after full loading of the vessel, and where the remaining balance is typically billed one to two weeks after discharge of the vessel. Accounts receivable also include $9.4 million and $6.1 million, as of December 31, 2022 and 2021, respectively, related to distribution costs recoverable from the customer through the cost pass-through mechanism where the costs and their recovery are included in cost of goods sold.

During the year, and predominantly during the three months ended December 31, 2022, we agreed to pay $140.8 million to certain customers with whom we have long-term, take-or-pay off-take contracts. The projected product sales to these customers and the weighted-average remaining term under these customers' contracts are $14.6 billion and 13.8 years, respectively. These customers agreed to reschedule and/or re-price our take-or-pay contracts. The payments and resulting changes to the take-or-pay contracts were treated as the termination of the original take-or-pay agreement and the creation of a new agreement under the modification rules of Accounting Standard Codification Topic 606, *Revenue from Contracts with Customers*. The amount we agreed to pay to those certain customers was recognized as a customer asset that will be amortized as a reduction to product sales revenue as remaining volumes are delivered under those long-term contracts, which is currently estimated to be until 2036. The asset has been tested for recoverability and is classified as short-term to the extent it is expected to be amortized during 2023 with the remainder classified as long-term. Our recoverability tests of these assets involve a comparison of the contract price we expect to receive under the related take-or-pay agreement, reduced by the amortization of the contract asset, as compared to our expected costs to produce, procure, and deliver the volumes specified in the contract. The expected costs of producing volumes in the future require estimates, including estimates of manufacturing throughput volumes and future energy, fiber, and overhead costs. The expected costs of producing volumes in the future require estimates, including estimates of commodity prices, supply sources, shipping and distribution costs, manufacturing throughput volumes and overhead costs. Actual results could be different than these estimates, or our estimates could change in the future based upon new facts and circumstances and could result in these assets no longer being recoverable.

As of December 31, 2022, $75.2 million to be paid during 2023 is included in customer liabilities and the $26.4 million to be paid after 2023 is included in other long-term liabilities which represent our unconditional obligation to make future payments under the terms of our modified agreements.

During the three months ended December 31, 2022, we entered into various agreements to sell and purchase wood pellets with the same customer between the fourth quarter of 2022 and 2025 at a fixed price per metric ton. Under these agreements, the quantities we agreed to purchase exceeded the quantities we agreed to sell. Under the revenue accounting standard, the sale and purchase agreements were combined because the agreements were entered into at or near the same time with the same customer and were negotiated as a package with a single commercial objective. We accounted for the combined contract as a modification of the existing enforceable rights and obligations of our long-term, take-or-pay off-take contracts with the same customer. The contact modification was considered to be the termination of the existing contract and the creation of a new contract. We allocated the total remaining transaction price (which includes any additional transaction price from the modification) to the remaining quantities to be transferred under the modified contract. We recorded $72.7 million of deferred revenue for consideration received from the customer during the three months ended December 31, 2022 in excess of the amounts allocated to the wood pellets transferred to that customer under the modified contract. This deferred revenue is currently estimated to be recognized in revenue primarily in 2024 but also in 2025 and 2026.

The agreements to purchase wood pellets from that same customer commencing in 2023 were accounted for by applying the repurchase agreement requirements in the revenue standard. Further, because the purchase prices exceed the original selling prices of the pellets under the modified contract, the wood pellets subject to repurchase are accounted for as a financing arrangement. As a result, we initially recognized a financial liability of $102.3 million that was equal to the selling prices of the wood pellets under the modified contract, which was classified as a current liability as the repurchases corresponding to the volumes delivered are expected to all occur in 2023. During the period between when volumes are delivered to this customer and when corresponding volumes are purchased from this customer, the difference between the selling price of the wood pellets under the modified contract and the contractual purchase price will be recognized as interest expense with a corresponding increase to the financial liability. As a result, we recognized $9.6 million of interest expense as an increase to the financial liability, which had a total balance of $111.9 million as of December 31, 2022.

Under repurchase accounting as a financing arrangement, we continued to recognize the volumes delivered as finished goods inventory at carrying value of $95.3 million, which include all costs directly incurred in bringing those delivered volumes

65

A2069

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

to their existing location. When the future volumes are purchased and sold to different customers, sales will be based on the finished goods inventory cost of the previously delivered volumes, not the repurchase price.

Cash proceeds from the delivery of volumes subject to repurchase are classified as cash inflows from financing activities. Cash payments made for repurchases are classified as a cash outflow from financing activities.

### (4) Significant Risks and Uncertainties, Including Business and Credit Concentrations

Our business is significantly impacted by greenhouse gas emission and renewable energy legislation and regulations in the U.K., the EU as well as its member states, and Japan. If the U.K., the EU or its member states, or Japan significantly modify such legislation or regulations, then our ability to enter into new contracts as our existing contracts expire may be materially affected.

One rail service provider transports wood pellet production for four of our ten production plants to the applicable terminal. Labor strikes or other disruptions to rail service could materially impact our ability to transport our finished products to ports for delivery to customers.

In addition to pellets sold from our own production, we procure wood pellets from third parties to resell under our long-term off-take arrangements and other sales agreements. During 2022, we purchased approximately $62.6 million of wood pellets under long-term contracts with third parties. Our three largest suppliers of wood pellets purchased represented 42%, 34%, and 16% of these purchases.

Our product sales are primarily to industrial customers located in the U.K., Denmark, Japan, and the Netherlands. Product sales to third-party customers that accounted for 10% or a greater share of consolidated product sales for each of the years ended December 31 are as follows:

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Customer A | 21 % | 32 % | 40 % |
| Customer B | 11 % | 5 % | 9 % |
| Customer C | 7 % | 17 % | 23 % |
| Customer D | 10 % | 9 % | 11 % |
| Customer E | 13 % | 18 % | 8 % |
| Customer F | 12 % | 6 % | — % |

### (5) Inventories

Inventories consisted of the following as of December 31:

|  | 2022 | 2021 |
|---|---|---|
| Raw materials and work-in-process | $ 23,272 | $ 21,995 |
| Consumable tooling | 28,548 | 22,952 |
| Finished goods on hand | 11,794 | 12,770 |
| Finished goods subject to repurchase accounting | 95,270 | — |
| Total inventories | $ 158,884 | $ 57,717 |

Due to a change in estimate about the likelihood and extent of their use, we recorded a reduction in the cost of raw materials inventories to net realizable value of $2.7 million for year ended December 31, 2022. We recorded no reductions from the cost to net realizable value for the year ended December 31, 2021.

A2070

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

**(6) Property, Plant, and Equipment, net**

Property, plant, and equipment, net consisted of the following as of December 31:

|  | 2022 | 2021 |
|---|---|---|
| Land | $ 26,491 | $ 26,414 |
| Land improvements | 77,126 | 61,850 |
| Buildings | 440,894 | 321,577 |
| Machinery and equipment | 1,299,385 | 859,115 |
| Vehicles | 9,667 | 8,318 |
| Furniture and office equipment | 27,064 | 24,840 |
| Leasehold improvements | 23,409 | 22,101 |
| Property, plant, and equipment | 1,904,036 | 1,324,215 |
| Less accumulated depreciation | (513,876) | (395,618) |
| Property, plant, and equipment, net | 1,390,160 | 928,597 |
| Construction in progress | 194,715 | 569,600 |
| Total property, plant, and equipment, net | $ 1,584,875 | $ 1,498,197 |

Total capitalized interest related to construction-in-progress and depreciation expense were as follows for the years ended December 31:

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Capitalized interest related to construction in progress | $ 18,869 | $ 20,166 | $ 9,423 |
| Depreciation expense | 114,187 | 92,630 | 80,372 |

We recorded loss on disposal of assets of $8.6 million, $10.2 million, and $8.7 million for the years ended December 31, 2022, 2021, and 2020, respectively, in the ordinary course of operating our fixed assets.

**(7) Leases**

Operating lease ROU assets and liabilities and finance leases as of December 31:

|  | 2022 | 2021 |
|---|---|---|
| Operating leases: | | |
| Operating lease right-of-use assets | $ 102,623 | $ 108,846 |
| | | |
| Current portion of operating lease liabilities | $ 9,525 | $ 8,187 |
| Long-term operating lease liabilities | 115,294 | 122,252 |
| Total operating lease liabilities | $ 124,819 | $ 130,439 |
| | | |
| Finance leases: | | |
| Property, plant, and equipment, net | $ 27,881 | $ 25,052 |
| | | |
| Current portion of long-term finance lease obligations | $ 9,376 | $ 8,074 |
| Long-term finance lease obligations | 12,747 | 10,358 |
| Total finance lease liabilities | $ 22,123 | $ 18,432 |

A2071

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

Operating and finance lease costs were as follows for the years ended December 31:

| Lease Cost | Classification | | 2022 | | 2021 | | 2020 |
|---|---|---|---|---|---|---|---|
| Operating lease cost: | | | | | | | |
| Fixed lease cost | Cost of goods sold | $ | 8,481 | $ | 7,011 | $ | 6,557 |
| | Selling, general, administrative, and development expenses | | 7,331 | | 7,820 | | 4,916 |
| Variable lease cost | Cost of goods sold | | 36 | | 18 | | 28 |
| | Selling, general, administrative, and development expenses | | 24 | | — | | 268 |
| Short-term lease cost | Cost of goods sold | | 11,744 | | 8,104 | | 9,216 |
| | Selling, general, administrative, and development expenses | | 77 | | 528 | | 187 |
| | Total operating lease costs | $ | 27,693 | $ | 23,481 | $ | 21,172 |
| Finance lease cost: | | | | | | | |
| Amortization of leased assets | Depreciation and amortization | $ | 12,569 | $ | 10,574 | $ | 8,165 |
| Variable lease cost | Cost of goods sold | | 336 | | 58 | | 254 |
| | Selling, general, administrative, and development expenses | | 14 | | — | | 231 |
| Interest on lease liabilities | Interest expense | | 889 | | 528 | | 651 |
| | Total finance lease costs, net | | 13,808 | | 11,160 | | 9,301 |
| | Total lease costs | $ | 41,501 | $ | 34,641 | $ | 30,473 |

Operating and finance lease cash flow information was as follows for the years ended December 31:

| | | 2022 | | 2021 | | 2020 |
|---|---|---|---|---|---|---|
| Cash paid for amounts included in the measurement of lease liabilities: | | | | | | |
| Operating cash flows from operating leases | $ | 15,756 | $ | 7,509 | $ | 10,912 |
| Operating cash flows from finance leases | | 766 | | 524 | | 651 |
| Financing cash flows from finance leases | | 10,819 | | 10,688 | | 8,334 |
| | | | | | | |
| Assets obtained in exchange for lease obligations: | | | | | | |
| Operating leases | $ | 2,283 | $ | 10,491 | $ | 55,784 |
| Finance leases | | 11,828 | | 8,531 | | 14,698 |

As of December 31, 2022, the future minimum lease payments and the aggregate maturities of operating and finance lease liabilities are as follows:

| Years Ending December 31, | | Operating Leases | | Finance Leases | | Total |
|---|---|---|---|---|---|---|
| 2023 | $ | 15,092 | $ | 10,113 | $ | 25,205 |
| 2024 | | 16,242 | | 5,053 | | 21,295 |
| 2025 | | 16,105 | | 2,782 | | 18,887 |
| 2026 | | 15,749 | | 1,634 | | 17,383 |
| 2027 | | 14,409 | | 735 | | 15,144 |
| Thereafter | | 121,946 | | 4,810 | | 126,756 |
| Total lease payments | | 199,543 | | 25,127 | | 224,670 |
| Less: imputed interest | | (74,724) | | (3,004) | | (77,728) |
| Total present value of lease liabilities | $ | 124,819 | $ | 22,123 | $ | 146,942 |

68

A2072

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

As of December 31, 2022, the weighted-average remaining lease terms and discount rates for our operating and finance leases were weighted using the undiscounted future minimum lease payments and are as follows:

| | |
|---|---|
| Weighted average remaining lease term (years): | |
| Operating leases | 14 |
| Finance leases | 5 |
| Weighted average discount rate: | |
| Operating leases | 6 % |
| Finance leases | 4 % |

**(8) Derivative Instruments**

We use derivative instruments to partially offset our business exposure to foreign currency exchange risk from expected future cash flows and interest rate risk resulting from certain borrowings. Although the preponderance of our off-take contracts and shipping contracts are U.S. Dollar-denominated, we are exposed to fluctuations in foreign currency exchange rates related to a minority of our off-take contracts that require future deliveries of wood pellets to be settled in British Pound Sterling ("GBP") and Euro ("EUR") and a minority of our shipping contracts that require freight rates to be settled in GBP.

On March 31, 2022, we entered into a bunker fuel oil swap to offset our business exposure to bunker fuel oil prices. The swap expired in December 2022.

We seek to mitigate the credit risk associated with derivative instruments by limiting our counterparties to major financial institutions. Although we monitor the potential risk of loss due to credit risk, we do not expect material losses as a result of defaults by counterparties. We use derivative instruments to manage cash flow and do not enter into derivative instruments for speculative or trading purposes.

We have entered and may continue to enter into foreign currency forward contracts, purchased option contracts or other instruments to partially manage this risk. We record the changes in the fair value of foreign currency derivatives as product sales or cost of goods sold depending on the nature of the item being hedged.

We entered into pay-fixed, receive-variable interest rate swaps to hedge interest rate risk associated with our variable rate borrowings under our senior secured credit facility that are not designated and accounted for as cash flow hedges. The interest rate swaps expired in 2021.

Our derivative instruments are classified as Level 2 assets or liabilities based on inputs such as forward foreign exchange rates. The fair value of derivative instruments as of December 31, 2022 and 2021 was as follows:

| | | Asset (Liability) | |
|---|---|---|---|
| **Balance Sheet Classification** | | **2022** | **2021** |
| Not designated as hedging instruments: | | | |
| Foreign currency exchange contracts: | | | |
| | Prepaid expenses and other current assets | $ — | $ 321 |
| | Other long-term assets | — | 309 |
| | Accrued and other current liabilities | (959) | (1,456) |
| | Other long-term liabilities | (810) | (1,001) |
| | | (1,769) | (1,827) |
| Total derivatives not designated as hedging instruments | | $ (1,769) | $ (1,827) |

69

A2073

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

Net unrealized and net realized gains and (losses) recorded to earnings were as follows:

| Classification | Derivative Instrument | | 2022 | | 2021 | | 2020 |
|---|---|---|---|---|---|---|---|
| Product sales | Foreign currency derivatives | Unrealized | $ | 59 | $ | 2,673 | $ | (4,327) |
| Product sales | Foreign currency derivatives | Realized | | 3,295 | | (2,689) | | 275 |
| Cost of goods sold | Bunker fuel swap | Realized | | 699 | | — | | — |
| Interest expense | Interest rate swap | Unrealized | | — | | 119 | | (167) |

We enter into master netting arrangements designed to permit net settlement of derivative transactions among the respective counterparties. If we had settled all transactions with our respective counterparties at December 31, 2022, we would have received a net settlement termination payment of $1.8 million, which differs insignificantly from the recorded fair value of the derivatives. We present our derivative assets and liabilities at their gross fair values.

The notional amounts of outstanding derivative instruments associated with outstanding or unsettled derivative instruments were as of follows as of December 31:

| | | 2022 | | 2021 |
|---|---|---|---|---|
| Foreign exchange forward contracts in GBP | £ | 15,281 | £ | 57,500 |
| Foreign exchange purchased option contracts in GBP | £ | — | £ | 7,275 |
| Foreign exchange forward contracts in EUR | € | 2,300 | € | 11,000 |

## (9) Fair Value Measurements

The amounts reported in the consolidated balance sheets as cash and cash equivalents, restricted cash, accounts receivable, other accounts receivable, prepaid expenses and other current assets, accounts payable, and accrued and other current liabilities approximate fair value because of the short-term nature of these instruments.

Derivative instruments and long-term debt including the current portion are classified as Level 2 instruments. Derivatives are classified as Level 2 as they are fair valued using inputs that are observable in active markets such as foreign exchange rates (see Note 8, *Derivative Instruments*). The fair value of our 2026 Notes (as defined below), Epes Tax-Exempt Green Bonds and Bond Tax-Exempt Green Bonds (see Note 12, *Long-Term Debt and Finance Lease Obligations*) were determined based on observable market prices in an active market and categorized as Level 2 in the fair value hierarchy. The fair value of the New Market Tax Credit loans and the Seller Note (as defined below) were estimated on discounted cash flow analyses based on observable inputs in active markets for debt with similar terms and remaining maturities and categorized as Level 2 in the fair value hierarchy. The carrying amount of other long-term debt, which is primarily comprised of the senior secured credit facility that resets based on a market rate, approximates fair value.

The carrying amount and estimated fair value of long-term debt were as follows as of December 31:

| | 2022 | | 2021 | |
|---|---|---|---|---|
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| 2026 Notes | $ 747,991 | $ 711,563 | $ 747,399 | $ 777,188 |
| Epes Tax-Exempt Green Bonds | 245,727 | 227,500 | — | — |
| Bond Tax-Exempt Green Bonds | 98,004 | 101,168 | — | — |
| New Markets Tax Credit loans | 28,791 | 28,786 | — | — |
| Seller Note | 8,705 | 8,737 | 36,442 | 38,284 |
| Other long-term debt | 441,418 | 441,418 | 469,273 | 469,273 |
| Total long-term debt | $ 1,570,636 | $ 1,519,172 | $ 1,253,114 | $ 1,284,745 |

## (10) Goodwill

Goodwill was $103.9 million at December 31, 2022 and 2021, respectively. Goodwill includes $4.3 million recorded from an acquisition in 2021, $14.0 million recorded associated with the Georgia Biomass Acquisition in 2020, $80.7 million

A2074

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

associated with the acquisition of Cottondale in 2015, and $4.9 million from acquisitions in 2010. We did not record any impairment losses during the years ended December 31, 2022, 2021, or 2020.

**(11) Accrued and Other Current Liabilities**

Accrued and other current liabilities consisted of the following as of December 31:

| | 2022 | 2021 |
|---|---|---|
| Accrued expenses - compensation and benefits | $ 11,942 | $ 22,758 |
| Accrued expenses - wood pellet purchases and distribution costs | 49,615 | 34,819 |
| Accrued expenses - operating costs and expenses | 51,122 | 55,463 |
| Accrued capital expenditures | 10,960 | 21,791 |
| Other accrued expenses and other current liabilities | 22,858 | 28,475 |
| Accrued and other current liabilities | $ 146,497 | $ 163,306 |

**(12) Long-Term Debt and Finance Lease Obligations**

Long-term debt and finance lease obligations at carrying value consisted of the following as of December 31:

| | 2022 | 2021 |
|---|---|---|
| 2026 Notes, net of unamortized discount, premium and debt issuance of $2.0 million and $2.6 million as of December 31, 2022 and 2021, respectively | $ 747,991 | $ 747,399 |
| Senior secured credit facility | 436,000 | 466,000 |
| Epes Tax-Exempt Green Bonds, net of unamortized discount and debt issuance of $4.3 million and $0.0 as of December 31, 2022 and 2021, respectively | 245,727 | — |
| Bond Tax-Exempt Green Bonds, net of debt issuance of $2.0 million and $0.0 as of December 31, 2022 and 2021, respectively | 98,004 | — |
| New Markets Tax Credit, net of unamortized discount and debt issuance of $2.6 million and $0.0 as of December 31, 2022 and 2021, respectively | 28,791 | — |
| Seller Note, net of unamortized discount of $45 thousand and $1.1 million as of December 31, 2022 and 2021, respectively | 8,705 | 36,442 |
| Other loans | 5,418 | 3,273 |
| Finance leases | 22,123 | 18,432 |
| Total long-term debt and finance lease obligations | 1,592,759 | 1,271,546 |
| Less current portion of long-term debt and finance lease obligations | (20,993) | (39,105) |
| Long-term debt and finance lease obligations, excluding current installments | $ 1,571,766 | $ 1,232,441 |

*2026 Notes*

In December 2019, we issued $600.0 million in principal amount of 6.5% senior unsecured notes due January 15, 2026 (the "2026 Notes"). In July 2020, we issued an additional $150.0 million aggregate principal amount of the 2026 Notes.

Interest payments are due semi-annually in arrears on January 15 and July 15 of each year.

We may redeem all or a portion of the 2026 Notes at any time at the applicable redemption price, plus accrued and unpaid interest, if any, (subject to the right of holders of record on the relevant record date to receive interest due on an interest payment date that is on or prior to the redemption date) and, in some cases, plus a make-whole premium.

As of December 31, 2022 and 2021, we were in compliance with the covenants and restrictions associated with, and no events of default existed under, the indenture governing the 2026 Notes. The 2026 Notes are guaranteed jointly and severally on a senior unsecured basis by most of our existing subsidiaries and may be guaranteed by certain future restricted subsidiaries.

A2075

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

***Senior Secured Credit Facility***

We have a senior secured credit facility that matures on June 30, 2027 which provides for (1) revolving credit borrowings, (2) term loans, and (3) the issuance of commercial letters of credit.

*Revolving Credit Facility*

As of December 31, 2022 and 2021, we had $436.0 million and $466.0 million, respectively, in outstanding revolver borrowings under our senior secured credit facility.

Borrowings under the revolving credit facility bear interest, at our option, at either a Term SOFR rate or at a base rate, in each case, plus an applicable margin. The applicable margin will fluctuate between 1.50% per annum and 2.75% per annum, in the case of Term SOFR rate borrowings, or between 0.50% per annum and 1.75% per annum, in the case of base rate loans, in each case, based on our Total Leverage Ratio (as defined in our credit agreement) at such time, with 25 basis point increases or decreases for each 0.50 increase or decrease in our Total Leverage Ratio from 2.75:1:00 to 4.75:1:00.

We are required to pay a commitment fee on the daily unused amount under the revolving credit commitments at a rate between 0.25% and 0.50% per annum. During the years ended December 31, 2022, 2021 and 2020, commitment fees were $0.6 million, $0.8 million, and $0.9 million, respectively.

*Letters of Credit*

As of December 31, 2022 and 2021, we had $1.0 million and $4.2 million, respectively, of letters of credit outstanding under our senior secured credit facility.

The senior secured credit facility contains certain covenants, restrictions, and events of default. We are required to maintain (1) a maximum Total Leverage Ratio at or below 5.50 to 1.00 (or 5.75 to 1.00 during a Material Transaction Period) and (2) a minimum Interest Coverage Ratio (as defined in our credit agreement) of not less than 2.25 to 1.00.

