# EXHIBIT 28

A2506

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# Form 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended June 30, 2022**

**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from \_\_\_ to \_\_\_**

**Commission file number 001-37363**

# Enviva Inc.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **46-4097730** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **7272 Wisconsin Ave. Suite 1800 Bethesda, MD** | **20814** |
| (Address of principal executive offices) | (Zip code) |

**(301) 657-5560**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common Stock | EVA | New York Stock Exchange |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

As of July 29, 2022, 66,671,994 shares of common stock were outstanding.

A2507

**ENVIVA INC.**
**QUARTERLY REPORT ON FORM 10-Q**
**TABLE OF CONTENTS**

| | | |
|---|---|---:|
| Cautionary Statement Regarding Forward-Looking Statements | | 1 |
| Glossary of Terms | | 3 |
| PART I—FINANCIAL INFORMATION | | 4 |
| Item 1. | Financial Statements (unaudited) | 4 |
| | Condensed Consolidated Balance Sheets | 4 |
| | Condensed Consolidated Statements of Operations | 5 |
| | Condensed Consolidated Statements of Comprehensive Loss | 6 |
| | Condensed Consolidated Statements of Changes in Equity | 7 |
| | Condensed Consolidated Statements of Cash Flows | 9 |
| | Notes to Condensed Consolidated Financial Statements | 11 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 22 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 36 |
| Item 4. | Controls and Procedures | 36 |
| PART II—OTHER INFORMATION | | 37 |
| Item 1. | Legal Proceedings | 37 |
| Item 1A. | Risk Factors | 37 |
| Item 6. | Exhibits | 37 |

i

A2508

**CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS**

Certain statements and information in this Quarterly Report on Form 10-Q (this "Quarterly Report") may constitute "forward-looking statements." The words "believe," "expect," "anticipate," "plan," "intend," "foresee," "should," "would," "could," or other similar expressions are intended to identify forward-looking statements, which are generally not historical in nature. These forward-looking statements are based on our current expectations and beliefs concerning future developments and their potential effect on us. Although management believes that these forward-looking statements are reasonable as and when made, there can be no assurance that future developments affecting us will be those that we anticipate. All comments concerning our expectations for future revenues and operating results are based on our forecasts of our existing operations and do not include the potential impact of any future acquisitions. Our forward-looking statements involve significant risks and uncertainties (some of which are beyond our control) and assumptions that could cause actual results to differ materially from those in our historical experience and our present expectations or projections. Factors that could cause our actual results to differ materially from those in the forward-looking statements include, but are not limited to, those summarized below:

- the volume and quality of products that we are able to produce or source and sell, which could be adversely affected by, among other things, operating or technical difficulties at our wood pellet production plants or deep-water marine terminals;

- the prices at which we are able to sell our products;

- failure of our customers, vendors, and shipping partners to pay or perform their contractual obligations to us;

- our inability to successfully execute our project development, capacity expansion, and new facility construction activities on time and within budget;

- the creditworthiness of our contract counterparties;

- the amount of low-cost wood fiber that we are able to procure and process, which could be adversely affected by, among other things, disruptions in supply or operating or financial difficulties suffered by our suppliers;

- our ability to successfully negotiate, complete, and integrate third-party acquisitions, or to realize the anticipated benefits of such acquisitions;

- changes in the price and availability of natural gas, coal, diesel, oil, gasoline, or other sources of energy;

- changes in prevailing domestic and global economic, political, and market conditions, including the imposition of tariffs or trade or other economic sanctions, political instability or armed conflict, rising inflation levels and government efforts to reduce inflation, or a prolonged recession;

- inclement or hazardous environmental conditions, including extreme precipitation, temperatures, and flooding;

- fires, explosions, or other accidents;

- changes in domestic and foreign laws and regulations (or the interpretation thereof) related to renewable or low-carbon energy, the forestry products industry, the international shipping industry, or power, heat, or combined heat and power generators;

- changes in domestic and foreign tax laws and regulations affecting the taxation of our business, and investors;

- changes in the regulatory treatment of biomass in core and emerging markets;

- our inability to acquire or maintain necessary permits or rights for our production, transportation, or terminaling operations;

- changes in the price and availability of transportation;

- changes in foreign currency exchange or interest rates and the failure of our hedging arrangements to effectively reduce our exposure to related risks;

- risks related to our indebtedness, including the levels, and maturity date of such indebtedness;

- our failure to maintain effective quality control systems at our wood pellet production plants and deep-water marine terminals, which could lead to the rejection of our products by our customers;

- changes in the quality specifications for our products required by our customers;

1

A2509

- labor disputes, unionization, or similar collective actions;

- our inability to hire, train, or retain qualified personnel to manage and operate our business and newly acquired assets;

- the possibility of cyber and malware attacks;

- our inability to borrow funds and access capital markets; and

- viral contagions or pandemic diseases, such as COVID-19.

Please read the risks described in our Annual Report on Form 10-K for the year ended December 31, 2021 and the risk factors included herein in Item 1A. Risk Factors. All forward-looking statements in this Quarterly Report are expressly qualified in their entirety by the foregoing cautionary statements.

Readers are cautioned not to place undue reliance on forward-looking statements and we undertake no obligation to update or revise any such statements after the date they are made, whether as a result of new information, future events or otherwise.

A2510

**GLOSSARY OF TERMS**

*biomass:* any organic biological material derived from living organisms that stores energy from the sun.

*co-fire:* the combustion of two different types of materials at the same time. For example, biomass is sometimes fired in combination with coal in existing coal plants.

*cost pass-through mechanism:* a provision in commercial contracts that passes costs through to the purchaser.

*metric ton:* one metric ton, which is equivalent to 1,000 kilograms and 1.1023 short tons.

*nameplate:* the intended full-load sustained maximum rated output of production.

*off-take contract:* an agreement concerning the purchase and sale of a certain volume of future production of a given resource such as wood pellets.

*ramp:* the process by which a plant increases production following startup for a period of time until full nameplate production capacity is demonstrated.

*utility-grade wood pellets:* wood pellets meeting minimum requirements generally specified by industrial consumers and produced and sold in sufficient quantities to satisfy industrial-scale consumption.

*wood fiber:* cellulosic elements that are extracted from trees and used to make various materials, including paper. In North America, wood fiber is primarily extracted from hardwood (deciduous) trees and softwood (coniferous) trees.

*wood pellets:* energy-dense, low-moisture, and uniformly sized units of wood fuel produced from processing various wood resources or byproducts.

3

A2511

## PART I—FINANCIAL INFORMATION

**Item 1. Financial Statements**

### ENVIVA INC. AND SUBSIDIARIES
**Condensed Consolidated Balance Sheets**
**(In thousands, except par value and number of shares)**

|  | June 30, 2022 | December 31, 2021 |
|---|---:|---:|
|  | (Unaudited) |  |
| **Assets** |  |  |
| Current assets: |  |  |
| Cash and cash equivalents | $ 12,700 | $ 16,801 |
| Restricted cash | 156 | 1,717 |
| Accounts receivable, net | 124,429 | 97,439 |
| Other accounts receivable | 4,466 | 17,826 |
| Inventories | 74,347 | 57,717 |
| Prepaid expenses and other current assets | 10,763 | 7,230 |
| Total current assets | 226,861 | 198,730 |
| Property, plant, and equipment, net | 1,551,762 | 1,498,197 |
| Operating lease right-of-use assets | 105,028 | 108,846 |
| Goodwill | 103,928 | 103,928 |
| Long-term restricted cash | 35,600 | — |
| Other long-term assets | 32,953 | 14,446 |
| Total assets | $ 2,056,132 | $ 1,924,147 |
| **Liabilities and Equity** |  |  |
| Current liabilities: |  |  |
| Accounts payable | $ 20,463 | $ 29,535 |
| Accrued and other current liabilities | 153,630 | 163,306 |
| Current portion of interest payable | 23,936 | 25,060 |
| Current portion of long-term debt and finance lease obligations | 37,284 | 39,105 |
| Total current liabilities | 235,313 | 257,006 |
| Long-term debt and finance lease obligations | 1,219,721 | 1,232,441 |
| Long-term operating lease liabilities | 118,622 | 122,252 |
| Deferred tax liabilities, net | 32 | 36 |
| Other long-term liabilities | 48,674 | 41,748 |
| Total liabilities | 1,622,362 | 1,653,483 |
| Commitments and contingencies |  |  |
| Equity: |  |  |
| Preferred stock, $0.001 par value, 100,000,000 shares authorized, none issued and outstanding at June 30, 2022 and December 31, 2021 | — | — |
| Common stock, $0.001 par value, 600,000,000 shares authorized, 66,671,944 and 61,137,744 issued and outstanding at June 30, 2022 and December 31, 2021, respectively | 67 | 61 |
| Additional paid-in capital | 553,852 | 317,998 |
| Accumulated deficit | (72,644) | — |
| Accumulated other comprehensive income | 194 | 299 |
| Total Enviva Inc.'s equity | 481,469 | 318,358 |
| Noncontrolling interests | (47,699) | (47,694) |
| Total equity | 433,770 | 270,664 |
| Total liabilities and equity | $ 2,056,132 | $ 1,924,147 |

See accompanying notes to condensed consolidated financial statements.

4

A2512

**ENVIVA INC. AND SUBSIDIARIES**
**Condensed Consolidated Statements of Operations**
**(In thousands, except shares or units, per share or per unit amounts)**
**(Unaudited)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 (Recast) | 2022 | 2021 (Recast) |
| Product sales | $ 293,615 | $ 271,242 | $ 524,527 | $ 495,772 |
| Other revenue | 2,706 | 14,721 | 4,776 | 31,812 |
| Net revenue | 296,321 | 285,963 | 529,303 | 527,584 |
| Operating costs and expenses: | | | | |
| Cost of goods sold, excluding items below | 250,276 | 234,564 | 461,312 | 432,266 |
| Loss on disposal of assets | 2,282 | 1,701 | 3,183 | 3,345 |
| Selling, general, administrative, and development expenses | 27,704 | 34,548 | 61,395 | 65,890 |
| Depreciation and amortization | 28,833 | 23,179 | 51,392 | 44,700 |
| Total operating costs and expenses | 309,095 | 293,992 | 577,282 | 546,201 |
| Loss from operations | (12,774) | (8,029) | (47,979) | (18,617) |
| Other (expense) income: | | | | |
| Interest expense | (13,959) | (17,481) | (23,929) | (30,858) |
| Other (expense) income, net | (611) | 399 | (727) | 508 |
| Total other expense, net | (14,570) | (17,082) | (24,656) | (30,350) |
| Net loss before income tax (benefit) expense | (27,344) | (25,111) | (72,635) | (48,967) |
| Income tax (benefit) expense | (2) | (260) | 14 | (941) |
| Net loss | (27,342) | (24,851) | (72,649) | (48,026) |
| Less net loss attributable to noncontrolling interests | 5 | 3,519 | 5 | 10,823 |
| Net loss attributable to Enviva Inc. | $ (27,337) | $ (21,332) | $ (72,644) | $ (37,203) |
| Net loss per Enviva Inc. common share or unit:[1] | | | | |
| Basic and diluted | $ (0.42) | $ (1.33) | $ (1.13) | $ (2.33) |
| Weighted-average number of shares or units outstanding: | | | | |
| Basic and diluted | 66,604 | 16,000 | 65,820 | 16,000 |

[1] Effective December 31, 2021, units were converted into shares due to the Company's conversion from a partnership to a corporation.

See accompanying notes to condensed consolidated financial statements.

5

A2513

**ENVIVA INC. AND SUBSIDIARIES**
**Condensed Consolidated Statements of Comprehensive Loss**
**(In thousands)**
**(Unaudited)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 (Recast) | 2022 | 2021 (Recast) |
| Net loss | $ (27,342) | $ (24,851) | $ (72,649) | $ (48,026) |
| Other comprehensive loss, net of tax of $0: | | | | |
|   Currency translation adjustment | (73) | 1 | (105) | 16 |
| Total comprehensive loss | (27,415) | (24,850) | (72,754) | (48,010) |
| Less comprehensive loss attributable to noncontrolling interests | 5 | 3,519 | 5 | 10,823 |
| Comprehensive loss attributable to Enviva Inc. | $ (27,410) | $ (21,331) | $ (72,749) | $ (37,187) |

See accompanying notes to condensed consolidated financial statements.

6

A2514

**ENVIVA INC. AND SUBSIDIARIES**
**Condensed Consolidated Statements of Changes in Equity**
**(In thousands, except per share amounts and Series B Units)**
**(Unaudited)**

| | Common Shares | | Additional Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive Income | Equity Attributable to Enviva Inc. | Noncontrolling Interests | Total Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | | |
| Equity, December 31, 2021 | 61,138 $ | 61 $ | 317,998 $ | — $ | 299 $ | 318,358 $ | (47,694) $ | 270,664 |
| Issuance of common shares, net | 4,945 | 5 | 333,186 | — | — | 333,191 | — | 333,191 |
| Dividends declared ($0.860 per share) | — | — | (58,957) | — | — | (58,957) | — | (58,957) |
| Common shares issued in lieu of dividends | 110 | — | 7,839 | — | — | 7,839 | — | 7,839 |
| Payments for withholding tax and number of units issued associated with Long-Term Incentive Plan vesting | 366 | 1 | (16,365) | — | — | (16,364) | — | (16,364) |
| Non-cash equity-based compensation and other expense | — | — | 10,235 | — | — | 10,235 | — | 10,235 |
| Other comprehensive loss | — | — | — | — | (32) | (32) | — | (32) |
| Net loss | — | — | — | (45,307) | — | (45,307) | — | (45,307) |
| Equity, March 31, 2022 | 66,559 $ | 67 $ | 593,936 $ | (45,307) $ | 267 $ | 548,963 $ | (47,694) $ | 501,269 |
| Dividends declared ($0.905 per share) | — | — | (61,837) | — | — | (61,837) | — | (61,837) |
| Issuance of common shares, net | — | — | (428) | — | — | (428) | — | (428) |
| Common shares issued in lieu of dividends | 105 | — | 8,349 | — | — | 8,349 | — | 8,349 |
| Payments for withholding tax and number of units issued associated with Long-Term Incentive Plan vesting | 8 | — | (213) | — | — | (213) | — | (213) |
| Non-cash equity-based compensation and other expense | — | — | 9,848 | — | — | 9,848 | — | 9,848 |
| Support Payments | — | — | 4,197 | — | — | 4,197 | — | 4,197 |
| Other comprehensive loss | — | — | — | — | (73) | (73) | — | (73) |
| Net loss | — | — | — | (27,337) | — | (27,337) | (5) | (27,342) |
| Equity, June 30, 2022 | 66,672 $ | 67 $ | 553,852 $ | (72,644) $ | 194 $ | 481,469 $ | (47,699) $ | 433,770 |

See accompanying notes to condensed consolidated financial statements.

7

A2515

**ENVIVA INC. AND SUBSIDIARIES**
**Condensed Consolidated Statements of Changes in Equity**
**(In thousands, except per share amounts and Series B Units)**
**(Unaudited)**

| | Series A | | Series B | | Equity Attributable to Enviva Inc. | Noncontrolling Interests | Total Equity |
|---|---|---|---|---|---|---|---|
| | Units | Amount | Units | Amount | | | |
| Equity, December 31, 2020 | 784,980 $ | (92,703) | 2,500 $ | 13,865 | $ (78,838) $ | 488,498 $ | 409,660 |
| Acquisition of noncontrolling interest | — | (45,317) | — | — | (45,317) | (108,031) | (153,348) |
| Cash distributions | — | — | — | — | — | (22,238) | (22,238) |
| Non-cash equity-based compensation and other expense, net of payments for withholding tax associated with Long-Term Incentive Plan vesting | — | — | — | 2,404 | 2,404 | (3,294) | (890) |
| Contribution of assets | — | — | — | — | — | 389 | 389 |
| Other comprehensive income | — | 8 | — | — | 8 | 7 | 15 |
| Net loss | — | (15,871) | — | — | (15,871) | (7,304) | (23,175) |
| Equity, March 31, 2021 | 784,980 $ | (153,883) | 2,500 $ | 16,269 | $ (137,614) $ | 348,027 $ | 210,413 |
| Acquisition of noncontrolling interest | — | (107) | — | — | (107) | 107 | — |
| Issuance of Enviva Partners, LP common units, net | — | — | — | — | — | 214,534 | 214,534 |
| Cash distributions | — | — | — | — | — | (22,229) | (22,229) |
| Non-cash equity-based compensation and other expense, net of payments for withholding tax associated with Long-Term Incentive Plan vesting | — | — | — | 2,404 | 2,404 | 2,408 | 4,812 |
| Other comprehensive income | — | — | — | — | — | 1 | 1 |
| Net loss | — | (21,332) | — | — | (21,332) | (3,519) | (24,851) |
| Equity, June 30, 2021 | 784,980 $ | (175,322) | 2,500 $ | 18,673 | $ (156,649) $ | 539,329 $ | 382,680 |

See accompanying notes to condensed consolidated financial statements.

8

A2516

**ENVIVA INC. AND SUBSIDIARIES**
**Condensed Consolidated Statements of Cash Flows**
**(In thousands)**
**(Unaudited)**

| | | Six Months Ended June 30, | |
|---|---|---|---|
| | | 2022 | 2021 (Recast) |
| Cash flows from operating activities: | | | |
| Net loss | $ | (72,649) | $ (48,026) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation and amortization | | 51,392 | 45,031 |
| Amortization of debt issuance costs, debt premium, and original issue discounts | | 1,260 | 1,704 |
| Loss on disposal of assets | | 3,183 | 3,348 |
| Deferred taxes | | — | (964) |
| Non-cash equity-based compensation and other expense | | 20,023 | 15,192 |
| Fair value changes in derivatives | | 4,519 | 2,797 |
| Unrealized (gain) loss on foreign currency transactions, net | | (95) | 27 |
| Change in operating assets and liabilities: | | | |
| Accounts and other receivables | | (13,573) | 52,608 |
| Prepaid expenses and other current and long-term assets | | (21,687) | 1,111 |
| Inventories | | (14,399) | (9,496) |
| Derivatives | | (3,983) | (2,072) |
| Accounts payable, accrued liabilities, and other current liabilities | | (10,852) | (1,778) |
| Related-party payables | | — | 114 |
| Deferred revenue | | (178) | (3,916) |
| Accrued interest | | (1,123) | 1,722 |
| Operating lease liabilities | | (7,205) | (3,413) |
| Other long-term liabilities | | (3,524) | 8,182 |
| Net cash (used in) provided by operating activities | | (68,891) | 62,171 |
| Cash flows from investing activities: | | | |
| Purchases of property, plant, and equipment | | (97,405) | (153,983) |
| Payment for acquisition of a business | | (5,000) | — |
| Net cash used in investing activities | | (102,405) | (153,983) |
| Cash flows from financing activities: | | | |
| Proceeds (principal payments) from (on) senior secured revolving credit facility, net | | (36,000) | (120,000) |
| Proceeds from debt issuance | | 31,270 | 321,750 |
| Proceeds from capital contribution of New Market Tax Credit financing | | 12,763 | — |
| Support payments | | 4,197 | — |
| Principal payments on other long-term debt and finance lease obligations | | (16,474) | (12,685) |
| Cash paid related to debt issuance costs and deferred offering costs | | (5,308) | (7,854) |
| Proceeds from issuance of Enviva Inc. common shares, net | | 333,009 | 214,865 |
| Payments for acquisition of noncontrolling interest in Development JV | | — | (130,143) |
| Principal payments on related-party note payable | | — | (20,000) |
| Cash dividends or distributions and equivalent rights | | (105,646) | (44,980) |
| Payment for withholding tax associated with Long-Term Incentive Plan vesting | | (16,577) | (10,554) |
| Net cash provided by financing activities | | 201,234 | 190,399 |
| Net increase in cash, cash equivalents, and restricted cash | | 29,938 | 98,587 |
| Cash, cash equivalents, and restricted cash, beginning of period | | 18,518 | 67,675 |
| Cash, cash equivalents, and restricted cash, end of period | $ | 48,456 | $ 166,262 |

See accompanying notes to condensed consolidated financial statements.

9

A2517

**ENVIVA INC. AND SUBSIDIARIES**
**Consolidated Statements of Cash Flows (Continued)**
**(In thousands)**
**(Unaudited)**

|  | Six Months Ended June 30, | |
|  | 2022 | 2021 (Recast) |
|---|---|---|
| Non-cash investing and financing activities: | | |
| Property, plant, and equipment acquired included in accounts payable and accrued liabilities | $ 12,843 | $ 24,962 |
| Supplemental information: | | |
| Interest paid, net of capitalized interest | $ 23,432 | $ 31,483 |

See accompanying notes to condensed consolidated financial statements.

10

A2518

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

### (1) Description of Business and Basis of Presentation

Enviva Inc. supplies utility-grade wood pellets primarily to major power generators under long-term, take-or-pay off-take contracts. We procure wood fiber and process it into utility-grade wood pellets and load the finished wood pellets into railcars, trucks, and barges for transportation to deep-water marine terminals, where they are received, stored, and ultimately loaded onto oceangoing vessels for delivery under long-term, take-or-pay off-take contracts to our customers principally in the United Kingdom (the "U.K."), the European Union (the "EU"), and Japan.

We own and operate ten industrial-scale wood pellet production plants located in the Southeastern United States. In addition to the volumes from our plants, we also procure wood pellets from third parties. Wood pellets are exported from our wholly owned deep-water marine terminal at the Port of Chesapeake, Virginia, terminal assets at the Port of Wilmington, North Carolina and at the Port of Pascagoula, Mississippi, and from third-party deep-water marine terminals in Mobile, Alabama, Panama City, Florida, and Savannah, Georgia under a short-term contract, a long-term contract, and a lease and associated terminal services agreement, respectively.

**Basis of Presentation**

The unaudited financial statements and notes have been prepared in accordance with accounting principles generally accepted in the United States ("GAAP") for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X of the Securities Exchange Act of 1934, as amended. Accordingly, they do not include all of the information and notes required by GAAP for complete financial statements.

In the opinion of management, all adjustments and accruals necessary for a fair presentation have been included. All such adjustments and accruals are of a normal and recurring nature unless disclosed otherwise. Our consolidated financial statements include the accounts of Enviva and its wholly owned subsidiaries and controlled subsidiaries, including variable interest entities in which we are the primary beneficiary as we have the sole power to direct the activities that most impact the economics of the variable interest entities. All intercompany balances and transactions have been eliminated in consolidation. The results reported in the financial statements are not necessarily indicative of the results that may be reported for the entire year.

The unaudited financial statements and notes should be read in conjunction with the audited financial statements and notes included in our Annual Report on Form 10-K for the year ended December 31, 2021, which include the names of legal entities that are our subsidiaries and which also include defined terms used in the unaudited financial statements.

*C-Corporation Conversion*

Effective December 31, 2021, Enviva Partners, LP (the "Partnership") converted from a Delaware limited partnership to a Delaware corporation (the "Conversion") named "Enviva Inc." The Partnership was a subsidiary of Enviva Holdings, LP (our "former sponsor" or "Holdings"). Enviva Partners GP, LLC, a wholly owned subsidiary of our former sponsor, was our former general partner (the "former GP"). References to "Enviva," the "Company," "we," "us," or "our" refer to (i) Enviva Inc. and its subsidiaries for the periods following the Conversion and (ii) the Partnership and its subsidiaries for periods prior to the Conversion, except where the context otherwise requires.

As a result of the Conversion, periods prior to December 31, 2021 reflect Enviva as a limited partnership, not a corporation. References to common units for periods prior to the Conversion refer to common units of the Partnership, and references to common stock for periods following the Conversion refer to shares of common stock of Enviva Inc. The primary financial impacts of the Conversion to the consolidated financial statements were (i) reclassification of partnership capital accounts to equity accounts reflective of a corporation and (ii) income tax effects. On the date of the Conversion, each common unit representing a limited partner interest in the Partnership issued and outstanding immediately prior to the Conversion was exchanged for one share of common stock of the Company, par value $0.001 per share.

*Simplification Transaction*

On October 14, 2021, the Partnership acquired our former sponsor and the former GP, and the incentive distribution rights held by our former sponsor were cancelled and eliminated (collectively, the "Simplification Transaction") in exchange for 16.0 million common units, which were distributed to the owners of our former sponsor. The owners of our former sponsor agreed to reinvest in our common stock all dividends from 9.0 million of the 16.0 million common units issued in connection with the Simplification Transaction during the period beginning with dividends paid for the third quarter of 2021 through the fourth quarter of 2024.

A2519

**ENVIVA INC. AND SUBSIDIARIES**
**Notes to Condensed Consolidated Financial Statements (Continued)**
**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

**(2) Significant Accounting Policies**

During interim periods, we follow the accounting policies disclosed in our Annual Report on Form 10-K for the year ended December 31, 2021, except as follows due to new facts and circumstances applicable to 2022.

