IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DUSTIN FANUCCHI

v.                          :   Civil Action No. DKC 22-2844

ENVIVA INC., et al.

## MEMORANDUM OPINION

Plaintiff Dustin Fanucchi ("Plaintiff"),[1] filed this securities action against several senior officers and underwriters of Enviva, Inc. ("Enviva"), alleging violations of the Securities Act of 1933 ("Securities Act") §§ 11 ("Section 11") and 15 ("Section 15"), 15 U.S.C. §§ 77k, 77o, and the rules promulgated thereunder; and the Securities Exchange Act of 1934 ("Exchange Act") §§ 10(b) ("Section 10(b)") and 20(a) ("Section 20(a)"), 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"). (ECF No. 34). Plaintiff also asserted claims against Enviva for alleged violations of Sections 11 and 10(b). (ECF No. 34). Enviva has filed for bankruptcy protection, resulting in an automatic stay of all claims against it. (ECF No.

---

[1] On November 3, 2022, former plaintiff David Fagen commenced the action by filing the original complaint. (ECF No. 1). On January 3, 2023, Dustin Fanucchi filed a motion for appointment as lead plaintiff and for approval of the law firm Pomerantz LLP, as lead counsel. (ECF No. 10). That motion was granted. (ECF Nos. 24; 25).

78).[2]  Thus, the claims solely against Enviva will not be addressed further.   The remainder of this opinion will only address Plaintiff's claims against Defendants Don Calloway ("Mr. Calloway"), Shai S. Even ("Mr. Even"), Jennifer Jenkins ("Ms. Jenkins"), Michael A. Johnson ("Mr. Johnson"), John K. Keppler ("Mr. Keppler"), Jason E. Paral ("Mr. Paral") (collectively, "Individual Defendants") and Defendants BMO Capital Corporation, Barclays Capital Inc., Citigroup Global Markets Inc., Goldman Sachs & Co. LLC, HSBC Securities (USA) Inc., J.P. Morgan Securities LLC, Loop Capital Markets LLC, RBC Capital Markets, LLC, Raymond James & Associates, Inc., Truist Securities, Inc., and USCA Securities LLC (collectively, "Underwriter Defendants").   Each group of Defendants filed a motion to dismiss. (ECF Nos. 62; 63). The issues have been briefed, and the court now rules, no hearing being deemed necessary.   Local Rule 105.6.   For the following reasons, both motions to dismiss will be granted.

## I.   Background

The following facts are alleged in the amended complaint, (ECF No. 34), filed by Plaintiff, who sues on his own behalf and on behalf of all purchasers of Enviva common stock between December

---

[2] On March 13, 2024, Enviva filed a suggestion of bankruptcy. (ECF No. 74).  On March 18, 2024, Plaintiff responded.  (ECF No. 76).   On March 20, 2024, the court administratively closed this action as to Enviva without prejudice to the right of Plaintiff to move to reopen this action for good cause.   (ECF No. 78).

18, 2018 and December 2, 2022 (the "Class Period"), as well as all purchasers of common stock pursuant to or traceable to the add-on offering (the "Offering") arising from Enviva's January 19, 2022 registration statement (the "Registration Statement") and prospectus filed with the Securities and Exchange Commission ("SEC") (collectively, the "Offering Documents").

**A. Enviva's Business**

Enviva is a sustainability-focused biomass energy company headquartered in Bethesda, Maryland. (ECF No. 34 ¶ 46). At all relevant times, wood pellet production was Enviva's core operation. (*Id.* ¶ 47). Wood pellets are "uniformly sized units of wood fuel produced from processing various wood resources or byproducts" that are used as a substitute for coal in power generation. (*Id.* ¶¶ 58-59). Enviva partners with private landowners to collect low-value wood[3] for its wood pellets and pledged that it would only source wood from suppliers who commit to replanting the forest source post-harvest. (*Id.* ¶¶ 91-92). Enviva markets itself as a "growth-oriented company" with a "platform to generate stable and growing cash flows" and is primarily valued based on its commitment to environmental, social, and corporate governance ("ESG"). (*Id.* ¶ 48).

---

[3] Low-value wood consists of "trees generally not suited for sawmilling or other manufactured forest products, tree tops and limbs, understory, brush, and slash that are generated in a harvest." (*Id.* ¶ 61).

**B. Events during the Class Period**

Pursuant to the Offering Documents, Enviva issued 4,945,000 shares of Enviva common stock at $70.00 per share, raising gross proceeds of $346 million.  (*Id.* ¶¶ 182-83, 187).

On October 12, 2022, the investment firm Blue Orca published a short-seller's report (the "Blue Orca Report") asserting that "Enviva is engaging in textbook greenwashing."  (*Id.* ¶ 200).  The Blue Orca Report stated that, based on data from Enviva and interviews with former executives, Enviva procures wood from clear-cutting forests, drives demand for deforestation, and contributes to decreasing hardwood forest inventory around its facilities.  (*Id.*).  The Blue Orca Report also stated that Enviva's greenwashing is evidenced by the fact that key sustainability officers departed Enviva in 2021.  On October 12, 2022, after Blue Orca's report was released, Enviva's stock price fell $7.74 per share—a 13.13% decline—to close at $51.23 per share.  (*Id.* ¶ 201).

On December 5, 2022, the conservation news web portal *Mongabay* published an article titled, "Whistleblower: Enviva claim of 'being good for the planet . . . all nonsense'" (the "Whistleblower Report").  (*Id.* ¶ 209).  The Whistleblower Report contained testimony from a former Enviva employee stating that "(i) representations that [Enviva] doesn't use big, whole trees, but only uses wood waste, in biomass production; (ii) assurances that [Enviva] only sources wood from areas where trees will be regrown;

4

and (iii) claims that [Enviva] doesn't contribute to deforestation were uniformly 'based on false pretenses.'" (*Id.* ¶ 210). Subsequently, on December 6, 2022, Enviva's stock price fell $3.35 per share from the previous day's closing price—a 9.43% decline—to close at $55.44 per share. (*Id.* ¶ 211).

Plaintiff alleges that before and during the Class Period, Mr. Keppler, Mr. Even, Ms. Jenkins, and Mr. Calloway (collectively, "Section 10(b) Defendants") misled ESG-focused investors by issuing numerous statements that materially misrepresented facts about Enviva's environmental sustainability. The statements at issue can be divided into five categories: (1) pertaining to Enviva's sourcing of wood pellets from low-value wood; (2) pertaining to reduced greenhouse gas ("GHG") emissions from using wood pellets in place of fossil fuels to generate energy; (3) pertaining to Enviva's support for forest growth; (4) pertaining to Enviva's commitment to sustainability; and (5) pertaining to the accuracy of Enviva's Sarbanes-Oxley Act ("SOX") certifications (the "SOX Certifications"). Plaintiff alleges that the Registration Statement contained various misrepresentations as well.

Plaintiff alleges that Section 10(b) Defendants' statements and the Registration Statement were misleading because Enviva mainly relied on using whole trees as opposed to scrap wood to produce its wood pellets, (*id.* ¶¶ 69, 76-77, 87), whose use in

5

generating power actually produced greater GHG emissions than burning coal, (*e.g.*, *id.* ¶ 143). Plaintiff also alleges that Enviva procured wood from forests harvested via clear-cutting, resulting in a failure to abide by its professed ESG principles. (*E.g.*, *id.* ¶ 114). Moreover, Plaintiff alleges that Enviva's SOX certifications failed to disclose that Enviva's practices undermined forests, did not ensure that Enviva's business and facilities were operated in an environmentally sound manner, delivered a product with worse GHG emissions than coal, and did not minimize the impact of Enviva's operations on the environment. (*Id.* ¶ 114).

In support of his allegations, Plaintiff relies on the statements of four confidential witnesses ("CWs") who are former Enviva employees. CW1, a "Regional/Corporate Project Manager" from September 2018 to April 2020, stated that "almost all of the trees Enviva used were whole trees[.]" (*Id.* ¶¶ 65-66, 68). CW1 stated that "it would not be possible to create pellets without needing the entire tree, specifically because scrap material does not contain enough lignan to bind the [wood] pellets." (*Id.* ¶ 76). CW2, a "Finance Operations Manager" from June 2021 to October 2022, "confirmed that Enviva used whole trees in its pellets, and referred to Enviva's claims about using only scraps and waste as a 'story' at odds with the truth." (*Id.* ¶¶ 77, 79). CW2 stated that "it seemed like the only people who believed Enviva was not

using whole trees were those outside the [c]ompany[,]" whereas "everybody who had been to one of Enviva's plants knew the Company was using whole trees." (*Id.* ¶ 80). CW3, a "Maintenance and Reliability Manager" from July 2020 to June 2022, contributed statements to the Whistleblower Report and "confirmed that Enviva used whole trees—including giant ones[.]" (*Id.* ¶¶ 82-83, 85). CW3 stated that "[Mr.] Keppler certainly knew Enviva was using whole trees because he visited [Enviva]'s . . . plant while [CW3] was there, and would have seen substantial quantities of leaves and limbs from whole trees harvested lying conspicuously on the ground." (*Id.* ¶ 88). Like CW1, CW3 stated that whole trees are required to create wood pellets with sufficient density. (*Id.* ¶ 89). CW3 also stated that Mr. Calloway "knowingly lied" in an April 22, 2022 CBS News report by asserting that Enviva only used leftover waste wood. (*Id.* ¶¶ 191, 194). CW4 was, among other roles, a "Sustainability Analyst" from August 2017 to August 2020. (*Id.* ¶ 93). CW4 stated that he "was unaware of Enviva seeking any consequences for its landowner partners if they did not reforest their land post-harvest." (*Id.* ¶ 94).

### C. Procedural History

On April 3, 2023, Plaintiff filed an amended complaint. (ECF No. 34). In Count I, Plaintiff alleges that Mr. Keppler, Enviva's Chief Executive Office from 2004 to November 2022; Mr. Even, Enviva's Executive Vice President and Chief Financial Officer; Mr.

7

Johnson, Enviva's Vice President and Chief Accounting Officer from June 2021 to the present; Mr. Paral, Enviva's Vice President, Associate General Counsel, and Secretary; and Underwriter Defendants are strictly liable under Section 11 as signatories of the Registration Statement for material misrepresentations and omissions contained therein. (*Id.* ¶¶ 23, 24, 27, 28, 226-36).  In Count II, Plaintiff alleges that Mr. Keppler, Mr. Even, and Mr. Johnson are liable under Section 15 for their violations of Section 11.  (*Id.* ¶¶ 237-44).  In Count III, Plaintiff alleges that Mr. Keppler; Mr. Even; Ms. Jenkins, Enviva's Vice President and Chief Sustainability Officer from February 2016 to July 2021; and Mr. Calloway, Enviva's Vice President, Equity, Inclusion, and Impact from July 2021 to December 2022, violated Section 10(b) and Rule 10b-5 by making material misrepresentations and omissions that deceived the investing public, artificially inflated and maintained the market price of Enviva's common stock, and caused Enviva common stock purchasers to pay artificially inflated prices.  (*Id.* ¶¶ 245-54).  In Count IV, Plaintiff alleges that Mr. Keppler, Mr. Even, Ms. Jenkins, and Mr. Calloway are liable under Section 20(a) as senior officers at Enviva during the Class Period. (*Id.* ¶¶ 255-60).