As of December 31, 2022 and 2021, we were in compliance with all covenants and restrictions associated with, and no events of default existed under, our senior secured credit facility. Our obligations under the senior secured credit facility are guaranteed by certain of our subsidiaries and secured by liens on substantially all of our assets; however, the senior secured credit facility is not guaranteed by the Hamlet JV or Enviva Pellets Epes, LLC, or secured by liens on their assets.

***New Markets Tax Credit ("NMTC") Loans***

In June 2022, we closed on a qualified NMTC financing transaction. The NMTC program is intended to induce capital investment in qualifying communities by permitting taxpayers to claim credits against their federal income taxes for up to 39% of qualified investments in the equity of community development entities ("CDEs").

In this transaction, we borrowed $31.4 million from a bank ("Bank A") then made a $31.4 million loan to an investment fund, into which another bank ("Bank B") made a capital contribution of $12.8 million. The investment fund then contributed $42.0 million to four CDEs, which, in turn, loaned it to us. The $42.0 million accrues interest at a weighted average rate of 2.9% per annum, of which $34.1 million matures in its entirety in June 2029, while $7.9 million could be prepaid starting in 2029 and through 2052. The net proceeds received are generally restricted to funding a portion of the costs of the acquisition, construction, equipping, and financing of our wood pellet production plant to be located in Epes, Alabama (the "Epes plant").

By virtue of the capital contribution, Bank B is entitled to substantially all of the tax benefits derived from the NMTC, while we effectively received net loan proceeds equal to the capital contribution of $12.8 million. This transaction includes a put/call provision whereby we may be obligated or entitled to repurchase the interest of Bank B in the investment fund, which we believe they will exercise in June 2029. The value attributed to the put/call is de minimis. We determined that the investment fund and CDEs constitute variable interest entities where we are the primary beneficiary, and, as a result, we consolidate those entities. The $31.4 million loan is presented on our consolidated balance sheet within long-term debt and finance lease obligations, while the $12.8 million contribution is presented within other long-term liabilities and is being accreted to interest expense as we expect the put/call will be exercised for a de minimis value, both net of their proportionate share of direct and incremental transaction costs.

A2076

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

The loan agreement contains certain covenants, restrictions, and events of default. We are required to maintain (1) a maximum Total Leverage Ratio at or below 5.00 to 1.00 (or 5.25 to 1.00 during a Material Transaction Period) and (2) a minimum Interest Coverage Ratio of not less than 2.25 to 1.00.

As of December 31, 2022, we were in compliance with the covenants and restrictions associated with, and no events of default existed under, the NMTC loans.

*Epes Tax-Exempt Green Bonds*

In July 2022, The Industrial Development Authority of Sumter County, Alabama (the "Epes Issuer") issued its Exempt Facilities Revenue Bonds (Enviva Inc. Project), Series 2022 (Green Bonds) (the "Epes Tax-Exempt Green Bonds") in the aggregate principal amount of $250.0 million. The proceeds of the offering were loaned to us pursuant to a loan and guaranty agreement by and among us, the Epes Issuer, and certain of our subsidiaries as guarantors. The loan is our senior unsecured obligation and matures in full on July 15, 2052. The loan is subject to mandatory tender for purchase by us in July 2032 at a purchase price equal to 100% of the principal amount of the Epes Tax-Exempt Green Bonds, plus accrued interest. Such prepayment may be required prior to maturity.

Borrowings under the loan and guaranty agreement bear interest at a rate equal to 6.00%. Interest is payable in arrears on January 15 and July 15 of each year, commencing on January 15, 2023. Our obligations under the loan and guaranty agreement are guaranteed by most of our existing subsidiaries and may be guaranteed by certain future restricted subsidiaries. We received net proceeds of $245.9 million after deducting underwriters' discount, commissions, and expenses. The net proceeds received are generally restricted to funding a portion of the costs of the acquisition, construction, equipping, and financing of the Epes plant.

As of December 31, 2022, we were in compliance with the covenants and restrictions associated with, and no events of default existed under, the loan.

*Bond Tax-Exempt Green Bonds*

In November 2022, the Mississippi Business Finance Corporation (the "Bond Issuer") issued its Exempt Facilities Revenue Bonds, (Enviva Inc.), Series 2022 (Green Bonds) (the "Bond Tax-Exempt Green Bonds"), in the aggregate principal amount of $100.0 million. The proceeds of the offering were loaned to us pursuant to a loan and guaranty agreement by and among us, the Bond Issuer, and certain of our subsidiaries as guarantors. The loan is our senior unsecured obligation and matures in full on July 15, 2047. The loan is subject to mandatory tender for purchase by us in July 2032 at a purchase price equal to 100% of the principal amount of the Bond Tax-Exempt Green Bonds, plus accrued interest. Such prepayment may be required prior to maturity. Borrowings under the loan and guarantee agreement bear interest at a rate equal to 7.75%. Interest is payable in arrears on January 15 and July 15 of each year, commencing on January 15, 2023. Our obligations under the loan and guarantee agreement are guaranteed by most of our existing subsidiaries and may be guaranteed by certain future restricted subsidiaries.

We received net proceeds of $98.7 million after deducting underwriters' discount, commissions, and expenses. The net proceeds are generally restricted to funding a portion of the costs of acquisition, construction, equipping, and financing our wood pellet production plant to be located near Bond, Mississippi, and certain related costs thereto, and to pay costs and expenses of the offering.

As of December 31, 2022, we were in compliance with all covenants and restrictions associated with, and no events of default existed under the loan.

*Seller Note*

We are a party to, and a guarantor of, a promissory note (the "Seller Note") with a remaining principal balance of $8.8 million. The Seller Note matures in February 2023 and has an interest rate of 2.5% per annum. Principal and related interest payments are due annually through February 2022 and quarterly thereafter.

*Debt Issuance Costs and Premium*

Unamortized debt issuance costs and premium included in long-term debt as of December 31, 2022 and 2021 were $11.0 million and $3.7 million, respectively. Unamortized debt issuance costs associated with the senior secured credit facility included in long-term assets was $3.5 million and $2.8 million as of December 31, 2022 and 2021, respectively. Amortization expense

73

A2077

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

included in interest expense for the years ended December 31, 2022, 2021, and 2020 was $2.5 million, $3.9 million, and $2.6 million, respectively.

### *Debt Maturities*

Our long-term debt matures through 2052 and our finance lease obligations have maturity dates of between 2023 and 2041. The aggregate maturities of long-term debt and finance lease obligations as of December 31, 2022 are as follows:

| Year Ending December 31: | | |
| --- | --- | --- |
| 2023 | $ | 20,993 |
| 2024 | | 5,558 |
| 2025 | | 3,494 |
| 2026 | | 751,862 |
| 2027 and thereafter | | 821,807 |
| Long-term debt and finance lease obligations | | 1,603,714 |
| Unamortized premium and debt issuance costs | | (10,955) |
| Total long-term debt and finance lease obligations | $ | 1,592,759 |

### (13) Related-Party Transactions

Riverstone/Carlyle Renewable and Alternative Energy Fund II, L.P. and certain affiliated entities (the "Riverstone Funds") were the sole members of our former general partner. On July 22, 2020, Holdings was recapitalized (the "Recapitalization") and Riverstone Echo Continuation Holdings, L.P. and Riverstone Echo Rollover Holdings, L.P. became the sole members of the general partner of our former sponsor.

Our former sponsor incurred an annual monitoring fee, which was paid quarterly to the Riverstone Funds, equal to 0.4% of the average value of the Riverstone Funds' capital contributions to our former sponsor during each fiscal quarter. The monitoring fee was terminated on the date of the Simplification Transaction. We incurred $1.1 million and $1.2 million of monitoring fee expense during the years ended December 31, 2021 and 2020, respectively, which was included in selling, general, administrative, and development expenses. As of December 31, 2021, we had an insignificant amount payable related to related-party monitoring fee expense included in accrued and other current liabilities.

On October 14, 2021, our former sponsor distributed 13.6 million common units of the Partnership to the Riverstone Funds. As part of the 16.0 million common units issued in exchange for the Simplification Transaction, 14.1 million were issued to the Riverstone Funds. The Riverstone Funds have agreed to reinvest in our common stock all dividends from 8.7 million of the 14.1 million common units issued in connection with the Simplification Transaction for the dividends paid for the period beginning with the third quarter of 2021 through the fourth quarter of 2024. On the date of the Simplification Transaction, the Riverstone Funds held 27.7 million common units. Pursuant to the dividend reinvestment plan established in connection with the Simplification Transaction, we have issued 496,378 shares of common stock in lieu of cash dividends of $33.2 million to the owners of our former sponsor in 2022.

In connection with the Simplification Transaction, our existing management fee waivers and other former sponsor support agreements associated with our earlier common control acquisitions were consolidated, fixed, and novated to certain of the former owners of our former sponsor. As a result, under the consolidated support agreement, we will receive quarterly payments in an aggregate amount of $55.5 million with respect to periods through the fourth quarter of 2023. During the years ended December 31, 2022 and 2021, we received $23.9 million and $15.4 million, respectively, in Support Payments.

### (14) Income Taxes

As a result of the Conversion, Enviva became subject to U.S. federal, foreign, and state, and local corporate income tax.

In the Conversion, Enviva recognized a step-up in the tax basis of certain assets that will be recovered as the assets are sold or the basis is amortized. The calculation and allocation of the step-up in tax basis to the various assets of the Company was determined by management with the assistance of a third-party specialist. Deferred income taxes reflect the net tax effects of temporary differences between the financial reporting and tax bases of assets and liabilities and are measured using the

74

A2078

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

applicable enacted tax rates and laws that will be in effect when such differences are expected to reverse. The final amount of the step-up in tax basis was finalized in the fourth quarter of 2022 after the filing of the 2021 tax returns. Enviva assessed the realizability of the deferred tax assets and concluded that as of December 31, 2022, a valuation allowance of $227.7 million for the deferred tax assets is deemed appropriate for the portion of the deferred tax assets which were not more likely than not to be realized under relevant accounting standards. On the date of the Conversion, we recorded an estimated net deferred tax asset of $142.8 million relating to the Conversion with a full valuation allowance, resulting in a net zero deferred tax benefit for the deferred taxes relating to the Conversion.

Loss before income taxes consists of the following:

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| U.S. | $ (165,174) | $ (162,246) | $ (106,155) |
| Foreign | (700) | 421 | 81 |
| Net loss not subject to federal income tax | — | 145,040 | 102,603 |
| Loss before income tax | $ (165,874) | $ (16,785) | $ (3,471) |

Components of the income tax provision applicable to our federal, state, and foreign taxes are as follows:

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Current income tax expense: | | | |
| Federal | $ 139 | $ 4,593 | $ — |
| State | — | 5 | — |
| Foreign | 281 | 55 | 86 |
| Total current income tax expense | $ 420 | $ 4,653 | $ 86 |
| Deferred income tax (benefit) expense: | | | |
| Federal | $ 2,264 | $ (21,570) | $ 82 |
| State | — | (58) | 1 |
| Foreign | $ (190) | $ — | $ — |
| Total deferred income tax (benefit) expense | $ 2,074 | $ (21,628) | $ 83 |
| Total income tax (benefit) expense | $ 2,494 | $ (16,975) | $ 169 |

75

A2079

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

The effective income tax rate from continuing operations varies from the U.S. Federal statutory rate principally due to the following:

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Income tax (benefit) expense at statutory federal income tax rate | $ (34,833) | $ (34,072) | $ (22,293) |
| Increase (decrease) in income taxes resulting from: | | | |
| Partnership earnings not subject to tax | — | 30,547 | 21,564 |
| Recognition/derecognition of deferred tax | (51,252) | (155,980) | — |
| Valuation allowance | 82,868 | 142,822 | — |
| Share based compensation | 4,227 | — | — |
| Tax-exempt interest | 1,647 | — | — |
| State taxes, net of federal tax benefit | (812) | — | — |
| Foreign taxes | 92 | — | — |
| Other | 557 | (292) | 898 |
| Total income tax (benefit) expense | $ 2,494 | $ (16,975) | $ 169 |

Significant components of deferred tax assets and liabilities are as follows as of December 31:

|  | 2022 | 2021 |
|---|---|---|
| Deferred tax assets: | | |
| Federal and state net operating loss carryforward | $ 38,999 | $ 1,033 |
| Operating lease liabilities | 26,870 | 27,906 |
| Equity based compensation | 13,077 | 10,681 |
| Property, plant, and equipment | 138,601 | 122,988 |
| Interest expense limitation | 12,777 | — |
| Contract liability | 24,913 | — |
| Financial liability subject to repurchase accounting | 24,173 | — |
| Deferred revenue | 15,711 | — |
| Other | 3,878 | 4,218 |
| Less: valuation allowance | $ (227,734) | $ (142,822) |
| Total deferred tax assets | $ 71,265 | $ 24,004 |
| Deferred tax liabilities: | | |
| Contract asset | $ (30,249) | $ — |
| Operating lease right-of-use assets | (22,078) | (23,286) |
| Finished goods subject to repurchase accounting | (20,596) | — |
| Other | (449) | $ (754) |
| Total deferred tax liabilities | $ (73,372) | $ (24,040) |
| Net deferred tax asset (liability) | $ (2,107) | $ (36) |

As of December 31, 2022, we have federal net operating loss carryforwards of $180.6 million, out of which $1.1 million will expire in years 2034 to 2037, if not utilized. We also have state net operating loss carryforwards of $31.2 million, out of which $0.4 million will expire in year 2037 and $19.1 million will expire in year 2042, if not utilized.

For calendar year 2022, the only periods subject to examination for U.S. federal and state income tax returns are 2019 through 2021. We believe our income tax filing positions, including our previous status as a pass-through entity, would be

76

A2080

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

sustained on audit and do not anticipate any adjustments that would result in a material change to our consolidated balance sheet. Therefore, no reserves for uncertain tax positions or interest and penalties have been recorded during the years ended December 31, 2022, 2021, and 2020.

Assessing whether deferred tax assets are realizable requires significant judgement. Enviva considers all available positive and negative evidence, including historical operating performance and expectations of future operating performance. The ultimate realization of deferred tax assets is often dependent upon future taxable income and therefore can be uncertain. To the extent that Enviva believes it is more likely than not that all or some portion of the asset will not be realized, valuation allowances are established against any deferred tax assets, which increases income tax expense in the period when such a determination is made. Enviva assessed the realizability of the deferred tax assets and concluded that a valuation allowance of $227.7 million is deemed appropriate for the portion of the deferred tax assets which were not more likely than not to be realized under relevant accounting standards.

The Company conducts its foreign operations through foreign taxable entities and is therefore subject to foreign income taxes. The Company generally has minimal foreign current and deferred income tax expense.

**(15) Equity**

*Issuance of Common Shares*

In January 2022, we issued 4,945,000 common shares at a price of $70.00 per common share for total net proceeds of $332.8 million, after deducting $13.4 million of issuance costs. We used the net proceeds of $332.8 million to fund a portion of our capital expenditures related to ongoing development projects, and to repay borrowings under our senior secured credit facility.

*Conversion*

As a result of the Conversion, periods prior to December 31, 2021 reflect Enviva as a limited partnership, not a corporation. References to common units for periods prior to the Conversion refer to common units of Enviva Partners, LP, and references to common stock for periods following the Conversion refer to shares of common stock of Enviva Inc.

On the date of the Conversion, each common unit representing a limited partner interest in the Partnership issued and outstanding immediately prior to the Conversion was exchanged for one share of common stock of the Company, par value $0.001 per share.

*Simplification Transaction*

On October 14, 2021, the Partnership closed on the Simplification Transaction where (a) the Company acquired (i) all of the limited partner interests in our former sponsor and (ii) all of the limited liability company interests in the former GP, and (b) the incentive distribution rights directly held by our former sponsor were cancelled and eliminated. In exchange, the Partnership issued 16.0 million common units, which were distributed to the owners of our former sponsor. The owners of our former sponsor agreed to reinvest in our common stock all dividends from 9.0 million of the 16.0 million common units issued in connection with the Simplification Transaction during the period beginning with dividends paid for the third quarter of 2021 through the fourth quarter of 2024. Pursuant to the dividend reinvestment plan established in connection with the Simplification Transaction, we have issued 496,378 shares of common stock in lieu of cash dividends of $33.2 million to the owners of our former sponsor in 2022.

Under a consolidated support agreement, we are entitled to receive quarterly payments (the "Support Payments") in an aggregate amount of up to $55.5 million with respect to periods from the fourth quarter of 2021 through the first quarter of 2024. See Note 13, *Related-Party Transactions* for more information on the Support Payments. See "*Noncontrolling Interests – The Partnership*" below about the capital of the Partnership.

*Noncontrolling Interests*

Noncontrolling interests of partners' capital consist of: (1) third-party equity ownership in the Partnership (2) the Hamlet JV and (3) the Development JV.

77

A2081

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

*The Partnership*

Prior to the Simplification Transaction, Holdings owned common units of the Partnership representing an approximate 30% limited partner interest. Holdings was an indirect owner of the Partnership's general partner, which held the incentive distribution rights ("IDRs") of the Partnership until December 31, 2020 and was an indirect owner of MLP Holdco, LLC, which held the IDRs between January 1, 2021 and the date of the Simplification Transaction.

Between January 1, 2021 and the date of the Simplification Transaction, the Partnership issued 4,925,000 of its common units at a price of $45.50 per common unit for total net proceeds of $214.5 million, after deducting $9.5 million of issuance costs. During the year ended December 31, 2020, the Partnership issued 6.2 million common units in a private placement at a price of $32.50 per common unit for gross proceeds of $200.0 million. The Partnership received proceeds of $190.5 million, net of $9.5 million of issuance costs.

The partnership agreement of the Partnership contained provisions for the allocation of its net income and loss to its limited partners and its general partner. For purposes of maintaining partners' capital accounts, items of income and loss were allocated among the limited partners in accordance with their respective percentage ownership interests. Normal allocations according to percentage interests were made after giving effect, if any, to priority income allocations in an amount equal to intercompany IDRs allocated 100% to the Partnership's general partner through December 31, 2020 and MLP Holdco between January 1, 2020 and the date of the Simplification Transaction.

The Partnership had distributed a quarterly cash distribution to its unitholders pursuant to a cash distribution policy. The partnership agreement had set forth the calculation to be used to determine the amount of cash distributions that our unitholders and our former sponsor would receive.

*Hamlet JV*

The capital of the Hamlet JV is divided into two classifications: (1) Class A Units and (2) Class B Units.

Class A Units were issued to the third-party member in exchange for capital contributions. As of December 31, 2022, the third-party member had a total capital commitment of $235.2 million and held 227.0 million Class A Units with a remaining capital commitment amount of $8.2 million.

Class B Units were issued to Enviva in exchange for capital contributions. As of December 31, 2022, Enviva had a total capital commitment of $232.2 million and held 224.0 million Class B Units with a remaining commitment amount of $8.2 million.

Pursuant to the limited liability company agreement of the Hamlet JV (the "Hamlet JV LLCA"), we are the managing member of the Hamlet JV and have the authority to manage the business and affairs of the Hamlet JV and take actions on its behalf, including adopting annual budgets, entering into agreements, effecting asset sales or biomass purchase agreements, making capital calls, incurring debt, and taking other actions, subject to consent of the third-party member in certain circumstances. The Hamlet JV LLCA also sets forth the capital commitments and limitations thereon from each of the members and provides for the allocation of sale proceeds and distributions among the holders of outstanding Class A Units and Class B Units.

Distributions to the third-party member and to Enviva are made in our reasonable discretion as managing member and are governed by the waterfall provisions of the Hamlet JV LLCA, which provides that distributions, after repayment of any revolving borrowings existing under the joint venture's revolving credit facility, are to be made as follows:

- First: To the members in proportion to their relative unreturned capital contributions, then to the members in proportion to their relative unpaid preference amount.

- Thereafter: 25% to the third-party member and 75% to Enviva.

*Development JV*

Our former sponsor held a controlling interest, and a third-party member held a noncontrolling interest, in the Development JV. In February 2021, we purchased all of the third-party member's limited liability company interests in Development JV. We paid a first installment of $130.1 million in February 2021 and a final installment of $23.7 million was paid in July 2021.

A2082

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

*Cash Dividends and Distributions*

The following table details the cash dividends and distribution paid or declared:

| Quarter Ended | Declaration Date | Record Date | Payment Date | | Per Share or Unit[1] |
|---|---|---|---|---|---|
| June 30, 2021 | July 27, 2021 | August 13, 2021 | August 27, 2021 | $ | 0.8150 |
| September 30, 2021 | November 3, 2021 | November 15, 2021 | November 26, 2021 | $ | 0.8400 |
| December 31, 2021 | February 2, 2022 | February 14, 2022 | February 25, 2022 | $ | 0.8600 |
| March 31, 2022 | May 4, 2022 | May 16, 2022 | May 27, 2022 | $ | 0.9050 |
| June 30, 2022 | August 3, 2022 | August 15, 2022 | August 26, 2022 | $ | 0.9050 |
| September 30, 2022 | November 2, 2022 | November 14, 2022 | November 25, 2022 | $ | 0.9050 |
| December 31, 2022 | February 8, 2023 | February 21, 2023 | February 24, 2023 | $ | 0.9050 |

[1]Prior to December 31, 2021, distributions were paid by the Partnership.

**(16) Equity-Based Awards**

*Enviva Inc. Long-Term Incentive Plan ("LTIP")*

We maintain the LTIP, which provides for the award, from time to time, at the discretion of our board of directors or a committee thereof, of options, share appreciation rights, restricted shares, restricted stock units ("RSUs"), DERs, and other awards. The LTIP limits the number of common units that may be delivered pursuant to awards under the plan to 3,450,000 common shares in accordance with the plan, which became effective on December 31, 2021. If equity awards awarded under the LTIP are forfeited, canceled, exercised, paid in cash, or otherwise terminate or expire without the actual delivery of the underlying common shares, the corresponding number of such common shares will remain available for delivery pursuant to other awards under the LTIP. The common shares issuable pursuant to the LTIP will consist, in whole or in part, of common shares acquired in the open market or from any affiliate or any other person, newly issued common shares, or any combination of the foregoing as determined by our board of directors or a committee thereof.