*Non-Cash Equity-Based Compensation Expense*

During the three and six months ended June 30, 2022, the performance-based restricted stock awards granted vest dependent on the total shareholder return for Enviva Inc. relative to the constituents of the S&P 500 index over their respective performance periods. Their grant date fair values were determined using a Monte Carlo multivariate pricing model following standard assumptions.

*Net Loss per Enviva Inc. Common Share*

For the three and six months ended June 30, 2022, the net loss per Enviva Inc. common share was computed by dividing the net loss attributable to Enviva Inc., after reducing it by the amounts paid for dividend equivalent rights on outstanding time-based restricted stock awards, by the weighted-average number of outstanding Enviva Inc. common shares.

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make judgments, estimates, and assumptions that affect the amounts reported in our consolidated financial statements and accompanying notes. Actual results could differ materially from those estimates.

*Recently Issued Accounting Standards not yet Adopted*

Currently, there are no recently issued accounting standards not yet adopted by us that we expect to be reasonably likely to materially impact our financial position, results of operations, or cash flows.

**(3) Transactions Between Entities Under Common Control**

*Recast of Historical Financial Statements*

The Simplification Transaction was a business combination of entities under common control and net assets acquired were combined at their historical costs with a change in reporting entity. Accordingly, the condensed consolidated financial statements have been retroactively recast to reflect the Simplification Transaction as if the Simplification Transaction had occurred on March 18, 2010, the date Holdings was originally organized. While the Partnership was the surviving entity for legal purposes, Holdings is the surviving entity for accounting purposes. As a result, the historical financial results prior to the Simplification Transaction are those of Holdings. Prior to the Simplification Transaction, Holdings controlled the Partnership so the financial statements of the Partnership were consolidated into the financial statements of Holdings and the common units of the Partnership held by the public are reflected as a noncontrolling interest.

A2520

**ENVIVA INC. AND SUBSIDIARIES**

Notes to Condensed Consolidated Financial Statements (Continued)

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

The following table presents changes as a result of the Simplification Transaction for the common control entities acquired to previously reported amounts in the unaudited condensed consolidated balance sheet as of June 30, 2021 included in Enviva's quarterly report on Form 10-Q for the quarter ended June 30, 2021:

| | As Reported | Common Control Entities Acquired | Total (Recast) |
|---|---|---|---|
| | As of June 30, 2021 | | |
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 42,901 | $ 121,800 | $ 164,701 |
| Restricted cash | — | 1,561 | 1,561 |
| Accounts receivable | 74,398 | — | 74,398 |
| Other accounts receivable | — | 12,296 | 12,296 |
| Inventories | 47,662 | 4,056 | 51,718 |
| Prepaid expenses and other current assets | 13,501 | (6,782) | 6,719 |
| Total current assets | 178,462 | 132,931 | 311,393 |
| Property, plant, and equipment, net | 1,114,521 | 260,779 | 1,375,300 |
| Operating lease right-of-use assets | 49,539 | 60,176 | 109,715 |
| Goodwill | 99,660 | — | 99,660 |
| Other long-term assets | 10,526 | 2,232 | 12,758 |
| Total assets | $ 1,452,708 | $ 456,118 | $ 1,908,826 |
| **Liabilities and Equity** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 28,041 | $ 12,185 | $ 40,226 |
| Related-party payables, net | 4,581 | (4,581) | — |
| Accrued and other current liabilities | 99,342 | 47,682 | 147,024 |
| Current portion of interest payable | 23,966 | 827 | 24,793 |
| Current portion of long-term debt and finance lease obligations | 12,056 | 1,349 | 13,405 |
| Related-party note and interest payable | — | 23,731 | 23,731 |
| Total current liabilities | 167,986 | 81,193 | 249,179 |
| Long-term debt and finance lease obligations | 789,451 | 310,061 | 1,099,512 |
| Long-term operating lease liabilities | 48,368 | 66,468 | 114,836 |
| Deferred tax liabilities, net | 13,224 | 11,030 | 24,254 |
| Other long-term liabilities | 13,154 | 25,211 | 38,365 |
| Total liabilities | 1,032,183 | 493,963 | 1,526,146 |
| Commitments and contingencies | | | |
| Total equity | 420,525 | (37,845) | 382,680 |
| Total liabilities and equity | $ 1,452,708 | $ 456,118 | $ 1,908,826 |

The recast unaudited interim condensed consolidated balance sheet resulting from the Simplification Transaction separately presents "Other accounts receivable," which included some amounts that had been previously reported as "Prepaid expenses and other current assets."

13

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

The following tables present the changes as a result of the Simplification Transaction to previously reported amounts in the unaudited interim condensed consolidated statements of operations for the three and six months ended June 30, 2021 included in Enviva's quarterly report on Form 10-Q for the quarter ended June 30, 2021:

| | Three Months Ended June 30, 2021 | | |
| --- | --- | --- | --- |
| | As Reported | Common Control Entities Acquired | Total (Recast) |
| Net revenue | $ 285,042 | $ 921 | $ 285,963 |
| Income (loss) from operations | 15,481 | (23,510) | (8,029) |
| Net income (loss) | 2,645 | (27,496) | (24,851) |
| Less net (income) loss attributable to noncontrolling interests | (57) | 3,576 | 3,519 |
| Net income (loss) attributable to Enviva Inc. | 2,588 | (23,920) | (21,332) |

| | Six Months Ended June 30, 2021 | | |
| --- | --- | --- | --- |
| | As Reported | Common Control Entities Acquired | Total (Recast) |
| Net revenue | $ 526,086 | $ 1,498 | $ 527,584 |
| Income (loss) from operations | 26,520 | (45,137) | (18,617) |
| Net income (loss) | 1,180 | (49,206) | (48,026) |
| Less net (income) loss attributable to noncontrolling interests | (82) | 10,905 | 10,823 |
| Net income (loss) attributable to Enviva Inc. | 1,098 | (38,301) | (37,203) |

The following tables present the changes as a result of the Simplification Transaction to previously reported amounts in the unaudited interim condensed consolidated statements of cash flows for the six months ended June 30, 2021 included in Enviva's quarterly report on Form 10-Q for the quarter ended June 30, 2021:

| | Six Months Ended June 30, 2021 | | |
| --- | --- | --- | --- |
| | As Reported | Common Control Entities Acquired | Total (Recast) |
| Net cash provided by (used in) operating activities | $ 111,438 | $ (49,267) | $ 62,171 |
| Net cash used in investing activities | (72,872) | (81,111) | (153,983) |
| Net cash (used in) provided by financing activities | (5,669) | 196,068 | 190,399 |
| Net increase in cash, cash equivalents, and restricted cash | $ 32,897 | $ 65,690 | $ 98,587 |

**(4) Revenue**

We disaggregate our revenue into two categories: product sales and other revenue. Product sales includes sales of wood pellets. Other revenue includes fees associated with customer requests to cancel, defer, or accelerate shipments in satisfaction of the related performance obligation and third party terminal services fees. These categories best reflect the nature, amount, timing, and uncertainty of our revenue and cash flows.

*Performance Obligations*

As of June 30, 2022, the aggregate amount of consideration from contracts with customers allocated to the performance obligations that were unsatisfied or partially satisfied was approximately $19.5 billion. This amount excludes forward prices related to variable consideration including inflation, foreign currency, and commodity prices. Also, this amount excludes the effects of the related foreign currency derivative contracts as they do not represent contracts with customers. We expect to recognize approximately 4.0% of our remaining performance obligations during the remainder of 2022, an additional 7.0% in 2023, and the balance thereafter. Our off-take contracts expire at various times through 2045 and our terminal services contract expires in 2023.

14

A2522

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

*Variable Consideration*

Variable consideration from off-take contracts arises from several pricing features in our off-take contracts, pursuant to which such contract pricing may be adjusted in respect of particular shipments to reflect differences between certain contractual quality specifications of the wood pellets as measured both when the wood pellets are loaded onto ships and unloaded at the discharge port as well as certain other contractual adjustments.

Variable consideration from our terminal services contract arises from price increases based on agreed inflation indices and from above-minimum throughput quantities or services. There was no variable consideration from our terminal services contract for the three and six months ended June 30, 2022 and 2021.

For the three and six months ended June 30, 2022, we recognized $0.3 million, respectively, of product sales revenue related to performance obligations satisfied in previous periods. For the three and six months ended June 30, 2021, we recognized $0.2 million and $0.4 million, respectively, of product sales revenue related to performance obligations satisfied in previous periods.

*Contract Balances*

Accounts receivable related to product sales as of June 30, 2022 and December 31, 2021 were $116.2 million and $91.3 million, respectively. Of these amounts, $82.1 million and $61.3 million, as of June 30, 2022 and December 31, 2021 respectively, related to amounts that were not yet billable under our contracts with customers pending finalization of prerequisite billing documentation. The amounts that had not been billed are billed upon receipt of prerequisite billing documentation, where substantially all is typically billed one to two weeks after full loading of the vessel, and where the remaining balance is typically billed one to two weeks after discharge of the vessel. Accounts receivable also include $8.2 million and $6.1 million, as of June 30, 2022 and December 31, 2021 respectively, related to distribution costs recoverable from the customer through the cost pass-through mechanism where the costs and their recovery are included in cost of goods sold.

As of June 30, 2022, we had $17.6 million of contract assets from and $0.4 million of deferred revenue for future performance obligations under contracts associated with off-take contracts. We did not have contract assets from or deferred revenue for future performance obligations under contracts associated with off-take contracts as of December 31, 2021.

**(5) Significant Risks and Uncertainties, Including Business and Credit Concentrations**

Our business is significantly impacted by greenhouse gas emission and renewable energy legislation and regulations in the U.K., the EU as well as its member states, and Japan. If the U.K., the EU or its member states, or Japan significantly modify such legislation or regulations, then our ability to enter into new contracts as our existing contracts expire may be materially affected.

Our product sales are primarily to industrial customers located in the U.K., Denmark, Japan, Belgium, and the Netherlands. Product sales to third-party customers that accounted for 10% or a greater share of consolidated product sales are as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | | |
| --- | --- | --- | --- | --- | --- |
| | 2022 | 2021 (Recast) | 2022 | (Recast) | 2021 (Recast) |
| Customer A | 18 % | 45 % | 20 % | | 38 % |
| Customer B | 11 % | 3 % | 8 % | | 5 % |
| Customer C | 9 % | 20 % | 13 % | | 18 % |
| Customer D | 14 % | 1 % | 14 % | | 9 % |
| Customer E | 17 % | 18 % | 18 % | | 17 % |
| Customer F | 14 % | 6 % | 11 % | | 4 % |

15

A2523

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

### (6) Inventories

Inventories consisted of the following as of:

|  | June 30, 2022 | December 31, 2021 |
|---|---|---|
| Raw materials and work-in-process | $ 23,798 | $ 21,995 |
| Consumable tooling | 25,772 | 22,952 |
| Finished goods | 24,777 | 12,770 |
| Total inventories | $ 74,347 | $ 57,717 |

### (7) Property, Plant, and Equipment, net

Property, plant, and equipment, net consisted of the following as of:

|  | June 30, 2022 | December 31, 2021 |
|---|---|---|
| Land | $ 27,342 | $ 26,414 |
| Land improvements | 92,214 | 61,850 |
| Buildings | 415,324 | 321,577 |
| Machinery and equipment | 1,190,907 | 859,115 |
| Vehicles | 8,981 | 8,318 |
| Furniture and office equipment | 27,122 | 24,840 |
| Leasehold improvements | 23,403 | 22,101 |
| Property, plant, and equipment | 1,785,293 | 1,324,215 |
| Less accumulated depreciation | (449,118) | (395,618) |
| Property, plant, and equipment, net | 1,336,175 | 928,597 |
| Construction in progress | 215,587 | 569,600 |
| Total property, plant, and equipment, net | $ 1,551,762 | $ 1,498,197 |

Total depreciation expense and capitalized interest related to construction in progress were as follows:

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | 2022 | 2021 (Recast) | 2022 | 2021 (Recast) |
| Depreciation expense | $ 29,107 | $ 23,345 | $ 51,832 | $ 45,032 |
| Capitalized interest related to construction in progress | 3,087 | 3,911 | 8,937 | 8,001 |

### (8) Derivative Instruments

We use derivative instruments to partially offset our business exposure to foreign currency exchange risk from expected future cash flows and interest rate risk resulting from certain borrowings. Although the preponderance of our off-take contracts and shipping contracts are U.S. Dollar-denominated, we are exposed to fluctuations in foreign currency exchange rates related to a minority of our off-take contracts that require future deliveries of wood pellets to be settled in British Pound Sterling ("GBP") and Euro ("EUR") and a minority of our shipping contracts that require freight rates to be settled in GBP.

On March 31, 2022, we entered into a bunker fuel oil swap to offset our business exposure to bunker fuel oil prices.

We seek to mitigate the credit risk associated with derivative instruments by limiting our counterparties to major financial institutions. Although we monitor the potential risk of loss due to credit risk, we do not expect material losses as a result of defaults by counterparties. We use derivative instruments to manage cash flow and do not enter into derivative instruments for speculative or trading purposes.

A2524

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

We have entered and may continue to enter into foreign currency forward contracts, purchased option contracts, or other instruments to partially manage this risk. We record the changes in the fair value of foreign currency derivatives as product sales or cost of goods sold depending on the nature of the item being hedged.

We entered into pay-fixed, receive-variable interest rate swaps to hedge interest rate risk associated with our variable rate borrowings under our senior secured revolving credit facility that were not designated and accounted for as cash flow hedges. The interest rate swaps expired in September 2021.

Our derivative instruments are classified as Level 2 assets or liabilities based on inputs such as forward foreign exchange rates. The fair value of derivative instruments was as follows as of:

| | | Asset (Liability) | |
| --- | --- | --- | --- |
| | Balance Sheet Classification | June 30, 2022 | December 31, 2021 |
| Not designated as hedging instruments: | | | |
| Foreign currency exchange contracts: | | | |
| | Prepaid expenses and other current assets | $ — | $ 321 |
| | Other long-term assets | — | 309 |
| | Accrued and other current liabilities | (1,024) | (1,456) |
| | Other long-term liabilities | (1,046) | (1,001) |
| | | (2,070) | (1,827) |
| Bunker fuel swap: | | | |
| | Other long-term assets | 21 | — |
| | Accrued and other current liabilities | (221) | — |
| | Other long-term liabilities | (93) | — |
| | | (293) | — |
| Total derivatives not designated as hedging instruments | | $ (2,363) | $ (1,827) |

Net unrealized and net realized gains and (losses) recorded to earnings were as follows:

| | | | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- | --- | --- |
| Classification | Derivative Instrument | | 2022 | 2021 (Recast) | 2022 (Recast) | 2021 (Recast) |
| Product sales | Foreign currency derivatives | Unrealized | $ (1,852) | $ 362 | $ (242) | $ (798) |
| Product sales | Foreign currency derivatives | Realized | 3,942 | (1,522) | 4,067 | (2,517) |
| Cost of goods sold | Bunker fuel swap | Unrealized | (293) | — | (293) | — |
| Cost of goods sold | Bunker fuel swap | Realized | (84) | — | (84) | — |
| Interest expense | Interest rate swap | Unrealized | — | 36 | — | 72 |

We enter into master netting arrangements designed to permit net settlement of derivative transactions among the respective counterparties. If we had settled all transactions with our respective counterparties at June 30, 2022, we would have paid a net settlement termination payment of $2.1 million, which differs insignificantly from the recorded fair value of the derivatives. We present our derivative assets and liabilities at their gross fair values.

17

A2525

**ENVIVA INC. AND SUBSIDIARIES**

Notes to Condensed Consolidated Financial Statements (Continued)

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

The notional amounts of outstanding derivative instruments associated with outstanding or unsettled derivative instruments were as follows as of:

|  | June 30, 2022 | December 31, 2021 |
|---|---|---|
| Foreign exchange forward contracts in GBP | £ 19,102 | £ 57,500 |
| Foreign exchange purchased option contracts in GBP | £ — | £ 7,275 |
| Foreign exchange forward contracts in EUR | € 4,050 | € 11,000 |
| Bunker fuel oil swap in MT | 10,500 | — |

**(9) Accrued and Other Current Liabilities**

Accrued and other current liabilities consisted of the following as of:

|  | June 30, 2022 | December 31, 2021 |
|---|---|---|
| Accrued expenses - compensation and benefits | $ 18,859 | $ 22,758 |
| Accrued expenses - wood pellet purchases and distribution costs | 41,182 | 34,819 |
| Accrued expenses - operating costs and expenses | 44,793 | 55,463 |
| Accrued capital expenditures | 22,079 | 21,791 |
| Other accrued expenses and other current liabilities | 26,717 | 28,475 |
| Accrued and other current liabilities | $ 153,630 | $ 163,306 |

**(10) Long-Term Debt and Finance Lease Obligations**

Long-term debt and finance lease obligations at carrying value consisted of the following as of:

|  | June 30, 2022 | December 31, 2021 |
|---|---|---|
| 2026 Notes, net of unamortized discount, premium, and debt issuance costs of $2.3 million and $2.6 million as of June 30, 2022 and December 31, 2021, respectively | $ 747,698 | $ 747,399 |
| Senior secured revolving credit facility | 430,000 | 466,000 |
| New Markets Tax Credit loans, net of unamortized discount and debt issuance costs of $2.7 million and $0.0 million as of June 30, 2022 and December 31, 2021, respectively | 28,719 | — |
| Seller Note, net of unamortized discount of $0.4 million and $1.1 million as of June 30, 2022 and December 31, 2021, respectively | 25,835 | 36,442 |
| Other loans | 4,193 | 3,273 |
| Finance leases | 20,560 | 18,432 |
| Total long-term debt and finance lease obligations | 1,257,005 | 1,271,546 |
| Less current portion of long-term debt and finance lease obligations | (37,284) | (39,105) |
| Long-term debt and finance lease obligations, excluding current installments | $ 1,219,721 | $ 1,232,441 |

The estimated fair value of debt materially approximated the carrying amount at June 30, 2022 and December 31, 2021.

*2026 Notes*

As of June 30, 2022 and December 31, 2021, we were in compliance with the covenants and restrictions associated with, and no events of default existed under, the indenture governing the 2026 Notes. The 2026 Notes are guaranteed jointly and severally on a senior unsecured basis by most of our existing subsidiaries and may be guaranteed by certain future restricted subsidiaries.

*Senior Secured Revolving Credit Facility*

In June 2022, we amended our senior secured revolving credit facility to extend the maturity date from April 2026 to June 2027, and to increase the maximum Total Leverage Ratio (as defined in the credit agreement) from 5.00:1.00 to 5.50:1.00 (and from 5.25:1.00 to 5.75:1.00 during a Material Transaction Period (as defined in the credit agreement)).

A2526

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

As of June 30, 2022 and December 31, 2021, we were in compliance with all covenants and restrictions associated with, and no events of default existed under, our senior secured revolving credit facility. Our obligations under the senior secured revolving credit facility are guaranteed by certain of our subsidiaries and secured by liens on substantially all of our assets; however, the senior secured revolving credit facility is not guaranteed by Enviva Wilmington Holdings, LLC or Enviva Pellets Epes, LLC, or secured by liens on their assets.

As of June 30, 2022 and December 31, 2021, we had $135.6 million and $99.8 million, respectively, available under our senior secured revolving credit facility, net of $4.4 million and $4.2 million, respectively, of letters of credit outstanding.

### *New Markets Tax Credit ("NMTC") Loans*

In June 2022, we closed on a qualified NMTC financing transaction. The NMTC program is intended to induce capital investment in qualifying communities by permitting taxpayers to claim credits against their federal income taxes for up to 39% of qualified investments in the equity of community development entities ("CDEs").

In this transaction, we borrowed $31.4 million from a bank ("Bank A") then made a $31.4 million loan to an investment fund, into which another bank ("Bank B") made a capital contribution of $12.8 million. The investment fund then contributed $42.0 million to four CDEs, which, in turn, loaned it to us. The $42.0 million accrues interest at a weighted average rate of 2.9% per annum, of which $34.1 million matures in its entirety in June 2029, while $7.9 million could be prepaid starting in 2029 and through 2052. The net proceeds we received are generally restricted to funding a portion of the costs of the acquisition, construction, equipping, and financing of our wood pellet production plant to be located in Epes, Alabama (the "Epes plant").

By virtue of the capital contribution, Bank B is entitled to substantially all of the tax benefits derived from the NMTC, while we effectively received net loan proceeds equal to the capital contribution of $12.8 million. This transaction includes a put/call provision whereby we may be obligated or entitled to repurchase the interest of Bank B in the investment fund, which we believe they will exercise in June 2029. The value attributed to the put/call is de minimis. We determined that the investment fund and CDEs constitute variable interest entities where we are the primary beneficiary, and, as a result, we consolidate those entities. The $31.4 million loan is presented on our condensed consolidated balance sheet within long-term debt and finance lease obligations, while the $12.8 million contribution is presented within other long-term liabilities as we expect the put/call will be exercised for a de minimis value, both net of their proportionate share of direct and incremental transaction costs.

As of June 30, 2022, we were in compliance with the covenants and restrictions associated with, and no events of default existed under, the NMTC loans.

### (11) Income Taxes

The Company's provision for income taxes is based on the estimated annual effective tax rate, plus discrete items. The effective tax rate for the three and six months ended June 30, 2022 was 0.0% and 0.0%, respectively. The effective tax rate for the three and six months ended June 30, 2021 was 1.0% and 1.9%, respectively. The effective tax rate for the three and six months ended June 30, 2022 was primarily due to the full valuation allowance against the net deferred tax asset. The effective tax rate for the three and six months ended June 30, 2021 was driven by the income taxes recorded for the corporate subsidiaries under the partnership structure.

### (12) Equity

### *Issuance of Common Shares*

In January 2022, we issued 4,945,000 shares of common stock at a price of $70.00 per share for total net proceeds of $332.8 million, after deducting $13.4 million of issuance costs. We intend to use the net proceeds of $332.8 million to fund a portion of our capital expenditures related to ongoing development projects.

### *Dividend Reinvestment*

Pursuant to the dividend reinvestment plan established in connection with the Simplification Transaction, we issued 104,765 shares of common stock in lieu of cash dividends of $8.3 million during the three months ended June 30, 2022 and issued 215,152 shares of common stock in lieu of cash dividends of $16.2 million during the six months ended June 30, 2022 to the owners of our former sponsor.

A2527

**ENVIVA INC. AND SUBSIDIARIES**

Notes to Condensed Consolidated Financial Statements (Continued)

(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)

*Cash Dividends and Distributions*

The following table details cash dividends and distributions paid or declared:

| Quarter Ended | Declaration Date | Record Date | Payment Date | Per Share or Unit[1] |
|---|---|---|---|---|
| June 30, 2021 | July 27, 2021 | August 13, 2021 | August 27, 2021 | $ 0.815 |
| September 30, 2021 | November 3, 2021 | November 15, 2021 | November 26, 2021 | $ 0.840 |
| December 31, 2021 | February 2, 2022 | February 14, 2022 | February 25, 2022 | $ 0.860 |
| March 31, 2022 | May 4, 2022 | May 16, 2022 | May 27, 2022 | $ 0.905 |
| June 30, 2022 | August 3, 2022 | August 15, 2022 | August 26, 2022 | $ 0.905 |

[1] Prior to December 31, 2021, distributions were paid by the Partnership.

### (13) Equity-Based Awards

*Enviva Inc. Long-Term Incentive Plan ("LTIP")*

*Affiliate Grants*

The following table summarizes information regarding restricted stock unit awards (the "Affiliate Grants") under the LTIP:

| | Time-Based Restricted Stock Units | | Performance-Based Restricted Stock Units | | Total Affiliate Grant Restricted Stock Units | |
|---|---|---|---|---|---|---|
| | Units | Weighted-Average Grant Date Fair Value (per unit)(1) | Units | Weighted-Average Grant Date Fair Value (per unit)(1) | Units | Weighted-Average Grant Date Fair Value (per unit)(1) |
| Nonvested December 31, 2021 | 1,002,061 | $ 40.82 | 608,117 | $ 38.56 | 1,610,178 | $ 39.97 |
| Granted | 217,939 | $ 72.20 | 116,224 | $ 93.05 | 334,163 | $ 79.45 |
| Forfeitures | (61,768) | $ 50.15 | (21,871) | $ 48.88 | (83,639) | $ 49.82 |
| Vested | (244,721) | $ 30.25 | (158,637) | $ 30.24 | (403,358) | $ 30.24 |
| Nonvested June 30, 2022 | 913,511 | $ 50.48 | 543,833 | $ 52.25 | 1,457,344 | $ 51.14 |

[1] Determined by dividing the aggregate grant date fair value of awards by the number of units.

The unrecognized estimated non-cash equity-based compensation expense relating to outstanding Affiliate Grants as of June 30, 2022 was $51.6 million, which will be recognized over the remaining vesting period.