On June 2, 2023, Individual Defendants moved to dismiss all counts of the amended complaint and Underwriter Defendants moved to dismiss Plaintiff's Section 11 claim.  (ECF Nos. 62; 63).  On

July 3, 2023, Plaintiff opposed both motions to dismiss.  (ECF Nos. 66; 67).  On August 1, 2023, Individual Defendants, and Underwriter Defendants replied.  (ECF Nos. 70; 71).

## II.  Standard of Review

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the sufficiency of the complaint.  *Presley v. City of Charlottesville,* 464 F.3d 480, 483 (4th Cir. 2006). Generally, a plaintiff's complaint need only satisfy the standard of Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed.R.Civ.P. 8(a)(2).  "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief."  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 n.3 (2007).  That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal citations omitted).

At this stage, all well-pleaded allegations in a complaint must be considered as true, *Albright v. Oliver,* 510 U.S. 266, 268 (1994), and all factual allegations must be construed in the light most favorable to the plaintiff, *see Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir. 1993)).  In evaluating the complaint, unsupported legal allegations need not

be accepted.  *Revene v. Charles Cnty. Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989).  Moreover, legal conclusions couched as factual allegations are insufficient, *Iqbal,* 556 U.S. at 678, as are conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst,* 604 F.2d 844, 847 (4th Cir. 1979).

Because Plaintiff's allegations sound in fraud, Plaintiff must also satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b).  *See Cozzarelli v. Inspire Pharms. Inc.,* 549 F.3d 618, 629 (4th Cir. 2008); *In re Medimmune, Inc. Sec. Litig.,* 873 F.Supp. 953, 960 (D.Md. 1995).  Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Particularity of pleading is generally required with regard to the time, place, speaker and content of the allegedly false statement, as well as the manner in which the statements are false and the specific facts raising an inference of fraud. *See Medimmune,* 873 F.Supp. at 960; *In re Criimi Mae, Inc. Sec. Litig.,* 94 F.Supp.2d 652, 657 (D.Md. 2000).  The Private Securities Litigation Reform Act ("PSLRA") imposes additional pleading requirements on plaintiffs in securities fraud actions. As relevant here, the PSLRA requires the complaint to (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading[;]" and (2) "state with particularity facts giving

rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321 (2007) (quoting 15 U.S.C. §§ 78u-4(b)(1), (b)(2)).

To avoid converting a motion to dismiss into a motion for summary judgment, courts deciding a Rule 12(b)(6) motion are limited to considering the complaint's allegations, documents attached to the complaint, documents referenced in the complaint, and judicially noticeable matters. *In re Under Armour Sec. Litig.*, 342 F.Supp.3d 658, 666-67 (D.Md. 2018) (citing *Tellabs*, 551 U.S. at 322); *see* Fed.R. Civ.P. 10(c). "A document is incorporated into the complaint by reference if it is 'integral to and explicitly relied on in the complaint' and if the plaintiffs do not challenge its authenticity." *Leacock v. IonQ, Inc.*, No. DLB-22-cv-1306-DLB, 2023 WL 6308045, at *8 (D.Md. Sept. 28, 2023) (quoting *Under Armour*, 342 F.Supp.3d at 606) (citing *Cozzarelli*, 549 F.3d at 625).[4] "The court also may consider facts that are subject to judicial notice under Rule 201(b) of the Federal Rules of Evidence." *Leacock*, 2023 WL 6308045, at *8. "Indeed, district

---

[4] The court will consider Exhibits 2, 3, 4, 5, 7, 8, 13, 14, 15, 19, 33, and 34 to Individual Defendants' motion to dismiss, (ECF Nos. 62-5; 62-6; 62-7; 62-8; 62-10; 62-11; 62-16; 62-17; 62-18; 62-22; 62-36; 62-37), and Exhibits 1 through 8 to Underwriter Defendants' motion to dismiss, (ECF Nos. 63-4; 63-5; 63-6; 63-7; 63-8; 63-9; 63-10; 63-11), because they are integral to and explicitly referenced in the amended complaint, and Plaintiff does not dispute their authenticity.

courts in this circuit 'routinely take judicial notice of newspaper articles, analysts' reports, and press releases in order to assess what the market knew at particular points in time, even where the materials were not specifically referenced in the complaint.'" *In re Hum. Genome Scis. Inc. Sec. Litig.*, 933 F.Supp.2d 751, 758 (D.Md. 2013). "When a court takes judicial notice of a public record, it takes notice that the record exists, or that it was filed with the agency, or that the information was publicly available." *Leacock*, 2023 WL 6308045, at *8 (quoting *Tchatchou v. India Globalization Cap., Inc.*, No. 18-cv-3396-PWG, 2021 WL 307415, at *5 (D.Md. Jan. 29, 2021)). "[T]he 'content of a noticed document may not be used to contradict well-pleaded allegations in the complaint.'" *Id.* (quoting *Tchatchou*, 2021 WL 307415, at *5). "[A]ny facts drawn from judicially noticed documents must be construed 'in the light most favorable to the plaintiffs.'" *Id.* (quoting *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015)). Moreover, a court need not judicially notice documents released after the relevant class period that "do not shed light on the commercial reality . . . at the time the alleged misstatements were made." *Id.* at *9.[5]

---

[5] With the exception of Exhibit 20, a Form 10-K ("10-K") which was not released until March 1, 2023, after the Class Period ended, the court will take judicial notice of Exhibits 1, 6, 9, 10, 11, 12, 16, 17, 18, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, and 32 to Individual Defendants' motion to dismiss, (ECF Nos. 62-4; 62-9; 62-12; 62-13; 62-14; 62-15; 62-19; 62-20; 62-21; 62-24; 62-25;

## III. Exchange Act Claims

### A. Section 10(b) and Rule 10b-5 (Count III)

Section 10(b) "prohibits the use of 'any manipulative or deceptive device or contrivance' in connection with the sale of a security in violation of SEC rules." *In re Under Armour Sec. Litig.*, 409 F.Supp.3d 446, 457 (D.Md. 2019) (quoting 15 U.S.C. § 78j(b)). "Rule 10b-5 encompasses only conduct already prohibited by § 10(b)." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008). A plaintiff bringing a Section 10(b) and Rule 10b-5 claim must establish the following elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 546 (4th Cir. 2017) (quoting *Stoneridge*, 552 U.S. at 157). Individual Defendants argue that Plaintiff's Section 10(b) and Rule 10b-5 claim should be dismissed because Plaintiff alleges neither an actionably misleading statement nor scienter. (ECF No. 62-1, at 11; 70, at 7, 16). Plaintiff contends otherwise. (ECF No. 66, at 25, 32).

---

62-26; 62-27; 62-28; 62-29; 62-30; 62-31; 62-32; 62-33; 62-34; 62-35), which consist of publicly available articles, reports, and SEC filings-information available to the market during the Class Period.

### 1. Material Misrepresentations or Omissions

"To allege a material misrepresentation[] or omission, the challenged statement must be a factual one—'that is, one that is demonstrable as being true or false'; (2) the 'statement itself must be *false*, or the omission must render public statements *misleading*'; and (3) 'any statement or omission of fact must be *material.*'" *Leacock*, 2023 WL 6308045, at *15 (quoting *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir. 1999)). Materiality, an objective concept, involves "the significance of an omitted or misrepresented fact to a reasonable investor." *Gasner v. Bd. of Sup'rs of the Cnty. of Dinwiddie, Va.*, 103 F.3d 351, 356 (4th Cir. 1996) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976)). In other words, "[a] fact—omitted or included—is material if there is a 'substantial likelihood' that its disclosure or removal 'would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F.4th 232, 244 (4th Cir. 2023) (quoting *TSC Indus.*, 426 U.S. at 449).[6] "If the plaintiff fails to allege *all* facts

---

[6] Plaintiff suggests that the materiality of the alleged misrepresentations should be resolved by a jury. (ECF No. 66, at 31-32) (quoting *Dunn v. Borta*, 369 F.3d 421, 427 (4th Cir. 2004)). The United States Court of Appeals for the Fourth Circuit, however, has stated that "[n]o shortage of cases . . . make clear that materiality may be resolved by a court as a matter of law." *Greenhouse v. MCG Cap. Corp.*, 392 F.3d 650, 657 (4th Cir. 2004) (citing *Longman v. Food Lion*, 197 F.3d 675 (4th Cir. 1999); *Klein*

but does allege *sufficient* facts to support a *reasonable belief* in the allegation that the defendant's statement was misleading, the court should deny the Rule 12(b)(6) motion as to this 'misrepresentation' element." *Teachers' Ret. Sys. Of LA v. Hunter*, 477 F.3d 162, 174 (4th Cir. 2007).

Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information[,]" but "disclosure of material information is required 'when necessary to make statements made, in the light of the circumstances under which they were made, not misleading.'" *Singer v. Reali*, 883 F.3d 425, 440 (4th Cir. 2018) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)); *see also* 17 C.F.R. § 240.10-b5(b). "[C]ompanies can control what they have to disclose under

---

*v. General Nutrition Cos.*, 186 F.3d 338, 342 (3d Cir. 1999); *Hillson Partners L.P. v. Adage, Inc.*, 42 F.3d 204, 219-20 (4th Cir. 1994); *Raab v. General Physics Corp.*, 4 F.3d 286, 290-91 (4th Cir. 1993)). Nevertheless, Plaintiff contends that the alleged misrepresentations are "undeniably material[]" on three bases: (1) they were about Enviva's core business; (2) Enviva "reli[es] on environmental subsidies which hinged on the very matters represented[;]" and (3) Enviva's stock value dropped significantly. (ECF No. 66, at 32). Such bases, however, are not dispositive. For instance, some statements, such as puffery, are inherently immaterial. *Sinnathurai v. Novavax, Inc.*, 645 F.Supp.3d 495, 522 (D.Md. 2022) (citing *In re Cable & Wireless, PLC*, 321 F.Supp.2d 749, 766-67 (E.D.Va. 2004)). Furthermore, misleading statements can be rendered immaterial if they were issued in a context where a reasonable investor possesses information sufficient to call it into question. *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 617 (4th Cir. 1999) (first quoting *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 529 (7th Cir. 1985); and then quoting *TSC Indus.*, 426 U.S. at 449).