During 2022, 2021, and 2020, our board of directors granted RSUs in tandem with corresponding DERs to our employees (the "Employee Awards") and RSUs in tandem with corresponding DERs to independent members of our board of directors (the "Director Awards"). The RSUs and corresponding DERs are subject to certain vesting and forfeiture provisions. Award recipients do not have all of the rights of a common shareholder with respect to the RSUs until the RSUs have vested and been settled. Awards of the RSUs settled in common shares are settled within 60 days after the applicable vesting date. If a RSU award recipient experiences a termination of service under certain circumstances set forth in the applicable award agreement, the unvested RSUs and corresponding DERs (in the case of performance-based Employee Awards) are forfeited. Forfeitures are recognized when the actual forfeiture occurs.

*Restricted Shares*

Certain employees had received Series B units of our former sponsor that were intended to constitute "profits interests" as defined by the Internal Revenue Service that, due to the Simplification Transaction, converted into common units of the Partnership. In August 2020, our former sponsor had issued equity-classified awards where it may issue up to 10,000 Series B units. Our former sponsor had issued 25% initially, or 2,500 Series B units, and expected to issue an additional 25% on each anniversary over the following three years. These Series B units were measured at the grant date fair value, which was estimated using a probability weighted discounted cash flow approach to be $38.5 million where we recognized $23.8 million and $13.9 million as non-cash equity-based compensation and other expense during the years ended December 31, 2021 and 2020, respectively. Of the $23.8 million recognized during the year ended December 31, 2021, $16.6 million was due to the accelerated vesting of all otherwise unvested Series B units as a result of the Simplification Transaction. After the Simplification Transaction, an additional $3.3 million was recognized as non-cash equity-based compensation and other expense during the year ended December 31, 2021 related to common shares of Enviva Inc. subject to restriction into which the Series B units were converted whose fair value were then measured at $50.5 million. During the year ended December 31, 2022, another $24.4 million was recognized as expense, of which $15.2 million was classified as non-cash equity-based compensation and other expense and $9.2 million was classified as executive separation. The common shares subject to restriction have had or will have their restrictions released as follows: one-third on each of December 31, 2022, 2023 and 2024. The unrecognized estimated non-

79

A2083

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

cash equity-based compensation and other expense relating to outstanding common shares subject to restriction as of December 31, 2022 was $22.8 million, which will be recognized over the remaining vesting period.

### *Employee Awards*

The following table summarizes information regarding Employee Awards under the LTIP for the years ended December 31, 2022, 2021, and 2020:

| | Time-Based Restricted Stock Units | | Performance-Based Restricted Stock Units | | Total Employee Awards Restricted Stock Units | |
|---|---|---|---|---|---|---|
| | Units | Weighted-Average Grant Date Fair Value (per unit)(1) | Units | Weighted-Average Grant Date Fair Value (per unit)(1) | Units | Weighted-Average Grant Date Fair Value (per unit)(1) |
| Nonvested December 31, 2021 | 1,002,061 | $ 40.82 | 608,117 | $ 38.56 | 1,610,178 | $ 39.97 |
| Granted | 252,805 | $ 70.12 | 233,424 | $ 93.05 | 486,229 | $ 81.13 |
| Forfeitures | (98,350) | $ 51.33 | (34,647) | $ 50.47 | (132,997) | $ 51.11 |
| Vested | (404,913) | $ 30.35 | (260,725) | $ 30.27 | (665,638) | $ 30.32 |
| Nonvested December 31, 2022 | 751,603 | $ 61.19 | 546,169 | $ 52.17 | 1,297,772 | $ 57.39 |

(1) Determined by dividing the aggregate grant date fair value of awards by the number of awards issued.

Time-based Employee Awards vest on the third or fourth anniversary of the grant date and performance-based Employee Awards vest in three or four years, where the number of shares that vest depend on achievement of specific performance milestones. We account for the delivery of common shares upon the settlement of vested Employee Awards as if such common shares were distributed by us. The fair value of the Employee Awards granted during 2022 and 2021 was $39.4 million and $27.7 million, respectively, based on the market price per share on the applicable date of grant. The grant date fair value of performance-based Employee Awards is reported based on the probable outcome of the performance conditions on the grant date. The fair value of the Employee Awards is expensed at the grant date. Compensation expense is based on the grant date fair value. Changes in non-cash equity-based compensation expense due to passage of time, forfeitures, probability of meeting required performance conditions, and final settlements are recorded as adjustments to non-cash equity-based compensation expense and equity. For performance-based Employee Awards, expense is accrued only to the extent that the performance goals are considered to be probable of occurring.

We recognize non-cash equity-based compensation expense for the shares awarded in cost of goods sold and selling, general, administrative, and development expenses. For the years ended December 31, 2022, and 2021, and 2020 we recognized $2.8 million and $2.3 million, and $2.7 million of cost of goods sold expense, respectively. For the years ended December 31, 2022, 2021, and 2020, we recognized $18.1 million, $25.7 million and $22.4 million of selling, general, administrative, and development expenses, respectively. For the year ended December 31, 2022, we recognized $7.6 million as executive separation.

We paid $16.9 million to satisfy the withholding tax requirements associated with 404,913 time-based Employee Awards and 260,725 performance-based Employee Awards that vested under the LTIP during the year ended December 31, 2022. We paid $11.0 million to satisfy the withholding tax requirements associated with 312,528 time-based Employee Awards and 156,801 performance-based Employee Awards that vested under the LTIP during the year ended December 31, 2021. We paid $5.0 million to satisfy the withholding tax requirements associated with 232,116 time-based Employee Awards and 67,881 performance-based Employee Awards that vested under the LTIP during the year ended December 31, 2020.

The unrecognized estimated non-cash equity-based compensation expense relating to outstanding Employee Awards at December 31, 2022 was $39.0 million, which will be recognized over the remaining vesting period.

80

A2084

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

### Director Awards

The following table summarizes information regarding Director Awards to independent directors of the Company under the LTIP:

| | Time-Based Restricted Stock Units | |
| --- | --- | --- |
| | Units | Weighted-Average Grant Date Fair Value (per unit)(1) |
| Nonvested December 31, 2021 | 14,234 | $ 48.48 |
| Granted | 18,729 | $ 72.08 |
| Vested | (14,234) | $ 48.49 |
| Nonvested December 31, 2022 | 18,729 | $ 72.07 |

(1) Determined by dividing the aggregate grant date fair value of awards by the number of awards issued.

In February 2022, Director Awards were granted valued at $1.3 million and which vest on the first anniversary of the grant date in February 2023. In January and April 2021, Director Awards valued at $0.6 million and $0.1 million were granted, which vested on the first anniversary of the grant dates, in January and April 2022, respectively. In January 2021, the Director Awards that were unvested at December 31, 2020 vested and common shares were issued in respect thereof.

For the years ended December 31, 2022, 2021, and 2020 we recorded $1.3 million, $0.8 million and $0.5 million of non-cash equity-based compensation expense with respect to the Director Awards. The unrecognized estimated non-cash equity-based compensation cost relating to outstanding Director Awards at December 31, 2022 is $0.1 million and will be recognized over the remaining vesting period.

### Dividend Equivalent Rights

DERs associated with the Employee Awards and the Director Awards subject to time-based vesting entitle the recipients to receive payments in respect thereof in a per-share amount that is equal to any dividends made by us to the holders of common shares within 60 days following the record date for such dividends. The DERs associated with the Employee Awards subject to performance-based vesting will remain outstanding and unpaid from the grant date until the earlier of the settlement or forfeiture of the related performance-based phantom units.

DER dividends paid related to time-based Employee Awards were $3.3 million, $3.5 million and $3.9 million for the years ended December 31, 2022, 2021 and 2020, respectively. At December 31, 2022 and 2021, there were no DER dividends unpaid related to time-based Employee Awards.

DER dividends unpaid related to the performance-based Employee Awards were as follows as of December 31:

| | 2022 | 2021 |
| --- | --- | --- |
| Accrued liabilities | $ 3,690 | $ 2,690 |
| Other long-term liabilities | 3,876 | 4,501 |
| Total unpaid DERs related to performance-based Employee Awards | $ 7,566 | $ 7,191 |

81

A2085

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

### (17) Net Loss per Enviva Inc. Common Share

Net loss per basic and diluted Enviva Inc. common share were computed as follows for the year ending December 31:

|  | | 2022 |
|---|---|---|
| Net loss attributable to Enviva Inc. | $ | (168,307) |
| Dividend equivalent rights paid on time-based restricted stock units | | (3,470) |
| Net loss attributable to Enviva Inc. common stockholders | $ | (171,777) |
| Weighted average shares outstanding - basic and diluted | | 66,312 |
| Net loss per common share - basic and diluted | $ | (2.59) |

As Holdings is the surviving entity for accounting purposes, the historical financial results prior to the Simplification Transaction are those of Holdings. The number of outstanding units for 2020, and the portion of 2021 prior to the Simplification Transaction constitutes the 16.0 million units issued to the owners of the former sponsor. For the portion of 2021 that is after the Simplification Transaction, the number of outstanding units are based on the actual number of common units of the Company during that period.

### (18) Commitments and Contingencies

*Commitments*

We have entered into throughput agreements expiring between 2023 and 2036 to receive terminal and stevedoring services at certain of our terminals, some of which include options to extend for up to 5 years. The agreements specify a minimum cargo throughput requirement at a fixed price per ton or a fixed fee, subject to an adjustment based on the consumer price index or the producer price index, for a defined period of time, ranging from monthly to annually. At December 31, 2022, we had approximately $22.1 million related to firm commitments under such terminal and stevedoring services agreements. For the years ended December 31, 2022, 2021 and 2020, terminal and stevedoring services expenses were $10.7 million, $12.3 million and $9.7 million, respectively.

We have entered into long-term arrangements to secure transportation from our plants to our export terminals. Under certain of these agreements, which expire between 2023 through 2032, we are committed to various annual minimum volumes under multi-year fixed-cost contracts with third-party logistics providers for trucking and rail transportation, subject to increases in the consumer price index and certain fuel price adjustments. For the years ended December 31, 2022, 2021 and 2020, ground transportation expenses were $53.9 million, $43.8 million and $36.6 million, respectively.

We have entered into long-term supply arrangements, expiring between 2024 through 2026, to secure the supply of wood pellets from third-party vendors. The minimum annual purchase volumes are at a fixed price per MT adjusted for volume, pellet quality and certain shipping-related charges. The supply agreements for the purchase of 330,000 MT of wood pellets from British Columbia are fully offset by an agreement to sell 330,000 MT of wood pellets to the same counterparty from our terminal locations, where $50.9 million remains to be sold as of December 31, 2022. Under long-term supply arrangements, we purchased approximately $62.6 million, $109.6 million and $25.1 million of wood pellets for the years ended December 31, 2022, 2021 and 2020, respectively.

Fixed and determinable portions of the minimum aggregate future payments under these firm terminal and stevedoring services, ground transportation and wood pellet supply agreements for the next five years are as follows:

| | | |
|---|---|---|
| 2023 | $ | 159,844 |
| 2024 | | 210,633 |
| 2025 | | 150,989 |
| 2026 | | 58,792 |
| 2027 | | 10,267 |
| Total | $ | 590,525 |

A2086

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

In order to mitigate volatility in our shipping costs, we have entered into fixed-price shipping contracts with reputable shippers matching the terms and volumes of certain our off-take contracts for which we are responsible for arranging shipping. Contracts with shippers, expiring between 2023 through 2039, include provisions as to the minimum amount of MTPY to be shipped and may also stipulate the number of shipments. Pursuant to these contracts, the terms of which extend up to 17 years, charges are based on a fixed-price per MT, and, in some cases, there are adjustment provisions for increases in the price of fuel or for other distribution-related costs. The charge per MT varies depending on the loading and discharge port. Shipping expenses included in cost of goods sold for the years ended December 31, 2022, 2021 and 2020 was $132.5 million, $94.7 million and $75.0 million, respectively.

**(19) Subsequent Events**

*Senior Secured Term Loan*

In January 2023, under our senior secured credit facility, we entered into a senior secured term loan facility in the amount of $105.0 million, maturing in June 2027. Borrowing rates are variable and calculated as SOFR plus 4.00% per annum. We used the proceeds to repay revolver borrowings under our senior secured credit facility and pay fees and expenses.

*Seller Note*

The outstanding principal of the Seller Note of $8.8 million and an insignificant amount of accrued interest were repaid in full at maturity in February 2023.

*Subscription Agreement*

On February 28, 2023, we entered into a subscription agreement where investors have agreed to subscribe for and purchase $250.0 million in shares of preferred stock (or common stock, if the purchase price per share is equal to or greater than the lower of the (1) closing price of the common stock on February 28, 2023 and (2) average closing price of the common stock for the five trading days immediately preceding February 28, 2023). The number of shares will be based on dividing the total purchase price by the closing price of the common stock on March 1, 2023.

A2087

**ITEM 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

A2088

**ITEM 9A.    CONTROLS AND PROCEDURES**

*Disclosure Controls and Procedures*

An evaluation of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13(a)-15(e) and 15(d)-15(e) under the Exchange Act) was carried out under the supervision and with the participation of management, including the Chief Executive Officer and Chief Financial Officer. Due to the material weakness described below, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of December 31, 2022 were not effective to ensure that information required to be disclosed by us in reports we file or submit under the Exchange Act, is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission.

*Internal Control over Financial Reporting*

*Management's Annual Report on Internal Control over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting for us as defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act. Under the supervision of, and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework and criteria established in Internal Control—Integrated Framework in 2013, issued by the Committee of Sponsoring Organizations of the Treadway Commission. We did not design and execute effective internal controls over the evaluation of the recoverability of customer assets recorded during the year ended December 31, 2022. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. Although there was no impairment of customer assets, and no misstatement was identified, management concluded that our internal controls over financial reporting related to evaluation of recoverability of customer assets was ineffective as of December 31, 2022. The effectiveness of our internal control over financial reporting as of December 31, 2022 has been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in their report which is included in Part II, Item 8. "Financial Statements and Supplementary Data of this report."

*Remediation Plan to Address Material Weakness*

We have evaluated the material weakness and begun developing and implementing a plan of remediation to strengthen our internal controls related to the customer assets recoverability testing process. We will continue to review, revise, and improve the effectiveness of our internal controls, including taking the following steps to remediate our material weakness:

- Enhance the level of precision at which our internal controls over financial reporting relating to customer asset recoverability assessments are performed and

- Improve our documentation to strengthen the support for the judgments applied in the recoverability analyses

*Inherent Limitations on Effectiveness of Controls*

Control systems, no matter how well conceived and operated, are designed to provide a reasonable, but not an absolute, level of assurance that the objectives of the control system are met. Further, the design of a control system must reflect the fact that there are resource constraints and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected. Because of the inherent limitations in any control system, misstatements due to error or fraud may occur and not be detected.

*Changes in Internal Control over Financial Reporting*

With the exception of the material weakness described above, there were no changes in our internal control over financial reporting (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) that occurred during the three months ended December 31, 2022 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

A2089

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of Enviva Inc.

**Opinion on Internal Control Over Financial Reporting**

We have audited Enviva Inc. and subsidiaries' internal control over financial reporting as of December 31, 2022, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway (2013 framework) (the COSO criteria). In our opinion, because of the effect of the material weakness described below on the achievement of the objectives of the control criteria, Enviva Inc. and subsidiaries (the Company) has not maintained effective internal control over financial reporting as of December 31, 2022, based on the COSO criteria.

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weakness has been identified and included in management's assessment. Management has identified a material weakness in controls whereby the Company did not design and execute controls to assess the recoverability of recognized customer assets in accordance with U.S. generally accepted accounting principles .

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the 2022 consolidated financial statements of the Company. This material weakness was considered in determining the nature, timing and extent of audit tests applied in our audit of the 2022 consolidated financial statements, and this report does not affect our report dated March 1, 2023, which expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP

Tysons, Virginia
March 1, 2023

A2090

**ITEM 9B.    OTHER INFORMATION**

On February 24, 2023, Enviva Inc. (the "Company") entered into a Twelfth Amendment to Credit Agreement (the "Twelfth Amendment") by and among the Company, certain other subsidiaries of the Company, Barclays Bank PLC as administrative agent and collateral agent, and the other lenders and issuing banks party thereto. The Twelfth Amendment, among other things, modifies the definitions of Consolidated Interest Expense and Consolidated EBITDA under the Credit Agreement to exclude the impact of repurchase accounting treatment for certain of the Company's wood pellet purchase or sale agreements.

The foregoing description of the Twelfth Amendment does not purport to be complete and is qualified in its entirety by reference to the full text of the Twelfth Amendment, a copy of which is filed as Exhibit 10.3 to this Annual Report on Form 10-K and is incorporated herein by reference.

**ITEM 9C.    DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS**

Not applicable.

A2091

**PART III**

**ITEM 10.   DIRECTORS, EXECUTIVE OFFICERS, AND CORPORATE GOVERNANCE**

The information required by Item 10 will be included in Enviva's definitive proxy statement, which will be filed with the SEC within 120 days after December 31, 2022, and is hereby incorporated by reference.

**ITEM 11.   EXECUTIVE COMPENSATION**

The information required by Item 11 will be included in Enviva's definitive proxy statement, which will be filed with the SEC within 120 days after December 31, 2022, and is hereby incorporated by reference.

**ITEM 12.   SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

The information required by Item 12 will be included in Enviva's definitive proxy statement, which will be filed with the SEC within 120 days after December 31, 2022, and is hereby incorporated by reference.

**ITEM 13.   CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS AND DIRECTOR INDEPENDENCE**

The information required by Item 13 will be included in Enviva's definitive proxy statement, which will be filed with the SEC within 120 days after December 31, 2022, and is hereby incorporated by reference.

**ITEM 14.   PRINCIPAL ACCOUNTING FEES AND SERVICES**

The information required by Item 14 will be included in Enviva's definitive proxy statement, which will be filed with the SEC within 120 days after December 31, 2022, and is hereby incorporated by reference.

A2092

**PART IV**

**ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES**

    (a)   Certain documents are filed as a part of this Annual Report and are incorporated by reference and found on the pages below.

1.    Financial Statements—Please read Part II, Item 8. "Financial Statements and Supplementary Data—Index to Financial Statements."

2.    Schedule II - Valuation and Qualifying Accounts for the Years Ended December 31, 2022, 2021, 2020. All other schedules have been omitted because they are either not applicable, not required or the information called for therein appears in the consolidated financial statements or notes thereto.

3.    Exhibits—Exhibits required to be filed by Item 601 of Regulation S-K set forth below are incorporated herein by reference.

A2093

**ENVIVA INC. AND SUBSIDIARIES**
**Schedule II - Valuation and Qualifying Accounts**
**For the Years Ended December 31, 2022, 2021 and 2020**
**(In thousands)**

| Year Ended December 31, | Description | Balance at beginning of period | | Additions Charged to: Costs and expenses | | Other accounts | | Deductions | | Balance at the end of period |
|---|---|---|---|---|---|---|---|---|---|---|
| 2022 | Deferred tax asset valuation allowance | $ | 142,822 | $ | 2,264 | $ | 82,648 | $ | — | $ 227,734 |
| 2021 | Deferred tax asset valuation allowance | | 2,038 | | — | | 140,784 | | — | 142,822 |
| 2020 | Deferred tax asset valuation allowance | | 3,856 | | — | | — | | 1,818 | 2,038 |

90

A2094

**EXHIBIT INDEX**

| Exhibit Number | Exhibit |
|---|---|
| 2.1 | Agreement and Plan of Merger, dated October 14, 2021, by and among Enviva Partners, LP, Enviva Holdings LP, EVA Partners Merger Sub, LLC and the other parties named therein (Exhibit 2.1, Form 8-K filed October 15, 2021, File No. 001-37363) |
| 2.2 | Agreement and Plan of Merger, dated October 14, 2021, by and among Enviva Cottondale Acquisition I, LLC, Enviva Partners, LP, Enviva, Inc. Merger Sub, LLC, Riverstone Echo Continuation Holdings, L.P. and Riverstone Echo Rollover Holdings, L.P. (Exhibit 2.2, Form 8-K filed October 15, 2021, File No. 001-37363) |
| 3.1 | Certificate of Incorporation of Enviva Inc. (Exhibit 3.1, Form 8-K filed January 3, 2022, File No. 001-37363) |
| 3.2 | Bylaws of Enviva Inc. (Exhibit 3.1, Form 8-K filed November 8, 2022, File No. 001-37363) |
| 4.1 | Indenture, dated as of December 9, 2019, by and among Enviva Partners, LP, Enviva Partners Finance Corp., the subsidiary guarantors party thereto, and Wilmington Trust, National Association, as trustee (incorporated by reference herein to Exhibit 4.1 to the Company's Form 8-K filed on December 9, 2019, File No. 001-37363) |
| 4.2 | Form of 6.500% 2026 Notes (included in Exhibit 4.1) |
| 4.3 | Description of Securities Registered Pursuant to Section 12 of the Securities Exchange Act of 1934 (Exhibit 4.3, Form 10-K file March 4, 2022, File No. 001-37363) |
| 4.4 | Registration Rights Agreement, dated October 14, 2021, by and among Enviva Partners, LP, the Holdings Limited Partners party thereto and the other parties thereto (Exhibit 4.1, Form 8-K filed October 15, 2021, File No. 001-37363) |
| 4.5 | Stockholders Agreement, dated October 14, 2021, by and among Enviva Partners, LP, Riverstone Echo Continuation Holdings, L.P. and Riverstone Echo Rollover Holdings, L.P. (Exhibit 4.2, Form 8-K filed October 15, 2021, File No. 001-37363) |
| 10.1 | Ninth Amendment to Credit Agreement, dated as of June 30, 2022, by and among Enviva Inc., Enviva, LP, certain other subsidiaries of Enviva Partners, LP, Barclays Bank PLC as administrative agent and collateral agent, and the other lenders and issuing banks party thereto (Exhibit 10.1, Form 8-K filed July 5, 2022, File No. 001-37363) |
| 10.2 | Eleventh Amendment to Credit Agreement, dated as of January 17, 2023, by and among Enviva Inc., Enviva, LP, certain other subsidiaries of Enviva Partners, LP, Barclays Bank PLC as administrative agent and collateral agent, and the other lenders and issuing banks party thereto (Exhibit 10.2, Form 8-K filed January 20, 2023, File No. 001-37363) |
| 10.3* | Twelfth Amendment to Credit Agreement, dated as of February 24, 2023, by and among Enviva Inc., Enviva, LP, certain other subsidiaries of Enviva Partners, LP, Barclays Bank PLC as administrative agent and collateral agent, and the other lenders and issuing banks party thereto |
| 10.4 | Loan and Guaranty Agreement, dated as of July 1, 2022, by and among The Industrial Development Authority of Sumter County, Enviva Inc. and certain subsidiaries of Enviva Inc. (Exhibit 10.1, Form 8-K filed July 19, 2022, File No. 001-37363) |
| 10.5 | Loan and Guaranty Agreement, dated as of November 1, 2022, by and among the Mississippi Business Finance Corporation, Enviva Inc., and certain subsidiaries of Enviva Inc. (Exhibit 10.1, Form 8-K filed November 22, 2022, File No. 001-37363) |
| 10.6 | Second Amended and Restated Credit Agreement by and between Enviva Wilmington Holdings, LLC and Enviva, LP dated April 2, 2019 (Exhibit 10.4, Form 10-Q filed May 9, 2019, File No. 001-37363) |
| 10.7* | First Amendment to Second Amended and Restated Credit Agreement by and between Enviva Wilmington Holdings, LLC and Enviva, LP, dated May 23, 2022 |
| 10.8 | Support Agreement, dated October 14, 2021, by and among Enviva Partners, LP, the persons set forth on Schedule I attached thereto, and the other parties named therein (Exhibit 10.1, Form 8-K filed October 15, 2021, File No. 001-37363) |
| 10.9† | Transaction bonus letter by and between Enviva Partners, LP and John K. Keppler, dated June 18, 2020 (Exhibit 10.23, Form 10-K filed February 25, 2021, File No. 001-37363) |
| 10.10† | Transaction bonus letter by and between Enviva Partners, LP and Shai S. Even, dated June 18, 2020 (Exhibit 10.24, Form 10-K filed February 25, 2021, File No. 001-37363) |
| 10.11† | Transaction bonus letter by and between Enviva Partners, LP and Thomas Meth, dated June 18, 2020 (Exhibit 10.25, Form 10-K filed February 25, 2021, File No. 001-37363) |
| 10.12† | Transaction bonus letter by and between Enviva Partners, LP and William H. Schmidt, Jr., dated June 18, 2020 (Exhibit 10.26, Form 10-K filed February 25, 2021, File No. 001-37363) |
| 10.13† | Employment Agreement, dated as of July 27, 2021, between Enviva Management Company, LLC and Michael A. Johnson (Exhibit 10.1, Form 8-K filed on August 2, 2021, File No. 001-37363) |
| 10.14† | Fourth Amended and Restated Employment Agreement by and between Enviva Management Company, LLC and Shai S. Even, dated December 1, 2021 (Exhibit 10.26, Form 10-K filed March 4, 2022, File No. 001-37363) |
| 10.15† | Sixth Amended and Restated Employment Agreement by and between Enviva Management Company, LLC and Edward Royal Smith, dated December 1, 2021 (Exhibit 10.27, Form 10-K filed March 4, 2022, File No. 001-37363) |
| 10.16*† | Sixth Amended and Restated Employment Agreement by and between Enviva Management Company, LLC and Thomas Meth, dated November 14, 2022. |
| 10.17*† | Separation Agreement by and between Enviva Management Company, LLC and John K. Keppler, dated November 14, 2022 |
| 10.18*† | Consulting Agreement by and between Enviva Management Company, LLC and John K. Keppler, dated November 15, 2022 |