*Director Grants*

The following table summarizes information regarding restricted stock unit awards to independent directors of the Company under the LTIP:

| | Time-Based Restricted Stock Units | |
|---|---|---|
| | Units | Weighted-Average Grant Date Fair Value (per unit)(1) |
| Nonvested December 31, 2021 | 14,234 | $ 48.48 |
| Granted | 18,732 | $ 72.07 |
| Vested | (14,219) | $ 48.54 |
| Nonvested June 30, 2022 | 18,747 | $ 72.07 |

[1] Determined by dividing the aggregate grant date fair value of awards by the number of units.

*Restricted Shares*

Certain employees previously received Series B units of our former sponsor that were intended to constitute "profits interests" as defined by the Internal Revenue Service that, due to the Simplification Transaction, converted into common units of the Partnership. The common shares subject to restriction will have their restrictions released as follows: one-third on each of December 31, 2022, 2023, and 2024. The unrecognized estimated non-cash equity-based compensation and other expense

20

**ENVIVA INC. AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements (Continued)**

**(In thousands, except number of shares or units, per share or per unit amounts, and unless otherwise noted)**

relating to outstanding common shares subject to restriction as of June 30, 2022 was $39.4 million, which will be recognized over the remaining vesting period.

**(14) Net Loss per Enviva Inc. Common Share**

Net loss per basic and diluted Enviva Inc. common share were computed as follows:

| | Three Months Ended June 30, 2022 | Six Months Ended June 30, 2022 |
|---|---|---|
| Net loss attributable to Enviva Inc. | $ (27,337) | $ (72,644) |
| Dividend equivalent rights paid on time-based restricted stock units | (837) | (1,799) |
| Net loss attributable to Enviva Inc. common stockholders | $ (28,174) | $ (74,443) |
| Weighted average shares outstanding - basic and diluted | 66,604 | 65,820 |
| Net loss per common share - basic and diluted | $ (0.42) | $ (1.13) |

As Holdings was the surviving entity for accounting purposes, the historical financial results prior to the Simplification Transaction are those of Holdings. Given that and the recapitalization, the number of outstanding units for the portion of 2021 prior to the Simplification Transaction constitutes the 16.0 million units issued to the owners of the former sponsor.

**(15) Subsequent Event**

*Tax-Exempt Green Bond Offering*

In July 2022, the Industrial Development Authority of Sumter County, Alabama issued its Exempt Facilities Revenue Bonds (the "Tax-Exempt Green Bonds") in the aggregate principal amount of $250.0 million. The proceeds of the offering were loaned to us pursuant to a Loan and Guaranty Agreement constituting a senior unsecured obligation to fund all or a portion of the costs of the acquisition, construction, equipping, and financing of the Epes plant and to pay costs of the offering. The Tax-Exempt Green Bonds, which were issued at par, bear interest at an annual rate of 6%, and mature in 2052, with the option for holders to redeem at par in 2032.

21

A2529

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*On December 31, 2021, Enviva Partners, LP (the "Partnership") converted from a Delaware limited partnership to a Delaware corporation (the "Conversion") named "Enviva Inc." References to "Enviva," the "Company," "we," "us," or "our" refer to (i) Enviva Inc. and its subsidiaries for the periods following the Conversion and (ii) the Partnership and its subsidiaries for periods prior to the Conversion, except where the context otherwise requires. References to common units for periods prior to the Conversion refer to common units of the Partnership, and references to common stock for periods following the Conversion refer to shares of common stock of Enviva Inc. As a result of the Conversion, the primary financial impact to the consolidated financial statements contained herein consisted of (i) reclassification of partnership capital accounts to equity accounts reflective of a corporation and (ii) income tax effects.*

*References to "our former sponsor" or "Holdings" refer to Enviva Holdings, LP, and, where applicable, its wholly owned subsidiaries Enviva MLP Holdco, LLC and Enviva Development Holdings, LLC. References to "our former GP" refer to Enviva Partners GP, LLC, formerly a wholly owned subsidiary of Holdings.*

*The following discussion and analysis should be read in conjunction with Management's Discussion and Analysis ("MD&A") in Part II, Item 7 of our Annual Report on Form 10-K for the year ended December 31, 2021 as filed with the U.S. Securities and Exchange Commission (the "SEC"). Our 2021 Form 10-K contains a discussion of other matters not included herein, such as disclosures regarding critical accounting policies and estimates. You should also read the following discussion and analysis together with the risk factors set forth in the 2021 Form 10-K, Item 1A. "Risk Factors" and the factors described under "Cautionary Statement Regarding Forward-Looking Information" and Item 1A. "Risk Factors" in this Quarterly Report on Form 10-Q for information regarding certain risks inherent in our business.*

**Basis of Presentation**

The following discussion about matters affecting the financial condition and results of operations of the Company should be read in conjunction with the unaudited condensed consolidated financial statements and notes thereto included in this report and the audited consolidated financial statements and related notes that are included in the 2021 Form 10-K. Among other things, those financial statements and the related notes include more detailed information regarding the basis of presentation for the following information.

*C-Corporation Conversion*

We converted from a Delaware limited partnership to a Delaware corporation effective December 31, 2021; consequently, results for periods prior to December 31, 2021 reflect Enviva as a limited partnership, not a corporation. The primary financial impacts of the Conversion to the consolidated financial statements were (i) reclassification of partnership capital accounts to equity accounts reflective of a corporation and (ii) income tax effects. On the date of the Conversion, each common unit representing a limited partner interest in the Partnership issued and outstanding immediately prior to the Conversion was exchanged for one share of common stock of the Company, par value $0.001 per share.

*Simplification Transaction*

On October 14, 2021, the Partnership acquired our former sponsor and the former GP, and the incentive distribution rights held by our former sponsor were cancelled and eliminated (collectively, the "Simplification Transaction") in exchange for 16.0 million common units, which were distributed to the owners of our former sponsor. In connection with the Simplification Transaction, we acquired certain assets under development, as well as off-take contracts in varying stages of negotiation. Additionally, our existing management services fee waivers (the "MSA Fee Waivers") and other support agreements with our former sponsor were consolidated, fixed, and novated to certain owners of our former sponsor. Under the consolidated support agreement, we are entitled to receive quarterly payments (the "Support Payments") in an aggregate amount of $55.5 million with respect to periods from the fourth quarter of 2021 through the first quarter of 2024. The consolidated financial statements have been retroactively recast to reflect the Simplification Transaction as if the Simplification Transaction occurred on March 18, 2010, the date on which Holdings was originally organized, instead of October 14, 2021, the closing date of the Simplification Transaction.

**Business Overview**

We develop, construct, acquire, and own and operate, fully contracted wood pellet production plants where we aggregate a natural resource, wood fiber, and process it into dry, densified, uniform pellets that can be effectively stored and transported around the world. We primarily sell our wood pellets through long-term, take-or-pay off-take contracts with creditworthy customers in the United Kingdom, the European Union, and Japan, who use our pellets to displace coal and other fossil fuels to generate renewable power and heat as part of their efforts to accelerate the energy transition from conventional energy

A2530

generation to renewable energy generation. Increasingly, our customers are also using our pellets as renewable raw material inputs to decarbonize hard-to-abate sectors like steel, cement, lime, chemicals, and aviation fuels. Collectively, the wood pellets we produce are viewed by our customers as a critical component of their efforts to reduce life-cycle greenhouse gas emissions in their core energy generation or industrial manufacturing processes, and mitigate the impact of climate change.

We own and operate ten plants (collectively, "our plants") with a combined production capacity of approximately 6.2 million metric tons ("MT") of wood pellets per year ("MTPY") in Virginia, North Carolina, South Carolina, Georgia, Florida, and Mississippi, the production of which is fully contracted, with many of our contracts extending well into the 2040s. We export our wood pellets to global markets through our deep-water marine terminal at the Port of Chesapeake, Virginia, terminal assets at the Port of Wilmington, North Carolina and the Port of Pascagoula, Mississippi, and from third-party deep-water marine terminals in Savannah, Georgia, Mobile, Alabama, and Panama City, Florida. In July 2022, we commenced construction of our fully contracted wood pellet production plant in Epes, Alabama (the "Epes plant"). All of our facilities are located in geographic regions with low input costs and favorable transportation logistics. Owning these cost-advantaged assets in a rapidly expanding industry provides us with a platform to generate stable and growing cash flows. Our plants are sited in robust fiber baskets providing stable pricing for the low-grade fiber used to produce wood pellets. Our raw materials are byproducts of traditional timber harvesting, principally low-value wood materials, such as trees generally not suited for sawmilling or other manufactured forest products, and tree tops and limbs, understory, brush, and slash that are generated in a harvest.

Our sales strategy is to fully contract the wood pellet production from our plants under long-term, take-or-pay off-take contracts with a diversified and creditworthy customer base. Our long-term off-take contracts typically provide for fixed-price deliveries that often include provisions that escalate the price over time and provide for other margin protection. For 2022, our production capacity from our wood pellet production plants is contracted under our existing long-term, take-or-pay off-take contracts.

Our largest customers use our wood pellets as a substitute fuel for coal in dedicated biomass or co-fired coal power plants. Wood pellets serve as a suitable "drop-in" alternative to coal because of their comparable heat content, density, and form. Due to the uninterruptible nature of our customers' fuel consumption, our customers require a reliable supply of wood pellets that meet stringent product specifications. We have built our operations and assets to deliver and certify the highest levels of product quality and our proven track record of reliable deliveries enables us to charge premium prices for this certainty. In addition to our customers' focus on the reliability of supply, they are concerned about the combustion efficiency of the wood pellets and their safe handling. Because combustion efficiency is a function of energy density, particle size distribution, ash/inert content, and moisture, our customers require that we supply wood pellets meeting minimum criteria for a variety of specifications and, in some cases, provide incentives for exceeding our contract specifications.

**Recent Developments**

***Product Sales Contracted Backlog***

Our volumes under our firm and contingent long-term, take-or-pay off-take contracts provide for a product sales backlog of $21.7 billion and have a total weighted-average remaining term of 14.2 years from July 1, 2022. This amount includes forward prices related to variable consideration including inflation, foreign currency, and commodity prices. Also, this amount includes the effects of the related foreign currency derivative contracts.

***Financing Activities***

In June 2022, we amended our senior secured revolving credit facility to extend the maturity date from April 2026 to June 2027, and to increase the maximum Total Leverage Ratio (as defined in the credit agreement) from 5.00:1.00 to 5.50:1.00 (and from 5.25:1.00 to 5.75:1.00 during a Material Transaction Period (as defined in the credit agreement)).

***New Markets Tax Credit ("NMTC") Loans***

In June 2022, we borrowed $42.0 million where the net proceeds are generally restricted to funding a portion of the costs of the acquisition, construction, equipping, and financing of the Epes plant. The NMTC financing accrues interest at a weighted average rate of 2.9% per annum. Of the $42.0 million, $34.1 million matures in its entirety in June 2029, while $7.9 million could be prepaid quarterly starting in 2029 and through 2052.

***Issuance of Common Shares***

In January 2022, we issued 4,945,000 shares of common stock at a price of $70.00 per share for total net proceeds of $332.8 million, after deducting $13.4 million of issuance costs. We intend to use the net proceeds of $332.8 million to fund a portion of our capital expenditures related to ongoing development projects.

A2531

*Tax-Exempt Green Bond Offering*

In July 2022, the Industrial Development Authority of Sumter County, Alabama issued its Exempt Facilities Revenue Bonds (the "Tax-Exempt Green Bonds") in the aggregate principal amount of $250.0 million. The proceeds of the offering were loaned to us pursuant to a Loan and Guaranty Agreement constituting a senior unsecured obligation to fund a portion of the costs of the acquisition, construction, equipping, and financing of the Epes plant and to pay costs of the offering. The Tax-Exempt Green Bonds, which were issued at par, bear interest at an annual rate of 6%, and mature in 2052, with the option for holders to redeem at par in 2032.

**Factors Impacting Comparability of Our Financial Results**

*Omicron Variant of Novel Coronavirus*

During the three months ended March 31, 2022, the Omicron variant of COVID-19 significantly impacted our operations and resulted in $15.2 million of incremental costs. Our contractors and supply chain partners experienced labor-related and other challenges associated with COVID-19 that had a more pronounced than anticipated impact on our operations and project execution schedule. In addition, the prevalence of the Omicron variant of COVID-19 and increased rates of infection across areas in which we operate affected the availability of healthy workers from time to time at our facilities and we experienced increased rates of absence in our hourly workforce as workers who contracted COVID-19 quarantined at home. These absences contributed to reduced facility availability and, in some cases, reduced aggregate production levels. For more information about the effects of COVID-19 on the six months ended June 30, 2022, please see below under "Results of Operations."

**How We Evaluate Our Operations**

*Adjusted Net Income (Loss)*

We define adjusted net income (loss) as net income (loss) excluding acquisition and integration costs and other, early retirement of debt obligation, effects of COVID-19 and the war in Ukraine, and Support Payments. We believe that adjusted net income (loss) enhances investors' ability to compare the past financial performance of our underlying operations with our current performance separate from certain items of gain or loss that we characterize as unrepresentative of our ongoing operations.

*Adjusted Gross Margin and Adjusted Gross Margin per Metric Ton*

We define adjusted gross margin as gross margin excluding loss on disposal of assets, equity-based compensation and other expense, depreciation and amortization, changes in unrealized derivative instruments related to hedged items, acquisition and integration costs and other, effects of COVID-19 and the war in Ukraine, and Support Payments. We define adjusted gross margin per metric ton as adjusted gross margin per metric ton of wood pellets sold. We believe adjusted gross margin and adjusted gross margin per metric ton are meaningful measures because they compare our revenue-generating activities to our cost of goods sold for a view of profitability and performance on a total-dollar and a per-metric ton basis. Adjusted gross margin and adjusted gross margin per metric ton primarily will be affected by our ability to meet targeted production volumes and to control direct and indirect costs associated with procurement and delivery of wood fiber to our wood pellet production plants and our production and distribution of wood pellets.

*Adjusted EBITDA*

We define adjusted EBITDA as net income (loss) excluding depreciation and amortization, interest expense, income tax expense (benefit), early retirement of debt obligation, equity-based compensation and other expense, loss on disposal of assets, changes in unrealized derivative instruments related to hedged items, acquisition and integration costs and other, effects of COVID-19 and the war in Ukraine, and MSA Fee Waivers and Support Payments. Adjusted EBITDA is a supplemental measure used by our management and other users of our financial statements, such as investors, commercial banks, and research analysts, to assess the financial performance of our assets without regard to financing methods or capital structure.

*Distributable Cash Flow*

We define distributable cash flow as adjusted EBITDA less cash income tax expenses, interest expense net of amortization of debt issuance costs, debt premium, and original issue discounts, and maintenance capital expenditures. We use distributable cash flow as a performance metric to compare our cash-generating performance from period to period and to compare the cash-generating performance for specific periods to the cash dividends (if any) that are expected to be paid to our shareholders. We do not rely on distributable cash flow as a liquidity measure.

A2532

*2021 Non-Recast Presentation*

The three and six months ended June 30, 2021 were calculated on a recast basis in accordance with accounting principles generally accepted in the United States ("GAAP") to reflect the consolidated performance of Enviva and our former sponsor as if Enviva had bought the former sponsor at inception instead of October 14, 2021, the closing date of the Simplification Transaction. In addition, we are also presenting results for the three and six months ended June 30, 2021, calculated on a non-GAAP basis that combines (i) the actual performance of Enviva for the three and six months ended June 30, 2021 on a non-recast basis, and (ii) our consolidated performance, calculated on a recast basis in accordance with GAAP, inclusive of the assets and operations acquired as part of the Simplification Transaction, for the three and six months ended June 30, 2021 (the "Non-Recast Presentation"). We believe the Non-Recast Presentation provides investors with relevant information to evaluate our financial and operating performance because it reflects Enviva's actual and historically reported performance on a stand-alone basis and on a consolidated basis for the three and six months ended June 30, 2021.

The Non-Recast Presentation does not reflect the recast of our historical results required under GAAP due to the Simplification Transaction and accordingly contains non-GAAP measures. Unless expressly stated otherwise, all results are presented on a recast basis.

*Limitations of Non-GAAP Financial Measures*

Adjusted net income (loss), adjusted gross margin, adjusted gross margin per metric ton, adjusted EBITDA, and distributable cash flow, as well as our Non-Recast Presentation, are not financial measures presented in accordance with GAAP. We believe that the presentation of these non-GAAP financial measures provides useful information to investors in assessing our financial condition and results of operations. Our non-GAAP financial measures should not be considered as alternatives to the most directly comparable GAAP financial measures. Each of these non-GAAP financial measures has important limitations as an analytical tool because they exclude some, but not all, items that affect the most directly comparable GAAP financial measures. You should not consider adjusted net income (loss), adjusted gross margin, adjusted gross margin per metric ton, adjusted EBITDA, or distributable cash flow, or our Non-Recast Presentation, in isolation or as substitutes for analysis of our results as reported in accordance with GAAP.

Our definitions of these non-GAAP financial measures may not be comparable to similarly titled measures of other companies, thereby diminishing their utility. Please see above for a reconciliation of the Non-Recast Presentation to the Recast Presentation and below for a reconciliation of each of adjusted net income (loss), adjusted gross margin and adjusted gross margin per metric ton, adjusted EBITDA, and distributable cash flow to the most directly comparable GAAP financial measure.

## Results of Operations

*Three Months Ended June 30, 2022 Compared to Three Months Ended June 30, 2021*

| | Three Months Ended June 30, | | Change |
| --- | --- | --- | --- |
| | 2022 | 2021 (Recast) | |
| | (in thousands) | | |
| Product sales | $ 293,615 | $ 271,242 | $ 22,373 |
| Other revenue | 2,706 | 14,721 | (12,015) |
| Net revenue | 296,321 | 285,963 | 10,358 |
| Cost of goods sold, excluding items below | 250,276 | 234,564 | 15,712 |
| Loss on disposal of assets | 2,282 | 1,701 | 581 |
| Selling, general, administrative, and development expenses | 27,704 | 34,548 | (6,844) |
| Depreciation and amortization | 28,833 | 23,179 | 5,654 |
| Total operating costs and expenses | 309,095 | 293,992 | 15,103 |
| Loss from operations | (12,774) | (8,029) | (4,745) |
| Interest expense | (13,959) | (17,481) | 3,522 |
| Other (expense) income, net | (611) | 399 | (1,010) |
| Net loss before income tax benefit | (27,344) | (25,111) | (2,233) |
| Income tax benefit | (2) | (260) | 258 |
| Net loss | $ (27,342) | $ (24,851) | $ (2,491) |

25

*Net revenue*

Revenue related to product sales for wood pellets produced or procured by us increased to $293.6 million in the three months ended June 30, 2022 from $271.2 million in the three months ended June 30, 2021. The $22.4 million, or 8%, increase was primarily attributable to a 16% increase in average sale price per MT, partially offset by a 7% decrease in product sales volumes for the three months ended June 30, 2022 as compared to the three months ended June 30, 2021.

The increase in average sales price per MT was primarily due to addressing dislocations in our customers' and other producers' supply chains, rescheduling certain contracted deliveries into future periods, enabling prompt deliveries to other customers requiring incremental deliveries at elevated spot pricing. Recent biomass spot market prices, as well as the forward curve pricing of certain European indices, have exceeded $300 per MT, representing a substantial premium to the current long-term contracted pricing of roughly $200 to $220 per MT across Enviva's weighted average portfolio, and we have been able to capture some of that differential during the three months ended June 30, 2022.

The decrease in product sales volumes was primarily due to the timing of shipments that has resulted in an increase in finished goods inventory and less volumes procured from third parties to fulfill product sales during the three months ended June 30, 2022 than during the three months ended June 30, 2021. The decrease in procured volumes was due to a lower availability of third-party pellets resulting from the war in Ukraine and related sanctions.

Other revenue for the three months ended June 30, 2022 and 2021 included $1.5 million and $13.2 million, respectively, in payments to us for adjusting deliveries under our take-or-pay off-take contracts, which otherwise would have been included in product sales and which was recognized under a breakage model based on when the pellets would have been loaded.

*Cost of goods sold*

Cost of goods sold increased to $250.3 million for the three months ended June 30, 2022 from $234.6 million for the three months ended June 30, 2021, an increase of $15.7 million, or 7%. The increase in cost of goods sold was primarily a result of incremental fiber procurement and energy costs. In addition, we incurred incremental cost of goods sold from the on-going ramp of the Lucedale plant and the commencement of operations of Enviva's new deep-water marine terminal in Pascagoula, Mississippi (the "Pascagoula terminal").

*Adjusted gross margin and adjusted gross margin per metric ton*

|  | Three Months Ended June 30, | | | | |
|  | 2022 | | 2021 (Recast) | | Change |
|  | (in thousands, except per metric ton) | | | | |
| Reconciliation of gross margin to adjusted gross margin and adjusted gross margin per metric ton: | | | | | |
| Gross margin[1] | $ | 16,816 | $ | 27,824 | $ | (11,008) |
| Loss on disposal of assets | | 2,282 | | 1,701 | | 581 |
| Equity-based compensation and other expense | | 567 | | 568 | | (1) |
| Depreciation and amortization | | 26,948 | | 21,872 | | 5,076 |
| Changes in unrealized derivative instruments | | 2,145 | | (362) | | 2,507 |
| Acquisition and integration costs and other | | (244) | | 72 | | (316) |
| Support Payments | | 6,236 | | — | | 6,236 |
| Adjusted gross margin | $ | 54,750 | $ | 51,675 | $ | 3,075 |
| Metric tons sold | | 1,275 | | 1,367 | | (92) |
| Adjusted gross margin per metric ton | $ | 42.94 | $ | 37.80 | $ | 5.14 |

[1]Gross margin is defined as net revenue less cost of goods sold (including related depreciation and amortization and loss on disposal of assets).

We earned adjusted gross margin of $54.8 million, or $42.94 per MT, for the three months ended June 30, 2022 compared to $51.7 million, or $37.80 per MT, for the three months ended June 30, 2021. The increase in adjusted gross margin was primarily due to the aforementioned increase in net revenue, as well as due to the increase in Support Payments for the three months ended June 30, 2022 as compared to the three months ended June 30, 2021, partially offset by the aforementioned increase in cost of goods sold.

26

A2534

*Selling, general, administrative, and development expenses*

Selling, general, administrative, and development expenses were $27.7 million and $34.5 million for the three months ended June 30, 2022 and 2021, respectively. Selling, general, administrative, and development expenses include costs to develop new markets, corporate and other overhead expenses, and costs of developing new plants or ports (for those that have not yet met the capitalization threshold or costs that are not eligible for capitalization). Once the plant or port is placed in-service, the expenses of a plant or port are classified as cost of goods sold. The $6.8 million decrease in total selling, general, administrative, and development expenses is primarily associated with decreased cash-based compensation and related expenses primarily due to the elimination of activities resulting from the Simplification Transaction.

*Depreciation and amortization*

Depreciation and amortization expense were $28.8 million and $23.2 million for the three months ended June 30, 2022 and 2021, respectively, primarily due to the Lucedale plant, Pascagoula terminal, and expansion assets placed in service during 2022.

*Interest expense*

We incurred $14.0 million and $17.5 million of interest expense during the three months ended June 30, 2022 and 2021, respectively. The decrease in interest expense from the prior year was primarily attributable to a lower cost of borrowing due to the extinguishment of the higher rate senior secured green term loan facility as part of the Simplification Transaction.

*Income tax*

We recorded an insignificant and $0.3 million income tax benefit for the three months ended June 30, 2022 and 2021, respectively.

*Adjusted net loss*

| | Three Months Ended June 30, | | | | |
| | 2022 | | 2021 (Recast) | | Change |
| | (in thousands) | | | | |
| Reconciliation of net loss to adjusted net loss: | | | | | |
| Net loss | $ | (27,342) | $ | (24,851) | $ | (2,491) |
| Acquisition and integration costs and other | | 3,591 | | 1,338 | | 2,253 |
| Support Payments | | 6,236 | | — | | 6,236 |
| Adjusted net loss | $ | (17,515) | $ | (23,513) | $ | 5,998 |

27

A2535

*Adjusted EBITDA*

| | | Three Months Ended June 30, | | | |
|---|---|---|---|---|---|
| | | **2022** | **2021 (Recast)** | | **Change** |
| | | | (in thousands) | | |
| Reconciliation of net loss to adjusted EBITDA: | | | | | |
| Net loss | $ | (27,342) | $ (24,851) | $ | (2,491) |
| Add: | | | | | |
| Depreciation and amortization | | 28,833 | 23,179 | | 5,654 |
| Interest expense | | 13,959 | 17,481 | | (3,522) |
| Income tax benefit | | (2) | (260) | | 258 |
| Equity-based compensation and other expense | | 9,763 | 7,504 | | 2,259 |
| Loss on disposal of assets | | 2,282 | 1,701 | | 581 |
| Changes in unrealized derivative instruments | | 2,145 | (362) | | 2,507 |
| Acquisition and integration costs and other | | 3,592 | 1,338 | | 2,254 |
| Support Payments | | 6,236 | — | | 6,236 |
| Adjusted EBITDA | $ | 39,466 | $ 25,730 | $ | 13,736 |

We generated adjusted EBITDA of $39.5 million for the three months ended June 30, 2022 compared to $25.7 million for the three months ended June 30, 2021. The $13.7 million increase was primarily attributable to the factors described above under the headings "Adjusted gross margin and adjusted gross margin per metric ton" and "Selling, general, administrative, and development expenses."