[Section 10(b) and Rule 10b-5] by controlling what they say to the market." *Matrixx*, 563 U.S. at 45; *see also Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5.").

Each category of alleged misrepresentations will be addressed in turn.[7]

### a. Sourcing Wood from Whole Trees

Plaintiff alleges that statements by Mr. Keppler, Ms. Jenkins, and Mr. Calloway pertaining to Enviva's sourcing of wood fiber only from low-value wood (the "Category C Statements") are material misrepresentations. (*See* ECF No. 34 ¶¶ 129, 142, 191, 192).[8]  The Category C Statements consist of the following:

- During an October 31, 2019 earnings call, Mr. Keppler stated, **"[t]*he low-grade wood fiber we procure is a byproduct of sustainable forestry operations and traditional saw timber harvest and gives us consistent and table access to a growing natural resource without any dependency on sawmilling, sawdust or other industrial residuals.*"**  (*Id.* ¶ 129) (alteration in original).
- A July 20, 2020 tweet quoted Ms. Jenkins's statement that "[g]ood biomass is made from low-value wood—a byproduct from sawmilling or planning timber harvests.  It's not made from high-value trees and it must safeguard

---

[7] Appendix A to the Individual Defendants' motion to dismiss ("Appendix A") summarizes and sorts each alleged material misrepresentation into six categories.  (ECF No. 62-1, at 45-54).  This discussion will use the same categorizations.

[8] The Category C Statements are grouped under Category C in Appendix A.  (*See* ECF No. 62-1, at 45-48).

biodiversity and conservation." (*Id.* ¶ 142).

- On April 22, 2022, in a CBS News segment, Mr. Calloway insisted that Enviva uses "***tops***" and "***limbs***" rather than tree trunks. (*Id.* ¶ 191). Mr. Calloway also stated that **"[e]*very piece of fiber that's taken into our program is low value wood*[.] . . . *If we did not create this service, it would be left to rot on the forest floor and would be left to create forest fires.*"** (*Id.* ¶ 192).

Plaintiff alleges that the Category C Statements are materially misleading because Enviva used whole trees in addition to low-value wood. (*See, e.g.*, *id.* ¶¶ 131, 143). Plaintiff appears to base the falsity of the Category C Statements on statements from CW1, CW2, and CW3, as well as the Whistleblower Report, all of which assert that Enviva uses whole trees. (*Id.* ¶¶ 65-89, 210). Individual Defendants counter that "sawtimber is not synonymous with whole trees[,]" and the amended complaint itself confirms that Enviva's definition of low-value wood includes "weaker or deformed ***trees***" and "***trees*** generally not suited for sawmilling." (ECF No. 62-1, at 25) (quoting ¶¶ 61, 62). Individual Defendants also point to numerous public filings indicating that Enviva uses "trees" unsuitable for the sawmilling and lumber industries. (*Id.* at 26) (citing ECF Nos. 62-6, at 15; 62-4, at 16; 62-5, at 7; 62-16, at 10; 62-18, at 11; 62-19, at 144; 62-20, at 19; 62-21, at 26-27; 62-22, at 10; 62-23, at 7; 62-24, at 28; 62-25, at 28; 62-26, at 34; 62-27, at 25; 62-28, at 26; 62-29, at 30; 62-30, at 24;

62-31, at 26; 62-32, at 26; 62-33, at 11-12).  Plaintiff responds that such "'truth-on-the-market' defenses are inappropriate at the pleading stage because they necessitate fact-specific determinations of whether corrective information was conveyed to the public . . . '"with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by" the alleged misstatements.'" (ECF No. 66, at 27) (quoting *KBC Asset Mgmt. NV v. 3D Sys. Corp.*, No. 0:15-cv-02393-MGL, 2016 WL 3981236 (D.S.C. July 25, 2016)).  In addition, Plaintiff maintains that the language cited by Individual Defendants "does not say 'whole trees,' and the 'tops' and 'limbs' from which Enviva claimed to have specifically sourced its wood pellets are obviously also parts of 'trees.'" (*Id.*).  Plaintiff also argues that "the large stock drops . . . demonstrate that the truth was *not* known to investors." (*Id.* at 28) (citing *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F.Supp.2d 348, 362 (S.D.N.Y. 2006)).

The Fourth Circuit has held that "'even lies are not actionable' when an investor 'possesses information sufficient to call the [mis]representation into question[,]" because there would not be a "'substantial likelihood' that an alleged misrepresentation 'significantly altered "the total mix" of information' a reasonable investor (the market) possesses." *Phillips*, 190 F.3d at 617 (first quoting *Teamsters Local 282*, 762

F.2d at 529; and then quoting *TSC Indus.*, 426 U.S. at 449).  Judge Davis's opinion in *Keeney v. Larkin*, 306 F.Supp.2d 522 (D.Md. 2003), *aff'd*, 102 F.App'x 787 (4th Cir. 2004), is instructive.  In *Keeney*, the plaintiff argued that the defendant company made materially misleading statements that it had integrated already-acquired entities.  *Id.* at 533.  Judge Davis held that because the defendant issued public filings warning of difficulties in—and the potential failure of—fully integrating acquired entities, the "[d]efendants' use in press releases of terms such as 'successful integration,' the 'framework of [an] existing integrated organization,' or even a 'full year of integrated operations under our belt' did not significantly alter a reasonable investor's view that [the defendant] was never truly fully integrated in light of the total mix of information available."  *Id.*

Even when interpreted in Plaintiff's favor, the facts here show that Enviva's use of whole trees has been previously disclosed.  For instance, in a June 28, 2019 post published on Enviva's website, Ms. Jenkins stated that Enviva's wood sources "[s]ometimes . . . tak[e] the form of whole trees[.]"  (ECF No. 62-34, at 5).  Enviva's July 2020 white paper stated, "Enviva acknowledges it does use trees in their intact form, but only those trees unsuitable for use in the sawmill and pulp industry because they are too small, contain defects or disease or are otherwise

rejected for high value use like construction or sawtimber."[9]  (ECF No. 62-9, at 11).  Plaintiff's argument that drops in stock prices suggest *individual* investors' ignorance of the truth, (ECF No. 66, at 28), is irrelevant to the court's ultimate inquiry about the *reasonable* investor's knowledge.  As in *Keeney*, even if Mr. Keppler and Mr. Calloway indeed lied that Enviva does not source wood fiber from whole trees, the Category C Statements are immaterial in light of the total mix of information available revealing Enviva's use of whole trees.  Thus, Plaintiff fails to allege that the Category C Statements are materially misleading.

**b. GHG Emissions**

Plaintiff alleges that statements by Mr. Keppler and Mr. Calloway pertaining to reduced GHG emissions as a result of using wood pellets as a substitute for fossil fuels in power generation (the "Category A Statements") are material misrepresentations. (*See* ECF No. 34 ¶¶ 109, 119, 123, 130, 138, 148, 154, 159, 161,

---

[9] Plaintiff asserts that "[n]one of the specific allegations set forth by the Blue Orca Report or the Whistleblower Report are actually refuted by [Enviva's July 2020 white paper], which appears largely to be based on propaganda culled from Enviva's own website."  (ECF No. 66, at 28 n.8).  Whether Enviva's July 2020 white paper actually refutes the Blue Orca Report or the Whistleblower Report is irrelevant to the court's inquiry, which is limited to determining whether the total mix of information available would inform a reasonable investor that Enviva uses whole trees to produce wood pellets.

178, 184, 188, 193).[10]  The following is a representative selection

of the Category A Statements:

- During a May 9, 2019 earnings call, Mr. Keppler stated, "*Enviva's wood pellets directly displace coal in power generation and heating applications and lower the lifecycle greenhouse gas emissions profile of utilities*." (*Id.* ¶ 119).

- During a November 5, 2020 earnings call, Mr. Keppler stated, "*Enviva is leading an industry that plays an increasingly critical role in the global fight against climate change.  The climate benefits have sustainably produced wood pellets continue to garner international recognition and we are keenly focused on promoting forest growth and providing incremental transparency*." (*Id.* ¶ 154).

- A February 17, 2021 press release quoted Mr. Keppler's statement that "**[f]***or more than a decade we have played a critical role in helping the world's energy producers substantially reduce their net carbon emissions by using sustainable bioenergy, enabling them to phase out coal, support increases in forest carbon stocks, and provide reliable, affordable energy to their communities*." (*Id.* ¶ 159).

- A February 24, 2021 press release quoted Mr. Keppler's statement that "*Enviva and the sustainable and renewable fuel we supply to our customers are part of an all-in solution to climate change*[.]" (*Id.* ¶ 161).

- On April 22, 2022, in a CBS News segment, Mr. Calloway stated, "**[t]***here's no real doubt here that wood pellets and frankly, woody biomass, are a far superior climate change mitigation option than fossil fuels, particularly coal*." (*Id.* ¶ 193).

---

[10] The Category A Statements are grouped under Category A in Appendix A.  (*See* ECF No. 62-1, at 45-48).

According to Plaintiff, the Category A Statements are materially misleading because using wood pellets instead of coal in power generation yielded comparatively more GHG emissions. (*See, e.g., id.* ¶¶ 110, 120). Plaintiff appears to base the falsity of the Category A Statements on the Blue Orca Report's assertion that "burning wood emits more CO2 per unit of heat generated than any major energy source (including coal)[.]" (*Id.* ¶ 200).

The Individual Defendants counter that the GHG Statements are non-actionable because "Enviva itself disclosed to investors that debate existed as to the environmental impact of replacing coal with biomass." (ECF No. 62-1, at 21) (quoting ECF No. 62-16, at 22-23 ("Biomass has been under additional regulatory scrutiny in recent years to develop standards to safeguard against adverse environmental effects from its use. Although regulators continue to consider biomass harvested with certain practices to be sustainable, certain special interest groups that focus on environmental issues have expressed their opposition to the use of biomass . . . [and] have encouraged the [European Union] not to classify the use of forest-related biomass as sustainable.")). Accordingly, Individual Defendants contend that the Category A Statements did not significantly alter the total mix of information available to a reasonable investor. (*Id.* at 21) (quoting *Phillips*, 190 F.3d at 615). Plaintiff does not respond to this argument in

his opposition and has therefore conceded the point.[11]   *See Ferdinand-Davenport v. Children's Guild*, 742 F.Supp.2d 772, 777 (D.Md. 2010) (holding that in failing to respond to the defendant's arguments for why her claim should be dismissed, a plaintiff abandoned her claim); *Stenlund v. Marriott Int'l, Inc.*, 172 F.Supp.3d 874, 887 (D.Md. 2016) ("In failing to respond to [defendant's] argument, Plaintiff concedes the point.").