91

A2095

| Exhibit Number | Exhibit |
|---|---|
| 10.19† | Enviva Inc. Annual Incentive Compensation Plan (Exhibit 10.2, Form 8-K, filed December 31, 2021, File No. 001-37363) |
| 10.20† | Enviva Inc. Long-Term Incentive Plan, effective as of December 31, 2021 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report filed on Form 8-K, File No. 001-37363, filed with the Commission on January 3, 2022) |
| 10.21† | Form of Restricted Stock Unit Award Grant Notice and Award Agreement (Employee) (Exhibit 10.33, Form 10-K filed March 4, 2022, File No. 001-37363) |
| 10.22† | Form of Restricted Stock Unit Award Grant Notice and Award Agreement (Director) (Exhibit 10.34, Form 10-K filed March 4, 2022, File No. 001-37363) |
| 10.23† | Form of Stock Award Grant Notice and Award Agreement (Exhibit 10.35, Form 10-K filed March 4, 2022, File No. 001-37363) |
| 10.24† | Form of Performance-Based Restricted Stock Unit Award Grant Notice and Award Agreement (Exhibit 10.36, Form 10-K filed March 4, 2022, File No. 001-37363) |
| 10.25 | Form of Indemnification Agreement (Exhibit 10.3, Form 8-K, File No. 001-37363) |
| 21.1* | List of Subsidiaries of Enviva Inc. |
| 23.1* | Consent of Ernst & Young LLP relating to the financial statements of Enviva Inc. for the year ended December 31, 2022 |
| 24.1* | Power of Attorney (incorporated by reference to the signature page of this Annual Report on Form 10-K) |
| 31.1* | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2* | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1** | Certification of Chief Executive Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2** | Certification of Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101 | The following financial information from Enviva Inc.'s Annual Report on Form 10-K for the year ended December 31, 2022 formatted in Inline XBRL (Extensible Business Reporting Language) includes: (i) the Consolidated Balance Sheets, (ii) the Consolidated Statements of Operations, (iii) the Consolidated Statements of Comprehensive Loss, (iv) the Consolidated Statements of Changes in Equity, (v) the Consolidated Statements of Cash Flows and (vi) Notes to the Consolidated Financial Statements. |
| 104 | Cover Page Interactive Data File - (formatted as Inline XBRL and contained in Exhibit 101) |

\*    Filed herewith.

\*\*    Furnished herewith.

†    Management Contract or Compensatory Plan or Arrangement

92

A2096

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized.

ENVIVA INC.

Date: March 1, 2023                                   By:      /s/ Thomas Meth
                                                                Thomas Meth
                                                                Title: *President and Chief Executive Officer*

93

A2097

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Jason E. Paral as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, for him and in his name, place, and stead, in any and all capacities, to sign any and all amendments to this Annual Report, and to file the same, with all exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorney-in-fact and agent, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorney-in-fact and agent, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this Annual Report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

94

A2098

| Name | Title | Date |
|------|-------|------|
| /s/ THOMAS METH<br>Thomas Meth | President and Chief Executive Officer<br>(Principal Executive Officer) | March 1, 2023 |
| /s/ SHAI S. EVEN<br>Shai S. Even | Executive Vice President and Chief Financial Officer<br>(Principal Financial Officer) | March 1, 2023 |
| /s/ MICHAEL A. JOHNSON<br>Michael A. Johnson | Vice President and Chief Accounting Officer<br>(Principal Accounting Officer) | March 1, 2023 |
| /s/ RALPH ALEXANDER<br>Ralph Alexander | Director | March 1, 2023 |
| /s/ JOHN C. BUMGARNER, JR<br>John C. Bumgarner, Jr. | Director | March 1, 2023 |
| /s/ MARTIN N. DAVIDSON<br>Martin N. Davidson | Director | March 1, 2023 |
| /s/ JIM H. DERRYBERRY<br>Jim H. Derryberry | Director | March 1, 2023 |
| /s/ GERRIT L. LANSING, JR.<br>Gerrit L. Lansing, Jr. | Director | March 1, 2023 |
| /s/ PIERRE F. LAPEYRE, JR.<br>Pierre F. Lapeyre, Jr. | Director | March 1, 2023 |
| /s/ DAVID M. LEUSCHEN<br>David M. Leuschen | Director | March 1, 2023 |
| /s/ JEFFREY W. UBBEN<br>Jeffrey W. Ubben | Director | March 1, 2023 |
| /s/ GARY L. WHITLOCK<br>Gary L. Whitlock | Director | March 1, 2023 |
| /s/ JANET S. WONG<br>Janet S. Wong | Director | March 1, 2023 |
| /s/ EVA T. ZLOTNICKA<br>Eva T. Zlotnicka | Director | March 1, 2023 |

95

A2099

## TWELFTH AMENDMENT TO CREDIT AGREEMENT

THIS TWELFTH AMENDMENT TO CREDIT AGREEMENT, dated as of February 24, 2023 (this "*Agreement*"), by and among the undersigned Lenders, ENVIVA INC., a Delaware corporation (the "*Administrative Borrower*"), ENVIVA, LP, a Delaware limited partnership (the "*Subsidiary Borrower*" and, together with the Administrative Borrower, the "*Borrowers*"), each of the other Guarantors, and BARCLAYS BANK PLC ("*Barclays*"), as Administrative Agent and Collateral Agent.

### RECITALS:

WHEREAS, reference is hereby made to the Credit Agreement, dated as of April 9, 2015 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to giving effect to this Agreement, the "*Existing Credit Agreement*" and the Existing Credit Agreement as amended by this Agreement, the "*Amended Credit Agreement*"), by and among the Borrowers, the Lenders and Issuing Banks party thereto from time to time, Barclays, as Administrative Agent and as Collateral Agent, and the other Persons party thereto;

WHEREAS, in connection with the accounting treatment of certain transactions executed by the Administrative Borrower and its subsidiaries, the Borrowers are requesting that certain financial definitions in the Existing Credit Agreement be revised to clarify the treatment of certain Wood Pellet purchase and sale transactions;

WHEREAS, each of the parties hereto has agreed to amend the Existing Credit Agreement in the manner set forth in Section 2 hereof, subject to the terms and conditions set forth herein; and

WHEREAS, each Loan Party party hereto expects to realize substantial direct and indirect benefits as a result of this Agreement becoming effective and agrees to reaffirm its obligations pursuant to the Amended Credit Agreement, the Security Documents and the other Loan Documents to which it is a party.

NOW, THEREFORE, in consideration of the premises and agreements, provisions and covenants herein contained, the parties hereto agree as follows:

1. **Defined Terms; Interpretation; Etc.** Capitalized terms used and not defined herein shall have the meanings assigned to such terms in the Amended Credit Agreement. The rules of construction specified in Sections 1.02 of the Amended Credit Agreement also apply to this Agreement, *mutatis mutandis*, as if fully set forth herein.

2. **Amendments to the Credit Agreement**. Each of the parties hereto agrees that, on and as of the Twelfth Amendment Effective Date and subject to the terms and conditions set forth in this Agreement, the Existing Credit Agreement shall be amended as follows:

(a)    The definition of "Consolidated Interest Expense" appearing in Section 1.01 of the Existing Credit Agreement is hereby amended and restated in its entirety to read as follows:

"*"Consolidated Interest Expense*" shall mean, for any period, the sum of (a) the interest expense (including imputed interest expense in respect of Capital Lease Obligations and Synthetic Lease Obligations) of the Administrative Borrower and the Restricted Subsidiaries for such period, net of interest income of the Administrative Borrower and the Restricted Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP, plus (b) any interest accrued

1

during such period in respect of Indebtedness of the Administrative Borrower or any Restricted Subsidiary that is required to be capitalized rather than included in consolidated interest expense for such period in accordance with GAAP. For purposes of the foregoing, interest expense shall be determined after giving effect to any net payments made or received by the Administrative Borrower or any Restricted Subsidiary with respect to interest rate Hedging Agreements. For purposes of determining the Interest Coverage Ratio: (x) Consolidated Interest Expense shall not include (i) amortization of original issue discount to the extent accrued but not paid, (ii) interest that is capitalized or paid in kind, (iii) the cost of the issuance of Indebtedness and (iv) repurchase or similar obligations resulting from the purchase or sale of Wood Pellets in the ordinary course of business to the extent such obligations are deemed to constitute interest expense solely as a result of such obligations being recharacterized as being part of a financing transaction through application of Repurchase Accounting Provisions; and (y) Consolidated Interest Expense shall be calculated as if all Indebtedness incurred or permanently repaid (excluding normal fluctuations in revolving Indebtedness incurred for working capital purposes) from the first day of the Applicable Period through and including the date of such determination shall be deemed to have been incurred or repaid at the beginning of such period."

(b)     Section 1.01 of the Existing Credit Agreement is hereby amended to add the following definition in correct alphabetical order:

"***Repurchase Accounting Provisions***" shall mean ASC 606, including but not limited to 606-10-25-26 and 606-10-55-66 through 606-10-55-75.

(c)     The definition of "Consolidated EBITDA" appearing in Section 1.01 of the Existing Credit Agreement is hereby amended by:

i. amending and restating clause (x)(e) of such definition in its entirety to read as follows:

"(e)     the amount of any net decrease to Consolidated EBITDA for such period resulting (whether through impact on the calculation of Consolidated Net Income (or any component thereof), through impact on the other adjustments to Consolidated EBITDA pursuant to this definition or otherwise) from the purchase or sale of Wood Pellets in the ordinary course of business being recharacterized as being part of a financing transaction through application of Repurchase Accounting Provisions, plus";

ii.     amending and restating clause (y) of such definition in its entirety to read as follows:

"(y)   the sum of the following, without duplication, (and other than in the case of clause (d)) to the extent included in calculating such Consolidated Net Income:"

iii.     amending clause (y)(b) of such definition to delete the word "and" at the end thereof;

iv.     amending clause (y)(c) of such definition to delete the period at the end of such clause and add "; and" in lieu thereof; and

2

v.amending clause (y) of such definition to add the following new clause (d) at the end thereof:

"the amount of any net increase to Consolidated EBITDA for such period resulting (whether through impact on the calculation of Consolidated Net Income (or any component thereof), through impact on the other adjustments to Consolidated EBITDA pursuant to this definition or otherwise) from the purchase or sale of Wood Pellets in the ordinary course of business being recharacterized as being part of a financing transaction through application of Repurchase Accounting Provisions."

3.    **Representations and Warranties**. By its execution of this Agreement, each Loan Party hereby represents and warrants that, as of the date hereof:

(a)    such Loan Party (i) has the organizational power and authority to execute, deliver and carry out the terms of this Agreement, (ii) has taken all necessary organizational action to authorize the execution, delivery and performance of this Agreement and (iii) has duly executed and delivered this Agreement;

(b)    this Agreement and the Amended Credit Agreement constitute legal, valid and binding obligations of such Loan Party enforceable against such Loan Party in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, fraudulent conveyance or transfer, moratorium or other similar laws affecting creditors' rights generally, and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law;

(c)    the representations and warranties of each Loan Party set forth in Article III of the Amended Credit Agreement and in each other Loan Document are true and correct in all material respects (other than representations and warranties that are qualified by materiality, which shall be true and correct in all respects) on and as of the date hereof with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations were true and correct in all material respects (other than representations and warranties that are qualified by materiality, which shall be true and correct in all respects) as of such earlier date; provided that, solely for purposes of this Section 3(c) and not for any other purpose, the reference in Section 3.15(a) of the Amended Credit Agreement to the "Fourth Amendment Effective Date" shall instead be deemed to refer to the Twelfth Amendment Effective Date; and

(d)    immediately before and after giving effect to this Agreement and the transactions contemplated under this Agreement, no Default or Event of Default has occurred and is continuing.

4.    **Conditions Precedent to Effectiveness**. The effectiveness of the amendments specified in Section 2 hereof are subject to the satisfaction of the following conditions (the date of satisfaction of such conditions being referred to herein as the "***Twelfth Amendment Effective Date***"):

(a) Execution of this Agreement. The Administrative Agent shall have received duly executed counterparts of this Agreement from the Administrative Agent, the Required Lenders, each Revolving Credit Lender and the Loan Parties.

(b) Payment of Fees and Expenses. The Borrowers shall have paid (or caused to be paid), to the extent invoiced at least one (1) Business Day prior to the Twelfth

A2102

Amendment Effective Date, all costs, fees and expenses of Barclays (including, without limitation, legal fees and expenses) required to be paid by the Borrowers.

(c) <u>Representations and Warranties</u>. The representations and warranties set forth in <u>Section 3</u> hereof shall be true and correct in all material respects (other than representations and warranties that are qualified by materiality, which shall be true and correct in all respects) on and as of the Twelfth Amendment Effective Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations shall be true and correct in all material respects (other than representations and warranties that are qualified by materiality, which shall be true and correct in all respects) as of such earlier date.

(d) <u>No Default or Event of Default</u>. As of the Twelfth Amendment Effective Date, immediately before and after giving effect to this Agreement and the transactions contemplated by this Agreement, no Default or Event of Default shall have occurred and be continuing.

5.    **Reaffirmations**.

(a)    Each Loan Party, subject to the terms and limits contained in the Amended Credit Agreement and in the Security Documents, reaffirms its guaranty of the Obligations (including all such Obligations as amended, reaffirmed and/or increased pursuant to the Amended Credit Agreement) pursuant to the Guarantee and Collateral Agreement and other Security Documents. Each Loan Party hereby acknowledges that it has reviewed the terms and provisions of this Agreement and consents to the amendment of the Existing Credit Agreement effected pursuant to this Agreement. Each Loan Party hereby confirms that each Loan Document to which it is a party or is otherwise bound will continue to be in full force and effect as amended by this Agreement and that its obligations thereunder shall not be impaired or limited by the execution or effectiveness of this Agreement.

(b)    Each Loan Party hereby (i) confirms that each Loan Document to which it is a party or is otherwise bound and all Collateral encumbered thereby will continue to secure to the fullest extent possible in accordance with the Loan Documents the payment and performance of the Obligations, (ii) confirms its respective grant to the Collateral Agent for the benefit of the Secured Parties of the security interest in and continuing Lien on all of such Loan Party's right, title and interest in, to and under all Collateral, in each case whether now owned or existing or hereafter acquired or arising and wherever located, as collateral security for the prompt and complete payment and performance in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, of all applicable Obligations (including all such Obligations as amended, reaffirmed and/or increased pursuant to the Amended Credit Agreement), subject to the terms contained in the applicable Loan Documents and (iii) confirms its other pledges, other grants of security interests and other obligations, as applicable, under and subject to the terms of each Loan Document to which it is a party.

6.    **Amendment, Modification and Waiver.** This Agreement may not be amended, modified or waived except in accordance with <u>Section 9.08</u> of the Amended Credit Agreement.

7.    **Entire Agreement**. This Agreement, the Amended Credit Agreement and the other Loan Documents constitute the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede all other prior agreements and understandings, both written and oral, among the parties or any of them with respect to the subject matter hereof.

4

A2103

8.      **Effect of the Amendment**. On and after the Twelfth Amendment Effective Date, (i) each reference to the "Credit Agreement" in any Loan Document shall be deemed to be a reference to the Amended Credit Agreement, (ii) the terms "Agreement", "this Agreement", "herein", "hereinafter", "hereto", "hereof", and words of similar import, as used in the Amended Credit Agreement, shall, unless the context otherwise requires, mean the Amended Credit Agreement and (iii) this Agreement shall constitute a "Loan Document" for all purposes of the Amended Credit Agreement and the other Loan Documents. Except as expressly provided in this Agreement, all Loan Documents shall continue to be in full force and effect and are hereby in all respects ratified and confirmed. The execution, delivery and effectiveness of this Agreement shall not operate as a waiver of any right, power or remedy of any Lender or the Administrative Agent under any of the Loan Documents, nor constitute a waiver of any provision of the Loan Documents. Each of the parties hereto acknowledges and agrees that the terms of this Agreement do not constitute a novation but, rather, an amendment of the terms of the Existing Credit Agreement.

9.      **GOVERNING LAW. THIS AGREEMENT AND ANY CLAIM, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.**

10.     **Miscellaneous**. The provisions of <u>Sections 9.11</u> and <u>9.15</u> of the Existing Credit Agreement are incorporated by reference herein and made a part hereof.

11.     **Severability**. In case any provision in or obligation hereunder or under any other Loan Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

12.     **Counterparts**. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same contract. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other customary means of electronic transmission (e.g., ".pdf") shall be as effective as delivery of a manually executed counterpart hereof. The words "execution," "execute", "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation amendments, waivers and consents) shall be deemed to include electronic signatures on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act. Each of the parties represents and warrants to the other parties that it has the corporate capacity and authority to execute the Agreement through electronic means and there are no restrictions for doing so in that party's constitutive documents.

**[**Remainder of page intentionally left blank**]**

5

A2104

**IN WITNESS WHEREOF**, each of the undersigned has caused its duly authorized officer to execute and deliver this Agreement as of the date first set forth above.