*Distributable cash flow*

The following is a reconciliation of adjusted EBITDA to distributable cash flow:

| | | Three Months Ended June 30, | | | |
|---|---|---|---|---|---|
| | | **2022** | **2021 (Recast)** | | **Change** |
| | | | (in thousands) | | |
| Reconciliation of adjusted EBITDA to distributable cash flow attributable to Enviva: | | | | | |
| Adjusted EBITDA | $ | 39,466 | $ 25,730 | $ | 13,736 |
| Less: | | | | | |
| Interest expense, net of amortization of debt issuance costs, debt premium, and original issue discount | | 13,348 | 16,075 | | (2,727) |
| Maintenance capital expenditures | | 4,787 | 3,940 | | 847 |
| Distributable cash flow attributable to Enviva Inc. | | 21,331 | 5,715 | | 15,616 |
| Less: Distributable cash flow attributable to incentive distribution rights | | — | 10,708 | | (10,708) |
| Distributable cash flow attributable to Enviva Inc. or Enviva Partners, LP limited partners | $ | 21,331 | $ (4,993) | $ | 26,324 |

28

A2536

The following table presents a reconciliation of net loss to adjusted EBITDA and distributable cash flow for the three months ended June 30, 2021, on a recast basis and non-recast basis:

| | Three Months Ended June 30, 2021 | | |
| | Recast | Adjustments | Non-Recast |
| | (in millions) | | |
|---|---|---|---|
| Net (loss) income | $ (24.8) | $ 27.5 | $ 2.7 |
| Add: | | | |
| Depreciation and amortization | 23.2 | (0.9) | 22.3 |
| Interest expense | 17.4 | (4.7) | 12.7 |
| Income tax benefit | (0.2) | 0.2 | — |
| Equity-based compensation and other expense | 7.5 | (4.8) | 2.7 |
| Loss on disposal of assets | 1.7 | — | 1.7 |
| Changes in unrealized derivative instruments | (0.4) | — | (0.4) |
| Acquisition and integration costs and other | 1.3 | (0.4) | 0.9 |
| MSA Fee Waivers | — | 6.3 | 6.3 |
| Adjusted EBITDA | 25.7 | 23.2 | 48.9 |
| Less: | | | |
| Interest expense, net of amortization of debt issuance costs, debt premium, and original issue discount | 9.8 | 2.2 | 12.0 |
| Maintenance capital expenditures | 3.9 | — | 3.9 |
| Distributable cash flow | $ 12.0 | $ 21.0 | $ 33.0 |

The following is a reconciliation of net loss to adjusted EBITDA and distributable cash flow for the three months ended June 30, 2022 and the three months ended June 30, 2021 on a non-recast basis:

| | Three Months Ended June 30, | | |
| | 2022 | 2021 | Change |
| | (in millions) | | |
|---|---|---|---|
| Net (loss) income | $ (27.3) | $ 2.7 | $ (30.0) |
| Add: | | | |
| Depreciation and amortization | 28.8 | 22.3 | 6.5 |
| Interest expense | 14.0 | 12.7 | 1.3 |
| Equity-based compensation and other expense | 9.8 | 2.7 | 7.1 |
| Loss on disposal of assets | 2.3 | 1.7 | 0.6 |
| Changes in unrealized derivative instruments | 2.1 | (0.4) | 2.5 |
| Acquisition and integration costs and other | 3.6 | 0.9 | 2.7 |
| Support Payments and MSA Fee Waivers | 6.2 | 6.3 | (0.1) |
| Adjusted EBITDA | 39.5 | 48.9 | (9.4) |
| Less: | | | |
| Interest expense, net of amortization of debt issuance costs, debt premium, and original issue discount | 13.3 | 12.0 | 1.3 |
| Maintenance capital expenditures | 4.8 | 3.9 | 0.9 |
| Distributable cash flow | $ 21.4 | $ 33.0 | $ (11.6) |

29

A2537

**Results of Operations**

*Six Months Ended June 30, 2022 Compared to Six Months Ended June 30, 2021*

| | | Six Months Ended June 30, | | | | |
|---|---|---|---|---|---|---|
| | | 2022 | | 2021 (Recast) | | Change |
| | | (in thousands) | | | | |
| Product sales | $ | 524,527 | $ | 495,772 | $ | 28,755 |
| Other revenue | | 4,776 | | 31,812 | | (27,036) |
| Net revenue | | 529,303 | | 527,584 | | 1,719 |
| Cost of goods sold, excluding items below | | 461,312 | | 432,266 | | 29,046 |
| Loss on disposal of assets | | 3,183 | | 3,345 | | (162) |
| Selling, general, administrative, and development expenses | | 61,395 | | 65,890 | | (4,495) |
| Depreciation and amortization | | 51,392 | | 44,700 | | 6,692 |
| Total operating costs and expenses | | 577,282 | | 546,201 | | 31,081 |
| Loss from operations | | (47,979) | | (18,617) | | (29,362) |
| Interest expense | | (23,929) | | (30,858) | | 6,929 |
| Other (expense) income, net | | (727) | | 508 | | (1,235) |
| Net loss before income tax expense (benefit) | | (72,635) | | (48,967) | | (23,668) |
| Income tax expense (benefit) | | 14 | | (941) | | 955 |
| Net loss | $ | (72,649) | $ | (48,026) | $ | (24,623) |

*Net revenue*

Revenue related to product sales for wood pellets produced or procured by us increased to $524.5 million in the six months ended June 30, 2022 from $495.8 million in the six months ended June 30, 2021. The $28.8 million, or 6%, increase was primarily attributable to a 12% increase in average sale price per MT, partially offset by a 6% decrease in product sales volumes for the six months ended June 30, 2022 as compared to the six months ended June 30, 2021.

The increase in average sales price per MT was primarily due to addressing dislocations in our customers' and other producers' supply chains, rescheduling certain contracted deliveries into future periods, enabling prompt deliveries to other customers requiring incremental deliveries at elevated spot pricing. Recent biomass spot market prices, as well as the forward curve pricing of certain European indices, have exceeded $300 per MT, representing a substantial premium to the current long-term contracted pricing of roughly $200 to $220 per MT across Enviva's weighted average portfolio, and we have been able to capture some of that differential during the six months ended June 30, 2022.

The decrease in product sales volumes was primarily due to the timing of shipments that has resulted in an increase in finished goods inventory and less volumes procured from third parties to fulfill product sales during the six months ended June 30, 2022 than during the six months ended June 30, 2021. The decrease in procured volumes was due to a lower availability of third-party pellets resulting from the war in Ukraine and related sanctions. For the three months ended March 31, 2022, product sales revenue from produced volumes were dampened as a result of labor-related and other challenges associated with COVID-19 experienced by our employees, contractors, and supply chain partners that, in some cases, resulted in curtailment of our operations that had a more pronounced than anticipated impact on our operations and project execution.

Other revenue for the six months ended June 30, 2022 and 2021 included $2.3 million and $29.3 million, respectively, in payments to us for adjusting deliveries under our take-or-pay off-take contracts, which otherwise would have been included in product sales and which was recognized under a breakage model based on when the pellets would have been loaded.

*Cost of goods sold*

Cost of goods sold increased to $461.3 million for the six months ended June 30, 2022 from $432.3 million for the six months ended June 30, 2021, an increase of $29.0 million, or 7%. The increase in cost of goods sold was primarily a result of incremental fiber logistics, energy, and wood pellet distribution costs. In particular, during the three months ended March 31, 2022, we experienced labor-related and other challenges associated with COVID-19 with our employees, contractors and supply chain partners that had a more pronounced than anticipated impact on our operations and project execution. Furthermore, we incurred incremental cost of goods sold from the on-going ramp of the Lucedale plant and the commencement of operations of the Pascagoula terminal.

A2538

*Adjusted gross margin and adjusted gross margin per metric ton*

| | | Six Months Ended June 30, | | | | |
|---|---|---|---|---|---|---|
| | | 2022 | | 2021 (Recast) | | Change |
| | | (in thousands, except per metric ton) | | | | |
| Reconciliation of gross margin to adjusted gross margin and adjusted gross margin per metric ton: | | | | | | |
| Gross margin[1] | $ | 16,555 | $ | 49,644 | $ | (33,089) |
| Loss on disposal of assets | | 3,183 | | 3,345 | | (162) |
| Equity-based compensation and other expense | | 1,301 | | 1,136 | | 165 |
| Depreciation and amortization | | 48,254 | | 42,328 | | 5,926 |
| Changes in unrealized derivative instruments | | 535 | | 798 | | (263) |
| Acquisition and integration costs and other | | 2,557 | | 72 | | 2,485 |
| Effects of COVID-19 | | 13,942 | | — | | 13,942 |
| Effects of the war in Ukraine | | 5,051 | | — | | 5,051 |
| Support Payments | | 14,085 | | — | | 14,085 |
| Adjusted gross margin | $ | 105,463 | $ | 97,323 | $ | 8,140 |
| Metric tons sold | | 2,371 | | 2,516 | | (145) |
| Adjusted gross margin per metric ton | $ | 44.48 | $ | 38.68 | $ | 5.80 |

[1]Gross margin is defined as net revenue less cost of goods sold (including related depreciation and amortization and loss on disposal of assets).

We earned adjusted gross margin of $105.5 million, or $44.48 per MT, for the six months ended June 30, 2022 compared to $97.3 million, or $38.68 per MT, for the six months ended June 30, 2021. The increase in adjusted gross margin was primarily due to the aforementioned increase in net revenue and due to the increase in Support Payments partially offset by incremental fiber logistics, energy, and wood pellet distribution costs.

The Omicron variant of COVID-19 significantly impacted our operations and resulted in $13.9 million of incremental costs during the six months ended June 30, 2022, all of which were incurred during the three months ended March 31, 2022.

- The impact on our supply chain logistics within our fiber supply base as well as our truck and rail service providers was more pronounced than anticipated. Our third-party service providers' failure to perform resulted in unprecedented incremental costs to procure raw materials and produce and deliver our wood pellets to customers.

- We incurred incremental costs related to increased employee overtime and significant contract labor to partially offset plant employee absenteeism.

- We incurred incremental costs related to obtaining short-term rentals of equipment due to delayed delivery of acquired equipment to ensure continued operations.

The war in Ukraine impacted our operations and resulted in $5.1 million of incremental costs during the six months ended June 30, 2022, all of which were incurred during the three months ended March 31, 2022.

- Severe dislocations within our third-party shipping partners' operations resulted in incremental distribution costs related to demurrage and to loading, transporting, and unloading our wood pellets.

- The immediate spike in energy prices negatively impacted the cost of our operations including incremental costs to support continued services from our third-party fiber suppliers and trucking service providers.

Due to the increased average sales price per MT and the reduction in sales volumes as described above and after excluding the aforementioned incremental fiber logistics, energy, and wood pellet distribution costs, adjusted gross margin increased during the six months ended June 30, 2022 compared to the six months ended June 30, 2021.

*Selling, general, administrative, and development expenses*

Selling, general, administrative, and development expenses were $61.4 million and $65.9 million for the six months ended June 30, 2022 and 2021, respectively. The $4.5 million decrease in total selling, general, administrative, and development

31

A2539

expenses is primarily associated with decreased cash-based compensation and consulting expenses primarily due to the elimination of activities resulting from the Simplification Transaction.

*Depreciation and amortization*

Depreciation and amortization expense were $51.4 million and $44.7 million for the six months ended June 30, 2022 and 2021, respectively, primarily due to the Lucedale plant, Pascagoula terminal, and expansion assets placed in service.

*Interest expense*

We incurred $23.9 million and $30.9 million of interest expense during the six months ended June 30, 2022 and 2021, respectively. The decrease in interest expense from the prior year was primarily attributable to a lower cost of borrowing due to the extinguishment of the higher rate senior secured green term loan facility as part of the Simplification Transaction.

*Income tax*

We recorded an insignificant income tax expense for the six months ended June 30, 2022 and $0.9 million of income tax benefit during the six months ended June 30, 2021.

*Adjusted net loss*

| | | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- | --- |
| | | 2022 | 2021 (Recast) | | Change |
| | | (in thousands) | | | |
| Reconciliation of net loss to adjusted net loss: | | | | | |
| Net loss | $ | (72,649) | $ (48,026) | $ | (24,623) |
| Acquisition and integration costs and other | | 14,369 | 1,495 | | 12,874 |
| Effects of COVID-19 | | 15,189 | — | | 15,189 |
| Effects of the war in Ukraine | | 5,051 | — | | 5,051 |
| Support Payments | | 14,085 | — | | 14,085 |
| Adjusted net loss | $ | (23,955) | $ (46,531) | $ | 22,576 |

*Adjusted EBITDA*

| | | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- | --- |
| | | 2022 | 2021 (Recast) | | Change |
| | | (in thousands) | | | |
| Reconciliation of net loss to adjusted EBITDA: | | | | | |
| Net loss | $ | (72,649) | $ (48,026) | $ | (24,623) |
| Add: | | | | | |
| Depreciation and amortization | | 51,392 | 44,700 | | 6,692 |
| Interest expense | | 23,929 | 30,858 | | (6,929) |
| Income tax expense (benefit) | | 14 | (941) | | 955 |
| Equity-based compensation and other expense | | 20,917 | 15,192 | | 5,725 |
| Loss on disposal of assets | | 3,183 | 3,345 | | (162) |
| Changes in unrealized derivative instruments | | 535 | 798 | | (263) |
| Acquisition and integration costs and other | | 14,370 | 1,495 | | 12,875 |
| Effects of COVID-19 | | 15,189 | — | | 15,189 |
| Effects of the war in Ukraine | | 5,051 | — | | 5,051 |
| Support Payments | | 14,085 | — | | 14,085 |
| Adjusted EBITDA | $ | 76,016 | $ 47,421 | $ | 28,595 |

We generated adjusted EBITDA of $76.0 million for the six months ended June 30, 2022 compared to $47.4 million for the six months ended June 30, 2021. The $28.6 million increase was primarily attributable to the factors described above under the headings "Adjusted gross margin and adjusted gross margin per metric ton" and "Selling, general, administrative, and

32

A2540

development expenses."

*Distributable cash flow*

The following is a reconciliation of adjusted EBITDA to distributable cash flow:

| | | Six Months Ended June 30, | | | | |
|---|---|---|---|---|---|---|
| | | 2022 | | 2021 (Recast) | | Change |
| | | (in thousands) | | | | |
| Reconciliation of adjusted EBITDA to distributable cash flow attributable to Enviva: | | | | | | |
| Adjusted EBITDA | $ | 76,016 | $ | 47,421 | $ | 28,595 |
| Less: | | | | | | |
| Interest expense, net of amortization of debt issuance costs, debt premium, and original issue discount | | 22,670 | | 28,710 | | (6,040) |
| Maintenance capital expenditures | | 6,682 | | 7,844 | | (1,162) |
| Distributable cash flow attributable to Enviva Inc. | | 46,664 | | 10,867 | | 35,797 |
| Less: Distributable cash flow attributable to incentive distribution rights | | — | | 19,030 | | (19,030) |
| Distributable cash flow attributable to Enviva Inc. or Enviva Partners, LP limited partners | $ | 46,664 | $ | (8,163) | $ | 54,827 |

The following table presents a reconciliation of net loss to adjusted EBITDA and distributable cash flow for the six months ended June 30, 2021, on a recast basis and non-recast basis:

| | | Six Months Ended June 30, 2021 | | | | |
|---|---|---|---|---|---|---|
| | | Recast | | Adjustments | | Non-Recast |
| | | (in millions) | | | | |
| Net (loss) income | $ | (48.0) | $ | 49.2 | $ | 1.2 |
| Add: | | | | | | |
| Depreciation and amortization | | 44.7 | | (1.5) | | 43.2 |
| Interest expense | | 30.9 | | (5.6) | | 25.3 |
| Income tax benefit | | (0.9) | | 0.9 | | — |
| Equity-based compensation and other expense | | 15.2 | | (9.8) | | 5.4 |
| Loss on disposal of assets | | 3.3 | | — | | 3.3 |
| Changes in unrealized derivative instruments | | 0.8 | | — | | 0.8 |
| Acquisition and integration costs and other | | 1.5 | | (0.5) | | 1.0 |
| MSA Fee Waivers | | — | | 15.0 | | 15.0 |
| Adjusted EBITDA | | 47.5 | | 47.7 | | 95.2 |
| Less: | | | | | | |
| Interest expense, net of amortization of debt issuance costs, debt premium, and original issue discount | | 28.7 | | (4.7) | | 24.0 |
| Maintenance capital expenditures | | 7.8 | | — | | 7.8 |
| Distributable cash flow | $ | 11.0 | $ | 52.4 | $ | 63.4 |

33

A2541

The following is a reconciliation of net loss to adjusted EBITDA and distributable cash flow for the six months ended June 30, 2022 and the six months ended June 30, 2021 on a non-recast basis:

| | Six Months Ended June 30, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | Change |
| | (in millions) | | |
| Net (loss) income | $ (72.6) | $ 1.2 | $ (73.8) |
| Add: | | | |
| Depreciation and amortization | 51.4 | 43.2 | 8.2 |
| Interest expense | 23.9 | 25.3 | (1.4) |
| Equity-based compensation and other expense | 20.9 | 5.4 | 15.5 |
| Loss on disposal of assets | 3.2 | 3.3 | (0.1) |
| Changes in unrealized derivative instruments | 0.5 | 0.8 | (0.3) |
| Acquisition and integration costs and other | 14.4 | 1.0 | 13.4 |
| Effects of COVID-19 | 15.2 | — | 15.2 |
| Effects of the war in Ukraine | 5.1 | — | 5.1 |
| Support Payments and MSA Fee Waivers | 14.1 | 15.0 | (0.9) |
| Adjusted EBITDA | 76.1 | 95.2 | (19.1) |
| Less: | | | |
| Interest expense, net of amortization of debt issuance costs, debt premium, and original issue discount | 22.7 | 24.0 | (1.3) |
| Maintenance capital expenditures | 6.7 | 7.8 | (1.1) |
| Distributable cash flow | $ 46.7 | $ 63.4 | $ (16.7) |

## Liquidity and Capital Resources

### *Overview*

Our primary sources of liquidity include cash and cash equivalent balances, cash generated from operations, availability under our senior secured revolving credit facility and, from time to time, debt and equity offerings. Our primary liquidity needs are to fund working capital, service our debt, finance greenfield construction projects, growth initiatives, and maintenance capital expenditures, and pay dividends. We believe cash on hand, cash generated from our operations and the availability of our senior secured revolving credit facility will be sufficient to meet our primary liquidity requirements. Similar to previous years, we expect cash generated from operations for the second half of 2022 to be significantly higher than the first half of the year due to the predictable seasonality in our business as well as, in this case, the ramp of production at our newest plant in Lucedale, Mississippi. However, future capital expenditures, such as expenditures made in relation to acquisitions of plants or terminals, plant development and/or plant expansion projects, and other cash requirements could be higher than we currently expect as a result of various factors. Additionally, our ability to generate sufficient cash from our operating activities depends on our future performance, which is subject to general economic, political, financial, competitive, and other factors beyond our control.

Our liquidity as of June 30, 2022, which included cash on hand (including cash generally restricted to funding a portion of the costs of the acquisition, construction, equipping, and financing of our Epes plant) and availability under our $570.0 million senior secured revolving credit facility, was $184.1 million. Our liquidity as of June 30, 2022 does not include any proceeds resulting from the Tax-Exempt Green Bonds issued in July 2022.

### *Cash Dividends*

We intend to pay cash dividends to holders of our common stock of $3.62 per common stock for 2022, except cash will not be paid on 9.0 million of the 16.0 million common units issued in connection with the Simplification Transaction where the former owners of our former sponsor have agreed to reinvest in our common stock all dividends paid for the period beginning with the third quarter of 2021 through the fourth quarter of 2024.

34

A2542

*Capital Requirements*

We operate in a capital-intensive industry, which requires significant investments to develop and construct new production and terminal facilities, and maintain and upgrade our existing facilities. Our capital requirements primarily have consisted, and we anticipate will continue to consist, of the following:

- Maintenance capital expenditures, which are cash expenditures incurred to maintain our long-term operating income or operating capacity. These expenditures typically include certain system integrity, compliance, and safety improvements; and

- Growth capital expenditures, which are cash expenditures we expect will increase our operating income or operating capacity over the long term. Growth capital expenditures include acquisitions or construction of new capital assets or capital improvements such as additions to or improvements on our existing capital assets as well as projects intended to extend the useful life of assets.

The classification of capital expenditures as either maintenance or growth is made at the individual asset level during our budgeting process and as we approve, execute, and monitor our capital spending.

We plan to invest $255.0 million to $275.0 million in capital expenditures in 2022. Of that amount, we expect to invest (i) $210.0 million to $220.0 million primarily on the production plant in Lucedale Mississippi which is in the process of ramping production, as well as the Pascagoula terminal, and the construction of the Epes plant, (ii) $30.0 million to $35.0 million primarily on the Multi-Plant Expansions, and (iii) $15.0 million to $20.0 million on maintenance capital expenditures.

Our current financing strategy is to fund acquisitions and construction activities with a combination of cash from operations and debt.

**Cash Flows**

The following table sets forth a summary of our net cash flows from operating, investing and financing activities for the six months ended June 30, 2022 and 2021:

|  | Six Months Ended June 30, | |
| --- | --- | --- |
|  | 2022 | 2021 (Recast) |
|  | (in thousands) | |
| Net cash (used in) provided by operating activities | $ (68,891) | $ 62,171 |
| Net cash used in investing activities | (102,405) | (153,983) |
| Net cash provided by financing activities | 201,234 | 190,399 |
| Net increase in cash, cash equivalents, and restricted cash | $ 29,938 | $ 98,587 |

*Cash Used in Operating Activities*

Net cash used in operating activities was $68.9 million and net cash provided by operating activities was $62.2 million for the six months ended June 30, 2022 and 2021, respectively. The $131.1 million decrease in net cash used in operating activities during the six months ended June 30, 2022 compared to the six months ended June 30, 2021 was primarily due to a decrease in cash from net loss adjusted for non-cash items of $11.5 million and a decrease in cash from changes in working capital of $119.6 million. The decrease in cash from changes in working capital was primarily attributable to a $71.1 million increase in accounts receivable and inventories due to the timing of shipments, and an $11.9 million decrease in accounts payable, accrued liabilities, other current liabilities, and accrued interest due to timing of payments.

*Cash Used in Investing Activities*

Net cash used in investing activities was $102.4 million and $154.0 million for the six months ended June 30, 2022 and 2021, respectively. The $51.6 million decrease in cash used in investing activities during the six months ended June 30, 2022 compared to the six months ended June 30, 2021 was primarily due to the timing of capital expenditures at the Lucedale plant, Pascagoula terminal, and on various expansion projects.

*Cash Provided by Financing Activities*

Net cash provided by financing activities was $201.2 million and $190.4 million for the six months ended June 30, 2022 and 2021, respectively. The $10.8 million increase in net cash provided by financing activities during the six months ended June 30, 2022 compared to the six months ended June 30, 2021 was primarily attributable to cash used to acquire a

35

noncontrolling interest of $130.1 million during the six months ended June 30, 2021, an increase in proceeds from the issuance of common shares or units of $118.1 million, a decrease in net proceeds from debt of $174.5 million, and an increase in cash dividends or distributions and equivalent rights of $60.7 million.

**Off-Balance Sheet Arrangements**

As of June 30, 2022, we did not have any off-balance sheet arrangements.

**Critical Accounting Policies and Estimates**

The preparation of financial statements in conformity with GAAP requires management to make judgments, estimates, and assumptions that affect the amounts reported in our unaudited condensed consolidated financial statements and accompanying notes. Actual results could differ materially from those estimates. We provide expanded discussion of our significant accounting policies, estimates, and judgments in our 2021 Form 10-K. We believe these accounting policies reflect our significant estimates and assumptions used in preparation of our financial statements. There have been no significant changes to our critical accounting policies and estimates since December 31, 2021.

**Item 3. Quantitative and Qualitative Disclosures About Market Risk**

There have been no material changes to our exposure to market risk as disclosed in our Annual Report on Form 10-K for the year ended December 31, 2021.

**Item 4. Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures*

An evaluation of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13(a)-15(e) and 15(d)-15(e) under the Exchange Act) was carried out under the supervision and with the participation of management, including the Chief Executive Officer and Chief Financial Officer. Our disclosure controls and procedures are designed to provide reasonable assurance that the information required to be disclosed by us in reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure and is recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the SEC. Based on their evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the design and operation of our disclosure controls and procedures were effective as of June 30, 2022.