### c. Forest Growth

Plaintiff alleges that statements by Mr. Keppler pertaining to Enviva's support for forest growth (the "Category B Statements") are material misrepresentations.   (*See id.* ¶¶ 121, 170, 176).[12] The Category B Statements consist of the following:

- An August 7, 2019 press release quoted Mr. Keppler's statement that "***robust forest markets such as ours are the key to healthy forests[.]***"   (*Id.* ¶ 121).
- During an April 29, 2021 earnings call, Mr. Keppler stated, "***With the tremendous growth we have achieved, coupled with what we had, we will continue to ensure that our wood pellets remain sustainably produced from for[ests] [whose] inventories have and continue to grow over[]time.***"   (*Id.* ¶ 170).

---

[11] Accordingly, it is unnecessary to evaluate the parties' other arguments regarding (1) whether the Blue Orca report corroborates Plaintiff's assertion that using wood pellets to generate energy does not result in reduced GHG emissions; (2) whether the Category A Statements arise from a non-actionable scientific disagreement; and (3) whether the Category A Statements are merely opinion statements.   (*See* ECF Nos. 62-1, at 17-22; 66, at 28-29).

[12] The Category B Statements are grouped under Category B in Appendix A.   (*See* ECF No. 62-1, at 48-49).

> Mr. Keppler also stated, "***Our track and trace system and our leading responsible sourcing policy provide us with the tools we need to set public transparent goals regarding how we manage, measure and improve our activities.***" (*Id.*).

- During a July 29, 2021 earnings call, Mr. Keppler stated, "***tools like our proprietary track and trace system and our industry leading responsible sourcing policy will continue to ensure that our wood pellets remain sustainably produced from forests whose inventories have continued to grow over time.***" (*Id.* ¶ 176).

Plaintiff alleges that the Category B Statements were materially misleading because Enviva's procurement practices "undermined rather than sustained forests[,]" Enviva replaced hardwood forests with low-value saplings, and "Enviva's Track & Trace program actually demonstrated its widespread reliance on environmentally-destructive clear-cutting practices[.]" (*See, e.g.*, *id.* ¶¶ 122, 171). Plaintiff appears to base the falsity of the Category B Statements on (1) CW4's contention that he "was unaware of Enviva seeking any consequences for its landowner partners if they did not reforest their land post-harvest[;]" (2) the Blue Orca Report's assertion that satellite imagery of GPS coordinates embedded in Enviva's Track and Trace database "reveals hundreds of clear-cut forests," suggesting that Enviva is "driving demand for deforestation" and contributing to decreasing inventories of hardwood trees that are being replaced by lower-value trees; and (3) the Whistleblower Report's statement that

24

Enviva made false representations that it only sources wood from forests that will be regrown post-harvest and does not contribute to deforestation.  (*Id.* ¶¶ 94, 200).

Individual Defendants contend that the Category B Statements are non-actionable because the alleged shortcomings of the Category B Statements merely arise from Plaintiff's disagreement with the "commonsense economic principle" that Enviva increases the demand for wood produced from privately-owned forests, thereby increasing economic incentives for forest owners to maintain high forest inventories.  (ECF No. 62-1, at 22-23).  In other words, Individual Defendants argue that Plaintiff has not pleaded sufficient facts demonstrating that the Category B Statements are false—as opposed to an alternative "permissible judgment[][.]" (*Id.* at 23) (quoting *Lerner v. Nw. Biotherapeutics*, 273 F.Supp.3d 573, 587 (D.Md. 2017)).  Moreover, Individual Defendants insist that "the [amended] [c]omplaint nowhere alleges facts showing that Enviva's suppliers would not grow their [forest] inventory over time[,]" given that it only alleges that inventories of *hardwood* trees were decreasing—and the Category B Statements "make no representation about the growth of 'hardwood trees' or 'forest biodiversity[.]'" (*Id.* at 24).  Plaintiff fails to respond to any of these arguments in his opposition.  Consequently, Plaintiff has conceded these points.

**d. Commitment to Sustainability**

Plaintiff alleges that statements by Mr. Keppler pertaining to Enviva's commitment to sustainability (the "Category D Statements") are material misrepresentations. (*See* ECF No. 34 ¶¶ 107, 108, 119, 123, 139, 150, 176, 198).[13]  The following is a representative selection of the Category D Statements:

- During a February 20, 2018 earnings call, Mr. Keppler stated, **"[s]***ustainability is the foundation of our business and is increasingly an area of focus for our investors, who place a great deal of value on having Enviva as* [a]*n ESG investment in their portfolio."* (*Id.* ¶ 107). Mr. Keppler also stated that Enviva's "**[p]***rograms . . .* **[***including***]** *our industry trace and trace system, tangibly and transparently illustrate our innovation on and commitment to sustainability in ways that extends far beyond third-party audits, and legal and regulatory compliance."* (*Id.* ¶ 108) (alterations in original).

- During a May 9, 2019 earnings call, Mr. Keppler stated that sustainability is "***the foundation of our business and an area of increasing focus for our investors who pla*[ce]** *a great deal of value on having Enviva as an ESG investment in their portfolios."* (*Id.* ¶ 119). Mr. Keppler also stated, "***As a company, our purpose is simple*[—]***to improve the environment by displacing coal and growing more trees."* (*Id.*).

- During a July 29, 2021 earnings call, Mr. Keppler stated, "***Sustainability is at the core of our value proposition, and our net zero advancements only make the product we manufacture that much more valuable in our***

---

[13] The Category D Statements are grouped under Category D in Appendix A. (*See* ECF No. 62-1, at 50-53).

> ***effort to displace coal, grow more trees,
> and fight climate change.***" (*Id.* ¶ 176).
> - During a May 5, 2022 earnings call, Mr.
>   Keppler stated, "***we've built a business
>   focus on our core values, caring about
>   people in our communities, fighting climate
>   change by displacing coal and ensuring that
>   we are growing more trees, managing our
>   business under industry-leading sustainability
>   practices that ensure we are delivering
>   favorable impact to energy and the
>   environment right in line with the IPCC
>   guidance.***" (*Id.* ¶ 198).

Plaintiff contends that the Category D Statements are materially misleading for the same reasons as the Category B Statements and appears to base the falsity of the Category D Statements on CW4's statement, the Blue Orca Report, and the Whistleblower Report. Plaintiff alleges that Enviva's procurement practices "undermined rather than sustained forests[,]" Enviva replaced hardwood forest inventory with low-value saplings, and Enviva's Track & Trace program showed its reliance on clear-cutting forests. (*See, e.g.*, *id.* ¶¶ 110, 124).

Individual Defendants argue that the Category D Statements are not materially misleading because they constitute "immaterial puffery[.]" (ECF No. 62-1, at 27). Moreover, Individual Defendants contend that Plaintiff fails to allege that Enviva did not have the commitments and priorities expressed by the . . . Category D [Statements][,] [n]or does [he] allege that Enviva has not actually received the numerous sustainability certifications it routinely describes in its public filings." (ECF No. 62-1, at

29).   Plaintiff responds that the Category D Statements were
actionably misleading because they "were contrary to concrete
information in [Mr. Keppler's] possession" and "would not have
been easily dismissed by investors" because they "accompanied
other, even more concrete representations on the same subject."
(ECF No. 66, at 30-31) (citing ECF No. 34 ¶¶ 65-89, 93-98; *City of
Sterling Heights*, 423 F.Supp.2d at 360; *Shapiro v. UJB Fin. Corp.*,
964 F.2d 272, 282 (3ᵈ Cir. 1992)).

"Puffery is defined as 'loosely optimistic statements that
are so vague, so lacking in specificity, or so clearly constituting
the opinions of the speaker, that no reasonable investor could
find them important to the total mix of information available.'"
*Sinnathurai*, 645 F.Supp.3d at 522 (citing *Cable & Wireless*, 321
F.Supp.2d at 766-67).   As explained in *Dunn*, 369 F.3d at 431
(alterations in original) (quoting *United States v. New S. Farm &
Home Co.*, 241 U.S. 64, 71 (1916)) (citing *Miller v. Premier Corp.*,
608 F.2d 973, 981 (4ᵗʰ Cir. 1979)),

> the judiciary has long distinguished between
> mere puffing statements utilizing opinion and
> exaggeration to pitch a sale, on the one hand,
> and factual statements that constitute
> fraudulent misrepresentations, on the other.
> The Supreme Court [of the United States] has
> explained that "when a proposed seller goes
> beyond [mere exaggeration of the qualities
> which an article has], assigns to the article
> qualities which it does not possess, does not
> simply magnify in opinion the advantages which
> it has but invents advantages and falsely
> asserts their existence, he transcends the

28

> limits of 'puffing' and engages in false
> representations and pretenses."

Judge Grimm's analysis in *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 543 F.Supp.3d 96 (D.Md. 2021), *aff'd sub nom. In re Marriott Int'l, Inc.*, 31 F.4th 898 (4th Cir. 2022), is illustrative. *Marriott Int'l* involved allegations that a company that experienced a data breach had made materially misleading statements regarding the importance of protecting customer data. *Id.* at 108, 134. According to Judge Grimm, "general commitments to safeguard customer data"—such as statements that data protection was "critical"—constituted non-actionable puffery that cannot materially mislead a reasonable investor because they merely contain "aspirational language . . . to[wards] reaching particular goals" that "provid[e] no guarantees[.]" *Id.* at 135-36. In other words, such statements "are not specific and verifiable and do not assign a quality to [the company's] cybersecurity that it did not have[.]" *Id.* at 136. By contrast, statements that "[a company] had 'strong data security and confidentiality standards' and maintained 'a highly sophisticated data information network that includes advanced security, protections and redundancies[]' . . . are of a character that could be proven true or false and cross the line from puffery into material statements." *Id.*

Here, regardless of whether Mr. Keppler possessed information indicating that Enviva fell short of its sustainability commitment, the Category D Statements make no factual representations about the *present* degree to which Enviva has fulfilled its sustainability commitments, nor do they guarantee that Enviva would take specific steps to fulfill its sustainability commitment.  Rather, the Category D Statements merely expressed that Enviva considered sustainability important.  As such, the Category D Statements are too vague, aspirational, and non-verifiable to be materially misleading to a reasonable investor. Thus, Plaintiff has failed to allege that the Category D Statements are material misrepresentations.[14]

### d. SOX Certifications

Plaintiff alleges that the SOX Certifications attached to Enviva's 10-K filed on March 4, 2019 (the "2018 10-K"), in which Mr. Keppler and Mr. Even attested that the 10-K "fairly presents, in all material respects, the . . . results of operations of

---

[14] Individual Defendants also argue that the Category D Statements are not false or misleading because the amended complaint "does not allege that Enviva did not have the commitments and priorities expressed by the . . . Category D [Statements][,] [n]or does [it] allege that Enviva has not actually received the numerous sustainability certifications it routinely describes in its public filings."  (ECF No. 62-1, at 29).  Because Plaintiff does not respond to Individual Defendants' argument in his opposition, he has conceded the point.