**BARCLAYS BANK PLC**, as the Administrative Agent and the Collateral Agent

By: /s/ Kevin Crealese
Name: Kevin Crealese
Title: Managing Director

[*Signature Page to Twelfth Amendment*]

A2105

**AgFirst Farm Credit Bank**, as a Lender

By: /s/ J. Michael Mancini, Jr.
Name: J. Michael Mancini, Jr.
Title: SVP, Capital Markets

[*Signature Page to Twelfth Amendment*]

A2106

**AMERICAN AGCREDIT, PCA**, as a Lender

By: /s/ Daniel K. Hansen
Name: Daniel K. Hansen
Title: Vice President

[*Signature Page to Twelfth Amendment*]

**Bank of Montreal, Chicago Branch**, as a Lender and an Issuing Bank

By: /s/ Alex Wu
Name: Alex Wu
Title: Vice President

[*Signature Page to Twelfth Amendment*]

**SPT INFRASTRUCTURE FINANCE SUB-5, LLC**, as a Lender

By: /s/ Haig Najarian
Name: Haig Najarian
Title: Authorized Signatory

[*Signature Page to Twelfth Amendment*]

A2109

**BARINGS TARGET YIELD INFRASTRUCTURE DEBT HOLDCO 1 S.À R.L.**,
as a Lender

acting by its attorney
BARINGS LLC

acting by:

By: /s/ James Moore
Name: James Moore
Title: Managing Director

[*Signature Page to Twelfth Amendment*]

A2110

**CITIBANK, N.A.**, as a Lender and an Issuing Bank


By: /s/ Agha Murtaza
Name: Agha Murtaza
Title: Director / Authorized Signatory


[*Signature Page to Twelfth Amendment*]

A2112

**Farm Credit East, ACA**, as a Lender

By: /s/ Eric W Pohlman
Name: Eric W Pohlman
Title: Vice President

[*Signature Page to Twelfth Amendment*]

**FORBRIGHT BANK**, as a Lender

By: /s/ John Gray
Name: John Gray
Title: Executive Vice President

[*Signature Page to Twelfth Amendment*]

A2113

A2114

**GreenStone Farm Credit Services, FLCA**, as a Lender

By: /s/ Shane Prichard
Name: Shane Prichard
Title: VP Capital Markets

[*Signature Page to Twelfth Amendment*]

**HSBC BANK USA, N.A.**, as a Lender

By: /s/ Chris Burns

Name: Chris Burns

Title: Senior Vice President

[*Signature Page to Twelfth Amendment*]

A2115

**JP Morgan Chase Bank, N.A.**, as a Lender

By: /s/ Michael Mastronikolas
Name: Michael Mastronikolas
Title: Vice President

[*Signature Page to Twelfth Amendment*]

A2116

**AGWEST FARM CREDIT, PCA**, successor in interest to Northwest Farm Credit
Services, PCA, as a Lender


By: /s/ Jeremy A. Roewe
Name: Jeremy A. Roewe
Title: Vice President


[*Signature Page to Twelfth Amendment*]

A2117

**ROYAL BANK OF CANADA**, as a Lender

By: /s/ Frank Lambrinos
Name: Frank Lambrinos
Title: Authorized Signatory

[*Signature Page to Twelfth Amendment*]

**Goldman Sachs Bank USA**, as a Lender and an Issuing Bank


By: /s/ Keshia Leday
Name: Keshia Leday
Title: Authorized Signatory


[*Signature Page to Twelfth Amendment*]

A2119

A2120

**Truist Bank**, a Lender

By: /s/ Bryan Kunitake
Name: Bryan Kunitake
Title: Director

**ENVIVA INC.**


By: /s/ Shai S. Even
Name: Shai S. Even
Title: Executive Vice President and Chief Financial Officer


**ENVIVA, LP**
By: ENVIVA GP, LLC, as its sole general partner


By: /s/ Shai S. Even
Name: Shai S. Even
Title: Executive Vice President and Chief Financial Officer

A2121

GUARANTORS:

**ENVIVA GP, LLC**

By:    /s/ Shai S. Even

    Name: Shai S. Even
    Title: Executive Vice President and Chief
    Financial Officer

**ENVIVA PARTNERS FINANCE CORP.**

By:    /s/ Shai S. Even

    Name: Shai S. Even
    Title: Executive Vice President and Chief
    Financial Officer

**ENVIVA ENERGY SERVICES, LLC**

By:    /s/ Shai S. Even

    Name: Shai S. Even
    Title: Executive Vice President and Chief
    Financial Officer

**ENVIVA PELLETS, LLC**

By:    /s/ Shai S. Even

    Name: Shai S. Even
    Title: Executive Vice President and Chief
    Financial Officer

**ENVIVA PELLETS WAYCROSS, LLC**

By:    /s/ Shai S. Even

    Name: Shai S. Even
    Title: Executive Vice President and Chief
    Financial Officer

**ENVIVA PELLETS GREENWOOD, LLC**

By:    /s/ Shai S. Even

    Name: Shai S. Even
    Title: Executive Vice President and Chief
    Financial Officer

**ENVIVA PELLETS LUCEDALE, LLC**

By:    /s/ Shai S. Even

    Name: Shai S. Even
    Title: Executive Vice President and Chief
    Financial Officer

**ENVIVA PORT OF PASCAGOULA, LLC**

By:    /s/ Shai S. Even
    Name: Shai S. Even
    Title: Executive Vice President and Chief
    Financial Officer

**ENVIVA DEVELOPMENT FINANCE COMPANY, LLC**

By:    /s/ Shai S. Even
    Name: Shai S. Even
    Title: Executive Vice President and Chief
    Financial Officer

**ENVIVA HOLDINGS GP, LLC**

By:    /s/ Shai S. Even
    Name: Shai S. Even
    Title: Executive Vice President and Chief
    Financial Officer

**ENVIVA HOLDINGS, LP**

By:    /s/ Shai S. Even
    Name: Shai S. Even
    Title: Executive Vice President and Chief
    Financial Officer

**ENVIVA AIRCRAFT HOLDINGS CORP.**

By:    /s/ Shai S. Even
    Name: Shai S. Even
    Title: Executive Vice President and Chief
    Financial Officer

**ENVIVA MANAGEMENT COMPANY, LLC**

By:    /s/ Shai S. Even
    Name: Shai S. Even
    Title: Executive Vice President and Chief
    Financial Officer

**ENVIVA SHIPPING HOLDINGS, LLC**

By:    /s/ Shai S. Even
    Name: Shai S. Even
    Title: Executive Vice President and Chief
    Financial Officer

A2123

**ENVIVA PELLETS BOND, LLC**

By:   /s/ Shai S. Even

    Name: Shai S. Even
    Title: Executive Vice President and Chief
    Financial Officer

A2124

**Execution Version**

**FIRST AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AGREEMENT**

FIRST AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AGREEMENT (this "***Agreement***"), dated as of May 23, 2022, between ENVIVA WILMINGTON HOLDINGS, LLC, a limited liability company formed under the laws of Delaware (the "***Borrower***"), and ENVIVA, LP, a Delaware limited partnership (together with its successors and assigns, "***Lender***").

**RECITALS**

A.      WHEREAS, the Borrower and the Lender are parties to that certain Second Amended and Restated Credit Agreement, dated as of April 2, 2019 (as amended, restated or otherwise modified prior to the date hereof, the "***Credit Agreement***", and as amended by this Agreement, the "***Amended Credit Agreement***"). Except as otherwise provided herein, all capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement;

B.      WHEREAS, the Borrower requested that the Lender extend the then-current Maturity Date, first by six months, then by an additional six-month period, and the Lender accepted each such request, extending the Maturity Date to June 30, 2023, all effective as of March 31, 2022;

C.      WHEREAS, Section 8.2(c) of the Credit Agreement permits amendments to the Credit Agreement pursuant to agreements in writing entered into by the Lender and the Borrower; and

D.      WHEREAS, the Lender and the Borrower desire to amend the Credit Agreement to further extend the maturity date thereunder.

Accordingly, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto agree as follows:

SECTION 1.   Amendments to the Credit Agreement.

The definition of "Maturity Date" in Section 1.1 of the Credit Agreement is hereby amended and restated as follows:

"**Maturity Date**" means the earliest of (i) June 30, 2024 and (ii) the date of termination of the Revolving Commitment; *provided* that the Lender may extend the Maturity Date by up to one year in the sole and absolute discretion of the Lender.

SECTION 2.   Representations and Warranties. The Borrower hereby represents and warrants to the Lender that the following statements are true and correct in all respects:

(a)      the representations and warranties set forth in Article III of the Credit Agreement are true and correct in all material respects on and as of the date hereof to the same extent as if made on and as of the date hereof, except to the extent such representations and warranties

A2125

specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date; <u>provided</u> that to the extent any such representation and warranty is already qualified by materiality or Material Adverse Effect, such representation and warranty shall be true and correct in all respects;

(b)     the Borrower has the requisite power and authority to execute and deliver this Agreement and to perform its obligations under the Credit Agreement. The execution and delivery of this Agreement and the performance by the Borrower of the Credit Agreement have been duly approved by all necessary organizational action of the Borrower; and

(c)     this Agreement has been duly executed and delivered by the Borrower and this Agreement is the legally valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, fraudulent conveyance or transfer, moratorium or similar laws relating to or limiting creditors' rights generally or by general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.  <u>Conditions to Effectiveness of this Agreement</u>. The effectiveness of the Agreement shall be subject to the following conditions precedent (the date on which such conditions have been satisfied (or waived) is referred to herein as the "***Effective Date***"):

(a)   The Lender has received a duly executed counterpart of this Agreement from the Borrower, which shall be an original or facsimile or ".pdf" file;

(b)   The representations and warranties set forth in Section 2 of this Agreement shall be true and correct; and

(c)   No Default or Event of Default shall exist, or would result from the execution and delivery of this Agreement.

SECTION 4.  <u>Effect of the Amendment</u>. Except as expressly provided in this Agreement, nothing herein shall be deemed to entitle the Borrower to any other consent to, or a waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants or agreements contained in the Credit Agreement. On and after the Effective Date, (i) the terms "Agreement", "this Agreement", "herein", "hereinafter", "hereto", "hereof", and words of similar import, as used in the Credit Agreement, shall, unless the context otherwise requires, mean the Amended Credit Agreement. The Borrower hereby ratifies and confirms that, except as specifically amended by this Agreement, the Credit Agreement shall remain in full force and effect.

SECTION 5.  <u>Counterparts</u>. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same contract. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other customary means of electronic transmission (e.g., ".pdf") shall be as effective as delivery of a manually executed counterpart hereof.

SECTION 6.  <u>Applicable Law</u>. This Agreement is governed by and will be construed in accordance with the laws of the State of New York, except for conflicts of laws rules that would require the application of the law of another jurisdiction.

SECTION 7.  <u>Miscellaneous</u>.    The provisions of <u>Sections 8.9</u> and <u>8.10</u> of the Credit Agreement are incorporated by reference herein and made a part hereof.

SECTION 8.  <u>Headings</u>. The headings of this Agreement are for purposes of reference only and shall not limit or otherwise affect the meaning hereof.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be duly executed by its duly authorized officers, all as of the date first above written.

**BORROWER:**

**ENVIVA WILMINGTON HOLDINGS, LLC**

By:    Enviva, LP, as its managing member

By: Enviva GP, LLC, as its sole general partner

By: __
Name: William H. Schmidt, Jr.
Title: Executive Vice President,
 Corporate Development and General
Counsel

**LENDER:**

**ENVIVA, LP**

By:    Enviva GP, LLC, as its sole general partner

By: __
    Name: Shai S. Even
    Title: Executive Vice President and Chief Financial Officer

**SIXTH AMENDED AND RESTATED
EMPLOYMENT AGREEMENT**

This Sixth Amended and Restated Employment Agreement ("Agreement") is made and entered into as of November 14, 2022 (the "Amendment Effective Date") by and between Enviva Management Company, LLC, a Delaware limited liability company (the "Company"), and Thomas Meth ("Executive") and supersedes and replaces in its entirety the Fifth Amended and Restated Employment Agreement (the "Prior Agreement") entered into as of June 4, 2022 by and between the Company and Executive.

1.      **Employment**. During the period commencing on the Amendment Effective Date and for the duration of the Employment Period (as defined in Section 4 below), the Company shall continue to employ Executive, and Executive shall serve, as President and Chief Executive Officer of the Company, Enviva Inc., a Delaware corporation ("EVA"), and such other Affiliates of the Company as may be designated by EVA from time to time.

2.      **Duties and Responsibilities of Executive**.

(a)      During the Employment Period, Executive shall devote Executive's full business time and attention to the business of the Company and its Affiliates, as applicable, and will not hold any outside employment or consulting position. Executive's duties pursuant to this Agreement will include those normally incidental to the position identified in Section 1, as well as such additional duties as may be assigned to Executive by EVA from time to time.

(b)      Executive represents and covenants that Executive is not the subject of or a party to any employment agreement, non-competition or non-solicitation covenant, non-disclosure agreement, or any other agreement, covenant, understanding, or restriction that would prohibit Executive from executing this Agreement and fully performing Executive's duties and responsibilities hereunder, or would in any manner, directly or indirectly, limit or affect the duties and responsibilities that may now or in the future be assigned to Executive hereunder.

(c)      Executive acknowledges and agrees that Executive owes the Company and its Affiliates fiduciary duties, including duties of care, loyalty, fidelity, and allegiance, such that Executive shall act at all times in the best interests of the Company and its Affiliates and shall not appropriate any business opportunity of the Company or its Affiliates for Executive. Executive agrees that the obligations described in this Agreement are in addition to, and not in lieu of, the obligations Executive owes the Company and its Affiliates under common law. The Parties acknowledge and agree that Executive may provide services (including as an executive, employee, director, or otherwise) to multiple Affiliates of the Company and, in providing such services, Executive will not be violating Executive's obligations hereunder so long as Executive abides by the terms of Sections 7, 8, and 9 below in the course of performing such services.

3.      **Compensation**.

(a)      Base Salary. As of the Amendment Effective Date, Executive's annualized base salary shall be $750,000 (the "Base Salary"). The Base Salary shall be provided in consideration for Executive's services under this Agreement, and payable on a not less than biweekly basis, in conformity with the Company's customary payroll practices for executives as in effect from time to time.

(b)      Annual Bonus. During the Employment Period, Executive shall be eligible for discretionary bonus compensation for the 2022 calendar year (so long as Executive remains employed through the 2022 calendar year) and each subsequent complete calendar year that Executive is employed by the Company hereunder (each, a "Bonus Year") pursuant to the

applicable incentive or bonus compensation plan of the Company, if any, that is applicable to similarly situated executives of the Company (each, an "Annual Bonus"). Each Annual Bonus shall have a target value that is not less than 150 % of Executive's Base Salary as in effect on the first day of the Bonus Year to which such Annual Bonus relates (the "Target Annual Bonus"); *provided*, *however*, that the Target Annual Bonus for the 2022 calendar year shall have a target value of not less than $731,770. The performance targets that must be achieved in order to realize certain bonus levels shall be established by the board of directors of EVA (the "Board") or a committee thereof annually, in its sole discretion, and communicated to Executive in accordance with terms of the applicable incentive or bonus plan, if any, or if no such plan has been adopted, within the first 90 days of each applicable Bonus Year following 2022. Each Annual Bonus, if any, will be paid as soon as administratively feasible after the Board or a committee thereof certifies whether the applicable performance targets for the applicable Bonus Year have been achieved, but in no event later than March 15 following the end of such Bonus Year.

(c)        Long-Term Incentive Plan. With respect to the 2023 calendar year and each subsequent calendar year during the Employment Period, Executive shall be eligible to receive annual awards under the EVA equity compensation plan as in effect from time to time (the "LTIP") with a target value equal to 300 % of Executive's Base Salary as in effect on the first day of such calendar year (the "Target Annual LTIP Award"). All awards granted to Executive under the LTIP, if any, shall be on such terms and conditions as the Board, or a committee thereof, shall determine from time to time and shall be subject to and governed by the terms and provisions of the LTIP as in effect from time to time and the award agreements evidencing such awards. Nothing herein shall be construed to give Executive any rights to any amount or type of grant or award except as provided in such award to Executive provided in writing and authorized by the Board (or a committee thereof).

4.        **Term of Employment**. The current term of Executive's employment under this Agreement is the period commencing on the Amendment Effective Date and ending on the first anniversary of the Amendment Effective Date (the "Current Term"). On the first anniversary of the Amendment Effective Date and on each subsequent anniversary of the Amendment Effective Date thereafter, the term of Executive's employment under this Agreement shall automatically renew and extend for a period of 12 months (each such 12-month period being a "Renewal Term") unless written notice of non-renewal is delivered by either party to the other not less than 60 days prior to the expiration of the then-existing Current Term or Renewal Term, as applicable. Notwithstanding any other provision of this Agreement to the contrary, Executive's employment pursuant to this Agreement may be terminated at any time in accordance with Section 6. The period from the Amendment Effective Date through the expiration of this Agreement or, if sooner, the termination of Executive's employment pursuant to this Agreement, regardless of the time or reason for such termination, shall be referred to herein as the "Employment Period."

5.        **Reimbursement of Business Expenses; Benefits**. Subject to the terms and conditions of this Agreement, Executive shall be entitled to the following reimbursements and benefits during the Employment Period:

(a)        Reimbursement of Business Expenses. The Company agrees to reimburse Executive for Executive's reasonable business-related expenses incurred in the performance of Executive's duties under this Agreement; *provided* that Executive timely submits all documentation for such reimbursement, as required by Company policy in effect from time-to-time. Any reimbursement of expenses under this Section 5(a) or Section 12 shall be made by the Company upon or as soon as practicable following receipt of supporting documentation reasonably satisfactory to the Company (but in any event not later than the close of Executive's taxable year following the taxable year in which the expense is incurred by Executive); *provided*, *however*, that, upon the termination of Executive's employment with the Company, in no event

2

shall any additional reimbursement be made prior to the date that is six months after the date of such termination (or, if earlier, prior to the date of Executive's death) to the extent such payment delay is required under Section 409A(a)(2)(B) of the Internal Revenue Code. In no event shall any reimbursement be made to Executive for such expenses incurred after the date that is five years after the date of the termination of Executive's employment with the Company. Executive is not permitted to receive a payment in lieu of reimbursement under this Section 5(a) or Section 12.

(b)　　Benefits. Executive shall be eligible to participate in the same benefit plans or fringe benefit policies in which other similarly situated Company employees are eligible to participate, subject to applicable eligibility requirements and the terms and conditions of such plans and policies as in effect from time to time. The Company shall not, by reason of this Section 5(b), be obligated to institute, maintain, or refrain from changing, amending, or discontinuing, any such plan or policy, so long as such changes are similarly applicable to similarly situated Company employees generally.

6.　　**Termination of Employment**.

(a)　　Company's Right to Terminate Executive's Employment for Cause. The Company shall have the right to terminate Executive's employment at any time for Cause. For purposes of this Agreement, "Cause" shall mean Executive's:

(i)　　material breach of any policy established by the Company or any of its Affiliates that (x) pertains to health and safety and (y) is applicable to Executive;

(ii)　　engaging in acts of disloyalty to the Company or its Affiliates, including fraud, embezzlement, theft, commission of a felony, or proven dishonesty; or

(iii)　　willful misconduct in the performance of, or willful failure to perform a material function of, Executive's duties under this Agreement.

(b)　　Company's Right to Terminate for Convenience. The Company shall have the right to terminate Executive's employment without Cause, at any time and for any reason or no reason at all.

(c)　　Executive's Right to Terminate for Good Reason. Executive shall have the right to terminate Executive's employment with the Company at any time for Good Reason. For purposes of this Agreement, "Good Reason" shall mean:

(i)　　a material diminution in Executive's authority, duties, title, or responsibilities; *provided, however*, the appointment of an Executive Chairman to the Board, and Executive reporting to the Executive Chairman, will not constitute a material diminution in Executive's authority, duties, title, or responsibilities;

(ii)　　a material diminution in Executive's Base Salary, Target Annual Bonus, or Target Annual LTIP Award;

(iii)　　the relocation of the geographic location of Executive's principal place of employment by more than 100 miles from the location of Executive's principal place of employment as of the Amendment Effective Date; or

(iv)　　the Company's delivery of a written notice of non-renewal of this Agreement to Executive.

3

A2131

Notwithstanding the foregoing provisions of this Section 6(c) or any other provision of this Agreement to the contrary, any assertion by Executive of a termination for Good Reason shall not be effective unless all of the following conditions are satisfied: (A) the condition described in Section 6(c)(i), (ii), (iii), or (iv) giving rise to Executive's termination of Executive's employment must have arisen without Executive's written consent; (B) Executive must provide written notice to the Company of such condition within 30 days of the date on which Executive knew of the existence of the condition; (C) the condition specified in such notice must remain uncorrected for 30 days after receipt of such notice by the Company; and (D) the date of Executive's termination of Executive's employment must occur within 30 days after the end of such cure period.

(d)    <u>Death or Disability</u>. Executive's employment with the Company shall terminate upon the death or Disability of Executive. For purposes of this Agreement, a "<u>Disability</u>" shall exist if Executive is unable to perform the essential functions of Executive's position, with reasonable accommodation (if applicable), due to an illness or physical or mental impairment or other incapacity that continues for a period in excess of 90 days, whether consecutive or not, in any period of 365 consecutive days. The determination of a Disability will be made by the Company after obtaining an opinion from a doctor of the Company's choosing. Executive agrees to provide such information and participate in such examinations as may be reasonably required by said doctor in order to form his or her opinion. If requested by the Company, Executive shall submit to a mental or physical examination to be performed by an independent physician selected by the Company to assist the Company in making such determination.

(e)    <u>Executive's Right to Terminate for Convenience</u>. Executive shall have the right to terminate Executive's employment with the Company for convenience at any time upon 60 days' advance written notice to the Company; *provided* that if Executive provides a notice of termination pursuant to this Section 6(e), the Company may designate an earlier termination date than that specified in Executive's notice. The Company's designation of such an earlier date will not change the nature of Executive's termination, which will still be deemed a voluntary resignation by Executive pursuant to this Section 6(e).

(f)    <u>Effect of Termination</u>.

(i)    If Executive's employment hereunder shall terminate (1) pursuant to Section 4 at the expiration of the then-existing Current Term or Renewal Term, as applicable, as a result of a non-renewal of this Agreement by Executive or (2) pursuant to Section 6(a) or 6(e), then all compensation and all benefits to Executive hereunder shall terminate contemporaneously with such termination of employment, except that Executive shall be entitled to (x) payment of all earned, unpaid Base Salary within 30 days of Executive's last day of employment, or earlier if required by law, (y) reimbursement for all incurred but unreimbursed expenses for which Executive is entitled to reimbursement in accordance with Section 5(a) and Section 12, and (z) benefits to which Executive may be entitled pursuant to the terms of any plan or policy described in Section 5(b).

(ii)    If Executive's employment terminates (1) pursuant to Section 6(b) or 6(c) or (2) due to Executive's death or Disability pursuant to Section 6(d), then all compensation and all benefits to Executive hereunder shall terminate contemporaneously with such termination of employment, except that (I) Executive shall be entitled to receive the compensation and benefits described in clauses (x) through (z) of Section 6(f)(i); and (II) if Executive executes, on or before the Release Expiration Date (as defined below), and does not revoke within the time provided by the Company to do so, a release of all claims in a form satisfactory to the Company (which shall be

4

substantially similar to the form of release attached hereto as Exhibit A) (the "Release")), then, *provided* that Executive abides by the terms of Sections 7, 8, 9, 10, and 12:

(A)     The Company shall pay to Executive an amount (the "Severance Payment") equal to the product of (x) 1.5 (or, if such termination occurs within 12 months following a Change in Control (as defined below), 2.0) and (y) the sum of Executive's Base Salary as in effect on the date of the termination of Executive's employment (the "Termination Date") and Executive's Target Annual Bonus as of the Termination Date. The Severance Payment will be divided into 36 (or, if such termination occurs within 12 months following a Change in Control, 48) substantially equal installments. On the Company's first regularly scheduled pay date that is on or after the date that is 60 days after the Termination Date, the Company shall pay to Executive, without interest, a number of such installments equal to the number of such installments that would have been paid during the period beginning on the Termination Date and ending on the Company's first regularly scheduled pay date that is on or after the date that is 60 days after the Termination Date had the installments been paid on a biweekly basis commencing on the Company's first regularly scheduled pay date coincident with or next following the Termination Date, and each of the remaining installments shall be paid on a biweekly basis thereafter; *provided*, *however*, that (1) to the extent, if any, that the aggregate amount of the installments of the Severance Payment that would otherwise be paid pursuant to the preceding provisions of this Section 6(f)(ii)(A) after March 15 of the calendar year following the calendar year in which the Termination Date occurs (the "Applicable March 15") exceeds the maximum exemption amount under Treasury Regulation Section 1.409A-1(b)(9)(iii)(A), then such excess shall be paid to Executive in a lump sum on the Applicable March 15 (or the first business day preceding the Applicable March 15 if the Applicable March 15 is not a business day) and the installments of the Severance Payment payable after the Applicable March 15 shall be reduced by such excess (beginning with the installment first payable after the Applicable March 15 and continuing with the next succeeding installment until the aggregate reduction equals such excess), and (2) all remaining installments of the Severance Payment, if any, that would otherwise be paid pursuant to the preceding provisions of this Section 6(f)(ii)(A) after December 31 of the calendar year following the calendar year in which the Termination Date occurs shall be paid with the installment of the Severance Payment, if any, due in December of the calendar year following the calendar year in which the Termination Date occurs.