*Changes in Internal Control over Financial Reporting*

During the quarter ended June 30, 2022, there were no changes in our internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

A2544

## PART II—OTHER INFORMATION

### Item 1. Legal Proceedings

There have been no material changes with respect to the legal proceedings disclosed in our Annual Report on form 10-K for the year ended December 31, 2021.

### Item 1A. Risk Factors

There have been no material changes with respect to the risk factors disclosed in our Annual Report on Form 10-K for the year ended December 31, 2021.

### Item 6. Exhibits

The information required by this Item 6 is set forth in the Exhibit Index accompanying the Quarterly Report on Form 10-Q and is incorporated herein by reference.

### EXHIBIT INDEX

| Exhibit Number | Exhibit |
|---|---|
| 3.1 | Certificate of Incorporation of Enviva Inc. (Exhibit 3.1, Form 8-K filed January 3, 2022, File No. 001-37363) |
| 3.2 | Bylaws of Enviva Inc. (Exhibit 3.2, Form 8-K filed January 3, 2022, File No. 001-37363) |
| 10.1*† | Fifth Amended and Restated Employment Agreement by and between Enviva Management Company, LLC and Thomas Meth, dated June 4, 2022 |
| 10.2*† | Sixth Amended and Restated Employment Agreement by and between Enviva Management Company, LLC and William H. Schmidt, Jr., dated June 4, 2022 |
| 31.1* | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2* | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1** | Certification of Chief Executive Officer and Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101 | The following financial information from Enviva Inc.'s Quarterly Report on Form 10-Q for the quarter ended June 30, 2022 formatted in Inline XBRL (Extensible Business Reporting Language) includes: (i) the Condensed Consolidated Balance Sheets, (ii) the Condensed Consolidated Statements of Operations, (iii) the Condensed Consolidated Statements of Comprehensive Loss, (iv) the Condensed Consolidated Statements of Changes in Equity, (v) the Condensed Consolidated Statements of Cash Flows and (vi) Notes to the Condensed Consolidated Financial Statements. |
| 104 | Cover Page Interactive Data File - (formatted as Inline XBRL and contained in Exhibit 101) |

\*    Filed herewith.

\*\*    Furnished herewith.

†    Management Contract or Compensatory Plan or Arrangement

A2545

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized.

ENVIVA INC.

Date: August 3, 2022

By:   /s/ SHAI S. EVEN
      Shai S. Even
Title:   *Executive Vice President and Chief Financial Officer (Principal Financial Officer)*

38

A2546

## FIFTH AMENDED AND RESTATED
## EMPLOYMENT AGREEMENT

This Fifth Amended and Restated Employment Agreement ("Agreement") is made and entered into as of June 4, 2022 (the "Amendment Effective Date") by and between Enviva Management Company, LLC, a Delaware limited liability company (the "Company"), and Thomas Meth ("Executive") and supersedes and replaces in its entirety the Fourth Amended and Restated Employment Agreement (the "Prior Agreement") entered into as of December 1, 2021 by and between the Company and Executive.

1.    **Employment**. During the period commencing on the Amendment Effective Date and for the duration of the Employment Period (as defined in Section 4 below), the Company shall continue to employ Executive, and Executive shall serve, as President of the Company, Enviva Inc., a Delaware corporation ("EVA"), and such other Affiliates of the Company as may be designated by EVA from time to time.

2.    **Duties and Responsibilities of Executive**.

(a)    During the Employment Period, Executive shall devote Executive's full business time and attention to the business of the Company and its Affiliates, as applicable, and will not hold any outside employment or consulting position. Executive's duties pursuant to this Agreement will include those normally incidental to the position identified in Section 1, as well as such additional duties as may be assigned to Executive by EVA from time to time.

(b)    Executive represents and covenants that Executive is not the subject of or a party to any employment agreement, non-competition or non-solicitation covenant, non-disclosure agreement, or any other agreement, covenant, understanding, or restriction that would prohibit Executive from executing this Agreement and fully performing Executive's duties and responsibilities hereunder, or would in any manner, directly or indirectly, limit or affect the duties and responsibilities that may now or in the future be assigned to Executive hereunder.

(c)    Executive acknowledges and agrees that Executive owes the Company and its Affiliates fiduciary duties, including duties of care, loyalty, fidelity, and allegiance, such that Executive shall act at all times in the best interests of the Company and its Affiliates and shall not appropriate any business opportunity of the Company or its Affiliates for Executive. Executive agrees that the obligations described in this Agreement are in addition to, and not in lieu of, the obligations Executive owes the Company and its Affiliates under common law. The Parties acknowledge and agree that Executive may provide services (including as an executive, employee, director, or otherwise) to multiple Affiliates of the Company and, in providing such services, Executive will not be violating Executive's obligations hereunder so long as Executive abides by the terms of Sections 7, 8, and 9 below in the course of performing such services.

3.    **Compensation**.

(d)    Base Salary. As of the Amendment Effective Date, Executive's annualized base salary shall be $625,000 (the "Base Salary"). The Base Salary shall be provided in consideration for Executive's services under this Agreement, and payable on a not less than biweekly basis, in conformity with the Company's customary payroll practices for executives as in effect from time to time.

(e)    Annual Bonus. During the Employment Period, Executive shall be eligible for discretionary bonus compensation for the 2022 calendar year (so long as Executive remains employed through the 2022 calendar year) and each subsequent complete calendar year that Executive is employed by the Company hereunder (each, a "Bonus Year") pursuant to the

applicable incentive or bonus compensation plan of the Company, if any, that is applicable to similarly situated executives of the Company (each, an "Annual Bonus"). Each Annual Bonus shall have a target value that is not less than 125% of Executive's Base Salary as in effect on the first day of the Bonus Year to which such Annual Bonus relates (the "Target Annual Bonus"); *provided*, *however*, that the Target Annual Bonus for the 2022 calendar year shall have a target value of not less than $703,125. The performance targets that must be achieved in order to realize certain bonus levels shall be established by the board of directors of EVA (the "Board") or a committee thereof annually, in its sole discretion, and communicated to Executive in accordance with terms of the applicable incentive or bonus plan, if any, or if no such plan has been adopted, within the first 90 days of each applicable Bonus Year following 2022. Each Annual Bonus, if any, will be paid as soon as administratively feasible after the Board or a committee thereof certifies whether the applicable performance targets for the applicable Bonus Year have been achieved, but in no event later than March 15 following the end of such Bonus Year.

(f)     Long-Term Incentive Plan. With respect to the 2023 calendar year and each subsequent calendar year during the Employment Period, Executive shall be eligible to receive annual awards under the EVA equity compensation plan as in effect from time to time (the "LTIP") with a target value equal to 300% of Executive's Base Salary as in effect on the first day of such calendar year (the "Target Annual LTIP Award"). All awards granted to Executive under the LTIP, if any, shall be on such terms and conditions as the Board, or a committee thereof, shall determine from time to time and shall be subject to and governed by the terms and provisions of the LTIP as in effect from time to time and the award agreements evidencing such awards. Nothing herein shall be construed to give Executive any rights to any amount or type of grant or award except as provided in such award to Executive provided in writing and authorized by the Board (or a committee thereof).

4.     **Term of Employment**. The current term of Executive's employment under this Agreement is the period commencing on the Amendment Effective Date and ending on the first anniversary of the Amendment Effective Date (the "Current Term"). On the first anniversary of the Amendment Effective Date and on each subsequent anniversary of the Amendment Effective Date thereafter, the term of Executive's employment under this Agreement shall automatically renew and extend for a period of 12 months (each such 12-month period being a "Renewal Term") unless written notice of non-renewal is delivered by either party to the other not less than 60 days prior to the expiration of the then-existing Current Term or Renewal Term, as applicable. Notwithstanding any other provision of this Agreement to the contrary, Executive's employment pursuant to this Agreement may be terminated at any time in accordance with Section 6. The period from the Amendment Effective Date through the expiration of this Agreement or, if sooner, the termination of Executive's employment pursuant to this Agreement, regardless of the time or reason for such termination, shall be referred to herein as the "Employment Period."

5.     **Reimbursement of Business Expenses; Benefits**. Subject to the terms and conditions of this Agreement, Executive shall be entitled to the following reimbursements and benefits during the Employment Period:

(a)     Reimbursement of Business Expenses. The Company agrees to reimburse Executive for Executive's reasonable business-related expenses incurred in the performance of Executive's duties under this Agreement; *provided* that Executive timely submits all documentation for such reimbursement, as required by Company policy in effect from time-to-time. Any reimbursement of expenses under this Section 5(a) or Section 12 shall be made by the Company upon or as soon as practicable following receipt of supporting documentation reasonably satisfactory to the Company (but in any event not later than the close of Executive's taxable year following the taxable year in which the expense is incurred by Executive); *provided*, *however*, that, upon the termination of Executive's employment with the Company, in no event

2

shall any additional reimbursement be made prior to the date that is six months after the date of such termination (or, if earlier, prior to the date of Executive's death) to the extent such payment delay is required under Section 409A(a)(2)(B) of the Internal Revenue Code. In no event shall any reimbursement be made to Executive for such expenses incurred after the date that is five years after the date of the termination of Executive's employment with the Company. Executive is not permitted to receive a payment in lieu of reimbursement under this Section 5(a) or Section 12.

(b)    Benefits. Executive shall be eligible to participate in the same benefit plans or fringe benefit policies in which other similarly situated Company employees are eligible to participate, subject to applicable eligibility requirements and the terms and conditions of such plans and policies as in effect from time to time. The Company shall not, by reason of this Section 5(b), be obligated to institute, maintain, or refrain from changing, amending, or discontinuing, any such plan or policy, so long as such changes are similarly applicable to similarly situated Company employees generally.

6.    **Termination of Employment**.

(g)    Company's Right to Terminate Executive's Employment for Cause. The Company shall have the right to terminate Executive's employment at any time for Cause. For purposes of this Agreement, "Cause" shall mean Executive's:

(i)    material breach of any policy established by the Company or any of its Affiliates that (x) pertains to health and safety and (y) is applicable to Executive;

(ii)    engaging in acts of disloyalty to the Company or its Affiliates, including fraud, embezzlement, theft, commission of a felony, or proven dishonesty; or

(iii)    willful misconduct in the performance of, or willful failure to perform a material function of, Executive's duties under this Agreement.

(c)    Company's Right to Terminate for Convenience. The Company shall have the right to terminate Executive's employment without Cause, at any time and for any reason or no reason at all.

(d)    Executive's Right to Terminate for Good Reason. Executive shall have the right to terminate Executive's employment with the Company at any time for Good Reason. For purposes of this Agreement, "Good Reason" shall mean:

(iv)    a material diminution in Executive's authority, duties, title, or responsibilities;

(v)    a material diminution in Executive's Base Salary, Target Annual Bonus, or Target Annual LTIP Award;

(vi)    the relocation of the geographic location of Executive's principal place of employment by more than 100 miles from the location of Executive's principal place of employment as of the Amendment Effective Date; or

(vii)    the Company's delivery of a written notice of non-renewal of this Agreement to Executive.

Notwithstanding the foregoing provisions of this Section 6(c) or any other provision of this Agreement to the contrary, any assertion by Executive of a termination for Good Reason shall

3

A2549

not be effective unless all of the following conditions are satisfied: (A) the condition described in Section 6(c)(i), (ii), (iii), or (iv) giving rise to Executive's termination of Executive's employment must have arisen without Executive's written consent; (B) Executive must provide written notice to the Company of such condition within 30 days of the date on which Executive knew of the existence of the condition; (C) the condition specified in such notice must remain uncorrected for 30 days after receipt of such notice by the Company; and (D) the date of Executive's termination of Executive's employment must occur within 30 days after the end of such cure period.

(h)     Death or Disability. Executive's employment with the Company shall terminate upon the death or Disability of Executive. For purposes of this Agreement, a "Disability" shall exist if Executive is unable to perform the essential functions of Executive's position, with reasonable accommodation (if applicable), due to an illness or physical or mental impairment or other incapacity that continues for a period in excess of 90 days, whether consecutive or not, in any period of 365 consecutive days. The determination of a Disability will be made by the Company after obtaining an opinion from a doctor of the Company's choosing. Executive agrees to provide such information and participate in such examinations as may be reasonably required by said doctor in order to form his or her opinion. If requested by the Company, Executive shall submit to a mental or physical examination to be performed by an independent physician selected by the Company to assist the Company in making such determination.

(i)     Executive's Right to Terminate for Convenience. Executive shall have the right to terminate Executive's employment with the Company for convenience at any time upon 60 days' advance written notice to the Company; *provided* that if Executive provides a notice of termination pursuant to this Section 6(e), the Company may designate an earlier termination date than that specified in Executive's notice. The Company's designation of such an earlier date will not change the nature of Executive's termination, which will still be deemed a voluntary resignation by Executive pursuant to this Section 6(e).

(j)     Effect of Termination.

(viii)    If Executive's employment hereunder shall terminate (1) pursuant to Section 4 at the expiration of the then-existing Current Term or Renewal Term, as applicable, as a result of a non-renewal of this Agreement by Executive or (2) pursuant to Section 6(a) or 6(e), then all compensation and all benefits to Executive hereunder shall terminate contemporaneously with such termination of employment, except that Executive shall be entitled to (x) payment of all earned, unpaid Base Salary within 30 days of Executive's last day of employment, or earlier if required by law, (y) reimbursement for all incurred but unreimbursed expenses for which Executive is entitled to reimbursement in accordance with Section 5(a) and Section 12, and (z) benefits to which Executive may be entitled pursuant to the terms of any plan or policy described in Section 5(b).

(ix)    If Executive's employment terminates (1) pursuant to Section 6(b) or 6(c) or (2) due to Executive's death or Disability pursuant to Section 6(d), then all compensation and all benefits to Executive hereunder shall terminate contemporaneously with such termination of employment, except that (I) Executive shall be entitled to receive the compensation and benefits described in clauses (x) through (z) of Section 6(f)(i); and (II) if Executive executes, on or before the Release Expiration Date (as defined below), and does not revoke within the time provided by the Company to do so, a release of all claims in a form satisfactory to the Company (which shall be substantially similar to the form of release attached hereto as Exhibit A) (the "Release")), then, *provided* that Executive abides by the terms of Sections 7, 8, 9, 10, and 12:

4

A2550

(A)    The Company shall pay to Executive an amount (the "Severance Payment") equal to the sum of Executive's Base Salary as in effect on the date of the termination of Executive's employment (the "Termination Date") and Executive's Target Annual Bonus as of the Termination Date. The Severance Payment will be divided into 24 substantially equal installments. On the Company's first regularly scheduled pay date that is on or after the date that is 60 days after the Termination Date, the Company shall pay to Executive, without interest, a number of such installments equal to the number of such installments that would have been paid during the period beginning on the Termination Date and ending on the Company's first regularly scheduled pay date that is on or after the date that is 60 days after the Termination Date had the installments been paid on a biweekly basis commencing on the Company's first regularly scheduled pay date coincident with or next following the Termination Date, and each of the remaining installments shall be paid on a biweekly basis thereafter; *provided*, *however*, that (1) to the extent, if any, that the aggregate amount of the installments of the Severance Payment that would otherwise be paid pursuant to the preceding provisions of this Section 6(f)(ii)(A) after March 15 of the calendar year following the calendar year in which the Termination Date occurs (the "Applicable March 15") exceeds the maximum exemption amount under Treasury Regulation Section 1.409A-1(b)(9)(iii)(A), then such excess shall be paid to Executive in a lump sum on the Applicable March 15 (or the first business day preceding the Applicable March 15 if the Applicable March 15 is not a business day) and the installments of the Severance Payment payable after the Applicable March 15 shall be reduced by such excess (beginning with the installment first payable after the Applicable March 15 and continuing with the next succeeding installment until the aggregate reduction equals such excess), and (2) all remaining installments of the Severance Payment, if any, that would otherwise be paid pursuant to the preceding provisions of this Section 6(f)(ii)(A) after December 31 of the calendar year following the calendar year in which the Termination Date occurs shall be paid with the installment of the Severance Payment, if any, due in December of the calendar year following the calendar year in which the Termination Date occurs.

(B)    All outstanding awards granted to Executive pursuant to the LTIP prior to the Termination Date that remain unvested as of the Termination Date shall immediately become fully vested as of the Termination Date; *provided*, *however*, that with respect to any such LTIP awards that were granted subject to a performance requirement (other than continued service by Executive) that has not been satisfied and certified by the Board (or a committee thereof) as of the Termination Date, then (1) if the Termination Date occurs within six months prior to the expiration of the performance period applicable to such LTIP award, such LTIP award shall become vested based on actual performance upon the expiration of such performance period; and (2) if the Termination Date occurs at any other time during the performance period applicable to such LTIP award, such LTIP award shall become vested as of the Termination Date based on target performance.

(C)    If Executive timely and properly elects to continue coverage for Executive and Executive's spouse and eligible dependents, if any, under the Company's group health plans pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), similar in the amounts and types of coverage provided by the Company to Executive prior to the Termination Date, then for a period of 12 months following the Termination Date or such earlier date as provided in this Section 6(f)(ii)(C), the Company shall

5

promptly reimburse Executive on a monthly basis for the entire amount Executive pays to effect and continue such coverage; *provided*, *however*, that Executive's rights to such reimbursements under this Section 6(f)(ii)(C) shall terminate upon the earlier of (1) the time Executive becomes eligible to be covered under a group health plan sponsored by another employer (and Executive shall promptly notify the Company in the event that Executive becomes so eligible) or (2) the date Executive is no longer eligible to receive COBRA continuation coverage. Notwithstanding anything in the preceding provisions of this Section 6(f)(ii)(C) to the contrary, (x) the election of COBRA continuation coverage and the payment of any premiums due with respect to such COBRA continuation coverage will remain Executive's sole responsibility, and the Company will assume no obligation for payment of any such premiums relating to such COBRA continuation coverage and (y) if the provision of the benefit described in this Section 6(f)(ii)(C) cannot be provided in the manner described above without penalty, tax, or other adverse impact on the Company, then the Company and Executive shall negotiate in good faith to determine an alternative manner in which the Company may provide a substantially equivalent benefit to Executive without such adverse impact on the Company.

For purposes of this Section 6(f)(ii), in the event of Executive's death, references to Executive (other than in Section 6(f)(ii)(C)) shall include Executive's estate, and references to Executive in Section 6(f)(ii)(C) shall include Executive's spouse and eligible dependents, if any, who are "qualified beneficiaries" (within the meaning of COBRA and the regulations thereunder) with respect to Executive's death.

(x)    Executive acknowledges Executive's understanding that if the Release is not executed and returned to the Company on or before the Release Expiration Date, and the required revocation period has not fully expired without revocation of the Release by Executive, then Executive shall not be entitled to any payments or benefits pursuant to Section 6(f)(ii). As used herein, the "Release Expiration Date" is that date that is 21 days following the date upon which the Company delivers the Release to Executive (which shall occur no later than seven days after the Termination Date) or, in the event that such termination of employment is "in connection with an exit incentive or other employment termination program" (as such phrase is defined in the Age Discrimination in Employment Act of 1967, as amended), the date that is 45 days following such delivery date.

(k)    Meaning of Termination of Employment. For all purposes of this Agreement, Executive shall be considered to have terminated employment with the Company when Executive incurs a "separation from service" with the Company within the meaning of Section 409A(a)(2)(A)(i) of the Internal Revenue Code; *provided*, *however*, that whether such a separation from service has occurred shall be determined based upon a reasonably anticipated permanent reduction in the level of bona fide services to be performed to no more than 25% of the average level of bona fide services provided in the immediately preceding 36 months.

7.    **Conflicts of Interest; Disclosure of Opportunities**. Executive agrees that Executive shall promptly disclose to the Board any conflict of interest involving Executive upon Executive becoming aware of such conflict. Executive further agrees that, throughout the Employment Period and for one year after Executive is no longer employed by the Company, Executive shall offer to the Company and its Affiliates, as applicable, all business opportunities relating to the acquisition, development, ownership, and operation of facilities that collect, process, and transform wood-based biomass into renewable energy feedstock, including wood pellets, regardless of where such business opportunities arise.

6

A2552

8.    **<u>Confidentiality</u>**. Executive acknowledges and agrees that, in the course of Executive's employment with the Company, Executive has been provided with and had access to (and, during the Employment Period, Executive will continue to be provided with, and have access to) valuable Confidential Information (as defined below). In consideration of Executive's receipt of and access to such Confidential Information and in exchange for other valuable consideration provided hereunder, and as a condition of Executive's employment hereunder, Executive agrees to comply with this Section 8.

(e)    Executive covenants and agrees, both during the Employment Period and thereafter that, except as expressly permitted by this Agreement or by directive of the Board, Executive shall not disclose any Confidential Information to any Person and shall not use any Confidential Information except for the benefit of the Company or any of its Affiliates. Executive shall take all reasonable precautions to protect the physical security of all documents and other material containing Confidential Information (regardless of the medium on which the Confidential Information is stored). The covenants in this Section 8(a) shall apply to all Confidential Information, whether now known or later to become known to Executive during the Employment Period.

(f)    Notwithstanding Section 8(a), Executive may make the following disclosures and uses of Confidential Information:

(i)    disclosures to other executives or employees of the Company or its Affiliates who have a need to know the information in connection with the business of the Company or its Affiliates;

(ii)    disclosures and uses that are incidental to Executive's provision of services to the Company and its Affiliates consistent with the terms of this Agreement or that are approved by the Board;

(iii)    disclosures for the purpose of complying with any applicable laws or regulatory requirements; or

(iv)    disclosures that Executive is legally compelled to make by deposition, interrogatory, request for documents, subpoena, civil investigative demand, order of a court of competent jurisdiction, or similar process, or otherwise by law.

(l)    Upon the end of Executive's employment with the Company and at any other time upon request of the Company, Executive shall surrender and deliver to the Company all documents (including electronically stored information) and other material of any nature containing or pertaining to all Confidential Information in Executive's possession and shall not retain any such document or other material. Within 10 days of any such request, Executive shall certify to the Company in writing that all such materials have been returned to the Company.

(m)    All non-public information, designs, ideas, concepts, improvements, product developments, discoveries, and inventions, whether patentable or not, that are conceived, made, developed, or acquired by Executive, individually or in conjunction with others, during the period Executive is or has been employed or affiliated with the Company or any of its Affiliates (whether during business hours or otherwise and whether on the Company's premises or otherwise) that relate to the Company's or any of its Affiliates' business or properties, products, or services (including all such information relating to corporate opportunities, business plans, trade secrets, strategies for developing business and market share, research, financial and sales data, pricing terms, evaluations, opinions, interpretations, acquisition prospects, the identity of customers or their requirements, the identity of key contacts within customers' organizations or within the organization of acquisition prospects, or marketing and merchandising techniques,

7

A2553

prospective names and marks) is defined as "Confidential Information." Moreover, all documents, videotapes, written presentations, brochures, drawings, memoranda, notes, records, files, correspondence, manuals, models, specifications, computer programs, e-mail, voicemail, electronic databases, maps, drawings, architectural renditions, models, and all other writings or materials of any type including or embodying any of such information, ideas, concepts, improvements, discoveries, inventions, and other similar forms of expression are and shall be the sole and exclusive property of the Company or its Affiliates and be subject to the same restrictions on disclosure applicable to all Confidential Information pursuant to this Agreement.

(n)    Nothing in this Agreement shall prohibit or restrict Executive from lawfully (i) initiating communications directly with, cooperating with, providing information to, causing information to be provided to, or otherwise assisting in an investigation by any governmental or regulatory agency, entity, or official(s) (collectively, "Governmental Authorities") regarding a possible violation of any law, (ii) responding to any inquiry or legal process directed to Executive individually from any such Governmental Authorities, (iii) testifying, participating, or otherwise assisting in an action or proceeding by any such Governmental Authorities relating to a possible violation of law, or (iv) making any other disclosures that are protected under the whistleblower provisions of any applicable law. Additionally, pursuant to the federal Defend Trade Secrets Act of 2016, Executive shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (x) is made (A) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (B) solely for the purpose of reporting or investigating a suspected violation of law, or (y) is made to Executive's attorney in relation to a lawsuit for retaliation against Executive for reporting a suspected violation of law, or (z) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Nor does this Agreement require Executive to obtain prior authorization from the Company or its Affiliates before engaging in any conduct described in this Section 8(e), or to notify the Company or its Affiliates that Executive has engaged in any such conduct.

9.    **Non-Competition; Non-Solicitation**.

(a)    The Company shall continue to provide Executive access to Confidential Information for use only during the period of Executive's employment with the Company, and Executive acknowledges and agrees that the Company will be entrusting Executive, in Executive's unique and special capacity, with continuing to develop the goodwill of the Company, and in consideration thereof and in consideration of the continued access to Confidential Information, and as a condition of Executive's employment hereunder, Executive has voluntarily agreed to the covenants set forth in this Section 9. Executive further agrees and acknowledges that the limitations and restrictions set forth herein, including the geographical and temporal restrictions on certain competitive activities, are reasonable in all respects and are material and substantial parts of this Agreement intended and necessary to protect the Company's legitimate business interests, including the preservation of its Confidential Information and goodwill.