[Enviva][,]" are material misrepresentations.   (ECF No. 34 ¶ 113)

(first alteration in original).   Plaintiff contends that

> [t]h[ose] statements . . . were materially
> false and misleading when made because the
> 2018 10-K did not fairly present, in all
> material aspects, the results of Enviva's
> operations, and because the statements omitted
> to disclose the following information
> necessary to make the statements not
> misleading under the circumstances in which
> they were made: (i) Enviva's actual
> procurement practices undermined rather than
> sustained forests; (ii) Enviva's actual
> practices did not ensure that its "business
> and facilities are operated in . . . an
> environmentally sound manner"; (iii) Enviva
> did not "deliver[] environmental benefits" but
> instead used environmentally unsound
> procurement practices to deliver a product
> with worse emissions than coal; and (iv)
> Enviva did not minimize the impact of its
> operations on the environment.

(*Id.* ¶ 114).   Plaintiff alleges that the SOX Certifications

attached to Enviva's 10-Ks filed on February 27, 2020, February

25, 2021, and March 4, 2022—also signed by Mr. Keppler and Mr.

Even—contain similar misrepresentations, some of which were

incorporated by reference into the Offering Documents.[15]   (*See id.*

¶¶ 134, 163, 184-85, 190).   Individual Defendants counter that

Plaintiff fails to allege that the SOX Certifications were

materially misleading.   (ECF No. 62-1, at 32).   Plaintiff does not

---

[15] The SOX Certifications are grouped under Category F in Appendix A.   (*See* ECF No. 62-1, at 54).

respond to Individual Defendants' argument in his opposition. Thus, Plaintiff has conceded the point.[16]

## 2. Scienter

Even if the allegations were sufficient to show that some of the statements by Section 10(b) Defendants were false or misleading, Plaintiff has failed to allege facts establishing scienter.  To allege scienter successfully, a plaintiff must "'state with particularity facts giving rise to a strong inference that the defendant acted' with intentional or reckless deception 'with respect to each act or omission alleged.'"  *Syneos Health*, 75 F.4th at 240-41 (quoting 15 U.S.C. § 78u-4(b)(2)(A); *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 344 (4th Cir. 2003)). "[A] reckless act is one that is 'so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  *Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009).

A successful showing of scienter requires satisfying a heavy pleading burden.  A plaintiff must allege facts establishing "*why*"

---

[16] Hence, it is unnecessary to address Individual Defendants' additional argument that "statements [drawn from SOX certifications] are inactionable as a matter of law."  (ECF No. 62-1, at 32-33) (citing *Lorusso v. Boulder Brands, Inc.*, No. 15-cv-00679-MSK-KMT, 2017 WL 4365180, at *14 (D.Colo. Mar. 1, 2017)).

the defendants made the misleading statements. *Syneos Health*, 75 F.4th at 241.  To do so, a plaintiff must show that the defendants knew the contrary or missing information and the relevance of that information for evaluating their statements.  *Id.*  The plaintiff must then show that the defendants "went ahead and left the information out anyway, with the intent to mislead [the] [p]laintiff[]—or at least with a reckless disregard for the risk that leaving the information out would make their [statements] misleading."  *Id.* at 242.  "[T]o the extent a plaintiff alleges fraud claims against individual defendants, the plaintiff must allege facts supporting a strong inference of scienter as to *each defendant*."  *Matrix*, 576 F.3d at 182 (emphasis added) (citing *Hunter*, 477 F.3d at 184).

The court's scienter analysis consists of a "comparative, two-step process."  *Syneos Health*, 75 F.4th at 241 (citing *Tellabs*, 551 U.S. at 314).  The court "first consider[s] the 'inferences [of scienter] urged by the plaintiff.'"  *Id.* (quoting *Tellabs*, 551 U.S. at 314).  Next, the court "weigh[s] those inferences against 'competing inferences rationally drawn from the facts alleged,' giving each only 'the inferential weight warranted by context and common sense.'"  *Id.* (first quoting *Tellabs*, 551 U.S. at 314; and then quoting *Matrix*, 576 F.3d at 183).  "The inference that the defendant acted with scienter need not be irrefutable, . . . [y]et the inference of scienter must be more than merely 'reasonable' or

'permissible'—it must be cogent and compelling[.]" *Tellabs*, 551 U.S. at 324.  A plaintiff has adequately alleged scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*  "The evaluation must be holistic, considering 'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Marriott Int'l*, 543 F.Supp.3d at 142 (citing *Tellabs*, 551 U.S. at 323).  "[U]nlike the typical analysis in a motion to dismiss, the PSLRA does not require all reasonable inferences to be construed in the light most favorable to plaintiffs, but rather requires plaintiffs to plead sufficient facts to raise a strong inference of scienter." *Under Armour*, 342 F.Supp.3d at 689 n.18 (citing *Hunter*, 477 F.3d at 172).

Plaintiff argues that he has adequately pleaded scienter because (1) the amended complaint alleges facts demonstrating that Section 10(b) Defendants knew, or recklessly ignored, material adverse information, (ECF No. 66, at 33); (2) Section 10(b) Defendants were motivated to "greenwash" Enviva's operations in order to retain the foreign subsidies Enviva was reliant upon, (*id.* at 34) (citing ECF No. 34 ¶ 159); and (3) the core operations

theory supports a strong inference of scienter, (*id.* at 35).[17]  The facts alleged in the amended complaint, however, fail to satisfy Plaintiff's heavy pleading burden.

### a. Knowledge or Reckless Disregard for Material Adverse Information

Plaintiff contends that he has sufficiently alleged facts demonstrating that Section 10(b) Defendants knew, or recklessly disregarded, material adverse information in issuing misleading statements.  (ECF No. 66, at 34).  In support, Plaintiff relies on statements from CW2 and CW3 as well as Section 10(b) Defendants' familiarity with Enviva's operations by virtue of their positions of control and authority.  (*Id.*).  Such allegations, however, do not sustain a compelling inference that Section 10(b) Defendants possessed the requisite scienter.

First, CW2 and CW3's statements are not reliable.  According to CW3, Mr. Calloway "knowingly lied" in an April 22, 2022 CBS News segment when he stated that "[Enviva] exclusively used leftover waste wood[,]" (ECF No. 34 ¶¶ 191, 194), and "[Mr. Keppler] certainly knew Enviva was using whole trees because he

---

[17] In their motion to dismiss, Individual Defendants argue that Ms. Jenkins's departure from her position as Enviva's Chief Sustainability Officer after fourteen months "is irrelevant to the scienter analysis" because Plaintiff does not provide particularized allegations connecting Ms. Jenkins's departure to the alleged fraud.  (ECF No. 62-1, at 38) (citing *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 118 (3d Cir. 2018)).  Because Plaintiff does not respond to Individual Defendants' argument, Plaintiff has conceded the point.

visited [the plant CW3 worked at] . . . and would have seen substantial quantities of leaves and limbs from whole trees[,]" (*id.* ¶ 88).  Plaintiff contends that CW2 corroborated CW3's statements by asserting that "it seemed like the only people who believed Enviva was not using whole trees were those outside [Enviva,]" and "everybody who had been to one of Enviva's plants knew [Enviva] was using whole trees." (*Id.* ¶ 80).  CW2 also stated that at a Q2 2022 meeting (the "Q2 2022 Meeting") amongst Enviva's senior executives, including directors, vice presidents, and senior vice presidents, Enviva's executive leadership overrode a vote to have Enviva cease its false public statements that it did not use whole trees—resulting in Enviva "continu[ing] to state publicly that it did not use whole trees." (*Id.* ¶ 81).

"When the complaint chooses to rely on facts provided by confidential sources, it must describe the sources with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged or in the alternative provide other evidence to support their allegations." *Hunter,* 477 F.3d at 174 (internal quotation marks omitted).  "Confidential witness allegations must be examined to consider the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, the coherence and plausibility of the allegations, and similar indicia." *In re Mun. Mortg. & Equity, LLC, Sec. &*

*Derivative Litig.*, 876 F.Supp.2d 616, 640 (D.Md. 2012), *aff'd sub nom. Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874 (4th Cir. 2014). "Hearsay allegations and bald assertions made by confidential witnesses will not defeat a Rule 12(b)(6) motion." *Mun. Mortg. & Equity*, 876 F.Supp.2d at 640; *see also In re Trex Co., Inc. Sec. Litig.*, 454 F.Supp.2d 560, 573 (W.D.Va.2006) ("A confidential witness' testimony can be used in pleading under the PSLRA so long as the testimony involves facts of which the witness had personal knowledge. Because the confidential witness must have personal knowledge, the testimony cannot be based on hearsay . . . Also, the plaintiffs must sufficiently allege that the confidential witness was in a position to know the facts related." (citing *Zucco Partners v. Digimarc Corp.*, 445 F.Supp.2d 1201 (D.Or. 2006))). An inference of scienter is weakened when a confidential witness lacked direct contact with the defendant executive and is several levels removed from the company's executive team. *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 609 (4th Cir. 2021) (quoting *Metzler Asset Mgmt. GmbH v. Kingsley*, 928 F.3d 151, 162 (1st Cir. 2019)).

Here, CW3's statements about Mr. Calloway and Mr. Keppler are merely bald assertions. Plaintiff does not allege that CW3 had *any* direct contact with Mr. Calloway and Mr. Keppler—much less any facts demonstrating *how* CW3 knew that Mr. Calloway was lying to CBS News and that Mr. Keppler indeed saw and understood that the

leaves and limbs at the production plant were from whole trees. Moreover, CW3 is a Maintenance and Reliability Manager five levels removed from Mr. Keppler, and is entirely outside Mr. Calloway's chain of command. (*See* ECF No. 34 ¶ 84).

CW2's statements are likewise bald assertions that do not corroborate CW3's statements. CW2's generalization that "it seemed like" all Enviva staff, as well as "everybody" who had visited Enviva's plants, knew that Enviva was using whole trees is too vague and ambiguous to support an inference of scienter with respect to any Section 10(b) Defendant. (*Id.* ¶ 80). CW2 does not explain *how* Enviva's use of whole trees became common knowledge within Enviva, and *how* he ascertained the knowledge of every person who visited Enviva's plants—especially given that he works at Enviva's North Carolina headquarters as opposed to a production plant. (*Id.* ¶ 79). In addition, CW2's description of the Q2 2022 Meeting is not supported by any allegations that CW2, a Finance Operations Manager who is not part of Enviva's senior leadership, (*id.* ¶ 78), has *personal knowledge* of the events that transpired during the Q2 2022 Meeting. Plaintiff does not allege that CW2 attended the Q2 2022 Meeting, nor does Plaintiff allege that CW2 discussed the Q2 2022 Meeting with any senior executive who attended the meeting.