(B)     To the extent Executive's Annual Bonus payable with respect to service in the year preceding the year in which the Termination Date occurs remains unpaid as of the Termination Date, such Annual Bonus will be paid based on actual performance at the time annual bonuses for such prior year are paid to executives of the Company generally (but no later than March 15 following the end of such prior year).

(C)     The Company shall pay to Executive a pro-rated Annual Bonus attributable to service performed by the Executive for the year in which the Termination Date occurs (pro-rated for the period beginning on the first day of the Bonus Year and ending on the Termination Date) (the "Pro-rated Bonus"). The Pro-rated Bonus will be paid at the time annual bonuses are paid to executives of the Company generally (but no later than March 15 of the year following the Termination Date) and will be determined based on target levels with respect to

5

any individual performance metrics and actual performance with respect to any metrics tied to EVA or any subsidiary or other financial or non-individual metrics.

(D)    All outstanding awards granted to Executive pursuant to the LTIP prior to the Termination Date that remain unvested as of the Termination Date shall immediately become fully vested as of the Termination Date; *provided*, *however*, that with respect to any such LTIP awards that were granted subject to a performance requirement (other than continued service by Executive) that has not been satisfied and certified by the Board (or a committee thereof) as of the Termination Date, then (1) if the Termination Date occurs within six months prior to the expiration of the performance period applicable to such LTIP award, such LTIP award shall become vested based on actual performance upon the expiration of such performance period; and (2) if the Termination Date occurs at any other time during the performance period applicable to such LTIP award, such LTIP award shall become vested as of the Termination Date based on target performance.

(E)    If Executive timely and properly elects to continue coverage for Executive and Executive's spouse and eligible dependents, if any, under the Company's group health plans pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("<u>COBRA</u>"), similar in the amounts and types of coverage provided by the Company to Executive prior to the Termination Date, then for a period of 18 months following the Termination Date or such earlier date as provided in this Section 6(f)(ii)(E), the Company shall promptly reimburse Executive on a monthly basis for the entire amount Executive pays to effect and continue such coverage; *provided*, *however*, that Executive's rights to such reimbursements under this Section 6(f)(ii)(E) shall terminate upon the earlier of (1) the time Executive becomes eligible to be covered under a group health plan sponsored by another employer (and Executive shall promptly notify the Company in the event that Executive becomes so eligible) or (2) the date Executive is no longer eligible to receive COBRA continuation coverage. Notwithstanding anything in the preceding provisions of this Section 6(f)(ii)(E) to the contrary, (x) the election of COBRA continuation coverage and the payment of any premiums due with respect to such COBRA continuation coverage will remain Executive's sole responsibility, and the Company will assume no obligation for payment of any such premiums relating to such COBRA continuation coverage and (y) if the provision of the benefit described in this Section 6(f)(ii)(E) cannot be provided in the manner described above without penalty, tax, or other adverse impact on the Company, then the Company and Executive shall negotiate in good faith to determine an alternative manner in which the Company may provide a substantially equivalent benefit to Executive without such adverse impact on the Company.

For purposes of this Section 6(f)(ii), in the event of Executive's death, references to Executive (other than in Section 6(f)(ii)(E)) shall include Executive's estate, and references to Executive in Section 6(f)(ii)(E) shall include Executive's spouse and eligible dependents, if any, who are "qualified beneficiaries" (within the meaning of COBRA and the regulations thereunder) with respect to Executive's death.

(iii)    Executive acknowledges Executive's understanding that if the Release is not executed and returned to the Company on or before the Release Expiration Date, and the required revocation period has not fully expired without revocation of the Release by Executive, then Executive shall not be entitled to any payments or benefits pursuant to Section 6(f)(ii). As used herein, the "<u>Release Expiration Date</u>" is that date

6

that is 21 days following the date upon which the Company delivers the Release to Executive (which shall occur no later than seven days after the Termination Date) or, in the event that such termination of employment is "in connection with an exit incentive or other employment termination program" (as such phrase is defined in the Age Discrimination in Employment Act of 1967, as amended), the date that is 45 days following such delivery date.

(iv)     For purposes of this Agreement, a "<u>Change in Control</u>" shall mean the occurrence of one or more of the following transactions:

(A)     the sale or disposal by EVA of all or substantially all of its assets to any person other than an Affiliate of EVA;

(B)     the merger or consolidation of EVA with or into another partnership, corporation, or other entity, other than a merger or consolidation in which the equityholders in EVA immediately prior to such transaction retain a greater than 50% equity interest in the surviving entity; or

(C)     the acquisition by any person or group (as defined in Section 13d(d)(3) of the Securities Exchange Act of 1934 (the "<u>Exchange Act</u>")) of the beneficial ownership (as defined in Section 13d(d)(3) of the Exchange Act) of more than 50% of the equity of EVA entitled to vote in the election of EVA's directors (or the persons performing the functions of directors).

(g)     <u>Meaning of Termination of Employment</u>. For all purposes of this Agreement, Executive shall be considered to have terminated employment with the Company when Executive incurs a "<u>separation from service</u>" with the Company within the meaning of Section 409A(a)(2)(A)(i) of the Internal Revenue Code; *provided*, *however*, that whether such a separation from service has occurred shall be determined based upon a reasonably anticipated permanent reduction in the level of bona fide services to be performed to no more than 25% of the average level of bona fide services provided in the immediately preceding 36 months.

7.     **Conflicts of Interest; Disclosure of Opportunities**. Executive agrees that Executive shall promptly disclose to the Board any conflict of interest involving Executive upon Executive becoming aware of such conflict. Executive further agrees that, throughout the Employment Period and for one year after Executive is no longer employed by the Company, Executive shall offer to the Company and its Affiliates, as applicable, all business opportunities relating to the acquisition, development, ownership, and operation of facilities that collect, process, and transform wood-based biomass into renewable energy feedstock, including wood pellets, regardless of where such business opportunities arise.

8.     **Confidentiality**. Executive acknowledges and agrees that, in the course of Executive's employment with the Company, Executive has been provided with and had access to (and, during the Employment Period, Executive will continue to be provided with, and have access to) valuable Confidential Information (as defined below). In consideration of Executive's receipt of and access to such Confidential Information and in exchange for other valuable consideration provided hereunder, and as a condition of Executive's employment hereunder, Executive agrees to comply with this Section 8.

(a)     Executive covenants and agrees, both during the Employment Period and thereafter that, except as expressly permitted by this Agreement or by directive of the Board, Executive shall not disclose any Confidential Information to any Person and shall not use any Confidential Information except for the benefit of the Company or any of its Affiliates. Executive shall take all reasonable precautions to protect the physical security of all documents

7

and other material containing Confidential Information (regardless of the medium on which the Confidential Information is stored). The covenants in this Section 8(a) shall apply to all Confidential Information, whether now known or later to become known to Executive during the Employment Period.

(b)    Notwithstanding Section 8(a), Executive may make the following disclosures and uses of Confidential Information:

(i)    disclosures to other executives or employees of the Company or its Affiliates who have a need to know the information in connection with the business of the Company or its Affiliates;

(ii)    disclosures and uses that are incidental to Executive's provision of services to the Company and its Affiliates consistent with the terms of this Agreement or that are approved by the Board;

(iii)    disclosures for the purpose of complying with any applicable laws or regulatory requirements; or

(iv)    disclosures that Executive is legally compelled to make by deposition, interrogatory, request for documents, subpoena, civil investigative demand, order of a court of competent jurisdiction, or similar process, or otherwise by law.

(c)    Upon the end of Executive's employment with the Company and at any other time upon request of the Company, Executive shall surrender and deliver to the Company all documents (including electronically stored information) and other material of any nature containing or pertaining to all Confidential Information in Executive's possession and shall not retain any such document or other material. Within 10 days of any such request, Executive shall certify to the Company in writing that all such materials have been returned to the Company.

(d)    All non-public information, designs, ideas, concepts, improvements, product developments, discoveries, and inventions, whether patentable or not, that are conceived, made, developed, or acquired by Executive, individually or in conjunction with others, during the period Executive is or has been employed or affiliated with the Company or any of its Affiliates (whether during business hours or otherwise and whether on the Company's premises or otherwise) that relate to the Company's or any of its Affiliates' business or properties, products, or services (including all such information relating to corporate opportunities, business plans, trade secrets, strategies for developing business and market share, research, financial and sales data, pricing terms, evaluations, opinions, interpretations, acquisition prospects, the identity of customers or their requirements, the identity of key contacts within customers' organizations or within the organization of acquisition prospects, or marketing and merchandising techniques, prospective names and marks) is defined as "Confidential Information." Moreover, all documents, videotapes, written presentations, brochures, drawings, memoranda, notes, records, files, correspondence, manuals, models, specifications, computer programs, e-mail, voicemail, electronic databases, maps, drawings, architectural renditions, models, and all other writings or materials of any type including or embodying any of such information, ideas, concepts, improvements, discoveries, inventions, and other similar forms of expression are and shall be the sole and exclusive property of the Company or its Affiliates and be subject to the same restrictions on disclosure applicable to all Confidential Information pursuant to this Agreement.

(e)    Nothing in this Agreement shall prohibit or restrict Executive from lawfully (i) initiating communications directly with, cooperating with, providing information to, causing information to be provided to, or otherwise assisting in an investigation by any governmental or regulatory agency, entity, or official(s) (collectively, "Governmental

8

Authorities") regarding a possible violation of any law, (ii) responding to any inquiry or legal process directed to Executive individually from any such Governmental Authorities, (iii) testifying, participating, or otherwise assisting in an action or proceeding by any such Governmental Authorities relating to a possible violation of law, or (iv) making any other disclosures that are protected under the whistleblower provisions of any applicable law. Additionally, pursuant to the federal Defend Trade Secrets Act of 2016, Executive shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (x) is made (A) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (B) solely for the purpose of reporting or investigating a suspected violation of law, or (y) is made to Executive's attorney in relation to a lawsuit for retaliation against Executive for reporting a suspected violation of law, or (z) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Nor does this Agreement require Executive to obtain prior authorization from the Company or its Affiliates before engaging in any conduct described in this Section 8(e), or to notify the Company or its Affiliates that Executive has engaged in any such conduct.

9.    **Non-Competition; Non-Solicitation**.

(a)    The Company shall continue to provide Executive access to Confidential Information for use only during the period of Executive's employment with the Company, and Executive acknowledges and agrees that the Company will be entrusting Executive, in Executive's unique and special capacity, with continuing to develop the goodwill of the Company, and in consideration thereof and in consideration of the continued access to Confidential Information, and as a condition of Executive's employment hereunder, Executive has voluntarily agreed to the covenants set forth in this Section 9. Executive further agrees and acknowledges that the limitations and restrictions set forth herein, including the geographical and temporal restrictions on certain competitive activities, are reasonable in all respects and are material and substantial parts of this Agreement intended and necessary to protect the Company's legitimate business interests, including the preservation of its Confidential Information and goodwill.

(b)    Executive agrees that, during the period set forth in Section 9(c) below, Executive shall not, without the prior written approval of the Company, directly or indirectly, for Executive or on behalf of or in conjunction with any other person or entity of whatever nature:

(i)    engage or participate within the Market Area in competition with the Company in any business in which either the Company or its Protected Affiliates engaged in, or had plans to become engaged in of which Executive was aware during the period of Executive's employment with the Company or the period set forth in Section 9(c) below, which business includes the acquisition, development, ownership, and operation of facilities that collect, process, and transform wood-based biomass into renewable energy feedstock, including wood pellets (the "Business"). As used herein, the term "Protected Affiliates" means any Affiliate of the Company for which Executive provided services during the period of Executive's employment with the Company, or about which Executive obtained Confidential Information during the period of Executive's employment with the Company.

(ii)    appropriate any Business Opportunity of, or relating to, the Company or its Affiliates located in the Market Area, or engage in any activity that is detrimental to the Company or its Affiliates or that limits the Company's or an Affiliate's ability to fully exploit such Business Opportunities or prevents the benefits of such Business Opportunities from accruing to the Company or its Affiliates; or

9

A2137

(iii)    solicit any employee of the Company or its Affiliates to terminate his or her employment therewith.

(c)    <u>Timeframe of Non-Competition and Non-Solicitation Agreement</u>. Executive agrees that the covenants of this Section 9 shall be enforceable during the period that Executive is employed by the Company and for a period of one year following the date that Executive is no longer employed by the Company, regardless of the reason for such termination.

(d)    Because of the difficulty of measuring economic losses to the Company and its Affiliates as a result of a breach of the foregoing covenants, and because of the immediate and irreparable damage that could be caused to the Company and its Affiliates for which they would have no other adequate remedy, Executive agrees that the foregoing covenant may be enforced by the Company and its Affiliates, in the event of breach by Executive, by injunctions and restraining orders and that such enforcement shall not be the Company's and its Affiliates' exclusive remedy for a breach but instead shall be in addition to all other rights and remedies available to the Company and its Affiliates, both at law and in equity.

(e)    The covenants in this Section 9 are severable and separate, and the unenforceability of any specific covenant (or any portion thereof) shall not affect the provisions of any other covenant (or any portion thereof). Moreover, in the event any court of competent jurisdiction or arbitrator, as applicable, shall determine that the scope, time, or territorial restrictions set forth in this Section 9 are unreasonable, then it is the intention of the parties that such restrictions be enforced to the fullest extent that the court or arbitrator deems reasonable, and this Agreement shall thereby be reformed.

(f)    For purposes of this Section 9, the following terms shall have the following meanings:

(i)    "<u>Business Opportunity</u>" shall mean any commercial, investment, or other business opportunity relating to the Business.

(ii)    "<u>Market Area</u>" shall mean any location or geographic area within 75 miles of a location where the Company or its Affiliates conducts Business, or has plans to conduct Business of which Executive is aware, during the period of Executive's employment with the Company.

(g)    All of the covenants in this Section 9 shall be construed as an agreement independent of any other provision in this Agreement, and the existence of any claim or cause of action of Executive against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of such covenants.

10.    **Ownership of Intellectual Property**. Executive agrees that the Company or its applicable Affiliate shall own, and Executive hereby assigns, all right, title, and interest (including patent rights, copyrights, trade secret rights, mask work rights, trademark rights, and all other intellectual and industrial property rights of any sort throughout the world) relating to any and all inventions (whether or not patentable), works of authorship, mask works, designs, know-how, ideas, and information authored, created, contributed to, made, or conceived or reduced to practice, in whole or in part, by Executive during the period that Executive is or has been employed or affiliated with the Company or any of its Affiliates that either (a) relate, at the time of conception, reduction to practice, creation, derivation, or development, to the Company's or any of its Affiliates' business or actual or anticipated research or development, or (b) were developed on any amount of the Company's time or with the use of any of the Company's or its Affiliates' equipment, supplies, facilities, or trade secret information (all of the foregoing collectively referred to herein as "<u>Company Intellectual Property</u>"), and Executive will promptly

10

disclose all Company Intellectual Property to the Company. All of Executive's works of authorship and associated copyrights created during the period that Executive is or has been employed by the Company or any of its Affiliates and in the scope of Executive's employment shall be deemed to be "works made for hire" within the meaning of the Copyright Act. Executive agrees to perform, during and after the Employment Period, all reasonable acts deemed necessary by the Company to assist the Company or its applicable Affiliate, at the Company's or such Affiliate's expense, in obtaining and enforcing its rights throughout the world in the Company Intellectual Property. Such acts may include, but are not limited to, execution of documents and assistance or cooperation (i) in the filing, prosecution, registration, and memorialization of assignment of any applicable patents, copyrights, mask work, or other applications, (ii) in the enforcement of any applicable patents, copyrights, mask work, moral rights, trade secrets, or other proprietary rights, and (iii) in other legal proceedings related to the Company Intellectual Property.

11.    **Arbitration**.

(a)    Subject to Section 11(d), any dispute, controversy, or claim between Executive and the Company or any of its Affiliates arising out of or relating to this Agreement or Executive's employment with the Company or services provided to any Affiliate of the Company will be finally settled by arbitration in New York, New York before, and in accordance with the rules for the resolution of employment disputes then in effect of, the American Arbitration Association ("AAA"). The arbitration award shall be final and binding on both parties.

(b)    Any arbitration conducted under this Section 11 shall be heard by a single arbitrator (the "Arbitrator") selected in accordance with the then-applicable rules of the AAA. The Arbitrator shall expeditiously (and, if possible, within 90 days after the selection of the Arbitrator) hear and decide all matters concerning the dispute. Except as expressly provided to the contrary in this Agreement, the Arbitrator shall have the power to (i) gather such materials, information, testimony, and evidence as the Arbitrator deems relevant to the dispute before him or her (and each party will provide such materials, information, testimony, and evidence requested by the Arbitrator, except to the extent any information so requested is proprietary, subject to a third-party confidentiality restriction, or to an attorney-client or other privilege), and (ii) grant injunctive relief and enforce specific performance. The decision of the Arbitrator shall be rendered in writing, be final and binding upon the disputing parties, and the parties agree that judgment upon the award may be entered by any court of competent jurisdiction; *provided* that the parties agree that the Arbitrator and any court enforcing the award of the Arbitrator shall not have the right or authority to award punitive or exemplary damages to any disputing party.

(c)    Each side shall share equally the cost of the arbitration and bear its own costs and attorneys' fees incurred in connection with any arbitration, unless the Arbitrator determines that compelling reasons exist for allocating all or a portion of such costs and fees to the other side.

(d)    Notwithstanding Section 11(a), an application for emergency or temporary injunctive relief by either party (including any such application to enforce the provisions of Sections 8, 9, or 10 herein) shall not be subject to arbitration under this Section 11; *provided*, *however*, that the remainder of any such dispute (beyond the application for emergency or temporary injunctive relief) shall be subject to arbitration under this Section.

(e)    By entering into this Agreement and entering into the arbitration provisions of this Section 11, THE PARTIES EXPRESSLY ACKNOWLEDGE AND AGREE THAT THEY ARE KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVING THEIR RIGHTS TO A JURY TRIAL.

11

(f)    Nothing in this Section 11 shall prohibit a party to this Agreement from (i) instituting litigation to enforce any arbitration award or (ii) joining another party to this Agreement in a litigation initiated by a person or entity that is not a party to this Agreement.

12.    **Defense of Claims**. Executive agrees that, during the Employment Period and thereafter, upon reasonable request from the Company, Executive will cooperate with the Company or its Affiliates in the defense of any claims or actions that may be made by or against the Company or its Affiliates that relate to Executive's actual or prior areas of responsibility, except if Executive's reasonable interests are adverse to the Company or its Affiliate(s), as applicable, in such claim or action. The Company agrees to pay or reimburse Executive for all of Executive's reasonable travel and other direct expenses incurred, or to be reasonably incurred, to comply with Executive's obligations under this Section 12, provided Executive provides reasonable documentation of same and obtains the Company's prior approval for incurring such expenses.

13.    **Withholdings**. The Company may withhold and deduct from any payments made or to be made pursuant to this Agreement (a) all federal, state, local, and other taxes as may be required pursuant to any law or governmental regulation or ruling and (b) any deductions consented to in writing by Executive.

14.    **Title and Headings; Construction**. Titles and headings to Sections hereof are for the purpose of reference only and shall in no way limit, define, or otherwise affect the provisions hereof. Any and all Exhibits or Attachments referred to in this Agreement are, by such reference, incorporated herein and made a part hereof for all purposes. The words "herein," "hereof," "hereunder," and other compounds of the word "here" shall refer to the entire Agreement and not to any particular provision hereof. The use herein of the word "including" following any general statement, term, or matter shall not be construed to limit such statement, term, or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation," "but not limited to," or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that could reasonably fall within the broadest possible scope of such general statement, term, or matter. Unless the context requires otherwise, all references herein to an agreement, instrument, or other document shall be deemed to refer to such agreement, instrument, or other document as amended, supplemented, modified, and restated from time to time to the extent permitted by the provisions thereof. All references to "dollars" or "$" in this Agreement refer to United States dollars. Wherever the context so requires, the masculine gender includes the feminine or neuter, and the singular number includes the plural and conversely.

15.    **Applicable Law; Submission to Jurisdiction**. This Agreement shall in all respects be construed according to the laws of the State of New York without regard to the conflict of law principles thereof. With respect to any claim or dispute related to or arising under this Agreement, the parties hereby consent to the arbitration provisions of Section 11 above and recognize and agree that should any resort to a court be necessary and permitted under this Agreement, then they consent to the exclusive jurisdiction, forum, and venue of the state and federal courts located in New York, New York.

16.    **Entire Agreement and Amendment**. This Agreement contains the entire agreement of the parties with respect to the matters covered herein; moreover, this Agreement supersedes all prior and contemporaneous agreements and understandings, oral or written, between the parties hereto concerning the subject matter hereof. Without limiting the scope of the preceding sentence, except as otherwise expressly provided in this Section 16, all understandings and agreements preceding the Amendment Effective Date and relating to the subject matter hereof (including the Prior Agreement) are hereby null and void and of no further

12

force or effect, and this Agreement shall supersede all other agreements, written or oral, that purport to govern the terms of Executive's employment (including Executive's compensation) with the Company or any of its Affiliates. Executive acknowledges and agrees that the Prior Agreement is hereby terminated and has been satisfied in full, as has any other employment agreement between Executive and the Company or any of its Affiliates. In entering into this Agreement, Executive expressly acknowledges and agrees that Executive has received all sums and compensation that Executive has been owed, is owed, or ever could be owed pursuant to the agreement(s) referenced in the previous sentence and for services provided to the Company and any of its Affiliates through the date that Executive signs this Agreement, with the exception of any unpaid base salary for the pay period that includes the date on which Executive signs this Agreement. Notwithstanding anything in the preceding provisions of this Section 16 to the contrary, the parties expressly acknowledge and agree that this Agreement does not supersede or replace, but instead complements and is in addition to, all equity compensation agreements between Executive and the Company or any of its Affiliates. This Agreement may be amended only by a written instrument executed by both parties hereto.