(b)    Executive agrees that, during the period set forth in Section 9(c) below, Executive shall not, without the prior written approval of the Company, directly or indirectly, for Executive or on behalf of or in conjunction with any other person or entity of whatever nature:

(i)    engage or participate within the Market Area in competition with the Company in any business in which either the Company or its Protected Affiliates engaged in, or had plans to become engaged in of which Executive was aware during the period of Executive's employment with the Company or the period set forth in Section 9(c) below, which business includes the acquisition, development, ownership, and operation of facilities that collect, process, and transform wood-based biomass into

8

A2554

renewable energy feedstock, including wood pellets (the "Business"). As used herein, the term "Protected Affiliates" means any Affiliate of the Company for which Executive provided services during the period of Executive's employment with the Company, or about which Executive obtained Confidential Information during the period of Executive's employment with the Company.

(ii)     appropriate any Business Opportunity of, or relating to, the Company or its Affiliates located in the Market Area, or engage in any activity that is detrimental to the Company or its Affiliates or that limits the Company's or an Affiliate's ability to fully exploit such Business Opportunities or prevents the benefits of such Business Opportunities from accruing to the Company or its Affiliates; or

(iii)     solicit any employee of the Company or its Affiliates to terminate his or her employment therewith.

(o)     Timeframe of Non-Competition and Non-Solicitation Agreement. Executive agrees that the covenants of this Section 9 shall be enforceable during the period that Executive is employed by the Company and for a period of one year following the date that Executive is no longer employed by the Company, regardless of the reason for such termination.

(p)     Because of the difficulty of measuring economic losses to the Company and its Affiliates as a result of a breach of the foregoing covenants, and because of the immediate and irreparable damage that could be caused to the Company and its Affiliates for which they would have no other adequate remedy, Executive agrees that the foregoing covenant may be enforced by the Company and its Affiliates, in the event of breach by Executive, by injunctions and restraining orders and that such enforcement shall not be the Company's and its Affiliates' exclusive remedy for a breach but instead shall be in addition to all other rights and remedies available to the Company and its Affiliates, both at law and in equity.

(q)     The covenants in this Section 9 are severable and separate, and the unenforceability of any specific covenant (or any portion thereof) shall not affect the provisions of any other covenant (or any portion thereof). Moreover, in the event any court of competent jurisdiction or arbitrator, as applicable, shall determine that the scope, time, or territorial restrictions set forth in this Section 9 are unreasonable, then it is the intention of the parties that such restrictions be enforced to the fullest extent that the court or arbitrator deems reasonable, and this Agreement shall thereby be reformed.

(r)     For purposes of this Section 9, the following terms shall have the following meanings:

(iv)     "Business Opportunity" shall mean any commercial, investment, or other business opportunity relating to the Business.

(v)     "Market Area" shall mean any location or geographic area within 75 miles of a location where the Company or its Affiliates conducts Business, or has plans to conduct Business of which Executive is aware, during the period of Executive's employment with the Company.

(g)     All of the covenants in this Section 9 shall be construed as an agreement independent of any other provision in this Agreement, and the existence of any claim or cause of action of Executive against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of such covenants.

9

10.     **Ownership of Intellectual Property**. Executive agrees that the Company or its applicable Affiliate shall own, and Executive hereby assigns, all right, title, and interest (including patent rights, copyrights, trade secret rights, mask work rights, trademark rights, and all other intellectual and industrial property rights of any sort throughout the world) relating to any and all inventions (whether or not patentable), works of authorship, mask works, designs, know-how, ideas, and information authored, created, contributed to, made, or conceived or reduced to practice, in whole or in part, by Executive during the period that Executive is or has been employed or affiliated with the Company or any of its Affiliates that either (a) relate, at the time of conception, reduction to practice, creation, derivation, or development, to the Company's or any of its Affiliates' business or actual or anticipated research or development, or (b) were developed on any amount of the Company's time or with the use of any of the Company's or its Affiliates' equipment, supplies, facilities, or trade secret information (all of the foregoing collectively referred to herein as "Company Intellectual Property"), and Executive will promptly disclose all Company Intellectual Property to the Company. All of Executive's works of authorship and associated copyrights created during the period that Executive is or has been employed by the Company or any of its Affiliates and in the scope of Executive's employment shall be deemed to be "works made for hire" within the meaning of the Copyright Act. Executive agrees to perform, during and after the Employment Period, all reasonable acts deemed necessary by the Company to assist the Company or its applicable Affiliate, at the Company's or such Affiliate's expense, in obtaining and enforcing its rights throughout the world in the Company Intellectual Property. Such acts may include, but are not limited to, execution of documents and assistance or cooperation (i) in the filing, prosecution, registration, and memorialization of assignment of any applicable patents, copyrights, mask work, or other applications, (ii) in the enforcement of any applicable patents, copyrights, mask work, moral rights, trade secrets, or other proprietary rights, and (iii) in other legal proceedings related to the Company Intellectual Property.

11.     **Arbitration**.

(s)     Subject to Section 11(d), any dispute, controversy, or claim between Executive and the Company or any of its Affiliates arising out of or relating to this Agreement or Executive's employment with the Company or services provided to any Affiliate of the Company will be finally settled by arbitration in New York, New York before, and in accordance with the rules for the resolution of employment disputes then in effect of, the American Arbitration Association ("AAA"). The arbitration award shall be final and binding on both parties.

(t)     Any arbitration conducted under this Section 11 shall be heard by a single arbitrator (the "Arbitrator") selected in accordance with the then-applicable rules of the AAA. The Arbitrator shall expeditiously (and, if possible, within 90 days after the selection of the Arbitrator) hear and decide all matters concerning the dispute. Except as expressly provided to the contrary in this Agreement, the Arbitrator shall have the power to (i) gather such materials, information, testimony, and evidence as the Arbitrator deems relevant to the dispute before him or her (and each party will provide such materials, information, testimony, and evidence requested by the Arbitrator, except to the extent any information so requested is proprietary, subject to a third-party confidentiality restriction, or to an attorney-client or other privilege), and (ii) grant injunctive relief and enforce specific performance. The decision of the Arbitrator shall be rendered in writing, be final and binding upon the disputing parties, and the parties agree that judgment upon the award may be entered by any court of competent jurisdiction; *provided* that the parties agree that the Arbitrator and any court enforcing the award of the Arbitrator shall not have the right or authority to award punitive or exemplary damages to any disputing party.

(u)     Each side shall share equally the cost of the arbitration and bear its own costs and attorneys' fees incurred in connection with any arbitration, unless the Arbitrator

10

A2556

determines that compelling reasons exist for allocating all or a portion of such costs and fees to the other side.

(v)     Notwithstanding Section 11(a), an application for emergency or temporary injunctive relief by either party (including any such application to enforce the provisions of Sections 8, 9, or 10 herein) shall not be subject to arbitration under this Section 11; *provided*, *however*, that the remainder of any such dispute (beyond the application for emergency or temporary injunctive relief) shall be subject to arbitration under this Section.

(w)     By entering into this Agreement and entering into the arbitration provisions of this Section 11, THE PARTIES EXPRESSLY ACKNOWLEDGE AND AGREE THAT THEY ARE KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVING THEIR RIGHTS TO A JURY TRIAL.

(x)     Nothing in this Section 11 shall prohibit a party to this Agreement from (i) instituting litigation to enforce any arbitration award or (ii) joining another party to this Agreement in a litigation initiated by a person or entity that is not a party to this Agreement.

12.     **Defense of Claims**. Executive agrees that, during the Employment Period and thereafter, upon reasonable request from the Company, Executive will cooperate with the Company or its Affiliates in the defense of any claims or actions that may be made by or against the Company or its Affiliates that relate to Executive's actual or prior areas of responsibility, except if Executive's reasonable interests are adverse to the Company or its Affiliate(s), as applicable, in such claim or action. The Company agrees to pay or reimburse Executive for all of Executive's reasonable travel and other direct expenses incurred, or to be reasonably incurred, to comply with Executive's obligations under this Section 12, provided Executive provides reasonable documentation of same and obtains the Company's prior approval for incurring such expenses.

13.     **Withholdings**. The Company may withhold and deduct from any payments made or to be made pursuant to this Agreement (a) all federal, state, local, and other taxes as may be required pursuant to any law or governmental regulation or ruling and (b) any deductions consented to in writing by Executive.

14.     **Title and Headings; Construction**. Titles and headings to Sections hereof are for the purpose of reference only and shall in no way limit, define, or otherwise affect the provisions hereof. Any and all Exhibits or Attachments referred to in this Agreement are, by such reference, incorporated herein and made a part hereof for all purposes. The words "herein," "hereof," "hereunder," and other compounds of the word "here" shall refer to the entire Agreement and not to any particular provision hereof. The use herein of the word "including" following any general statement, term, or matter shall not be construed to limit such statement, term, or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation," "but not limited to," or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that could reasonably fall within the broadest possible scope of such general statement, term, or matter. Unless the context requires otherwise, all references herein to an agreement, instrument, or other document shall be deemed to refer to such agreement, instrument, or other document as amended, supplemented, modified, and restated from time to time to the extent permitted by the provisions thereof. All references to "dollars" or "$" in this Agreement refer to United States dollars. Wherever the context so requires, the masculine gender includes the feminine or neuter, and the singular number includes the plural and conversely.

11

15.     **Applicable Law; Submission to Jurisdiction**. This Agreement shall in all respects be construed according to the laws of the State of New York without regard to the conflict of law principles thereof. With respect to any claim or dispute related to or arising under this Agreement, the parties hereby consent to the arbitration provisions of Section 11 above and recognize and agree that should any resort to a court be necessary and permitted under this Agreement, then they consent to the exclusive jurisdiction, forum, and venue of the state and federal courts located in New York, New York.

16.     **Entire Agreement and Amendment**. This Agreement contains the entire agreement of the parties with respect to the matters covered herein; moreover, this Agreement supersedes all prior and contemporaneous agreements and understandings, oral or written, between the parties hereto concerning the subject matter hereof. Without limiting the scope of the preceding sentence, except as otherwise expressly provided in this Section 16, all understandings and agreements preceding the Amendment Effective Date and relating to the subject matter hereof (including the Prior Agreement) are hereby null and void and of no further force or effect, and this Agreement shall supersede all other agreements, written or oral, that purport to govern the terms of Executive's employment (including Executive's compensation) with the Company or any of its Affiliates. Executive acknowledges and agrees that the Prior Agreement is hereby terminated and has been satisfied in full, as has any other employment agreement between Executive and the Company or any of its Affiliates. In entering into this Agreement, Executive expressly acknowledges and agrees that Executive has received all sums and compensation that Executive has been owed, is owed, or ever could be owed pursuant to the agreement(s) referenced in the previous sentence and for services provided to the Company and any of its Affiliates through the date that Executive signs this Agreement, with the exception of any unpaid base salary for the pay period that includes the date on which Executive signs this Agreement. Notwithstanding anything in the preceding provisions of this Section 16 to the contrary, the parties expressly acknowledge and agree that this Agreement does not supersede or replace, but instead complements and is in addition to, all equity compensation agreements between Executive and the Company or any of its Affiliates. This Agreement may be amended only by a written instrument executed by both parties hereto.

17.     **Waiver of Breach**. Any waiver of this Agreement must be executed by the party to be bound by such waiver. No waiver by either party hereto of a breach of any provision of this Agreement by the other party, or of compliance with any condition or provision of this Agreement to be performed by such other party, will operate or be construed as a waiver of any subsequent breach by such other party or any similar or dissimilar provision or condition at the same or any subsequent time. The failure of either party hereto to take any action by reason of any breach will not deprive such party of the right to take action at any time while such breach continues.

18.     **Assignment**. This Agreement is personal to Executive, and neither this Agreement nor any rights or obligations hereunder shall be assignable or otherwise transferred by Executive. The Company may assign this Agreement to any Affiliate or successor (whether by merger, purchase, or otherwise) to all or substantially all of the equity, assets, or businesses of the Company, if such Affiliate or successor expressly agrees to assume the obligations of the Company hereunder. For the avoidance of doubt, the Company may assign its rights and obligations hereunder to any successor or any of its Affiliates (including to EVA or any EVA subsidiary) including in conjunction with any corporate restructuring, simplification, or reorganization. In the event of any such assignment, the Company's assignee shall have all rights and obligations of, and shall be deemed to be, the "Company" hereunder.

19.     **Affiliates**. For purposes of this Agreement, the term "<u>Affiliates</u>" is defined as any person or entity Controlling, Controlled by, or Under Common Control with the Company. The term "<u>Control</u>," including the correlative terms "<u>Controlling</u>," "<u>Controlled By</u>," and "<u>Under</u>

12

A2558

Common Control with," means possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract, or otherwise) of a person or entity. For the purposes of the preceding sentence, Control shall be deemed to exist when a person or entity possesses, directly or indirectly, through one or more intermediaries (a) in the case of a corporation, more than 50% of the outstanding voting securities thereof, (b) in the case of a limited liability company, partnership, limited partnership, or joint venture, the right to more than 50% of the distributions therefrom (including liquidating distributions), or (c) in the case of any other person or entity, more than 50% of the economic or beneficial interest therein.

20.    **Notices**. Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly received (a) when delivered in person, (b) on the first business day after such notice is sent by air express overnight courier service, or (c) on the third business day following deposit in the United States mail, registered or certified mail, return receipt requested, postage prepaid and addressed, in each case, to the following address, as applicable:

(1)    If to the Company, addressed to:

Enviva Management Company, LLC
7272 Wisconsin Ave.
Suite 1800
Bethesda, MD 20814
Attention: General Counsel

(2)    If to Executive, addressed to the most recent address the Company has in its employment records for Executive.

21.    **Counterparts**. This Agreement may be executed in any number of counterparts, including by facsimile or ".pdf" or similar electronic format, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument. Each counterpart may consist of a copy hereof containing multiple signature pages, each signed by one party, but together signed by both parties hereto.

22.    **Deemed Resignations**. Unless otherwise agreed to in writing by the Company and Executive prior to the termination of Executive's employment, any termination of Executive's employment shall constitute (a) an automatic resignation of Executive as an officer of the Company, EVA, and each other Affiliate of the Company, as applicable, (b) an automatic resignation of Executive from the board of directors (or similar governing body) of the Company, EVA, and each other Affiliate of the Company, as applicable, and (c) an automatic resignation from the board of directors or any similar governing body of any corporation, limited liability entity, or other entity in which the Company or any Affiliate holds an equity interest and with respect to which board or similar governing body Executive serves as the Company's or such Affiliate's designee or other representative (if applicable).

23.    **Effect of Termination**. The provisions of Sections 6(f), 7-12, 22, and 24 and those provisions necessary to interpret and enforce them, shall survive any termination of the employment relationship between Executive and the Company.

24.    **Third-Party Beneficiaries**. Each Affiliate of the Company shall be a third-party beneficiary of Executive's obligations under Sections 7, 8, 9, 10, and 22 and shall be entitled to enforce such obligations as if a party hereto.

25.    **Severability**. Subject to Section 9(e), if an arbitrator or court of competent jurisdiction determines that any provision of this Agreement (or part thereof) is invalid or

13

A2559

unenforceable, then the invalidity or unenforceability of that provision (or part thereof) shall not affect the validity or enforceability of any other provision (or part thereof) of this Agreement, and all other provisions (or part thereof) shall remain in full force and effect.

26.     **Section 409A**. Notwithstanding any provision of this Agreement to the contrary, all provisions of this Agreement are intended to comply with Section 409A of the Internal Revenue Code of 1986, as amended, and the applicable Treasury regulations and administrative guidance issued thereunder (collectively, "Section 409A") or an exemption therefrom and shall be construed and administered in accordance with such intent. Any payments under this Agreement that may be excluded from Section 409A either as separation pay due to an involuntary separation from service or as a short-term deferral shall be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, each installment payment provided under this Agreement shall be treated as a separate payment. Notwithstanding any provision in this Agreement to the contrary, if any payment or benefit provided for herein would be subject to additional taxes and interest under Section 409A if Executive's receipt of such payment or benefit is not delayed until the earlier of (i) the date of Executive's death or (ii) the date that is six months after the Termination Date (such date, the "Section 409A Payment Date"), then such payment or benefit shall not be provided to Executive (or Executive's estate, if applicable) until the Section 409A Payment Date. Notwithstanding the foregoing, the Company makes no representations that the payments and benefits provided under this Agreement are exempt from, or compliant with, Section 409A and in no event shall the Company or any of its Affiliates be liable for all or any portion of any taxes, penalties, interest, or other expenses that may be incurred by Executive on account of non-compliance with Section 409A.

*[The remainder of this page was left blank intentionally; the signature page follows.]*

14

A2560

**IN WITNESS WHEREOF**, Executive and the Company each have caused this Agreement to be executed in its name and on its behalf, effective for all purposes as provided above.

**EXECUTIVE**

_____

Thomas Meth

**ENVIVA MANAGEMENT COMPANY**, LLC

By: _____

Roxanne B. Klein
Executive Vice President and Chief Human Resources Officer

Signature Page to
Fifth Amended and Restated
Employment Agreement
(Thomas Meth)

A2561

**EXHIBIT A**

**FORM OF RELEASE AGREEMENT**

This Release Agreement (this "Agreement") constitutes the release referred to in that certain Fifth Amended and Restated Employment Agreement (the "Employment Agreement") dated as of June 4, 2022, by and between Thomas Meth ("Executive") and Enviva Management Company, LLC (the "Company"). Capitalized terms used but not defined herein shall have the meanings assigned to them in the Employment Agreement.

(a)     For good and valuable consideration, including the Company's provision of certain severance payments (or a portion thereof) to Executive in accordance with Section 6(f)(ii) of the Employment Agreement, Executive hereby releases, discharges, and forever acquits (A) the Company, its subsidiaries and all of its other Affiliates, (B) EVA, its subsidiaries, and all of its other Affiliates, and (C) the past, present, and future stockholders, officers, members, partners, directors, managers, employees, agents, attorneys, heirs, representatives, successors, and assigns of the entities specified in clauses (A) and (B) above, in their personal and representative capacities (collectively, the "Company Parties"), from liability for, and hereby waives, any and all claims, damages, or causes of action of any kind related to Executive's employment with any Company Party, the termination of such employment, and any other acts or omissions related to any matter on or prior to the date of the execution of this Agreement including, without limitation, (1) any alleged violation through the date of this Agreement of: (i) the Age Discrimination in Employment Act of 1967, as amended (including as amended by the Older Workers Benefit Protection Act); (ii) Title VII of the Civil Rights Act of 1964, as amended; (iii) the Civil Rights Act of 1991; (iv) Sections 1981 through 1988 of Title 42 of the United States Code, as amended; (v) the Employee Retirement Income Security Act of 1974, as amended; (vi) the Immigration Reform Control Act, as amended; (vii) the Americans with Disabilities Act of 1990, as amended; (viii) the National Labor Relations Act, as amended; (ix) the Occupational Safety and Health Act, as amended; (x) the Family and Medical Leave Act of 1993; (xi) any federal, state, or local anti-discrimination law; (xii) any federal, state, or local wage and hour law; (xiii) any other local, state, or federal law, regulation, or ordinance; and (xiv) any public policy, contract, tort, or common law claim; (2) any allegation for costs, fees, or other expenses including attorneys' fees incurred in or with respect to a Released Claim; (3) any and all rights, benefits, or claims Executive may have under any employment contract, incentive compensation plan, or equity incentive plan with any Company Party or to any ownership interest in any Company Party except as expressly provided: (I) in Section 6(f)(ii) of the Employment Agreement; and (II) pursuant to the terms of any equity compensation agreement between Executive and a Company Party (including any Award Agreement (as defined in the LTIP) relating to an award granted to Executive pursuant to the LTIP), and (4) any claim for compensation or benefits of any kind not expressly set forth in the Employment Agreement or any equity compensation agreement (collectively, the "Released Claims"). In no event shall the Released Claims include (a) any claim that arises after the date Executive signs this Agreement, (b) any claim to vested benefits under an employee benefit plan or equity compensation plan, or (c) any claims for contractual payments under Section 5(a) or Section 6(f)(ii) of the Employment Agreement. This Agreement is not intended to indicate that any such claims exist or that, if they do exist, they are meritorious. Rather, Executive is simply agreeing that, in exchange for the consideration recited in the first sentence of this paragraph, any and all potential claims of this nature that Executive may have against the Company Parties, regardless of whether they actually exist, are expressly settled, compromised, and waived. By signing this Agreement, Executive is bound by it. Anyone who succeeds to Executive's rights and responsibilities, such as heirs or the executor of Executive's estate, is also bound by this Agreement. This release also applies to any claims brought by any person or agency or class action under which Executive may have a right or benefit. Notwithstanding the release of liability contained herein, nothing in this Agreement prevents Executive from filing any non-legally waivable claim (including a challenge to the

EXHIBIT A-1

A2562

validity of this Agreement) with the Equal Employment Opportunity Commission, National Labor Relations Board, Occupational Safety and Health Administration, Securities and Exchange Commission, Financial Industry Regulatory Authority (FINRA), or any other federal, state, or local governmental agency, authority, or commission (each, a "Governmental Agency") or participating in any investigation or proceeding conducted by any Governmental Agency. Executive understands that this Agreement does not limit Executive's ability to communicate with any Governmental Agency or otherwise participate in any investigation or proceeding that may be conducted by any Governmental Agency (including by providing documents or other information to a Governmental Agency) without notice to the Company or any other Company Party. This Agreement does not limit Executive's right to receive an award from a Governmental Agency for information provided to a Governmental Agency. **THIS RELEASE INCLUDES MATTERS ATTRIBUTABLE TO THE SOLE OR PARTIAL NEGLIGENCE (WHETHER GROSS OR SIMPLE) OR OTHER FAULT, INCLUDING STRICT LIABILITY, OF ANY OF THE COMPANY PARTIES.**

(b)     Executive agrees not to bring or join any lawsuit or arbitration proceeding against any of the Company Parties in any court relating to any of the Released Claims. Executive represents that Executive has not brought or joined any lawsuit or filed any charge or claim against any of the Company Parties in any court or before any government agency and has made no assignment of any rights Executive has asserted or may have against any of the Company Parties to any person or entity, in each case, with respect to any Released Claims.

(c)     By executing and delivering this Agreement, Executive acknowledges that:

(i)     Executive has carefully read this Agreement;

(ii)     Executive has had at least [twenty-one (21)] [forty-five (45)] days to consider this Agreement before the execution and delivery hereof to the Company [*to be added if 45 days applies*: , and Executive acknowledges that attached to this Agreement are (1) a list of the positions and ages of those employees selected for termination (or participation in the exit incentive or other employment termination program); (2) a list of the ages of those employees not selected for termination (or participation in such program); and (3) information about the unit affected by the employment termination program of which Executive's termination was a part, including any eligibility factors for such program and any time limits applicable to such program];

(iii)     Executive has been advised, and hereby is advised in writing, that Executive may, at Executive's option, discuss this Agreement with an attorney of Executive's choice and that Executive has had adequate opportunity to do so;

(iv)     Executive fully understands the final and binding effect of this Agreement; the only promises made to Executive to sign this Agreement are those stated in the Employment Agreement and herein; and Executive is signing this Agreement knowingly, voluntarily, and of Executive's own free will, and that Executive understands and agrees to each of the terms of this Agreement; and

(v)     With the exception of any sums that Executive may be owed pursuant to Section 6(f)(ii) of the Employment Agreement, Executive has been paid all wages and other compensation to which Executive is entitled under the Agreement and received all leaves (paid and unpaid) to which Executive was entitled during the period of Employee's employment with the Company.

EXHIBIT A-2

Notwithstanding the initial effectiveness of this Agreement, Executive may revoke the delivery (and therefore the effectiveness) of this Agreement within the seven-day period beginning on the date Executive delivers this Agreement to the Company (such seven-day period being referred to herein as the "Release Revocation Period"). To be effective, such revocation must be in writing signed by Executive and must be delivered to the General Counsel of the Company before 11:59 p.m., New York, New York time, on the last day of the Release Revocation Period. If an effective revocation is delivered in the foregoing manner and timeframe, this Agreement shall be of no force or effect and shall be null and void ab initio. No consideration shall be paid if this Agreement is revoked by Executive in the foregoing manner.

Executed on this _____ day of _____, _____.

Thomas Meth

EXHIBIT A-3

A2564

**SIXTH AMENDED AND RESTATED
EMPLOYMENT AGREEMENT**

       This Sixth Amended and Restated Employment Agreement ("Agreement") is made and entered into as of June 4, 2022 (the "Amendment Effective Date") by and between Enviva Management Company, LLC, a Delaware limited liability company (the "Company"), and William H. Schmidt, Jr. ("Executive") and supersedes and replaces in its entirety the Fifth Amended and Restated Employment Agreement (the "Prior Agreement") entered into as of December 1, 2021 by and between the Company and Executive.