Second, Section 10(b) Defendants' familiarity with Enviva's operations by virtue of their positions of control and authority,

(*see id.* ¶ 250), is insufficient to establish scienter.  Courts "have routinely held that corporate executives' access to information and internal affairs is not enough to demonstrate scienter under the PSLRA[,]" and a plaintiff "must show 'additional detailed allegations establishing the defendants' actual exposure' to the subject of the fraud."  *Lerner*, 273 F.Supp.3d at 593-94 (first citing *Criimi Mae*, 94 F.Supp.2d at 661; then citing *In re Peritus Software Servs., Inc. Securities Litig.*, 52 F.Supp.2d 211, 228 (D.Mass. 1999); and then quoting *Yates*, 744 F.3d at 890). While Plaintiff contends that Section 10(b) Defendants "held themselves out as intimately familiar with Enviva's wood-harvesting and processing operations and spoke [about] them in detail," (ECF No. 66, at 34) (citing ECF No. 34 ¶¶ 95, 108, 119, 123, 176, 198),[18] the court may not "stack inference upon inference" to conclude that Section 10(b) Defendants' knowledge of Enviva's overall business necessarily entails understanding that their statements would be *misleading* for investors, *Syneos Health*, 75 F.4th at 243 (quoting *Maguire*, 876 F.3d at 548).  Thus, Plaintiff's allegations do not sufficiently demonstrate that Section 10(b) Defendants knew, or recklessly disregarded, material adverse information.

---

[18] Plaintiff's citations only refer to statements made by Mr. Keppler.

**b. Motive**

Plaintiff argues that "[Section 10(b)] Defendants were motivated to greenwash Enviva's operations because, if found to be less than carbon neutral [or reliant on using whole trees], [Enviva] stood to lose the foreign subsidies that [it] was admittedly reliant upon." (ECF No. 66, at 34-35) (citing ECF No. 34 ¶ 159). Individual Defendants respond that in failing to allege "'a concrete and personal benefit' to any individual [Section 10(b)] Defendant," Plaintiff has not adequately pleaded motive. (ECF No. 40, at 19).

"[T]o demonstrate motive, a plaintiff must show concrete benefits that could be realized by one or more of the false statements and wrongful non-disclosures alleged." *Ottmann*, 353 F.3d at 352 (quoting *Phillips*, 190 F.3d at 621). A generalized motive shared by all companies or corporate officers is insufficient to demonstrate scienter. *See id.* (citing *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1269 (10th Cir. 2001); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 39 (1st Cir. 2002)); *see also Cozzarelli*, 549 F.3d at 627; *Yates*, 744 F.3d at 891; *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 754 (4th Cir. 2021). For example, a corporate officer's "incentive to improve the lot of th[e] compan[y] . . . is not, absent unusual circumstances, a motive to commit fraud." *In re Volkswagen AG Sec. Litig.*, 661 F.Supp.3d 494, 524 (E.D.Va. 2023) (quoting *Inst'l Investors Grp.*

*v. Avaya, Inc.*, 564 F.3d 242, 279 (3<sup>d</sup> Cir. 2009)), *reconsideration denied sub nom. In re Volkswagen AG*, No. 1:22-cv-45-RDA-WEF, 2024 WL 646344 (E.D.Va. Feb. 15, 2024).  As such, a plaintiff bringing securities fraud claims against a corporate officer should "allege[] 'specific facts of "motive and opportunity" to defraud' for personal gain[.]"  *See id.* (quoting *Phillips*, 190 F.3d at 621); *see also Boykin v. K12, Inc.*, 54 F.4th 175, 186 (4th Cir. 2022) (holding that plaintiffs asserting that the defendant corporate officers made various misrepresentations in order to increase stock prices failed to allege motive because they did not state that the defendants would personally gain from self-dealing such as insider trading, special bonuses, and improved performance reviews); *Tellabs*, 551 U.S. at 325 ("[P]ersonal financial gain may weigh heavily in favor of a scienter inference[.]").

Here, Plaintiff does not allege how Section 10(b) Defendants—as opposed to Enviva in general—would *personally* benefit from making the alleged material misrepresentations.  Regardless, presuming that Section 10(b) Defendants would personally benefit from maintaining the foreign subsidies that Enviva already possesses, "[a]llegations that 'merely charge that executives aim to prolong the benefits they hold' are, standing alone, insufficient to demonstrate the necessary strong inference of scienter."  *Phillips*, 190 F.3d at 621 (quoting *Shields v. Citytrust Bancorp. Inc.*, 25 F.3d 1124, 1130 (2<sup>d</sup> Cir. 1994)).  Accordingly,

Plaintiff has not alleged enough facts about Section 10(b) Defendants' motive to support a finding of scienter.

c. **Core Operations Theory**

Plaintiff argues that the core operations theory supports a strong inference of scienter because Section 10(b) Defendants, as senior officers of Enviva, may be presumed to know that the alleged material misrepresentations about Enviva's core operations were false. (*See* ECF No. 66, at 35). Plaintiff is incorrect, as he neglects to provide the requisite particularized facts from which a core operations inference may be drawn. Under the core operations theory, "if a senior executive's alleged misstatements are related to his company's core operations, he is more likely to have known that his statements were false." *Leacock*, 2023 WL 6308045, at *27 (citing *DXC Tech.*, 19 F.4th at 612). While Plaintiff has alleged that wood pellet production is Enviva's core operation, (ECF No. 34 ¶ 47), "these generalized allegations must be accompanied by particularized allegations that [Section 10(b) Defendants] w[ere] aware of problems affecting the core operations[,]" *Leacock*, 2023 WL 6308045, at *27 (citing *Yates*, 744 F.3d at 890). "[B]are allegations that officers must have had knowledge of key facts relating to the business's core operations are rarely enough to support a strong inference of scienter." *Id.* (quoting *Yates*, 744 F.3d at 890). Here, other than a bare assertion that "it would be absurd to suggest that [Section 10(b)

42

Defendants] were not aware of the truth about Enviva's wood pellet production activities and practices at all relevant times[,]" Plaintiff does not offer any particularized allegations indicating that Section 10(b) Defendants knew the relevant facts. (ECF No. 34 ¶ 47). Hence, Plaintiff's insufficient allegations fail to support a compelling core operations inference that Section 10(b) Defendants possessed the requisite scienter.

### d. Holistic Analysis

The fact that each of the categories discussed above do not support a compelling inference of scienter counsels in favor of the same conclusion even under a holistic view of Plaintiff's allegations. Plaintiff advances a malicious inference that Section 10(b) Defendants knew that, contrary to public statements, Enviva used whole trees, contributed to greater GHG emissions than burning coal, failed to support forest growth, was not committed to sustainability, and sourced its wood from unsustainably-managed forests, and provided misleading SOX Certifications. Plaintiff's failure, however, to allege particularized facts supporting a plausible motive "'weighs heavily' against [him] in the scienter analysis." *Syneos Health*, 75 F.4th at 242 (quoting *Triangle*, 988 F.3d at 752). "To overcome this weakness, Plaintiff['s] 'circumstantial evidence of fraud must be correspondingly greater.'" *Id.* (quoting *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 776 (2d Cir. 2010)). Plaintiff's circumstantial evidence in the

form of Section 10(b) Defendants' familiarity with Enviva's operations by virtue of their positions of control and authority, in addition to the fact that wood pellet production is Enviva's core operation, falls far short. Plaintiff has neither sufficiently alleged that *each* Section 10(b) Defendant knew specifically *how* their statements were misleading, nor explained *why* they issued those statements. Such "omissions and ambiguities count against inferring scienter[.]" *See Tellabs*, 551 U.S. at 326. The more compelling inference is the non-culpable one advanced by the Individual Defendants—that Section 10(b) Defendants "simply disagreed with Plaintiff's view on the sustainability and environmental benefits of Enviva's business." (ECF No. 62-1, at 42). Plaintiff's failure to allege scienter adequately therefore dooms his Section 10(b) and Rule 10b-5 claim.

### B. Section 20(a) (Count IV)

Plaintiff contends that Section 10(b) Defendants violated Section 20(a) because they, by virtue of their positions as senior officers of Enviva, controlled the contents of the alleged misrepresentations. (ECF No. 34 ¶¶ 255-60). Individual Defendants counter that Plaintiff's secondary liability claim under Section 20(a) must fail because he did not adequately plead his primary

liability claim under Section 10(b).  (ECF No. 62-1, at 43).  Under Section 20(a),

> [e]very person who directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  Thus, "the liability of a control person under section 20(a) is derivative of—and dependent upon—liability of a controlled person under Section 10(b)."  *Singer*, 883 F.3d at 438; *In re Under Armour Sec. Litig.*, 540 F.Supp.3d 513, 523 (D.Md. 2021) (noting that a Section 20(a) claim for controlling person liability must allege a predicate violation of Section 10(b)).  Section 20(a) confers a private right of action on buyers and sellers of securities who trade "contemporaneously" with an insider in possession of material nonpublic information.  *See* 15 U.S.C. § 78t-1(a).  Because Plaintiff's Section 10(b) and Rule 10b-5 claim fails, Plaintiff's Section 20(a) claim must be dismissed as well.

**IV.  Securities Act Claims**

**A. Section 11 (Count I)**

According to Section 11, a "person acquiring [a] security" has a civil cause of action when a registration statement "contain[s] an untrue statement of a material fact or omit[s] to

state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 11 adheres to the same standard for assessing materiality as Section 10(b) and Rule 10b-5. *In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F.Supp.2d 614, 633 (D.Md. 2010) (citing *Garber v. Legg Mason*, 537 F.Supp.2d 597, 615 (S.D.N.Y. 2008)). Section 11, however, imposes strict liability and does not require a plaintiff to establish scienter. *Yates*, 744 F.3d at 894.

Plaintiff alleges that Mr. Keppler, Mr. Even, Mr. Johnson, Mr. Paral, and Underwriter Defendants (collectively, "Section 11 Defendants") are liable under Section 11 for the misrepresentations and omissions in the Registration Statement. (ECF No. 34 ¶¶ 229, 231). Individual and Underwriter Defendants contend that Plaintiff lacks standing. (ECF Nos. 62-1, at 42-43; 63-1, at 9-13). Moreover, Individual and Underwriter Defendants argue that Plaintiff's Section 11 claim should be dismissed because Plaintiff has failed to allege any actionably misleading statements under Rule 9(b)'s heightened pleading requirements, (ECF Nos. 62-1, at 15-16; 63-1, at 13-14). Alternatively, Underwriter Defendants contend that Plaintiff has failed to allege any actionably misleading statements even under Rule 8(a)'s lower pleading requirement. (ECF No. 63-1, at 13-14). Plaintiff argues that he has standing. (ECF No. 67, at 10). Plaintiff also contends

that Rule 8(a) rather than Rule 9(b) governs his Section 11 claim, but regardless, he has adequately alleged actionably misleading statements under either standard. (*Id.* at 10-12).