17. **Waiver of Breach**. Any waiver of this Agreement must be executed by the party to be bound by such waiver. No waiver by either party hereto of a breach of any provision of this Agreement by the other party, or of compliance with any condition or provision of this Agreement to be performed by such other party, will operate or be construed as a waiver of any subsequent breach by such other party or any similar or dissimilar provision or condition at the same or any subsequent time. The failure of either party hereto to take any action by reason of any breach will not deprive such party of the right to take action at any time while such breach continues.

18. **Assignment**. This Agreement is personal to Executive, and neither this Agreement nor any rights or obligations hereunder shall be assignable or otherwise transferred by Executive. The Company may assign this Agreement to any Affiliate or successor (whether by merger, purchase, or otherwise) to all or substantially all of the equity, assets, or businesses of the Company, if such Affiliate or successor expressly agrees to assume the obligations of the Company hereunder. For the avoidance of doubt, the Company may assign its rights and obligations hereunder to any successor or any of its Affiliates (including to EVA or any EVA subsidiary) including in conjunction with any corporate restructuring, simplification, or reorganization. In the event of any such assignment, the Company's assignee shall have all rights and obligations of, and shall be deemed to be, the "Company" hereunder.

19. **Affiliates**. For purposes of this Agreement, the term "<u>Affiliates</u>" is defined as any person or entity Controlling, Controlled by, or Under Common Control with the Company. The term "<u>Control</u>," including the correlative terms "<u>Controlling</u>," "<u>Controlled By</u>," and "<u>Under Common Control with</u>," means possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract, or otherwise) of a person or entity. For the purposes of the preceding sentence, Control shall be deemed to exist when a person or entity possesses, directly or indirectly, through one or more intermediaries (a) in the case of a corporation, more than 50% of the outstanding voting securities thereof, (b) in the case of a limited liability company, partnership, limited partnership, or joint venture, the right to more than 50% of the distributions therefrom (including liquidating distributions), or (c) in the case of any other person or entity, more than 50% of the economic or beneficial interest therein.

20. **Notices**. Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly received (a) when delivered in person, (b) on the first business day after such notice is sent by air express overnight courier service, or (c) on the third business day following deposit in the United States mail, registered or certified mail, return receipt requested, postage prepaid and addressed, in each case, to the following address, as applicable:

13

A2141

(1)   If to the Company, addressed to:

> Enviva Management Company, LLC
> 7272 Wisconsin Ave.
> Suite 1800
> Bethesda, MD 20814
> Attention: General Counsel

(2)   If to Executive, addressed to the most recent address the Company has in its employment records for Executive.

21.   **Counterparts**. This Agreement may be executed in any number of counterparts, including by facsimile or ".pdf" or similar electronic format, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument. Each counterpart may consist of a copy hereof containing multiple signature pages, each signed by one party, but together signed by both parties hereto.

22.   **Deemed Resignations**. Unless otherwise agreed to in writing by the Company and Executive prior to the termination of Executive's employment, any termination of Executive's employment shall constitute (a) an automatic resignation of Executive as an officer of the Company, EVA, and each other Affiliate of the Company, as applicable, (b) an automatic resignation of Executive from the board of directors (or similar governing body) of the Company, EVA, and each other Affiliate of the Company, as applicable, and (c) an automatic resignation from the board of directors or any similar governing body of any corporation, limited liability entity, or other entity in which the Company or any Affiliate holds an equity interest and with respect to which board or similar governing body Executive serves as the Company's or such Affiliate's designee or other representative (if applicable).

23.   **Effect of Termination**. The provisions of Sections 6(f), 7-12, 22, and 24 and those provisions necessary to interpret and enforce them, shall survive any termination of the employment relationship between Executive and the Company.

24.   **Third-Party Beneficiaries**. Each Affiliate of the Company shall be a third-party beneficiary of Executive's obligations under Sections 7, 8, 9, 10, and 22 and shall be entitled to enforce such obligations as if a party hereto.

25.   **Severability**. Subject to Section 9(e), if an arbitrator or court of competent jurisdiction determines that any provision of this Agreement (or part thereof) is invalid or unenforceable, then the invalidity or unenforceability of that provision (or part thereof) shall not affect the validity or enforceability of any other provision (or part thereof) of this Agreement, and all other provisions (or part thereof) shall remain in full force and effect.

26.   **Section 409A**. Notwithstanding any provision of this Agreement to the contrary, all provisions of this Agreement are intended to comply with Section 409A of the Internal Revenue Code of 1986, as amended, and the applicable Treasury regulations and administrative guidance issued thereunder (collectively, "Section 409A") or an exemption therefrom and shall be construed and administered in accordance with such intent. Any payments under this Agreement that may be excluded from Section 409A either as separation pay due to an involuntary separation from service or as a short-term deferral shall be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, each installment payment provided under this Agreement shall be treated as a separate payment. Notwithstanding any provision in this Agreement to the contrary, if any payment or benefit provided for herein would be subject to additional taxes and interest under Section 409A if Executive's receipt of such payment or benefit is not delayed until the earlier of (i) the date of Executive's death or (ii) the

14

date that is six months after the Termination Date (such date, the "Section 409A Payment Date"), then such payment or benefit shall not be provided to Executive (or Executive's estate, if applicable) until the Section 409A Payment Date. Notwithstanding the foregoing, the Company makes no representations that the payments and benefits provided under this Agreement are exempt from, or compliant with, Section 409A and in no event shall the Company or any of its Affiliates be liable for all or any portion of any taxes, penalties, interest, or other expenses that may be incurred by Executive on account of non-compliance with Section 409A.

[*The remainder of this page was left blank intentionally; the signature page follows.*]

15

**IN WITNESS WHEREOF**, Executive and the Company each have caused this Agreement to be executed in its name and on its behalf, effective for all purposes as provided above.

**EXECUTIVE**

Thomas Meth

**ENVIVA MANAGEMENT COMPANY**, LLC

By:

Roxanne B. Klein

Executive Vice President and Chief Human Resources Officer

Signature Page to
Sixth Amended and Restated
Employment Agreement
(Thomas Meth)

A2144

**EXHIBIT A**

**FORM OF RELEASE AGREEMENT**

This Release Agreement (this "Agreement") constitutes the release referred to in that certain Sixth Amended and Restated Employment Agreement (the "Employment Agreement") dated as of November 14, 2022, by and between Thomas Meth ("Executive") and Enviva Management Company, LLC (the "Company"). Capitalized terms used but not defined herein shall have the meanings assigned to them in the Employment Agreement.

(a)    For good and valuable consideration, including the Company's provision of certain severance payments (or a portion thereof) to Executive in accordance with Section 6(f)(ii) of the Employment Agreement, Executive hereby releases, discharges, and forever acquits (A) the Company, its subsidiaries and all of its other Affiliates, (B) EVA, its subsidiaries, and all of its other Affiliates, and (C) the past, present, and future stockholders, officers, members, partners, directors, managers, employees, agents, attorneys, heirs, representatives, successors, and assigns of the entities specified in clauses (A) and (B) above, in their personal and representative capacities (collectively, the "Company Parties"), from liability for, and hereby waives, any and all claims, damages, or causes of action of any kind related to Executive's employment with any Company Party, the termination of such employment, and any other acts or omissions related to any matter on or prior to the date of the execution of this Agreement including, without limitation, (1) any alleged violation through the date of this Agreement of: (i) the Age Discrimination in Employment Act of 1967, as amended (including as amended by the Older Workers Benefit Protection Act); (ii) Title VII of the Civil Rights Act of 1964, as amended; (iii) the Civil Rights Act of 1991; (iv) Sections 1981 through 1988 of Title 42 of the United States Code, as amended; (v) the Employee Retirement Income Security Act of 1974, as amended; (vi) the Immigration Reform Control Act, as amended; (vii) the Americans with Disabilities Act of 1990, as amended; (viii) the National Labor Relations Act, as amended; (ix) the Occupational Safety and Health Act, as amended; (x) the Family and Medical Leave Act of 1993; (xi) any federal, state, or local anti-discrimination law; (xii) any federal, state, or local wage and hour law; (xiii) any other local, state, or federal law, regulation, or ordinance; and (xiv) any public policy, contract, tort, or common law claim; (2) any allegation for costs, fees, or other expenses including attorneys' fees incurred in or with respect to a Released Claim; (3) any and all rights, benefits, or claims Executive may have under any employment contract, incentive compensation plan, or equity incentive plan with any Company Party or to any ownership interest in any Company Party except as expressly provided: (I) in Section 6(f)(ii) of the Employment Agreement; and (II) pursuant to the terms of any equity compensation agreement between Executive and a Company Party (including any Award Agreement (as defined in the LTIP) relating to an award granted to Executive pursuant to the LTIP), and (4) any claim for compensation or benefits of any kind not expressly set forth in the Employment Agreement or any equity compensation agreement (collectively, the "Released Claims"). In no event shall the Released Claims include (a) any claim that arises after the date Executive signs this Agreement, (b) any claim to vested benefits under an employee benefit plan or equity compensation plan, or (c) any claims for contractual payments under Section 5(a) or Section 6(f)(ii) of the Employment Agreement. This Agreement is not intended to indicate that any such claims exist or that, if they do exist, they are meritorious. Rather, Executive is simply agreeing that, in exchange for the consideration recited in the first sentence of this paragraph, any and all potential claims of this nature that Executive may have against the Company Parties, regardless of whether they actually exist, are expressly settled, compromised, and waived. By signing this Agreement, Executive is bound by it. Anyone who succeeds to Executive's rights and responsibilities, such as heirs or the executor of Executive's estate, is also bound by this Agreement. This release also applies to any claims brought by any person or agency or class action under which Executive may have a right or benefit. Notwithstanding the release of liability contained herein, nothing in this Agreement prevents Executive from filing any non-legally waivable claim (including a challenge to the

EXHIBIT A-1

A2145

validity of this Agreement) with the Equal Employment Opportunity Commission, National Labor Relations Board, Occupational Safety and Health Administration, Securities and Exchange Commission, Financial Industry Regulatory Authority (FINRA), or any other federal, state, or local governmental agency, authority, or commission (each, a "Governmental Agency") or participating in any investigation or proceeding conducted by any Governmental Agency. Executive understands that this Agreement does not limit Executive's ability to communicate with any Governmental Agency or otherwise participate in any investigation or proceeding that may be conducted by any Governmental Agency (including by providing documents or other information to a Governmental Agency) without notice to the Company or any other Company Party. This Agreement does not limit Executive's right to receive an award from a Governmental Agency for information provided to a Governmental Agency. **THIS RELEASE INCLUDES MATTERS ATTRIBUTABLE TO THE SOLE OR PARTIAL NEGLIGENCE (WHETHER GROSS OR SIMPLE) OR OTHER FAULT**, **INCLUDING STRICT LIABILITY**, **OF ANY OF THE COMPANY PARTIES.**

(b)    Executive agrees not to bring or join any lawsuit or arbitration proceeding against any of the Company Parties in any court relating to any of the Released Claims. Executive represents that Executive has not brought or joined any lawsuit or filed any charge or claim against any of the Company Parties in any court or before any government agency and has made no assignment of any rights Executive has asserted or may have against any of the Company Parties to any person or entity, in each case, with respect to any Released Claims.

(c)    By executing and delivering this Agreement, Executive acknowledges that:

(i)    Executive has carefully read this Agreement;

(ii)    Executive has had at least [twenty-one (21)] [forty-five (45)] days to consider this Agreement before the execution and delivery hereof to the Company [*to be added if 45 days applies*: , and Executive acknowledges that attached to this Agreement are (1) a list of the positions and ages of those employees selected for termination (or participation in the exit incentive or other employment termination program); (2) a list of the ages of those employees not selected for termination (or participation in such program); and (3) information about the unit affected by the employment termination program of which Executive's termination was a part, including any eligibility factors for such program and any time limits applicable to such program];

(iii)    Executive has been advised, and hereby is advised in writing, that Executive may, at Executive's option, discuss this Agreement with an attorney of Executive's choice and that Executive has had adequate opportunity to do so;

(iv)    Executive fully understands the final and binding effect of this Agreement; the only promises made to Executive to sign this Agreement are those stated in the Employment Agreement and herein; and Executive is signing this Agreement knowingly, voluntarily, and of Executive's own free will, and that Executive understands and agrees to each of the terms of this Agreement; and

(v)    With the exception of any sums that Executive may be owed pursuant to Section 6(f)(ii) of the Employment Agreement, Executive has been paid all wages and other compensation to which Executive is entitled under the Agreement and received all leaves (paid and unpaid) to which Executive was entitled during the period of Employee's employment with the Company.

EXHIBIT A-2

Notwithstanding the initial effectiveness of this Agreement, Executive may revoke the delivery (and therefore the effectiveness) of this Agreement within the seven-day period beginning on the date Executive delivers this Agreement to the Company (such seven-day period being referred to herein as the "Release Revocation Period"). To be effective, such revocation must be in writing signed by Executive and must be delivered to the General Counsel of the Company before 11:59 p.m., New York, New York time, on the last day of the Release Revocation Period. If an effective revocation is delivered in the foregoing manner and timeframe, this Agreement shall be of no force or effect and shall be null and void ab initio. No consideration shall be paid if this Agreement is revoked by Executive in the foregoing manner.

Executed on this _____ day of _____, ____.


Thomas Meth




EXHIBIT A-3

A2147

**SEPARATION AGREEMENT AND
GENERAL RELEASE OF CLAIMS**

This SEPARATION AGREEMENT AND GENERAL RELEASE OF CLAIMS (this "*Agreement*") is entered into as of November 14, 2022 (the "*Effective Date*") by and between Enviva Management Company, LLC, a Delaware limited liability company (the "*Company*"), and John K. Keppler ("*Employee*"). Employee and the Company are each referred to herein individually as a "*Party*" and collectively as the "*Parties*."

WHEREAS, reference is made to (i) the Sixth Amended and Restated Employment Agreement between the Parties made and entered into as of December 1, 2021 (the "*Employment Agreement*"); (ii) the Restricted Stock Unit Award Grant Notices and Restricted Stock Unit Award Agreements between Employee and Enviva Inc., a Delaware corporation ("*EVA*") executed and agreed to as of February 1, 2022, January 27, 2021, January 29, 2020 (vesting January 29, 2023) and January 29, 2020 (vesting January 29, 2024) (collectively, the "*RUAs*"); (iii) the Performance-Based Restricted Stock Unit Award Grant Notices and Performance-Based Restricted Stock Unit Award Agreements between Employee and Enviva executed and agreed to as of February 1, 2022, January 27, 2021, January 29, 2020 (with a performance period ending December 31, 2022) and January 29, 2020 (with a performance period ending December 31, 2023) (collectively, the "*PUAs*"); (iv) the Enviva Management Company, LLC Annual Incentive Compensation Plan (the "*AIC Plan*"); and (v) the Strategic Advisor Agreement between Employee and EVA effective as of November 15, 2022 (the "*Advisor Agreement*").

WHEREAS, Employee's employment with the Company will end on November 14, 2022;

WHEREAS, if Employee enters into this Agreement and satisfies the terms herein, then the Company will provide Employee with the separation benefits as set forth herein; and

WHEREAS, the Parties wish to resolve any and all claims that Employee has or may have against the Company or any of the other Company Parties (as defined below), including any claims that Employee may have arising out of Employee's employment or the end of such employment;

NOW, THEREFORE, in consideration of the promises set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Employee and the Company, the Parties hereby acknowledge and agree as follows:

1.    **Separation from Employment.**

(a)    Employee's employment with the Company will terminate on November 14, 2022 (the "*Separation Date*").

(b)    Employee's employment with the Company will end as of the Separation Date, and as of the Separation Date, Employee will have no further employment relationship with the Company or any other Company Party. The Parties further acknowledge and agree that, as of the Separation Date, Employee will automatically be deemed to have resigned, to the extent applicable from all officer and board positions as set forth in Section 22 of the Employment Agreement.

(c)    Employee will enter into the Advisor Agreement to be effective November 15, 2022. During the term of the Advisor Agreement, Employee will be a consultant and an

independent contractor. Nothing in the Advisor Agreement is intended to extend Employee's employment beyond the Separation Date.

**2.** **Severance Benefits**. Provided that (i) Employee executes this Agreement and returns a copy of this Agreement signed by Employee to the Company care of Roxanne B. Klein, Executive Vice President and Chief Human Resources Officer at 7272 Wisconsin Ave., Bethesda, MD 20814, or via e-mail at Roxanne.Klein@envivabiomass.com, so that it is received by Ms. Klein no later than December 14, 2022; and (ii) Employee abides by each of his commitments set forth herein; and (iii) Employee does not exercise his revocation right set forth in Section 6, then:

(a)    The Company shall provide Employee with the severance pay and benefits set forth in Sections 6(f)(ii)(A) through (C) of the Employment Agreement, with such pay and benefits being provided in the time and manner set forth in Sections 6(f)(ii)(A) through (C) of the Employment Agreement;

(b)    For the 2022 calendar year, Employee shall receive an Annual Bonus (as defined in the Employment Agreement) equal to the Actual Award (as defined in the AIC Plan) that he would have received pursuant to the AIC Plan for calendar year 2022 had he remained continuously employed by the Company through the payment of such Actual Award, which amount: (i) shall be based on target individual performance, and calculated by reference to Employee's Target Annual Bonus (as defined in the Employment Agreement) and take into account the final payout ratio for the Company for 2022, based on the Company's and its affiliates' actual performance in such calendar year relative to the applicable performance targets for such calendar year; (ii) shall be pro-rated by multiplying the amount in Section 2(b)(i) by a fraction, the numerator of which is 318 and the denominator of which is 365; and (iii) shall be paid no later than March 15, 2023.

Employee acknowledges and agrees that the consideration described in this Section 2 represents the entirety of the amounts Employee is eligible to receive as severance pay and benefits from the Company or any other Company Party.

**3.** **Satisfaction of All Leaves and Payment Amounts.** Employee expressly acknowledges and agrees that, as of the Signing Date, Employee has received all leaves (paid and unpaid) to which Employee has been entitled during Employee's employment with the Company or any other Company Party and Employee has received all wages, bonuses and other compensation, been provided all benefits and been afforded all rights, been reimbursed for all expenses, and been paid all sums that Employee is owed and has been owed by the Company or any other Company Party, and all payments arising out of all incentive plans and any other bonus or contractual arrangements. For the avoidance of doubt, Employee acknowledges and agrees that Employee has no right to the severance pay and benefits described in Section 2 above but for his entry into this Agreement and compliance with the terms herein, and Employee's receipt of the severance pay and benefits described in Section 2 above will fully and finally satisfy any and all rights that Employee has had, or could ever have, to severance pay or benefits from the Company or any other Company Party, including pursuant to Section 6 of the Employment Agreement.

**4.** **Complete Release of Claims**.

(a)    For good and valuable consideration, including the Company's agreement to provide the consideration described herein (and any part thereof), Employee hereby forever releases, discharges and acquits the Company, EVA, each of their respective parents, subsidiaries and other affiliates, and each of the foregoing entities' respective past, present and future subsidiaries, affiliates, stockholders, members, managers, partners, directors, officers,

2

A2149

employees, professional employer organizations, agents, attorneys, heirs, predecessors, successors and representatives, in their personal and representative capacities as well as all employee benefit plans maintained by the Company or any of its affiliates and all fiduciaries and administrators of any such plans, in their personal and representative capacities (collectively, the "***Company Parties***"), from liability for, and Employee hereby waives, any and all claims, damages, or causes of action of any kind related to Employee's employment or affiliation with any Company Party, the termination of such employment or affiliation, and any other acts or omissions related to any matter occurring or existing, whether known or unknown, on or prior to the time that Employee executes this Agreement, whether arising under federal or state laws or the laws of any other jurisdiction, including (i) any alleged violation through such time of: (A) any federal, state or local anti-discrimination or anti-retaliation law, including Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, and Sections 1981 through 1988 of Title 42 of the United States Code, the Americans with Disabilities Act of 1990; (B) the Employee Retirement Income Security Act of 1974 ("***ERISA***"); (C) the Immigration Reform Control Act; (D) the National Labor Relations Act; (E) the Occupational Safety and Health Act; (F) the Family and Medical Leave Act of 1993; (G) any law, regulation, or ordinance or orders under Maryland State law, the Maryland Equal Pay Act, and Title 20 of the State Government Article of the Maryland Annotated Code; (H) any other local, state or federal law, regulation, ordinance or orders which may have afforded any legal or equitable causes of action of any nature; or (I) any public policy, contract, tort, or common law claim, including any claim for defamation, emotional distress, wrongful termination, fraud or misrepresentation of any kind; (ii) any allegation for costs, fees, or other expenses including attorneys' fees incurred in, or with respect to, a Released Claim; (iii) any and all claims Employee may have under any employment contract (including the Employment Agreement and the Prior Agreement (as defined in the Employment Agreement)) or any other agreement, incentive or compensation plan or under any other benefit plan, program or practice, including any claim arising under or relating to the AIC Plan; (iv) any claim, whether direct or derivative, arising from, or relating to, Employee's status as a member or holder of any interest in any Company Party, including all claims arising from or relating to the RUAs and the PUAs, and (v) any claim for compensation, damages or benefits of any kind not expressly set forth in this Agreement (collectively, the "***Released Claims***"). This Agreement is not intended to indicate that any such claims exist or that, if they do exist, they are meritorious. Rather, Employee is simply agreeing that, in exchange for the consideration received by Employee through this Agreement, any and all potential claims of this nature that Employee may have against the Company Parties, regardless of whether they actually exist, are expressly settled, compromised and waived. **THIS RELEASE INCLUDES MATTERS ATTRIBUTABLE TO THE SOLE OR PARTIAL NEGLIGENCE (WHETHER GROSS OR SIMPLE) OR OTHER FAULT, INCLUDING STRICT LIABILITY, OF ANY OF THE COMPANY PARTIES**.