       1.    **Employment**. During the period commencing on the Amendment Effective Date and for the duration of the Employment Period (as defined in Section 4 below), the Company shall continue to employ Executive, and Executive shall serve, as Executive Vice President, Chief Development Officer, and General Counsel of the Company, Enviva Inc., a Delaware corporation ("EVA"), and such other Affiliates of the Company as may be designated by EVA from time to time.

       2.    **Duties and Responsibilities of Executive**.

       (a)    During the Employment Period, Executive shall devote Executive's full business time and attention to the business of the Company and its Affiliates, as applicable, and will not hold any outside employment or consulting position. Executive's duties pursuant to this Agreement will include those normally incidental to the positions identified in Section 1, as well as such additional duties as may be assigned to Executive by EVA from time to time.

       (b)    Executive represents and covenants that Executive is not the subject of or a party to any employment agreement, non-competition or non-solicitation covenant, non-disclosure agreement, or any other agreement, covenant, understanding, or restriction that would prohibit Executive from executing this Agreement and fully performing Executive's duties and responsibilities hereunder, or would in any manner, directly or indirectly, limit or affect the duties and responsibilities that may now or in the future be assigned to Executive hereunder.

       (c)    Executive acknowledges and agrees that Executive owes the Company and its Affiliates fiduciary duties, including duties of care, loyalty, fidelity, and allegiance, such that Executive shall act at all times in the best interests of the Company and its Affiliates and shall not appropriate any business opportunity of the Company or its Affiliates for Executive. Executive agrees that the obligations described in this Agreement are in addition to, and not in lieu of, the obligations Executive owes the Company and its Affiliates under common law. The Parties acknowledge and agree that Executive may provide services (including as an executive, employee, director, or otherwise) to multiple Affiliates of the Company and, in providing such services, Executive will not be violating Executive's obligations hereunder so long as Executive abides by the terms of Sections 7, 8, and 9 below in the course of performing such services.

       3.    **Compensation**.

       (d)    <u>Base Salary</u>. As of the Amendment Effective Date, Executive's annualized base salary shall be $525,000 (the "Base Salary"). The Base Salary shall be provided in consideration for Executive's services under this Agreement, and payable on a not less than biweekly basis, in conformity with the Company's customary payroll practices for executives as in effect from time to time.

       (e)    <u>Annual Bonus</u>. During the Employment Period, Executive shall be eligible for discretionary bonus compensation for the 2022 calendar year (so long as Executive remains employed through the 2022 calendar year) and each subsequent complete calendar year

that Executive is employed by the Company hereunder (each, a "Bonus Year") pursuant to the applicable incentive or bonus compensation plan of the Company, if any, that is applicable to similarly situated executives of the Company (each, an "Annual Bonus"). Each Annual Bonus shall have a target value that is not less than 125% of Executive's Base Salary as in effect on the first day of the Bonus Year to which such Annual Bonus relates (the "Target Annual Bonus"); *provided*, *however*, that the Target Annual Bonus for the 2022 calendar year shall have a target value of not less than $625,000. The performance targets that must be achieved in order to realize certain bonus levels shall be established by the board of directors of EVA (the "Board") or a committee thereof annually, in its sole discretion, and communicated to Executive in accordance with terms of the applicable incentive or bonus plan, if any, or if no such plan has been adopted, within the first 90 days of each applicable Bonus Year following 2022. Each Annual Bonus, if any, will be paid as soon as administratively feasible after the Board or a committee thereof certifies whether the applicable performance targets for the applicable Bonus Year have been achieved, but in no event later than March 15 following the end of such Bonus Year.

(f)    Long-Term Incentive Plan. With respect to the 2023 calendar year and each subsequent calendar year during the Employment Period, Executive shall be eligible to receive annual awards under the EVA equity compensation plan as in effect from time to time (the "LTIP") with a target value equal to 250% of Executive's Base Salary as in effect on the first day of such calendar year (the "Target Annual LTIP Award"). All awards granted to Executive under the LTIP, if any, shall be on such terms and conditions as the Board, or a committee thereof, shall determine from time to time and shall be subject to and governed by the terms and provisions of the LTIP as in effect from time to time and the award agreements evidencing such awards. Nothing herein shall be construed to give Executive any rights to any amount or type of grant or award except as provided in such award to Executive provided in writing and authorized by the Board (or a committee thereof).

4.    **Term of Employment**. The current term of Executive's employment under this Agreement is the period commencing on the Amendment Effective Date and ending on the first anniversary of the Amendment Effective Date (the "Current Term"). On the first anniversary of the Amendment Effective Date and on each subsequent anniversary of the Amendment Effective Date thereafter, the term of Executive's employment under this Agreement shall automatically renew and extend for a period of 12 months (each such 12-month period being a "Renewal Term") unless written notice of non-renewal is delivered by either party to the other not less than 60 days prior to the expiration of the then-existing Current Term or Renewal Term, as applicable. Notwithstanding any other provision of this Agreement to the contrary, Executive's employment pursuant to this Agreement may be terminated at any time in accordance with Section 6. The period from the Amendment Effective Date through the expiration of this Agreement or, if sooner, the termination of Executive's employment pursuant to this Agreement, regardless of the time or reason for such termination, shall be referred to herein as the "Employment Period."

5.    **Reimbursement of Business Expenses; Benefits**. Subject to the terms and conditions of this Agreement, Executive shall be entitled to the following reimbursements and benefits during the Employment Period:

(a)    Reimbursement of Business Expenses. The Company agrees to reimburse Executive for Executive's reasonable business-related expenses incurred in the performance of Executive's duties under this Agreement; *provided* that Executive timely submits all documentation for such reimbursement, as required by Company policy in effect from time-to-time. Any reimbursement of expenses under this Section 5(a) or Section 12 shall be made by the Company upon or as soon as practicable following receipt of supporting documentation reasonably satisfactory to the Company (but in any event not later than the close of Executive's taxable year following the taxable year in which the expense is incurred by Executive); *provided*,

2

A2566

*however*, that, upon the termination of Executive's employment with the Company, in no event shall any additional reimbursement be made prior to the date that is six months after the date of such termination (or, if earlier, prior to the date of Executive's death) to the extent such payment delay is required under Section 409A(a)(2)(B) of the Internal Revenue Code. In no event shall any reimbursement be made to Executive for such expenses incurred after the date that is five years after the date of the termination of Executive's employment with the Company. Executive is not permitted to receive a payment in lieu of reimbursement under this Section 5(a) or Section 12.

(b)    <u>Benefits</u>. Executive shall be eligible to participate in the same benefit plans or fringe benefit policies in which other similarly situated Company employees are eligible to participate, subject to applicable eligibility requirements and the terms and conditions of such plans and policies as in effect from time to time. The Company shall not, by reason of this Section 5(b), be obligated to institute, maintain, or refrain from changing, amending, or discontinuing, any such plan or policy, so long as such changes are similarly applicable to similarly situated Company employees generally.

6.    **<u>Termination of Employment</u>**.

(g)    <u>Company's Right to Terminate Executive's Employment for Cause</u>. The Company shall have the right to terminate Executive's employment at any time for Cause. For purposes of this Agreement, "<u>Cause</u>" shall mean Executive's:

(i)    material breach of any policy established by the Company or any of its Affiliates that (x) pertains to health and safety and (y) is applicable to Executive;

(ii)    engaging in acts of disloyalty to the Company or its Affiliates, including fraud, embezzlement, theft, commission of a felony, or proven dishonesty; or

(iii)    willful misconduct in the performance of, or willful failure to perform a material function of, Executive's duties under this Agreement.

(c)    <u>Company's Right to Terminate for Convenience</u>. The Company shall have the right to terminate Executive's employment without Cause, at any time and for any reason or no reason at all.

(d)    <u>Executive's Right to Terminate for Good Reason</u>. Executive shall have the right to terminate Executive's employment with the Company at any time for Good Reason. For purposes of this Agreement, "<u>Good Reason</u>" shall mean:

(iv)    a material diminution in Executive's authority, duties, title, or responsibilities;

(v)    a material diminution in Executive's Base Salary, Target Annual Bonus, or Target Annual LTIP Award;

(vi)    the relocation of the geographic location of Executive's principal place of employment by more than 100 miles from the location of Executive's principal place of employment as of the Amendment Effective Date; or

(vii)    the Company's delivery of a written notice of non-renewal of this Agreement to Executive.

3

A2567

Notwithstanding the foregoing provisions of this Section 6(c) or any other provision of this Agreement to the contrary, any assertion by Executive of a termination for Good Reason shall not be effective unless all of the following conditions are satisfied: (A) the condition described in Section 6(c)(i), (ii), (iii), or (iv) giving rise to Executive's termination of Executive's employment must have arisen without Executive's written consent; (B) Executive must provide written notice to the Company of such condition within 30 days of the date on which Executive knew of the existence of the condition; (C) the condition specified in such notice must remain uncorrected for 30 days after receipt of such notice by the Company; and (D) the date of Executive's termination of Executive's employment must occur within 30 days after the end of such cure period.

(h)     Death or Disability. Executive's employment with the Company shall terminate upon the death or Disability of Executive. For purposes of this Agreement, a "Disability" shall exist if Executive is unable to perform the essential functions of Executive's position, with reasonable accommodation (if applicable), due to an illness or physical or mental impairment or other incapacity that continues for a period in excess of 90 days, whether consecutive or not, in any period of 365 consecutive days. The determination of a Disability will be made by the Company after obtaining an opinion from a doctor of the Company's choosing. Executive agrees to provide such information and participate in such examinations as may be reasonably required by said doctor in order to form his or her opinion. If requested by the Company, Executive shall submit to a mental or physical examination to be performed by an independent physician selected by the Company to assist the Company in making such determination.

(i)     Executive's Right to Terminate for Convenience. Executive shall have the right to terminate Executive's employment with the Company for convenience at any time upon 60 days' advance written notice to the Company; *provided* that if Executive provides a notice of termination pursuant to this Section 6(e), the Company may designate an earlier termination date than that specified in Executive's notice. The Company's designation of such an earlier date will not change the nature of Executive's termination, which will still be deemed a voluntary resignation by Executive pursuant to this Section 6(e).

(j)     Effect of Termination.

(viii)   If Executive's employment hereunder shall terminate (1) pursuant to Section 4 at the expiration of the then-existing Current Term or Renewal Term, as applicable, as a result of a non-renewal of this Agreement by Executive or (2) pursuant to Section 6(a) or 6(e), then all compensation and all benefits to Executive hereunder shall terminate contemporaneously with such termination of employment, except that Executive shall be entitled to (x) payment of all earned, unpaid Base Salary within 30 days of Executive's last day of employment, or earlier if required by law, (y) reimbursement for all incurred but unreimbursed expenses for which Executive is entitled to reimbursement in accordance with Section 5(a) and Section 12, and (z) benefits to which Executive may be entitled pursuant to the terms of any plan or policy described in Section 5(b).

(ix)     If Executive's employment terminates (1) pursuant to Section 6(b) or 6(c) or (2) due to Executive's death or Disability pursuant to Section 6(d), then all compensation and all benefits to Executive hereunder shall terminate contemporaneously with such termination of employment, except that (I) Executive shall be entitled to receive the compensation and benefits described in clauses (x) through (z) of Section 6(f)(i); and (II) if Executive executes, on or before the Release Expiration Date (as defined below), and does not revoke within the time provided by the Company to do so, a release of all claims in a form satisfactory to the Company (which shall be

4

A2568

substantially similar to the form of release attached hereto as Exhibit A) (the "Release")), then, *provided* that Executive abides by the terms of Sections 7, 8, 9, 10, and 12:

(A)    The Company shall pay to Executive an amount (the "Severance Payment") equal to the product of (x) 1.0 (or, if such termination occurs within 12 months following a Change in Control (as defined below), 1.5) and (y) the sum of Executive's Base Salary as in effect on the date of the termination of Executive's employment (the "Termination Date") and Executive's Target Annual Bonus as of the Termination Date. The Severance Payment will be divided into 24 (or, if such termination occurs within 12 months following a Change in Control, 36) substantially equal installments. On the Company's first regularly scheduled pay date that is on or after the date that is 60 days after the Termination Date, the Company shall pay to Executive, without interest, a number of such installments equal to the number of such installments that would have been paid during the period beginning on the Termination Date and ending on the Company's first regularly scheduled pay date that is on or after the date that is 60 days after the Termination Date had the installments been paid on a biweekly basis commencing on the Company's first regularly scheduled pay date coincident with or next following the Termination Date, and each of the remaining installments shall be paid on a biweekly basis thereafter; *provided*, *however*, that (1) to the extent, if any, that the aggregate amount of the installments of the Severance Payment and any payments under Section 6(f)(ii)(C) that would otherwise be paid pursuant to the preceding provisions of this Section 6(f)(ii)(A) or Section 6(f)(ii)(C) after March 15 of the calendar year following the calendar year in which the Termination Date occurs (the "Applicable March 15") exceeds the maximum exemption amount under Treasury Regulation Section 1.409A-1(b)(9)(iii)(A), then such excess shall be paid to Executive in a lump sum on the Applicable March 15 (or the first business day preceding the Applicable March 15 if the Applicable March 15 is not a business day) and the installments of the Severance Payment payable after the Applicable March 15 shall be reduced by such excess (beginning with the installment first payable after the Applicable March 15 and continuing with the next succeeding installment until the aggregate reduction equals such excess), and (2) all remaining installments of the Severance Payment, if any, that would otherwise be paid pursuant to the preceding provisions of this Section 6(f)(ii)(A) after December 31 of the calendar year following the calendar year in which the Termination Date occurs shall be paid with the installment of the Severance Payment, if any, due in December of the calendar year following the calendar year in which the Termination Date occurs.

(B)    All outstanding awards granted to Executive pursuant to the LTIP prior to the Termination Date that remain unvested as of the Termination Date shall immediately become fully vested as of the Termination Date; *provided*, *however*, that with respect to any such LTIP awards that were granted subject to a performance requirement (other than continued service by Executive) that has not been satisfied and certified by the Board (or a committee thereof) as of the Termination Date, then (1) if the Termination Date occurs within six months prior to the expiration of the performance period applicable to such LTIP award, such LTIP award shall become vested based on actual performance upon the expiration of such performance period; and (2) if the Termination Date occurs at any other time during the performance period applicable to such LTIP award, such LTIP award shall become vested as of the Termination Date based on target performance.

5

(C)    If Executive timely and properly elects to continue coverage for Executive and Executive's spouse and eligible dependents, if any, under the Company's group health plans pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), similar in the amounts and types of coverage provided by the Company to Executive prior to the Termination Date, then during the COBRA Continuation Period (as defined below), the Company shall promptly reimburse Executive on a monthly basis for the entire amount Executive pays to effect and continue such coverage ("COBRA Benefit"). Each payment of the COBRA Benefit shall be paid to Executive on the Company's first regularly scheduled pay date in the calendar month immediately following the calendar month in which Executive submits to the Company documentation of the applicable premium payment having been paid by Executive, which documentation shall be submitted by Executive to the Company within 30 days following the date on which the applicable premium payment is paid. Notwithstanding anything in the preceding provisions of this Section 6(f)(ii)(C) to the contrary, (x) the election of COBRA continuation coverage and the payment of any premiums due with respect to such COBRA continuation coverage will remain Executive's sole responsibility, and the Company will assume no obligation for payment of any such premiums relating to such COBRA continuation coverage and (y) if the provision of the benefit described in this Section 6(f)(ii)(C) cannot be provided in the manner described above without penalty, tax, or other adverse impact on the Company, then the Company and Executive shall negotiate in good faith to determine an alternative manner in which the Company may provide a substantially equivalent benefit to Executive without such adverse impact on the Company.

As used herein, the "COBRA Continuation Period" shall mean the period beginning on the first day of the first calendar month following the Termination Date and continuing for a number of months thereafter equal to 12 months (or, if such termination occurs within 12 months following a Change in Control, 18 months); *provided, however*, that the COBRA Continuation Period shall immediately terminate upon the earlier of (1) the time Executive becomes eligible to be covered under a group health plan sponsored by another employer (and Executive shall promptly notify the Company in the event that Executive becomes so eligible) or (2) the date Executive is no longer eligible to receive COBRA continuation coverage. For purposes of this Section 6(f)(ii), in the event of Executive's death, references to Executive (other than in Section 6(f)(ii)(C)) shall include Executive's estate, and references to Executive in Section 6(f)(ii)(C) shall include Executive's spouse and eligible dependents, if any, who are "qualified beneficiaries" (within the meaning of COBRA and the regulations thereunder) with respect to Executive's death.

(x)    Executive acknowledges Executive's understanding that if the Release is not executed and returned to the Company on or before the Release Expiration Date, and the required revocation period has not fully expired without revocation of the Release by Executive, then Executive shall not be entitled to any payments or benefits pursuant to Section 6(f)(ii). As used herein, the "Release Expiration Date" is that date that is 21 days following the date upon which the Company delivers the Release to Executive (which shall occur no later than seven days after the Termination Date) or, in the event that such termination of employment is "in connection with an exit incentive or other employment termination program" (as such phrase is defined in the Age Discrimination in Employment Act of 1967, as amended), the date that is 45 days following such delivery date.

(xi)    For purposes of this Agreement, a "Change in Control" shall mean the occurrence of one or more of the following transactions:

6

A2570

(A)    the sale or disposal by EVA of all or substantially all of its assets to any person other than an Affiliate of EVA;

(B)    the merger or consolidation of EVA with or into another partnership, corporation, or other entity, other than a merger or consolidation in which the equityholders in EVA immediately prior to such transaction retain a greater than 50% equity interest in the surviving entity; or

(C)    the acquisition by any person or group (as defined in Section 13d(d)(3) of the Securities Exchange Act of 1934 (the "Exchange Act")) of the beneficial ownership (as defined in Section 13d(d)(3) of the Exchange Act) of more than 50% of the equity of EVA entitled to vote in the election of EVA's directors (or the persons performing the functions of directors).

(a)    Meaning of Termination of Employment. For all purposes of this Agreement, Executive shall be considered to have terminated employment with the Company when Executive incurs a "separation from service" with the Company within the meaning of Section 409A(a)(2)(A)(i) of the Internal Revenue Code; *provided*, *however*, that whether such a separation from service has occurred shall be determined based upon a reasonably anticipated permanent reduction in the level of bona fide services to be performed to no more than 25% of the average level of bona fide services provided in the immediately preceding 36 months.

7.    **Conflicts of Interest; Disclosure of Opportunities**. Executive agrees that Executive shall promptly disclose to the Board any conflict of interest involving Executive upon Executive becoming aware of such conflict. Executive further agrees that, throughout the Employment Period and for one year after Executive is no longer employed by the Company, Executive shall offer to the Company and its Affiliates, as applicable, all business opportunities relating to the acquisition, development, ownership, and operation of facilities that collect, process, and transform wood-based biomass into renewable energy feedstock, including wood pellets, regardless of where such business opportunities arise.

8.    **Confidentiality**. Executive acknowledges and agrees that, in the course of Executive's employment with the Company, Executive has been provided with and had access to (and, during the Employment Period, Executive will continue to be provided with, and have access to) valuable Confidential Information (as defined below). In consideration of Executive's receipt of and access to such Confidential Information and in exchange for other valuable consideration provided hereunder, and as a condition of Executive's employment hereunder, Executive agrees to comply with this Section 8.

(b)    Executive covenants and agrees, both during the Employment Period and thereafter that, except as expressly permitted by this Agreement or by directive of the Board, Executive shall not disclose any Confidential Information to any Person and shall not use any Confidential Information except for the benefit of the Company or any of its Affiliates. Executive shall take all reasonable precautions to protect the physical security of all documents and other material containing Confidential Information (regardless of the medium on which the Confidential Information is stored). The covenants in this Section 8(a) shall apply to all Confidential Information, whether now known or later to become known to Executive during the Employment Period.

(c)    Notwithstanding Section 8(a), Executive may make the following disclosures and uses of Confidential Information:

7

A2571

(i)      disclosures to other executives or employees of the Company or its Affiliates who have a need to know the information in connection with the business of the Company or its Affiliates;

(ii)      disclosures and uses that are incidental to Executive's provision of services to the Company and its Affiliates consistent with the terms of this Agreement or that are approved by the Board;

(iii)      disclosures for the purpose of complying with any applicable laws or regulatory requirements; or

(iv)      disclosures that Executive is legally compelled to make by deposition, interrogatory, request for documents, subpoena, civil investigative demand, order of a court of competent jurisdiction, or similar process, or otherwise by law.

(d)      Upon the end of Executive's employment with the Company and at any other time upon request of the Company, Executive shall surrender and deliver to the Company all documents (including electronically stored information) and other material of any nature containing or pertaining to all Confidential Information in Executive's possession and shall not retain any such document or other material. Within 10 days of any such request, Executive shall certify to the Company in writing that all such materials have been returned to the Company.

(e)      All non-public information, designs, ideas, concepts, improvements, product developments, discoveries, and inventions, whether patentable or not, that are conceived, made, developed, or acquired by Executive, individually or in conjunction with others, during the period Executive is or has been employed or affiliated with the Company or any of its Affiliates (whether during business hours or otherwise and whether on the Company's premises or otherwise) that relate to the Company's or any of its Affiliates' business or properties, products, or services (including all such information relating to corporate opportunities, business plans, trade secrets, strategies for developing business and market share, research, financial and sales data, pricing terms, evaluations, opinions, interpretations, acquisition prospects, the identity of customers or their requirements, the identity of key contacts within customers' organizations or within the organization of acquisition prospects, or marketing and merchandising techniques, prospective names and marks) is defined as "<u>Confidential Information.</u>" Moreover, all documents, videotapes, written presentations, brochures, drawings, memoranda, notes, records, files, correspondence, manuals, models, specifications, computer programs, e-mail, voicemail, electronic databases, maps, drawings, architectural renditions, models, and all other writings or materials of any type including or embodying any of such information, ideas, concepts, improvements, discoveries, inventions, and other similar forms of expression are and shall be the sole and exclusive property of the Company or its Affiliates and be subject to the same restrictions on disclosure applicable to all Confidential Information pursuant to this Agreement.

(f)      Nothing in this Agreement shall prohibit or restrict Executive from lawfully (i) initiating communications directly with, cooperating with, providing information to, causing information to be provided to, or otherwise assisting in an investigation by any governmental or regulatory agency, entity, or official(s) (collectively, "<u>Governmental Authorities</u>") regarding a possible violation of any law, (ii) responding to any inquiry or legal process directed to Executive individually from any such Governmental Authorities, (iii) testifying, participating, or otherwise assisting in an action or proceeding by any such Governmental Authorities relating to a possible violation of law, or (iv) making any other disclosures that are protected under the whistleblower provisions of any applicable law. Additionally, pursuant to the federal Defend Trade Secrets Act of 2016, Executive shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (x) is made (A) in confidence to a federal, state, or local government official,

8

A2572

either directly or indirectly, or to an attorney and (B) solely for the purpose of reporting or investigating a suspected violation of law, or (y) is made to Executive's attorney in relation to a lawsuit for retaliation against Executive for reporting a suspected violation of law, or (z) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Nor does this Agreement require Executive to obtain prior authorization from the Company or its Affiliates before engaging in any conduct described in this Section 8(e), or to notify the Company or its Affiliates that Executive has engaged in any such conduct.

9.      **Non-Competition; Non-Solicitation**.

(g)      The Company shall continue to provide Executive access to Confidential Information for use only during the period of Executive's employment with the Company, and Executive acknowledges and agrees that the Company will be entrusting Executive, in Executive's unique and special capacity, with continuing to develop the goodwill of the Company, and in consideration thereof and in consideration of the continued access to Confidential Information, and as a condition of Executive's employment hereunder, Executive has voluntarily agreed to the covenants set forth in this Section 9. Executive further agrees and acknowledges that the limitations and restrictions set forth herein, including the geographical and temporal restrictions on certain competitive activities, are reasonable in all respects and are material and substantial parts of this Agreement intended and necessary to protect the Company's legitimate business interests, including the preservation of its Confidential Information and goodwill.

(h)      Executive agrees that, during the period set forth in Section 9(c) below, Executive shall not, without the prior written approval of the Company, directly or indirectly, for Executive or on behalf of or in conjunction with any other person or entity of whatever nature:

(v)      engage or participate within the Market Area in competition with the Company in any business in which either the Company or its Protected Affiliates engaged in, or had plans to become engaged in of which Executive was aware during the period of Executive's employment with the Company or the period set forth in Section 9(c) below, which business includes the acquisition, development, ownership, and operation of facilities that collect, process, and transform wood-based biomass into renewable energy feedstock, including wood pellets (the "<u>Business</u>"). As used herein, the term "<u>Protected Affiliates</u>" means any Affiliate of the Company for which Executive provided services during the period of Executive's employment with the Company, or about which Executive obtained Confidential Information during the period of Executive's employment with the Company.

(vi)      appropriate any Business Opportunity of, or relating to, the Company or its Affiliates located in the Market Area, or engage in any activity that is detrimental to the Company or its Affiliates or that limits the Company's or an Affiliate's ability to fully exploit such Business Opportunities or prevents the benefits of such Business Opportunities from accruing to the Company or its Affiliates; or

(vii)      solicit any employee of the Company or its Affiliates to terminate his or her employment therewith.