### 1. Standing

Plaintiff alleges that his Section 11 claim "is asserted by Plaintiff against Defendants . . . individually and on behalf of all other persons who acquired shares traceable to the Offering, in which the shares issued pursuant to the Offering Documents were sold." (ECF No. 34 ¶ 228). Individual and Underwriter Defendants contend that Plaintiff lacks standing to bring his Section 11 claim because he has not shown that he purchased shares issued under the Offering Documents. (ECF Nos. 62-1, at 42-43; 63-1, at 9-13). Plaintiff counters that general allegations that he purchased stock "pursuant or traceable to the Offering Documents is sufficient to allege standing, and "[n]othing more is required[]" other than his allegation that he purchased shares traceable to the Offering and a sworn PSLRA certification (the "Certification") that he understood his shares emanated from the Offering. (ECF No. 67, at 10) (quoting *Mun. Mortg. & Equity*, 876 F.Supp.2d at 658) (citing *In re 2U, Inc. Sec. Class Action*, No. 19-cv-3455-TDC, 2021 WL 3418841, at *26 (D.Md. Aug. 5, 2021); *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013)).

Plaintiff is incorrect. A plaintiff bringing a Section 11 claim must "plead and prove that he purchased shares traceable to

the allegedly defective registration statement[.]" *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 770 (2023).   As explained in *TransEnterix Inv. Grp. v. TransEnterix, Inc.*, 272 F.Supp.3d 740, 760-61 (E.D.N.C. 2017),

> [i]n analyzing standing under Section 12(a)(2), the Fourth Circuit in *Yates* . . . h[eld] that "using the 'pursuant and/or traceable to' language—coupled with sufficient supporting facts—can give rise to a plausible inference of standing in certain circumstances." *Yates*, 744 F.3d at 900.   The Fourth Circuit held that the plaintiffs had not plausibly alleged standing because the complaint lacked "supporting facts sufficient to push the claim into the realm of plausibility." *Id.* This court concludes that the Fourth Circuit would subject allegations of standing under Section 11 to the same plausibility analysis.

Accordingly, where, as here, "[a] company has issued shares in multiple offerings under more than one registration statement, 'a greater level of factual specificity will be needed before a court can reasonably infer that shares purchased in the aftermarket are traceable to a particular offering.'"   *Id.* at 761 (citing *Century Aluminum*, 729 F.3d at 1107).   "In th[is] case, 'the plaintiff must prove that his or her shares were issued under the allegedly false or misleading registration statement, rather than some other registration statement.'"   *Id.* (quoting *In re Ariad Pharms., Inc. Sec. Litig.*, 842 F.3d 744, 755 (1st Cir. 2016)); *but see, e.g., City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F.Supp.3d 379, 403 (S.D.N.Y. 2020) ("To establish standing

under § 11 at the motion-to-dismiss stage, therefore, Plaintiffs need only assert that they purchased shares 'issued pursuant to, or traceable to the public offerings.'" (quoting *Perry v. Duoyuan Printing, Inc.*, No. 10-cv-7235-GBD, 2013 WL 4505199, at *10 (S.D.N.Y. Aug. 22, 2013))).  To do so, a plaintiff may either prove that the shares at issue were purchased directly in the secondary offering or, if the shares were purchased in the aftermarket, prove that the chain-of-title for the shares can be traced back to the secondary offering, starting with the plaintiff's purchase and ending with someone who purchased directly in the secondary offering.  *Id.* (quoting *Century Aluminum*, 729 F.3d at 1106-07).  On its own, a conclusory allegation that a plaintiff purchased stock "traceable to" the secondary offering at issue "does not allow [the court] to draw a reasonable inference about anything because it is devoid of factual content."  *Century Aluminum*, 729 F.3d at 1108.

Here, Plaintiff's conclusory allegation that he purchased shares "traceable to the Offering" is not rendered plausible by any accompanying factual enhancement.  (ECF No. 34 ¶ 228).  As Underwriter Defendants argue, "Plaintiff does not allege that he purchased any shares directly in the secondary offering itself, nor does he even attempt to trace the chain of title for his shares back to the secondary offering."  (ECF No. 63-1, at 12).  Instead, the amended complaint merely incorporates the Certification, (ECF

No. 34 ¶ 21) (incorporating by reference ECF No. 10-6), which only lists the dates, numbers of shares, and prices of Plaintiff's Enviva stock purchases, (*see* ECF No. 10-6, at 4)—none of which plausibly suggest that the shares Plaintiffs acquired must have originated from the Offering.

Plaintiff's reliance on *Mun. Mortg. & Equity*, 876 F.Supp.2d 616, and *2U*, 2021 WL 3418841, fares no better. While the *Mun. Mortg. & Equity* court indeed determined that "[t]he pleading requirement for Section 11 standing is satisfied by general allegations that [the] plaintiff purchased [the defendant company's stocks] pursuant to or traceable to [a] false registration statement[,]" it is an outdated case that was decided prior to *Yates* and *TransEnterix*. *Mun. Mortg. & Equity*, 876 F.Supp.2d at 658 (quoting *In re Wachovia Equity Sec. Litig.*, 753 F.Supp.2d 326, 373 (S.D.N.Y. 2011)). *2U* is distinguishable because that case involved shares that the plaintiff alleged were purchased *directly from*—not merely traceable to—the offering at issue. *2U*, 2021 WL 3418841, at *25-26.

Given that Plaintiff has not alleged facts supporting a reasonable inference that Plaintiff purchased shares traceable to the Offering, Plaintiff lacks standing to bring his Section 11 claim.

## 2. Pleading Standard

Even if Plaintiff possesses standing under Section 11, Plaintiff fails to allege actionably misleading statements. Plaintiff alleges that Section 11 Defendants are liable on the basis of misrepresentations and omissions that also underlie his Section 10(b) and Rule 10b-5 claim.[19]   (*See* ECF No. 34 ¶¶ 229, 231, 248).   Accordingly, Individual and Underwriter Defendants argue that Plaintiff's Section 11 claim sounds in fraud and is subject to Rule 9(b)'s heightened pleading standards.   (ECF Nos. 62-1, at 15 n.4; 63-1, at 8-9; 71, at 9-10).   Plaintiff counters that "it is . . . not enough . . . to point to [his] Section 10(b) claim[] to settle the question of whether Rule 9(b) applies."   (ECF No. 67, at 11).   Instead, Plaintiff insists that an examination of the amended complaint's "wording and imputations" indicate that his Section 11 claim "expressly plead strict liability and negligence[,]" and therefore Rule 8(a) applies.   (*Id.* at 11-12) (citing ECF No. 34 ¶¶ 227, 230, 231, 232).

"Rule 9(b) applies to allegations under the Securities Act where those allegations sound in fraud." *Cozzarelli*, 549 F.3d at 629 (citing *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 68 (1st Cir. 2008); *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d

---

[19] The misrepresentations underlying Plaintiff's Section 11 claim include those underlying his Section 10(b) and Rule 10b-5 claim against Enviva.   (*See* ECF No. 34 ¶¶ 111-13, 161, 163, 164, 168, 172, 174).

1273, 1277–78 (11th Cir. 2006)).  "[A] plaintiff mak[ing] an allegation that has the *substance* of fraud . . . cannot escape the requirements of Rule 9(b) by adding a superficial label of negligence or strict liability."  *Cozzarelli*, 549 F.3d at 629 (emphasis added).  When a plaintiff's claims under Section 11, Section 10(b), and Rule 10b-5 are premised on allegedly false statements that are "part of a single, coordinated scheme to defraud investors"—for instance, when the plaintiff's allegations of fraud under Section 11 are "exactly the same" as the plaintiff's allegations of fraud under Section 10(b) and Rule 10b-5—the plaintiff's Section 11 claim sounds in fraud.  *Id.*

As Underwriter Defendants contend, "the very same statements alleged to support Plaintiff's Section 11 claim are also alleged to be fraudulent for purposes of his Section 10(b) [and Rule 10b-5] claim."  (ECF No. 71, at 9 (citing ECF No. 63-1, at 8); *see* ECF No. 34 ¶¶ 184-86, 226, 229-31).  Although Plaintiff alleges that his Section 11 claim "is premised on strict liability . . . and does not assert that [the Section 11] Defendants acted with fraudulent intent[,]" (ECF No. 34 ¶ 227; *see also id.* ¶¶ 230, 231, 232), such assertions are merely superficial labels that do not alter the *substance* of Plaintiff's Section 11 claim, *see Cozzarelli*, 549 F.3d at 629.  Here, Plaintiff's Section 11 claim sounds in fraud because Plaintiff cannot simultaneously argue that the alleged misrepresentations in the Registration Statement are

fraudulent under Section 10(b) and not fraudulent under Section 11. *Id.*

In support of his argument that "[m]erely utilizing statutory language (*e.g.*, describing a statement as misleading or an omission as known) does not mean that claim sounds in fraud[,]" Plaintiff relies on two inapposite cases: *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F.Supp.2d 260 (S.D.N.Y. 2010), and *Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F.Supp.3d 526 (S.D.N.Y. 2017). (ECF No. 67, at 12) (citing *Bank of Am. Corp.*, 757 F.Supp.2d at 321-22; *Fresno*, 268 F.Supp.3d at 558). The *Bank of Am. Corp.* court held that when a complaint contains no other "verbiage commonly associated with fraud[,]" an allegation under 15 U.S.C. § 78n(a)(1) ("Section 14(a)") and 17 C.F.R. § 240.14a-9(a) ("Rule 14a-9") that restates Rule 14a-9's "false and misleading" language does not automatically render the plaintiffs' claim as sounding in fraud. *Bank of Am. Corp.*, 757 F.Supp.2d at 321. The *Fresno* court held that plaintiffs who "went beyond 'nominal efforts' to distinguish their fraud allegations under Section 10(b) from their strict liability and negligence allegations" under Section 11 and Section 14(a)—by, for instance, dividing those allegations into separate sections in the complaint—do not present Section 11 and Section 14(a) claims that sound in fraud. *Fresno*, 268 F.Supp.3d at 558. *Bank of Am. Corp.* and *Fresno* are distinguishable from this case

because here, Plaintiff does not solely restate Section 11's language or clearly separate his Section 11 allegations from his Section 10(b) and Rule 10b-5 allegations. Rather, Plaintiff's Section 11 claim incorporates his allegations under Section 10(b) and Rule 10b-5. Therefore, Rule 9(b)'s heightened pleading requirement applies to Plaintiff's Section 11 claim.