       (b)      Notwithstanding this release of liability, *nothing in this Agreement prevents Employee from filing any non-legally waivable claim, including a challenge to the validity of this Agreement, with the Equal Employment Opportunity Commission, National Labor Relations Board, Occupational Safety and Health Administration, or other federal, state or local governmental agency or commission (collectively "**Governmental Agencies**") or participating in (or cooperating with) any investigation or proceeding conducted by any Governmental Agency; however, Employee understands and agrees that, to the extent permitted by law, Employee is waiving any and all rights to recover any monetary or personal relief or recovery from a Company Party as a result of such Governmental Agency proceeding or subsequent legal actions*. Nothing herein waives Employee's right to receive an award for information provided to a Governmental Agency. Further, in no event shall the Released Claims include (i) any claim that arises after the date this Agreement is executed by Employee, (ii) any claim to enforce Employee's rights under this Agreement, or (iii) any claim to vested benefits under an employee benefit plan that is subject to ERISA. Nothing herein will prevent Employee from seeking workers' compensation or unemployment insurance benefits.

3

A2150

(c)     Employee represents and warrants that, as of the time Employee executes this Agreement, Employee has not brought or joined any lawsuit or filed any lawsuit, complaints, appeals, charges or claims against any of the Company Parties in any court or before any government agency or arbitrator for or with respect to a matter, claim or incident that occurred or arose out of one or more occurrences that took place on or prior to the time at which Employee signs this Agreement. Employee further represents and warrants that Employee has made no assignment, sale, delivery, transfer or conveyance of any rights Employee has asserted or may have against any of the Company Parties to any person or entity, in each case, with respect to any Released Claim. Employee also confirms that he has no known workplace injuries or occupational diseases.

**5.     Employee's Acknowledgements.** By executing and delivering this Agreement, Employee expressly acknowledges that:

(a)     Employee has carefully read this Agreement;

(b)     Employee has had sufficient time (and at least twenty-one (21) days) to consider this Agreement before the execution and delivery to Company, although Employee may, but is not required to, execute and deliver this Agreement as early as the Separation Date;

(c)     Employee has been advised, and hereby is advised in writing, to discuss this Agreement with an attorney of Employee's choice before signing this Agreement, and Employee has had adequate opportunity to do so prior to executing this Agreement;

(d)     the only matters relied upon by Employee and causing Employee to sign this Confirming Release are the provisions set forth in writing within this Agreement;

(e)     Employee fully understands the final and binding effect of this Agreement; the only promises made to Employee to sign this Agreement are those stated within this document; and Employee is signing this Agreement knowingly, voluntarily and of Employee's own free will, and that Employee understands and agrees to each of the terms of this Agreement; and

(f)     No Company Party has provided any tax or legal advice regarding this Agreement and Employee has had an adequate opportunity to receive sufficient tax and legal advice from advisors of Employee's own choosing such that Employee enters into this Agreement with full understanding of the tax and legal implications thereof.

**6.     Revocation Right.** Notwithstanding the initial effectiveness of this Agreement, Employee may revoke the delivery (and therefore the effectiveness) of this Agreement within the seven-day period beginning on the date Employee executes this Agreement (such seven-day period being referred to herein as the "*Release Revocation Period*"). To be effective, such revocation must be in writing signed by Employee and must be received by the Company care of Roxanne B. Klein, Executive Vice President and Chief Human Resources Officer at 7272 Wisconsin Ave., Bethesda, MD 20814, or via e-mail at Roxanne.Klein@envivabiomass.com, so that it is received by Ms. Klein no later than 11:59 p.m. Bethesda, Maryland time, on the last day of the Release Revocation Period. In the event Employee exercises his revocation right as set forth herein, the release in Section 4 will be of no force or effect and Employee will not be entitled to receive the consideration set forth in Section 2 of this Agreement but all other provisions of this Agreement shall remain in full force and effect.

**7.     Reaffirmation of Restrictive Covenants.** Employee acknowledges and agrees that, in connection with Employee's employment with the Company, Employee has obtained Confidential Information (as defined in the Employment Agreement), and that Employee has

4

continuing non-disclosure, non-competition, non-solicitation and intellectual property-related obligations to the Company and the other Company Parties pursuant to Sections 8 through 10 of the Employment Agreement (the "***Restrictive Covenants***"). In entering into this Agreement, Employee acknowledges the continued effectiveness and enforceability of the Restrictive Covenants and expressly reaffirms Employee's commitment to abide by, and promises to abide by, the terms of the Restrictive Covenants.

**8.**     <u>**No Waiver.**</u> No failure by any Party at any time to give notice of any breach by the other Party of, or to require compliance with, any condition or provision of this Agreement shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.

**9.**     <u>**Applicable Law; Dispute Resolution.**</u> This Agreement shall in all respects be construed according to the laws of the State of New York without regard to the conflict of law principles thereof. With respect to any claim or dispute related to or arising under this Agreement, the Parties hereby consent to the arbitration provisions in Section 11 of the Employment Agreement and recognize and agree that should any resort to a court be necessary and permitted under this Agreement, then they consent to the exclusive jurisdiction, forum, and venue of the state and federal courts located in New York, New York. **THE PARTIES EXPRESSLY ACKNOWLEDGE AND AGREE THAT THEY ARE KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVING THEIR RIGHTS TO A JURY TRIAL**.

**10.**     <u>**Severability and Modification.**</u> To the extent permitted by applicable law, the Parties agree that any term or provision of this Agreement (or part thereof) that renders such term or provision (or part thereof) or any other term or provision (or part thereof) of this Agreement invalid or unenforceable in any respect shall be severable and shall be modified or severed to the extent necessary to avoid rendering such term or provision (or part thereof) invalid or unenforceable, and such severance or modification shall be accomplished in the manner that most nearly preserves the benefit of the Parties' bargain hereunder.

**11.**     <u>**Withholding of Taxes and Other Deductions.**</u> The Company may, or may direct any other Company Party to, withhold from any payments made pursuant to this Agreement all federal, state, local, and other taxes and withholdings as may be required pursuant to any law or governmental regulation or ruling.

**12.**     <u>**Counterparts.**</u> This Agreement may be executed in one or more counterparts (including portable document format (.pdf) and facsimile counterparts), each of which shall be deemed to be an original, but all of which together will constitute one and the same agreement.

**13.**     <u>**Third-Party Beneficiaries; Affiliate Definition.**</u>

(a)     This Agreement shall be binding upon and inure to the benefit of the Company and each other Company Party, and Employee expressly acknowledges and agrees that each other Company Party shall be a third-party beneficiary of Employee's representations, warranties and releases set forth in this Agreement.

(b)     As used in this Agreement, the term "***affiliate***," as used with respect to a particular person or entity, shall mean any other person or entity that owns or controls, is owned or controlled by, or is under common ownership or control with, such person or entity.

**14.**     <u>**Amendment; Entire Agreement.**</u> This Agreement may not be changed orally but only by an agreement in writing agreed to and signed by Employee and the Company. This Agreement (and, as referenced herein, the Employment Agreement) constitute the entire agreement of the Parties with regard to the subject matter hereof; *provided, however*, this

5

A2152

Agreement and the Restrictive Covenants complement and are in addition to, and do not supersede or replace, any other obligations that Employee has to the Company, EVA, or any of their affiliates with respect to confidentiality or non-disclosure, return of property, non-competition, or non-solicitation, or the assignment of intellectual property.

15.     **Return of Property**. Employee represents and warrants that, as of the Separation Date and except to the extent reasonably required to perform his duties under the Advisor Agreement, Employee will have returned to the Company all property belonging to the Company or any other Company Party, including all computer files, electronically stored information and other materials provided to Employee by the Company or any other Company Party in the course of Employee's employment and Employee further represents and warrants that Employee will not maintain a copy of any such materials in any form.

16.     **Continued Cooperation**. Following the Separation Date, Employee will provide the Company and other Company Parties with assistance when reasonably requested, with respect to transitioning matters related to his job responsibilities and otherwise providing information relating to the duties he performed for the Company. In requesting and scheduling Employee's assistance pursuant to this Section 16, the Company shall take into consideration Employee's personal and professional obligations.

17.     **Further Assurances**. Employee shall, and shall cause his affiliates, representatives, and agents to, from time to time at the request of the Company and without any additional consideration, furnish the Company with such further information or assurances, execute and deliver such additional documents, instruments, and conveyances, and take such other actions and do such other things, as may be reasonably necessary or desirable, as determined in the sole discretion of the Company, to carry out the provisions of this Agreement or transition his responsibilities.

18.     **Section 409A**. Neither this Agreement nor any payment provided hereunder are intended to constitute "deferred compensation" subject to the requirements of Section 409A of the Internal Revenue Code of 1986 and the Treasury regulations and interpretive guidance issued thereunder (collectively, "***Section 409A***"), and this Agreement shall be construed and administered in accordance with such intent. Notwithstanding the foregoing, the Company makes no representations that the payments provided under this Agreement comply with or are exempt from the requirements of Section 409A and in no event shall the Company or any other Company Party be liable for all or any portion of any taxes, penalties, interest or other expenses that may be incurred by Employee on account of non-compliance with Section 409A.

19.     **Interpretation.** Titles and headings to Sections hereof are for the purpose of reference only and shall in no way limit, define or otherwise affect the provisions hereof. The word "or" as used herein is not exclusive and is deemed to have the meaning "and/or." The words "herein", "hereof", "hereunder" and other compounds of the word "here" shall refer to the entire Agreement and not to any particular provision hereof. All references herein to a law, agreement, instrument or other document shall be deemed to refer to such law, agreement, instrument or other document as amended, supplemented, modified and restated from time to time to the extent permitted by the provisions thereof. The use herein of the word "including" following any general statement, term or matter shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation", "but not limited to", or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that could reasonably fall within the broadest possible scope of such general statement, term or matter. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against any Party, whether under any rule of construction or otherwise. This Agreement has been reviewed by each of the Parties and shall be

6

construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of the Parties. The Confirming Release is incorporated by reference as if fully set forth herein.

[*Signatures begin on the following page*]

7

A2154

The Parties have executed this Agreement on the date(s) set forth beneath their signatures below, with this Agreement effective as of the Effective Date.

**ENVIVA MANAGEMENT COMPANY, LLC**

By:_____
Name:   Roxanne B. Klein

Title: Executive Vice President and Chief Human    Resources Officer

Date: <u>November 14, 2022</u>

**JOHN K. KEPPLER**

_____
John K. Keppler

Date: _____

A2155

**STRATEGIC ADVISOR AGREEMENT**

**THIS STRATEGIC ADVISOR AGREEMENT** (this "*Agreement*") is entered into as of November 14, 2022 but effective as of November 15, 2022 (the "*Effective Date*"), by and between **Enviva Inc.**, a Delaware corporation with a principal executive office at 7272 Wisconsin Ave., Suite 1800, Bethesda, MD 20814 ("*Enviva*"), and **John K. Keppler** (the "*Consultant*" and, together with Enviva, each a "*Party*" and collectively the "*Parties*").

**WHEREAS,** Enviva desires to retain Consultant and Consultant desires to provide certain consulting services to Enviva on the terms set forth herein.

**NOW, THEREFORE,** in consideration of the promises and mutual covenants contained herein, Enviva and Consultant agree as follows:

**1)      SERVICES**. Enviva hereby retains Consultant, and Consultant hereby agrees to provide, consulting services to Enviva as an independent contractor. During the Term (as defined below), as Enviva may reasonably request of Consultant from time to time but generally not more than eight hours per month, Consultant agrees to act as a strategic advisor by providing consultation and advice to Enviva and its chief executive officer (the "*Services*"). So that Enviva may properly communicate to Consultant its desired advice and consultation by Consultant, Consultant agrees to attend such meetings as Enviva may reasonably request. Consultant shall coordinate the furnishing of Services in such a way as to generally conform to Enviva's business schedule, but the method of performance, time of performance, place of performance, hours utilized in such performance, and any other details regarding the manner of performance of the Services shall be within Consultant's sole control.

**2)      INDEPENDENT CONTRACTOR**. At all times during the Term, Consultant shall be an independent contractor of Enviva. In no event shall Consultant be deemed to be an employee of Enviva or any of its affiliates, and Consultant shall not at any time be entitled to any employment rights or benefits from Enviva, or have any power to bind or commit Enviva or any of its affiliates, or otherwise act on their behalf. Consultant shall not at any time communicate or represent to any third party, or cause or knowingly permit any third party to assume, that in performing the Services hereunder, Consultant is an employee, agent, or other representative of Enviva or any of its affiliates, or has any authority to bind Enviva or its affiliates, or act on behalf of Enviva or its affiliates. It is not the purpose or intention of this Agreement or the Parties to create, and the same shall not be construed as creating, any partnership, joint venture, agency, or employment relationship.

**3)      TERM OF AGREEMENT**. Consultant's Services and appointment under this Agreement shall begin as of the Effective Date and shall expire on March 31, 2023 (the "*Initial Term*"); provided, however, unless this Agreement is terminated as set forth herein, the term of the Agreement will be automatically be extended month to month beginning at the end of the Initial Term (the Initial Term together with all such extensions, the "*Term*"). Either Party may, at its discretion, terminate this Agreement before the Term expires with written notice to the other Party, at which time Enviva shall pay Consultant for any Services provided up to the date of such termination. Consultant's obligations set forth in Sections 7-8 shall survive the termination or expiration of this Agreement for whatever reason.

**4)      PAYMENT OF FEES & EXPENSES**. In exchange for the Services, Enviva shall pay Consultant twenty-five thousand US dollars ($25,000) per month (the "*Monthly Fee*"), payable in advance for each month during which the Term is in effect (prorated for any partial month during the Term). The first such payment shall be made reasonably promptly following execution of this Agreement and any excess payment for a pro-rated month shall be reimbursed by Consultant to Enviva reasonably promptly following the end of the Term. Enviva shall reimburse Consultant for all reasonable and documented out-of-pocket expenses that Consultant actually incurs in performing Services (the "*Expenses*"). Enviva shall reimburse Consultant's Expenses according to Enviva policy, if Consultant

itemizes and provides proper supporting documentation for the Expenses within 20 days after each completed month.

**5)      TAXES, FEES, AND BENEFITS**. Because this Agreement creates an independent contractor relationship between the Parties, the Parties understand Enviva has no obligation to and will not withhold any state or federal income taxes, social security, or other taxes from payments to Consultant, nor shall it make any workers' compensation or unemployment benefit payments, contributions, or payroll tax payments on behalf of Consultant. Consultant agrees he shall not be eligible for or entitled to, participate in any of Enviva's, or any of its affiliates', benefit plans, retirement, or insurance coverage. Consultant also acknowledges and agrees that Enviva will issue a Form 1099 for all compensation paid to Consultant, and it is Consultant's obligation to report and pay all federal, state, and local income, payroll, and other taxes related to compensation earned under this Agreement and as may be required by law. Consultant shall be solely responsible for making all applicable tax filings and remittances with respect to amounts paid to Consultant pursuant to this Agreement and shall indemnify and hold harmless Enviva and its affiliates, and the foregoing entities' respective representatives, for all claims, damages, costs, and liabilities arising from Consultant's failure to do so.

**6)      CONFLICTS OF INTEREST**. Consultant may engage in non-profit, business, or commercial activities for other parties as a consultant, independent contractor, employee, or otherwise, during the Term. However, during the Term, Consultant shall not render any services on behalf of any person or entity other than for Enviva, or any of its affiliates, if such activities either: (a) prevent Consultant from performing the Services in accordance with this Agreement or would violate Sections 7 and 8; or (b) cause Consultant to breach any provision of this Agreement.

**7)      CONFIDENTIALITY**.

a)      Consultant understands that during Consultant's engagement with Enviva, Enviva may disclose to Consultant (intentionally or inadvertently), or Consultant may otherwise obtain, Confidential Information (as defined below) belonging to Enviva. Consultant agrees to keep the Confidential Information strictly confidential, and to use the Confidential Information only for the legitimate business purposes under this Agreement, and as Enviva may expressly authorize.

b)      Except to the extent the use or disclosure of any Confidential Information is required to perform the Services in accordance with this Agreement during the Term, Consultant agrees not to misappropriate, use either directly or indirectly, for Consultant's own benefit or for the benefit of any other person (other than Enviva), disclose to any third party, either directly or indirectly, or aid anyone else in disclosing to any third party, either directly or indirectly, in each case all or any part of any Confidential Information.

c)      The term "***Confidential Information***" means (1) any and all information or data of any nature whatsoever, including engineering, environmental, economic, financial, legal, regulatory, operational, commercial, marketing, and business information, projections, customer information, samples, data, technology, and designs, in each case that has been, or in the future is, provided by or on behalf of Enviva (including by Enviva's or its affiliates' employees, contractors, agents, or other representatives) to Consultant; (2) other information ascertained through discussions between the Parties concerning the Services (including discussions between Consultant and Enviva's, or its affiliates', employees, contractors, agents, or other representatives); (3) notes, analyses, compilations, studies, interpretations, memoranda, or other documentation prepared by Consultant to the extent containing, reflecting, or based upon any information otherwise constituting Confidential Information; (4) the existence of this Agreement and/or of any agreement relating to the Services, if applicable, and the fact that Confidential Information has been made available to Consultant and that any investigations, discussions, or negotiations have taken, or are taking, place between the Parties concerning the Services; and (5) the potential or actual terms with respect to the Services. Confidential Information also includes any information that Enviva obtains from another party or entity and

2

A2157

that Enviva treats or designates as confidential or proprietary information, regardless of whether Enviva either owned or developed such information.

**8)     RIGHTS TO MATERIAL/INFORMATION**. All Enviva records, files, memoranda, reports, pricing information, account/customer lists, plans, documents, equipment, and all other Enviva materials, documents, and data used, prepared, or collected by Consultant as part of Consultant's engagement with Enviva, in whatever form, will remain Enviva's property. Consultant understands and agrees that all Confidential Information that comes into Consultant's possession while Consultant is providing Services, whether prepared by the Consultant or others, is and will remain Enviva's property. Thus, Consultant agrees that Consultant will return to Enviva, as requested at any time (and, in any event, by the last day of the Term), all documents, written material, information, and any other property belonging to Enviva, in Consultant's possession or control, regardless of the manner in which such information is stored or maintained, including all originals, copies, and compilations of the information.

**9)     ASSIGNMENT, MODIFICATION, & ENTIRE AGREEMENT**. This Agreement is personal to Consultant and, as such, may not be assigned by Consultant. This Agreement may only be modified by the Parties in a writing signed by both Parties. This Agreement constitutes the entire agreement between the Parties and supersedes all prior and contemporaneous agreements, representations, and understandings of the Parties, whether in writing or orally made.

**10)     GOVERNING LAW, JURISDICTION, & WAIVER OF TRIAL BY JURY.** To the fullest extent permitted by applicable law, the Parties hereby irrevocably (a) submit to the exclusive jurisdiction of the state and federal courts sitting in the Borough of Manhattan, New York, NY, in respect of any suit, action, or proceeding arising out of or relating to this Agreement; (b) agree that all claims in respect of any such suit, action, or proceeding may be heard and determined in any such court; (c) waive any objection they may now or hereafter have to the laying of venue of any such suit, action, or proceeding brought in any such court, and any claim that any such suit, action, or proceeding brought in any such court has been brought in an inconvenient forum; and (d) **waive any right to trial by jury with respect to any action or proceeding arising out of or relating to this Agreement**.

**11)     SECURITIES LAW**. Consultant hereby acknowledges and agrees that Consultant is aware that United States securities laws prohibit any person who has material, non-public information concerning a publicly traded company from either purchasing or selling such company's securities, or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person would purchase or sell such securities. In addition, Consultant acknowledges and agrees, while in possession of material, non-public information concerning Enviva or any of its affiliates, not to purchase or sell Enviva's, or any of its affiliates', debt or equity securities and to refrain from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person would purchase or sell such securities.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first above written.

**Enviva Inc.**

By:_____                                         **Consultant**
Name: Jason E. Paral
Title: Senior Vice President, Deputy General Counsel, and        Signature: _____
Secretary                                                   Name: John K. Keppler

3

**EXHIBIT 21.1**

**LIST OF SUBSIDIARIES OF ENVIVA INC.**

| Subsidiary of Enviva Inc. | State of Incorporation |
|---|---|
| Enviva, LP | Delaware |
| Enviva Holdings, LP | Delaware |
| Enviva Pellets, LLC | Delaware |
| Enviva Pellets Greenwood, LLC | Delaware |
| Enviva Pellets Hamlet, LLC | Delaware |
| Enviva Pellets Lucedale, LLC | Delaware |
| Enviva Pellets Waycross, LLC | Delaware |
| Enviva Port of Pascagoula, LLC | Delaware |

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the following Registration Statements:

- 333-261986 on Form S-8; and
- 333-262240 on Form S-3

of our reports dated March 1, 2023, with respect to the consolidated financial statements and schedule of Enviva Inc. and subsidiaries and the effectiveness of internal control over financial reporting of Enviva Inc. and subsidiaries included in this Annual Report (Form 10-K) of Enviva Inc. for the year ended December 31, 2022.

/s/ Ernst & Young, LLP

Tysons, Virginia
March 1, 2023

A2160

**Certification of Principal Executive Officer**
**Pursuant to Rule 13a-14(a) or 15d-14(a)**
**of the Securities Exchange Act of 1934, as amended**

I, Thomas Meth, certify that:

1.    I have reviewed this annual report on Form 10-K for the year ended December 31, 2022 of Enviva Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements and other financial information included in this report fairly present, in all material respects, the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 1, 2023

/s/ Thomas Meth
Thomas Meth
*President and Chief Executive Officer*

A2161

**EXHIBIT 31.2**

**Certification of Principal Financial Officer**
**Pursuant to Rule 13a-14(a) or 15d-14(a)**
**of the Securities Exchange Act of 1934, as amended**

I, Shai S. Even, certify that:

1.   I have reviewed this annual report on Form 10-K for the year ended December 31, 2022 of Enviva Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements and other financial information included in this report fairly present, in all material respects, the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 1, 2023

/s/ Shai S. Even
Shai S. Even
*Executive Vice President and Chief Financial Officer of Enviva Inc.*
*(Principal Financial Officer)*

A2162

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of Enviva Inc. ("Enviva") for the year ended December 31, 2022 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Thomas Meth, President and Chief Executive Officer of Enviva, certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to his knowledge:

(1)  the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2)  the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Enviva.

/s/ Thomas Meth
Thomas Meth
President and Chief Executive Officer of Enviva Inc.

Date: March 1, 2023

A2163

**CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of Enviva Inc. ("Enviva") for the year ended December 31, 2022 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Shai S. Even, Executive Vice President and Chief Financial Officer of Enviva, certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to his knowledge:

(1)  the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2)  the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Enviva.


/s/ Shai S. Even
Shai S. Even
*Executive Vice President and Chief Financial Officer of Enviva Inc.*
*(Principal Financial Officer)*

Date: March 1, 2023

A2164