(i)      <u>Timeframe of Non-Competition and Non-Solicitation Agreement</u>. Executive agrees that the covenants of this Section 9 shall be enforceable during the period that Executive is employed by the Company and for a period of one year following the date that Executive is no longer employed by the Company, regardless of the reason for such termination.

9

A2573

(j)      Because of the difficulty of measuring economic losses to the Company and its Affiliates as a result of a breach of the foregoing covenants, and because of the immediate and irreparable damage that could be caused to the Company and its Affiliates for which they would have no other adequate remedy, Executive agrees that the foregoing covenant may be enforced by the Company and its Affiliates, in the event of breach by Executive, by injunctions and restraining orders and that such enforcement shall not be the Company's and its Affiliates' exclusive remedy for a breach but instead shall be in addition to all other rights and remedies available to the Company and its Affiliates, both at law and in equity.

(k)      The covenants in this Section 9 are severable and separate, and the unenforceability of any specific covenant (or any portion thereof) shall not affect the provisions of any other covenant (or any portion thereof). Moreover, in the event any court of competent jurisdiction or arbitrator, as applicable, shall determine that the scope, time, or territorial restrictions set forth in this Section 9 are unreasonable, then it is the intention of the parties that such restrictions be enforced to the fullest extent that the court or arbitrator deems reasonable, and this Agreement shall thereby be reformed.

(l)      For purposes of this Section 9, the following terms shall have the following meanings:

(i)      "Business Opportunity" shall mean any commercial, investment, or other business opportunity relating to the Business.

(ii)      "Market Area" shall mean any location or geographic area within 75 miles of a location where the Company or its Affiliates conducts Business, or has plans to conduct Business of which Executive is aware, during the period of Executive's employment with the Company.

(m)      All of the covenants in this Section 9 shall be construed as an agreement independent of any other provision in this Agreement, and the existence of any claim or cause of action of Executive against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of such covenants.

10.      **Ownership of Intellectual Property**. Executive agrees that the Company or its applicable Affiliate shall own, and Executive hereby assigns, all right, title, and interest (including patent rights, copyrights, trade secret rights, mask work rights, trademark rights, and all other intellectual and industrial property rights of any sort throughout the world) relating to any and all inventions (whether or not patentable), works of authorship, mask works, designs, know-how, ideas, and information authored, created, contributed to, made, or conceived or reduced to practice, in whole or in part, by Executive during the period that Executive is or has been employed or affiliated with the Company or any of its Affiliates that either (a) relate, at the time of conception, reduction to practice, creation, derivation, or development, to the Company's or any of its Affiliates' business or actual or anticipated research or development, or (b) were developed on any amount of the Company's time or with the use of any of the Company's or its Affiliates' equipment, supplies, facilities, or trade secret information (all of the foregoing collectively referred to herein as "Company Intellectual Property"), and Executive will promptly disclose all Company Intellectual Property to the Company. All of Executive's works of authorship and associated copyrights created during the period that Executive is or has been employed by the Company or any of its Affiliates and in the scope of Executive's employment shall be deemed to be "works made for hire" within the meaning of the Copyright Act. Executive agrees to perform, during and after the Employment Period, all reasonable acts deemed necessary by the Company to assist the Company or its applicable Affiliate, at the Company's or such Affiliate's expense, in obtaining and enforcing its rights throughout the world in the Company Intellectual Property. Such acts may include, but are not limited to,

10

execution of documents and assistance or cooperation (i) in the filing, prosecution, registration, and memorialization of assignment of any applicable patents, copyrights, mask work, or other applications, (ii) in the enforcement of any applicable patents, copyrights, mask work, moral rights, trade secrets, or other proprietary rights, and (iii) in other legal proceedings related to the Company Intellectual Property.

11.     **Arbitration**.

(n)     Subject to Section 11(d), any dispute, controversy, or claim between Executive and the Company or any of its Affiliates arising out of or relating to this Agreement or Executive's employment with the Company or services provided to any Affiliate of the Company will be finally settled by arbitration in New York, New York before, and in accordance with the rules for the resolution of employment disputes then in effect of, the American Arbitration Association ("AAA"). The arbitration award shall be final and binding on both parties.

(o)     Any arbitration conducted under this Section 11 shall be heard by a single arbitrator (the "Arbitrator") selected in accordance with the then-applicable rules of the AAA. The Arbitrator shall expeditiously (and, if possible, within 90 days after the selection of the Arbitrator) hear and decide all matters concerning the dispute. Except as expressly provided to the contrary in this Agreement, the Arbitrator shall have the power to (i) gather such materials, information, testimony, and evidence as the Arbitrator deems relevant to the dispute before him or her (and each party will provide such materials, information, testimony, and evidence requested by the Arbitrator, except to the extent any information so requested is proprietary, subject to a third-party confidentiality restriction, or to an attorney-client or other privilege), and (ii) grant injunctive relief and enforce specific performance. The decision of the Arbitrator shall be rendered in writing, be final and binding upon the disputing parties, and the parties agree that judgment upon the award may be entered by any court of competent jurisdiction; *provided* that the parties agree that the Arbitrator and any court enforcing the award of the Arbitrator shall not have the right or authority to award punitive or exemplary damages to any disputing party.

(p)     Each side shall share equally the cost of the arbitration and bear its own costs and attorneys' fees incurred in connection with any arbitration, unless the Arbitrator determines that compelling reasons exist for allocating all or a portion of such costs and fees to the other side.

(q)     Notwithstanding Section 11(a), an application for emergency or temporary injunctive relief by either party (including any such application to enforce the provisions of Sections 8, 9, or 10 herein) shall not be subject to arbitration under this Section 11; *provided*, *however*, that the remainder of any such dispute (beyond the application for emergency or temporary injunctive relief) shall be subject to arbitration under this Section.

(r)     By entering into this Agreement and entering into the arbitration provisions of this Section 11, THE PARTIES EXPRESSLY ACKNOWLEDGE AND AGREE THAT THEY ARE KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVING THEIR RIGHTS TO A JURY TRIAL.

(s)     Nothing in this Section 11 shall prohibit a party to this Agreement from (i) instituting litigation to enforce any arbitration award or (ii) joining another party to this Agreement in a litigation initiated by a person or entity that is not a party to this Agreement.

12.     **Defense of Claims**. Executive agrees that, during the Employment Period and thereafter, upon reasonable request from the Company, Executive will cooperate with the Company or its Affiliates in the defense of any claims or actions that may be made by or against the Company or its Affiliates that relate to Executive's actual or prior areas of responsibility,

11

except if Executive's reasonable interests are adverse to the Company or its Affiliate(s), as applicable, in such claim or action. The Company agrees to pay or reimburse Executive for all of Executive's reasonable travel and other direct expenses incurred, or to be reasonably incurred, to comply with Executive's obligations under this Section 12, provided Executive provides reasonable documentation of same and obtains the Company's prior approval for incurring such expenses.

13.     **Withholdings**. The Company may withhold and deduct from any payments made or to be made pursuant to this Agreement (a) all federal, state, local, and other taxes as may be required pursuant to any law or governmental regulation or ruling and (b) any deductions consented to in writing by Executive.

14.     **Title and Headings; Construction**. Titles and headings to Sections hereof are for the purpose of reference only and shall in no way limit, define, or otherwise affect the provisions hereof. Any and all Exhibits or Attachments referred to in this Agreement are, by such reference, incorporated herein and made a part hereof for all purposes. The words "herein," "hereof," "hereunder," and other compounds of the word "here" shall refer to the entire Agreement and not to any particular provision hereof. The use herein of the word "including" following any general statement, term, or matter shall not be construed to limit such statement, term, or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation," "but not limited to," or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that could reasonably fall within the broadest possible scope of such general statement, term, or matter. Unless the context requires otherwise, all references herein to an agreement, instrument, or other document shall be deemed to refer to such agreement, instrument, or other document as amended, supplemented, modified, and restated from time to time to the extent permitted by the provisions thereof. All references to "dollars" or "$" in this Agreement refer to United States dollars. Wherever the context so requires, the masculine gender includes the feminine or neuter, and the singular number includes the plural and conversely.

15.     **Applicable Law; Submission to Jurisdiction**. This Agreement shall in all respects be construed according to the laws of the State of New York without regard to the conflict of law principles thereof. With respect to any claim or dispute related to or arising under this Agreement, the parties hereby consent to the arbitration provisions of Section 11 above and recognize and agree that should any resort to a court be necessary and permitted under this Agreement, then they consent to the exclusive jurisdiction, forum, and venue of the state and federal courts located in New York, New York.

16.     **Entire Agreement and Amendment**. This Agreement contains the entire agreement of the parties with respect to the matters covered herein; moreover, this Agreement supersedes all prior and contemporaneous agreements and understandings, oral or written, between the parties hereto concerning the subject matter hereof. Without limiting the scope of the preceding sentence, except as otherwise expressly provided in this Section 16, all understandings and agreements preceding the Amendment Effective Date and relating to the subject matter hereof (including the Prior Agreement) are hereby null and void and of no further force or effect, and this Agreement shall supersede all other agreements, written or oral, that purport to govern the terms of Executive's employment (including Executive's compensation) with the Company or any of its Affiliates. Executive acknowledges and agrees that the Prior Agreement is hereby terminated and has been satisfied in full, as has any other employment agreement between Executive and the Company or any of its Affiliates. In entering into this Agreement, Executive expressly acknowledges and agrees that Executive has received all sums and compensation that Executive has been owed, is owed, or ever could be owed pursuant to the agreement(s) referenced in the previous sentence and for services provided to the Company and

12

A2576

any of its Affiliates through the date that Executive signs this Agreement, with the exception of any unpaid base salary for the pay period that includes the date on which Executive signs this Agreement. Notwithstanding anything in the preceding provisions of this Section 16 to the contrary, the parties expressly acknowledge and agree that this Agreement does not supersede or replace, but instead complements and is in addition to, all equity compensation agreements between Executive and the Company or any of its Affiliates. This Agreement may be amended only by a written instrument executed by both parties hereto.

17.     **Waiver of Breach**. Any waiver of this Agreement must be executed by the party to be bound by such waiver. No waiver by either party hereto of a breach of any provision of this Agreement by the other party, or of compliance with any condition or provision of this Agreement to be performed by such other party, will operate or be construed as a waiver of any subsequent breach by such other party or any similar or dissimilar provision or condition at the same or any subsequent time. The failure of either party hereto to take any action by reason of any breach will not deprive such party of the right to take action at any time while such breach continues.

18.     **Assignment**. This Agreement is personal to Executive, and neither this Agreement nor any rights or obligations hereunder shall be assignable or otherwise transferred by Executive. The Company may assign this Agreement to any Affiliate or successor (whether by merger, purchase, or otherwise) to all or substantially all of the equity, assets, or businesses of the Company, if such Affiliate or successor expressly agrees to assume the obligations of the Company hereunder. For the avoidance of doubt, the Company may assign its rights and obligations hereunder to any successor or any of its Affiliates (including to EVA or any EVA subsidiary) including in conjunction with any corporate restructuring, simplification, or reorganization. In the event of any such assignment, the Company's assignee shall have all rights and obligations of, and shall be deemed to be, the "Company" hereunder.

19.     **Affiliates**. For purposes of this Agreement, the term "Affiliates" is defined as any person or entity Controlling, Controlled by, or Under Common Control with the Company. The term "Control," including the correlative terms "Controlling," "Controlled By," and "Under Common Control with," means possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract, or otherwise) of a person or entity. For the purposes of the preceding sentence, Control shall be deemed to exist when a person or entity possesses, directly or indirectly, through one or more intermediaries (a) in the case of a corporation, more than 50% of the outstanding voting securities thereof, (b) in the case of a limited liability company, partnership, limited partnership, or joint venture, the right to more than 50% of the distributions therefrom (including liquidating distributions), or (c) in the case of any other person or entity, more than 50% of the economic or beneficial interest therein.

20.     **Notices**. Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly received (a) when delivered in person, (b) on the first business day after such notice is sent by air express overnight courier service, or (c) on the third business day following deposit in the United States mail, registered or certified mail, return receipt requested, postage prepaid and addressed, in each case, to the following address, as applicable:

    (1)   If to the Company, addressed to:

        Enviva Management Company, LLC
        7272 Wisconsin Ave.
        Suite 1800
        Bethesda, MD 20814
        Attention: Chief Executive Officer

A2577

(2)    If to Executive, addressed to the most recent address the Company has in its employment records for Executive.

21.    **Counterparts**. This Agreement may be executed in any number of counterparts, including by facsimile or ".pdf" or similar electronic format, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument. Each counterpart may consist of a copy hereof containing multiple signature pages, each signed by one party, but together signed by both parties hereto.

22.    **Deemed Resignations**. Unless otherwise agreed to in writing by the Company and Executive prior to the termination of Executive's employment, any termination of Executive's employment shall constitute (a) an automatic resignation of Executive as an officer of the Company, EVA, and each other Affiliate of the Company, as applicable, (b) an automatic resignation of Executive from the board of directors (or similar governing body) of the Company, EVA, and each other Affiliate of the Company, as applicable, and (c) an automatic resignation from the board of directors or any similar governing body of any corporation, limited liability entity, or other entity in which the Company or any Affiliate holds an equity interest and with respect to which board or similar governing body Executive serves as the Company's or such Affiliate's designee or other representative (if applicable).

23.    **Effect of Termination**. The provisions of Sections 6(f), 7-12, 22, and 24 and those provisions necessary to interpret and enforce them, shall survive any termination of the employment relationship between Executive and the Company.

24.    **Third-Party Beneficiaries**. Each Affiliate of the Company shall be a third-party beneficiary of Executive's obligations under Sections 7, 8, 9, 10, and 22 and shall be entitled to enforce such obligations as if a party hereto.

25.    **Severability**. Subject to Section 9(e), if an arbitrator or court of competent jurisdiction determines that any provision of this Agreement (or part thereof) is invalid or unenforceable, then the invalidity or unenforceability of that provision (or part thereof) shall not affect the validity or enforceability of any other provision (or part thereof) of this Agreement, and all other provisions (or part thereof) shall remain in full force and effect.

26.    **Section 409A**. Notwithstanding any provision of this Agreement to the contrary, all provisions of this Agreement are intended to comply with Section 409A of the Internal Revenue Code of 1986, as amended, and the applicable Treasury regulations and administrative guidance issued thereunder (collectively, "Section 409A") or an exemption therefrom and shall be construed and administered in accordance with such intent. Any payments under this Agreement that may be excluded from Section 409A either as separation pay due to an involuntary separation from service or as a short-term deferral shall be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, each installment payment provided under this Agreement shall be treated as a separate payment. Notwithstanding any provision in this Agreement to the contrary, if any payment or benefit provided for herein would be subject to additional taxes and interest under Section 409A if Executive's receipt of such payment or benefit is not delayed until the earlier of (i) the date of Executive's death or (ii) the date that is six months after the Termination Date (such date, the "Section 409A Payment Date"), then such payment or benefit shall not be provided to Executive (or Executive's estate, if applicable) until the Section 409A Payment Date. Notwithstanding the foregoing, the Company makes no representations that the payments and benefits provided under this Agreement are exempt from, or compliant with, Section 409A and in no event shall the Company or any of its Affiliates be liable for all or any portion of any taxes, penalties, interest, or other expenses that may be incurred by Executive on account of non-compliance with Section 409A.

14

[*The remainder of this page was left blank intentionally; the signature page follows.*]

15

A2579

**IN WITNESS WHEREOF**, Executive and the Company each have caused this Agreement to be executed in its name and on its behalf, effective for all purposes as provided above.

**EXECUTIVE**

_____

William H. Schmidt, Jr.

**ENVIVA MANAGEMENT COMPANY**, LLC

By: _____

      Roxanne B. Klein
      Executive Vice President and Chief Human Resources Officer

Signature Page to
Sixth Amended and Restated
Employment Agreement
(William H. Schmidt, Jr.)

A2580

**EXHIBIT A**

**FORM OF RELEASE AGREEMENT**

This Release Agreement (this "Agreement") constitutes the release referred to in that certain Sixth Amended and Restated Employment Agreement (the "Employment Agreement") dated as of June 4, 2022, by and between William H. Schmidt, Jr. ("Executive") and Enviva Management Company, LLC (the "Company"). Capitalized terms used but not defined herein shall have the meanings assigned to them in the Employment Agreement.

(a) For good and valuable consideration, including the Company's provision of certain severance payments (or a portion thereof) to Executive in accordance with Section 6(f)(ii) of the Employment Agreement, Executive hereby releases, discharges, and forever acquits (A) the Company, its subsidiaries and all of its other Affiliates, (B) EVA, its subsidiaries, and all of its other Affiliates, and (C) the past, present, and future stockholders, officers, members, partners, directors, managers, employees, agents, attorneys, heirs, representatives, successors, and assigns of the entities specified in clauses (A) and (B) above, in their personal and representative capacities (collectively, the "Company Parties"), from liability for, and hereby waives, any and all claims, damages, or causes of action of any kind related to Executive's employment with any Company Party, the termination of such employment, and any other acts or omissions related to any matter on or prior to the date of the execution of this Agreement including, without limitation, (1) any alleged violation through the date of this Agreement of: (i) the Age Discrimination in Employment Act of 1967, as amended (including as amended by the Older Workers Benefit Protection Act); (ii) Title VII of the Civil Rights Act of 1964, as amended; (iii) the Civil Rights Act of 1991; (iv) Sections 1981 through 1988 of Title 42 of the United States Code, as amended; (v) the Employee Retirement Income Security Act of 1974, as amended; (vi) the Immigration Reform Control Act, as amended; (vii) the Americans with Disabilities Act of 1990, as amended; (viii) the National Labor Relations Act, as amended; (ix) the Occupational Safety and Health Act, as amended; (x) the Family and Medical Leave Act of 1993; (xi) any federal, state, or local anti-discrimination law; (xii) any federal, state, or local wage and hour law; (xiii) any other local, state, or federal law, regulation, or ordinance; and (xiv) any public policy, contract, tort, or common law claim; (2) any allegation for costs, fees, or other expenses including attorneys' fees incurred in or with respect to a Released Claim; (3) any and all rights, benefits, or claims Executive may have under any employment contract, incentive compensation plan, or equity incentive plan with any Company Party or to any ownership interest in any Company Party except as expressly provided: (I) in Section 6(f)(ii) of the Employment Agreement; and (II) pursuant to the terms of any equity compensation agreement between Executive and a Company Party (including any Award Agreement (as defined in the LTIP) relating to an award granted to Executive pursuant to the LTIP), and (4) any claim for compensation or benefits of any kind not expressly set forth in the Employment Agreement or any equity compensation agreement (collectively, the "Released Claims"). In no event shall the Released Claims include (a) any claim that arises after the date Executive signs this Agreement, (b) any claim to vested benefits under an employee benefit plan or equity compensation plan, or (c) any claims for contractual payments under Section 5(a) or Section 6(f)(ii) of the Employment Agreement. This Agreement is not intended to indicate that any such claims exist or that, if they do exist, they are meritorious. Rather, Executive is simply agreeing that, in exchange for the consideration recited in the first sentence of this paragraph, any and all potential claims of this nature that Executive may have against the Company Parties, regardless of whether they actually exist, are expressly settled, compromised, and waived. By signing this Agreement, Executive is bound by it. Anyone who succeeds to Executive's rights and responsibilities, such as heirs or the executor of Executive's estate, is also bound by this Agreement. This release also applies to any claims brought by any person or agency or class action under which Executive may have a right or benefit. Notwithstanding the release of liability contained herein, nothing in this Agreement prevents Executive from filing any non-legally waivable claim (including a challenge to the

EXHIBIT A-1

A2581

validity of this Agreement) with the Equal Employment Opportunity Commission, National Labor Relations Board, Occupational Safety and Health Administration, Securities and Exchange Commission, Financial Industry Regulatory Authority (FINRA), or any other federal, state, or local governmental agency, authority, or commission (each, a "Governmental Agency") or participating in any investigation or proceeding conducted by any Governmental Agency. Executive understands that this Agreement does not limit Executive's ability to communicate with any Governmental Agency or otherwise participate in any investigation or proceeding that may be conducted by any Governmental Agency (including by providing documents or other information to a Governmental Agency) without notice to the Company or any other Company Party. This Agreement does not limit Executive's right to receive an award from a Governmental Agency for information provided to a Governmental Agency. **THIS RELEASE INCLUDES MATTERS ATTRIBUTABLE TO THE SOLE OR PARTIAL NEGLIGENCE (WHETHER GROSS OR SIMPLE) OR OTHER FAULT**, **INCLUDING STRICT LIABILITY**, **OF ANY OF THE COMPANY PARTIES.**

(b)     Executive agrees not to bring or join any lawsuit or arbitration proceeding against any of the Company Parties in any court relating to any of the Released Claims. Executive represents that Executive has not brought or joined any lawsuit or filed any charge or claim against any of the Company Parties in any court or before any government agency and has made no assignment of any rights Executive has asserted or may have against any of the Company Parties to any person or entity, in each case, with respect to any Released Claims.

(c)     By executing and delivering this Agreement, Executive acknowledges that:

(i)     Executive has carefully read this Agreement;

(ii)     Executive has had at least [twenty-one (21)] [forty-five (45)] days to consider this Agreement before the execution and delivery hereof to the Company [*to be added if 45 days applies*: , and Executive acknowledges that attached to this Agreement are (1) a list of the positions and ages of those employees selected for termination (or participation in the exit incentive or other employment termination program); (2) a list of the ages of those employees not selected for termination (or participation in such program); and (3) information about the unit affected by the employment termination program of which Executive's termination was a part, including any eligibility factors for such program and any time limits applicable to such program];

(iii)     Executive has been advised, and hereby is advised in writing, that Executive may, at Executive's option, discuss this Agreement with an attorney of Executive's choice and that Executive has had adequate opportunity to do so;

(iv)     Executive fully understands the final and binding effect of this Agreement; the only promises made to Executive to sign this Agreement are those stated in the Employment Agreement and herein; and Executive is signing this Agreement knowingly, voluntarily, and of Executive's own free will, and that Executive understands and agrees to each of the terms of this Agreement; and

(v)     With the exception of any sums that Executive may be owed pursuant to Section 6(f)(ii) of the Employment Agreement, Executive has been paid all wages and other compensation to which Executive is entitled under the Agreement and received all leaves (paid and unpaid) to which Executive was entitled during the period of Employee's employment with the Company.

EXHIBIT A-2

Notwithstanding the initial effectiveness of this Agreement, Executive may revoke the delivery (and therefore the effectiveness) of this Agreement within the seven-day period beginning on the date Executive delivers this Agreement to the Company (such seven-day period being referred to herein as the "Release Revocation Period"). To be effective, such revocation must be in writing signed by Executive and must be delivered to the Chief Executive Officer of the Company before 11:59 p.m., New York, New York time, on the last day of the Release Revocation Period. If an effective revocation is delivered in the foregoing manner and timeframe, this Agreement shall be of no force or effect and shall be null and void ab initio. No consideration shall be paid if this Agreement is revoked by Executive in the foregoing manner.

Executed on this _____ day of _____, ____.


William H. Schmidt, Jr.



EXHIBIT A-3

A2583

**EXHIBIT 31.1**

**Certification of Principal Executive Officer**
**Pursuant to Rule 13a-14(a) or 15d-14(a)**
**of the Securities Exchange Act of 1934, as amended**

I, John K. Keppler, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Enviva Inc. (the "Registrant"):

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements and other financial information included in this report fairly present, in all material respects, the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 3, 2022

/s/ John K. Keppler

John K. Keppler
*Chairman and Chief Executive Officer of Enviva Inc.*
*(Principal Executive Officer)*

A2584

**EXHIBIT 31.2**

**Certification of Principal Financial Officer**
**Pursuant to Rule 13a-14(a) or 15d-14(a)**
**of the Securities Exchange Act of 1934, as amended**

I, Shai S. Even, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Enviva Inc. (the "Registrant"):

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements and other financial information included in this report fairly present, in all material respects, the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 3, 2022

/s/ Shai S. Even
Shai S. Even
*Executive Vice President and Chief Financial Officer of Enviva Inc.*
*(Principal Financial Officer)*

A2585

**EXHIBIT 32.1**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the quarterly report on Form 10-Q of Enviva Inc. ("Enviva"), as filed with the Securities and Exchange Commission on the date hereof (the "Report"), John K. Keppler, Chairman and Chief Executive Officer of Enviva, and Shai S. Even, Executive Vice President and Chief Financial Officer of Enviva, each certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to his knowledge:

(1)    the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2)    the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Enviva.

Date: August 3, 2022

By:    /s/ John K. Keppler
Name:    John K. Keppler
Title:    *Chairman and Chief Executive Officer*

Date: August 3, 2022

By:    /s/ Shai S. Even
Name:    Shai S. Even
Title:    *Executive Vice President and Chief Financial Officer*

A2586