### 3. Material Misrepresentations or Omissions

Plaintiff alleges that the Registration Statement incorporates the following material misrepresentations:

- A 10-K filed on February 25, 2021 (the "2020 10-K") contained substantively similar statements as the 2018 10-K, which stated that "[*Enviva's*] *customers are subject to stringent requirements regarding the sustainability of the fuels they procure. In addition to our internal sustainability policies and initiatives,* [*Enviva's*] *wood fiber procurement is conducted in accordance with leading forest certification standards.*" (*See* ECF No. 34 ¶¶ 111, 163). The 2018 10-K explained that "[t]he board of directors of Enviva's General Partner has established a Health, Safety, Sustainability and Environmental Committee" (the "HSSE Committee") whose responsibility is to assist the board with fulfilling its "*continuing commitment to (1) ensuring the safety of our employees and the public and assuring that our businesses and facilities are operated and maintained in a safe and environmentally sound manner, (2) sustainability, including sustainable forestry practices, (3) delivering environmental benefits to our customers, the forests from which we source our wood fiber and the communities in which we operate and (4) minimizing the impact of our operations on the environment.*" (*Id.*

54

¶ 112).    The 2020 10-K contained SOX
Certifications similar to the ones in the
2018 10-K, where Mr. Keppler and Mr. Even
attested to the accuracy of the information
in the 10-K.  (*See id.* ¶¶ 113, 163).

- A February 24, 2021 press release stated,
"***the product we manufacture helps reduce
the lifecycle GHG* [greenhouse gas]
*emissions of our customers, we believe we
must also do our part within our operations
to mitigate the impacts of climate change.*"
(*Id.* ¶ 161) (alteration in original).  The
press release also quoted Mr. Keppler's
statement that "***Enviva and the sustainable
and renewable fuel we supply to our
customers are part of an all-in solution to
climate change*[.]*"  (*Id.*).

- A March 1, 2021 press release stated that
Enviva was "***fighting climate change,
displacing coal,* [and] *growing more
trees*[.]*"  (*Id.* ¶ 164).  The press release
also noted "***substantial GHG reductions*[,]*"
Enviva's participation in a "***market driven
by* [a] *global commitment to fight climate
change*[,]*" as well as Enviva's "***responsible
wood supply program*[.]*"  (*Id.*) (second
alteration in original).

- An April 28, 2021 press release reiterated
Enviva's "***adherence to and accountability
for sustainable forest management and wood
sourcing*[.]*"  (*Id.* ¶ 168).  The press
release also stated that "***Enviva requires
landowners to commit to replant following
harvests in which Enviva participates.*"
(*Id.*).

- A May 10, 2021 press release contained
substantively similar statements as those
set forth in the March 1, 2021 press
release.  (*Id.* ¶ 172).

- A July 28, 2021 press release stated that
"[s]*ustainability is the core of* [*Enviva's*]
*value proposition in* [*its*] *mission to
displace coal, grow more trees, and fight
climate change*[,]*" citing Enviva's
"***sustainable forest management*" as an
example.  (*Id.* ¶ 174) (first alteration in

original).  The press release also asserted
that "**on average just under 32% of the
volume of each harvest went to Enviva[]**"
given that "**Enviva only uses . . . low-value
wood in its operations[.]**"  (*Id.*).

As explained above, the 2020 10-K's SOX Certifications and
Mr. Keppler's statement in the February 24, 2021 press release,
(*see id.* ¶¶ 113, 161, 163), are non-actionable.  Individual
Defendants' arguments regarding whether the Category C Statements
are materially misleading, (*see, e.g.*, ECF Nos. 62-1, at 24-26),
include the alleged misrepresentations in Enviva's July 28, 2021
press release regarding Enviva's use of low-value wood, (ECF No.
34 ¶ 174).  Individual Defendants' arguments regarding whether the
Category A Statements are materially misleading, (*see, e.g.*, ECF
Nos. 62-1, at 17-22), include the alleged misrepresentations in
Enviva's February 24, 2021, March 1, 2021, and May 10, 2021 press
releases, (ECF No. 34 ¶¶ 161, 164, 172).  Individual Defendants'
arguments regarding the whether the Category D Statements are
materially misleading, (*see, e.g.*, ECF Nos. 62-1, at 27-29),
include the alleged misrepresentation in the July 28, 2021 press
release regarding Enviva's sustainability commitment as well as
the alleged misrepresentation in the 2020 10-K regarding the HSSE
Committee, (ECF No. 34 ¶¶ 174, 111, 163).  Underwriter Defendants
largely echo the arguments raised by Individual Defendants,[20] (*see*

---

[20] Apart from incorporating Individual Defendants' arguments
that the alleged misrepresentations underlying Plaintiff's Section

ECF No. 63-1), and Plaintiff addresses their arguments together, (*see* ECF Nos. 66 (opposition to Individual Defendants' motion to dismiss); 67 (incorporating ECF No. 66 in the opposition to Underwriter Defendants' motion to dismiss)). Hence, for the same reasons discussed above with respect to the Category C, A, and D Statements, the 2020 10-K, in addition to Enviva's February 24, 2021, March 1, 2021, May 10, 2021, and July 28, 2021 press releases, do not contain actionably misleading statements.

Plaintiff contends that the remaining alleged misrepresentations in the 2020 10-K concerning the policies governing Enviva's wood procurement process, (*see id.* ¶¶ 111, 163), and in the April 28, 2021 press release (collectively, the "Category E Statements"),[21] (*id.* ¶ 168), are materially misleading

---

11 claim are not materially misleading, Underwriter Defendants advance some additional arguments. First, Underwriter Defendants contend that the February 24, 2021 press release contains non-actionable forward-looking statements and puffery, and lacks particularized facts showing that Enviva did not believe that the company contributed to mitigating climate change. (ECF No. 63-1, at 15-18). Second, Underwriter Defendants contend that the 2020 10-K contains non-actionable forward-looking statements and Plaintiff "offers only conclusory allegations that Enviva has not achieved [its sustainability] commitment." (*Id.* at 20). Third, Underwriter Defendants contend that the March 1, 2021 and May 10, 2021 press releases consist of puffery. (*Id.* at 22-23). Fourth, Underwriter Defendants contend that the July 28, 2021 press release contains non-actionable forward-looking statements and interpretations of data. (*Id.* at 25-26). Plaintiff did not respond to these arguments, and has thus conceded these points.

[21] The Category E Statements are grouped under Category E in Appendix A. (*See* ECF No. 62-1, at 53-54). Individual Defendants

for similar reasons as the Category B and D Statements and appears to base the falsity of the Category E Statements on CW4's statement and the Whistleblower Report.[22]   Plaintiff alleges that Enviva's procurement practices "undermined rather than sustained forests[,]" and "Enviva did not secure replanting or regeneration" of harvested trees. (*E.g.*, *id.* ¶ 169).   Individual and Underwriter Defendants counter that Plaintiff has not alleged facts suggesting that the Category E Statements are either false or misleading. (*See* ECF Nos. 62-1, at 31; 63-1, at 24).

Statements about a company policy have been held actionable where they "went beyond aspirational or general puffery, so as, for example, to falsely represent a record of past or present compliance with such policies" or "to lull a discontented investor[.]"  *In re Braskem S.A. Sec. Litig.*, 246 F.Supp.3d 731, 756-57 (S.D.N.Y. 2017).  Where a defendant company has not provided any "qualitative assurances" that a company policy is properly managed or enforced, courts have declined to find statements

---

misrepresent the Category E Statements as the Category D Statements in their reply brief.  (*See* ECF No. 70, at 16).

[22] Although Plaintiff insists that the Blue Orca report corroborates CW4's statement, (*see* ECF No. 66 at 30) (citing ECF No. 34 ¶ 200), the Blue Orca Report actually suggests that Enviva's suppliers were indeed reforesting post-harvest:  "As evidence of the purported sustainability of its practices, Enviva claims that forest inventories are increasing in sourcing regions around its facilities.   This is misleading, because it ignores that inventories of hardwood trees are decreasing, replaced by less expensive pine seedlings[,]" (ECF No. 34 ¶ 200).

regarding the company policy to be materially misleading on the basis that the company policy is not *effective*-as opposed to the basis that the company policy did not *exist*. *In re FBR Inc. Sec. Litig.*, 544 F.Supp.2d 346, 359-60 (S.D.N.Y. 2008); *see also, e.g.*, *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F.Supp.3d 340, 360 (S.D.N.Y. 2015) (holding that a complaint that "does not challenge the actual existence of [codes of ethics], nor [the defendant company's] description of them," fails to allege false or misleading statements because although the "codes of ethics prohibit . . . fraudulent conduct, they do not claim that [the defendant's] officers are abiding by them"); *cf. Novak v. Kasaks*, 216 F.3d 300, 311 (2$^d$ Cir. 2000) (finding that filings stating that a company would follow a particular policy were materially misleading where the company actually followed a different policy).

Here, the Category E Statements do not provide any assurances that Enviva would enforce landowners' commitments to reforest post-harvest, much less assert that Enviva has enforced such commitments in the past or present.  Nor do the Category E Statements guarantee that no landowners have ever failed to reforest post-harvest as a result of Enviva's required commitment. Therefore, the Category E Statements constitute puffery that merely declare Enviva's *aspirations* toward sourcing wood only from sustainably-managed forests.  Furthermore, even if Enviva failed

59

to disclose landowners' failures to fulfill their reforesting commitments, Plaintiff has not alleged that the Category E Statements are materially misleading because he does not dispute that Enviva subjects its wood procurement process to sustainability policies or that Enviva requires landowners to reforest post-harvest.

## B. Section 15 (Count II)

Plaintiff alleges that Mr. Keppler, Mr. Even, Mr. Jenkins, and Mr. Calloway are liable under Section 15 by virtue of their violations of Section 11.  (ECF No. 34 ¶¶ 237-244).  Individual Defendants counter that Plaintiff's Section 15 claim "fails as a matter of law because Plaintiff's primary liability claim[] [under Section 11] [is] not adequately pleaded."  (ECF No. 62-1, at 43).  "[S]ection [15] creates control-person liability only where Sections 11 or 12 have been violated."  *Cozzarelli*, 549 F.3d at 630 (citing 15 U.S.C. § 77o; *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 656 n.7 (4th Cir. 2004)).  Plaintiff lacks standing to bring his Section 11 claim, and fails to plead any actionably misleading statements even if he does possess standing.  Accordingly, Plaintiff's Section 15 claim will be dismissed.

## V.   Conclusion

For the foregoing reasons, the motions to dismiss filed by Individual Defendants and Underwriter Defendants will be granted. A separate order will follow.

<u>          /s/            </u>

DEBORAH K. CHASANOW
United States District Judge